# 25-1382-cv(L), 25-3155-cv(XAP)

# United States Court of Appeals
## for the
## Second Circuit

MISTY BLANCHETTE PORTER, M.D.,

*Plaintiff-Appellee-Cross-Appellant,*

– v. –

DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, DARTMOUTH-HITCHCOCK HEALTH,
DARTMOUTH-HITCHCOCK MEDICAL CENTER,

*Defendants-Appellants-Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT (BURLINGTON)

## JOINT APPENDIX
### Volume 1 of 6 (Pages A-1 to A-288)

| | |
|---|---|
| DONALD W. SCHROEDER | SARAH NUNAN |
| MORGAN MCDONALD | GEOFFREY J. VITT |
| FOLEY & LARDNER LLP | VITT & NUNAN, PLC |
| 111 Huntington Avenue, Suite 2500 | 8 Beaver Meadow Road |
| Boston, Massachusetts 02199 | P.O. Box 1229 |
| (617) 342-4041 | Norwich, Vermont 05055 |
| – and – | (802) 649-5700 |
| TRISTRAM J. COFFIN | – and – |
| DOWNS RACHLIN MARTIN PLLC | ERIC D. JONES |
| 199 Main Street, | LANGROCK SPERRY & WOOL, LLP |
| P.O. Box 190, 6th Floor | 210 College Street, Suite 400 |
| Burlington, Vermont 05402 | Burlington, Vermont 05401 |
| (802) 863-2375 | (802) 864-0217 |
| *Attorneys for Defendants-Appellants-* | *Attorneys for Plaintiff-Appellee-* |
| *Cross-Appellees* | *Cross-Appellant* |

CP COUNSEL PRESS    (800) 4-APPEAL • (390775)

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, filed October 11, 2017 ............................ A-35

    Attached to Complaint -
    Civil Cover Sheet..................................................... A-68

First Amended Complaint, filed August 1, 2018 ....... A-69

Certificate of Service of First Amended Complaint,
    filed August 1, 2018............................................... A-105

Defendants' Answer to Plaintiff's Amended
    Complaint, filed September 7, 2018 ...................... A-106

Mandate in Docket No. 20-3894, issued on
    February 27, 2024 .................................................. A-133

Order of the United States Court of Appeals for the
    Second Circuit, filed February 27, 2024................ A-134

Motion *In Limine* by Defendants to Preclude the
Testimony of Robert Bancroft, filed
February 14, 2025 ...................................................... A-234

Memorandum of Law by Defendants in Support of
Motion *In Limine*, filed February 14, 2025 .............. A-237

    Exhibit A to Memorandum of Law -
    Expert Report of Robert L. Bancroft, dated
    October 30, 2018 .................................................. A-247

    Exhibit B to Memorandum of Law -
    Expert Report of Robert L. Bancroft, dated
    October 1, 2019 .................................................... A-253

ii

Page

Exhibit C to Memorandum of Law -
Deposition Transcript of Robert L. Bancroft,
dated October 30, 2019.......................................... A-261

Exhibit D to Memorandum of Law -
Expert Report of Robert L. Bancroft, dated
August 26, 2024...................................................... A-289

Memorandum of Law by Plaintiff in Opposition to
Defendants' Motion *In Limine*, filed
February 28, 2025 ................................................... A-296

Notice of Hearing, filed March 6, 2025..................... A-309

Reply Memorandum of Law by Defendants in
Further Support of Motion *In Limine*, filed
March 11, 2025 ....................................................... A-310

Revised Notice of Hearing, filed March 13, 2025 ..... A-319

Transcript of Motion *In Limine* Hearing, dated
March 14, 2025 and filed March 19, 2025 ............. A-320

Renewed Motion *In Limine* by Defendants to
Preclude the Testimony of Robert Bancroft
("Renewed Motion"), filed March 20, 2025.......... A-424

Exhibit A to Renewed Motion -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit B to Renewed Motion -
Expert Report of Robert L. Bancroft, dated
March 19, 2025....................................................... A-433

Memorandum of Law by Plaintiff in Opposition to
Defendants' Renewed Motion, filed
March 21, 2025....................................................... A-439

**iii**

**Page**

Order Denying Motion to Preclude Robert
 Bancroft's Testimony, filed March 21, 2025 .........   A-442

Motion *In Limine* by Defendants to Preclude the
 Expert Report, filed March 26, 2025 .....................   A-459

Motion *In Limine* by Defendants Regarding
 Undisclosed Expert Opinions of Robert Bancroft,
 filed March 29, 2025...............................................   A-464

 Exhibit 1 to Motion -
 Expert Report of Robert L. Bancroft, dated
 October 30, 2018
 (Reproduced herein at pp. A-248 - A-252)

 Exhibit 2 to Motion -
 Expert Report of Robert L. Bancroft, dated
 October 1, 2019
 (Reproduced herein at pp. A-254 - A-260)

 Exhibit 3 to Motion -
 Expert Report of Robert L. Bancroft, dated
 August 26, 2024
 (Reproduced herein at pp. A-290 - A-295)

 Exhibit 4 to Motion -
 Expert Report of Robert L. Bancroft, dated
 March 19, 2025
 (Reproduced herein at pp. A-434 - A-438)

Plaintiff's Opposition to Defendants' Motion *In
 Limine* Regarding Undisclosed Expert Opinions
 of Robert Bancroft, filed March 30, 2025 .............   A-474

 Exhibit A to Plaintiff's Opposition -
 Deposition Transcript of Robert L. Bancroft,
 dated October 30, 2019
 (Reproduced herein at pp. A-262 - A-288)

iv

**Page**

Exhibit B to Plaintiff's Opposition -
Transcript of Motion *In Limine* Hearing, dated
March 14, 2025
(Reproduced herein at pp. A-320 - A-423)

Exhibit C to Plaintiff's Opposition -
Excerpts from the Rough Draft of Robert
Bancroft's Trial Testimony .................................... A-484

Exhibit D to Plaintiff's Opposition -
Plaintiff's Response to Defendant Mary
Hitchcock Memorial Hospital's First Set of
Interrogatories Propounded on Plaintiff, dated
April 20, 2018......................................................... A-488

Exhibit E to Plaintiff's Opposition -
Dartmouth-Hitchcock 2017 Benefits Guide .......... A-492

Excerpts from the Jury Trial Transcript, dated
March 27, 2025 (Day 4)......................................... A-540

Excerpts from the Jury Trial Transcript, dated
March 28, 2025 (Day 5)......................................... A-547

Excerpts from the Jury Trial Transcript, dated
March 31, 2025 (Day 6)......................................... A-599

Excerpts from the Jury Trial Transcript, dated
April 2, 2025 (Day 8).............................................. A-747

Jury Trial Transcript, dated April 7, 2025 (Day 11)... A-757

Court Jury Charge, filed April 7, 2025 ...................... A-844

Excerpts from the Jury Trial Transcript, dated
April 8, 2025 (Day 12)............................................ A-876

Jury Charge, filed April 8, 2025................................. A-895

Jury Verdict Form, filed April 10, 2025...................... A-929

v

**Page**

Motion by Plaintiff for Prejudgment Interest, filed
April 23, 2025 ....................................................... A-936

Opposition by Defendants to Plaintiff's Motion for
Prejudgment Interest, filed May 7, 2025 ............... A-940

Index of Exhibits to Defendants' Opposition, filed
May 7, 2025 .......................................................... A-955

Exhibit 1 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
October 30, 2018
(Reproduced herein at pp. A-248 - A-252)

Exhibit 2 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
October 1, 2019
(Reproduced herein at pp. A-254 - A-260)

Exhibit 3 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit 4 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
March 19, 2025
(Reproduced herein at pp. A-434 - A-438)

Exhibit 5 to Defendants' Opposition -
DH Simple Interest Chart 12% .............................. A-957

Exhibit 6 to Defendants' Opposition -
DH Simple Interest Chart 3% ................................ A-959

Motion by Plaintiff for Attorneys' Fees, filed
May 8, 2025 .......................................................... A-961

vi

**Page**

Exhibit 1 to Motion for Attorneys' Fees -
Declaration of Geoffrey J. Vitt, dated
May 6, 2025 ........................................................... A-973

Exhibit 2 to Motion for Attorneys' Fees -
Declaration of Eric D. Jones, dated May 7, 2025,
with Exhibit A ...................................................... A-981

Exhibit A to Motion for Attorneys' Fees -
Vitt & Associates' Invoices for Professional
Services Rendered ................................................ A-993

Exhibit B to Motion for Attorneys' Fees -
DGW Kramer LLP's Invoices for Professional
Services Rendered ................................................ A-1254

Exhibit C to Motion for Attorneys' Fees -
Vitt & Associates' Invoices for Professional
Services Rendered ................................................ A-1262

Motion by Plaintiff to Amend Judgment, filed
May 8, 2025 ........................................................... A-1397

Reply by Plaintiff in Further Support of Motion for
Prejudgment Interest, filed May 21, 2025 ............. A-1404

Exhibit A to Plaintiff's Reply -
Excerpts from the Draft Trial Transcript of
March 28, 2025 ..................................................... A-1413

Exhibit B to Plaintiff's Reply -
Excerpts from the Draft Trial Transcript of
March 26, 2025 ..................................................... A-1428

Motion by Defendants to Alter or Amend the
Judgment and, in the Alternative, for a New Trial
on Plaintiff's VFEPA Claim, filed May 22, 2025 .. A-1445

Opposition by Defendants to Plaintiff's Motion to
Amend Judgment, filed May 22, 2025 .................. A-1459

**vii**

**Page**

Motion by Defendants for a New Trial Related to
Damages Issues, filed May 22, 2025 ...................... A-1468

Index to Exhibits to Defendants' Motion for a New
Trial Related to Damages Issues, filed
May 22, 2025 ........................................................ A-1481

Exhibit 1 to Defendant's Motion -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit 2 to Defendants' Motion -
Demonstrative Excerpt from Expert Report of
Robert L. Bancroft, dated March 19, 2025 ............ A-1482

Exhibit 3 to Defendants' Motion -
Robert Bancroft Cross Examination Exhibit,
Marked C19 ........................................................... A-1484

Exhibit 4 to Defendants' Motion -
Email Correspondence, dated June 6, 2017, with
Attachment.............................................................. A-1486

Opposition by Defendants to Plaintiff's Motion for
Attorneys' Fees, filed May 22, 2025...................... A-1499

Opposition by Plaintiff to Defendants' Motion to
Alter Judgment, filed June 5, 2025 ........................ A-1512

Reply by Plaintiff in Further Support of Motion to
Amend Judgment, filed June 5, 2025 ..................... A-1523

Memorandum of Law by Plaintiff in Opposition to
Defendants' Motion for a New Trial, filed
June 5, 2025 ........................................................... A-1525

Reply Memorandum of Law by Plaintiff in
Response to Defendants' Opposition to Motion
for Attorneys' Fees, filed June 5, 2025 .................. A-1533

**viii**

|  | **Page** |
|---|---|
| Exhibit A to Plaintiff's Reply Memorandum - Itemized Chart and Invoices | A-1542 |
| Reply by Defendants in Further Support of Motion to Alter Judgment, filed June 20, 2025 | A-1556 |
| Reply Memorandum of Law by Defendants in Further Support of Motion for a New Trial Related to Damages Issues, filed June 20, 2025 | A-1566 |
| Supplemental Memorandum of Law by Plaintiff in Further Support of Motion for Attorneys' Fees, filed June 25, 2025 | A-1574 |
| Excerpts from the Post-Trial Motions Hearing, dated July 1, 2025 | A-1577 |
| Second Supplemental Memorandum of Law by Plaintiff in Support of Motion for Attorneys' Fees, filed July 11, 2025 | A-1591 |
| Exhibit A to Second Supplemental Memorandum - Chart (Attorneys and Paralegals) | A-1594 |
| Exhibit B to Second Supplemental Memorandum - Chart (Fees for Four Attorneys) | A-1596 |
| Exhibit C to Second Supplemental Memorandum - Statements from Vitt & Nunan | A-1597 |
| Exhibit D to Second Supplemental Memorandum - Statements from Langrock, Sperry & Wool | A-1604 |

ix

Page

Response by Defendants in Opposition to Plaintiff's
Second Supplemental Memorandum in Support
of Motion for Attorneys' Fees, filed
July 18, 2025 ......................................................... A-1607

Judgment of the United States District Court for the
District of Vermont, filed April 24, 2025,
Appealed From (Doc. 297), with Notice to
Litigants ................................................................. A-1612

Notice of Appeal by Defendants, filed
May 27, 2025 ......................................................... A-1614

Order of the Honorable Kevin J. Doyle, filed
July 7, 2025, Appealed From (Doc. 329)............... A-1616

Order of the Honorable Kevin J. Doyle, filed
November 26, 2025, Appealed From (Doc. 334) .. A-1619

Opinion and Order of the Honorable Kevin J.
Doyle, filed November 26, 2025, Appealed From
(Doc. 335) .............................................................. A-1630

Order of the Honorable Kevin J. Doyle, filed
November 26, 2025, Appealed From (Doc 336) ... A-1685

Order of the Honorable Kevin J. Doyle, filed
November 26, 2025, Appealed From (Doc. 337) .. A-1697

Amended Judgment of the United States District
Court for the District of Vermont, filed December
2, 2025, Appealed From (Doc. 338) ...................... A-1713

Notice of Cross-Appeal by Plaintiff, filed
December 15, 2025................................................. A-1715

Amended Notice of Appeal by Defendants, filed
December 16, 2025................................................. A-1717

A-1

APPEAL,CLOSED,ENE3,ENEN,L.R. 73

# U.S. District Court
## District of Vermont (Burlington)
## CIVIL DOCKET FOR CASE #: 2:17-cv-00194-kjd

Blanchette Porter v. Dartmouth Hitchcock Medical Center et al
Assigned to: Judge Kevin J. Doyle
Cause: 28:1332 Diversity-Employment Discrimination

Date Filed: 10/11/2017
Date Terminated: 04/24/2025
Jury Demand: Plaintiff
Nature of Suit: 445 Civil Rights: Americans
with Disabilities - Employment
Jurisdiction: Diversity

**Special Master**

**John Schraven**                    represented by    **John A. Schraven**
Shoup Evers & Green, PLLC
Suite 430
126 College Street
Burlington, VT 05401
(802) 861-6666
Email: jschraven@seglawyers.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Misty Blanchette Porter**              represented by    **Eric D. Jones , Esq.**
*M.D*.                                                     Langrock Sperry & Wool, LLP
210 College Street
P.O. Box 721
Burlington, VT 05402-0721
(802) 864-0217
Fax: (802) 864-0137
Email: ejones@langrock.com
*ATTORNEY TO BE NOTICED*

**Geoffrey J. Vitt , Esq.**
Vitt & Associates
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
Fax: (802) 649-1692
Email: gvitt@vittnunanlaw.com
*ATTORNEY TO BE NOTICED*

**Katherine Burghardt Kramer , Esq.**
Dto Law
307 Fifth Avenue
12th Floor
New York, NY 10016
646-688-4081
Email: kkramer@dtolaw.com
*TERMINATED: 12/06/2024*

A-2

**Sarah H. Nunan , Esq.**
Vitt & Nunan PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055
802-649-5700
Email: snunan@vittnunanlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Dartmouth-Hitchcock Medical Center**      represented by   **Daniel R. Long , Esq.**
Paul Frank + Collins PC
1 Church Street
P.O. Box 1307
Burlington, VT 05402-1307
(802) 658-2311
Email: dlong@pfclaw.com
*TERMINATED: 10/29/2019*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Donald W. Schroeder , Esq.**
Foley & Lardner LLP
111 Huntington Avenue, Suite 2500
Boston, MA 02199
617-342-4041
Fax: 617-342-4001
Email: dschroeder@foley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica E. Joseph , Esq.**
Foley & Lardner LLP
111 Huntington Avenue, Suite 2500
Boston, MA 02199
(617) 342-4000
Fax: (617) 342-4001
Email: jjoseph@foley.com
*ATTORNEY TO BE NOTICED*

**Megan Martinez , Esq.**
Foley & Lardner LLP
111 Huntington Avenue, Suite 2500
Boston, MA 02199
617-342-4051
Email: memartinez@foley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan McDonald**
Foley & Lardner LLP

A-3

111 Huntington Avenue, Suite 2500
Boston, MA 02199
978-604-7808
Email: mmcdonald@foley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tristram J. Coffin , Esq.**
Downs Rachlin Martin PLLC
199 Main Street
P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375
Email: tcoffin@drm.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dartmouth-Hitchcock Clinic**                represented by  **Daniel R. Long , Esq.**
(See above for address)
*TERMINATED: 10/29/2019*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Donald W. Schroeder , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica E. Joseph , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan Martinez , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan McDonald**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tristram J. Coffin , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mary Hitchcock Memorial Hospital**          represented by  **Daniel R. Long , Esq.**
(See above for address)
*TERMINATED: 10/29/2019*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Donald W. Schroeder , Esq.**

A-4

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica E. Joseph , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan Martinez , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan McDonald**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tristram J. Coffin , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dartmouth-Hitchcock Health**                represented by   **Daniel R. Long , Esq.**
(See above for address)
*TERMINATED: 10/29/2019*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Donald W. Schroeder , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica E. Joseph , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan Martinez , Esq.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan McDonald**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tristram J. Coffin , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ENE Evaluator**

A-5

| | |
|---|---|
| **ENE Evaluator**<br>*TERMINATED: 11/07/2019* | represented by **Gregory S. Clayton , Esq.**<br>Clayton Mediation, LLC<br>P.O. Box 1016<br>Camden, ME 04843-1016<br>(207) 706-4977<br>Email: gclayton@claytonmediation.com<br>*TERMINATED: 11/07/2019*<br>*ATTORNEY TO BE NOTICED* |

V.

**Movant Party**

| | |
|---|---|
| **Susan Burton**<br>*TERMINATED: 06/02/2025* | represented by **Susan Burton**<br>620 8th Avenue<br>New York, NY 10018<br>917-309-7096<br>PRO SE |

| Date Filed | # | Docket Text |
|---|---|---|
| 10/11/2017 | 1 | COMPLAINT against Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital filed by Misty Blanchette Porter. (Attachments: # 1 Civil Cover Sheet)(esb) Deft names clarified on 10/11/2017 (law). (Entered: 10/11/2017) |
| 10/23/2017 | 2 | WAIVER OF SERVICE Returned Executed: Dartmouth-Hitchcock Clinic waiver sent on 10/16/2017, answer due 12/15/2017.(Vitt, Geoffrey) (Entered: 10/23/2017) |
| 10/23/2017 | 3 | WAIVER OF SERVICE Returned Executed: Dartmouth-Hitchcock Health waiver sent on 10/16/2017, answer due 12/15/2017.(Vitt, Geoffrey) (Entered: 10/23/2017) |
| 10/23/2017 | 4 | WAIVER OF SERVICE Returned Executed: Dartmouth-Hitchcock Medical Center waiver sent on 10/16/2017, answer due 12/15/2017.(Vitt, Geoffrey) (Entered: 10/23/2017) |
| 10/23/2017 | 5 | WAIVER OF SERVICE Returned Executed: Mary Hitchcock Memorial Hospital waiver sent on 10/16/2017, answer due 12/15/2017.(Vitt, Geoffrey) (Entered: 10/23/2017) |
| 12/15/2017 | 6 | ANSWER to Complaint by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Coffin, Tristram) Attachments 1- 4 removed on 12/18/2017 (law). (Entered: 12/15/2017) |
| 12/15/2017 | 7 | CORPORATE DISCLOSURE STATEMENT pursuant to Local Rule 7.1(a) by Mary Hitchcock Memorial Hospital. (esb) (Entered: 12/15/2017) |
| 12/15/2017 | 8 | CORPORATE DISCLOSURE STATEMENT pursuant to Local Rule 7.1(a) by Dartmouth-Hitchcock Medical Center. (esb) (Entered: 12/15/2017) |
| 12/15/2017 | 9 | CORPORATE DISCLOSURE STATEMENT pursuant to Local Rule 7.1(a) by Dartmouth-Hitchcock Health. (esb) (Entered: 12/15/2017) |
| 12/15/2017 | 10 | CORPORATE DISCLOSURE STATEMENT pursuant to Local Rule 7.1(a) by Dartmouth-Hitchcock Clinic. (esb) (Entered: 12/15/2017) |

A-6

| | | |
|---|---|---|
| 12/18/2017 | 11 | NOTICE OF DOCKET ENTRY CORRECTION re: 6 Answer to Complaint filed by Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Clinic. Attachments 1 - 4 have been removed, they were re-entered separately (see Docs. 7 - 10 ). (law) (Entered: 12/18/2017) |
| 12/18/2017 | 12 | ENE LETTER re: Potential Evaluators sent; responses due by 1/5/2018. (hbc) (Entered: 12/18/2017) |
| 01/02/2018 | 13 | PROPOSED Stipulated Discovery Schedule/Order by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital.(Coffin, Tristram) (Entered: 01/02/2018) |
| 01/04/2018 | 14 | STIPULATED DISCOVERY SCHEDULE/ORDER Discovery due by 8/15/2018. Motions due by 9/15/2018. Early Neutral Evaluation set for 4/2018. Ready for Trial by 11/15/2018. Signed by Chief Judge Geoffrey W. Crawford on 1/3/2018. (esb) (Entered: 01/04/2018) |
| 01/05/2018 | 15 | STIPULATION AS TO ENE by all parties.(Vitt, Geoffrey) (Entered: 01/05/2018) |
| 01/08/2018 | 16 | ASSIGNED Early Neutral Evaluator: Gregory S. Clayton, Esq. (hbc) (Entered: 01/08/2018) |
| 01/19/2018 | 17 | NOTICE OF APPEARANCE by Katherine B. Kramer, Esq on behalf of Misty Blanchette Porter.(Kramer, Katherine) (Entered: 01/19/2018) |
| 01/22/2018 | 18 | DISCOVERY CERTIFICATE - Request to Produce *Documents* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 01/22/2018) |
| 01/23/2018 | 19 | DISCOVERY CERTIFICATE - Initial Disclosures by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 01/23/2018) |
| 02/20/2018 | 20 | MOTION for Authorization to Contact Dartmouth-Hitchcock Employees Ex Parte, Pursuant to Vermont Rule of Professional Conduct 4.2 filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 02/20/2018) |
| 03/06/2018 | 21 | RESPONSE in Opposition re 20 MOTION for Authorization to Contact Dartmouth-Hitchcock Employees Ex Parte, Pursuant to Vermont Rule of Professional Conduct 4.2 filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital . (Coffin, Tristram) Filers clarified on 3/20/2018 (jlh). (Entered: 03/06/2018) |
| 03/14/2018 | 22 | REPLY to Response to 20 MOTION for Authorization to Contact Dartmouth-Hitchcock Employees Ex Parte, Pursuant to Vermont Rule of Professional Conduct 4.2 filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 03/14/2018) |
| 03/19/2018 | 23 | DISCOVERY CERTIFICATE - Interrogatories and Request to Produce by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 03/19/2018) |
| 03/20/2018 | 24 | JOINT MOTION for Protective Order filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Exhibit 1)(Coffin, Tristram) (Entered: 03/20/2018) |
| 03/21/2018 | 25 | CONFIDENTIALITY STIPULATION, PROTECTIVE AGREEMENT AND ORDER granting 24 Joint Motion for Protective Order. Signed by Chief Judge Geoffrey W. Crawford on 3/21/2018. (Attachments: # 1 Exhibit A) (esb) (Entered: 03/21/2018) |
| 03/27/2018 | 26 | MOTION to Compel *Response to Plaintiff's First Set of Requests to Produce* filed by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 03/27/2018) |

A-7

| | | |
|---|---|---|
| 04/09/2018 | 27 | DISCOVERY CERTIFICATE - Response to Request for Admissions by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 04/09/2018) |
| 04/09/2018 | 28 | DISCOVERY CERTIFICATE - Response to Request to Produce by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 04/09/2018) |
| 04/10/2018 | 29 | RESPONSE in Opposition re 26 MOTION to Compel *Response to Plaintiff's First Set of Requests to Produce* filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Coffin, Tristram) Filers clarified on 4/18/2018 (law). (Entered: 04/10/2018) |
| 04/17/2018 | 30 | JOINT MOTION to Amend the Discovery Schedule/Order filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit A)(Vitt, Geoffrey) (Entered: 04/17/2018) |
| 04/18/2018 | 31 | AMENDED STIPULATED DISCOVERY SCHEDULE/ORDER granting 30 JOINT MOTION to Amend the Discovery Schedule/Order. Discovery due by 12/15/2018. Motions due by 1/15/2019. Early Neutral Evaluation shall be conducted at a date and time in September 2018. Ready for Trial by 2/15/2019. Signed by Chief Judge Geoffrey W. Crawford on 4/18/2018. (law) Motions deadline corrected on 4/18/2018 (law). (Entered: 04/18/2018) |
| 04/20/2018 | 32 | JOINT MOTION for Hearing *(status conference)* filed by Misty Blanchette Porter.(Vitt, Geoffrey) Event/text clarified on 4/20/2018. (Entered: 04/20/2018) |
| 04/23/2018 | 33 | DISCOVERY CERTIFICATE - Answer to Interrogatories and Requests to Produce by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 04/23/2018) |
| 04/23/2018 | 34 | DISCOVERY CERTIFICATE - Answer to Interrogatories and Requests to Produce by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 04/23/2018) |
| 04/24/2018 | 35 | REPLY to Response to 26 MOTION to Compel *Response to Plaintiff's First Set of Requests to Produce* filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 04/24/2018) |
| 05/03/2018 | 36 | ORDER granting 32 MOTION for Hearing. Signed by Chief Judge Geoffrey W. Crawford on 5/3/2018. (This is a text-only Order.) (jal) (Entered: 05/03/2018) |
| 05/08/2018 | 37 | NOTICE of Hearing re: 20 MOTION for Authorization to Contact Dartmouth-Hitchcock Employees Ex Parte, Pursuant to Vermont Rule of Professional Conduct 4.2, 26 MOTION to Compel Response to Plaintiff's First Set of Requests to Produce, and a Status Conference. Hearing set for 5/29/2018 at 2:30 PM in Rutland Courtroom before Chief Judge Geoffrey W. Crawford. (pjl) (Entered: 05/08/2018) |
| 05/08/2018 | | Set Hearing: Status Conference set for 5/29/2018 at 2:30 PM in Rutland Courtroom before Chief Judge Geoffrey W. Crawford. (pjl) (Entered: 05/08/2018) |
| 05/08/2018 | 38 | MOTION for Appearance Pro Hac Vice of Daniel R. Long filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Affidavit of Daniel R. Long, # 2 Certificate of Good Standing)(jlh) Filer added on 5/16/2018 (law). (Entered: 05/09/2018) |
| 05/08/2018 | 39 | MOTION for Appearance Pro Hac Vice of Donald W. Schroeder filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Affidavit of Donald W. Schroeder, # 2 Certificate of Good Standing)(jlh) Filer added on 5/16/2018 (law). (Entered: 05/09/2018) |
| 05/16/2018 | 40 | ORDER granting 38 , 39 MOTIONS for Admission Pro Hac Vice of Daniel R. Long, Esq. & Donald W. Schroeder, Esq. Signed by Chief Judge Geoffrey W. Crawford on |

A-8

| | | |
|---|---|---|
| | | 5/16/2018. (This is a text-only Order.) (pjl) (Entered: 05/16/2018) |
| 05/31/2018 | 41 | REVISED NOTICE of Hearing re: 20 MOTION for Authorization to Contact Dartmouth-Hitchcock Employees Ex Parte, Pursuant to Vermont Rule of Professional Conduct 4.2, 26 MOTION to Compel Response to Plaintiff's First Set of Requests to Produce and for a Status Conference. Hearing reset for 6/28/2018 at 1:30 PM in Rutland Courtroom before Chief Judge Geoffrey W. Crawford. (pjl) (Entered: 05/31/2018) |
| 06/21/2018 | 42 | SECOND REVISED NOTICE of Hearing re: 20 MOTION for Authorization to Contact Dartmouth-Hitchcock Employees Ex Parte, Pursuant to Vermont Rule of Professional Conduct 4.2, 26 MOTION to Compel Response to Plaintiff's First Set of Requests to Produce, and for a Status Conference. Hearing reset for 7/17/2018 at 1:30 PM in Rutland Courtroom before Chief Judge Geoffrey W. Crawford. (pjl) (Entered: 06/21/2018) |
| 06/21/2018 | | Set Hearing: Status Conference set for 7/17/2018 at 1:30 PM with Motion Hearing in Rutland Courtroom before Chief Judge Geoffrey W. Crawford. (pjl) (Entered: 06/21/2018) |
| 07/16/2018 | 43 | MOTION for Appearance Pro Hac Vice of Jessica Joseph filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Affidavit of Jessica E. Joseph, # 2 Certificate of Good Standing)(jlh) (Entered: 07/17/2018) |
| 07/17/2018 | 44 | ORDER granting 43 MOTION for Appearance Pro Hac Vice of Jessica Joseph. Signed by Chief Judge Geoffrey W. Crawford on 7/17/2018. (This is a text-only Order.) (pjl) (Entered: 07/17/2018) |
| 07/17/2018 | 45 | MINUTE ENTRY for proceedings held before Chief Judge Geoffrey W. Crawford: Status Conference and Motion Hearing held on 7/17/2018 re: 20 MOTION for Authorization to Contact Dartmouth-Hitchcock Employees Ex Parte, 26 MOTION to Compel Response to Plaintiff's First Set of Requests to Produce. G. Vitt, Esq. & K. Kramer, Esq. present for pltf. T. Coffin, Esq., D. Schroeder, Esq. & J. Joseph, Esq. present for dfts. Court makes inquiries and counsel make statements re: pending motions. ORDERED: 20 MOTION for Authorization, 26 MOTION to Compel are taken under advisement. STATUS CONFERENCE: Counsel make statements re: (1) Request for deadline re: production of documents, (2) Confidentiality issue re: filings of confidential material. ORDERED: Dfts are to complete production of documents to pltf by 8/1/2018. The court gives counsel permission to file confidential documents under seal. The parties are to submit a revised stipulated discovery schedule as soon as possible. Parties predict that they will be trial-ready by June 2019. (Court Reporter: Recorded) (pjl) (Entered: 07/17/2018) |
| 07/24/2018 | 46 | JOINT MOTION to Amend the Discovery Schedule/Order filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit A)(Vitt, Geoffrey) (Entered: 07/24/2018) |
| 07/25/2018 | 47 | AMENDED STIPULATED DISCOVERY SCHEDULE/ORDER granting 46 JOINT MOTION to Amend the Discovery Schedule/Order. Discovery due by 2/28/2019. Motions due by 1/15/2019. Early Neutral Evaluation set for 10/2018. Ready for Trial by 6/15/2019. Signed by Chief Judge Geoffrey W. Crawford on 7/25/2018. (esb) (Entered: 07/25/2018) |
| 07/27/2018 | 48 | STIPULATED MOTION to Amend 1 Complaint, filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Vitt, Geoffrey) (Entered: 07/27/2018) |
| 07/30/2018 | 49 | ORDER granting 48 MOTION to Amend Complaint. Signed by Chief Judge Geoffrey W. Crawford on 7/30/2018. (This is a text-only Order.) (jal) (Entered: 07/30/2018) |
| 08/01/2018 | 50 | FIRST AMENDED COMPLAINT against Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial |

|  |  |  |
|---|---|---|
|  |  | Hospital filed by Misty Blanchette Porter. (Attachments: # 1 Certificate of Service) (esb) (Entered: 08/01/2018) |
| 08/09/2018 | 51 | DECISION granting 20 Motion for Authorization to Contact Dartmouth-Hitchcock Employees Ex Parte, Pursuant to Vermont Rule of Professional Conduct 4.2 ; granting 26 Motion to Compel Response to Plaintiff's First Set of Requests to Produce. Signed by Chief Judge Geoffrey W. Crawford on 8/9/2018. (esb) (Entered: 08/09/2018) |
| 08/31/2018 | 52 | DISCOVERY CERTIFICATE re: First Set of Interrogatories Propounded on Plaintiff Misty Blanchette Porter and Second Request for Production of Documents to Plaintiff Misty Blanchette Porter by Dartmouth-Hitchcock Clinic.(Coffin, Tristram) (Entered: 08/31/2018) |
| 09/04/2018 | 53 | DISCOVERY CERTIFICATE - Interrogatories and Request to Produce by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 09/04/2018) |
| 09/07/2018 | 54 | ANSWER to 50 Amended Complaint by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital.(Coffin, Tristram) (Entered: 09/07/2018) |
| 10/10/2018 | 55 | DISCOVERY CERTIFICATE re: Response to Defendants' Second Request for Production of Documents and Response to Defendant Dartmouth-Hitchcock Clinic's First Set of Interrogatories by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 10/10/2018) |
| 10/16/2018 | 56 | DISCOVERY CERTIFICATE - Response to Request to Produce by Dartmouth-Hitchcock Clinic (Coffin, Tristram) Filers clarified on 10/23/2018 (jlh). (Entered: 10/16/2018) |
| 12/06/2018 | 57 | JOINT MOTION to Amend the Discovery Schedule/Order filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Exhibit A)(Coffin, Tristram) (Entered: 12/06/2018) |
| 12/06/2018 | 58 | Entry removed from the docket. (Entered: 12/06/2018) |
| 12/07/2018 | 59 | NOTICE OF DOCKET ENTRY REMOVAL: Document 58 has been removed from the docket in light of 57 Joint Motion to Amend the Discovery Schedule filed. (law) (Entered: 12/07/2018) |
| 12/10/2018 | 60 | AMENDED STIPULATED DISCOVERY SCHEDULE/ORDER granting 57 JOINT MOTION to Amend the Discovery Schedule/Order. Discovery due by 4/30/2019. Motions due by 5/31/2019. Early Neutral Evaluation set for 2/2019. Ready for Trial by 10/31/2019. Signed by Chief Judge Geoffrey W. Crawford on 12/10/2018. (esb) (Entered: 12/10/2018) |
| 12/21/2018 | 61 | MOTION to Compel *Production of Documents* filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit A)(Vitt, Geoffrey) Text clarified on 12/21/2018 (jlh). (Entered: 12/21/2018) |
| 01/02/2019 | 62 | STIPULATED MOTION for Extension of Time to File Response/Reply as to 61 MOTION to Compel *Production of Documents* filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital.(Coffin, Tristram) (Entered: 01/02/2019) |
| 01/02/2019 | 63 | AFFIDAVIT of Geoffrey J. Vitt re: 61 MOTION to Compel *Production of Documents* by Misty Blanchette Porter (Vitt, Geoffrey) (Entered: 01/02/2019) |
| 01/04/2019 | 64 | MOTION to Compel *Answers to Interrogatories* filed by Misty Blanchette Porter. (Attachments: # 1 Affidavit of Geoffrey J. Vitt)(Vitt, Geoffrey) (Entered: 01/04/2019) |

| | | |
|---|---|---|
| 01/04/2019 | 65 | ORDER granting 62 MOTION for Extension of Time to File Response as to 61 Motion to Compel Production of Documents. Time extended to January 14, 2019. Signed by Chief Judge Geoffrey W. Crawford on 1/4/2019. (This is a text-only Order.) (jal) (Entered: 01/04/2019) |
| 01/10/2019 | 66 | STIPULATED MOTION for Extension of Time to File Response/Reply as to 64 MOTION to Compel *Answers to Interrogatories* filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital.(Coffin, Tristram) (Entered: 01/10/2019) |
| 01/14/2019 | 67 | ORDER granting 66 STIPULATED MOTION for Extension of Time to File Response as to 64 MOTION to Compel Answers to Interrogatories. Signed by Chief Judge Geoffrey W. Crawford on 1/14/2019. (This is a text-only Order.) (jal) (Entered: 01/14/2019) |
| 01/14/2019 | 68 | RESPONSE in Opposition re 64 MOTION to Compel *Answers to Interrogatories* filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Coffin, Tristram) (Entered: 01/14/2019) |
| 01/15/2019 | 69 | RESPONSE in Opposition re 61 MOTION to Compel *Production of Documents* filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Coffin, Tristram) (Entered: 01/15/2019) |
| 01/25/2019 | 70 | RESPONSE re: 64 MOTION to Compel Answers to Interrogatories by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Coffin, Tristram) Link added on 1/28/2019 (jlh). (Entered: 01/25/2019) |
| 01/28/2019 | 71 | REPLY to Response to 61 MOTION to Compel *Production of Documents* filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 01/28/2019) |
| 02/08/2019 | 72 | REPLY to Response to 64 MOTION to Compel *Answers to Interrogatories* filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 02/08/2019) |
| 03/11/2019 | 73 | ORDER granting 61 Motion to Compel Production of Documents and 64 Motion to Compel Answers to Interrogatories. Defendants shall produce all documents withheld based on the attorney-client privilege, to this court, for an in camera review. Defendants shall comply within 15 days from the date of this order. Signed by Chief Judge Geoffrey W. Crawford on 3/11/2019. (esb) (Entered: 03/11/2019) |
| 04/02/2019 | 74 | MOTION for Attorney Fees filed by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 04/02/2019) |
| 04/02/2019 | 75 | ORDER: In reviewing the attorney-client privilege materials, it is frequently difficult to identify who is the attorney. Defense counsel shall provide a list of attorneys who are senders or recipients of the communications. This list may be submitted ex parte as part of the in camera review process. Signed by Chief Judge Geoffrey W. Crawford on 4/2/2019. (This is a text-only Order.) (jal) (Entered: 04/02/2019) |
| 04/05/2019 | 76 | DISCOVERY CERTIFICATE - Interrogatories and Request to Produce by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 04/05/2019) |
| 04/16/2019 | 77 | RESPONSE in Opposition to 74 MOTION for Attorney Fees *Pursuant to F.R.C.P. 37(a)(5)(A)* filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Coffin, Tristram) (Entered: 04/16/2019) |

A-11

| | | |
|---|---|---|
| 04/18/2019 | 78 | ENE LETTER re: session past due. Responses due by 4/25/2019. (eh) (Entered: 04/18/2019) |
| 04/18/2019 | 79 | JOINT MOTION to Amend the Discovery Schedule/Order filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit A)(Vitt, Geoffrey) (Entered: 04/18/2019) |
| 04/19/2019 | 80 | FOURTH AMENDED STIPULATED DISCOVERY SCHEDULE/ORDER granting 79 MOTION to Amend the Discovery Schedule/Order. Discovery due by 10/15/2019. Motions due by 11/15/2019. Early Neutral Evaluation shall be conducted in August 2019. Ready for Trial by February 2020. Signed by Chief Judge Geoffrey W. Crawford on 4/19/2019. (law) (Entered: 04/19/2019) |
| 04/25/2019 | 81 | DISCOVERY CERTIFICATE - Notice of Deposition of *Dr. Joanne Conroy* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 04/25/2019) |
| 04/29/2019 | 82 | REPLY to Response to 74 MOTION for Attorney Fees *Pursuant to F.R.C.P. 37(a)(5)(A)* filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 04/29/2019) |
| 04/30/2019 | 83 | DISCOVERY CERTIFICATE - Notice of Deposition of *Ed Merrens, M.D.* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 04/30/2019) |
| 05/02/2019 | 84 | ORDER granting in part, denying in part 61 MOTION to Compel Production of Documents (as to documents withheld from production as privileged and documents to be produced). Signed by Chief Judge Geoffrey W. Crawford on 5/2/2019. (pjl) (Entered: 05/02/2019) |
| 05/14/2019 | 85 | MOTION for Protective Order *Regarding Notice of Deposition of Dr. Joanne Conroy* filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Affidavit of Donald W. Schroeder)(Coffin, Tristram) (Entered: 05/14/2019) |
| 05/17/2019 | 86 | ORDER denying 74 MOTION for Attorney's Fees Pursuant to Fed. R. Civ. P. 37(a)(5)(A). Signed by Chief Judge Geoffrey W. Crawford on 5/17/2019. (pjl) (Entered: 05/17/2019) |
| 05/23/2019 | 87 | STIPULATED MOTION for Extension of Time to File Response/Reply as to 85 MOTION for Protective Order *Regarding Notice of Deposition of Dr. Joanne Conroy* filed by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 05/23/2019) |
| 05/28/2019 | 88 | ORDER granting 87 MOTION for Extension of Time to File Response/Reply as to 85 MOTION for Protective Order Regarding Notice of Deposition of Dr. Joanne Conroy. Time extended to June 3, 2019. Signed by Chief Judge Geoffrey W. Crawford on 5/28/2019. (This is a text-only Order.) (jal) (Entered: 05/28/2019) |
| 06/03/2019 | 89 | RESPONSE in Opposition re 85 MOTION for Protective Order *Regarding Notice of Deposition of Dr. Joanne Conroy* filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit 1)(Vitt, Geoffrey) (Entered: 06/03/2019) |
| 06/04/2019 | 90 | ADDITIONAL ORDER: re 61 MOTION to Compel *Production of Documents*. Signed by Chief Judge Geoffrey W. Crawford on 6/4/2019. (esb) (Entered: 06/04/2019) |
| 06/07/2019 | 91 | DISCOVERY CERTIFICATE - Notice of Deposition of *Defendants* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 06/07/2019) |
| 06/13/2019 | 92 | DISCOVERY CERTIFICATE - Notice of Deposition of *Elizabeth C. Todd* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 06/13/2019) |
| 06/13/2019 | 93 | DISCOVERY CERTIFICATE - Notice of Deposition of *Daniel Herrick* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 06/13/2019) |

A-12

| | | |
|---|---|---|
| 06/17/2019 | 94 | REPLY to Response to 85 MOTION for Protective Order *Regarding Notice of Deposition of Dr. Joanne Conroy* filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Exhibit A)(Coffin, Tristram) (Entered: 06/17/2019) |
| 06/21/2019 | 95 | NOTICE of Hearing re: 85 MOTION for Protective Order Regarding Notice of Deposition of Dr. Joanne Conroy. Hearing set for 7/8/2019 at 1:30 PM in Rutland Courtroom before Chief Judge Geoffrey W. Crawford. (pjl) (Entered: 06/21/2019) |
| 06/25/2019 | 96 | DISCOVERY CERTIFICATE - Notice of Deposition of *Kimberly Fleury* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 06/25/2019) |
| 07/08/2019 | 97 | MINUTE ENTRY for proceedings held before Chief Judge Geoffrey W. Crawford: Motion Hearing held on 7/8/2019 re: 85 MOTION for Protective Order Regarding Notice of Deposition of Dr. Joanne Conroy. G. Vitt, Esq. & K. Kramer, Esq. present for plaintiff. T. Coffin, Esq. & D. Schroeder, Esq. present for defendants. Court makes inquiries and counsel make statements. ORDERED: 85 MOTION for Protective Order Regarding Notice of Deposition of Dr. Joanne Conroy is denied. Court makes inquiries re: status of discovery schedule deadlines. ORDERED: Counsel are to file an amended stipulated discovery schedule setting out new deadlines discussed. (Court Reporter: Barry Cohen, O'Brien Court Reporting) (pjl) (Entered: 07/08/2019) |
| 07/10/2019 | 98 | DISCOVERY CERTIFICATE - Notice of Deposition of *Maria Padin, M.D.* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 07/10/2019) |
| 07/10/2019 | 99 | DISCOVERY CERTIFICATE - Notice of Deposition of *Ed Merrens, M.D. (Amended)* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 07/10/2019) |
| 07/17/2019 | 100 | NOTICE of Hearing: Status Conference set for 7/23/2019 at 02:00 PM in Rutland Courtroom before Chief Judge Geoffrey W. Crawford. (Attorneys for defense to appear by telephone pursuant to chambers). (esb) (Entered: 07/17/2019) |
| 07/19/2019 | 101 | DISCOVERY CERTIFICATE - Notice of Deposition of *Rule 30(b)(6) - Amended* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 07/19/2019) |
| 07/19/2019 | 102 | DISCOVERY CERTIFICATE - Notice of Deposition of *Kimberly Fleury (Amended)* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 07/19/2019) |
| 07/22/2019 | 103 | DISCOVERY CERTIFICATE - Notice of Deposition of *Heather Gunnell* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 07/22/2019) |
| 07/23/2019 | 104 | MINUTE ENTRY for proceedings held before Chief Judge Geoffrey W. Crawford: Status Conference held on 7/23/2019. G. Vitt, Esq. & K. Kramer, Esq. present for plaintiff. D. Schroeder, Esq. & J. Joseph, Esq. present for defendants. Counsel make statements re: (1) need to revise scheduling order deadlines, (2) custodian of records and release of documents, (4) request for in camera review. ORDERED: Counsel are to submit a fifth stipulated discovery schedule setting out dates agreed to. Defendants are to make inquiries of custodians of records and release any records not previously sent to plaintiff. Counsel is to submit records for in camera review to the court by 7/30/2019. (Court Reporter: Anne Henry) (pjl) Due date corrected on 7/24/2019 (jlh). (Entered: 07/24/2019) |
| 07/29/2019 | 105 | JOINT MOTION to Amend the Discovery Schedule/Order filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit A )(Vitt, Geoffrey) (Entered: 07/29/2019) |
| 07/30/2019 | 106 | FIFTH AMENDED STIPULATED DISCOVERY SCHEDULE/ORDER granting 105 JOINT MOTION to Amend the Discovery Schedule/Order. Discovery due by 10/31/2019. Motions due by 12/1/2019. Early Neutral Evaluation set for 10/2019. Ready for Trial by |

| | | |
|---|---|---|
| | | 6/2020. Signed by Chief Judge Geoffrey W. Crawford on 7/30/2019. (esb) Link added/text clarified on 7/31/2019 (law). (Entered: 07/30/2019) |
| 08/05/2019 | 107 | DISCOVERY CERTIFICATE - Notice of Deposition of *Elizabeth C. Todd (Amended)* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 08/05/2019) |
| 08/05/2019 | 108 | DISCOVERY CERTIFICATE - Notice of Deposition of *Kimberly Fleury (Second Amended)* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 08/05/2019) |
| 08/07/2019 | 109 | ORDER On In Camera Review. Signed by Chief Judge Geoffrey W. Crawford on 8/6/2019. (law) (Entered: 08/07/2019) |
| 08/07/2019 | 110 | DISCOVERY CERTIFICATE - Notice of Deposition of *Heather Gunnell (Amended)* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 08/07/2019) |
| 08/08/2019 | 111 | DISCOVERY CERTIFICATE - Notice of Deposition of *Leslie DeMars* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 08/08/2019) |
| 08/16/2019 | 112 | DISCOVERY CERTIFICATE - Notice of Deposition of *Rule 30(b)(6) - Second Amended* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 08/16/2019) |
| 08/21/2019 | 113 | DISCOVERY CERTIFICATE - Notice of Deposition of *Dr. Joanne Conroy* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 08/21/2019) |
| 09/03/2019 | 114 | DISCOVERY CERTIFICATE - Interrogatories and Request to Produce by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 09/03/2019) |
| 09/04/2019 | 115 | STIPULATED MOTION to Amend the Discovery Schedule/Order filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Exhibit A)(Coffin, Tristram) (Entered: 09/04/2019) |
| 09/06/2019 | 116 | DISCOVERY CERTIFICATE - Notice of Deposition of *Plaintiff's Rule 30(b)(6) Notice of Deposition to Defendants* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 09/06/2019) |
| 09/12/2019 | 117 | SIXTH STIPULATED DISCOVERY SCHEDULE/ORDER granting 115 STIPULATED MOTION to Amend the Discovery Schedule/Order. Discovery due by 10/31/2019. Motions due by 12/1/2019. Early Neutral Evaluation set for 11/2019. Ready for Trial by 6/2020. Signed by Chief Judge Geoffrey W. Crawford on 9/12/2019. (esb) (Entered: 09/12/2019) |
| 09/17/2019 | 118 | DISCOVERY CERTIFICATE - Notice of Deposition of *Leslie DeMars (Amended)* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 09/17/2019) |
| 10/01/2019 | 119 | DISCOVERY CERTIFICATE - Response to Request to Produce by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 10/01/2019) |
| 10/03/2019 | 120 | MOTION to Compel *Response to Fourth Set of Interrogatories and Requests to Produce* filed by Misty Blanchette Porter.(Kramer, Katherine) Text clarified on 10/3/2019 (jlh). (Entered: 10/03/2019) |
| 10/17/2019 | 121 | RESPONSE in Opposition re 120 MOTION to Compel *Response to Fourth Set of Interrogatories and Requests to Produce* filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Coffin, Tristram) (Main Document 121 replaced on 10/18/2019) (jlh). (Entered: 10/17/2019) |
| 10/18/2019 | 122 | NOTICE OF DOCKET ENTRY CORRECTION re: 121 RESPONSE in Opposition re 120 MOTION to Compel Response to Fourth Set of Interrogatories and Requests to |

A-14

| | | |
|---|---|---|
| | | Produce. The incorrect document was uploaded at the time of filing. The correct document is now attached to 121 as well as this entry. (jlh) (Entered: 10/18/2019) |
| 10/24/2019 | 123 | ORDER granting 120 Motion to Compel Response to Fourth Set of Interrogatories and Requests to Produce. Signed by Chief Judge Geoffrey W. Crawford on 10/24/2019. (esb) (Entered: 10/24/2019) |
| 10/25/2019 | 124 | JOINT MOTION for Status Conference *to be held on or before November 7, or as soon as Practicable* filed by Misty Blanchette Porter.(Kramer, Katherine) (Main Document 124 replaced on 10/28/2019) (jlh). (Additional attachment(s) added on 10/28/2019: # 1 Exhibit) (jlh). (Entered: 10/25/2019) |
| 10/28/2019 | 125 | NOTICE OF DOCKET ENTRY CORRECTION re: 124 JOINT MOTION for Status Conference *to be held on or before November 7, or as soon as Practicable* filed by Misty Blanchette Porter. THe main document was uploaded with that of its attachment as a singular pdf. The document has been broken apart and reattached to the entry. The corrected documents are now attached to 124 as well as this entry. (Attachments: # 1 Exhibit) (jlh) (Entered: 10/28/2019) |
| 10/28/2019 | 126 | DISCOVERY CERTIFICATE - Notice of Deposition of *Judy McBean, M.D.* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 10/28/2019) |
| 10/29/2019 | 127 | NOTICE of Hearing: Status Conference set for 11/4/2019 at 10:00 AM in Rutland Courtroom before Chief Judge Geoffrey W. Crawford. (pjl) (Entered: 10/29/2019) |
| 10/29/2019 | 128 | NOTICE *of Withdrawal of Daniel Long, Esq.* by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital (Long, Daniel) (Entered: 10/29/2019) |
| 11/04/2019 | 129 | MINUTE ENTRY for proceedings held before Chief Judge Geoffrey W. Crawford: Status Conference held on 11/4/2019. G. Vitt, Esq. & K. Kramer, Esq. present for pltf. D. Schroeder, Esq. & J. Joseph, Esq. present for dfts. Counsel make statements re: (1) dispute re: work product, (2) discovery issues and deadlines for outstanding discovery, (3) pltf's request for add'l depositions, (4) pltf's request for renewed depositions of previously deposed individuals, and (5) pltf's request to identify add'l custodians of records. ORDERED: Discovery re: 4th set of requests to produce is due by 11/18/2019. All discovery is to be completed by 12/15/2019. Summary judgment motions are due by 1/15/2020. Ready for trial date is June 2020. Pltf's request for add'l depositions beyond 10 is denied. Pltf's request for renewed depositions of previously deposed individuals is denied. Pltf's request to identify add'l custodian of records beyond the 20 currently identified is denied. The court will issue an order setting out these deadlines. (Court Reporter: Anne Henry) (pjl) (Entered: 11/04/2019) |
| 11/04/2019 | 130 | ORDER granting 124 JOINT MOTION for a Status Conference. Plaintiff's request for production of Defendants' Document 80 is denied. Defendants' responses to written discovery are due by 11/18/2019; Discovery is to be completed by 12/15/2019; Summary judgment motions are due by 1/15/2020. Signed by Chief Judge Geoffrey W. Crawford on 11/4/2019. (pjl) (Entered: 11/04/2019) |
| 11/07/2019 | 131 | REPORT of Early Neutral Evaluator.(Clayton, Gregory) (Entered: 11/07/2019) |
| 11/20/2019 | 132 | DISCOVERY CERTIFICATE - Notice of Deposition of *Aimee Giglio* by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 11/20/2019) |
| 12/02/2019 | 133 | UNOPPOSED MOTION In Camera Review of Additional Documents filed by Misty Blanchette Porter.(Vitt, Geoffrey) (Entered: 12/02/2019) |
| 12/12/2019 | 134 | ORDER granting 133 MOTION for In Camera Review of Additional Documents. Signed by Chief Judge Geoffrey W. Crawford on 12/11/2019. (This is a text-only Order.) (jal) |

A-15

| | | (Entered: 12/12/2019) |
|---|---|---|
| 12/26/2019 | 135 | LETTER re: 134 Order granting 133 MOTION for In Camera Review of Additional Documents by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Joseph, Jessica) (Entered: 12/26/2019) |
| 01/07/2020 | 136 | ORDER re 133 UNOPPOSED MOTION In Camera Review of Additional Documents. Signed by Chief Judge Geoffrey W. Crawford on 1/7/2020. (esb) (Entered: 01/07/2020) |
| 01/13/2020 | 137 | STIPULATED MOTION to Amend the Discovery Schedule/Order filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Exhibit A)(Coffin, Tristram) (Entered: 01/13/2020) |
| 01/13/2020 | 138 | SEVENTH AMENDED STIPULATED DISCOVERY SCHEDULE/ORDER granting 137 STIPULATED MOTION to Amend the Discovery Schedule/Order. Motions due by 1/29/2020. Ready for Trial by 6/1/2020. Signed by Chief Judge Geoffrey W. Crawford on 1/13/2020. (pjl) (Entered: 01/13/2020) |
| 01/29/2020 | 139 | MOTION for Summary Judgment *On All Claims* filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Statement of Undisputed Facts, # 2 Index of Exhibits, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Affidavit of Dr. Edward Merrens, # 14 Affidavit of Daniel Herrick, # 15 Affidavit of Dr. Jocelyn Chertoff, # 16 Affidavit of Michele Z. King, # 17 Exhibit A, # 18 Exhibit B, # 19 Memorandum in Support)(Coffin, Tristram) (Entered: 01/29/2020) |
| 03/06/2020 | 140 | RESPONSE in Opposition re: 139 MOTION for Summary Judgment *On All Claims* filed by Misty Blanchette Porter. (Attachments: # 1 Memorandum in Support, # 2 Certificate of Service, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20, # 23 Exhibit 21, # 24 Exhibit 22) *(documents sealed)* (esb) Date filed corrected on 3/9/2020 (law). Exhibits 17 and 18 unsealed on 6/3/2020 pursuant to Document 149 (TOO) (law). (Entered: 03/09/2020) |
| 03/23/2020 | 141 | UNOPPOSED MOTION for Hearing/*Status Conference Regarding Confidentiality Designation* re: 139 MOTION for Summary Judgment *On All Claims* filed by Misty Blanchette Porter.(Kramer, Katherine) Event/text clarified, link added on 3/23/2020 (law). (Entered: 03/23/2020) |
| 03/25/2020 | 142 | MEMORANDUM by Misty Blanchette Porter re: 141 UNOPPOSED MOTION for Hearing/*Status Conference Regarding Confidentiality Designation* re: 139 MOTION for Summary Judgment *On All Claims* (Kramer, Katherine) (Entered: 03/25/2020) |
| 03/27/2020 | 143 | REPLY to Response to 139 MOTION for Summary Judgment *On All Claims* filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Exhibit A) (Coffin, Tristram) (Entered: 03/27/2020) |
| 05/12/2020 | 144 | NOTICE of Change of Address filed by Misty Blanchette Porter(Kramer, Katherine) (Entered: 05/12/2020) |
| 06/01/2020 | 145 | MEMORANDUM by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital *Regarding* |

A-16

| | | |
|---|---|---|
| | | *Confidentiality Designation Of Exhibits* re: 140 Response in Opposition to 139 MOTION for Summary Judgment. (Coffin, Tristram) (Entered: 06/01/2020) |
| 06/01/2020 | 146 | NOTICE of Hearing: Status Conference by telephone set for 6/2/2020 at 10:00 AM in Rutland Courtroom before Chief Judge Geoffrey W. Crawford. (pjl) (Entered: 06/01/2020) |
| 06/01/2020 | 147 | ORDER granting 141 MOTION for Hearing/Status Conference Regarding Confidentiality Designation re: 139 Motion for Summary Judgment on All Claims. Signed by Chief Judge Geoffrey W. Crawford on 6/1/2020. (This is a text-only Order.) (jal) (Entered: 06/01/2020) |
| 06/02/2020 | 148 | MINUTE ENTRY for proceedings held before Chief Judge Geoffrey W. Crawford: Telephone Status Conference held on 6/2/2020. G. Vitt, Esq. & K. Kramer, Esq. present for plaintiff. D. Schroeder, Esq., J. Joseph, Esq. & T. Coffin, Esq. present for defendants. Court and counsel discuss confidentiality issues. ORDERED: Documents 10 & 11 are to be sealed. Sealing is denied for documents 17 & 18. Court discusses (1) settlement, (2) oral argument on pending motion, (3) trial. ORDERED: The court will not schedule oral argument re: 139 MOTION for Summary Judgment at this time. Counsel request the scheduling of a jury trial for early Spring 2021. (Court Reporter: Anne Henry) (pjl) (Entered: 06/02/2020) |
| 06/02/2020 | 149 | ORDER: re 140 RESPONSE in Opposition re: 139 MOTION for Summary Judgment On All Claims--Following a hearing on June 2, 2020, the court orders that Doc. 140-12 and 140-13 (Ex. 10 and 11) shall be sealed. Doc. 140-19 and Doc. 140-20 (Ex. 17 and 18) are not sealed. Signed by Chief Judge Geoffrey W. Crawford on 6/2/2020. (This is a text-only Order.) (jal) (Entered: 06/02/2020) |
| 06/03/2020 | | UNSEALED Document(s): Exhibits 17 and 18 to 140 Response in Opposition are unsealed pursuant to court's Order (Document No. 149). (law) (Entered: 06/03/2020) |
| 06/16/2020 | 150 | REDACTIONS to 140 RESPONSE in Opposition re: 139 MOTION for Summary Judgment On All Claims by Misty Blanchette Porter (Attachments: # 1 Statement of Disputed Material Facts *(redacted)*, # 2 Exhibit 19 *(redacted)*)(Vitt, Geoffrey) Link added, text clarified on 6/16/2020 (law). (Entered: 06/16/2020) |
| 07/16/2020 | 151 | NOTICE of Change of Address filed by Misty Blanchette Porter.(Kramer, Katherine) Text clarified on 7/17/2020 (law). (Entered: 07/16/2020) |
| 11/03/2020 | 152 | DECISION granting 139 Motion for Summary Judgment *On All Claims*. Signed by Chief Judge Geoffrey W. Crawford on 11/3/2020. (esb) (Entered: 11/03/2020) |
| 11/04/2020 | 153 | **VACATED IN PART on 2/27/2024 pursuant to 157 Mandate** JUDGMENT - in favor of Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health against Misty Blanchette Porter, M.D.. Signed by Deputy Clerk on 11/4/2020. (Attachments: # 1 Notice to Litigants (appeal period expires 12/4/2020)) (esb) (Main Document 153 and Attachment 1 replaced and text updated on 3/12/2024) (sjl). (Entered: 11/04/2020) |
| 11/17/2020 | 154 | NOTICE OF APPEAL as to 153 Judgment, 152 Decision on Motion for Summary Judgment by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 11/17/2020) |
| 11/17/2020 | | USCA Appeal Fees received $ 505 receipt number 4682023453 re 154 Notice of Appeal filed by Misty Blanchette Porter. (eh) (Entered: 11/17/2020) |
| 11/23/2020 | 155 | TRANSMITTED Index on Appeal Circuit No. 20-3894 re: 154 Notice of Appeal. (gmg) (Entered: 11/23/2020) |

| 02/15/2024 | 156 | NOTICE of Hearing: Status Conference set for 3/27/2024 at 2:30 PM in Rutland Courtroom before Chief Judge Geoffrey W. Crawford. (eh) (Entered: 02/15/2024) |
| 02/27/2024 | 157 | MANDATE of USCA Case No 20-3894 as to 154 Notice of Appeal. The 153 judgment is affirmed in part, and vacated and remanded in part. (Attachments: # 1 Supporting Document)(law) (Entered: 02/27/2024) |
| 03/08/2024 | 158 | ORDER re: Appointment of Special Settlement Master. Signed by Chief Judge Geoffrey W. Crawford on 3/8/2024. (sjl) (Entered: 03/08/2024) |
| 03/13/2024 | 159 | MOTION to Unseal 140 RESPONSE in Opposition re: 139 MOTION for Summary Judgment *On All Claims* filed by Misty Blanchette Porter (Vitt, Geoffrey) Modified on 3/14/2024 to clarify event/text and to link entries (sjl). (Entered: 03/13/2024) |
| 03/15/2024 | 160 | MOTION Shorten Time and Permit Oral Argument re 159 MOTION to Unseal 140 RESPONSE in Opposition re: 139 MOTION for Summary Judgment *On All Claims* filed by Misty Blanchette Porter(Vitt, Geoffrey) (Entered: 03/15/2024) |
| 03/18/2024 | 161 | ORDER granting 160 Motion to Shorten Time and Permit Oral Argument re 159 Motion to Unseal. Any opposition to the motion to unseal shall be filed no later than March 26, 2024. Signed by Chief Judge Geoffrey W. Crawford on 3/18/2024. (sjl) (Entered: 03/18/2024) |
| 03/18/2024 | 162 | AFFIDAVIT of John Schraven Pursuant to 28 U.S.C. §455 re: 158 Order re: Appointment of Special Settlement Master. (sjl) (Entered: 03/18/2024) |
| 03/19/2024 | 163 | RESPONSE by Misty Blanchette Porter re 158 ORDER re: Appointment of Special Settlement Master. (Vitt, Geoffrey) Modified on 3/19/2024 to clarify text (sjl). (Entered: 03/19/2024) |
| 03/22/2024 | 164 | MEMORANDUM re 159 MOTION to Unseal 140 RESPONSE in Opposition re: 139 MOTION for Summary Judgment *On All Claims* by Misty Blanchette Porter (Vitt, Geoffrey) Modified on 3/26/2024 to clarify text/links (sjl). (Entered: 03/22/2024) |
| 03/22/2024 | 165 | MOTION for Appearance Pro Hac Vice of Morgan McDonald (Filing fee $ 150 receipt number AVTDC-1897956) filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Certificate of Admission and Good Standing, # 2 Affidavit of Morgan McDonald)(Coffin, Tristram) (Entered: 03/22/2024) |
| 03/26/2024 | 166 | RESPONSE in Opposition re 159 MOTION to Unseal 140 RESPONSE in Opposition re: 139 MOTION for Summary Judgment *On All Claims* filed by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Attachments: # 1 Exhibit A)(Coffin, Tristram) (Entered: 03/26/2024) |
| 03/26/2024 | 167 | RESPONSE re 158 Order *Re: Appointment of Special Settlement Master* by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Coffin, Tristram) (Entered: 03/26/2024) |
| 03/27/2024 | 168 | ORDER granting 165 MOTION for Admission Pro Hac Vice of Morgan McDonald. Signed by Chief Judge Geoffrey W. Crawford on 3/27/2024. (This is a text-only Order.) (jal) (Entered: 03/27/2024) |
| 03/27/2024 | 169 | MINUTE ENTRY for proceedings held before Chief Judge Geoffrey W. Crawford: Status Conference and Motion Hearing held on 3/27/2024 re 159 MOTION to Unseal 140 RESPONSE in Opposition re: 139 MOTION for Summary Judgment *On All Claims*. G. Vitt, Esq. and K. Kramer, Esq. present with plaintiff. D. Schroeder, Esq., M. McDonald, Esq., and T. Coffin, Esq. present for deft. Court introduces Special Settlement Master |

|  |  | John Schraven to parties. Court makes inquiries and counsel make statements re: reassigning case to Judge Kevin Doyle, trial length and timing, and 159 Motion to Unseal 140 Response in Opposition re: 139 Motion for Summary Judgment. Court makes findings. ORDERED: parties to submit stipulated order re: unsealing of exhibits 10 & 11 in 140 Response in Opposition re: 139 Motion for Summary Judgment. The parties shall also file a joint consent or objection to reassignment of the case to Magistrate Judge Kevin Doyle. (Court Reporter: Sunnie Donath) (eh) (Entered: 03/28/2024) |
| 03/28/2024 | 170 | ORDER Appointing John Schraven as Special Master. Signed by Chief Judge Geoffrey W. Crawford on 3/28/2024. (sjl) (Entered: 03/29/2024) |
| 04/02/2024 | 171 | JOINT CONSENT to Assignment of Case to Magistrate Judge Kevin J. Doyle by Dartmouth-Hitchcock Clinic, Dartmouth-Hitchcock Health, Dartmouth-Hitchcock Medical Center, Mary Hitchcock Memorial Hospital. (Coffin, Tristram) Modified on 4/3/2024 to clarify text (sjl). (Entered: 04/02/2024) |
| 04/03/2024 | 172 | NOTICE *Clarifying Consent* by Misty Blanchette Porter re 171 JOINT CONSENT to Assignment of Case to Magistrate Judge Kevin J. Doyle (Vitt, Geoffrey) Modified on 4/3/2024 to clarify text (sjl). (Entered: 04/03/2024) |
| 04/12/2024 | 173 | ORDER denying 159 Motion to Unseal 140 Response in Opposition re: 139 Motion for Summary Judgment On All Claims. Signed by Chief Judge Geoffrey W. Crawford on 4/12/2024. (eh) (Entered: 04/12/2024) |
| 04/16/2024 | 174 | ORDER OF REFERRAL. Having received the consent of both parties to the referral of this case to U.S. Magistrate Judge Kevin Doyle for trial, the court ORDERS that this case is assigned to Judge Doyle for all purposes including jury trial and any further motion practice. Chief Judge Geoffrey W. Crawford no longer assigned to case. Signed by Chief Judge Geoffrey W. Crawford on 4/16/2024. (sjl) (Entered: 04/16/2024) |
| 05/07/2024 | 175 | NOTICE of Hearing: Status Conference set for 5/16/2024 1:00 PM **via video conference** before Judge Kevin J. Doyle. (hbc) (Entered: 05/07/2024) |
| 05/16/2024 | 176 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Status Conference held on 5/16/2024. Present **via video conference** are Attys Geoffrey Vitt, Katherine Kramer, and Sarah Nunan for Plaintiff and Attys Tristram Coffin, Morgan McDonald, and Donald Schroeder for Defendants. Also present is Special Master John Schraven. Discussion/clarification re any trial will be held in Burlington. Review of potential trial dates discussed during 3/27/2024 Status Conference. Statements re possible duration of trial. Plaintiff requests trial begin on 1/27/2025 and Defendants request trial occur in late March, early April 2025. Counsel to confer w/ Plaintiff re proposal and will advise within a week. John Schraven confirms he has met with all the parties re settlement discussions. (Court Reporter: Recorded) (hbc) (Entered: 05/16/2024) |
| 05/28/2024 | 177 | MEMORANDUM Regarding Trial Date re: 176 Status Conference (Vitt, Geoffrey) Docket text simplified on 5/28/2024 (drg). (Entered: 05/28/2024) |
| 06/07/2024 | 178 | CERTIFIED ORDER of USCA Case No 20-3894 as to 154 Notice of Appeal filed by Misty Blanchette Porter. Costs are taxed in the amount of $1,458.50 in favor of Appellant. (law) (Entered: 06/07/2024) |
| 06/17/2024 | 179 | NOTICE of Hearing: Jury Draw set for 3/24/2025 at 9:00 AM in Burlington Courtroom 410 before Judge Kevin J. Doyle. Jury Trial will commence immediately following Jury Draw and will be held daily from 9:00 AM to 4:30 PM through 4/11/2025. (hbc) (Date corrected and Main Document 179 replaced on 9/30/2024) (hbc). (Entered: 06/17/2024) |
| 06/27/2024 | 180 | NOTICE OF APPEARANCE by Sarah H. Nunan, Esq on behalf of Misty Blanchette Porter.(Nunan, Sarah) (Entered: 06/27/2024) |

| | | |
|---|---|---|
| 09/30/2024 | 181 | NOTICE OF DOCKET ENTRY CORRECTION re: 179 NOTICE of Hearing: document has been replaced to correct the year in the date for Jury Trial. The corrected document is now attached to 179 as well as to this entry. (hbc) (Entered: 09/30/2024) |
| 10/21/2024 | 182 | MOTION for Status Conference *with Request for Oral Argument/Hearing* filed by Misty Blanchette Porter(Vitt, Geoffrey) Docket text clarified on 10/23/2024 (eh). (Entered: 10/21/2024) |
| 10/31/2024 | 183 | NOTICE OF APPEARANCE by Eric D. Jones, Esq on behalf of Misty Blanchette Porter. (Attachments: # 1 Certificate of Service)(Jones, Eric) (Entered: 10/31/2024) |
| 11/04/2024 | 184 | RESPONSE in Opposition re 182 MOTION for Status Conference filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Coffin, Tristram) Docket text clarified on 11/6/2024 (eh). (Entered: 11/04/2024) |
| 11/05/2024 | 185 | REPLY to Response to 182 MOTION for Status Conference filed by Misty Blanchette Porter. (Vitt, Geoffrey) Docket text clarified on 11/6/2024 (eh). (Entered: 11/05/2024) |
| 11/06/2024 | 186 | MOTION to Withdraw as Attorney *and Substitute Counsel* filed by Misty Blanchette Porter(Kramer, Katherine) (Entered: 11/06/2024) |
| 12/06/2024 | 187 | ORDER: 182 MOTION for Status Conference is DENIED. The Motion does not comply with Local Rule 7(a)(7), which requires a party filing a non-dispositive motion to certify that the party has made a good faith attempt to obtain the opposing party's agreement to the requested relief. Plaintiff represents that there may be "substantial pre-trial matters" in this case, and that a briefing schedule should be set to ensure timely resolution of any motions in limine. (Doc. 182 at 2.) Trial in this matter is scheduled to commence on March 24, 2025. The Court will schedule a pretrial conference to occur in early January 2025, at which time the Court and the parties will discuss the timing of pretrial motions and any other scheduling issues. Signed by Judge Kevin J. Doyle on 12/6/2024. (This is a text-only Order.) (cdc) (Entered: 12/06/2024) |
| 12/06/2024 | 188 | ORDER: 186 MOTION to Withdraw as Counsel and Substitute Counsel is GRANTED. Attorney Katherine Burghardt Kramer is relieved as counsel for Plaintiff, and Attorney Eric D. Jones is substituted in her place. Signed by Judge Kevin J. Doyle on 12/6/2024. (This is a text-only Order.) (cdc) (Entered: 12/06/2024) |
| 12/23/2024 | 189 | NOTICE of Hearing: Pretrial Conference set for 1/13/2025 at 2:00 PM in Burlington Courtroom 410 before Judge Kevin J. Doyle. (eh) (Entered: 12/23/2024) |
| 01/06/2025 | 190 | MOTION for Appearance Pro Hac Vice of Megan Martinez (Filing fee $ 150 receipt number AVTDC-2015520) filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health (Attachments: # 1 Affidavit of Megan Martinez, # 2 Certificate of Good Standing) (Coffin, Tristram) Modified on 1/6/2025 to include receipt number (sjl). (Entered: 01/06/2025) |
| 01/07/2025 | 191 | ORDER: 190 MOTION for Appearance Pro Hac Vice of Megan Martinez is GRANTED. Signed by Judge Kevin J. Doyle on 1/7/2025. (This is a text-only Order.) (cdc) (Entered: 01/07/2025) |
| 01/08/2025 | 192 | PRETRIAL MEMORANDUM by Misty Blanchette Porter (Vitt, Geoffrey) (Entered: 01/08/2025) |
| 01/10/2025 | 193 | DISCOVERY CERTIFICATE - Answer to Interrogatories and Request to Produce *Supplemental Interrogatory Answers* by Misty Blanchette Porter. (Vitt, Geoffrey) Text clarified on 1/13/2025 (hbc). (Entered: 01/10/2025) |

| | | |
|---|---|---|
| 01/13/2025 | 194 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Pretrial Conference held on 1/13/2025. E. Jones, Esq., G. Vitt, Esq., and S. Nunan, Esq. present with plaintiff. D. Schroeder, Esq., M. Martinez, Esq., and T. Coffin, Esq. present on behalf of defts. Court makes inquiries and counsel make statements re: trial logistics and potential unsealing of Exhibit 10 (Doc. 140 -12) and Exhibit 11 (Doc. 140 -13) of 140 Response in Opposition re: 139 Motion for Summary Judgment On All Claims. ORDERED: Jury Draw remains scheduled for 3/24/2025 at 9:00 AM. Jury Trial will commence immediately following Jury Draw and will be held daily from 9:00 AM to 4:30 PM through 4/11/2025. Motions in Limine due by 2/14/2025, responses due within 14 days of filing. Motion to Quash Trial Subpoena due by 2/14/2025. Jury Instructions and Expert Witness & Exhibits lists due by 3/10/2025. (Court Reporter: Recorded) (eh) (Entered: 01/17/2025) |
| 01/22/2025 | 195 | ORDER: During the pretrial conference held on 1/13/2025, Plaintiff advised of its intent to seek unsealing of Exhibit 10 (Doc. 140 -12) and Exhibit 11 (Doc. 140 -13) of 140 Response in Opposition re: 139 Motion for Summary Judgment. Defendants oppose unsealing. ORDERED: Motions regarding potential unsealing of Exhibits 10 and 11 due by 2/14/2025. (This is a text-only Order.) Signed by Judge Kevin J. Doyle on 1/22/2025. (eh) Docket text re: text-only order added on 1/22/2025 (eh). (Entered: 01/22/2025) |
| 01/22/2025 | 196 | REVISED NOTICE of Hearing (updating courtroom number and including Court Reporter): Jury Draw set for 3/24/2025 at 9:00 AM in Burlington Courtroom 110 before Judge Kevin J. Doyle. Jury Trial will commence immediately following Jury Draw and will be held daily from 9:00 AM to 4:30 PM through 4/11/2025. (eh) (Entered: 01/22/2025) |
| 02/04/2025 | 197 | MOTION *to Unseal Exhibits 10 & 11 for Trial* re 140 Response filed by Misty Blanchette Porter. (Vitt, Geoffrey) Text modified on 2/5/2025 (cdc). Event corrected/link added on 2/10/2025 (hbc). (Entered: 02/04/2025) |
| 02/14/2025 | 198 | MOTION in Limine *to Preclude the Testimony of Robert Bancroft* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(Coffin, Tristram) (Entered: 02/14/2025) |
| 02/14/2025 | 199 | MOTION to Quash *Dr. Joanne Conroy's Trial Subpoena* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health (Attachments: # 1 Memorandum in Support, # 2 Exhibit A) (Coffin, Tristram) (Entered: 02/14/2025) |
| 02/14/2025 | 200 | MOTION in Limine *to Preclude the "Cat's Paw" Theory of Liability* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B)(Coffin, Tristram) (Entered: 02/14/2025) |
| 02/14/2025 | 201 | MOTION in Limine *to Preclude Duplicative Testimony of Dr. Porter's Qualifications as a Physician* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Index of Exhibits, # 9 Exhibit G) (Coffin, Tristram) Additional attachments added on 2/18/2025 (cdc). (Entered: 02/14/2025) |
| 02/14/2025 | 202 | MOTION in Limine *to Preclude Inadmissible Hearsay and Character Evidence* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health (Attachments: # 1 Memorandum in Support)(Coffin, Tristram) (Entered: 02/14/2025) |

| | | |
|---|---|---|
| 02/18/2025 | 203 | NOTICE OF DOCKET ENTRY CORRECTION re: 201 MOTION in Limine. Index of Exhibits and Exhibit G were not uploaded at time of filing. They are now attached to 201 and this entry. (cdc) (Entered: 02/18/2025) |
| 02/18/2025 | 204 | RESPONSE in Opposition re 197 MOTION to Unseal Document *Exhibits 10 & 11 For Trial* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Coffin, Tristram) (Entered: 02/18/2025) |
| 02/21/2025 | 205 | REPLY to Response to 197 MOTION to Unseal Document *Exhibits 10 and 11* filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 02/21/2025) |
| 02/28/2025 | 206 | RESPONSE in Opposition re 199 MOTION to Quash *Dr. Joanne Conroy's Trial Subpoena* filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Vitt, Geoffrey) Attachment descriptions modified on 3/3/2025 (cdc). (Entered: 02/28/2025) |
| 02/28/2025 | 207 | RESPONSE in Opposition re 200 MOTION in Limine *to Preclude the "Cat's Paw" Theory of Liability* filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 02/28/2025) |
| 02/28/2025 | 208 | RESPONSE in Opposition re 198 MOTION in Limine *to Preclude the Testimony of Robert Bancroft* filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 02/28/2025) |
| 02/28/2025 | 209 | RESPONSE in Opposition re 202 MOTION in Limine *to Preclude Inadmissible Hearsay and Character Evidence* filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 02/28/2025) |
| 03/01/2025 | 210 | RESPONSE in Opposition re 201 MOTION in Limine *to Preclude Duplicative Testimony of Dr. Porter's Qualifications as a Physician* filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 03/01/2025) |
| 03/06/2025 | 211 | NOTICE of Hearing re: 198 , 200 - 202 MOTIONS in Limine and 199 MOTION to Quash *Dr. Joanne Conroy's Trial Subpoena*. An evidentiary hearing will be held on 198 MOTION in Limine *to Preclude the Testimony of Robert Bancroft*. Motion Hearing set for 3/14/2025 at 1:30 PM in Burlington Courtroom 410 before Judge Kevin J. Doyle. (eh) (Entered: 03/06/2025) |
| 03/07/2025 | 212 | REPLY to Response to 199 MOTION to Quash *Dr. Joanne Conroy's Trial Subpoena* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Attachments: # 1 Exhibit 1)(Coffin, Tristram) (Entered: 03/07/2025) |
| 03/07/2025 | 213 | MOTION to Amend *Complaint* filed by Misty Blanchette Porter (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Vitt, Geoffrey) Attachment description clarified on 3/7/2025 (cdc). (Entered: 03/07/2025) |
| 03/10/2025 | 214 | REPLY to Response to 200 MOTION in Limine *to Preclude the "Cat's Paw" Theory of Liability* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Coffin, Tristram) (Entered: 03/10/2025) |
| 03/10/2025 | 215 | WITNESS LIST by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health.. (Coffin, Tristram) (Entered: 03/10/2025) |
| 03/10/2025 | 216 | Entry removed from the docket. (Entered: 03/10/2025) |

| | | |
|---|---|---|
| 03/10/2025 | 217 | PROPOSED JURY INSTRUCTIONS by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Coffin, Tristram) (Entered: 03/10/2025) |
| 03/10/2025 | 218 | PROPOSED JURY INSTRUCTIONS by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 03/10/2025) |
| 03/10/2025 | 219 | EXHIBIT LIST *of Misty Blanchette Porter, M.D*. by Misty Blanchette Porter.. *(document image is sealed)* (Vitt, Geoffrey) Sealed on 4/15/2025 (eh). (Additional attachment(s) added on 4/22/2025: # 1 Main Document (redacted)) (eh). (Entered: 03/10/2025) |
| 03/10/2025 | 220 | WITNESS LIST by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 03/10/2025) |
| 03/10/2025 | 221 | EXHIBIT LIST by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (McDonald, Morgan) Text modified on 3/11/2025 (cdc). (Entered: 03/10/2025) |
| 03/11/2025 | 222 | NOTICE OF DOCKET ENTRY REMOVAL: Document 216 has been removed, see 221 for self-corrected filing. (cdc) (Entered: 03/11/2025) |
| 03/11/2025 | 223 | REPLY to Response to 198 MOTION in Limine *to Preclude the Testimony of Robert Bancroft* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Coffin, Tristram) (Entered: 03/11/2025) |
| 03/12/2025 | 224 | RESPONSE in Opposition re 213 MOTION to Amend *Complaint* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Coffin, Tristram) (Entered: 03/12/2025) |
| 03/13/2025 | 225 | REVISED NOTICE of Hearing re: 198 , 200 - 202 MOTIONS in Limine, 199 MOTION to Quash *Dr. Joanne Conroy's Trial Subpoena*, **and 213 MOTION to Amend *Complaint***. An evidentiary hearing will be held on 198 MOTION in Limine *to Preclude the Testimony of Robert Bancroft*. Motion Hearing set for 3/14/2025 at 1:30 PM in Burlington Courtroom 410 before Judge Kevin J. Doyle.(eh) (Entered: 03/13/2025) |
| 03/13/2025 | 226 | ORDER granting 197 MOTION to *Unseal Exhibits 10 & 11 for Trial* re 140 Response. Signed by Judge Kevin J. Doyle on 3/13/2025. (cdc) (Entered: 03/13/2025) |
| 03/13/2025 | | UNSEALED Document: 140 RESPONSE in Opposition unsealed and all attachments pursuant to 226 Order. (cdc) (Entered: 03/13/2025) |
| 03/13/2025 | 227 | SUPPLEMENTAL DOCUMENT(S) by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Coffin, Tristram) (Entered: 03/13/2025) |
| 03/14/2025 | 228 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Evidentiary Hearing and Motions Hearing held on 3/14/2025. Present with Plaintiff are Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan. Present on behalf of Defendants are Attorneys Donald Schroeder, Morgan McDonald, and Tristram Coffin. Evidentiary hearing re 198 MOTION in Limine *to Preclude the Testimony of Robert Bancroft*. Motion Hearing re 199 MOTION to Quash *Dr. Joanne Conroy's Trial Subpoena*, 200 MOTION in Limine *to Preclude the "Cat's Paw" Theory of Liability*, 201 MOTION in Limine *to Preclude Duplicative Testimony of Dr. Porter's Qualifications as a Physician*, 202 MOTION in Limine *to Preclude Inadmissible Hearsay and Character Evidence*, and 213 MOTION to Amend *Complaint*. **ORDERED:** Motions Taken Under Advisement. (Court Reporter: Recorded) (tml) (Entered: 03/18/2025) |
| 03/18/2025 | 229 | ORDER denying 201 MOTION in Limine *to Preclude Duplicative Testimony of Dr. Porter's Qualifications as a Physician*. Signed by Judge Kevin J. Doyle on 3/18/2025. |

| | | |
|---|---|---|
| | | (cdc) (Entered: 03/18/2025) |
| 03/19/2025 | 230 | TRANSCRIPT of Motions Hearing held on 3/14/2025, before Judge Kevin J. Doyle. Court Reporter/Transcriber Sunnie Donath, telephone number 802-747-3140. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/14/2025. Redacted Transcript Deadline set for 4/24/2025. Release of Transcript Restriction set for 6/20/2025. (cdc) (Entered: 03/19/2025) |
| 03/19/2025 | 231 | ORDER denying 202 MOTION in Limine *to Preclude Inadmissible Hearsay and Character Evidence*. Signed by Judge Kevin J. Doyle on 3/19/2025. (cdc) (Entered: 03/19/2025) |
| 03/20/2025 | 232 | MEMORANDUM by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health *Regarding Import Of Court Of Appeals Decision* (Coffin, Tristram) (Entered: 03/20/2025) |
| 03/20/2025 | 233 | ORDER denying 213 MOTION to Amend *Complaint*. Signed by Judge Kevin J. Doyle on 3/20/2025. (cdc) (Entered: 03/20/2025) |
| 03/20/2025 | 234 | ORDER denying 199 MOTION to Quash *Dr. Joanne Conroy's Trial Subpoena*. Signed by Judge Kevin J. Doyle on 3/20/2025. (cdc) (Entered: 03/20/2025) |
| 03/20/2025 | 235 | RENEWED MOTION to Preclude *Testimony of Robert Bancroft Based on New March 19, 2025 Report* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health (Attachments: # 1 Exhibit A, # 2 Exhibit B)(McDonald, Morgan) Text clarified on 3/21/2025 (hbc). (Entered: 03/20/2025) |
| 03/21/2025 | 236 | RESPONSE in Opposition re 235 RENEWED MOTION to Preclude *Testimony of Robert Bancroft Based on New March 19, 2025 Report* filed by Misty Blanchette Porter. (Jones, Eric) Text clarified on 3/21/2025 (hbc). (Entered: 03/21/2025) |
| 03/21/2025 | 237 | EXHIBIT LIST (Updated) by Misty Blanchette Porter. *(document image is sealed)* (Jones, Eric) Text clarified on 3/21/2025 (hbc). Sealed on 4/15/2025 (eh). (Additional attachment(s) added on 4/22/2025: # 1 Main Document (redacted)) (eh). (Entered: 03/21/2025) |
| 03/21/2025 | 238 | ORDER denying 198 MOTION in Limine *to Preclude the Testimony of Robert Bancroft* and denying 235 RENEWED MOTION to Preclude *Testimony of Robert Bancroft Based on New March 19, 2025 Report*. Signed by Judge Kevin J. Doyle on 3/21/2025. (hbc) (Entered: 03/21/2025) |
| 03/21/2025 | 239 | ORDER denying 200 MOTION in Limine *to Preclude the "Cat's Paw" Theory of Liability*. Signed by Judge Kevin J. Doyle on 3/21/2025. (hbc) (Entered: 03/21/2025) |
| 03/21/2025 | 240 | EXHIBIT LIST *(Amended)* by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (McDonald, Morgan) (Entered: 03/21/2025) |
| 03/23/2025 | 241 | EXHIBIT LIST *(Second Amended)* by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Martinez, Megan) (Entered: 03/24/2025) |
| 03/24/2025 | 242 | PROPOSED VOIR DIRE by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Martinez, Megan) (Entered: 03/24/2025) |

| 03/24/2025 | 243 | EXHIBIT LIST *(Third Amended)* by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Martinez, Megan) (Entered: 03/24/2025) |
|---|---|---|
| 03/24/2025 | 244 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Selection held on 3/24/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Juror Orientation held by court. Clerk swears in Jury Pool. Court seats 28 potential jurors. Plaintiff's voir dire held. Jury excused at 11:45 am and instructed to return at 12:45 pm. Jury returns at 12:54 pm. Defendants' voir dire held. Jury of 12 chosen. Clerk swears in Jury. Preliminary Jury Instructions provided. Parties give opening statements. Jury excused at 4:13 pm. Trial to resume 3/25/2025 at 9:00 am. (Court Reporter: Jan-Marie Glaze) (eh) text clarified on 3/25/2025 (eh). (Entered: 03/25/2025) |
| 03/24/2025 | 245 | JURY Seating Arrangement. (Document is sealed). (eh) (Entered: 03/25/2025) |
| 03/24/2025 | 246 | JOINT STATEMENT of the Case. (eh) (Entered: 03/25/2025) |
| 03/25/2025 | 247 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 2) held on 3/25/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court convenes at 9:16 am and jury enters courtroom at 9:22 am. Sharon Parent & Julia MacCallum sworn as plaintiff witnesses. Jury excused at 12:02 pm for lunch. Court reconvenes at 1:04 pm and jury returns at 1:11 pm with Julia MacCallum on the witness stand. Plaintiff Misty Blanchette Porter sworn. Jury excused at 4:19 pm. ORDERED: Trial to resume 3/26/2025 at 9:00 am. (Court Reporter: Jan-Marie Glaze) (eh) (Entered: 03/26/2025) |
| 03/26/2025 | 248 | MOTION in Limine *to Preclude the Expert Report* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health(Martinez, Megan) (Entered: 03/26/2025) |
| 03/26/2025 | 249 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 3) held on 3/26/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court convenes at 9:01 am and jury enters at 9:11 am. Plaintiff Misty Blanchette Porter sworn. Jury excused for lunch at 12:05 pm. Court reconvenes at 1:07 pm and jury enters the courtroom at 1:15 pm with Plaintiff on the witness stand. Jury excused at 4:33 pm and court adjourns at 4:36 pm. ORDERED: Hearing re: 248 MOTION in Limine *to Preclude the Expert Report* to be held 8:30 am 3/27/2025 outside presence of the jury. Trial to resume 3/27/2025 at 9:00 am. (Court Reporter: Jan-Marie Glaze) (eh) (Entered: 03/27/2025) |
| 03/27/2025 | 250 | EXHIBIT LIST *Plaintiff's 2nd Updated Exhibit List (document image is sealed)* by Misty Blanchette Porter.. (Jones, Eric) Sealed on 4/15/2025 (eh). (Additional attachment(s) added on 4/22/2025: # 1 Main Document (redacted)) (eh). (Entered: 03/27/2025) |
| 03/27/2025 | 251 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Motion Hearing held on 3/27/2025 re 248 MOTION in Limine *to Preclude the Expert Report* held outside presence of jury. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court makes inquiries and counsel make statements. Parties stipulate to modified version of expert report and will revisit demonstrative/evidentiary admissibility at a future point in trial. ORDERED: Court defers ruling on 248 MOTION in Limine *to Preclude the Expert Report* re: demonstrative/evidentiary admissibility pending further argument by counsel. (Court Reporter: Jan-Marie Glaze) (eh) (Entered: 03/28/2025) |

| 03/27/2025 | 252 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 4) held on 3/27/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court convenes at 9:00 am and jury enters at 10:03 am. Plaintiff Misty Blanchette Porter sworn. Jury excused for lunch at 11:57 am. Court reconvenes at 1:07 pm and jury returns at 1:17 pm with Plaintiff on the witness stand. Jury excused for 2:02 pm and court adjourns at 2:03 pm. ORDERED: Trial to resume 3/28/2025 at 9:00 am. (Court Reporter: Jan-Marie Glaze) (eh) (Entered: 03/28/2025) |
|---|---|---|
| 03/28/2025 | 253 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 5) held on 3/28/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court convenes at 9:01 am. Jury enters courtroom at 9:04 am. Jenice Gonyea, Victoria Maxfield, Karen George, and Maria Padin sworn as plaintiff witnesses. Jury excused for lunch and court reconvenes at 1:17 pm with Maria Padin on the witness stand. Robert Bancroft sworn as plaintiff witness. Jury exits the courtroom at 2:16 pm. Court and counsel make inquiries of Robert Bancroft re: report. Court takes recess and reconvenes at 2:57 pm outside presence of the jury. Counsel make statements and court makes findings. ORDERED: Deft to submit written submissions re: R. Bancroft report disclosure by 7:00 pm 3/29/2025. Plaintiff to file a response by 5:00 pm 3/30/2025. Jury reenters courtroom at 3:11 pm and is discharged for the day. Court adjourns at 3:37 pm. ORDERED: Oral arguments re: R. Bancroft report disclosure to be held 8:00 am 3/31/2025 outside presence of the jury. Jury trial to resume 9:00 am 3/31/2025. (Court Reporter: Jan-Marie Glaze) (eh) (Entered: 03/28/2025) |
| 03/29/2025 | 254 | MOTION in Limine *Regarding Undisclosed Expert Opinions of Bancroft* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Martinez, Megan) Attachment names clarified on 3/31/2025 (hbc). (Entered: 03/29/2025) |
| 03/30/2025 | 255 | WITNESS LIST (Updated) by Misty Blanchette Porter. (Vitt, Geoffrey) Text added on 3/31/2025 (hbc). (Entered: 03/30/2025) |
| 03/30/2025 | 256 | RESPONSE in Opposition re 254 MOTION in Limine *Regarding Undisclosed Expert Opinions of Bancroft* filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 03/30/2025) |
| 03/30/2025 | 257 | RESPONSE in Opposition re 254 MOTION in Limine *Regarding Undisclosed Expert Opinions of Bancroft [CORRECTED to include Exhibits]* filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Vitt, Geoffrey) Attachment descriptions corrected on 3/31/2025 (hbc). (Entered: 03/30/2025) |
| 03/31/2025 | 258 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Motion Hearing held on 3/31/2025 re 254 MOTION in Limine *Regarding Undisclosed Expert Opinions of Bancroft* held outside presence of jury. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court makes inquiries and counsel make statements. Court makes findings ORDERED: 254 MOTION in Limine *Regarding Undisclosed Expert Opinions of Bancroft* is denied. (Court Reporter: Sunnie Donath) (eh) (Entered: 03/31/2025) |
| 03/31/2025 | 259 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 6) held on 3/31/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present |

for Defendants. Court convenes at 9:21 am. Robert Bancroft sworn as plaintiff witness. Jury excused for lunch at 12:26 pm and court reconvenes at 1:32 pm. Jury reenters courtroom at 1:40 pm with Robert Bancroft on the witness stand. Leslie DeMars sworn as plaintiff witness. Jury excused for the day at 4:30 pm. ORDERED: Jury trial to resume 9:00 am 4/1/2025. (Court Reporter: Sunnie Donath) (eh) (Entered: 03/31/2025)

| 04/01/2025 | 260 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 7) held on 4/1/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Jury enters at 9:03 am. Leslie DeMars sworn as plaintiff witness. Jury excused for lunch at 12:00 pm. Court reconvenes at 1:03 pm. Defense makes oral motion re: testimony of Michelle Russell. Counsel make statements. Jury enters courtroom at 1:17 pm and exits at 1:51 pm. Court revisits oral motion re: Michelle Russell outside presence of jury. Court takes recess at 1:52 pm and reconvenes at 2:12 pm. Court makes findings. ORDERED: Defendant's oral motion re: testimony of Michelle Russell is granted in part and denied in part. Court issues limiting instructions re: Michelle Russell's testimony. Jury enters courtroom at 2:29 pm. Michelle Russell, Joanne Conroy, and Ira Bernstein sworn as Plaintiff witness. Jury excused at 4:19 pm. Court adjourns at 4:28 pm. ORDERED: Jury trial to resume 9:00 am 4/2/2025. (Court Reporter: Sunnie Donath) (eh) (Entered: 04/02/2025) |
| 04/02/2025 | 261 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 8) held on 4/2/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Jury enters the courtroom at 9:04 am. Edward Merrens sworn as plaintiff witness. Jury takes morning break at 10:16 am; Plaintiff rests and parties make statements re: admissibility of R. Bancroft exhibit and chart. Court makes findings. ORDERED: R. Bancroft exhibit and chart are not admitted into evidence but can be used for demonstrative purposes. Deft makes motion for directed verdict. Court takes recess at 10:27 am and reconvenes at 10:43 am. Jury reenters at 10:48 am and is excused for lunch until 1:00 pm. Counsel make oral arguments re: Defendant's Oral Motion for Directed Verdict. Court takes recess at 11:57 am and reconvenes at 12:51 pm. Court makes findings. ORDERED: Defendant's Oral Motion for Directed Verdict is denied. Jury enters courtroom at 1:04 pm. Judith Stern, Kathleen Mansfield, and Kelley Mousley sworn as defendant witnesses. Court adjourns at 4:02 pm. ORDERED: Jury trial to resume 9:00 am 4/3/2025. (Court Reporter: Sunnie Donath) (eh) (Entered: 04/02/2025) |
| 04/03/2025 | 262 | PROPOSED JURY INSTRUCTIONS by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Martinez, Megan) (Entered: 04/03/2025) |
| 04/03/2025 | 263 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 9) held on 4/3/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court convenes at 8:57 am. Jury enters the courtroom at 9:20 am. Edward Merrens sworn as defendant witness. Jury excused for lunch at 11:59 am. Court reconvenes at 1:03 pm and jury enters courtroom at 1:05 pm. Daniel Herrick and Heather Gunnell sworn as defendant witnesses. Jury excused at 4:10 pm. Court adjourns at 4:13 pm. ORDERED: Jury trial to resume 9:00 am 4/4/2025. (Court Reporter: Sunnie Donath) (eh) (Entered: 04/04/2025) |
| 04/04/2025 | 264 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 10) held on 4/4/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Jury enters the courtroom at 9:10 am. Jocelyn Chertoff and Maria Padin sworn as defendant witnesses. Jury takes morning break at 10:29 am. Defendant rests and |

renews Motion for Directed Verdict. Court takes a recess and returns at 11:03 am. ORDERED: Defendant's Oral Motion for Directed Verdict is denied. Court makes inquiries and counsel make statements re: rebuttal case. Jury reenters courtroom at 11:28 and is excused for lunch until 12:45 pm. Court reconvenes at 12:33 pm and makes findings and instructions re: rebuttal case. Jury enters courtroom at 12:51 pm. Eunice Lee sworn as plaintiff witness for rebuttal case. Plaintiff rests and jury excused at 1:30 pm. Court adjourns at 1:36 pm. ORDERED: Jurors to report 4/8/2025 at 9:00 am for closings and jury charge. Parties to hold a charge conference 4/7/2025 at 1:00 pm. (Court Reporter: Sunnie Donath) (eh) Docket text updated on 4/9/2025 (eh). (Entered: 04/04/2025)

| | | | |
|---|---|---|---|
| 04/04/2025 | 265 | EXHIBIT LIST *Updated Redacted (document image is sealed)* by Misty Blanchette Porter.. (Vitt, Geoffrey) Sealed on 4/15/2025 (eh). (Additional attachment(s) added on 4/22/2025: # 1 Main Document (redacted)) (eh). (Entered: 04/04/2025) | |
| 04/06/2025 | 266 | MOTION requesting (i) a jury instruction to the effect that the jury should not include pre-judgment interest in connection with any damages awarded to Dr. Porter, and (ii) that, if the jury determines that Dr. Porter is indeed entitled to damages, the Court apply the federal interest rate filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health(Martinez, Megan) (Entered: 04/06/2025) | |
| 04/06/2025 | 267 | MOTION to preclude any reduction of damages based on conditional offer of severance pay filed by Misty Blanchette Porter(Vitt, Geoffrey) (Entered: 04/06/2025) | |
| 04/06/2025 | 268 | RESPONSE in Opposition re 266 MOTION requesting (i) a jury instruction to the effect that the jury should not include pre-judgment interest in connection with any damages awarded to Dr. Porter, and (ii) that, if the jury determines that Dr. Porter is indeed entitled to damages, th filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 04/06/2025) | |
| 04/06/2025 | 269 | RESPONSE in Opposition re 267 MOTION to preclude any reduction of damages based on conditional offer of severance pay filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Martinez, Megan) (Entered: 04/06/2025) | |
| 04/07/2025 | 270 | COURT'S PROPOSED JURY INSTRUCTIONS. (eh) (Entered: 04/07/2025) | |
| 04/07/2025 | 271 | COURT'S PROPOSED JURY VERDICT FORM. (eh) (Entered: 04/07/2025) | |
| 04/07/2025 | 272 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Charge Conference (Trial Day 11) held on 4/7/2025.. Attorneys Eric Jones and Geoffrey Vitt present on behalf of Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court makes inquiries and counsel make statements re: 270 Court's Proposed Jury Instructions and 271 Court's Proposed Verdict Form. Court makes inquiries and counsel make statements re: 266 MOTION requesting (i) a jury instruction to the effect that the jury should not include pre-judgment interest in connection with any damages awarded to Dr. Porter, and (ii) that, if the jury determines that Dr. Porter is indeed entitled to damages, the Court apply the federal interest rate and 267 MOTION to preclude any reduction of damages based on conditional offer of severance pay. Court makes findings. Court revisits ruling re: R. Bancroft exhibit and does not allow document to be used as an exhibit or for demonstrative purposes. ORDERED: 266 MOTION requesting (i) a jury instruction to the effect that the jury should not include pre-judgment interest in connection with any damages awarded to Dr. Porter, and (ii) that, if the jury determines that Dr. Porter is indeed entitled to damages, the Court apply the federal interest rate is denied as moot. 267 MOTION to preclude any reduction of damages based on conditional offer of severance pay is taken under advisement. Parties to meet at 8:30 am 4/8/2025 to review revised jury instructions and verdict form. Trial to commence 9:00 | |

| | | am. (Court Reporter: Sunnie Donath) (eh) Text clarified on 4/9/2025 (eh). (Entered: 04/07/2025) |
|---|---|---|
| 04/08/2025 | 273 | ASSENTED-TO MOTION seal previous exhibit lists re 265 Exhibit List, 250 Exhibit List, 237 Exhibit List, 219 Exhibit List filed by Misty Blanchette Porter(Vitt, Geoffrey) (Entered: 04/08/2025) |
| 04/08/2025 | 274 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 12) held on 4/8/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court convenes at 8:36 am to review revised jury instructions and verdict form. Counsel makes statements re: 267 MOTION to preclude any reduction of damages based on conditional offer of severance pay. Court makes findings. ORDERED: 267 MOTION to preclude any reduction of damages based on conditional offer of severance pay is granted in part and denied in part based on limitations provided on the record. Jury enters the courtroom at 9:10 am. Plaintiff and Defendant make closing statements, Plaintiff makes rebuttal. Jury excused at 11:37 am for lunch. Court reconvenes at 12:50 pm. Defendant moves to strike rebuttal statement. Court takes a brief recess and reconvenes at 1:10 pm. Court makes findings. OREDERED: Defendant's Oral Motion to Strike Rebuttal Statement is denied. Jury enters courtroom at 1:11 pm. Court reads jury charge and appoints foreperson. Jury exits the courtroom at 2:13 pm and reenters at 2:15 pm to receive instructions from the court re: time for deliberation. Jury exits the courtroom at 2:18 pm and begins deliberations. Court officers sworn. Court receives Jury Note #1 and convenes at 4:31 pm. Jury enters the courtroom at 4:32 pm and are excused at 4:33 pm. ORDERED: Deliberations to resume 9:00 am 4/9/2025. (Court Reporter: Sarah Bentley, Bentley Court Reporters) (eh) Text clarified on 4/10/2025 (eh). (Entered: 04/09/2025) |
| 04/08/2025 | 275 | JURY CHARGE. (Attachments: # 1 Main Document *(unredacted, sealed)*) (eh) (Entered: 04/09/2025) |
| 04/08/2025 | 276 | JURY NOTE #1. (Document image is sealed).. (eh) (Entered: 04/09/2025) |
| 04/09/2025 | 277 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 13) held on 4/9/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Jury in deliberations. Court convenes at 4:29 pm re: Jury Notes 2 & 3. Jury enters at 4:32 and are excused at 4:33 pm for the day. ORERED: Court to meet with counsel re: jury request at 8:30 am 4/10/2025. Jury to resume deliberations at 9:00 am. (Court Reporter: Sarah Bentley, Bentley Court Reporters) (eh) (Entered: 04/10/2025) |
| 04/09/2025 | 278 | JURY NOTE #2. (Document image is sealed). (eh) (Entered: 04/10/2025) |
| 04/09/2025 | 279 | JURY NOTE #3. (Document image is sealed). (eh) (Entered: 04/10/2025) |
| 04/10/2025 | 280 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial held on 4/10/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court convenes at 8:36; counsel and court makes statement re: jury note. Jury enters the courtroom at 9:13 am and Court give instruction re: request. Jury exits the courtroom at 9:16 am to continue deliberations. Court reconvenes at 10:42 am and reviews new jury note. Court reconvenes at 4:06 pm and informs parties of jury note re: verdict. Jury enters courtroom at 4:07 pm. Deputy clerk reads verdict. Jurors exit the courtroom at 4:15 pm. Counsel make statements re: post trial motions. Court makes findings. ORDERED: Parties to file post trial motions due in 28 days. (Court Reporter: Sarah Bentley, Bentley Court Reporters) (eh) (Entered: 04/10/2025) |

| 04/10/2025 | 281 | JURY VERDICT. (Attachments: # 1 Main Document *(unredacted, sealed)*) (eh) (Entered: 04/10/2025) |
|---|---|---|
| 04/10/2025 | 282 | JURY NOTE #4. (Document image is sealed). (eh) (Entered: 04/10/2025) |
| 04/10/2025 | 283 | JURY NOTE #5. (Document image is sealed). (eh) (Entered: 04/10/2025) |
| 04/10/2025 | 285 | OFFICIAL EXHIBIT LIST. (eh) (Entered: 04/15/2025) |
| 04/10/2025 | 286 | OFFICIAL WITNESS LIST. (eh) (Entered: 04/15/2025) |
| 04/15/2025 | 284 | ORDER granting in part and denying in part 273 ASSENTED-TO MOTION seal previous exhibit lists re 265 Exhibit List, 250 Exhibit List, 237 Exhibit List, 219 Exhibit List. The Court will not seal the previous exhibit lists in their entirety. On or before 4/22/2025, Plaintiff shall file proposed Exhibit Lists that redact the relevant patient information but otherwise permit public access to the previous Exhibit Lists. Signed by Judge Kevin J. Doyle on 4/15/2025. (This is a text-only Order.) (eh) (Entered: 04/15/2025) |
| 04/18/2025 | 287 | TRANSCRIPT of Trial Testimony of Dr. Misty Blanchette Porter held on 3/25/2025-3/27/2025, before Judge Kevin J. Doyle. Court Reporter/Transcriber Jan-Marie Glaze, telephone number (253) 312-0257. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2025. Redacted Transcript Deadline set for 5/22/2025. Release of Transcript Restriction set for 7/21/2025. (eh) (Entered: 04/18/2025) |
| 04/22/2025 | 288 | NOTICE OF DOCKET ENTRY CORRECTION re: 219 , 237 , 250 , and 265 Exhibit Lists. A redacted copy of each exhibit list has been added and can be found attached to 219 , 237 , 250 , 265 and this entry. (Attachments: # 1 Document 237, # 2 Document 250, # 3 Document 265) (eh) (Entered: 04/22/2025) |
| 04/23/2025 | 289 | MOTION for Clarification Regarding Deadline for Post-Trial Motions filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health(Martinez, Megan) (Entered: 04/23/2025) |
| 04/23/2025 | 290 | TRANSCRIPT of Jury Trial (Day 6) hearing held on 3/31/2025, before Judge Kevin J. Doyle. Court Reporter/Transcriber Sunnie Donath, telephone number (802) 747-3140. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/19/2025. Redacted Transcript Deadline set for 5/30/2025. Release of Transcript Restriction set for 7/25/2025. (eh) (Entered: 04/23/2025) |
| 04/23/2025 | 291 | TRANSCRIPT of Jury Trial (Day 7) hearing held on 4/1/2025, before Judge Kevin J. Doyle. Court Reporter/Transcriber Sunnie Donath, telephone number (802) 747-3140. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/19/2025. Redacted Transcript Deadline set for 5/30/2025. Release of Transcript Restriction set for 7/25/2025. (eh) (Entered: 04/23/2025) |
| 04/23/2025 | 292 | TRANSCRIPT of Jury Trial (Day 8) hearing held on 4/2/2025, before Judge Kevin J. Doyle. Court Reporter/Transcriber Sunnie Donath, telephone number (802) 747-3140. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/19/2025. Redacted |

| | | |
|---|---|---|
| | | Transcript Deadline set for 5/30/2025. Release of Transcript Restriction set for 7/25/2025. (eh) (Entered: 04/23/2025) |
| 04/23/2025 | 293 | TRANSCRIPT of Jury Trial (Day 9) hearing held on 4/3/2025, before Judge Kevin J. Doyle. Court Reporter/Transcriber Sunnie Donath, telephone number (802) 747-3140. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/19/2025. Redacted Transcript Deadline set for 5/30/2025. Release of Transcript Restriction set for 7/25/2025. (eh) (Entered: 04/23/2025) |
| 04/23/2025 | 294 | TRANSCRIPT of Jury Trial (Day 10) hearing held on 4/4/2025, before Judge Kevin J. Doyle. Court Reporter/Transcriber Sunnie Donath, telephone number (802) 747-3140. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/19/2025. Redacted Transcript Deadline set for 5/30/2025. Release of Transcript Restriction set for 7/25/2025. (eh) (Entered: 04/23/2025) |
| 04/23/2025 | 295 | TRANSCRIPT of Jury Trial (Day 11)- Charge Conference hearing held on 4/7/2025, before Judge Kevin J. Doyle. Court Reporter/Transcriber Sunnie Donath, telephone number (802) 747-3140. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/19/2025. Redacted Transcript Deadline set for 5/30/2025. Release of Transcript Restriction set for 7/25/2025. (eh) (Entered: 04/23/2025) |
| 04/23/2025 | 296 | MOTION for Prejudgment Interest filed by Misty Blanchette Porter(Vitt, Geoffrey) (Entered: 04/23/2025) |
| 04/24/2025 | 297 | JUDGMENT is hereby entered in the amount of $1,125,000.00 for Plaintiff Misty Blanchette Porter, against Defendants Dartmouth-Hitchcock MedicalCenter, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health. Signed by Deputy Clerk on 4/24/2025. (Attachments: # 1 Notice to Litigants *(appeal period expires 5/27/2025)*)(eh) (Entered: 04/24/2025) |
| 04/24/2025 | 298 | ORDER granting 289 Motion for Clarification Regarding Deadline for Post-Trial Motions. Post-Trial Motions shall be filed 28 days from the date of Entry of Judgment on the docket of this Court. Signed by Judge Kevin J. Doyle on 4/24/2025. (This is a text-only Order.) (eh) (Entered: 04/24/2025) |
| 05/07/2025 | 299 | RESPONSE in Opposition re 296 MOTION for Prejudgment Interest filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6)(Martinez, Megan) (Entered: 05/07/2025) |
| 05/08/2025 | 300 | MOTION for Attorney Fees filed by Misty Blanchette Porter (Attachments: # 1 Declaration of Geoffrey J. Vitt, # 2 Declaration of Eric Jones, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C)(Vitt, Geoffrey) (Entered: 05/08/2025) |
| 05/08/2025 | 301 | BILL OF COSTS by Misty Blanchette Porter. (Attachments: # 1 Exhibit A)(Vitt, Geoffrey) (Entered: 05/08/2025) |
| 05/08/2025 | 302 | MOTION to Alter Judgment filed by Misty Blanchette Porter(Vitt, Geoffrey) (Entered: 05/08/2025) |

A-31

| 05/12/2025 | 303 | MOTION for Access to Audio Recordings of Trial Proceedings filed by Susan Burton. (cdc) (Entered: 05/12/2025) |
|---|---|---|
| 05/21/2025 | 304 | REPLY to Response to 296 MOTION for Prejudgment Interest filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit A, # 2 Exhibit B) ( Vitt, Geoffrey) Attachment description modified on 6/6/2025 (cdc). (Entered: 05/21/2025) |
| 05/22/2025 | 305 | MOTION to Alter Judgment & MOTION for New Trial *on Plaintiff's VFEPA Claim with Request for Oral Argument/Hearing* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health (McDonald, Morgan) Text odified on 5/22/2025 (cdc). (Entered: 05/22/2025) |
| 05/22/2025 | 306 | RESPONSE in Opposition re 302 MOTION to Alter Judgment filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (McDonald, Morgan) (Entered: 05/22/2025) |
| 05/22/2025 | 307 | NOTICE *of Objection to Plaintiff's Bill of Costs* by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health (McDonald, Morgan) (Entered: 05/22/2025) |
| 05/22/2025 | 308 | MOTION for New Trial *Related to Damages Issues with Request for Oral Argument/Hearing* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4)(McDonald, Morgan) (Entered: 05/22/2025) |
| 05/22/2025 | 309 | RESPONSE in Opposition re 300 MOTION for Attorney Fees filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (McDonald, Morgan) (Entered: 05/22/2025) |
| 05/27/2025 | 310 | NOTICE OF APPEAL as to 297 Judgment by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (Filing fee $ 605 receipt number AVTDC-2080613) (McDonald, Morgan) (Entered: 05/27/2025) |
| 05/27/2025 | 311 | RESPONSE in Opposition re 303 MOTION Access to Audio Recordings of Trial Proceedings filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (McDonald, Morgan) (Entered: 05/27/2025) |
| 06/02/2025 | 312 | ORDER denying 303 MOTION for Access to Audio Recordings of Trial Proceedings. The transcript is the official record of proceedings in this case. Under the Guide to Judiciary Policy, there is no public entitlement to back-up recordings in these circumstances. Signed by Judge Kevin J. Doyle on 6/2/2025. (This is a text-only Order.) (cdc) (Entered: 06/02/2025) |
| 06/03/2025 | 313 | TRANSMITTED Index on Appeal, Circuit No. 25-1382, re: 310 Notice of Appeal, (Attachments: # 1 Docket Sheet (public), # 2 Partial Docket Sheet (sealed), # 3 Clerk's Certification)(kac) (Entered: 06/03/2025) |
| 06/05/2025 | 314 | RESPONSE in Opposition re 305 MOTION to Alter Judgment & 305 MOTION for New Trial *on Plaintiff's VFEPA Claim* filed by Misty Blanchette Porter. (Vitt, Geoffrey) Text modified on 6/6/2025 (cdc). (Entered: 06/05/2025) |
| 06/05/2025 | 315 | REPLY to Response to 302 MOTION to Alter Judgment filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 06/05/2025) |
| 06/05/2025 | 316 | RESPONSE in Opposition re 308 MOTION for New Trial *Related to Damages Issues* filed by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 06/05/2025) |

| | | |
|---|---|---|
| 06/05/2025 | 317 | REPLY to Response to 300 MOTION for Attorney Fees *OBJECTION TO BILL OF COSTS* filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Vitt, Geoffrey) Attachment description modified on 6/6/2025 (cdc). (Entered: 06/05/2025) |
| 06/05/2025 | 318 | REPLY to Response to 300 MOTION for Attorney Fees filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit A) (Vitt, Geoffrey) Attachment description modified on 6/6/2025 (cdc). (Entered: 06/05/2025) |
| 06/05/2025 | 319 | BILL OF COSTS *Revised* by Misty Blanchette Porter (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Vitt, Geoffrey) Attachment description modified on 6/6/2025 (cdc). (Entered: 06/05/2025) |
| 06/06/2025 | 320 | NOTICE of Hearing re: Plaintiff's 296 MOTION for Prejudgment Interest, 300 MOTION for Attorney Fees, 301 , 319 BILL of Costs, 302 MOTION to Alter Judgment; Defendants' 305 MOTION to Alter Judgment, MOTION for New Trial *on Plaintiff's VFEPA Claim*, 308 MOTION for New Trial *Related to Damages Issues*. Motion Hearing set for 7/1/2025 at 10:30 AM in Burlington Courtroom 410 before Judge Kevin J. Doyle. (hbc) (Entered: 06/06/2025) |
| 06/17/2025 | 321 | MAIL RETURNED as Undeliverable re: 312 Order. Mail sent to Susan Burton (Attachments: # 1 Document 312) (eh) (Entered: 06/18/2025) |
| 06/18/2025 | 322 | TRANSCRIPT of Jury Trial (Day 12) held on 4/8/2025 before Judge Kevin J. Doyle re: 310 Notice of Appeal. Court Reporter/Transcriber Sarah M. Bentley, email: sbireland7@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/14/2025. Redacted Transcript Deadline set for 7/24/2025. Release of Transcript Restriction set for 9/19/2025. (eh) (Entered: 06/18/2025) |
| 06/18/2025 | 323 | TRANSCRIPT of Jury Trial (Day 14) held on 4/10/2025 before Judge Kevin J. Doyle re: 310 Notice of Appeal. Court Reporter/Transcriber Sarah M. Bentley, email: sbireland7@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/14/2025. Redacted Transcript Deadline set for 7/24/2025. Release of Transcript Restriction set for 9/19/2025. (eh) (Entered: 06/18/2025) |
| 06/20/2025 | 324 | REPLY to Response to 305 MOTION to Alter Judgment MOTION for New Trial *on Plaintiff's VFEPA Claim* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (McDonald, Morgan) (Entered: 06/20/2025) |
| 06/20/2025 | 325 | REPLY to Response to 308 MOTION for New Trial *Related to Damages Issues* filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (McDonald, Morgan) (Entered: 06/20/2025) |
| 06/25/2025 | 326 | SUPPLEMENTAL DOCUMENT(S) re: 300 MOTION for Attorney Fees by Misty Blanchette Porter. (Vitt, Geoffrey) (Entered: 06/25/2025) |
| 06/27/2025 | 327 | TRANSMITTED Supplemental Index on Appeal, Circuit No. 25-1382, re 310 Notice of Appeal. (Attachments: # 1 Partial Docket Sheet, # 2 Clerk's Certification)(kac) (Entered: 06/27/2025) |
| 07/01/2025 | 328 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Motion Hearing held on 7/1/2025 re Plaintiff's 296 MOTION for Prejudgment Interest, 300 MOTION for |

| | | |
|---|---|---|
| | | Attorney Fees, and 302 MOTION to Alter Judgment; Defendants' 305 MOTION to Alter Judgment, MOTION for New Trial *on Plaintiff's VFEPA Claim*, and 308 MOTION for New Trial *Related to Damages Issues*. Present are Attys Eric Jones, Geoffrey Vitt, and Sarah Nunan with Plaintiff and Attys Donald Schroeder, Megan Martinez, and Morgan McDonald for Defendants. Arguments by counsel. Court makes findings: All motions taken under advisement. (Court Reporter: Recorded) (tml) (Entered: 07/01/2025) |
| 07/07/2025 | 329 | ORDER: Plaintiff's Second Supplemental Memorandum re: 300 Motion for Attorney Fees due by 7/11/2025. Signed by Judge Kevin J. Doyle on 7/7/2025. (cdc) (Entered: 07/07/2025) |
| 07/11/2025 | 330 | REPLY to Response to 300 MOTION for Attorney Fees *Second Supplemental Memo* filed by Misty Blanchette Porter. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Vitt, Geoffrey) (Entered: 07/11/2025) |
| 07/18/2025 | 331 | SUR-REPLY to 300 MOTION for Attorney Fees filed by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health. (McDonald, Morgan) (Entered: 07/18/2025) |
| 07/24/2025 | 332 | TRANSCRIPT filed for date(s) of July 1, 2025, before Judge Kevin J. Doyle as to 310 Notice of Appeal. Court Reporter/Transcriber Johanna Masse, telephone number (802) 951-8102. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/18/2025. Redacted Transcript Deadline set for 8/28/2025. Release of Transcript Restriction set for 10/27/2025. (law) (Entered: 07/24/2025) |
| 07/29/2025 | 333 | TRANSMITTED Second Supplemental Index on Appeal, Circuit No. 25-1382, re: 310 Notice of Appeal. (Attachments: # 1 Partial Docket Sheet, # 2 Clerk's Certification)(kac) (Entered: 07/29/2025) |
| 11/26/2025 | 334 | ORDER: Plaintiff's 296 MOTION for Prejudgment Interest is GRANTED IN PART AND DENIED IN PART. Signed by Judge Kevin J. Doyle on 11/26/2025. (hbc) (Entered: 11/26/2025) |
| 11/26/2025 | 335 | OPINION AND ORDER: Plaintiff's 300 MOTION for Attorney Fees and 302 MOTION to Alter Judgment are GRANTED IN PART AND DENIED IN PART. Signed by Judge Kevin J. Doyle on 11/26/2025. (hbc) (Entered: 11/26/2025) |
| 11/26/2025 | 336 | ORDER: Defendants' 305 MOTION to Alter Judgment & MOTION for New Trial on Plaintiff's VFEPA Claim is DENIED. Signed by Judge Kevin J. Doyle on 11/26/2025. (hbc) (Entered: 11/26/2025) |
| 11/26/2025 | 337 | ORDER: Defendants' 308 MOTION for New Trial *Related to Damages Issues* is DENIED. Signed by Judge Kevin J. Doyle on 11/26/2025. (hbc) (Entered: 11/26/2025) |
| 12/02/2025 | 338 | AMENDED JUDGMENT is hereby entered in the amount of $2,536,770.92 for Plaintiff Misty Blanchette Porter, against Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health. Signed by Deputy Clerk on 12/2/2025. (cdc) (Entered: 12/02/2025) |
| 12/15/2025 | 339 | NOTICE OF CROSS APPEAL as to 335 Opinion and Order re: 300 MOTION for Attorney Fees and 302 MOTION to Alter Judgment by Misty Blanchette Porter. Filing fee $ 605, receipt number AVTDC-2162991. (Vitt, Geoffrey) Text/links clarified on 12/15/2025 (law). (Entered: 12/15/2025) |
| 12/16/2025 | 340 | AMENDED NOTICE OF APPEAL as to 297 Judgment, 334 Order, 335 Opinion and Order, 336 Order, 337 Order, and 338 Amended Judgment by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, |

A-34

| | | |
|---|---|---|
| | | Dartmouth-Hitchcock Health (McDonald, Morgan) Text clarified, links added on 12/17/2025 (hbc). (Entered: 12/16/2025) |
| 12/18/2025 | 341 | USCA Forms C by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health re 310 Notice of Appeal. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Martinez, Megan) (Entered: 12/18/2025) |
| 12/18/2025 | 342 | USCA Forms D by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health re 310 Notice of Appeal. (Martinez, Megan) (Entered: 12/18/2025) |
| 12/19/2025 | 343 | Removed from the docket on 1/7/2026. (Entered: 12/22/2025) |
| 12/19/2025 | 344 | TRANSCRIPT filed for date(s) of March 24, 2025 (Volume 1), before Judge Hon. Kevin J. Doyle as to 310 Notice of Appeal. Court Reporter/Transcriber Jan-Marie Glaze, telephone number (253) 312-0257. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/12/2026. Redacted Transcript Deadline set for 1/23/2026. Release of Transcript Restriction set for 3/23/2026. (law) (Entered: 12/22/2025) |
| 12/19/2025 | 345 | TRANSCRIPT filed for date(s) of March 25, 2025 (Volume 2) before Judge Hon. Kevin J. Doyle , as to 310 Notice of Appeal. Court Reporter/Transcriber Jan-Marie Glaze, telephone number (253) 312-0257. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/12/2026. Redacted Transcript Deadline set for 1/23/2026. Release of Transcript Restriction set for 3/23/2026. (law) (Entered: 12/22/2025) |
| 12/19/2025 | 346 | TRANSCRIPT filed for date(s) of March 26, 2025 (Volume 3), before Judge Hon. Kevin J. Doyle as to 310 Notice of Appeal. Court Reporter/Transcriber Jan-Marie Glaze, telephone number (253) 312-0257. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/12/2026. Redacted Transcript Deadline set for 1/23/2026. Release of Transcript Restriction set for 3/23/2026. (law) (Entered: 12/22/2025) |
| 12/19/2025 | 347 | TRANSCRIPT filed for date(s) of March 27, 2025 (Volume 4), before Judge Hon. Kevin J. Doyle as to 310 Notice of Appeal. Court Reporter/Transcriber Jan-Marie Glaze, telephone number (253) 312-0257. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/12/2026. Redacted Transcript Deadline set for 1/23/2026. Release of Transcript Restriction set for 3/23/2026. (law) (Entered: 12/22/2025) |
| 12/19/2025 | 348 | TRANSCRIPT filed for date(s) of March 28, 2025 (Volume 5), before Judge Hon. Kevin J. Doyle as to 310 Notice of Appeal. Court Reporter/Transcriber Jan-Marie Glaze, telephone number (253) 312-0257. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/12/2026. Redacted Transcript Deadline set for 1/23/2026. Release of Transcript Restriction set for 3/23/2026. (law) (Entered: 12/22/2025) |
| 12/30/2025 | 349 | TRANSMITTED Third Supplemental Index, Circuit No. 25-1382, to US Court of Appeals re: 310 Notice of Appeal. (Attachments: # 1 Partial Docket Sheet, # 2 Clerk's Certification)(kac) (Entered: 12/30/2025) |

| 01/05/2026 | 350 | USCA Form D by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health re 310 Notice of Appeal. (McDonald, Morgan) Text clarified on 1/6/2026 (law). (Entered: 01/05/2026) |
| --- | --- | --- |
| 01/05/2026 | 351 | USCA Form C by Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health re 310 Notice of Appeal. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(McDonald, Morgan) Text clarified on 1/6/2026 (law). (Entered: 01/05/2026) |
| 01/07/2026 | 352 | TRANSMITTED Index on Appeal, Circuit No. 25-3155, re: 339 Notice of Cross Appeal. (Attachments: # 1 Docket Sheet (Public), # 2 Docket Sheet (Sealed), # 3 Clerk's Certification)(kac) (Entered: 01/07/2026) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 02/20/2026 15:18:08 | | |
| **PACER Login:** | memcdonald | **Client Code:** | 999100-0101 |
| **Description:** | Docket Report | **Search Criteria:** | 2:17-cv-00194-kjd |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

A-36

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 OCT 11  PM 1: 33

BY_____
DEPUTY CLERK

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Docket No. 5:17-cv-194

Jury Trial Demanded

**COMPLAINT**

The plaintiff, Misty Blanchette Porter, M.D. ("Dr. Blanchette Porter") files this Complaint against the defendants, Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively "Dartmouth-Hitchcock") seeking damages and other relief for wrongful discharge, discrimination, and violation of the New Hampshire Whistleblowers' Protection Act and other statutes.

**NATURE OF THE CASE**

1.  Dartmouth-Hitchcock has had a Division of Reproductive Medicine and Infertility ("REI Division") since 1979.  This program has provided services in Reproductive

1

A-37

Endocrinology and Infertility to thousands of children, women, men, and couples in Northern New England.

2.      On May 4, 2017, Dartmouth-Hitchcock abruptly announced that the REI Division would close at the end of the month, and on that same day, it informed Dr. Blanchette Porter that as of June 3, 2017, she would no longer have a job.  Dr. Blanchette Porter, a senior voting member of the Dartmouth-Hitchcock Professional Staff, had worked for more than twenty years providing exceptional clinical service in Obstetrics and Gynecology ("OB/GYN"), Reproductive Endocrinology and Infertility ("REI"), and Radiology.  Those services covered all aspects of reproductive medicine, including the care of children and women with hormonal imbalance and genetic syndromes affecting the reproductive system, *in vitro* fertilization and assisted reproductive technologies ("IVF/ART") procedures, complex gynecologic clinical care and surgery with attention to women who desired to retain child-bearing capacity, and gynecologic and early pregnancy pelvic ultrasound.

3.      Dartmouth-Hitchcock's decision to terminate the employment of Dr. Blanchette Porter reflects a significant decline in its commitment to providing the highest-quality health care for women.

4.      Dr. Blanchette Porter was the heart and soul of the REI Division at Dartmouth-Hitchcock.  Her name and image were widely used in advertising the program and she was selected to testify before the New Hampshire legislature in support of requiring insurance funding for infertility services.  Dr. Blanchette Porter's job performance was impeccable, up to and including the date that Dartmouth-Hitchcock decided to fire her without reasonable notice or cause.

5.      In addition to performing REI services, Dr. Blanchette Porter is a talented

2

gynecological ultrasonographer and surgeon who is skilled at providing consultative and surgical services that are in on-going demand at Dartmouth-Hitchcock. There was more than adequate work available for Dr. Blanchette Porter to perform even after the REI Division closed, and there was no business reason why it was necessary to terminate her employment.

6. When Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was on long-term disability, although she had been able to return to work half-time. With this accommodation, Dr. Blanchette Porter was performing at her usual high standards and she was able to meet all the essential job requirements. Dr. Blanchette Porter's termination was motivated, in part, by her disability.

7. Dr. Blanchette Porter was a force at Dartmouth-Hitchcock advocating for the use of best practices and strict compliance with all applicable laws and regulations. Dartmouth-Hitchcock's decision to terminate Dr. Blanchette Porter's employment was motivated, in part, out of retaliation for her blowing the whistle on Dartmouth-Hitchcock's wrongdoing and refusing to go along with or remain quiet about questionable medical practices, including a) its tolerance of medical care by members of its staff that was significantly below an acceptable standard of care; b) fraudulent billing practices; c) performing procedures on patients without consent; d) impregnating a patient through assisted reproduction where the transmission of Zika virus to the conception was a known risk; and e) failing to retain appropriate physician staff with knowledge as required to fulfill validation and reporting obligations.

**THE PARTIES**

8. The plaintiff, Dr. Blanchette Porter, is an individual residing in Windsor County, Vermont. She was employed by Dartmouth-Hitchcock from 1996 until June 3, 2017.

3

A-39

9.      The defendant Dartmouth-Hitchcock Medical Center ("D-H Medical Center") is a nonprofit organized under the laws of New Hampshire with its principal place of business in Lebanon, New Hampshire.  For purposes of federal jurisdiction and venue, D-H Medical Center is a citizen of New Hampshire and resident of Vermont.

10.     The defendant Dartmouth-Hitchcock Clinic ("D-H Clinic") is a nonprofit organized under the laws of New Hampshire with its principal place of business in Lebanon, New Hampshire.  For purposes of federal jurisdiction and venue, D-H Clinic is a citizen of New Hampshire and a resident of Vermont.

11.     The defendant Mary Hitchcock Memorial Hospital ("MHMH") is a nonprofit organized under the laws of New Hampshire with its principal place of business in Lebanon, New Hampshire.  For purposes of federal jurisdiction and venue, MHMH is a citizen of New Hampshire and resident of Vermont.

12.     The defendant Dartmouth-Hitchcock Health ("DHH") is a nonprofit organized under the laws of New Hampshire with its principal place of business in Lebanon, New Hampshire.  DHH is the controlling and coordinating organization for the D-H Clinic and MHMH, which are related organizations.  For purposes of federal jurisdiction and venue, DHH is a citizen of New Hampshire and resident of Vermont.

**JURISDICTION AND VENUE**

13.     This Court has original diversity jurisdiction (28 U.S.C. § 1332), as plaintiff is a citizen of Vermont while defendants are all citizens of New Hampshire and the amount in controversy exceeds $75,000.  This Court also has federal question jurisdiction (28 U.S.C. § 1331) over the Americans with Disabilities Act claim and supplemental jurisdiction (28 U.S.C. § 1367) over the state law claims.

4

A-40

14.     Venue is proper in Vermont pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(c)(2) because defendants conduct substantial business in Vermont, subjecting them to personal jurisdiction and residence within this State.

## FACTS

### Dr. Blanchette Porter's Experience and Central Role in the Department of Obstetrics and Gynecology, and the Division of Reproductive Endocrinology and Infertility

15.     Dr. Blanchette Porter was recruited in 1996 by the Chair of the Department of Obstetrics and Gynecology (the "Department") to join the REI Division, providing general obstetrics and gynecology ("OB/GYN") care as well as all aspects of care for patients with reproductive medicine and infertility diagnoses.  A year later, she was promoted to the position of Medical Director of the IVF/ART program, and jointly appointed to the Department of Radiology.  In 2001, she became a senior voting member of the Dartmouth-Hitchcock Professional Staff.  In 2011, she was promoted to Acting Division Director of the REI Division. And in 2016, she was appointed as Head, Gynecologic Ultrasound for the Women's Health Service Line of the Dartmouth-Hitchcock Health Alliance.

16.     When first hired in 1996, she was appointed to the faculty as an Assistant Professor of Obstetrics and Gynecology, Geisel School of Medicine at Dartmouth and, in 2007, she was promoted to Associate Professor.  As a member of the faculty, she taught medical students, residents, and fellows.

17.     Reproductive Endocrinology and Infertility:   In 1979, Dartmouth-Hitchcock began a new program offering REI services to children, women, and couples of northern New England.  Central to the care of these patients has been the provision of IVF/ART services for women and couples who are infertile and who desire to have children.  The REI clinic at

5

Dartmouth-Hitchcock has been the only realistic chance for many patients in New England to have a family.  In 1985, Dartmouth-Hitchcock's REI service performed the first successful IVF procedure in the State of New Hampshire.  Prior to its closing, the IVF/ART program at Dartmouth-Hitchcock helped thousands of women become pregnant and deliver healthy babies.  For these successes, Dartmouth-Hitchcock has had regional recognition and the endless gratitude of those patients and couples who have been assisted to have children.

18.     During the years that Dr. Blanchette Porter did such work, the REI Division was the only full-range REI service in New Hampshire, and Dartmouth-Hitchcock's Human Embryology and Andrology Laboratory—integral to the performance of these services—is the only human embryology and gamete laboratory in New Hampshire.  Location is important.  Fertility care is complex and requires many return visits for blood work and ultrasound monitoring tailored to the individual patient.  Dartmouth-Hitchcock's REI program has always been patient centered to accommodate the necessarily-frequent medical visits while the patient is also typically working a job, maintaining privacy among colleagues and supervisors, managing emotional and physical stress, and balancing family obligations.  Other area REI or "fertility programs" restrict their services to consultative services and only provide limited therapy for fertility care.  Their patients must travel to Massachusetts to have IVF/ART procedures performed because this is where their human embryology laboratory services are located.  Most do not perform fertility-sparing surgery, nor do they include a full scope of reproductive endocrinology care.  Thus, the decision to close the REI service at Dartmouth-Hitchcock restricts access to care for residents of New Hampshire and the Dartmouth-Hitchcock service area.

19.     As a reproductive endocrinologist, Dr. Blanchette Porter was trained to provide general and complex OB/GYN services as well as REI services.  Such specialty care includes

evaluation and treatment of children and women with hormonal imbalance that affect reproductive health such as therapy for pituitary tumors, gynecologic evaluation and treatment for childhood genetic abnormalities such as Turner's syndrome, providing fertility care for patients with complex reproductive hormonal disorders such as polycystic ovarian syndrome, and consultation for menopausal women desiring expertise in hormonal therapy.

20.    Dr. Blanchette Porter's general gynecologic clinical knowledge, skills, and medical insight are unparalleled in the Department and the expertise that she has brought to the care of the Department's patients has made a significant impact.  She has been an important resource to the general obstetrician gynecologist, high-risk obstetrician, resident physician staff, advanced nurse practitioners, and midwives.  Dr. Blanchette Porter's termination will have a significant negative impact on the clinical care provided by the Department and the greater D-H Health Alliance.  Surgeons with her level of skill and breadth of services are not easily replaced.

21.    Minimally-Invasive and Complex Gynecologic Surgical Care:  Dr. Blanchette Porter has provided expertise in minimally-invasive and complex surgeries, including the evaluation and treatment for complex congenital uterine and reproductive tract abnormalities, abnormal uterine and postmenopausal bleeding, complex uterine reconstruction procedures, removal of ovarian masses which threaten fertility, and minimally-invasive therapies for disease of the fallopian tubes, and minimally-invasive hysterectomies.  For many years, Dr. Blanchette Porter was the only physician in the Department who had the advanced surgical training and the ability to handle cases in pediatric gynecology and fertility-sparing, advanced, minimally-invasive surgical therapies to those desiring pregnancy.  Dr. Blanchette Porter has been the only surgeon at Dartmouth-Hitchcock who is capable of performing advanced hysteroscopic (telescopic uterine) procedures, including uterine septum repair and complex laparoscopic

7

A-43

surgery for advanced staged endometriosis, and the only physician providing fertility-sparing procedures for patients with life-threatening pregnancies in abnormal locations such as within a cesarean scar, uterine cervix, or interstitial pregnancy.

22.     Gynecologic and Early Pregnancy Pelvic Ultrasound:  Dr. Blanchette Porter has a national and international reputation in the area of gynecologic and early pregnancy pelvic ultrasound.  For the past 21 years, Dr. Blanchette Porter has been the most qualified person within the Departments of OB/GYN and Radiology to read and interpret gynecologic and early pregnancy ultrasound.  She was the only Dartmouth-Hitchcock gynecologist jointly appointed to the Department of Radiology.

23.     Dr. Blanchette Porter has been the "go-to" person to provide interpretation of and consultation regarding pelvic ultrasounds to providers throughout the Dartmouth-Hitchcock Health Alliance for such common diagnoses as abnormal uterine and postmenopausal bleeding, ectopic and extra-uterine pregnancy, congenital anomalies of the reproductive tract, and ovarian and adnexal tumors in patients from the in-utero fetus to pregnant patients to postmenopausal woman.   Often there was a line outside her door to provide consultation and expert opinion for health care providers seeking assistance in the management of their patients for a wide variety of reproductive and gynecologic disorders, and re-interpretation of the pelvic ultrasound imaging obtained outside of the Department.  She is the gynecologist who read the majority of the gynecologic ultrasounds during that period.  Although Dr. Blanchette Porter has not been employed by Dartmouth-Hitchcock since early June, she continues to get calls from former colleagues asking her to educate them in how to perform pelvic ultrasound procedures for common diagnoses in gynecology.

24.     Fertility Preservation for Cancer and Patients with Medical Disorders Threatening

8

Fertility:  Fertility preservation is of prime concern for reproductive age patients with life-threating illness.  The American Society of Clinical Oncology's ("ASCO") published guidelines recommend that providers working with cancer patients should address fertility concerns with their patients before starting treatment, refer any patients interested in fertility preservation to a reproductive specialist, and document the discussion in the patient's record.  Dr. Blanchette Porter has been the principal physician in the Department to provide consultative service for patients of the Norris Cotton Cancer Center who want to take steps to assure that, after receiving treatment for cancer, they would retain the capacity to conceive and bear children.  The IVF/ART program and the Reproductive Sciences lab provided the only program in the State of New Hampshire to offer oocyte (egg), sperm, and embryo cryopreservation to men, women, and adolescents who desire to preserve their fertility.  Dr. Blanchette Porter has advised such patients of the options available to them and she has arranged to have eggs, embryos, and/or sperm cryopreserved.  In addition, she has provided counseling regarding other options available to these patients for completing their family, such as donor oocyte, donor sperm, embryo adoption, gestational carrier, and resources for adoption.  The REI service represented a link to the national organizations that provide emotional, financial, and educational resources for these patients who desire to preserve their fertility.  In closing the REI Division, that knowledge base and the ability to provide this critical access to fertility preservation and counseling regarding reproductive options to patients facing life-threatening illness has been lost.  Furthermore, patients with a new diagnosis of cancer are in crisis and require counseling and the performance of fertility-preserving treatments in a narrow interval from diagnosis to the onset of chemotherapeutic treatments.

25.    As a result of Dartmouth-Hitchcock's decision to close the REI Division, cancer

9

patients and those undergoing medical therapy that threatens to end their fertility will need to travel to Boston, Massachusetts or Burlington, Vermont to receive fertility-preserving treatments. Clinics that are a 1.5- to 3-hour drive from their home do not present a viable alternative. This poses an undue burden on this stressed and emotionally fragile patient population. Without REI services at Dartmouth-Hitchcock to provide onsite and timely counseling and treatment, it is highly likely many cancer patients will decide either not to pursue fertility preservation in the course of their cancer therapy or to receive comprehensive cancer treatment elsewhere. A nationally recognized cancer service such as the Norris Cotton Cancer Center should be able to offer fertility-sparing services such as those provided by the REI Division. In closing the REI Clinic, Dartmouth-Hitchcock is transferring the complex task of managing fertility care and fertility preservation to the hands of its patients, who are now faced with extreme difficulty in finding other realistic options.

26.    General Gynecologist:  In addition to surgery and infertility work, Dr. Blanchette Porter is a talented general gynecologist and her practice has always been fully subscribed. She established a wide referral base for consultation and treatment for a wide variety of general gynecologic diagnoses, and her schedule has rarely had an opening. For many years, she has been the only provider in the Department with the knowledge to counsel patients regarding the potential impact of their disorders on their fertility and miscarriage rates. She provided counseling of the potential pregnancy complications, such as uterine rupture and preterm birth, and the risk of cesarean section.

27.    Human Embryology and Andrology Laboratory:  The Human Embryology and Andrology Laboratory is overseen by a PhD embryologist, Dr. Navid Esfandiari, and is certified through Clinical Laboratory Improvement Amendments ("CLIA") through the Centers for

Medicare and Medicaid Services ("CMS"), and is also accedited by the College of American Pathologists ("CAP"). This Laboratory is the repository for thousands of cryopreserved human oocytes, sperm, and embryos. Also housed in the Laboratory are embryos that couples have donated for embryo research and quality control and approximately five sets of embryos that couples have donated to the REI Division for anonymous embryo adoption, i.e., use for another infertile couple.

28.     Dr. Blanchette Porter was a valuable clinical resource to the Department and the Laboratory director during inspections by the FDA and CAP, fulfilling reporting requirements, and counseling patients regarding their stored embryos and gametes. While the Laboratory remains in the very capable hands of Dr. Esfandiari, with the termination of Dr. Blanchette Porter, Dartmouth-Hitchcock has lost the historic knowledge of the REI Division's clinical protocols, including policies established by the Dartmouth-Hitchcock ethics committee on embryo discard. Dartmouth-Hitchcock now has no subspecialty trained nor appropriately credentialed individual to assist the embryologists in clinical decision-making. Annually, there are couples and patients who reach the definition of abandoment of their embryos and gametes in long-term storage in the Reproductive Science Laboratory. The adminstrative decision to suddenly close the REI service has left Dartmouth-Hitchcock with no clinician with the knowledge of the ethics committee decisions, nor anyone with expertise to sign the orders to discard abdandoned embryos and gametes.

29.     SART and CDC Data Reporting: From January 1, 2017, to May 31, 2017, Dartmouth-Hitchcock's IVF/ART program completed treatment cycles for a multitude of patients. Under the Fertility Clinic Success Rate and Certification Act of 1992, each assisted reproductive technologies program, including Dartmouth-Hitchcock's fertility program, is

11

required to complete annual reports to the Society of Assisted Reproductive Technology ("SART") and the CDC.  These data include discrete clinical information for these patients' infertility diagnoses, information pertaining to the ART procedures, and statistics on resulting pregnancy and birth.  That data is generated by the Human Embryology and Andrology Laboratory and verified for accuracy and content by the Dartmouth-Hitchcock IVF Medical Director—Dr. Blanchette Porter's role prior to her termination.  The decision by Dartmouth-Hitchcock to terminate the employment of Dr. Blanchette Porter and close the REI Division means there is no clinician with knowledge of these patient's clinical treatment, nor anyone of appropriate clinical training and skill to verify the required reporting data.

30.    Medical Education:    D-H Medical Center/MHMH is the sponsoring institution for the OB/GYN residency.  Reproductive medicine and infertility is one of four boarded subspecialties of OB/GYN, and it is integral to the fabric of an academic practice in women's health care.  Subspecialists in REI complete four years of training in obstetrics and gynecology followed by a three-year fellowship in reproductive medicine and infertility.  To achieve certification by the American Board of Obstetricians and Gynecologists, the candidate must pass both a written and oral board examination in general obstetrics and gynecology, followed by both a written and oral board examination in REI.  REI subspecialists provide knowledge and clinical services woven into the structure of all other boarded subspecialties of OB-GYN:  Maternal Fetal Medicine, Gynecologic Oncology, Urogynecology, and they provide services beyond the scope of General Obstetrics and Gynecology.

31.    The OB/GYN Department educates sixteen resident physicians as well as medical students from The Geisel School of Medicine during their basic classroom years and clinical clerkship rotations.  Members of the Department also play an active role in educating residents

12

and fellows in the department of Radiology and Medical Endocrinology. The REI Division has been responsible for instructing OB/GYN residents in all aspects of patient care in reproductive medicine and infertility. The REI Division was responsible for the daily ambulatory clinical, gynecologic ultrasound, and inpatient surgical teaching of OB/GYN residents who rotated on the REI service six months of their four years of training. Dr. Blanchette Porter has been the principal faculty physician within the Department to teach residents to perform a variety of surgeries that occur in an REI practice. Dr. Blanchette Porter also provided the majority of teaching of the performance and interpretation of gynecologic ultrasound, and the performance of common ultrasound sound-guided procedures such as IUD placement and removal, fallopian tube patency testing, and the assessment of the uterus for abnormal and postmenopausal bleeding. The decision to close the REI Division has significantly hindered the training program in OB/GYN.

32.     At the time the REI Division was closed and Dr. Blanchette Porter was fired by the Dartmouth-Hitchcock administration, she was the Program Site Director for the 3rd year REI fellow training at Dartmouth-Hitchcock from the University of Vermont Medical Center ("UVMMC"). Dr. Blanchette Porter was responsible for training the fellow in clinical REI, gynecologic ultrasound, IVF/ART, and surgical procedures. The decision to close the REI Division has left the OB/GYN residency and the 30 year-old UVMMC fellowship in peril and subject to critical review by the Accreditation Council for Graduate Medical Education ("ACGME") for violation of program requirements in graduate medical education.

33.     The American Board of Obstetricians and Gynecologists together with the American Institute of Ultrasound in Medicine jointly have ratified a required curriculum for the teaching of ultrasound to all OB/GYN residents. Dr. Blanchette Porter is nationally-recognized

13

in the diagnosis and management of early pregnancy complications and pregnancies of unknown location and was an author on a landmark work published in the New England Journal of Medicine on this topic. The Department of Radiology does not have the capacity, nor the clinical skill in gynecology, to absorb residents into their department, nor will it be able to provide the same expertise for the education of OB/GYN residents in gynecology ultrasound and ultrasound-guided procedures. Loss of Dr. Blanchette Porter's clinical acumen and skill leaves an enormous deficit in the education of residents, medical students, and fellows.

34.     Dr. Blanchette Porter was twice selected by the residents to receive the national faculty teaching award for excellence in residency teaching, conferred by the Council of Residency Education in Obstetrics and Gynecology ("CREOG"). The REI Division was responsible for regular didactic lectures on disorders on a host of REI topics. Dr. Blanchette Porter has regularly participated in classroom lectures and small group teaching sessions for medical students at the Geisel School of Medicine, and participated in the education of third and fourth year medical students during their women's health sub-internships. Dr. Blanchette Porter also participated in didactic lectures for residents and staff in Radiology on such topics as infertility, abnormal first trimester pregnancies, and abnormal uterine bleeding. Her role as educator included participation in didactic education for the REI fellows at UVMMC.

35.     As Dartmouth-Hitchcock has closed the REI Division, so has the Dartmouth-Hitchcock administration begun to unravel the academic practice of Obstetrics and Gynecology. This decision has placed the Dartmouth OB/GYN residency at significant risk for probation by the ACGME, hindered the education and training of the Geisel Medical Students, and additionally places the Fellowship in REI at UVMMC in peril. The Dartmouth-Hitchcock administration's decision to close the REI Division—what they have depicted as only "affecting

14

124 patients"—will have a significant ripple effect on the available services and training of residents in inter-related subspecialties such as radiology, medical oncology, pediatrics, and medical endocrinology.

36.     Residents who benefitted from the training received through the REI Division have already complained about the detrimental impact of the closing of the REI Division on the resident program.

37.     <u>Commitment to the comprehensive medical care for Patients and Employees:</u> Dartmouth-Hitchcock's Mission states: "We advance health through research, education, clinical practice and community partnerships, providing each person the best care in the right place, at the right time, every time." Infertility is a medically-recognized disease. It is a time-consuming and an emotionally-draining undertaking for a woman or a couple to participate in the fertility program. When Dartmouth-Hitchcock encouraged patients to participate in its infertility program, it made a commitment that its services would be available during the entire period leading up to pregnancy and, if fortunate, birth. When Dartmouth-Hitchcock decided to cover fertility services as a healthcare benefit for its employees, Dartmouth-Hitchcock as an employer made a statement that it "understood the gift of children in their employee's lives." With the REI Division program closing, Dartmouth-Hitchcock has announced it will cease to cover fertility services as an employee benefit as of December 31, 2017. While the decision may seem wise given Dartmouth-Hitchcock's perilous financial situation, the cost of providing comprehensive infertility services to its employees is minimal. Moreover, covering fertility treatments allows patients to access treatment at a younger age, allows patient and couples to receive services much earlier in the course of their disease, improves pregnancy rates, and lowers the risk of treatment complications by encouraging elective single embryo transfer. In addition, providing coverage

15

for fertility benefits allows patients to receive fertility-preserving treatments prior to the course of their cancer treatments and medical therapy which threatens to end their fertility.  In closing the REI program, the current Dartmouth-Hitchcock administration is sending a resounding message that they no longer support women's health, no longer support ready access to fertility preservation, and no longer want to provide healthcare coverage that would allow their employees and their patients to have children.  The current administration of Dartmouth-Hitchcock is clearly abandoning their mission to providing the best care in the right place, at the right time, every time.

**Dr. Blanchette Porter's Disability**

38.     In November 2015, as a result of an injury, Dr. Blanchette Porter became disabled and by December, her disability was sufficiently serious that she could not continue to work.  Dr. Blanchette Porter took a leave of absence under the Family and Medical Leave Act and on December 15, 2015, she went on Short-Term Disability.   On June 14, 2016, she went on Long-Term Disability.

39.     On June 15, 2016, Dr. Blanchette Porter was able to return to work on a part-time basis, and on July 29, 2016, the Chair of the Department gave permission for Dr. Blanchette Porter to do additional work remotely, including interpretation and billing for gynecologic ultrasound images, consultation with members of the Department and nursing staff, counseling patients via telephone, authoring a book chapter for the preeminent REI teaching resource, and preparing for invited presentations at national and international meetings.

40.     During the summer of 2016, Dr. Blanchette Porter provided care for a group of patients, largely physicians, who had postponed their conception specifically awaiting

16

availability on her schedule. She continued to provide much needed clinical services in gynecologic ultrasound and resident education. And, at the request of the Chair of the Department, she was tasked with providing exceptional care to couples who had complained about the quality of the care they had received in her absence and were threatening legal action against Dartmouth-Hitchcock.

41.    Dr. Blanchette Porter's disability did not improve as hoped and on September 6, 2016, she had surgery at the Mayo Clinic. On November 4, 2016, Dr. Blanchette Porter returned to work, gradually increasing her work load until, by January 2017, she was working 20 hours per week. She continued at 20 hours per week until she was fired by Dartmouth-Hitchcock. Dr. Blanchette Porter was on Long-Term Disability status when she was fired.

42.    When Dr. Blanchette Porter returned to work part-time, she provided the Chair of the Department a list of recommended accommodations developed by her treating providers. The Chair approved the accommodations which included, in part, having a quiet space in which to work and limiting work periods.

43.    Nevertheless, Dr. Blanchette Porter's immediate supervisor, the REI Division Director David Seifer, asked her to resume a full call schedule, ignored her work boundaries, and continually pushed her to extend her work time to consult with him and the other REI provider on their cases.

44.    Dr. Blanchette Porter repeatedly explained to him that her schedule was limited while she was recovering on the advice of her physicians and further explained her approved accommodations.

45.    When he continued to make critical comments about her schedule and failed to respect her approved accommodations, Dr. Blanchette Porter sought the assistance of the practice

17

manager, Heather Gunnell, and the Chair of the Department, Dr. Leslie DeMars. The situation did not improve.

46. When Dr. Blanchette Porter was terminated, her job responsibilities consisted primarily of performing non-REI work that was essential to the function of the Department. In view of her expertise in multiple areas, there was more than sufficient work to fill her schedule and keep her busy, even with the closure of the REI program.

47. Dr. Blanchette Porter was terminated just days after she informed the Department Chair that she needed to return to the Mayo Clinic for a follow-up appointment and was repeatedly reminded by the Chief Clinical Officer, Dr. Edward Merrens, that she could remain out on long-term disability.

48. After Dr. Blanchette Porter's employment was terminated, the Dartmouth-Hitchcock administration told members of the staff that the decision to terminate her employment was motivated by the fact that she had been out of work for an extended period and was only able to work part-time.

**IVF/ART Regulation**

49. The medical practice of in vitro fertilization and assisted reproductive technology is one of the most highly regulated medical practices in the United States. At the federal level, three agencies regulate IVF/ART: the Centers for Disease Control and Prevention ("CDC") collects and publishes data, the Food and Drug Administration has jurisdiction over screening and testing of reproductive tissues such as donor eggs and sperm, and the Centers for Medicare and Medicaid Services ("CMS") is responsible for implementation of the Clinical Laboratory Improvement Act to insure the quality of laboratory testing.

18

A-54

50.     Dr. Blanchette Porter has insisted that the REI Division strictly comply with all applicable state and federal regulations that govern IVF/ART.

51.     Her insistence on best practices and strict compliance with the law, and repeated complaints to the Department's leadership when she observed improper or unlawful conduct, motivated, in part, Dartmouth-Hitchcock's decision to terminate her employment.

## Problems with Quality of Care in the REI Division

### *Junior Physician Incompetence*

52.     During the summer of 2014, Dr. Blanchette Porter worked for the first time with a newly-employed junior physician in the REI Division who had apparently been hired without undergoing the standard scrutiny for the employment of a physician at Dartmouth-Hitchcock. Dr. Blanchette Porter observed this junior physician's practice in the clinic, operating room, and in the management and treatment of REI patients, and she concluded that his knowledge base and skill were significantly below what was expected for a recent graduate of a fellowship in REI.  Indeed, she later learned the fellowship program that trained this physician had been placed on probation for substandard training practices.

53.     In good faith, Dr. Blanchette Porter spent significant time trying to train this junior physician including taking call with him on a daily basis for approximately six months.

54.     Dr. Blanchette Porter repeatedly expressed her concerns about this physician to the Chair of the Department and to the Practice Manager.  She reported that in addition to the physician's lack of knowledge and technical skills, the most troubling problem was his lack of critical thinking and lack of ability to assess patients to determine the appropriate treatment of care.  She further noted the adverse effects on patients when his work was poorly performed.

19

55.     In May 2016, Dr. Blanchette Porter was asked by the Department Chair, Dr. DeMars, to provide comments to herself and the new REI Division Director, Dr. Seifer, on the practices of this physician and, in particular, whether the practices posed a risk to patient safety. Dr. Blanchette Porter provided detailed comments which explained the ways in which the physician's practices and behavior were below the standard of care expected of Dartmouth-Hitchcock physicians, how there was a significant deficit in his fund of knowledge in clinical medicine, how the physician's surgery skills were nearly absent, and why patient safety had been, and would continue to be, compromised.

56.     Dr. Blanchette Porter informed Dr. DeMars, Dr. Seifer, and Ms. Gunnell that other professionals were similarly concerned.  For example, she explained that senior resident physicians had been assigning upper-level residents to assist this physician in the operating room, even on simple surgical cases more commonly assigned to interns, in order to attempt to keep the physician out of trouble, and she described specific instances in which injury to patients had been prevented only because other medical professionals had intervened.  Nurses who had observed consistently low pregnancy rates for this new physician began to schedule embryo transfers on Dr. Blanchette Porter's schedule instead of this new physician where possible.

57.     Dr. Blanchette Porter also reported to management that the physician's pregnancy rates for embryo transfers were consistently poor and showed no signs of improving.  She recommended that he not be permitted to handle any more transfer of embryos because he significantly compromised the patients' ability to conceive, and it was unfair and unsafe for the patients.  As a result of the new physician's poor practices, and at the request of the Department Chair, Dr. Blanchette Porter handled—at no charge—the repeat IVF cycles of couples who had received suboptimal clinical care by the junior physician.

58.     Dr. Blanchette Porter did not receive a response to her comments, and when she asked her Dr. Seifer about what action Dartmouth-Hitchcock intended to take, he told her that her views were "elitist." Dr. DeMars told her that Dr. Seifer would take over remedial training for this physician, who was permitted to continue to see patients and perform REI procedures.

*Senior Physician Incompetence*

59.     In May 2016, Dartmouth-Hitchcock hired a senior physician to become the new REI Division Director. Although the physician did not yet have a New Hampshire medical license, he nevertheless provided care to patients in the presence of the junior physician described above. Dr. Blanchette Porter objected saying that such action constituted the practice of medicine without a license in violation of New Hampshire law and ethical obligations and reported his conduct to Dr. DeMars and Ms. Gunnell.

60.     In July 2016, Dr. Blanchette Porter was approached on multiple occasions by the REI nurses, ultrasound technicians, and embryologists who expressed serious reservations about the substandard technical ability of the new REI Division Director and other concerns impacting patient safety. The staff stated that they did not have confidence in the ability of this physician to competently handle the work, and providers within the Department were reluctant to contact this physician when he was on call for general gynecology due to his limited skill with gynecologic surgery.

61.     The nurses had reported that the REI Division Director's oocyte harvest technique was unnecessarily traumatic. The nurses had reported that when the senior physician performed the oocyte harvest, the follicules aspirated were unnecessarily bloody, and the patients frequently reported more postoperative pain than typical for this procedure.

62.     The ultrasound technicians expressed further concern that unnecessary and

21

inappropriate procedures (such as fallopian tube patency testing on patients not trying to conceive) were being performed on patients without appropriate consent.

63.     Dr. Blanchette Porter and other members of the staff observed that the senior physician appeared disorganized and forgetful.

64.     Dr. Blanchette Porter referred all of these persons to their supervisors, and when the supervisors approached Dr. Blanchette Porter raising the same issues, she referred them to the Practice Manager and the Department Chair.

65.     Eventually, the Chair of the Department directed the physician to cease doing the unnecessary and inappropriate procedures, and in August 2016, Dr. Blanchette Porter was asked by the Chair of the Department to assess the oocyte retrieval skills and other technical abilities of the new senior physician. Dr. Blanchette Porter concluded that the physician's technical ability for oocyte retrievals and other commonly conducted infertility procedures was poor and not up to current standards.

66.     In addition, Dr. Blanchette Porter reported that because the scope of this physician's practice was extremely limited, he was unable to meet his clinical productivity and financial obligations, and he would be unable to fill his schedule. The Division had felt the effects of his lack of clinical acumen as he declined to see patients who had been scheduled to see him for common gynecologic diagnoses, limiting himself to a practice of fertility care only.

67.     Dr. Blanchette Porter discussed her observations and recommendations verbally and in writing to the Chair of the Department and to the Practice Manager.

**Dr. Blanchette Porter Warns About Zika Virus**

68.     In February 2017, Dr. Blanchette Porter was asked by the Director of the Human

Embryology and Andrology Laboratory to review the chart and course of care of a couple then under the care of the junior and senior REI physicians described above. The couple had created two (2) embryos with the use of anonymous donor oocyte through an outside egg bank and the husband's cryopreserved sperm that had potentially been exposed to the Zika virus.

69.     The couple were evaluated by the REI service on the day they traveled to Brazil on vacation. The couple subsequently traveled on vacation to the Caribbean. Both Brazil and the Caribbean are on the CDC (Centers for Disease Control) list of countries with known active Zika virus transmission. The Zika virus can be transmitted through mosquito bite, the placenta, infected sperm, and/or other body fluids. Thus, during their vacation travel both members of the couple were twice potentially exposed to Zika virus.

70.     Zika virus infection in pregnancy can result in miscarriage or stillbirth and can lead to infants with severe birth defects, microcephaly (small brains), skull deformities, and children with severe physical and cognitive disabilities. Four organizations, including the CDC, the World Health Organization ("WHO"), the American Congress of Obstetricians and Gynecologists ("ACOG"), and the American Society for Reproductive Medicine ("ASRM") provide guidance for time from potential exposure to Zika virus to pregnancy for both the male and female partners. The guidance varies, but the majority of organizations recommend that men wait six months prior to participating in a pregnancy following travel to a known Zika endemic area. These embryos were created with sperm frozen within approximately two weeks from returning from Brazil. The true risk of transmitting Zika virus under the circumstances was not known, and, while it is likely low, the risk was not zero. On the other hand, the risk of harm if transmission occurred was great. Thus, participation in a conception assisted by the REI Division for a couple known to have traveled not once, but twice, to areas of Zika virus

23

transmission, represented considerable potential harm for the couple and liability for Dartmouth-Hitchcock.  Further, the risk could have been reduced by delaying collection of sperm for the recommended 6 months from the last exposure.

71.     Dr. Blanchette Porter was informed by the nursing staff that the REI Division Director and Risk Management had created a consent form for the couple to "assume the risk" of a Zika-infected pregnancy and hold Dartmouth-Hitchcock harmless.

72.     Dr. Blanchette Porter contacted Risk Management and was advised that "we do things outside of national guidelines all the time, and as long as the patient is informed and the physician documents their reason for going outside guidelines, then it is acceptable practice." Dr. Blanchette Porter made it clear in conversations with Risk Management that in her opinion, it was unethical and unsafe to proceed with the transfer particularly where, as here, the potential harm was great and there was another option with significantly less risk.  Dr. Blanchette Porter recommended that the couple be presented with the alternative of creating new embryos following the recommended period of delay to conception and asserted that without offering all reasonable options to the couple, informed consent would be incomplete.

73.     Before the woman underwent embryo transfer, the physicians in the REI Division met and reviewed the national and international guidance (CDC, ASRM, WHO, and ACOG), and discussed treatment alternatives for the provision of safe fertility care for this couple. Dr. Blanchette Porter recommended reimbursing the couple for the cost of the donor oocytes, use of condoms or avoidance of intercourse, and creating a second set of embryos after the recommended wait time to conception post travel for both partners had passed, thus minimizing the risk of transmission of Zika virus.  Dr. Blanchette Porter expressed her strong disapproval of proceeding with the transfer of the embryo(s) with the potential Zika exposure where a

24

reasonable treatment alternative was available. When the Division Director declined to offer the alternative option to the couple, Dr. Blanchette Porter refused to have a role in assisting in the planned frozen embryo transfer. Despite Dr. Blanchette Porter's explicit warning and the risk associated with the transfer of these embryos, the REI Division proceeded with an elective embryo transfer and the woman became pregnant. She has an ongoing pregnancy, thus the outcome is not known, and may not be truly known for years. The couple have one remaining embryo in long-term storage at Dartmouth-Hitchcock and, thus, the potential for a second child exposed to the Zika virus remains.

**Irregularities and Fraudulent Medical Billing Practice**

74.     The American Society of Reproductive Medicine ("ASRM") provides guidance on the recommended diagnostic evaluation for infertility. Most insurance carriers, including Medicaid, cover only a well-defined series of infertility testing, but not infertility treatment. Even for covered testing, patients must absorb costs associated with co-pays and deductibles as well as loss of work time and travel expenses. Conducting tests outside the standard diagnostic evaluation protocol or beyond what is clinically indicated increases the risk of harm to the patient and raises red flags to insurance carriers, who may deny coverage to the patient and/or impose consequences on the physician and hospital for excessive and fraudulent medical billing.

75.     When Dr. Blanchette Porter returned to work, she learned that the other two physicians in the REI Division (described above) were deviating from the standard diagnostic protocol and ordering excessive and unnecessary tests.

76.     Dr. Porter strongly objected and told the physicians and Dr. DeMars and Ms. Gunnell that it was improper, fraudulent, and unlawful to order and bill for unnecessary patient

25

A-61

testing.  She also informed the Dartmouth-Hitchcock Value Institute of the practice of these physicians to order unnecessary tests.

77.     The REI Division Director pressured her to perform unwarranted and inappropriate imaging studies on patients.  She refused.

78.     Dr. Blanchette Porter also objected to the junior physician's practice of performing and billing for outpatient consultative ambulatory visits in a Department of Radiology room designated as inpatient.  Dr. Porter counseled the junior physician on three occasions that he could not properly bill for outpatient consults in a space designated for inpatient services.  When he continued the practice, she informed Dartmouth-Hitchcock management.  After an extended period of time, the Department Chair put a stop to the unlawful billing practice.

### Announcement of Decision to Close the REI Division

79.     On May 4, 2017, Dartmouth-Hitchcock issued a public announcement that it would close the REI Division as of May 31, 2017.

80.     Dartmouth-Hitchcock's administrators have given a series of explanations why they decided to close the REI Division and fire all of the physicians who worked there, including that the right staff could not be provided by Dartmouth-Hitchcock for a service that required 24/7 coverage; that "declining birth rates" were somehow responsible for the decision to close the Division; and that there were "personality problems" and the doctors "could not get along."

81.     Dartmouth-Hitchcock's decision to close the REI Division was not based on staffing shortages.  There have been times when the REI Division has experienced nursing shortages, but at no time did anyone suggest that the solution to such shortages was to close the

26

REI Division.  Dartmouth-Hitchcock had the ability to recruit additional qualified providers, and indeed, just weeks before announcing the decision to close the program, had been in discussions with several experienced and competent providers interested in joining the REI Division.

82.    Dartmouth-Hitchcock's decision to fire Dr. Blanchette Porter and to close the REI Division was not the result of economics or profitability or a lack of patients.  Dartmouth-Hitchcock's management has been widely quoted as saying that the REI Division was profitable.

83.    The decision to fire Dr. Blanchette Porter is also not related to the duplication of available services, nor do other Dartmouth-Hitchcock providers have similar knowledge or skill.

84.    Likewise, it was not based on the quality of Dr. Blanchetter Porter's work, which was impeccable.  Her loss has been deeply felt by the many consulting subspecialists and general providers in the Department.  At no time has any administrator stated that anything in Dr. Blanchette Porter's job performance was cause for her termination and, in fact, her job performance was excellent.

85.    Insistence on the provision of high-quality services by competent providers in accordance with established rules and guidance is not properly characterized as an inability to get along with others.

86.    Dartmouth-Hitchcock failed to put patients first in closing the REI Division. Although Dartmouth-Hitchcock informed a small number of the patients of the REI Division of its decision to cease providing infertility services and reproductive medicine care, most of the patients learned of the decision through reading the newspaper, hearing about it through social media, or calls from other patients.  The failure of Dartmouth-Hitchcock to directly inform its patients of the decision caused needless upset and harm.

87.    Dartmouth-Hitchcock had an ethical obligation to the patients who had already

27

entered into an infertility treatment cycle of care for the summer of 2017 to complete those treatment cycles. When the REI Division was abruptly closed on May 31, 2017, there were patients who had already purchased thousands of dollars of medication, taken time off from work, signed institutional consent for treatment, and were scheduled for IVF/ART procedures. All of these patients were forced on short notice to reestablish care at outside facilities, leading to undue expense, stress, and anger. At least one patient (whose frozen embryo transfer had been scheduled for June) threatened legal action against Dartmouth-Hitchcock due to the sudden closure of the REI program without adequate provision for patients already in the midst of treatment. To this patient, her cryopreserved embryo represented her baby, and the risk of loss of the embryo during shipping to an outside facility was unconscionable, particularly where the time to her anticipated embryo transfer was only a matter of days. Dr. Blanchette Porter has personally counseled and cared for this patient and others to assist them in their transition.

## COUNT 1

### WRONGFUL DISCHARGE

88.     Dr. Blanchette Porter re-alleges and incorporates by reference paragraphs 1 through 87.

89.     In bad faith, as retaliation, and with malice, Dartmouth-Hitchcock terminated Dr. Blanchette Porter's employment for performing an act that public policy would encourage—that is, among other things, speaking up and urging Dartmouth-Hitchcock to take steps to curtail or eliminate the risk and actual harm to patients caused by the junior and senior REI physicians described above; insisting that Dartmouth-Hitchcock obtain patient consent before performing procedures on them; objecting to improper patient billing; objecting to the practice of medicine

28

A-64

without an active New Hampshire license; and urging Dartmouth-Hitchcock not to close its Reproductive Science Laboratory (thereby causing injury to patients who had stored their cryopreserved sperm, oocytes, and embryos and who reasonably expected that D-H would assist them in having a child).

90.     In addition, or in the alternative, Dartmouth-Hitchcock terminated Dr. Blanchette Porter's employment for refusing to go along with behaviors that public policy would condemn. Among other things, Dr. Blanchette Porter refused to participate or acquiesce in Dartmouth-Hitchcock's failure to strictly comply with state and federal laws and professional society guidelines regarding unsafe and unethical behavior; she refused to participate in a procedure involving an embryo and mother both potentially exposed to the Zika virus; and she refused to order or participate in unnecessary tests on patients and associated improper billing practices.

91.     D-H's wrongful discharge of Dr. Blanchette Porter proximately caused her damages in an amount to be proved at trial.

## COUNT 2

### VIOLATION OF THE WHISTLEBLOWERS' PROTECTION ACT

92.     Dr. Blanchette Porter re-alleges and incorporates by reference paragraphs 1 through 87.

93.     In violation of the New Hampshire Whistleblowers' Protection Act, RSA 275-E:2 (the "Whistleblowers' Protection Act"), Dartmouth-Hitchcock harassed, abused, intimidated, discharged, threatened, and otherwise discriminated against Dr. Blanchette Porter regarding compensation, terms, conditions, locations and privileges of employment because, in good faith, Dr. Blanchette Porter reported or caused to be reported what she had reasonable cause to believe

29

were violations of the law—namely, a) the transfer and implantation of an embryo where transmission of Zika virus to the conception was a known risk; b) performing procedures on patients without obtaining the patients' consent; c) fraudulent billing practices; and d) failure to retain necessary personnel to validate Federally-required data reports.

94.     Also in violation of the Whistleblowers' Protection Act, Dartmouth-Hitchcock harassed, abused, intimidated, discharged, threatened and otherwise discriminated against Dr. Blanchette Porter regarding compensation, terms, conditions, locations and privileges of employment because Dr. Blanchette Porter objected to and refused to participate in activities that she believed, in good faith, violated the law.

95.     Pursuant to the Whistleblowers' Protection Act, the Court should order reinstatement and back-pay, as well as reasonable attorneys' fees and costs, to Dr. Blanchette Porter for Dartmouth-Hitchcock's violations of the Whistleblowers' Protection Act.

## COUNT 3

### DISABILITY DISCRIMINATION & RETALIATION

96.     Dr. Blanchette Porter re-alleges and incorporates by reference the allegations of paragraphs 1 through 87.

97.     Dartmouth-Hitchcock unlawfully discriminated and retaliated against Dr. Blanchette Porter in violation of Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.*, as well as New Hampshire's unlawful discriminatory practice laws, RSA 354-A:7, I (discrimination/termination), RSA 354-A:7, VII (reasonable accommodations), and RSA 354-A:19 (retaliation), when it failed to provide reasonable accommodations and subsequently terminated her employment.

30

98.     At the time that Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was a well-qualified physician with a disability who, with reasonable accommodation, was capable of performing all of her essential duties.

99.     Dartmouth-Hitchcock's decision to terminate Dr. Blanchette Porter's employment was motivated in part by her disability and request for accommodations.

100.    Dartmouth-Hitchcock has informed members of its professional staff that Dr. Blanchette Porter was terminated because she had been injured and was only working part-time.

101.    At the time of Dartmouth-Hitchcock's decision to close the REI Division and terminate Dr. Blanchette Porter's employment, Dartmouth-Hitchcock did not tell Dr. Blanchette Porter that accommodating her disability would be an undue hardship, nor did Dartmouth-Hitchcock evaluate the feasibility of restructuring her position or reassigning her to another position within the Department.

102.    At the time that Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was spending only a small portion of her time handling infertility work and there was sufficient clinical demand for her OB/GYN skills in the Department to fill her schedule.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that the Court enter judgment in her favor and against defendant, containing the following relief:

a.      A declaratory judgment that the actions, conduct, and practices of defendants complained of herein violate the laws of the United States and the State of New Hampshire.

b.      An injunction that requires defendants to reinstate plaintiff as an employee with no loss of seniority or other benefits.

31

A-67

c.     An award of damages for any and all other monetary and non-monetary losses suffered by plaintiff in an amount to be determined at trial.

d.     An award to plaintiff for her costs of litigation, including but not limited to attorney's fees, costs of suit, and prejudgment interest.

e.     Such other relief as the Court deems just and proper.

**Jury Demand**

The plaintiff demands trial by jury on all issues so triable.

Dated: October 11, 2017

Respectfully submitted,

VITT & ASSOCIATES, PLC

By:                                 
Geoffrey J. Vitt
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittandassociates.com

*Counsel for the Plaintiff*
*Misty Blanchette Porter, M.D.*

32

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Misty Blanchette Porter, MD | Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health |
| **(b)** County of Residence of First Listed Plaintiff   Windsor County, VT *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant   Grafton County, NH *(IN U.S. PLAINTIFF CASES ONLY)* NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* Geoffrey J. Vitt Vitt & Associates, PLC PO Box 1229, Norwich, VT  05055; (802) 649-5700 | Attorneys *(If Known)* Donald W. Schroeder Foley & Lardner LLP, 111 Huntington Ave., Suite 2500 Boston, MA  02199-7610; (617) 342-4041 |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government  Plaintiff
- ❏ 2  U.S. Government  Defendant
- ❏ 3  Federal Question  *(U.S. Government Not a Party)*
- ☒ 4  Diversity  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ❏ 625 Drug Related Seizure | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane   ❏ 365 Personal Injury - | of Property 21 USC 881 | ❏ 423 Withdrawal | ❏ 376 Qui Tam (31 USC |
| ❏ 130 Miller Act | ❏ 315 Airplane Product   Product Liability | ❏ 690 Other | 28 USC 157 | 3729(a)) |
| ❏ 140 Negotiable Instrument | Liability   ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel &   Pharmaceutical | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| & Enforcement of Judgment | Slander   Personal Injury | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers'   Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted | Liability   ❏ 368 Asbestos Personal | | ❏ 835 Patent - Abbreviated | ❏ 460 Deportation |
| Student Loans | ❏ 340 Marine   Injury Product | | New Drug Application | ❏ 470 Racketeer Influenced and |
| (Excludes Veterans) | ❏ 345 Marine Product   Liability | | ❏ 840 Trademark | Corrupt Organizations |
| ❏ 153 Recovery of Overpayment | Liability   **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| of Veteran's Benefits | ❏ 350 Motor Vehicle   ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle   ❏ 371 Truth in Lending | Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ |
| ❏ 190 Other Contract | Product Liability   ❏ 380 Other Personal | ❏ 720 Labor/Management | ❏ 863 DIWC/DIWW (405(g)) | Exchange |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal   Property Damage | Relations | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | Injury   ❏ 385 Property Damage | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| | ❏ 362 Personal Injury -   Product Liability | ❏ 751 Family and Medical | | ❏ 893 Environmental Matters |
| | Medical Malpractice | Leave Act | | ❏ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights   **Habeas Corpus:** | ❏ 791 Employee Retirement | ❏ 870 Taxes (U.S. Plaintiff | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting   ❏ 463 Alien Detainee | Income Security Act | or Defendant) | ❏ 899 Administrative Procedure |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment   ❏ 510 Motions to Vacate | | ❏ 871 IRS—Third Party | Act/Review or Appeal of |
| ❏ 240 Torts to Land | ❏ 443 Housing/   Sentence | | 26 USC 7609 | Agency Decision |
| ❏ 245 Tort Product Liability | Accommodations   ❏ 530 General | | | ❏ 950 Constitutionality of |
| ❏ 290 All Other Real Property | ☒ 445 Amer. w/Disabilities -   ❏ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment   **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 446 Amer. w/Disabilities -   ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | |
| | Other   ❏ 550 Civil Rights | Actions | | |
| | ❏ 448 Education   ❏ 555 Prison Condition | | | |
| | ❏ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original  Proceeding
- ❏ 2 Removed from  State Court
- ❏ 3 Remanded from  Appellate Court
- ❏ 4 Reinstated or  Reopened
- ❏ 5 Transferred from  Another District  *(specify)*
- ❏ 6 Multidistrict  Litigation -  Transfer
- ❏ 8 Multidistrict  Litigation -  Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 12101 et seq.
Brief description of cause:
Wrongful termination, violation of whistleblower protection laws, violation of disability discrimination laws

## VII. REQUESTED IN COMPLAINT:

- ❏ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   10-11-2016

SIGNATURE OF ATTORNEY OF RECORD   *Geoffrey J. Vitt*

**FOR OFFICE USE ONLY**

RECEIPT #   46301   AMOUNT   400.00   APPLYING IFP _____   JUDGE   1013   MAG. JUDGE _____

7666

5:17-cv-194

A-69

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

2018 AUG -1  AM 11: 09

CLERK

BY_____
DEPUTY CLERK

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D., <br><br> Plaintiff, <br><br> v. <br><br><br> DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Docket No.
5:17-cv-194-gwc

**Jury Trial Demanded**

**FIRST AMENDED COMPLAINT**

The plaintiff, Misty Blanchette Porter, M.D. ("Dr. Blanchette Porter") files this

Complaint against the defendants, Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock

Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively

"Dartmouth-Hitchcock") seeking damages and other relief for wrongful discharge,

discrimination, and violation of the New Hampshire Whistleblowers' Protection Act and other

statutes.

**NATURE OF THE CASE**

1.     Dartmouth-Hitchcock has had a Division of Reproductive Medicine and Infertility

("REI Division") since 1979.  This program has provided services in Reproductive

Endocrinology and Infertility to thousands of children, women, men, and couples in Northern

1

New England.

2.      On May 4, 2017, Dartmouth-Hitchcock abruptly announced that the REI Division would close at the end of the month, and on that same day, it informed Dr. Blanchette Porter that as of June 3, 2017, she would no longer have a job.  Dr. Blanchette Porter, a senior voting member of the Dartmouth-Hitchcock Professional Staff, had worked for more than twenty years providing exceptional clinical service in Obstetrics and Gynecology ("OB/GYN"), Reproductive Endocrinology and Infertility ("REI"), and Radiology.  Those services covered all aspects of reproductive medicine, including the care of children and women with hormonal imbalance and genetic syndromes affecting the reproductive system, *in vitro* fertilization and assisted reproductive technologies ("IVF/ART") procedures, complex gynecologic clinical care and surgery with attention to women who desired to retain child-bearing capacity, and gynecologic and early pregnancy pelvic ultrasound.

3.      Dartmouth-Hitchcock's decision to terminate the employment of Dr. Blanchette Porter reflects a significant decline in its commitment to providing the highest-quality health care for women.

4.      Dr. Blanchette Porter was the heart and soul of the REI Division at Dartmouth-Hitchcock.  Her name and image were widely used in advertising the program and she was selected to testify before the New Hampshire legislature in support of requiring insurance funding for infertility services.  Dr. Blanchette Porter's job performance was impeccable, up to and including the date that Dartmouth-Hitchcock decided to fire her without reasonable notice or cause.

5.      In addition to performing REI services, Dr. Blanchette Porter is a talented gynecological ultrasonographer and surgeon who is skilled at providing consultative and surgical

2

services that are in on-going demand at Dartmouth-Hitchcock. There was more than adequate work available for Dr. Blanchette Porter to perform even after the REI Division closed, and there was no business reason why it was necessary to terminate her employment.

6. When Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was on long-term disability, although she had been able to return to work half-time. With this accommodation, Dr. Blanchette Porter was performing at her usual high standards and she was able to meet all the essential job requirements. Dr. Blanchette Porter's termination was motivated, in part, by her disability.

7. Dr. Blanchette Porter was a force at Dartmouth-Hitchcock advocating for the use of best practices and strict compliance with all applicable laws and regulations. Dartmouth-Hitchcock's decision to terminate Dr. Blanchette Porter's employment was motivated, in part, out of retaliation for her blowing the whistle on Dartmouth-Hitchcock's wrongdoing and refusing to go along with or remain quiet about questionable medical practices, including a) its tolerance of medical care by members of its staff that was significantly below an acceptable standard of care; b) fraudulent billing practices; c) performing procedures on patients without consent; d) impregnating a patient through assisted reproduction where the transmission of Zika virus to the conception was a known risk; and e) failing to retain appropriate physician staff with knowledge as required to fulfill validation and reporting obligations.

**THE PARTIES**

8. The plaintiff, Dr. Blanchette Porter, is an individual residing in Windsor County, Vermont. She was employed by Dartmouth-Hitchcock from 1996 until June 3, 2017.

9. The defendant Dartmouth-Hitchcock Medical Center ("D-H Medical Center") is a

3

nonprofit organized under the laws of New Hampshire with its principal place of business in Lebanon, New Hampshire. For purposes of federal jurisdiction and venue, D-H Medical Center is a citizen of New Hampshire and resident of Vermont.

10.     The defendant Dartmouth-Hitchcock Clinic ("D-H Clinic") is a nonprofit organized under the laws of New Hampshire with its principal place of business in Lebanon, New Hampshire. For purposes of federal jurisdiction and venue, D-H Clinic is a citizen of New Hampshire and a resident of Vermont.

11.     The defendant Mary Hitchcock Memorial Hospital ("MHMH") is a nonprofit organized under the laws of New Hampshire with its principal place of business in Lebanon, New Hampshire. For purposes of federal jurisdiction and venue, MHMH is a citizen of New Hampshire and resident of Vermont.

12.     The defendant Dartmouth-Hitchcock Health ("DHH") is a nonprofit organized under the laws of New Hampshire with its principal place of business in Lebanon, New Hampshire. DHH is the controlling and coordinating organization for the D-H Clinic and MHMH, which are related organizations. For purposes of federal jurisdiction and venue, DHH is a citizen of New Hampshire and resident of Vermont.

13.     Defendant Dartmouth-Hitchcock is a recipient of federal financial assistance. This federal financial assistance includes but is not limited to Medicare/Medicaid reimbursement. Dartmouth-Hitchcock also receives federal funding from the National Science Foundation, the National Institutes of Health, the Center for Medicare and Medicaid, and the Health Resources and Services Administration. Moreover, Dartmouth-Hitchcock is principally engaged in the business of providing health care.

14.     Defendant Dartmouth-Hitchcock conducts substantial business in Vermont.

4

Dartmouth-Hitchcock has a hospital location in Vermont at the Southwestern Vermont Medical Center in Bennington, and provides services in Brattleboro, VT, and in St. Johnsbury, VT.

## JURISDICTION AND VENUE

15. This Court has original diversity jurisdiction (28 U.S.C. § 1332), as plaintiff is a citizen of Vermont while defendants are all citizens of New Hampshire and the amount in controversy exceeds $75,000. This Court also has federal question jurisdiction (28 U.S.C. § 1331) over the Americans with Disabilities Act claim and the claim under Section 504 of the Rehabilitation Act of 1973 and supplemental jurisdiction (28 U.S.C. § 1367) over the state law claims.

16. Venue is proper in Vermont pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(c)(2) because defendants conduct substantial business in Vermont, subjecting them to personal jurisdiction and residence within this State.

17. On April 23, 2018, Dr. Blanchette Porter filed a charge of employment discrimination with the Equal Employment Opportunities Commission ("EEOC").

18. On April 28, 2018, Dr. Blanchette Porter received the Notice of Dismissal and Right to Sue from the EEOC, thereby exhausting her administrative remedies.

## FACTS

### Dr. Blanchette Porter's Experience and Central Role in the Department of Obstetrics and Gynecology, and the Division of Reproductive Endocrinology and Infertility

19. Dr. Blanchette Porter was recruited in 1996 by the Chair of the Department of Obstetrics and Gynecology (the "Department") to join the REI Division, providing general

5

obstetrics and gynecology ("OB/GYN") care as well as all aspects of care for patients with reproductive medicine and infertility diagnoses. A year later, she was promoted to the position of Medical Director of the IVF/ART program, and jointly appointed to the Department of Radiology. In 2001, she became a senior voting member of the Dartmouth-Hitchcock Professional Staff. In 2011, she was promoted to Acting Division Director of the REI Division. And in 2016, she was appointed as Head, Gynecologic Ultrasound for the Women's Health Service Line of the Dartmouth-Hitchcock Health Alliance.

20. When first hired in 1996, she was appointed to the faculty as an Assistant Professor of Obstetrics and Gynecology, Geisel School of Medicine at Dartmouth and, in 2007, she was promoted to Associate Professor. As a member of the faculty, she taught medical students, residents, and fellows.

21. Reproductive Endocrinology and Infertility: In 1979, Dartmouth-Hitchcock began a new program offering REI services to children, women, and couples of northern New England. Central to the care of these patients has been the provision of IVF/ART services for women and couples who are infertile and who desire to have children. The REI clinic at Dartmouth-Hitchcock has been the only realistic chance for many patients in New England to have a family. In 1985, Dartmouth-Hitchcock's REI service performed the first successful IVF procedure in the State of New Hampshire. Prior to its closing, the IVF/ART program at Dartmouth-Hitchcock helped thousands of women become pregnant and deliver healthy babies. For these successes, Dartmouth-Hitchcock has had regional recognition and the endless gratitude of those patients and couples who have been assisted to have children.

22. During the years that Dr. Blanchette Porter did such work, the REI Division was the only full-range REI service in New Hampshire, and Dartmouth-Hitchcock's Human

6

Embryology and Andrology Laboratory—integral to the performance of these services—is the only human embryology and gamete laboratory in New Hampshire. Location is important. Fertility care is complex and requires many return visits for blood work and ultrasound monitoring tailored to the individual patient. Dartmouth-Hitchcock's REI program has always been patient centered to accommodate the necessarily-frequent medical visits while the patient is also typically working a job, maintaining privacy among colleagues and supervisors, managing emotional and physical stress, and balancing family obligations. Other area REI or "fertility programs" restrict their services to consultative services and only provide limited therapy for fertility care. Their patients must travel to Massachusetts to have IVF/ART procedures performed because this is where their human embryology laboratory services are located. Most do not perform fertility-sparing surgery, nor do they include a full scope of reproductive endocrinology care. Thus, the decision to close the REI service at Dartmouth-Hitchcock restricts access to care for residents of New Hampshire and the Dartmouth-Hitchcock service area.

23. As a reproductive endocrinologist, Dr. Blanchette Porter was trained to provide general and complex OB/GYN services as well as REI services. Such specialty care includes evaluation and treatment of children and women with hormonal imbalance that affect reproductive health such as therapy for pituitary tumors, gynecologic evaluation and treatment for childhood genetic abnormalities such as Turner's syndrome, providing fertility care for patients with complex reproductive hormonal disorders such as polycystic ovarian syndrome, and consultation for menopausal women desiring expertise in hormonal therapy.

24. Dr. Blanchette Porter's general gynecologic clinical knowledge, skills, and medical insight are unparalleled in the Department and the expertise that she has brought to the care of the Department's patients has made a significant impact. She has been an important

7

resource to the general obstetrician gynecologist, high-risk obstetrician, resident physician staff, advanced nurse practitioners, and midwives. Dr. Blanchette Porter's termination will have a significant negative impact on the clinical care provided by the Department and the greater D-H Health Alliance. Surgeons with her level of skill and breadth of services are not easily replaced.

25. <u>Minimally-Invasive and Complex Gynecologic Surgical Care:</u> Dr. Blanchette Porter has provided expertise in minimally-invasive and complex surgeries, including the evaluation and treatment for complex congenital uterine and reproductive tract abnormalities, abnormal uterine and postmenopausal bleeding, complex uterine reconstruction procedures, removal of ovarian masses which threaten fertility, and minimally-invasive therapies for disease of the fallopian tubes, and minimally-invasive hysterectomies. For many years, Dr. Blanchette Porter was the only physician in the Department who had the advanced surgical training and the ability to handle cases in pediatric gynecology and fertility-sparing, advanced, minimally-invasive surgical therapies to those desiring pregnancy. Dr. Blanchette Porter has been the only surgeon at Dartmouth-Hitchcock who is capable of performing advanced hysteroscopic (telescopic uterine) procedures, including uterine septum repair and complex laparoscopic surgery for advanced staged endometriosis, and the only physician providing fertility-sparing procedures for patients with life-threatening pregnancies in abnormal locations such as within a cesarean scar, uterine cervix, or interstitial pregnancy.

26. <u>Gynecologic and Early Pregnancy Pelvic Ultrasound:</u> Dr. Blanchette Porter has a national and international reputation in the area of gynecologic and early pregnancy pelvic ultrasound. For the past 21 years, Dr. Blanchette Porter has been the most qualified person within the Departments of OB/GYN and Radiology to read and interpret gynecologic and early pregnancy ultrasound. She was the only Dartmouth-Hitchcock gynecologist jointly appointed to

the Department of Radiology.

27.     Dr. Blanchette Porter has been the "go-to" person to provide interpretation of and consultation regarding pelvic ultrasounds to providers throughout the Dartmouth-Hitchcock Health Alliance for such common diagnoses as abnormal uterine and postmenopausal bleeding, ectopic and extra-uterine pregnancy, congenital anomalies of the reproductive tract, and ovarian and adnexal tumors in patients from the in-utero fetus to pregnant patients to postmenopausal woman.   Often there was a line outside her door to provide consultation and expert opinion for health care providers seeking assistance in the management of their patients for a wide variety of reproductive and gynecologic disorders, and re-interpretation of the pelvic ultrasound imaging obtained outside of the Department.  She is the gynecologist who read the majority of the gynecologic ultrasounds during that period.  Although Dr. Blanchette Porter has not been employed by Dartmouth-Hitchcock since early June, she continues to get calls from former colleagues asking her to educate them in how to perform pelvic ultrasound procedures for common diagnoses in gynecology.

28.     Fertility Preservation for Cancer and Patients with Medical Disorders Threatening Fertility:  Fertility preservation is of prime concern for reproductive age patients with life-threating illness.  The American Society of Clinical Oncology's ("ASCO") published guidelines recommend that providers working with cancer patients should address fertility concerns with their patients before starting treatment, refer any patients interested in fertility preservation to a reproductive specialist, and document the discussion in the patient's record.  Dr. Blanchette Porter has been the principal physician in the Department to provide consultative service for patients of the Norris Cotton Cancer Center who want to take steps to assure that, after receiving treatment for cancer, they would retain the capacity to conceive and bear children.  The

9

A-78

IVF/ART program and the Reproductive Sciences lab provided the only program in the State of New Hampshire to offer oocyte (egg), sperm, and embryo cryopreservation to men, women, and adolescents who desire to preserve their fertility. Dr. Blanchette Porter has advised such patients of the options available to them and she has arranged to have eggs, embryos, and/or sperm cryopreserved. In addition, she has provided counseling regarding other options available to these patients for completing their family, such as donor oocyte, donor sperm, embryo adoption, gestational carrier, and resources for adoption. The REI service represented a link to the national organizations that provide emotional, financial, and educational resources for these patients who desire to preserve their fertility. In closing the REI Division, that knowledge base and the ability to provide this critical access to fertility preservation and counseling regarding reproductive options to patients facing life-threatening illness has been lost. Furthermore, patients with a new diagnosis of cancer are in crisis and require counseling and the performance of fertility-preserving treatments in a narrow interval from diagnosis to the onset of chemotherapeutic treatments.

29. As a result of Dartmouth-Hitchcock's decision to close the REI Division, cancer patients and those undergoing medical therapy that threatens to end their fertility will need to travel to Boston, Massachusetts or Burlington, Vermont to receive fertility-preserving treatments. Clinics that are a 1.5- to 3-hour drive from their home do not present a viable alternative. This poses an undue burden on this stressed and emotionally fragile patient population. Without REI services at Dartmouth-Hitchcock to provide onsite and timely counseling and treatment, it is highly likely many cancer patients will decide either not to pursue fertility preservation in the course of their cancer therapy or to receive comprehensive cancer treatment elsewhere. A nationally recognized cancer service such as the Norris Cotton Cancer Center should be able to

10

A-79

offer fertility-sparing services such as those provided by the REI Division.  In closing the REI Clinic, Dartmouth-Hitchcock is transferring the complex task of managing fertility care and fertility preservation to the hands of its patients, who are now faced with extreme difficulty in finding other realistic options.

30.    General Gynecologist:  In addition to surgery and infertility work, Dr. Blanchette Porter is a talented general gynecologist and her practice has always been fully subscribed.  She established a wide referral base for consultation and treatment for a wide variety of general gynecologic diagnoses, and her schedule has rarely had an opening.  For many years, she has been the only provider in the Department with the knowledge to counsel patients regarding the potential impact of their disorders on their fertility and miscarriage rates.  She provided counseling of the potential pregnancy complications, such as uterine rupture and preterm birth, and the risk of cesarean section.

31.    Human Embryology and Andrology Laboratory:   The Human Embryology and Andrology Laboratory is overseen by a PhD embryologist, Dr. Navid Esfandiari, and is certified through Clinical Laboratory Improvement Amendments ("CLIA") through the Centers for Medicare and Medicaid Services ("CMS"), and is also accedited by the College of American Pathologists ("CAP").  This Laboratory is the repository for thousands of cryopreserved human oocytes, sperm, and embryos.  Also housed in the Laboratory are embryos that couples have donated for embryo research and quality control and approximately five sets of embryos that couples have donated to the REI Division for anonymous embryo adoption, i.e., use for another infertile couple.

32.    Dr. Blanchette Porter was a valuable clinical resource to the Department and the Laboratory director during inspections by the FDA and CAP, fulfilling reporting requirements,

11

and counseling patients regarding their stored embryos and gametes. While the Laboratory remains in the very capable hands of Dr. Esfandiari, with the termination of Dr. Blanchette Porter, Dartmouth-Hitchcock has lost the historic knowledge of the REI Division's clinical protocols, including policies established by the Dartmouth-Hitchcock ethics committee on embryo discard. Dartmouth-Hitchcock now has no subspecialty trained nor appropriately credentialed individual to assist the embryologists in clinical decision-making. Annually, there are couples and patients who reach the definition of abandoment of their embryos and gametes in long-term storage in the Reproductive Science Laboratory. The adminstrative decision to suddenly close the REI service has left Dartmouth-Hitchcock with no clinician with the knowledge of the ethics committee decisions, nor anyone with expertise to sign the orders to discard abdandoned embryos and gametes.

33.    SART and CDC Data Reporting: From January 1, 2017, to May 31, 2017, Dartmouth-Hitchcock's IVF/ART program completed treatment cycles for a multitude of patients. Under the Fertility Clinic Success Rate and Certification Act of 1992, each assisted reproductive technologies program, including Dartmouth-Hitchcock's fertility program, is required to complete annual reports to the Society of Assisted Reproductive Technology ("SART") and the CDC. These data include discrete clinical information for these patients' infertility diagnoses, information pertaining to the ART procedures, and statistics on resulting pregnancy and birth. That data is generated by the Human Embryology and Andrology Laboratory and verified for accuracy and content by the Dartmouth-Hitchcock IVF Medical Director—Dr. Blanchette Porter's role prior to her termination. The decision by Dartmouth-Hitchcock to terminate the employment of Dr. Blanchette Porter and close the REI Division means there is no clinician with knowledge of these patient's clinical treatment, nor anyone of

12

appropriate clinical training and skill to verify the required reporting data.

34.     Medical Education:     D-H Medical Center/MHMH is the sponsoring institution for the OB/GYN residency.  Reproductive medicine and infertility is one of four boarded subspecialties of OB/GYN, and it is integral to the fabric of an academic practice in women's health care.  Subspecialists in REI complete four years of training in obstetrics and gynecology followed by a three-year fellowship in reproductive medicine and infertility.  To achieve certification by the American Board of Obstetricians and Gynecologists, the candidate must pass both a written and oral board examination in general obstetrics and gynecology, followed by both a written and oral board examination in REI.  REI subspecialists provide knowledge and clinical services woven into the structure of all other boarded subspecialties of OB-GYN:  Maternal Fetal Medicine, Gynecologic Oncology, Urogynecology, and they provide services beyond the scope of General Obstetrics and Gynecology.

35.     The OB/GYN Department educates sixteen resident physicians as well as medical students from The Geisel School of Medicine during their basic classroom years and clinical clerkship rotations.  Members of the Department also play an active role in educating residents and fellows in the department of Radiology and Medical Endocrinology.  The REI Division has been responsible for instructing OB/GYN residents in all aspects of patient care in reproductive medicine and infertility.  The REI Division was responsible for the daily ambulatory clinical, gynecologic ultrasound, and inpatient surgical teaching of OB/GYN residents who rotated on the REI service six months of their four years of training.  Dr. Blanchette Porter has been the principal faculty physician within the Department to teach residents to perform a variety of surgeries that occur in an REI practice. Dr. Blanchette Porter also provided the majority of teaching of the performance and interpretation of gynecologic ultrasound, and the performance

13

of common ultrasound sound-guided procedures such as IUD placement and removal, fallopian tube patency testing, and the assessment of the uterus for abnormal and postmenopausal bleeding. The decision to close the REI Division has significantly hindered the training program in OB/GYN.

36. At the time the REI Division was closed and Dr. Blanchette Porter was fired by the Dartmouth-Hitchcock administration, she was the Program Site Director for the 3rd year REI fellow training at Dartmouth-Hitchcock from the University of Vermont Medical Center ("UVMMC"). Dr. Blanchette Porter was responsible for training the fellow in clinical REI, gynecologic ultrasound, IVF/ART, and surgical procedures. The decision to close the REI Division has left the OB/GYN residency and the 30 year-old UVMMC fellowship in peril and subject to critical review by the Accreditation Council for Graduate Medical Education ("ACGME") for violation of program requirements in graduate medical education.

37. The American Board of Obstetricians and Gynecologists together with the American Institute of Ultrasound in Medicine jointly have ratified a required curriculum for the teaching of ultrasound to all OB/GYN residents. Dr. Blanchette Porter is nationally-recognized in the diagnosis and management of early pregnancy complications and pregnancies of unknown location and was an author on a landmark work published in the New England Journal of Medicine on this topic. The Department of Radiology does not have the capacity, nor the clinical skill in gynecology, to absorb residents into their department, nor will it be able to provide the same expertise for the education of OB/GYN residents in gynecology ultrasound and ultrasound-guided procedures. Loss of Dr. Blanchette Porter's clinical acumen and skill leaves an enormous deficit in the education of residents, medical students, and fellows.

38. Dr. Blanchette Porter was twice selected by the residents to receive the national

14

faculty teaching award for excellence in residency teaching, conferred by the Council of Residency Education in Obstetrics and Gynecology ("CREOG"). The REI Division was responsible for regular didactic lectures on disorders on a host of REI topics. Dr. Blanchette Porter has regularly participated in classroom lectures and small group teaching sessions for medical students at the Geisel School of Medicine, and participated in the education of third and fourth year medical students during their women's health sub-internships. Dr. Blanchette Porter also participated in didactic lectures for residents and staff in Radiology on such topics as infertility, abnormal first trimester pregnancies, and abnormal uterine bleeding. Her role as educator included participation in didactic education for the REI fellows at UVMMC.

39.    As Dartmouth-Hitchcock has closed the REI Division, so has the Dartmouth-Hitchcock administration begun to unravel the academic practice of Obstetrics and Gynecology. This decision has placed the Dartmouth OB/GYN residency at significant risk for probation by the ACGME, hindered the education and training of the Geisel Medical Students, and additionally places the Fellowship in REI at UVMMC in peril. The Dartmouth-Hitchcock administration's decision to close the REI Division—what they have depicted as only "affecting 124 patients"—will have a significant ripple effect on the available services and training of residents in inter-related subspecialties such as radiology, medical oncology, pediatrics, and medical endocrinology.

40.    Residents who benefitted from the training received through the REI Division have already complained about the detrimental impact of the closing of the REI Division on the resident program.

41.    Commitment to the comprehensive medical care for Patients and Employees: Dartmouth-Hitchcock's Mission states: "We advance health through research, education, clinical

15

practice and community partnerships, providing each person the best care in the right place, at the right time, every time." Infertility is a medically-recognized disease. It is a time-consuming and an emotionally-draining undertaking for a woman or a couple to participate in the fertility program. When Dartmouth-Hitchcock encouraged patients to participate in its infertility program, it made a commitment that its services would be available during the entire period leading up to pregnancy and, if fortunate, birth. When Dartmouth-Hitchcock decided to cover fertility services as a healthcare benefit for its employees, Dartmouth-Hitchcock as an employer made a statement that it "understood the gift of children in their employee's lives." With the REI Division program closing, Dartmouth-Hitchcock has announced it will cease to cover fertility services as an employee benefit as of December 31, 2017. While the decision may seem wise given Dartmouth-Hitchcock's perilous financial situation, the cost of providing comprehensive infertility services to its employees is minimal. Moreover, covering fertility treatments allows patients to access treatment at a younger age, allows patient and couples to receive services much earlier in the course of their disease, improves pregnancy rates, and lowers the risk of treatment complications by encouraging elective single embryo transfer. In addition, providing coverage for fertility benefits allows patients to receive fertility-preserving treatments prior to the course of their cancer treatments and medical therapy which threatens to end their fertility. In closing the REI program, the current Dartmouth-Hitchcock administration is sending a resounding message that they no longer support women's health, no longer support ready access to fertility preservation, and no longer want to provide healthcare coverage that would allow their employees and their patients to have children. The current administration of Dartmouth-Hitchcock is clearly abandoning their mission to providing the best care in the right place, at the right time, every time.

16

A-85

### Dr. Blanchette Porter's Disability

42.     In November 2015, as a result of an injury, Dr. Blanchette Porter became disabled and by December, her disability was sufficiently serious that she could not continue to work. Specifically, Dr. Blanchette Porter developed a cerebral spinal fluid ("CSF") leak in her spinal column. This caused symptoms including double vision, loss of balance, nausea, fatigue, cognitive decline, headaches, and more. Dr. Blanchette Porter initially received treatment at Dartmouth-Hitchcock. That treatment, including a blood patch procedure, was insufficient and incorrectly administered. Even though she was not improving, her treating physician refused to authorize a consult with the Mayo Clinic, which had significant expertise in CSF leaks. Dr. Blanchette Porter knew she was not receiving adequate treatment at Dartmouth-Hitchcock and requested an outside consultation numerous times, yet she was always denied. Ultimately, after her treating physician retired and she obtained a new treating physician at Dartmouth-Hitchcock, Dr. Blanchette Porter was finally given authorization for a consult at the Mayo Clinic. After receiving treatment at the Mayo Clinic, Dr. Blanchette Porter has now made what appears to be a full recovery from the disability.

43.     In or about December 2015, Dr. Blanchette Porter took a leave of absence under the Family and Medical Leave Act and on December 15, 2015, she went on Short-Term Disability. On June 14, 2016, she went on Long-Term Disability.

44.     On June 15, 2016, Dr. Blanchette Porter was able to return to work on a part-time basis, and on July 29, 2016, the Chair of the Department gave permission for Dr. Blanchette Porter to do additional work remotely from her home in Vermont, including interpretation and billing for gynecologic ultrasound images, consultation with members of the Department and nursing staff, counseling patients via telephone, authoring a book chapter for the preeminent REI

17

teaching resource, and preparing for invited presentations at national and international meetings.

45.     During the summer of 2016, Dr. Blanchette Porter provided care for a group of patients, largely physicians, who had postponed their conception specifically awaiting availability on her schedule.  She continued to provide much needed clinical services in gynecologic ultrasound and resident education.  And, at the request of the Chair of the Department, she was tasked with providing exceptional care to couples who had complained about the quality of the care they had received in her absence and were threatening legal action against Dartmouth-Hitchcock.

46.     Dr. Blanchette Porter's disability did not improve as hoped and on September 6, 2016, she had surgery at the Mayo Clinic.  On November 4, 2016, Dr. Blanchette Porter returned to work, gradually increasing her work load until, by January 2017, she was working 20 hours per week.  She continued at 20 hours per week until she was fired by Dartmouth-Hitchcock.  Dr. Blanchette Porter was on Long-Term Disability status when she was fired.

47.     When Dr. Blanchette Porter returned to work part-time, she provided the Chair of the Department a list of recommended accommodations developed by her treating providers. The Chair approved the accommodations which included, in part, having a quiet space in which to work and limiting work periods.

48.     Nevertheless, Dr. Blanchette Porter's immediate supervisor, the REI Division Director David Seifer, asked her to resume a full call schedule, ignored her work boundaries, and continually pushed her to extend her work time to consult with him and the other REI provider on their cases.

49.     Dr. Blanchette Porter repeatedly explained to him that her schedule was limited while she was recovering on the advice of her physicians and further explained her approved

18

accommodations.

50.     When he continued to make critical comments about her schedule and failed to respect her approved accommodations, Dr. Blanchette Porter sought the assistance of the practice manager, Heather Gunnell, and the Chair of the Department, Dr. Leslie DeMars.  The situation did not improve.

51.     When Dr. Blanchette Porter was terminated, her job responsibilities consisted primarily of performing non-REI work that was essential to the function of the Department.  In view of her expertise in multiple areas, there was more than sufficient work to fill her schedule and keep her busy, even with the closure of the REI program.

52.     Dr. Blanchette Porter was terminated just days after she informed the Department Chair that she needed to return to the Mayo Clinic for a follow-up appointment and was repeatedly reminded by the Chief Clinical Officer, Dr. Edward Merrens, that she could remain out on long-term disability.

53.     After Dr. Blanchette Porter's employment was terminated, the Dartmouth-Hitchcock administration told members of the staff that the decision to terminate her employment was motivated by the fact that she had been out of work for an extended period and was only able to work part-time.

**IVF/ART Regulation**

54.     The medical practice of in vitro fertilization and assisted reproductive technology is one of the most highly regulated medical practices in the United States.  At the federal level, three agencies regulate IVF/ART:  the Centers for Disease Control and Prevention ("CDC") collects and publishes data, the Food and Drug Administration has jurisdiction over screening

19

and testing of reproductive tissues such as donor eggs and sperm, and the Centers for Medicare and Medicaid Services ("CMS") is responsible for implementation of the Clinical Laboratory Improvement Act to insure the quality of laboratory testing.

55.     Dr. Blanchette Porter has insisted that the REI Division strictly comply with all applicable state and federal regulations that govern IVF/ART.

56.     Her insistence on best practices and strict compliance with the law, and repeated complaints to the Department's leadership when she observed improper or unlawful conduct, motivated, in part, Dartmouth-Hitchcock's decision to terminate her employment.

**Problems with Quality of Care in the REI Division**

*Junior Physician Incompetence*

57.     During the summer of 2014, Dr. Blanchette Porter worked for the first time with a newly-employed junior physician in the REI Division who had apparently been hired without undergoing the standard scrutiny for the employment of a physician at Dartmouth-Hitchcock. Dr. Blanchette Porter observed this junior physician's practice in the clinic, operating room, and in the management and treatment of REI patients, and she concluded that his knowledge base and skill were significantly below what was expected for a recent graduate of a fellowship in REI.  Indeed, she later learned the fellowship program that trained this physician had been placed on probation for substandard training practices.

58.     In good faith, Dr. Blanchette Porter spent significant time trying to train this junior physician including taking call with him on a daily basis for approximately six months.

59.     Dr. Blanchette Porter repeatedly expressed her concerns about this physician to the Chair of the Department and to the Practice Manager.  She reported that in addition to the

20

physician's lack of knowledge and technical skills, the most troubling problem was his lack of critical thinking and lack of ability to assess patients to determine the appropriate treatment of care. She further noted the adverse effects on patients when his work was poorly performed.

60.     In May 2016, Dr. Blanchette Porter was asked by the Department Chair, Dr. DeMars, to provide comments to herself and the new REI Division Director, Dr. Seifer, on the practices of this physician and, in particular, whether the practices posed a risk to patient safety. Dr. Blanchette Porter provided detailed comments which explained the ways in which the physician's practices and behavior were below the standard of care expected of Dartmouth-Hitchcock physicians, how there was a significant deficit in his fund of knowledge in clinical medicine, how the physician's surgery skills were nearly absent, and why patient safety had been, and would continue to be, compromised.

61.     Dr. Blanchette Porter informed Dr. DeMars, Dr. Seifer, and Ms. Gunnell that other professionals were similarly concerned. For example, she explained that senior resident physicians had been assigning upper-level residents to assist this physician in the operating room, even on simple surgical cases more commonly assigned to interns, in order to attempt to keep the physician out of trouble, and she described specific instances in which injury to patients had been prevented only because other medical professionals had intervened. Nurses who had observed consistently low pregnancy rates for this new physician began to schedule embryo transfers on Dr. Blanchette Porter's schedule instead of this new physician where possible.

62.     Dr. Blanchette Porter also reported to management that the physician's pregnancy rates for embryo transfers were consistently poor and showed no signs of improving. She recommended that he not be permitted to handle any more transfer of embryos because he significantly compromised the patients' ability to conceive, and it was unfair and unsafe for the

21

patients. As a result of the new physician's poor practices, and at the request of the Department Chair, Dr. Blanchette Porter handled—at no charge—the repeat IVF cycles of couples who had received suboptimal clinical care by the junior physician.

63.     Dr. Blanchette Porter did not receive a response to her comments, and when she asked her Dr. Seifer about what action Dartmouth-Hitchcock intended to take, he told her that her views were "elitist." Dr. DeMars told her that Dr. Seifer would take over remedial training for this physician, who was permitted to continue to see patients and perform REI procedures.

*Senior Physician Incompetence*

64.     In May 2016, Dartmouth-Hitchcock hired a senior physician to become the new REI Division Director. Although the physician did not yet have a New Hampshire medical license, he nevertheless provided care to patients in the presence of the junior physician described above. Dr. Blanchette Porter objected saying that such action constituted the practice of medicine without a license in violation of New Hampshire law and ethical obligations and reported his conduct to Dr. DeMars and Ms. Gunnell.

65.     In July 2016, Dr. Blanchette Porter was approached on multiple occasions by the REI nurses, ultrasound technicians, and embryologists who expressed serious reservations about the substandard technical ability of the new REI Division Director and other concerns impacting patient safety. The staff stated that they did not have confidence in the ability of this physician to competently handle the work, and providers within the Department were reluctant to contact this physician when he was on call for general gynecology due to his limited skill with gynecologic surgery.

66.     The nurses had reported that the REI Division Director's oocyte harvest technique was unnecessarily traumatic. The nurses had reported that when the senior physician performed

22

A-91

the oocyte harvest, the follicules aspirated were unnecessarily bloody, and the patients frequently reported more postoperative pain than typical for this procedure.

67.     The ultrasound technicians expressed further concern that unnecessary and inappropriate procedures (such as fallopian tube patency testing on patients not trying to conceive) were being performed on patients without appropriate consent.

68.     Dr. Blanchette Porter and other members of the staff observed that the senior physician appeared disorganized and forgetful.

69.     Dr. Blanchette Porter referred all of these persons to their supervisors, and when the supervisors approached Dr. Blanchette Porter raising the same issues, she referred them to the Practice Manager and the Department Chair.

70.     Eventually, the Chair of the Department directed the physician to cease doing the unnecessary and inappropriate procedures, and in August 2016, Dr. Blanchette Porter was asked by the Chair of the Department to assess the oocyte retrieval skills and other technical abilities of the new senior physician.  Dr. Blanchette Porter concluded that the physician's technical ability for oocyte retrievals and other commonly conducted infertility procedures was poor and not up to current standards.

71.     In addition, Dr. Blanchette Porter reported that because the scope of this physician's practice was extremely limited, he was unable to meet his clinical productivity and financial obligations, and he would be unable to fill his schedule.  The Division had felt the effects of his lack of clinical acumen as he declined to see patients who had been scheduled to see him for common gynecologic diagnoses, limiting himself to a practice of fertility care only.

72.     Dr. Blanchette Porter discussed her observations and recommendations verbally and in writing to the Chair of the Department and to the Practice Manager.

23

**Dr. Blanchette Porter Warns About Zika Virus**

73.     In February 2017, Dr. Blanchette Porter was asked by the Director of the Human Embryology and Andrology Laboratory to review the chart and course of care of a couple then under the care of the junior and senior REI physicians described above. The couple had created two (2) embryos with the use of anonymous donor oocyte through an outside egg bank and the husband's cryopreserved sperm that had potentially been exposed to the Zika virus.

74.     The couple were evaluated by the REI service on the day they traveled to Brazil on vacation. The couple subsequently traveled on vacation to the Caribbean. Both Brazil and the Caribbean are on the CDC (Centers for Disease Control) list of countries with known active Zika virus transmission. The Zika virus can be transmitted through mosquito bite, the placenta, infected sperm, and/or other body fluids. Thus, during their vacation travel both members of the couple were twice potentially exposed to Zika virus.

75.     Zika virus infection in pregnancy can result in miscarriage or stillbirth and can lead to infants with severe birth defects, microcephaly (small brains), skull deformities, and children with severe physical and cognitive disabilities. Four organizations, including the CDC, the World Health Organization ("WHO"), the American Congress of Obstetricians and Gynecologists ("ACOG"), and the American Society for Reproductive Medicine ("ASRM") provide guidance for time from potential exposure to Zika virus to pregnancy for both the male and female partners. The guidance varies, but the majority of organizations recommend that men wait six months prior to participating in a pregnancy following travel to a known Zika endemic area. These embryos were created with sperm frozen within approximately two weeks from returning from Brazil. The true risk of transmitting Zika virus under the circumstances was not known, and, while it is likely low, the risk was not zero. On the other hand, the risk of harm if

24

transmission occurred was great.  Thus, participation in a conception assisted by the REI Division for a couple known to have traveled not once, but twice, to areas of Zika virus transmission, represented considerable potential harm for the couple and liability for Dartmouth-Hitchcock.  Further, the risk could have been reduced by delaying collection of sperm for the recommended 6 months from the last exposure.

76.     Dr. Blanchette Porter was informed by the nursing staff that the REI Division Director and Risk Management had created a consent form for the couple to "assume the risk" of a Zika-infected pregnancy and hold Dartmouth-Hitchcock harmless.

77.     Dr. Blanchette Porter contacted Risk Management and was advised that "we do things outside of national guidelines all the time, and as long as the patient is informed and the physician documents their reason for going outside guidelines, then it is acceptable practice." Dr. Blanchette Porter made it clear in conversations with Risk Management that in her opinion, it was unethical and unsafe to proceed with the transfer particularly where, as here, the potential harm was great and there was another option with significantly less risk.  Dr. Blanchette Porter recommended that the couple be presented with the alternative of creating new embryos following the recommended period of delay to conception and asserted that without offering all reasonable options to the couple, informed consent would be incomplete.

78.     Before the woman underwent embryo transfer, the physicians in the REI Division met and reviewed the national and international guidance (CDC, ASRM, WHO, and ACOG), and discussed treatment alternatives for the provision of safe fertility care for this couple. Dr. Blanchette Porter recommended reimbursing the couple for the cost of the donor oocytes, use of condoms or avoidance of intercourse, and creating a second set of embryos after the recommended wait time to conception post travel for both partners had passed, thus minimizing

25

the risk of transmission of Zika virus. Dr. Blanchette Porter expressed her strong disapproval of proceeding with the transfer of the embryo(s) with the potential Zika exposure where a reasonable treatment alternative was available. When the Division Director declined to offer the alternative option to the couple, Dr. Blanchette Porter refused to have a role in assisting in the planned frozen embryo transfer. Despite Dr. Blanchette Porter's explicit warning and the risk associated with the transfer of these embryos, the REI Division proceeded with an elective embryo transfer and the woman became pregnant. She has an ongoing pregnancy, thus the outcome is not known, and may not be truly known for years. The couple have one remaining embryo in long-term storage at Dartmouth-Hitchcock and, thus, the potential for a second child exposed to the Zika virus remains.

## Irregularities and Fraudulent Medical Billing Practice

79.     The American Society of Reproductive Medicine ("ASRM") provides guidance on the recommended diagnostic evaluation for infertility. Most insurance carriers, including Medicaid, cover only a well-defined series of infertility testing, but not infertility treatment. Even for covered testing, patients must absorb costs associated with co-pays and deductibles as well as loss of work time and travel expenses. Conducting tests outside the standard diagnostic evaluation protocol or beyond what is clinically indicated increases the risk of harm to the patient and raises red flags to insurance carriers, who may deny coverage to the patient and/or impose consequences on the physician and hospital for excessive and fraudulent medical billing.

80.     When Dr. Blanchette Porter returned to work, she learned that the other two physicians in the REI Division (described above) were deviating from the standard diagnostic protocol and ordering excessive and unnecessary tests.

26

81.     Dr. Porter strongly objected and told the physicians and Dr. DeMars and Ms. Gunnell that it was improper, fraudulent, and unlawful to order and bill for unnecessary patient testing.  She also informed the Dartmouth-Hitchcock Value Institute of the practice of these physicians to order unnecessary tests.

82.     The REI Division Director pressured her to perform unwarranted and inappropriate imaging studies on patients.  She refused.

83.     Dr. Blanchette Porter also objected to the junior physician's practice of performing and billing for outpatient consultative ambulatory visits in a Department of Radiology room designated as inpatient.  Dr. Porter counseled the junior physician on three occasions that he could not properly bill for outpatient consults in a space designated for inpatient services.  When he continued the practice, she informed Dartmouth-Hitchcock management.  After an extended period of time, the Department Chair put a stop to the unlawful billing practice.

**Announcement of Decision to Close the REI Division**

84.     On May 4, 2017, Dartmouth-Hitchcock issued a public announcement that it would close the REI Division as of May 31, 2017.

85.     Dartmouth-Hitchcock's administrators have given a series of explanations why they decided to close the REI Division and fire all of the physicians who worked there, including that the right staff could not be provided by Dartmouth-Hitchcock for a service that required 24/7 coverage; that "declining birth rates" were somehow responsible for the decision to close the Division; and that there were "personality problems" and the doctors "could not get along."

86.     Dartmouth-Hitchcock's decision to close the REI Division was not based on

staffing shortages. There have been times when the REI Division has experienced nursing shortages, but at no time did anyone suggest that the solution to such shortages was to close the REI Division. Dartmouth-Hitchcock had the ability to recruit additional qualified providers, and indeed, just weeks before announcing the decision to close the program, had been in discussions with several experienced and competent providers interested in joining the REI Division.

87.     Dartmouth-Hitchcock's decision to fire Dr. Blanchette Porter and to close the REI Division was not the result of economics or profitability or a lack of patients. Dartmouth-Hitchcock's management has been widely quoted as saying that the REI Division was profitable.

88.     The decision to fire Dr. Blanchette Porter is also not related to the duplication of available services, nor do other Dartmouth-Hitchcock providers have similar knowledge or skill.

89.     Likewise, it was not based on the quality of Dr. Blanchetter Porter's work, which was impeccable. Her loss has been deeply felt by the many consulting subspecialists and general providers in the Department. At no time has any administrator stated that anything in Dr. Blanchette Porter's job performance was cause for her termination and, in fact, her job performance was excellent.

90.     Insistence on the provision of high-quality services by competent providers in accordance with established rules and guidance is not properly characterized as an inability to get along with others.

91.     Dartmouth-Hitchcock failed to put patients first in closing the REI Division. Although Dartmouth-Hitchcock informed a small number of the patients of the REI Division of its decision to cease providing infertility services and reproductive medicine care, most of the patients learned of the decision through reading the newspaper, hearing about it through social media, or calls from other patients. The failure of Dartmouth-Hitchcock to directly inform its

28

A-97

patients of the decision caused needless upset and harm.

92.     Dartmouth-Hitchcock had an ethical obligation to the patients who had already entered into an infertility treatment cycle of care for the summer of 2017 to complete those treatment cycles.  When the REI Division was abruptly closed on May 31, 2017, there were patients who had already purchased thousands of dollars of medication, taken time off from work, signed institutional consent for treatment, and were scheduled for IVF/ART procedures. All of these patients were forced on short notice to reestablish care at outside facilities, leading to undue expense, stress, and anger.  At least one patient (whose frozen embryo transfer had been scheduled for June) threatened legal action against Dartmouth-Hitchcock due to the sudden closure of the REI program without adequate provision for patients already in the midst of treatment.  To this patient, her cryopreserved embryo represented her baby, and the risk of loss of the embryo during shipping to an outside facility was unconscionable, particularly where the time to her anticipated embryo transfer was only a matter of days.  Dr. Blanchette Porter has personally counseled and cared for this patient and others to assist them in their transition.

93.     A few weeks after the REI Division was closed, Dr. DeMars, then the Chair of the OB/GYN Department, abruptly announced that she was stepping down as Chair.  Her "resignation" statement was terse, and she did not offer a reason why she was stepping down. Dr. DeMars had been a vocal supporter of Dr. Blanchette Porter, and she supported the idea of maintaining or re-opening the REI Division.  Her stepping down as Chair was likely related in some way to the closure of the REI Division.

29

## COUNT 1

## <u>WRONGFUL DISCHARGE</u>

94.     Dr. Blanchette Porter re-alleges and incorporates by reference paragraphs 1 through 93 as if stated fully herein.

95.     In bad faith, as retaliation, and with malice, Dartmouth-Hitchcock terminated Dr. Blanchette Porter's employment for performing an act that public policy would encourage—that is, among other things, speaking up and urging Dartmouth-Hitchcock to take steps to curtail or eliminate the risk and actual harm to patients caused by the junior and senior REI physicians described above; insisting that Dartmouth-Hitchcock obtain patient consent before performing procedures on them; objecting to improper patient billing; objecting to the practice of medicine without an active New Hampshire license; and urging Dartmouth-Hitchcock not to close its Reproductive Science Laboratory (thereby causing injury to patients who had stored their cryopreserved sperm, oocytes, and embryos and who reasonably expected that D-H would assist them in having a child).

96.     In addition, or in the alternative, Dartmouth-Hitchcock terminated Dr. Blanchette Porter's employment for refusing to go along with behaviors that public policy would condemn. Among other things, Dr. Blanchette Porter refused to participate or acquiesce in Dartmouth-Hitchcock's failure to strictly comply with state and federal laws and professional society guidelines regarding unsafe and unethical behavior; she refused to participate in a procedure involving an embryo and mother both potentially exposed to the Zika virus; and she refused to order or participate in unnecessary tests on patients and associated improper billing practices.

97.     D-H's wrongful discharge of Dr. Blanchette Porter proximately caused her damages in an amount to be proved at trial.

30

## COUNT 2

### VIOLATION OF THE NEW HAMPSHIRE WHISTLEBLOWERS' PROTECTION ACT

98.     Dr. Blanchette Porter re-alleges and incorporates by reference paragraphs 1 through 93 as if stated fully herein.

99.     In violation of the New Hampshire Whistleblowers' Protection Act, RSA 275-E:2 (the "Whistleblowers' Protection Act"), Dartmouth-Hitchcock harassed, abused, intimidated, discharged, threatened, and otherwise discriminated against Dr. Blanchette Porter regarding compensation, terms, conditions, locations and privileges of employment because, in good faith, Dr. Blanchette Porter reported or caused to be reported what she had reasonable cause to believe were violations of the law—namely, a) the transfer and implantation of an embryo where transmission of Zika virus to the conception was a known risk; b) performing procedures on patients without obtaining the patients' consent; c) fraudulent billing practices; and d) failure to retain necessary personnel to validate Federally-required data reports.

100.    Also in violation of the Whistleblowers' Protection Act, Dartmouth-Hitchcock harassed, abused, intimidated, discharged, threatened and otherwise discriminated against Dr. Blanchette Porter regarding compensation, terms, conditions, locations and privileges of employment because Dr. Blanchette Porter objected to and refused to participate in activities that she believed, in good faith, violated the law.

101.    Pursuant to the Whistleblowers' Protection Act, the Court should order reinstatement and back-pay, as well as reasonable attorneys' fees and costs, to Dr. Blanchette Porter for Dartmouth-Hitchcock's violations of the Whistleblowers' Protection Act.

## COUNT 3

### DISABILITY DISCRIMINATION & RETALIATION
### (AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101 *et seq.*)

102.   Dr. Blanchette Porter re-alleges and incorporates by reference the allegations of paragraphs 1 through 93 as if stated fully herein.

103.   Dartmouth-Hitchcock unlawfully discriminated and retaliated against Dr. Blanchette Porter in violation of Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.* by failing to provide reasonable accommodations to Dr. Blanchette Porter and by terminating her employment as a result of her disability.

104.   At the time that Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was a well-qualified physician with a disability who, with reasonable accommodation, was capable of performing all of her essential duties.

105.   Dartmouth-Hitchcock's decision to terminate Dr. Blanchette Porter's employment was motivated by her disability and/or request for accommodations.

106.   Dartmouth-Hitchcock has informed members of its professional staff that Dr. Blanchette Porter was terminated because she had been injured and was only working part-time.

107.   At the time of Dartmouth-Hitchcock's decision to close the REI Division and terminate Dr. Blanchette Porter's employment, Dartmouth-Hitchcock did not tell Dr. Blanchette Porter that accommodating her disability would be an undue hardship, nor did Dartmouth-Hitchcock evaluate the feasibility of restructuring her position or reassigning her to another position within the Department.

108.   At the time that Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was spending only a small portion of her time handling infertility work and there was sufficient clinical demand for her GYN skills in the Department to fill her schedule.

32

A-101

## COUNT 4

### DISABILITY DISCRIMINATION
### (SECTION 504 OF THE REHABILITATION ACT OF 1973)

109.   Dr. Blanchette Porter re-alleges and incorporates by reference the allegations of paragraphs 1 through 93 as if stated fully herein.

110.   Dartmouth-Hitchcock violated Section 504 of the Rehabilitation Act of 1973, 29 USC § 794, by subjecting Dr. Blanchette Porter to discrimination in employment as a result of her disability, as alleged in this Complaint.

111.   Dr. Blanchette Porter was an otherwise qualified individual with a disability.

112.   Solely by reason of her disability, she was excluded from employment at Dartmouth-Hitchcock.  She was therefore excluded from participation in and denied the benefits of employment at Dartmouth-Hitchcock, and she was wrongfully subjected to discrimination.

113.   Dartmouth-Hitchcock is a recipient of federal financial assistance.  This federal financial assistance includes but is not limited to Medicare/Medicaid reimbursement. Dartmouth-Hitchcock also receives federal funding from the National Science Foundation, the National Institutes of Health, the Center for Medicare and Medicaid, and the Health Resources and Services Administration.  Moreover, Dartmouth-Hitchcock is principally engaged in the business of providing health care.

## COUNT 5

### DISABILITY DISCRIMINATION AND RETALIATION
### (NEW HAMPSHIRE, RSA 354-A:7, RSA 354-A:7, VII, and RSA 354-A:19)

114.   Dr. Blanchette Porter re-alleges and incorporates by reference the allegations of paragraphs 1 through 93 as if stated fully herein.

33

115.    Dartmouth-Hitchcock also violated New Hampshire's unlawful discriminatory practice laws, RSA 354-A:7, I (discrimination/termination), RSA 354-A:7, VII (reasonable accommodations), and RSA 354-A:19 (retaliation), when it failed to provide reasonable accommodations and subsequently terminated her employment.

116.    At the time that Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was a well-qualified physician with a disability who, with reasonable accommodation, was capable of performing all of her essential duties.

117.    Dartmouth-Hitchcock's decision to terminate Dr. Blanchette Porter's employment was motivated by her disability and/or request for accommodations.

118.    Dartmouth-Hitchcock has informed members of its professional staff that Dr. Blanchette Porter was terminated because she had been injured and was only working part-time.

119.    At the time of Dartmouth-Hitchcock's decision to close the REI Division and terminate Dr. Blanchette Porter's employment, Dartmouth-Hitchcock did not tell Dr. Blanchette Porter that accommodating her disability would be an undue hardship, nor did Dartmouth-Hitchcock evaluate the feasibility of restructuring her position or reassigning her to another position within the Department.  There was no bona fide occupational qualification that prevented Dr. Blanchette Porter's employment.

120.    At the time that Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was spending only a small portion of her time handling infertility work and there was sufficient clinical demand for her GYN skills in the Department to fill her schedule

34

## COUNT 6

### DISABILITY DISCRIMINATION AND RETALIATION
### (VERMONT FAIR EMPLOYMENT PRACTICES ACT, 21 V.S.A. § 495 *et seq.*)

121.    Dr. Blanchette Porter re-alleges and incorporates by reference the allegations of paragraphs 1 through 93 as if stated fully herein.

122.    Dartmouth-Hitchcock violated the Vermont Fair Employment Practices Act, 21 V.S.A. § 495 *et seq.*, ("VFEPA") and discriminated against Dr. Blanchette Porter by terminating her employment as a result of disability.  In addition, Dartmouth-Hitchcock violated VFEPA by failing to accommodate Dr. Blanchette Porter's disability, and by retaliating against her for complaints about failure to accommodate her disability.

123.    Dartmouth-Hitchcock is an employer covered by VFEPA.  Dartmouth-Hitchcock does business and operates within Vermont.  In addition, Dr. Blanchette Porter is a resident of Vermont and regularly worked from home in Vermont.  Dartmouth-Hitchcock subjected Dr. Blanchette Porter to the effects of disability discrimination while she was working from home in Vermont, and Dr. Blanchette suffered the effects of unlawful discrimination in Vermont.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that the Court enter judgment in her favor and against defendant, containing the following relief:

a.    A declaratory judgment that the actions, conduct, and practices of defendants complained of herein violate the laws of the United States and the State of New Hampshire.

b.    An injunction that requires defendants to reinstate plaintiff as an employee with no loss of seniority or other benefits.

35

A-104

c.     An award of damages for any and all other monetary and non-monetary losses suffered by plaintiff in an amount to be determined at trial.

d.     An award to plaintiff for her costs of litigation, including but not limited to attorney's fees, costs of suit, and prejudgment interest.

e.     Punitive damages.

f.     Such other relief as the Court deems just and proper.

**Jury Demand**

The plaintiff demands trial by jury on all issues so triable.

Dated:  July 30, 2018

Respectfully submitted,

VITT & ASSOCIATES, PLC

By:

Geoffrey J. Vitt
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittandassociates.com

Katherine Burghardt Kramer
KATHERINE BURGHARDT KRAMER
LAW OFFICE PLLC
79 Court. St., Suite 3
P.O. Box 23
Middlebury, VT 05753
(802) 349-1627
kbk@kbkramerlaw.com

*Counsel for the Plaintiff*
*Misty Blanchette Porter, M.D.*

36

A-105

## CERTIFICATE OF SERVICE

I hereby certify that on July 30th, 2018, I have sent a copy of the First Amended Complaint, by regular U.S. Mail, postage prepaid, properly addressed to:

Tristram J. Coffin
Downs Rachlin Martin PLLC
Courthouse Plaza
199 Main Street
Burlington, VT 05402

Donald W. Schroeder
Jessica E. Joseph
Foley & Lardner LLP
111 Huntington Avenue
Boston, MA 02199

*Counsel for Defendants*
*Dartmouth-Hitchcock Health, et al.*

Katherine Burghardt Kramer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,

        Plaintiff,

vs.

DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,

        Defendants.

Case No. 5:17-cv-194

**DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED COMPLAINT**

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Defendants" or "Dartmouth-Hitchcock"), by and through their attorneys, hereby answer the Amended Complaint and Demand for Jury Trial ("Amended Complaint") brought by Plaintiff Misty Blanchette Porter ("Plaintiff") as follows:

**NATURE OF THE CASE**

1. Admitted.

2. Defendants admit that, on May 4, 2017, Dartmouth-Hitchcock announced that the REI Division would close at the end of May 2017 and that Plaintiff would no longer be employed by Dartmouth-Hitchcock as of June 3, 2017. Defendants further admit that, at times during her employment, Plaintiff was a senior voting member of Dartmouth-Hitchcock's staff and worked at Dartmouth-Hitchcock for more than twenty years in Obstetrics and Gynecology ("OB/GYN"), Reproductive Endocrinology and Infertility ("REI"), and Radiology. Defendants

1

further admit that Plaintiff performed work in various aspects of reproductive medicine, including the care of children and women with hormonal imbalance and genetic syndromes affecting the reproductive system, *in vitro* fertilization and assisted reproductive technology procedures, complex gynecologic clinical care, surgery for women who desired to have child-bearing capacity, and gynecologic and early pregnancy pelvic ultrasound.  Defendants deny the remaining allegations in Paragraph 2.

3.      Denied.

4.      Defendants are without knowledge or information sufficient to form a belief as to the extent of Dartmouth-Hitchcock's use of Plaintiff's name and image in advertisements, if any, and Plaintiff's testimony, if any, before the New Hampshire legislature.   Defendants are, accordingly, without knowledge or information sufficient to form a belief as to the truth of those allegations and therefore deny those allegations.   Defendants deny the remaining allegations in Paragraph 4.

5.      Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning her beliefs and characterizations of her medical skillset, and therefore deny those allegations.  Defendants deny the remaining allegations in Paragraph 5.

6.      Defendants admit that Plaintiff was receiving long-term disability benefits at the time Dartmouth-Hitchcock terminated her employment.   Defendants deny the remaining allegations in Paragraph 6.

7.      Denied.

2

## THE PARTIES

8.     Defendants are without knowledge or information sufficient to form a belief as to Plaintiff's place of residence.  Defendants admit that Plaintiff was employed by Dartmouth-Hitchcock from 1996 until on or around June 3, 2017.

9.     Defendants admit the allegations in the first sentence of Paragraph 9.  The allegations in the second sentence of Paragraph 9 contain conclusions of law for which no responsive pleading is required.

10.     Defendants admit the allegations in the first sentence of Paragraph 10.  The allegations in the second sentence of Paragraph 10 contain conclusions of law for which no responsive pleading is required.

11.     Defendants admit the allegations in the first sentence of Paragraph 11.  The allegations in the second sentence of Paragraph 11 contain conclusions of law for which no responsive pleading is required.

12.     Defendants admit the allegations in the first two sentences of Paragraph 12.  The allegations in the third sentence of Paragraph 12 contain conclusions of law for which no responsive pleading is required.

13.     Defendants admit the allegations in the first two sentences of Paragraph 13.  With respect to the allegations in the third sentence of Paragraph 13, Defendants admit that Dartmouth-Hitchcock receives federal funding from the National Science Foundation, the National Institutes of Health, the Centers for Medicare and Medicaid Services, and the Health Resources and Services Administration.  Defendants admit the allegations in the fourth sentence of Paragraph 13.

3

14.     The allegations in the first sentence of Paragraph 14 contain conclusions of law for which no responsive pleading is required. Defendants admit the allegations in the second sentence of Paragraph 14.

## JURISDICTION AND VENUE

15.     The allegations in Paragraph 15 of the Amended Complaint are conclusions of law for which no responsive pleading is required. To the extent a response is required, Defendants admit that Plaintiff purports to invoke this Court's jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

16.     The allegations in Paragraph 16 of the Amended Complaint are conclusions of law for which no responsive pleading is required. To the extent a response is required, Defendants admit that Plaintiff purports to establish the propriety of her chosen venue pursuant to 28 U.S.C. § 1391.

17.     Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations in Paragraph 17, and therefore deny those allegations.

18.     Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations in Paragraph 18, and therefore deny those allegations.

## ALLEGED FACTS

19.     Admitted.

20.     Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations in Paragraph 20, and therefore deny those allegations.

21.     Defendants deny Plaintiff's allegations in Paragraph 21 that Dartmouth-Hitchcock's REI clinic has been the only realistic chance for many patients in New England to have a family. Defendants are without knowledge or information sufficient to form a belief as to

4

the truth of Plaintiff's allegations purporting to characterize the level of gratitude expressed towards Dartmouth-Hitchcock by its patients.  Defendants admit the remaining allegations in Paragraph 21 of the Amended Complaint.

22.     Defendants admit that Dartmouth-Hitchcock's REI Division was a full-range REI service.  Defendants also admit that fertility care is complex, it requires return visits for blood work and ultrasound monitoring in some instances, and Dartmouth-Hitchcock's REI program was patient-centered.  Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegation that Dartmouth-Hitchcock's Human Embryology and Andrology Laboratory is the only human embryology and gamete laboratory in New Hampshire, and therefore deny that allegation.  Defendants are also without knowledge or information sufficient to form a belief as to the truth of Plaintiff's characterizations of the day-to-day obligations and stresses of patients and her characterizations of the REI or fertility services offered by other healthcare providers, and therefore deny those allegations.  Defendants deny the remaining allegations in Paragraph 22 of the Amended Complaint.

23.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 of the Amended Complaint, and therefore deny those allegations.

24.     Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning her beliefs of the impact her purported expertise had on the Department of Obstetrics and Gynecology.  Defendants deny the remaining allegations in Paragraph 24.

25.     Defendants admit the allegations in the first sentence of Paragraph 25. Defendants deny the remaining allegations in Paragraph 25.

5

26.     Defendants admit the allegations in the last sentence of Paragraph 26.  Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's subjective beliefs concerning her reputation and qualifications, and therefore deny those allegations.  To the extent any further responsive pleading is necessary, Defendants deny the remaining allegations in Paragraph 26.

27.     Defendants deny that Plaintiff has been the "go-to" person to provide interpretation of and consultation regarding pelvic ultrasounds to providers throughout the Dartmouth-Hitchcock Health Alliance for diagnoses of abnormal uterine and postmenopausal bleeding, ectopic and extra-uterine pregnancy, congenital anomalies of the reproductive tract, and ovarian and adnexal tumors in patients from the in-utero fetus to pregnant patients to postmenopausal women.  Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning any line outside her door, and therefore deny those allegations.  Defendants are also without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegation that she was "the gynecologist who read the majority of the gynecologic ultrasounds during that period" because Plaintiff has failed to specify the period to which she is referring.  Defendants are further without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegation that, since early June, she has continued to get calls from former colleagues concerning pelvic ultrasound procedures, and therefore deny that allegation.  Defendants deny the remaining allegations in Paragraph 27.

28.     Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations in Paragraph 28 regarding the primary concerns of reproductive age patients with life-threatening illnesses.  The allegations in the second sentence

of Paragraph 28 purport to state the contents of guidelines published by the American Society of Clinical Oncology. That document speaks for itself and, therefore, no responsive pleading is required. Defendants admit that Dartmouth-Hitchcock's IVF/ART program and Reproductive Sciences lab were the only program in the state of New Hampshire that offered oocyte, sperm, and embryo cryopreservation. Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations in Paragraph 28 concerning specific advice or counsel that she provided to patients. Defendants are also without knowledge of information sufficient to form a belief as to the truth of Plaintiff's broad characterizations of the counseling needs of patients who have been recently diagnosed with cancer. Defendants deny the remaining allegations in Paragraph 28.

29.    Denied.

30.    Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations in Paragraph 30 regarding her subjective beliefs and characterizations of her medical treatment capabilities. Defendants are also without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations in Paragraph 26 regarding specific counseling that she purportedly provided to patients. Defendants deny the remaining allegations in Paragraph 30.

31.    Admitted.

32.    Defendants admit that Plaintiff provided some assistance to the OB/GYN Department during inspections by the FDA and CAP and has counseled patients regarding their stored embryos and gametes. Defendants also admit that Dr. Esfandiari has oversight of Dartmouth-Hitchcock's Human Embryology and Andrology Laboratory. Defendants further admit that Dartmouth-Hitchcock does not currently have a clinician to sign orders to discard

7

abandoned embryos and gametes.  Further answering, Defendants state that since the REI Division closed, Dartmouth-Hitchcock, as a matter of policy, does not dispose of stored patient embryos or gametes and has waived storage fees for patients who have embryos or gametes stored at Dartmouth-Hitchcock.  Therefore, the fact that there is not currently a clinician on Dartmouth-Hitchcock's staff who can sign orders to discard abandoned embryos or gametes is irrelevant given that Dartmouth-Hitchcock does not discard such embryos or gametes. Defendants deny the remaining allegations in Paragraph 32.

33.    Defendants are without knowledge or information sufficient to form a belief as to the number of patients to whom Plaintiff refers in her allegation that, between January 1, 2017 and May 31, 2017, Dartmouth-Hitchcock's IVF/ART program completed treatment cycles for a "multitude" of patients.  Defendants are, therefore, without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 33, and, accordingly, deny those allegations.  The second and third sentences of Paragraph 33 purport to state the contents and requirements of the Fertility Clinic Success Rate and Certification Act of 1992.  That document speaks for itself and, therefore, no responsive pleading is required. Defendants admit that Dartmouth-Hitchcock's Human Embryology and Andrology Laboratory generates certain data pertaining to pregnancy and birth statistics, including information related to patients' infertility diagnoses, ART procedures, and statistics on pregnancy and birth rates. Defendants deny the remaining allegations in Paragraph 33.

34.    Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning the present number of boarded subspecialties of OB/GYN and the structure of those subspecialties, and therefore deny those allegations. Defendants admit the remaining allegations in Paragraph 34.

8

35.     Defendants admit that Dartmouth-Hitchcock's OB/GYN Department has educated resident physicians and medical students from the Geisel School of Medicine during their classroom years and clinical rotations.  Defendants further admit that the OB/GYN Department has assisted in educating residents and fellows in the Radiology Department, and that the REI Division has provided instruction to OB/GYN residents.  Defendants are without knowledge or information sufficient to form a belief as to Plaintiff's allegations that (i) the OB/GYN Department assisted in educating residents and fellows in the Medical Endocrinology Department and (ii) that Plaintiff provided a majority of teaching of the performance and interpretation of gynecologic ultrasound and the performance of common ultrasound sound-guided procedures because Plaintiff has failed to allege the time frame to which this allegation relates.  To the extent a responsive pleading is required, Defendants deny these allegations and all remaining allegations in Paragraph 35.

36.     Defendants admit the allegations in the first two sentences of Paragraph 36. Defendants deny all remaining allegations in Paragraph 36.

37.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences of Paragraph 37, and therefore deny those allegations.  Defendants deny the remaining allegations in Paragraph 37.

38.     Defendants admit that Dartmouth-Hitchcock's REI division gave lectures on REI-related topics and disorders.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 38, and therefore deny those allegations.

39.     Denied.

9

40.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, and therefore deny those allegations.

41.     The allegations in the first sentence of Paragraph 41 purport to state the contents of a mission statement.  That document speaks for itself and, therefore, no responsive pleading is required.  Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegation that infertility is a "medically-recognized disease" because Plaintiff fails to allege by whom infertility is recognized as a disease.  Defendants are without knowledge or information sufficient to form a belief as to the extent of time or emotional energy expended by individuals who participated in Dartmouth-Hitchcock's fertility program and, accordingly, are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations in the third sentence of Paragraph 41.  Plaintiff's allegation that Dartmouth-Hitchcock made a statement that it "understood the gift of children in their employee's lives" apparently purports to describe a statement issued by Dartmouth-Hitchcock.  To the extent that a document containing such statement exists, that document speaks for itself and, to the extent such document does not exist, Defendants are without knowledge or information sufficient to form a belief as to this allegation.  Defendants are further without knowledge or information sufficient to form a belief as to the truth of Plaintiff's broad allegations purporting to describe the benefits of infertility service insurance coverage.  Defendants deny all remaining allegations in Paragraph 41.

42.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42, and therefore deny those allegations.

43.     Defendants admit that Plaintiff took a leave of absence pursuant to the Family and Medical Leave Act in approximately December 2015, that she received short-term disability

10

benefits beginning in approximately December 2015, and that she received long-term disability benefits beginning in approximately June 2016.

44.    Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegation that she was "able to return to work" on June 15, 2016.  Further answering, Defendants state that Plaintiff returned to work at Dartmouth-Hitchcock on a part-time basis beginning in July 2016, and was given permission by the Chair of the OB/GYN Department (the "Department Chair") to perform certain work remotely, including interpreting ultrasounds, consulting with staff members, and counseling patients.  Defendants deny the remaining allegations in Paragraph 44.

45.    Defendants admit that Plaintiff provided medical care on a limited basis during the summer of 2016.  Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning particular patients' rationale for obtaining care during summer 2016, and therefore deny those allegations.  Defendants deny the remaining allegations in Paragraph 45.

46.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 46, and therefore deny those allegations.  Defendants admit that Plaintiff returned to work in approximately November 2016, worked on a part-time basis from that time through the date on which the REI Division closed, and was receiving long-term disability benefits at the time the REI Division closed.  Defendants deny the remaining allegations in Paragraph 46.

47.    Defendants admit that, upon Plaintiff's return to work, she communicated with the Department Chair about potential accommodations for her medical condition and provided a list of accommodations to the Department Chair, which were purportedly recommended by

11

Plaintiff's physicians.   The Department Chair approved of the accommodations, including having a quiet space in which Plaintiff could work and limiting her work periods.   To the extent any further responsive pleading is required, Defendants deny the remaining allegations in Paragraph 47.

48.   Denied.

49.   Denied.

50.   Denied.

51.   Denied.

52.   Denied.   Further answering, Defendants state that Plaintiff was notified that her employment would be terminated as a result of the REI Division closing approximately one month before she was terminated.

53.   Denied.

54.   Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54.

55.   Denied.

56.   Denied.

57.   Defendants admit that in the summer of 2014 Plaintiff worked with a junior physician in the REI Division.   Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning her observations or opinions about the junior physician's practice, knowledge base, and skills or what she purports to have learned about the junior physician's fellowship program, and therefore deny those allegations. Defendants deny the remaining allegations in Paragraph 57.

58.     Denied.  Further answering, Defendants state that Plaintiff spent limited time, as part of the credentialing process, training the junior physician over the first month of the junior physician's employment, and provided little-to-no training or support to the junior physician thereafter.

59.     Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations in Paragraph 59 concerning her subjective observations and opinions about the junior physician's knowledge, technical skills, critical thinking, patient-assessment capabilities, and patient treatment.  Defendants admit that Plaintiff expressed her subjective observations and opinions about the junior physician to the Department Chair and the OB/GYN Practice Manager.  To the extent any further response is required, Defendants deny the allegations in Paragraph 59.

60.     Defendants deny that the Department Chair asked Plaintiff to provide comments to herself and the new REI Division Director regarding whether the practices of the junior physician posed a risk to patient safety.  Further answering, any feedback that the Department Chair sought from Plaintiff regarding the junior physician would have been in the context of seeking feedback for regular evaluation purposes and entirely unrelated to patient safety concerns.  Defendants admit that Plaintiff expressed criticisms of the junior physician to the Department Chair, but did so within the formal evaluation process.  To the extent any further response is required, Defendants deny the allegations in Paragraph 60.

61.     Defendants are without knowledge or information sufficient to form a belief about the truth of Plaintiff's allegations concerning conversations she allegedly had with other professionals at Dartmouth-Hitchcock about the junior physician, conversations she allegedly had with nurses about the junior physician, or nurses' rationales concerning how they scheduled

13

embryo transfers, and therefore deny those allegations. Defendants deny all remaining allegations in Paragraph 61.

62. Denied. Further answering, to the extent Plaintiff handled any repeat IVF cycles for couples free of charge, that decision would have solely been Plaintiff's and would not have been requested by the Department Chair.

63. Defendants admit that the junior physician, during his employment at Dartmouth-Hitchcock, treated patients and performed REI procedures. Defendants deny the remaining allegations in Paragraph 63.

64. Defendants admit that Dartmouth-Hitchcock hired a senior physician to become the new REI Division Director in or around May 2016. Defendants deny the remaining allegations in Paragraph 64.

65. Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning conversations she had with nurses, ultrasound technicians, and embryologists, and therefore deny those allegations. Defendants deny the remaining allegations in Paragraph 65.

66. Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning conversations she had with nurses, and therefore deny those allegations. Defendants deny the remaining allegations in Paragraph 66.

67. Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning conversations she had with ultrasound technicians, and therefore deny those allegations. Defendants deny the remaining allegations in Paragraph 67.

68.    Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning her observations or the observations of other staff members, and therefore deny those allegations.  To the extent any further response is required, Defendants deny the allegations in Paragraph 68.

69.    Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning conversations she had with nurses, ultrasound technicians, and embryologists, and therefore deny those allegations.  Defendants deny the remaining allegations in Paragraph 69.

70.    Defendants admit that Plaintiff was asked to observe a limited number of the senior physician's procedures, solely for ordinary credentialing purposes.  Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning conclusions she drew regarding the senior physician's technical ability, and therefore deny those allegations.  Defendants deny the remaining allegations in Paragraph 70.

71.    Denied.

72.    Defendants admit that Plaintiff discussed her observations regarding the senior physician's procedures solely within the context of the senior physician's credentialing process. Defendants deny the remaining allegations in Paragraph 72.

73.    Defendants deny Plaintiff's allegation in the first sentence of Paragraph 68. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 73, and therefore deny those allegations.

74.    The second sentence of Paragraph 74 purports to state the contents of a Centers for Disease Control list of countries with known active Zika virus transmission.  That document

15

speaks for itself and, therefore, no responsive pleading is required.  To the extent a responsive pleading is required, Defendants deny the allegations in the second sentence of Paragraph 69. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 74, and therefore deny those allegations.

75.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75 of the Amended Complaint, and therefore deny those allegations.

76.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76, and therefore deny those allegations.

77.     Denied.

78.     Defendants admit that the physicians in the REI Division discussed fertility care options for a couple who had travelled in the Caribbean.  Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 78, and therefore deny those allegations.

79.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 79, and therefore deny those allegations.  Defendants deny the remaining allegations in Paragraph 79.

80.     Denied.

81.     Denied.

82.     Denied.

83.     Denied.

84.     The allegations in Paragraph 84 purport to state the contents of an announcement issued by Dartmouth-Hitchcock.  That document speaks for itself and, therefore, no responsive pleading is required.

85.     Denied.

86.     Defendants admit that the REI Division experienced nurse staffing shortages. Defendants deny the remaining allegations in Paragraph 86.

87.     Denied.

88.     Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegation that her termination was "not related to the duplication of available services," and therefore deny that allegation.  Defendants deny the remaining allegations in Paragraph 88.

89.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89, and therefore deny those allegations.

90.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90, and therefore deny those allegations.

91.     Defendants are without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations in Paragraph 91 pertaining to how patients learned that the REI Division was closing, and therefore deny those allegations.  Defendants deny the remaining allegations in Paragraph 91.

92.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92, and therefore deny those allegations.

93.     Defendants admit that after the REI Division was closed, Dr. DeMars, who was then the Chair of the OB/GYN Department, announced that she was stepping down as Chair.

The remaining allegations in Paragraph 93 are Plaintiff's characterizations of Dr. DeMars' resignation statement, relationship with Plaintiff, and desires regarding the REI Division, as well as Plaintiff's conjecture regarding Dr. DeMars' reasons for stepping down as Chair. Defendants are without knowledge or information sufficient to form a belief as to such allegations, and therefore deny those allegations.

## COUNT I
### Wrongful Discharge

94.     Defendants incorporate herein all of the answers in Paragraphs 1 through 93 above, inclusive, as if the same were fully set forth herein.

95.     Defendants admit that Plaintiff's employment at Dartmouth-Hitchcock was terminated. The remaining allegations in Paragraph 95 of the Amended Complaint are conclusions of law for which no responsive pleading is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 95.

96.     Defendants admit that Plaintiff's employment at Dartmouth-Hitchcock was terminated. The remaining allegations in Paragraph 96 of the Amended Complaint are conclusions of law for which no responsive pleading is required. To the extent a response is required, Defendants deny the allegations in Paragraph 96.

97.     The allegations in Paragraph 97 of the Amended Complaint are conclusions of law for which no responsive pleading is required. To the extent a response is required, Defendants deny the allegations in Paragraph 97.

**WHEREFORE,** Defendants respectfully request that this Court enter judgment for Defendants dismissing Count I of the Amended Complaint and allow Defendants such other and further relief as the Court deems just and proper.

## COUNT II
### Violation of the New Hampshire Whistleblowers' Protection Act

98.     Defendants incorporate herein all of the answers in Paragraphs 1 through 97 above, inclusive, as if the same were fully set forth herein.

99.     The allegations in Paragraph 99 of the Amended Complaint are conclusions of law for which no responsive pleading is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 99.

100.    The allegations in Paragraph 100 of the Amended Complaint are conclusions of law for which no responsive pleading is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 100.

101.    The allegations in Paragraph 101 of the Amended Complaint are conclusions of law for which no responsive pleading is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 101.

**WHEREFORE,** Defendants respectfully request that this Court enter judgment for Defendants dismissing Count II of the Amended Complaint and allow Defendants such other and further relief as the Court deems just and proper.

## COUNT III
### Disability Discrimination & Retaliation
### Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.*

102.    Defendants incorporate herein all of the answers in Paragraphs 1 through 101 above, inclusive, as if the same were fully set forth herein.

19

A-125

103.    Defendants admit that Plaintiff's employment at Dartmouth-Hitchcock was terminated.   The remaining allegations in Paragraph 103 of the Amended Complaint are conclusions of law for which no responsive pleading is required.   To the extent a response is required, Defendants deny the remaining allegations in Paragraph 103.

104.    Defendants admit that Plaintiff's employment at Dartmouth-Hitchcock was terminated.   The remaining allegations in Paragraph 104 of the Amended Complaint are conclusions of law for which no responsive pleading is required.   To the extent a response is required, Defendants deny the remaining allegations in Paragraph 104.

105.    Denied.

106.    Denied.

107.    Denied.

108.    Denied.

**WHEREFORE,** Defendants respectfully request that this Court enter judgment for Defendants dismissing Count III of the Amended Complaint and allow Defendants such other and further relief as the Court deems just and proper.

### COUNT IV
**Disability Discrimination**
**Section 504 of the Rehabilitation Act of 1973**

109.    Defendants incorporate herein all of the answers in Paragraphs 1 through 108 above, inclusive, as if the same were fully set forth herein.

110.    The allegations in Paragraph 110 are conclusions of law for which no responsive pleading is required.   To the extent a response is required, Defendants deny the allegations in Paragraph 110.

111.    The allegation in Paragraph 111 is a conclusion of law for which no responsive pleading is required.  To the extent a response is required, Defendants deny the allegation in Paragraph 111.

112.    The allegations in Paragraph 112 are conclusions of law for which no responsive pleading is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 112.

113.    Defendants admit the allegations in the first two sentences of Paragraph 113. With respect to the allegations in the third sentence of Paragraph 113, Defendants admit that Dartmouth-Hitchcock receives federal funding from the National Science Foundation, the National Institutes of Health, the Centers for Medicare and Medicaid Services, and the Health Resources and Services Administration.  Defendants admit the allegations in the fourth sentence of Paragraph 113.

**Count 5**
**Disability Discrimination and Retaliation**
**New Hampshire RSA 354-A:7, RSA 354-A:7, VII, and RSA 354-A:19**

114.    Defendants incorporate herein all of the answers in Paragraphs 1 through 113 above, inclusive, as if the same were fully set forth herein.

115.    Defendants admit that Plaintiff's employment at Dartmouth-Hitchcock was terminated.  The remaining allegations in Paragraph 115 of the Amended Complaint are conclusions of law for which no responsive pleading is required.  To the extent a response is required, Defendants deny the remaining allegations in Paragraph 115.

116.   Defendants admit that Plaintiff's employment at Dartmouth-Hitchcock was terminated.   The remaining allegations in Paragraph 116 of the Amended Complaint are conclusions of law for which no responsive pleading is required.   To the extent a response is required, Defendants deny the remaining allegations in Paragraph 116.

117.   Denied.

118.   Denied.

119.   Denied.

120.   Denied.

## Count 6
### Disability Discrimination and Retaliation
### Vermont Fair Employment Practices Act, 21 V.S.A. § 495 *et seq.*

121.   Defendants incorporate herein all of the answers in Paragraphs 1 through 120 above, inclusive, as if the same were fully set forth herein.

122.   Defendants admit that Plaintiff's employment at Dartmouth-Hitchcock was terminated.   The remaining allegations in Paragraph 122 of the Amended Complaint are conclusions of law for which no responsive pleading is required.   To the extent a response is required, Defendants deny the remaining allegations in Paragraph 122.

123.   The allegation in the first sentence of Paragraph 123 is a conclusion of law for which no responsive pleading is required.   Defendants admit the allegations in the second sentence of Paragraph 123.   Defendants are without knowledge or information sufficient to form a belief as to the allegations in the third sentence of Paragraph 123, and therefore deny those allegations.   Defendants deny the allegations in the fourth sentence of Paragraph 123.

**AFFIRMATIVE DEFENSES TO THE AMENDED COMPLAINT**

Pursuant to Fed. R. Civ. P. 8(c), Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health, by their attorneys, hereby set forth the following affirmative defenses and reserve the right to raise additional affirmative defenses based on information learned through discovery.

1.      Plaintiff fails to state claims upon which relief can be granted.

2.      Plaintiff's claims are barred, in whole or in part, due to her failure to exhaust administrative remedies.

3.      Plaintiff is not disabled as that term is defined under federal or state law.

4.      At all relevant times, Defendants acted reasonably and in good faith.

5.      Defendants cannot be held liable under the Americans with Disabilities Act, N.H. RSA 354-A:7(I), NH RSA 354-A:7(VII), or NH RSA 354-A:19, because all actions taken by Defendants with regard to Plaintiff were legitimate and non-discriminatory.

6.      To the extent applicable, Defendants met their obligations under the Americans with Disabilities Act and New Hampshire's unlawful discriminatory practice laws to engage in the interactive process with Plaintiff.

7.      Defendants cannot be held liable under the Americans with Disabilities Act or New Hampshire's unlawful discriminatory practice laws because Plaintiff was not a qualified disabled person, as she was not capable of performing the essential functions of her position with or without a reasonable accommodation.

8.      To the extent applicable, Defendants cannot be held liable under the Americans with Disabilities Act or New Hampshire's unlawful discriminatory practice laws because some

23

or all of Plaintiff's requested accommodations would impose an undue hardship on Defendants' business operations.

9.      To the extent applicable, practices that Plaintiff alleges were discriminatory were based upon a bona fide occupational qualification.

10.      Plaintiff cannot establish a case for disability discrimination because no similarly-situated non-disabled employees were treated differently than Plaintiff.

11.      Plaintiff cannot establish any causal connection between her alleged protected class and any adverse action by Defendants.

12.      Plaintiff cannot prove that Defendants' legitimate, non-discriminatory reasons for any adverse employment actions were a pretext for disability-based animus.

13.      Plaintiff cannot establish that her termination from employment was for a reason that conflicts with a sufficiently important and well-defined public policy to create an exception to the at-will employment rule.

14.      Plaintiff cannot establish that she reported, or caused to be reported, what she had reasonable cause to believe was a violation of a New Hampshire law or rule.

15.      Plaintiff cannot prove that Defendants' legitimate, non-discriminatory reasons for any adverse actions taken against Plaintiff were a pretext for taking such actions because of a protected act engaged in by Plaintiff.

16.      Plaintiff's common law wrongful discharge claim is preempted by the New Hampshire Whistleblowers' Protection Act.

17.      To the extent applicable, Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

18.     To the extent applicable, Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, laches and/or estoppel.

19.     To the extent applicable, Plaintiff's claims are barred in whole or in part, by the doctrine of unclean hands.

20.     Plaintiff has failed to establish any basis for asserting claims for recovery of compensatory damages or attorneys' fees.

21.     Plaintiff has failed to mitigate her damages.

22.     Plaintiff has failed to establish any basis for asserting claims for recovery of punitive damages.

23.     To the extent applicable, Plaintiff's damages should be set off in the amount of the long-term disability benefits received by Plaintiff.

Defendants reserve the right to amend this Answer to add such affirmative defenses and potential counterclaims as warranted by additional investigation and discovery in this case.

Dated:  September 4, 2018                    Respectfully submitted,

                                            DARTMOUTH-HITCHCOCK MEDICAL
                                            CENTER, DARTMOUTH-HITCHCOCK
                                            CLINIC, MARY HITCHCOCK MEMORIAL
                                            HOSPITAL, and DARTMOUTH-
                                            HITCHCOCK HEALTH,

                                            By their attorneys,

                                            /s/ Tristram J. Coffin
                                            Tristram J. Coffin
                                            DOWNS RACHLIN MARTIN PLLC
                                            Courthouse Plaza
                                            199 Main Street
                                            Burlington, VT 05402
                                            Telephone: 802-863-2375
                                            tcoffin@drm.com

                                            *Attorney for Defendants*

25

A-131

Donald W. Schroeder (admitted *pro hac vice*)
Jessica E. Joseph (admitted *pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Telephone: 617-342-4000
Fax: 617-342-4001
dschroeder@foley.com
jjoseph@foley.com

*OF COUNSEL*

A-132

**CERTIFICATE OF SERVICE**

I hereby certify that on September 7, 2018, I electronically filed a true copy of Defendants Answer to Plaintiff's Amended Complaint with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Tristram J. Coffin
Tristram J. Coffin

A-133

**MANDATE**

## UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 6th day of February, two thousand twenty-four.

Before:    Debra Ann Livingston,
                 *Chief Judge*,
            Amalya L. Kearse,
            John M. Walker Jr.,
                 *Circuit Judges*.

_____

Misty Blanchette Porter, M.D.,

          Plaintiff - Appellant,

    v.

Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health,

          Defendants - Appellees.

_____

**JUDGMENT**

Docket No. 20-3894

The appeal in the above captioned case from a judgment of the United States District Court for the District of Vermont was argued on the district court's record and the parties' briefs.

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is affirmed in part, and vacated and remanded in part.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

**MANDATE ISSUED ON 02/27/2024**

A-134

20-3894
Porter v. Dartmouth-Hitchcock Medical Center

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2021

(Argued:  February 24, 2022                    Decided:  February 6, 2024 )

Docket No. 20-3894

_____

MISTY BLANCHETTE PORTER, M.D.,

*Plaintiff-Appellant*,

- v. -

DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-
HITCHCOCK   CLINIC,   MARY   HITCHCOCK   MEMORIAL
HOSPITAL, DARTMOUTH-HITCHCOCK HEALTH,

*Defendants-Appellees*.

_____

Before:  LIVINGSTON, *Chief Judge*, KEARSE and WALKER, *Circuit Judges*.

Appeal by plaintiff from a judgment of the United States District Court

for the District of Vermont, Geoffrey W. Crawford, *Chief Judge*, dismissing her

A-135

amended complaint against her former employer, defendants Dartmouth-Hitchcock Medical Center *et al.* (collectively "DHMC"), principally alleging discriminatory termination of her employment (a) on account of her disability, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and the laws of Vermont and New Hampshire; and (b) on account of her "whistleblowing"--and other complaints to DHMC of improper, incompetent, and harmful conduct by physicians in her DHMC division-- in violation of New Hampshire law.  The district court granted summary judgment in favor of defendants for lack of proof of causation, concluding principally that although plaintiff had shown a prima facie case with regard to disability and whistleblowing activity, DHMC adduced sufficient evidence of legitimate business reasons for the termination of her employment, to wit, the closure of the division in which she was employed and the unavailability of other suitable positions for her at DHMC; and that plaintiff failed to point to evidence sufficient to permit an inference that defendants' proffered reasons for her termination were pretext for the alleged discrimination. *See Porter v. Dartmouth Hitchcock Medical Center*, No. 5:17-cv-194, 2020 WL 6789564 (D. Vt. Nov. 3, 2020).

On appeal, plaintiff contends principally that the district court applied erroneous legal standards in assessing the causation element of her claims, and that in granting summary judgment the court decided genuine issues of fact as to whether defendants' explanations for their actions were pretext for such discrimination, issues that should have been submitted to a jury. We conclude that the district court did not properly apply summary judgment standards in considering the evidence as to pretext and causation, and hence it erred in concluding that no rational juror could infer that plaintiff was terminated, and not retained, based on her disability or her whistleblowing-type activity. We affirm insofar as the court dismissed plaintiff's claims that she was otherwise discriminated against by denial of a reasonable accommodation for her disability prior to her termination or was retaliated against for exercising her rights to such accommodation.

Affirmed in part, vacated and remanded in part.

GEOFFREY J. VITT, Norwich, Vermont (Vitt & Associates, Norwich, Vermont; Katherine B. Kramer, DGW Kramer, New York, New York, on the brief), *for Plaintiff-Appellant*.

DONALD W. SCHROEDER, Boston, Massachusetts (Jessica E. Joseph, Morgan McDonald, Foley & Lardner, Boston, Massachusetts, on the brief), *for Defendants-Appellees*.

A-137

KEARSE, *Circuit Judge*:

Plaintiff Misty Blanchette Porter, M.D., appeals from a judgment of the United States District Court for the District of Vermont, Geoffrey W. Crawford, *Chief Judge*, dismissing her amended complaint against her former employer, defendants Dartmouth-Hitchcock Medical Center *et al.* (collectively "DHMC" or "D-H"), principally alleging discriminatory termination of her employment (a) on account of her disability, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 701(a) *et seq.*, and the laws of Vermont and New Hampshire; and (b) on account of her reporting to DHMC on conduct by physicians in her DHMC division that she reasonably believed was unlawful (*i.e.*, whistleblowing) or unethical, improper, or harmful to patients (collectively Dr. Porter's "reporting activities"), in violation of New Hampshire law. The district court granted summary judgment in favor of defendants for lack of proof of causation, concluding principally that although Dr. Porter had shown a prima facie case with regard to her disability and her whistleblowing activity, DHMC adduced sufficient evidence of legitimate business reasons for the termination of her employment, to wit, the closure of the division in which she was employed and the unavailability of other suitable positions for her at DHMC; and that Dr. Porter failed

A-138

to point to evidence sufficient to permit an inference that defendants' proffered reasons for her termination were pretext for the alleged discrimination. *See Porter v. Dartmouth Hitchcock Medical Center*, No. 5:17-cv-194, 2020 WL 6789564 (D. Vt. Nov. 3, 2020).

On appeal, Dr. Porter contends principally that the district court applied erroneous legal standards in assessing the causation element of her claims, and that in granting summary judgment the court decided genuine issues of fact as to whether defendants' explanations for their actions were pretext for such discrimination and retaliation, issues that should have been submitted to a jury. For the reasons that follow, we conclude that the district court did not properly apply summary judgment standards in considering the evidence as to pretext and causation, and that it erred in concluding that no rational juror could infer that Dr. Porter was terminated, and not retained, based on her disability or her reporting activities. We affirm insofar as the court dismissed claims by Dr. Porter that she was otherwise discriminated against by denial of a reasonable accommodation for her disability prior to her termination or was retaliated against for exercising her rights to such accommodation.

A-139

## I. BACKGROUND

The record as to the events at issue here, taken in the light most favorable to Dr. Porter as the party against whom summary judgment was granted, includes the following evidence. Some portions of the record have been filed under seal; they are hereby deemed unsealed to the extent that their contents are quoted or described in this opinion.

DHMC has an obstetrics and gynecology department ("OB/GYN") that, from 1979 through May 2017, included a Reproductive Endocrinology and Infertility Division ("REI" or "REI Division"). REI provided services covering various aspects of reproductive medicine, including the care of children and women with hormonal imbalance and genetic syndromes affecting the reproductive system, procedures for *in vitro* fertilization ("IVF") and for assisted reproductive technologies ("ART"), complex gynecologic clinical care, surgery for women who desired to have child-bearing capacity, and gynecologic and early pregnancy pelvic ultrasound.

A-140

A. *Dr. Porter's First 20 Years at DHMC*

Dr. Porter began working as a staff physician at DHMC in the REI Division in 1996. She specialized in the treatment of women and their partners who were experiencing difficulties with fertility. A year later she was promoted to the position of Medical Director of the IVF/ART program and was appointed jointly to DHMC's Department of Radiology. In 2001, she became a senior voting member of the DHMC Professional Staff.

1. *Dr. Porter's Performance*

Dr. Porter was skilled in radiology, complex OB/GYN surgery, and general gynecological care, and had been internationally recognized for her skill in reading gynecologic ultrasounds. Dr. Michelle Russell--a physician in DHMC's OB/GYN Department who specialized in maternal-fetal medicine, which focuses on patients with high-risk pregnancies--worked with Dr. Porter from 2005 until Dr. Porter's termination in 2017. (*See* Declaration of Dr. Michelle Russell dated March 5, 2020 ("Dr. Russell Decl."), ¶¶ 1-2.) She described Dr. Porter as "an outstanding physician" with "a broad range of skills, including the ability to perform complex surgery and read difficult ultrasounds. She was our go-to person for complex benign

A-141

GYN surgeries, such as myomectomies (removal of uterine fibroids).  Many GYN surgery cases went to Dr. Porter."  (*Id*. ¶ 6.)  Dr. Russell stated that she "relied on Dr. Porter's expertise on a regular basis. . . .  We all used Dr. Porter a lot for first trimester ultrasounds . . . ."  (*Id*. ¶ 7.)

Sharon Parent, an OB/GYN and REI nurse, observed that "[t]here were times when there would literally be a line of OB/GYN doctors waiting to see Dr. Porter."  (Declaration of Sharon Parent dated February 28, 2020 ("Parent Decl."), ¶ 2.)

Dr. Leslie DeMars, who at the times relevant here was chair of the OB/GYN Department, often discussed the skills of Dr. Porter (or "Misty") using the term "Misty magic."  She testified that "Misty is an amazingly gifted and dedicated reproductive endocrinologist and infertility specialist who I think through technical skill and creativity was able to achieve lots of desired pregnancies for women, and that's her 'Misty magic.'" (Deposition of Dr. Leslie DeMars ("Dr. DeMars Dep.") at 43.)

In 2011, Dr. Porter became Acting Director of the REI Division.  A new Director, Dr. David Seifer, was appointed in May 2016.  (*See* Part I.C. below.)

2. *Dr. Albert Hsu*

In 2014, Dr. Albert Hsu joined the REI Division following the completion of his fellowship training in reproductive medicine. After learning that the position had been offered to Dr. Hsu, Dr. Porter--who was then REI's Acting Director--"called him to ask about his experience handling IVF cases." (Declaration of Dr. Misty Blanchette Porter dated March 4, 2020 ("Dr. Porter Decl."), ¶ 1.) Learning, to her "surprise[,] . . . that he had significantly less experience in doing the basic procedures than would be expected of a doctor at his level of training," she thereafter attempted to mentor and train him. (*Id*. ¶¶ 1-2.) "Given his limited experience, I spent the next 6 months directly teaching him at his side, taking call with him 7 days a week[,] teaching" him various relevant procedures. (Dr. Porter Report to Dr. Seifer dated June 3, 2016.)

Notwithstanding Dr. Porter's "considerable investment" of time and effort, "Dr. Hsu continued to demonstrate poor clinical decision-making and procedure skills." (Dr. Porter Decl. ¶ 2.) Dr. Porter began reporting Dr. Hsu's deficiencies to Dr. DeMars and to Heather Gunnell, the OB/GYN Practice Manager, within a few months after Dr. Hsu began working in REI. (*See, e.g.*, Deposition of Dr. Misty Blanchette Porter ("Dr. Porter Dep.") at 30-31.) She "regularly" told Dr. DeMars

that Dr. Hsu did not have the capacity to be a competent REI physician.  (Dr. Porter Decl. ¶ 4.)

Other members of the DHMC medical staff were similarly critical of Dr. Hsu's performance.  Dr. Porter stated that "[i]t was common for physicians, nurses, nurse practitioners, technicians, and others to come to me to express a concern about Dr. Hsu . . . . I told the persons who came to me that they needed to speak with their direct supervisor and Dr. Leslie DeMars, who was Chair of the OB/GYN Department."  (*Id*. ¶ 3.)  Dr. Julia MacCallum, who was in the OB/GYN residency program in 2012-2016, spent two years working with Dr. Porter and Dr. Hsu.  She "found that Dr. Hsu did not have a good understanding of the basic knowledge that would be expected of an attending physician in an REI Division," and that "[b]ecause Dr. Hsu lacked a basic knowledge base, he often provided confusing or misleading information to his patients."  (Declaration of Dr. Julia MacCallum dated March 5, 2020, ¶ 4; *see also id*. ¶ 6 (describing Dr. Hsu's lack of awareness of a certain procedure with respect to a myomectomy surgery--which was therefore performed by Dr. MacCallum who had been assisting--and describing Dr. Hsu's surgical technique as "unrefined and unskilled," "rushed, imprecise, and crude"); *id*. ¶ 7 ("The residents were all aware that there was an element of danger when Dr. Hsu was in the lead in

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 154 of 298

A-144

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 11 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page11 of 100

the OR."); *id*. ¶ 8 ("Every time he went into the OR, he presented a risk to patient safety.").)

Dr. MacCallum told her "direct supervisor about Dr. Hsu being a danger to patients," which her "supervisor shared . . . with Dr. DeMars"; and Dr. MacCallum herself "told Dr. DeMars about the danger that Dr. Hsu posed to patients when he operated." (*Id*. ¶ 7.) She stated that "[Dr. DeMars's] responses were to the effect of, 'thanks for telling me,'" and Dr. DeMars "did nothing to prevent him from continuing to perform procedures." (*Id*.)

Dr. Russell had also worked with Dr. Hsu; she judged him unqualified for his position at REI. (*See* Dr. Russell Decl. ¶ 9.) "Dr. Hsu didn't have necessary skill level, and the additional training he received from Dr. Porter did not seem to improve his abilities." (*Id*. ¶ 16.) "On a fairly regular basis" she overheard Dr. Hsu on the telephone giving patients what appeared to be "incorrect advice." (*Id*. ¶ 4.) She was "aware of at least one situation when Dr. Porter was called into the OR to fix a series of problems that occurred when Dr. Hsu was operating." (*Id*. ¶ 18.) Dr. Russell also described a case in which Dr. Hsu had failed to notice his patient's medical history--a history that called for certain endocrinological precautions that Dr. Hsu

failed to undertake or recommend--a failure that resulted directly in the patient's losing her pregnancy at 26 weeks. (*See id*. ¶ 14.)

Nurse Parent stated that she had assisted Dr. Hsu when he was performing IVF transfers and retrievals. She described his uncertainty in performing transfers, which he evinced in questions he asked of the ultrasound technicians; his inefficient manual "jerk[s] or twitch[es]" even after receiving assurance that no further movement was needed; and frequent reports by the patients of their discomfort and pain. (Parent Decl. ¶ 3.) Parent went to Dr. DeMars multiple times to describe Dr. Hsu's performance in those procedures. (*See id*. ¶¶ 5-6.)

In June 2016, Dr. Porter sent an 11-page report to new-REI Director Dr. Seifer in response to his request for an assessment of the performance of Dr. Hsu. It detailed Dr. Porter's observations as to, *inter alia*, the state of Dr. Hsu's knowledge, and his deficiencies in critical thinking, in professionalism, and in technical skill.

In February 2017, Dr. DeMars made a division-wide request for confidential feedback as to Dr. Seifer's performance. (*See* Dr. DeMars Dep. 114.) In response, Dr. Judith McBean, a per-diem contract provider of services to REI, in addition to criticizing Dr. Seifer's skills and standards of care (*see* Part I.C.2. below), stated that one of her biggest concerns about Dr. Seifer was his failure to address

problems in the performance of Dr. Hsu. (*See* Dr. McBean email to Dr. DeMars dated February 22, 2017 ("Dr. McBean email to Dr. DeMars").) She stated that Dr. Hsu's procedures were not within standards set by the American Society for Reproductive Medicine ("ASRM") and were "both ineffective and costly to patients"; that his skill set with regard to patient care was inadequate; and that "[h]is surgical skills endanger patients." (*Id.*)

B. *Dr. Porter's Disability*

In November 2015, Dr. Porter developed a cerebral spinal fluid ("CSF") leak that caused her serious neurological problems, including blurred vision, severe head and neck pain, tinnitus, and loss of balance. In December she began a medical leave of absence, during which she had a procedure in an attempt to stop the leak.

Dr. Porter returned to work in April 2016 on a part-time basis, working five-to-seven hours a week. In June, she increased her work schedule to 12 hours a week, although with limitations on the scope of her work. In July, she requested a number of accommodations that were recommended by her physician, including private office space, restricted duties, no multi-tasking, and a work schedule of no more than 12 hours a week. Dr. DeMars granted the requested accommodations. As

A-147

discussed in Part II.D. below, Dr. Porter complains that Drs. Seifer and Hsu frequently encroached on the agreed accommodations.

In late August 2016, Dr. Porter began a second medical leave of absence, which lasted until November. In September she underwent surgery to repair the CSF leak, following which she was restricted to bed rest for six weeks. During that time, she nonetheless did some work, including reading ultrasounds, providing consultations, and participating in team meetings by telephone. She physically returned to work in November, at first working four hours a week. She gradually increased her schedule, working seven hours a week in December; and by March 2017 she was working 20 hours a week.

In addition to her increased hours, the number of complex tasks that Dr. Porter could perform also gradually increased, and by April 2017, she was performing the full range of her prior skills. In April, she performed a complex surgery, proctored by Dr. Maria Padin, DHMC's then-Chief Medical Officer, following which Dr. Padin sent her a note saying, "Misty[,] You are a talented surgeon" (Dr. Padin email to Dr. Porter dated April 11, 2017 ("Dr. Padin April 2017 email to Dr. Porter")).

A-148

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 15 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page15 of 100

C. *Dr. David Seifer*

In the meantime, Dr. Seifer had been appointed Director of REI in May 2016.  He became Director of REI through the efforts of Dr. DeMars.  His route to that position--as described by Dr. Edward Merrens, who chaired the DHMC credentials committee--was neither traditional nor uncontroversial.  REI was closed a year later; Dr. Seifer's performance in the interim had been generally criticized.

1. *Dr. Seifer's Hiring*

In May 2016, Dr. Merrens was DHMC's Chief Medical Officer (*see* Deposition of Dr. Edward Merrens ("Dr. Merrens Dep.") at 78); he would soon transition to Chief Clinical Officer (*see id*. at 29).  In the latter position he would eventually make the decision to close REI.  (*See id*. at 19, 152; DHMC Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment on All Claims ("DHMC Rule 56 Statement") ¶ 11).  Dr. Merrens testified about the appointment of Dr. Seifer as REI Director and about the closing of REI.

The credentials committee was displeased with the process by which Dr. DeMars proposed Dr. Seifer's appointment as REI Director.  DHMC's usual process for filling a division director position included a national search, print ads,

networking, reaching out to national societies, a winnowing process, and interviewing potential candidates, before making an offer. (*See* Dr. Merrens Dep. 74.) Dr. DeMars, however, a short time before proposing that Dr. Seifer be made director of REI, had hired Dr. Seifer in an "administrative role, which was completely within her discretion . . . and then, once he was in the system, then she basically leveraged that to then push him in as division director." (*Id*. at 175; *see id*. at 74-75.)

The committee also had serious substantive concerns about Dr. Seifer because, "independently, members of [the faculty at his previous employer had] reached out to [DHMC]" to express "concerns about his practice," and to state that he "had a more limited focus in terms of his approach to reproductive endocrinology," "a different practice style," and perhaps "different capabilities than his [former] colleagues." (Dr. Merrens Dep. 75.) And "there was the suggestion that he had also been asked to cease providing care in some areas." (*Id*.)

Dr. Merrens, as chair of the credentials committee, sought clarification as to Dr. Seifer's "status" at his former employer, "the procedures he was asked to stop," and whether he "had been fully vetted for his role" at DHMC. (*Id*.) He "had Dr. DeMars come before the committee to explain her rationale for bringing [Dr. Seifer] forward and her understanding." (*Id*. at 77.) Dr. DeMars expressed her displeasure

A-150

that Dr. Seifer's former colleagues had contacted DHMC to convey their concerns. (*See id*.) She told the committee that Dr. Seifer was an accomplished physician, that he might have had a falling-out with his peers, that she believed his former situation had not been a good fit, and that the director role at REI would be a better fit. (*See id*. at 77-78, 83.)

Dr. Merrens testified that Dr. DeMars assured the committee "that she would take personal responsibility that [Dr. Seifer] would be a success." (*Id*. at 77.) The committee thus "allowed [Dr. DeMars] to hire Dr. Seifer with the understanding that *she would ensure that he would be a success in this role*." (*Id*. (emphasis added); *see id*. at 83 ("That's how she left the meeting."); *id*. ("this was on her").)

2. *Dr. Seifer's Performance as REI Director*

Dr. Seifer began work at REI on June 15, 2016. His tenure as REI's Director was not a success. "[C]omplaints about . . . Dr. Seifer[] started from the very beginning of his employment at D-H in the spring of 2016 and accelerated in July 2016 when he began doing procedures." (Dr. Porter Answer to DHMC Interrogatory 10.) Although Dr. Porter was unable to recall the "specific dates when individuals complained," she stated that there "was an endless stream, from multiple sources,

over multiple conversations, and in multiple different situations." (*Id*.)  In response to DHMC's interrogatory requesting identification of "each and every REI nurse, ultrasound technician, and embryologist who approached [her] in July 2016 and expressed serious reservations about [Dr. Seifer's] alleged substandard technical ability . . . and other concerns impacting patient safety" (DHMC Interrogatory 10 (internal quotation marks omitted)), Dr. Porter named 12 persons as "some" of those individuals: the head of the embryology laboratory, an embryologist, four ultrasound technicians, and six nurses (Dr. Porter Answer to DHMC Interrogatory 10).

Dr. Porter stated that the principal criticisms were that Dr. Seifer was unnecessarily rough with intravaginal ultrasound probes; that his patients woke up with more pain than was typical following routine oocyte harvests; that the test tubes into which follicular aspirates were collected were unusually bloody; that he appeared to be disoriented; and that he did not seem to know what he was doing. (*See id*.)  "The theme was always very clear, and the concerns were always similar-- specifically, that the REI Division Director was unsafe with patients," and Dr. Porter instructed everyone who complained or commented to her to report their concerns to OB/GYN chair Dr. DeMars and other persons in "the chain of command." (*Id*.)

Parent, one of the nurses identified by Dr. Porter as concerned about Dr. Seifer, had assisted both Dr. Hsu and Dr. Seifer in performing oocyte retrievals, and she stated, "I went to Dr. Leslie DeMars on multiple occasions because I was worried about what I saw happening to the women who were being treated by Drs. Seifer and Hsu." (Parent Decl. ¶ 6.)  Dr. DeMars's response was "that Dr. Porter set a high bar and [Parent] had to accept that other doctors did things differently." (*Id*.)  Parent, an OB/GYN nurse for some four decades, including 17 years at REI (*id*. ¶ 1), stated that "[Dr. Seifer's] retrievals were the most bloody and painful that I have ever witnessed" (*id*. ¶ 4).

Dr. Russell, in her declaration, observed that "[t]he nursing staff found it incredibly difficult to work with Dr. Seifer and Dr. Hsu." (Dr. Russell Decl. ¶ 17.)  Dr. Russell stated that she did not work much with Dr. Seifer; but her office was close to his, and she regularly heard him on the telephone "say[ing] things to patients that didn't sound right, including seemingly incorrect advice." (*Id*. ¶ 4.)

Dr. Russell also stated that when she "sent consults to Dr. Seifer, his consults were not at the level of other REIs that [she had] worked with, despite his many years of experience.  He certainly did not have the competency needed to be a division director." (*Id*. ¶ 16.)

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 163 of 298

A-153

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 20 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page20 of 100

In February 2017, in response to Dr. DeMars's division-wide request for assessments of Dr. Seifer's performance, Dr. McBean, who served REI on a per-diem basis and was "a well-thought-of provider" (Dr. Merrens Dep. 185), gave her evaluation of Dr. Seifer. As to technical skills, Dr. McBean stated that "Dr. Seifer ha[d] been a practicing REI physician for years, but upon arrival [he] did not seem to understand our system for oocyte retrieval," which had been standard "for over 7 years"; that "he does not do the standard fertility surgeries of hysteroscopy and laparoscopy," despite the fact that "a broad set of skills is critical for success in a small program"; and that he has "limited ultrasound skills both in performing and interpreting." (Dr. McBean email to Dr. DeMars.) As to standard of care, Dr. McBean stated that Dr. Seifer "practic[ed] outside of ASRM standard of care"; that his "conversations regarding ASRM guidelines during team meetings . . . do not reflect current standards"; and that his "screening and evaluation of patients is often incomplete or scattered and causes concern in patients." (*Id.*)

D. *Dr. Porter's Reports of Wrongdoing by Drs. Seifer and Hsu*

In addition to the concerns reported by REI staff as to the competence of Drs. Seifer and Hsu and their non-adherence to professional standards, Dr. Porter and

staff members expressed concerns about other improprieties. These included procedures performed without the patient's consent, procedures performed or repeated unnecessarily or in excess of applicable guidelines, and procedures that were contraindicated by the patient's condition.

The most pervasive practice causing such concerns was the performance by Drs. Seifer and Hsu of mock embryo transfers. Such trial transfers were not part of the standard infertility evaluation but were used after a patient or couple decided that she or they were likely to proceed with an embryo transfer. Trial transfers are sometimes categorically inappropriate, because some patients decide never to have IVF, or decide to adopt, or achieve pregnancy with simpler means such as ovulation induction. But Drs. Seifer and Hsu, unlike any DHMC REI physicians before them-- and while Dr. Porter was on her medical leave of absence--ordered that mock embryo transfers be performed on every new infertility patient. (*See* Dr. Porter Answer to DHMC Interrogatory 12.)

Dr. Porter testified that Dr. Seifer and Dr. Hsu "were ordering and performing unnecessary testing and . . . they were billing for that unnecessary testing." (Dr. Porter Dep. 38.) Many patients had insurance for diagnostic testing for infertility; but such diagnostic testing did not include trial embryo transfers. Thus,

A-155

the decision of Drs. Seifer and Hsu to have such mock transfers routinely performed for all infertility patients invited accusations of insurance fraud.

Dr. Porter also identified staff members who informed her that Dr. Hsu had performed unnecessary fallopian tube patency studies, *i.e.*, tests to determine whether the tubes were open.  He had performed such tests on patients who presented for abnormal bleeding, not for concerns regarding fertility; for these patients, such a study was not indicated.  In addition, Dr. Hsu and Dr. Seifer were "observed . . . performing a tubal patency study on a patient whose tubes were tied (thus, it was impossible that she required a tubal patency study)." (Dr. Porter Answer to DHMC Interrogatory 11.)  "It is unlawful billing fraud to order and bill for tests that you know are unnecessary." (Dr. Porter Answer to DHMC Interrogatory 12.)

Dr. Porter was also informed that procedures were being performed by Dr. Seifer, or by Dr. Hsu with Dr. Seifer observing, without the patients' consent. She identified staff members who had observed such procedures and had first-hand knowledge that patient consent, written or oral, had not been obtained.  Dr. Porter asked that these infractions be reported to the supervising radiologists.  She also met with the lead ultrasound technician and asked him to report these complaints to Dr. DeMars.  (*See* Dr. Porter Answer to DHMC Interrogatories 10-11.)

A-156

Dr. Porter reported, or directed others to report, these concerns about the acts of Drs. Seifer and/or Hsu--performing unnecessary procedures, billing for such procedures, performing them without patient consent--to OB/GYN Practice Manager Gunnell, and to OB/GYN chair Dr. DeMars.  (*See* Dr. Porter Answer to DHMC Interrogatories 10-12.)

Dr. Porter also learned from the head of DHMC's embryology laboratory--and reported to DHMC's Risk Management personnel--that Drs. Seifer and Hsu, with respect to a couple under their joint care, had not followed recommendations of ASRM and/or the United States Center for Disease Control ("CDC") with regard to embryo transfer and implantation where there was a known risk of transmission of the Zika virus.  The generally applicable guidance was that men should delay participation in a pregnancy for six months after traveling to a known Zika-endemic area such as Brazil.  The couple in question had been evaluated by Dr. Seifer or Dr. Hsu on the day they were to leave for a vacation in Brazil.  Drs. Seifer and Hsu neither requested that the couple cryopreserve the husband's sperm before going to Brazil nor followed the ASRM or CDC guidelines for a waiting period after their trip.  Less than six months after their return, the couple created two embryos from an anonymous oocyte donor, using cryopreserved sperm of the husband that had

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 167 of 298

A-157

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 24 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page24 of 100

potentially been exposed to the Zika virus. (*See* Dr. Porter Answer to DHMC Interrogatory 16.)

In addition, in the summer after he started in REI, Dr. Seifer was providing care to patients before he was licensed to practice in New Hampshire. Although he did so in the presence of Dr. Hsu, Dr. Porter objected that Dr. Seifer's actions constituted the practice of medicine without a license in violation of New Hampshire law. She reported this conduct to Dr. DeMars. (*See* Dr. Porter Dep. 33-34.)

E. *The Decision To Close REI*

By the Spring of 2017, the nursing staff in REI had dwindled to a single fully trained nurse. One REI nurse had been terminated in November 2016; and nurse Parent, who had given DHMC a year's notice of her intention to retire, retired in December 2016. Those nurses had not been replaced; thus, in the spring of 2017 REI had only five "providers": Dr. Seifer, Dr. Porter, Dr. Hsu, Dr. McBean who provided per-diem services, and nurse practitioner Elizabeth Todd. (Dr. Porter Decl. ¶ 5.) According to DHMC,

[i]n the March/April timeframe, OB/GYN Department management and DHMC leadership had multiple discussions regarding issues in the REI Division, including *the general dysfunction as well as the nursing shortage predicament. . . . Dr. DeMars*, Chair of the OB/GYN Department, *Daniel Herrick*, Vice President of Perioperative and Surgical Services, *and Dr. Ed[ward] Merrens*, Chief Clinical Officer, *participated in these meetings*, along with others.

(DHMC Rule 56 Statement ¶ 10 (emphases added).)

The closing of REI was recommended by Herrick, a DHMC vice president for OB/GYN who was the "administrative partner" of the department's chair.  (Deposition of Daniel Herrick ("Herrick Dep.") at 122; *see id*. at 12-13, 27.) Herrick testified that in or around February 2017, he and Dr. DeMars had attended a workshop with DHMC's Human Resources personnel, including those who did recruiting, and others, to discuss problems at REI.  (*See* Herrick Dep. 30, 49-51.)  He testified that "[f]ollowing that meeting when everyone left the room, Leslie and I remained, and I shared with Leslie that it was my very strong recommendation that we needed to either shut the program down or put it on hiatus . . . , but that we cannot continue." (*Id*. at 50.)  "[S]he agreed that based on what we had just heard that she did not see another option," and "it was at that point that we made the decision to recommend to the senior leadership that we would shut the program down."  (*Id*.

A-159

at 50-51.)  Herrick testified that "[a]s of April 18," Dr. DeMars concurred that they should recommend to senior management that REI be closed, and that its staff, including physicians, be terminated.  (*Id*. at 49.)

Dr. DeMars, however, testified that by the time she was included in discussions as to the future of the REI Division with Dr. Merrens and other senior management, the decision to close REI had already been made.  She testified that at her first such meeting she tried to propose a reduced REI that did not include IVF, and a plan to have Dr. Porter deal with ultrasounds, to have Dr. Hsu undertake the remaining REI duties, and to "counsel [Dr. Seifer] out of his position"--*i.e.*, to end his employment at DHMC.  (Dr. DeMars Dep. 139; *see id*. at 136, 139-40.)  Dr. DeMars testified that her plan was summarily rejected:

> Essentially every single point I brought up was dismissed, and I was told that there was not going to be any plan, that I was not allowed to make any plan.
>
> Q.  Who told you that?
>
> A.  Ed [*i.e.*, Dr. Merrens].  That it was my fault.

(*Id*. at 140.)

The final decision to close REI was made on April 20 or 21.  (*See* Dr. Merrens Dep.  148.)  Dr.  Merrens testified that

A-160

the decision was we're just going to shut REI down.  We're not going to continue some select services, and we're just going to shut this down and go from there.

Q.  And what was the decision about staffing at that point?

A.  In terms that we would shut down the program, end, end the providers, terminate the providers that were engaged in it . . . .

(*Id*.; *but see id*. at 149 (noting that nurse "Beth Todd was someone that could continue on working just in GYN").)

Despite that decision to close REI, Dr. DeMars on April 25--envisioning the "rebirth of this program"--sent Herrick an email urging that she be allowed to hire a certain candidate for REI "in some capacity asap."  (Dr. DeMars email to Herrick dated April 25, 2017 ("Dr. DeMars April 25 email to Herrick").)  She stated that "it is very hard to hire REIs into an academic program.  That's how we got stuck with David [*i.e.*, Dr. Seifer]."  (*Id*.)

In that email, Dr. DeMars also commented on REI's current staff of physicians, in part, as follows:

*While David is not a good leader, his failure is also the result of a masterful takedown by Misty Porter.  If she had wanted to support him, she would have made the division successful.*

A-161

Misty is counting on her longevity and my friendship to come in as the savior of the division.

*Ed is also lumping Albert* [*i.e.*, Dr. Hsu] into *"he's been a problem since day 1".*  This is not a fair characterization *of Albert.*  Again, Misty has decided that she no longer wants to work with him or teach him, and she is bullying him.  He did an amazing job by himself Jan-Aug 2016.

David is a nudge, who somehow lacks situational awareness, but he came into a dysfunctional division with half the team determined to make him fail.

. . . .

We have to be very careful about the conditions under which we can terminate our providers.  *David*'s wife is a Pedi Endocrinologist who works mostly in Manchester.  *It is conceivable that he could join one of the Boston IVF practices (Lord help them)* and compete directly for these patients.

(*Id.* (emphases added).)

On May 4, DHMC informed the REI staff--and began informing REI patients--that REI would close at the end of May.  Herrick, when asked in his deposition "[w]hy was the decision made to close the division," testified that the decision

was pretty *straightforward*.  It was marginally profitable.  It was at that time totally dysfunctional.  *We were unable to sustain staff to run the operation.*  Patients were not getting the care that they

- 28 -

A-162

deserved, and we were not able to provide care that was [consistent with] the reputation of Dartmouth-Hitchcock.

Q.  Anything else?

A.  No.

(Herrick Dep. 13 (emphases added).)

Dr. Merrens, however, indicated that the reason for the decision to close REI was not straightforward.  The shortage of nurses was only the last "straw."  (Dr. Merrens Dep. 186.)  He had sought input from Aimee Giglio, DHMC's head of Human Resources (*see id*. at 22), as to how to frame a solid explanation for the closure, stating that

[w]hile *on the surface* we are *pinning* the dissolution of our reproductive endocrinology program *on our failure to maintain and recruit nurses* for this work, *it is ultimately the dysfunction of the physicians who worked in this area for years* (*as well as recent hires*) and ultimately a failure of leadership, for which I hold Leslie [*i.e.*, Dr. DeMars] fully accountable.

The fact that *failures of such programs due to nursing shortages are not common* and we'll be referring patients to a similar, rural academic REI center in Burlington Vermont, *will make our explanation* to the public, patients and the media, well, *rather thin*.

(Dr. Merrens email to Giglio dated May 2, 2017 (emphases added).)  Giglio responded:

A-163

Let's discuss this morning. *I appreciate your candor* and recognition of the issues. PR here is very sensitive--goes without saying. *We will need to manage internal vs. external messaging and issues.*

(Giglio email to Dr. Merrens dated May 2, 2017 (emphases added).)

F. *The Termination of Dr. Porter's Employment at DHMC*

REI was closed effective June 2017. Dr. Porter's employment at DHMC ended on June 3, 2017. Herrick testified that "[t]he entire program was shuttered so all of the providers were terminated"; Dr. Porter "was terminated along with the closure of the REI program." (Herrick Dep. 14-15.) "[B]ecause she was in the program and because the program was closed, therefore her employment was terminated." (*Id*. at 15.)

Dr. Merrens likewise testified that Dr. Porter was terminated simply

[b]ecause we closed the program, the REI program. So her termination was, occurred at the same time we terminated the other physician providers in the program. We ended the program in which she worked.

(Dr. Merrens Dep. 19.) At the time of REI's closure, Dr. Porter also had a joint appointment in DHMC's Radiology Department. (*See, e.g., id*. at 43.) But on June

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 174 of 298

A-164

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 31 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page31 of 100

3, Dr. Porter's entire employment at DHMC was ended.  (*See id.*; DHMC Answer ¶¶ 95-96.)

Despite Herrick's statement that when REI closed all of the REI providers were terminated, one provider was not.  Nurse Todd was instead reassigned to OB/GYN.  (*See* Dr. Merrens Dep. 24-25.)  Dr. Merrens received numerous emails suggesting that Dr. Porter should be retained, including one from OB/GYN Nurse Coordinator Victoria Maxfield (*see* Maxfield email to Dr. Merrens dated May 12, 2017 ("Maxfield May 12 email to Dr. Merrens" or "Maxfield email") (further described below)).  In response to that email, Dr. Merrens stated, *inter alia*, that decisions with regard to REI's staff had been made "at the recommendation of Dr. De[M]ars."  (Dr. Merrens email to Maxfield dated May 12, 2017 ("Dr. Merrens May 12 email to Maxfield").)

1. *Dr. DeMars's Non-Recommendation To Retain Dr. Porter*

Both Herrick and Dr. Merrens testified in their depositions that after the decision was made to close REI, there was no request by Dr. DeMars for Dr. Porter to be retained in OB/GYN.  Herrick said that after Dr. DeMars on April 18 "supported closing the REI Division and terminating the physicians" (Herrick

A-165

Dep. 49), she suggested that "there[ was] an option of keeping Dr. Porter and having her do ultrasound in the gynecology department" (*id*. at 55).  But Dr. DeMars broached this as "more of a potential option" (*id*. at 54); and she then "put it forth as *not* really a practical opening" (*id*. at 58 (emphasis added)).  Herrick testified that in various discussions he had with Dr. DeMars and Gunnell it was concluded that the ultrasound work was already adequately staffed, that there was no anticipation of additional demand, and that there thus was no need for Dr. Porter.  Although Herrick's domain was budgets and finance (*see id*. at 33, 55), he testified that there was no actual "analysis of whether there was sufficient demand for [Dr. Porter] to do this work" (*id*. at 56 ("analysis," he said, "might be the wrong word")).  Herrick testified that keeping Dr. Porter at DHMC "was never planned in [his] mind."  (*Id*. at 54.)

Dr. Merrens, in his deposition, testified that his "understanding through Dr. DeMars was that [Dr. Porter's] primary interest . . . was around REI and IVF" (Dr. Merrens Dep. 204), and that she would not want to do other work. He said that after receiving many messages about Dr. Porter, he "reflected" about her with Dr. DeMars, and that that "discussion" convinced him that Dr. Porter was not interested in pursuing anything different from IVF.  (*Id*. at 207-08; *but see id*.

A-166

at 209 ("I don't think I had specific conversations with Dr. DeMars about Dr. Porter" in mid-May).)  As discussed in Part II.E.2. below, Dr. Merrens testified that "*[t]here was never a proposal that* we're going to end the program and *Misty will continue on doing GYN ultrasound*."  (*Id*. at 169 (emphases added).)

### 2.  *Dr. Merrens's "Disability" Answer to Dr. Russell's Question*

Dr. Merrens testified that "there was nothing about [Dr. Porter's] disability that led to [his] decision about her termination."  (Dr. Merrens Dep. 216.) However, Dr. Russell--who attended the OB/GYN department meeting that was convened for Dr. Merrens to address his decision to close REI--described Dr. Merrens's answer to "why" Dr. Porter was not being retained by DHMC as follows:

> Dr. Merrens said that the REI Division was closed due to
> problems recruiting adequate nursing staff for the division.  He
> then began discussing personnel and the termination of three
> physicians in conjunction with the closure.  When he began
> discussing personnel, I raised my hand (I was seated towards
> the front) and *asked Dr. Merrens why Dr. Porter had been
> terminated*.  I said something like, "I can understand why the
> other two needed to leave, but *why Misty*?"  *Dr. Merrens
> responded by saying that Misty was "on disability."*  I specifically
> recall him using the word "disability" in his response, because I

- 33 -

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 177 of 298

A-167

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 34 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page34 of 100

was so shocked that he said that.  I said something like, "but she was coming back," *and Dr. Merrens moved on to a different subject*.

(Dr. Russell Decl. ¶ 10 (emphases ours).)

3. *Dr. Merrens's Response to the Maxfield Email*

Nurse Maxfield in her email to Dr. Merrens described Dr. Porter's expertise and OB/GYN's staffing needs in a number of areas.  Having been employed in the OB/GYN clinic for some 18 years, including the most recent eight years as Nurse Coordinator and Uro/GYN Charge Nurse, and having worked with Dr. Porter during those 18 years, Maxfield observed that Dr. Porter "provides reproductive endocrinology expertise separate from infertility."  (Maxfield May 12 email to Dr. Merrens.)  She stated that Dr. Porter's "expertise in gynecologic ultrasounds, myomectomies, hysteroscopy, and gyn surgeries *provide a level of care to women that is not available from other members of the Gynecology staff*."  (*Id.* (emphasis added).)  Maxfield observed that OB/GYN "*is short staffed already with GYN MD's*," and said "I hope there is a way we could still keep Dr. Porter as a non-infertility REI specialist, GYN surgeon and expert in gynecologic imaging.  Her expertise and skills are greatly needed!"  (*Id.* (emphasis added).)

A-168

Dr. Merrens promptly responded to Maxfield's email, stating in full as follows:

> Victoria,
>
> Thanks for your email.  The recommendations around closing the program and its staff were at the recommendation of Dr. De[M]ars.  As you know *Dr. Porter currently works at 20% of her time currently* and I'm not sure of her interest in staying on if the infertility part were to cease.  I'm clearly aware how difficult this is for patients and staff.  I have been answering emails all week, heartfelt concerned and sad at this transition.  I completely understand.

(Dr. Merrens May 12 email to Maxfield, at 2:19 p.m. (emphasis added).)  A few minutes later, Dr. Merrens sent the following email to Dr. DeMars:

> *I am getting inundated* with heartfelt and long emails *wondering why Misty can't stay on to do her ultrasound complex operative and teaching role* even if we end REI.  *I suspect* that you considered this in the evaluation the program and your knowledge of Misty.  I just need to know how *better* to answer this question.

(Dr. Merrens email to Dr. DeMars dated May 12, 2017, 2:27 p.m. ("Dr. Merrens May 12 email to Dr. DeMars") (emphases added).)

Dr. DeMars responded with a lengthy email, stating at the outset that the inquirers asking why Dr. Porter was not being retained were "*remembering Misty as a full time* employee wearing 3 hats, and *not the one who has been out for*

*almost 18 months*."  (Dr. DeMars email to Dr. Merrens dated May 12, 2017 ("Dr. DeMars May 12 email to Dr. Merrens") (emphases added).)

Dr. Merrens's response to the Maxfield email had stated that he was "not sure of [Dr. Porter's] interest in staying on if the infertility part were to cease."  As described in Part II.C.3. below, Dr. Merrens testified that at some point he received a document from Dr. Porter stating expressly that she had an interest in remaining in OB/GYN even if the infertility part were to cease.  However, he never discussed such a possibility with her.

G.  *Summary Judgment Dismissing the Present Action*

Dr. Porter commenced the present action in October 2017.  Her six-count amended complaint ("Complaint") alleged principally that the termination of her employment by DHMC resulted in part from her reporting and causing to be reported what she reasonably believed to be unlawful, unethical, or medically dangerous conduct by Drs. Seifer and Hsu, including performance of medical procedures without client consent, the performance of unnecessary procedures, fraudulent billing practices, and knowingly allowing the transfer and implantation of an embryo where the transmission of Zika virus was a known risk.  The

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 180 of 298

A-170

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 37 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page37 of 100

Complaint asserted that her termination in these circumstances constituted wrongful discharge and whistleblower discrimination in violation of New Hampshire law (counts 1 and 2).

In addition, the Complaint alleged that when DHMC terminated her employment Dr. Porter was on long-term disability, although she had been able to return to work half-time, and with that accommodation she was performing at her usual high level of expertise and was able to meet all essential job requirements.  It alleged that DHMC, in terminating Dr. Porter's employment, neither "evaluate[d] the feasibility of restructuring her position or reassigning her to another position within" OB/GYN nor told her that such an accommodation of her disability "would be an undue hardship."  (Complaint ¶ 107.)  It alleged that the termination of her employment was motivated in part by her disability, in violation of the ADA, 42 U.S.C. § 12101, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) (counts 3 and 4), as well as in violation of the laws of New Hampshire and Vermont (counts 5 and 6).  Dr. Porter also alleged that she had been denied adequate other accommodation during her shorter workweeks.

DHMC moved for summary judgment dismissing the Complaint in its entirety, contending that Dr. Porter could not show that she was denied

accommodation for her disability or that her termination was the result of any prohibited discrimination or retaliation.  It proffered evidence, principally the deposition testimony of Herrick and Dr. Merrens, to show that the decision to close REI was a legitimate business decision unrelated to Dr. Porter's disability or to her reporting activities, and that there was no other suitable position for Dr. Porter at DHMC.

Dr. Porter, disputing DHMC's suggestion that the closure of REI made the June 2017 termination of her employment at DHMC necessary, stated that in fact in the spring of 2017 she was doing mostly non-REI work.  (*See* ¶¶ 1-22 of Dr. Porter Answer to DHMC Interrogatory 7, describing her responsibilities that, at the time of her termination, were "not REI-related" and that were sufficient "to occupy [her] entire schedule, even . . . full-time".)

For example, Dr. Porter "was regularly consulted by GYN oncology and hematology oncology for young women with cancers (e.g., breast, lymphomas, colorectal, endometrial cancer, borderline ovarian cancer, and cervical cancer) who desired fertility preservation."  (*Id*. ¶ 1.)  She provided first trimester ultrasounds and care for patients with pregnancy complications (*id*. ¶ 11); she provided consults for, *inter alia*, pregnancies in unusual locations (*id*.

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 182 of 298

A-172

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 39 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page39 of 100

¶ 12), pediatric gynecology (*id*. ¶ 20), and abnormal uterine bleeding in pre- and post-menopausal women (*id*. ¶ 16).  She performed ultrasound-guided benign gynecologic procedures such as biopsies of the uterine lining, draining of pelvic cysts, and removal of imbedded IUDs (*id*. ¶ 17), and performed minimally invasive advanced laparoscopic surgery for many benign gynecological diagnoses (*id*. ¶ 2).

Dr. Porter also pointed out that even without an REI division, DHMC still needs capability to perform fertility evaluations; until she was terminated, she performed such evaluations which, when indicated, included ultrasound-guided tubal patency studies, which "[n]one of the remaining gynecologists at D-H kn[ew] how to do."  (*Id*. ¶ 10.)  Dr. Porter stated, "one of the generalist OB/GYNs called me shortly after my termination and asked me to walk her through how to perform the procedure, as she had never done or seen one, and a patient on her schedule later that day had requested it."  (*Id*.)

As to DHMC's assertion that in June 2017, when REI was closed, there was no available DHMC position to which she could be reassigned, Dr. Porter submitted evidence of OB/GYN's June 2017 request to hire another GYN physician.  (*See* Attachment to Gunnell email to Chief Clinical Officer Dr. Merrens

A-173

and Chief Medical Officer Dr. Padin dated June 30, 2017 ("OB/GYN's June 2017 Hiring Request").)  The request--signed by Gunnell and DeMars--said, *inter alia*, that another GYN physician was "essential for provision of direct patient care in the Ob/Gyn clinic, operating rooms, and Birthing Pavilion," and that OB/GYN "ha[s] a shortage of subspecialists and generalists in the department."  (*Id*.)  It stated:  "We have no capacity to fill in these duties with existing staff."  (*Id*.)

The district court, in an opinion dated November 3, 2020, *see* 2020 WL 6789564 ("D.Ct. Op."), granted summary judgment dismissing the Complaint.  For Dr. Porter's disability and whistleblowing claims, the court employed the *McDonnell Douglas* burden-shifting analysis, under which the plaintiff bears the burden of showing a prima facie case of unlawful discrimination; the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action; if the employer adduces such evidence, the plaintiff, in order to avoid summary judgment, must point to evidence sufficient to permit an inference that the employer's proffered reason is pretext for the alleged prohibited discrimination, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-07 (1973).

A-174

The district court ruled that the evidence adduced by Dr. Porter, viewed in the light most favorable to her, was sufficient to meet the first step of the *McDonnell Douglas* analysis as to her whistleblowing and disability discrimination claims. *See, e.g.*, D.Ct. Op., 2020 WL 6789564, at *9 ("[s]ome portion of" Dr. Porter's reporting activities, *i.e.*, "[h]er criticism of Dr. Seifer and Dr. Hsu[,] continued through the spring of 2017," and "likely qualifies as protected whistleblowing activity"); *id*. at *13 (Dr. Merrens and Dr. DeMars were aware of Dr. Porter's disability). And the court found that "Dr. Porter's complaints about the other physicians are communications that would satisfy the public policy" element of a wrongful discharge claim. *Id*. at *15. However, the court found that DHMC proffered legitimate business reasons for closing REI and terminating Dr. Porter's employment and that Dr. Porter failed to adduce sufficient evidence to permit an inference that those reasons were pretext for the alleged discrimination, and thus, all of Dr. Porter's principal claims failed for lack of proof of causation.

As to the causation element of the whistleblower and wrongful discharge claims, the district court found that there was no evidence that Dr. Merrens, as decisionmaker, knew of Dr. Porter's reporting activities (*see* Part II.E.1. below). It thus concluded that there was no evidence that DHMC closed REI and

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 185 of 298

A-175

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 42 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page42 of 100

terminated Dr. Porter because of her reporting activities.  *See* D.Ct. Op., 2020 WL 6789564, at *8-*11, *15.  Although Dr. Porter contended that Dr. Merrens made the decision to deny her further employment at DHMC because he was influenced to do so by Dr. DeMars, who had received Dr. Porter's reports and was angry at her persistent complaints of improper and unlawful conduct, the court stated (as described in Part II.E.2. below) that Dr. DeMars advocated for Dr. Porter's retention, and that the evidence did not support an inference that her irritation at Dr. Porter's criticism of Dr. Seifer was so great that she would retaliate by recommending Dr. Porter's termination.  *See id*. at *9-*11.

As to the causation element of Dr. Porter's disability claims, the district court ruled that there was no proof that her disability was a "but-for" cause of DHMC's decision not to move her to another position within DHMC.  As set forth more fully in Part II.C.2. below, the court ruled principally that, standing alone, Dr. Merrens's reference to Dr. Porter's "disability" in response to Dr. Russell's inquiry as to why Dr. Porter was not being retained was "inconclusive," and, *inter alia*, that there was no evidence of "more explicit statements of discrimination" or of "a pattern of discriminatory comments," and that there were "possible interpretations" of that response other than its literal meaning.  *Id*. at *13.

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 43 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page43 of 100

## II.  DISCUSSION

On appeal, Dr. Porter contends principally that the district court applied incorrect legal standards in assessing the causation element of her termination-of-employment claims, and that the court inappropriately resolved genuine issues of fact as to whether DHMC's explanations for terminating her employment, and not reassigning her to another DHMC position, were pretext for unlawful discrimination and retaliation.  As to these claims, we agree.  For the reasons that follow, we conclude principally that the district court did not properly apply summary judgment standards in considering the evidence as to DHMC's reasons for not retaining Dr. Porter within OB/GYN; and it thus erred in concluding that no rational juror could infer that there was a causal connection between Dr. Porter's disability or her reporting activities and defendants' decision not to retain her in OB/GYN.

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 187 of 298

A-177

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 44 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page44 of 100

A. *Summary Judgment Principles*

Principles governing consideration of motions for summary judgment, and appellate review of the grant of such motions, are well established.

> A motion for summary judgment may properly be granted--and the grant of summary judgment may properly be affirmed--only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(c)(2) . . . . *The function of the district court in considering the motion for summary judgment is not to resolve* disputed questions of fact *but only to determine whether*, as to any material issue, a genuine factual dispute exists. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 . . . (1986) ("*Liberty Lobby*").

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("*Kaytor*") (emphases added).

> In reviewing the evidence and the inferences that may reasonably be drawn, the court "*may not make credibility determinations or weigh the evidence . . . . 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'*" *Reeves[ v. Sanderson Plumbing Products, Inc.]*, 530 U.S. [133,] 150 [(2000)] (quoting *Liberty Lobby*, 477 U.S. at 255 . . . ).

*Kaytor*, 609 F.3d at 545 (emphases in *Kaytor*).  Further,

> *the district court may not properly consider the record in piecemeal fashion* . . . ; rather, it must "review all of the evidence in the record," . . . .  And in reviewing all of the evidence to determine

> whether judgment as a matter of law is appropriate, "the court must *draw all reasonable inferences in favor of the nonmoving party*," . . . even though contrary inferences might reasonably be drawn . . . .

*Id*. (quoting *Reeves*, 530 U.S. at 150 (other internal quotation marks omitted) (second emphasis in *Kaytor*; first emphasis ours)).  Thus, while the court is required to review the record as a whole, it "'*must disregard all evidence favorable to the moving party that the jury is not required to believe*.'"  *Kaytor*, 609 F.3d at 545 (quoting *Reeves*, 530 U.S. at 151 (intermediate quotation marks omitted) (emphasis in *Kaytor*)).

B.  *Causation Standards Governing Employment Disability Discrimination Claims*

The ADA and the Rehabilitation Act prohibit covered employers from discriminating against qualified individuals on account of disability.  The ADA prohibits "discriminat[ion] against a qualified individual *on the basis of* disability in regard to," *inter alia*, "the . . . discharge of employees."  42 U.S.C. § 12112(a) (emphasis added).  The Rehabilitation Act provides that

> [n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

A-179

discrimination under any program or activity receiving Federal financial assistance . . . ."

29 U.S.C. § 794(a).  The ADA defines a "'qualified individual'" as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

It defines "disability" as

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individuals;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment . . . .

*Id*. § 12102(1).  The Rehabilitation Act, with respect to employment, uses essentially the same definition.  *See* 29 U.S.C. § 705(9).  And as amended in 1992, it uses the same standards as those applicable to employment discrimination claims under the ADA:

The standards used to determine whether this section [*i.e.*, 29 U.S.C. § 794] has been violated in a complaint alleging employment discrimination under this section *shall be the standards applied under* title I of *the Americans with Disabilities Act* of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act

A-180

of 1990 (42 U.S.C. 12201-12204 and 12210), *as such sections relate to employment*.

29 U.S.C. § 794(d) (footnote omitted) (emphases added).

The ADA and the Rehabilitation Act require covered employers to, *inter alia*, make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is . . . an employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A); *see* 29 U.S.C. § 794(d); 45 C.F.R. § 84.12. "The term 'reasonable accommodation' may include . . . job restructuring . . . [and] reassignment to a vacant position . . . ." 42 U.S.C. § 12111(9)(B). Unless the employer can demonstrate that an accommodation would impose on its operations undue hardship, the denial of a reasonable accommodation constitutes prohibited discrimination. *See* 42 U.S.C. §§ 12112(a) and (b)(5)(A); 29 U.S.C. § 794(d).

The "'on the basis of'" language in the ADA imposes a "but-for" standard of causation. *Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019) ("*Natofsky*"). And because "the Rehabilitation Act incorporates the ADA's causation standard for employment discrimination claims," such a claim under the

A-181

Rehabilitation Act--notwithstanding the presence of the word "solely" in § 794(a)-- also is governed by the but-for standard of causation. *Id*. at 346. The amending "text of the statute, § 794(d), requires *applying the ADA causation standard* to employment discrimination claims asserted under the Rehabilitation Act." *Natofsky*, 921 F.3d at 345 (emphasis added).

We note that the district court articulated the converse principle, stating that "*Natofsky* aligned the ADA standard with the 'solely by reason' standard of the Rehabilitation Act, which requires a plaintiff to demonstrate that disability was the sole cause of the adverse employment action," D.Ct. Op., 2020 WL 6789564, at *11 (other internal quotation marks omitted); *but see id*. at *11-*13 (apparently applying the but-for standard). *Natofsky* itself makes clear that

> when a plaintiff alleges an employment discrimination claim under the Rehabilitation Act, the causation standard that applies is *the same one that would govern a complaint alleging employment discrimination under the ADA*,

921 F.3d at 345 (emphasis added), *i.e.*, "but-for."

The New Hampshire and Vermont statutes invoked by Dr. Porter in counts five and six of the Complaint are similar to the ADA and the Rehabilitation Act in prohibiting disability-based employment discrimination, and the district

A-182

court dismissed all four disability discrimination counts for lack of proof of causation.  But the district court stated that New Hampshire "follows the 'sole reason' standard of the Rehabilitation Act," D.Ct. Op., 2020 WL 6789564, at *11, citing a 1991 New Hampshire case; and it stated that Vermont law "[s]imilarly . . . follows the language of the Rehabilitation Act," id., and cited a 1995 Vermont case. Given that the Rehabilitation Act's own causation standard was changed with the 1992 amendment discussed above, and now requires that employment discrimination claims under that Act be governed by the ADA's "but-for" standard, we leave it to the district court on remand to reassess and reconsider the causation standards governing Dr. Porter's disability claims under the relevant State laws.

C.  *The Claims of Termination Based on Disability*

1.  *The Analytical Framework*

In cases concerning alleged employment discrimination, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes," *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 524 (1993) (other internal quotation marks omitted), as "*[e]mployers are rarely so cooperative* as to include a notation in

A-183

the personnel file that the firing is for a reason expressly forbidden by law," *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999) (internal quotation marks omitted) (emphasis ours).  Consequently, many discrimination claims depend on proof by circumstantial evidence.  But "*statements or actions by [the employer's] decisionmakers . . . that may be viewed as directly reflecting the alleged discriminatory attitude*" constitute the proverbial "smoking gun."  *Id*. at 446 (internal quotation marks omitted) ("directly reflecting" emphasized in original; other emphases ours).

"[T]he *McDonnell Douglas* framework does not apply in every employment discrimination case."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (discussing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("*Thurston*")).  "The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff [has her] day in court *despite the unavailability of direct* evidence."  *Thurston*, 469 U.S. at 121 (internal quotation marks omitted) (emphases ours).  The "*McDonnell Douglas* test is *inapplicable* where the plaintiff presents *direct* evidence of discrimination," *e.g.*, that the employer's motivation was "discriminatory on its face."  *Id*. (emphases added).

Courts in New Hampshire and Vermont also follow this approach, applying the *McDonnell Douglas* burden-shifting framework when the plaintiff has only indirect, not direct, evidence of discriminatory motivation.  *See Burnap v. Somersworth School District*, 172 N.H. 632, 637, 232 A.3d 390, 395 (2019); *Robertson v. Mylan Laboratories, Inc.*, 176 Vt. 356, 364, 848 A.2d 310, 318 (2004).

In the present case, there is direct evidence that the decision by Dr. Merrens to terminate, rather than continue, Dr. Porter's employment was based on her disability.  As set out in Part I.F. above, Dr. Russell, in the meeting of OB/GYN staff convened by Dr. Merrens to explain the closing of REI, asked Dr. Merrens "why Misty" was being terminated rather than retained, and his sole response was that Dr. Porter was "on disability." (Dr. Russell Decl. ¶ 10.)  As described in Dr. Russell's declaration, her question was precise; and the answer--by the person who had made the decision--was responsive, succinct, and explicit.  Dr. Merrens's response constitutes direct evidence that Dr. Porter's employment at DHMC was ended based, in whole or in part, on her disability.  Accordingly, the *McDonnell Douglas* burden-shifting test--although its conditions were easily met on this record--was inapplicable to Dr. Porter's claims that the termination of her employment violated the federal and state laws at issue.

A-185

2. *DHMC's Focus on Dr. Porter's Disability*

In ruling that the evidence of Dr. Merrens's "on disability" response to Dr. Russell's "why Misty" question was not evidence from which a rational juror could infer that Dr. Porter's termination was motivated by her disability, the court's discussion was principally as follows:

> *Standing alone, . . .* this exchange *is inconclusive.  It would not be reasonable to interpret the exchange as a confession by Dr. Merrens before the entire OB/GYN Department that he had terminated a long-time employee and colleague because she was partially disabled.*  That is the only interpretation which *would directly* support plaintiff's claim.  *There are other possible interpretations.*  These include the possibility that Dr. Merrens was assuring the group that Dr. Porter had access to income independent to her hospital salary.  *It is also possible that Dr. Merrens and Dr. Russell misunderstood one another entirely.*  None of these interpretations would support a claim of discrimination and *the court will not speculate about what Dr. Merrens may have meant to say.*  The comment *would* play a role *if it formed part of a pattern* of discriminatory comments by Dr. Merrens or others within the hospital.  *By itself*, it is insufficient to provide evidence of discriminatory intent.

D.Ct. Op., 2020 WL 6789564, at *13 (emphases added); *see also id*. (Dr. Merrens's "*[m]entioning her disability* in front of a large group of colleagues *or discussing it in an email* with another staff member may have been insensitive," but these statements "*provide no basis*" on which a reasonable jury could find disability-based

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 196 of 298

A-186

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 53 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page53 of 100

discrimination "*standing alone without the context of more explicit statements of discrimination*" (emphases added)).

This analysis misapplied summary judgment standards in several ways. First, in finding that Dr. Merrens's "on disability" response to the "why" question was "inconclusive," the court applied the wrong standard for assessing evidence adduced in opposition to a motion for summary judgment. Such evidence need not be conclusive; it need only be, when viewed in the light most favorable to the claimant, sufficient to present a genuine issue as to a material fact. And if it meets that standard, it is the province of the factfinder, not the summary judgment court, to decide what to conclude.

Second, even if Dr. Merrens's "on disability" response to the "why" question, were not in itself a sufficiently direct explanation by the decisionmaker to withstand DHMC's motion for summary judgment on the claims of disability discrimination, it could not properly be assessed in isolation. Yet the district court began its analysis by viewing the exchange as "[s]tanding alone," and it ended that passage by stating that this evidence was insufficient "[b]y itself."

Nor was the court correct in finding that Dr. Merrens's "on disability" response was insufficient because it was not "part of a pattern of discriminatory

A-187

comments by Dr. Merrens or others within the hospital."  While proof of such a pattern would provide additional support for a finding of discrimination, it was not required.  *Cf. Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, n.14 (1977) (A "pattern" of discrimination is "not . . . a necessary predicate to a violation of the Equal Protection Clause.  A single invidiously discriminatory governmental act" is not "immunized by the absence of such discrimination in the making of other comparable decisions.").  When the decisionmaker was asked "why" an employee was not being retained, his answer that she was "on disability" virtually precludes a ruling as a matter of law that disability has played no role.

Further, in rejecting Dr. Merrens's "on disability" statement on the ground that it was not "more explicit," the court refused to view in Dr. Porter's favor a statement that on its face supported her claims, and it invaded the province of the jury to decide whether the "on disability" response to "why" was sufficiently clear to be accepted as showing disability motivation.

The district court acknowledged that an "interpretation" of the "on disability" response by Dr. Merrens as genuinely meaning what he said in answer to the "why" question "*would directly* support plaintiff's claim."  D.Ct. Op., 2020 WL

A-188

6789564, at *13 (emphasis added).  But the court stated that "[i]t would not be reasonable" to infer that Dr. Merrens meant what he said, because he gave that answer "before the entire OB/GYN Department."  *Id*.  While it likely was not anticipatable that Dr. Merrens would make such a statement openly, the fact remains that there is first-hand evidence that he did.  It was not within the province of the court in ruling on a motion for summary judgment to decide as a matter of law that Dr. Merrens's statement--which the court acknowledges was literally "true," *id*.--was not in fact responsive to the plain question that immediately preceded it.

And while stating that "the court will not speculate about what Dr. Merrens *may have meant to say*," *id*. (emphasis added), the court in fact speculated that it was "possib[le]" that Dr. Merrens was assuring the group that Dr. Porter had access to income independent to her hospital salary," or that it was "possible that Dr. Merrens and Dr. Russell misunderstood one another entirely," *id*.  If there is evidence in the record that could make such "other possible interpretations," *id*., more than mere speculation, the choice among them will be the responsibility of the jury, not the court.

A-189

In addition to rejecting Dr. Merrens's "on disability" response to Dr. Russell's "why" as having any evidentiary value, the district court similarly rejected other such evidence, most notably, Dr. Merrens's response to the email from OB/GYN nursing coordinator Maxfield who hoped that Dr. Porter could be retained to fill existing gaps in the department's services.  Dr. Merrens's response stated, in part:

> "As you know Dr. Porter currently works at 20 % of her time currently . . . ."

*Id*. (quoting Dr. Merrens May 12 email to Maxfield).  The court--stating that that email was "probably unwise"--interpreted this statement as

> Dr. Merrens referr[ing] to Dr. Porter's disability status *in explaining his decision to terminate all three physicians*.  His comment was inaccurate about the percentage of time Dr. Porter was working, and, like so many emails, *probably unwise*, but it is not reasonably possible to read it as evidence of animus or discriminatory intent.

D.Ct. Op., 2020 WL 6789564, at *13 (emphases added).  This rationale for disregarding Dr. Merrens's response is puzzling.

Maxfield had not inquired about the other two REI physicians, only about Dr. Porter.  More importantly, it would make no sense to explain that two of the three physicians were being terminated because the third was working only

part time (especially if the part-time percentage were as low as the Dr. Merrens email mistakenly portrayed it).

Finally, while characterizing Dr. Merrens's statement "about the percentage of time Dr. Porter was working" as "probably unwise," the district court concluded that "it is not reasonably possible to read it as evidence of animus or discriminatory intent."   *Id*.  Doubtless DHMC would agree that the statement was "unwise" from its point of view; but that is precisely because it would be quite reasonable to read that express reference to limited capability as evidence of motivation based on disability.

That "reasonably possible" inference appears to have occurred to Dr. Merrens himself, given that, just minutes after his response to Maxfield, he emailed Dr. DeMars stating that he needed a "better" way to answer inquiries about why Dr. Porter was not being retained (Dr. Merrens May 12 email to Dr. DeMars).

Dr. DeMars's response may not have suggested a "better" explanation, for her email itself also referred to Dr. Porter's disability.  Dr. DeMars stated, *inter alia*, that the inquirers asking why Dr. Porter was not being retained were "*remembering* Misty as *a full time employee* wearing 3 hats, and *not the one who has*

A-191

*been out for almost 18 months*."  (Dr. DeMars May 12 email to Dr. Merrens (emphases added).)

A jury would be entitled to view Dr. DeMars's response to Dr. Merrens's email as supporting Dr. Merrens's repeated references to Dr. Porter's disability as a reason for her termination.

3. *The Denial of a Reassignment Accommodation*

As noted in Part II.B. above, the ADA and the Rehabilitation Act provide that reasonable accommodation for an individual with a disability may include job restructuring or reassignment to a vacant position, *see* 42 U.S.C. § 12111(9)(B); 45 C.F.R. § 84.12.  And "[t]he ADA envisions an 'interactive process' by which *employers and employees work together* to assess whether an employee's disability can be reasonably accommodated." *Jackan v. New York State Department of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) (emphasis added).  With respect to the requirement for such a reassignment accommodation, the plaintiff has the burden of proving "that a vacancy existed into which he or she might have been transferred."  *Id*.

A-192

The record shows that Dr. Porter presented such evidence.  In May 2017, after the impending closure of REI was announced, Dr. Merrens was "inundated" with emails urging that Dr. Porter be retained.  (Dr. Merrens May 12 email to Dr. DeMars.)  One was the Maxfield email that noted Dr. Porter's "expertise" in several specified areas and stated that OB/GYN was "is short staffed already with GYN MD's."  (Maxfield May 12 email to Dr. Merrens.)  And Dr. Merrens was well aware prior to the decision to close REI that OB/GYN was "short-staffed"; he testified "we . . . had not been able to recruit physicians to a number of areas within OB/GYN."  (Dr. Merrens Dep. 202.)

In response to Maxfield's email, Dr. Merrens had also stated, "I'm not sure of [Dr. Porter's] interest in staying on if the infertility part were to cease."  (Dr. Merrens May 12 email to Maxfield.)  But after it was announced in May 2017 that REI would close, Dr. Porter informed Dr. Merrens in writing that she was in fact interested in being reassigned to OB/GYN notwithstanding that "the infertility part would cease."  (Dr. Merrens Dep. 206.)  Dr. Porter was a "highly respected," "talented clinician" (*id*. at 43); *see also id*. at 207 (Dr. Porter was "a talented physician"); and Chief Medical Officer Padin, after observing Dr. Porter perform a complex surgery in April 2017, stated that Dr. Porter was "a talented surgeon" (Dr.

Padin April 2017 email to Dr. Porter).  There was "no question of [Dr. Porter's] competence."  (Herrick Dep. 127.)

Yet Dr. Merrens would not even speak to Dr. Porter about a reassignment to OB/GYN.  (*See*, *e.g.*, Dr. Merrens Dep. 206 ("Q.  At any point did you talk to Dr. Porter about whether she did have an interest in staying on if the infertility part were to cease?  A.  I did not.").)  There was no interaction between employee and employer, only the employee's request.  Although Dr. Merrens says he gave Dr. Porter's request "a lot" of thought, there is no indication that he considered it seriously:

> Q.  Did it cause you to reevaluate her termination *when you found out that she did, in fact, have a very strong interest in remaining at Dartmouth-Hitchcock*, even without the infertility piece?
>
> A.  I would say that I thought a lot about this and even *reflected with Leslie*, like, [w]hat are the opportunities, and *how do we think about this*? . . . .
>
> . . . .
>
> Q.  *Did you ever sit down with Dr. Porter and propose to her a very limited role and assess her interest?*
>
> A.  *No.*

(*Id*. at 207-08 (emphases added).)

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 204 of 298

A-194

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 61 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page61 of 100

And in June, DHMC having just terminated Dr. Porter, OB/GYN sought permission to hire a new gynecologist, stating, *inter alia*, that OB/GYN "ha[s] a shortage of subspecialists and generalists in the department"; that OB/GYN "ha[s] no capacity to fill in these duties with existing staff"; that another GYN physician was "essential."  (OB/GYN's June 2017 Hiring Request.)

In sum, from Dr. Merrens's direct "on disability" answer to the question of "why" Dr. Porter was being terminated and not retained, as well as from the other evidence--including (a) OB/GYN's June 2017 Hiring Request, (b) Dr. Merrens's awareness of "a number of areas" in which OB/GYN was "short-staffed," (c) Dr. Porter's communication to Dr. Merrens of her interest in an OB/GYN position that did not center on infertility, (d) Dr. Porter's recognized skills, and (e) several statements by Dr. Merrens and Dr. DeMars that, in the context of whether to terminate or retain Dr. Porter, referred explicitly or implicitly to Dr. Porter's disability--a jury could permissibly infer that reassigning Dr. Porter to OB/GYN instead of terminating her employment would have been a reasonable accommodation, and that she would have been so reassigned but for her disability.

Accordingly, we vacate the district court's dismissal of Dr. Porter's claims that her employment was terminated on the basis of her disability in

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 205 of 298

A-195

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 62 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page62 of 100

violation of the ADA, the Rehabilitation Act, and the laws of New Hampshire and Vermont.

D. *Claims of Retaliation and Other Denials of Accommodation*

Dr. Porter also asserted claims that retaliatory and discriminatory denials of reasonable accommodation had occurred during the period of her disability prior to her termination.  The district court dismissed these claims on the ground that the circumstances of which she complains in that period did not constitute a denial of reasonable accommodation.  Viewing the record as a whole, we agree.

The accommodations granted to Dr. Porter included two medical leaves of absence; a very limited schedule upon her returns to work, beginning with workweeks of five hours (in April 2016) or four hours (in November 2016), with increases as she felt able; and permission for some of her work to be done from home.  She has not asserted that any of these accommodations were not fulfilled.  In June 2016, Dr. Porter presented DHMC with a list of a dozen requested workplace-condition accommodations that were recommended by her doctor, including limited work periods, a quiet workspace, frequent rest breaks,

A-196

and only gradual increases in responsibilities and multi-tasking.  Dr. Porter acknowledges that Dr. DeMars informed the REI staff of these accommodations by "sen[ding] out an email to members of the department."  (Dr. Porter Dep. 45.)  She does not contend that DHMC refused to agree to any accommodations she requested.

Rather, Dr. Porter contends that Drs. Seifer and Hsu encroached on agreed accommodations, principally by asking her questions.  She also describes two specific occasions of other encroachment, the first of which occurred in mid-June 2016 on her first day dealing with ultrasounds following her return to work.  Dr. Porter needed space in the ultrasound reading room, and Drs. Seifer and Hsu did not leave the room when she requested.  (*See* Dr. Porter Answer to DHMC Interrogatory 6.)  Dr. Porter complained of this, and she acknowledges that Dr. DeMars "emailed [Drs. Seifer and Hsu] to remind them of the restriction that I was not to be distracted in the ultrasound reading room."  (Dr. Porter Answer to DHMC Interrogatory 4.)

Dr. Porter's other specific complaint concerned a weekend in March 2017 when, although she was not in the on-call schedule, she was forced to be on call because Drs. Seifer and Hsu were away (attending "non-urgent, elective

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 207 of 298

A-197

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 64 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page64 of 100

meetings") and were unreachable.  This resulted in an REI nurse's having to call Dr. Porter "at home on the weekend to have [her] make all treatment decisions," even though Dr. Porter "was not approved by [her] physicians to take call."  (Dr. Porter Answer to DHMC Interrogatory 6.)  However, such an encroachment on a single weekend out of the several dozen weekends during her period of disability is insubstantial, especially given that it occurred in March 2017 when Dr. Porter was working 20 hours a week, and that she had told Dr. Seifer months earlier that she "would consider being in the call schedule when [she] was back to 20 hours a week" (*id.*).

Dr. Porter complains as a general matter that Drs. Seifer and Hsu frequently interrupted her at work or telephoned her at home to ask her questions or to seek opinions.  But the accommodations she had requested did not include barring her less experienced colleagues from seeking her advice and counsel.

A reasonable accommodation is one that "enable[s] an individual with a disability who is qualified to perform the essential functions of that position . . . [or] to enjoy equal benefits and privileges of employment."  29 C.F.R. §§ 1630.2(o)(1)(ii) and (iii).  Thus, a granted accommodation should be "effective"; but it need not be perfect, *see, e.g., Noll v. International Business Machines Corp.*, 787

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 208 of 298

A-198

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 65 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page65 of 100

F.3d 89, 95 (2d Cir. 2015). Dr. Porter states that with the accommodations granted, she was able to perform at her usual high level of expertise. The fact that the encroachments of which she complains may have been annoying or stressful did not make the accommodations ineffective.

Dr. Porter also claims that DHMC retaliated against her for being on disability or for complaining about encroachments by Drs. Seifer and Hsu on the agreed-upon accommodations, but she has not pointed to evidence sufficient to support such a claim. Although she states that when she returned to work on her reduced schedule, "I heard comments from colleagues about me not pulling my weight due to my limitation on work hours" (Dr. Porter Answer to DHMC Interrogatory 4), she has not pointed to evidence of any adverse employment action she experienced as a result of her complaints about the intrusive conduct by Drs. Seifer and Hsu.

We affirm the grant of summary judgment dismissing Dr. Porter's claims of retaliation and denial of reasonable accommodation for her disability prior to her termination.

A-199

E.  *The Whistleblower Discrimination and Wrongful Discharge Claims*

New Hampshire's Whistleblowers' Protection Act provides, in relevant part, that

> [n]o employer shall . . . discharge . . . or otherwise discriminate against any employee regarding . . . employment *because*:
>
> (a) The *employee, in good faith, reports or causes to be reported*, verbally or in writing, *what the employee has reasonable cause to believe is a violation of any law or rule* adopted under the laws of this state, a political subdivision of this state, or the United States . . . .

N.H. Rev. Stat. Ann. § 275-E:2(I)(a) (emphases added).   This statute "contemplates a series of events" beginning with "notice to the employer of a violation." *In re Fred Fuller Oil Co.*, 144 N.H. 607, 612, 744 A.2d 1141, 1145 (2000).  New Hampshire courts apply the *McDonnell Douglas* burden-shifting framework in evaluating such whistleblower discrimination claims.  *See In re Seacoast Fire Equipment Co.*, 146 N.H. 605, 608, 777 A.2d 869, 872 (2001).

Under New Hampshire common law, a plaintiff may recover against her former employer on a claim of wrongful discharge for, *inter alia*, being "discharged because [s]he performed an act that public policy would encourage" (hereafter, for present purposes, "public policy reporting"), if she shows that the

A-200

defendant, in terminating her employment "was motivated by bad faith, malice, or retaliation." *Cloutier v. Great Atlantic & Pacific Tea Co.*, 121 N.H. 915, 921-22, 436 A.2d 1140, 1143-44 (1981).  The public policy factor may "be based on non-statutory policies," *id*. at 922, 436 A.2d at 1144; and malice may be established by proof that "the record does not support the stated reason for the discharge," *see Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 44 (1st Cir. 2001).

The district court found that the record contained sufficient evidence to permit a jury to find that Dr. Porter had engaged in whistleblowing activity or public policy reporting by informing Dr. DeMars of conduct by her two REI co-physicians that could reasonably be believed to be illegal, fraudulent, unethical, or harmful to patients.  But DHMC argued that it had terminated Dr. Porter because it closed REI and there was no other suitable position for her, and the court concluded that Dr. Porter had not pointed to sufficient evidence that the decision not to retain Dr. Porter was "because" of her whistleblower or public-policy-reporting activities.  *See* D.Ct. Op., 2020 WL 6789564, at *9-*11 (whistleblowing activity); *id*. at *15 (public policy reporting).

As discussed in Part II.E.1. below, the district court's conclusion that there was no evidence of causation rested principally on its view that Dr. Merrens

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 68 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page68 of 100

was the person who made the decision to terminate Dr. Porter's employment at DHMC, and that he did not know of Dr. Porter's reporting activities, *see id*. at *8. Dr. Porter argued that there was sufficient evidence that Dr. Merrens did have such knowledge. But she contended, alternatively, that even if Dr. Merrens did not know, DHMC could nonetheless be held liable because Dr. DeMars--to whom Dr. Porter had made, or caused to be made, the critical reports--sought Dr. Porter's termination in retaliation and in bad faith, and that as to Dr. Porter's termination, Dr. DeMars either was the actual decisionmaker (*see* Part II.E.3. below) or caused Dr. Merrens to make that decision because of her advice (*see* Part II.E.2. below, discussing the "cat's paw" theory of liability). The district court rejected both of these contentions that Dr. Porter's termination resulted from impermissible animus on the part of Dr. DeMars, stating that the record instead suggested that Dr. DeMars wanted, and advocated, to have DHMC retain Dr. Porter.

As to each of the district court's factual premises--*i.e.*, that Dr. Merrens had no knowledge of Dr. Porter's reporting activities, and that Dr. DeMars wanted and attempted to retain Dr. Porter at DHMC--the record contains evidence that would permit a factfinder to draw reasonable inferences contrary to those drawn by the district court in granting summary judgment. While as to Dr. Porter's

A-202

claims of whistleblowing and reporting discrimination we have not seen a smoking gun similar to Dr. Merrens's immediate "disability" response to why Dr. Porter had not been retained, the record contains ammunition from which a jury could find (1) that Dr. Merrens had the requisite knowledge of Dr. Porter's reporting activity, or (2) that if he lacked such knowledge, either (a) he as decisionmaker relied on the retaliatory or bad-faith recommendation by Dr. DeMars, or (b) the ultimate decisionmaker as to Dr. Porter's termination--as contrasted with the decision to close REI--was not Dr. Merrens but Dr. DeMars.

1. *The State of Dr. Merrens's Knowledge*

With respect to the decision to terminate Dr. Porter, the district court described the record as to the knowledge of Dr. Merrens as follows:

> *Dr. Porter does not contest that the principal decision-maker-- Dr. Merrens--had no knowledge of her complaints about Dr. Seifer and Dr. Hsu. He expressly denies such knowledge.* There is no evidence to the contrary. *It is unsurprising* that the chief clinical officer of a large hospital would not know about intra-departmental complaints about disputes over patient care and billing practices. The reasons DHMC offers to explain the closure of the REI Division are substantial. While the parties disagree about whether the closure was a good business decision, *it followed months of deliberation over business concerns.* No reasonable jury could find that the concerns of hospital

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 213 of 298

A-203

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 70 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page70 of 100

leadership about *staffing levels or physician conflict* were excuses they concocted to deflect attention from their true motive of retaliating against Dr. Porter.

D.Ct. Op., 2020 WL 6789564, at *9.  Although the district court thus apparently viewed it as established that Dr. Merrens lacked knowledge of Dr. Porter's reporting activities, the record does not warrant that finding as a matter of law.

First, the district court's view that Dr. Porter did not dispute Dr. Merrens's assertion of ignorance as to her reporting activity disregarded her argument that, in labeling her a cause of REI's problems, Dr. Merrens used "dysfunction" as a "code word" for her reporting on the incompetence of Drs. Seifer and Hsu.  (Dr. Porter Response in Opposition to DHMC's Motion for Summary Judgment at 16; *see also* Dr. Porter brief on appeal at 22 (contending that "dysfunction" was a code word to refer to her whistleblower and public-policy-reporting activity, as well as her disability).)  Implicit in the contention that Dr. Merrens used "a code word" for Dr. Porter's whistleblower and public-policy-reporting activity, is a contention that Dr. Merrens knew of that reporting activity.

Second, while the court also relied on Dr. Merrens's "express[] deni[al of] such knowledge"--apparently referring to his affidavit stating that when he made and announced his decision to close REI he "*was not aware of whether Dr.*

Misty Blanchette *Porter had raised any complaints or concerns regarding . . . employees . . . within the REI Division"* (Affidavit of Dr. Edward Merrens dated January 28, 2020, 4 (emphases added))--credibility determinations are within the province of the factfinder.  A jury would not be required to believe Dr. Merrens's claim that he did not know of Dr. Porter's reporting activity; thus, the court in deciding the summary judgment motion could not properly rely on his disclaimer.

Further, the district court inferred that Dr. Merrens's denial of knowledge of Dr. Porter's reporting activity was credible because it would be "unsurprising that the chief clinical officer of a large hospital would not know about the intra-departmental complaints about disputes over patient care and billing practices."  D.Ct. Op., 2020 WL 6789564, at *9.  This may well be so as a matter of routine day-to-day operation.  But, as the court also recognized, "the closure of an entire division serving many women and families was a major decision by DHMC."  *Id*. at *3.  DHMC stated that, in March and April 2017, before that major decision was made, "OB/GYN Department management and DHMC leadership,"--identified as Dr. DeMars, Herrick, and Dr. Merrens--"*had multiple discussions regarding issues in the REI Division, including the general dysfunction.*" (DHMC Rule 56(b) Statement ¶ 10 (emphases added).)  A rational juror could well

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 215 of 298

A-205

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 72 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page72 of 100

infer that--in the "multiple discussions regarding" REI's "issues"--before Dr. Merrens made "a major decision" affecting "many women and families," D.Ct. Op., 2020 WL 6789564, at *3, it was probable that he would have requested concrete information as to the nature of the "general dysfunction" in order to assess whether there was available a solution less drastic than dissolution.  And indeed, as discussed below, Dr. Merrens testified that in those discussions they "had a fair amount of discovery about the dysfunction of the group" (Dr. Merrens Dep. 166).

In their depositions, Dr. Merrens and Herrick were asked about the nature of "the dysfunction."  Herrick, whose principal concern was finance, testified that he had heard no negative comments about the skills or competence of any of the physicians, and he provided no concrete information as to the nature of the dysfunction, other than the dearth of nurses.  Herrick testified that Dr. DeMars repeatedly "described Misty as being a *disruptive* behavior, *disruptive* influence on the team."  (Herrick Dep. 118-19 (emphases added).)  But he gave little insight as to what that meant:

>    Q.  What does that mean?
>
>    A.  That means that, well, based on what, *I guess you'd have to ask Leslie.*

A-206

Q. *Did anybody ask* her what does that mean?

A.  Leslie just explained that [Dr. Porter] tries to use her previous friendship to influence behaviors of Leslie and of the team and that she is disruptive at times.

Q.  There's a lot of behavior that might fall within the term "disruptive," right?

A.  Yeah, there is.

. . . .

Q.  Okay.  So did anyone in the conversations you're talking about get down to a little granular level *saying* look, here's *what she does* that really makes it difficult?

A.  *I don't recall any conversations about that . . . .*

(*Id*. at 119-20 (emphases added).)

Nor did Herrick himself observe any disruptive behavior by Dr. Porter.  Although in an email to Dr. Merrens he said, "*[b]ased on my observations and interactions*, Misty has been the biggest driver to the dysfunction within REI" (Herrick email to Dr. Merrens dated May 12, 2017 ("Herrick May 12 email to Dr. Merrens") (emphasis added)), Herrick confessed in his deposition, "*I have no observations of Misty herself related to this*, any negative or positive" (Herrick Dep. 123 (emphasis added)).

A-207

Although no details as to the nature of Dr. Porter's alleged dysfunction were forthcoming from Herrick, somewhat greater insight is available from the deposition of Dr. Merrens.  With respect to senior management's examination into the dysfunction of REI, Dr. Merrens was not referring simply to its shortage of nurses; while that was an important factor, he said that was "just the last wheel to come off the cart." (Dr. Merrens Dep. 124.)  He testified that "there were many, many problems in this division, and, by . . . late April . . . I was apprised of how significant those problems were." (*Id*. at 168.)  He stated that "[t]here were clearly challenges around Albert[ Hsu]'s capability," and there were "the issues with David Seifer." (Dr. Merrens Dep. 166-67.)  He said management had "gone through all this work *to understand* that, *at every level,* there is dysfunction and *we're not sure that we can safely provide care* for women in an ongoing fashion." (*Id*. at 163 (emphases added).)

But while Dr. Merrens stated that all three REI physicians contributed to the dysfunction (*see, e.g., id*. at 213), he attributed the issues of professional competence only to Drs. Seifer and Hsu.  Dr. Porter, in contrast, was described as a "talented surgeon" (Dr. Padin April 2017 email to Dr. Porter after observing her perform surgery in April 2017); a "talented physician" (Dr. Merrens Dep. 207); and a "talented clinician" (*id*. at 43).  When asked whether he agreed with Herrick's

- 74 -

A-208

statement that "Misty ha[d] been *the biggest driver to the dysfunction* within REI"

(Herrick May 12 email to Dr. Merrens (emphasis added)), Dr. Merrens responded

in part as follows:

> [As to the] dysfunction amongst those three physicians, . . . each had a role in the dysfunction. . . . It was not just Dr. Hsu and Dr. Seifer. *Misty played a role*, whether she was present or whether she was on leave, *in understanding, involving herself*, and doing a whole range of things . . . .

(Dr. Merrens Dep. at 213 (emphases added).)

We think it peculiar to refer to a physician's "understanding" as a

factor contributing to dysfunction.  Indeed, as shown above, Dr. Merrens testified

that through management's discussions about every level of REI, he had come to

"understand" that it was "not sure" that REI could "safely provide care."  (*Id.*

at 163.)  A jury could reasonably infer that Dr. Merrens's pointing to Dr. Porter's

"understanding" and her "involving herself" reflected his recognition that

whistleblowing on illegalities and reporting on misconduct impacting patients'

health and safety entail (a) understanding that certain conduct was unlawful,

unethical, or unsafe, and (b) getting involved sufficiently to report it.  That

interpretation may also be viewed as further supported by Dr. DeMars's statement

to Dr. Merrens that, given "Misty's past behavior and her inability to just be a

worker bee," Dr. DeMars was disinclined to retain Dr. Porter at DHMC unless she

"could be put into a box enough to keep her from being disruptive" (Dr. DeMars May 12 email to Dr. Merrens).

Given Dr. Merrens's testimony that his decisions in April and May 2017--to close REI and not retain Dr. Porter--were based fundamentally on the problematic practices and performance of Drs. Seifer and Hsu, and on Dr. Porter's "understanding" and her "involving herself" to do "a whole range of things," a rational juror could permissibly infer that Dr. Merrens was in fact aware that one category of "things" Dr. Porter had done was to report on practices of her two colleagues that she reasonably believed to be illegal, unethical, or endangering patient safety, and that his reference to a "dysfunction" on the part of Dr. Porter was code for her reporting activities.

We conclude that the district court erred in dismissing Dr. Porter's claims of whistleblower discrimination and wrongful discharge on the basis that Dr. Merrens as a matter of law lacked knowledge of her reportage.

2. *Dr. DeMars and the "Cat's Paw" Theory*

If Dr. Porter is unable to persuade the jury that Dr. Merrens, as decisionmaker, knew of her reports of conduct or practices she believed to be illegal or otherwise wrongful, she may nonetheless be able to recover on her

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 220 of 298

A-210

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 77 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page77 of 100

claims of whistleblower discrimination or wrongful discharge on a "cat's paw"

theory of liability--if such a theory is available under New Hampshire law, *see*

*generally Burnap v. Somersworth School District*, 172 N.H. at 639, 232 A.3d at 397.

Under that theory, an employer may be held liable for the animus of a supervisor

who was not charged with making the ultimate adverse employment decision but

who was relied on by the decisionmaker.  *See, e.g., Staub v. Proctor Hospital*, 562

U.S. 411, 420-21 (2011); *id*. at 415 n.1; *Natofsky*, 921 F.3d at 350; *Vasquez v. Empress*

*Ambulance Service, Inc.*, 835 F.3d 267 (2d Cir. 2016) ("*Vasquez*"); *Ameen v. Amphenol*

*Printed Circuits, Inc.*, 777 F.3d 63, 70 (1st Cir. 2015).

DHMC states that Dr. Porter raises the cat's paw theory of liability for

the first time on appeal, and it contends that the theory is available

> "only when an employer in effect adopts an employee's
> unlawful animus by acting *negligently* with respect to the
> information provided . . . and thereby affords that biased
> employee an outsize role in its own employment decision, can
> the employee's motivation be imputed to the employer and
> used to support a claim."

(DHMC brief on appeal at 27-28 (quoting *Vasquez*, 835 F.3d at 275 (emphasis in

DHMC brief).)  DHMC argues that "there is no evidence that Dr. Merrens closed

the program on Dr. DeMars' recommendation," and "no evidence that Dr. Merrens,

as the decisionmaker, negligently gave effect to any purported retaliatory animus

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 221 of 298

A-211

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 78 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page78 of 100

possessed by Dr. DeMars."  (DHMC brief on appeal at 28.)  These contentions are wide of the mark.

First, in arguing to the district court that Dr. Merrens relied on impermissible motivations of Dr. DeMars, Dr. Porter was focusing not on the closing of REI but rather on the termination of her employment.  She argued that, as to "the decision to terminate Dr. Porter, separate and apart from the decision to close the REI Division," Dr. DeMars "presented that recommendation to Dr. Merrens, who adopted it."  (Dr. Porter Response in Opposition to DHMC's Motion for Summary Judgment at 19-20.)  While Dr. Porter apparently did not give her argument the "cat's paw" label, she plainly asserted the main elements of the cat's paw theory.

Second, DHMC's reliance on *Vasquez* is misplaced, as that case alleged a retaliatory motive of one of the plaintiff's co-workers, not of a supervisor.  We noted that

> [w]hile the Supreme Court ha[d] approved holding an
> employer liable for the retaliatory intent of one of its
> "supervisors" under a "cat's paw" theory, it specifically
> "express[ed] no view as to whether the employer would be
> liable if a co-worker, rather than a supervisor, committed a
> discriminatory act that influenced the ultimate employment
> decision."

A-212

*Vasquez*, 835 F.3d at 273 (quoting *Staub*, 562 U.S. at 422 n.4).  We concluded that the employer could be held liable if a co-worker's retaliatory act was allowed to influence the employer's decision to fire the plaintiff, and if that influence was "attributable to the employer's own negligence," *id*.

In the present case, Dr. DeMars was no mere co-worker.  As Dr. Merrens described Dr. DeMars's position, "[s]he's the department chair, and she's the one that has been managing . . . each of these principal people in her division. . . .  [S]he is directly responsible for every aspect of this division" (Dr. Merrens Dep. 167), including "management of the principal physicians" (*id*. at 214).  And in his May 12 email to Maxfield explaining why Dr. Porter had not been retained, he began by saying that the decisions with respect to REI "staff" had been made "at the recommendation of Dr. De[M]ars."  Thus, the *Vasquez* principle that an employer is not liable for a non-negligent decision prompted by a mere co-worker, rather than by a supervisor, is not applicable here.

We note, however, that if Dr. Merrens made the decision to terminate Dr. Porter without knowing of her reporting activity, and if Dr. Porter were required to show that he did so negligently, there is evidence from which a jury could reasonably find such negligence.  The record includes testimony that:

A-213

Dr. Merrens knew that there were issues as to the capabilities of Dr. Hsu and Dr. Seifer (*See, e.g.,* Dr. Merrens Dep. 166-68);

Dr. DeMars, in order to persuade the Credentials Committee to allow her to make Dr. Seifer the REI Director, had "take[n] personal responsibility that [Dr. Seifer] would be a success" in that position (Dr. Merrens Dep. 77);

Dr. Merrens knew that Dr. DeMars was well aware that her position as chair of OB/GYN was in jeopardy if Dr. Seifer failed as REI Director.  He testified that it "was understood" that Dr. Seifer's performance would impact "decisions about [Dr. DeMars's] competence as . . . chair" of OB/GYN (*id*. at 83); and Dr. DeMars testified that when the committee reluctantly allowed her to make Dr. Seifer REI Director, Dr. Merrens "looked at me . . . and said this is on you" (Dr. DeMars Dep. 127);

Dr. Merrens knew that Dr. Porter was "a talented physician" (Dr. Merrens Dep. 207), "a talented clinician who [wa]s highly respected" (*id*. at 43);

Dr. DeMars repeatedly described Dr. Porter as "disruptive" (Herrick Dep. 119-20);

Dr. Merrens knew that Dr. DeMars had resented the fact that Dr. Seifer's former colleagues were warning DHMC about Dr. Seifer's shortcomings (*see* Dr. Merrens Dep. 77 ("[Dr. DeMars] *expressed that she was not pleased* that people from [Dr. Seifer's former employer] *had contacted us and expressed [their] concern*" (emphases added)));

As to Dr. Merrens's meetings with Dr. DeMars and Herrick about the future of REI and its staff, Herrick could not say that anyone asked Dr. DeMars what she meant by calling Dr. Porter "disruptive" (Herrick Dep. 120); and

Dr. Merrens, despite receiving a letter from Dr. Porter stating expressly that she wanted to remain at DHMC despite the cessation of

A-214

infertility practice, never spoke to Dr. Porter herself and instead "reflected with"--and was "convinced" by--Dr. DeMars that Dr. Porter was interested only in IVF (Dr. Merrens Dep. 206-208).

In short, the record includes evidence that Dr. Merrens knew (a) that the performances of Dr. Hsu and Dr. Seifer were substandard, (b) that Dr. Porter understood that their conduct was problematic, (c) that Dr. DeMars knew her position as OB/GYN chair was in jeopardy because of Dr. Seifer's failure, giving her a motive to retaliate against Dr. Porter for reporting Dr. Seifer's failures, and (d) that Dr. DeMars was displeased about being warned--even in advance--about shortcomings of a candidate she favored, and thus would not recommend retaining Dr. Porter unless she could be kept in a box.  The district court recognized that "Dr. DeMars's involvement in hiring Dr. Seifer in 2016" could have motivated "her . . . to be angry at his critics a year later" since "his tenure at DHMC did not go well."  D.Ct. Op., 2020 WL 6789564, at *11.  If Dr. Merrens made the decision to terminate Dr. Porter without knowing of Dr. Porter's reporting activity, a jury could reasonably find that, as he had learned of the "significant" capability and performance "problems" of Drs. Seifer and Hsu, he was negligent (1) in not asking what Dr. DeMars meant when she said that the highly respected Dr. Porter was "disruptive," (2) in basing his decision that Dr. Porter should be terminated on Dr. DeMars's representations that Dr. Porter was not interested in non-IVF work at

A-215

DHMC without even speaking to Dr. Porter despite Dr. Porter's having written to him expressly stating that she had such an interest, and (3) in not attempting to determine whether Dr. DeMars's non-recommendation of Dr. Porter's retention and possible misrepresentation of Dr. Porter's interest in remaining at DHMC without an IVF practice were impermissibly motivated.

The district court rejected any possibility that DHMC could be liable for a discriminatory termination of Dr. Porter's employment on the basis of retaliatory motivation by Dr. DeMars because it found--as described in the next sections--that there was insufficient evidence of any bad-faith, malicious, or retaliatory actions or motivation on the part of Dr. DeMars.  In so ruling, the court referred to Dr. DeMars's efforts to retain Dr. Porter, and her attitude toward Dr. Porter.

a. *Efforts*

As to Dr. DeMars's efforts to retain Dr. Porter at DHMC, the court stated principally as follows:

> The evidence is *undisputed that following the announcement of the closure of the REI Division, Dr. DeMars and Mr. Herrick considered retaining Dr. Porter to perform ultrasound work within the Gynecology Department.  In Dr. DeMars's initial discussions with senior management* about reorganizing the REI Division, *she*

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 226 of 298

A-216

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 83 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page83 of 100

*advocated for "keep[ing Dr. Porter] in an ultrasound role" despite her medical leave.* ([Dr. DeMars Dep.] 139.)  Dr. DeMars testified that "[i]t was unclear to me how long her recovery was going to take, and *I wanted* to be able to give her as much time as she needed to recover and to put her in an ultrasound-heavy role that would, we could then grow that role or grow her otherwise as her recovery allowed."  (*Id.*)

*Following the decision to close the division, Dr. DeMars continued to seek a way to keep Dr*. Porter on staff at DHMC.  She testified in her deposition that "I had a choice of *could I* keep her within the department or *could I* have her be a member of the Department of Radiology."  The Radiology Department advised that they had no open position.  DHMC has supplied an affidavit from the chair of the Radiology Department confirming that in 2017, "the Department of *Radiology did not have any need to hire or move a physician into the Department* to perform or read only gynecologic and/or early obstetric ultrasounds, or any other small sub-segment of ultrasounds."  Mr. Herrick determined that the *existing* patient need for ultrasound evaluation was already met by *existing* staff and that there was no business need for another physician to read ultrasounds.  ([Herrick Dep.] 54-64.)  Dr. DeMars was never able to *create a new position for Dr. Porter in the OB/GYN Department*.

D.Ct. Op., 2020 WL 6789564, at *10 (other internal citations to the record omitted)

(emphases ours).

We have several difficulties with the district court's characterization

of Dr. DeMars's actions.  First, we note that in stating that Dr. DeMars "advocated"

keeping Dr. Porter, the court cited deposition testimony in which Dr. DeMars said

she "wanted" to keep Dr. Porter (Dr. DeMars Dep. 139).  In crediting that

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 227 of 298

A-217

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 84 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page84 of 100

testimony by Dr. DeMars as to her mental state, the court both assumed Dr. DeMars's veracity and, based on that assessment of her credibility, drew its own inference that actual advocacy had ensued.  As will be discussed in the next section, there is evidence from which a jury could infer that Dr. DeMars's deposition testimony that she "wanted" Dr. Porter to remain at DHMC was not genuine.  But in addition, Dr. Merrens in his deposition repeatedly denies that Dr. DeMars actually advocated Dr. Porter's retention (*see, e.g.*, Dr. Merrens Dep. 150, 169, 209, 228).

In chronological order, the three stages at which the district court's above ruling characterizes Dr. DeMars as having made efforts to keep Dr. Porter at DHMC are:  Dr. DeMars's initial meeting with senior management, the period between the decision to close REI and the announcement of that decision, and the period after the announcement.  We see the record of Dr. DeMars's efforts at the first stage as, at best, equivocal and the inference that she made such efforts later as unsupported.

It is not clear from the present record precisely when Dr. DeMars's first meeting with senior management on this matter occurred.  But as discussed in Part I.E. above, Herrick's deposition testimony indicates that Herrick, Dr. DeMars, and Gunnell did not meet with senior management to discuss REI until after April

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 228 of 298

A-218

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 85 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page85 of 100

18.  According to Herrick, by the time of that meeting, Dr. DeMars had agreed that REI should be shut down and its entire staff terminated.  (*See* Herrick Dep. 49.) Dr. DeMars testified, however, that she had planned to recommend at that first meeting that Dr. Porter be retained to deal with ultrasounds; that the decision had already been made to close REI and terminate the physicians; and that every suggestion she made was summarily "dismissed, and [she] was told that there was not going to be any plan, that [she] was not allowed to make any plan."  (Dr. DeMars Dep. 139-40.)  She testified that, as to the possibility of "redeploying Dr. Porter to do ultrasound work," there was no discussion at that meeting; "[t]hat was something that I had in the back of my mind."  (*Id*. at 158.)

Herrick testified that after April 18, Dr. DeMars had suggested that "there's an option" of keeping Dr. Porter, but "it was more of a potential option" that Dr. DeMars herself then said was "not really" practical.  (*Id*. at 55, 54, 58.) A jury would be entitled to infer that Dr. DeMars was not in fact advocating for the retention of Dr. Porter.

Dr. Merrens testified that his decision to close REI was made on April 20 or 21; the decision was announced at DHMC internally on May 4.  Contrary to the district court's view of the record, we have not seen evidence that Dr. DeMars advocated retaining Dr. Porter at DHMC after April 21.  Other than her deposition,

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 229 of 298

A-219

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 86 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page86 of 100

the only statements we have seen in the record from Dr. DeMars after that date are (a) her April 25 email to Herrick (quoted in part in Part I.E. above), commenting on the three REI physicians and seeking permission to hire a new candidate in the hopes that REI would soon be revived, and (b) her May 12 email to Dr. Merrens.

Dr. DeMars's April 25 email surely does not compel an inference that she was making an attempt to retain Dr. Porter at DHMC.  Rather, Dr. DeMars makes certain negative comments about Dr. Porter (*see* Part II.E.2.b. below); and that email's only reference to a position for Dr. Porter at DHMC states, "We could offer her [an] ultrasound only position," but that would make it "impossible" to "keep[] her out of any rebuilding plans."  This email was not addressed to Dr. Merrens; and when he read it in his deposition he did not interpret Dr. DeMars's statements as recommending an offer, and he testified that "[t]here was never a proposal . . . to end the program and Misty will continue on doing GYN ultrasound."  (Dr. Merrens Dep. 161, 169.)

Nor could the district court's descriptions of Dr. DeMars's supposed efforts to find another position for Dr. Porter in OB/GYN or in the Radiology Department justify a conclusion as a matter of law that Dr. DeMars advocated for Dr. Porter's retention.  The determination by Herrick, for example, that OB/GYN had no need for Dr. Porter because "the *existing* patient need for ultrasound

Case: 25-1382, 03/19/2026, DktEntry: 60.1, Page 230 of 298

A-220

Case 2:17-cv-00194-kjd   Document 157-1   Filed 02/27/24   Page 87 of 100
Case 20-3894, Document 140-2, 02/27/2024, 3611961, Page87 of 100

evaluation was already met by *existing* staff," D.Ct. Op., 2020 WL 6789564, at *10 (citing Herrick Dep. 54 (emphases added)), was entirely superficial:  The "existing staff" that met "the existing patient need" included Dr. Porter; her work included non-REI ultrasounds (*see*, *e.g.*, paragraphs 10, 11, and 17 of Dr. Porter Answer to DHMC Interrogatory 7).  Further, Herrick testified that there was no actual "analysis" as to ultrasound demand in the future; "we did some conversations, some analysis," which were just conversations among himself, Dr. DeMars, and Gunnell; he said "you know[,] analysis might be the wrong word."  (Herrick Dep. 55-57.)

The statement from the Radiology Department that it "did not have any need *to hire* or *move a physician into* the Department," D.Ct. Op., 2020 WL 6789564, at *10 (internal quotation marks omitted) (emphases ours), is simply puzzling:  Dr. Porter was at that time already a member of the Radiology Department; she "had a dual appointment" in OB/GYN and Radiology "at the time of termination."  (Dr. Merrens Dep. 43.)  When REI was closed, DHMC terminated Dr. Porter's employment entirely.

The district court's finding that Dr. DeMars attempted to have Dr. Porter retained in OB/GYN after the decision to close REI was reached on April 20 or 21 or announced on May 4, is also contrary to the testimony of Dr. Merrens.  His

- 87 -

view nearly from the outset had been that REI should be closed and that all of its staff should be terminated.  (*See, e.g.,* Dr. Merrens Dep. 20 ("[w]e ended the program, and, in ending the program, we made the decision also that the people that provided that care . . . would also be terminated," including "Misty"); *id.* at 128-29; *but see id.* at 148-49 (Todd was allowed to continue in OB/GYN).)

But after sending his May 12 email to Maxfield stating that the decisions as to REI's staff had been made on Dr. DeMars's recommendations, Dr. Merrens sent an email to Dr. DeMars.  Seeking an appropriate way to respond to the "inundat[ion]" of "emails *wondering why Misty can't stay on* to do her ultrasound complex operative and teaching role even if we end REI," he said, "*I suspect* that you considered this . . . ."  (Dr. Merrens May 12 email to Dr. DeMars (emphases added).)  Dr. Merrens's stating only that he "suspect[ed]" that Dr. DeMars had considered why Dr. Porter should not be retained can reasonably be interpreted by a factfinder as meaning that Dr. DeMars had not in fact recommended to Dr. Merrens that Dr. Porter be retained.  And indeed, Dr. DeMars's immediate response confirmed that she had not made such a suggestion, as she hypothesized what might have occurred "*[i]f I had made a decision to try* to keep her." (Dr. DeMars May 12 email to Dr. Merrens (emphasis added).)

A-222

Dr. DeMars stated, "it was the right decision to include [Dr. Porter] in the terminations, *and I don't want to change that decision*." (*Id.* (emphasis added).) We have not seen in the record any recommendation by Dr. DeMars to Dr. Merrens for the retention of Dr. Porter thereafter.

Finally, we note that Dr. Merrens's May 12 email to Maxfield, in addition to saying that the staffing decisions had been made on Dr. DeMars's recommendations, said that Dr. Merrens was not sure of Dr. Porter's interest in staying at DHMC if there were no infertility practice. But in his deposition, Dr. Merrens stated that at some point Dr. Porter wrote to him stating exactly such an interest:

> Q. *Did you ever receive communication from Dr. Porter expressing that she did, in fact, want to stay on, even if the infertility part were to cease?*
>
> A. *Yes.*
>
> Q. Did that give you information about her interest?
>
> A. She had sent a document. I'm not sure of the date. I reviewed it as part of the, of some of the information. She conveyed to us a document expressing her dismay at the closure of the program, her perspectives on her value, her years of service, and what she could bring to it. There was not a mention of other issues that were going on related to Dr. Hsu or Dr. Seifer, nor was there any mention of her disability. *It was more around there are other things that I can, that, that I'm interested in.*

(Dr. Merrens Dep. 206 (emphasis added).)

Dr. Merrens testified that he never spoke with Dr. Porter about her desire to be reassigned to OB/GYN (*see id*. at 206, 208); he only "reflected" about it with Dr. DeMars (*id*. at 207).  Although the timing and depth of their "reflect[ions]" are unclear--(*see, e.g., id*. at 209 ("Q.  When you talked to Dr. DeMars . . . around this time, middle of May 2017, what were your discussions about Dr. Porter?  A.  I don't think I had specific conversations with Dr. DeMars about Dr. Porter."))--Dr. Merrens testified that he "was convinced" by Dr. DeMars that Dr. Porter "was really tied to REI and IVF" (*id*. at 208); and Dr. DeMars did not recommend reassigning Dr. Porter to OB/GYN:

> Q.  *Did Dr. DeMars suggest finding a way to keep Dr. Porter at Dartmouth-Hitchcock?*
>
> A.  *She did not.*

(Dr. Merrens Dep. 209 (emphases added); *see also id*. at 169 ("[t]here was never a proposal that we're going to end the program and Misty will continue on doing GYN ultrasound"); *id*. at 227 ("Q.  Did you believe that Dartmouth-Hitchcock was [on May 18th, 2017] working on a way to keep Misty Blanchette Porter?  A.  No."); *id*. at 228 ("[w]e were not working on a way to keep Misty Blanchette Porter

A-224

employed"); *id*. at 150 ("I was not presented with a plan by Leslie" for Dr. Porter to continue just with ultrasound. "That was not part of the plan.").)

In sum, the record does not support the district court's conclusion as a matter of law that after Dr. Merrens decided to close REI, Dr. DeMars "advocated" that Dr. Porter be retained and reassigned rather than terminated.  Instead, the record includes evidence that Dr. DeMars described her own early suggestions of such a possible option as not really practical; that after the final decision was reached to close REI, Dr. DeMars advocated to Dr. Merrens the termination of all REI staff except nurse Todd; that the Radiology Department's statement that it did not need to bring in a new physician was irrelevant since Dr. Porter was already a member of that department; that the financial conclusions were not based on any actual analysis of future need; and that Dr. Merrens, after receiving directly from Dr. Porter her statement of interest in reassignment to OB/GYN for non-IVF-related work, elected not to speak to Dr. Porter and instead relied only on Dr. DeMars who--far from advocating for Dr. Porter's retention--said "it was the right decision to include her in the terminations, and I don't want to change that decision."

b. *Attitudes*

As to Dr. DeMars's attitude toward Dr. Porter, the district court found that the evidence showed that Dr. DeMars was "[i]rritated" by Dr. Porter's "criticism of" Dr. Seifer, D.Ct. Op., 2020 WL 6789564, at *9, but not "*sufficiently angered or embarrassed by Dr. Porter's complaints against Dr. Seifer to retaliate by opposing her retention*," *id*. at *10 (emphasis added).  The court's finding that Dr. DeMars was not sufficiently angered to have a retaliatory animus was based on its view that

> [t]here is no evidence of this anger.  It is a theory which is often stated in Plaintiff's papers but remains *unsupported by an email* or deposition testimony.  *No reasonable jury could infer that Dr. DeMars decided not to arrange for a new position within the OB/GYN Department because Dr. Porter had criticized Dr. Seifer*.  At most, Dr. DeMars's involvement in hiring Dr. Seifer in 2016 gave her reason to be angry at his critics a year later and disappointed that his tenure at DHMC did not go well.

*Id*. at *11 (emphases added).  The court concluded that "[t]here is . . . no evidence that Dr. DeMars sought to terminate Dr. Porter's employment at DHMC.  *The deposition testimony is to the contrary*." *Id*. (emphasis added).

We cannot see that the record supports these findings by the district court.  First, the statement that "[t]here is . . . no evidence that Dr. DeMars sought to terminate Dr. Porter's employment at DHMC" ignores the emails of Dr. Merrens

A-226

and Dr. DeMars themselves.  (*See* Dr. Merrens May 12 email to Maxfield, stating the decisions as to REI "staff" upon its closing were made "at the recommendation of Dr. De[M]ars"; Dr. DeMars May 12 email to Dr. Merrens, stating that "it was the right decision to include [Dr. Porter] in the terminations, and I don't want to change that decision").

Second, any "deposition testimony . . . to the contrary" by Dr. Merrens or Dr. DeMars should not have been considered by the district court in ruling on DHMC's motion for summary judgment, given that a jury is not required to credit a witness's testimony.

Third, in noting that Dr. DeMars's interest in having Dr. Seifer succeed "gave [Dr. DeMars] reason to be angry at his critics a year later" but finding she was not "sufficiently angered" to have retaliated, D.Ct. Op., 2020 WL 6789564, at *11, *10, the district court engaged in weighing the evidence.  The drawing of factual inferences and weighing the evidence is the province of a factfinder, not of the court in considering a motion for summary judgment.

Viewing the record as a whole in the light most favorable to Dr. Porter, we conclude that a jury could permissibly infer that Dr. DeMars--who, according to Dr. Merrens, never recommended that Dr. Porter be retained--bore Dr. Porter ill will for insistently reporting, and causing other REI staff members to

- 93 -

report their observations of, impermissible or unsafe conduct and practices by Drs. Seifer and Hsu, and particularly by Dr. Seifer.  As described in Part I.C.1. above, Dr. Seifer was made REI director in May 2016 despite substantial warnings from his most recent former colleagues.  He was appointed on Dr. DeMars's strong endorsement, with Dr. Merrens's express warning to Dr. DeMars that if Dr. Seifer failed it "was on her," and it was thus "understood" that DeMars's tenure as OB/GYN's chair was in jeopardy (Dr. Merrens Dep. 83).

Dr. Seifer began his REI work on June 15, 2016, and before the end of July, Dr. Porter had heard reports from at least a dozen REI staff members as to Dr. Seifer's lack of competence.  Dr. Porter instructed them to report their concerns up the chain of command and to Dr. DeMars.  Dr. DeMars said she had heard such reports in July from multiple sources.

In November 2016, Dr. DeMars collected REI staff members' assessments of Dr. Seifer's performance.  Dr. Porter's evaluation, and others, were negative; but Dr. DeMars sent them to DHMC's Medical Staff Office with a covering summary that characterized the evaluations favorably, stating that there were no repeated criticisms of Dr. Seifer from the physicians, patients, or staff (*see id*. at 96-97, 101-02, 106, 109).  In February 2017, Dr. DeMars collected additional assessments of Dr. Seifer's performance, which also were negative.  Dr. DeMars

did not inform Dr. Merrens of any of these negative evaluations.  (*See* Dr. Merrens

Dep. 118-19, 121-22.)  Dr. Merrens viewed the evaluations--when he finally saw

them--as raising "significant concerns" as to, *inter alia*, Dr. Seifer's technical skill,

approach to patients, and standard of care (*id*. at 120).  Dr. DeMars said that she

did not tell Dr. Merrens "about any of the[] issues reflected in the" negative

evaluations, "[b]ecause he [had] looked at me in the Credentialing Committee and

said this is on you."  (Dr. DeMars Dep. 127.)

In contrast to Dr. DeMars's nondisclosure of the negative views of Dr.

Seifer to Dr. Merrens, Dr. DeMars shared negative views of Dr. Seifer with others.

In July 2016--barely six weeks after Dr. Seifer started work at REI--Dr. DeMars

texted a former chair of OB/GYN stating,

> *I'm not sure that DS is clinically competent*. . . .  I don't know what
> he's been doing for 25 years, but I'm not sure it was IVF. . . . *I*
> *have heard separately voiced concerns from nursing, anesthesia and*
> *ultrasound techs*.  The lab folks complain about bloody aspirates
> and low egg counts.

(Dr. Merrens Dep. 88-89 (internal quotation marks omitted) (emphases ours).)  In

April 2017, Dr. DeMars's email to Herrick observed, *inter alia*, that after Dr. Seifer's

termination from DHMC "[i]t is conceivable that he could join one of the Boston

IVF practices," but Dr. DeMars added, "*Lord help them*."  (Dr. DeMars April 25

email to Herrick (emphasis added).)  And despite the fact that Dr. Seifer's REI

A-229

appointment was due solely to Dr. DeMars's own tenacious endorsement despite the reluctance of the credentials committee and the warnings of Dr. Seifer's former colleagues (*see* Part I.C.1. above), and that Dr. Seifer was her "responsibility" (Dr. DeMars Dep. 110 ("I made the decision to hire him")), Dr. DeMars described her situation as getting "stuck with" Dr. Seifer (Dr. DeMars's April 25 email to Herrick); and she placed the blame for Dr. Seifer's failures squarely on Dr. Porter. She said:

> While David is not a good leader, *his failure is also the result of a masterful takedown by Misty Porter*.  If she had wanted to support him, she would have made the division successful.

(*Id*. (emphasis added).)

In her April 25 email to Herrick, Dr. DeMars also noted that Dr. Porter had strong ties to the University of Vermont Medical Center ("UVM").  And, apparently referring to an ongoing DHMC in-house investigation into a mysteriously stored collection of medicines (*see* Herrick Dep. 68, 87 (a bag of medicines found "in a storage closet . . . were for multiple patients, and . . . it was unclear why they were there")), Dr. DeMars predicted that Dr. Porter would surely be hired by UVM "unless she is going to be *forced to resign over the medication diversion issues*" (Dr. DeMars April 25 email to Herrick (emphasis added)).  And despite her previous friendship with Dr. Porter, Dr. DeMars said:

> *My life* and the messaging *would be much easier if* **[DHMC's general counsel] determines that** *all three providers* **are at fault in the medi diversion issue and** *are facing loss of license.*

(*Id*. (italics ours) (bolding in original).)

Given this record, a rational juror would not be required to credit Dr. DeMars's testimony that she wanted only the best for Dr. Porter.  The jury could instead infer that Dr. DeMars's representations and recommendations to Dr. Merrens convincing him to terminate Dr. Porter rather than reassigning her to OB/GYN, were motivated by bad faith, malice, or retaliation, given, *inter alia*,

- ■ Dr. DeMars's blaming Dr. Porter for Dr. Seifer's failure-- despite the pre-hiring warnings from Dr. Seifer's former colleagues and the numerous multi-source, on-site criticisms of his performance at REI;

- ■ her assertion that Dr. Porter--"who ha[d] been out for almost 18 months" (Dr. DeMars May 12 email to Dr. Merrens)--could have made Dr. Seifer a success; and

- ■ her emphatic view that "**My life and the messaging would be much easier if**" she could tell others that Dr. Porter, who was "gifted and dedicated" (Dr. DeMars Dep. 43)--but who reported unlawful, unethical, and harmful conduct--was let go because she was at risk of "**los[ing her] license**" to practice medicine.

We conclude that the district court erred in finding that the record lacked evidence from which a jury could permissibly find that Dr. Merrens terminated Dr. Porter's employment--rather than reassigning her, as she requested,

A-231

to fill known needs of OB/GYN--in reliance on the representations and recommendations from Dr. DeMars that were motivated by malice, bad faith, or a desire for retaliation.

### 3. *Dr. DeMars as Decisionmaker*

In the above discussion, we have explored the record as to whether or not Dr. Merrens knew of Dr. Porter's reporting activity--and the evidence of his reliance on reflections or discussions he had with Dr. DeMars--on the assumption that Dr. Merrens was the ultimate decisionmaker as to whether to terminate Dr. Porter rather than retain her at DHMC.  In so doing we do not mean to exclude the possibility that a jury could find that the actual decisionmaker with respect to the termination of Dr. Porter, after Dr. Merrens decided that REI would be closed, was not Dr. Merrens but Dr. DeMars, who plainly knew of Dr. Porter's reporting activities.

While Dr. Merrens testified that he was responsible for those decisions because he was "ultimately responsible for everything that happens from a clinical aspect at Dartmouth-Hitchcock" (Dr. Merrens Dep. 20), it is not clear that he was the actual decisionmaker with regard to termination or retention of the REI staff.  For example, while his initial view was that when REI closed, all staff should

automatically be terminated, one staff member--nurse Todd--was in fact thereafter retained in OB/GYN.  That decision was made although Dr. Merrens did "not" have a "complete understanding" of Todd's capabilities (Dr. Merrens Dep. 25); and his testimony lends itself to an inference that the decision was made by Dr. DeMars.  He said, "I don't remember Dr. DeMars explaining why Beth Todd was retained."  (Dr. Merrens Dep. 25-26.)

An inference that the decision to retain Todd had been made by Dr. DeMars would be entirely consistent with Dr. Merrens's May 12 email to Maxfield stating that the REI-closure staffing decisions had been made "at the recommendation of Dr. De[M]ars").  And the jury could infer that Dr. DeMars, not Dr. Merrens, had also made the decision not to retain Dr. Porter, especially given that, minutes after Dr. Merrens sent his email to Maxfield in response to her inquiry as to why Dr. Porter was not being retained, he emailed Dr. DeMars stating that he "*need[ed] to know* how better to answer this question."  (Dr. Merrens May 12 email to Dr. DeMars (emphasis added).)

In sum, the record is susceptible to several permissible inferences as to the cause of DHMC's decision to terminate Dr. Porter.  It did not lend itself to a judgment as a matter of law in favor of DHMC on her claims that she was terminated because of her reporting activities.

A-233

CONCLUSION

We have considered all of the parties' respective arguments challenging or supporting the judgment of the district court and, except as noted above, have found them to be without merit.  For the reasons discussed above, we vacate so much of the judgment as dismissed plaintiff's claims of disability discrimination in the termination of her employment, in violation of the ADA, the Rehabilitation Act, and the laws of New Hampshire and Vermont, and her claims of whistleblower discrimination and wrongful discharge in violation of New Hampshire law, and we remand for trial of those claims.  We affirm so much of the judgment as dismissed plaintiff's other claims that defendants, prior to her termination, failed to accommodate her disability or retaliated against her on account of her disability.

Costs to plaintiff.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,


            Plaintiff,

vs.


DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,


            Defendants.

Case No. 2:17-cv-194

### DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE THE TESTIMONY OF ROBERT BANCROFT

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Defendants" or "Dartmouth Health") hereby move (the "Motion"), pursuant to Fed. R. Evid. 702 and the Order issued by this Honorable Court on January 13, 2025, at ECF Docket No. 194, to preclude the expert witness testimony of Robert Bancroft ("Bancroft"). The grounds for Defendants' Motion are fully set forth in the accompanying memorandum of law. In brief, the exclusion of Bancroft's testimony is appropriate because he is unqualified to be an expert in the instant case, and his opinions are unreliable.

Pursuant to Local Rule 7(a)(7), Defendants hereby certify that they have made a good faith attempt to obtain Plaintiff's agreement to the requested relief, and such agreement was not obtained. Defendants hereby request an evidentiary hearing on this Motion pursuant to Fed. R. Evid. 702, Local Rule 7(a)(6), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

4914-1373-5190.6

Date: February 14, 2025                    Respectfully submitted,

                                           */s/ Tris J. Coffin*

                                           **DOWNS RACHLIN MARTIN PLLC**

                                           Tristram J. Coffin
                                           199 Main Street
                                           Burlington, VT 05402
                                           Telephone: 802-863-2375
                                           tcoffin@drm.com

                                           **FOLEY & LARDNER LLP**

                                           Donald W. Schroeder (admitted *pro hac vice*)
                                           Morgan McDonald-Ramos (admitted *pro hac vice*)
                                           Megan E. Martinez (admitted *pro hac vice*)
                                           111 Huntington Avenue
                                           Boston, MA 02199
                                           Tel: (617) 342-4000
                                           dschroeder@foley.com
                                           mmcdonald@foley.com
                                           memartinez@foley.com

                                           *Attorneys for Defendants*

4914-1373-5190.6

A-236

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 14, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

/s/ Tris J. Coffin
Tristram J. Coffin

4914-1373-5190.6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,

      Plaintiff,

vs.

DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,

      Defendants.

Case No. 2:17-cv-194

### MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE THE TESTIMONY OF ROBERT BANCROFT

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Defendants" or "Dartmouth Health") respectfully submit this memorandum of law in support of Defendants' Motion *in Limine* (the "Motion") to preclude the expert witness testimony of Robert Bancroft ("Bancroft") on behalf of Plaintiff Misty Blanchette Porter, M.D. ("Plaintiff" or "Dr. Porter"). The basis for excluding Bancroft's testimony is two-fold: (1) he is unqualified; and (2) his opinions, which are based on speculation or Plaintiff's unfounded assumptions, are unreliable.

### FACTUAL BACKGROUND

On January 23, 2018, counsel for Plaintiff filed initial disclosures that included "all expert witnesses identified by any party." *See* ECF Docket No. 19. In accordance with Fed. R. Civ. P. 26(a)(2)(B), Plaintiff subsequently disclosed the expert report of Robert Bancroft ("Bancroft"), dated October 30, 2018. **Exhibit A**. Pursuant to Fed. R. Civ. P. 26(a)(2)(E), Plaintiff later disclosed a supplemental expert report from Bancroft, dated October 1, 2019. **Exhibit B**. On October 30, 2019,

1

Defendants' counsel deposed Bancroft. *See* **Exhibit C**, Deposition of Bancroft ("Bancroft Dep."). Plaintiff later disclosed one (1) additional expert report from Bancroft, dated August 26, 2024. **Exhibit D**. Apart from Bancroft's August 2024 report, Plaintiff has not provided any additional information from Bancroft within the five (5) plus years since his deposition.

At his deposition, Bancroft admitted that he had no professional licenses and had not published anything within the last twenty (20) years. *See* **Exhibit C** Bancroft Dep. 5:21–23; 13:5–8. Moreover, he had not testified at trial in the last four (4) to five (5) years and could not remember the last time he testified at trial for an employment dispute. *Id.*, at 16:21–17:1; 17:15–20. Indeed, he conceded that he suffers from a short-term memory deficit that was then-turning into long-term memory deficit. *Id.*, at 32:4–6. Accordingly, he could only confirm that he provided expert testimony for two (2) employment cases in the last four (4) years. *Id.*, at 24:4–18. He admittedly performed more work on behalf of plaintiffs compared to defendants in the few employment cases he remembered handling in the recent past. *Id.*, at 15:23–25.

When asked about assumptions made in his expert reports, Bancroft admittedly relied on information about salary increases that was "not precise[,]" from the U.S. Bureau of Labor Statistics which was not reflective of doctors' salaries nor generally "fits with people in health care." *Id.*, at 54:1–19; *see also* **Exhibits A, B**, and **D**. Perhaps most disturbing, Bancroft's reports assume that Dr. Porter should receive an inexplicable gross-up on her total purported damages to account for federal and state taxes, which equates to *almost half* of his total damages calculation (approximately $2.1 million). **Exhibits A, B**, and **D**.  Dr. Porter's claims are based solely on back pay and front pay damages and, therefore, any damages would naturally constitute W-2 earnings which would be subject to applicable state and federal tax withholdings.  In assuming Dr. Porter's expenses for living in Burlington, VT, Bancroft relied on his personal experience, including anecdotal evidence from his own life, and he did

not review any outside sources. *See* **Exhibit C** Bancroft Dep. at 78:22–79:6; *see also* **Exhibits A**, **B**, and **D**. Notably, Bancroft's reports also failed to account for Dr. Porter's long-term disability payments received in 2018. *Id.*

In drafting his reports, Bancroft admittedly relied on Dr. Porter's subjective belief that, in 2017, she would have been promoted by Dartmouth Health to a Full Professor position and receive a 5% salary increase. **Exhibit C**, Bancroft Dep., at 56:15–25; *see also* **Exhibits A, B** and **D**. Notably, Bancroft did not consider whether any of Dr. Porter's beliefs were reasonable. **Exhibit C**, Bancroft Dep., at 67:1–4. Bancroft's second report also considers multiple, future possibilities in Dr. Porter's career. *Id.,* at 36:17–37:1; *see also* **Exhibit B**. For example, in one scenario, Bancroft's assumes that, in July 2021, Dr. Porter would continue to work on a part-time basis at the University of Vermont ("UVM") after resignation from her full-time position, and that UVM would permit Dr. Porter to engage in part-time work for two days a week. *Id.* at 37:2–9; *see also* **Exhibit B**.  However, in his most recent report, Bancroft now assumes that Dr. Porter would leave her full-time position at UVM in January 2025, and UVM will permit Dr. Porter to work in a 60% part-time position. **Exhibit D.**   Given Bancroft's deposition testimony and his expert reports' multiple, glaring deficiencies, Defendants respectfully request this Court to preclude Bancroft's testimony at trial altogether.

<strong><u>LEGAL STANDARD</u></strong>

"The purpose of a motion in limine is to 'aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of the trial.'" *Ne. Farm Sales & Serv., Inc. v. Krone NA, Inc.*, No. 5:17-CV-72, 2019 WL 13251287, at *6 (D. Vt. Mar. 27, 2019) (*quoting Ellerton v. Ellerton*, 745 F. Supp. 2d 458, 460 (D. Vt. 2010)). Fed. R. Ev. 702 provides that

3

4899-6480-2838.6

"[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"Whether a witness is qualified as an expert by his or her knowledge, skill, experience, training, or education is a 'threshold question' that the court must resolve before determining whether his or her opinions are admissible." *Gordon v. New England Cent. R.R., Inc.*, 2019 WL 4068639, at *4 (D. Vt. Aug. 28, 2019) (*quoting Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005)). Once that qualification threshold is met, "the district court [has] 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Kew v. Town of Northfield, VT*, 2023 WL 6050287, at *1 (D. Vt. July 10, 2023) (*quoting Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

Because Plaintiff is "proffering expert testimony[, she] bears the burden of establishing its admissibility 'by a preponderance of proof.'" *Gordon*, 2019 at *3 (*quoting Daubert*, 509 U.S. at 592, n.10) (granting defendant's motion *in limine* to preclude the opinions of an expert witness for purposes of trial); *see also Borawick v. Shay*, 68 F.3d 597, 609 (2d Cir. 1995) (granting defendant's motion *in limine* to preclude the testimony of an expert witness who "was not properly qualified[.]"). Here, Plaintiff cannot meet her burden.

## ARGUMENT

1. **Bancroft is not qualified as an expert because he does not have sufficient experience working on employment cases, and his report is riddled with speculation, improper assumptions and subjective opinions.**

As a threshold matter, Bancroft has no professional licenses and has not published anything within the last twenty (20) years. **Exhibit C**, Bancroft Dep., at 5:21–23; 13:5–8.  Moreover, at least as of

4

A-241

October 2019, Bancroft had not testified at trial in the last four (4) to five (5) years and could not remember the last time he testified at trial for an employment dispute. **Exhibit C**, Bancroft Dep., at 16:21–17:1; 17:15–20. To be clear, he could only confirm his expert testimony in discovery in two (2) employment cases in the previous four (4) years. *Id.*, at 24:4–18. Before reaching additional grounds to exclude his testimony, Bancroft's lack of experience with employment cases is sufficient reason alone to disqualify him as an expert in this matter. *See Simuro v. Shedd*, No. 2:13-CV-00030, 2016 WL 9526418, at *2 (D. Vt. Nov. 9, 2016) (where expert was not qualified because he did "not have significant experience working specifically" with the subject matter at issue.); *see also Grajeda v. Vail Resorts Inc.*, No. 2:20-CV-00165, 2023 WL 4803755, at *3 (D. Vt. July 27, 2023) (excluding an expert's testimony, in part, because "his opinions . . . exceed[ed] his area of expertise."). In sum, a cursory review of his admissions reveals that Bancroft does not meet the Court's presumption in favor of appropriate expert credentials. *See Borawick*, 68 F.3d at 609 (2d Cir. 1995) (noting that "there should be a general presumption in favor of appropriate academic credentials."); *see also Top Ridge Invs., LLC v. Anichini, Inc.*, No. 5:16-CV-76, 2017 WL 5952693, at *3 (D. Vt. Nov. 30, 2017) (granting motion *in limine* to preclude expert testimony where expert witness lacked professional qualifications, obtained no professional education, did not publish, and held no professional license.").

But that is not the only disqualifying basis for excluding his expert testimony. Bancroft is further unqualified due to his reliance on subjective experience and speculation in drafting his reports. *See Gonyea v. Irick Excavating, LLC*, No. 2:08-CV-242, 2010 WL 11606973, at *4 (D. Vt. Nov. 30, 2010) ("Relying on experience and subjectivity has been identified as a 'red flag' indicating an expert may not be qualified to testify on a particular subject[.]"); *see also Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 60 (2d Cir. 2002) (where an expert "was not qualified to make an assessment" in part because the expert's opinion "would invite the jury to award damages based on

5

speculation."). Here, Bancroft acknowledged that he relied on imprecise statistical evidence to support his findings.  **Exhibit C**, Bancroft Dep., at 54:1–19; *see also* **Exhibits A, B**, and **D**.

To be sure, this Court has clearly stated that "expert testimony should be excluded if it is 'speculative or conjectural.'" *Buck v. Fairpoint Commc'ns, Inc.*, No. 2:14-CV-157, 2016 WL 7665784, at *1 (D. Vt. Apr. 20, 2016) (*quoting Major League Baseball Props.*, *Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). Bancroft's reports are inherently speculative, as he considers multiple, hypothetical possibilities in Dr. Porter's career. **Exhibit C**, Bancroft Dep., at 36:17–37:1; **Exhibits A, B** and **D**.  At the same time, Bancroft assumes that Dr. Porter would remain employed at Dartmouth Health on a full-time basis until 2033.  In doing so, Bancroft inexplicably holds Defendants liable for the expected dip in Dr. Porter's total earnings under each of the scenarios.

A few examples demonstrate the internal inconsistencies in Bancroft's analysis.  In one scenario, Bancroft assumes that, in July 2021, Dr. Porter would continue to work on a part-time basis at the University of Vermont ("UVM") after resignation from her full-time position. **Exhibit C**, Bancroft Dep., at 37:2–9; **Exhibit B**. In his most recent report, however, Bancroft now assumes that Dr. Porter would leave her full-time position at UVM in January 2025, and UVM will permit Dr. Porter to work in a 60% part-time position. **Exhibit D.**   In both scenarios, Dartmouth Health is unfairly held responsible for the dramatic delta in earnings.  Setting aside the issue of liability, Defendants have no legal obligation to finance Dr. Porter's voluntary decision to fundamentally alter her work arrangements with UVM by assuming a part-time position. Given his report's reliance on subjective experience and hypotheticals without any factual support, Bancroft is unqualified to testify as an expert on this basis alone.

   **2. Bancroft's testimony is not reliable.**

6

Bancroft's reliance on Dr. Porter's subjective opinions also renders his testimony unreliable. *See Gordon*, 2019 at *4 (where expert testimony was excluded as unreliable because the expert "act[ed] as a mere conduit for Plaintiffs' version of the operative facts.). For example, Bancroft's analysis relies on Dr. Porter's subjective belief that she would be promoted by Dartmouth Health to a full professor and receive a 5% salary increase in 2017. **Exhibit C**, Bancroft Dep., at 56:15–25; *See also* **Exhibits A, B** and **D**. Importantly, Bancroft did not consider whether any of Dr. Porter's beliefs were reasonable. **Exhibit C**, Bancroft Dep., at 67:1–4. Thus, Bancroft's report is a mere conduit for Dr. Porter's subjective version of the operative facts, and it is not reliable as expert testimony.

The potential for artificial inflation of damages renders Bancroft's expert testimony inadmissible. *See Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-CV-230, 2014 WL 2040133, at *3 (D. Vt. May 16, 2014) (excluding expert's opinion, in part, where the "damages model was unreliable, had the potential to artificially inflate Plaintiffs' damages, and was therefore inadmissible."). Here, Bancroft acknowledged that he suffers from a short-term memory deficit that was then-turning into long-term memory deficit (as of five-plus years ago). **Exhibit C**, Bancroft Dep., at 32:4–6. This cognitive impairment further impedes the reliability of his testimony. *See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 310 (D. Vt. 2007) ("The expert opinions offered must be the product of reliable principles and methods that have been reliably applied to the facts of the case."). The proof is in the pudding. As just one example, Bancroft's reports assume Dr. Porter's total damages should be "grossed up" to account for federal and state taxes (approximately $2.1 million). **Exhibits A, B**, and **D**. There is no entitlement under the law to this post-tax calculation where state and federal taxes should be deducted from compensation attributable to back pay or front pay. Bancroft's reports also failed to account for Dr. Porter's long-term disability payments received in 2018. **Exhibits A, B** and **D**.

3. **This Court has significantly limited Bancroft's expert testimony in multiple cases involving projected lost earnings.**

7

This Court has appropriately limited Bancroft's expert testimony in similar matters for the foregoing reasons. *See, e.g. Deldebbio v. Blanchard*, No. 2:06-CV-115, 2008 WL 2581080, at *2 (D. Vt. June 26, 2008) (deciding that Bancroft "may not testify concerning his calculation of projected lost earnings . . . [because] those numbers are based on [an] unsupported and doubly speculative assumption[.]"); *Connors v. Dartmouth Hitchcock Med. Ctr.*, No. 2:10-CV-94, 2013 WL 1222185, at *5 (D. Vt. Nov. 18, 2013) (excluding Bancroft's "opinions. . . as speculative under Federal Rule of Evidence 702.").

In *Deldebbio*, the plaintiff sought to introduce Bancroft's expert testimony regarding projected lost income calculations. *Deldebbio*, at *1. In that case, this Court found Bancroft's testimony improper because "proof of loss of earning capacity must be supported by admissible evidence and may not be based on undue speculation." *Id.* at *1–2. Here, Bancroft again speculates regarding Dr. Porter's projected loss earnings. For example, in crafting his expert report, Bancroft used speculative information about future salary increases that was "not precise[,]" Dr. Porter's subjective belief that she would be promoted, and his personal, subjective experience. **Exhibit C**, Bancroft Dep., at 54:21; 56:15–25; 78:22–25. Thus, Bancroft's expert testimony is not appropriately admissible.

The plaintiff in *Connors* also sought to introduce Bancroft's expert testimony regarding projected lost income. There, Bancroft speculated that, had defendants not terminated plaintiff's residency, "with an additional year of experience her productivity, and consequently her income, would continue to show a differential" for the next twelve (12) years. *Connors*, 2013 WL at *5. This Court properly excluded Bancroft's testimony because there was "simply no evidence beyond speculation that taking an additional year to complete a residency produces an income shortfall that stretches twelve years into the resident's future." *Id.* Again, Bancroft's analysis here is inherently speculative, as he considers multiple, future possibilities in Dr. Porter's career. **Exhibit C**, Bancroft Dep., at 36:17–37:1.

8

Given the multiple examples of speculation and unfounded assumptions in Bancroft's analysis, his testimony should be precluded.

## CONCLUSION

Defendants respectfully request the Court to preclude expert witness testimony from Bancroft during the trial of this matter.

Date: February 14, 2025                    Respectfully submitted,

/s/ Tris J. Coffin

**DOWNS RACHLIN MARTIN PLLC**

Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

**FOLEY & LARDNER LLP**

Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald-Ramos (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

*Attorneys for Defendants*

9

4899-6480-2838.6

A-246

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 14, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.


/s/ Tris J. Coffin
Tristram J. Coffin

10

4899-6480-2838.6

# Exhibit A

**Robert L. Bancroft, Ph.D.**
405 Brookside Road
Westford, VT  05494

Tel (802) 879-7386
E-mail Ban_econ@msn.com

October 30, 2018

Geoffrey J. Vitt, Esq.
Katie Burghardt Kramer, Esq.
Vitt & Associates, PLC
P.O. Box 1229
Norwich, VT  05055

Re:  Porter v. Dartmouth-Hitchcock Medical Center, et al.

Dear Mr. Vitt and Ms. Kramer:

I have undertaken an analysis of Dr. Misty Blanchette Porter's lost earnings, due to the loss of her employment with the Dartmouth-Hitchcock Medical Center (DHMC) in June 2017. The loss estimates are set forth in the attached table. A list of assumptions used in deriving my estimates accompany the table.

Dr. Porter's 2017 DHMC income projection is based on the assumption she would continue to be on disability until mid-November, at which time she would return to full time status. Her 2017 full time salary was $305,539. It is assumed she would receive a 2.5% salary increase commencing in July 2018. It is further assumed she would have been promoted to full professor in 2019 with a 5% increase in her salary. In subsequent years, her salary is projected to increase at an annual rate of 2.5%. The estimate of her lost fringe benefits includes DHMC's contribution to a health insurance policy and a retirement plan.

Out through June 2021, the post-termination projections of Dr. Porter's income are based on her employment with the University of Vermont (UVM) and the University of Vermont Medical Group (UVMMG). Two key assumptions underlying the income projections. The first is she will start receiving a salary of $260,000 in November 2018. The second key assumption is that she will receive a grant and her salary will go up to $340,000 in July 2019.

Post-termination income projection beyond June 2021  is based on the assumption Dr. Porter will leave her position at UVM and find employment closer to her home in Norwich, Vermont. The projection of her earnings is based on her obtaining a half-time position at the New London Hospital (NLH) in New London, New Hampshire. Her 2021 half-time salary is assumed to be $115,000. In addition to her NLH half-time position, it is assumed she would continue to work at UVMMG one day a week for 48 weeks a year at a 2021 per diem rate of $190 per hour. Both NLH and UVMMG income projections are assumed to increase at an annual rate of 2.5%.

Re: Dr. Misty Blanchette Porter
October 30, 2018
Page 2

The annual estimates of Dr. Porter's gross lost earnings are reduced for the income taxes she would be expected to pay on her reduced annual earnings. The annual, after-tax, lost earnings are then adjusted to reflect present values as of December 2018.

Due to the distance between Dr. Porter's home in Norwich and her UVM/UVMMG position in Burlington, she is incurring significant additional employment related costs. She has had to obtain housing in the Burlington area. The estimate of these housing costs include rent, utilities, renters' insurance and heat. Additional, she is having to travel an additional 7,500 miles a year. These extraordinary costs are carried out through June 2021, at which time, I am assuming she would no longer be employed by UVM/UVMMG.

The second to last column in each table presents a moving total of the present values of Dr. Porter's annual, after-tax, lost income. These cumulative present values do not take into account the income taxes that would be assessed on any award. The next to last column in the table presents estimates of the additional sums that would be needed to cover the income tax obligations of receiving a particular settlement. If, for instance, Dr. Porter is to be fully compensated for her after-tax, lost earnings through the year 2033 of $1,640,020, she will need an additional $1,382,000 to cover the income taxes on receiving such an award, thus bringing the total settlement award to $3,022,020.

If you have any questions or if I can be of further assistance, do not hesitate to contact me.

Sincerely,

Robert L. Bancroft, Ph.D.

# Projected Lost Earnings for Dr. Misty Blanchette Porter

Prepared by: Robert L. Bancroft, Ph.D.

October 30, 2018

| | | Dartmouth-Hitchcock Medical Center | | | Post-Termination/UVM Projections | | | | | | | | | | | |
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| Year | Age | Gross Earned Income | Fringe Benefits | Total Earnings | Gross Earned Income | Fringe Benefits | Total Earnings | Gross Adjusted Lost Earnings | Income Taxes | Tax Adjusted Lost Earnings | Extraordinary Employment Costs | Total Loss | Present Value | Cumulative Present Value | Settlement Income Tax | Total Economic Loss |
| 2017 ^ | 54 | $180,954 | $21,715 | $202,669 | $180,340 | $3,825 | $184,165 | $18,504 | ($154) | $18,350 | $25,929 # | $44,279 | $50,700 | $50,700 | $21,000 | $71,700 |
| 2018 | 55 | $309,358 | $37,123 | $346,481 | $138,354 | $12,452 | $150,806 | $195,675 | ($42,751) | $152,924 | $45,339 | $198,263 | $209,168 | $259,868 | $160,000 | $419,868 |
| 2019 | 56 | $324,826 | $38,979 | $363,805 | $300,000 | $27,000 | $327,000 | $36,805 | ($6,207) | $30,599 | $46,246 | $76,845 | $75,736 | $335,603 | $226,000 | $561,603 |
| 2020 | 57 | $332,947 | $39,954 | $372,900 | $344,250 | $30,983 | $375,233 | ($2,332) | $2,826 | $494 | $47,171 | $47,664 | $45,733 | $381,336 | $266,000 | $647,336 |
| 2021 | 58 | $341,270 | $49,231 | $390,502 | $298,397 | $26,856 | $325,252 | $65,249 | ($10,718) | $54,531 | $24,057 | $78,588 | $77,367 | $458,703 | $335,000 | $793,703 |
| 2022 | 59 | $349,802 | $58,947 | $408,750 | $280,151 | $25,214 | $305,365 | $103,385 | ($17,413) | $85,972 | $0 | $85,972 | $82,395 | $541,099 | $408,000 | $949,099 |
| 2023 | 60 | $358,547 | $60,421 | $418,968 | $273,981 | $24,658 | $298,639 | $120,329 | ($21,142) | $99,187 | $0 | $99,187 | $92,544 | $633,643 | $490,000 | $1,123,643 |
| 2024 | 61 | $367,511 | $61,932 | $429,443 | $274,079 | $24,667 | $298,746 | $130,696 | ($23,358) | $107,338 | $0 | $107,338 | $97,497 | $731,140 | $576,000 | $1,307,140 |
| 2025 | 62 | $376,699 | $63,480 | $440,179 | $277,471 | $24,972 | $302,443 | $137,736 | ($24,807) | $112,929 | $0 | $112,929 | $99,858 | $830,998 | $665,000 | $1,495,998 |
| 2026 | 63 | $386,116 | $65,067 | $451,183 | $282,634 | $25,437 | $308,071 | $143,112 | ($25,871) | $117,241 | $0 | $117,241 | $100,927 | $931,925 | $754,000 | $1,686,925 |
| 2027 | 64 | $395,769 | $66,694 | $462,463 | $288,791 | $25,991 | $314,782 | $147,680 | ($26,744) | $120,936 | $0 | $120,936 | $101,351 | $1,033,276 | $844,000 | $1,877,276 |
| 2028 | 65 | $405,663 | $68,361 | $474,024 | $295,545 | $26,599 | $322,144 | $151,880 | ($27,530) | $124,350 | $0 | $124,350 | $101,453 | $1,134,728 | $934,000 | $2,068,728 |
| 2029 | 66 | $415,805 | $70,070 | $485,875 | $302,695 | $27,243 | $329,938 | $155,937 | ($28,277) | $127,660 | $0 | $127,660 | $101,395 | $1,236,123 | $1,024,000 | $2,260,123 |
| 2030 | 67 | $426,200 | $71,822 | $498,022 | $310,140 | $27,913 | $338,053 | $159,969 | ($29,015) | $130,954 | $0 | $130,954 | $101,257 | $1,337,380 | $1,114,000 | $2,451,380 |
| 2031 | 68 | $436,855 | $73,617 | $510,472 | $317,831 | $28,605 | $346,436 | $164,037 | ($29,756) | $134,281 | $0 | $134,281 | $101,080 | $1,438,460 | $1,203,000 | $2,641,460 |
| 2032 | 69 | $447,776 | $75,458 | $523,234 | $325,745 | $29,317 | $355,062 | $168,173 | ($30,508) | $137,665 | $0 | $137,665 | $100,883 | $1,539,343 | $1,293,000 | $2,832,343 |
| 2033 | 70 | $458,971 | $77,344 | $536,315 | $333,872 | $30,048 | $363,920 | $172,395 | ($31,275) | $141,120 | $0 | $141,120 | $100,677 | $1,640,020 | $1,382,000 | $3,022,020 |

^   Partial year (June 4 through Dec. 31).

\#   Partial year (June 4 through Dec. 31).

The year 2029 (under lined) is consistent with the worklife of a 55 year old female with a graduate degree..

ASSUMPTIONS
Projected Lost Earnings for Dr. Misty Blanchette Porter
October 30, 2018

Footnote

1   The projection of Dr. Porter's 2017 Darmouth-Hichcock Medical Center (DHMC) income is composed of her actual DHMC income, an additional $68,000 of disability income and one and half months at her full time salary of $305,539. In July 2018, it is assumed her salary would increase by 2.5%. The 2019 projection is based on the assumption she would be promoted to a full professor and receive a 5% salary increase. In subsequent years, it is assumed she would receive annual wage increases of 2.5%.

2   Dr. Porter's fringe benefits, given her continued employment with DHMC, include the medical center's contribution to health insurance and a retirement plan. The value of DHMC's medical insurance contribution is assumed to be $15,000 in 2017. The value of this contribution is assumed to increase at an annual rate of 2.5%. DHMC's retirement plan contributions is assumed to be 12% of her earned income. The value of DHMC's health insurance contributions is excluded from June 3, 2017 through June 30, 2021 period, as it is assumed Dr. Porter will receive comparable coverage through UVM.

3   The addition of DHMC's gross income and fringe benefits.

4   Dr. Porter's actual earned income is reported for the year 2017. The projection of her January 1, 2018 through October 31, 2018 income is based on her University of Vermont (UVM) and the University of Vermont Medical Group (UVMMG) earnings through September 15, 2018. Her income for the last month and a half of 2018 is based on an annual salary of $260,000. A $260,000 annual salary is assumed for the first six months of 2019. Beginning in July 2019, it is assumed Dr. Porter will receive a grant and begin receiving an annual salary of $340,000. This income is projected to increase at an annual rate of 2.5% in each following July. Beginning in July 2021, it is assumed Dr. Porter will leave her position at UVM and find employment closer to her home in Norwich, Vermont. The projection of her earnings is based on the assumption she will obtain a half time position at the New London Hospital (NLH) in New London, New Hampshire. Her 2021 half time salary is assumed to be $115,000. In addition to her NLH half time position, it is assumed she would continue to work at UVMMG one day a week for 48 weeks a year at a 2021 per diem rate of $190 per hour. Both NLH and UVMMG income projections are assumed to increase at an annual rate of 2.5%.

5   UVM/UVMMG's contributions to a retirement plan (9%) is the only employer provided post-termination fringe benefit valued. UVM's contribute to Dr. Porter health insurance policy is excluded as it is comparable to DHMC's contribution, which is excluded from DHMC fringe benefit calculations during the time Dr. Porter is assumed to work at UVM (see footnote 2).

6   The addition of post-termination gross income and fringe benefits.

7   The difference between DHMC and post-termination projections of total earnings.

8   Estimated income taxes (federal and state) Dr. Porter would have had to pay on the difference between DHMC and post-termination projections of total earnings.

Re: Dr. Misty Blanchette Porter
Page 2

9    Gross lost earnings less income taxes.

10   Due the distance between Dr. Porter's home in Norwich, Vermont and her UVM position in Burlington, there are additional employment related costs. These extraordinary employment costs are estimated to equal $44,450 a year in 2017 dollars. This figure includes annual housing rental costs of $36,00, $1,800 for utilities, $600 for renters' insurance, $2,000 for heat and 7,500 miles of travel at $0.53 a mile in 2017. Her annual costs are projected to increase at an annual rate of 2%.

11   The addition of tax adjusted lost earnings and extraordinary employment costs.

12   A simple interest rate of 12% is used to compute interest on the historical earnings losses (2017 & 2018). A discount rate of 2.72% (10 year, tax-free, AAA, municipal bonds, October 30, 2018, Bloomberg web site) is used to derive the present value of future income streams. A December 2018 settlement is assumed.

13   A running total of annual present values from previous column.

14   Additional amount needed to pay income taxes on an award sufficient to insure an after-tax settlement, in each year, consistent with amount specified in prior column. The estimated state and federal income tax is based on current tax laws.

15   Addition of the cumulative present value and settlement income tax columns.

# Exhibit B

## Robert L. Bancroft, Ph.D.
405 Brookside Road
Westford, VT  05494

Tel (802) 879-7386
E-mail Ban_econ@msn.com

October 1, 2019

Geoffrey J. Vitt, Esq.
Katie Burghardt Kramer, Esq.
Vitt & Associates, PLC
P.O. Box 1229
Norwich, VT  05055

Re: Porter v. Dartmouth-Hitchcock Medical Center, et al.

Dear Mr. Vitt and Ms. Kramer:

As requested, I have updated my preliminary analysis of Dr. Misty Blanchette Porter's lost earnings, due to the loss of her employment with Dartmouth-Hitchcock Medical Center (DHMC) in June 2017.  My revised loss estimates are presented in the attached two worksheets.  Accompanying each of the worksheets is a list of assumptions employed in developing the estimates.

As discussed, I have developed an alternate estimate of Dr. Porter's lost earnings.  Scenario A is consistent with my original October 30, 2018 preliminary analysis.  In this scenario, it is assumed Dr. Porter will leave her full-time position at the University of Vermont Medical Center (UVMMC) in June 2021 and obtain a half-time position close to her home in Norwich, Vermont while continuing to work one day a week at UVMMC.  In Scenario B, it is assumed Dr. Porter will continue to work part-time at UVMMC two days a week after she resigns her full-time position in June 2021.  This scenario assumes she would not be able to find suitable employment close to her home.

There are five technical changes from my October 30, 2018 report.  They are: (1) a new settlement (judgment) date of January 2020; (2) the current interest rate on 10 year, AAA, tax-free, municipal bonds, (3) Dr. Porter's actual 2018 UVMMC income, (4) the use of Dr. Porter's July 21, 2019 earnings statement to project out her UVMMC full-time income through June 2021, and (5) the addition of commuting expenses after June 2021 in Scenario A.

If you have any questions or if I can be of further assistance, do not hesitate to call.

Sincerely,

Robert L. Bancroft, Ph.D.

# Projected Lost Earnings for Dr. Misty Blanchette Porter

Scenario A: Half Time Post-Termination Employment Starting in July 2021

Prepared by: Robert L. Bancroft, Ph.D.

October 1, 2019

| | | Dartmouth-Hitchcock Medical Center | | | Post-Termination Projections | | | | | | | | | | | |
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| Year | Age | Gross Earned Income | Fringe Benefits | Total Earnings | Gross Earned Income | Fringe Benefits | Total Earnings | Gross Adjusted Lost Earnings | Income Taxes | Tax Adjusted Lost Earnings | Extraordinary Employment Costs | Total Loss | Present Value | Cumulative Present Value | Settlement Income Tax | Total Economic Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2017 ^ | 54 | $180,954 | $21,715 | $202,669 | $180,340 | $3,825 | $184,165 | $18,504 | ($240) | $18,264 | $26,425 # | $44,689 | $56,979 | $56,979 | $57,000 | $113,979 |
| 2018 | 55 | $309,358 | $37,123 | $346,481 | $217,607 | $19,585 | $237,192 | $109,290 | ($35,783) | $73,507 | $46,206 | $119,713 | $141,859 | $198,838 | $177,000 | $375,838 |
| 2019 | 56 | $324,826 | $38,979 | $363,805 | $227,500 | $20,475 | $247,975 | $115,830 | ($37,957) | $77,873 | $47,130 | $125,003 | $133,128 | $331,967 | $289,000 | $620,967 |
| 2020 | 57 | $332,947 | $39,954 | $372,900 | $230,344 | $20,731 | $251,075 | $121,826 | ($40,015) | $81,811 | $48,073 | $129,883 | $129,023 | $460,990 | $398,000 | $858,990 |
| 2021 | 58 | $341,270 | $49,231 | $390,502 | $210,592 | $10,365 | $220,957 | $169,545 | ($50,965) | $118,580 | $25,767 | $144,347 | $143,132 | $604,121 | $518,000 | $1,122,121 |
| 2022 | 59 | $349,802 | $58,947 | $408,750 | $192,659 | $0 | $192,659 | $216,091 | ($61,286) | $154,805 | $8,012 | $162,816 | $159,122 | $763,244 | $652,000 | $1,415,244 |
| 2023 | 60 | $358,547 | $60,421 | $418,968 | $197,475 | $0 | $197,475 | $221,493 | ($62,818) | $158,675 | $8,144 | $166,819 | $160,688 | $923,932 | $787,000 | $1,710,932 |
| 2024 | 61 | $367,511 | $61,932 | $429,443 | $202,412 | $0 | $202,412 | $227,030 | ($64,388) | $162,642 | $8,280 | $170,921 | $162,271 | $1,086,203 | $924,000 | $2,010,203 |
| 2025 | 62 | $376,699 | $63,480 | $440,179 | $207,473 | $0 | $207,473 | $232,706 | ($65,998) | $166,708 | $8,417 | $175,125 | $163,869 | $1,250,072 | $1,061,000 | $2,311,072 |
| 2026 | 63 | $386,116 | $65,067 | $451,183 | $212,659 | $0 | $212,659 | $238,524 | ($67,648) | $170,875 | $8,557 | $179,432 | $165,483 | $1,415,555 | $1,200,000 | $2,615,555 |
| 2027 | 64 | $395,769 | $66,694 | $462,463 | $217,976 | $0 | $217,976 | $244,487 | ($69,339) | $175,147 | $8,699 | $183,846 | $167,114 | $1,582,669 | $1,341,000 | $2,923,669 |
| 2028 | 65 | $405,663 | $68,361 | $474,024 | $223,425 | $0 | $223,425 | $250,599 | ($71,073) | $179,526 | $8,844 | $188,370 | $168,762 | $1,751,432 | $1,484,000 | $3,235,432 |
| 2029 | 66 | $415,805 | $70,070 | $485,875 | $229,011 | $0 | $229,011 | $256,864 | ($72,850) | $184,014 | $8,991 | $193,005 | $170,427 | $1,921,858 | $1,627,000 | $3,548,858 |
| 2030 | 67 | $426,200 | $71,822 | $498,022 | $234,736 | $0 | $234,736 | $263,285 | ($74,671) | $188,615 | $9,140 | $197,755 | $172,108 | $2,093,966 | $1,771,000 | $3,864,966 |
| 2031 | 68 | $436,855 | $73,617 | $510,472 | $240,605 | $0 | $240,605 | $269,868 | ($76,538) | $193,330 | $9,292 | $202,622 | $173,807 | $2,267,773 | $1,918,000 | $4,185,773 |
| 2032 | 69 | $447,776 | $75,458 | $523,234 | $246,620 | $0 | $246,620 | $276,614 | ($78,451) | $198,163 | $9,447 | $207,610 | $175,522 | $2,443,295 | $2,066,000 | $4,509,295 |
| 2033 | 70 | $458,971 | $77,344 | $536,315 | $252,785 | $0 | $252,785 | $283,530 | ($80,412) | $203,117 | $9,604 | $212,721 | $177,256 | $2,620,551 | $2,215,000 | $4,835,551 |

^   Partial year (June 4 through Dec. 31).

#   Partial year (June 4 through Dec. 31).

The year 2029 (under lined) is consistent with the worklife of a 56 year old female with a graduate degree..

A-256

## ASSUMPTIONS
Projected Lost Earnings for Dr. Misty Blanchette Porter
Scenario A: Half Time Post-Termination Employment Starting July 2021
October 1, 2019

Footnote

1   The projection of Dr. Porter's 2017 Darmouth-Hichcock Medical Center (DHMC) income is composed of her actual DHMC income, an additional $68,000 of disability income and one and a half months at her full time salary of $305,539. In July 2018, it is assumed her salary would increase by 2.5%. The 2019 projection is based on the assumption she would be promoted to a full professor and receive a 5% salary increase. In subsequent years, it is assumed she would receive annual wage increases of 2.5%.

2   Dr. Porter's fringe benefits, given her continued employment with DHMC, include the medical center's contribution to health insurance and a retirement plan. The value of DHMC's medical insurance contribution is assumed to be $15,000 in 2017. The value of this contribution is assumed to increase at an annual rate of 2.5%. DHMC's retirement plan contributions is assumed to be 12% of her earned income. The value of DHMC's health insurance contributions is excluded from June 3, 2017 through June 30, 2021 period, as it is assumed Dr. Porter will receive comparable coverage through UVM.

3   The addition of DHMC's gross income and fringe benefits.

4   Dr. Porter's actual earned income is reported for the years 2017 and 2018. The projection of her 2019 income is based on her University of Vermont Medical Center (UVMMC) earnings through July 31, 2019. This income is projected to increase at an annual rate of 2.5%. Beginning in July 2021, it is assumed Dr. Porter will leave her position at UVM and find employment closer to her home in Norwich, Vermont. The projection of her earnings is based on the assumption she will obtain a half-time position at the New London Hospital (NLH) in New London, New Hampshire. Her 2021 half-time salary is assumed to be $115,000. In addition to her NLH half-time position, it is assumed she would continue to work at UVMMC one day a week for 48 weeks a year at a 2021 per diem rate of $190 per hour. Both NLH and UVMMC income projections are assumed to increase at an annual rate of 2.5%.

5   UVM's contributions to a retirement plan (9%) is the only employer provided post-termination fringe benefit valued. UVM's contribution to Dr. Porter's health insurance policy is excluded as it is comparable to DHMC's contribution, which is excluded from DHMC fringe benefit calculations during the time Dr. Porter is assumed to work full time at UVM (see footnote 2).

6   The addition of post-termination gross income and fringe benefits.

7   The difference between DHMC and post-termination projections of total earnings.

8   Estimated income taxes (federal and state) Dr. Porter would have had to pay on the difference between DHMC and post-termination projections of total earnings.

9   Gross lost earnings less income taxes.

Re: Dr. Misty Blanchette Porter
October 1, 2019
Page 2

10  Due to the distance between Dr. Porter's home in Norwich, Vermont and her UVM position in Burlington, there are additional employment related costs. These extraordinary employment costs are estimated to equal $45,300 a year in 2017 dollars. This figure includes annual housing rental costs of $36,000, $1,800 for utilities, $600 for renters' insurance, $2,000 for heat and 9,100 miles of travel at $0.53 a mile in 2017. Her annual costs are projected to increase at an annual rate of 2%. Beginning in July 2021, it is assumed she will commute one day a week for 48 weeks from her home in Norwich to Burlington (190 miles round trip). The cost per mile in 2021 is assume to be $0.59. This figure is assumed to increase at an annual rate of 1.5%. Commencing in July 2021, it is assumed Dr. Porter will incur hotel expenses of $2,500 a year, which will increase at a rate of 2% per year. The $2,500 figure is based on the assumption Dr. Porter would stay over in Burlington 10 to 12 nights a year at a cost ranging from $200 to $250 a night.

11  The addition of tax adjusted lost earnings and extraordinary employment costs.

12  A simple interest rate of 12% is used to compute interest on the historical earnings losses (2017 - 2019). A discount rate of 1.46% (10 year, tax-free, AAA, municipal bonds, October 1, 2019, Bloomberg web site) is used to derive the present value of future income streams. A January 2020 settlement is assumed.

13  A running total of annual present values from previous column.

14  Additional amount needed to pay income taxes on an award sufficient to insure an after-tax settlement, in each year, consistent with amount specified in prior column. The estimated state and federal income tax is based on current tax laws.

15  Addition of the cumulative present value and settlement income tax columns.

## Projected Lost Earnings for Dr. Misty Blanchette Porter

### Scenario B: Post-Termination Employment Reduced to Two Days a Week Starting in July 2021

Prepared by: Robert L. Bancroft, Ph.D.

October 1, 2019

| Year | Age | Dartmouth-Hitchcock Medical Center 1 Gross Earned Income | 2 Fringe Benefits | 3 Total Earnings | Post-Termination Projections 4 Gross Earned Income | 5 Fringe Benefits | 6 Total Earnings | 7 Gross Adjusted Lost Earnings | 8 Income Taxes | 9 Tax Adjusted Lost Earnings | 10 Extraordinary Employment Costs | 11 Total Loss | 12 Present Value | 13 Cumulative Present Value | 14 Settlement Income Tax | 15 Total Economic Loss |
|------|-----|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 2017 ^ | 54 | $180,954 | $21,715 | $202,669 | $180,340 | $3,825 | $184,165 | $18,504 | ($240) | $18,264 | $26,425 # | $44,689 | $56,979 | $56,979 | $57,000 | $113,979 |
| 2018 | 55 | $309,358 | $37,123 | $346,481 | $217,607 | $19,585 | $237,192 | $109,290 | ($35,783) | $73,507 | $46,206 | $119,713 | $141,859 | $198,838 | $177,000 | $375,838 |
| 2019 | 56 | $324,826 | $38,979 | $363,805 | $227,500 | $20,475 | $247,975 | $115,830 | ($37,957) | $77,873 | $47,130 | $125,003 | $133,128 | $331,967 | $289,000 | $620,967 |
| 2020 | 57 | $332,947 | $39,954 | $372,900 | $230,344 | $20,731 | $251,075 | $121,826 | ($40,015) | $81,811 | $48,073 | $129,883 | $129,023 | $460,990 | $398,000 | $858,990 |
| 2021 | 58 | $341,270 | $49,231 | $390,502 | $189,572 | $10,365 | $199,937 | $190,565 | ($59,163) | $131,402 | $49,034 | $180,436 | $178,917 | $639,907 | $548,000 | $1,187,907 |
| 2022 | 59 | $349,802 | $58,947 | $408,750 | $149,568 | $0 | $149,568 | $259,182 | ($78,091) | $181,090 | $50,015 | $231,105 | $225,862 | $865,769 | $738,000 | $1,603,769 |
| 2023 | 60 | $358,547 | $60,421 | $418,968 | $153,307 | $0 | $153,307 | $265,661 | ($80,044) | $185,618 | $51,015 | $236,633 | $227,936 | $1,093,705 | $930,000 | $2,023,705 |
| 2024 | 61 | $367,511 | $61,932 | $429,443 | $157,140 | $0 | $157,140 | $272,303 | ($82,045) | $190,258 | $52,035 | $242,293 | $230,030 | $1,323,735 | $1,124,000 | $2,447,735 |
| 2025 | 62 | $376,699 | $63,480 | $440,179 | $161,068 | $0 | $161,068 | $279,110 | ($84,096) | $195,014 | $53,076 | $248,091 | $232,145 | $1,555,880 | $1,319,000 | $2,874,880 |
| 2026 | 63 | $386,116 | $65,067 | $451,183 | $165,095 | $0 | $165,095 | $286,088 | ($86,198) | $199,890 | $54,138 | $254,027 | $234,280 | $1,790,159 | $1,516,000 | $3,306,159 |
| 2027 | 64 | $395,769 | $66,694 | $462,463 | $169,222 | $0 | $169,222 | $293,240 | ($88,353) | $204,887 | $55,220 | $260,107 | $236,435 | $2,026,594 | $1,715,000 | $3,741,594 |
| 2028 | 65 | $405,663 | $68,361 | $474,024 | $173,453 | $0 | $173,453 | $300,571 | ($90,562) | $210,009 | $56,325 | $266,334 | $238,611 | $2,265,205 | $1,916,000 | $4,181,205 |
| 2029 | 66 | $415,805 | $70,070 | $485,875 | $177,789 | $0 | $177,789 | $308,086 | ($92,826) | $215,259 | $57,451 | $272,711 | $240,808 | $2,506,014 | $2,118,000 | $4,624,014 |
| 2030 | 67 | $426,200 | $71,822 | $498,022 | $182,234 | $0 | $182,234 | $315,788 | ($95,147) | $220,641 | $58,600 | $279,241 | $243,027 | $2,749,040 | $2,322,000 | $5,071,040 |
| 2031 | 68 | $436,855 | $73,617 | $510,472 | $186,790 | $0 | $186,790 | $323,682 | ($97,525) | $226,157 | $59,772 | $285,929 | $245,266 | $2,994,307 | $2,529,000 | $5,523,307 |
| 2032 | 69 | $447,776 | $75,458 | $523,234 | $191,460 | $0 | $191,460 | $331,774 | ($99,964) | $231,811 | $60,968 | $292,779 | $247,528 | $3,241,835 | $2,737,000 | $5,978,835 |
| 2033 | 70 | $458,971 | $77,344 | $536,315 | $196,246 | $0 | $196,246 | $340,069 | ($102,463) | $237,606 | $62,187 | $299,793 | $249,811 | $3,491,646 | $2,947,000 | $6,438,646 |

^    Partial year (June 4 through Dec. 31).

#    Partial year (June 4 through Dec. 31).

The year 2029 (under lined) is consistent with the worklife of a 56 year old female with a graduate degree..

## ASSUMPTIONS
Projected Lost Earnings for Dr. Misty Blanchette Porter
Scenario B: Post-Termination Employment Reduced to Two Days A Week Starting July 2021
October 1, 2019

Footnote

1    The projection of Dr. Porter's 2017 Darmouth-Hichcock Medical Center (DHMC) income is composed of her actual DHMC income, an additional $68,000 of disability income and one and a half months at her full time salary of $305,539. In July 2018, it is assumed her salary would increase by 2.5%. The 2019 projection is based on the assumption she would be promoted to a full professor and receive a 5% salary increase. In subsequent years, it is assumed she would receive annual wage increases of 2.5%.

2    Dr. Porter's fringe benefits, given her continued employment with DHMC, include the medical center's contribution to health insurance and a retirement plan. The value of DHMC's medical insurance contribution is assumed to be $15,000 in 2017. The value of this contribution is assumed to increase at an annual rate of 2.5%. DHMC's retirement plan contributions is assumed to be 12% of her earned income. The value of DHMC's health insurance contributions is excluded from June 3, 2017 through June 30, 2021 period, as it is assumed Dr. Porter will receive comparable coverage through UVM.

3    The addition of DHMC's gross income and fringe benefits.

4    Dr. Porter's actual earned income is reported for the year 2017 and 2018. The projection of her 2019 income is based on her University of Vermont Medical Center (UVMMC) earnings through July 31, 2019. This income is projected to increase at an annual rate of 2.5%. Beginning in July 2021, it is assumed Dr. Porter will leave her full-time position at UVMMC and work part-time. It is assumed she would continue to work at UVMMC two days a week for 48 weeks a year at a 2021 per diem rate of $190 per hour. Her UVMMC per diem rate is assumed to increase at an annual rate of 2.5%.

5    UVM's contributions to a retirement plan (9%) is the only employer provided post-termination fringe benefit valued. UVMMC's contribution to Dr. Porter's health insurance policy is excluded as it is comparable to DHMC's contribution, which is excluded from DHMC fringe benefit calculations during the time Dr. Porter is assumed to work full time at UVMMC (see footnote 2).

6    The addition of post-termination gross income and fringe benefits.

7    The difference between DHMC and post-termination projections of total earnings.

8    Estimated income taxes (federal and state) Dr. Porter would have had to pay on the difference between DHMC and post-termination projections of total earnings.

9    Gross lost earnings less income taxes.

Re: Dr. Misty Blanchette Porter
October 1, 2019
Page 2

10  Due to the distance between Dr. Porter's home in Norwich, Vermont and her UVM position in Burlington, there are additional employment related costs. These extraordinary employment costs are estimated to equal $45,300 a year in 2017 dollars. This figure includes annual housing rental costs of $36,000, $1,800 for utilities, $600 for renters' insurance, $2,000 for heat and 9,100 miles of travel at $0.53 a mile in 2017. Her annual costs are projected to increase at an annual rate of 2%.

11  The addition of tax adjusted lost earnings and extraordinary employment costs.

12  A simple interest rate of 12% is used to compute interest on the historical earnings losses (2017 - 2019). A discount rate of 1.46% (10 year, tax-free, AAA, municipal bonds, October 1, 2019, Bloomberg web site) is used to derive the present value of future income streams. A January 2020 settlement is assumed.

13  A running total of annual present values from previous column.

14  Additional amount needed to pay income taxes on an award sufficient to insure an after-tax settlement, in each year, consistent with amount specified in prior column. The estimated state and federal income tax is based on current tax laws.

15  Addition of the cumulative present value and settlement income tax columns.

A-261

# Exhibit C

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT
Case No. 5:17-CV-194

MISTY BLANCHETTE PORTER, M.D.,
Plaintiff,

V.

DARTMOUTH-HITCHCOCK MEDICAL CENTER,
DARTMOUTH-HITCHCOCK CLINIC,
MARY HITCHCOCK MEMORIAL HOSPITAL,
and DARTMOUTH-HITCHCOCK HEALTH,
Defendants.

DEPOSITION
- of -
ROBERT L. BANCROFT, Ph.D.
held on Wednesday, October 30, 2019, at
the offices of Vitt & Associates, PLC,
8 Beaver Meadow Road, Norwich, Vermont,
commencing at 10:15 a.m.

APPEARANCES:

GEOFFREY J. VITT, ESQUIRE
Vitt & Associates, PLC
8 Beaver Meadow Road, P.O. Box 1229
Norwich, Vermont 05055
(802) 649-5700 | gvitt@vittandassociates.com
On behalf of the Plaintiff
JESSICA E. JOSEPH, ESQUIRE
Foley & Lardner, LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199-7610
(617) 342-4000 | jjoseph@foley.com
On behalf of the Defendants

IN ATTENDANCE:  JULIA KORKUS

COURT REPORTER:  KAREN L. WRIGHT, RPR, CRR

O'BRIEN REPORTING SERVICES, INC.
(802) 747-0199

Page 2

INDEX
DEPONENT:  ROBERT L. BANCROFT, Ph.D.
EXAMINATION BY                Page
ATTY. JOSEPH                  3

EXHIBITS
Number    Exhibit Description        Page
Bancroft
No. 1   Curriculum Vitae            6
No. 2   Litigation Consulting Fees  21
No. 3   Summary of Testimony        24
No. 4   10/1/19 Expert Report       34
No. 5   Dr. Bancroft's File         49

*(The original exhibits are attached to the original transcript.)
*(The original transcript was sent to Atty. Vitt for the witness to read and sign.)

Page 3

Wednesday, October 30, 2019; 10:15 a.m.
ROBERT L. BANCROFT, Ph.D.,
having been duly sworn by the Notary to tell the truth, the whole truth, and nothing but the truth, deposes and says as follows:

EXAMINATION BY ATTORNEY JOSEPH

Q.   Hi, Dr. Bancroft.  My name is Jessica Joseph.  We met a few minutes ago.  I'm counsel for the defendants in this matter, Dartmouth-Hitchcock entities.  And we're here today to talk about the expert report that you submitted in this matter.
     I know that you've been deposed several times before, so I'm going to go through the ground rules, but I'll go through them quickly, if that's okay.
A.   (Witness nodding.)
Q.   So the first is, if you could always make sure to give a verbal answer rather than nodding or gesturing so that the court reporter can take down the answer.  Understood?
A.   Yes.
Q.   Great.  If you want a break at any time, just let me know.  We'll take breaks.  The only thing I ask is that if the question is pending, we not

Page 4

take a break until the question is answered. Make sense?
A.   Yes.
Q.   Okay.  And are you taking any medication that would affect your ability to testify truthfully today?
A.   No.
Q.   Okay.  So I'd like to start with just your background.  What's your current address?
A.   405 Brookside Road, Westford, Vermont.
Q.   Okay.  And what's your date of birth?
A.   September 29th, 1947.
Q.   And could you go through your educational background for me starting with college.
A.   I have a bachelor's in economics from the University of Vermont; I have a Master of Science in agricultural economics from the University of Vermont; and I have a Ph.D. in agricultural economics from Purdue University.
Q.   So you mentioned agricultural economics.  Could you explain what specifically that is and, I guess, how it differs from just economics?
A.   I think the short answer is that historically agricultural economics has been the applied -- more applied economics than theoretical, although

540889d0-4ff5-44c5-a75e-10182bf4ad3d

A-263

Page 5

the lines have gotten quite blurred.

People who have advanced degrees in agricultural economics work in many of the same areas that a -- that a -- somebody with a Ph.D. in economics. They work in labor, natural resources, businesses, business management, those kinds of issues. But historically, it's been a more applied economics.

I also should add that the first economists in this country were agricultural economists from the land-grant schools.

Q. What are the land-grant schools?

A. Well, each state has a land-grant school. In Vermont, it's the University of Vermont.

Q. Okay.

A. New Hampshire -- Massachusetts, University of Massachusetts is the land-grant school. They were set up by the federal government and they were given land to finance the building of the universities.

Q. Understood. Do you have any professional licenses?

A. No.

Q. Have you had any in the past?

A. No.

Page 6

Q. Okay. So I'd like to look at this document.

ATTORNEY JOSEPH: We'll mark it as Exhibit 1.

(Bancroft Exhibit 1 was marked for identification.)

Q. And this is your résumé, correct?

A. Yes.

Q. Okay. And so it says here that beginning in June 1979 you were working at the USDA?

A. Yes.

Q. Until August 1981. Could you walk me through what you did there?

A. I was recruited by the Economic Research Service in USDA to come to Washington, D.C., from -- I was at Purdue to write my dissertation. They wanted an econometric forecasting model developed that they could use to forecast farmers' participation in various government programs.

So I moved to Washington, D.C., in -- well, I moved to Maryland and worked in Washington, D.C., I think it was the late spring of '79 -- it all kind of blurs now -- and was with the Economic Research Service until December of 1980. And then in '81 I went over to -- I forget the -- another agency within the U.S.

Page 7

Department of Agriculture, which basically provided testimony and research -- well, that's what I was doing for the -- the remaining eight months I was there, was actually going to Capitol Hill and providing backup to Under Secretaries when they were asked questions from Representatives of the House.

Q. Okay. And so from there, you moved to the University of Vermont as an adjunct professor. Could you tell me a little bit about that?

A. As a -- not as an adjunct, associate.

Q. Oh, yes. I was skipping over --

A. Yeah. Yeah.

Q. -- '81 to '91.

A. Yes.

Q. Could you tell me a little bit about your time at UVM?

A. Well, I was fortunate. I wanted to return home and was able to return to the department where I had a -- I got my master's degree.

And so I was -- I was hired to -- as an assistant professor at the University of Vermont in the Department of Agriculture and Resource Economics, which then became Community Development and Applied Economics. The name of

Page 8

it changed. And I was there. So I -- starting in August of 1981, I came back to Vermont, the University of Vermont.

Q. Okay. And then you also, since October 1981, have been self-employed as an economic consultant --

A. That's correct.

Q. -- correct?

So are all of the positions you've had relating to economics listed on your résumé, all of the employment that you've had that's economics-related?

A. That I've been hired by -- where I was an employee, yes.

Q. Okay. You make the distinction between when you were an employee and when you weren't because?

A. Well, the difference is -- in my mind is as my self-employed consulting business.

Q. Oh, understood. Okay. So aside from projects as a consultant, all of the other employment is listed on your résumé that's related to economics?

A. Yeah. I don't know if you consider being a representative for the state of Vermont employment, but I do get a paycheck from them,

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 9

so...

Q. Right. And that's on here anyway.

Do you have any work experience with economics outside of the field of agriculture?

A. Oh, yes.

Q. Okay. Could you describe that for me?

A. Well, in the -- over the -- what is it? -- it's getting to be around 38, 39 years that I've been in economic consulting, I've consulted in a wide area.

Initially, when I started out, as you might expect, it was dealing primarily with agricultural issues, although they may be, like, personal injury, even a wrongful death having to -- and then there were some lost business profits.

But then that -- in a very short amount of time, that expanded into non-agriculture issues. I happened to be at the right place at the right time in Vermont.

And I was, at that time -- I'm not very computer literate today compared to what's happened, but at that time, I was computer literate and used the -- probably before your time, but the old Radio Shacks where they had the

Page 10

floppy disks about this big around.

And so I was able to do analysis rather quickly as opposed to doing it by longhand. And if assumptions changed, it was real easy to change. And so I was -- I want to say I was a big hit.

Anyways, I ended up getting hired by -- for -- with attorneys for non-agricultural work very soon, I'm going to say after about a year and a half of doing ag work. One of the largest -- it may have been the largest firm at that time in Vermont; if not, it was the second largest -- asked if I'd be interested in doing some non-agriculture type of work. And I said I was.

And so anyway, from that point forward, at least in the forensic area, I have done a lot more non-agriculture-related litigation forensic work than I've done agriculture. And then, over the years, I have had occasion to do other kinds of economic analysis that are non-ag in nature.

Q. So about what -- you said was very soon afterwards. About what year would you say that it was that you started doing more

Page 11

non-agricultural-related work?

A. I would say that it was in probably late '82 --

Q. Okay.

A. -- or early '83. It was -- it wasn't very long. I had a couple cases with a firm Paul, Frank + Collins. They were ag-related. One -- the last one -- the second one -- first one was a barn fire and it had to do with loss of profits.

The second one was a personal injury case on a farm. And I was asked at that time by their lead litigator if I would be interested in some non-ag work. And so that was -- boy, it was -- wasn't very long after coming back to UVM that I started doing non-ag work.

Q. Okay. Got it. So currently you're a state representative. What is the time commitment for that?

A. Well, the hard time commitment is -- where they supposedly take attendance is January. We start around the -- somewhere between the first and second week of January. I think it's, like, the second Wednesday in January you start. And then it goes through -- they budget for 18 weeks. We do have a week off in March for town meeting.

But every year that I've been there,

Page 12

with the exception -- I think every year, maybe one that we've gone beyond that. So I may go into -- I mean, it's gone into June at least two years, if not three. At least two. And then the others have gone into late May.

Q. Okay. And how often do you meet when you're in session?

A. Well, the session is -- except for the first week, when we start on Wednesday, it's Tuesday through Friday is the -- is when we technically meet, yes.

But there are things on Mondays that -- they might have a special committee meeting or might be a hearing on Monday, so...

Q. Okay. And so you're elected to that role. How long will you serve in that position?

A. How long have I served?

Q. How long will you?

A. Will I serve?

Q. Yeah. How long is, I guess, your appointment?

A. Oh, it's -- it's elected for two years.

Q. Okay. And when were you most recently elected?

A. Well, this will -- I'll -- I would be -- if I run again, I'll be up for election next fall.

540889d0-4ff5-44c5-a75e-10182bf4ad3d

A-265

Page 13

Q. Okay.

A. So it expires after -- well, my appointment actually expires next -- the day that they swear in the new members, which will be January of '21.

Q. Okay. And so you've listed here on page 2 of Exhibit 1 "Publications: None within the last 20 years"?

A. That's correct.

Q. Is that typical for someone in your role not to do any publication?

A. I think so. I mean, I -- it varies, but I'm not an academia. So if I was a -- and many people -- if you're referring to forensic economists, many forensic economists are still at university, so they may publish work.

So it runs a gamut. Some people write and some people -- when I -- that -- if I was -- if I was so inclined would be the National Journal of Forensic Economics, but I haven't seemed that interested in writing an article.

Q. Okay. So your -- on the first page, under the "Consulting activities" for your economics consultant position, it says "I have consulted in the areas of hazardous and municipal waste, land use/development, pollution abatement,

Page 14

agriculture, child support, investment analysis and forensic economics."

What percent of your work would you say is forensic economics?

A. Well, you want over the whole 38 years or would you like a shorter period?

Q. Let's do over the whole -- the whole time you've been consulting.

A. Any number I give you, no matter what we do, is going to be a guess.

Q. Sure.

A. But I would say that over the whole 38 years, probably 70 percent.

Q. Okay. What about in the last five years?

A. Pretty much 100 percent. I'm trying to think. I don't -- I still get solicitations if I'm interested in submitting a proposal from the State of Vermont and for other federal government and that kind of stuff. And I -- at my age, I'm -- I have a full plate just doing this part-time, legislature, and other interests that I have, so I'm not -- I don't look for any outside work other than the forensic -- I don't look for it, but I get calls.

Q. And so the next line reads "I have been retained

Page 15

in over 2,500 lawsuits covering lost business profits, personal injury, wrongful death, wrongful discharge, malpractice, bankruptcy, and income taxes."

How many of those 25 -- over 2,500 lawsuits were relating to wrongful discharge, understanding you have --

A. Yeah.

Q. -- to make an estimate?

A. Well, let me preface that question that I don't think I ever did an employment case until somewhere in the early 1990s, somewhere between 1990 and '95. And, again, I'm guessing here, but I think maybe it was one.

And then, from '95 to 2000, then maybe I did ten. And then after 2000, there was a lot of them. I would say that probably since 2000 or 2005, 20 percent of the cases I'm involved in have to do with employment.

Q. Okay. And in those cases, are you typically retained by the plaintiff, or by the employee, I guess?

A. Particularly with regards to employment cases, I have a much higher percentage plaintiff than I have defense, although I do work on occasions for

Page 16

defense. If there's -- somebody else hires somebody else, then I'm -- I'm retained to review the analysis.

Q. Okay.

A. But particularly in -- in employment cases, it's probably 75 percent for -- or maybe slightly more for plaintiffs.

Q. Okay. Meaning the employee versus the employer?

A. Yeah.

Q. Okay.

A. Yes.

Q. And in how many cases have you testified at trial, any type of case, not just wrongful discharge?

A. Oh, boy. I haven't testified very much recently at trial. There's been -- at least from my observations, there's been kind of a structural change in -- in litigation, and particularly regards to at least hiring of and using of economic experts.

So I -- I think I sent you the four-year summary, which was -- and I don't think there were any trials on that. You know, I haven't -- I'm trying to think of the last time I've testified at trial, but I'd say it must be

4 (Pages 13 to 16)

Page 17

four, five years ago anyways.

But I used to do it much more often in the -- in the '80s and the '90s and even into the early part of 2000. But even the same with depositions. You know, I -- I think I sent you the -- the Rule 26 disclosure on that. I think there were just 12. And I think, moving that forward six months, I dropped seven cases, you know, running total.

Q. Mm-hmm.

A. If you went back and took a look at this, let's say, 15, 20 years ago, there'd be over 100, a little over 100. And many of them -- I want to say maybe 20 percent of them would be trials.

Q. Okay. In how many cases have you testified at trial that were employment disputes?

A. I can't give you an answer. I don't know. I'm sure that -- I know -- I know there's been some, but I can't tell you if it's been more than two or more than ten. I just -- I don't remember.

Q. Okay.

A. But I think it's safe to say that the percentage of cases that go to trial, in my experience, is less for employment cases than it is for maybe personal injury or -- or wrongful death.

Page 18

Q. Okay. So --

A. They get settled out before.

Q. So you think probably you've testified at trial in more personal injury cases than --

A. Oh, yeah.

Q. -- employment disputes because more of those go to trial?

A. Yes. I definitely have. Even in the last 20 years, it's been more -- I've testified more at a combination of personal injury or wrongful death cases than I have employment cases.

Q. Okay.

A. Definitely.

Q. And have you ever been disqualified as an expert?

A. No. I'm not sure how to -- let me explain. Back in -- right after Daubert came out, I was testifying on a trial in a personal injury case and I was testifying about household services.

And at that time, there was a study out of Cornell that looked at the amount of time individuals spent performing household services. It looked at it by sex and number of children and whether you're employed or not employed.

And the attorney on the other side objected and said that this was -- there was --

Page 19

that it wasn't scientifically sound.

And the judge, who I know, had just got back from Maine attending a Daubert hearing. And he -- so he implemented the Daubert hearing, said I couldn't testify because of that.

What was really interesting, about six months later same attorney -- this was a wrongful death case where I talked about -- where I -- part of the -- one of the elements of damages was loss of household services.

So the attorney on the other side for the defense asked for a Daubert hearing. And when I got there, I was basically told, you know, don't worry about it. You know, it's not -- it didn't make any sense to -- you know, to apply Daubert to that testimony.

In fact, I even did a -- poor choice of words, but a dog and pony show for the Vermont Bar Association where we read excerpts from the hearing. And there were judges on the panel. And the agreement was that it really didn't apply.

Q. Other than that case, have there been any other cases where you were disqualified as an expert?

A. No. There was one other case where I wasn't

Page 20

allowed to testify, but that wasn't my fault. That was the -- the judge ruled that the -- the attorney had not presented -- didn't have -- I forget what the reason was, but I got my name out, that was it.

Q. Okay. What type of case was that?

A. That was a personal injury case.

Q. Okay. And where --

A. It dealt with a woman from Canada in the United States. And so there was an issue about she was -- had become a U.S. resident but had no work experience.

Q. Do you remember what court it was in?

A. Chittenden.

Q. Okay. And have you always been paid to testify?

A. I send a bill out, yes.

Q. Fair enough.

A. And I've been paid most -- most every time.

Q. Okay.

A. There have only been a couple times when I -- when I've run into some problems.

Q. Okay. And how do you set your rates?

A. I define them. No. I don't know how I set them. I just, you know, well, I think I'm going to increase them or I think I -- you know, I maybe

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 21

want to cut back on my business, so I raise the rates. No secret to it.

I do charge one and a half times, or I charge $400 an hour for depositions, where my regular rate is 260. And that 260 is for writing reports and testifying in court.

The reason that I charge one and a half is that there was an issue about six or seven years ago with a law firm that I have done a lot of work for, but -- but in this time, they took my deposition and they said that their policy was that they didn't pay for reviewing the deposition, which I might add is not true and actually showed them a bill where they had.

Anyway, so I said, Well, I'm not going to argue with you folks. From now on, I'm just going to add -- increase my rate and I won't charge for reviewing it, so...

Q. Got it.

ATTORNEY JOSEPH: So let's call this Exhibit 2.

(Bancroft Exhibit 2 was marked for identification.)

Q. And so these are the rates that you provided to our office a couple days ago reflecting the fees

Page 22

that you've charged in this matter, correct?

A. Yes.

Q. Okay. And these are the fees that you charge for all cases?

A. Yes.

Q. Okay. And do you have any kind of fee agreement in writing for this matter?

A. No.

Q. Okay.

A. I've only had about three of those in my career, I think, maybe four, but they're all out in the Midwest dealing with large -- I was retained by a couple of large utility companies. And so we wrote up an agreement there. But this is Vermont; handshake'll do it.

Q. So is any part of the fee that you would receive related in any way to the success of Plaintiff's case?

A. No.

Q. Okay. And does your fee, understanding your agreement, involve any indemnification?

A. No.

Q. How did you come to be Plaintiff's expert in this case? Who contacted you?

A. Well, I'm not -- someone from Mr. Vitt's office.

Page 23

I don't know if it was him. Oh, maybe it was -- it might have been...

ATTORNEY VITT: Katie?

THE WITNESS: It might have been Katie, yes.

ATTORNEY VITT: I think it was me, but I'm not sure.

ATTORNEY JOSEPH: Okay.

Q. And how many cases have you worked with Mr. Vitt on before?

A. One other. I -- I think that's all I can remember, is just one other.

Q. And that's the Father John --

A. Yes.

Q. -- matter? Okay.

A. What's the last name?

Q. Sorry?

A. What's the last name?

Q. I can spell it.

A. I can't even spell it.

Q. Are you receiving any compensation from Vitt & Associates or from Plaintiff for anything else other than your expert fees in this case?

A. No.

ATTORNEY JOSEPH: We'll mark this as

Page 24

Exhibit 3.

(Bancroft Exhibit 3 was marked for identification.)

Q. So this is a -- Exhibit 3 is a list of all of the matters in which you've provided expert testimony for the last four years; is that correct?

A. Yes.

Q. And at the top of this, it says "October 2015 through September 2019." But is this still an accurate list as of today, October 30th, 2019?

A. Well, the only addition would be today.

Q. Right. Okay. But no other additions besides today?

A. No.

Q. So are any of these employment cases, aside from Number 2?

A. Number 2. Number 9, West & Ferris. There were actually -- there were two separate cases.

Q. So just Number 9?

A. Yeah. I've been trying to remember Number 8. I don't -- I can't tell you whether that was a -- for some reason, I think it -- it -- it was one of these unusual ones. I think it may have had to do with contracting a consultant or -- I don't remember much about it, but -- so maybe 8.

6 (Pages 21 to 24)

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 25

Q. Okay.
A. But definitely 9. And I don't -- and 2 we just mentioned.
Q. Right.
A. And I think none of the -- the rest are either lost business profits, personal injury, or wrongful death.
Q. Okay. And so for Number 9, were you retained by counsel for the plaintiff?
A. Yes.
Q. Okay. And I think you had mentioned earlier that you have been retained as counsel for a defendant -- or as an expert by counsel for a defendant before or an employer. Do you remember which cases those were?
A. I don't.
Q. Okay.
A. And I -- it seems to be the case, particularly in the last 15 years, that even when I'm retained, I'm not necessarily disclosed.
Q. Okay.
A. There has to be a really egregious error on the part of the plaintiff's expert that the defense would want to put me on; otherwise, it's -- I provide them with -- I may provide them a report,

Page 26

I may not, but critiquing the analysis.
Q. Got it. So what did you do to prepare for your deposition today?
A. Yest- -- not yesterday. Monday I went through my file.
Q. Okay.
A. And then I -- yesterday I did -- I came down here at the request of Mr. Vitt and met with him for about -- met with Mr. Vitt and Ms. Kramer for about an hour and a half.
Q. Okay. You said you looked through your file. What documents are in your file?
         (Julia Korkus entered the deposition.)
A. I have my October 1st, 2019, report and my preliminary report from October of 2018. And I've got handwritten notes. And I've got tax -- some W-2s. Several e-mails from Ms. Korkus. Benefit statement from Dartmouth-Hitchcock dealing with pensions, health care. A letter from Dartmouth-Hitchcock to Dr. Porter regarding her benefits at -- pension benefits at the time of her termination. I've got e-mails.
         I have pay stubs from the University of Vermont, 2019. 2018 income tax return.

Page 27

Again, a bunch of W-2s. More e-mails, e-mails, e-mails.
         I think this may be a duplicate copy, but it -- a duplicate, but it has to do with the pensions at Dartmouth.
         A letter from Dartmouth dealing with -- basically what was in -- what I got out of this was her current pay rate. I think there's some fringe benefit information in there.
         And then I believe Dr. Porter sent me this summary of medical school faculty compensation for all schools. I printed it out, but I didn't rely on it.
         ATTORNEY JOSEPH: Okay. Could we --
A. Actually, I have this information.
         ATTORNEY VITT: Could we do what?
         ATTORNEY JOSEPH: Could we go off the record.
         (Recess taken.)
         ATTORNEY JOSEPH: Back on the record.
Q. So you mentioned that you met with Geoffrey and Katie yesterday?
A. Yes.
Q. Did you review any documents with them?
A. No.

Page 28

Q. Okay. And can you give me -- go ahead.
A. I don't -- at the actual meeting, I did not review any documents. When I got home, an e-mail was sent to me on an issue that we had discussed. And that was -- had to do with Dr. Porter's housing in Burlington.
         I had been under the assumption, based on my telephone conversation with her -- obviously, I must have misunderstood or -- that she had a -- wanted a three-bedroom or possibly four-bedroom home so that she could have her family there.
         And when I got home yesterday afternoon, there was an e-mail waiting for me that said that she -- her place that they bought was only a two-bedroom home, which would have some implications for my rejections of her costs.
Q. Okay.
A. 'Cause my costs were based on a three/four-bedroom.
Q. Okay. We'll get into that --
A. Yeah.
Q. -- a little later.
         So can you give me a description of the work that you were asked to do, how -- the

7 (Pages 25 to 28)

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 29

way that it was described to you on this matter?

A.   I don't think there was much discussion.  To be honest with you, I don't remember.  I can only tell you what I -- I think was said, which is pretty much the same in every case, you know, that I've got this case.  It's a wrongful termination or employment case.  Here is the name of the plaintiff.  And here is the name of the defendant.  I would ask for that because I want to make sure I don't have any conflicts.  And they would like to retain my services to develop projections of the individual's economic loss.

Q.   What documents were you provided?

A.   Boy, it's rather lengthy.  And I should point out that not all the documents I received are in that file.  Many of them that were sent -- they're -- I think everything I -- or most everything, if not everything, came PDF.

So many of them are on my computer.  They were just, you know, large files.  A lot of them had to do with the benefit program.  I did print out one of them.  I think I had '17, '18, and '19, and I only printed out one of them.

So I was provided with income tax returns for at least 2018, W-2s for '17 and '18.

Page 30

I don't remember if I was provided with a -- I think I was provided with a '17 income tax return.  I don't remember off the top of my head.

I was provided with pay stubs at UVM for 2019.  I think I mentioned there was several things on -- on Dartmouth-Hitchcock's fringe benefit program which dealt with medical and -- and retirement plans.

I mentioned, I think at the -- before we went on break, is that Dr. Porter sent me a list of -- of pay for various doctors.  I printed it out, but I never used it, never relied on it.

And then there's a lot of information that was sent to me via e-mail that had to do with questions that I had.  A lot of them had to do -- many of the e-mails had to do with early on in the -- in -- when I was doing my analysis, the preliminary one, and there was some confusion on my part.  At that point, many things had not been established for Dr. Porter, so there was discussions about when she -- what might happen in the future.  So that information is scattered throughout the -- my file.

And I did make an attempt to print out any e-mail that was -- that was pertinent or that

Page 31

I relied on, but I did not always print out every single one of the attached documents.

Q.   Okay.  So you mentioned there were some documents not in your physical file that you had with you today that are on your computer?

A.   Yes.

Q.   Aside from benefits summaries for Dartmouth-Hitchcock, do you remember what any of those other documents are?

A.   Those are the major, I think -- right now, I'm going to say that the only ones I can think of off the top of my head are the whole listing of the Dartmouth-Hitchcock benefits for '17, '18, and '19.  That's all that comes to mind, but there -- there very may well be others; I can't tell you for sure.

Q.   And so all of the documents that you relied on are in the file that you brought with you today; is that correct?

A.   I believe so.

Q.   Okay.  And who all did you talk to about your analysis?

A.   Mr. Vitt, Ms. Kramer, Ms. Korkus, and I didn't discuss the results, but I had at least one, if not two conversations with Dr. Porter, but that

Page 32

was getting some background information.

Q.   Okay.  And how long did you talk to Dr. Porter for, if you recall?

A.   You're talking to a person who not only has a short-term memory deficit, but now it's turning into long.  I don't remember.

I think one of the conversations was -- was lengthy; less than an hour, but probably longer than 20 minutes.  So I'll give you a range there I think might be a reasonable estimate.  Somewhere between 20 minutes and 60.  How's that?

Q.   Sure.  So all of the information you used to form your analysis came from either Mr. Vitt's office or Dr. Porter --

A.   Yes.

Q.   -- is that correct?

Okay.  Were there any subjects you were instructed not to address when doing your report, or your analysis, rather?

A.   No.

Q.   Okay.  Were there any facts you were told not to consider?

A.   No.

Q.   Did you review any of the pleadings in this case?

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 33

A. That's what I was trying to think, if there had been one of those, if I got a copy of the complaint. I don't think I did.

I apologize. You know, I have, oh, 20 cases right now going, and a couple of them are wrongful termination. And so it's hard to remember which one I reviewed the complaint on. But the complaints generally aren't terribly relevant for -- other than dates.

Q. And do you have an idea of the substantive issues of this case, or were you more concerned with just calculating the estimated loss?

A. No. I don't -- I'm sure that I was explained, you know, a lot to do with the termination. But that's really not relevant for me. That's not my role.

My role is how much -- is to estimate how much the individual would have earned if they continued in the employment they had prior and then offset that by projections of what they'll likely earn given that they're no longer employed with that initial -- original employer.

ATTORNEY JOSEPH: Okay. So let's go off the record.

(Recess taken.)

Page 34

ATTORNEY JOSEPH: Back on the record.

I have here what I'd like to mark as Exhibit 4.

(Bancroft Exhibit 4 was marked for identification.)

Q. This is the expert report that you provided on October 1st, 2019, correct?

A. Yes.

Q. And this reflects that it was updated or changed from your original October 30th, 2018, analysis; is that accurate?

A. Yes.

Q. Who asked you to make those changes?

ATTORNEY VITT: You mean -- I object. Are you asking him who asked him to provide an updated report?

ATTORNEY JOSEPH: Yes.

A. I'm not sure if it was Mr. Vitt or Ms. Kramer, but it was understood that my first report was preliminary and there were lots of issues that were still up in the air and that it was understood that my report would need to be updated with the passage of time as new information became available.

So I'm not sure anybody called up, but

Page 35

there was an understanding that this had to be updated. And I think that's the -- the phone call I got, and I -- it may have been from Ms. Korkus, that it was time to update the analysis, that there was a -- I think disclosure was coming -- a disclosure was coming up.

Q. You said a lot of issues were up in the air. What issues were those?

A. Well, at the time I did my initial report, she hadn't been at UVM very long. There was issues about whether she was going to be working more.

There was an issue about whether she was going to get a grant; and if so, maybe she would get a promotion.

I'm not sure at that juncture if she had actually bought that -- bought a house. I was under the assumption that she hadn't and that she was looking for a three- to four-bedroom.

So there were lots of things in order to just get out a preliminary report that I was requested, but there were a lot of -- I felt that -- with the passage of time that we could update the report and wouldn't have to make projections based on what might happen.

Q. When you say "she," you mean Dr. Porter, the

Page 36

plaintiff, right?

A. Yes.

Q. Any other issues that you remember specifically that were up in the air that needed to be changed in the second report?

A. Well, there always was the issue about what she would be doing in the future. So that was an issue back in the -- in the original preliminary report.

And I -- and I knew that that was still an ongoing issue, that there was some uncertainty what she would do in the future. So that was always -- I knew that was an issue that had to be revisited.

Q. Anything else?

A. Not that I can think of.

Q. Okay. And so, in your report, you go through two scenarios, Scenario A and Scenario B.

And so the first scenario is assuming that Dr. Porter leaves her full-time position at the University of Vermont Medical Center in June 2021 and obtains a half-time position closer to home in Norwich, Vermont, while continuing to work one day a week at University of Vermont Medical Center; is that correct?

9 (Pages 33 to 36)

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 37

A.  Yes.

Q.  And then Scenario B you assume that Dr. Porter will continue to work part-time at the University of Vermont Medical Center two days a week after she resigns her full-time position in June 2021. And this scenario assumes that she would not be able to find suitable employment close to her home; is that correct?

A.  Yes.

Q.  What's the basis for the assumption that Dr. Porter will leave her full-time position at the University of Vermont in June 2021?

A.  That was information that Dr. Porter expressed to me, that she didn't know how long she would stay at UVM. She made it clear that this wasn't an ideal situation. She enjoyed the work, but she didn't like being away from her family and having to commute.

Q.  So did she give you the specific date of June 2021? Why was June specifically chosen?

A.  She was the source of that information.

Q.  Okay.

A.  And I don't know why she -- why she picked June as opposed to May or July.

Q.  And she said she didn't like being away from her

Page 38

family. So that refers to her husband and her children?

A.  Yes.

Q.  Okay. And where do her husband and children live?

A.  In Norwich.

Q.  Okay. Are you aware that her children are -- do they live there full-time, that you know?

A.  I don't know that.

Q.  Okay. So in your report, Exhibit 4, you have a list of assumptions, 1 through 15, it looks like, for each of the scenarios and then also for each of the scenarios a chart with projected lost earnings. Is that correct?

A.  Yes.

Q.  And are all of the assumptions that you made in creating the projected lost earnings in Scenario A listed on this assumptions page for Scenario A?

A.  Yes.

Q.  And are all of the assumptions that you made in conducting your analysis of projected lost earnings under Scenario B listed under the assumptions page for Scenario B?

A.  Yes. I don't know. Just to be -- put a fine

Page 39

point on it, technically, I did rely on another piece of information; that is, her work life. And so that's not -- that's identified on the -- on the spreadsheet itself.

Q.  Okay. So outside of what's contained in Exhibit 4, there are no other assumptions that you used in creating your analysis for either scenario?

A.  Well, we did have a discussion about how long she might work. And that was sort of the -- she could -- there's a possibility she would have worked out to age 70 --

Q.  Okay.

A.  -- under the right circumstances.

Q.  Okay. And I think that's reflected on the charts for both -- for both scenarios. Is that correct?

A.  Yes.

Q.  And so are there any other assumptions that you used in coming up with the projected lost earnings for either scenario that aren't in Exhibit 4?

A.  I don't think so. I can't think of anything.

Q.  Okay. And can you, I guess, just give me an outline of the general methodology you used to create these projected lost earnings charts?

Page 40

A.  Sure. The first step is to project out what she would have earned if she'd continued her employment with Dartmouth-Hitchcock. And that's composed of her salary plus the value of fringe benefits. In this case, fringe benefits that were of value that I valued were contributions to health insurance and also contributions to a retirement plan.

And then the next step is to -- well, I guess is looking at post-termination earnings, which again is composed of income plus any benefits that she might receive. Up through 2018, I used what she actually earned, and then in 2019 what she'd earned up through July 31, and then used that as a basis to forecast forward.

But anyways, that was -- and then some other assumptions on what she would do after 2021, and carried that on out, along with any fringe benefits that might have been available. There wasn't any after July -- after June 2021.

And so when -- and so then I'd have the -- I'd have the projections of -- of the Dartmouth-Hitchcock earnings. And then I would offset that by projections -- or actual and projections of what she would earn

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 41

post-termination. And that would be her gross loss.

From that, I estimate what kind of income taxes she would have had to pay each year on the -- on the loss. And then the next step is to determine the present value. And the present value, I add interest to historical and then I discount future loss projections to the present.

And then the next step -- and then I -- it's a mathematical thing. I have a running total to assist the trier of fact.

And then the next important step is estimating the tax liabilities that would be assessed on any award that she might receive.

Q. Okay. Was there any other approach that you considered?

A. No.

Q. Okay. And how did you develop this approach?

A. It's an approach that I've been using for -- for, I don't know, 20, 25 years. Same. It hasn't varied.

Q. Is it generally accepted amongst economists?

A. Yes.

Q. Have you seen any other approaches being used to calculate projected lost earnings?

Page 42

A. Yes.

Q. And what are those?

A. Similar to this, where it's -- except for that last component of taxes, it's no different than a personal injury or a wrongful death case where you project out what the person would earn pre-injury and what they earn post-injury or, in this case, pre-termination and post-termination.

And in the state of Vermont in state court, at least on personal injury, it is in after-tax dollars. And I think that's the true economic measure of a person's loss, is in after-tax dollars.

But because, unlike a personal injury or wrongful death case, the award is taxable, so that's where you need to take -- I need to take account of -- I need to gross up the award to take account of the income taxes that would be assessed on receiving a settlement amount.

Q. Is there any other way of doing it that you've seen anyone use?

A. Well, I have over the years seen people ignore that last income tax thing. They -- where they've -- I guess I don't want to put words in their mouth, but I assume that they were assuming

Page 43

that it was a wash, that they wouldn't back out income taxes from each year, and therefore they didn't need to gross it up at the end, but that's inappropriate.

Q. Why is it inappropriate?

A. Well, because if I was -- if I was owed by an employer $50,000 a year for the next ten years and I received $50,000 in each of the next ten years, I'd have some sort of tax liability. Say for the sake of mathematics we'll assume it's $5,000. So over that ten years, I would pay $50,000 in income taxes.

But now you give me a half a million dollars, my taxes are going to be greater than $50,000 because I'm going to be pushed into a higher marginal tax bracket.

And as you can see from my calculations, once you get above that $500,000 after-tax loss, the next -- not the -- it would be the third -- third-to-last column, you've got to give about 85 percent -- you've got to gross that up by 85 percent to cover the taxes. What's insidious about it is that you've got to pay taxes on taxes.

Q. When did you do this analysis?

Page 44

A. The October 1st, 2019?

Q. Yes.

A. It was done sometime in the last couple weeks of September of this year.

Q. Okay. And when did you do the analysis that resulted in your original October 30th, 2018, report?

A. I would say in September, the month prior to it.

Q. How long did it take you to do your original analysis from the first report in 2018?

A. First report, I want to say maybe ten hours.

Q. Is that typical?

A. It might have been a little more. I think what was maybe a little unusual is the amount of time we spent on telephone conversations.

Q. Okay. And why do you say unusual?

A. Well, I generally don't ever -- not ever. I generally do not talk with the plaintiff. Information generally comes to me from the -- from the -- through the attorney. So that may be that one thing that's unusual.

And it did seem to me there was a lot of -- particularly back in -- in '18, when we were discussing what her options were at UVM and what might happen, there was -- there was a lot

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 45

of back-and-forth at that time. So there was, you know, a lot of e-mails, which add time.

Q.  Mm-hmm. Why do you think you spoke to the plaintiff in this case as opposed to typically you said you wouldn't?

A.  Well, I -- the reason, that had to do with the kind of questions I was asking about. And the -- most of them had to do, not all of them had to do with what was going to happen at UVM.

Q.  How long did it take you to do your analysis, the updated analysis that resulted in the October 1st, 2019, report?

A.  I'm going to say maybe six hours.

Q.  And is it typical for you to need to update a report after some period of time?

A.  Yes.

Q.  Did you have any assistance from anyone else in preparing either report?

A.  No.

Q.  Did you consult any literature to prepare the report?

A.  No, I didn't. I mean, I have in the past. Again, I've been using this for 25 years. So when there's something in -- generally it's in the Journal of Forensic Economists that might

Page 46

have something to do, that obviously I review that; but the basic methodology hasn't changed.

Q.  Okay. So in this case, you didn't review any outside source for --

A.  For this case, no.

Q.  Okay. So looking specifically at the scenarios. It looks like the analysis and the calculation through 2020 are the same for Scenarios A and B. Is that correct?

A.  I'm sorry. I didn't --

Q.  It looks like the analysis and the calculations for Scenarios A and B are the same through 2020. Is that accurate?

A.  I believe so.

Q.  Okay.

A.  They should be, yes.

Q.  And so the assumptions for the calculations made through 2020 for Scenarios A and B are the same, correct?

A.  The projections through -- want to give me those years again?

Q.  Yeah. The assumptions that you made in calculating the projected lost earnings for the years 2017 through 2020 are the same for Scenarios A and B?

Page 47

A.  Yes. Through 2020, yes.

Q.  And so the report indicates that Dr. Porter is currently working full-time at the University of Vermont Medical Center. Do you know when she began that work?

A.  No, I don't.

Q.  Okay.

A.  That information may very well be in some of my documents there.

Q.  Okay.

A.  But it wasn't critical to my analysis, because I actually knew what she actually earned, and the representation was this was -- what she'd earned for the first seven months of 2019 was indicative of what she'd earn for the next nine, ten months.

Q.  Okay. And that was what Dr. Porter represented to you?

A.  By counsel.

Q.  Okay. So looking at the assumptions page for Scenario A in the reports, which I think is the third page. So Footnote 1 lists the assumptions that you made in calculating the projected lost earnings column 1 in your chart; is that correct?

A.  Yes.

Page 48

Q.  Okay. And that's the same, these footnote numbers match up with the columns throughout both scenarios in the chart?

A.  Yes.

Q.  Okay. So this states Footnote 1, Assumption 1 is "The projection of Dr. Porter's 2017 Dartmouth-Hitchcock Medical Center income is composed of her actual DHMC income, an additional $68,000 of disability income and one and a half months at her full-time salary of $305,539." How did you determine her actual Dartmouth-Hitchcock income?

A.  There is a document in my folder that gives her current salary of $305,539.

Q.  What type of document was it? Would it be helpful to actually look at the --

A.  Yeah. If I had my file, I could look at that.

ATTORNEY JOSEPH: Why don't we go off the record.

(Recess taken.)

ATTORNEY JOSEPH: Back on the record.

Q.  So before the break, we were talking about how you determined Dr. Porter's actual Dartmouth-Hitchcock income. And you had mentioned there was a document in your file that

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 49

you would have looked at.

Could you tell me which documents those would be?

ATTORNEY JOSEPH: Actually, let's go ahead and mark this as Exhibit 5.

(Bancroft Exhibit 5 was marked for identification.)

Q. I'm handing you what's marked as Exhibit 5. This is a copy of the file that you brought with you, except for a couple documents that Counsel has indicated he's reviewing to see whether they are privileged.

Could you show me the document in that group of documents that you reviewed to determine her actual income?

A. Before I go looking in here -- 'cause I did look before and couldn't find it, but there it is.

Q. Okay.

A. So that's what I'm going to be looking for.

Q. Okay. So this is a document with the heading "Dartmouth-Hitchcock Individual Rate Increase Sheets, Dartmouth-Hitchcock Clinic, 2014 Annual Wage Increase."

It looks like it's several documents paper-clipped together. It's towards the end of

Page 50

the back, maybe the second from the end.

A. There it is.

Q. So that's the document you used to determine Dr. Porter's actual Dartmouth-Hitchcock income for 2017?

A. Her salary, yes.

Q. Her salary, rather. Yes.

Did you review anything to determine her actual income?

A. Yes. I had W-2s.

Q. Okay. And you note also that there is an additional $68,000 of disability income. What was the basis for that number?

A. There was a document somewhere in here. I don't know if I'd recognize it, but there was a document. It might have been a 1099. You want me to go through this and --

Q. Yeah.

A. -- see if I can find it?

Q. That'd be good if you can find which one it is.

A. Okay. Let me close this up.

Okay. There's one. I'm looking at this document that was clipped together.

Q. Okay.

A. And it was sort of toward the back.

Page 51

Q. Okay. It looks like this one.

A. And then fifth page in. I believe that this is part of the -- what I was assuming for workers' comp, $51,522.29. And then it's 2017. And I don't think I've missed anything, but I very well may have. Let's see.

There is one from Unum Life Insurance for 17,000 -- Social Security earnings, 17,041.70. I'm not sure if that --

Q. Where is that?

A. Well, it's one, two, three, four, five pages from the back. Although, I'm questioning -- I assume that that was -- those two will add up to the 68,000, roughly.

Q. Okay. So you're referring to, for the record, a W-2 from Unum Life Insurance Company and a W-2 from Hartford Life Insurance Company, both for 2017?

A. Yes.

Q. Okay. And those documents were the basis for the $68,000 in disability income for Assumption 1 for Scenario 1?

A. I believe that to be the case, yes.

Q. Okay. So the next item that you list as the basis for your projection is one and a half

Page 52

months at Dr. Porter's full-time salary of $305,539.

A. I'm sorry. Where are you reading now?

Q. I'm sorry.

A. Are you reading --

Q. I'm reading --

A. -- Footnote 1?

Q. -- Footnote 1 in, yeah, the assumptions page for Scenario 1.

A. Yes. Okay. Yeah.

Q. So what was the basis for using one and a half months?

A. I believe that's information I was provided. It very well may be in one of these e-mails, but I was provided with information that she would go back to work -- would have gone back to work if she hadn't been terminated from Dartmouth, that after being on disability, she would have gone back to work in mid-November 2017 full-time.

Q. Okay. And did she tell you what the basis for that was, or she just gave you that date?

A. I don't remember what the basis was.

Q. Okay. Do you know if there was one that was provided to you and you just don't remember it, or there --

13 (Pages 49 to 52)

540889d0-4ff5-44c5-a75e-10182bf4ad3d

A-275

Page 53

A.  I don't remember.  What was important is what she said.

Q.  Okay.  Understood.  You've assumed that in July 2018 her salary would increase by 2.5 percent.  And this is, again, in Footnote 1 for the assumptions for Scenario A.

What's the basis for the 2.5 percent?

A.  That's information provided by Dr. Porter.

Q.  Okay.  And do you know what the basis was for that number from her, or she just gave you that number?

A.  I believe, and I could tell the -- the lengthy telephone conversation we had, she expressed that she believed that she would get promoted next year, 2018.  And it was her estimate that the -- she thought the increase would be at least 5 -- at least 5 percent, so...

Q.  Oh, I'm asking about the 2.5 percent --

A.  Oh.

Q.  -- assumption for the increase in July 2018.

A.  Oh.  Oh, okay.  No.  That -- that is an assumption I made based on recent salary increases.

Q.  For Dr. Porter?

A.  No.  I did not look at the -- I didn't have a --

Page 54

I don't have a lengthy series, at least current, of what's happening for doctors, but I do have information on how salaries in general have increased nationally.

Q.  Okay.  What's the source for that information?

A.  US Bureau of Labor Statistics.

Q.  Okay.  And do you typically rely on that source for --

A.  Yes.  Yes.

Q.  Okay.  And are the numbers provided there broken down by industry, or is it just salaries generally?

A.  You can find total compensation by various industries.  They look at service industries, manufacturing, transportation.  I can't think of one that really would -- that fits with people in health care.  I guess that may be services, but services covers such a -- a wide swath from retail clerks to -- to other people.

So I looked at the -- and, again, it's not precise.  I looked at what's happened to wages.  I know wages -- what happened to wages from -- you know, you tell me what period you want me to tell you what happened, I'll tell you roughly how they increased.

Page 55

But recently, wages have -- after the recession, wages were increasing at about 1, 1-1/2 percent, somewhere -- in some years, between 1-1/2 and 2 percent.  They're now increasing at 2-1/2 to 2 plus.  That's just the income side.

If you look at total compensation, which is also reported by the US Bureau of Labor Statistics, which takes into consideration not only wages but also the value of fringe benefits, that number tends to be at least a half percent higher.

Q.  So the 2.5 percent that you got from the US Bureau of Labor Statistics was a number across all industries and professions?

A.  Yeah.  I -- again, I -- I can't say specifically that I went and looked at that series for this case, but I look at it all the time.  And, you know, it wasn't I used this year or these three years, but this is what I believe to be a conservative estimate of what her salary would increase at actually.

And I say conservative because it really is based on what it's looking like what salaries are going to be increasing at in the

Page 56

last year and -- and at least into the near future.  And then, when you add in the value of fringe benefits, that number should be higher.

So I -- if we were sitting here and I was working for the defense and somebody had 3 percent, I would be hard-pressed to argue with them.

Q.  So the 2.5 percent is just the number that you've used in cases this year as the metric for salary increases?

A.  I think it's a reasonable estimate, a conservative estimate of what salary -- how salaries will increase -- how her salary would increase.

Q.  So continuing in the first assumption here.  And I think you had touched on this earlier.  You state that "The 2019 projection is based on the assumption she would be promoted to a full professor and receive a 5 percent salary increase."

And what was the basis for that?

A.  From information provided by Dr. Porter.

Q.  And so the 5 percent salary increase was based on --

A.  Yeah.

14 (Pages 53 to 56)

540889d0-4ff5-44c5-a75e-10182bf4ad3d

2:17-cv-00194-kjd    Document 198-4    Filed 02/14/25    Page 16 of 28

Page 57

Q.  -- what Dr. Porter said?

A.  Yeah.  I asked her what she thought would be reasonable and she thought 5.  I believe she said at least 5 percent.

Q.  Okay.  Did you review the rate of her compensation increases during her employment with Dartmouth-Hitchcock?

A.  No, other than I had four, five years of W-2s.  But I don't remember what they were.  I don't -- I did not -- I don't think I wrote them down.  I might have.

Yeah, I did have a series.  I know what her -- what her actual earnings were for tax purposes up through -- from 2014.  And now I -- and I have 2018 now, too, so...

Q.  Okay.  So did you look at the percentage increases in her compensation from year to year?

A.  Well, there was a significant increase from '14 to '15, but then '16 and '17 were lower.  And I understand that was due to some health issues.

And I see, if you -- if you can find my handwritten notes that says "Porter."

Q.  So this is the document that says "Porter" on the top and then it looks like "D of T 6-3-17" --

A.  Yes.

Page 58

Q.  -- "Age 54, 7 months."  I'm just reading what it is so that we know which document.

A.  Yes.  You'll notice that, if I could, I -- the calculation of the 68,000 can be found there in '17 over at Baystate, Hartford, Abvie and Unum.

COURT REPORTER:  AB?

THE WITNESS:  It looks like A-b-v-i-e.

A.  Anyways, you'll see -- it's my understanding that she had health issues and that's why the income was -- declined in '16 and that continued over into '17.

So the point being, is that '16 and '17 are not indicative of what -- her salary increase because there was an exogenous factor causing that to go down.

Q.  Okay.  So you weren't able to look at any compensation increases --

A.  No.  I --

Q.  -- historically for her?

A.  I looked at '14, '15.

Q.  Okay.  But aside from '14 or '15, no; is that correct?

A.  Yes.

Q.  Okay.  So the last sentence in Footnote 1 for the first assumption for Scenario A is that in

Page 59

subsequent years you've assumed Dr. Porter would receive annual wage increases of 2.5 percent.

What's the basis for that 2.5 percent?

A.  We discussed it when we were talking about in July of '18 the 2.5 percent.

Q.  Okay.  So moving on to Footnote 2 or Assumption Number 2.  You state "Dr. Porter's fringe benefits, given her continued employment with DHMC, include the medical center's contribution to health insurance and a retirement plan."

Are those the only two components that you used to estimate fringe benefits?

A.  Those are the only two that I had of -- there are other fringe benefits offered by Dartmouth, but these are the two that have value.  I mean, they offer life insurance; but I'm assuming she lives, so --

Q.  Okay.

A.  -- no value.  And there are some other ones, too.

Q.  What were the others that you --

A.  Well, Social Security.  But I did not include Social Security in there because she's at least -- in most years, she's over the -- it's about $132,000, I think is the cap that you assess the 5.4 percent, which is -- or

Page 60

5.5 percent, which is the old age of retirement, which you hope you're going to get back when you retire.  I probably -- I might get most of it back, but I don't know about you.

Q.  We'll see.

A.  So I didn't include that because it -- post-termination, I assume that she's -- you know, that's going to be covered, she's going to be earning at least that much.

Q.  Okay.  Anything else that you didn't include in fringe benefits?

A.  I don't remember.  I had the documents with the fringe -- various fringe benefits they had.  You know, they have a wellness program and, you know, et cetera, et cetera.  But the two of significant value were the health insurance and the retirement.

Q.  Okay.  But you reviewed all of the other --

A.  Well --

Q.  -- benefits offered by --

A.  -- I read the document.

Q.  Okay.

A.  If you look at my reports, whether they be personal injury or wrongful death or employment, there's generally only three fringe benefits that

15 (Pages 57 to 60)

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 61

I value in there:  the employer's contribution to Social Security, the employer's contribution to health insurance and the dental and vision, and contribution to retirement plan.  In this case, I did not have Social Security in here.

Q.  Okay.  What's the basis for your assumption that the value of DH's medical insurance contribution is assumed to be $15,000 in 2017?

A.  Well, actually, I think it's quite conservative. But if you take a look -- I was hoping I could find it and I -- as I said earlier, I think I have your benefits.  And I think I have the one for 2019 and '18.  And I think those may be on my computer, but I'm hoping...

On page 14 of that document.

Q.  This is the document with --

A.  "Your Benefits, Your Health, Choices for Healthy Living."  This is in 2017.

If you look at page 14, you'll see that -- what the employee had to contribute, which for a family program was $200 a month, which is very low.  That's $2,400.  A family plan's going to cost at least $25,000.  So my 15,000, I'd argue, is very low.  Extremely conservative.

Page 62

On page 14, that's what -- what the employee has to pay for -- for a health insurance plan, which is -- for a family is going to be at least $25,000.

Q.  When you refer to $200, you mean this entry that says 198.56?

A.  Yes.  And even if she fell into the FTE between a half and a little less than three-quarters, it's still a little less than $300.  So it's -- the 15,000 is an extremely conservative number.

Q.  What's the basis for assuming the total contribution by DH based on Plaintiff's contribution?

A.  On the retirement?

Q.  Yes.

A.  Well, if I can find that here.  I know it's in the '19 one.  And I apologize.  I thought I printed that one page out.  It may be in here. Let me see if I can find it, if they actually put it in the '17 one.  On page 34.

Q.  Okay.

A.  If you look at number of base contribution points, she would be 220, I believe, based on my calculations.  What she would be entitled to is 7 percent contribution, base contribution, plus

Page 63

an additional 5 percent because her earnings would be over 118,500.

Q.  And this is DH's contribution to medical insurance?

A.  No.  Retirement.  I thought you asked about retirement?

Q.  I was asking about medical insurance.

A.  Oh, I'm sorry.

ATTORNEY VITT:  No.  You asked about retirement.

ATTORNEY JOSEPH:  Okay.

ATTORNEY VITT:  I mean, the question was retirement.

ATTORNEY JOSEPH:  Oh, okay.

Q.  I meant -- sorry.  I meant to ask what the basis was for calculating DH's medical insurance contribution based on her -- her contribution, which was listed on page 14.

A.  Well, at the time, I think I -- I think I -- trying to be conservative, and I was estimating that the cost would be around 20,000.  And I assumed she was paying, you know, around 3 or 4. So it comes out to be about 16.  I used 15 to be conservative.

But, in fact, in going back and

Page 64

reviewing it, particularly when I took a look at the '19 one, 15 is way on the low side.  It probably would be -- a more reasonable estimate would be 20,000 or more, maybe 22,000.

Q.  And you're basing that just based on your estimate of what the percent of her contribution would be versus the total cost?

A.  Yes.  Knowing what -- having a rough idea of what cost -- medical insurance costs if you go out and buy it as a private individual, versus -- and then comparing that with how much the employee has to contribute, there's quite a differential. And I'm saying the differential's probably at least 20,000, not 15.

Q.  And what's the basis for the assumption that the value of DH's contribution to medical insurance would increase at 2.5 percent annually?  Is that the same as the --

A.  It's the same -- it is the same as the wages. But actually, I think everybody -- pretty common knowledge that medical expenses have -- insurance premiums have been increasing much faster than inflation or wages increases.

And I alluded to that when I said that when you look at wage increases and then you

16 (Pages 61 to 64)

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 65

compare that with increases in total compensation, which includes health insurance, it's a great -- it's a higher number, 'cause health insurance is going up at a faster rate.

Q. And then going back to what you touched on a moment ago, retirement plan contributions. That was on page 34, you said. Could you walk me through how you came up with the 12 percent?

A. 34?

Q. Yes.

A. Yes. That's how I came up with the -- it's the 7 plus the 5.

Q. Okay. So looking at Footnote 4, that's Assumption 4, in Scenario A. Actually, for both Scenarios A and B, you've noted that for that assumption "Dr. Porter's actual earned income is reported for the years 2017 and 2018."
Did you determine her actual income from her W-2s for those two years?

A. Yes.

Q. Okay. And you reviewed her actual earnings -- or her, I guess, actual earnings from the University of Vermont Medical Center through July 31st, 2019, in order to project the rest of her 2019 income?

Page 66

A. Yes.

Q. Okay.

A. And there is a pay stub in here.

Q. Okay. And is the basis for the assumption that this income would increase at an annual rate of 2.5 percent the Bureau of Labor Statistics that we discussed before?

A. Yes.

Q. Okay. What's the basis for your assumption that Dr. Porter will obtain a half-time position as opposed to working full-time?

A. Information provided by Dr. Porter to me personally and then also through counsel.

Q. Okay. Was it considered that she might work full-time instead of half-time somewhere else after leaving UVM?

A. My recollection of the conversation was that she thought that was the best that she'd be able to get. She wouldn't be able to get a full-time position.

Q. Do you know why that was?

A. Beg your pardon?

Q. Do you know why that was?

A. No, I don't. I don't remember. She may have discussed it. But again, what I'm interested in

Page 67

is, okay, this is what I believe. And fine, that's good enough for me. It's not my role to -- to say, Well, I don't believe that or, You're being really conservative.

Q. And is the assumption that her new position would be at the New London Hospital based on conversations with Dr. Porter?

A. I believe it was all brought up in the conversation, but I know most of the information I -- I think was -- was from Dr. Porter, but transmitted to me through counsel.

Q. Okay. Were there any other positions at any other hospitals or employers considered?

A. No. I believe in my conversation with Ms. Porter, she indicated that that was the only likely place that she could get a position. And I think she said she may know somebody there and thought maybe that she might be able to because -- knowing the individual.
But again, she wasn't sure that she could -- that was a possibility. But when I did my initial analysis, I -- you know, obviously, when I do any of these analyses, one of the key parts are what are you going to do going forward? And so -- and many times it's kind of early and

Page 68

we have to make some assumptions. And they may prove to be correct, they may not. I mean, as time passes, we'll have more information.
But so anyways, it is -- she thinks it is a possibility, but I -- I don't want to put words in her mouth, but I think she indicated that it wasn't a certainty, or far from it.

Q. All right. And you've also assumed that her 2021 half-time salary would be $115,000. What's the basis for that assumption?

A. I was provided -- I can't remember if it was Dr. Porter or if it was through counsel. They gave me a range. I want to say it was -- the range was 220 to 240. And I think you may see it in my written notes of the conversation. And I took the midpoint, which was 230. That was for a full-time position.

Q. Right.

A. And then took half of it.

Q. And did you do any independent research on what an appropriate range of earnings would be?

A. No.

Q. And so it also -- you've also written here under Assumption Number 4 "In addition to her NLH half-time position, it is assumed she would

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 69

continue to work at the University of Vermont Medical Center one day a week for 48 weeks a year at a 2021 per diem rate of $190 per hour."
        What's the basis for assuming that she would continue at UVM?

A. Well, that's what she said she would do.

Q. Okay.

A. It wasn't my role to question her.

Q. And the one day a week was also something that came from Dr. Porter?

A. Yeah, that she would commute there one day a week. I thought that was going to be hard, but she said that she -- that's what she planned to do. It was a possibility, I should put it.

Q. And what was the basis for the $190 per hour per diem rate --

A. I believe --

Q. -- assumption?

A. -- the current rate or the rate was 175. And I just increased it, I think, by 2-1/2 or whatever and rounded it up to 190.

Q. And so she provided you with the current rate?

A. Yes. I think somewhere in this there's an e-mail that says that the current rate is 175.

Q. Okay. And is the basis for the 2.5 percent

Page 70

increase in income the same source we discussed before with the --

A. Yes.

Q. -- other 2.5 percent?
        So looking at Assumption Number 5, what's the basis for the assumption that UVM's contributions to Dr. Porter's retirement plan would be 9 percent?

A. I believe that's what she told me. Plus, I had just finished up a case within six months, eight months of this, I think, and I had actual documents from UVM that indicated it was 9 percent. I'm -- anyways, I've seen the 9 percent.

Q. Were there any other post-termination fringe benefits that you considered valuing?

A. I didn't. I mean, they're -- again, there'd be Social Security, but I didn't put it in the -- in the pre-injury. And then I -- I think UVM has a wellness program, and so didn't Dartmouth.

Q. Okay. And were discussions with counsel or Dr. Porter the basis for your assumption that UVM's contribution to her health insurance policy is comparable to Dartmouth-Hitchcock's contribution?

Page 71

A. Yes.

Q. Okay. So then moving on to the eighth assumption. And that goes with column 8 in the projected lost earnings charts for income taxes.
        What tax rate did you use to calculate income taxes?

A. I don't remember. It's going to be -- it's going to vary. It would depend on what the income was. It would -- it would depend on what the marginal income was; that is, this is what she -- what she's going to earn now -- best if I -- for me to explain it.
        If she's going to earn $100,000 now and would have earned 200,000 or -- well, let's make it 300,000. So her loss -- and I'm talking just about income, because fringes aren't -- so her loss in income is 200,000. So what would be the tax on that 200,000 on top of what it would be for the 100,000?
        I wouldn't count that, but I did look at -- it might be a couple of different marginal tax brackets in there. So if you want to find out what the -- what the actual percentage is, you just would have to go and subtract -- take the income from Dartmouth, minus the

Page 72

post-termination income, which would get you your gross income loss, which actually is a little overstatement, because a lot of her income is -- you don't have to pay taxes on it because her contributions to retirement and health are not taxable. And then divide that by whatever tax -- use that as a denominator and divide that into the -- whatever tax number I have will give you the rate.
        So in the example that I gave you where I have $200,000 as the loss in gross income and I said that the taxes would be 50,000, then it's a 25 percent rate. But that 25 percent rate may -- may have one rate that it's at 35 percent, another one that's 18. I don't know if I'm making myself clear.

Q. So how -- you said you weren't sure which rate you used because it varied. How would you -- if you were to go back and do this, how would you do this? Is there a spreadsheet that you used to calculate this out or...?

A. No. I would -- on this particular thing, I take a look at the difference, as I explained, between the pre- and the post-termination earnings, the earnings side of it, and then make -- say --

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 73

well, basically what I'm saying is what would the tax be on 300,000, and what would the tax be on 100,000. And I subtract one from the other, and that'll give me the tax on the 200,000.

So if I earn $100,000 and I pay taxes on that, let's say $10,000, and then if I earn 300,000 and my taxes on that are $80,000, then I subtract the 10 from the 80, and my tax on that additional 200,000 is 70,000. So that's basically the process that I'm going through.

Q. Okay. So how did you determine the rate at which each amount would be taxed for each year?

A. You know, for '17, '18, I looked at what tax rates were and I made the assumption that those tax rates will stay the same, although the brackets will creep with inflation, so...

Q. So you made adjustments assuming that the brackets would move up?

A. Yeah. They won't move up much. They move up by inflation. So, you know, if the bracket for the -- the 25 percent rate is -- for a married couple is 100 to 120,000 -- I'm just pulling these numbers out of the air -- then next year it might be from 101,000 to 127,000.

Q. Okay.

Page 74

A. I mean, I don't get -- I don't put that fine a point on it, though.

Q. Would you be able to find the actual rates that you used? Is that written down somewhere?

A. I could. But again, you can find them by taking the number in column -- if you will, column 1 -- column 1, which is the gross earned income from Dartmouth, subtract from that the gross earned income from the post-termination. That'll tell you the additional income, the loss income.

And then look at what I've calculated for the income tax. And so I would -- the income tax would be the numerator. And the difference -- the lost income would be the denominator. And that'll give you the percentage.

Q. Okay. But you don't have written down somewhere these are the rates that I used in 2025 or --

A. No.

Q. Okay. So looking back at the assumptions page, Footnote 10. That's on page 2 of the assumptions page for Scenario A.

And you've stated that "Due to the distance between Dr. Porter's home in Norwich, Vermont and her UVM position in Burlington, there

Page 75

are additional employment-related costs. These extraordinary employment costs are estimated to equal $45,300 a year in 2017 dollars."

And then you've split out that $45,300 into annual housing rental costs of 36,000; 1,800 for utilities; 600 for renter's insurance; 2,000 for heat; and 91 -- 9,100 miles of travel at $0.53 a mile in 2017.

What was the basis for the assumption that housing rental would cost $36,000 a year?

A. Based on one of the -- there may have been more than one. I think there was two conversations, but don't hold me to that.

But one of the conversations that I had with Dr. Porter was what she wanted for housing, and that she -- I -- my recollection is that she said she really wanted to lease a three-bedroom, if not a four-bedroom to accommodate her family. That's what she would like.

So what I did is I looked at rentals in the Burlington area for three/four-bedroom apartments. And they ranged from anywhere from the low end of 2,300, which I'm not sure that she'd want to live there, all the way up to about

Page 76

6,000. And so I looked at what I thought would be reasonable, around $3,000. And there were a lot around that 3,000 range. And I used that figure.

But as I indicated earlier in the deposition, I have since found out that she only has a two-bedroom. And so the rent on that would be 18 to 2,000 instead of 3,000.

Q. So $1,800 to $2,000?

A. I beg your pardon?

Q. $1,800 --

A. Yeah. Reduced by 1,000 or $1,200.

Q. You have to --

A. I'm sorry.

Q. -- wait for me, just so she can get it down. Where did you look for rental prices?

A. On the internet.

Q. Okay. Any specific websites?

A. Well, there were specific websites. I can't tell you what they are now.

ATTORNEY VITT: You want lunch? It's here. Are you at a good breaking point or do you want to --

ATTORNEY JOSEPH: Sure. We can stop.

ATTORNEY VITT: It's up to you.

19 (Pages 73 to 76)

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 77

ATTORNEY JOSEPH: No, that's fine. We'll go off the record.

(Lunch recess taken.)

ATTORNEY JOSEPH: So back on the record.

Q. These are some pages that also came from the file that was marked as Exhibit 5 that we'd like to add to Exhibit 5.

And so now Exhibit 5 consists of the entire file that you brought with you here today?

ATTORNEY VITT: Yes, it does. Dr. Bancroft would not know, but it is the entire file.

Q. BY ATTORNEY JOSEPH: So before we took our lunch break, we were talking about the annual housing rental cost estimate in Footnote 10 or Assumption 10 with respect to Scenario A.

And I think we had talked about how the monthly cost -- you received information from Dr. Porter or from counsel yesterday indicating that she would be renting a two-bedroom house, which would lower the housing rental cost annually?

A. Yeah. It's a two-bedroom house that she has, yes.

Page 78

Q. Okay. And so the figure you would now assume would be $1,800 a month to $2,000 a month for annual --

A. Yes.

Q. -- housing cost?

A. Yes.

Q. Okay. And you came to that costs conclusion based on the same sources that you used to get the initial annual estimate?

A. I can't say for sure that they are the same sources. I -- in Google I typed up "rents in Burlington" yesterday, and a whole bunch came up. And they ranged at two bedrooms from -- well, I did see one at 1,300, but then I saw -- there was one one-bedroom at 6,800. Good view, though.

Q. I'm sure. Okay. So it was from an internet search that you came up with those --

A. Yes.

Q. -- estimated costs? Okay. Got it.

So the next assumption that you made was that there would be $1,800 for utilities. Can you give me the basis for that assumption?

A. Well, just practical experience in my own life and also in other cases where I'm looking at where there's a need to quantify that.

Page 79

So I'm assuming about $150 a month -- I mean $150 a month for -- that would include electricity and if there is gas appliances.

Q. Okay. Did you review any outside sources to get that estimate?

A. No.

Q. And did counsel or Dr. Porter provide you with any information that you used for that assumption?

A. No.

Q. Okay. You assumed $600 for renters insurance. What was the basis for that?

A. I asked a couple people who were -- who were renting places what they were paying. And that was -- it was in that vicinity.

Q. Were they renting in Burlington?

A. I think they were both in Essex, which is right next to Burlington. Essex is the second largest town in Vermont.

Q. Okay. Did you ask them any of the terms of their insurance policies or just generally what they were paying for renters insurance?

A. The question what are you paying for your renters insurance?

Q. Okay. What's the basis for the $2,000 estimate

Page 80

for heat?

A. Again, just practical -- my practical experience, both from heating and from, you know, doing this kind of work.

Q. So that's -- both utilities and heat, those are the estimates that you gave assuming that she would have a three- to four-bedroom house?

A. Yes, they were. Yes.

Q. So would those numbers decrease given that she would be renting a two-bedroom?

A. Probably not the utilities, but the heating might. The utilities, electricity, you know, I'm trying to think. You know, some of that might be gas if there's a gas range. And I don't think the number of bedrooms are going to affect that very much. I -- electric, I -- I probably wouldn't change utilities, but probably the heat. Might make it 1,500 or something.

Q. And did you consult any outside sources for the number that you estimate for heat?

A. No. Just, again, based on my personal experience.

Q. And you also estimated or assumed 9,100 miles of travel at $0.53 a mile in 2017. How much travel does that envision? Where is that 9,100 miles

20 (Pages 77 to 80)

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 81

coming from?

A.  That's 48 trips, round trips, at 180 or 190 miles round trip.

Q.  Okay.

A.  48 weeks.  So divide 48 and it'll tell you how many miles I'm assuming.  Well, I guess you'd have to -- yeah.  Divide 9,100 by 48.

Q.  Right.

A.  It'll give you the number of miles round trip.

Q.  So you've estimated $0.53 a mile.  What was the basis for that number?

A.  That's the federal rate.

Q.  Okay.  Did you subtract the estimated cost of the commute Dr. Porter would have to Dartmouth-Hitchcock from her home if she was still employed there?

A.  No, I did not.

Q.  Okay.  What's the basis for the assumption that her annual costs would increase at a rate of 2 percent?

A.  Well, projections on what inflation's going to be.

Q.  Okay.  So similar to what we discussed before, I believe, for --

A.  Yes.  I'm looking at inflation and not wages,

Page 82

though.

Q.  Right.  Okay.  And what sources did you consult for that number, if any?

A.  Again, I -- you can either get it at the Census Bureau or at the Bureau of Labor Statistics.  But I look at that information all the time.

Q.  And you assume that the cost per mile in 2021 would be $0.59 per mile.  What's the basis for that assumption?

A.  I think it's 57 or $0.58 right now, so.  In -- yeah, in '19 I think it's 58 or $0.59.

Q.  So you were just sort of projecting out what you thought --

A.  Yeah.

Q.  -- it would be?

A.  Right.

Q.  Okay.  Did you consider whether any utility costs, for example, might go down at home for Dr. Porter if she's not living there, if she's living in this rental house instead of at her home in Norwich, when calculating estimated costs?

A.  No.  It's my understanding her husband still lives there.

Q.  Okay.  Did you estimate that utilities might --

Page 83

or consider that utilities or grocery costs might go down when there's --

A.  Well, I didn't look at grocery costs.  I'm assuming --

Q.  Any costs.

A.  -- it's a wash on groceries.  No.  I didn't back out what -- there might be a -- I don't know how they heat their hot water, but I suppose there could be a little savings that she's not taking showers there every day.

Q.  What's the basis for assuming that the mileage -- the cost per mile will increase at an annual rate of 1.5 percent?

A.  Just looking at what's happened to mileage rates over the last four, five years, six years.

Q.  Okay.  And so are these -- the annual housing rental, utilities, renters insurance, heat, and the travel mileage costs, those are the only extraordinary employment costs that you're considering in your estimate, correct?

A.  Yes.

Q.  So you've stated that "Commencing in July 2021, it is assumed Dr. Porter will incur hotel expenses of $2,500 a year, which will increase at a rate of 2 percent per year."  And that "The

Page 84

$2,500 figure is based on the assumption Dr. Porter would stay over in Burlington 10 to 12 nights a year at a cost ranging from $200 to $250 a night."

What's the basis for the assumption that she would stay over 10 to 12 nights a year?

A.  That was information provided to me, either -- I don't know if that was directly.  I believe it was provided -- Dr. Porter provided that information to counsel and counsel forwarded it on to me.

Q.  Okay.

A.  There may have been another -- I think there was another phone call in there, so that very well may have been discussed.  I think there was a second phone call.  And that might have been discussed then.

Q.  Okay.  But it was either from Dr. Porter or counsel?

A.  Yes.  Right.

Q.  Okay.  And what's the basis for the assumption that the cost would be 200 to $250 a night?

A.  I looked at the best hotel in Burlington, and that's what it was.

Q.  Okay.  And do you use a -- what's the basis for

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 85

the 2 percent per year increase for hotel expenses? Is that the same as the annual costs 2 percent number that you used before?

A. Yes.

Q. Okay. And why did you use a simple interest rate of 12 percent for interest on historical earnings losses from 2017 to 2019? This is in Footnote --

A. It is the state legal rate in Vermont.

COURT REPORTER: Did you want to say what footnote number it is?

ATTORNEY JOSEPH: Footnote Number 12.

COURT REPORTER: Thank you.

Q. And I see you used a discount rate of 1.46 percent to determine the present value of future income.

Did you consider any alternative sources for the discount rate?

A. No.

Q. And then moving to Footnote 14, which is the settlement income tax. Could you walk me through how you calculated this?

A. It's actually an iterative process, so again, best if I could give you an example.

So if I've got a -- an after-tax loss, say, of 200,000 that the person needs to be whole

Page 86

in a particular year -- or over a number of years; it doesn't make any difference -- the question then is how much taxes would they have to pay?

Now, if you just give them the 200,000, that's all taxable. That -- and that $200,000 figure is after taxes. That's what they need to be whole. So I've got to -- you've got to add some additional money in there.

So if you will, this is -- this is sort of the process I go through, but not quite so tedious. So if I was to get a -- if they were to get an additional 200,000 on top of the income they already earned, how much taxes would they have to pay?

So on 200,000, given that they're in a fairly high tax bracket, it -- it might be $80,000. Or let's say it's 60,000 just to make it easy. 60,000.

But now -- so you say, Well, I've got to get them 260,000. So now they put $260,000 on their tax return. Now it turns out they've got to pay another 5,000. On and on. Eventually you get to a point where you come up with a number. And that's that number in the last column.

Page 87

If Dr. Porter was awarded the number in the last column, she would have to pay the tax that's in the next-to-last column, thereby netting out what her after-tax loss would be in that particular year.

Q. Okay. And what rate did you use for each year?

A. I used the current tax rates. And they're in 2018. And so each one -- you know, it isn't very long before, given the high base income they have, that they're in the highest marginal tax bracket of 39.5 and 8 percent for the State of Vermont. So it's within three -- a couple years. You know, the marginal rate does not change.

Q. So you've used the same tax rates -- understanding you used the actual tax rates for 2017 and 2018, you used the same tax rate for 2019 onward in --

A. The same marginal tax brackets, yes.

Q. Okay.

A. You know, the rate -- there's, what, five -- obviously, in the individual years, I -- some of -- well, this income's quite high, so if it wasn't the highest marginal rate, I was pretty close to it.

Where when I move over to the

Page 88

settlement one, because of the amount of money -- they're -- on top of what they already currently earn, they're very quickly, I think maybe even the first year, if not the second year of my analysis, they're moving into the highest marginal tax bracket.

Q. Okay. So assuming that's correct, you used the same rate for all of the years subsequent to that?

A. My tax calculations in both columns are based on current tax rates in 2018.

Q. Okay. Is there a spreadsheet or notes that you have reflecting your calculations? How did you do those?

A. There is -- there is -- to the -- to the right of the table that I -- and it's in my report. There are several other columns that feed into various columns within the report.

So there is -- there actually may be a column -- there is a column there, I think, that has Dartmouth-Hitchcock earnings. It's off to the right. And it just transfers over one-to-one.

The fringe benefits for Dartmouth are based on a percentage -- a percentage figure plus

22 (Pages 85 to 88)

540889d0-4ff5-44c5-a75e-10182bf4ad3d

A-284

Page 89

the 15,000. And so that actually is derived by multiplying the numbers in the first column by -- I forget, by -- by 12 percent and then adding in 15,000.

Then, when you get over to the -- the last -- the next-to-last column, there are about four additional columns to the right that go through that whole tax calculation.

Q. But since this doesn't reflect the actual rates that were used, is there anywhere that I could get that information, aside from having to back out the calculation from the total economic loss versus the settlement income tax?

A. Run that by me again.

Q. Is there anywhere that I could get the actual rate that you -- the actual tax rate that was applied to calculate the settlement income tax?

A. Yes. You can divide column 11 by column -- let me put my glasses on. You can divide -- if you want the average rate, you can divide -- take column 14 and divide it by the number in column 15.

Q. Is there anywhere that you would have written down not just the average rate but how you actually broke down the calculation for each of

Page 90

the different marginal tax brackets?

A. As I indicated before, to the right of this spreadsheet there are -- I think it's four columns that actually go ahead and calculate the taxes.

It's an iterative process, much like I explained to you before, where I plug in a number, oh, that's not enough, I've got to plug in more, more; eventually I get to a place where it equates.

And that -- and that, in this case, I don't know, there may only be one or two years where I don't use the -- the highest marginal tax bracket, but it's very quickly, say no more than three years out. The formula doesn't change.

Q. Okay.

A. It's the same rate. Because they're -- they're over half a million dollars -- well over a half a million dollars.

Q. So when you say you plug in the numbers, are you just doing it by hand, or you're just calculating and making notes or...?

A. Yeah. What I do is I have a column there that I estimate -- I estimate what the taxes are. Well, I go to that column 12. I say, well, I'm going

Page 91

to take a guess. And I guess that it's going to be $100,000. And then 100,000 gets fed in and turns out, oh, no, it really is 120,000. So I plug in -- I go up and I plug in 140,000. Oh, that's too much. It's 130,000. And then I eventually get it down, bang, okay, it turns out to be it's $127,000.

Q. Did you review any of Plaintiff's actual tax returns to see what her actual effective tax rate was?

A. Yes.

Q. Okay. Which returns?

A. I have '18, I know. That's in the file. I believe I have '17, too.

Q. Okay. So you would have reviewed both --

A. I did.

Q. -- 2017 and 2018?

And so I think that you mentioned that you hadn't considered Plaintiff's existing commute to Dartmouth if she was still employed there in determining her pre-2021 extraordinary employment costs.

Was it considered post-2021? Did you adjust her -- did you adjust any of the travel costs based on what they would have been for

Page 92

Plaintiff if she was working at Dartmouth-Hitchcock after 2021?

A. No. I did not -- are you -- I'm not sure what your question is. Your question's going back to did I take account of the time that, if she was at Dartmouth-Hitchcock, she would have traveled from Norwich over to Dartmouth?

Q. The mileage.

A. The mileage?

Q. Yes.

A. I didn't.

Q. Okay.

A. But I -- I didn't, but I -- I don't know exactly where she lives in Norwich, so the 190 miles, you know, it -- it may be more than that, so. Like I indicated to you earlier today that my travel down, which was a little bit further, was about 100 to 102 miles, somewhere in that vicinity.

Q. Okay. Moving to Scenario B. And so we discussed that the assumptions in the analysis performed for Scenario B are the same as those for Scenario A until July 2021; is that correct?

A. That's correct. If I might add, so Footnotes 1 and 2 are the same. 3 is the same. 4 is different. I don't think 5 is different,

23 (Pages 89 to 92)

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 93

although it's applied to different years. And 6, 7, 8, and 9, 11, 12, 13, 14, and 15 are the same. And 10 is different.

So the difference really is 4 and 10.

Q.  For all of the assumptions for Scenario B, except for Footnotes 4 and 10, the basis for these assumptions would be the same as they were that we discussed for Scenario A, correct?

A.  Yes.

Q.  Scenario B assumes that Dr. Porter will leave her full-time position at the University of Vermont Medical Center and work part-time.

Is the basis for this assumption discussions with Dr. Porter or counsel?

A.  Yes.

Q.  And it assumes that she would work two days a week at the University of Vermont Medical Center for 48 weeks a year at a 2021 per diem rate of $190 per hour.

What's the basis for two days a week?

A.  Information provided by Dr. Porter. I can't remember if it was directly to me or if it was through counsel.

Q.  Were there any other amounts of time considered?

A.  No.

Page 94

Q.  And do you know whether those two days were going to be back-to-back days, so, you know, Monday and Tuesday, Tuesday and Wednesday, or were they just two days a week?

A.  I wasn't provided any guidance on that, but I've assumed that they'd be back to back, because otherwise I would have to have more hotels.

But I did -- let me back up. I did assume that she would stay over 10 -- somewhere between 10 and 12 nights. Some of that might be because she doesn't work back to back, but actually, I was thinking more about travel and if she had a late day where she didn't come out of surgery until, you know, late in the day, she might be too tired to -- to travel, particularly in the wintertime.

Q.  I don't think that is reflected in Footnote 10 for Scenario B.

A.  Oh, it isn't. Sorry. I did not make any assumption -- I assumed that she was going to -- oh, I'm confused. I'm sorry.

No. I assumed that she would still have her apartment or her condominium and still incur those same -- same expenses.

Q.  Okay. But no hotel costs?

Page 95

A.  No hotel. I'm sorry. That was after -- that was in the Scenario 1 --

Q.  Right.

A.  -- where she was going to commute up there one day a week.

Q.  Okay. And is the basis for your assumption that in 2021 she would be paid a $190 per hour per diem rate at UVMMC the same as the basis for that assumption in Footnote 4 for Scenario A?

A.  Yes.

Q.  And is your basis for assuming that her per diem rate at UVMMC would increase at an annual rate of 2.5 percent the same as it was in Footnote 4 in Scenario A?

A.  I used the same percent. I used the 2.5 in all of the income projections.

Q.  Okay. For Scenario B, looking at Footnote 10, you've listed for extraordinary employment costs annual housing rental costs, utilities, renters insurance, heat, and 9,100 miles of travel in 2017.

Are those all of the extraordinary employment costs that are considered for Scenario B?

A.  Yes.

Page 96

Q.  And that $45,300 a year in 2017 dollars for Scenario B is the same as it was for Scenario A, Footnote 10, I believe. Is that accurate?

A.  Yes. The difference is that this is carried out right out through the year 2023, where in Scenario 1 these housing costs were only carried out through June of 2021.

Q.  Right. Are the assumptions that you made to come to the total for annual housing rental costs in Scenario B, Footnote 10 the same as they were that we discussed for Footnote 10 with Scenario A?

A.  Yes.

Q.  So for this one also, you estimate now that the costs would be lower because she's renting a two-bedroom?

A.  She owns it. She's not renting it.

Q.  Okay.

A.  But it's a two-bedroom.

Q.  So what is the rental cost if she owns the --

A.  Well, she doesn't have any rental cost, but if you will, that represents she has an option of either renting or buying, and she decided to buy. And I think a reasonable estimate of what the cost would be would be the rental. And from a

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 97

purely economic standpoint, the opportunity cost of owning that place is what she can rent it for.

Q. Understood. So the discussion we had about housing rental costs with respect to Footnote 10 in Scenario A would apply also to Scenario B?

A. Yes.

Q. And is the same true for utilities, renters insurance, heat, and travel?

A. Yes.

Q. So it's the exact same calculation in Footnote 10 for Scenario B made using the exact same assumptions and the same basis for those assumptions as Scenario A, it's just projected out beyond July 2021?

A. Yes.

Q. Did you consider when calculating the costs in Footnote 10 for Scenario B whether they would change because she's only working two days a week at the University of Vermont instead of full-time?

A. No.

Q. Okay. What was your basis for assuming the analysis out to the year 2033 for both scenarios?

A. I believe in the conversation that I had with Dr. Johnson that she projected there was a

Page 98

possibility she'd work out to 70.

She liked what she was doing and would like to do it as long as she could. And she had no plans at that point of when she definitely would retire.

Q. You mean Dr. Porter?

A. Dr. Porter, I'm sorry. Dr. Porter would have retired. So therefore, I carried it out to 70. But again, I want to underscore that it's up to the trier of fact to determine how long he thinks or she thinks it would be reasonable for Dr. Porter to work out into the future. That's why I have a running total there.

So if the trier of fact thinks it's -- out through age 66 is -- is a reasonable area to truncate, then they can look at the corresponding number for the -- for age 66.

Q. On both of the projected lost earnings charts for Scenario A and Scenario B, there's a footnote that states "The year 2029 (under lined) is consistent with the worklife of a 56-year-old female with a graduate degree."

What's the basis for that assertion?

A. That's a study that was -- that's actually been done -- updated about four times. It's in the

Page 99

National Journal of Forensic Economics that looks at work lives by sex and age and education level.

The problem with it is that it has people with master's, as well as Ph.D.s and M.D.s. And if you look at education overall for -- they have less than high school, high school, some college, associate's degree, four-year degree, and then graduate degree. You see work lives increase, everything else being held constant and stuff. You look at female 50 years of age, if you follow them through those different education levels, the work life gets greater and greater.

One might expect, and I would expect that, that there would be an increase in work lives for somebody that had a Ph.D. in general than somebody with a master's.

So what I'm saying is that I think it's a conservative estimate of -- of an average work life.

Q. You mentioned a study. How recent was that study?

A. I think -- well, it's -- it's been -- I think this is the fourth update. And the last one, I think, was 2015.

Page 100

Q. Okay. So you would have reviewed whatever the most recent update was?

A. Yes.

Q. Did you assume any risk of normal termination, that she might not be able to -- that Plaintiff might not be able to work to any given year because of normal life events?

A. No, I did not. And that's why there is this running total in here. Unlike maybe in a personal injury case, where I'd render an opinion that I think the loss is X, the person would have worked out to their normal work life, and so when I do all the calculations, their loss is $850,000.

And in wrongful termination cases or employment cases, I put this running total in there because I'm going to let the trier of fact take into account those factors of -- that a person might not work there for X number of years.

They're going to hear a lot more testimony than I'm going to hear. And then it's up to them to make that decision that I think, well, it's reasonable to expect she would -- that Dr. Porter would work for 3 more years or 5 more

540889d0-4ff5-44c5-a75e-10182bf4ad3d

A-287

Page 101

years or 15 more years.

So I'm not rendering an opinion that she would work out to age 70. I'm not rendering an opinion that she would work out to age 60. I'm leaving that entirely up to the trier of fact.

Q. Okay. Let's take a five-minute break.

A. Okay.

(Recess taken.)

ATTORNEY JOSEPH: All right. Back on the record.

Q. Looking back at Exhibit 5, which is the file that you brought in, could you tell me, to the best of your ability, what, if any, documents you relied on that aren't in that file?

A. I did look at the 2000 -- I think it's 2019 fringe benefit package; the same as the '17, except it was 2019.

And I think -- I think I saw 2017 income tax returns. I think it may be on my computer. But more importantly was the -- in 2017 was the W-2s, which are in here.

I can't think of anything that --

Q. Okay. And is the 2017 tax return in this file?

A. No. I did not see it.

Page 102

Q. Okay. But you recall looking at --

A. I don't -- I'm -- don't hold me to it. I think it was there. But I may have just used the W-2s to get the income. But I think I did see the '17.

Q. Okay. So aside from the 2017 tax return and the 2019 benefits summary, there's nothing else you can recall that isn't in this file that's Exhibit 5 that you relied on?

A. No. No. I'm sure -- I'm pretty sure that everything I relied on in is in this, including, if you will, the fringe benefit from the 2017. I don't think there was any significant change.

At least there was no change in the retirement contribution in 2019. The weekly payments or monthly payments went up in '19 from the 2017. And that's all I can think of, yeah.

Q. Okay. And in Exhibit 5, there's this set of papers that, at the top, says "Table 11, Summary Statistics on Medical School Faculty Compensation for All Schools."

Did you use this document?

A. No.

Q. Okay. So you didn't rely on anything --

A. No. It was just sent to me.

Page 103

Q. Okay.

A. I didn't ask for it.

Q. That's all the questions I have.

ATTORNEY VITT: I have no questions.

(Whereupon, the deposition was concluded at 1:58 p.m.)

* * * * *

Page 104

SIGNATURE PAGE

I, ROBERT L. BANCROFT, Ph.D., do hereby certify that I have read the foregoing deposition transcript of my testimony, taken on October 30, 2019, and further certify it is a true and accurate record of my testimony. (Any corrections should be made on the separate errata sheet, which will then be attached to this signed transcript.)

Signed under the pains and penalties of perjury this _____ day of _____ 20____.

_____
ROBERT L. BANCROFT, Ph.D.

STATE OF _____

_____, SS.

At _____, in said county, this _____ day of _____ 20____, personally appeared before me the above-named ROBERT L. BANCROFT, Ph.D., and made oath that the foregoing answers subscribed by him are true.

_____
Notary Public
My Commission expires:_____

26 (Pages 101 to 104)

540889d0-4ff5-44c5-a75e-10182bf4ad3d

A-288

2:17-cv-00194-kjd    Document 198-4    Filed 02/14/25    Page 28 of 28

Page 105

CERTIFICATE

STATE OF VERMONT

DEPOSITION OF: ROBERT L. BANCROFT, Ph.D.

RE: MISTY BLANCHETTE PORTER, M.D. vs. DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH

CASE NO. 5:17-cv-194

I, KAREN L. WRIGHT, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public in and for the State of Vermont, do hereby certify as follows:

1. That ROBERT L. BANCROFT, Ph.D., the witness whose testimony is hereinbefore set forth, was duly recorded by me on Wednesday, October 30, 2019;

2. That such testimony was transcribed by me and is a true and accurate record of the testimony given by the said witness, to the best of my knowledge, skill, and ability;

3. I further certify that I am neither attorney for, nor related to or employed by any of the parties, nor financially interested in this matter; and

4. That a dash as used through this transcript is meant to represent an interruption in thought or between a question and answer.

IN WITNESS THEREOF, I hereunto set my hand and Notarial seal this 11th day of November, 2019.

_____
Karen L. Wright, RPR, CRR
Registered Professional Reporter,
Certified Realtime Reporter, and
Notary Public
My Commission Expires: 1/31/2021

Page 106

WITNESS'S ERRATA SHEET

WITNESS: ROBERT L. BANCROFT, Ph.D.

RE: MISTY BLANCHETTE PORTER, M.D. vs. DARTMOUTH-HITCHCOCK MEDICAL CENTER, et al.

CASE NO. 5:17-cv-194

INSTRUCTIONS: Enclosed herewith is the original transcription of your deposition to read and sign. Please use this errata sheet to clearly identify any corrections or changes you wish to make, referring to the corresponding page and line number along with your change, and sign the next-to-last page of this transcript before a Notary Public. DO NOT WRITE DIRECTLY ON THIS ORIGINAL TRANSCRIPT! Then return the errata sheet(s) and signed original transcript to either your attorney or the attorney who conducted this deposition.

PAGE _____    CORRECTION _____

LINE _____    REASON _____

_____

PAGE _____    CORRECTION _____

LINE _____    REASON _____

_____

PAGE _____    CORRECTION _____

LINE _____    REASON _____

_____

PAGE _____    CORRECTION _____

LINE _____    REASON _____

_____

_____
ROBERT L. BANCROFT, Ph.D.

Page 107

O'BRIEN REPORTING SERVICES, INC.
P.O. BOX 711
RUTLAND, VERMONT 05702
802-747-0199

November 11, 2019

Robert L. Bancroft, Ph.D.
c/o Vitt & Associates, PLC
P.O. Box 1229
Norwich, Vermont 05055

In Re: Misty Blanchette Porter, M.D. v. Dartmouth-Hitchcock Medical Center, et al. - Deposition of ROBERT L. BANCROFT, Ph.D.

Dear Dr. Bancroft:

Enclosed is the printed original of your deposition transcript, including the Exhibits 1 through 5, taken in the above matter to read and then sign before a Notary Public. An Errata Sheet is also enclosed for any changes/corrections. Kindly follow the instructions on this Errata Sheet.

Upon completion of the reading and signing by the witness, please return this transcript to Attorney Joseph.

If you have any questions, please call.

Regards,

Karen L. Wright, RPR, CRR

e-cc: Atty. Joseph

27 (Pages 105 to 107)

540889d0-4ff5-44c5-a75e-10182bf4ad3d