# 25-1382-cv(L), 25-3155-cv(XAP)

# United States Court of Appeals

## for the

## Second Circuit

MISTY BLANCHETTE PORTER, M.D.,

*Plaintiff-Appellee-Cross-Appellant,*

– v. –

DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, DARTMOUTH-HITCHCOCK HEALTH,
DARTMOUTH-HITCHCOCK MEDICAL CENTER,

*Defendants-Appellants-Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT (BURLINGTON)

## JOINT APPENDIX
### Volume 2 of 6 (Pages A-289 to A-578)

DONALD W. SCHROEDER
MORGAN MCDONALD
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199
(617) 342-4041
– and –
TRISTRAM J. COFFIN
DOWNS RACHLIN MARTIN PLLC
199 Main Street,
P.O. Box 190, 6th Floor
Burlington, Vermont 05402
(802) 863-2375

*Attorneys for Defendants-Appellants-
Cross-Appellees*

SARAH NUNAN
GEOFFREY J. VITT
VITT & NUNAN, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, Vermont 05055
(802) 649-5700
– and –
ERIC D. JONES
LANGROCK SPERRY & WOOL, LLP
210 College Street, Suite 400
Burlington, Vermont 05401
(802) 864-0217

*Attorneys for Plaintiff-Appellee-
Cross-Appellant*

CP COUNSEL PRESS  (800) 4-APPEAL • (390775)

i

## TABLE OF CONTENTS

Page

District Court Docket Entries ...................................... A-1

Complaint, filed October 11, 2017 ............................ A-35

    Attached to Complaint -
    Civil Cover Sheet.................................................... A-68

First Amended Complaint, filed August 1, 2018 ....... A-69

Certificate of Service of First Amended Complaint,
    filed August 1, 2018................................................ A-105

Defendants' Answer to Plaintiff's Amended
    Complaint, filed September 7, 2018 ...................... A-106

Mandate in Docket No. 20-3894, issued on
    February 27, 2024.................................................. A-133

Order of the United States Court of Appeals for the
    Second Circuit, filed February 27, 2024................ A-134

Motion *In Limine* by Defendants to Preclude the
Testimony of Robert Bancroft, filed
February 14, 2025 .................................................... A-234

Memorandum of Law by Defendants in Support of
Motion *In Limine*, filed February 14, 2025 .............. A-237

    Exhibit A to Memorandum of Law -
    Expert Report of Robert L. Bancroft, dated
    October 30, 2018 .................................................. A-247

    Exhibit B to Memorandum of Law -
    Expert Report of Robert L. Bancroft, dated
    October 1, 2019 .................................................... A-253

ii

|  | Page |
|---|---|

Exhibit C to Memorandum of Law -
Deposition Transcript of Robert L. Bancroft,
dated October 30, 2019 .......................................... A-261

Exhibit D to Memorandum of Law -
Expert Report of Robert L. Bancroft, dated
August 26, 2024 .................................................... A-289

Memorandum of Law by Plaintiff in Opposition to
Defendants' Motion *In Limine*, filed
February 28, 2025 ................................................. A-296

Notice of Hearing, filed March 6, 2025 ..................... A-309

Reply Memorandum of Law by Defendants in
Further Support of Motion *In Limine*, filed
March 11, 2025 ..................................................... A-310

Revised Notice of Hearing, filed March 13, 2025 ..... A-319

Transcript of Motion *In Limine* Hearing, dated
March 14, 2025 and filed March 19, 2025 ............ A-320

Renewed Motion *In Limine* by Defendants to
Preclude the Testimony of Robert Bancroft
("Renewed Motion"), filed March 20, 2025 .......... A-424

Exhibit A to Renewed Motion -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit B to Renewed Motion -
Expert Report of Robert L. Bancroft, dated
March 19, 2025 ..................................................... A-433

Memorandum of Law by Plaintiff in Opposition to
Defendants' Renewed Motion, filed
March 21, 2025 ..................................................... A-439

**iii**

|  | **Page** |
|---|---|
| Order Denying Motion to Preclude Robert Bancroft's Testimony, filed March 21, 2025 ......... | A-442 |
| Motion *In Limine* by Defendants to Preclude the Expert Report, filed March 26, 2025 ..................... | A-459 |
| Motion *In Limine* by Defendants Regarding Undisclosed Expert Opinions of Robert Bancroft, filed March 29, 2025............................................. | A-464 |

Exhibit 1 to Motion -
Expert Report of Robert L. Bancroft, dated
October 30, 2018
(Reproduced herein at pp. A-248 - A-252)

Exhibit 2 to Motion -
Expert Report of Robert L. Bancroft, dated
October 1, 2019
(Reproduced herein at pp. A-254 - A-260)

Exhibit 3 to Motion -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit 4 to Motion -
Expert Report of Robert L. Bancroft, dated
March 19, 2025
(Reproduced herein at pp. A-434 - A-438)

| Plaintiff's Opposition to Defendants' Motion *In Limine* Regarding Undisclosed Expert Opinions of Robert Bancroft, filed March 30, 2025 ............. | A-474 |

Exhibit A to Plaintiff's Opposition -
Deposition Transcript of Robert L. Bancroft,
dated October 30, 2019
(Reproduced herein at pp. A-262 - A-288)

iv

**Page**

Exhibit B to Plaintiff's Opposition -
Transcript of Motion *In Limine* Hearing, dated
March 14, 2025
(Reproduced herein at pp. A-320 - A-423)

Exhibit C to Plaintiff's Opposition -
Excerpts from the Rough Draft of Robert
Bancroft's Trial Testimony ..................................... A-484

Exhibit D to Plaintiff's Opposition -
Plaintiff's Response to Defendant Mary
Hitchcock Memorial Hospital's First Set of
Interrogatories Propounded on Plaintiff, dated
April 20, 2018......................................................... A-488

Exhibit E to Plaintiff's Opposition -
Dartmouth-Hitchcock 2017 Benefits Guide .......... A-492

Excerpts from the Jury Trial Transcript, dated
March 27, 2025 (Day 4)......................................... A-540

Excerpts from the Jury Trial Transcript, dated
March 28, 2025 (Day 5)......................................... A-547

Excerpts from the Jury Trial Transcript, dated
March 31, 2025 (Day 6)......................................... A-599

Excerpts from the Jury Trial Transcript, dated
April 2, 2025 (Day 8)............................................. A-747

Jury Trial Transcript, dated April 7, 2025 (Day 11)... A-757

Court Jury Charge, filed April 7, 2025 ...................... A-844

Excerpts from the Jury Trial Transcript, dated
April 8, 2025 (Day 12)........................................... A-876

Jury Charge, filed April 8, 2025................................. A-895

Jury Verdict Form, filed April 10, 2025 ..................... A-929

v

**Page**

Motion by Plaintiff for Prejudgment Interest, filed
April 23, 2025 ..................................................... A-936

Opposition by Defendants to Plaintiff's Motion for
Prejudgment Interest, filed May 7, 2025 ............... A-940

Index of Exhibits to Defendants' Opposition, filed
May 7, 2025 ........................................................ A-955

Exhibit 1 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
October 30, 2018
(Reproduced herein at pp. A-248 - A-252)

Exhibit 2 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
October 1, 2019
(Reproduced herein at pp. A-254 - A-260)

Exhibit 3 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit 4 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
March 19, 2025
(Reproduced herein at pp. A-434 - A-438)

Exhibit 5 to Defendants' Opposition -
DH Simple Interest Chart 12% .............................. A-957

Exhibit 6 to Defendants' Opposition -
DH Simple Interest Chart 3% ................................ A-959

Motion by Plaintiff for Attorneys' Fees, filed
May 8, 2025 ........................................................ A-961

vi

**Page**

Exhibit 1 to Motion for Attorneys' Fees -
Declaration of Geoffrey J. Vitt, dated
May 6, 2025 ........................................................ A-973

Exhibit 2 to Motion for Attorneys' Fees -
Declaration of Eric D. Jones, dated May 7, 2025,
with Exhibit A ..................................................... A-981

Exhibit A to Motion for Attorneys' Fees -
Vitt & Associates' Invoices for Professional
Services Rendered ............................................... A-993

Exhibit B to Motion for Attorneys' Fees -
DGW Kramer LLP's Invoices for Professional
Services Rendered ............................................... A-1254

Exhibit C to Motion for Attorneys' Fees -
Vitt & Associates' Invoices for Professional
Services Rendered ............................................... A-1262

Motion by Plaintiff to Amend Judgment, filed
May 8, 2025 ........................................................ A-1397

Reply by Plaintiff in Further Support of Motion for
Prejudgment Interest, filed May 21, 2025 ............. A-1404

Exhibit A to Plaintiff's Reply -
Excerpts from the Draft Trial Transcript of
March 28, 2025 ................................................... A-1413

Exhibit B to Plaintiff's Reply -
Excerpts from the Draft Trial Transcript of
March 26, 2025 ................................................... A-1428

Motion by Defendants to Alter or Amend the
Judgment and, in the Alternative, for a New Trial
on Plaintiff's VFEPA Claim, filed May 22, 2025 .. A-1445

Opposition by Defendants to Plaintiff's Motion to
Amend Judgment, filed May 22, 2025 .................. A-1459

vii

**Page**

Motion by Defendants for a New Trial Related to
Damages Issues, filed May 22, 2025 ...................... A-1468

Index to Exhibits to Defendants' Motion for a New
Trial Related to Damages Issues, filed
May 22, 2025 ........................................................ A-1481

Exhibit 1 to Defendant's Motion -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit 2 to Defendants' Motion -
Demonstrative Excerpt from Expert Report of
Robert L. Bancroft, dated March 19, 2025 ............ A-1482

Exhibit 3 to Defendants' Motion -
Robert Bancroft Cross Examination Exhibit,
Marked C19 .......................................................... A-1484

Exhibit 4 to Defendants' Motion -
Email Correspondence, dated June 6, 2017, with
Attachment ............................................................ A-1486

Opposition by Defendants to Plaintiff's Motion for
Attorneys' Fees, filed May 22, 2025 ...................... A-1499

Opposition by Plaintiff to Defendants' Motion to
Alter Judgment, filed June 5, 2025 ........................ A-1512

Reply by Plaintiff in Further Support of Motion to
Amend Judgment, filed June 5, 2025 .................... A-1523

Memorandum of Law by Plaintiff in Opposition to
Defendants' Motion for a New Trial, filed
June 5, 2025 .......................................................... A-1525

Reply Memorandum of Law by Plaintiff in
Response to Defendants' Opposition to Motion
for Attorneys' Fees, filed June 5, 2025 .................. A-1533

**viii**

**Page**

Exhibit A to Plaintiff's Reply Memorandum -
Itemized Chart and Invoices ................................. A-1542

Reply by Defendants in Further Support of Motion
to Alter Judgment, filed June 20, 2025 .................. A-1556

Reply Memorandum of Law by Defendants in
Further Support of Motion for a New Trial
Related to Damages Issues, filed June 20, 2025.... A-1566

Supplemental Memorandum of Law by Plaintiff in
Further Support of Motion for Attorneys' Fees,
filed June 25, 2025................................................. A-1574

Excerpts from the Post-Trial Motions Hearing,
dated July 1, 2025 ................................................. A-1577

Second Supplemental Memorandum of Law by
Plaintiff in Support of Motion for Attorneys'
Fees, filed July 11, 2025 ....................................... A-1591

Exhibit A to Second Supplemental
Memorandum -
Chart (Attorneys and Paralegals)........................... A-1594

Exhibit B to Second Supplemental
Memorandum -
Chart (Fees for Four Attorneys)............................. A-1596

Exhibit C to Second Supplemental
Memorandum -
Statements from Vitt & Nunan .............................. A-1597

Exhibit D to Second Supplemental
Memorandum -
Statements from Langrock, Sperry & Wool .......... A-1604

ix

**Page**

Response by Defendants in Opposition to Plaintiff's
    Second Supplemental Memorandum in Support
    of Motion for Attorneys' Fees, filed
    July 18, 2025 ........................................................ A-1607

Judgment of the United States District Court for the
    District of Vermont, filed April 24, 2025,
    Appealed From (Doc. 297), with Notice to
    Litigants ................................................................ A-1612

Notice of Appeal by Defendants, filed
    May 27, 2025 ........................................................ A-1614

Order of the Honorable Kevin J. Doyle, filed
    July 7, 2025, Appealed From (Doc. 329) ............... A-1616

Order of the Honorable Kevin J. Doyle, filed
    November 26, 2025, Appealed From (Doc. 334) .. A-1619

Opinion and Order of the Honorable Kevin J.
    Doyle, filed November 26, 2025, Appealed From
    (Doc. 335) ............................................................. A-1630

Order of the Honorable Kevin J. Doyle, filed
    November 26, 2025, Appealed From (Doc 336) ... A-1685

Order of the Honorable Kevin J. Doyle, filed
    November 26, 2025, Appealed From (Doc. 337) .. A-1697

Amended Judgment of the United States District
    Court for the District of Vermont, filed December
    2, 2025, Appealed From (Doc. 338) ...................... A-1713

Notice of Cross-Appeal by Plaintiff, filed
    December 15, 2025 ................................................ A-1715

Amended Notice of Appeal by Defendants, filed
    December 16, 2025 ................................................ A-1717

A-289

# Exhibit D

**Robert L. Bancroft, Ph.D.**

405 Brookside Road
Westford, VT  05494

Tel (802) 879-7386
E-mail Ban_econ@msn.com

August 26, 2024

Geoffrey J. Vitt, Esq.
Vitt & Associates, PLC
P.O. Box 1229
Norwich, VT  05055

Re:  Porter v. Dartmouth-Hitchcock Medical Center, et al.

Dear Mr. Vitt:

As discussed, I have undertaken an analysis of Dr. Misty Blanchette Porter's lost earnings, due to the loss of her employment with the Dartmouth-Hitchcock Medical Center (DHMC) in June 2017. Additionally, I have developed an estimate of Dr. Porter's extraordinary University of Vermont (UVM) employment costs.

The projection of Dr. Porter's 2017 DHMC income is based on the assumption she would continue to be on disability until mid-November, at which time she would return to full time status. Her 2017 full time salary was $305,539. It is assumed she would receive a 2.5% salary increase commencing in July 2018. It is further assumed she would have been promoted to full professor in 2019 with a 5% increase in her salary. In subsequent years, her salary is projected to increase at an annual rate of 3%. The estimate of her lost fringe benefits includes DHMC's contribution to a retirement plan and medical insurance.

Dr. Porter's actual post-termination UVM and the University of Vermont Medical Group (UVMMG) income is reported for the years 2017 through 2023. The 2024 projection is based on her 2022 and 2023 income and a 3% salary inflator. Commencing in January 2025, it is assumed she will communes working at a 60% FTE level absent an on call requirement.

The annual estimates of Dr. Porter's gross lost earnings are reduced for the income taxes she would be expected to pay on her reduced annual earnings. The annual, after-tax, lost earnings are then adjusted to reflect present values as of October 2024.

The second to last column in each table presents a moving total of the present values of Dr. Porter's annual, after-tax, lost income. These cumulative present values do not take into account the income taxes that would be assessed on any award. The next to last column in the table presents estimates of the additional sums that would be needed to cover the income tax obligations of receiving a particular settlement. If for instance, Dr. Porter is to be fully compensated for her after-tax, lost earnings through the year 2033 of $2,210,258, she will need an additional $2,119,000 to cover the income taxes on receiving such an award, thus bringing the total settlement award to $4,329,258.

A-291

Re: Dr. Misty Blanchette Porter
May 26, 2024
Page 2


Based on information provided by Dr. Porter, I have estimated her extraordinary UVM employment costs. The costs cover five categories. They are electric and heating costs attribute to her Burlington condominium. Her rental costs for the first 11 months of her UVM employment are also included. Additionally, Dr. Porter and her husband's UVM related travel costs are estimated. The present value of these additional employment costs is $359,051.

If you have any questions or if I can be of further assistance, do not hesitate to contact me.


Sincerely,

*Robert L Bancroft*

Robert L. Bancroft, Ph.D.

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 14 of 300

A-292

2:17-cv-00194-kjd     Document 198-5     Filed 02/14/25     Page 4 of 7

# Projected Lost Earnings for Dr. Misty Blanchette Porter

Reduce University of Vermont Medical Center Appointment to 60% of a FTE Without Call, Starting January 1, 2025

Prepared by:  Robert L. Bancroft, Ph.D.

August 26, 2024

| | | Dartmouth-Hitchcock Medical Center | | | Post-Termination Projections (UVM) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Year | Age | Gross Earned Income | Fringe Benefits | Total Earnings | Gross Earned Income | Fringe Benefits | Total Earnings | Gross Adjusted Lost Earnings | Income Taxes | Tax Adjusted Lost Earnings | Present Value | Cumulative Present Value | Settlement Income Tax | Total Economic Loss |
| 2017 ^ | 54 | $180,954 | $25,623 | $206,578 | $180,340 | $4,514 | $184,854 | $21,724 | ($240) | $21,484 | $39,639 | $39,639 | $48,000 | $87,639 |
| 2018 | 55 | $309,358 | $43,805 | $353,163 | $217,607 | $23,545 | $241,152 | $112,011 | ($35,783) | $76,228 | $133,781 | $173,419 | $174,000 | $347,419 |
| 2019 | 56 | $324,826 | $45,995 | $370,822 | $254,995 | $27,590 | $282,585 | $88,236 | ($27,234) | $61,002 | $99,738 | $273,158 | $270,000 | $543,158 |
| 2020 | 57 | $334,571 | $47,375 | $381,946 | $269,272 | $29,135 | $298,407 | $83,539 | ($25,467) | $58,072 | $87,980 | $361,137 | $354,000 | $715,137 |
| 2021 | 58 | $344,608 | $48,797 | $393,405 | $329,333 | $35,634 | $364,967 | $28,438 | ($5,957) | $22,480 | $31,360 | $392,497 | $384,000 | $776,497 |
| 2022 | 59 | $354,946 | $50,260 | $405,207 | $310,271 | $33,571 | $343,842 | $61,364 | ($17,423) | $43,941 | $56,025 | $448,522 | $437,000 | $885,522 |
| 2023 | 60 | $365,595 | $51,768 | $417,363 | $300,741 | $32,540 | $333,281 | $84,082 | ($25,293) | $58,789 | $67,901 | $516,423 | $502,000 | $1,018,423 |
| 2024 | 61 | $376,563 | $53,321 | $429,884 | $305,506 | $33,056 | $338,562 | $91,322 | ($27,712) | $63,610 | $65,836 | $582,260 | $565,000 | $1,147,260 |
| 2025 | 62 | $387,859 | $75,449 | $463,309 | $162,750 | $32,661 | $195,411 | $267,898 | ($87,793) | $180,105 | $176,995 | $759,254 | $734,000 | $1,493,254 |
| 2026 | 63 | $399,495 | $77,918 | $477,413 | $167,633 | $33,764 | $201,396 | $276,017 | ($90,426) | $185,591 | $177,954 | $937,209 | $904,000 | $1,841,209 |
| 2027 | 64 | $411,480 | $80,469 | $491,949 | $172,661 | $34,905 | $207,566 | $284,383 | ($93,139) | $191,244 | $178,920 | $1,116,128 | $1,075,000 | $2,191,128 |
| 2028 | 65 | $423,824 | $83,105 | $506,930 | $177,841 | $36,085 | $213,927 | $293,003 | ($95,933) | $197,070 | $179,891 | $1,296,019 | $1,246,000 | $2,542,019 |
| 2029 | 66 | $436,539 | $85,829 | $522,369 | $183,177 | $37,306 | $220,483 | $301,886 | ($98,811) | $203,074 | $180,868 | $1,476,888 | $1,418,000 | $2,894,888 |
| 2030 | 67 | $449,635 | $88,644 | $538,280 | $188,672 | $38,570 | $227,241 | $311,038 | ($101,776) | $209,263 | $181,852 | $1,658,740 | $1,592,000 | $3,250,740 |
| 2031 | 68 | $463,124 | $91,554 | $554,678 | $194,332 | $39,877 | $234,209 | $320,469 | ($104,829) | $215,640 | $182,842 | $1,841,581 | $1,767,000 | $3,608,581 |
| 2032 | 69 | $477,018 | $94,560 | $571,578 | $200,162 | $41,229 | $241,391 | $330,187 | ($107,974) | $222,213 | $183,837 | $2,025,419 | $1,942,000 | $3,967,419 |
| 2033 | 70 | $491,329 | $97,667 | $588,996 | $206,167 | $42,628 | $248,795 | $340,201 | ($111,213) | $228,988 | $184,839 | $2,210,258 | $2,119,000 | $4,329,258 |

^    Partial year (June 4  through Dec. 31).

The year 2033 (under lined) is consistent with the worklife of a 61 year old female with a graduate degree..

A-293

## ASSUMPTIONS
### Projected Lost Earnings for Dr. Misty Blanchette Porter
Reduce University of Vermont Medical Center Appointment to 60% of a FTE,
Without Call, Starting January 1, 2025
August 26, 2024

Footnote

1    The projection of Dr. Porter's 2017 Darmouth-Hichcock Medical Center (DHMC) income is composed of her actual DHMC income, an additional $68,000 of disability income and one and a half months at her full time salary of $305,539. In July 2018, it is assumed her salary would increase by 2.5%. The 2019 projection is based on the assumption she would be promoted to a full professor and receive a 5% salary increase. In subsequent years, it is assumed she would receive annual wage increases of 2.5%.

2    Dr. Porter's fringe benefits, given her continued employment with DHMC, include the medical center's contribution to health insurance and a retirement plan. The value of DHMC's medical insurance contribution is assumed to be $15,000 in 2017. The value of this contribution is assumed to increase at an annual rate of 4% through 2024. After 2024, DHMC's contribution to medical insurance is assumed to equal 5.3% of her earned income. DHMC's retirement plan contributions is assumed to be 12% of her earned income. The value of DHMC's health insurance contributions is excluded from June 3, 2017 through December 31, 2024 period, as it is assumed Dr. Porter will receive comparable coverage through the University of Vermont (UVM).

3    The addition of DHMC's gross income and fringe benefits.

4    Dr. Porter's actual earned income is reported for the years 2017 through 2023. The projection of her 2024 income is based on the average of her income her UVM and University of Vermont Medical Center (UVMMC) income in the prior two years. Beginning in January 2025, it is assumed Dr. Porter will leave her full-time position at UVMMC and accept a 60% part -time position without a call obligation. Her future UVMMC income is assumed to increase at an annual rate of 3%.

5    UVM's contributions to a retirement plan is assumed to equal 8.5% of her income. UVM's contribution to the Old Age component of Social Security is assumed to equal 2.32% of her income from 2017 through 2025. From June 2017 through December 2024, UVM's contribution to Dr. Porter's health insurance policy is excluded as it is comparable to DHMC's contribution, which is also excluded from DHMC fringe benefit calculations during the time Dr. Porter is assumed to work full time at UVMMC (see footnote 2). Beginning in January 2025, it is assumed UVM will no longer be fully funding her health insurance. UVM's contribution will be reduced by 40%, given her 60% FTE appointment. The value of UVMMC's health insurance after 2024 is derived by multiply DHMC's projected cost by 60%.

6    The addition of post-termination gross income and fringe benefits.

7    The difference between DHMC and post-termination projections of total earnings.

8    Estimated income taxes (federal and state) Dr. Porter would have had to pay on the difference between DHMC and post-termination projections of total earnings.

A-294

9    Gross lost earnings less income taxes.

10    A simple interest rate of 12% is used to compute interest on the historical earnings losses (2017 - 2024). A discount rate of 2.49% (5 year, tax-free, AAA, municipal bonds, August 26, 2024, Bloomberg web site) is used to derive the present value of future income streams. An October 2024 settlement is assumed.

11    A running total of annual present values from previous column.

12    Additional amount needed to pay income taxes on an award sufficient to insure an after-tax settlement, in each year, consistent with amount specified in prior column. The estimated state and federal income tax is based on current tax laws.

13    Addition of the cumulative present value and settlement income tax columns.

# Additional University of Vermont Employment Related Costs for Dr. Misty Blanchette Porter

Prepared by:  Robert L. Bancroft, Ph.D.

August 26 2024

| | | (1) | (2) | (3) | (4) | (5) | (6) (1) through (5) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Travel | | | Present | Cumulative Present |
| Year | Age | Electric Utilities | Heat | Rent | Dr. Porter | Husband | Total | Value | Value |
| 2017 ^ | 54 | $1,050 | $1,169 | $21,000 | $5,138 | $5,138 | $33,495 | $61,799 | $61,799 |
| 2018 | 55 | $1,249 | $836 | $12,000 | $5,234 | $5,234 | $24,552 | $43,090 | $104,888 |
| 2019 | 56 | $2,251 | $572 | | $5,570 | $5,570 | $13,964 | $22,831 | $127,719 |
| 2020 | 57 | $1,958 | $607 | | $5,522 | $5,522 | $13,610 | $20,619 | $148,339 |
| 2021 | 58 | $2,754 | $494 | | $5,378 | $5,378 | $14,004 | $19,536 | $167,874 |
| 2022 | 59 | $1,943 | $485 | | $5,810 | $5,810 | $14,049 | $17,912 | $185,787 |
| 2023 | 60 | $2,015 | $513 | | $6,291 | $6,291 | $15,109 | $17,451 | $203,237 |
| 2024 | 61 | $2,028 | $511 | | $6,435 | $6,435 | $15,409 | $15,948 | $219,186 |
| 2025 | 62 | $2,079 | $525 | | $6,596 | $6,596 | $15,795 | $15,795 | $234,981 |
| 2026 | 63 | $2,131 | $531 | | $6,760 | $6,760 | $16,183 | $15,517 | $250,498 |
| 2027 | 64 | $2,184 | $541 | | $6,929 | $6,929 | $16,584 | $15,516 | $266,013 |
| 2028 | 65 | $2,239 | $550 | | $7,103 | $7,103 | $16,994 | $15,512 | $281,526 |
| 2029 | 66 | $2,295 | $559 | | $7,280 | $7,280 | $17,414 | $15,510 | $297,036 |
| 2030 | 67 | $2,352 | $568 | | $7,462 | $7,462 | $17,845 | $15,507 | $312,543 |
| 2031 | 68 | $2,411 | $578 | | $7,649 | $7,649 | $18,286 | $15,505 | $328,048 |
| 2032 | 69 | $2,471 | $587 | | $7,840 | $7,840 | $18,739 | $15,502 | $343,551 |
| 2033 | 70 | $2,533 | $597 | | $8,036 | $8,036 | $19,202 | $15,500 | $359,051 |

^    Partial year (June 4  through Dec. 31).

Column Number

1-5   Information provided by Dr. Porter.

7     A simple interest rate of 12% is used to compute interest on the historical earnings losses (2017 - 2023).  A discount rate of 2.49% (5 year, tax-free, AAA, municipal bonds, August 26, 2024, Bloomberg web site) is used to derive the present value of future income streams.  An October 2024 settlement is assumed.

The year 2033 (under lined) is consistent with the worklife of a 61 year old female with a graduate degree..

**A-296**

## UNITED STATES DISTRICT COURT
### DISTRICT OF VERMONT

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D., ) ) | |
|       **Plaintiff,** ) | |
| ) | |
| v. ) | **Docket No. 2:17-CV-194** |
| ) | |
| DARTMOUTH-HITCHCOCK ) | |
| MEDICAL CENTER, ) | |
| DARTMOUTH-HITCHCOCK ) | |
| CLINIC, MARY HITCHCOCK ) | |
| MEMORIAL HOSPITAL, and ) | |
| DARTMOUTH-HITCHCOCK ) | |
| HEALTH, ) | |
|       **Defendants.** ) | |

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE THE TESTIMONY OF ROBERT BANCROFT

Plaintiff Misty Blanchette Porter, M.D. ("Dr. Porter") submits this Memorandum to oppose the Motion *in Limine* to Exclude the Testimony of Robert Bancroft (Doc. 198) filed by Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth Health"). Dartmouth Health fails to show a valid reason for excluding Robert Bancroft's testimony, and the Court should therefore deny Defendants' motion.

According to Dartmouth Health, Robert Bancroft, Ph.D. ("Dr. Bancroft") "is unqualified" and "his opinions … are unreliable." (*See* Doc. 198-1 at 1.)  Dartmouth Health's arguments are completely unfounded and should be rejected.  As Dartmouth Health's local law firm is undoubtedly aware, Dr. Bancroft is a well-established forensic economist who has testified and consulted in thousands of cases pending before nearly every court—state and federal— throughout Vermont over the past four decades.  He is eminently qualified to testify as an expert

economist on economic losses in all types of cases, including wrongful employment termination cases. His analyses and methodology have routinely been accepted as reliable by many courts, including this court. *See Bilodeau v. Usinage Berthold, Inc.*, No. 5:22-cv-101, 2024 WL 3744150, at *3–*4 (Crawford, J.) (D. Vt. Aug. 9, 2024) (adopting the expert report of Dr. Bancroft in awarding damages, noting "[t]he economic assumptions and projections are reasonable and reflect a conservative approach to the economic loss issues"). There is no reason to exclude Dr. Bancroft's testimony in this case.

FACTS

Since 1980 Dr. Bancroft has worked as an economist. From serving as an Economist for the United States Department of Agriculture, to teaching as an Assistant Professor and an Adjunct Professor at the University of Vermont, to spending over 40 years as an Economic Consultant, he has spent his full career in the field of economics. (Doc. 198-4 at 6–10.) Dr. Bancroft holds a Bachelor's Degree in Economics from the University of Vermont, a Master's Of Science Degree in Agricultural Economics from the University of Vermont, and a Doctor of Philosophy (Ph.D.) Degree in Agricultural Economics from Purdue University. (*Id.* at 4.)

Dr. Bancroft has been engaged as an expert economist in over 2,500 lawsuits. (*Id.* at 15.) Since the year 2000, nearly 20% of Dr. Bancroft's consulting work has been for cases concerning employment termination. (*Id.*) Dr. Bancroft has testified in over 100 cases. (*Id.* at 17.) At the time of his deposition on October 30, 2019, Dr. Bancroft had approximately 20 current cases, "and a couple of them are wrongful termination." (*Id.* at 33.)[1]

---

[1] Dr. Bancroft is so widely known among the members of Vermont's employment law bar as a qualified forensic economist in employment cases that the Court can likely take judicial notice of his long-standing history as an expert in such cases. If needed, Plaintiff is confident that numerous employment law practitioners would submit affidavits in support of this proposition.

2

A-298

As part of this lawsuit, Dr. Porter engaged Dr. Bancroft to analyze her economic losses and provide expert testimony in support of her claims for damages (which include claims for lost wages, lost benefits, compensatory damages, and future lost income). Dr. Bancroft issued a preliminary report on October 30, 2018. (Doc. 198-2.) During the seven-and-a-half years that this case has been pending, Dr. Bancroft has updated his preliminary report twice. First, in advance of his deposition testimony in this case Dr. Bancroft updated his analyses so that the parties had current information for the deposition; this updated report was issued on October 1, 2019. (Doc. 198-3.) Then, after the United States Court of Appeals for the Second Circuit remanded this case for trial, Dr. Bancroft again issued an updated report, which is dated August 26, 2024. (Doc.198-5.) The purpose of these updates was to provide current analysis in light of new facts that occurred as time passed. (Doc. 198-4 at 33, 68.) In these updated reports, Dr. Bancroft only updated factual information to reflect what had actually happened with the passage of time. He did not change his methodology or approach.

Dr. Bancroft has relied upon a consistent and accepted methodology for decades. (*Id*. at 41, 45–46.) His first step is to project out what the plaintiff would have earned if she had not been fired (salary plus fringe benefits). (*Id*. at 39–40.) Next, he calculates post-termination earnings (again including monetary earnings plus benefits). (*Id*. at 40.) He then offsets these interim earnings from the initial lost earnings to calculate the "gross loss." (*Id*. at 41.) The next steps are (1) to estimate the income taxes that would have been paid, and (2) to determine the present value of the loss by adding interest to historical losses and discounting future loss projections to the present. (*Id*.). Finally, Dr. Bancroft analyzes the tax liability that would be incurred by payment of a settlement or damages award and compares this tax liability to the tax liability that would have resulted from the timely payment of earnings if employment had not

3

**A-299**

been terminated. Since a lump sum payment in one year likely produces a significantly larger liability than regular payments over time, a true "make whole" payment requires a "gross up" to any award. (*Id*. at 42.) This methodology is not controversial, it is not novel, and it is not experimental; in sum, it is not "junk science." Dr. Bancroft's analysis is, however, highly valuable to a jury or a judicial fact finder when undertaking the task of assessing damages. *See, e.g., Bilodeau,* 2024 WL 3744150, at *3–*4.

## LEGAL STANDARDS

Rule 702 of the Federal Rules of Evidence, as amended in 2000 to reflect the Supreme Court's decisions in *Daubert v. Merrill Dow Pharm., Inc.,* 509 U.S. 579 (1993) and *Kumho Tire v. Carmichael,* 526 U.S. 137 (1999), governs the admissibility of expert testimony. The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts and data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert,* the Supreme Court, emphasizing the "liberal thrust" of the Rules of Evidence favoring the admissibility of expert testimony, rejected the "general acceptance" test of *Frye v. United States,* 293 F. 1013, 1014 (D.C. Cir. 1923). *Daubert,* 509 U.S. at 588. In the Second Circuit, it is a "well-accepted principle" that Rule 702 embodies a "liberal standard of admissibility for expert opinions." *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir. 2005); *see also Amorgianos v. Nat'l RR Passenger Corp.,* 303 F.3d 256, 265 (2d Cir. 2002) (observing departure, under Rule 702, from the *Frye* standard); *Drake v. Allergan, Inc.,* No.

4

2:13-cv-234, 2014 WL 5392995, at *2 (D. Vt. Oct. 23, 2014) (*Daubert* emphasized "liberal thrust" of the Federal Rules of Evidence, favoring the admissibility of expert opinion testimony).

With the foregoing in mind, under *Daubert* and its progeny, trial courts maintain a "gatekeeping responsibility" of ensuring that expert testimony is admissible, *i.e.,* that it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597; *see also Amorgianos,* 303 F.3d at 265. To fulfill its gatekeeping role, the trial court should consider Rule 702's admissibility requirements, which the Second Circuit has delineated into three broad criteria: (1) qualifications;[2] (2) reliability; and (3) relevance. *Nimely,* 414 F.3d at 396–397. However, the trial court's gatekeeping role under Rule 702 was not intended to serve as a replacement for the adversary system. *See, e.g.,* Fed. R. Evid. 702, Advisory Committee Notes, 2000 amend.; *Royal Park Investments SA/NV v. Deutsche Bank National Trust Co.,* No. 14-CV-4394, 2018 WL 1750595, at *7 (S.D.N.Y. April 11, 2018) (despite establishment of gatekeeper function, the *Daubert* test is nonetheless "a liberal" and "permissive" standard of admissibility); *Floyd v. City of New York*, 861 F.Supp.2d 274, 286 (S.D.N.Y. 2012). Instead, the traditional method for attacking admissible expert testimony deemed "shaky" by a challenging party is not to exclude the expert testimony but rather to engage in "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Gonyea v. Irick Excavating*, No. 2:08-cv-00242, 2010 WL 11606974, at *3 (D. Vt. Aug. 12, 2010) (quoting *Daubert,* 509 U.S. at 595); *see also Olin Corp. v. Certain Underwriters at Lloyd's London,* 468 F.3d 120, 134 (2d Cir. 2006) (approving the techniques of cross-examination and presentation of opposing expert testimony to expose weaknesses in an expert's testimony).

---

[2] Courts within the Second Circuit have "liberally construed" expert qualification requirements. *See, e.g., In re MTBE Prods. Liab. Litig.*, No. M21-88, 2008 WL 1971538, at *5 (S.D.N.Y May 7, 2008).

Furthermore, the focus of the trial court's inquiry must be solely on principles and methodology, not on the conclusions they generate. *Daubert,* 509 U.S. at 595, *Campbell ex rel. Campbell v. Metropolitan Prop. & Cas. Ins. Co.,* 239 F.3d 179, 186 (2d Cir. 2001) (arguments that an expert's conclusions are wrong go to the weight of the evidence, not its admissibility). However, only serious flaws in an expert's methodology or reasoning warrant exclusion, *Amorgianos,* 303 F.3d at 267 (emphasis added), and as long as an expert's testimony rests upon "good grounds, based upon what is known," it should be tested by the adversary process— competing expert testimony and active cross-examination—rather than being excluded. *Daubert,* 509 U.S. at 596. Thus, the court should not weigh the correctness of an expert's opinion or choose between conflicting expert opinions, *see, e.g., Perkins v. Origin Medsystems, Inc.,* 299 F.Supp.2d 45, 54 (D. Conn. 2000), and if an expert's testimony lies within "the range where experts might reasonably differ," the jury, and not the court, "should decide among the conflicting views of different experts." *In re Fosamax Product Liability Litig.,* 645 F.Supp.2d 164, 173 (S.D.N.Y. 2009) (quoting *Kumho Tire,* 526 U.S. at 153).

If proffered expert testimony is relevant (an element the Defendants here do not challenge), the court should then determine whether the testimony has a sufficiently "reliable foundation" to permit it to be considered by the trier of fact. *Daubert*, 509 U.S. at 597; *see also Campbell,* 239 F.3d at 185. The reliability inquiry is a "flexible one," and the trial judge enjoys "broad latitude" in deciding how to determine reliability. *Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 316 (D. Vt. 2002) (citing *Kumho Tire,* 526 U.S. at 142).

The flexible *Daubert* inquiry thus provides the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact. *Amorgianos,* 303 F.3d at 267. Indeed, "[I]t is well-

established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence." *Mobile Medical Intern. Corp. v. Advanced Mobile Hosp. Systems, Inc.*, No. 2:07-cv-231, 2015 WL 778553, at *2 (D. Vt. Feb. 24, 2015) (quoting *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). Thus, while expert testimony should be excluded if it is speculative or conjectural, or based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other challenges to the testimony go the weight, not the admissibility, of the testimony. *Boucher,* 73 F.3d at 21 (internal citations and quotations omitted); *Gonyea,* 2010 WL 11606974 at *6 (criticisms of expert's methodology and conclusions went to weight of testimony, and not admissibility, as testimony was likely to assist the trier of fact).

Applying these standards, Dr. Bancroft's testimony is clearly admissible.

ARGUMENT

**I.      Dr. Bancroft Is Qualified to Testify as a Forensic Economist To Show Plaintiff's Financial Losses**

Dr. Bancroft is clearly qualified to testify as an expert economist in this case. He possesses a Bachelor's degree, a Master's degree, and a Ph. D. in the field of economics. He has taught economics at the University of Vermont as an Associate Professor and as an Adjunct Professor. And, he has over 40 years of experience in the field. Moreover, as a forensic economist, he has consulted on over 2,500 cases, including testifying in over 100 cases. Courts—including this court—have routinely acknowledged his qualifications. There is no serious question about Dr. Bancroft's qualifications.

Dartmouth Health argues that Dr. Bancroft is unqualified because he has no professional licenses and he has not published a professional paper in the last 20 years. (Doc. 198-1 at 2.) This observation is completely irrelevant. There is no requirement that a person have a license to

7

serve as a credentialed economist. Moreover, there is no expectation or requirement that Dr. Bancroft publish professional articles in order to maintain his standing. Dr. Bancroft has relied upon a consistent and established methodology for over 20 years. He is not developing new theories or methods to support his work, so there is nothing to publish. Also, since he is no longer in academia, there is no professional reason to publish. These issues are red herrings that have no bearing on Dr. Bancroft's qualifications at all.

Dartmouth Health then seeks to question Dr. Bancroft's qualifications by claiming that he somehow lacks experience in employment cases. In support, they rely on testimony that at the time of his deposition he had only consulted on 2 employment cases in the past 4 years. (Doc. 198-1 at 5.) This argument is disingenuous for two reasons. First, Defendants completely disregard Dr. Bancroft's significant experience in employment cases dating back to the year 2000. There is nothing special about the past four years that renders Dr. Bancroft's prior experience stale. As Dr. Bancroft testified, his methodology has not changed in the past 20 years. There is no basis to disregard Dr. Bancroft's work on employment cases just because he only worked on two such cases over a particular four-year period. Second, the lost earnings analysis and methodology Dr. Bancroft deploys is the same in employment cases as it is in personal injury cases and other cases where a plaintiff claims to have lost earnings. Dartmouth Health cannot evade Dr. Bancroft's expertise by claiming that there is something unique about the lost earnings analysis in employment cases.

Unable to present a credible challenge to Dr. Bancroft's actual professional qualifications, Dartmouth Health instead launches a cheap personal attack based on an obvious joke Dr. Bancroft made in his deposition. Dartmouth Health suggests that Dr. Bancroft suffers from a memory deficit condition that renders him unqualified to testify. (Doc. 198-1 at 2, 7.) The basis

for this unfounded statement is a clear joke. When explaining that he could not remember how long a certain telephone conversation with Plaintiff had lasted, Dr. Bancroft made a self-effacing joke about having "a short-term memory deficit, but now it's turning into long." (Doc. No. 198-4 at 32.) It is clear from the context of the comment that Dr. Bancroft was joking. Defendants' lawyer also understood that the comment was a joke; if she thought for one second that Dr. Bancroft was serious, she certainly would have engaged in follow-up inquiry. The fact that counsel did not explore the matter at all shows that she knew that the comment was intended to be humorous.

Finally, Dartmouth Health suggests that Dr. Bancroft is somehow unqualified because, according to them, he relied upon speculation or subjective experience in drafting his reports. (Doc. 198-1 at 5–6.) The example of speculation that Dartmouth Health cites is a preliminary assumption in Dr. Bancroft's first report that Dr. Porter would resign her full-time position with the University of Vermont and take a part time job closer to her home starting in July 2021. Then, in a subsequent report, Dr. Bancroft changed this assumption to one that she would leave her full time UVM position in January 2025. Dartmouth Health characterizes these assumptions as "hypotheticals" and then argues that Dr. Bancroft has relied upon speculation so severe that he has become unqualified to testify. (Doc. 198-1 at 6.) Dartmouth Health ignores Dr. Bancroft's explanation that he updated reports as facts unfolded with time. While Dr. Porter initially projected that she would resign her full-time position at UVM to find a part-time job closer to her Norwich home in 2021, that did not happen. Instead, she remained in her full-time position and changed her projected horizon for a change to 2025. Dr. Bancroft merely updated his report

A-305

to reflect these facts as they arose.[3] Thus, Dartmouth Health's final effort to question Dr. Bancroft's qualifications fails.

## II.    Dr. Bancroft's Opinions and Analyses Are Reliable and Admissible

Just as Dr. Bancroft is clearly qualified to testify, his opinions and analyses are sufficiently reliable that they may be admitted into evidence. Dr. Bancroft has been recognized as a qualified and credible expert for over four decades. He relies upon a consistent and established methodology that Dartmouth Health does not even question. For this reason, Dr. Bancroft has testified at in over 100 cases. Indeed, this Court accepts Dr. Bancroft's analyses when determining damages. *See, e.g., Bilodeau*, 2024 WL 3744150 at 3–4.

Dartmouth Health's baseless attacks do not support an order excluding Dr. Bancroft's testimony. In arguing that Dr. Bancroft's testimony is not reliable, Dartmouth Health again claims that Dr. Bancroft relies upon speculation. (Doc. 198-1 at 7.) But they offer no new information to support this claim. As Plaintiff has already explained above, the fact that Dr. Bancroft updated his assumptions to incorporate facts as they actually unfolded over time does not render his opinion unreliable. Moreover, in arguing that Dr. Bancroft's opinion is unreliable, Dartmouth Health again accuses him of suffering a memory deficit. (Doc. 198-1 at 7.) Dr. Porter has already addressed this unfounded argument. The fact that Dartmouth Health repeats this spurious claim shows that they lack any serious challenge to the reliability of Dr. Bancroft's opinions.

Notably, Dartmouth Health does not question Dr. Bancroft's methodology or his analyses. Rather, they question some of the assumptions he relied upon in his report. Any dispute over his

---

[3]  Of course, if Dr. Bancroft had not updated his report, Dartmouth Health would accuse him of relying upon factually inaccurate assumptions.

10

assumptions, however, can—and should—be addressed through cross examination and the adversarial process. It would be inappropriate to exclude an expert's testimony solely because one party disagreed with the factual basis of some of the assumptions identified in the expert report.

A primary product of Dr. Bancroft's work is his chart of financial loss projections. While Dr. Bancroft supplies a chart to guide the jury to understand the scope of a plaintiff's losses over time, Dr. Bancroft understands that his role is not to act as a finder of fact. He respects the jury's role in deciding facts and resolving factual disputes. As he testified at his deposition,

> [the jury is] going to hear a lot more testimony than I am going to hear. And then it's up to them to make that decisions that I think, well, it's reasonable to expect she would—that Dr. Porter would work for 3 more years or 5 more years or 15 more years. So I'm not rendering an opinion that she would work out to age 70. I'm not rendering an opinion that she would work out to 60. I'm leaving that entirely up to the trier of fact.

(Doc. No. 198-4 at 100-01.) Dr. Bancroft's testimony will assist the jury in their work of analyzing the parties' positions on Plaintiff's damages claims, and it is therefore entirely reasonable, reliable, and admissible.

Dartmouth Health's final effort to exclude Dr. Bancroft is their observation that this Court has twice limited Dr. Bancroft's testimony in prior cases. Both cases cited by Defendants, however, are inapposite, and neither case questions Dr. Bancroft's competence or qualifications to provide expert testimony. In the first case, *Deldebbio v. Blanchard*, No. 2:06-cv-115, 2008 WL 2581080 (D.Vt. June 26, 2008), for example, the plaintiff claimed loss of future earnings based upon a career that the plaintiff had hoped to begin but for which he had no prior experience. The Court simply ruled that the plaintiff could not pursue such a claim, and thus limited the expert testimony. But the Court did permit Dr. Bancroft to testify about the plaintiff's

11

2:17-cv-00194-kjd    Document 208    Filed 02/28/25    Page 12 of 13

general lost earning potential. Moreover, a separate reason that the Court limited the scope of Dr. Bancroft's testimony was the plaintiff's counsel's untimely opposition to the motion *in limine* to exclude testimony; clearly, this reason had nothing to do with Dr. Bancroft's qualifications as an expert or the reliability of his methodology.

Similarly, in the second case, *Connors v. Dartmouth Hitchcock Med. Ctr.*, No. 2:10-cv-2013, 2013 WL 1221853 (D. Vt. Nov. 18, 2013), the plaintiff's counsel changed his theory of damages and submitted a new expert report based in part on data that had not been properly disclosed in discovery. The Court was concerned about "the late and incomplete disclosure of underlying data, the plaintiff's about-face on her damages theory, and the apparent illogic of the numbers [based on the new theory]." *Id*. at *3. In this case, Dr. Porter has not changed her theory of damages, and Dr. Bancroft's report is based on data that has been disclosed in a proper and timely manner. None of the Court's concerns in the *Connors* case apply to the case at bar.

Of course, these two examples where Dr. Bancroft's testimony was limited (due to reasons unrelated to his qualifications or the reliability of his general methodology) out of over a hundred cases in which he has testified fails to raise a credible question about Dr. Bancroft's general qualifications as an expert economist. Defendants have failed to raise a meaningful question about Dr. Bancroft's qualifications or the reliability of his analyses. Accordingly, the Court should reject Defendants' arguments and deny their motion.

A-308

CONCLUSION

For the foregoing reasons, Dr. Porter requests that the Court DENY Defendants' motion.

Dated: February 28, 2025                    /s/ Geoffrey J. Vitt
                                            Geoffrey J. Vitt, Esq.
                                            Vitt & Nunan, PLC
                                            8 Beaver Meadow Road
                                            P.O. Box 1229
                                            Norwich, VT 05055-1229
                                            (802) 649-5700
                                            gvitt@vittnunanlaw.com

                                            Eric D. Jones, Esq.
                                            Langrock Sperry & Wool, LLP
                                            210 College Street
                                            P.O. Box 721
                                            Burlington, VT 05402
                                            (802) 864-0217
                                            ejones@langrock.com

                                            Sarah H. Nunan, Esq.
                                            Vitt & Nunan PLC
                                            8 Beaver Meadow Road
                                            P.O. Box 1229
                                            Norwich, VT 05055
                                            (802) 649-5700
                                            snunan@vittnunanlaw.com

                                            *Attorneys for Plaintiff,*
                                            *Misty Blanchette Porter, M.D.*

A-309

NOTICE OF HEARING

# UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF VERMONT

Misty Blanchette Porter, et al

     v.                                        Case No. 2:17-cv-194

Dartmouth-Hitchcock Medical Center, et al

TAKE NOTICE that the above-entitled case has been scheduled at 01:30 p.m. on Friday, March 14, 2025 in Burlington, Vermont, before Honorable Kevin J. Doyle, Magistrate Judge, for a hearing on Motions in Limine (Docs. 198, 200-202) and Motion to Quash Dr. Joanne Conroy's Trial Subpoena (Doc. 199). An evidentiary hearing will be held on the Motion in Limine to Preclude the Testimony of Robert Bancroft (Doc. 198).

Location: 410                                JEFFREY S. EATON, Clerk
                                             By: /s/ Emerson F. Howe
                                             Deputy Clerk
                                             3/6/2025

TO:

Eric D. Jones, Esq.
Geoffrey J. Vitt, Esq.
Sarah H. Nunan, Esq.

Donald W. Schroeder, Esq.
Jessica E. Joseph, Esq.
Megan Martinez, Esq.
Morgan McDonald, Esq.
Tristram J. Coffin, Esq.

A-310

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,

      Plaintiff,

vs.

DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,

      Defendants.

Case No. 2:17-cv-194

**REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION IN LIMINE TO PRECLUDE TESTIMONY OF ROBERT BANCROFT**

Defendants submit this Reply Memorandum in Further Support of their Motion in Limine to Preclude Testimony of Robert Bancroft.

I.    Qualification Issues

As discussed in Defendants' opening memorandum, Bancroft is at best barely qualified to render expert opinions on the issues of the economic impact of termination of a specialty physician's employment at one academic medical institution and near simultaneous transfer to another similar program nearby by virtue of his advanced degree in agricultural economics 45 years ago and his career as a mostly-plaintiff-designated hired witness to provide interpretations of his clients' alleged damages. While Bancroft has undoubtedly had many cases over the years, the fact remains that employment cases – not to mention employment cases like this -- are a

1

small part of his career and have been vanishingly infrequent at the twilight of his career. Given his at-best borderline credentials to opine on a case such as this, the Court should be cautious about permitting wide-ranging testimony dressed as expert opinion to go to the jury, and should carefully consider what testimony is really expert analysis of evidence in the case, and what is just an amplification of self-serving spin.

II.    Speculative, Conjectural and Illogical Opinions Without Foundation Should Be Barred

Plaintiff's exhibit list lists only Bancroft's August 24, 2024 report – created after expert discovery was closed and Bancroft's deposition was taken – as the apparent basis for his testimony. There has been no other discovery, and no updates to Bancroft's reliance materials since the case was with the trial court prior to summary judgment. Plaintiff's have yesterday first identified as a trial exhibit Bancroft's August 24, 2024 "analysis." See Plaintiff's Exhibit List filed March 10, 2025. Plaintiff has provided no report or analysis dated August 24, 2024.

Assuming Plaintiff's reference to the August 24, 2024 analysis on the exhibit list is mistaken and Plaintiff really is intending to offer Bancroft's August 26, 2024 report, this report would appear to be on its face inadmissible hearsay if offered by Plaintiff. The Plaintiff has not identified any exhibits they plan to use as substantive or demonstrative evidence in relation to this report, such as the Projected Lost Earnings chart on page 3 attached to the report. Nor have they provided us with any other exhibits they plan to introduce through Bancroft, such as reliance documents or the assumptions on which it is based which may found the basis for Bancroft's testimony. **See Exhibit D.**

The August 26, 2024 report was preceded by two prior, very different reports, **see Exhibits A and B,** which reached widely different conclusions. All of them suffered from the

2

same shortcomings: they were based on speculation, hearsay, imprecision and fuzzy logic that make Bancroft's opinions subject to challenge as improper expert testimony.

To the extent the Bancroft seeks to introduce his analysis via the Projected Lost Earnings chart as a demonstrative exhibit or otherwise, DHMC seeks to have that table or analysis in particular precluded. DHMC reserves the right to expand on its bases for objecting to Bancroft's opinions based on testimony elicited at the upcoming evidentiary hearing.

In a nutshell, Bancroft's analysis as set forth in his August 26, 2024 opinion and accompanying assumptions and table of calculations is objectionable for the following categories of reasons, among others:

A.    He assumes a 12% present value annual increase in damages.

Bancroft appears to assume an annual percentage rate increase of 12% for purposes of calculating present value. Of course actual interest rates have run far lower than that rate, with a conservative range over that period of quarterly rates at 3.25 to 8.25% over the years since Dr. Porter ceased working at DHMC.[1]

As this Court noted in GU Markets LLC v. Supermarket Equip. Resale, Inc., Civil Action No. 1:01-CV-288, 2003 U.S. Dist. LEXIS 20543, at *2 (D.Vt. Sept. 9, 2003) (emphasis added): "Under Vermont law, an award of prejudgment interest is mandatory where damages are readily ascertainable and discretionary in other cases." Although the Vermont statute for pre-judgment interest, 9 V.S.A. sec. 41a(a), calls for 12% prejudgment interest, this highly inflated number is only applicable for a "sum certain", a reasonably identifiable, hardly disputable amount which would be payable by the defendant, and not an unquantifiable, indirect or disputable sum. Estate

---

[1] See JPMorganChase Historical Prime Rate Chart at https://www.jpmorganchase.com/legal/historical-prime-rate.

3

A-313

of <u>Fleming v. Nicholson</u>, 168 Vt. 495,724 A.2d 1026 (Vt. 1998); <u>d'Arc Turcotte v. Estate of LaRose</u>, 153 Vt. 196, 569 A.2d 1086 (Vt. 1989).

Here, many factors make Dr. Porter's calculation of damages at best uncertain, undefined or speculative. Indeed, the three reports by Bancroft over the years varying the amounts to which Dr. Porter is entitled based on differing analytic methodologies with outcomes varying by millions of dollars make that point eloquently. <u>See</u> <u>Exhibits</u> A, B, and C (calculating damages at $3.8 million, $4.8 million and $4.3 million). Furthermore, pre-judgment interest should not be allocated given the district court's summary judgment ruling in favor of Defendants in 2020, the global COVID pandemic delaying adjudication of the appeal from that judgment, and other issues that have made this case go on for longer than the norm, often at the request or with the consent of Plaintiff. Instead, the Court should not direct the jury to find a sum certain that is subject to 12% interest, and should instead instruct them to find damages from the evidence in the case as they see fit and reasonable. If prejudgment interest is deemed appropriate, the jury can find it based on their conclusions of what the evidence shows.

B.    <u>Huge portions of Bancroft's opinions rely on scant and inadmissible hearsay, making his analysis in admissible</u>.

As described in his deposition testimony, and in his work papers, huge portions of Bancroft's analysis are drawn entirely from conversations and communications with Plaintiff or her counsel, rather than from non-subjective data. That makes the statements subject to hearsay challenges and further undermines the nature of the expert opinion. Bancroft is merely parroting what he has been told by plaintiff or counsel and dressing it up as "expert" testimony. This is the type of expert opinion the rules are intended to police.

4

C.   His opinions are based on assumptions that are unsupported and grossly self-serving rather than "objective science."

Dr. Bancroft's assumptions are essentially unsupported.  For example, in his August 26, 2024 analysis, he assumes that in January 2025, Dr. Porter would have assumed a .6 part-time position at UVMMC, while if she had stayed at Dartmouth, she would have continued to be employed full time, resulting in over a hundred thousand dollars in claimed damages due to this difference in salary.   See **Exhibit D, Assumption 4, and Projected Lost Earnings at columns 1 and 7.**

This is wholly unsupported wishful-thinking adorned as expert analysis.  There is no basis for concluding or projecting, as Bancroft does, that Dr. Porter would have continued to work full-time at DHMC while accepting a part-time position at UVMMC.  The only basis for this is speculation as to what Dr. Porter would have supposedly hoped to do and to happen.  Dr. Porter can testify to that, if adequate foundation is laid, but Bancroft should not be able to dress that opinion up as "expert" economic analysis.  Moreover, Dartmouth should not be held liable for Dr. Porter's personal life choice to reduce her employment to .6 of full time. Using this unsupportable assumption as a starting point undermines all of Bancroft's loss earning calculations after January 1, 2025.

The effect of this calculation in Bancroft's report is substantial.  It increases Dr. Porter's claimed annual loss attributed to Dartmouth by over $160,000 per year over the years 2025 to 2033 for a cumulative amount of some $1.4 million. **See Exhibit D, Lost Earnings chart at column 7.**

Similarly, Bancroft appears to try to find a basis to increase Dr. Porter's losses from the alleged improper termination at every turn.  He assumes, with scant basis, that she would receive

5

a 2.5% salary increase each year. That is based on only the most stretched analysis. Again, it is uncontroverted that the division in which she worked was eliminated. The hospital was going through difficult financial times. There was the effect of a global pandemic that may have affected salary increases. At the time her position was eliminated, she was not working full-time. Regardless, Bancroft predicts Dr. Porter would have had consistent 2.5% annual raises. This is unsupported speculation, and should not be anointed as expert economic data or analysis. Again, the inflated rates infect the whole of Bancroft's calculations.

Moreover, he assumes, based on no data other that his client's say-so, that she would have made full professor in 2022 years after her termination and received a 5% pay increase. We are unaware of any evidence supporting this conclusion, and it's impact on the calculations is substantial. It should not be permitted as "expert" opinion. These speculative and unsupported calculations flow throughout Bancroft's table.

    D.    <u>There is no explanation of the second "gross up" of Dr. Porter's damages.</u>

This is double and even triple counting. The basis for compensatory damages is pretty standard. Back pay converted to present value and front pay converted to present value. The figures for back pay and front pay that Dr. Bancroft uses as the basis for his opinion are all drawn from W2 and other salary information that are amounts before taxes. Thus, there is no need to "gross these up". They already include the amounts he would need to pay in taxes in them. Moreover, to then take these amounts and "gross them up" a second time, **see Exhibit D Column 12**, is just double counting, apparently motivated by a desire to make a high analysis for the client who pays his fee. This may be why the nature of his analysis, or its logic, was not spelled out in his chart. Our experts could not understand it, nor reproduce it. It is notable that almost half of the $4 million in damages claimed by Bancroft is attributable to this two-step

6

grossing up process. If Bancroft's explanation is that a judgment received as a lump sum would be taxable at a higher interest rate because the lump payment would move Plaintiff into a higher tax bracket, the cost of that to Dr. Porter is only the amount that is subject to the higher marginal tax rate, not the calculation he has in his table adding some $2 million we had to the loss figure.[2] Also relevant is that Dr. Porter already is a high earner, making well-over $300,000 a year, so there is only so much higher her tax rate can go.

      E.    <u>Other problems exist as well</u>. It is anticipated other issues showing deficiencies in Bancroft's calculations and loss table will be shown via testimony.

## III. <u>Conclusion</u>

For the foregoing reasons, and others that will be asserted based on hearing testimony, Bancroft's expert testimony should be excluded or significantly limited. His qualifications are too limited. His analysis is too speculative, based on hearsay and conjectural. The views on loss that he purports to bring as an expert economist are too confined to being a mouthpiece for unsupported and self-serving assertions by Plaintiff. They should not be countenanced as "expert" testimony. We reserve the right to supplement this memorandum should Bancroft express new or altered opinions, or proffer new reliance information.

---

[2] Economic experts we had assess this could not reproduce Bancroft's math from his descriptions.

7

A-317

Date: March 11, 2025                    Respectfully submitted,


                                        /s/ Tristram J. Coffin
                                        Tristram J. Coffin

                                        **DOWNS RACHLIN MARTIN PLLC**
                                        Tristram J. Coffin
                                        199 Main Street
                                        Burlington, VT 05402
                                        Telephone: 802-863-2375
                                        tcoffin@drm.com

                                        and

                                        **FOLEY & LARDNER LLP**

                                        Donald W. Schroeder (admitted *pro hac vice*)
                                        Morgan McDonald-Ramos (admitted *pro hac vice*)
                                        Megan E. Martinez (admitted *pro hac vice*)
                                        111 Huntington Avenue
                                        Boston, MA 02199
                                        Tel: (617) 342-4000
                                        dschroeder@foley.com
                                        mmcdonald@foley.com
                                        memartinez@foley.com

A-318

## CERTIFICATE OF SERVICE

I hereby certify that, on March 11, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

/s/ Tristram J. Coffin
Tristram J. Coffin

23410080.1

A-319

REVISED NOTICE OF HEARING

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

Misty Blanchette Porter, et al

        v.                                    Case No. 2:17-cv-194

Dartmouth-Hitchcock Medical Center, et al

TAKE NOTICE that the above-entitled case has been scheduled  at 01:30 p.m. on Friday, March 14, 2025 in Burlington, Vermont, before Honorable Kevin J. Doyle, Magistrate Judge, for a hearing on Motions in Limine (Docs. 198, 200-202), Motion to Quash Dr. Joanne Conroy's Trial Subpoena (Doc. 199), and Motion to Amend Complaint (Doc. 213). An evidentiary hearing will be held on the Motion in Limine to Preclude the Testimony of Robert Bancroft (Doc. 198).

Location: 410
*Revised to include Motion to Amend Complaint (Doc. 213)*

JEFFREY S. EATON, Clerk
By: */s/ Emerson F. Howe*


Deputy Clerk
3/13/2025


TO:

Eric D. Jones, Esq.
Geoffrey J. Vitt, Esq.
Sarah H. Nunan, Esq.

Donald W. Schroeder, Esq.
Jessica E. Joseph, Esq.
Megan Martinez, Esq.
Morgan McDonald, Esq.
Tristram J. Coffin, Esq.

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter,       )
                               )
                               )
v.                             ) Case No. 2:17-cv-194
                               )
                               )
Dartmouth-Hitchcock Medical    )
Center, et al.                 )
                               )
_____)

RE:  Hearing on Motions in Limine (Docs. 198, 200-202), Motion to Quash Dr. Joanne Conroy's Trial Subpoena (Doc. 199), Motion to Amend Complaint (Doc. 213), and an Evidentiary Hearing on the Motion in Limine to Preclude the Testimony of Robert Bancroft (Doc. 198)

DATE:  March 14, 2025

LOCATION:  Burlington, Vermont

BEFORE:  Honorable Kevin J. Doyle
         Magistrate Judge

**APPEARANCES**:

Eric D. Jones, Esq.
Langrock, Sperry & Wool, LLP
210 College Street
PO Box 721
Burlington, VT 05402-0721

Geoffrey J. Vitt, Esq.
Vitt & Associates
8 Beaver Meadow Road
PO Box 1229
Norwich, VT 05055-1229

                    - Continued on Next Page -

Donald W. Schroeder, Esq.
Morgan McDonald, Esq.
Foley & Lardner LLP
111 Huntington Avenue, Suite 2500
Boston, MA 02199

Tristram J. Coffin, Esq.
Downs Rachlin Martin PLLC
199 Main Street
PO Box 190
Burlington, VT 05402-0190

TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
United States District Court Reporter
*verbatim@vermontel.net*

INDEX OF EXAMINATION

| Witness | Examined By | Page | Line |
|---|---|---|---|
| Robert Bancroft | Atty. Coffin | 8 | 17 |
| | Atty. Jones | 44 | 13 |

\*    \*    \*    \*    \*

(A portion of the beginning of the hearing was not recorded.  The following transcript is where the audio recording begins.)

ATTORNEY COFFIN:  -- August 26th 2024, and they'll have that go to the jury and explain that to the jury either as substantive or demonstrative evidence.  You know, we'd submit that there are problems with the chart such that it really can't be produced or introduced in a way that is fair expert testimony.  It's either, you know, adding up pretty basic numbers that don't need an expert, or it's expert analysis that really is not sensible, logical, or grounded in information.

And so I'll go through kind of a focused presentation of our issues with the report, but our briefing lays out some of those as well, but there will be some additional ones, Your Honor.

THE COURT:  Okay.

ATTORNEY JONES:  Happy to have Vermont as well.

THE COURT:  Sure.

ATTORNEY JONES:  It appears to us that defendants' objections to Dr. Bancroft's analysis is that they challenge his assumptions.  They're not challenging his basic methodology.  They're not challenging his basic qualifications.  We think the qualifications and methodology are clear.  It's not junk science.  This is the same methodology he's been applying for 40 years in all types of cases, including

employment cases.

What they're challenging is the factual assumptions. That is often, if not always, the case with expert testimony, and it's the party proffering the opinion, us, that bears the burden of proving those facts, and we believe that we will, but it's the adversary process of cross-examination that allows the jury to make decisions about what to accept and what not to accept with regard to those assumptions. But, with regard to Dr. Bancroft's qualifications and his methodology, there's no serious question that he is a qualified expert. He's testified in this court. Judge Crawford recently adopted his report. And so we think he's fully qualified, and, if they have concerns about the assumptions, that's for the trial.

THE COURT: Okay. Mr. Coffin?

ATTORNEY COFFIN: And very brief volley back. The Court will need to assess the relevance of his testimony based on testimony or the testimony that's actually offered at the trial. So probably it may not be something that the Court can fully decide after today's hearing, and we're going to have to wait to hear what the testimony that lays the foundation for his testimony is should the Court rule that he is qualified to even go forward.

That leads to an interesting problem, though, because he's got a very detailed, elaborate chart which was produced in August of 2024. And so I think that the plaintiffs are either

in a, you know, hundred percent win or nothing comes in in terms of a chart from him. Because it's too late for further expert disclosures and opinions with regard that.

ATTORNEY JONES: Yeah, Judge, *Daubert* talks about the Court's gatekeeping function, about whether the expert should be allowed to testify in the first instance. They asked for a *Daubert* hearing. Here we are. I think the Court, as of today's hearing, is in a position to make that ruling about whether or not he is able to testify. Again, all these issues are trial issues, not expert qualification issues.

THE COURT: Right. It is a gatekeeping function for the Court, as the parties are well aware of. So are you asking me at this point then to essentially make that gatekeeping assessment and then, assuming it goes in plaintiff's favor, then Dr. Bancroft testifies and cross-examination is how you attack assumptions and all the other things that you have raised in your brief?

ATTORNEY COFFIN: Well, respectfully we haven't posed this as a *Daubert* issue. It's not just the qualifications of the witness. It's the substance of his testimony with the analytic chart. And so the Court may, for example, may reach a decision today, Okay, I'm going to let him go forward saying that it's possible that he won't provide junk science here. But, you know, after the testimony is laid at trial, the Court may well decide, Hey, that chart, based on what you hear at

this hearing and what you hear at the trial, is unfair to present to the jury because it's filled with problems.

And that's certainly I would say a *Daubert* hearing. It's more a relevance and a 403 issue that the probative value of his testimony or at least as documented in that chart endorsed as provided by an expert witness outweighs the probative value.

THE COURT: Okay. So Dr. Bancroft is here. Would you like to examine him today at all, or is this just -- I was under the impression that we were --

ATTORNEY COFFIN: Yeah, well, I don't think we asked for the hearing.

THE COURT: I thought you did ask for an evidentiary hearing. No, no. It's in the briefing, if I'm not mistaken.

ATTORNEY COFFIN: I don't think it is.

THE COURT: All right. Let's --

ATTORNEY COFFIN: No, it's not. Yeah, we were wondering where that came from.

THE COURT: Yeah. Defendants hereby request an evidentiary hearing on this motion pursuant to Rule 702.

ATTORNEY COFFIN: We did? So I guess we did.

ATTORNEY JONES: If they're withdrawing it, we agree that he can do this at the trial.

THE COURT: Okay. So you're not seeking an evidentiary hearing at this time?

ATTORNEY COFFIN: Well, let me just confer with

counsel.

THE COURT:  Okay, sure, sure.

ATTORNEY COFFIN:  We'd like to proceed now, and, if it makes sense, we'd have additional voir dire of him at trial, but we've had this hearing now, which lays a good groundwork, and the judge can, you can make rulings accordingly.

THE COURT:  Okay, all right.  So then would you like to call Dr. Bancroft at this time?

ATTORNEY COFFIN:  We're going to call Dr. Bancroft.

THE COURT:  Okay.  Dr. Bancroft.

ROBERT BANCROFT,

having been duly sworn to tell the truth,

testifies as follows:

ATTORNEY COFFIN:  May I approach, Your Honor, with the exhibit binders?

THE COURT:  Yes, yes.

DIRECT EXAMINATION BY ATTORNEY COFFIN

Q.   Good afternoon, Dr. Bancroft.

A.   Good afternoon.

Q.   I'm not sure if you remember me, but we've worked together before many years ago now, but good to see you again.

A.   I certainly remember you.

ATTORNEY COFFIN:  Good.  So we'd like marked as an exhibit to this a binder of exhibits which is, are numbered 1 through 6, and Number 6 is a placeholder for the deposition

that I didn't stick the whole deposition in there, but we'd move that Dr. Bancroft's deposition of October 30, 2019 be submitted as an exhibit here today, please.

THE COURT:  Mr. Jones, any objection?

ATTORNEY JONES:  No objection.

THE COURT:  Okay.  It's admitted.

BY ATTORNEY COFFIN:

Q.   And, Dr. Bancroft, if you look at that notebook in front of you that's been marked as Exhibit 1, and I guess these are subexhibits -- wait.  Let's make that -- I'd suggest we make that Exhibit A and then Exhibits 1 through 6 in the binder. The first exhibit there is under Tab 1.  Do you recognize that as your CV?

A.   Yes.

Q.   Okay.  And that sets forth your qualifications as you'd assert them here today to provide the testimony in this case?

A.   Yes.

Q.   Okay.  And you've been a witness many, many times before as an economic analyst; is that right?

A.   Yes.

Q.   Now, aren't I right, though, your actual academic training is a masters in 1976 in agricultural economics from the University of Vermont?

A.   I did get a masters, yes, in '76, yes.

Q.   And then a PhD from Purdue in 1981?

A.    Yes.

Q.    And you spent some time with USDA, but it was quite some time ago; is that fair to say

A.    I spent some time with the economic research service, yes.

Q.    Okay.  And you were adjunct professor of economics at UVM until 1996; is that right?

A.    I was an assistant professor until '91 and then an adjunct after to '96.

Q.    Okay.  An adjunct is more part-time than an assistant; is that fair to say?

A.    Yes.  I taught one course a year.

Q.    So, essentially, from basically 1996 to the present, your primary occupation has been providing these sorts of expert opinions to litigants; is that right?

A.    It has been my primary, but it was my primary probably from about '86 on.

Q.    Okay.  And fair to say you provide expert analysis in all sorts of cases; is that correct?

A.    Yes.

Q.    But your expert analysis in employment matters is a fairly small subset of your overall practice; is that right?

A.    No.

Q.    Okay.  You list a number of different topics here that you've provided, and I see about ten, and in there is wrongful discharge.  You don't think that's a, that makes a small part

of your practice?

A.    No, I don't think it's a small part of my practice, no.

Q.    Would you say your practice is about 10 to 20 percent employment matters?

A.    I would say that it varies.  I think, probably, over the last 30 years, it's probably been 20, 25 percent.  Right now it's actually almost 50 percent.

Q.    Okay.  And are you fully engaged as an economic consultant at this point?

A.    I'm not looking for cases, no.

Q.    Okay.  And you've handled 2,500 cases over the course of your career, I think, was your testimony; is that correct?

A.    Yes.

Q.    And about how many cases are you working on right now?

A.    I have 22 cases right now that I'm actively working on that I know, and then there's maybe as many as another 20 that I have worked on in the last, oh, six to eight months.  I've rendered reports.  I assume they're still active, but I don't know.

Q.    Okay.  And, during the bulk of your career, you said 20 to 25 percent was related to employment matters; is that correct?

A.    Yes.  And since -- let me qualify that.  Since the late 1990s.

Q.    Okay.  I imagine a fairly small subset of those dealt with physicians at academic teaching hospitals; is that right?

A.   I've had some, but as a, in the grand total, yes, it's a small, obviously a small percent.

Q.   Okay.  And how about cases involving the transfer of a physician who is terminated at one academic teaching hospital in New England to another?

A.   I've had other cases, not many, but I've had similar ones.

Q.   One or two?

A.   I can't say for sure, but at least one and more likely two.

Q.   Okay.  So at least one, possibly two, that are closely parallel to this case in that they involved some sort of a personnel action of a physician at one academic teaching hospital in New England transferring to another; is that right?

A.   Yes.

Q.   Now, you've prepared a series of reports per your work in this case; is that right?

A.   Yes.

Q.   And those are set forth at, on the binder that's Exhibit A, at Exhibit 3, 4 and 5.  Do you see those?  Sorry, 2, 4, and 5.

A.   Yes, I see them.

Q.   Am I correct that a lot of information in that report was based on conversations you had with plaintiff and her counsel?

A.   Yes.

Q.   And conversations you had, but with plaintiff and her

counsel; is that correct?

A.    Yes.

Q.    And there's some additional materials, but you're not denying that you rely heavily on what the plaintiff told you for reaching your conclusions as asserting in these reports; is that correct?

A.    On projecting out what her earnings would be post-termination, yes.

Q.    Okay.  And the basic -- so directing your attention, please, to the August 26th 2024 report --

THE COURT:  I don't want to interrupt your flow, Mr. Coffin, but so you have moved for the admission of Exhibit 6?

ATTORNEY COFFIN:  I'm sorry.  I had meant to move for the admission of all of A, which is a the whole binder.

THE COURT:  Okay.  Mr. Jones, any objection to 1 to 6 in Exhibit A?

ATTORNEY JONES:  No objection.

THE COURT:  Okay.  So then Exhibit A in its entirety is admitted.  Go ahead.

BY ATTORNEY COFFIN:

Q.    Thank you.  Directing your attention to Tab 2, Exhibit 2 of A, is that your report dated August 26th 2024?

A.    Yes.

Q.    And that's the last report you prepared that was submitted

to the defense in this case; do you understand that?

A.    That's the last report I prepared, yes.

Q.    And the report includes a two-page narrative section; is that right?

A.    Yes.

Q.    And then a, what looks like a table called "Projected Lost Earnings for Dr. Misty Blanchette Porter" -- is that correct -- on the third page of --

A.    Yes.

Q.    -- Exhibit 2?  Yeah.  And then there's a couple of pages of assumptions; is that correct?

A.    Yes.

Q.    And then a finally last table; is that right?  A last table, last table entitled "Additional University of Vermont Employment-Related Costs".

A.    Yes.

Q.    Is that right?  Okay.  And you prepared other reports dated October 30th and October 1st; is that right?  Excuse me. October 30th 2018 and October 1st 2019; is that right?

A.    Yes.

Q.    Okay.  And those are submitted and are at Tabs 4 and 5 of Exhibit A; is that right?

A.    Appears to be, yes.

Q.    And your methodology for these reports and all of your reports is fairly consistent in that you're essentially looking

for what her earnings were at the place from which she was subject to the personnel action, Dartmouth-Hitchcock, and comparing them with her earnings at the new place -- is that right --  UVM Medical Center?

A.    Yes.  And I have issue with the adjective fairly.  They are exactly the same methodology.

Q.    Okay.  Exactly the same methodology.  But, essentially, you're comparing what she was earning at Dartmouth and what she was earning and is expected to earn at UVM to determine the difference between the two, which would be her loss; is that correct?

A.    Yes.  I projecting out what her earnings would have been at Dartmouth, and I'm projecting out -- well, I know what she's actually earned at least as of the last year.

Q.    Right.

A.    And then I'm making projections of what I think she will earn based on information she provided me.

Q.    Right.  And then you convert it to present value by adding an amount of money to make up the difference of current dollars for inflation; is that right?  Future.

A.    Well, you know, some of it's historical, which I add interest onto, and some of it's future, which I discount back to the present.

Q.    Okay.  So let's talk about the past earnings.  The damages that you assessed to her that happened previously, you add an

adjustment for inflation; is that correct?

A.    Not for inflation.  I add an interest factor on.

Q.    Okay.  And what is the interest factor for if it's not for inflation?

A.    I don't know it's not for inflation, but it's a -- I think you'd have to go back and look at back in the 70s when the Vermont legislature, in its wisdom, decided that prejudgment interest should be calculated at 1 percent per month, simple interest.

Q.    Okay.  So that's how you came up with 12 percent as applicable for the interest on the past damages; is that right?

A.    12 percent simple interest, annual interest, or 1 percent Vermont.

Q.    Got it, okay.  Now, you would agree with me that 12 percent interest is an unnaturally high level of interest per in today's climate?

A.    All depends on the risk.  I understand where you're going with it.  It's a high rate, but there are interest rates that are higher than that, but, again, they are risk-dependent.

Q.    Okay.  As an economist, are you aware of interest rates that are commonly available in the market that are lower than that?

A.    Yes.

Q.    Consumer price index?

A.    That's not an interest rate.

Q.    Well, let's leave -- is it ever used to calculate interest?  Treasury bonds?

A.    There are inflation index treasury bonds, yes.

Q.    Okay.  If you go to a bank, what they do return for a CD?

A.    It all depends on when and what the terms are.

Q.    Is it anywhere approaching 12 percent?

A.    I don't believe so.

Q.    Okay.  More like 2 or 3 percent?

A.    I just got one yesterday for 3.9.

Q.    What's the interest rate on a treasury bond right now?

A.    I haven't looked it up in a couple of weeks, but what year and how many?  What are we talking about?

Q.    Approximately -- well, you know, a standard, you know, United States treasury bond, what would that go for right now?

A.    Well, it varies on how it paid.  From, are you talking 6 months or are you talking 30 years?

Q.    Well, how about 10 years?

A.    Ten years is around 4 percent, give or take.

Q.    Okay.  20 years?

A.    Slightly higher, but not much.

Q.    Okay.  So it's not uncommon for the interest rate to be somewhere in the order of 2 to 3, maybe 4 percent; is that correct?

A.    5 percent, yeah.

Q.    And yet you in, in your chart, have used 12 percent as --

glasses. Sorry. You've used 12 percent as your interest adjustment for all of the loss on the right side of your chart; is that correct?

A. For all the loss?

Q. Sorry. Let's go through your chart. Your chart at Exhibit 2 on the table, the projected lost earnings, the third page -- oh, yeah.

A. Thank you. Yes. I'm sorry

Q. Okay. You've applied a 12 percent inflation, interest adjustment added to your calculation of losses for the losses from 2017 through 2024; is that right?

A. Yes.

Q. And that's set forth in one of your assumptions on the next page, Assumption 1; isn't that right?

A. I think it actually states it in Assumption 10.

Q. Okay, yeah. I apologize. Right. The simple interest rate of 12 percent is used to commute interest on the historical earnings losses. Thank you. That's right.

Let's go through the chart just a little bit. I apologize. I meant to do that.

A. Okay.

Q. Just so everybody's on the same page. Directing your attention to Exhibit 2, the projected lost earning chart, so what you've done here is for each year you've calculated what the plaintiff's gross income was at Dartmouth, her fringe

benefits and her total earnings; is that correct?

A.    Yes.  I project -- yes.

Q.    Okay.  And then you went on and did the same thing for her post-termination projections at UVM; is that correct?

A.    Yes.

Q.    And so, and then on the left there's an index that goes by year.  So 2017 to 2033 is what you have on here; is that right?

A.    2033.

Q.    And then you go from there, and then you make an adjustment for the difference between those two, which is, is between the UVM and the Dartmouth losses, and that is what you've described as gross adjusted loss earnings; is that right?

A.    Yes, that's the difference between the two.

Q.    Okay, good.  And then I'll ask you some questions about some of the these later columns later on, but you sort of accumulate these and make some additions to them and ultimately come out with a column on the far right which is what you call the total economic loss; is that correct?

A.    Yes.

Q.    And in the lower right-hand corner where it says 4.329, 258 million is what you estimated the total economic loss for Dr. Porter; is that right?

A.    If she was to work out to age 70, yes.

Q.    Yes.

A.    But I'm not opining that she would work out to age 70.

Q.    Okay.  Because so, for example, if she were only to work to age 65 in 2028, the loss figure you project would be 2.542; is that right?

A.    Yes.

Q.    Okay.  Now, the loss earnings you have are based on her W-2 reported income; is that right?

A.    I report her W-2 income, yes.

Q.    Yes, you drew those figures from her actual W-2s which include pretax dollars; is that right?

A.    Yes.

Q.    And from that she'd have to pay whatever income tax she owed, right?

A.    Yes.

Q.    Okay.  And you analyzed from, in your chart from 2017.  I think you said you used up through 2023 W-2s; is that right?

A.    I think so, yes.

Q.    Now, you assume a 3 percent increase for periods in the out years in her pay; is that correct?

A.    Yes.

Q.    And by out years I mean years beyond which you don't have W-2s, correct?

A.    Yes.

Q.    And so anything after 2023 you're assuming there is a 3 percent increase in her pay; is that right?

A-340

A.    Yes.

Q.    Okay.  And that would go out to 2033 --

A.    Yes.

Q.    -- is that right?  And I think you also assumed that in, again, drawing from your assumptions on -- this is assumption Number 1 on the third page of Exhibit 2.  You make an assumption that she would become a full professor at Dartmouth in 2019; is that correct?

A.    Yes.

Q.    And that she would then get a 5 percent salary increase; isn't that correct?

A.    Yes.

Q.    Aren't I correct that you drew your information that she would get that promotion in 2019 to full professor from Dr. Porter; isn't that correct?

A.    Yes.

Q.    And aren't I also correct that you got the information that she would get a 5 percent increase from being made a full professor from Dr. Porter?

A.    Yes.

Q.    What, if anything, do you know from your expert knowledge of economics about her likelihood of getting a promotion or how much pay increase she would get as a result of that?

A.    I can't opine on the likelihood of whether she would have got a promotion.  I haven't done a study to it, but a 5 percent

increase based on my experience at least at UVM, when one got a promotion like that, they tended to be at least 5 percent.

Q. Okay. So if it was a -- your experience is based on your working on cases for a long time, and, in particular, you said, Well, at UVM it would be 5 percent?

A. Yes, I'm familiar with that. As I indicated earlier, I've only worked on maybe one or two other cases where we've had a doctor. Actually, I worked on a lot more than that because I worked on some personal injury cases with doctors involved. But I, those people weren't necessarily at a university.

Q. Okay. And in your chart the way that 5 percent bump would be reflected is, if she had stayed at Dartmouth -- you know, she left Dartmouth. When did she leave Dartmouth?

A. 2017, sometime in that period.

Q. Okay. So all of those projections on, for Dartmouth are not her actual W-2s from Dartmouth; they're your estimates of what her W-2s would be based on your assumption that she would get a 2 and a half percent annual pay increase, she would become a full professor in 2019 and get a 5 percent increase from that; isn't that right?

A. Yes.

Q. Now, and your projection on the 2 and a half percent pay increase in based on just your -- I think from your deposition you said it was based on your looking at US Labor Department statistics; is that right?

A.    Yes, I looked at the average wage increases across the board, yes.

Q.    Across the board meaning all professions, correct?

A.    Yes.

Q.    All regions, correct?

A.    Yes.

Q.    Throughout the United States --

A.    Yes.

Q.    -- correct?  And that's what you projected that to be the basis for, correct?

A.    I did use -- that 2 and a half percent was based on a review of that.

Q.    Okay.  Now you produced in your, as part of the deposition process a lot of working papers that you used to base your opinion on; is that correct?

A.    I assume so.  I don't remember.

Q.    The tools that you relied on, correct?

A.    I don't remember what you've, what was given to you.

Q.    Okay.  Well, maybe this will refresh your memory.  We understood from these to be materials that you relied on in reaching your opinions.  And so do you recall some analysis of Dr. Porter's pension situation at Dartmouth?

A.    Yes.

Q.    And a pension table?

A.    Yes.

Q.   And something called a Dartmouth-Hitchcock Clinic Calculation Summary of Pension Plan of Employees?

A.   I don't remember the title, but I did look at stuff from Dartmouth on pensions.

Q.   Okay.  Look at, please, in Tab 3 of your book.  Go to the, go to the last three pages from the back, please.  Okay.  Do you remember seeing this document?

A.   I believe I saw this document.  I mean, it doesn't jump out to me that I saw it, but I do believe I have seen something like this, yes.

Q.   Okay.  Looking on the left, there's a column that says "Year" and has the years 2008 to 2017 and then something says, the next column says total pensionable pay and something qualified pensionable pay.  Do you see these columns?

A.   Yes.

Q.   Okay.  Total pensionable pay, doesn't that look like her full earnings from Dartmouth-Hitchcock?

A.   Her pension pay or the total pension pay?

Q.   Total pensionable pay, doesn't that look like her W-2 income from Dartmouth-Hitchock?

A.   I don't have her W-2s in front of me, but I wouldn't disagree.  It looks like that would be -- it looks like it's consistent with what my recollection is.

Q.   Okay.  And, if you note, the numbers there do not go steadily up by 2.5 or 3 percent.  Do you see that?

A.    Yes.

Q.    In fact, they go up and down, right?

A.    Yes.

Q.    So this shows her actual experience at Dartmouth-Hitchcock with a salary that does not go up 2 or 3 percent every year, right?

A.    It doesn't go up by two and a half percent every year, no.

Q.    And it goes up and down, correct?

A.    Yes, it goes down a couple or two years, three years.

Q.    But your projections in Exhibit 2 on the chart don't go up and down; isn't that right?

A.    No, they don't, no.

Q.    They go up 3 percent every year; isn't that correct?

A.    Yeah, whatever the increase is, yes.

Q.    Plus the amount for her professorship, correct?

A.    Well, that went up at one time.

Q.    Well --

A.    One time only.

Q.    You made an upward adjustment based on an assumption that she would become a professor; isn't that correct?

A.    Yes.

Q.    Okay.  Now, and your testimony is that was worthy of a 5 percent increase in her salary from Dartmouth?

A.    When she got the promotion, she would get a 5 percent increase.

Q.   And that is repeated throughout that table on the left column at Exhibit 2, right?

A.   Well, it's, it's baked into the numbers in the future, but every year it's not a 5 percent increase.

Q.   No, but -- yeah, exactly, that's my point.  Thank you.  It gets baked in and amplified based on that each year at a higher rate --

A.   Yes.

Q.   -- right?  And it's better for the plaintiff to have a higher salary from her prior employer, right?

A.   Yes.

Q.   Because, if she has a higher salary and gets a lower salary, she has lost more based on your calculations; isn't that correct?

A.   Well, based on anybody's calculations.

Q.   Fair enough.  And so the flipside of that is, to the extent her salary at University of Vermont is lower than it otherwise would be, that also would answer a benefit in your loss calculations; isn't that right?

A.   If her, because her salary is lower than it would be, my projections at Dartmouth, yes, there is a loss.

Q.   Right.

A.   That's what I'm trying to measure is the loss.

Q.   Exactly.  And, if her salary is lower at the new place than the old place, the lower it is, the greater the loss;

isn't that right?

A.    Yes.  Simple math.

Q.    Simple math.  Now, you don't calculate any professorial increase from Dr. Porter's promotion to a full professorship at UVM?

A.    I thought there was something in there where she got promoted historically.

Q.    There is, there is something in your chart that shows a 5 percent bump from her becoming a professor at the University of Vermont?

A.    I used what she actually earned up through -- well, actually, I didn't have the stuff through 2024.

Q.    Oh, 2024?

A.    Well, I didn't have the W-2 for 20 --

Q.    You don't have the W-2 for 2024?

A.    Oh, yeah.  Yes.  I'm sorry.  2026.  I apologize.

Q.    Not '26.  Let's, the 2024 W-2.  I would just say that we don't have the W-2 for 2024.  Do you?

A.    No.

Q.    Okay.  As an economic expert coming to court to provide expert information, wouldn't it be sensible for you to have the W-2 for her last earnings?

A.    Well, yes, but I did this report in August of '24, so how could I get a W-2 for 2024 if I did it in August?

Q.    Well, you're testifying about her salary information for

then.  Could you have asked for it and gotten it when it came out this year?

A.    I could have, yes, and I will be asking for that when this moves on to trial.  I will be looking at all that information, and I assume at the request of plaintiff's counsel I'll be updating my analysis.

Q.    Had you been told that Dr. Porter became a full professor at UVM in August of 2023, July of 2023?

A.    I believe, I believe I have been.

Q.    Okay.  Is that reflected on your report?

A.    I have her actual earnings for 2023, and I have what she, what her contract was for '24.

Q.    You have her full professor contract for '24?

A.    That was what I based my projections on is the contract or what she had earned under the new contract.  I had, may have annualized it up.

Q.    Do you have an employment contract for her after she had been promoted to a full professor at UVM Medical Center?

A.    I don't remember if I have a, if I had a contract, but I did have what she actually earned after she got the promotion.  Then based -- I don't know how many months that was, but let's assume that it was four months.  Then I would annualize it up to a 12-month figure.

Q.    I don't see anything in your report or your assumptions describing the effect of her promotion to full professor at UVM

Medical Center sort of analogous to the 5 percent inflator you gave her when she became a full professor at Dartmouth-Hitchcock.

A.    Well, I disagree, but if you read --

Q.    Where does it say that?

A.    Well, it does not say that in that many words because I, I don't know if I had that, but what I did, what it does say in Footnote 2, Footnote 4, is that I looked at what her earnings were and used that as a basis to forecast forward.

Q.    But you don't -- I think what you just said is, I don't know if I had that or not.

A.    I don't know if I have her contract.

Q.    I don't know if I had the information about her becoming a full professor, yes or no, did you have that?

A.    I don't know.

Q.    Okay.  Because, if you did have that, you would have said, Oh, I need to make the adjustment in my projections for UVM and add 5 percent on top of her about $300,000 salary for all of my projections going forward; isn't that right?

A.    No.  I've tried to explain to you that I took a look at what she was getting for pay after that happened, and, while I did not have a full calendar year of her earning at that level, I did have some period of time where she was earning at that level which I then annualized.

Q.    Okay.  You didn't have her 2023 W-2s that showed an

increase in salary there on enough of the time that you could make an annualized projection, though, right?

A.    No.  If I just, if I rely just on the W-2 for 2023, no.

Q.    Because you just didn't know.  They didn't tell you that she'd gotten this promotion, right?

A.    I don't know.  I don't remember.  That was a long time ago.

Q.    If her salary was increased by 5 percent from 2023, July 2023 through the end through 2023 and it isn't reflected in your chart because you didn't understand that, wouldn't that make your numbers in here completely wrong?

A.    Well, I disagree that I didn't understand that.  But, obviously, if you put a higher inflator in there, the numbers are going to be greater.

Q.    Okay, great.  Which means the numbers for UVM are greater, which means the loss figure between her job at Dartmouth and her job at UVM is less significant; isn't that right?

A.    Well, only if, only if you're correcting your assumption.

Q.    Correct.  What if there was a limit on the funding that went to physicians at Dartmouth-Hitchcock during the Covid years, say 2021 to 2022?  Let's say that Dartmouth held flat on the amount of money we're going to pay doctors.  Wouldn't that mean that perhaps your numbers in here are inaccurate?

A.    If there was -- if that's the case, if they gave no increases, obviously, those projections for those years that

are based on a 2.5 to 3 percent increase would not be right.

Q.  Now, let's talk a little bit about fringe benefits.  You have a calculation in Column 2 of the fringe benefits at Dartmouth-Hitchcock and Column 5 of the fringe benefits at University of Vermont; is that correct?

A.  Yes.

Q.  And I think your analysis simplified the fringe benefits to say, well, I'm only going to look at contributions to pension and health care plans; is that correct?

A.  Yes.

Q.  Okay.  Now, directing your attention again to that document that was in Tab 3, the table that is the pension plan of employees of Dartmouth-Hitchcock clinical calculation summary --

A.  Where is that located?

Q.  I'm sorry.  Yeah.  I have a harder time than you even. It's in Tab 3 about three pages from the back.

A.  Yes.

Q.  Do you see that document?

A.  I see it, yes.

Q.  And aren't I correct that, in developing your table for the August 2024 report, you calculated the costs of her pensions at 12 percent of total pensionable pay; is that correct?

A.  Yes.

Q.   Okay.  Now, doesn't it make more sense to do 12 percent of qualified pensionable pay?

A.   I'm trying to remember.  I'd have to go back and look at the documents.  There was an explanation in one of the documents about how pensions were calculated, and --

Q.   It seems --

A.   May I finish?

Q.   Oh, sure.  I thought you were done.  Sorry.

A.   There was an explanation that, for people going over a certain amount, there was a bump.

Q.   Okay.  So you seem to recall an explanation that you can't describe in detail that conveniently answers my question; is that what you're saying?

A.   I don't know if it conveniently answers your question.  All I'm saying is that there is a document in there that says this is what they will contribute on a pension plan and, if your income is above a certain level, which hers were, there would be an additional contribution made on behalf.

Q.   Oh, okay.

A.   And I don't have that document in front of me to tell you exactly what that percentage is, but I believe that is where I derived the 12 percent from.

Q.   Okay.  I would be interested in seeing that.  So, if you identify that, send that to me, please.  Qualified pensionable pay, doesn't this look like what I think, and I'm not that

knowledgeable about pensions, but, you know, it seems like that's an amount of pay that you're going to qualify for your pension purposes and then above that they don't kick in any more. Is that consistent with that?

A. That's your assumption, not mine. I don't know. I'm telling you what I believe is another document that goes through and talks about what percentage Dartmouth will contribute of an employee's salary and that there are two, there is a bump-up if you're over a certain percentage.

Q. If the theory that I'm positing is correct that qualified pensionable pay is the amount of salary you can earn up to the point at which the institution will kick in in its maximum matching contribution, if I'm correct about that and the amount that is on your fringe benefit for pensions is 12 percent of qualified pensionable pay as opposed to 12 percent of total pensionable pay, doesn't your report overstate the value of the Dartmouth fringe benefits?

A. I don't know. I can't tell from that, your hypothetical here. I mean, obviously, if you multiply 12 percent times the qualified pension play, pay, it's going to be a smaller number than the total pension pay. But I'm not saying -- I'm not agreeing with you. That's what I did, and that's how I derived the 12 percent.

Q. Are you familiar with a program at UVM to provide tuition remission to UVM employees?

A.    Yes.

Q.    Okay.  And that applies for UVM graduate schools, too, to your knowledge?

A.    I assume so.

Q.    Okay.

A.    I have never had the opportunity to look at it.

Q.    Okay.  Are you aware that the plaintiff had tuition remission for one of her sons in an amount of, you know, about $17,000?

A.    No.

Q.    Okay.  Do you recall seeing in any of your review materials that you reviewed to prepare these opinions a reference to that?

A.    No.

Q.    Okay.  Directing your attention, please, just go to the next page on that tab on Exhibit 3 on the next page after that where you see where --

A.    What tab are we on?

Q.    I'm sorry.  We're on Exhibit 3.  It's actually the last page before Exhibit 4 starts.  It states at the last thing I read here it says, I also received benefits as being part of the faculty at UVM Medical School from the university besides pay.  My son's tuition is compensated this year.  No tuition for senior year.  Yikes.  Or yippee.  Sorry.  About the college tuition.

A.   I don't know where you're reading that from.  I'm sorry.

Q.   Okay.

A.   Oh, I see it now, okay, at the bottom, yeah.

Q.   Okay.  And just to -- you recall these were questions you posed to her counsel and her counsel passed to Ms. Porter to answer; is that right?

A.   I'm not sure what your question is.

Q.   My question is, Is that what that document is, questions you provided to Ms. Porter's counsel and she provided to Ms. Porter to provide you information so you could render an expert economic opinion in this case?

A.   I don't know what you're referring to.  I don't think I've seen this.

Q.   Okay.  You don't recall that as being part of --

A.   No, no.  I don't remember seeing this, no.

Q.   Okay.  So it would be news to you that the plaintiff, in 2019, had her tuition paid for by the University of Vermont for her son?

A.   Yes.  You asked me that, and I said, no, I was not aware of that.

Q.   Okay.  And I'm just showing you this because there are references to that in your reliance materials.  Do you have an explanation for why you may not have seen a reference to that in the reliance materials?

A.   I don't remember seeing this, no.

Q.   If Ms. Porter had received a $17,000 fringe benefit increase in 2019, that would have increased her UVM fringe benefits for that year; isn't that correct?

A.   Yes.

Q.   And, due to your methodology, it would have carried forward?

A.   Yes, but I would have had a crucial question that needed to be asked before I did that.

Q.   Are you aware of the ages of her children?

A.   No.

Q.   How many children does she have?

A.   I don't know.

Q.   Directing your attention back to the chart which is at Exhibit 2, third page in, I note that her earnings for UVM dropped dramatically in 2025.  Do you see that?  On, if you look at 2025 and then Column 6, she goes from to $195,411 when the year before it's $338,000.  Do you see that?

A.   I'm not seeing your number, but I see for 2024 I have at UVM $305,506, and then in 2025 it drops down to $162,750.

Q.   Okay, fair enough, for the earnings.  Thank you.  That's Column 4.  I'd gone for total earnings.  But aren't I correct there that you have that drop-down there based on an assumption set forth in your report that she would, on January 1, 2025, start working only a .6 time position at University of Vermont Medical Center so her earnings would drop; is that right?

A.    Yes.

Q.    And yet your chart for Dartmouth projected out into the future shows that her earnings would continue based on an assumption that, if she was at Dartmouth, she'd work full time, but, if she was at the University of Vermont having just received a full professorship and everything, she would go to .6 time?

A.    Yes.  Based on her information, she said that she was, this was very stressful being in the community up into Burlington as opposed to being able to commute to Dartmouth.

Q.    Based on the information she provided you; is that correct?

A.    She took -- she provided me, said that, that what her plans were was that, starting January of 2025, she was going to be working 65 percent.

Q.    Okay.

A.    60 percent.

Q.    Okay.  And that she told you that either verbally or in an email; is that correct?

A.    One or the other, yes.

Q.    It was not based on any kind of independent corroborative information at all; isn't that right?

A.    I did not do any research on that, no.

Q.    And she didn't provide you any information that would substantiate that that's what her plan was; isn't that correct?

A.   No, I don't think so.

Q.   Okay.  And doesn't that dramatically increase the loss damages for her?

A.   Yeah, yeah.

Q.   Right?  So she goes from, like, well under a hundred thousand dollars a year in the difference between her Dartmouth and UVM salary to, you know, a couple hundred thousand dollars a year; is that correct?

A.   Yes.

Q.   Extending out forever; is that correct?

A.   Well, not forever.

Q.   Well, true, fair enough.  2033, it will be here before we know it, but it's a long way out, right?

A.   Well, yeah, it's '33.

Q.   Okay.  So that seems like that makes up -- that that adjustment in your projections, you know, accounts for a huge amount of her loss; isn't that correct?

A.   Yes.

Q.   Doesn't she benefit by going to a .6 position nonmonetarily?

A.   Well, she obviously is saying that that's what she would like to do given the situation that she's in.  It's my understanding from my conversations with her she'd like to be back at Dartmouth working full time and that, and that we have had several conversations about her working at UVM and how

stressful it was and this was not her preferred position.

Q.   Okay.  And that was based entirely on her saying, Yeah, that's what I want to do, and that's what it's going to be, correct?

A.   Yeah, that assumption is based on what she told me, yes.

Q.   Her say-so?

A.   Yes.

Q.   And, if you didn't use that dramatic change to .6 from full-time employed while she's at UVM, wouldn't your chart be, you know, very, very different in its entries?

A.   It would be different.  The losses would be smaller, yes.

Q.   A lot smaller?

A.   Explain a lot.

Q.   Well, a lot is a normative term, but, you know, I'm just a simple lawyer.  You know, when you're talking, like, $4 million, that's not a lot -- that is a lot.

A.   It wouldn't have been up by $4 million, not even close.

Q.   Have you done an analysis about what it would be?

A.   No.

Q.   Why not?

A.   Because I was asked to assume that she would go to a .6 appointment starting January of 2025, and that's what I assumed, and my analysis is predicated on that assumption.

Q.   Let's talk about your cumulative present value and settlement tax and your total economic loss columns.  See those

columns?  Those are 11, 12 and 13 on the chart.

A.    Yes.

Q.    Okay.  So what I understood from your deposition testimony is this was an attempt to gross up her losses so that she would be fairly compensated if a judgment was rendered and she had to pay taxes on that judgment; isn't that right?

A.    Yes, because she does have to pay taxes on it.

Q.    Sure.  But aren't the salary calculations in here pretax, i.e., they include an amount from which one will pay their taxes?

A.    Yeah.  I back out taxes.

Q.    Okay.

A.    In Column 8 I am backing out the taxes that she would have to pay on the difference between the Dartmouth gross income and the UVM gross income.  So I'm backing out taxes, and I'm coming up, and it's a key to this analysis is I'm coming with up with a tax-adjusted lost earnings.  That is Column 9.  Taxes are then backed out.  And, if this was like a personal injury case or a wrongful death case which is not taxable, then all I would do is convert the present values and have a running total, and I wouldn't have to do a settlement income tax.  But the point is that employment cases are taxable.  The awards are taxable.

Q.    Fair enough.  But the amount of earnings that you've used to determine her taxable compensation are in pretax, i.e., they're already grossed up; they don't need to be grosses up a

second time?

A.    That's not true.  I just explained to you that in Column 8 I'm backing taxes out, and Column 9 is after-tax loss.

Q.    How about settlement income tax; where does that come from?

A.    That comes from how much additional money would Dr. Porter need in order to ensure that she received a specified after-tax amount.  If you want to use the year 2023, the present value of her loss out through the year 2033 is $2,210,000.  That's in after-tax dollars.  If there was no tax consequences, end of story.  There wouldn't be a Column 12, and there wouldn't be a Column 13.  It would be just like if this was a wrongful death or personal injury case.

     But it is taxable, and because we have a progressive income tax here, if I get money all in a lump sum, I am going to be forced into the highest tax bracket relatively quickly, and, secondly, what's insidious about this is you're going to end up paying taxes on the taxes.

Q.    Well, that's where it kind of doesn't all add up, because it comes up to roughly half of your total damages number.  Your total economic loss is $4.3 million in your August 2024 report, but your settlement tax, just the tax on the tax, is $2.1 million, correct?

A.    That's right.  But we, now, you remember you have now put this person in the highest marginal tax bracket, both federal

and state.

Q.   But she's in a pretty darn high tax bracket to begin with.

A.   Yeah, she is.

Q.   So it's not like getting it in a lump sump increases her marginal tax rate for, you know, huge portions of her income.

A.   No, it doesn't, in her case, it does not increase that marginal tax bracket, but it does increase her taxable income significantly.  And what those numbers in that column, Column 12, represent is the additional sums that she would need.

So, for instance, going back to the year 2033, I am saying that, in order to make her whole, that is so that if she would receive an award of $2,210,258 without any tax consequences, she would need an additional $2,119,000, bringing the total amount that she would need as a settlement of $4,329,258.  When she filled out her income tax, she would put down, I received $4,329,258, and after she put in her income and her husband's income, the additional amount of taxes I'm estimating that she would have to pay would be around $2,200,000.

Q.   Do you have worksheets that show how you reached this calculation?

A.   I have tables, yes, that are to the -- I think I explained in my deposition that to the right of this table are a set of columns that look at what the taxes would be, a calculation of the taxes give a particular settlement.

Q.   Would it surprise you to learn that we had some economists

look at this and they couldn't make heads or tails of this?

A.    I don't know who your economist was.  I've seen lots of economists that couldn't make heads or tails out of anything.

Q.    Now, your projections conclude that, even though she went to .6 position at University of Vermont, she would continue working full time, not just through age 65, but through age 70; is that correct?

A.    I'm not -- again, we went over that.  I'm not assuming that.  I'm leaving that entirely up to the trier of fact to determine how far out into the future she would work.  I'm not implying that she would work to 70.  I'm not implying that she would work to age 65.  I'm leaving it to the trier of fact to determine that, and, if the trier of fact buys the underlying assumption in my calculations, then they can use that table to calculate a loss.

Q.    Okay.  But, if the trier of fact concluded that, you know, she probably would stop working at age 65 or earlier, your loss calculations would be, as they indicate for those years, for that year further into the right-hand column of 11, 12 and 13; is that right?  I didn't ask a very good question.  I can rephrase it if you want.

A.    Well, I think I get what you're driving at.  Yeah, if she retires -- if the trier of fact says, I believe she would retire or it's reasonable to assume she would retire at 65, then you need to go over to Column 13 and go down to age 65 and

look at the number, and that is $2,542,019.

Q.   Right.  Again, assuming that she would keep working at Dartmouth 100 percent of the time while opting for this part-time position at University of Vermont given her full professorship?

A.   Yeah, starting in January of this year at the .6, yes.

            ATTORNEY COFFIN:  Just a second, Your Honor.

            THE COURT:  Okay.

            ATTORNEY COFFIN:  Those are all the questions I have right now, Your Honor.

            THE COURT:  Okay.  Mr. Jones?

                CROSS-EXAMINATION BY ATTORNEY JONES

Q.   Good afternoon, Doctor.

A.   Good afternoon.

Q.   Just a couple of questions to follow on up on Mr. Coffin. Mr. Coffin asked you a couple of times whether the source of the information for your assumptions was Dr. Porter or her lawyers, and you said yes.  Is that common in the cases that you work on?

A.   Absolutely, sure.

Q.   You don't see her role as being a finder of fact or a trier of fact?

A.   No.  You know, over the 2,500, 3,000 cases I've worked on, there may have been a few of them where I have actually given the task of looking up something, but they're unusual cases,

but 95 percent of the personal injury, wrongful death cases, and employment cases, unless the person has found a job that everybody feels comfortable with that this is indicative of what they'll be able to do in the future, then there has to be some assumptions made of what this person might do and might work, and it is not my role to, to question them. It's my -- I accept them. If I'm asked to assume a certain thing, I will assume it, but I, it's not my responsibility to defend it.

Q. Thank you. Mr. Coffin also asked you a couple of times. There's been some suggestion in the briefing that your analysis has some form of double-dipping because past earnings would be taxable. Just to be clear, does your analysis take into account that past earnings would be taxable?

A. Yes.

Q. And you've backed out the taxes, all the past earnings?

A. I've backed out the taxes on past earnings, and I've backed out taxes on future earnings.

Q. To get present value?

A. And then the next step for me is to determine the present value of a after-tax number.

Q. Okay. So there's no double-dipping or triple-dipping in your numbers?

A. No.

Q. And then Mr. Coffin asked you a lot of questions about the fact that Dr. Porter, in fact, became a professor at UVM in

2023.  I think you said it.  I want to make sure it's clear. In your August 2024 report, the numbers you used for her UVM earnings were, in fact, the actual earnings she was making with that professorship; is that correct?

A.    That's right.  I used those.  Yes, I used that information, scaled it up, and then used that as the basis to go forward.

Q.    Right.  So, if you were then to add another 5 percent, wouldn't that be improper because you already had the actual numbers?

A.    Well, yeah, it would be inappropriate to do that.  It would unjustly inflate the number.

Q.    Because you have the actual numbers already?

A.    I have the actual, yes.

Q.    There's also been questions, at least in the papers, about whether you have an appropriate level of expertise in employment cases.  Does -- backing up a little bit, is what you do in almost all of the cases you've worked in is provide earnings projections?

A.    Yes.  Yeah.  That's why I, I it's hard for me when I'm asked a question, How many employment cases have you worked on, or, How many wrongful death cases have you worked on, or, How many personal injury?  They're all lost income, and they're all, with the exception -- there's one exception with employment cases, but all of them deal with projecting out a

stream of income, whether it be before termination or before injury or before death, at least in the injury cases and in the employment cases, and then projecting out what is a reasonable expectation of what a person would earn over their lifetime.

The difference being is, when we get to that gross-up for taxes. If it's a personal injury case, once you back out the taxes for each individual year, you turn the present value on that, end of story, but this one has an extra step involved.

Q. So, before you get to the gross-up, which is unique to the employment earnings, is it true that your methodology and approach to an earnings projection is the same regardless of whether it's employment, wrongful death, personal injury?

A. Yes. If this was a personal injury case and all the underlying assumptions were the same, you know, for whatever reason, can't work at Dartmouth and can't work at UVM under this and that, that table would be the same, except Column 13 and 14 would not be there.

Q. Yeah. And, finally, providing the gross-up issue, that is unique to the employment cases. The numbers we're talking about in Dr. Porter's earnings are somewhat larger than usual, but can you walk the Court through an example of why grossing up is essential to make a person whole with, say, smaller numbers, for example, a $50,000 loss?

A. Sure. An example that I've used before is if we have a situation where a person has lost $50,000, and let's assume

that people conclude that or reasonably conclude that they would have lost this $50,000 at least in the next ten years, ignoring inflation and that.  So the taxes on $50,000 for a single person, just federal taxes -- and I'm not, I won't get into state taxes, but the same concept applies here -- is around $4,000, one year.

So if we were to go out ten years, multiply that by ten, it comes out to be about $40,000.  If, instead of that $50,000 over the next ten years you were to award the person five, a half a million dollars, that is $50,000 for each of those ten years.  That's a half a million dollars.  The tax on that would be about $125,000, about three times larger than it would be if that money was paid out over ten-year period.

Q.   So the impact really is huge?

A.   It is huge.  And what really leverages these cases up is that you've got to pay taxes on the taxes.  So, for instance, in the example that I just gave, so I went through and so I said, okay, well, if the persons needs $125,000 to pay taxes on that.  So I plug that in, and, if you will, I do the tax return.  I plug that $125,000 in with the settlement.  Wait a minute.  They've got to pay more taxes because now that $125,000 that I said was the tax is, they've got to report as income, and so there's going to be tax on that.

So, eventually, it's going to be an iterative process where you finally reach a point where you say, okay, the

process is 125 is too low.  So I'll increase it 150.  That's still too low.  I increase it to 175.  That's too high.  I come back down to 165.  That's too high, and then I come to 160.  Bingo.  So there it is.  So, if you give the person 160, they will get out whatever their after-tax loss is.

ATTORNEY JONES:  Yeah, thank you.  Your Honor, if I could have one second to consult with counsel.

THE COURT:  Okay.

ATTORNEY JONES:  We have no further questions.

THE COURT:  Okay.  Any further questions?

ATTORNEY COFFIN:  No further questions.  Thank you, Your Honor.

THE COURT:  Thank you, Dr. Bancroft.  Okay.  Now, is there any further argument at this time?  Mr. Coffin, you had said in the beginning, I think you said this isn't a *Daubert* motion, but you are ultimately objecting to the use of this expert.

ATTORNEY COFFIN:  Yeah, I would say I don't know if it's a *Daubert* motion, but it's a little bit a hybrid, I guess I would say.  You know?

THE COURT:  Okay.

ATTORNEY COFFIN:  We do object to his qualifications and think it is improper for him to provide this testimony in this case because his qualifications do not reach the level that's necessary for to reach this gatekeeper function for the

Court.

Plus, as we've heard today, there are a number of significant substantive problems with his report. And so, if the plan is, and we don't know what the plan is, that he is going to testify about this chart that we've been talking about so much, I think that is, you know, extremely prejudicial without probative value given the testimony that you've heard here today. You know, and we would just, you know, ask the Court to focus on, you know, the 12 percent mark-up, the .6 employment, the 2.5 percent pay increases assumed. No accounting for the, you know, promotion to professor, not even knowing that.

You know, not knowing what the current W-2 is despite what my brother had him testify to here today. I think that the record is he probably doesn't have it, and we certainly don't have it, Your Honor, and that's a discovery issue that we do need to get right away. The gross-up issue, does that really account for $2.1 million in the total damages?

Again, we may need to -- the Court may think it's wise to hear what the testimony is that lays the foundation and what he can testify to and make a decision after cross about whether that chart can come in or not, whether there's some level of testimony he can provide, but right now I don't think he's met his threshold.

THE COURT:  Okay.

ATTORNEY JONES:  Your Honor, can I make a few points?

THE COURT:  Please, go ahead.

ATTORNEY JONES:  Almost everything Tris just talked about is an issue for trial.  Those would be great questions for trial.  That would be great arguments for the jury, but it does not go to the gatekeeping issue that really is what we're dealing with pretrial is whether or not Dr. Bancroft can testify, and I don't think any of the issues they've raised go to his qualifications or to the reliability of his methodology.  So all the issues we've been talking about this afternoon, I imagine that would be their trial position, and we'll deal with it at trial, but it does not go to whether or not Dr. Bancroft can testify in the first instance.

With regard to the 12 percent issue, that's a statute.  This is not some expert using discretion or pulling a number out of the air.  The law says it's 12 percent.

With regard to the issue of her professorial promotion, Dr. Bancroft used the actual earnings.  So that's a red herring.  And, finally, with regard to the gross-up issue there's plenty of law, and we're prepared to brief it if you would like it, but the Third Circuit, Seventh Circuit, Ninth Circuit, Tenth Circuit, Federal Circuit all have held in employment cases grossing up earnings to account for the tax liability is appropriate. So all of this, the legal stuff is clear legal stuff.  The factual stuff is for a jury.

THE COURT:  Though it appears that courts in this circuit have gone both ways on the grossing up question, which I'm sure you know, and there's, in fact, a circuit split on grossing up right now.  And I was going to ask Mr. Coffin, Is it so much that you're disagreeing with the grossing-up notion as a theory or kind of the, you know, based on your questioning of Dr. Bancroft, you have an issue with respect to how it's calculated?

ATTORNEY COFFIN:  We don't know how it's calculated.

THE COURT:  Right.

ATTORNEY COFFIN:  And I think there is not some law in this circuit about whether you do it and the circumstances you do it and how you do it, and I think it's important that the W-2 income is grossed up to begin with, and, if the notion is, okay, you're going to gross it up for -- if the logic is you're going to gross it up because you get a lump sum that changes your marginal tax rate, this is a person who actually has a pretty high marginal tax rate to begin with.

THE COURT:  Right.

ATTORNEY COFFIN:  And I do want to make one more point when the Court is ready for me.

THE COURT:  Okay.  So I was just going to say, so it sounds to me like your argument is more about the accuracy of the calculations as opposed to whether grossing up is an acceptable theory?

ATTORNEY COFFIN:  Is ever appropriate, right,

THE COURT:  Right, okay.  Was there another point?

ATTORNEY COFFIN:  Yeah, the point I wanted to make was on the 12 percent and the sum certain.  12 percent is the statutory interest rate, but, of course, the case law is that the 12 percent is only to be applied when you have a sum certain.  So it's a very different situation where you got a promissory note of $20,000 which somebody has stiffed you on and they've sat on that for three years as opposed to this very complicated set of facts and premises about what they were supposed to pay and when.

And, in addition, in this case, it's particularly unfair because we won at summary judgment back in 2020.  You know, what were we supposed to do, pay her the money after we won?  You know, and the Court, for a lot of reasons, the Court is quite familiar with it just took a while for us to get back here.  So that portion, I think, should not be considered of the 12 percent.  But, really, I think 12 percent, based on my review of the Vermont case law and how I've seen Vermont courts handle this, they wouldn't dream of giving 12 percent in this very complicated case.

THE COURT:  Okay.  And the complexity that you're talking about here is not just because it's limited to the medical community, right?  The point of your questions for Dr. Bancroft was asking him about how much experience he has in

the hospital setting, but the nature of these disputes is not something that's unique to the hospital setting; is that fair?

This goes to the gatekeeping function, right? So, if Dr. Bancroft testifies that, you know, No, I haven't done dozens of projections of loss amounts in the context of hospital care, that means that he shouldn't testify in this case and he should be excluded kind of under the gatekeeping role?

ATTORNEY COFFIN: Well, I mean, I do think his limited qualifications in this kind of a case make him particularly lacking in qualifications that would permit him to testify here. But, you know, I would say that the complexity of this matter for assessing whether a 12 percent prejudgment interest, which under Vermont case law is only to be applied when there's a sum certain, would not be appropriate at all here because we don't have a sum certain here.

You know, we've got, we have three different reports in three different years, each of which is quite different with different methodologies. We've landed on this notion that the losses are primarily driven by the fact that she is going to work .6 at UVM, but, if she'd stayed at Dartmouth, she would have worked full time until age 70. You know, and we didn't know that about that, and presumably neither did she, until August of this year. How can that be a sum certain for us to pay?

THE COURT:  Yeah.  No.  I have to say that doesn't strike me as going to his qualifications.  That's cross-examination material, it would seem to me.  And, as you well know, I mean, the standard for allowing an expert to testify, there's definitely some principles of law that apply there, but it's not particularly onerous.  Certain threshold requirements have to be met, of course, but it's more typical that an expert is allowed in and subject to the able cross-examination that you just did of Dr. Bancroft here in court.

All right.  Is there anything further on this particular motion at this time?  It's going to be taken under advisement.  I'll be issuing written rulings on all of these, in fact, but, if there's anything else you'd like to --

ATTORNEY COFFIN:  No, thank you, Your Honor.

ATTORNEY JONES:  Nothing further, Your Honor.

THE COURT:  All right.

ATTORNEY JONES:  Dr. Bancroft can leave?

THE COURT:  Yes.  I have all of your motions here in a separate folder, so it's a matter of picking which one we go to next.  Let's, I guess let's turn to the issue of Dr. Porter's qualifications.  So, Mr. Coffin, I've read all the briefing here.  I mean, we don't need to belabor what has been written.  I'm sorry, Mr. Schroeder.  Are you arguing this particular motion?

ATTORNEY SCHROEDER:  Yes, I am, and I won't belabor anything, Your Honor, go ahead.

THE COURT:  Yeah.  No.  You stood, so I'm happy to hear from you on everything.  I was just going to say I've read everything.  I'm familiar with the issues, but I may have a question or two here or there, but go ahead.

ATTORNEY SCHROEDER:  I'll keep it short, Your Honor.  This really goes to probative evidence and part of a bigger issue as well regarding something I raised in January, which was the fair distribution of time for our three-week trial, and having done just a few of these over the years in various courts, right now, we know that -- we have the exhibit lists and the witness lists.  The witness list has 34 total people.  Plaintiffs have 20, actually 25.  Five of them are our witnesses.  And I would submit, Your Honor, that, if you look at the witness list, at least ten of them go to the issue of character evidence because they certainly didn't come up in the course of discovery in this case, but they go to issues of working with Dr. Porter and presumably about the skills of Dr. Porter and qualifications.

When you judge where we are and what we expect to handle in this case and specifically what we, jury selection, opening statements.  Dr. Porter, I suspect, will be on the stand until at least Wednesday, and then you couple that with all of these character witnesses -- and I count ten off this list from

plaintiff's witness list -- I do not see from a timing perspective how we're going to get fair distribution of time to put on our case in chief, including the fact that, if you take her 25 witnesses, 5 of them she's calling on in their case in chief our witnesses on cross, two on March 31, one on April 1, full day, Dr. Merrens, and one on April 2nd, Dr. Conroy at least of right now, and then presumably, if Dr. Bancroft is allowed to testify, somewhere in there.

I'm merely -- one of the reasons for doing this is to say the witness list actually bears out our concern, Your Honor, about cumulative evidence that I can tell from the witness list is going to happen.

THE COURT:  So, when you refer to them as character witnesses, do you mean that you anticipate their testimony to be primarily or exclusively to get on the stand and talk about what a good doctor Dr. Porter is, or do they have other relevance as to what they're testifying to and as part of their testimony, they might say, my experience with Dr. Porter is such and such and this is what kind of doctor she is?

ATTORNEY SCHROEDER:  I think it's the former, Your Honor.

THE COURT:  The former?

ATTORNEY SCHROEDER:  The former.  Because we did a lot of discovery in this case, a lot of -- I think we produced over 30,000 pages of documents, and looking at a number of

these people that never came up in the course of discovery, I submit, okay, maybe, maybe seven out of ten. Maybe I have overshot my numbers, but I can tell you, looking at knowing this case from a -- Mr. Vitt and myself are the only two that have been in the case since the start.

I can tell you that one of them is a patient. I can tell you that a number of them are former employees in different departments, radiology, urology. Those are not part of the REI division, right? So she had interactions with these people. The only conclusion -- maternal fetal medicine, these are different midwife and OB/GYN. These are not part of this case in terms of the relevant issues before the court. And we had a concern that this may happen when there was a suggestion that they'd have 20 to 30 witnesses.

Well, now we know, and if we're starting on the 24th and we know that the following week, Monday, Tuesday, Wednesday, are already slated for them to do cross of our witnesses, well, then assume for sake of argument that we somehow keep going plaintiff's case. We're going to have maybe a week to put on our case, and they get two, and I think that's my concern in foreshadowing what I suspect will happen, and I think this list actually proves my point.

THE COURT: Okay. And so, talking about what your proposal is, though, as I read your papers, you're willing to stipulate to the qualifications of Dr. Porter on the one hand,

right, or, in the absence of a stipulation, some type of limitation.

Curious to hear how you would propose that that be limited based on what you are saying now. Are you saying certain witnesses should not be allowed to testify at all, like, excluded or

ATTORNEY SCHROEDER: I would submit, Your Honor, they are for purposes of character evidence qualifications --

THE COURT: Yeah.

ATTORNEY SCHROEDER: -- that we would have some limitation on this. My concern is just we've got three weeks and --

THE COURT: I hear you.

ATTORNEY SCHROEDER: And this is a robust list of witnesses. I expect to call, I think, at least most of my witnesses, and I would say the lion's share of my witnesses. So with their list it's 25. I think we had 13 or 14. There's five that are overlap. We're obviously going to call those five in our case in chief and/or on cross-examination depending upon their availability.

But, when you look at those numbers and you look at the people that are listed here who are either current or former employees in other divisions, not REI division, I think it's a fair assumption that that evidence will be duplicative and cumulative. Of course, if they perhaps have some relevance to

part of this case, the material facts of this case, I could understand why that would be allowed, but, if we're looking at three weeks, I just don't want to be a position where April 3rd or April 4th -- my daughter's 19th birthday.  She'd be happy that I said something about that in court -- that we're looking at just putting on our case in chief the week of April 7th where a lot of time was wasted on talking about Dr. Porter's qualifications.

We've asked to submit that she's -- we even said eminently qualified.  We even give a few adverbs in there, but the fact of the matter is we've got three weeks, and we've got to try this case 9:00 to 4:30, and I don't see how, based on that list, against our motion which was -- you know, certainly thought this is what was going to happen.  I just don't want to be at April 4th having this discussion again when we're trying to figure out how to jam all of our witnesses in one week.

THE COURT:  Your list of witnesses in your filing are these people that you refer to them as plaintiffs seeks to parade in front of the jury, I just want to be clear on that.  Are these witnesses that you're suggested shouldn't be testifying?

ATTORNEY SCHROEDER:  I would say -- from their list?

THE COURT:  I think it is.  Isn't it?

ATTORNEY SCHROEDER:  Yes.  So I would submit that there are a number of witnesses on this witness.  List we

obviously filed our motion before getting the exhibit list.

THE COURT: Right.

ATTORNEY SCHROEDER: But the exhibit list bears out our concern, and having reviewed their list in ETL with my client, I'd rather drop at least nine to ten people. I actually had ten that would be cumulative because, from everything I know about the discovery in this case, that's all it would go to would be the qualifications issue.

THE COURT: Okay. I mean, on the stipulation topic, obviously, I can't force the other side to stipulate. You know that. And that's also kind of been a little bit of tension with the case law that talks about a plaintiff's right to kind of present the case and present the facts, too, right? So a stipulation is, it happens, but in this kind of a case in particular, I feel like a stipulation might not be workable, it seems to me, but that's just my kind of preliminary --

ATTORNEY SCHROEDER: I understand, Your Honor, and I understand the tension there.

THE COURT: Yeah.

ATTORNEY SCHROEDER: But I have seen this play out before this way, And I don't -- I'd like to be wrong that, you know, we start to get our case in chief on earlier, but, even by their own trial subpoenas -- which, by the way, they gave a trial subpoena for one of my witnesses which we can deal with later who is one of, somebody that's represented by us and gave

a trial subpoena to them in December and didn't even give us notice of it and didn't even tell us about it.  So we'll deal with that, a few minor issues or major issues later on.

But the fact of the matter is they're calling our witnesses.  They have a right to do that.  I understand that, but even based o their math, Monday, Tuesday, Wednesday of the second week the likelihood that we'll even be able to get all four of those witnesses done just in those three days is somewhat Herculean.  And so this is just a foreshadowing of our concerns in that regard.

THE COURT:  Yes.  If your sense of what these witnesses is going to testify is correct, if -- I'm very interested to hear from Mr. Vitt on this.  I mean, if they are actually being called just to testify to what you refer to as character, well, then, yeah, I would have some concerns about cumulative evidence or duplicative evidence, but I think it will be useful to hear from the other side, who I'm sure is going to tell me now that this is catastrophization.  Right, Mr. Vitt?

ATTORNEY SCHROEDER:  I only heard that word a few times in the papers, yes.  Thank you, Your Honor.

THE COURT:  Mr. Vitt?

ATTORNEY VITT:  Thank you, Judge.  May it please the Court, we do not intend to parade, to use their term, those 13 witnesses on the stand.  We intend to try this case

efficiently.  We intend to try it in a way to keep the jury's attention, and I do not expect we will get to a situation where Dartmouth-Hitchcock is jammed up in the slightest in terms of being able to put on their case.

Do we intend to call some of their witnesses?  Yes.  Do we expect them to take a day, a half day?  No, absolutely not.  We intend to try this case efficiently, and the witnesses we're calling are not character witnesses as that term has been used in my experience, period.  Now --

THE COURT:  Are they purely qualifications witnesses?

ATTORNEY VITT:  Well --

THE COURT:  I think we are using the word character but what we're talking about is qualifications.

ATTORNEY VITT:  No.  Look, these are people who were involved in some way in this situation.  How do you know Dr. Porter?  For example, I don't -- back up just a second. Dartmouth-Hitchcock says the crux of this case is whether the decision to close the REI division and terminate Dr. Porter's employment was a pretext for disability discrimination or whistleblower retaliation.  That is not what the Second Circuit held.  Is that part of the case?  Yeah.  Is it the crux of the case?  No way.

The court and the jury must consider why Dr. Porter was not retained or reassigned to OB/GYN.  That's going to be a significant part of this case, and to do that one of the things

we need to establish are, What are the qualifications and the skills that she had that no one else had within the OB/GYN department? For example, she could read ultrasounds in a way nobody else could. She could do surgeries that no one else at the institution could perform. She had an experience in endocrinology that simply was lacking within the department.

And there are quite a number of emails. Victoria Maxfield is going to testify she spent 18 years at OB/GYN, and she says Dr. Porter's expertise in gynecological ultrasound, myomectopies, hysteroscopies and GYN surgeries provide a level of care to women that is not available from other members of the gynecology staff. Now, as part of her testifying, will she talk about this experience and her skills? Of course she will. Will it take a long time? No.

But, in order for the jury to assess whether the decision not to reassign Dr. Porter made any sense whatsoever, we need to explain why it should have happened. And so that's not going to take a long period of time, and, to the extent we get to a point where somebody thinks we're duplicating, we'll deal with it then. We don't intend to duplicate. We intend to try this case efficiently.

Now, the part of the motion that I found surprising -- there are some other words that come to mind. They say you should not mention Misty Magic, and it would be a serious mistake to allow a description from the chair of the OB/GYN

department, which happens to have been something that was quoted in full by the Second Circuit. And they say, and I wrote this down, we're trying to glorify her abilities in an effort to mislead and confuse the jury into making a decision based off emotion rather than the merits of the case.

That is an extraordinary prank. You're going to introduce testimony that is so glowing that it ought to be prohibited or restricted in some way. What principle of law is this court supposed to apply in deciding that this type of evidence should be rejected? None that I'm aware of.

And will Misty Magic be mentioned? Of course it will. It was it was the kind of a common expression within the department. You know, she was able to accomplish things nobody else could, and there is nothing improper and certainly shouldn't be restricted as some sort of prohibition on, you know, being overly -- I don't know -- generous, you know. So that part of the motion is easy to deny and, in terms of the schedule, we do not intend to bog this down. Mr. Schroeder will have all the time he needs. Thank you.

THE COURT: Okay. Mr. Schroeder?

ATTORNEY SCHROEDER: Just very quickly, Your Honor. I know we've got a pretty robust motions coming.

Two of the people that were just identified on the witness list, Eunice Lee who was apparently a former patient of Dr. Porter, they were just identified for the first time. And

Chris Strogain who was is a doctor at Dartmouth-Hitchcock who was just identified on the exhibit list. Never disclosed before, never identified.

So perhaps, certainly, they're going to consider discussions about what was referred to by Leslie Demars and cross-examine her on that. I understand that, but it goes to the bigger issue of how much evidence are we going to have related to qualifications, et cetera, and if it's going to her care as a patient, well, why is that particular individual as well as the doctor at Dartmouth-Hitchcock who is not, was in the REI division, why are they just being disclosed now at this eleventh hour?

One additional one, Your Honor, and we did put this in our papers was Dr. Bornstein who has never worked at Dartmouth-Hitchcock as far as I know. And he's, what else is he other than a character or qualifying witness for the plaintiff here where he never even worked at Dartmouth-Hitchcock? He works at UVM. That's where he is. So, you know, I hope we're on schedule to be done April 11th but my fear is, just looking at a handful of these examples, it, you know, the proof is in the pudding, so to speak. Thank you.

THE COURT: Okay. Are you also arguing the quash the subpoena issue?

ATTORNEY SCHROEDER: Yes, I am.

THE COURT: Do you want to just stay there then?

ATTORNEY SCHROEDER: I do, but I got to get another group of documents here, Your Honor. Thank you. I'll try and be short, Your Honor. I know we've got obviously a few more of these to go through. With respect to the motion to quash, we've highlighted this fact before, which is Dr. Porter was announced her, was given notice of her termination May 4th. Her final day of employment was June 3rd 2016. Dr. Conroy didn't come there until August 7th 2017. Those are undisputed facts in the record whether you look at Second Circuit or the trial court. She has no first --

And one of the arguments, Your Honor, and I'd ask you to review Document Number 89, which was plaintiff's submission on June 3rd 2019 which seems like a really, really long time ago. However, in that submission, where we had sought a motion for protective order because we said we didn't believe that Dr. Conroy should have to testify. They said, well, you know, there's, she has a unique perspective on the needs and values of the institution and if the REI -- this was their submission of pretext -- that the REI division was closed for other reasons, perhaps as an opportunity to clean house with regards to Dr. Porter and the other physicians under a, under a pretext and then reopening shortly thereafter, that would be, you know, something that would be worth putting before the Court. Now that was 2019 which is pretty close to the closing of the REI

division.

The REI division closed, and that hasn't been opened in eight years. So that whole pretext theory that served as the basis for them to get the deposition in the first place, that has gone away. They haven't opened the REI division. It hasn't even been discussed of opening the REI division over the last eight years, and so that's where we are. So that the underlying assumption or submission for purposes of even getting the deposition hasn't been borne out because the REI division hasn't been opened, again, in eight years.

With respect to Dr. Conroy's deposition, we had the fact that she was asked numerous hypotheticals, really being asked to be a Monday morning quarterback, documents that she'd never seen before, asked those questions. They had the right to do the deposition. I think it was for three hours. They did it, but they were all hypotheticals because she wasn't on those documents. And, in fact, when you look at their opposition in this case, they refer to emails by Dr. Merrens and emails by Dr. Levine, all of which happened before Dr. Conroy got there.

And, in fact, they have already put in trial subpoenas to have Dr. Merrens testify and Dr. Levine testify. So you have the argument of cumulative as well, never mind 401 or 401 and 403.

THE COURT: Right, but the argument, right, is that there's potentially an inconsistent explanation for the

closing.  I think that's the point, right?

ATTORNEY SCHROEDER:  Absolutely.  And I would ask Your Honor to just review the deposition testimony that's been submitted against the actual article, because it's not always quoting Dr. Conroy, and I would submit there's a number of instances where it actually is a misrepresentation by the plaintiff of what actually she said and the implications of it.

For example, they had an issue with respect to one of the issues they say is any inconsistency with respect to providers, and here the issue of providers she actually explained that that included nurses, and one of the issues, when you close a division of this magnitude and they'd never close a division before -- so Dartmouth-Hitchcock has 15,000 employees, $3.5 billion enterprise at this point, has never closed a division before.  Of course, there's multiple reasons, but in those multiple reasons she was consistent in what she explained out of a five-minute conversation with Dr. Merrens after the fact, after the fact.

And so, if you look at the deposition testimony against the actual quotes from an article in September of 2017, they extrapolate, well, these reasons are different.  I understand that there might be a inconsistency.  There is not inconsistencies, actually between her deposition testimony.  So they finally got the chance to do it, and they have nothing to show for it.

This is somebody who is in charge of 15,000 employees, has a huge, you know, $3.5 billion in revenue, six community hospitals in New Hampshire and Vermont, five multi-specialty community group practices, only academic center in New Hampshire, Dartmouth-Hitchcock Medical Center, only children's hospital.  Dartmouth Cancer Center being one of 57 NCI designate comprehensive cancer centers in the United States. She's got huge responsibilities.

It's one thing to do her deposition in her office down the hall for two or three hours.  It's another thing to basically take her out of commission for at least one workday.  And so, in terms of the undue burden under Rule 45(D)(3)(a), little 4, it's clear in the case law that having Dr. Conroy testify on a five-minute conversation that she had with doctor Dr. Merrens well after the closure of the REI division where she actually is consistent with those reasons, is duplicative, cumulative, and an undue burden for somebody of her stature at this point in this case.

THE COURT:  Okay.  Thank you.

ATTORNEY SCHROEDER:  Thank you.  I'm going to try to keep all my presentations under five minutes.  I'm going to see if I can do that.  I've got a few more I think to do.

ATTORNEY VITT:  Okay.  May it please the Court, Dartmouth-Hitchcock physicians have been that, although the REI division was marginally profitable, it needed to be closed

because there was a shortage of nursing staff.  Ed Merrens, who made decision to close the REI division, admits that pinning the dissolution of the REI division on failure to maintain and recruit nurses for this work is rather thin.

So why does the explanation even matter? Dartmouth-Hitchcock says, Look, we had a legitimate business reason to shut the REI division, get rid of all the doctors and cease providing reproductive endocrinology care to women and children who otherwise would have gone to Dartmouth-Hitchcock to get that medical help.

We say this is pretext, pure and simple.  It was a way to get rid of two incompetent doctors who they worried would raise some sort of just cause complaint or be, you know, hearing God knows what, and they could get rid of the doctor who was the thorn in their side who simply wouldn't tolerate and wouldn't be quiet and insisted that something had to be done to deal with the situation with these doctors and, Oh, by the way, she was on disability.  We can just get her out the door.

Now, the explanation about why they closed it is thin. Joanne Conroy didn't have to say a word, but she volunteered to sit down at a apparently two -- it's a little unclear, but met with the press.  There were reports.  She certainly understood that this issue was a big issue and was likely to be asked about, and she gets a briefing from Ed Merrens, and she comes up with an explanation that is different than what Ed Merrens

testified about.

And I'd like to hand up just one document.  There's, it was marked as Exhibit 2 during the Conroy deposition.  There is an email from David Seifer, one of the doctors who was terminated who we say couldn't do the job, and the other is from Leslie Demars who was the chair of OB/GYN and ended up losing her job because of this situation.  So may I hand it up, please?

THE COURT:  Yes.  Mr. Schroeder, do you have a copy of this?

ATTORNEY VITT:  I gave it to him, yes.

ATTORNEY SCHROEDER:  I just got it, yes, Your Honor.

THE COURT:  Okay.

ATTORNEY VITT:  So, beginning at the bottom, David Seifer writes to Leslie Demars saying, I wasn't aware we closed because we couldn't recruit new providers.  Where does revised information like this come from?  And LRD, which is Leslie Demars, says, I met with Joanne and told her that I hoped that she'd been misquoted in the article because, if that is the information that's been given her, it is completely untrue and now a different narrative that is in the public eye.

I understand Joanne Conroy is busy and a billion this and 15,000 employees, and I get all that, but the way we see it, Judge, Dartmouth-Hitchcock can't keep its story straight.  There may be an innocent explanation why this other excuse was

provided, but it's fundamental to this case, and our view is Joanne Conroy needs to show up and describe and provide answer. Thank you.

THE COURT:  Okay.  Thank you.  Are you replying or moving on to the next motion?

ATTORNEY SCHROEDER:  Touche, Your Honor.  I'd just want if I may, very quickly.  I think I was under my five minutes, so I'm just going to use that extra 30 seconds.  This goes to the issue, Your Honor, which we've raised separately, but the fact of the matter is they're tying to do character assassination through emails where they didn't even depose Dr. Seifer.  They didn't depose Dr. Su, and Joanne Conroy, nothing is attributed to her in this email exchange as far as comments, nothing that Joanne said, blah, blah, blah.  It's discussion back and forth between two people.  Joanne Conroy, there's nothing attributable to her in this email other than, I told her this.

And, certainly, they're going to have Leslie Demars on the stand.  It's perfectly appropriate to cross-examine her on that.  If they had called or deposed Dr. Seifer, they could have perhaps done the same thing, but he's not a witness in this trial.  It's just Leslie Demars.  They've done a trial subpoena.  This is overkill, and it's between two people talking about what they think as opposed to what Joanne Conroy said.  It's, it proves the point.  Thank you.

THE COURT:  Okay, all right.  We've been talking about character evidence so let's move on to the actual character evidence motion.

ATTORNEY McDONALD:  Thank you, Your Honor.  I'll also try to keep it pretty brief.  I'm mostly going to respond to the opposition to the motion.

THE COURT:  Okay.

ATTORNEY McDONALD:  As you know from our papers and it's in the evidence about the performance of Dr. Su and Dr. Seifer, based on undue prejudice, relevance, hearsay, and character evidence.

THE COURT:  So how is it hearsay?

ATTORNEY McDONALD:  What's that?

THE COURT:  How is it hearsay?

ATTORNEY McDONALD:  Well, a lot of the documents I think that they intend to introduce, there will be no witnesses able to testify as to the contents of those documents.

THE COURT:  So like Exhibits 10 and 11, you're talking about, those are hearsay?

ATTORNEY McDONALD:  Correct.  I think there's a lot of issues about those documents.  I think the biggest issue is undue prejudice.

THE COURT:  Okay.  Your hearsay point that you still, you maintain that those are hearsay because of not having a declarant; is that what you said?

ATTORNEY McDONALD:  Correct.

THE COURT:  Okay.

ATTORNEY McDONALD:  So in the opposition it basically says that evidence regarding the performance of these doctors is, by definition, admissible because we did not, Dartmouth-Hitchcock, did not object to the evidence being included in the summary judgment briefing.

That's a misrepresentation of Rule 56(c) which states that a party may object to the material cited in the summary judgment motion on the grounds that it may not be, it is not presented in a form that's admissible to the court.  There's no, there's no law that would suggest that we've waived our ability to contest the admissibility of that evidence at trial, and the suggestion that the Second Circuit has also determined that it's admissible is also complete inaccurate.  The word admissible does appear in the Second Circuit opinion.  So to suggest that, because it's in the Second Circuit opinion, it comes into this trial, I think, is totally incorrect.

THE COURT:  Though it is interesting, right?  The Second Circuit considered this information.  It's kind of hard then to say at trial we shouldn't consider it, isn't it?

ATTORNEY McDONALD:  Well, I think, on the point of relevance, sure, but I think there's still an undue prejudice issue.

THE COURT:  I see, okay.

ATTORNEY McDONALD:  And, also, we'll have to deal with the hearsay issue as well.  When the Second Circuit decided that, it had no sense of who was going to be called at trial.  When we did our briefing, we had no sense of who was going to be called at trial.  Now we know that Dr. Su and Dr. Seifer are not witnesses.  They cannot, they are not going to be called to testify regarding the information in the documents.  And, as I said, there is no, there's nothing in the Second Circuit decision that speaks to admissibility.

THE COURT:  Okay.

ATTORNEY McDONALD:  Plaintiff's opposition also suggests that Su and Seifer's performance goes to Dartmouth-Hitchcock's motivation to close the division.  We were a little confused by that point.  Dartmouth-Hitchcock's position is that there were a number of reasons that led to the decision to close the division, one of which was interpersonal strife among the physicians.  So, to the extent that there is evidence regarding, you know, infighting among the physicians, that would actually support Dartmouth-Hitchcock's position.  So more, we didn't really understand that point.

And, to the point that it goes, this evidence goes to Dr. Demars putting herself on the hook for the performance of Dr. Su and Dr. Seifer, the allegation that Dr. Demars was putting herself on the hook for Dr. Su is new to us.  We always understood their argument to be related to Dr. Seifer, that Dr.

Demars was on the hook for Dr. Seifer's performance.  And I think that this is probably an eleventh-hour pivot so that they can argue for the admissibility of Exhibit 10, which is the self-serving 12-page email of all of Dr. Su's perceived failures.  Again, defendants don't contest that Dr. Porter made complaints about these physicians.

THE COURT:  And isn't that very relevant to the whistleblower claims and the retaliation claims and the alleged unlawful termination?

ATTORNEY McDONALD:  Certainly the fact that she made those reports, and we don't contest that.

THE COURT:  Right.

ATTORNEY McDONALD:  I think the specific nature of the allegations is an undue prejudice issue.

THE COURT:  Prejudice how?

ATTORNEY McDONALD:  Prejudice, this is an attack on Dartmouth-Hitchcock in a way.  This is ten pages that Dr. Porter herself wrote about all of the perceived failures of Dr. Su.  It doesn't go to whether she made these reports.  It goes to an attack on Dartmouth-Hitchcock as a whole and is trying to make, attack Dartmouth-Hitchcock and trying to make Dartmouth-Hitchcock look bad.

THE COURT:  Okay.

ATTORNEY McDONALD:  So I think Exhibit 11 is another example of that.  It's an email from Dr. McBean to Dr. Demars.

I don't understand.  We don't understand why a complaint about another provider that was not Dr. Porter is relevant to Dr. Porter's complaints in this case.

THE COURT:  Okay.

ATTORNEY McDONALD:  So, now that we've received the exhibit list, the exhibit list has at least 15 examples of documents we've counted of documents that relate to specific complaints that Dr. Porter made about Dr. Seifer and Dr. Su, as well as other providers and other staff at Dartmouth-Hitchcock. So it seems that this is going to be a major issue that they're going to try to push this through, this theory through.

THE COURT:  Okay.  And are you still maintaining the Rule 404 objection to this?

ATTORNEY McDONALD:  Yes.

THE COURT:  And the objection is under both 404(a) and (b)?

ATTORNEY McDONALD:  Yes, that's right.

THE COURT:  So it's impermissible character evidence as to Dr. Su and Dr. Seifer?

ATTORNEY McDONALD:  Correct.

THE COURT:  Okay.  Why don't you explain that one to me?  Because I'm a little bit unclear as to why that's impermissible character evidence under the first prong 404(a).

ATTORNEY McDONALD:  Certainly.  I think that this evidence goes to specific incidents that she raises in these

papers goes to the suggestion that these two were prone to making poor decisions and endangering patients, and that was an issue that continued to crop up for years within Dr. Porter's tenure at Dartmouth-Hitchcock. So I think that she is attempting to use these specific instances to argue that, for the entirety of her time there, Dr. Su and Dr. Seifer were creating an unsafe environment.

THE COURT: Okay. So under 404(a) you're saying that that is evidence that would be sought to be used to prove that, on a particular occasion, the person acted in accordance with that character or trait?

ATTORNEY McDONALD: I think our argument under 404(b) is stronger, but 404(a) correct.

THE COURT: Okay. And then your argument under 404(b), so, if evidence of any other wrong or act is not admissible to prove a person's character to show that on a particular occasion they acted in accordance with character, you've just made that argument, but, of course, there's alternative bases for something to come in under 404(b). So, for example, here it seems knowledge. Isn't this about knowledge of decision makers at the hospital?

ATTORNEY McDONALD: I think so, but I didn't think that anyone the people to whom Dr. Porter reported these are able to testify. They are able to testify to whether they report this to anyone else. I don't think the contents of the

reports speaks, the complaints goes to the knowledge of anyone who's higher up at Dartmouth-Hitchcock.

THE COURT: Okay. But, I mean, they are pretty strongly worded assessments.

ATTORNEY McDONALD: Certainly.

THE COURT: So I think the knowledge notion there is Dr. Porter writes these letters to decision makers at the hospital, and she reports, she makes some fairly she delivers some fairly strong opinions about what she views as substandard performance by them. The relevance then of the knowledge of Dartmouth people receiving those and then the allegation is taking adverse employment action against Dr. Porter seems like, to me, that would be very much squarely within 404(b)'s rule.

ATTORNEY McDONALD: Understood.

THE COURT: All right. Anything else on this?

ATTORNEY McDONALD: Thank you so much.

THE COURT: Thank you.

ATTORNEY VITT: May it please the Court, as a technical matter, I think motions in limine are not properly filed to exclude evidence unless the evidence is clearly inadmissible, and this is not one of those situations. What I think Your Honor has identified what's the principal argument that I would have which is, Look, there are over 30 separate references in the Second Circuit opinion of the competence of Dr. Seifer and Dr. Su. And the Second Circuit is critical -- I

could probably use a stronger term -- to describe the hospital's failure to do anything despite this behavior.

So I really don't understand the motion, and I don't understand the idea that somehow we can't refer to this as just some sort of far-fetched claim and, you know, seems to me that this is a big part of what the case is about.  There were problems with these doctors.  The institution looked bad.  They were reported, not only by Dr. Porter, but by a number of witnesses who we're going to be calling to the stand.  That's the case.  I mean, that's certainly a big part of the case. That's the whistleblower case in part.

THE COURT:  Sir, did you want to address the argument, though, that Dartmouth is saying the Second Circuit included all those references as a matter of relevance but they weren't taking into account the matter of prejudice?  The argument was made.  Curious if you have a response to that.

ATTORNEY VITT:  I don't think I'm prepared to say that the Second Circuit ignored that issue of prejudice.  Is the evidence prejudicial?  Of course, it is prejudicial. That's what this case is about.  It ought to be prejudicial. It's not unfairly prejudicial.  It's not like we're talking about somebody abusing, you know, a child or something.  I mean, you know, this is -- it's damaging testimony, and is it prejudicial?  Yeah, and it ought to be.

THE COURT:  Okay, all right.  Thank you.

ATTORNEY McDONALD:  One brief point.  The Second Circuit decision was considering a summary judgment record. They were considering the fact in the light most favorable to Dr. Porter not, and as they would be perceived at trial.

THE COURT:  Right.  Yes, thank you.  Just want to be clear.  Are you Ms. McDonald?

ATTORNEY McDONALD:  I am, yes.

THE COURT:  Okay.  Thank you.  All right.  Yes and the next one cat's paw theory.  So, Mr. Schroeder, you're arguing that one?  Okay.

ATTORNEY SCHROEDER:  Yes.

THE COURT:  I'll say as you walk up to the podium, I'll give you something to think about.

ATTORNEY SCHROEDER:  Two things at once, Your Honor. Okay.  I got you.

THE COURT:  So your initial motion talks about how cat's paw theory may or may not be available under state law in New Hampshire and Vermont.  There is, we'll call it a concession, but just a statement of the law where you say that it applies federal claims.  The reply brief comes in now and says it only applies in certain federal claims and not these, right?  It doesn't apply to the ADA and the Rehab Act, but it applies in Title Seven.

ATTORNEY SCHROEDER:  Right.  And, yes, in cases -- yes go ahead.  Want me to explain?

THE COURT: Yeah, I mean, was that kind of a, upon further thought, we looked into this a little more deeply and, actually, we're going parse it out more narrowly about which federal claims it applies to?

ATTORNEY SCHROEDER: Well, I think the issue was replying to their point that this should come in through the federal claims and responding to their opposition where they raise these cases under Title Seven and Eucera and I think an age discrimination case. So quite frankly, it was in response to that.

Whether or not it can come in under federal claims or federal claims we understand that the Second Circuit has weighed in on this in terms of Title Seven. It's not a Title Seven case, and so for the, for the -- I think everybody's in agreement that New Hampshire and Vermont have not adopted this doctrine yet, okay. And so that hopefully it's four out of six of the claims. So the other two claims you're addressing their point, well, yeah, we've got these federal claims. I think it certainly could be confusing to the jury, right, to explain the difference between, well, these claims have this theory, but this claim has this theory.

But set that aside. The Zorro decision out of Connecticut in 2020 says that the Second Circuit has not yet addressed whether the cat's paw theory applies to claims brought under the ADA or Section 504 of the Rehab Act. Our reply was to

really address their issue of, well, we can still bring it under federal claims.

They wanted to bring it under state claims as well, and I think that's pretty clear, but, in terms of the federal claims, they're out of luck there as well because it hasn't been adopted by the Second Circuit. So whether it's been adopted by other circuits and whether or not it's not been applied to Title Seven and Eucera claims, there's only ADA and Rehab Act here as federal claims, and so I don't see the avenue or the lane through which they can drive that theory at this point.

And, in light of the lack of adoption by New Hampshire and Vermont, in light of the lack of adoption of this theory to ADA and rehab claims, I don't see -- and, even if they -- we'll get to the motion for leave to amend, but it's not applicable anyway because that's a Vermont claim, and that hasn't been adopted there. I do not see a path, Your Honor, for them to get there.

THE COURT: Okay. You say in your brief it's clear that Dr. Merrens made the closure decision, and so the record doesn't support the cat's paw theory, separate from your legal argument about whether it applies, but you say, as a matter of fact, it's clear that Dr. Merrens made this decision so cat's paw would not be applicable here.

The Second Circuit decision, though, I think it's fair to say, kind of opined that, you know, there is a little bit of a

fact question on this issue, isn't there?

ATTORNEY SCHROEDER:  They have laid that out, Your Honor, as every inference in favor of the nonmoving party. I'll acknowledge that.  But it's Rule 56.  It's whether or not there's a factual dispute that gets you to the jury trial.  But here Dr. Merrens has testified that he was the ultimate decision maker and that he made the decision, and there's this, obviously, this theory that they're now going, well, we think it could be -- if it's not, if Dr. Merrens isn't at fault for whistleblower retaliation and disability discrimination, well, you know what?  It's really because he was the puppet, and Dr. Demars was the puppeteer, right? And that's really what they're saying at the end of the day and that she had it out for Dr. Porter.

Either way, none of their claims have case law that supports the use of that theory here today in this circuit. And I'd submit that, as a result, we don't, I don't want to have to, midstream in trial, have to brief this issue.  We know it was put out there.  We actually didn't even believe that it actually had been briefed by the plaintiff.  But the Second Circuit obviously disagreed with that, and they referenced it, and I think, because that's in play, we want to address it now. It's not like the Second Circuit said, well, you know, you can definitely use this theory.

THE COURT:  Right.  And so on that question, right,

like, if I were now to rule on the cat's paw theory in the context of a motion in limine, right, I mean, it's a little bit unusual that a legal theory gets kind of excluded at the outset of trial, but you make the point that, if the cat's paw theory were to be excluded, that would affect the evidence that comes in.  Can you give me a little bit of a sense of how a decision on cat's paw at the outset of the trial would affect what comes in in terms of the evidence?

ATTORNEY SCHROEDER:  Well, I think it goes to the issue of the amount of evidence, right, that is before the Court on any particular theory.  I agree with you that the legal theory in and of itself isn't typically brought in the context of a motion in limine.  I think this is a really rather unique situation where you actually have case law under state and federal law.  So it would limit, I think, perhaps, but not necessarily, limit -- it depends on what Leslie Demars testifies to and Dr. Merrens testifies to.

But I think, in terms of jury instructions and I think how that plays out -- so I understand the Court may want to see how the evidence plays out before making a decision on that issue, but we're going to begin with jury instructions ahead of time and what theories they're going to be able to use in terms of proving their case.  And so it goes to the elements of their claim, and I'd submit that, if you can't use the cat's paw theory, well then you've got -- you can still put in evidence

as, well, we think this person made the decision, we think that person made the decision, not at cat's paw theory, but we really think this person was responsible for the decision and certainly put that evidence in.

THE COURT:  So it may mean that the evidence wouldn't change, that the evidence will still come in.  There will be Dr. Demars.  There will be Dr. Merrens.  All that evidence will come in however it comes in, and then at the jury instruction stage, as you say, right, which makes some sense, after we see how the evidence comes in, a decision can be made, and I'm going to have to decide or determine whether it's legally available, right, so not just as a factual matter.

ATTORNEY SCHROEDER:  Right.  And so factually --

THE COURT:  Yeah.

ATTORNEY SCHROEDER:  -- they can certainly elicit testimony on that point, Your Honor.  It's just we know based upon -- and this is unusual, right, that this legal theory has been adopted in other places but courts have stated that it hasn't been adopted in New Hampshire, Vermont or the Second Circuit.  So we want to limit the amount of all the different legal theories that are going to be at play in the jury instructions.  Well, one of those theories merely isn't applicable under the law.  Let's deal with it now ahead of time which is, you know, why we would do it as a motion in limine. I realize it's a rather unique, but it's just a precursor to,

well, we're going to make that same argument at the jury instruction stage. It's not going to change, and for that reason we think it's, it's relevant and probative to deal with it today. Thank you.

THE COURT: Okay. All right. Thank you. Mr. Jones?

ATTORNEY JONES: Thank you, Your Honor. Defendant seeks to preclude the so-called cat's paw theory. This theory has an odd name. It's not an odd concept. It's not an unusual theory at all. It's not even really controversial. We can thank Judge Hollingsworth for the metaphor and the name. At the end of the day they're talking about the simple law of agency and a body of law that has remained unchanged for hundreds of years. As the Supreme Court clarified in Staub versus Proctor Hospital, this theory is just the application of agency to an employment decision where more than one person participated or influenced the decision. That's it. We're just talking about agency law here. It's not some weird novel thing that some circuits have to struggle with, do we accept it or not, or states have to accept it. It's just agency law.

THE COURT: But it applies differently in federal law depending on the cause of action. So, even if it is a general agency principle, apparently the case law says it applies to certain types of federal claims, but not all.

ATTORNEY JONES: Right.

THE COURT: So is it really an agency principle that

carries across all cases?

ATTORNEY JONES:  Well, it is.  It's an application of agency to -- and in those indications, the courts that have questioned its application, for example, at ADA have said, well, does that really in a but-for context?  Does that agency principle apply in this causation context?  So it's still agency law at the end of the day.  It's not some weird, novel theory, and, because of that, it's not remarkable that every federal circuit court of appeals who looked at it squarely has recognized it.

Similarly, every state Supreme Court case where the court has squarely addressed the issue has recognized it.  Nowhere in their papers is a single court that rejects it.  There are plenty of courts that, as a matter of judicial conservatism say, I don't have to get to it because, even if we accept it, the facts don't exist in this case, but no one's rejected it.

So, well, anyway, there's no example of a court rejecting it.  That being the case, there is no reason to think that the New Hampshire Supreme Court or the Vermont Supreme Court would reject the theory if it was squarely brought to their attention.  Both courts have had occasion to look at it.  Both courts have analyzed it but then found in those cases insufficient evidence that even if it was recognized, it could fly.

But they never said we reject it, and there is no indicia

or anything to think that they would reject it.  Notably, both New Hampshire Supreme Court and Vermont Supreme Court have held that their states' respective discrimination laws look to federal law for guidance.  So it has been recognized under some federal law claims.  I understand the issue with the case that was cited, and it has been universally recognized by the states that have squarely considered it.  In light of those two factors, it is the most compelling reason to expect that both Vermont Supreme Court and the New Hampshire Supreme Court, if pushed to resolve the issue, would recognize it.

Again, it's not a weird theory.

With regard to the factual dispute which I think Your Honor had made the point I was going to make so I won't belabor it, but the Second Circuit did find that a reasonable juror could, in fact, based on the record evidence, reach a conclusion directly opposite from the very factual foundation of defendants' motions.  They say Dr. Merrens was the decision maker and Dr. Demars was not a part of the decision and, in fact, fought for Dr. Porter, and the Second Circuit said, no, a reasonable junior could find the other way on both those policies.  So this is not the time to exclude a theory based upon hotly disputed facts.

THE COURT:  And do you think either way, if it was excluded or allowed in limine, that would impact the way the evidence comes in or the nature of the evidence that comes in?

ATTORNEY JONES:  Well, if you were to rule that it's excluded that, under Vermont and federal law, well, to the extent we are argue it's still viable under federal law, no.  I think the case comes in, the case comes in, and we can argue the law at jury charge, as you pointed out.  But this is not a motion in limine resolution situation.

THE COURT:  Okay, all right.  Thank you.

ATTORNEY SCHROEDER:  Very briefly, Your Honor, just to retort on that?

THE COURT:  Yes.

ATTORNEY SCHROEDER:  There's been a lot of comments made by plaintiff's counsel about the import of the Second Circuit decision.  Well, interestingly enough and one of the points you raised in January was to hear the significance or lack of significance of that decision.  We'll have a bench memo to you this coming week on that issue because I think it's important.  It was a summary judgment case.

They repeatedly talked about how important that decision was to say this, that, or the other thing, but what it doesn't say is that the cat's paw theory applies under Second Circuit case law.  I mean, they took 100 pages to talk.  They could have used a few words on that, and they don't, and I think that's informative.  They also say, If it's even available under New Hampshire law, and, yes, we could wait for the jury instructions phase of this case to deal with it, but that will

be after perhaps that evidence has all come in, and I want to be clear about what, how this case is going to be tried and what legal claims and theories each party, you know, they're allowed to go into.

THE COURT: Right. Which is why I keep asking that question. I want to know what impact it will have on the actual presentation of evidence, and I don't mean to press you on this, you know, unnecessarily, but that's relevant, right?

ATTORNEY SCHROEDER: It is relevant, Your Honor. I understand that. I think it goes to what can be said in the opening statements, right? I think it could have some significance there and perhaps in closing statements, and I want to deal with the jury instructions. I think it's, it, given the fact that the law it hasn't been adopted state and federal on these claims that are before us, it's not germane to even have it in play at all as a theory in the case.

Is it necessarily going to change what questions are asked or not asked? I don't know yet. I don't think so. But, if we're going to have to deal with this at the jury instruction stage, why can't we deal with it now where it's one less issue to deal with down the line and we'll, the point of doing this pretrial, in part, is to try to narrow what's before the Court, right, and, to the extent that that's possible and is fair and reasonable and judge's discretion, obviously.

So I would submit that the, you know, Second Circuit could

have taken any number of liberties on this one, and they didn't, and I think that's because it's not adopted in the Second Circuit for that, for these particular claims.

THE COURT: Right. And, with respect to the state law claims, they said it may apply, almost suggesting that a trial court then might make the decision to predict what the state high courts might do on this issue for purposes of trial, right?

ATTORNEY SCHROEDER: Absolutely, yeah, I think it's up to your discretion.

THE COURT: Yeah. Short timing, though, to make that kind of a decision with trial starting in a week.

ATTORNEY SCHROEDER: Correct. I understand that.

THE COURT: Right. Okay.

ATTORNEY SCHROEDER: Thank you.

THE COURT: Thank you. All right. So what remains is the motion to amend the complaint. Am I missing a motion?

ATTORNEY COFFIN: No, that's it.

ATTORNEY VITT: That's it.

ATTORNEY SCHROEDER: No, Your Honor. That's the last one.

THE COURT: Okay. So, Mr. Vitt, obviously, I'll hear from you at this point on this one at this point, or, sorry, Mr. Jones. I shouldn't assume. You're going to predict the obvious question. We are a week out from trial now. A new

legal theory is being added to a case that's been around for eight years. I'm trying to understand why. I've read, I've read the pleadings. I was trying to figure out, Is there some additional remedy available under the Vermont whistleblower statute? Is that what this is about?

ATTORNEY JONES: Yeah.

THE COURT: Because you're saying that there's no additional facts. There's no change in the showing that would have to be made. I don't know this myself. I haven't researched the statute, but that's what you're saying. I'm kind of, I'm just wondering why? Why this late?

ATTORNEY JONES: Yeah, to be very transparent, you got it. We believe that, under the Vermont whistleblower statute, remedies are simply much clearer, specifically with regard to the availability of punitive damages. But it does not change any of the legal theory. It does not change a single fact, and allowing the case to proceed will not change the way this case is tried at all.

In fact, I would submit that, even if we tried the case under the current pleadings, you would be able at the conclusion of evidence to file a motion to amend the pleadings to conform to the evidence. The facts would be identical. They tick off the elements. It changes nothing. And, yes, it makes clear what the available remedies are in a way that the New Hampshire statute doesn't.

THE COURT:  Okay.  And what about the legal elements of the claim?  Are they the same as New Hampshire's?

ATTORNEY JONES:  They are the same.  The only difference is that in the Vermont statute the specific language that, with regard to protective whistleblower conduct it applies, not just to recording violations of law but reporting substandard patient care.  Now, while that language is not in the New Hampshire statute, the Second Circuit has clearly defined the claim under the New Hampshire statute as improving the Court's substandard patient care.  So, to the extent that a slightly difference in the two statutes, that's already in the case.

So there's literally no difference in factual or legal presentation of the case.  We're just adding another theory that's available on the same elements with the same factual finding.

THE COURT:  Okay.  All right.

ATTORNEY SCHROEDER:  I should note, Your Honor, I'm not sure.  Either there is a new theory, or there is not a new theory, and I guess it seems like there's a different theory that they're going on under Vermont statute.  You know, we laid out the chronology on this, Judge.  They wanted to have a status conference in October.  You agreed that that was not really necessary because I suspect you had a pretty heavy caseload as did the rest of us.  And then that January 8th.

Then we have we had a submission from them on January 8.  No mention of that.  Then January 13th, pretrial conference.  No Mention of that.

We really want to get these deadlines done.  We really want to brief everything.  No surprises.  That was the theme, right?  We all agree on what, how we're going to do it, and then we, not even the eleventh hour, like 11:58, they are now saying, well, you know, I know we have a Vermont statute claim, but we're going to add another claim under Vermont law.

We are going to have to amend our answer.  We obviously, based on just what he said, we're go going to have to have jury instructions amended to deal with that issue, and there's a lot to do in one week, and adding this to that pile is under the standard, right, for denying to leave to amend.  In fact, two of the cases they cited actually deny leave to amend.

Undue delay, bad faith, undue prejudice, we hit the trifecta, Your Honor.  I submit we hit the trifecta on that, and it is going to open up a Pandora's box of stuff that we have to deal with because they've now come up with this new theory that they want under Vermont statute relating to, I guess, substandard patient care.

Either way, and I thought I heard him say punitive damages.  So, if that's really true, I haven't analyzed Vermont case law on this particular claim yet.  Obviously, we will.  But, to then add another damages theory, how is that not

different if the supposition is, well, we can't get punitive damages perhaps under New Hampshire law, but we might be able to get it under Vermont law if we add this claim. That, that's adding a whole new realm of briefing.

THE COURT: So is that what you're referring to in your papers when you talk about it would inevitably involve problems of proof? Do you mean as to damages --

ATTORNEY SCHROEDER: Yes.

THE COURT: -- or the way the evidence would come in generally?

ATTORNEY SCHROEDER: No. It would come down to proof. It would come down to jury instructions. And they've even said it's another legal theory. Well, if it's another legal theory, then it's not based upon everything else that's already in the case if it's another legal theory. So it's too little, too late, I would submit. We've been down this road already. We set up this schedule to do all these things ahead of time. And to then say, you know, 11:58, well, you know, we're going to add this claim as well. Perhaps maybe they have a basis to do it at the end of the evidence, but they certainly don't have a basis to do it right now, we would submit. Thank you.

THE COURT: Thank you.

ATTORNEY JONES: Just one comment. Punitive damages have been a part of this case since day one.

THE COURT:  Right.  It was in the demand for relief.

ATTORNEY JONES:  Yes.

THE COURT:  Yes, in the beginning, but -- yeah, okay.  Have we covered everything?  We have.  Okay.  All right.  Well, thank you.  Helpful to have the conversation.  Yes Mr. Vitt?

ATTORNEY VITT:  I have one question.  It's not a question.  It's a -- we're trying to honestly put our exhibit list together, and we've gotten there.  There's a question of authentication, right, and I'm hoping that the parties can agree that the documents exchanged in discovery are authentic.  If that's not going to be the case, we're going to have to serve subpoenas early next week on multiple officials at Dartmouth-Hitchcock.  I'd just as soon not go through that, but I've raised this issue before, and I don't want to be in a situation where we get stuck trying to get evidence admitted and there is the question about, you know, we're not stipulating to authenticity.

THE COURT:  So you mean like all the emails, things like that?

ATTORNEY VITT:  Yeah, basically, it's what they produced.  I mean, all of them have a stamp.  You know, we produced them with ours and they produced it with theirs.  And, yeah, these are, there's a ton of emails, as you can imagine, and it's mostly emails we're talking about here.

THE COURT:  So, when you say you've raised it before,

you mean with counsel?

ATTORNEY VITT:  Yeah and the only reason I'm raising it now is we're getting close to trial.  I would suggest subpoenas served.  I would prefer not to go that route, but I'm surprised we don't have it resolved.

THE COURT:  All right.  Mr. Schroeder?

ATTORNEY SCHROEDER:  Judge, two issues.  Well, there's a couple of issues with that.  First of all, they just raised it this week.  I think it was this week or maybe like late week.  That was the first time they asked us to stipulate to authenticity.  And, to the extent they might have an authenticity problem, well, that's their problem at trial, and we'll deal with it at trial, but to then say to us, we expect you to stipulate to every single thing, they did not produce any of their documents with any metadata.  So how am I supposed to stipulate to or I'm willing to stipulate to that authenticity of their documents?

It's one thing to be emails.  Perhaps that will be true that we'll stipulate to the authenticity of that, but to come in here and say, well, I hope we don't have to worry about that next week.  Well, that's not my fault that you didn't ask about this issue beforehand and you asked about this week while we're were getting ready for motions to be heard today.  I said we would be available to discuss -- guys, I just have to say, Judge.  Throughout today, they've been back-benching the whole

time, and it's really disruptive, and I don't want to do it at trial, and I certainly don't do it in front of any judge, but they've been doing it the whole time, and it's inappropriate.

THE COURT:  Okay.  So, listen, are you saying that there are certain types of documents that Dartmouth is willing to stipulate to?

ATTORNEY SCHROEDER:  I'm sure there will be documents that we will stipulate to, yes, Your Honor.

THE COURT:  All right.  So you may be able to work through at least some of these?

ATTORNEY SCHROEDER:  Right.

THE COURT:  And, for the ones that you can't, then witnesses will be called to lay a foundation for these documents to get in.  And you, yourself, raised the question about whether you're going to have enough time to put your case in, too, so additional witnesses --

ATTORNEY SCHROEDER:  I don't --

THE COURT:  -- to establish authenticity and foundations.

ATTORNEY SCHROEDER:  I understand that, but then they have to have the witnesses for foundation, Your Honor, because they're trying this case without a number of people that they're engaging in character assassination about that they never deposed and never had them here for trial and they could have done all those things.

So, yes, you're right, but they did not produce their documents with any metadata. So, for me to say I stipulate to the authenticity of that document, for example, there is a document that where Misty Porter sent it to her own personal email. Well, how am I -- I don't know that she did it on that particular day and whether or not that's authentic. That's just one example.

But do I think that we will be able to stipulate to a fair amount, obviously, a lot of these emails that there's a fair amount of crossover? Absolutely. But there's also ten examples of duplicate emails that they put in their exhibit list. So, you know, we didn't do that. There's ten. So there's a lot to be done. I already said that we would be available on Tuesday to go over authenticity and stipulation issues. I sent that email, I think, Wednesday night at 11:30.

So we've already said that we would have that meeting. We're just not doing it on his timeline, but so be it. We're certainly going to be dealing with it ahead of trial. Thank you.

THE COURT: Okay, all right. Anything further, Mr. Vitt?

ATTORNEY VITT: Nothing further, Judge.

THE COURT: Okay. I mean, with respect to the comment about the back-benching and everything, you know, you're going to be in front of a jury. So I don't expect the

alleged back-benching to be happening at the trial. That would not be good for either side, right? So all right. Well, I will see you then Monday. There will be rulings on all of these, yes, not this Monday.

ATTORNEY SCHROEDER: Sorry, Your Honor. Ms. McDonald just raised one question. Sequestration, your rules on that and how we should comport ourselves with respect to witnesses and having them sequestered? Obviously not Dr. Porter or if it's going to be Dr. Merrens, it's Dr. Merrens. There's a corporate representative. But for everyone else we just want to be mindful of where they should go to before they get called so that we can actually make sure we're moving things on.

THE COURT: Right, right. I mean, typically, your witnesses will be sequestered, except for the ones that you just identified, presumably the expert as well. Typically, the way it functions is they are outside the courtroom. You know, don't forget, we're not going to be in this courtroom. We're going to be in the first floor courtroom, and there's kind of a lobby area there, and someone on your trial team, when you know that that person is next up, can go out and get that person. After they testify, obviously, they can stay in the courtroom.

ATTORNEY SCHROEDER: Sure. And, Your Honor, just on that point, is it your expectation that we'll have some kind of discussion between the parties during, you know, at the end of the day, like, okay, we've got this many witnesses? They don't

A-422

have to tell me necessarily who they're going to call.

THE COURT:  Yeah, I think --

ATTORNEY SCHROEDER:  But they go first, so I just want to make sure we know.

ATTORNEY VITT:  We'll let them know.

THE COURT:  Yes, that's typically how it goes.

ATTORNEY VITT:  Absolutely.

THE COURT:  At the end of every day, whoever is putting their case in chief on will give some indication of who they expect to testify the next day.

ATTORNEY VITT:  Absolutely.

THE COURT:  Sounds like Mr. Vitt plans on doing that. So, yeah, we'll have a sense of the dramatis personae for the next day.  Okay.  All right.  Thank you.

(Whereupon the hearing was adjourned.)

C E R T I F I C A T E

I, Sunnie Donath, RMR, Official Court Reporter for the United States District Court, District of Vermont, do hereby certify that the foregoing pages are a true and accurate transcription of an audio recording of the hearing taken in the above-titled matter on March 14, 2025 to the best of my skill and ability.

*Sunnie Donath, RMR*

----------------------------------

Sunnie Donath, RMR

A-424

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,    )
                                  )
                                  )
            Plaintiff,            )
                                  )
        vs.                       )    Case No. 2:17-cv-194
                                  )
DARTMOUTH-HITCHCOCK MEDICAL       )
CENTER, DARTMOUTH-HITCHCOCK       )
CLINIC, MARY HITCHCOCK            )
MEMORIAL HOSPITAL, and            )
DARTMOUTH HITCHCOCK HEALTH,       )
                                  )
            Defendants.           )

**DEFENDANTS' RENEWED MOTION TO PRECLUDE THE TESTIMONY OF
ROBERT BANCROFT BASED ON NEW MARCH 19, 2025 REPORT**

Now come Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock

Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth Hitchcock Health (collectively,

"Dartmouth Health") and submit this Renewed Motion to Preclude the Testimony of Robert

Bancroft Based on New March 19, 2025 Report. As grounds for this Renewed Motion, Dartmouth

Health asserts as follows:

**BACKGROUND**

I.    March 14, 2025 Hearing

The Court held an evidentiary hearing on Dartmouth Health's Motion *in Limine* to Preclude

the Testimony of Robert Bancroft on March 14, 2025 (*see* ECF Nos. 208, 228). At the hearing,

Dr. Bancroft was examined regarding, *inter alia,* his August 26, 2024 report of economic losses

sustained by Plaintiff Misty Blanchette Porter ("Plaintiff") and, in particular, a chart he had

1

prepared in conjunction with that report. A copy of the August 26, 2024 report (the third prepared by Dr. Bancroft in connection with this matter) is included as Exhibit A to this Motion.

Under questioning, Dr. Bancroft admitted that several key assumptions he had used in developing his August 26, 2024 report, if changed, could make his conclusions inaccurate. He also admitted that he lacked factual information underpinning some of his assumptions and findings and that, depending what that information revealed, his conclusions could be different. Dr. Bancroft's August 26, 2024 analysis asserted that Plaintiff suffered $4,329,258 in Total Economic Loss.

Dr. Bancroft was questioned closely on several assertions that appeared speculative, counterfactual, illogical, economically unsound, and/or reliant upon hearsay. These primarily included:

- a claim/assumption that Plaintiff would have worked full-time at Dartmouth Health but only 0.6 FTE at the University of Vermont Medical Center ("UVMMC") starting January 1, 2025. Dr. Bancroft attributed all of the difference in Plaintiff's pay from this speculative and self-serving choice to Dartmouth Health as damages;

- a presumed series of annual 2.5% pay increases at Dartmouth Health, despite the fact that Plaintiff's earnings history did not reflect that;

- a presumed professorship at Dartmouth Health, but not at UVMMC, resulting in a 5% pay increase that would have happened in 2019; and

- an asserted damages figure calculating prejudgment interest of 12% annually for a "sum certain" despite lack of certainty in the sum allegedly owed based on his three reports and their differing calculation methodology.

Other issues were considered at the hearing as well. In particular, Dr. Bancroft admitted on cross-examination that: (1) he had not considered the most recent earnings data for Dr. Porter from UVMMC, to include the year 2024; (2) he was unaware that Dr. Porter was promoted to full Professor of Medicine at UVMMC in July 2023; and (3) if Dr. Porter's earnings were higher as a result of her attaining the rank of professor or otherwise through demonstrated 2024 earnings, his

2

chart of damages would be inaccurate. This is because the heart of Dr. Bancroft's analysis is a comparison between what Dr. Porter earned at Dartmouth Health and what she earned and will earn at UVMMC. To the extent that Dr. Porter made more money at Dartmouth Health and less at UVMMC, her damages are increased according to Dr. Bancroft.

II.    Dr. Bancroft's New Report Dated March 19, 2025

On March 19, 2025, Dr. Bancroft presented a new report and analysis with accompanying charts. The new report estimates that Dr. Porter's Total Economic Loss in connection with her transition from Dartmouth Health physician to UVMMC full professor is $1,787.722. A copy of the March 19, 2025 report is included as Exhibit B to this Motion. In the March 19, 2025 report, Dr. Bancroft made eight substantive changes to his previous analysis that had been the subject of the March 14, 2025 evidentiary hearing. Many of the changes were drawn from information and testimony elicited at the evidentiary hearing. For example, in response to questioning by counsel for Dartmouth Health about his previous failure to incorporate Dr. Porter's actual 2024 earnings, Dr. Bancroft has now reviewed Plaintiff's 2024 W-2 and revised his analysis to include that information. Dr. Bancroft also incorporated a Dartmouth Health "pay freeze" assumption in response to questioning at the evidentiary hearing. He further accounted for Dr. Porter's son's in-state tuition as a UVM fringe benefit when confronted. Despite acknowledging at the hearing that he could have used other interest rates, in the new report Dr. Bancroft continued to include a 12% per annum pre-judgment interest rate for the annual losses he calculated as incurred by Dr. Porter, citing the Vermont statutory interest rate for payment of a sum certain, which has been limited by case law.

3

This new expert calculation, made two business days before trial, changed Dr. Bancroft's conclusions of Total Economic Loss from $4,329,258 to $1,787,722 – a change of almost $2.6 million.

Notwithstanding Dartmouth Health's longstanding discovery requests seeking information about Dr. Porter's current earnings, and notwithstanding the central role her current earnings play in Plaintiff's claims about the financial differences between her old job and her current one, Plaintiff only produced information about these matters on March 18, 2025, four days after the evidentiary hearing and less than a week before trial. It is undisputable that Dr. Porter was appointed to be a full Professor at UVM's Larner College of Medicine in May 2023, effective July 1, 2023. Although this information was responsive to discovery requests and clearly pertinent to Dr. Bancroft's loss calculations—indeed, Dr. Bancroft testified that he would seek this information out upon learning of its existence—it was inexplicably not provided to him for more than twenty months.

Moreover, although Dr. Porter's 2024 earnings were requested in discovery, and the analysis of her earnings at UVMMC was a central part of Dr. Bancroft's damages conclusions in all of his three prior reports, the evidence of these 2024 earnings was not provided to him (nor apparently requested by this purported expert in economics) until after he was confronted at the hearing. Evidence demonstrating Dr. Porter's earnings was only produced on March 18, 2025, in the form of a W-2 from UVMMC and the University of Vermont College of Medicine.

Dartmouth Health seeks to exclude Dr. Bancroft's testimony because the manner in which the opinions and discovery were disclosed have made it impossible for Dartmouth Health to fully respond to the evolving expert analyses. As a possible alternative, Dartmouth Health requests to

have its own expert economist present her analysis for the comparative earnings and damages issues.[1]

III.   The Promotion

Dr. Porter received a promotion in July 2023 to full professor at the UVM Larner College of Medicine.  Though this occurred nearly two years ago, Dr. Bancroft was unaware of it at the time of the evidentiary hearing.  The issue of promotion to professor was one of central significance because Dr. Bancroft opined, both in his August 2024 report and at the hearing, that such a promotion at medical schools would be rewarded with a 5% pay increase.  His August 2024 report, prepared for use in discussing damages at a renewed mediation that occurred in September 2024 for the purpose of reaching a settlement short of trial, projected damages that would accrue because Dr. Porter would have been promoted to full professor at Dartmouth Health in 2019.  Dr. Bancroft did not opine that she would become full professor at UVMMC.

Nonetheless, as Plaintiff and counsel knew at the time of the mediation, Dr. Porter had become a full professor at UVM in July 2023.  This resulted in the need to adjust Dr. Bancroft's damages calculations and chart to reflect the UVM pay increase, and damages reduction, that would flow from that change.

IV.   The Change in Pay

The 2024 W-2s for the University of Vermont Medical School and the Larner College of Medicine were only produced on Tuesday, March 18, 2025 despite prior standing requests to which they were responsive.  Dr. Bancroft failed to include this information in his August 26, 2024 report, produced as the parties tried again to mediate the case.  The W-2's were only produced in response

---

[1] Dartmouth Health says this is only a possible alternative because in the one day since it became apprised of the new earnings evidence, it has not yet been able to fully confer with its economist and ascertain her availability to provide this testimony.

5

A-429

to a letter sent by counsel for Dartmouth Health after the March 14, 2025 hearing in which they figured prominently. Although central to the analysis submitted by Dr. Bancroft on August 26, 2024 for use in attempting to settle the case at mediation, for some reason, Dr. Bancroft did not seek this information then – or as the case headed to trial.

V.    Late Disclosure of Expert Opinion and Prejudice to Dartmouth Health

The timing of yet another expert analysis by Dr. Bancroft – although welcome to the extent that the projected loss was reduced by almost $2.6 million– is incredibly prejudicial to Dartmouth Health. This is the fourth expert report submitted by Dr. Bancroft. It appears to be an inherently moving target with numerous changed assumptions and calculations, many of which are speculative, based on hearsay, lacking economic rationale or incoherent. The failure to timely provide these materials leaves Dartmouth Health unable to effectively rebut Dr. Bancroft's testimony. With four days left before trial, key discovery on damages has only just been produced, and Dartmouth Health has now received a very different expert report incorporating new opinions that will be presented to the jury.

Moreover, as described through examination at the hearing, Dr. Bancroft's prior report is rife with unsustainable assumptions that render it so unreliable that it cannot be depended upon. Plaintiff must have agreed, because within days of Dr. Bancroft's testimony and after the requested information was produced, she is now proffering a new report with a massively different $2.6 million conclusion.

VI.    Suggested and Fair Remedy

Because of the limitations of Dr. Bancroft's report, and given that the report is wildly deviating from prior iterations, produced literal days before trial, and based upon discovery that was requested months ago and not provided, his testimony should be precluded in full.

6

A-430

As a secondary solution, if Dr. Bancroft is permitted to testify, he should not be able to submit the illustrative chart attached to his fourth report (or other earlier iterations) to the jury. An alternative approach, one which given the late disclosure Dartmouth Health is not yet able to determine is fully viable, Dartmouth Health should be able to present its own expert economist to provide analysis of the discrete universe of financial documents in the case. Plaintiff's only possible complaint about such a witness is that she has not been given lengthy notice. That objection of course rings hollow as Plaintiff has not abided by her discovery obligations, rendering Dartmouth Health unable to respond to key evidence at trial. Expert disclosures were due years ago. Plaintiff has not sought an extension of the discovery period in this regard to offer new opinions, nor proffered good cause for the extremely late and serial nature of the additional disclosures of expert opinions in this matter.

## CONCLUSION

Given the late production of discovery and the late and varying disclosures of expert opinions—produced on the eve of trial and many months later than was required or reasonably possible to respond to—the fair thing to do is to exclude Dr. Bancroft from testifying in this matter in full. Or, if the Court permits Dr. Bancroft to testify, it should not permit him to use the defective and untimely chart as substantive or demonstrative evidence.[2] As an alternative, it should permit Dartmouth Health to present its own expert witness.[3] Not permitting these remedies undermines the ability of Dartmouth Health to effectively defend itself against these widely varying claims of large damages.

---

[2] It seems incontrovertible that Dr. Bancroft's narrative letter and assumptions cannot be introduced by him because they are hearsay without an exception. They, of course, can be introduced by Dartmouth Health as admissions of a party opponent and otherwise as impeachment evidence.
[3] If the Court thought it proper under the circumstances, Dartmouth Health would offer the Plaintiff the opportunity to depose its expert economist witness prior to testimony, perhaps over one of the weekends during trial.

A-431

Date: March 20, 2025

Respectfully submitted,

*/s/ Tristram J. Coffin*

**DOWNS RACHLIN MARTIN PLLC**

Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

**FOLEY & LARDNER LLP**

Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald-Ramos (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

*Attorneys for Defendants*

8

A-432

## CERTIFICATE OF SERVICE

I hereby certify that, on March 20, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

*/s/ Morgan McDonald-Ramos*
Morgan McDonald-Ramos

A-433

# EXHIBIT B

A-434

## Robert L. Bancroft, Ph.D.
405 Brookside Road
Westford, VT  05494

Tel (802) 879-7386
E-mail Ban_econ@msn.com

March 19, 2025

Geoffrey J. Vitt, Esq.
Vitt & Associates, PLC
P.O. Box 1229
Norwich, VT  05055

Re:  Porter v. Dartmouth-Hitchcock Medical Center, et al.

Dear Mr. Vitt:

I have updated my August 26, 2024 analysis of Dr. Misty Porter's lost earnings, due to the loss of her employment with the Dartmouth-Hitchcock Medical Center (DHMC) in June 2017.  The updated loss estimates are presented in the attached table.  Accompany the table is a list of assumptions used in deriving the estimates.  In addition to the lost earnings projections, I have updated the estimates of Dr. Porter's extraordinary University of Vermont (UVM) employment costs.

There are eight substantive changes from my August 26, 2024 lost earnings projections, four are due to new information and four are due to the passage of time. They are:

1.  No DHMC salary increases for 2020 and 2021;

2.  An additional UVM fringe benefit of $7,698 in 2019 (son's UVM tuition);

3.  No loss of DHMC's medical insurance contributions beyond April 2018;

4.  UVM's retirement contribution is equal to 9% of her income;

5.  Dr. Porter's actual 2024 UVM earned income;

6.  The assumption that Dr. Porter will go to a 75% part-time position on July 1, 2025;

7.  An assumed settlement date of April 2025; and

8.  The current interest rate on 5 year, tax-free, AAA municipal bonds.

There are two substantive changes to the estimates of Dr. Porter's extraordinary UVM employment costs.  They are an assumed settlement date of April 2025 and the current interest rate on 5 year, tax-free, AAA municipal bonds.

If you have any questions or if I can be of further assistance, do not hesitate to contact me.

Sincerely,

Robert L. Bancroft, Ph.D.

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 157 of 300

A-435

## Projected Lost Earnings for Dr. Misty Blanchette Porter

Reduce University of Vermont Medical Center Appointment to 75% of a Part-Time Position, Starting July 1, 2025

Prepared by:  Robert L. Bancroft, Ph.D.

March 19, 2025

| | | Dartmouth-Hitchcock Medical Center | | | Post-Termination Projections (UVM) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Year | Age | Gross Earned Income | Fringe Benefits | Total Earnings | Gross Earned Income | Fringe Benefits | Total Earnings | Gross Adjusted Lost Earnings | Income Taxes | Tax Adjusted Lost Earnings | Present Value | Cumulative Present Value | Settlement Income Tax | Total Economic Loss |
| 2017 ^ | 54 | $180,954 | $29,965 | $210,919 | $180,340 | $3,825 | $184,165 | $26,754 | ($227) | $26,527 | $50,666 | $50,666 | $58,000 | $108,666 |
| 2018 | 55 | $309,358 | $42,583 | $351,941 | $217,607 | $19,585 | $237,192 | $114,750 | ($33,948) | $80,802 | $147,059 | $197,725 | $199,000 | $396,725 |
| 2019 | 56 | $324,826 | $38,979 | $363,805 | $254,995 | $30,918 | $285,913 | $77,893 | ($25,838) | $52,055 | $88,494 | $286,219 | $284,000 | $570,219 |
| 2020 | 57 | $324,826 | $38,979 | $363,805 | $269,272 | $24,234 | $293,506 | $70,299 | ($20,555) | $49,744 | $78,595 | $364,814 | $359,000 | $723,814 |
| 2021 | 58 | $324,826 | $38,979 | $363,805 | $329,333 | $29,640 | $358,973 | $4,832 | $1,668 | $6,500 | $9,490 | $374,304 | $368,000 | $742,304 |
| 2022 | 59 | $332,947 | $39,954 | $372,900 | $310,271 | $27,924 | $338,195 | $34,705 | ($8,390) | $26,315 | $35,262 | $409,566 | $402,000 | $811,566 |
| 2023 | 60 | $341,270 | $40,952 | $382,223 | $300,741 | $27,067 | $327,808 | $54,415 | ($14,996) | $39,419 | $48,092 | $457,657 | $447,000 | $904,657 |
| 2024 | 61 | $349,802 | $41,976 | $391,779 | $313,263 | $28,194 | $341,457 | $50,322 | ($13,520) | $36,802 | $37,170 | $494,828 | $482,000 | $976,828 |
| 2025 | 62 | $358,547 | $43,026 | $401,573 | $302,494 | $27,225 | $329,719 | $71,854 | ($20,740) | $51,114 | $50,881 | $545,708 | $531,000 | $1,076,708 |
| 2026 | 63 | $367,511 | $44,101 | $411,612 | $311,569 | $28,041 | $339,611 | $72,002 | ($20,698) | $51,303 | $49,682 | $595,391 | $579,000 | $1,174,391 |
| 2027 | 64 | $376,699 | $45,204 | $421,903 | $320,916 | $28,882 | $349,799 | $72,104 | ($20,639) | $51,464 | $48,486 | $643,876 | $624,000 | $1,267,876 |
| 2028 | 65 | $386,116 | $46,334 | $432,450 | $330,544 | $29,749 | $360,293 | $72,157 | ($20,562) | $51,596 | $47,290 | $691,166 | $669,000 | $1,360,166 |
| 2029 | 66 | $395,769 | $47,492 | $443,261 | $340,460 | $30,641 | $371,102 | $72,160 | ($20,464) | $51,696 | $46,095 | $737,261 | $714,000 | $1,451,261 |
| 2030 | 67 | $405,663 | $48,680 | $454,343 | $350,674 | $31,561 | $382,235 | $72,108 | ($20,346) | $51,762 | $44,902 | $782,164 | $756,000 | $1,538,164 |
| 2031 | 68 | $415,805 | $49,897 | $465,702 | $361,194 | $32,507 | $393,702 | $72,000 | ($20,206) | $51,794 | $43,710 | $825,874 | $798,000 | $1,623,874 |
| 2032 | 69 | $426,200 | $51,144 | $477,344 | $372,030 | $33,483 | $405,513 | $71,831 | ($20,043) | $51,788 | $42,519 | $868,393 | $840,000 | $1,708,393 |
| 2033 | 70 | $436,855 | $52,423 | $489,278 | $383,191 | $34,487 | $417,678 | $71,600 | ($19,856) | $51,744 | $41,329 | $909,722 | $878,000 | $1,787,722 |

^    Partial year (June 4  through Dec. 31).

The year 2033 (under lined) is consistent with the worklife of a 62 year old female with a graduate degree..

A-436

## ASSUMPTIONS
### Projected Lost Earnings for Dr. Misty Blanchette Porter
Reduce University of Vermont Medical Center Appointment to 75% of a FTE,
Starting July 1, 2025

March 19, 2025

Footnote

1   The projection of Dr. Porter's 2017 Darmouth-Hichcock Medical Center (DHMC) income is composed of her actual DHMC income, an additional $68,000 of disability income and one and a half months at her full time salary of $305,539.  In July 2018, it is assumed her salary would increase by 2.5%.  The 2019 projection is based on the assumption she would be promoted to a full professor and receive a 5% salary increase.  With the exception of 2020 and 2021, it is assumed she would have received annual salary increases of 2.5%.  No salary increases are assumed for 2020 and 2021.

2   Dr. Porter's fringe benefits, given her continued employment with DHMC, include the medical center's contribution to health insurance and a retirement plan.  The value of DHMC's medical insurance contribution in included from June 2017 to May 2018 (no UVM health insurance).  The full year cost in 2017 and 2018 is assumed to be $15,000 and $15,600, respectively.  After April 2018, the value of DHMC's health insurance contributions is excluded as it is assumed Dr. Porter will receive comparable coverage through the University of Vermont (UVM).  DHMC's retirement plan contributions is assumed to be 12% of her earned income.

3   The addition of DHMC's gross income and fringe benefits.

4   Dr. Porter's actual earned income is reported for the years 2017 through 2024.  Her projected 2025 income is derived by applying a 3% annual salary increase to her 2024 University of Vermont Medical Center (UVMMC) income and reducing it to reflected her moving to a 75% part-time position on July 1, 2025.  Her future UVMMC income is assumed to increase at an annual rate of 3%.

5   UVM's fringe benefits include the University's contributions to a retirement plan is assumed to equal 9% of her income.  In the 2019 spring semester, Dr. Porter's son received free UVM tuition given his mother's employment with UVM.  The value of the tuition was $7,968.

6   The addition of post-termination gross income and fringe benefits.

7   The difference between DHMC and UVMMC post-termination projections of total earnings.

8   Estimated income taxes (federal and state) Dr. Porter would have had to pay on the difference between DHMC and UVMMC post-termination projections of total earnings.

9   Gross lost earnings less income taxes.

A-437

10  A simple interest rate of 12% is used to compute interest on the historical earnings losses (2017 - 2024). A discount rate of 2.79% (5 year, tax-free, AAA, municipal bonds, March 19, 2025 Bloomberg web site) is used to derive the present value of future income streams. An April 2025 settlement is assumed.

11  A running total of annual present values from previous column.

12  Additional amount needed to pay income taxes on an award sufficient to insure an after-tax settlement, in each year, consistent with amount specified in prior column. The estimated state and federal income tax is based on current tax laws.

13  Addition of the cumulative present value and settlement income tax columns.

## Additional University of Vermont Employment Related Costs
## for Dr. Misty Blanchette Porter

Prepared by:  Robert L. Bancroft, Ph.D.

March 19, 2025

| | | (1) | (2) | (3) | (4) | (5) | (6) (1) through (5) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|---|
| | | Electric | | | Travel | | | Present | Cumulative Present |
| Year | Age | Utilities | Heat | Rent | Dr. Porter | Husband | Total | Value | Value |
| 2017 ^ | 54 | $1,050 | $1,169 | $21,000 | $5,138 | $5,138 | $33,495 | $63,641 | $63,641 |
| 2018 | 55 | $1,249 | $836 | $12,000 | $5,234 | $5,234 | $24,552 | $44,440 | $108,081 |
| 2019 | 56 | $2,251 | $572 | | $5,570 | $5,570 | $13,964 | $23,599 | $131,680 |
| 2020 | 57 | $1,958 | $607 | | $5,522 | $5,522 | $13,610 | $21,368 | $153,048 |
| 2021 | 58 | $2,754 | $494 | | $5,378 | $5,378 | $14,004 | $20,306 | $173,354 |
| 2022 | 59 | $1,943 | $485 | | $5,810 | $5,810 | $14,049 | $18,685 | $192,039 |
| 2023 | 60 | $2,015 | $513 | | $6,291 | $6,291 | $15,109 | $18,282 | $210,320 |
| 2024 | 61 | $2,028 | $511 | | $6,435 | $6,435 | $15,409 | $16,796 | $227,116 |
| 2025 | 62 | $2,079 | $525 | | $6,596 | $6,596 | $15,795 | $15,687 | $242,803 |
| 2026 | 63 | $2,131 | $531 | | $6,760 | $6,760 | $16,183 | $15,636 | $258,439 |
| 2027 | 64 | $2,184 | $541 | | $6,929 | $6,929 | $16,584 | $15,589 | $274,027 |
| 2028 | 65 | $2,239 | $550 | | $7,103 | $7,103 | $16,994 | $15,540 | $289,567 |
| 2029 | 66 | $2,295 | $559 | | $7,280 | $7,280 | $17,414 | $15,492 | $305,060 |
| 2030 | 67 | $2,352 | $568 | | $7,462 | $7,462 | $17,845 | $15,444 | $320,504 |
| 2031 | 68 | $2,411 | $578 | | $7,649 | $7,649 | $18,286 | $15,397 | $335,901 |
| 2032 | 69 | $2,471 | $587 | | $7,840 | $7,840 | $18,739 | $15,349 | $351,250 |
| 2033 | 70 | $2,533 | $597 | | $8,036 | $8,036 | $19,202 | $15,302 | $366,553 |

^    Partial year (June 4  through Dec. 31).

Column Number

1-5   Information provided by Dr. Porter.

7    A simple interest rate of 12% is used to compute interest on the historical earnings losses (2017 - 2024).  A discount rate of 2. 79% (5 year, tax-free, AAA, municipal bonds, March 219 2025, Bloomberg web site) is used to derive the present value of future income streams.  An April 2025 settlement is assumed.

The year 2033 (under lined) is consistent with the worklife of a 62 year old female with a graduate degree..

A-439

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| MISTY BLANCHETTE PORTER, M.D., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:17-CV-194 |
| | ) | |
| DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' RENEWED MOTION TO PRECLUDE THE TESTIMONY OF ROBERT BANCROFT**

Plaintiff Misty Blanchette Porter, M.D. ("Dr. Porter" or "Plaintiff") submits this memorandum to oppose Defendants' Renewed Motion to Preclude the Testimony of Robert Bancroft (Doc. 235). Notably, Defendants' first Motion to Preclude the Testimony of Robert Bancroft (Doc.198) is still pending. Yet Defendants now file a "renewed" motion with only one business day before trial begins. Just as Defendants' first motion was unfounded, however, Defendants "renewed" motion fails to show a valid reason for excluding Robert Bancroft's testimony, and the Court should therefore deny Defendants' motion.

At the outset, Defendants' "renewed" motion to preclude Dr. Bancroft's testimony is simply another motion *in limine* – one that has been filed weeks after the deadline for such motion. For that reason alone the Court should disregard the filing.

Moreover, Defendants once again focus on issues that can, and should, be resolved through the adversary process of cross-examination. The concerns they raise about Dr. Bancroft's

undated analysis should be addressed with the jury in cross examination – there is no basis to exclude the testimony. As long as Dr, Bancroft is deemed qualified, and his methodology is deemed reliable, then the Court's gate-keeping function is complete, and Defendants remaining concerns can be addressed at trial.

Finally, although Defendants complain that Dr. Bancroft has updated his report, this update does not support the remedies Defendants seek. Economic experts routinely update their analyses before trial to ensure that the analysis is based on the most current and accurate information. In addition, many of the changes were made to address issues that Defendants themselves identified at the evidentiary hearing. For example, Defendants' counsel explained that salaries at Dartmouth Health had been frozen during COVID. Taking counsel at his word, Dr. Bancroft adjusted his assessment to assume that this was true. This adjustment resulted in a reduction of Plaintiff's damages, so it is unclear why Defendants object so vehemently. Moreover, Dr. Bancroft has updated his assessment to account for the fact that Dr. Porter has not been able to adjust her schedule to a .6 FTE with no call. As she intended, and as Dr. Bancroft assumed in his August 2024 report, Dr. Porter asked her current employer to make that schedule adjustment. However, to date her employer has not agreed. It would not be appropriate to proceed to trial without taking this fact into account. Again, this adjustment has only lowered Plaintiff's losses, so Defendants have not been prejudiced.

Defendants' alternative remedy – to call its own expert – should be rejected. Defendants have had nearly 8 years to find and designate an expert. They have not done so. They should not be permitted to designate a testifying expert one business day before trial. This would be even more prejudicial to Plaintiff than the prejudice Defendants claimed they would suffer if Plaintiff

2

had been permitted to amend her complain. Just as the Court denied Plaintiff's motion to amend,

the Court should reject Defendants' request to designate a testifying expert.

CONCLUSION

For the foregoing reasons, Dr. Porter requests that the Court DENY Defendants' motion.


Dated: March 21, 2025                    /s/ Geoffrey J. Vitt
                                         Geoffrey J. Vitt, Esq.
                                         Vitt & Nunan, PLC
                                         8 Beaver Meadow Road
                                         P.O. Box 1229
                                         Norwich, VT 05055-1229
                                         (802) 649-5700
                                         gvitt@vittnunanlaw.com

Dated: March 21, 2025                    /s/ Eric D. Jones
                                         Eric D. Jones, Esq.
                                         Langrock Sperry & Wool, LLP
                                         210 College Street
                                         P.O. Box 721
                                         Burlington, VT 05402
                                         (802) 864-0217
                                         ejones@langrock.com

Dated: March 21, 2025                    /s/ Sarah H. Nunan
                                         Sarah H. Nunan, Esq.
                                         Vitt & Nunan PLC
                                         8 Beaver Meadow Road
                                         P.O. Box 1229
                                         Norwich, VT 05055
                                         (802) 649-5700
                                         snunan@vittnunanlaw.com

                                         *Attorneys for Plaintiff,*
                                         *Misty Blanchette Porter, M.D.*

3

A-442

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

      Plaintiff,

      v.                                                                Civil Action No. 2:17–cv–194

Dartmouth-Hitchcock Medical Center,
Dartmouth-Hitchcock Clinic,
Mary Hitchcock Memorial Hospital, and
Dartmouth-Hitchcock Health,

      Defendants.

## ORDER
(Docs. 198, 235)

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary

Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth

Health") filed a Motion *In Limine* to exclude in full the testimony of Plaintiff's expert witness,

Dr. Robert Bancroft. (*See generally* Doc. 198.) Dr. Porter seeks to introduce Dr. Bancroft's

testimony on her economic losses, including lost wages, lost benefits, compensatory damages,

and future lost income. (*See* Doc. 208 at 3.)

Dartmouth Health asks the Court to exclude Dr. Bancroft's testimony for two reasons.

First, Dartmouth Health argues that Dr. Bancroft is unqualified because he lacks sufficient

experience with employment cases and because his expert report relies on speculation and

opinion. (*See* Doc. 198-1 at 4–6.) Second, Dartmouth Health contends that Dr. Bancroft's

testimony is not reliable because his expert report incorporates several of Dr. Porter's predictions

regarding her future earning potential and because Dr. Bancroft assumes that Dr. Porter's

damages should be increased to account for taxes (that is, "grossed up"). (*Id.* at 7.)

A-443

2:17-cv-00194-kjd    Document 238    Filed 03/21/25    Page 2 of 17

Dr. Porter opposes Dartmouth Health's Motion. (*See generally* Doc. 208.) The Court held an evidentiary hearing on March 14, 2025. On March 20, 2025, Dartmouth Health filed its Renewed Motion to Preclude the Testimony of Robert Bancroft Based on New March 19, 2025 Report. (Doc. 235.) Dr. Porter filed her memorandum in opposition to the Renewed Motion on March 21, 2025. (Doc. 236.)

## Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 obligates the court to serve as a gatekeeper for expert testimony, ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

Although the proponent of the expert testimony bears the burden of establishing by a preponderance of the evidence that the demands of Rule 702 are met, "the district court is the ultimate gatekeeper," *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted), and the court has "broad latitude" to admit or exclude proffered expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142, 153 (1999). "[T]he Second Circuit has espoused a particularly broad standard for the admissibility of expert testimony," *Sec. Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 275 (S.D.N.Y. 2016)

2

(internal quotation marks and alterations omitted), where exclusion is "the exception rather than the rule." *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (quoting Fed. R. Evid. 702 Advisory Comm. Note (2000)).

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also United States v. LaVictor*, 848 F.3d 428, 444 (6th Cir. 2017) (holding that "[a]ny emerging prejudice [from an expert witness's testimony] was addressed during cross-examination").

To determine whether the requirements of Rule 702 have been satisfied, the Court considers: (1) the proposed expert's qualifications; (2) whether the expert's opinion is based on reliable data and methodology; and (3) whether the expert's testimony will assist the trier of fact. *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005).

## A.    Dr. Bancroft's Qualifications

A witness may give opinion testimony if "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The Court first asks "whether the proffered expert has the educational background or training in a relevant field by looking at the totality of the witness's background." *I.M. v. United States*, 362 F. Supp. 3d 161, 192 (S.D.N.Y. 2019) (internal alterations and quotation marks omitted). Next, the Court "compare[s] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony to ensure that the expert will actually be testifying on issues or subject matters within his or her area of expertise." *Id.* (internal quotation marks omitted). "Courts in the Second Circuit liberally construe the expert qualifications requirement, and generally will not exclude expert testimony provided the expert has educational and experiential qualifications in a

3

general field closely related to the subject matter in question." *Id.* (internal quotation marks omitted); *see also United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (holding that the qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the Rule").

Dr. Bancroft has extensive education and work experience in a field relevant to Dr. Porter's economic losses: applied economics. Dr. Bancroft holds a bachelor's degree in economics from the University of Vermont ("UVM"); a Master of Science in agricultural economics from UVM; and a Ph.D. in agricultural economics from Purdue University. (Doc. 198-4 at 2, 4:15–19.) Agricultural economics focuses more on practical application of economics than on economic theory. (*Id.* at 2–3, 4:20–5:8.) Individuals with advanced degrees in agricultural economics work in a range of disciplines including labor, natural resources, and business management. (*Id.*)

From June 1979 until August 1981, Dr. Bancroft worked for the United States Department of Agriculture to develop an econometric forecasting model to forecast farmers' participation in certain government programs and to provide testimony and research to the U.S. House of Representatives. (*Id.* at 3, 6:8–8:3.) Next, Dr. Bancroft began work as an assistant professor in the Department of Agriculture and Resource Economics—later renamed the Department of Community Development and Applied Economics—at the University of Vermont in August 1981. (*Id.*) Dr. Bancroft continued as an assistant professor of economics until 1991, when he became an adjunct professor. (Doc. 230 at 10:5–11.) He worked as an adjunct professor of economics until 1996. (*Id.*)

Dr. Bancroft's proffered testimony on economic losses falls squarely within his area of expertise. While at UVM, Dr. Bancroft started a solo practice as an economic consultant in

4

October 1981. (Doc. 198-4 at 3, 8:4–7.) His practice as an economic consultant has been his primary occupation since approximately 1986. (Doc. 230 at 10:12–16.) Dr. Bancroft estimates that 70% of his work in his thirty-eight years as a consultant has been in the field of forensic economics. (Doc. 198-4 at 5, 14:3–15.) In the last five years, that percentage has increased to "pretty much 100%." (*Id.* at 14:25–15:19.) Dr. Bancroft has been retained in over 2,500 lawsuits. (*Id.*) Since the early 2000s, Dr. Bancroft estimates that 20% of his cases relate to employment lawsuits. (*Id.*) Considering Dr. Bancroft's extensive credentials in the field of applied economics, including his education, experience, and general knowledge of the subject matter, the Court finds him qualified to offer expert testimony on Dr. Porter's damages.

Although Dartmouth Health points out that Dr. Bancroft has not testified in many, if any, employment cases over the last several years, (Doc. 198-1 at 4–5), that does not impact Dr. Bancroft's qualifications as an expert witness. The threshold question under Rule 702 is "whether the witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions," not whether the expert has recent experience testifying at trial. *Nimely*, 414 F.3d at 396, n.11 (internal quotation marks omitted); *see also, e.g., First Marblehead Corp. v. House*, 541 F.3d 36, 41 (1st Cir. 2008) (although defendant's expert witness was not certified financial planner who focused entirely on individual investment decisions, expert, who had extensive consulting experience in economics, finance, and strategy and provided investment advice to employees and accredited investors, was qualified to testify about how individuals choose investments and arrange portfolios); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) ("It is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."); Dr. Porter

has shown that Dr. Bancroft is qualified by education and experience to give his opinion on Dr. Porter's economic losses. Such a showing is sufficient for the first step in the Court's inquiry.

Dartmouth Health also contends that Dr. Bancroft is unqualified because he relies on subjective experience and speculation for his opinions. (Doc. 198-1 at 5–6.) In particular, Dartmouth Health contends that Dr. Bancroft's opinions are speculative because: (1) he relied on "imprecise statistical evidence," including a 2.5% annual salary increase, to support his findings; (2) he considers multiple possibilities for Dr. Porter's career; (3) he "assumes that Dr. Porter would remain employed at Dartmouth Health on a full-time basis until 2033;" (4) his most recent report, in which he assumes that Dr. Porter will not leave her full-time position at UVM until January 2025, differs from an assumption used in an earlier report; (5) "Dartmouth Health is unfairly held responsible for . . . Dr. Porter's voluntary decision to fundamentally alter her work arrangements with UVM by assuming a part-time position;" and (6) he inappropriately applied Vermont's statute requiring 12% prejudgment interest. (*Id.* at 6); (Doc. 223 at 3.)

The Court does not find that any of these objections warrant excluding Dr. Bancroft's testimony in its entirety. Although a court should exclude expert testimony "if it is speculative or conjectural," or "based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an 'apples and oranges comparison,' other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (per curiam) (internal citations and quotation marks omitted). Dartmouth Health challenges Dr. Bancroft's use of information from the U.S. Bureau of Labor Statistics ("BLS") regarding average annual salary increases of 2.5% nationwide as "imprecise statistical evidence," but courts have frequently upheld use of similar statistics by both lay and expert witnesses. *See, e.g., id.* at 23 (internal quotation marks and

6

alterations omitted) ("Statistical charts, such as the mortality tables and the work-life expectancy tables prepared by the United States Department of Labor are often deemed authoritative. . . ."); *Carroll v. Xerox Corp.*, 294 F.3d 231, 240 (1st Cir. 2002) (holding that a plaintiff might have shown that he was limited from other jobs besides his own using expert vocational testimony or publicly available labor market statistics); *Higgins v. Kinnebrew Motors, Inc.*, 547 F.2d 1223, 1225–26 (5th Cir. 1977) (upholding expert witness's use of statistics from the BLS instead of a couple's actual expenses); *Kenealy v. Saul*, No. 19-cv-40-jdp, 2019 U.S. Dist. LEXIS 206866, at *17 (W.D. Wis. Dec. 2, 2019) (internal quotation marks omitted) ("An expert can support her estimates by drawing on knowledge of labor market conditions and occupational trends, gleaned from reviewing relevant data sources or from placing workers in jobs."). The same is true for Dr. Bancroft's use of data on work-life expectancy to predict that Dr. Porter may continue to work until the year 2033. (*See* Doc. 198-4 at 26, 98:18–99:25); *see also Boucher*, 73 F.3d at 23; *Weil v. Seltzer*, 873 F.2d 1453, 1465 (D.C. Cir. 1989) ("Statistics, such as those prepared by the Department of Labor on work-life expectancy, are only one tool which may be used by an expert in forming an opinion.").

Nor does the Court find that Dr. Bancroft's choice to consider multiple possible future career paths for Dr. Porter or to update the assumptions used in his August 2024 report render his opinion testimony too speculative. Dr. Porter's most recent filing clarifies that the "internal inconsistencies" in Dr. Bancroft's expert reports resulted from new information that impacted Dr. Bancroft's economic loss analysis:

> While Dr. Porter initially projected that she would resign her full-time position at UVM to find a part-time job closer to her Norwich home in 2021, that did not happen. Instead, she remained in her full-time position and changed her projected horizon for a change to 2025. Dr. Bancroft merely updated his report to reflect these facts as they arose.

7

(Doc. 208 at 9–10.) Dr. Bancroft's decision to update his expert reports after receiving new information was entirely appropriate, as was his decision to include multiple scenarios for Dr. Porter's potential damages depending on how many years she continues to work. *See Rosario v. City of New York*, No. 18 Civ. 4023 (LGS), 2021 U.S. Dist. LEXIS 91675, at *15 (S.D.N.Y. May 13, 2021*)* ("[E]xperts may provide opinions tailored to different factual scenarios that the jury may consider.")

The Court is also not persuaded that Dr. Porter's plan to decrease her work at UVM from full-time employment ("FTE") to .6 FTE is too speculative for Dr. Bancroft's use. Dr. Bancroft "may base an opinion on facts or data in the case." Fed. R. Evid. 703. Dr. Porter is the most reliable—perhaps the only—source of information on whether and when she intends to decrease her working hours. And as Dr. Bancroft testified, Dr. Porter has a reasonable explanation for why she intends to decrease her hours at UVM: she finds it more stressful to commute from her home in Norwich, VT, to Burlington (as opposed to Lebanon). (Doc. 230 at 37:2–17, 38:21–39:1; *see also* Doc. 198-4 at 11, 37:10–18 (testimony that Dr. Porter said that she didn't know how long she would stay at UVM because she enjoyed the work but "didn't like being away from her family and having to commute")).

As to Dartmouth Health's argument that it has "no legal obligation to finance Dr. Porter's voluntary decision to fundamentally alter her work arrangements with UVM by assuming a part-time position," (Doc. 198-1 at 6), the Court finds this objection goes to the weight of Dr. Bancroft's testimony rather than its admissibility. It appears to pertain more to Dr. Porter's duty to mitigate damages than to Dr. Bancroft's qualifications as an expert. *See, e.g., Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998). Dr. Bancroft may properly rely on Dr. Porter's assumption that she will decrease her work at UVM to .6 FTE because this

8

assumption is "not so unrealistic and contradictory as to suggest bad faith" given that the substantial commute from Norwich to Burlington apparently increases her stress and reduces time with her family. *See Boucher* 73 F.3d at 21; *cf. Bergerson v. New York State C₁f. cf Mental Health, Cent. New York Psychiatric Ctr.*, 526 F. App'x 109, 111–12 (2d Cir. 2013) (summary order) (finding district court erred in concluding that employee failed to mitigate damages when she resigned from employment located two and a half to three hours from her home because employee "was not obligated to mitigate damages by pursuing or continuing employment located such an unreasonable distance from her home"). Considering the broad standard for admissibility of expert testimony in this Circuit, the Court declines to find Dr. Bancroft unqualified on this basis. Dartmouth Health will have the opportunity to challenge Dr. Porter's alleged damages through cross-examination or the presentation of conflicting evidence at trial. *See Daubert*, 509 U.S. at 596.

Dartmouth Health further contends that Dr. Bancroft's opinion relies on subjective experience and speculation because he applies 9 V.S.A. § 41a(a), which mandates a prejudgment interest rate of 12% per year, in the absence of an agreement as to the rate of interest, to his analysis. (Doc. 223 at 3.) Dartmouth Health argues that Dr. Bancroft should not have used Vermont's statutory prejudgment interest rate to calculate Dr. Porter's damages because the statute only applies to a "sum certain" and not an "unquantifiable, indirect or disputable sum." (*Id.*) The Court disagrees for two reasons.

First, the Court anticipates that the Vermont Supreme Court would hold that prejudgment interest is available as of right in this case. Prejudgment interest is "awarded as of right when the principal sum recovered is liquidated or capable of ready ascertainment and may be awarded in the court's discretion for other forms of damage." *Hirchak v. Hirchak*, 2024 VT 81, ¶¶ 36–37,

___ Vt. ___, ___ A.3d ___ (internal quotation marks omitted). The Vermont Supreme Court has upheld a trial court's award of mandatory prejudgment interest for lost wages and medical expenses as "reasonably ascertainable"[1] because the plaintiff's "salary was known with reasonable certainty, as was the general nature of her injuries and the likely course of treatment." *See Smedberg v. Detlef's Custodial Serv., Inc.*, 2007 VT 99, ¶¶ 37–39, 182 Vt. 349, 940 A.2d 674 (2007). Noting that "reasonable ascertainment" does not mandate that "the amounts be precisely or infallibly ascertainable," the *Smedberg* court rejected the defendant's "proposed rule, which would appear to limit prejudgment interest to a very narrow class of cases in which a known sum of money was converted to the tortfeasor's use on a precisely known date" because "[p]rejudgment interest on compensatory damage awards is meant to restore—to the extent possible—harmed plaintiffs to the financial position they would have enjoyed but for the tort, and should not be limited to such a tiny fraction of tort cases." *Id.* at ¶¶ 38–39. Under *Smedberg*, Dr. Porter's compensatory damages—comprised of lost earnings and extraordinary employment costs—are "reasonably ascertainable" because they can be "measured against a reasonably certain standard." (S*ee* Doc. 198-5 at 5–6); *Smedberg*, 2007 VT at ¶ 37. Therefore, Dr. Porter is likely entitled to prejudgment interest as of right under 9 V.S.A. § 41a(a).

Second, even if Dr. Porter could not receive prejudgment interest as of right under 9 V.S.A. § 41a(a), a jury may still award her prejudgment interest in a discretionary capacity. *See Est. of Fleming*, 724 A.2d at 1030 (emphasizing that the trier of fact has the discretionary capacity to award prejudgment interest in cases where damages are not liquidated or reasonably ascertainable "where it is required to make the plaintiff whole"). Therefore, Dr. Bancroft's use of

---

[1] The Vermont Supreme Court has acknowledged that the terms "readily ascertainable" and "reasonably ascertainable" are substantively similar with respect to an award for prejudgment interest. *See Est. of Fleming v. Nicholson*, 724 A.2d 1026, 1030 n.2 (Vt. 1998).

10

A-452

the statutory prejudgment interest rate in 9 V.S.A. § 41a(a) is not based on unreliable data and methodology, and the Court declines to exclude Dr. Bancroft's testimony on this basis.

In short, the Court finds Dr. Bancroft qualified to give testimony on Dr. Porter's economic losses and proceeds to the next step of the analysis: whether Dr. Bancroft's testimony is reliable.

### B.   Whether Dr. Bancroft's Testimony Is Based on Reliable Data and Methodology

Dartmouth Health asks the Court to find that Dr. Bancroft's testimony is not reliable for two reasons. First, Dartmouth Health argues that Dr. Bancroft's analysis "relies on Dr. Porter's subjective belief that she would be promoted by Dartmouth Health to a full professor and receive a 5% salary increase in 2017" without considering whether this belief is reasonable. (Doc. 198-1 at 7.) Second, Dartmouth Health argues that Dr. Bancroft's report impermissibly "grosses up" Dr. Porter's damages to account for federal and state taxes. (*Id.*)

"[W]here lost future earnings are at issue, an expert's testimony should be excluded . . . if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Sinkov v. Americor, Inc.*, 419 F. App'x 86, 90–91 (2d Cir. 2011) (summary order) (internal quotation marks omitted), quoting *Boucher*, 73 F.3d at 21. It is within the district court's discretion to "determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984). While a court may exclude opinion evidence when the "court concludes that there is simply too great an analytical gap between the data and the opinion proffered," the Second Circuit has noted that "[f]requently . . ., gaps or inconsistencies in the reasoning leading to the expert's opinion go to the weight of the evidence, not to its admissibility." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (internal quotation marks and alterations omitted).

11

On this record, the Court does not find that Dr. Porter's assumption that she would have been promoted to full professor and received a 5% salary increase in 2018 is unrealistic such that Dr. Bancroft's opinion testimony is unreliable. Dr. Porter's professional skills are widely recognized. Dr. Porter began working as a staff physician at Dartmouth Health in 1996. (Doc. 139-3 at 4.) One year later, she was promoted to Medical Director of the IVF/ART program and appointed jointly to Dartmouth Health's Department of Radiology. *Porter v. Dartmouth-Hitchcock Med. Ctr.* 92 F.4th 129, 133 (2024). Dr. Porter became a senior voting member of Dartmouth Health's Professional Staff in 2001. *Id.* In 2011, she became Acting Director of the REI Division and continued in that role until Dr. David Seifer was appointed Director in May 2016. *Id.* at 134. Before Dr. Porter became ill, she also served as Vice Chair of Perioperative Services and Director of Gynecological Ultrasound. (Doc. 139-4 at 28–30, 27:3–29:20.) Dr. Leslie DeMars, the chair of the OB/GYN Department and Dr. Porter's supervisor at Dartmouth Health, has described Dr. Porter as "an amazingly gifted and dedicated reproductive endocrinologist and infertility specialist" and described her skills using the term "Misty magic." (Doc. 140-8 at 3, 42:25–43:10.) Other providers at Dartmouth Health have also attested to the high quality of Dr. Porter's professional skills. (*See, e.g.*, Doc. 140-5 at 2–4; Doc. 140-6 at 2; Doc. 140-4 at 2–6.)

In short, while the Court does not express an opinion on whether Dr. Porter would indeed have been promoted to full professor at Dartmouth Health, "the possibility . . . was hardly so unlikely as to preclude the jury from considering it." *See Sinkov*, 419 F. App'x at 90–91 (upholding damages award based on expert analysis providing three alternative calculations of loss of earning potential, including that of a secondary schoolteacher and a typical man with either an associate's or a bachelor's degree, because expert's appraisals were "rooted in the

12

evidence" that individual had already earned educational credits towards his associate's degree and stated his intention to become a teacher). In fact, after leaving Dartmouth Health Dr. Porter did get promoted to full professor at UVM Medical Center, a "similar, rural academic REI center" to Dartmouth Health. (*See* Doc. 230 at 28:7–29:3; Doc. 140-19 at 2.)

Moreover, Dr. Porter's possible promotion at Dartmouth Health differs from the types of assumptions the Second Circuit has considered speculative because it is rooted in record evidence. *See Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 511 F. App'x 54, 56–57 (2d Cir 2013) (summary order) (finding no error in district court's exclusion of expert testimony composed of "sweeping statements that were detached from the actual evidence"); *Boucher*, 73 F.3d at 22 (overturning damages awards when expert estimated lost earnings based on assumptions that plaintiff would work full-time every week with fringe benefits and regular pay increases for the rest of his career when plaintiff's "sporadic employment had yielded fluctuating low levels of income, with long spells of no income whatsoever" and few, if any, fringe benefits). Dr. Bancroft reasonably assumed that Dr. Porter would be promoted to full professor at Dartmouth Health in 2018, and any gaps in the reasoning go to the weight of the evidence, not to its admissibility. *See Shatkin*, 727 F.2d at 208; *Restivo*, 846 F.3d at 577.

As to Dartmouth Health's argument that Dr. Bancroft's use of a 5% increase in salary from becoming a full professor is speculative, Dr. Bancroft's analysis may properly rest on his personal knowledge and experience. (*See* Doc. 230 at 21:10–22:6) (testimony of Dr. Bancroft that in his experience, a promotion to full professor at UVM tended to include a 5% increase in salary). The Court declines to strike Dr. Bancroft's testimony on this basis.

Finally, Dartmouth Health argues that Dr. Bancroft's analysis is not based on reliable methods because it "artificially inflat[es]" Dr. Porter's damages through a "post-tax calculation

13

where state and federal taxes should be deducted from compensation attributable to back pay or front pay." (Doc. 198-1 at 7.) Dartmouth Health challenges Dr. Bancroft's assumption that Dr. Porter's total damages award should include funds to cover state and federal taxes because the salary numbers that he uses "are all drawn from W2 and other salary information that are amounts before taxes." (Doc. 226 at 6.) Therefore, "there is no need" to account for tax liability from a damages award because the salary numbers Dr. Bancroft uses "already include the amounts [Dr. Porter] would need to pay in taxes in them." (*Id.*) In other words, Dartmouth Health argues that Dr. Bancroft is double counting. (*Id.*)

The Court need not exclude Dr. Bancroft's testimony on this point as unreliable. To the Court's understanding, Dr. Bancroft's analysis estimates and subtracts federal and state income taxes from Dr. Porter's damages before calculating the current present value of Dr. Porter's lost earnings. (*See* Doc. 198-5 at 4–5, n.7–9.)[2] In other words, Dr. Bancroft uses a post-tax potential damages award to calculate the estimated settlement tax Dr. Porter would incur. (*See id.* at 4–6, n.9.) Thus, Dr. Bancroft's analysis appears to account for tax liability only once rather than double-counting. Dr. Bancroft has explained that he uses this method because the progressive income tax causes an individual who receives lost earnings as a lump sum award to pay higher taxes on that award than she would have if she had received the same amount divided over several years as part of her salary. (*See* Doc. 230 at 41:4–18; Doc. 198-4 at 12, 41:24–43:24.)

---

[2] In addition to challenging the substance of Dr. Bancroft's testimony, Dartmouth Health characterizes Dr. Bancroft's expert report dated August 26, 2024, as "inadmissible hearsay" and asks the Court to preclude him from using the Lost Earnings Chart (Doc. 198-5 at 4) at trial because Dr. Porter "has not identified [it] as substantive or demonstrative evidence in relation to" the expert report. (Doc. 223 at 2–3.) Dr. Porter's Exhibit List identifies "Bancroft Analysis" as Exhibit 1. (Doc. 219 at 1.) The descriptor "Bancroft Analysis" adequately identifies the Lost Earnings Chart because Dr. Bancroft's "analysis" encompasses the detailed breakdown of each step of his damages calculations contained within the Chart. And Dr. Bancroft's expert report, including the Chart, is "not inadmissible hearsay, because it reflects his own opinions." *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 980 F. Supp. 2d 425, 442 (S.D.N.Y. 2013); *see also Muto v. Cty. of Mendocino*, Case No. 20-cv-06232-SK, 2022 U.S. Dist. LEXIS 80131, at *31 (N.D. Cal. May 3, 2022) ("It is axiomatic that the opinion of an expert witness is not hearsay.").

A-456

For the reasons explained above, the Court finds that Dr. Bancroft's proffered testimony on Dr. Porter's damages is based on reliable data and methodology.

## C.   Whether Dr. Bancroft's Testimony Will Assist the Trier of Fact

Finally, the Court must determine whether Dr. Bancroft's opinion will assist the trier of fact. The Court must make a "common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993) (internal quotation marks omitted).

Dartmouth Health does not appear to contest that Dr. Bancroft's testimony would assist the trier of fact. (*See generally* Docs. 198, 223.) The Court finds that Dr. Bancroft's testimony would be helpful to a jury. The use of a damages expert at trial "is . . . commonplace and may be essential." *In re KeySpan Corp. Sec. Litig.*, No. CV 2001-5852 (ARR) (MDG), 2005 U.S. Dist. LEXIS 29068, at *21 (E.D.N.Y. Aug. 25, 2005). Dr. Bancroft's testimony would benefit a jury because the advanced economics and mathematics required to calculate lost earnings goes beyond the knowledge of the average juror. (*See* Doc. 198-4 at 11–12, 39:23–43:24) (describing Dr. Bancroft's methodology for projecting gross loss, present value, and estimated tax liabilities); *see also, e.g.*, *Jackson v. State Farm Fire & Cas. Co.*, Civil No. 1:23-cv-24-HSO-BWR, 2024 U.S. Dist. LEXIS 38993, at *27 (S.D. Miss. Mar. 6, 2024) (internal alteration and quotation marks omitted) ("Generally speaking, expert testimony on damages frequently will help the trier of fact because damage calculations often involve complex aspects of economics and mathematics.").

15

**D.    Dartmouth Health's Request to Present Its Own Expert Economist**

Dartmouth Health has requested that, if the Court does not preclude Dr. Bancroft's testimony in full, Dartmouth Health be permitted to "present its own expert economist to provide analysis of the discrete universe of financial documents in the case." (Doc. 235 at 7.) In general, before a party can introduce expert testimony at trial, it must disclose the expert at least ninety days before the date set for trial. Fed. R. Civ. P. 26(a)(2)(D)(i). Moreover, Rule 26(a)(2)(B) requires that the disclosure of the expert must be accompanied by a written report prepared and signed by the witness. According to the most recent scheduling order, Dartmouth Health's deadline to submit any expert reports was December 15, 2018. (Doc. 138 at 2.) If the party fails to make a timely disclosure, the undisclosed witness cannot testify at trial unless the failure to disclose was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1).

The Court cannot find that Dartmouth Health's untimely disclosure is substantially justified or harmless. Dartmouth Health has not identified or provided any information about its expert witness and that witness's expected testimony or explained why it did not disclose an expert witness sooner in compliance with the Federal Rules. Courts in this Circuit have ruled that the failure to disclose an expert witness may prejudice the opposing party. *See, e.g., Evans v. United States*, 978 F. Supp. 2d 148, 153 (E.D.N.Y. 2013); *Palma v. Pharmedica Commc'ns, Inc.*, No. 00-CV-1128 (AHN), 2002 WL 32093275, at *2 (D. Conn. Mar. 27, 2002). The untimely disclosure and the absence of an expert report may prejudice Dr. Porter by denying her a clear understanding of the expert's intended testimony and compromising her ability to prepare effective cross-examination or rebuttal evidence. Under these circumstances, the Court cannot find that Dartmouth Health's disclosure of a potential expert witness four days before trial is

A-458

substantially justified or harmless. The Court therefore declines Dartmouth Health's belated

request "to present its own expert economist." (Doc. 235 at 7.)

### Conclusion

For the reasons explained above, Dartmouth Health's Motion *In Limine* to Preclude the

Testimony of Robert Bancroft (Doc. 198) and Renewed Motion to Preclude the Testimony of

Robert Bancroft Based on New March 19, 2025 Report (Doc. 235) are DENIED.

Dated at Burlington, in the District of Vermont, this 21st day of March 2025.

/s/ Kevin J. Doyle
United States Magistrate Judge

17

A-459

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,    )
                                  )
                                  )
            Plaintiff,            )
                                  )
      vs.                         )    Case No. 2:17-cv-194
                                  )
DARTMOUTH-HITCHCOCK MEDICAL       )
CENTER, DARTMOUTH-HITCHCOCK       )
CLINIC, MARY HITCHCOCK            )
MEMORIAL HOSPITAL, and            )
DARTMOUTH HITCHCOCK HEALTH,       )
                                  )
            Defendants.           )

**DEFENDANTS' MOTION IN LIMINE TO PRECLUDE THE EXPERT REPORT**

Now come Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock

Clinic, Mary Hitchcock Memorial Hospital and Dartmouth Hitchcock Health ("Dartmouth

Health" or "Defendants") and submit Motion in Limine to Preclude Dr. Robert Bancroft's Expert

Report in the above-captioned matter. Dartmouth-Hitchcock respectfully submits as follows:

Dr. Porter ("Plaintiff") seeks to introduce into evidence the reports of her expert Dr.

Bancroft dated August 26, 2024 and March 19, 2025, marked for identification as Plaintiff's

Exhibit Nos. 1 and 1A. As it is expected that Dr. Bancroft will be called to testify at trial, the

introduction of the reports into evidence can serve no useful purpose. Courts have held that

where an expert is expected to testify at trial, his report is not only inadmissible hearsay, but also

redundant. *Aktas v. JMC Dev. Co.*, No. 1:09-CV-01436 MAD, 2013 WL 55827, at *5 (N.D.N.Y.

Jan. 3, 2013); *see Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2002 WL

826956, at *7 (S.D.N.Y.2002) (collecting cases and agreeing that "where an expert is expected to

testify at trial, her report is inadmissible hearsay and redundant") ("Defendants' motion is granted insofar as it seeks to preclude the admission of Dr. Graham's expert report."); *see also Ake v. Gen. Motors Corp.*, 942 F.Supp. 869 (W.D.N.Y.1996) (excluding as hearsay the expert's report); *see also Horn v. Med. Marjuana, Inc.*, No. 15-CV-701-JWF, 2021 WL 1700257 (W.D.N.Y. Apr. 29, 2021) (same); *see also Johnston v. Borders*, No. 615CV936ORL40DCI, 2018 WL 4215027, at *1 (M.D. Fla. Sept. 4, 2018) ("Expert reports are hearsay; that is, a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); *see also Jones v. Royal Caribbean Cruises, Ltd.*, No. 12–20322–CIV, 2013 WL 8695361, at *2 (S.D. Fla. Apr. 4, 2013) (finding expert's written report is not admissible at trial, but it can be used to refresh his recollection, if necessary); *Neagle v. Illinois Tool Works, Inc.*, No. 1:08-cv-2080-WSD, 2011 WL 13173913, at *1 (N.D. Ga. Feb. 11, 2011) (noting expert reports generally are inadmissible because they are hearsay).

Even if Dr. Bancroft's charts are permitted to be presented to the jury, Dr. Bancroft's report is hearsay, an out-of-court statement offered to prove the truth of the matter asserted. The report is not a business record, a record of events made at or near the time of the event, a record involving the proponent's regularly conducted business, a public record, a prior consistent statement because it was not offered to rebut a charge of recent fabrication or improper motive, an adoptive admission because it was not offered against the party who adopted it, or the basis for the expert's opinion because "the report is his opinion." *Ake v*, 942 F. Supp. at 877–78. While Dr. Bancroft will be permitted to testify as to his opinion at trial, the reports contain narratives that may not be connected to testimony at trial, and therefore, if allowed into evidence, will convey to the jury information that is not otherwise properly before them and not subjected to cross-examination. The Court should rule consistent with other courts that have considered

2

the admissibility of a testifying expert's report at trial and exclude its admission. *Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 96-CV-7874, 2002 WL 826956, at *7 (S.D.N.Y. May 1, 2002) (collecting cases and agreeing that "where an expert is expected to testify at trial, her report is inadmissible hearsay and redundant").

The Court's reliance on *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 980 F. Supp. 2d 425, 442 (S.D.N.Y. 2013) to support the admissibility of the reports is misplaced. In *MTBE*, the court was determining whether it could consider the expert's opinions in the report on a for summary judgment purposes, not whether the report itself would be admissible at trial. *Id.* The posture in *Muto v. Cty. of Mendocino*, was the same, whether a court could consider an expert's opinions in a report at summary judgment and was expressly limited as such. No. 20-cv-06232-SK, 2022 U.S. Dist. LEXIS 80131, at *31 (N.D. Cal. May 3, 2022) ("[T]he form of the content does not control the admissibility of evidence *for summary judgment.* … If called as an expert witness at trial, Naber could provide her opinion" through testimony (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003)-(emphasis added)).

Conclusion

In conclusion, Dartmouth-Hitchcock asserts that the Court should preclude Dr. Bancroft's report itself as inadmissible hearsay. The report is an unsworn, out of court statement being offered for the truth of the matter asserted. As decided by the court, the expert will have the opportunity to testify as to his opinions at trial, subject to cross-examination. The reports contain narratives that are unlikely to be connected to testimony at trial, and therefore, if allowed into evidence, will convey to the jury information that is not otherwise properly before them. The Court should rule consistent with other courts that have considered the admissibility of a testifying expert's report at trial and exclude its admission.

A-462

Date: March 26, 2025                    Respectfully submitted,


                                        /s/ Tristram J. Coffin
                                        Tristram J. Coffin

                                        **DOWNS RACHLIN MARTIN PLLC**

                                        Tristram J. Coffin
                                        199 Main Street
                                        Burlington, VT 05402
                                        Telephone: 802-863-2375
                                        tcoffin@drm.com

                                        **FOLEY & LARDNER LLP**

                                        Donald W. Schroeder (admitted *pro hac vice*)
                                        Morgan McDonald-Ramos (admitted *pro hac vice*)
                                        Megan E. Martinez (admitted *pro hac vice*)
                                        111 Huntington Avenue
                                        Boston, MA 02199
                                        Tel: (617) 342-4000
                                        dschroeder@foley.com
                                        mmcdonald@foley.com
                                        memartinez@foley.com
                                        *Attorneys for Defendants*

A-463

2:17-cv-00194-kjd   Document 248   Filed 03/26/25   Page 5 of 5

## CERTIFICATE OF SERVICE

I hereby certify that, on March 26, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.


/s/ Megan E. Martinez
Megan E. Martinez


23446286.1

A-464

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,   )
                                 )
                                 )
              Plaintiff,          )
                                 )
        vs.                       )        Case No. 5:17-cv-194
                                 )
DARTMOUTH-HITCHCOCK MEDICAL       )
CENTER, DARTMOUTH-HITCHCOCK       )
CLINIC, MARY HITCHCOCK            )
MEMORIAL HOSPITAL, and            )
DARTMOUTH HITCHCOCK HEALTH,       )
                                 )
              Defendants.          )

Motion In Limine Regarding Undisclosed Expert Opinions of Bancroft

Now comes Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock

Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively,

"Dartmouth Health" or "Defendants") and submits this Motion in Limine Regarding Undisclosed

Expert Opinions of Bancroft.

At day-five of the trial in the above-captioned matter, while on direct examination, Dr.

Bancroft was asked to describe his opinions regarding how he factored in certain pension

information about Plaintiff from a defined benefit plan pension she was making payments toward

while employed at Dartmouth Health.  Defendants objected, stating that this analysis was not set

forth in the expert report nor in the analytic chart or assumptions that were provided to

Defendants prior to trial (albeit, Plaintiff provided the last full expert report incorporating "eight

substantive changes"; four from "new information" and four from "passage of time", a mere five

1

4925-1988-9200.2

days prior to trial). This new report reduced the projected Total Economic Loss by some $2.6 million.

Aside from identifying the pension testimony as an undisclosed expert opinion, Defendants further asserted that the chart did not take into account the present value of the amount of benefit which Plaintiff would obtain by getting life-long payments from her Dartmouth Health pension plan. Defendants also understood Dr. Bancroft to be saying that she would not receive a pension benefit from Dartmouth Health, notwithstanding her separation.[1]

Plaintiff's counsel asserted that this opinion was to be magically devined from the chart, that the analysis was always baked into the chart even in its earlier iterations, and that Defendants just needed to understand that analysis. Dr. Bancroft, on examination outside of the presence of the jury, and Plaintiff's counsel, appeared to acknowledge that the analysis for the pension difference was not stated in any of Dr. Bancroft's four expert reports in this case, nor was it stated forthrightly in the assumptions sections of his reports.

Background

Some background is relevant here.

Dr. Bancroft's expert opinion to be offered here is based on the latest of four expert reports and analytic charts he has provided in this case. All of the reports are based on massively differing assumptions and reach widely divergent conclusions about Total Economic Loss and numerous sub-issues that he has assessed to make up his claimed loss. These reports and the bottom-line results they reach are:

-- October 30, 2018: Total Economic Loss: $3.0 million. See Exhibit 1.

---

[1] Dr. Bancroft, on examination outside of the jury's presence, appears to now acknowledge that Dr. Porter would receive a pension benefit from Dartmouth Health, only that it would be reduced due to her separation and employment at another institution.

2

A-466

-- October 1, 2019:  Total Economic Loss:  $4.8 million.  See Exhibit 2.

-- August 26, 2024:  Total Economic Loss:  $4.3 million[2].  See Exhibit 3.

-- March 19, 2025:  Total Economic Loss:  $1.787 million[3].  See Exhibit 4.

Moreover, these reports and the changes to the assumptions accompanying them, are based to an unusual degree solely on the Plaintiff's say so.  As part of expert discovery in the case, Dr. Bancroft produced his "file" prior to the October 30, 2019 deposition at which his October 2018 and October 2019 reports was the basis for his testimony.  Plaintiff has not provided any additional working papers for any of the two subsequent reports or otherwise in the case until after the evidentiary hearing on March 14, 2025, when Defendants' counsel wrote to Plaintiff's counsel asking them specifically to update their discovery, and in particular to produce the most recent earnings information, including her 2024 W2s, and her full professor/currently employment contract.  No other information was provided.[4]

Defendants understand, therefore, that the only basis for certain key assumptions in Dr. Bancroft's August 2024 changed opinion and analysis and the March 2025 opinion and analysis are the hearsay statements of Dr. Porter or her counsel.  For example, assumptions key to the

---

[2] Interestingly, this report was prompted by a scheduled mediation session at which the parties would meet to formally negotiate a settlement to the case.

[3] This report, dropping the Total Economic Loss opinion by some $2.6 million, followed an evidentiary hearing at which, *inter alia*, certain deficiencies in Plaintiff's expert and fact discovery became apparent.  Namely, that Plaintiff had been promoted to Full Professor at UVMMC **effective July 1, 2023** and that Dr. Bancroft had not obtained or reviewed and Plaintiff had not produced her 2024 W2 or other material earnings information for her post-promotion earnings.  This information was highly relevant because Dr. Bancroft expressed the opinion that Dr. Porter would have received a 5% pay increase for being promoted to a professorship at Dartmouth Health, but made no such adjustment for that eventuality in his pay calculations for UVMMC in his August 2024 report fifteen (15) weeks after her promotion.  This resulted in Dr. Porter's earnings at Dartmouth Health being overstated and her earnings and UVMMC being understated based on Dr. Bancroft's expert opinion.  The damages were accordingly exaggerated because they are purportedly the difference between her compensation she would get at Dartmouth Health and what she will get at UVMMC.

[4] Nor, despite repeated requests, have Plaintiffs produced prior invoices of Dr. Bancroft.  After multiple requests, Plaintiff provided one invoice on March 27, 2025, provided an invoice of some $6,900 for work done in year 2024.  No invoices for work on prior or subsequent reports have been provided.

3

opinion that Dr. Bancroft presents are based wholly on the Plaintiff. Among those are: her plan to work .6 time in the August 2024 report, her plans to work .75 in the 2025 report, her speculation that she would have been chosen as a full professor at DHMC in 2019, and her likelihood to work to age 70, as implied in the August 2024 and March 2025 charts. These changes to the premises of the reports, and the modified conclusions, alter the loss projections by millions of dollars and are based on the unforeseeable and unverifiable subjective whims of Plaintiff. Of course, these alterations of the information provided by Plaintiff and her lawyers, could not be forecast by Dartmouth Health. These factors show that, far from being a sum readily ascertainable by Defendant, over the years, the Total Economic Loss Projections have varied at Plaintiff's say-so with no predictability or basis other than her hearsay support.

Which brings us to the issue at bar. After such divergent and evolving opinions, without being provided any additional working papers or reliance materials to support them, Defendants are understandably on guard for new, unanticipated or unanticipatable opinions being offered at trial. Responding to them on the fly at trial is challenging and prejudicial, and is not what the rules of expert disclosure require. Although it was difficult for Dartmouth Health's counsel to understand in the moment, Dr. Bancroft, on direct examination, began to provide an undisclosed opinion of how he calculated the effect of Dr. Porter's pension contributions on his damages calculations in his March 19, 2025 report. To Defendants, these were new calculations and assessments that were not stated with any clarity whatsoever in prior reports, charts or assumptions. Defendants objected on that specific basis. Defendants also are concerned that Dr. Bancroft's mention of the effect of her pension benefits is one-sided, and does not include any recognition that Dr. Porter will still get a pension (although of lesser total amount), or the present value of that life-long earnings stream. Defendants' have had the value of that pension over her

4

lifetime to be worth some $1.47 million. Dr. Bancroft does not appear to calculate the present value of that benefit in his calculations. Suffice it to say, that such calculations are, at best, complex and should have been openly disclosed rather than hidden among the weeds of a chimeric report disclosed on the eve of trial.

Before discussing the legal rules and principles that apply, another example of the varying whims of Dr. Bancroft's report is apropos. In Dr. Bancroft's October 1, 2019 report, Dr. Bancroft, presumably based on what he was told by Dr. Porter and counsel, opined that she would cease working in 2029 at age 66, noting that: "The year 2029 (underlined) is consistent with the work life of a 56-year-old female with a graduate degree." Because of this note, his analytic chart for that report included an underline of the yearly income and damages figures for that year and age. The most recent reports have dropped that underline and the presumption note. Again, presumably based entirely on Dr. Porter's changed reportage of her plans. See Exhibit 2, emphasis in original. [5] Rather, from the chart, and her testimony, one would infer she in fact plans to work until the age of 70.

### Discussion

The rules for expert discovery are set forth primarily in Rule 26 of the Federal Rules of Civil Procedure. According to Rule 26(a), a retained expert is required to produce a report which "must contain" . . . "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Further, it "must contain" . . . "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(ii). Further, it

---

[5] A skeptic might conclude that the altered assumptions and the faltering discovery are motivated by the fact that Dr. Porter has so successfully mitigated her damages by obtaining an excellent position as a full OB-GYN professor at UVMMC, that she is striving for ways to inflate her Total Economic Loss number, albeit perhaps unsuccessfully since Dr. Bancroft's loss opinion is down to $1.787 million if she works to age 70, and $1.36 million if she works to age 65. This opinion of course is down from $4.3 million in August 2024 prior to the final settlement mediation, and was only offered for the first time last week.

5

A-469

2:17-cv-00194-kjd    Document 254    Filed 03/29/25    Page 6 of 10

"must contain" . . . "any exhibits that will be used to summarize or support them." Fed. R. Civ.

P. 26(a)(2)(B)(iii).

Under our local rules, the timing of disclosures related to expert witnesses is based on the

discovery schedule pursuant to Local Rule 26(a). Assuming that the court would find

exceptional circumstances to extend the deadline to expert disclosure in this case to cover post-

remand events to a degree, while such an extension might govern the timing of subsequent expert

reports, it does not alleviate the Plaintiff from her discovery obligations under Fed. R. Civ. P. 26.

Accordingly, while perhaps Plaintiff could have extended the discovery deadline to submit an

additional report or reports[6], she still needs to comply with the expert discovery requirements in

her expert disclosure and opinions to be rendered at trial. She has not satisfied these

requirements.[7]

The case law regarding late disclosed and inadequately disclosed expert opinions

warrants many remedies to preclude the testimony, including preclusion of the expert opinion.

Examples of cases dealing with this subject include the following:

In *Chart v. Town of Parma*, the Court found the expert's "Second [] Report [was] an

untimely new opinion because it [was] supported by different calculations and assumptions."

No. 10-CV-6179P, 2014 WL 4923166, at *23 (W.D.N.Y. Sept. 30, 2014) ("As a general matter,

courts should not permit untimely disclosure of new opinions to fill gaps in expert proof,

particularly where those gaps are revealed through the opposing party's summary judgment

---

[6] Although, notably, the Plaintiff did not make a motion to extend the discovery expert discovery deadlines, and merely helped herself to that prerogative.

[7] Notably, Dr. Bancroft has not supplemented his work papers other than responding to Plaintiff's post-hearing letter request to provide Dr. Porter's current full-professor employment contract and her 2024 W2s from her UVM Medical Center and UVM College of Medicine positions, since the work papers provided prior to Dr. Bancroft's deposition way back in October 2019. There is no information that has been produced on which he bases many of the conclusions he intends to offer in his new report. We are left to infer that the new opinions are literally based on haphazard conversations with Dr. Porter or her lawyers.

6

4925-1988-9200.2

motion."). The Court further found that the expert's new opinions did not merely "elaborate upon prior opinions, but instead [were] untimely opinions." *Id.* at *22.

In *Morritt v. Stryker Corp.,* the Court found that the expert affidavit submitted in opposition to defendant's summary judgment motion was "unquestionably designed to fill a significant and logical gap in his expert report" and was produced "only after defendants raised [the] deficiency in their motion ... constitut[ing] a clear violation of Rule 26." No. 07-CV-2319 RRM RER, 2011 WL 3876960, at *6 (E.D.N.Y. 2011) (internal quotations omitted).

In *Connors v. Dartmouth Hitchcock Med. Ctr.,* the Court excluded Dr. Bancroft's newly proposed testimony on future lost earnings that was disclosed on the eve of trial. Dr. Bancroft's "supplementation" or "correction" of his expert report was excluded because it "was not timely" and there was "no reason to conclude that Plaintiff was substantially justified in the . . . failure to supplement her expert's report until the eve of trial." No. 2:10-CV-94, 2013 WL 12221853, at *4 (D. Vt. Nov. 18, 2013).

Moreover, in *McLaughlin v. Langrock, Sperry & Wool, LLP,* the Court found that the "supplementation was not timely" and "contain[ed] previously undisclosed opinions on new subject matters." No. 2:19-CV-00112, 2020 WL 3118646, at *5 (D. Vt. June 12, 2020). The Court stated that the "supplemental disclosure [sought] to rectify [a] deficiency and offer[] new opinions that could and should have been disclosed previously." *Id.* However, the Court's conclusion "is not altered by Defendant's suggestion that Plaintiff could and should have asked [the expert] questions about [the subject matter] in his deposition" as "[s]uch an inquiry would have been outside the scope of [the] expert witness disclosure, and a party has no obligation to ferret out any other opinions an expert witness may have." *Id.*

7

As the Rule and these authorities unexpectedly show, the deficiencies in expert discovery are taken seriously by courts in this Circuit and include remedies up to and including preclusion of the testimony regarding the new opinions. Given the late and inadequate expert disclosures in this case, there are several potential remedies are available to the Court to attempt to provide a fair trial. These include:

(1) Limiting or striking Dr. Bancroft's testimony in full;

(2) Limiting his testimony regarding the impact of the effects of the differential fringe benefit calculation between Dartmouth-Hitchcock and UVMMC as inadequately disclosed pursuant to the expert disclosure rules;

(3) Finding, with the evolving, serial and undisclosed nature of his opinions and required discovery surrounding them, that Plaintiff has not shown a sum certain was readily ascertainable by Defendants, such that the 12% prejudgment interest order is inappropriate[8]; or

(4) Some combination of the above.

## Conclusion

For the foregoing reasons, Dartmouth Health respectfully requests that the Court grant its Motion in Limine Regarding Undisclosed Expert Opinions, and order the relief requested.

---

[8] Contrary to the testimony and leading questioning on direct examination about the materials provided to and reviewed by Dr. Bancroft, the reliance materials produced back in 2019 include only a portion of one year of tax returns, very paltry and incomplete pay stub information, an incomplete set of W2s and only a very limited snapshot of documentation of Dr. Porter's financial situation, augmented by her and her counsel's hearsay statements to clarify details.

8

4925-1988-9200.2

A-472

Respectfully submitted,


*/s/ Tristram J. Coffin*

Tristram J. Coffin
**DOWNS RACHLIN MARTIN PLLC**
Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

and

**FOLEY & LARDNER LLP**
Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald-Ramos (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

*Attorneys for Defendants*

9

4925-1988-9200.2

A-473

## CERTIFICATE OF SERVICE

I hereby certify that, on March 29, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

/s/ Megan E. Martinez
Megan E. Martinez

23453976.1

10

4925-1988-9200.2

A-474

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER,       )
M.D.,                          )
      Plaintiff,               )
                               )
    v.                        )          Docket No. 2:17-CV-194
                               )
DARTMOUTH-HITCHCOCK            )
MEDICAL CENTER,               )
DARTMOUTH-HITCHCOCK           )
CLINIC, MARY HITCHCOCK        )
MEMORIAL HOSPITAL, and        )
DARTMOUTH-HITCHCOCK           )
HEALTH,                       )
      Defendants.              )

## PLAINTIFF'S OPPOSITION TO MOTION IN LIMINE
## REGARDING UNDISCLOSED EXPERT OPINIONS OF BANCROFT

This is Defendants' fourth effort to exclude or limit Dr. Bancroft's expert opinion. Like

the others, it must fail. As this Court has already determined, Dr. Bancroft is an eminently

qualified economist and expert on the economic losses experienced by Dr. Porter in this case.

(Doc. 238 at 4 (denying Defendants' first two motions to preclude Dr. Bancroft's testimony[1] and

acknowledging that Dr. Bancroft has "extensive education and work experience" in economics

and his "proffered testimony on economic losses falls squarely within his area of expertise").)

The scope of his report and testimony, the categories of data considered, and the methodology

---

[1] Defendants' Renewed Motion to Preclude the Testimony of Robert Bancroft Based on New
March 19, 2025 Report (Doc. 235); Defendants' Motion in Limine to Preclude the Testimony of
Robert Bancroft (Doc. 198). The Court found no basis to exclude Dr. Bancroft's testimony and
noted that any challenges to the facts and assumptions would go to weight rather than
admissibility. (Doc. 238 at 6.) *See also Walsh v. Chez*, 583 F.3d 990, 992-95 (7th Cir. 2009)
(concluding that two expert reports were admissible and "any weaknesses in those reports should
have gone to the weight of the evidence before the jury" where they provided defendant with
"ample notice of the theory against which he had to defend, and they alerted him to the kind of
rebuttal and cross-examination he would need to undertake").

used have remained identical for over seven years, and for Defendants to now argue surprise is totally unfounded.

Plaintiff has not offered—or tried to offer—an undisclosed expert opinion at all. Defense counsel's alleged failure to understand the basis of Dr. Bancroft's fringe-benefit analysis is not due to any failure of the Plaintiff. Dr. Bancroft's fringe benefit analysis (including the DH pension plan) has been a part of his analysis since his first report, and it has remained in each report since. Indeed, at Dr. Bancroft's deposition in 2019 (six years ago), Defense counsel at the time, Jessica Joseph, specifically asked about the pension assumption. (*See* Ex. A (Bancroft Dep. Tr.) at 59-63, 65.) While the questioning was not in depth (as the Court noted at the hearing on March 28, 2025), that is on Defendants' counsel, who had the opportunity to inquire further if she wanted to do so. Plaintiff had no obligation to stop her before she changed topics to urge her to dig deeper. More troubling, however, is that DH counsel Tris Coffin actually inquired further about this issue at the pre-trial hearing regarding Dr. Bancroft's testimony. (Ex. B (March 14, 2025 Hearing Tr.) at 18:22 to 19:2; 23:21 to 24:20; 31:2 to 33:23.) Defendants have been on notice of Dr. Bancroft's opinion as well as Plaintiff's intention to claim retirement losses for seven years, and two of their lawyers have had the chance to inquire about it. To claim surprise at trial is simply unfounded.

### Legal Standard

In the ordinary course, a party must disclose the identity of an expert witness it may use at trial to present evidence, along with a signed, written expert report, within the timeframe ordered by the court or. FRCP 26(a)(2). The report must include, in relevant part: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them." FRCP 26(a)(2)(B). These disclosures must be

2

supplemented "if the party learns that in some material respect the disclosure or response is incomplete or incorrect" and, in the case of an expert witness, "the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition." FRCP 26(a)(2)(E); FRCP 26(e).

Failure to timely disclose the required information, unless "substantially justified" or "harmless," can result in exclusion of the undisclosed or untimely disclosed information. Fed. R. Civ. P. 37(c)(1). The Court has discretion to allow the information in appropriate circumstances and, where needed, in conjunction with additional to reduce possible prejudice. *See, e.g., Hein v. Cuprum, S.A., De C.V.*, 53 F. App'x 134, 135-37 (2d Cir. 2002) (noting that sanctions for abuse of discovery are within the court's discretion and acknowledging that even if defendant's expert failed to disclose some of his testimony in his report, "it was not an abuse of discretion for the trial judge to have allowed the challenged testimony where he took appropriate steps to ensure that plaintiff would not be harmed by the defendants' nondisclosure"); *Centrella v. Ritz-Craft Corp. of Pennsylvania, Inc.*, No. 2:14-CV-111-JMC, 2018 WL 840038, at *8–10 (D. Vt. Feb. 12, 2018), *aff'd sub nom. Brennan-Centrella v. Ritz-Craft Corp. of Pennsylvania*, 788 F. App'x 799 (2d Cir. 2019) (court was within its discretion to admit expert opinion testimony that went beyond the scope of the report where it took steps to mitigate any prejudice from the failure to timely disclose, including allowing defendant's own expert to testify beyond the scope of his own report in response). Courts in the Second Circuit and in Vermont consider the four "*Outley* factors" to assist them in determining whether and how to allow the challenged information. These factors include: "(1) the party's explanation for failure to comply with a discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988). *See also*

3

*Grajeda v. Vail Resorts Inc.*, No. 2:20-CV-00165, 2023 WL 4803755, at *6–7 (D. Vt. July 27, 2023) (using the *Outley* factors and excluding four paragraphs from the expert's declaration).

<u>Defendants Mischaracterize Dr. Bancroft's Testimony</u>

At trial, Defendants' counsel argued that Dr. Bancroft claimed Dr. Porter would lose the pension by virtue of her termination from DH. (Ex. C (March 28, 2025 Trial Tr.) at 20:2 to 20:5. *See also* Doc. 254 at 2 ("Defendants also understood Dr. Bancroft to be saying that she would not receive a pension benefit from Dartmouth Health, notwithstanding her separation.").) Dr. Bancroft did not. Asked if he had calculated "what would have been the payment to her yearly if she retired when she was 65 under the terms of that plan," Dr. Bancroft agreed that he had, and that he had also performed the same calculation for other possible retirement years, noting that there is a reduction in benefits for retirement prior to the age of 55. (Ex. C at 19:15 to 19:21.)

Defense counsel alleged that "these were new calculations and assessments that were not stated with any clarity whatsoever in prior reports, charts or assumptions." (Doc. 254 at 4.) Dr. Bancroft calculated post-2017 retirement contributions based on DH's 12% defined contribution.[2] The information is not new and, indeed, can be found in Dr. Bancroft's very first report in 2018. The pension portion of Dr. Porter's retirement as of her termination date was set. Had she remained at DH and participated in the defined contribution plan, however, she would

---

[2] When Dr. Porter was hired in 1996, Defendants offered a defined benefit retirement plan (effectively, a pension). The nature of a defined benefit plan is that the plan is funded through employer contributions. After retirement, the employee receives a benefit that is calculated based on a combination of average compensation at the time of retirement, years of creditable service, and a percentage set by DH. DH moved to a defined contribution plan for new employees after 2006; however, certain employees were offered the option of remaining in the old defined benefit plan. Dr. Porter chose that option. After 2017, the prior defined benefit plan was "frozen," and all DH employees went to a defined contribution plan where the employee and the employer contribute funds into a 401(a) account. (*See* Ex. E (DH 2017 Benefit Guide) at 34-35.)

have received, in addition to the pension benefit, income from the defined contribution plan. Dr. Bancroft was asked, in relevant part, to determine the amount by which Dr. Porter's retirement benefits would be reduced as a consequence of her termination from DH. Using data provided by DH, Dr. Bancroft calculated that additional amount. Defendants now complain that this analysis is "one-sided" because it does not make clear that Dr. Porter will still receive sizeable retirement benefits. (Doc. 254 at 4-5.) But the relevant analysis is what Dr. Porter *has lost* not what she has retained.

<u>No Surprise That Plaintiff Sought Compensation for Reduced Retirement Benefits</u>

From the beginning, Plaintiff has been clear that she would seek compensation for "[r]educed retirement benefits" and that economist Dr. Bancroft would provide expert testimony as to the extent of her damages. (Ex. D (Pl.'s Resp. to Def. MHMH 1st Set of Interrogs.).) Dr. Bancroft's preliminary expert report was provided within the October 31, 2018 discovery deadline for plaintiff's expert disclosures. (Doc. 198-2; Doc. 138 at 2.) In that initial report, Dr. Bancroft stated that the calculation for "lost fringe benefits" included DH's contributions to health and retirement. (Doc. 198-2 at 2.) The projected lost earnings chart includes columns for fringe benefits both at DH and UVM. Dr. Bancroft lists the assumptions he made in projecting lost earnings. Assumption #2 states that "Dr. Porter's fringe benefits, given her continued employment with DHMC, include the medical center's contribution to health insurance and a retirement plan. … DHMC's retirement plan contributions is assumed to be 12% of her earned income." Assumption #5 notes that UVM's contributions to retirement are assumed to be 9%.

The retirement portion of the DH fringe benefit calculation has not changed. Since the 2018 report, Dr. Bancroft has issued three updated reports. (Doc. 198-3; Doc. 198-5.) Because of the passage of time, some of Dr. Porter's plans and some of the assumptions made have

5

A-479

played out differently than initially projected. For example, Dr. Porter's income for the period between 2018 and 2024 was initially estimated; however, over time, the actual values for these years became known. Dr. Bancroft replaced estimated values with actual values as they arose. In another example, some of the assumptions made about Dr. Porter's career path after DH have shifted over time and Dr. Bancroft has either provided multiple scenarios to account for possible alternative paths, (*see* Doc. 198-3 (providing calculations for two alternative scenarios, depending on whether Dr. Porter was able to find a position closer to her Norwich, Vermont home in 2021)), or has updated the assumptions to reflect present reality, (*see* Doc. 198-5; Doc. 208 at 9 (as of August 2024, Dr. Porter had not found employment closer to home and continued to work at UVM but hoped to reduce her hours and call obligations by January 2025; UVM's retirement contribution was recalculated at 8.5% instead of 9%)).[3] These changed assumptions altered the calculations for her income and benefits losses but did not change the overall method Dr. Bancroft used to calculate such losses nor did they impact the base figures calculated for the retirement portion of DH's fringe benefits.

Prior counsel for DH conducted a deposition of Dr. Bancroft on October 30, 2019. At that time, Dr. Bancroft had produced both the initial 2018 report and the revised October 2019 report. During the deposition, counsel for DH and Dr. Bancroft explored the contents of his working file and the information he had referred to or relied on in making his reports. In explaining his methodology for calculating losses, Dr. Bancroft explained that the first step was to project out what Dr. Porter would have earned if her employment at DH had continued,

---

[3] Defendants' Motion in Limine to Preclude the Expert Report (Doc. 248) seeking to prevent Plaintiff from introducing into evidence Dr. Bancrofts' March 19, 2025, and August 26, 2024, expert witness reports. The Court accepted the parties' stipulation after a hearing to a modified version of the expert report and agreed to "revisit demonstrative/evidentiary admissibility at a future point in trial." (Doc. 251.)

including her salary and certain fringe benefits such as health and retirement contributions.  (Ex. A at 40:1 to 40:8.)  Dr. Bancroft then looks at what she has earned or is expected to earn post-termination and subtracts that from what she would have earned at DH to determine her "gross loss."  (*Id.* at 40-41.)  Afterwards, he factors in tax consequences and present value adjustments.[4]  (*Id.* at 41.)  This is the approach he has used for more than a quarter of a century and the method he has used in each of the reports produced for this case.  (*Id.  See also* Ex. B at 14:17 to 15:7 (Dr. Bancroft stated that he is using "exactly the same methodology.").)  Counsel for DH questioned Dr. Bancroft about his calculations for DH fringe benefits, including Dr. Porter's retirement benefits.  (Ex. A at 26:11 to 31:20, 59-65, 70, 97-101.)  *See Minebea Co. v. Papst*, 231 F.R.D. 3, 8 (D.D.C. 2005) (drawing distinction between information in report and information raised during deposition, which may or may not have been covered in the initial report, and noting that plaintiff is not prohibited from eliciting testimony from expert about any "evidence, issues or opinions" raised during the deposition).

Although Defense counsel implies otherwise, the updates made by Dr. Bancroft supplement his prior reports based on new information; they do not introduce new methodology or theories.  *See* FRCP 26(e) (permitting supplements or corrections in response to new information).  *See also, e.g., Kahle v. Leonard*, 563 F.3d 736, 741 (8th Cir. 2009) (finding district

---

[4] "Aside from identifying the pension testimony as an undisclosed expert opinion, Defendants further asserted that the chart did not take into account the present value of the amount of benefit which Plaintiff would obtain by getting life-long payments from her Dartmouth Health pension plan."  (Doc. 254 at 2.)  Defense counsel repeatedly complains that Dr. Bancroft has not provided "any additional working papers" to support his updated reports.  (Doc. 254 at 3 (noting that defense counsel asked for updated recent earnings information).)  This allegation has been addressed generally, but as it relates to DH pension calculations, the simple answer is that there are no new working papers to account for.  DH did provide certain information to Dr. Bancroft regarding a wage freeze during COVID at the March 14, 2025 hearing, which Dr. Bancroft incorporated into his most recent report.  Plaintiff did not have access to her 2024 W2s until recently.  All the invoices that have been issued to Bancroft have already been provided.  Again, these did not impact the DH pension calculations.

court within its discretion in admitting psychologist expert report updated shortly before trial where the report "updated a previously-disclosed assessment of Kahle's treatment needs based on additional information—her expected release date"); *Miller v. Ffizer, Inc.*, 356 F.3d 1326, 1332 (10th Cir.2004) (noting that "an expert's initial Rule 26 report cannot always anticipate every possible challenge to the report" and that refusing to allow the expert "to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning" may, in some instances, "even constitute an abuse of discretion"); *Minebea Co. v. Papst*, 231 F.R.D. 3, 6–8 (D.D.C. 2005) (noting the exception permitting a supplemental expert report "for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report").  Indeed, after hearing argument from all parties and testimony from Dr. Bancroft, this Court determined that "Dr. Bancroft's decision to update his expert reports after receiving new information was entirely appropriate, as was his decision to include multiple scenarios for Dr. Porter's potential damages depending on how many years she continues to work."  (Doc. 238 at 8.)  Nor did the Court find Dr. Bancroft's reliance on information from Dr. Porter about "whether and when she intends to decrease her working hours" to be problematic, particular where, as here, "Dr. Porter has a reasonable explanation for why she intends to decrease her hours at UVM:  she finds it more stressful to commute from her home in Norwich, VT, to Burlington (as opposed to Lebanon)." (Doc. 238 at 8-9.)

Defense counsel had an additional opportunity to question Dr. Bancroft about his report and expected testimony at the March 14, 2025 evidentiary hearing.  Counsel for DH specifically questioned Dr. Bancroft about his pension analysis.  (Ex. B at 23:21 to 24:20; 31:2 to 33:23.)  The issue of taxes and present value calculations was also addressed.

The purpose of the expert report disclosures is to "eliminate unfair surprise" and allow

the opposing party to understand the substance of the expected testimony and take steps to prepare a response. *See, e.g., Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007) (describing the purpose of Rule 26 expert disclosures and stating that the rule "does not limit an expert's testimony simply to reading his report" but rather "contemplates that the expert will supplement, elaborate upon, [and] explain … his report in his oral testimony") (internal citations, quotations, and alterations omitted); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir.2010) ("The purpose of expert reports is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary.") (internal quotations and alterations omitted). Defense counsel has had every fair opportunity to explore the retirement issue; their failure to do so in more depth is their own responsibility.[5] *See, e.g., Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 63-64 (1st Cir. 2011) (finding that although expert's testimony used different language than the report, "it was a reasonable elaboration of the opinion disclosed in the report," and that plaintiff could reasonably have anticipated the testimony based on the report "and, therefore, could not have been unfairly surprised to warrant striking the challenged testimony"); *Walsh v. Chez*, 583 F.3d 990, 992-95 (7th Cir. 2009) (noting that the purpose of an expert report "is not to replicate every word that the expert might say on the stand" but rather to "convey the substance of the expert's opinion … so that the opponent

---

[5] Neither is Plaintiff's counsel responsible for Defense counsel's failure to educate themselves on the differences in the retirement plans offered by DH. For example, Defense counsel writes that "Dr. Bancroft was asked to describe his opinions regarding how he factored in certain pension information about Plaintiff from a defined benefit plan pension she was making payments toward while employed at Dartmouth Health." (Doc. 254 at 1.) Plaintiff did not make payments towards a defined benefit pension plan at DH, because the nature of such a plan is that it is funded by the employer. Although the DH plan changed in 2017 to a defined contribution plan under which Dr. Porter could have made contributions, Dr. Bancroft disclosed repeatedly that he calculated the post-2017 contributions based on DH's 12% defined contribution.

9

**A-483**

2:17-cv-00194-kjd   Document 257   Filed 03/30/25   Page 10 of 10

will be ready to rebut, to cross-examine, and to offer a competing expert if necessary").

CONCLUSION

For the foregoing reasons, Defendants Motion in Limine should be denied.

Dated: <u>March 30, 2025</u>       /s/ Geoffrey J. Vitt       
Geoffrey J. Vitt, Esq.
Vitt & Nunan, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittnunanlaw.com

Eric D. Jones, Esq.
Langrock Sperry & Wool, LLP
210 College Street
P.O. Box 721
Burlington, VT 05402
(802) 864-0217
ejones@langrock.com

Sarah H. Nunan, Esq.
Vitt & Nunan PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055
(802) 649-5700
snunan@vittnunanlaw.com

***Attorneys for Plaintiff,***
***Misty Blanchette Porter, M.D.***

10

A-484

# EXHIBIT

# C

```
                    UNITED STATES DISTRICT COURT
                            FOR THE
                      DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, MD,     )
                                 )
              Plaintiff,         )
         v.                      )   2:17-CV-194
                                 )
DARTMOUTH-HITCHCOCK MEDICAL      )
CENTER, DARTMOUTH-HITCHCOCK      )   March 28, 2025
CLINIC, MARY HITCHCOCK MEMORIAL  )
HOSPITAL, and                    )
DARTMOUTH-HITCHCOCK HEALTH,      )
                                 )
              Defendants.        )
                                 )
   _____

              BEFORE THE HONORABLE KEVIN DOYLE
              UNITED STATES DISTRICT JUDGE
   _____


                     ** ROUGH DRAFT **

          TRIAL TESTIMONY OF DR. ROBERT BANCROFT

APPEARANCES:

For the Plaintiff:

ERIC JONES
GEOFFREY J. VITT
SARAH H. NUNAN


For the Defendants:

DONALD W. SCHROEDER
MORGAN McDONALD
TRISTRAM J. COFFIN


Jan-Marie Glaze, CCR, RPR, CRR      Certified Court Reporter
```

years of creditable service, and then some percentage. And she was able to be grandfathered into that. Dartmouth, at that time, in that 2017 period, was moving to a defined contribution where she would put in an X amount of money every year into an account.

Q   What I'm hearing you say is that Dr. Porter qualified for a defined benefit plan at Dartmouth-Hitchcock, right?

A   Yes, she did.

Q   And if she had remained at Dartmouth-Hitchcock, she would have been eligible to receive the payments under that plan, correct?

A   Yes.

Q   And did you calculate -- I realize it's not reflected in the report, but did you calculate what would have been the payment to her yearly if she retired when she was 65 under the terms of that plan?

A   I did at 65.  I did it for several years.

Q   All right.

A   I looked at if she retired at 65.  I actually looked at it earlier.  There's a reduction in your benefits if you retire before 65.

MR. COFFIN:  Objection, Your Honor.  If we could approach, please?

THE COURT:  Yes.

Bancroft - Direct by Mr. Vitt

(Bench conference.)

MR. COFFIN:  The fact that she would lose a pension is nothing that was raised in the report.  And, in fact, our evidence is that she is going to get a pension.  She would get a pension that is somewhat smaller than if she had stayed at Dartmouth but prorated, based on her contributions and her years there.  So for him to -- if you would, please.  For him to, at the very last minute, offer all these changes in this report that this is a new undisclosed expert opinion is improper.

THE COURT:  Go ahead.

MR. VITT:  This was simply predicate for to get Dr. Bancroft to say, essentially, that the calculation in that report reflects the damages.  We are not asking for any more.  It was simply an example of why there is -- in the report, there is an analysis that reflects the loss of the retirement benefit.  It's already in there.  It's baked into those numbers, so I'm not saying that there's an additional loss.  It's simply saying, okay, what would she have received, having calculated that it is reflected in the report.

MR. COFFIN:  It is not spelled out as such in the report so it's completely opaque.  It should have been noticed early.  And, in addition, I think it's

Bancroft - Direct by Mr. Vitt

A-488

# EXHIBIT

# D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

MISTY BLANCHETTE PORTER, M.D.,

      Plaintiff,

vs.

DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,

      Defendants.

Case No. 5:17-cv-194

**PLAINTIFF'S RESPONSE TO DEFENDANT MARY HITCHCOCK MEMORIAL
HOSPITAL'S FIRST SET OF INTERROGATORIES PROPOUNDED ON PLAINTIFF
MISTY BLANCHETTE PORTER**

Plaintiff Misty Blanchette Porter, M.D., ("Plaintiff" or "Dr. Porter"), pursuant to Rules 26

and 36 of the Federal Rules of Civil Procedure and by and through her counsel, Katherine B.

Kramer, Esq., of Katherine Burghardt Kramer Law Office PLLC, and Geoffrey J. Vitt, Esq., of

Vitt & Associates PLC, responds as follows to Defendant Mary Hitchcock Memorial Hospital's

First Set of Interrogatories to Plaintiff.

**Defendants' Interrogatories and Plaintiff's Responses**

1.    Identify each and every element of damages you allege to have suffered as a result of

Defendants' alleged unlawful conduct, and for each element, please separately state the monetary

value you assign to it and explain how you arrived at that figure, including in your explanation a

statement of all premises, figures and/or assumptions underlying such figure(s).

**Response: Plaintiff will supplement this response. Plaintiff has retained an economic
expert and will produce an expert report regarding her economic loss. Without waiving
the right to supplement, Plaintiff identifies the following categories of damages:**

1

A-490

- **Reduced retirement benefits**
- **Loss of fringe benefits (e.g., health insurance coverage, accrued vacation benefits)**
- **Reduced income**
- **Cost of purchasing a second residence in Burlington closer to new employment, plus fees, renovation expense, utilities, costs of setting up a second residence (furnishings, household goods, appliances, etc.)**
- **Financial loss resulting from delay in academic promotion, along with professional reputational loss**
- **Emotional harm and non-economic loss**
- **Attorney's fees and costs of litigation**

2.      State the amount of any loss of wages, income, or benefits you are claiming as a result of this lawsuit, and state with respect thereto:

   a.   The total gross and net amount of each alleged loss;

   b.   The method by which you computed the amount of the loss; and

   c.   Identify each person who assisted you in computing or calculating such alleged loss.

**Response:  Plaintiff will supplement this response.  Plaintiff has retained an economic expert, Robert L. Bancroft, Ph.D., to assist in calculating her economic loss and will produce an expert report.**

3.      Identify each and every entity or person for whom you have performed work or professional services, whether as an employee, consultant, or contractor, since November 1, 2015, including, if applicable, self-employment, and provide the following information related to each entity or person:

   a.   Name and address of the entity or person;

2

A-491

DATED at Norwich, Vermont, in the County of Addison, this 20 day of April 2018.


_Misty Blanchette Porter_
Misty Blanchette Porter, M.D.
Plaintiff


STATE OF VERMONT
COUNTY OF WINDSOR, SS.

Subscribed and sworn to me this 20 day of April, 2018.

Before me: _____
Notary Public
Commission Expires:  2/10/2019


As to objections:

_____
Geoffrey J. Vitt, Esq.


## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2018, I caused a true copy of the above document to be served upon the attorneys of record for Defendants via electronic mail and first-class mail.

/s/ Geoffrey J. Vitt_____
Geoffrey J. Vitt

17

A-492

# EXHIBIT

# E

# Your **Benefits** Your **Health**

Choices for Healthy Living in 2017

YOUR 2017 BENEFITS GUIDE



Dartmouth-Hitchcock

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 215 of 300

2:17-cv-00194-kjd   Document 257-5   Filed 03/30/25   Page 2 of 48

A-493



# Your 2017 Guide to Benefits

The health and well-being of our employees and our community is vital to the success of our organization and a critical component of our vision to "achieve the healthiest population possible." Dartmouth-Hitchcock (D-H) offers a total compensation package that includes a variety of benefits provided by D-H at no cost to you, as well as the option to select additional benefits to meet your personal needs. D-H shares the cost of some of the benefit options while you pay the cost of others at group premium rates negotiated by D-H for our employees.

This guide is designed to help you understand the D-H 2017 Benefits program so you will be prepared to make an informed decision when you enroll in your 2017 benefits.

The first section of this guide provides an overview of the D-H benefits that most employees are eligible to participate in, including health, dental, life, and disability insurance, as well as wellness and retirement programs. Similar to many health care organizations, these benefits vary slightly for different positions [i.e., Staff, Residents/Fellows, Physicians, and Advanced Practice Providers]. The benefit variations for specific positions are listed in the Table of Contents.

Please review the information in this guide carefully and then select the most appropriate benefits for you and your family within the required time frame.

A-494

# What's Inside

Enrolling in Your Benefits ............................... 2

Benefits Eligibility ........................................... 5

Medical and Prescription Drug Insurance ........ 9

Health Savings Account ............................... 17

Health Reimbursement Account .................... 19

Flexible Spending Accounts .......................... 20

Dental Insurance ......................................... 21

Vision Coverage .......................................... 24

Staff Short-Term and
Long-Term Disability Insurance ..................... 25

Staff Life Insurance Benefits ......................... 26

Identity Theft Protection ............................... 28

New Benefits for 2017 ................................ 29

Wellness Programs ...................................... 30

Retirement Plans ......................................... 32

Retirement Financial Fitness ......................... 36

Resident/Fellow Benefits .............................. 37

Physician and
Advanced Practice Provider Benefits ............. 40

Who to Contact ........................................... 44

2:17-cv-00194-kjd   Document 257-5   Filed 03/30/25   Page 4 of 48

A-495

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 217 of 300

# Enrolling in Your Benefits

D-H's online enrollment system — BenefitConnect — gives employees easy access to their benefits information, decision-support tools, and financial planning material throughout the year. To enroll in your 2017 benefits, please review this guide and then log on to BenefitConnect using the instructions below.

**Before you log on to BenefitConnect, be sure to have the name, Social Security Number, and date of birth for each dependent you wish to cover for medical and/or dental coverage.** If you do not add all of your dependent information, the system will not highlight the appropriate benefit options available to you.

## How To Enroll

**1.** Go to **MyDHBenefits.com**.

**NOTE:** If you are logged on to the D-H network, your sign-in will be automatic. If you are prompted to sign in, please use your D-H Windows username and password. If you do not know, or remember, your D-H Windows username and/or password, please call the D-H Computer Help Desk at **603.650.2222** and they can reset it for you. Once you have been given a new password, you will be required to change it to a confidential password.

**2.** On the *myBenefits* page, select "Enroll In or Change Benefits."

**3.** On the left side of the next screen, select "Click Here to Enroll."

**4.** On the *BenefitConnect* home screen, click the enrollment link in the *Alerts* section.

**5.** The system will guide you through adding your dependents (if needed), enrolling in benefits, and updating beneficiaries.

**6.** Click *Save* and *Continue* at the bottom of each page as you go through the process.

**7.** When you are finished enrolling, **print a copy** of your final elections for your records. You can log on to *BenefitConnect* to view and/or print your benefit elections at any time — 24 hours a day, 7 days a week.

**DID YOU KNOW?**

You can get an overview of all your D-H benefits and rewards through **My Rewards at D-H**. You can see personalized details about the total value of your compensation, health and welfare, and retirement benefits all in one place at **MyDHBenefits.com**.

It's a great place to start when preparing for Open Enrollment, as you can see what you currently have and learn more about each of the programs. Take a look today to help you make informed choices for your financial, professional, and personal wellbeing.

2:17-cv-00194-kjd    Document 257-5    Filed 03/30/25    Page 5 of 48

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 218 of 300

A-496



# If You Don't Enroll

| BENEFITS ELIGIBLE IN 2016 | NEWLY BENEFITS ELIGIBLE IN 2017 |
|---|---|
| Your 2016 medical, dental, life, and disability benefit elections will automatically carry over to 2017. If you wish to make any changes, it is your responsibility to enroll before the end of the Open Enrollment period. You must re-elect any Health Savings Account (HSA) or Flexible Spending Account (FSA) elections as these do not roll over.<br><br>All employees must log in to BenefitConnect, review their 2017 benefits, and print a copy of their 2017 elections — regardless of whether or not they are making any changes — as authorization of their 2017 payroll deductions is required. | If you are hired in 2017 or become newly eligible for benefits during the 2017 calendar year, you must make your benefit elections online within 30 days of your benefits eligibility date (hire date in most cases).<br><br>If you do not make your benefit elections during the period noted above, you will be enrolled automatically in the default benefits listed below. You will not have the opportunity to change your benefit elections until the next Open Enrollment unless you experience a qualified life event.<br><br>Default Benefits:<br>• ElevateHealth HSA Plan, Employee Only coverage<br>• Dental: Basic Dental Insurance, Employee Only coverage<br>• Basic Short-Term and Long-Term Disability Insurance<br>• Basic Life and Accidental Death and Dismemberment (AD&D) Insurance |
| Your coverage will be effective January 1 – December 31, 2017. | Your coverage will be effective on your 30th day of employment and will continue through December 31, 2017. |

3

2:17-cv-00194-kjd    Document 257-5    Filed 03/30/25    Page 6 of 44

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 219 of 300

A-497

# Changing Your Benefit Elections

The D-H benefit plan year is January 1 through December 31.

Each fall, you have an opportunity to change your benefit elections for the upcoming benefit plan year during the annual Open Enrollment period. The elections you make during Open Enrollment cannot be changed during the year unless you experience a "qualified life event."

## Qualified Life Event

A qualified life event is a change in your work or family status that allows you to make adjustments to certain benefit elections, depending on the nature of the life event. For example, if you get married during the year, you may add your spouse to your health care coverage, and you may change the plan in which you are enrolled. To make changes to your benefits as the result of a qualified life event, you must notify the Benefits Administration Office within 30 days of the event.

You may log in to BenefitConnect for certain types of life events and change coverage options online.

If you do not find the life event specific to your situation (online through the BenefitConnect system), call the Benefits Administration Office at 603.653.1400 or email **DHBenefits@Hitchcock.org**.

**You must make the change and provide supporting documentation (e.g., marriage/birth/death certificate) within 30 days of the event.**

Examples of qualified life events include:

- **Change in Status** — change in marital status, change in number of dependents, change in employment status of the employee, spouse or dependent, change in residence that affects benefits coverage, or change in dependent eligibility status.

- **Dependent Care Changes** — changes to dependent care provider. For example: If you move out of the area and can no longer use the same day care provider.

- **HIPAA Special Enrollment Rights** — loss of other coverage due to exhaustion of a COBRA period, loss of eligibility, or if employer contributions to another plan under which you have coverage ends. In addition, HIPAA grants rights to add coverage upon marriage or a new dependent child if previously waived.

### ADDING OR CHANGING DEPENDENTS

Before you log on to BenefitConnect, be sure to have the name, Social Security Number, and date of birth for each dependent you wish to cover for medical and/or dental coverage.



4

# Benefits Eligibility

Each position at D-H is budgeted to work a certain number of hours per week based on a Full Time Equivalent (FTE) schedule. For example, a position budgeted for 0.5 FTE would be budgeted to work half as many hours as an employee budgeted at 1.0 FTE. Although many positions may regularly work more hours than budgeted, it is important to note that benefit eligibility and employee contributions toward health care coverage are based on budgeted hours, not actual hours worked.

Employees budgeted at least 0.5 FTE, and their eligible dependents, may participate in D-H's benefit plans on the employee's 30th day of employment.

Many benefits are based on salary, in addition to FTE, including health insurance premiums, life insurance, and disability buy-up insurance. Changes to your salary during the year may change your per-pay-check premiums for these benefits. You will be sent a confirmation statement if a change in salary occurs.

**FULL TIME EQUIVALENT (FTE)**

The term Full Time Equivalent (FTE) is defined as the number of hours an employee is budgeted to work per week divided by a forty (40) hour work week. For example, an employee budgeted to work 24 hours per week is a 0.6 FTE (24 hours divided by 40 hours = 0.6).

5



# Enhancing the Health of D-H Employees and Their Families: Tobacco Use Premium

When enrolling in their 2017 health care coverage, employees must complete a tobacco use affirmation for themselves and their dependents. As supported in the Center for Disease Control (CDC) literature, current smoking and smokeless tobacco use are defined by D-H as using any tobacco product or nonpharmacological nicotine delivery device, such as the electronic cigarette, at least once in the past 30 days.

Employees or their covered dependents (including their spouse) who use tobacco, may be subject to a tobacco use premium equal to $15 per bi-weekly pay period ($390 per year based on 26 pay periods) per family, which will be added to their bi-weekly health care plan contributions. It is important to note that the tobacco use premium will be $15 per-pay-period regardless of the number of family members who use tobacco.

The goal of the tobacco use premium is to support the health and well-being of D-H employees and their family members by discouraging the use of any tobacco products.

Products such as cigarettes, e-cigarettes, cigars, pipe tobacco, and chewing tobacco are proven harmful to health even when used in moderation. The most important goal of the tobacco use premium is to encourage people to stop using products that have been proven harmful to their personal and family's health — bringing D-H one step closer toward our vision of achieving the healthiest population possible.

**TOBACCO SURCHARGE: IT PAYS TO QUIT**

Watch this short video to learn more about the tobacco use premium.

D-H offers employees and their covered dependents free tobacco cessation programs, services, and medications to help tobacco users "quit the habit." If, throughout the course of the 2017 plan year, an employee or dependent stops using tobacco products or completes a tobacco cessation program, an affidavit may be presented to the Benefits Administration Office, and the additional tobacco use premium will be removed from their health care premium within two payroll periods. Employees, and/or their covered dependents, who are unable to achieve tobacco-free status due to a medical condition will need to bring a letter from the treating physician stating the medical reason why they are unable to complete the tobacco cessation program if they wish to have the premium waived. For more information, contact Live Well/Work Well at 603.650.5900.

6

2:17-cv-00194-kjd    Document 257-5    Filed 03/30/25    Page 10 of 48

A-501

# Spouse/Same Sex Civil Union Partner Coverage

Benefits eligible employees may enroll a spouse, same sex civil union partner, or legally separated spouse in health care, dental, and dependent life insurance benefits.

If you choose to cover your spouse under a D-H health care plan, and your spouse has access to group-sponsored health insurance coverage through their own employer, your 2017 health care contributions will be twice the standard premium for the coverage you desire to enroll in.

## SPOUSAL SURCHARGE: WHAT YOU NEED TO KNOW

Watch this short video to learn more about the spousal surcharge.

You may be eligible to continue coverage for your separated or former spouse, and his or her eligible dependents, if you are legally separated or divorced.

The Benefits Administration Office is available to assist with eligibility questions related to your specific situation. Call **603.653.1400** or email **DHBenefits@Hitchcock.org** for more information.

## Important Notes Regarding Spouse Coverage

- An employee may only cover one spouse under D-H's benefit plans at any given time.
- Domestic partner or common law spouse coverage is not available under the D-H benefit plans. However, legally married same sex spouses, and their eligible dependents, may be covered.

# Dartmouth-Hitchcock Couples Enrollment Restriction (Double Coverage Rule)

If you and your spouse/same sex civil union partner are both eligible to enroll in D-H benefits, you cannot be enrolled as both an employee and dependent in health and life insurance. In addition, either you or your spouse/same sex civil union partner may cover dependents in health and life insurance; they cannot be covered by both of you.

# Dependent Child Coverage

You may enroll a dependent child in the D-H health care and dental plans, regardless of their tax dependent, student, residence, or marital status. A dependent child is considered a natural child, stepchild, foster child, legally adopted child, or any other child for whom you or your spouse/same sex civil union partner are legally responsible. Dependent child coverage is available until the end of the month in which the adult child turns age 26. Disabled children over age 26 may be eligible to continue coverage through the D-H plans by contacting Health Plans, Inc. at **866.471.5550**.

For all other D-H plans, please review the dependent eligibility criteria available on the myBenefits portal at **MyDHBenefits.com**.

# Taxation of Dependent Coverage

You pay for most dependent coverage with pre-tax dollars; however, the IRS may not allow pre-tax coverage for certain dependents such as adult children over the age of 26. It is your responsibility to ensure the proper tax treatment of your dependent coverage. You must update BenefitConnect or call the Benefits Administration Office immediately if the IRS tax-qualified status of any of your dependents changes during the year. More information on taxation of benefits may be found on the myBenefits portal at **MyDHBenefits.com** on the resources page.

## INGREDIENTS:

Cooking spray

1 teaspoon olive oil

¼ cup onion, chopped finely

½ cup green or red pepper, chopped into ¼ inch pieces

1 cup other vegetables, chopped into ¼ inch pieces (such as asparagus, mushroom, broccoli, zucchini)

6 eggs (see "Hints" below if using egg substitutes or whites)

½ cup skim milk

½ cup shredded cheddar cheese

¼ teaspoon salt

1/8 teaspoon ground pepper

*Mini frittatas baked in muffin tins create an individual egg dish perfect for brunch, snack, appetizer, or on-the-go breakfast. Easy to make ahead and reheat. Pair it with a whole grain and fruit to make it a meal.*

**MAKES:** 12 regular sized "muffins"      **SERVING SIZE:** 1 frittata "muffin"

## PREPARATION

1. Position rack in center of oven; preheat to 350°F. Coat a nonstick muffin tin generously with cooking spray.

2. Heat a large nonstick skillet over medium-high heat. Add oil to the pan. Add onion and peppers and other vegetables of your choosing. Cook, stirring often until softened, 5 to 7 minutes. Transfer to a bowl. Let cool for 5 minutes.

3. Whisk eggs and milk in a medium bowl. Stir in cheese, salt, and pepper. Stir in cooked vegetables.

4. Spoon ¼ cup mixture into each muffin cup.

5. Bake until the frittatas are set in the middle and tops are just beginning to brown, 20 to 25 minutes.

6. Let cool on a wire rack for 5 minutes before removing from the pan. Note: They will likely deflate upon cooling, so don't worry if the middle sinks some. Serve warm. Cool any leftovers completely before storing.

## NUTRITION (PER "MUFFIN"):
Calories 68, Fat 3.5g, Carbohydrates 2g, Protein 6g, Fiber 1g, Sodium 118mg

**TIPS & NOTES**

✓ For egg substitution: 1 whole egg = 2 egg whites or ¼ cup egg substitute

✓ Make Ahead Tip: After cooling, wrap in plastic. Refrigerate for up to 3 days or freeze for up to 1 month. To reheat, remove plastic, wrap in a paper towel and microwave on high for 30 to 60 seconds.

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 224 of 300

2:17-cv-00194-kjd   Document 257-5   Filed 03/30/25   Page 11 of 48

A-502

# Dartmouth-Hitchcock Benefits

## Medical and Prescription Drug Insurance

The medical and prescription drug coverage offered through D-H is designed to provide employees with the greatest value in receiving high-quality health care. These benefits are focused on helping employees maintain good health by offering free (in-network) preventive care services, encouraging the use of a primary care provider to coordinate your health care, and promoting the use of the lowest-cost, highest-value health care services and prescription drugs.

D-H offers you a choice of three medical plan options — the **ElevateHealth HSA Plan**, the **ElevateHealth HRA Plan**, and the **Choice Health Plan**. Deciding which plan to choose is a personal and financial decision. To help you choose, we have outlined some similarities and differences between the plans.

### How the Plans Are the Same

 **The deduction from your paycheck is the same.** The employee premiums that are deducted from your paycheck are based on the coverage level and your base salary. However, premiums will not differ based on the plan you choose. Employee premiums are available online at **MyDHBenefits.com**.

 **The plans cover the same in-network services** including preventive care (generally covered at 100%), emergency services, inpatient and outpatient care, and prescription drugs. How much you pay for each service will depend on the plan you choose.

 **Prescription drug coverage is included.** How you pay for prescription drugs depends on the plan you choose.

 **There is a deductible,** which is the amount you pay before the plan begins paying for services.

 **You share in the out-of-pocket costs during the year** with the plan through co-insurance (a percentage of the cost, usually payable after the deductible).

**You're protected by an out-of-pocket maximum.** If what you pay toward medical services and prescription drugs hits this maximum, the plan will pay 100% of any additional costs for covered services for the remainder of the year. This feature protects you, financially, should you or one of your covered dependents experience a catastrophic illness or injury.



You will receive a new medical plan card, regardless of which option you choose, in 2017.

You will not receive a new Health Savings Account or Flexible Spending Account card until your current card expires, unless you are enrolling in either account for the first time in 2017.

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 225 of 300

2:17-cv-00194-kjd   Document 257-5   Filed 03/30/25   Page 12 of 48

A-503

## Factors to Consider

### How do you want to pay for future health care costs?

- The ElevateHealth HSA and Choice Health plans allow you to save for future health care costs in a tax-advantaged Health Savings Account (HSA).

- The ElevateHealth HRA Plan comes with a Health Reimbursement Account (HRA) that only D-H is allowed to contribute to.

Below is a summary of some other differences between an HSA and HRA. You can read more about the HSA and HRA on pages 18 to 21.

### Do you want the protection of a lower deductible and out-of-pocket maximum?

Both ElevateHealth plans have the same deductibles and out-of-pocket maximums, which are lower than the Choice Health Plan.

### Do you need out-of-network coverage?

ElevateHealth's network reflects providers and facilities where most D-H employees and their families are seeking care today; primarily in New Hampshire and Vermont. The ElevateHealth plans do not provide coverage for services outside the network (other than emergencies). The Choice Health Plan offers a national network of providers through the Harvard Pilgrim network and a supplemental network for those who travel or live outside of the Harvard Pilgrim network area.

### Do you have significant prescription drug costs?

In the HSA plan, you pay the full cost of your prescription drugs until you meet your deductible. In the HRA plan, you pay a co-pay for generic drugs and pay a percentage of the cost for brand and specialty drugs. There is no requirement to meet your deductible first. The amount you pay towards prescriptions on a co-pay basis does not contribute toward your annual deductible, but does count toward your out-of-pocket maximum.

| | HEALTH SAVINGS ACCOUNT (HSA) | HEALTH REIMBURSEMENT ACCOUNT (HRA) |
|---|---|---|
| **Available with...** | ElevateHealth HSA Plan and Choice Health Plan | ElevateHealth HRA Plan |
| **Who contributes?** | D-H and employee may contribute | Only D-H is allowed to contribute |
| **What are the contribution limits?** | Employer contribution $300 individual / $600 family Employee contribution* HSA maximum is $3,400 individual / $6,750 family | Employer contribution: $150 individual / $300 family |
| **What happens to funds at the end of the year?** | Balance accumulates and rolls over each year if you enroll in a plan with the same type of account. | |
| **What about tax savings?** | There's a triple tax advantage: 1. Your payroll contributions are tax-free 2. Earnings on your account are tax-free 3. Money withdrawn to pay for qualified medical expenses are not taxed | Employee contributions are not allowed. Employees can use the Health Care Reimbursement Account which offers pre-tax savings but has a "use it or lose it" feature. |
| **When are funds available?** | You can only spend up to the amount you have in your account at the time. D-H will provide the employer HSA base contribution in the first paycheck of 2017 on January 6th. | You can access the employer HRA base contribution in the first paycheck of 2017 on January 6th. |
| **How do I manage my account?** | From the HealthEquity website at **HealthEquity.com** | |
| **What happens to the funds if I leave D-H?** | You own your account and will continue to have full access to the account if you enroll in a different plan that does not have a Health Savings Account or you leave D-H. | HRAs are employer-based accounts so you will not have access to the HRA if you enroll in a different plan or leave D-H. |

* The IRS determines the combined employee plus employer HSA contribution limits each year. The limits shown reflect the 2017 limits.

## ElevateHealth Plans

ElevateHealth is an insurance partnership of Dartmouth-Hitchcock, Elliot Health System, and Harvard Pilgrim Health Care. Employees who enroll in one of the two ElevateHealth plans can expect care from a high quality, close-knit network of providers focused on keeping you healthy and well.

## Choice Health Plan

The D-H Choice Health Plan, administered by Health Plans, Inc., offers a national network of providers. In the Choice Health Plan, you have access to the Harvard Pilgrim network of providers. If you choose to see a provider that is out-of-network, you will be responsible for the out-of-network deductible, co-insurance, and plan provisions.

If you are traveling or reside outside of the Harvard Pilgrim network service area, you will have access to the UnitedHealth Care Options PPO network. This network serves as a supplemental network to ensure coverage for those who live or travel outside of the Harvard Pilgrim network. Outside of the six New England states and New York, United Healthcare Options PPO network will be the wrap network to provide coverage to you and your families. To find out more about the network, log on to HealthPlansInc.com.

It is important to note that ElevateHealth is a little different than a traditional health insurance provider network. It offers a select network of providers and facilities primarily located in New Hampshire and Vermont. This network reflects providers and facilities where most D-H employees and their families are seeking care today; however, coverage is not provided for service outside the ElevateHealth network. The only exception to this provision is in the event of an emergency situation or a service that is not provided at the facilities in the ElevateHealth network which is medically necessary.

Outpatient-based services, like primary care and specialist appointments at D-H, our affiliates, and strategic partners, are covered at 10% co-insurance after meeting your deductible.

It is important to note that the ElevateHealth network is dynamic and continues to grow. The network will continue to be updated on the myBenefits Portal and you may call Health Plans, Inc. to confirm coverage at **1.866.471.5550**.

All members in an ElevateHealth Plan will need to select a Primary Care Provider (PCP).

We believe that a smaller network means greater coordination among providers and we do recognize that the ElevateHealth Plans are not "one size fits all" plans. This is why we have the Choice Health Plan offering to provide a full network, with national coverage for employees and their family members.



ElevateHealth offers expanded dependent care for children who live outside of New Hampshire or Vermont. Parents who select ElevateHealth and have children who live in a different state may complete a form with Health Plans, Inc. and have expanded in-network coverage using the Harvard Pilgrim national network.

11

A-505

## Free Preventive Care Services

All of the D-H medical/prescription drug plans cover in-network preventive care services at 100%, with no deductible, co-payments, or co-insurance. For a list of preventive services covered by the plans, please see the appropriate Medical Plan Summary Plan Description located in the Benefits section of the D-H intranet at **http://one.hitchcock.org/pay-benefits/insurance-fsas-retirement.html** and the myBenefits portal at **MyDHBenefits.com**.

## Identifying a Primary Care Provider (PCP)

All employees and covered dependents are encouraged to establish a relationship with a PCP or practice to oversee their health and coordinate their care. Employees who choose the ElevateHealth HSA or ElevateHealth HRA Plan are required to select a PCP. To find a PCP, visit the Health Plans, Inc. web page at **HealthPlansInc.com**. You can also call Health Plans, Inc. at **866.471.5550**.



### ElevateHealth

A health insurance offering that provides access to a select network of New Hampshire and Vermont's premier providers at discounted rates, and member well-being is a main focus.

### Choice Health

A health insurance offering that provides access to an expanded network of providers in exchange for higher cost share at the point of service.

12

2:17-cv-00194-kjd   Document 257-5   Filed 03/30/25   Page 15 of 48

A-506

# 2017 Medical/Prescription Plans Summary

**Single** = Employee Only coverage, **Family** = all other coverage levels

| PLAN FEATURES | ELEVATEHEALTH HSA PLAN | | ELEVATEHEALTH HRA PLAN | | CHOICE HEALTH PLAN | |
| --- | --- | --- | --- | --- | --- | --- |
| | **Preferred Providers** | **ElevateHealth Network** | **Preferred Providers** | **ElevateHealth Network** | **In-Network** | **Out-of-Network** |
| Deductible | Single: $1,400 Family: $2,800 | | Single: $1,400 Family: $2,800 | | Single: $2,000 Family: $4,000 | Single: $4,000 Family: $8,000 |
| Co-Insurance | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible | 30% after deductible | 50% after deductible |
| Out-of-Pocket Maximum | Single: $2,200 Family: $4,400 (Includes prescription drugs) | | | | Single: $3,400 Family: $6,800 | Single: $5,600 Family: $11,200 |
| | | | | | (Includes prescription drugs) | |
| D-H Annual HSA or HRA Contribution | HSA Single: $300; Family: $600 | | HRA Single: $150; Family: $300 | | HSA Single: $300; Family: $600 | |

## PHARMACY BENEFITS

Based on IRS guidelines, Health Savings Account Plans (HSAs) require that medical care and prescriptions are handled the same towards the deductible and out-of-pocket maximum. The member pays the contracted rate for prescriptions until meeting the deductible and then pays co-insurance based on the pharmacy.

| DAYS SUPPLY | LOCATION | ELEVATEHEALTH HSA PLAN | ELEVATEHEALTH HRA PLAN | CHOICE HEALTH PLAN |
| --- | --- | --- | --- | --- |
| 30 days | • D-H Medical Center Pharmacy<br>• Cheshire Medical Center Pharmacy<br>• The Pharmacy in Bennington, VT & Manchester, VT<br>• Colonial Pharmacy in New London, NH<br>• Select CVS Retail Pharmacies* | Subject to deductible and 10% co-insurance | Generics $10<br>Brand 30% co-insurance up to $100<br>Specialty 50% co-insurance up to $200 | Subject to deductible and 10% co-insurance |
| | All Other Retail | Subject to deductible and 30% co-insurance | Generics $15<br>Brand 40% co-insurance up to $100<br>Specialty 60% co-insurance up to $200 | Subject to deductible and 30% co-insurance |
| 90 days | • D-H Medical Center Pharmacy<br>• D-H Medical Center Pharmacy Mail Order | Subject to deductible and 10% co-insurance | Generics $30<br>Brand 30% co-insurance up to $300<br>Specialty 50% co-insurance up to $600 | Subject to deductible and 10% co-insurance |
| | • OptumRx Mail Service Pharmacy<br>• The Pharmacy in Bennington, VT & Manchester, VT<br>• Colonial Pharmacy, New London, NH | Subject to deductible and 30% co-insurance | Generics $45<br>Brand 40% co-insurance up to $300<br>Specialty 60% co-insurance up to $600 | Subject to deductible and 30% co-insurance |
| | All Other Retail | Not Available | Not Available | Not Available |

\* Select Community Group Practice CVS Retail Pharmacies. Locations available on the *myBenefits* portal at **MyDHBenefits**.com.
2017 benefit premiums have increased in line with medical plan usage trends.

2:17-cv-00194-kjd   Document 257-5   Filed 03/30/25   Page 16 of 48

A-507

# 2017 Medical/Prescription Drug Employee Contributions

| MEDICAL AND PRESCRIPTION PLAN | Bi-Weekly Premiums for Non-Tobacco Users |
|---|---|
| | ELEVATEHEALTH PLAN WITH HSA AND HRA |
| | CHOICE HEALTH PLAN |
| **FTE (0.75 OR GREATER)** | |
| **Base Salary $0 to $49,999** | |
| Employee | $32.17 |
| Employee + Child(ren) | $48.26 |
| Employee + Spouse | $67.56 |
| Family | $89.11 |
| **Base Salary of $50,000 to $99,999** | |
| Employee | $47.90 |
| Employee + Child(ren) | $71.86 |
| Employee + Spouse | $100.60 |
| Family | $132.70 |
| **Base Salary of $100,000 or greater** | |
| Employee | $71.69 |
| Employee + Child(ren) | $107.52 |
| Employee + Spouse | $150.54 |
| Family | $198.56 |
| **FTE (0.5 – 0.74)** | |
| Employee | $104.20 |
| Employee + Child(ren) | $159.45 |
| Employee + Spouse | $221.02 |
| Family | $290.58 |

Please note: If you incur the spouse premium, your health care contributions may differ slightly from those shown above due to rounding.

14

# Additional Premiums or Premium Adjustments May Apply

**Tobacco Use Premium:** The employee contributions shown on this page are for non-tobacco users only. If you or a covered dependent use tobacco, a $15 tobacco use premium will be added to your contribution each pay period (See page 6).

**Spouse Premium:** If you choose to cover your spouse/same-sex civil union partner under a D-H health care plan, your 2017 health care contributions will be twice the standard premium if your spouse/same-sex civil union partner has access to group-sponsored health insurance coverage through their own employer (See page 7).

**Salary Level Premium:** All salary based insurance premiums, such as medical insurance, life and disability buy-up insurance, may increase or decrease based on salary adjustments throughout the calendar year. For example, medical insurance premiums are based on salary levels. If an employee has an adjustment in salary, the premium and/or benefit level change will take effect within two pay periods of the date in which Human Resources receives the change.

*Did You Know?*

These new rates will begin with your January 6th paycheck.

# Prescription Drug Benefits

OptumRx is D-H's Prescription Benefit Manager. You must enroll in a D-H medical plan to have prescription drug coverage. If you enroll in the ElevateHealth HSA Plan or the Choice Health Plan, your prescription drug expenses (at full retail cost) apply toward your annual deductible and are subject to co-insurance after you meet the deductible. Your deductible and co-insurance will apply to your out-of-pocket maximum for the year. If you enroll in the ElevateHealth HRA Plan, prescription drugs are not subject to the deductible. Instead you pay a co-pay for generic drugs and co-insurance for brand name or specialty drugs.

To find a pharmacy that is in the OptumRx network, visit **www.optumrx.com** or call **800-498-5428**.

## Premium Formulary

Your prescription drug plan provides coverage for medications listed on the OptumRx formulary. The formulary includes FDA-approved prescription generic, brand-name, and specialty medications that are preferred over other medications in the same drug class. You and your physician can use the formulary to help choose effective, quality medications that minimize your out-of-pocket expense. OptumRx updates this list of medications quarterly using the latest evidence to identify opportunities to promote safe, effective, and affordable drug therapy. If your provider determines you need a prescription medication that is not covered by the formulary, you can request a medical exception through OptumRx and their medical review team.

NOTE: Approved authorizations for exemptions from the Premium Formulary Program are only good for a one-year period following the date of authorization. All appeals for non-covered medications are handled by OptumRx's medical review team.

## Preventive Drug Program

Preventive care coverage is an integral part of a comprehensive health care plan that includes preventive drug therapies. Preventive medications are those prescribed to prevent the occurrence of a disease or condition for those individuals with risk factors, or to prevent the recurrence of a disease or condition for those who have recovered; conditions such as high blood pressure, high cholesterol, diabetes, asthma, osteoporosis, and heart attack. In our ElevateHealth HSA Plan and our Choice Health Plan, drugs on the Preventive Drug List will bypass the deductible and only require you to pay co-insurance. OptumRx manages this program and the list of drugs included in the Preventive Drug Program.

## Maintenance Medications

Employees and their enrolled dependents who take long-term or maintenance medications are limited to two 30-day fills of such medications before being required to transition to a 90-day fill available through mail order or pick-up from the D-H Pharmacy for a 10% co-insurance after deductible, or a 30% co-insurance after deductible at any of our preferred pharmacies. Mail order is a convenient service that provides 90-day fills of maintenance medication delivered to your door at no extra charge, unless expedited service is required. The mail-order program should only be used to obtain medications needed for a long-term condition. Short-term medications such as antibiotics are not appropriate to obtain from the mail-order program. Once you fill a 30-day prescription of a maintenance medication, you will receive a notification from OptumRx, along with instructions on how to transfer from a 30-day prescription to a 90-day prescription.



15



*Did You Know?*

The **Prescription Advantage Program** provides discounted rates on certain approved prescription drugs (those on the Prescription Advantage Program's list) purchased at the D-H Pharmacy, whether purchased in person or through the mail. A typical 30-day prescription of approved drugs costs $7 and a typical 90-day prescription costs $14. The D-H Pharmacy will mail these prescriptions to you at no cost. This is a special program offered through the D-H Pharmacy and is not part of the D-H medical plans; therefore, claims for this program will not be processed through your medical insurance and also not apply toward your deductible or out-of-pocket maximums. Employees, dependents, retirees, and volunteers are eligible for this program, regardless of participation in a D-H medical plan. More information is located in the Benefits section of the D-H intranet at **http://one. hitchcock.org/intranet/departments/d-h_pharmacy** and the myBenefits portal at **MyDHBenefits.com**.

## SAVING MONEY ON PRESCRIPTION DRUGS

You may save money on 30-day and 90-day prescriptions by filling them at the D-H Pharmacy. You may also have 90-day prescriptions for maintenance medications shipped to you, free of charge. Please see the Medical/Prescription Plans Summary on page 13 for prescription drug and co-insurance amounts.

# Health Savings Account (HSA)

The HSA is a pre-tax savings account that can be used to pay for eligible out-of-pocket health care, dental, or vision expenses, as well as to save for future health care costs. D-H provides a base contribution to the HSA account for all eligible employees who enroll in the ElevateHealth HSA Plan or the Choice Health Plan.

During the enrollment process you must attest that you are eligible for an HSA in order to receive the contribution. The employer contribution is based on when you attest eligibility so if this changes mid-year you would be eligible for a prorated amount.

Once your HSA is activated through HealthEquity, you will receive a personalized debit card to use when paying for your eligible health care expenses. You will also have access to HealthEquity's online system to help you manage your HSA.

Upon turning age 65 and enrolling in Medicare A, or upon receipt of Medicare due to one of Medicare's qualifying eligibility rules, an employee is no longer eligible to participate in the HSA. Funds are still accessible for qualified expenses. However, if a member defers their enrollment in Medicare they are able to continue contributions to their HSA account.



**HDHP + HSA = A PERFECT MATCH**

Watch this short video to learn how the HSA works with the ElevateHealth HSA or Choice Health plans.

17

## Contributions to Your HSA Account

### D-H Contributions

To help you pay for some of the expenses that will be subject to your health care plan deductible and co-insurance, if you enroll in the ElevateHealth HSA Plan or the Choice Health Plan and are eligible for HSA contributions, D-H will make a base contribution to your HSA based on the coverage level you elect. D-H will contribute the following amounts for 2017:

- $300 for employee only coverage
- $600 for all other coverage levels

The D-H contributions will be deposited into your HSA account as a lump sum deposit. If you are a new hire or you are newly benefits eligible in 2017, you will receive a pro-rated lump sum contribution in the first pay period of the month following your benefit eligibility. For example, if you became benefit eligible on February 15th, your HSA would be effective on March 1st, and your contribution eligibility begins the next full pay period in March.

### Your Contributions

In addition to D-H's contribution, you may elect to make additional pre-tax contributions to your HSA through payroll deductions, subject to IRS annual limits. For 2017, the limit is $3,400 for Employee Only coverage and $6,750 for all other coverage levels. These amounts represent the total amount (your contributions plus D-H's contributions) that can be deposited into your account in 2017. Employees who are age 55 or older in 2017 may also make additional "catch up" contributions of up to $1,000 to their HSA in 2017. Remember, the amount you contribute to your HSA is tax-free and the dollars that are deposited in your HSA belong to you, whether deposited by you or D-H.

The HSA does not have a "Use It or Lose It" rule, so you can carry over your balance from year to year and you can take the account with you if you leave or retire from D-H. You may start, stop, or change your HSA payroll contribution amount at any time during the year by contacting the Benefits Administration Office at **603.653.1400** or **DHBenefits@Hitchcock.org**.

### Beneficiary Designation

When the account owner passes away, any amount remaining in the HSA transfers to the entity or individual named as the beneficiary(ies). For more information on naming a beneficiary and IRS regulations about the use of this account, please visit the HealthEquity website.

## Penalties for Non-Eligible Health Care Expenses Under an HSA

The IRS governs the provisions of the HSA and provides guidelines on what is considered an eligible health care expense. You can find a list of eligible expenses on the HealthEquity website. If you use your HSA funds to pay for non-eligible health care expenses, you may be subject to a 20% penalty and your non-eligible expense will be treated as taxable income. There are also penalties for falsifying tax forms.

### Did You Know?

You can manage your account and pay health care providers directly from the HealthEquity website at **HealthEquity.com**.

## HSA Eligibility

1. Not enrolled in any other health plan that is not a qualified High Deductible Health Plan (HDHP)
2. Not claimed as a dependent on another's tax return
3. Not enrolled in Medicare
4. Neither you or your spouse are enrolled in a Health Reimbursement Account (HRA) or Standard Health Care Flexible Spending Account (FSA)
5. Have not received VA benefits (Medical and RX) during the past 3 months

# Health Reimbursement Account (HRA)

The HRA is a savings account that can be used to pay for eligible out-of-pocket health care, dental, or vision expenses. Only D-H can contribute to an HRA, and will provide a contribution for employees who enroll in the ElevateHealth HRA Plan.

Once your HRA is activated through HealthEquity, you will receive a personalized debit card to use when paying for your eligible health care expenses. You will also have access to HealthEquity's online system to help you manage your HRA.

The balance in your HRA account accumulates and rolls over each year if you continue to enroll in the ElevateHealth HRA Plan. HRA accounts are employer based accounts so you will not have access to the HRA if you enroll in a different plan, leave, or retire from D-H.

## Contributions to Your HRA Account

### D-H Contributions

To help you pay for some of the expenses that will be subject to your health care plan deductible and co-insurance, if you enroll in the ElevateHealth HRA Plan and are eligible for HRA contributions, D-H will make a contribution to your HRA based on the coverage level you elect. D-H will contribute the following amounts for 2017:

- $150 for employee only coverage
- $300 for all other coverage levels

The D-H contribution will be deposited into your HRA account as a lump sum deposit at the start of the plan year. If you are a new hire or you are newly benefits eligible in 2017, you will receive a pro-rated lump sum contribution in the first pay period of the month following your benefit eligibility. For example, if you became benefit eligible on February 15th, your HRA would be effective on March 1st, and your contribution eligibility begins the next full pay period in March.

### Your Contributions

Employees cannot make contributions to an HRA, but can use the Health Care Reimbursement Account (HCRA) which offers pre-tax savings, see page 21.

## Value Based Insurance Program

Employees and their families enrolled in the HRA plan are eligible for the D-H Value Based Insurance Program. Members who enroll in this program are eligible for certain medications used to treat hypertension, diabetes, and mental health for free if they engage in a care management program quarterly. To learn more about this exciting program and to see the list of free medications, please go to **myDHBenefits.com** under health insurance.



**HRA, HSA, AND FSA: WHAT YOU NEED TO KNOW**
Watch this short video to learn about the differences between the HRA, HSA, and FSA.

# Flexible Spending Accounts (FSA)

D-H offers two Flexible Spending Accounts — the Health Care Reimbursement Account (HCRA) and Dependent Care Reimbursement Account (DCRA). HealthEquity is the plan administrator for D-H's Flexible Spending Accounts.

Once you have elected your payroll contributions, D-H may not discontinue your per-pay-period contributions during the calendar year unless you experience a qualified life event.

## Health Care Reimbursement Account (HCRA)

The HCRA is a pre-tax savings account available to employees who waive health care coverage, enroll in the ElevateHealth HRA plan, or are in our Resident/Fellow Medical PPO plan. The HCRA can be used to pay for eligible health care, dental, or vision care expenses that are not covered by insurance, for you and your eligible dependents. The maximum amount you may contribute to your HCRA is $2,500 each calendar year. Once you sign up for the HCRA, you will receive a personalized debit card from HealthEquity to use when paying for your eligible health care expenses.

**NOTE:** You may not use your HSA, HRA, or HCRA to pay for, or be reimbursed for, over-the-counter medications unless prescribed by a provider.

## Dependent Care Reimbursement Account (DCRA)

The DCRA is a pre-tax savings account that may be used to pay for eligible elder and child care expenses. You may only use this account if you utilize day care or elder care services so that you and your spouse/same sex civil union partner can work, obtain gainful employment, or attend school full time. It is important to note that your day care or elder care provider must furnish you with his/her Social Security Number (SSN) or Tax Identification Number (TIN) in order to receive reimbursement for your expenses. IRS regulations limit the amount you may contribute to any DCRA to $5,000 for your family (or $2,500 if married and filing separate tax returns) per calendar year.

In order to qualify for reimbursement, expenses must be incurred for the care of "eligible dependents" who the IRS defines as:

- A child under the age of 13, or a child of any age who is physically or mentally incapable of self-care,
- Your opposite sex spouse, if physically or mentally incapable of self-care and living in your home for more than 50% of the year, or
- Any other dependent (including your same sex spouse, domestic or civil union partner) who is physically or mentally incapable of self-care who meets specific criteria.

For more details about who qualifies as eligible dependents under the DCRA, refer to IRS Publication 503, titled Child and Dependent Care Expenses, which is available by calling the IRS at 800.829.1040 or at IRS.gov.

**NOTE:** You can only participate in the DCRA if you earn less than the highly compensated limits. The limit for 2017 is $120,000.

## Flexible Spending Accounts

The deadline for submitting 2017 HCRA and DCRA claims for reimbursement is March 31, 2018. You may reimburse yourself for expenses incurred between January 1 and December 31, 2017, as long as they are incurred while you are an active participant in the plan. If you don't use them, funds in these accounts do not roll over to the next calendar year. If you terminate coverage or employment from D-H during the year, you may only submit expenses incurred through the last day of employment if you submit for reimbursement within 90 days of your termination date.

# Dental Insurance

D-H offers two Dental options for you and your eligible dependents through Northeast Delta Dental:

- Basic Dental Option
- Enhanced Dental Option

Dental hygiene can impact your overall physical health. Practicing good oral care, such as brushing and flossing daily and visiting your dentist on a regular basis, are important steps toward keeping your mouth free from the build up of bacteria that can lead to oral infections. Preventive screenings (dental check-ups and cleanings) can also help detect signs of other diseases. D-H offers two preventive screenings each year at no cost under both plan options.

Highlights of the covered benefits under each plan as well as employee contributions for coverage are shown on page 24.



## Qualified Life Event

Changes to your benefits due to a qualified life event must be made within 30 days of the event. The change will become effective on the date of the event for birth and marriage events; all other events will become effective on the first of the following month after the date of the event. For more information, log into the BenefitConnect website, call the Benefits Administration Office at 603.653.1400, or **DHBenefits@Hitchcock.org**.

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 238 of 300

2:17-cv-00194-kjd    Document 257-5    Filed 03/30/25    Page 25 of 48

A-516

## Enhanced Dental Carryover Benefit

Northeast Delta Dental offers a Double-Up Max carryover benefit feature on the Enhanced Dental Option. With this feature, enrollees may double their annual maximum by accumulating $250 a year in additional benefits for use in future coverage periods. When a dental procedure is needed that costs more than the annual maximum allows, accrued carryover benefit dollars can help make up the difference.

*To Qualify*

- Members are enrolled in the Enhanced Dental Option

- Northeast Delta Dental must have paid a claim for either an oral exam or a cleaning during the Calendar Year. If enrollees don't receive one of these services, they will not be eligible to accumulate dollars for future use.

- A member's paid claims during the Calendar Year cannot exceed a threshold of $500.

- Accumulated amounts may only be used after the current annual maximum has been exhausted.

- Carryover benefit amounts cannot be used toward lifetime orthodontic benefits.

## Health Through Oral Wellness (HOW) Program

Northeast Delta Dental's free HOW program works with your existing dental benefits to help you achieve and maintain better oral wellness.

You can visit **HealthThroughOralWellness.com** to find out more and take a free oral health risk assessment. Your dentist can discuss your results with you at your next visit and perform a clinical version of the assessment. Based on your risk, as shown on your clinical assessment, you may be eligible for additional preventive benefits at no cost.*

*Additional preventive benefits are subject to the provisions of your Northeast Delta Dental policy. Only the clinical risk assessment performed by your dentist can determine your eligibility for additional preventive benefits.

22

## Black Bean and Corn Salsa

*Don't limit salsa to being served just with chips. Try adding it into an omelet or on a fish or chicken dish.*

**SERVING SIZE:** ½ cup      **MAKES:** 16 servings

**INGREDIENTS:**

One 15 ounce can white corn, drained

One 15 ounce can yellow corn, drained

One 15 ounce can black beans, drained and rinsed

One 14.5 ounce can Italian-style diced tomatoes, drained and chopped

1 bunch cilantro, finely chopped

5 green onions, finely sliced

1 small red onion, finely chopped

1 red bell pepper, seeded and finely chopped

1 tablespoon minced garlic

¼ cup lime juice

1 tablespoons olive oil, or to taste

**INSTRUCTIONS:**

Combine and mix all ingredients in a large bowl.

**NUTRITION (PER SERVING):** Calories 60, Fat 1g, Carbohydrates 10.5g, Protein 2.5g, Fiber 2g, Sodium 125mg

**HEALTHY HINTS**

✓ Get creative with this recipe; tailor the types of vegetables to best suit your preferences. Modifying the types of vegetables will not change the macronutrients significantly so you can indulge in this healthy recipe with confidence!

# Dental Plans Summary

**Single** = Employee Only coverage, **Family** = all other coverage levels

| PLAN FEATURES | BASIC | ENHANCED |
|---|---|---|
| **Deductible** | Single: $50<br>Family: $150 | Single: $25<br>Family: $75 |
| **Preventive Care** | 100%, no deductible (2 annual cleanings) | 100%, no deductible (2 annual cleanings) |
| **Basic Restorative Care**<br>**(Fillings, Extractions, Root Canals)** | Plan pays 50%, after deductible | Plan pays 80%, after deductible |
| **Major Restorative Care**<br>**(Crowns, Dentures, Bridges)** | Plan pays 50%, after deductible | Plan pays 50%, after deductible |
| **Orthodontia** | Plan pays 50%, no deductible, lifetime maximum benefit of $2,000 per covered member | Plan pays 50%, no deductible, lifetime maximum benefit of $2,000 per covered member |
| **Annual Maximum Benefit** | $1,000 per covered member | $1,500 per covered member |

# 2017 Dental Plan Employee Contributions

| | Bi-Weekly Contributions | |
|---|---|---|
| **DENTAL** | **BASIC** | **ENHANCED** |
| **FTE (0.5 –1.0)** | | |
| **Employee** | $2.34 | $5.14 |
| **Employee + Child(ren)** | $9.80 | $19.59 |
| **Employee + Spouse** | $9.80 | $19.59 |
| **Family** | $18.66 | $36.86 |

23

# Vision Coverage

D-H offers vision coverage for eyewear through DeltaVision. DeltaVision is supported by the **EyeMed Vision Care network**, with almost 67,000 providers at over 26,700 locations nationwide, including private practitioners and the most popular optical retail outlets. You can search for providers at **eyemedvisioncare.com**. Click on "Find a Provider" and choose "Access" from the "Choose Network" drop-down menu.

Our medical plan continues to cover your routine eye exams under preventive services and the DeltaVision plan can be used to cover your frames and lenses. The plan provides the following in-network benefits:

- FRAMES: $130 allowance every 24 months, then 20% off the balance.

- LENSES: You pay only a $10 co-pay for Standard Plastic Lenses, including bifocal and trifocal, the plan pays the balance. Available once every 12 months. Additional co-pays apply to other lens options, like UV coating, tinting, and scratch resistance For more specific plan information please see this **summary**.

- CONTACTS: $130 allowance every 12 months (in lieu of spectacle lenses). In addition to the allowance, you also receive 15% off any balance payable for non-disposable contacts.

- LASER VISION CORRECTION — LASIK OR PRK: 15% off retail price or 5% off promotional price.

## Additional In-Network Discounts

- 20% discount on items not covered by the plan at network providers (may not be combined with any other discounts or promotional offers, and the discount does not apply to EyeMed provider's professional services, or contact lenses).

- 40% discount off complete prescription eyeglass purchases and a 15% discount off conventional contact lenses once the funded benefit has been used.

- After initial purchase, replacement contact lenses may be obtained via the Internet at substantial savings and mailed directly to the member. Details are available at **eyemedvisioncare.com**. The contact lens benefit allowance is not applicable to this service.

| Employee Bi-weekly Contributions | |
|---|---|
| Employee | $2.42 |
| Employee + Child(ren) | $4.57 |
| Employee + Spouse | $4.72 |
| Family | $7.14 |



24

# Staff Short-Term and Long-Term Disability Insurance

D-H provides Short-Term Disability (STD) and Long-Term Disability (LTD) insurance at no cost to you through The Hartford. Both STD and LTD provide income protection for non-work related injuries or illness. STD and LTD disability payments may be offset by Social Security Disability, Workers' Compensation, pension payments, or any other group disability insurance payments that you are eligible to receive. Both STD and LTD payments are considered taxable income. D-H provides the following STD and LTD benefits for eligible employees at no cost to you:

## Short-Term Disability (STD) Insurance*

- 70% of your base salary, for a maximum of 24 weeks

## Long-Term Disability (LTD) Insurance

- 50% of your base salary, to a maximum of $15,000 per month

Staff STD benefits begin following a 14-day elimination period. You may use your earned time to provide income during this time. The Hartford determines eligibility and medical necessity for LTD. If approved, LTD payments begin immediately following the date STD payments end.

## Long-Term Disability (LTD) Insurance "Buy-up" Options

In addition to the LTD benefit provided to you at no cost, D-H's 2017 Benefits program offers two "buy-up" options. If you choose one of these options, you are responsible for paying the entire cost of the "buy-up" coverage

## Residents/Fellows, Physicians & Advanced Practice Providers

Please refer to pages 39 & 41 for disability benefits information pertaining to these positions.

*In order to be eligible for STD coverage, you must begin STD on the 15th full day of missed work.

through after-tax payroll deductions. In addition, Evidence of Insurability (EOI) may be required. The buy-up options are as follows:

- 60% of your base salary, to a maximum of $15,000 per month
- 66 2/3% of your base salary, to a maximum of $15,000 per month

**NOTE:** In the event of a disability, The Hartford determines your disability coverage based on the date your disability began, as determined by the medical information provided to them. The Hartford may pay your disability benefit based on the amount of coverage in effect when the disability began. Therefore, if you elected to increase ("buy-up") coverage after the date the disability began, your coverage for that specific disability may not reflect your most recent disability coverage amount.

## STD Coverage

In order to be eligible for STD coverage you must begin STD on the 15th full day of missed work.

## Evidence of Insurability (EOI): Long-Term Disability

When you are first eligible to enroll in Long-Term Disability (LTD), you may elect any level of LTD coverage with no EOI. During Open Enrollment, you may buy up one level of coverage with no EOI.



# Staff Life Insurance Benefits

D-H provides Basic Life and Accidental Death and Dismemberment (AD&D) insurance through The Hartford. This coverage is designed to provide financial protection for you and your family if you die or become seriously injured while you are employed at D-H. The following Life and AD&D benefits are provided to you at no cost.

## Basic Life Insurance*

- 1 x annual salary up to $200,000

## Accidental Death and Dismemberment (AD&D) Insurance*

- 1 x annual salary up to $200,000

IRS rules allow an employer to provide up to $50,000 of life insurance to an employee, tax-free. The cost of coverage for any amount over $50,000 is subject to taxation, and is known as "imputed income."

## Imputed Income – Life Insurance

Imputed income is determined based on your age and the related cost for life insurance found in the IRS insurance rate tables. Imputed income equals the estimated cost that the IRS assumes you would pay to purchase an individual life insurance policy for the amount of your coverage above the $50,000 limit. This amount is added to the taxable earnings reported on your paycheck.

* Under the plan provisions, Basic Life/AD&D insurance reduces by 50% at age 70.

## Evidence of Insurability (EOI) — Life Insurance

EOI is the proof of good health that must be submitted to the life insurance carrier before approval for certain life insurance coverage amounts. During Open Enrollment, you can increase your own coverage by one times your annual salary, to a maximum of $500,000, and you can increase your spouse/civil union partner coverage by $5,000, up to a maximum of $50,000, without providing EOI. EOI is not required for life insurance for a dependent child(ren). When you enroll online you will be notified which levels of coverage require EOI and how to provide EOI, if needed.

# Staff Supplemental Life and AD&D Insurance**

In addition to the Basic Life and AD&D insurance provided to you at no cost, D-H's 2017 Benefits program offers you the opportunity to purchase additional Supplemental Life and AD&D insurance for yourself and your eligible dependents. Some levels of coverage will require you to provide evidence of your good health or Evidence of Insurability (EOI). Changes to Life Insurance will not take effect until an employee is actively at work, for instance if a change is made at Open Enrollment and an employee is on a leave of absence until January 15th, the change will be effective January 16th when they return to active duty at work.

## Coverage Options

• One-half to five times annual salary, up to $1,500,000 maximum

Each Open Enrollment period, you may increase your coverage by one times your annual salary, without EOI, up to a maximum of $500,000. Newly hired or newly benefits eligible employees may elect up to $500,000 of Supplemental Life/AD&D with no EOI.

** Under the plan provisions, employee Supplemental Life/AD&D insurance coverage reduces by 50% at age 70.

## Spouse/Civil Union Partner Life/AD&D Insurance Coverage Options

• Up to $100,000 of coverage, in $5,000 increments, subject to EOI

Each Open Enrollment period, you may increase coverage for your Spouse/ Civil Union Partner in increments of $5,000, to a maximum of $50,000, without EOI. Any amount elected over $50,000 is subject to EOI. Newly hired or newly benefits eligible employees may elect up to $50,000 of coverage for their spouse with no EOI.

## Dependent Child(ren) Life Insurance Coverage Options

• $5,000 or $10,000, no EOI required

If elected, one premium covers all eligible children. There is no EOI requirement for dependent children and coverage begins at one day old through 26 years old.



# Identity Theft Protection

D-H offers Identity Theft Protection through InfoArmor. You can enroll in the PrivacyArmor plan to help protect your identity, online reputation, and credit. InfoArmor offers industry-leading identity and credit monitoring solutions to alert you of concerns and assist in taking action. The protection includes fraud prevention, proactive monitoring, and real time alerts via email, text, or phone. In addition, InfoArmor will provide services to restore your identity.

Through the PrivacyArmor Plus plan, you will have the protection of:

- identity monitoring
- credit monitoring
- social media monitoring
- NPI monitoring
- a password management solution
- wallet protection
- identity theft insurance
- solicitation reduction
- internet surveillance

| Employee Bi-weekly Contributions | |
|---|---|
| Employee | $4.60 |
| Family | $8.29 |

With family coverage, you can choose to cover anyone you support financially or that lives under your roof.

28

# New for 2017!

## Discount Programs

We are offering D'Perks (D-H Discounts) in conjunction with the Chamber of Commerce in Hanover, NH. It provides an extensive variety of discounts and offers, by local and regional businesses, as well as national corporations. All D-H employees, regardless of location, are eligible for these discounts and offers.

You can find out more by visiting **employeemall.com/clients/workstream/hanover/**

## Solar Benefit

You are eligible for a 10% discount on the base price of residential solar energy equipment and installation labor ("Installed Cost") from Geostellar. The discount will be applied to the standard base pricing in effect at the time of purchase. Any financing charges for leases, loans or PPAs will be calculated using the discounted Installed Cost.

## Farro, Apple, and Walnut Salad

**INGREDIENTS:**

1 ½ cup farro (semi-pearled)

¼ cup olive oil, divided

½ medium red onion, chopped

1 large gala or granny smith apple or pear, cored and chopped

1 tablespoon chopped thyme

3 tablespoons apple cider vinegar

¾ cup chopped walnuts

Salt and pepper to taste

**MAKES:** 8 servings    **SERVING SIZE:** ¾ cup

**INSTRUCTIONS:**

**1.** Soak farro in cold water for 20 minutes. Drain off liquid.

**2.** Bring to a boil 2 quarts (8 cups) water in a medium pot. Add a pinch of salt to the water, if desired. Add farro. Simmer until tender, approximately 30 minutes.

**3.** Pour the farro into a colander over the sink to drain off the liquid. Run the colander with the farro under cold water. (This will stop the grain from cooking further and becoming mushy.) Place drained, cool farro in a large bowl, cover and refrigerate.

**4.** Heat 2 tablespoons oil in a large skillet over medium heat. Add onions and cook until soft, approximately 5 minutes. Stir in apples and cook another 2 to 3 minutes. Remove from heat and add apple/onion mixture to the bowl with farro.

**5.** In a small bowl whisk together dressing of thyme, vinegar, 2 tablespoons oil, salt and pepper. Add this dressing and walnuts to the farro. Toss gently to combine. Serve immediately.

**NUTRITION (PER SERVING):** Calories 260, Fat 16g, Carbohydrates 27g, Protein 6g, Fiber 5g, Sodium 50mg



29

# Dartmouth-Hitchcock Wellness Programs

## D-H Live Well/Work Well

Live Well/Work Well offers a variety of programs to improve and maintain your health, including health and wellness coaching options, fitness programs, life/stress management, and other educational resources. These programs are available to all employees and immediate family members, regardless of enrollment in a D-H health care plan. For more information, contact Live Well/Work Well at 603.650.5900.

## Live Well/Work Well Primary Care

Live Well/Work Well offers primary care services for employees and their adult dependents of all ages who are enrolled in a D-H health plan. Live Well/Work Well Primary Care is based at our D-H Heater Road facility in Lebanon, NH, 603.650.3640.

## Dartmouth-Hitchcock Wellness Plus (DHWP) Care Management/Care Coordination Services

DHWP Case Managers and Care Coordinators are available to assist employees who have D-H health insurance. Care Managers and Care Coordinators are nurses and social workers who, in conjunction with your health care team and Health Plans, Inc., work with you and your family members and focus on acute or chronic illness or other health challenges. Services provide:

- Individualized assistance managing complex or chronic medical conditions, helping you achieve optimal health and wellbeing

- Educating and connecting you with available community resources to help manage your health.

To learn more, please visit D-H Wellness Plus Care Management/Care Coordination Services on the D-H intranet or contact a member of the team at 866.212.1838.



30

# Deskercise

For the average desk worker, repetition is a must and often does not require a full range of motion to complete these repetitious movements. This can lead to tightness and pain in muscle groups, especially the lower back, neck, and shoulders. Did you know that you can stretch without even leaving your chair?

Try this routine twice a day to stay limber and feeling good, not only for your time at work but also for when you go home. Start by holding each stretch for 10-15 seconds and as you become more flexible hold for 20-30 seconds, but never stretch past your limit.

- Gently pull each elbow over your head and place your hand on your opposite shoulder blade and hold.

- Extend your legs in your chair and reach for your toes and hold.

- While seated pull one knee at a time to your chest and hold.

- Clasp your hands together out in front of you and lower your chin to your chest.

- Extend each arm overhead and to the opposite side.

- Raise both shoulders at once up toward your ears, hold and release.

- Clasp hands behind your back, push your chest out, and raise your chin.

- Cross your legs and alternate twists toward the back of your chair.

- Clasp hands together above your head and reach upwards. Add a lean to the left and right.

- Lean your head forward and slowly roll from side to side.

- Gently pull your head sideways towards each shoulder.



A-525

# Dartmouth-Hitchcock Retirement Plans

## Dartmouth-Hitchcock Employee Investment Plan – 403(b)

Eligible employees may save for retirement by making voluntary contributions to the Dartmouth-Hitchcock Employee Investment Plan – 403(b). Your contributions — and any associated investment earnings — are vested immediately.

If you are newly hired at D-H, you will be automatically enrolled in the plan with an annual contribution of 1% of base salary, pre-tax. This will increase 1% annually up to a maximum of 10%. You may increase this percentage or opt out of this program by contacting T. Rowe Price at **800.922.9945** or **RPS.TRowePrice.com**.

You may save up to 100% of your income, subject to IRS annual maximums*, through:

- 403(b) Pre-tax contributions,
- 403(b) Roth After-tax contributions, or
- A combination of both types of savings.

If you are age 50 or older in 2017, you may also make "catch-up" contributions, subject to IRS annual maximums*.

You may make changes to your contributions at any time throughout the year.

If you are newly hired at D-H and have made contributions to a 403(b) at a previous employer or affiliated employer, you will want to confirm that you remain under the annual IRS limit. It is your responsibility to prevent contributions being made over the annual IRS limit for the year.

## 403(b) Roth After-Tax

403(b) Roth contributions are taxed in the year they are saved. The investment income on 403(b) contributions remains tax-free if you leave your money in your 403(b) account for at least five years from the first year of contribution.

You may wish to contact Financial Fitness Advisors (FFA) at 877.846.8792, for a free appointment at your work location. FFA can discuss the best approach for you to save for retirement. (See page 37 for more information about FFA.)

*In 2017, the IRS contribution limit is $18,000 for employees under age 50. Employees age 50 or older during the year may save up to an additional $6,000 in "catch-up" contributions.



### Automatic Enrollment

Newly benefits eligible employees will be automatically enrolled in the 403(b) Plan at 1% of your base salary, pre-tax. This will increase 1% annually up to a maximum of 10%. Employees who wish to increase this percentage or opt out may contact T. Rowe Price at **800.922.9945** or **RPS.TRowePrice.com**.

### Remember!

You can change your contribution amount at any time throughout the year. Just log on or call T.Rowe Price.

2:17-cv-00194-kjd   Document 257-5   Filed 03/30/25   Page 35 of 43

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 248 of 300

A-526



# Dartmouth-Hitchcock Retirement Plan – 401(a) Plan

The 401(a) Plan includes two different types of contributions from D-H: a Base Contribution and a Discretionary Matching Contribution. D-H's contributions to the 401(a) Plan — and any associated investment earnings — are vested after you complete three years of vesting service, turn 65-years old, become disabled, or at the time of your death.

## Base Contributions

Eligible employees will receive a Base Contribution between 1% and 7% of pay, plus additional amounts on pay over the Social Security Wage Base, if eligible, according to acquired "Points" determined each pay period. Refer to chart on page 35.

### Be on the look out!

Look for retirement sessions happening around D-H. Get help with understanding retirement at D-H and how to make sure you are on the right track!

33

2:17-cv-00194-kjd    Document 257-5    Filed 03/30/25    Page 36 of 48

A-527



# How to Calculate Your Base Contribution Points

**Base Contribution Points**

**=**

**Employee's Age x 2**

**+**

**Years of Vesting Service as of January 1, 2017**

| NUMBER OF BASE CONTRIBUTION POINTS | ON ALL PAY UP TO $265,000*, YOU WILL RECEIVE A BASE CONTRIBUTION OF... | IF YOU EARN MORE THAN $118,500**, YOU WILL RECEIVE AN ADDITIONAL BASE CONTRIBUTION OF...*** |
|---|---|---|
| Less than 60 | 1% | 1% |
| 60 to 89 | 3% | 3% |
| 90 to 119 | 5% | 5% |
| 120 or More | 7% | 5% |

The percentage of your Base Pay that D-H will contribute into your 401(a) account. These funds become yours once you are vested (credited with 1000+ hours per year for 3 years).

\* Your Base Contribution is provided per-pay-period on all Compensation up to the annual IRS limit ($265,000 in 2016).
\*\* Social Security Wage Base for 2016 ($118,500 in 2016).
\*\*\* D-H Putnam Staff are not eligible for additional contributions for pay over the Social Security Wage Base.

34

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 250 of 300

2:17-cv-00194-RJC   Document 257-5   Filed 03/30/25   Page 37 of 48

A-528



# Discretionary Matching Contributions

The amount of D-H's Discretionary Matching Contribution each fiscal year is determined by D-H's Board of Trustees, based on pre-defined performance measures. If you are not saving through a D-H retirement plan during the year, you will not be eligible to receive the Discretionary Matching Contribution, if approved, for that year. D-H's ability to contribute towards the Discretionary Matching Contribution program is communicated each year after Board of Trustees approval.

**NOTE:** Employees who were participants in one of the legacy defined benefit pension plans and chose to transition to the new Defined Contribution Plan, effective January 1, 2007, may also be receiving "Transition Contributions." Transition contributions will be discontinued when the plan is frozen, which is expected to happen on December 31, 2017. For more information on Transition Contributions, see the Dartmouth-Hitchcock Retirement Plan Summary Plan Description (SPD), available on the *myBenefits* portal at **MyDHBenefits.com** and on the D-H intranet.

## Legacy Defined Benefit Pension Plans

If you were an employee of D-H prior to February 9, 2006, you may currently participate in either the D-H Clinic or Mary Hitchcock Memorial Hospital legacy defined benefit pension plan. Depending on your circumstances and employment history, this benefit may be stationary, increase as your pay increases, or increase with years of service. These plans provide a lifetime monthly annuity, post-retirement, based on formulas that consider many factors, including your service and pay history (until the earlier of date you elect retirement, terminate employment, or the planned freeze date of December 31, 2017) while participating in the plan, and the age you begin receiving your benefit.

35

2:17-cv-00194-kjd    Document 257-5    Filed 03/30/25    Page 38 of 48

A-529

# Retirement Financial Fitness

## Financial Fitness Advisors (FFA)

Keeping yourself physically fit can help you enjoy a longer and better quality life. However, it can also mean that you will spend more years enjoying retirement. Establishing retirement income goals and periodically checking in and adjusting those goals can help ensure you will be financially fit throughout your retirement years.

D-H provides free one-on-one counseling through the services of FFA, a team of independent (noncommissioned) retirement advisors who will meet with you to explore your retirement goals. You may call FFA at **877.846.8792** or email **info@FFAdvisors.org** to make an appointment. You are encouraged to bring your spouse or partner to these sessions.

### Did you know!

If a person that spent $5 a day, every day on coffee from age 20 to age 60 decided to invest that money instead, they would have about $817,000!

## Retirement Employee Self Service Tool

Knowing what you have is the first step in understanding what you need! D-H's Retirement Employee Self Service Tool helps you take control of your future. Access it online at **myDHBenefits.com** (click on the "Retirement" button on the left side of the screen) to see how much money you'll have in retirement, determine how much you'll need to save to meet your goals and research pension benefits.

The tool makes it easy to estimate your retirement income from your D-H plans as well as your personal savings. Helpful tips will guide you through your retirement planning using simple assumptions. Once you get more comfortable, or if you're already an expert, you can use more advanced assumptions to model your benefits.



2:17-cv-00194-kjd   Document 257-5   Filed 03/30/25   Page 39 of 48

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 252 of 300

A-530

# Resident/Fellow Benefits

*The following benefits apply to benefits eligible Residents/Fellows in lieu of the benefits described earlier in this guide.*

## Medical/Prescription Insurance

Residents/Fellows are eligible for one D-H medical plan — the $0 Deductible PPO Plan. The following is an overview of the coverage provided by the $0 Deductible PPO Plan as well as the Resident/Fellow bi-weekly contributions for coverage under this plan.

| PLAN FEATURES | $0 DEDUCTIBLE PPO PLAN | |
| --- | --- | --- |
| | **In-Network** | **Out-of-Network** |
| Deductible | $0 | Single: $300; Family: $600 |
| Co-Insurance | N/A | 40% after deductible |
| Out-of-Pocket Maximum | Single: $1,800; Family: $3,600 (includes prescription drugs) | |
| **IN-NETWORK BENEFIT COVERAGE HIGHLIGHTS** | | |
| Preventive Care | Plan pays 100% of eligible services | |
| Routine Eye Exam | Plan pays 100%, one routine eye exam per member, per year | |
| **PHARMACY BENEFITS** | | |

| SUPPLY | LOCATION | $0 DEDUCTIBLE PPO PLAN |
| --- | --- | --- |
| 30 Days | D-H Medical Center Pharmacy<br>Cheshire Medical Center Pharmacy<br>The Pharmacy in Bennington, VT & Manchester, VT<br>Colonial Pharmacy in New London, NH<br>Select CVS Retail Pharmacies* | Generic $5<br>Brand Name $25<br>Non-Preferred $50 |
| | All Other Retail Pharmacies | Generic $10<br>Brand Name $50<br>Non-Preferred $75 |
| 90 Days | D-H Medical Center Pharmacy<br>D-H Medical Center Pharmacy Mail Order | Generic $10<br>Brand Name $50<br>Non-Preferred $100 |
| | OptumRx Mail Service Pharmacy<br>The Pharmacy in Bennington, VT & Manchester, VT<br>Colonial Pharmacy in New London, NH | Generic $30<br>Brand Name $100<br>Non-Preferred $150 |
| | All Other Retail Pharmacies | Not Available |

* Select Community Group Practice CVS Retail Pharmacies. Locations available on the *myBenefits* portal at **MyDHBenefits.com**.

**A-532**

# Resident/Fellow Benefits

| RESIDENT/FELLOW MEDICAL CONTRIBUTION RATES | |
|---|---|
| **Bi-Weekly** | **Non Tobacco User** |
| Employee | $32.17 |
| Employee + Child(ren) | $48.26 |
| Employee + Spouse | $67.56 |
| Family | $89.11 |

## Short-Term Disability (STD) Insurance

The 2017 Benefits program provides Residents/Fellows with STD coverage equal to 100% of base salary for up to 90 days. This benefit begins immediately following The Hartford's determination of disability.

## Long-Term Disability (LTD) Insurance

The 2017 Benefits program provides Residents/Fellows with basic LTD coverage equal to 80% of base salary, to a maximum benefit of $3,750 per month. The Hartford determines eligibility and medical necessity for LTD. If approved, LTD payments begin immediately following the date STD payments end.

## Life Insurance Benefits*

The 2017 Benefits program provides Residents/Fellows with the following Life and AD&D insurance at no cost.

### Resident/Fellow Basic Life Insurance

• 1x salary to a maximum of $100,000

### Resident/Fellow Accidental Death and Dismemberment (AD&D) Insurance

• 1x salary to a maximum of $100,000

### Flexible Spending Accounts

As a Resident/Fellow you may be eligible for our Health Care Reimbursement Account (HCRA) and Dependent Care Reimbursement Account (DCRA) accounts. Please see page 21 for details on these accounts.

\* Under the plan provisions, Resident/Fellow Basic Life/AD&D insurance and Supplemental Life insurance coverage reduces by 50% at age 70.



# Dartmouth-Hitchcock Employee Investment Plan — 403(b) Plan

Residents/Fellows are eligible to participate in the Dartmouth-Hitchcock Employee Investment Plan – the 403(b) Plan. You may save up to 100% of your income per year, subject to IRS maximums**, through:

- 403(b) Pre-tax contributions,
- 403(b) Roth After-tax contributions, or
- A combination of both types of savings.

If you are age 50 or older in 2017, you may also make "catch-up contributions," subject to IRS annual maximums**.

Residents/Fellows are not eligible for benefits from the Dartmouth-Hitchcock Retirement Plan 401(a) Plan.

** In 2017, the IRS contribution limit is $18,000 for employees under age 50. Employees age 50 or older during the year may save up to an additional $6,000 in "catch-up" contributions.

## Retirement Financial Fitness

Residents/Fellows are encouraged to save for their own retirement and may utilize FFA's services, as outlined in the Retirement Financial Fitness section of this guide, refer to page 37.

2:17-cv-00194-kjd   Document 257-5   Filed 03/30/25   Page 42 of 48

Case: 25-1382, 03/19/2026, DktEntry: 61.1, Page 255 of 300

A-533

# Physician and Advanced Practice Provider Benefits

*The following benefits apply to benefits eligible Physicians and Advanced Practice Providers in lieu of the benefits described earlier in this guide.*

## Physician and Advanced Practice Provider Short-Term and Long-Term Disability Insurance

D-H provides Short-Term Disability (STD) and Long-Term Disability (LTD) insurance at no cost to you through The Hartford. Both STD and LTD provide income protection for non-work related injuries or illness. STD and LTD payments may be offset by Social Security Disability, Workers' Compensation, pension payments or any other group disability insurance payments that you are eligible to receive. Both STD and LTD payments are considered taxable income.

The Hartford determines eligibility and medical necessity for STD and LTD. If approved, LTD payments begin immediately following the date STD payments end.

## Short-Term Disability (STD) Insurance

The 2017 Benefits program provides Physicians and Advanced Practice Providers with STD coverage equal to 100% of base salary for up to 26 weeks. This benefit begins immediately following determination of disability. Please contact the Benefits Office to initiate this benefit at 603.653.1400.

A-534



40



A-535

# Physician and Advanced Practice Provider Benefits

## Long-Term Disability

- 50% of your base salary, to a maximum of $15,000 per month

The Hartford determines eligibility and medical necessity for LTD. If approved, LTD payments begin immediately following the date STD payments end.

## Long-Term Disability Insurance "Buy-Up" Options

In addition to the LTD benefit provided to you at no cost, D-H's 2017 Benefits program offers two "buy-up" options. If you choose one of these options, you are responsible for paying the entire cost of the "buy-up" coverage through after-tax payroll deductions. In addition, Evidence of Insurability (EOI) may be required. The buy-up options are as follows:

- 60% of your base salary, to a maximum of $15,000 per month
- 66 ⅔% of your base salary, to a maximum of $15,000 per month

**NOTE:** In the event of a disability, The Hartford determines your disability coverage based on the date your disability began, as determined by the medical information provided to them. The Hartford may pay your disability benefit based on the amount of coverage in effect when the disability began. Therefore, if you elected to increase ("buy-up") coverage after the date the disability began, your coverage for that specific disability may not reflect your most recent disability coverage amount.

## Evidence of Insurability (EOI): Long-Term Disability

When you are first eligible to enroll in Long-Term Disability (LTD), you may elect any level of LTD coverage with no EOI. During Open Enrollment, you may buy up one level of coverage with no EOI.

41



# Physician Benefits

## Physician Life Insurance*

The 2017 Benefits program provides Basic Life and Accidental Death and Dismemberment (AD&D) insurance through The Hartford. The following Life and AD&D benefits are provided to Physicians at no cost.

## Physician Basic Life Insurance

• Equal to $200,000

## Physician Accidental Death and Dismemberment (AD&D) Insurance

• Equal to $200,000

IRS rules allow an employer to provide up to $50,000 of life insurance to an employee, tax free. The cost of coverage for any amount over $50,000 is subject to taxation, and is known as "imputed income."

## The Hartford Age-Rated

This is a closed plan to new entrants, however, existing members may choose to remain in the Age-Rated plan or switch to Group-Rated Supplemental Life Insurance through The Hartford (but not both). Supplemental coverage is available in $50,000 increments, up to a maximum of $1,000,000, subject to EOI.

## The Hartford Group-Rated*

Supplemental coverage is available in $100,000 increments, up to a maximum of $1,500,000, subject to EOI.

**NOTE:** If a Physician enrolled in The Hartford Age-Rated coverage, they will have the opportunity to switch to The Hartford Group-Rated coverage at a later date. However, once enrolled in The Hartford Group-Rated coverage, Physicians may not switch to The Hartford Age-Rated coverage.

---

\*   Physician Basic Life and AD&D insurance coverage and Group-Rated Supplemental Life insurance coverage, reduces by 50% at age 70.



## Physician Dependent Life and AD&D Insurance

### The Hartford Age-Rated

Physicians must be enrolled in The Hartford Age-Rated Supplemental Life insurance in order to elect The Hartford Age-Rated Dependent Life insurance.

- Spouse/Civil Union Partner Coverage: Coverage is available in $25,000 increments, up to a maximum of the lesser of $300,000 or 50% of the Physician coverage amount, subject to EOI for coverage amounts of $25,000 or more.

- Dependent Child(ren) Coverage: Coverage is available in the amount of $10,000 per child. One premium covers all eligible children. There is no EOI requirement for dependent children and coverage begins at one day old through 26 years old.

### The Hartford Group-Rated

- Spouse/Civil Union Partner Coverage: Coverage is available in $5,000 increments, up to $100,000, subject to EOI. EOI is not required for coverage amounts of $50,000 or less.

- Dependent Child(ren) Coverage: Coverage is available in the amount of $5,000 or $10,000. One premium covers all of your eligible children. There is no EOI requirement for dependent children and coverage begins at one day old through 26 years old.

## Designating Beneficiaries

You are encouraged to designate a beneficiary(ies) for your life insurance. Please review your beneficiary information to make sure your designations are up-to-date.

43

# Who to Contact

| Health Plans | T.Rowe Price |
|---|---|
| 🖥 http://d-h.healthplansinc.com/ | 🖥 http://rps.troweprice.com |
| ☎ 866-471-5550 | ☎ 800-922-9945 |

| Health Equity | OptumRx |
|---|---|
| 🖥 http://www.healthequity.com/ | 🖥 http://www.optumrx.com |
| ☎ 866-346-5800 | ☎ 800-498-5428 |

| Delta Dental | The Hartford |
|---|---|
| 🖥 http://www.nedelta.com/Home | 🖥 http://www.thehartfordatwork.com |
| ☎ 800-832-5700 | ☎ 800-538-8439 (STD/LTD Insurance)<br>800-563-1124 (Life/AD&D Insurance) |

| InfoArmor | KGA |
|---|---|
| 🖥 https://www.infoarmor.com | 🖥 http://www.kgreer.com |
| ☎ 800-789-2720 | ☎ 800-648-9557 |

| Dartmouth-Hitchcock<br>Financial Fitness | Dartmouth-Hitchcock<br>Live Well Work Well |
|---|---|
| @ info@FFAdvisors.org | 🖥 http://employees.dartmouth-hitchcock.org/livewellworkwell.html |
| ☎ 877-846-8792 | ☎ 603-650-5900 |

| DeltaVision | Dartmouth-Hitchcock Employee<br>Assistance Program (EAP) |
|---|---|
| 🖥 www.eyemedvisioncare.com | 🖥 http://employees.dartmouth-hitchcock.org/livewellworkwell/eap_dhmc.html |
| ☎ 866-723-0513 | ☎ 603-650-5819 |

## Plan Documents and Summary Plan Descriptions

This 2017 Guide to Your Benefits provides a brief summary of D-H's benefit plans effective January 1 – December 31, 2017. The Plan Documents and Summary Plan Descriptions (SPDs) fully describe the plans. If there is any discrepancy between this summary and the official Plan Documents, the official Plan Documents will govern. D-H intends to operate the plans indefinitely, but reserves the right to change the levels and types of benefits or otherwise terminate the plans, in whole or in part, at any time, at its sole and absolute discretion.

All Plan Documents and Summary Plan Descriptions (SPDs) for each benefit plan are located at the Benefits section of the D-H intranet and the *myBenefits* portal at **MyDHBenefits.com**. You may request a printed version by contacting the Benefits Administration Office:

**Benefits Administration Office**
**Colburn Hill, Entrance C**
**Lebanon, NH 03756**
**603.653.1400**
**DHBenefits@Hitchcock.org**

44

A-538



UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, MD,       )
                                   )
          Plaintiff,               )
     v.                            )   2:17-CV-194
                                   )
DARTMOUTH-HITCHCOCK MEDICAL        )
CENTER, DARTMOUTH-HITCHCOCK        )   March 27, 2025
CLINIC, MARY HITCHCOCK MEMORIAL    )
HOSPITAL, and                      )
DARTMOUTH-HITCHCOCK HEALTH,        )
                                   )
          Defendants.              )
                                   )

------------------------------------------------------------

BEFORE THE HONORABLE KEVIN DOYLE
UNITED STATES DISTRICT JUDGE

------------------------------------------------------------


TRIAL

VOLUME 4   Pages 645 to 787

APPEARANCES:

For the Plaintiff:

ERIC JONES
GEOFFREY J. VITT
SARAH H. NUNAN


For the Defendants:

DONALD W. SCHROEDER
MORGAN McDONALD
TRISTRAM J. COFFIN


Jan-Marie Glaze, CCR, RPR, CRR       Certified Court Reporter

Thursday, March 27, 2025

Morning Session

* * *

THE CLERK:  Your Honor, the matter before the Court is Case No. 17-CV-194, Misty Blanchette Porter vs. Dartmouth-Hitchcock Medical Center, et al. Appearing on behalf of the plaintiff are attorneys Geoffrey Vitt, Eric Jones, and Sarah Nunan.  Present on behalf of Defendants are attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We are here currently for a hearing on a motion in limine and a jury trial.

THE COURT:  Good morning.

Just to confirm, Plaintiffs haven't filed a written response to the defendants' motion.

MR. JONES:  We have not.

THE COURT:  Okay.

MR. COFFIN:  I think we have an agreement on that, Your Honor.

THE COURT:  Oh, okay.

MR. COFFIN:  I'm happy to speak to it. Please correct, Mr. Jones, if I get anything wrong.  As of this morning, I believe the plaintiff's position is they're agreeable to removing the narrative report portion from Dr. Bancroft's submission, and that that

would not be introduced into evidence.  So they would, I guess, not oppose our motion in limine.

Remaining for some discussion at the appropriate time is how we handle the chart and the assumptions and whether those are a demonstrative exhibit that they talk about in front of the jury or actually are introduced into evidence in which case it would go back to the jury room.  I believe our position will be, although I would like to see how the evidence rules out a little bit, that we will oppose the chart and the assumptions being used as substantive evidence, but we do not oppose them as being demonstrative evidence.  That's our view on things.

THE COURT:  Okay.  So then the expert, Dr. Bancroft, could make reference to his chart, he could make reference to his assumptions on the stand, just that neither one of those documents would --

MR. COFFIN:  That's right -- sorry.

THE COURT:  Neither of those documents would go back to the jury?

MR. COFFIN:  Yes.  But I think more than that, I assume he would display them and use them as part of his testimony and then we will have a discussion at the appropriate time whether to admit them as substantive.

A-543

MR. JONES:  We do intend to offer it as substantive evidence and have it admitted as an exhibit.  We will have that disagreement at some point, but everything else that Mr. Coffin said, I believe, is correct.  We have a new marked Exhibit 1B.  We recently removed the cover report, but the remainder of his report we propose to use both as substantive and demonstrative evidence.

THE COURT:  And that consists of the chart and the assumptions?

MR. JONES:  Correct.

THE COURT:  Okay.  So when you say "at the appropriate time," when Dr. Bancroft takes the stand and Mr. Jones attempts to show him his chart and wants that to be shown, you're saying that's not something we need to discuss because it won't be opposed at this time for him to be able to look at his chart during his testimony.

MR. COFFIN:  Correct.  And my request would be that the Court hear his testimony both on direct and cross and then make a decision about whether it is appropriate to submit as demonstrative evidence.  At the end of our -- when we hear what he testifies to on direct and cross, we may not oppose as admitting it as substantive evidence.

THE COURT: Okay.

MR. COFFIN: At this point, he can use it as demonstrative evidence.

THE COURT: Okay. Mr. Vitt?

MR. VITT: I'm on my feet because I'm going to be putting Dr. Bancroft on the stand.

THE COURT: Okay.

MR. VITT: I want to be certain that I can show him his chart and it will come up in front of the jury because he has to explain what's on the chart, and nobody -- well, I don't want to say "nobody," but most people can't keep those numbers in their head; they have to look at it. So I want to be clear, he gets on the stand, I show him the chart, it comes up in front of all the jurors.

MR. COFFIN: Certainly. The only question is whether, at the end of the trial, it goes back into the jury room with the other exhibits as substantive evidence.

THE COURT: Right.

MR. VITT: We can deal with that later.

THE COURT: Right. So for purposes of today, we're on the same page about it can be used. We'll make a decision at the appropriate time as to whether it's substantive evidence, demonstrative. And then if

it's only used as a demonstrative kind of a question, and if it's not back in the jury room, and assuming the jury wants to reach the question of damages in this case, if they ask to come back out and look at it as a demonstrative, presumably that would be -- is it a distinction without a difference? Are they still essentially kind of the same?

MR. COFFIN: I need to process that a little bit, Your Honor. It feels like a bridge we can cross when we get there.

THE COURT: Yeah. Okay. All right. Well, that was easier than we thought.

Mr. Schroeder?

MR. COFFIN: Buckle up.

MR. JONES: We try to cooperate where we can.

MR. SCHROEDER: Judge, we gave an initial list of stipulated exhibits. I have three or four more. I'm going to try to get with Plaintiff's counsel and try to streamline that upfront so that hopefully when we start at nine, we'll be able to move things along. If we have to put them in, we'll put them in, but hopefully at the front end, we can just have them marked and then we'll proceed, but I'll confer with Plaintiff's counsel on that.

THE COURT: So before I bring the jury back

CERTIFICATE


I, Jan-Marie Glaze, RPR, CRR, Pro-Tem Court Reporter for the United States District Court for the District of Vermont at Burlington, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.


I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


_____
JAN-MARIE GLAZE
COURT REPORTER

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, MD,        )
                                    )
            Plaintiff,              )
      v.                            )   2:17-CV-194
                                    )
DARTMOUTH-HITCHCOCK MEDICAL         )
CENTER, DARTMOUTH-HITCHCOCK         )   March 28, 2025
CLINIC, MARY HITCHCOCK MEMORIAL     )
HOSPITAL, and                       )
DARTMOUTH-HITCHCOCK HEALTH,         )
                                    )
            Defendants.             )
                                    )

-----------------------------------------------------------

BEFORE THE HONORABLE KEVIN DOYLE
UNITED STATES DISTRICT JUDGE

-----------------------------------------------------------

TRIAL

VOLUME 5    Pages 788 to 981

APPEARANCES:

For the Plaintiff:

ERIC JONES
GEOFFREY J. VITT
SARAH H. NUNAN


For the Defendants:

DONALD W. SCHROEDER
MORGAN McDONALD
TRISTRAM J. COFFIN


Jan-Marie Glaze, CCR, RPR, CRR      Certified Court Reporter

MR. VITT:  No, Your Honor.

MR. SCHROEDER:  No, Your Honor.

THE COURT:  Okay.  So the agreement, with respect to Dr. Bancroft, just want to be clear on this, so the chart, based on the conversation yesterday morning is something that there's no objection to that being used at least as a demonstrative for purposes of today.  Mr. Coffin?

MR. COFFIN:  Yes, and the assumptions and the assumptions underlying it, Your Honor, but not the underlying report portion.

MR. VITT:  The answer is yes.

THE COURT:  So the assumptions also are okay between the parties.  Okay.  All right.  Thank you.  Then we'll bring the jury in.

(Jury present.)

THE CLERK:  Your Honor, the matter before the Court is Case No. 17-CV-194, Misty Blanchette Porter vs. Dartmouth-Hitchcock Medical Center, et al.  Present on behalf of Plaintiff are attorneys Geoffrey Vitt, Eric Jones, and Sarah Nunan.  Present for the defendants are attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We're here for Day 5 of the jury trial.

THE COURT:  Good morning.  Has anyone spoken

Certainly, they were also having challenges with coverage in obstetrics, and Dr. Porter would not have been able to really provide that part of obstetrical coverage call.

MR. JONES:  Your Honor, I have no further questions at this time.

THE COURT:  Okay.  Cross.

MR. SCHROEDER:  Your Honor, I don't have any questions at this time.  We'll reserve the right to call Dr. Padin in our case in chief.

THE COURT:  Okay.  Thank you, Dr. Padin.  You may step down.

MR. VITT:  I'll get the next witness.

THE COURT:  Okay.

THE CLERK:  Raise your right hand, please.

**Robert Bancroft**, witness herein, being first duly sworn on oath, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you, sir.  Counsel, do we still need ID 2 up at the witness stand, the deposition of the previous witness?

MR. JONES:  Is it still up there?

THE CLERK:  I believe so, yes.

Sir, if you would state and spell your name

please.

THE WITNESS:  My name is Robert Lewis Bancroft.

THE COURT:  If you would spell your name, sir.

MR. VITT:  Spell your name.

THE WITNESS:  B-a-n-c-r-o-f-t.  I apologize, I'm hard of hearing and I even have hearing aids in, but driving too many tractors.

MR. VITT:  I'll try and speak up, and if I'm not loud enough, give me a high sign.

### DIRECT EXAMINATION

BY MR. VITT:

Q    What's your name, please?

A    Robert Bancroft.

THE COURT:  Dr. Bancroft, can you hear me?

THE WITNESS:  Beg your pardon?

THE COURT:  Over here.  Could you please speak into the microphone?  Thank you.

THE WITNESS:  Robert Bancroft.

Q    (By Mr. Vitt) And where do you live?

A    In Westford, Vermont.

Q    What's your occupation?

A    Semi-retired, but I am still doing some consulting as an economist.

Q    Were you hired by Dr. Porter to calculate her lost earnings by reason of losing her employment at Dartmouth-Hitchcock?

A    I was.  I was retained by -- actually, by you for her.

Q    I was acting on behalf of Dr. Porter, right?

A    Yes.

Q    Okay.  A little bit of background.  Could we start with your education and start with college?

A    Okay.  College, I have a bachelor's in economics from the University of Vermont.  I have a master's in agricultural economics from the University of Vermont, and I have a Ph.D. in agricultural economics from Purdue.

Q    So can you provide kind of a sketch of what agricultural economics is?

A    Well, a lot of it deals directly with agriculture, but an agricultural economist deals with just about everything that a normal economist.  I think they -- the generally accepted difference is that agricultural economists tend to be more practical oriented as opposed to theoretical, and agricultural economists deal with labor, international trade, natural resources all across the board.

Q    Could we turn to your work experience?  After getting the Ph.D., what did you do?

A    Well, for a little while, I was getting my Ph.D., I had an opportunity to go to Washington, D.C.  They wanted me to build an econometric model, which I went down there, and as -- for my dissertation to get a Ph.D. so I worked down there after I got my Ph.D., worked at Economic Research Service in Washington, D.C.  And then I had the opportunity to return back to Vermont in '81 to the University of Vermont where I was an assistant professor in the Department of Agricultural and Resource Economics which is now Community Development and Applied Economics.

Q    You mentioned that the work at the Department of Agricultural involved econometric forecasting?

A    Yes.

Q    In a brief over-sketch, what does that entail?  Can you do it simply?

A    This is, I feel like, a six-credit course.  It entails looking at historical data and seeing if you can determine trends and use those trends and that information then to develop models that will forecast what people will do given certain criteria.

Q    So in August of 1981 you became an assistant professor at UVM, correct?

A    Yes.

Q    And you remained an assistant professor for how long?

Bancroft - Direct by Mr. Vitt

A    Until 1991.

Q    So ten years in that, right?

A    Yes.

Q    And then did you become an adjunct professor?

A    After I left in '91, I was an adjunct professor for about five years.

Q    So a total of 15 years teaching at UVM, correct?

A    Yes.

Q    Okay.  When did you begin offering testimony calculating economic loss?

A    Well, my first -- I came back to Vermont in August of '81, and I got my first economic consulting assignment in September, but we didn't have to do with litigation. My first involvement with forensic, or litigation, work was in 1982.

Q    All right.  And have you continued to do work in the litigation area since then?

A    Oh, yes.

Q    And in what types of cases have you worked?

A    Well, a variety.  The bulk of them are personal injury, wrongful death, employment, and commercial lost business profits.  Those are the major ones, but there's been some unusual ones.  I've been retained by the IRS to look at whether a rational person would make a certain investment.  And I've done things like viewed

A-554

a red herring prospectus for a company that was going public.

Q   So you -- have you developed or used a methodology for calculating lost earnings?

A   Yes.  Yes.  It's a pretty standard methodology, nothing unique about it.  Any forensic economist uses the same basic -- same basic methodology.  Different approaches to it, but it's still -- you could distill it down to it's projecting out what the person would have earned and compare that with what they're likely to earn.

Q   All right.  Have you appeared often in the courts of Vermont as an expert witness?

A   Yes, I have.  I've testified in every single court in Vermont except for Essex County.

Q   So all the state courts in Vermont other than Essex you've testified in, right?

A   Yes.

Q   And have you been an expert witness in courts in the federal courts in Vermont?

A   Yes, I've testified in all three -- this courthouse, Rutland, and Richland.

Q   Did you prepare a report recently to calculate Dr. Porter's economic loss that has been sustained as she'll continue to sustain reflecting her losses because she's no longer an employee at

Dartmouth-Hitchcock?

A    Yes, I did.

MR. JONES:  Your Honor, what we've done is taken the report that you've seen before and we removed the first page, and it's been marked as Plaintiff's Exhibit 1-B, and what I would like to do is to show the report to Dr. Bancroft -- can you indulge me one second?

THE COURT:  Yes.

MR. VITT:  We can pull it up on the monitor.

THE COURT:  Exhibit 1-B has been shown to opposing counsel?

MR. VITT:  Yes, they have.

MR. COFFIN:  Your Honor -- a couple things, if you could just speak a little louder, I'm having a hard time discerning what you're saying.  And you keep saying "report."  I think you're talking about the chart?

MR. VITT:  Chart.

MR. COFFIN:  Charging assumptions because we have an evidentiary ruling on that.  1-B.

MR. VITT:  Yep.  1-B.  What I think I would like to do is move its admission now.

THE COURT:  Okay.  So that raises a question.  Would you like to approach?

Bancroft - Direct by Mr. Vitt

MR. COFFIN:  If we can approach.

THE COURT:  Yes.

(Bench conference.)

THE COURT:  So when you say "admission," you're treating it like an exhibit that's in evidence.

MR. VITT:  So I want to be able to obviously show it to the jury.

THE COURT:  Right, and the agreement is that it can be shown to the jury as a demonstrative.

MR. VITT:  And at the end, we'll figure out whether it's --

MR. COFFIN:  It specifically should be -- I suggest our position would be, it needs to be made clear to the jury that this is being shown to you for illustrative or demonstrative purposes but it is not admitted into evidence until it is.  There's a distinction there.

THE COURT:  All right.  So when you do that, when you ask it to be put up, we'll make that statement then.

MR. VITT:  Close enough.  I'll get to it.

(End of bench conference.)

Q    (By Mr. Vitt) I believe that the agreement is that the report, Exhibit 1-B, will be shown to you and it will appear on the screens so the jury has a way to follow

Bancroft - Direct by Mr. Vitt

your testimony, but it is not, at this time, being

offered in evidence?

     THE COURT:  Yes.  This exhibit, I'll instruct

the jury is meant to be illustrative.  It is not in

evidence at this time.

     MR. VITT:  Thank you.

Q  (By Mr. Vitt) What's the date, Dr. Bancroft, of the

most recent report that you prepared?

A  March 19th of this year.

Q  And is the -- what's been marked as Exhibit 1-B that

report?

A  I assume so, I don't see a mark on this.  Oh, I do now.

Q  All right.  So is this the most recently report you

prepared, correct?

A  Yes.

Q  And does it reflect your analysis of Dr. Porter's lost

earnings by reason of losing her employment at

Dartmouth-Hitchcock and then becoming employed at

UVMMC?

A  Yes.

Q  And the lost earnings are for what period of time?

A  From year 2017 through -- I made projections through

the year 2033.

Q  All right.  You're not asserting that Dr. Porter would

necessarily work until she's 70, correct?

A    That's correct, I'm not.

Q    But you simply provided, by year, what the losses would be up to that age, correct?

A    Yeah.  That's correct.  You can look at any particular year, and there's a loss associated with it.

Q    And how do you begin your analysis?

A    Well, to begin my analysis, I have to get information. The support that I get, biographical information, date of birth, education level, and obviously in employment cases, termination cases, I need a date of termination. And then once I sort of understand the -- some of the parameters of the case, I'm going to require additional information regarding the employment that the person was terminated from.

     I need information regarding wages that the person was receiving, and information on fringe benefits.  I need tax returns.  And then if the person, as in this case, they have found alternative employment, sometimes that's not the case, but I do the same thing.  I look at what their salary is, or wages, and the fringe benefits associated with it.  And I didn't mention income tax returns right up to present.

Q    And did you receive from Dr. Porter the information you described, the tax returns, W-2s, the information that allowed you to calculate what she was earning at

Dartmouth-Hitchcock?

A    Yes.

Q    And did you also receive that same information from University of Vermont and University of Vermont Medical Center?

A    Yes.  Dr. Porter provided that to me, yes.

Q    Okay.  Can you explain how you undertook your analysis and reached your conclusions?

A    Sure.  As I mentioned, the -- if you will, kind of two basic steps.  First step is to estimate out what the person what I believe is a reasonable estimate what the person would have made if they had continued employment.  In this case, continued -- Dr. Porter had continued her employment at Dartmouth-Hitchcock.  And then from that, I need to estimate out what -- actually, I'll have her actual earnings, and then going forward, I've got to project out what she would likely to make now that she's no longer there.  Then I've got to compare those two, and then there's several steps before I get to what I would classify the present value of the losses in any particular year.  I can go through those individual steps if you would like.

Q    Yeah.  If you can continue on the individual steps, I would appreciate it.

A    Yeah.  Right.  Looking at the chart, I think the first

column -- well, the first column is year.  Second column is age.  The first column that requires some forecasting is under the Dartmouth-Hitchcock Medical Center, and it's under the gross earned income.  And here, this is where I developed the projections of what I believe are reasonable estimates of what I believe Dr. Porter would've made if she continued to work at Dartmouth-Hitchcock.

In developing those estimates, I looked at what her past earnings were, what her current contract was, and then there was a little -- 2017 was a bit unusual because she was on disability for part of the year, so I had to take that into account for 2017, but --

Q    For 2017, did you include the amount she received in disability payments when you're calculating the gross income for the year?

A    Yes, I did.  But then starting in 2018, I just based on what she would receive as a salary as a doctor at Dartmouth-Hitchcock.  In developing those forecasts, I used -- in most years, I used -- I assumed that her wages would grow at an annual rate of 2.5 percent.

Q    Did you believe that was reasonable?

A    Yeah.  That's significantly below what the average wages have grown.  I don't care what -- any length of period.  If you use 10, 15, 20, 30 years, it's up in

Bancroft - Direct by Mr. Vitt

the three to three and a half percent.

Q    So the number you chose was lower than historic data?

A    Yes.  Yes.

MR. COFFIN:  Objection, Your Honor.  This is all totally leading, and I understand that he needs to set the foundation, but the witness should be testifying, not Attorney Vitt.

THE COURT:  Okay.  Sustained.

You'll have some leeway, Mr. Vitt.  I understand it's an expert witness.

Q    (By Mr. Vitt) Will you continue, please?  We were at the 2018 -- you assumed an increase of 2.5 percent.

A    Yes.  I assumed -- for most years, I assumed an increase of 2.5 percent.  There were three exceptions to that annual increase of 2.5.  The first one was -- and I assumed the increases would happen in July of each year; that's the fiscal year for Dartmouth and that's when raises went into effect, in July.

I assumed that in the year July of 2018 that she would receive a 5 percent salary increase because she would be promoted to a full professor.

And then the other two exceptions were in the years 2000 and 2021, I assumed no increase.

Q    2020 and 2021?

A    2020, and 2021.

Q    Go ahead.

A    That there would be no increases, and that was based on information that was provided by Defense saying that there were no increases during those two years.

Q    Those were the COVID years?

A    Yes.

Q    And so, essentially, Dartmouth-Hitchcock, the representation was, that there would be no raises, and we were prepared to accept that, right?

A    I had -- yes.  I accepted it, and I had no way to verify it, so I accepted it.

Q    And did you make an assumption about whether there would be raises subsequent to the COVID years to essentially make up for the two years of, you know, no raises?

A    No.  I used the conservative two and a half percent, you know, recognizing that, you know, when you can forecast out into the future, you pick what you think is a reasonable rate.  You're not saying that every single year would be exactly that rate, but on average, over the forecasting period, that it would -- would be what you're assuming.  In this case, I'm assuming two and a half percent which, again, I believe to be a very conservative estimate of --

Q    Just to be -- to recap it, for those two years, the

COVID years, 2020 and 2021, your report assumes no raise for Dr. Porter, right?

A   That's correct, yes.

Q   Okay.  Continue, please.

A   So anyway, I took her basically -- for 2018, I took her salary that she had -- contracted salary in 2017 -- actually it went from July of 2017 through June of 2018, so I used that as the basis, and then I applied a two and a half percent in 2018.  2019 I applied the 5 percent.  Then no increases in '20 and '21, and then after that, an increase of two and a half percent.  That's how I was able to develop that first column there on the gross earned income under the Dartmouth-Hitchcock Medical Center estimates.

Q   So the June 2017 date was used because that's when she ceased to be employed by Dartmouth-Hitchcock, correct?

A   That's correct, yes.

Q   Okay.

A   The next column over is my estimate of the fringe benefits that she would have received if she remained employed at Dartmouth.  Typically, there are three fringe benefits that I'm generally interested in.  One is the employer's contributions to Social Security, the employer's contribution to health insurance, and the employer's contribution to retirement.

Bancroft - Direct by Mr. Vitt

In this particular case, I wasn't concerned about Social Security because that contribution only goes up to about -- currently it's about $150,000, so the earnings were all over that, so there's no loss on that contribution that Dartmouth would have made to Social Security, because there's a similar contribution being made at UVM.

Q   So because the contribution was equal, there's no loss, correct?

A   Correct.  It washes so it was excluded from my estimates at Dartmouth and also when I get to the UVM, it was excluded from the UVM fringe benefits.

And then the next one was I looked at was medical insurance.  And medical insurance, the only years that I put Dartmouth's contribution to medical insurance was the six months or so of 2018 after she was let go, and then for, I think, it was through April of 2018, because after April, she got a position at UVM where she got medical insurance.  So, again, going forward from May of 2018, the value of Dartmouth's medical insurance was equivalent to the value of the UVM contribution of medical insurance, so it's a complete wash.

Q   All right.

A   So it's not included in there.

Bancroft - Direct by Mr. Vitt

A-565

Q    All right.

A    The other factor that is included in there is Dartmouth's contribution to retirement which, based on my analysis, is equivalent to about 12 percent of her earned income.  And in her case, she was actually able to be grandfathered in.  She has what is called -- referred to as a defined benefit package.  That is it's -- not many of those around anymore; State of Vermont has one -- where your retirement is based on the average of three to five years, your number of years of creditable service, and then some percentage.  And she was able to be grandfathered into that.  Dartmouth, at that time, in that 2017 period, was moving to a defined contribution where she would put in an X amount of money every year into an account.

Q    What I'm hearing you say is that Dr. Porter qualified for a defined benefit plan at Dartmouth-Hitchcock, right?

A    Yes, she did.

Q    And if she had remained at Dartmouth-Hitchcock, she would have been eligible to receive the payments under that plan, correct?

A    Yes.

Q    And did you calculate -- I realize it's not reflected in the report, but did you calculate what would have

been the payment to her yearly if she retired when she was 65 under the terms of that plan?

A    I did at 65.  I did it for several years.

Q    All right.

A    I looked at if she retired at 65.  I actually looked at it earlier.  There's a reduction in your benefits if you retire before 65.

MR. COFFIN:  Objection, Your Honor.  If we could approach, please?

THE COURT:  Yes.

(Bench conference.)

MR. COFFIN:  The fact that she would lose a pension is nothing that was raised in the report.  And, in fact, our evidence is that she is going to get a pension.  She would get a pension that is somewhat smaller than if she had stayed at Dartmouth but prorated, based on her contributions and her years there.  So for him to -- if you would, please.  For him to, at the very last minute, offer all these changes in this report that this is a new undisclosed expert opinion is improper.

THE COURT:  Go ahead.

MR. VITT:  This was simply predicate for to get Dr. Bancroft to say, essentially, that the calculation in that report reflects the damages.  We

are not asking for any more.  It was simply an example of why there is -- in the report, there is an analysis that reflects the loss of the retirement benefit.  It's already in there.  It's baked into those numbers, so I'm not saying that there's an additional loss.  It's simply saying, okay, what would she have received, having calculated that it is reflected in the report.

MR. COFFIN:  It is not spelled out as such in the report so it's completely opaque.  It should have been noticed early.  And, in addition, I think it's untrue.

MR. VITT:  Okay.  Well, you took his deposition.  You had an opportunity to call an expert witness if you wanted to put somebody on who was going to prepare a report to say that.  You were entitled to do that.  We think the report is accurate.  You can cross-examine him on it, but this is not something that we hid or tried to sneak in.

MR. COFFIN:  It's an undisclosed expert opinion.  I don't know what your motives were, but it was not disclosed.

THE COURT:  It's not this is something that was in the assumptions is that your --

MR. COFFIN:  Yes.

MR. VITT:  He has described how he calculated

Bancroft - Direct by Mr. Vitt

it.  This amount is in there.  It is already baked into his analysis.

THE COURT:  Was this something that was discussed at the evidentiary hearing?

MR. VITT:  No.

MR. COFFIN:  And let's not forget, there's been five reports, the deposition of this expert occurred in 2019.  There was one in August 2024 which, as you know from the hearing, we had significant problems with, which resulted four days after our cross-examination of him, him offering a new report which reduced his calculations by $2.6 million, and that's a significant change.

And so, like, for them to come in today and offer a new additional opinion, there's another hidden time bomb in our opinion.  I think is not what expert opinion is for.

THE COURT:  It does seem to be kind of a new aspect of the analysis that I haven't heard of before.

MR. VITT:  Judge, we didn't get to this level of detail.  He can explain the report that you received, and the report that we gave to them had this in there.  That is -- he can describe how it's 12 percent and he has calculated this loss.  This is not new, not new at all.  This is -- this isn't some

Bancroft - Direct by Mr. Vitt

sort of something that we're pulling out of the air. This is the analysis that was reflected in that report, and it was reflected in the earlier report, Judge.

MR. COFFIN: It just wasn't stated that anybody could know about it except Mr. Vitt and Dr. Bancroft, and that's not what the purpose of expert discovery and disclosure and reports are for. This is a problem we've had throughout this particular expert witness' reports and testimony. It just seems like there's a lot of undisclosed information.

THE COURT: All right. So, you know, it seems like this is kind of a premise of the report that I'm hearing is undisclosed. And I'm kind of reluctant to allow this expert to testify to something that the other side hasn't had an opportunity to kind of probe.

MR. VITT: Judge, they had every opportunity -- it was in the first report. It has been in every report. This is not new. If they'd asked the question -- maybe the thing to do, Judge, so that I can -- instead of -- I think we should excuse the jury; I can have him explain it. It was in all the reports, this -- the loss of -- the loss of retirement amounts because Dartmouth-Hitchcock had a better plan than UVM has been in all the reports.

THE COURT: Okay. When you say has been in

Bancroft - Direct by Mr. Vitt

all the reports, what I'm hearing, the objection is this hasn't been spelled out as an assumption.

MR. COFFIN:  Or articulated in the narrative report describing what his calculations are.  It's hidden in the numbers which are numerous columns and repeated over 30 years.  It's not something set forth. It's something you have to find, and I think that is not right.

MR. VITT:  If he had been asked these questions, he would have been -- this is not something that we've been trying to hide.  I mean, there is no reason that we would hide this, Judge.  The loss, because we have -- and he has been saying Dartmouth-Hitchcock had a more generous retirement plan than UVM, and that loss is reflected in this.  He has been saying that.

MR. COFFIN:  My proffer to the Court would be that our expert would say that he is -- she -- she is going to get a continued benefit from this, and if we'd known this was spelled out, it might have been another reason to call an expert.  This is half-baked.

MR. VITT:  Wait a minute.  I haven't said that the there will not be a continued benefit; there will.  It is simply lower.

MR. COFFIN:  I thought you did say that to

him.

MR. VITT:  No.

MR. COFFIN:  Well, it sure sounded like it was going to be lower, and that's when I stood up.

THE COURT:  In light of that, Mr. Coffin, is there any way that he can continue to testify about this?  Is this based on a mishearing of what he said?

MR. COFFIN:  Partially, perhaps that little portion of it.  But I still think it's an undisclosed expert opinion, and we've tolerated many, repeated disclosures of expert opinions as the assumptions have changed right up to the eve of trial, and we asked for our own expert and were not permitted to provide that kind of rebuttal.  So for them to change and disclose this other stuff is, to me, concerning.

MR. VITT:  Judge, the prior report reflected a significantly larger loss because Dr. Porter was planning to go to a .6 FTE and no call.  UVM wouldn't, and we're going to have this explained.  UVM would not accept it and, as a result, she's testified, I've stayed at .75, with call.  So she'll be working with call.

So, yes, has there been a reduction?  Significant. Because she had planned, if UVM had agreed to it, she would have gone to .6 with no call, and as she can

Bancroft - Direct by Mr. Vitt

testify, and as Dr. Bancroft would testify, call is a big issue. They need people to take call. So if you're not prepared to take call, you can still be employed but at a significantly reduced salary. So we took the new information, which I'm kind of surprised they're complaining we reduced the demand.

MR. COFFIN: I'm not complaining about it. I'm complaining about the timing of it.

MR. VITT: Well, the decision for UVM to say no is quite recent, so it's not like we were hiding this.

THE COURT: Okay. So this is a bit of a problem that we have here, it seems. This particular feature of his testimony is something that I'm hearing that the defense did not really have, and you're saying it's been in the report, but I'm not hearing it being articulated as it was kind of spelled out that this was kind of part of the analysis, and I would be reluctant to allow him to continue to testify on this point if the defense is telling me that they didn't really quite appreciate this facet of his analysis. It seems only fair that they should have that ability to probe that, but they're hearing about it now for the first time is what they're telling me.

MR. VITT: Judge, I think that the only

Bancroft - Direct by Mr. Vitt

reason that they're hearing about it for the first time is they didn't ask. So rather than have me try and explain it, you know, to the best I can, if I could suggest perhaps the jury be excused and I can have him explain how this is baked into this report. It's been -- it's been true from Day 1. It's been true from the first report that we submitted. The first report had a loss associated with the retirement. First report. Seven years or whatever it was.

MR. COFFIN: If it was hidden then and it's still hidden, the fact that we have this and are just learning this on Day 5 of the trial doesn't solve our problem of prejudice.

THE COURT: All right. Well, I would be inclined to hear from him just so I have a better understanding of kind of the factual argument which is not prepared, and we can hash it out more outside the presence of the jury.

MR. COFFIN: Fair enough. As a joinder as you listen, remember that we will be listening to this for the first time as you will.

THE COURT: Okay.

(End of bench conference.)

THE COURT: So, members of the jury, I'm going to ask you to retire to the jury room. There is

some items that I need to discuss with counsel, so I'll ask you to retire at this time.

(Jury exits.)

THE COURT:  So, Mr. Vitt, you were going to conduct an examination of Dr. Bancroft on this specific issue.

MR. VITT:  Right.

**VOIR DIRE**

**BY MR. VITT:**

Q    Dr. Bancroft, I want to focus now on the retirement loss that Dr. Porter will experience by reason of the facts that she will not be eligible to receive the full, sort of, package that she would have received had she continued until she was 65.  All right?

A    Yes.

Q    Is the -- do you make an assumption that Dr. Porter would receive -- would continue to receive, a retirement amount from Dartmouth-Hitchcock even though she was terminated?

A    Yes.  She's qualified for a pension -- I don't know if you want to call it a pension or retirement fund, annuity -- based on her employment up to 2017.

Q    And has that analysis been reflected in all of the reports that you've prepared for Dr. Porter?

A    Yes.

Q    Can you explain how that's factored into the analysis?

A    What -- in my analysis, I looked at what the additional benefits would be upon retirement over and above what she is entitled to for the years that she did work there.  I looked at those benefits over her lifetime. I made projections for each year, and then based on that, I looked at how much would have to be contributed in each year beyond 2017 to be able to fund that future retirement stream, and that's how I derived up with the 12 percent figure.  That's the value each year, 12 percent of her salary would be, if you will, invested, and in return it will generate a higher retirement income for her.

Q    And that analysis has been included in all of your reports, has it not?

A    Yes.

Q    All right.  And if you had been asked in your deposition "how did you factor in the retirement loss?" you would have provided exactly that explanation, would you not?

A    Yes.

THE COURT:  Anything further?

MR. VITT:  I -- no.  I'm not sure how to proceed now.  That is, when -- I hear what the lawyers for Dartmouth-Hitchcock are saying.

Bancroft - Voir Dire

THE COURT:  Well, at this time, I'll give an opportunity for Defense to speak to Dr. Bancroft.

MR. VITT:  All right.

MR. COFFIN:  I have a few questions, if I may, of the witness.

THE COURT:  Yes.

MR. COFFIN:  Very few.  I'd like to do it up there, Geoff, if that's okay.  I'll sort of park here.

MR. VITT:  I'll move over.  You need the mic anyway.

BY MR. COFFIN:

Q    All right.  Dr. Bancroft, how are you?  Good to see you.

So what I heard you say just now was a little different than what I thought I heard you say before we left -- excused the jury, and that is you have considered and calculated into your analytical chart that she does receive some residual benefit --

A    Yes.

Q    -- even though she's left Dartmouth, right?  Is that right?

A    Yes.  I'm estimating what the value is of the additional benefits.  That's what I did.

Q    Okay.

A    Additional benefits.

Bancroft - Voir Dire

Q    Okay.  And what is your amount for the additional benefits per year?

A    12 percent.  Each year that she worked beyond 2017, the value of the contribution that Dartmouth would have made that she ultimately would have been able to draw on when she took retirement is equivalent to 12 percent of her salary.  That's not -- that's just the additional benefits that she received for working one more year.

Q    Okay.  I'm asking a slightly different thing, which is, for her defined benefit, which I'll call her pension that she would continue to receive anyways, even though she's now an UVMMC employee, that she would continue to receive from Dartmouth, what's the annual amount that you've assessed that at?

A    What was her --

Q    Yeah.

A    I don't remember exactly what her -- I saw it.  There was a calculation provided to her for what her benefit would be based on her time at Dartmouth up through 2017.  It was over $100,000 a year, but I don't remember -- I don't remember the precise figure.

Q    Okay.  So you don't remember that figure even though you're prepared to come in and testify about this chart today, right?  "Yes" or "no," right?

A    Yeah.  I can't tell you the precise figure.  It's over $100,000.

Q    And you agree, I think, that it's not spelled out in your narrative report, correct?

A    Well, I don't know how you want to interpret that. What I estimate is the additional value of her working another year at Dartmouth, what the value of Dartmouth's contribution would be to her retirement plan.

Q    I'm asking a different question.  Nowhere in your four different narrative reports was this fact stated, correct?

A    Not in the words you have, but I don't state it that way.

Q    Okay.  That's an answer to my question.  Thank you.
      Next question:  It's not stated from the face of your analytical chart that you have shown the jury, is it?  "Yes" or "no."

A    I'm not saying that.  But what I do say is that I'm estimating the additional benefits.  Implied in that is that there are some basic benefits.

Q    And it's not stated in the assumption that is you've provided to us in those five -- four different reports?

                MR. VITT:  I object.  It is in the assumptions.