# 25-1382-cv(L), 25-3155-cv(XAP)

## United States Court of Appeals
### for the
### Second Circuit

MISTY BLANCHETTE PORTER, M.D.,

*Plaintiff-Appellee-Cross-Appellant,*

– v. –

DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, DARTMOUTH-HITCHCOCK HEALTH,
DARTMOUTH-HITCHCOCK MEDICAL CENTER,

*Defendants-Appellants-Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT (BURLINGTON)

**JOINT APPENDIX**
**Volume 3 of 6 (Pages A-579 to A-875)**

DONALD W. SCHROEDER
MORGAN MCDONALD
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199
(617) 342-4041
– and –
TRISTRAM J. COFFIN
DOWNS RACHLIN MARTIN PLLC
199 Main Street,
P.O. Box 190, 6th Floor
Burlington, Vermont 05402
(802) 863-2375

*Attorneys for Defendants-Appellants-
Cross-Appellees*

SARAH NUNAN
GEOFFREY J. VITT
VITT & NUNAN, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, Vermont 05055
(802) 649-5700
– and –
ERIC D. JONES
LANGROCK SPERRY & WOOL, LLP
210 College Street, Suite 400
Burlington, Vermont 05401
(802) 864-0217

*Attorneys for Plaintiff-Appellee-
Cross-Appellant*

CP COUNSEL PRESS   (800) 4-APPEAL • (390775)

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, filed October 11, 2017 ............................ A-35

    Attached to Complaint -
    Civil Cover Sheet..................................................... A-68

First Amended Complaint, filed August 1, 2018 ....... A-69

Certificate of Service of First Amended Complaint,
    filed August 1, 2018................................................ A-105

Defendants' Answer to Plaintiff's Amended
    Complaint, filed September 7, 2018 ...................... A-106

Mandate in Docket No. 20-3894, issued on
    February 27, 2024 .................................................. A-133

Order of the United States Court of Appeals for the
    Second Circuit, filed February 27, 2024................ A-134

Motion *In Limine* by Defendants to Preclude the
Testimony of Robert Bancroft, filed
February 14, 2025 ....................................................... A-234

Memorandum of Law by Defendants in Support of
Motion *In Limine*, filed February 14, 2025 .............. A-237

    Exhibit A to Memorandum of Law -
    Expert Report of Robert L. Bancroft, dated
    October 30, 2018 .................................................... A-247

    Exhibit B to Memorandum of Law -
    Expert Report of Robert L. Bancroft, dated
    October 1, 2019 ...................................................... A-253

ii

                                                                    **Page**

Exhibit C to Memorandum of Law -
  Deposition Transcript of Robert L. Bancroft,
  dated October 30, 2019........................................... A-261

Exhibit D to Memorandum of Law -
  Expert Report of Robert L. Bancroft, dated
  August 26, 2024................................................... A-289

Memorandum of Law by Plaintiff in Opposition to
  Defendants' Motion *In Limine*, filed
  February 28, 2025................................................. A-296

Notice of Hearing, filed March 6, 2025...................... A-309

Reply Memorandum of Law by Defendants in
  Further Support of Motion *In Limine*, filed
  March 11, 2025 .................................................... A-310

Revised Notice of Hearing, filed March 13, 2025 ..... A-319

Transcript of Motion *In Limine* Hearing, dated
  March 14, 2025 and filed March 19, 2025 ............ A-320

Renewed Motion *In Limine* by Defendants to
  Preclude the Testimony of Robert Bancroft
  ("Renewed Motion"), filed March 20, 2025.......... A-424

  Exhibit A to Renewed Motion -
  Expert Report of Robert L. Bancroft, dated
  August 26, 2024
  (Reproduced herein at pp. A-290 - A-295)

  Exhibit B to Renewed Motion -
  Expert Report of Robert L. Bancroft, dated
  March 19, 2025.................................................... A-433

Memorandum of Law by Plaintiff in Opposition to
  Defendants' Renewed Motion, filed
  March 21, 2025.................................................... A-439

**iii**

**Page**

Order Denying Motion to Preclude Robert
Bancroft's Testimony, filed March 21, 2025 .........    A-442

Motion *In Limine* by Defendants to Preclude the
Expert Report, filed March 26, 2025 .....................    A-459

Motion *In Limine* by Defendants Regarding
Undisclosed Expert Opinions of Robert Bancroft,
filed March 29, 2025.............................................    A-464

    Exhibit 1 to Motion -
    Expert Report of Robert L. Bancroft, dated
    October 30, 2018
    (Reproduced herein at pp. A-248 - A-252)

    Exhibit 2 to Motion -
    Expert Report of Robert L. Bancroft, dated
    October 1, 2019
    (Reproduced herein at pp. A-254 - A-260)

    Exhibit 3 to Motion -
    Expert Report of Robert L. Bancroft, dated
    August 26, 2024
    (Reproduced herein at pp. A-290 - A-295)

    Exhibit 4 to Motion -
    Expert Report of Robert L. Bancroft, dated
    March 19, 2025
    (Reproduced herein at pp. A-434 - A-438)

Plaintiff's Opposition to Defendants' Motion *In
Limine* Regarding Undisclosed Expert Opinions
of Robert Bancroft, filed March 30, 2025 .............    A-474

    Exhibit A to Plaintiff's Opposition -
    Deposition Transcript of Robert L. Bancroft,
    dated October 30, 2019
    (Reproduced herein at pp. A-262 - A-288)

iv

**Page**

Exhibit B to Plaintiff's Opposition -
Transcript of Motion *In Limine* Hearing, dated
March 14, 2025
(Reproduced herein at pp. A-320 - A-423)

Exhibit C to Plaintiff's Opposition -
Excerpts from the Rough Draft of Robert
Bancroft's Trial Testimony ..................................... A-484

Exhibit D to Plaintiff's Opposition -
Plaintiff's Response to Defendant Mary
Hitchcock Memorial Hospital's First Set of
Interrogatories Propounded on Plaintiff, dated
April 20, 2018........................................................ A-488

Exhibit E to Plaintiff's Opposition -
Dartmouth-Hitchcock 2017 Benefits Guide .......... A-492

Excerpts from the Jury Trial Transcript, dated
March 27, 2025 (Day 4)......................................... A-540

Excerpts from the Jury Trial Transcript, dated
March 28, 2025 (Day 5)......................................... A-547

Excerpts from the Jury Trial Transcript, dated
March 31, 2025 (Day 6)......................................... A-599

Excerpts from the Jury Trial Transcript, dated
April 2, 2025 (Day 8)............................................. A-747

Jury Trial Transcript, dated April 7, 2025 (Day 11)... A-757

Court Jury Charge, filed April 7, 2025 ...................... A-844

Excerpts from the Jury Trial Transcript, dated
April 8, 2025 (Day 12)........................................... A-876

Jury Charge, filed April 8, 2025................................. A-895

Jury Verdict Form, filed April 10, 2025...................... A-929

v

**Page**

Motion by Plaintiff for Prejudgment Interest, filed
April 23, 2025 ...................................................... A-936

Opposition by Defendants to Plaintiff's Motion for
Prejudgment Interest, filed May 7, 2025 ............... A-940

Index of Exhibits to Defendants' Opposition, filed
May 7, 2025 ......................................................... A-955

Exhibit 1 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
October 30, 2018
(Reproduced herein at pp. A-248 - A-252)

Exhibit 2 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
October 1, 2019
(Reproduced herein at pp. A-254 - A-260)

Exhibit 3 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit 4 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
March 19, 2025
(Reproduced herein at pp. A-434 - A-438)

Exhibit 5 to Defendants' Opposition -
DH Simple Interest Chart 12% .............................. A-957

Exhibit 6 to Defendants' Opposition -
DH Simple Interest Chart 3% ................................ A-959

Motion by Plaintiff for Attorneys' Fees, filed
May 8, 2025 ......................................................... A-961

vi

**Page**

Exhibit 1 to Motion for Attorneys' Fees -
Declaration of Geoffrey J. Vitt, dated
May 6, 2025 ............................................................ A-973

Exhibit 2 to Motion for Attorneys' Fees -
Declaration of Eric D. Jones, dated May 7, 2025,
with Exhibit A ....................................................... A-981

Exhibit A to Motion for Attorneys' Fees -
Vitt & Associates' Invoices for Professional
Services Rendered ................................................. A-993

Exhibit B to Motion for Attorneys' Fees -
DGW Kramer LLP's Invoices for Professional
Services Rendered ................................................. A-1254

Exhibit C to Motion for Attorneys' Fees -
Vitt & Associates' Invoices for Professional
Services Rendered ................................................. A-1262

Motion by Plaintiff to Amend Judgment, filed
May 8, 2025 ........................................................... A-1397

Reply by Plaintiff in Further Support of Motion for
Prejudgment Interest, filed May 21, 2025 ............. A-1404

Exhibit A to Plaintiff's Reply -
Excerpts from the Draft Trial Transcript of
March 28, 2025 ...................................................... A-1413

Exhibit B to Plaintiff's Reply -
Excerpts from the Draft Trial Transcript of
March 26, 2025 ...................................................... A-1428

Motion by Defendants to Alter or Amend the
Judgment and, in the Alternative, for a New Trial
on Plaintiff's VFEPA Claim, filed May 22, 2025 .. A-1445

Opposition by Defendants to Plaintiff's Motion to
Amend Judgment, filed May 22, 2025 .................. A-1459

**vii**

**Page**

Motion by Defendants for a New Trial Related to
Damages Issues, filed May 22, 2025 ...................... A-1468

Index to Exhibits to Defendants' Motion for a New
Trial Related to Damages Issues, filed
May 22, 2025 ........................................................... A-1481

Exhibit 1 to Defendant's Motion -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit 2 to Defendants' Motion -
Demonstrative Excerpt from Expert Report of
Robert L. Bancroft, dated March 19, 2025 ............ A-1482

Exhibit 3 to Defendants' Motion -
Robert Bancroft Cross Examination Exhibit,
Marked C19 ............................................................ A-1484

Exhibit 4 to Defendants' Motion -
Email Correspondence, dated June 6, 2017, with
Attachment.............................................................. A-1486

Opposition by Defendants to Plaintiff's Motion for
Attorneys' Fees, filed May 22, 2025...................... A-1499

Opposition by Plaintiff to Defendants' Motion to
Alter Judgment, filed June 5, 2025 ........................ A-1512

Reply by Plaintiff in Further Support of Motion to
Amend Judgment, filed June 5, 2025 ..................... A-1523

Memorandum of Law by Plaintiff in Opposition to
Defendants' Motion for a New Trial, filed
June 5, 2025 ............................................................ A-1525

Reply Memorandum of Law by Plaintiff in
Response to Defendants' Opposition to Motion
for Attorneys' Fees, filed June 5, 2025 .................. A-1533

**viii**

|  | Page |
|---|---|

Exhibit A to Plaintiff's Reply Memorandum -
Itemized Chart and Invoices ................................. A-1542

Reply by Defendants in Further Support of Motion
to Alter Judgment, filed June 20, 2025 .................. A-1556

Reply Memorandum of Law by Defendants in
Further Support of Motion for a New Trial
Related to Damages Issues, filed June 20, 2025.... A-1566

Supplemental Memorandum of Law by Plaintiff in
Further Support of Motion for Attorneys' Fees,
filed June 25, 2025.................................................. A-1574

Excerpts from the Post-Trial Motions Hearing,
dated July 1, 2025 .................................................. A-1577

Second Supplemental Memorandum of Law by
Plaintiff in Support of Motion for Attorneys'
Fees, filed July 11, 2025 ........................................ A-1591

Exhibit A to Second Supplemental
Memorandum -
Chart (Attorneys and Paralegals)............................ A-1594

Exhibit B to Second Supplemental
Memorandum -
Chart (Fees for Four Attorneys)............................. A-1596

Exhibit C to Second Supplemental
Memorandum -
Statements from Vitt & Nunan ............................... A-1597

Exhibit D to Second Supplemental
Memorandum -
Statements from Langrock, Sperry & Wool .......... A-1604

ix

**Page**

Response by Defendants in Opposition to Plaintiff's
    Second Supplemental Memorandum in Support
    of Motion for Attorneys' Fees, filed
    July 18, 2025 ...................................................... A-1607

Judgment of the United States District Court for the
    District of Vermont, filed April 24, 2025,
    Appealed From (Doc. 297), with Notice to
    Litigants ................................................................ A-1612

Notice of Appeal by Defendants, filed
    May 27, 2025 ........................................................ A-1614

Order of the Honorable Kevin J. Doyle, filed
    July 7, 2025, Appealed From (Doc. 329) ............... A-1616

Order of the Honorable Kevin J. Doyle, filed
    November 26, 2025, Appealed From (Doc. 334) .. A-1619

Opinion and Order of the Honorable Kevin J.
    Doyle, filed November 26, 2025, Appealed From
    (Doc. 335) .............................................................. A-1630

Order of the Honorable Kevin J. Doyle, filed
    November 26, 2025, Appealed From (Doc 336) ... A-1685

Order of the Honorable Kevin J. Doyle, filed
    November 26, 2025, Appealed From (Doc. 337) .. A-1697

Amended Judgment of the United States District
    Court for the District of Vermont, filed December
    2, 2025, Appealed From (Doc. 338) ...................... A-1713

Notice of Cross-Appeal by Plaintiff, filed
    December 15, 2025 ................................................ A-1715

Amended Notice of Appeal by Defendants, filed
    December 16, 2025 ................................................ A-1717

THE COURT:  All right.  You can have an opportunity to speak to Dr. Bancroft again.  So I know this is kind of cross-examination, I really want to get at -- I want to allow him to answer so I can really understand the nature of the analysis instead of limiting it to "yes" or "no."

MR. COFFIN:  Fair enough.  I appreciate that, Judge.  Understand that I'm seeking the same thing, and I'm trying to get him to answer some questions with some precision for me as well, and I apologize for that.  And I have, really, kind of just one more set of questions, and maybe just one question.

Q    (By Mr. Coffin) So to calculate her benefit from that, you would need to reduce to present value, wouldn't you, her future earnings of this pension that she's going to receive anyway from Dartmouth, as part of the value of the benefit she still gets from Dartmouth, right?

A    Ultimately, that happens when I compute by adding -- estimating what the additional value of her retirement is, which I came to the 12 percent, then I carry that through across the table, and then it does get present value.  So in there, if you will, technically, it's looking at the present value of those future streams.  I don't project those future streams out on a sheet,

Bancroft - Voir Dire

but that's how I arrive at the 12 percent figure.

MR. COFFIN:  Those are all the questions I have, Your Honor.  I'm sure you have more, but I would say that is barely comprehensible to me and hard to define from the report in the middle of a trial.

THE COURT:  Okay.  Mr. Vitt?

**BY MR. VITT:**

Q    Do you have the assumptions there?

A    I do.

Q    Footnote 2?

A    Yes.

Q    Go to the end.  You describe what the Dartmouth-Hitchcock retirement plan contribution is assumed to be.  Do you see that?

A    Yes.

Q    So it's assumed to be 12 percent of her earned income, right?

A    That's right.

Q    And you calculate that for each year?

A    Each year, yes.

Q    And then you come to the present value of that, right?

A    Eventually, yes, along with her earnings.

Q    Right.

A    And certain calculations in between there, but, ultimately, I'm determining the present value.  And

included in that present value is the value of Dartmouth's contribution to her retirement plan, if you will, after she left in 2017.

THE COURT:  And for how many years forward?

THE WITNESS:  I'm sorry?

THE COURT:  For how many years forward do you apply that assumption in the analysis?

THE WITNESS:  Each one of these years, that's why I have the 12 percent.  In each year, I assume the value of what -- in order to fund the retirement for her, the additional amount, so she -- let's just -- for the sake of discussion, let's assume that she's going to get $100,000 a year for the work that she did.  Now, for each additional year that she works, I'm estimating that what she would get for benefits upon her retirement are equivalent to 12 percent in each year. So if she worked just 2018 -- well, 2018 -- let's have some medical in there.  So 2019, I'm estimating that Dartmouth's value of their contribution to her retirement is almost $39,000.  That $39,000 would have to be invested, and then if she was to retire and not work anymore and retire at age 65, she would -- they would need $39,000 invested at -- I forget what I used -- I think, six percent to generate the additional amount that she would receive.

Bancroft - Voir Dire

It's the same as -- it's not much -- the analysis I'm doing is very similar to a defined contribution, and UVM has a defined contribution. They're contributing nine percent. There's no guarantee with UVM because -- what the end value is going to be unlike Dartmouth with a defined benefit; they're guaranteeing what the value is going to be. Implicit in that, when their actuarial sat down and said, Well, we think we could earn this kind of benefit for the retirement. For each year she worked longer, we understand her retirement benefits are going to go up, and this is how much we need now invested so when she gets to 65, she'll be able to get those values. And I don't do it just for 65; I do it for 66, 67, 68, 69 and 70.

Q    (By Mr. Vitt) Right. I understand that and each of the reports that you prepared had the same analysis that we have just gone over, correct?

A    Yes.

THE COURT: Mr. Coffin, you were standing?

MR. COFFIN: At the appropriate time, I had a couple more questions.

THE COURT: For the witness?

MR. COFFIN: Yeah, questions for the witness.

THE COURT: Okay.

MR. COFFIN: If now is the time.

Bancroft - Voir Dire

A-583

THE COURT:  Sure.

**BY MR. COFFIN:**

Q    But, Dr. Bancroft, your report calculations that you've just described, those attribute a continuing benefit every year to Dr. Porter without considering the present value of the fact that she's still going to get a pension from them, albeit a slightly reduced one because she isn't contributing to it anymore.

A    I don't have to do that.  All I am interested in is what the additional value is going to be.  That's all I'm estimating, is what is the additional value of that retirement; that is, if she works one more year at a certain salary, how much more is she going to get in retirement benefits?  And then I say, okay, this is how much she's going to get in retirement benefits.  How much is needed in that particular year to be invested, and I believe I used six -- I might have used seven -- that would generate that additional value.

Q    Well, that's not spelled out in that, and it further raises the question that, you know, the whole point of this exercise is to compare the value of her income stream and benefits from UVM with those at Dartmouth, and that analysis doesn't take into the fact that she isn't just, you know, paying more into the Dartmouth fringe benefits.  She's going to get an income stream

for the rest of her life that is considerable and isn't accounted for in your analysis. And so that means that the damages between her UVM salary and her Dartmouth salary and fringe benefits are exaggerated.

A    No. Absolutely not. I am -- I'll say it for the umpteenth time, I am estimating what the additional value is of her retirement over and above what she's going to get; whatever she's going to get, whether it's $100,000 or $150,000, all I'm interested in, if she works one more year, how much is that going to go up?

So let's assume it's $100,000 she's going to get. She works one more year, she's going to get $125,000 a year. How much money needs to be invested now to generate that 125,000? That's all I'm estimating is -- what I'm estimating here is what she's lost by not working another year. I'm doing that with the income. I'm doing that for her salary. I'm doing that with the retirement.

MR. COFFIN: This is still an undisclosed expert opinion that we're getting in mid trial preceded by serial undisclosed expert opinions, and I don't think we should be subjected to it, Your Honor.

BY MR. VITT:

Q    Dr. Bancroft, when did you submit -- remind me, the first report was in 2018 or 2019?

Bancroft - Voir Dire

A    I believe it was '18, I believe.

MR. VITT:  So from 2018 through the present, the analysis has been the same, Judge.  We're not citing anything, and I -- it's not a charge that I take lightly.  You know, we didn't hide anything in this case.  We turned over all the information; we turned it over quickly.  We've made Dr. Bancroft available.  Have there been other reports?  Of course, there have been.  When the case is pending eight years, you have to account for the interest and account for other changes, and the -- there was a recent change in the bond.  You know, we tried to figure out present value.  We tried to bring this up to date so that it's current today.

And, apparently, Dartmouth-Hitchcock has an expert that hasn't been disclosed, and they're getting some different information, but that's not something that we can deal with.  All we can deal with is put Dr. Bancroft on the stand and say it's the same analysis he's had from the get-go, Judge.  And having this created at the list minute is unsettling, at best, and I don't think it's fair to us.  You know, it's been a long road here.  We've been straight up with Dr. Bancroft.  We've made him available.  We haven't tried to hide one single thing.

THE COURT:  All right.  Mr. Coffin?  By the

Bancroft - Voir Dire

way, what has been the previous, kind of, analysis of the expert's report? Was there a deposition? Was there previous questioning of this topic in the deposition? It's certainly, or at least hinted at in the assumptions, that there's a reference to retirement plans and percentages. So no questions at deposition to further refine the understanding --

MR. COFFIN: I was not deeply involved -- if I might, Mr. Vitt? -- I was not deeply involved in the deposition process. I've been getting involved with this more recently. But realize, Your Honor, obviously, the procedural posture of this case is unusual. It came out from a pause, and in August 2024, Mr. Bancroft issued a new opinion, which had raised the total economic loss at $4.3 million.

We had the hearing, we had some issues with the report, as you know. As a result of the hearing, we had what I would say is a completely different report which came out on March 19th, which we're looking at now, which moved the loss figure from $4.3 million to $1.7 million. So some big changes. And nowhere in there was this mentioned or spelled out. And, in a way, this is kind of one of the -- this is not the massive issue in the context of the other problems with the report, some of which we'll get with, but we just

Bancroft - Voir Dire

have just not had disclosure on this, and that's not how expert discovery is supposed to work.

THE COURT: Okay. I'm going to take a brief recess. I'll be back in a moment.

(Recess taken.)

MR. VITT: May I say something, Judge?

THE COURT: Yes.

MR. VITT: We went back and got the deposition of Dr. Bancroft. It was taken by somebody in Mr. Schroeder's firm. October 30th, 2019. And we begin asking about Footnote 2 which is the footnote we were talking about.

THE COURT: Oh, footnote is part of the assumptions.

MR. VITT: Yes. Yes. And then on Page 65, they say, "Could you walk me through how you came up with the 12 percent?" which was what Dr. Bancroft was just talking about. Didn't spend long on it, but they knew about it in 19 -- sorry, 2019.

There is just no surprises here, and Mr. Jones and I and my partner, Sarah Nunan, take pretty seriously to disclose items and not hide the ball from somebody, particularly this late in the game to be hearing that somehow that we're trying to pull a fast one. That didn't happen. We didn't do it. And they had an

opportunity, when they took the deposition to go through exactly the calculations that Dr. Bancroft was talking about. And if they didn't do it, that's on them.

THE COURT: Okay. So on that point, right, the 12 percent issue, so there's the percentage figure that he used in terms of the DHMC contributions, but what I'm hearing the argument today by Defendants -- and correct me if I'm wrong, is that the issue is about, kind of, the offset with respect to what she might -- Dr. Porter might continue to be receiving in her employment with UVMMC and kind of how that affects then the damages calculation in terms of the offset.

MR. COFFIN: Both of the issues are in play, Your Honor. That's an issue that I would raise with that, but still the late disclosure. And my brother wants to say something.

MR. SCHROEDER: May I be heard, Your Honor?

THE COURT: Yes. Why don't you come to the podium. I've heard you, Mr. Vitt, and you can have every opportunity to respond, if you'd like.

MR. VITT: I'll sit.

MR. SCHROEDER: It's interesting Mr. Vitt referred to the fact that Mr. Jones was involved in the case, I don't think Mr. Jones got involved in the case

until about two months ago.  In 2019, one of the associates in my group took -- at the time before she went in house -- took the deposition.  And what's interesting is, when you look at the calculations for the fringe benefits and you compare what would be at Dartmouth Health and then what there is for post-termination projections, there's zeros in that column in that report in October 1, 2019.

So, yes, he was deposed October 30, 2019.  And at that time -- at that time, the projections were it looks like somewhere 5. -- the numbers have gone all over the place, Your Honor.  In 2019, I think it was 5.4 or 6.4.  The copy I have is really hard to read.

The assumptions that were made, no matter what they were, are drastically different than the assumptions that are in the current report.  So whatever happened at the October 30th, 2019, deposition could not have anticipated five, six years later new assumptions that, in fact, don't reflect this one specific issue that my brother has said, Mr. Coffin.  In fact, the chart has zeros in that one column on fringe benefits.

So, you know, what's interesting is this case started -- at one point, the report said through 2033 the damages were 6.5 million.  Now they're down to

1.7 million.  That in and of itself suggests that there's a lot of inconsistencies with how we got to where we are today.  Setting aside the fact that we're on our fourth report, but the last two reports came well after Mr. Bancroft's deposition.  Thank you for letting me be heard.

THE COURT:  Sure.  Okay.

Mr. Vitt?

MR. VITT:  In terms of whether there's been a change, I'd have to defer to Dr. Bancroft.  I don't see it.

THE WITNESS:  No.  I don't have that report in front of me, but I believe that my projections at Dartmouth are the same numbers.

MR. VITT:  Right.

THE WITNESS:  The only difference being that new information that I got on the no increase for 2000 and 2001.

MR. VITT:  2020 and 2021.

THE WITNESS:  2020 and 2021 are the only changes in that column.  There are significant changes over in the UVM, but that's based on information that Dr. Porter provided me about how long -- how much, kind of, equivalent she was going to work.  The August report had her working .6 with no call, earning half of

what she's earning now or under half.  That's why the numbers were higher.

MR. VITT:  Right.

THE WITNESS:  There's been eight changes from the August report, five of them are due to the passage of time.

THE COURT:  Okay.  If you're done?

MR. VITT:  I think so.  I mean, if you have other questions.

THE COURT:  No, I don't have other questions, but look.  So given the nature of the issue of being raised by the defendants right now, right, so there's an allegation there was a non-disclosure.  I'll tell you, I'm not sure if this is a non-disclosure that really rises to the level of that impacts this report. I don't know that right now.  But it is an allegation that I'm not going to rush to make a judgment on right now.

So I want to hear from the parties in a written submission.  I want this to be filed by Sunday afternoon.  And I want to understand the exact nature of what the alleged non-disclosure is here.  I want to get Plaintiff's perspective.  I know you've articulated it to me today why you think it's always been part of the report, and Defendants had an opportunity to

examine it.

My law clerk did try to look through some of the deposition history in the case when we took a recess. I am not at all speaking definitively on this issue, but there does appear to be a section of the deposition which might be the same section you're referring to, Mr. Vitt, where whoever is doing the deposition for the Defendants kind of raises the contributions in terms of retirement, but then the next question then pivots to medical benefits and things of that nature.

So I'm not really clear on what the discovery history in this case, particularly as it pertains to this particular issue and, frankly, what the law might be on this. I mean, there's some law out there. We've kind of found a little bit of law in the last ten minutes, which I am very reluctant to rely on definitively right now, but that at least suggests, you know, an expert doesn't have to read from his chart, as in this case, like a script. There is, perhaps, an ability to explain and elucidate some of those concepts there. So issues here that I want to see kind of spelled out, and I really want to have an opportunity to think about this. I'm not going to rush to make a judgment on it.

I'm not really sure what the request is, by the

way, from the defendants.  If their allegation is true, that, obviously, potentially has significant impact on what we're doing here in this trial.  If it doesn't, if the law suggests that this is not what perhaps it seems to be, and this is not as significant an issue, well, then we go down a different road.  But as I say, I know it's going to slow it down, but this is not the kind of issue that should be rushed through.

Mr. Coffin?

MR. COFFIN:  Totally agree.  I'm sorry not to have raised this beforehand; just didn't foresee it.  And one and two, I imagine that as part of our briefing, the Court would like some, sort of, proposed remedies and practical solutions of what to do.

THE COURT:  Yes, of course.  I very much would like to hear that.  So I look forward to your submissions.  I plan on reading them this weekend and give this some considered thought.  All right, so we're kind of bouncing all over.

Mr. Jones?

MR. JONES:  Yeah.  I'm sorry.  It seems to me -- until I hear what that request is, it's hard to respond to it.  Can we somehow do a briefing schedule?

THE COURT:  I've thought about that, whether I ask the defendants to file their brief and then you

respond to it.  You know, it is the weekend, but you're all in trial.  So it won't shock you to be doing work over the weekend.  Perhaps, it does make some more sense to do it as Defendants articulate their position -- it technically is their objection, so what do you see as the problem here -- and then have a response to it.

Mr. Coffin?

MR. COFFIN:  Sure.  Whatever the -- we serve at the pleasure of the Court, so whatever you want.

THE COURT:  Yeah.  You know, that makes some sense.  I also want to be reasonable.  I know it's the weekend.  So if I ask the defendants to have their brief on file by tomorrow at four p.m.?

MR. COFFIN:  I certainly would like at least -- well, I was going to say Sunday or something, but...

MR. JONES:  We're Sunday.

THE COURT:  The only thing is...  So I don't want to --

MR. COFFIN:  If you want to do this so the witness can testify on Monday.

THE COURT:  Exactly, and I don't want to receive Plaintiff's response Monday morning because their brief was filed, you know, Sunday evening.

MR. COFFIN:  If 4:00 works.

THE COURT:  I can do it a little bit later.

MR. COFFIN:  Yeah.  Maybe give us 7:00?

THE COURT:  All right.  So how about Defendants will file their brief by seven p.m. tomorrow evening.  And then, Plaintiffs, your response then will be due by 5:00 on Sunday.

MR. JONES:  We'll have it.

THE COURT:  Okay.  So now, obviously, what that means for now, is that Dr. Bancroft is not going to continue testifying right now.  So I do want to talk to the parties.  The jury is coming back.  So Dr. Bancroft can be off the stand when the jury comes back, and what is your suggestion about what I say to the jury because, obviously, I do not want anyone to be prejudiced by them coming back and Dr. Bancroft is not on the stand.

MR. VITT:  Whatever you think is best.

THE COURT:  What I could say to the jurors -- and let me know how you feel about this.  So I'll say: As you can see, Dr. Bancroft is not on the stand right now.  I have asked the parties to address a legal question for me, and because of that, I've asked that Dr. Bancroft not continue his testimony today until I can have answers to that question I have.

Mr. Vitt, does that work for the plaintiffs?

MR. VITT:  That works fine.

THE COURT:  Defendants?

MR. SCHROEDER:  Certainly acceptable, Your Honor.  I suspect that no one on the jury is going to object to leaving early today.

THE COURT:  Yeah.  I think that's probably true.

And then I think Plaintiff said that there's another witness in the wings.  Do you have someone who can go on today?

MR. VITT:  I don't think so.  Hold on.

(Pause.)

MR. VITT:  I think not, Judge.  If it's all right with the Court.

THE COURT:  No.  This is obviously unpredictable.

MR. VITT:  Right.  It is.

THE COURT:  That's not a problem.  Okay.  So then, they'll come back in, I'll explain to them what happened and say that the trial day is over for today.  Okay?  All right.

THE WITNESS:  Up and out?

THE COURT:  Yes.

THE CLERK:  Yes, Dr. Bancroft.  Thank you.

(Jury present.)

THE COURT:  Good afternoon, members of the jury.  I'm sorry for the extended break.  You'll see that Dr. Bancroft is not on the stand right now, and that's only because I have asked the parties to address a legal issue with me, and I had actually asked for some kind of written submissions from the parties on it.  So until I get that, I've asked that Dr. Bancroft not continue until this particular question that I have is addressed.  Okay?

There is not another witness lined up today, so the long and short of it is, you're going to be dismissed early today, 3:10, so an early weekend for you.  Thank you very much for your attention today, and let me, as always, remind you:  Please don't talk to anyone about the case or do any independent research on the case over the weekend.  So have a good weekend.

(Jury exits.)

THE COURT:  Question:  Mr. Howe was asking whether we should be telling the jury to be coming in Monday a little bit later because presumably we are going to be taking up this issue in the morning.  So if we do what we've been doing, meeting at 8:30, then 9:00 is unlikely to be the start time.  We could meet earlier.  That's up to the parties.  I mean, we could

CERTIFICATE


        I, Jan-Marie Glaze, RPR, CRR, Pro-Tem Court Reporter for the United States District Court for the District of Vermont at Burlington, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.


        I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.




                                _____
                                JAN-MARIE GLAZE
                                COURT REPORTER

VOLUME: 6
PAGES: 1-221

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


Misty Blanchette Porter          )
                                 )
                                 )
v.                               ) Case No. 2:17-cv-194
                                 )
                                 )
Dartmouth-Hitchcock              )
Medical Center, et al.           )
                                 )
_____)


RE:  Day 6 of Jury Trial

DATE: March 31, 2025

LOCATION: Burlington, Vermont

BEFORE:  Honorable Kevin J. Doyle
         Magistrate Judge

**APPEARANCES**:

Geoffrey J. Vitt, Esq.
Sarah H. Nunan, Esq.
Vitt & Nunan, PLC
8 Beaver Meadow Road
Norwich, VT 05055

Eric D. Jones, Esq.
Langrock, Sperry & Wool
210 College Street, Suite 400
Burlington, VT 05410

Donald W. Schroeder, Esq.
Morgan McDonald, Esq.
Foley & Lardner, LLP
111 Huntington Avenue, Suite 2500
Boston, MA 02199

- Continued on Next Page -

A-600

4

VOLUME: 6
PAGES: 1-221

(Court opened at 8:09 a.m.)

COURTROOM DEPUTY:  Your Honor, this is Case Number 17-cv-194, Misty Blanchette Porter versus Dartmouth-Hitchcock Medical Center.  Present on behalf of the plaintiff are Attorneys Geoffrey Vitt and Eric Jones and, excuse me, Attorney Sarah Nunan.  Present on behalf of defendants are attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We are here on a motion in limine regarding undisclosed expert opinions of Dr. Bancroft.

THE COURT:  Good morning.

ATTORNEY COFFIN:  Good morning, Your Honor.

THE COURT:  Okay.  So I have received the parties' submissions over the weekend.  Plaintiff filed twice, right, to add your exhibits yesterday evening?  I received that.  Thank you.  Defendants have received a second copy with the exhibits, I assume.  Mr. Coffin, you've received the second filing?

ATTORNEY COFFIN:  Oh, yes, Your Honor.

THE COURT:  Okay, all right.  So, as I say, I have read both sides' filings.  Happy to hear if there's any additional argument.  I may have some questions for you, but, Mr. Coffin, your motion.  Would you like to be heard?

ATTORNEY COFFIN:  Thank you, Your Honor.  I think our position is pretty well laid out the papers, but just to sort of briefly recap, if this was implicit in the expert analysis as it's evolved over the years from Dr. Bancroft, it was not

A-601

VOLUME: 6
PAGES: 1-221

spelled out with adequate clarity as required under the rules, and, you know, fundamentally, we're just dealing with an issue where we have to wait until what we hear coming out of Dr. Bancroft's mouth as he testifies and as this evolves, and we have to wait until another report comes in that changes things, and that's not how it's supposed to go.  It's very difficult to manage that situation in trial because, you know, I don't know what he's going to say until it comes out, and I don't even know kind of completely what he's going to say requiring me to object or waive.

I will say that the plaintiff's explanations of how he looked at the fringe benefits and kind of the proffer of testimony that I was able to see in writing, you know, albeit only last night after 7:00 o'clock, or 6:30 or so, was helpful. That's just not exactly how we're supposed to run the railroad here, and I think some of the cases we've cited, the case, the Judge Sessions opinion and the Judge Reiss opinions, kind of talk about the way this is supposed to be done under the rules. So and, you know, we provided some additional information to the Court about the level of disclosure that we've seen in addition under the, under the discovery rules for experts.

And so we'd submit that there, you know, we're prejudiced because this is kind of a slow-rolling thing that's coming out. What the Court should do about it is, practically, is a, is a more difficult question, and we've made some suggestions, but

A-602

6

VOLUME: 6
PAGES: 1-221

obviously, the opinions by Judge Reiss and Judge Sessions talk about limiting or even excluding testimony.  Some of the lawyers in those decisions are here today, and so they've had some probably more notice than I have about the import of those decisions.

But, you know, I'd suggest that, you know, something, something ought to be done to provide some limits and some guidance to Dr. Bancroft's testimony, and, to me, the theme that goes throughout these is that, like, they're allowed to disclose and change their analysis and add to the bottom line and, in the most recent case, reduce it a week before trial by $2.6 million, and we're just meant to sort of respond to that a little bit on the fly.

You know, so I've proposed some possible resolutions to the Court, and, really, you know, I look to the wisdom of the Court of what the fair thing to do here is, but, to me, fundamentally, you can't say that this is an obligation that was a sum certain like in a sort of more normal employment case because of the new opinions, the new position, the new analytical models.  And so I just, I think, fundamentally, the thing that's really unfair is to say, Oh, well, Dartmouth should have been able to foresee these changes, which, again, are based largely on whatever the plaintiff happens to be telling Dr. Bancroft at the moment.

Let's go back to the most recent report last Tuesday which

VOLUME: 6
PAGES: 1-221

occurred three or four days after the evidentiary hearing where Dr. Bancroft was confronted and crossed on some information. The two big things that came out of that hearing -- well, there are many big things that came out of that hearing, but two of the bigger things that came out of the hearing is he had not been informed that Dr. Porter was promoted to full professor at UVM, which happened in July of 2023, and he had not been provided the most recent tax return information for her fiscal year 2024.

That was information that was uniquely in the hands of the plaintiff and her counsel, and Dr. Bancroft, being a prestigious economist, you think he might have followed up and asked those questions because he was analyzing that she would become a professor at Dartmouth based on what she was telling him, and he didn't -- and that would cause a 5 percent increase in her pay and would not, did not opine at all what would happen with her at UVM.

Well, guess what? She became a professor at UVM, and he did not project the 5 percent increase. And, fundamentally, the, two of the key variables here, of course, are the plaintiff is trying to show that she would have made more at Dartmouth than she made at UVM and the bigger difference between those results in larger damages calculations. So, fundamentally, Your Honor, I think the Court needs to address in some fashion, and we would accept the Court's wisdom on

A-604

8

VOLUME: 6
PAGES: 1-221

this.

THE COURT:  Okay.  So the idea of preclusion in these circumstances is not a general issue.  It gets really in the weeds about the specific allegation of the nondisclosure.  So what specifically are you claiming is the new opinion that was not disclosed, okay?

So I've reviewed everything that has been attached to the plaintiff's filing.  You have the preliminary report issued sometime in 2018.  You have defense counsel deposing Dr. Bancroft in 2019.  There is a discussion of the methodology that he applies to reach his kind of loss projections.  Then you have a lengthy period of time where the case, as you know better than I, is dealing with summary judgment proceedings and appellate proceedings and everything but eventually comes back.

A new report is issued in August 2024.  I've looked at the assumptions and the cover letter of the August 2024 report.  I've looked at the March 2025 report.  The assumptions are basically the same.  The methodology is basically the same.  So I'm almost wondering, you know, having taken a look at the hearing transcript from Friday, what the initial impetus was for the objection, and I wonder if it perhaps -- maybe I'm wrong, but I wonder if it was perhaps a misperception of what Dr. Bancroft was saying.

Let me explain what I think this might mean.  So it appeared that, that your objection was that Dr. Bancroft might

be claiming that there is not going to be a continuing Dartmouth-Hitchcock pension benefit going forward, which, obviously, would be a different type of premise to his ultimate opinion.  But you'll look at the chart, the chart going back to August, the chart in March, and there are continuing projections for the Dartmouth-Hitchcock pension plan going forward, offset by what Dr. Porter eventually makes at UVM Medical Center.

So, you know, I've read your case law, too, right?  So, for example, the *Parma* case, *Town of Parma* I think, you know, quite different on the facts, right?  So, in that case, it's a complex environmental matter.  The expert apparently opines in his first report on one aspect of environmental damages, and then, later on down the road, has a whole new assessment of environmental damages with new assumptions, new mathematical calculations.  I'm not so sure that I see that here.

And the case that you mentioned with Judge Sessions also involving Dr. Bancroft, so there Judge Sessions says the theory of damages is so novel, almost getting back to the 702 kind of analysis, getting back towards the liability, seems like it's not, again, on all fours with what we have here.

So, I guess, let me come around to a question.  What is the specific claim of inconsistency here or the new information?

ATTORNEY COFFIN:  Sure.  Let me try to speak to

VOLUME: 6
PAGES: 1-221

those, Your Honor.  Your Honor is correct that, to a degree, in part correct that the thing that sort of prompted me was my concern of where he was going that he was not going to acknowledge that she would get a damages or would get a pension if she continued on at Dartmouth or, sorry, if she had left and wasn't acknowledging that and where that was going to go in his testimony.

That was clarified at sidebar and by additional testimony and in the briefing.  It doesn't -- that was not my only concern.  My concern is on the pensions issue as exemplary, but on all of these issues we need to read between the lines for what his opinion is going to be, and, you know, in the 2019 report there was, like, no calculation of fridge benefits, and I'm concerned that the Court --

THE COURT:  Did that report precede the deposition?

ATTORNEY COFFIN:  Yes, it did, by less than a month.

THE COURT:  So there was no mention in the 2019 report about fringe benefits involving pension, but yet there was questions at the deposition about percentages and assumptions on the pension plan?

ATTORNEY COFFIN:  There was some questioning at, some questioning in the deposition.

THE COURT:  So where did the defense -- where did counsel get this information about asking about the 9 percent and the 12 percent assumptions in the various pension plans

VOLUME: 6
PAGES: 1-221

with no report?

ATTORNEY COFFIN:  I don't know the answer to that question myself.  Perhaps Mr. Schroeder can speak to that.  I was not involved in that deposition.

ATTORNEY SCHROEDER:  I think the fundamental issue on it, Judge, if you look at the October 1, 2019 report and whether or not there's an offset, right, there's nothing in the column for fringe benefits for UVM at all, and that's maybe taken into account later in the August 2024 fringe benefit column for UVM, but there is no offset for it in the earlier reports.  There's zeros.

THE COURT:  So then why -- I'm looking at Page 40 of the deposition, Document 257-1 attached to plaintiff's opposition.  There's an extended explanation by Dr. Bancroft as to the offset.  So where is this coming from if it's not in a report?  Why is counsel questioning Dr. Bancroft about this if counsel has no basis to even understand how he was calculating damages?

ATTORNEY COFFIN:  I don't know the answer to that question, but I would suggest that that's, to a degree, immaterial because the expert report is supposed to provide the basis for their opinions and the actual opinions that are rendered, and whether or not that lawyer had some level of knowledge of that, I don't know, but I'd suggest that that is actually immaterial to whether or not the plaintiff still has

12

VOLUME: 6
PAGES: 1-221

discovery obligations on expert disclosures.

You know, the fact is Dr. Bancroft's reports in seriatim are extremely bare bones, and then the chart is very, very thorough giving him a lot of leeway, if the Court were to not require disclosure of the report, for deposing counsel to have to sort of guess at what he's about, and questioning counsel would have to guess what he's about.

And, you know, to see these reports evolve and change, you know, both as to substance and methodology, but, you know, even if it's only as to substance, you know, they change radically because, Oh, I do the same thing. I provide a 12 percent markup on whatever it is, but yet his information has changed so the bottom line to us has changed radically and requires a different analysis that we're not on notice of.

THE COURT: Okay. But you say the methodology has changed. How has the methodology changed?

ATTORNEY COFFIN: The methodology --

THE COURT: That is critical to the case law, right? If it's new methodologies, new assumptions, then that might lead to a preclusion result, but if there's not new methodology, that would seem to then fall on the side of the ledger that says it doesn't need to be. So I really want to narrow it down on, What is the changed methodology?

ATTORNEY COFFIN: I guess I would say, Your Honor, I'm not confident it's not changed methodology because where he

A-609

13

VOLUME: 6
PAGES: 1-221

describes where the methodology is is so de minimis and hidden in the report that I'm just not confident.  I haven't run the numbers enough to really know that.  But I would suggest that I disagree with your reading of the case law because it's really both things.  If he radically changes the information and it hasn't been disclosed to us, I do think those cases show that, you know, that, too, is a failure to update information in his expert report.

THE COURT:  Definitely.  So what information hasn't been disclosed?

ATTORNEY COFFIN:  So, for example, the changes in, in the salary, the changes in her professor, the changes in position, the allocation of the income in 2004 updated at the very end.  And, with regard to the pension, I don't see a discounting to present value for the income stream coming on.  And, again, this is all stuff to have disclosed well beforehand so one can understand it and think it through, but I believe she can claim a pension right now at Dartmouth and could be receiving that income stream, and that would be something that's part of her income and would change the damages calculation.

THE COURT:  Okay.  And the discounting of present value, so the fact that the chart does talk about a present value, that is inadequate?  Third-to-last column seems to have a calculation as to present value, but that, is in your view,

VOLUME: 6
PAGES: 1-221

inadequate?

ATTORNEY COFFIN:  Yeah, because depends what you mean by inadequate, inadequate without further explanation and guidance what it is.  Because these are, you know, these are numbers on the chart, and we get them, you know, a week before trial.  We get them after the case has been in hibernation for years, and, you know, we're supposed to penetrate what these numbers amount for and, you know, be prepared to, you know, get whatever we can from cross-examination on the witness, essentially unguided, and, you know, kind of take, take it on the fly what the math is.

THE COURT:  Okay.

ATTORNEY SCHROEDER:  Judge, I think, just big picture-wise --

THE COURT:  Yes.

ATTORNEY SCHROEDER:  -- when you look at the October 1, 2019 report, right, if there's a calculation for, well, you should be getting income from Dartmouth, right, going forward, they, they don't account for that as an offset for UVM.  There's zeros all the way down, so that's one issue.  But here, big picture, big picture, when you look at -- I mean, we highlighted this in the outline.  The numbers go from, like, 4.3 to 4.4 to 6.4 as of August 2024, and the number now is 1.8 million in economic damages?  By itself, Your Honor, by -- and this is eight years later, right?  It, there's an incongruity

VOLUME: 6
PAGES: 1-221

that falls out of the assumptions that Dr. Bancroft has made. Like, on its face it is, it is a far cry from a clear methodology and clear assumptions.

And, to the extent that the assumptions are new and the numbers are lower, okay, I guess, good for Dartmouth-Hitchcock, right?  But we got those assumptions on March 19th of 2025, and there's no way that that, that that can't be calculated within the judge's decision and consideration of all the issues that are before the Court.  These are assumptions that were made March 19th, and the only reason they were made -- and, by the way, one of those assumptions is that Dr. Porter became a full-time professor in May or June of 2023.  Well, is that reflected in Dr. Bancroft's August 2024 report?  No, it wasn't, and it's inexplicable why.  It's a year later.

And so I would submit that, to the extent -- and I think it's a far cry, Your Honor, to say -- I've had a lot of cases with expert reports where there's actually writing in the report as opposed to, Here's my list of a few assumptions and some methodology and, here's the chart.  This is the most bare bones report I've ever seen, and I've seen it before from Dr. Bancroft because I've had other cases with him dealing with plaintiff's counsel.

So this is about as bare bones as you get.  It's not a quote, unquote, report because there's not really a lot of meat on the bones.  And so you take that and you couple that with

VOLUME: 6
PAGES: 1-221

the assumptions that are made on March 19th 2025 and on the heels of trial, brand-new assumptions, I mean, they obviously lower the economic value of the case.

THE COURT:  And, with respect to those assumptions, I'm looking at the cover letter March 19th.  Assumption 1, no DHMC salary increases for 2020 and 2021.  So that assumption was put into this report based on Mr. Coffin's cross-examination at the motion in limine, correct?

ATTORNEY SCHROEDER:  Correct, on March 14th.

THE COURT: So, Number 2, an additional UVM fridge benefit of $7,698 for the son's UVM tuition, that was also in response to Mr. Coffin's cross-examination at the motion in limine, correct?

ATTORNEY SCHROEDER:  Correct.

THE COURT:  Okay.  The no loss of DHMC's medical insurance contributions beyond April 2018, does that derive from the evidentiary hearing?

ATTORNEY SCHROEDER:  I don't recall.  With such an exquisite cross-examination from Mr. Coffin, I may have been lost in that.  I'm not entirely sure, Your Honor.

THE COURT:  Okay.  Then I just want to understand what the genesis is of the various changes in the report.

ATTORNEY SCHROEDER:  Yeah.

THE COURT:  So Dr. Porter's actual -- I'm sorry.  UVM's retirement contribution is equal to 9 percent of her

VOLUME: 6
PAGES: 1-221

income.  So that is relatively similar to the assumption listed in the August report, if not the same, right?  One was 8.5 percent.  The other was 9.

ATTORNEY SCHROEDER:  Yes, I think you're right.

THE COURT:  Okay.  So this change is not particularly --

ATTORNEY SCHROEDER:  Meaningful.

THE COURT:  Right, okay.  Dr. Porter's actual 2024 UVM earned income, now, this was a topic explored at the motion in limine hearing about, and I believe Dr. Bancroft essentially was saying, Well, I don't have the W-2 yet.  He was cross-examined on that.  Clearly, he, not clearly, but he must have received a W-2 after that hearing and made this adjustment to the report.  Do you have that information, the W-2?

ATTORNEY SCHROEDER:  We got it.  We got it after we wrote to them that week right before trial.  And just on that point, Your Honor --

THE COURT:  I just want to finish this list.  All right.  So with that, though, what that amounts to is what perhaps was initially a projection of lost income in 2024 Has now been substantiated for the actual amount earned in that year based on the W-2, right?

ATTORNEY SCHROEDER:  I would assume so, Your Honor.  The problem I have is that it should have been disclosed in January of 2025 when everybody, I believe, that is a W-2

A-614

VOLUME: 6
PAGES: 1-221

employee gets their W-2 delivered to their house or through their employer.  It wasn't disclosed.  It wasn't disclosed.

THE COURT:  Okay.  And then 6, the assumption that Dr. Porter will go to a 75 percent part-time position, as I recall, there may have been some questions.  I'm not sure if it got to this point, though, at the motion in limine hearing.

ATTORNEY SCHROEDER:  This is -- I don't know whether it came up then or in his cross-examination on Friday, Your Honor, but there is no question that that assumption standing alone is brand new.  And, and there's been some testimony as to, Well, I couldn't do this, I couldn't do that.  All those things, whether that's true or not, are things that have apparently or allegedly happened within the last six months.

I don't know when that happened.  But you can't say that a deposition in October of 2019, you know, would suffice to be able to say, Well, I've got to be a fortune teller and figure out what it would look like.  That assumption is brand-new.

THE COURT:  Right.  Of course, that kind of an assumption, I guess, could change over time based on the plaintiff's kind of plans for her life, couldn't it?  So, if you have -- I mean we're in a little bit of a tough spot here, right?  Because I hear your point about how, at a deposition in 2019, how are you to kind of know what the report might be? You wouldn't have known that the final report is going to come out some six years later.

19

VOLUME: 6
PAGES: 1-221

ATTORNEY SCHROEDER:  Understood.

THE COURT:  And, I guess, you know, on the one hand -- obviously, you can see what I'm getting at here -- some of these revised assumptions were because of issues raised at the evidentiary hearing.  So what am I to do to not permit those types of changes to be made in response to questioning, legitimate questioning of the witness if I didn't -- or not that I have anything to do with whether a revised report was issued, but, once it was issued if somehow I were to say that that's inappropriate, then wouldn't there kind of be a separate issue then there too?  Mr. Coffin?

ATTORNEY COFFIN:  Not to come up in here, Your Honor, but with the Court's permission, I'd just like to add.  The Court views our eliciting of this information at cross-examination as somehow something that should redound to the benefit of the plaintiffs here.  On the contrary, this is stuff, every single one of those they should have disclosed earlier on, in my view.

ATTORNEY SCHROEDER:  And just, Your Honor, one last point just to jump on -- no, you used word redound very well.  Thank you.  The issue we have is one assumption was made, one assumption that he makes is based on a fact from May, June of 2023.  There is no question about that, that Dr. Porter assumed a full-time, received a promotion to a full-time professor at UVM.  We may have learned that fact by way of great

cross-examination by my brother, Mr. Coffin.  However, that fact should have been disclosed certainly before the August 2024 report, right?

In terms of this going to a .75, I don't believe there is any testimony that that just happened magically in the last two months, that she could only go, that Dr. Porter could only go to .75 and not .6.  That is not what the testimony was, I believe, in the record.  So that's another assumption that -- I understand, things change over time, but they need to be timely disclosed, Your Honor, and that was not timely disclosed.

And, in terms of the W-2, the only reason we knew that there was -- well, we had asked for the W-2, and it should have been disclosed when the W-2 was issued, and unless they do things differently in Vermont, I'm pretty sure that most W-2s get issued in January, and they should have been disclosed well in advance of March 19th or, actually, after March, around March 19th when we asked for the documents.  Where are the documents?  We shouldn't have to ask for those documents.  Those should be disclosed on a timely fashion.  They weren't.  They came out of that March 14th hearing.

And, to Mr. Coffin's point, well, because we were able to examine Dr. Bancroft and elicit that testimony, that shouldn't inure to the plaintiff's benefit because they were late in disclosing these things.  Leave it up to the Court's discretion on how that's dealt with with Dr. Bancroft, but that's the

VOLUME: 6
PAGES: 1-221

conundrum we're in.

THE COURT:  And, in practical effect, so before you actually get a W-2 for that year -- this is kind of the point I was making before or trying to make before.  Until you get the actual income as established by that W-2, before that you're working off of an income projection, right?

ATTORNEY SCHROEDER:  Yes, but here's the other issue, though.  In 2023, right, there would be a W-2 for 2023 which would, which would show a jump in salary assumption.  Now, you wouldn't necessarily see that.  You'd have to, you know, the baked-in figures.  And, by the way, there was no report until August of 2024, and I don't believe -- so there's a disclosure issue on the, on that issue because you're talking about two years of data, the W-2 for 2023 and the W-2 for 2024.

You are making projections, but the problem is the projections, I don't believe, are being, are taken into account and certainly not disclosed in any way in the August 2024 report, and that would have related to a year earlier when she was appointed to full professor.

THE COURT:  Right.  But, as to the more recent information, my point is simply, what was projected income becomes actual income now based on that W-2 --

ATTORNEY SCHROEDER:  Yes, Your Honor.

THE COURT:  -- in terms of prejudice to the defendant on that point?

A-618

22

VOLUME: 6
PAGES: 1-221

ATTORNEY SCHROEDER:  Correct, Your Honor, yes.

THE COURT:  Okay.

ATTORNEY JONES:  May I?

THE COURT:  Yes, Mr. Jones.

ATTORNEY JONES:  I'm not sure where to begin, but let me start with this.  The kerfuffle on Friday was triggered by questions about the pension.  Everything else that they mentioned this morning was part of their renewed motion to preclude Dr. Bancroft's testimony that they filed before trial.  You've already ruled on that, so I don't know why we are relitigating all that stuff, okay?  That was already dealt with, first of all.

Second of all, you're absolutely correct, Your Honor.  Nothing has changed about the fundamental assumptions.  Nothing has changed about the methodology.  There has been no change.

Third, the October 2019 report did, in fact, have information about the pension, which is why Attorney Joseph inquired of it.  The columns that my colleague seems so obsessed about under UVM having zero was because, at that time, my client was a per diem, not eligible for that benefit.  But, in the August report and the most recent report, we have that data.  No one is hiding anything.  The only surprise, frankly, is that this happened last Friday.

THE COURT:  Okay.  Did you want to speak to the point about the full-time professorship and the part-time?

A-619

23

VOLUME: 6
PAGES: 1-221

ATTORNEY JONES:  Well, that was part of the pretrial renewed motion that was an account then.  At the hearing on October, on March 14th, Dr. Bancroft actually even addressed that, at that time, he was using current pay stubs so that he already had the salary reflecting her promotion so he no longer had to add a 5 percent increase.  I think I even asked him the question, Because he was using actual pay stubs, it would be inappropriate to then add 5 more percent, and he said "yes".

So that was part of the pretrial rulings on this issue that have been heard and resolved already.  The only thing that blew up on Friday was this pension issue, and that wasn't new.

ATTORNEY COFFIN:  I'd just say we have received no pay stubs from 2025 or 2024, any reliance materials since prior to the deposition, not for the 20, August 2024 report and certainly not related to the basis for Dr. Bancroft's testimony.  So, if he was basing them on those, we haven't been provided that reliance material.

THE COURT:  Mr. Jones?

ATTORNEY JONES:  On what material?

ATTORNEY COFFIN:  You said that -- I think you just said in court that Dr. Bancroft based his opinion about the full professorship and her salary going forward on recent pay stubs.  I have seen no pay stubs like that.

ATTORNEY JONES:  After that hearing you asked us for the W-2s, which we promptly provided, and those are the full

24

VOLUME: 6
PAGES: 1-221

year's actual salary.

ATTORNEY COFFIN:  I guess, my misunderstanding.  I thought pay stubs are different than W-2s.  W-2 is a report of your yearly earnings for the IRS, is my understanding, and pay stubs are the stubs you get with your pay.  I, I, we haven't received pay stubs.

And, of course, I believe -- you know, we'd have to check the transcript, but I believe, in response to questioning by Mr. Vitt, Dr. Bancroft described reviewing pay stubs, W-2s, tax return information.  That would surprise me because we have received none of that in recent times and none, no pay stubs, essentially, no pay stubs from earlier times.

ATTORNEY JONES:  After the hearing Mr. Coffin asked us for some documents.  We gave him every document.

THE COURT:  When you say after the hearing --

ATTORNEY JONES:  After the March 4th motion in limine hearing.

THE COURT:  Okay.  What did you provide, Mr. Jones?

ATTORNEY JONES:  I'm sorry.  After the March 14th motion in limine hearing, Mr. Coffin sent us a list of documents he wanted.  We gave it to him, and they're all actually now on defendant's exhibit list.  So, I mean, not only do they have it, it's on their exhibit list.

THE COURT:  Consisting of, what, though?  Are these W-2s?

A-621

25

VOLUME: 6
PAGES: 1-221

ATTORNEY JONES:  It's the W-2s.  It's the letter memorializing Dr. Porter's promotion to her full professorship. I forget what else.

ATTORNEY COFFIN:  There is nothing else.  Well, the the letter request was more fulsome than that, but one thing --

THE COURT:  Mr. Jones.  Go ahead, Mr. Coffin.

ATTORNEY COFFIN:  The letter requested certain things.  There was a follow-up letter sent on Monday or Tuesday.  I did mention to them after the hearing on Friday that we wanted the most recent pay information, including the W-2s.  We were told that would be coming.  We did not immediately receive it over the weekend, so we sent a letter. I think the next day we got the contract between UVM and Dr. Porter for her full professorship, and we got the most recent 2024 W-2s.

I believe that was all.  Checking and verifying.  That's all we got.  Our request for pay information was broader than that.  But, in any event, it specifically requested the W-2s, and we only got the W-2s and the pay contract.

THE COURT:  And that's for 2024 and 2023?

ATTORNEY COFFIN:  Yes.  From the time of her full professorship, which was she was appointed, I believe, in May 2023, effective July 1, 2023.

THE COURT:  Okay.  Are you suggesting that the W-2s are, or the pay stubs are required in addition to the W-2s and

VOLUME: 6
PAGES: 1-221

that you're somehow prejudiced without getting pay stubs as opposed to W-2s?

ATTORNEY COFFIN:  I would suggest that a qualified economist may need to look at those and that Dr. Bancroft testified that he did, and plaintiff's counsel said that, on direct examination, a question implying that he was provided them to him and followed up by Mr. Jones making the same implication here.  All I'm saying is we would have requested those as materials that Dr. Bancroft relied on and had not been provided to them.  They had not been provided to us.

THE COURT:  Okay.  Anything further?  Mr. Jones?

ATTORNEY JONES:  No, Your Honor.

THE COURT:  Okay.  I'm just going to take a very brief five minutes.  I want to collect something, and I'll be right back.

(A recess was taken from 8:43 a.m. to 9:01 a.m.)

THE COURT:  Okay.  So, just beginning with a couple of the factual issues that were discussed this morning, with respect to the pay stubs issue, so I do not think pay stubs were brought up at the motion in limine hearing from a review of the transcript.  Just kind of putting that out there.

With respect to pay stubs mentioned on Friday as part of direct, so the transcript that I received, of course, of Friday's hearing is incomplete.  It's just an excised portion of that transcript.  But, based on that transcript, limited

VOLUME: 6
PAGES: 1-221

though it is, there is no reference to pay stubs there.  I don't have a recollection myself about the mention of pay stubs.  Look, if it turns out that the full transcript says otherwise, it is what it is.  But, at least in terms of what I can recall sitting here today, I don't recall mention of that.

With respect to the discussion about the 2019 Dr. Bancroft report, particularly the section that has zeros in it with respect to UVM pension plans, after 2021 I believe that report then has a series of zeros.  The assumption in that 2019 report, though, I believe, was that Dr. Porter would leave UVM in July of 2021, which would appear to account for the fact that that earlier report has zeros from the summer of 2021 and beyond.

The August 2024 report, however, does again, as you know, picks up the UVM benefits from 2021 on, to reflect what, in fact, happened, which was that Dr. Porter did not leave UVM. So that is an explanation for that particular observation made earlier.  So it does seem to me then that defendants did have pension information relevant to both Dartmouth-Hitchcock and UVM prior to that deposition in 2019.

With respect to the full professorship, I believe the suggestion was that Dr. Bancroft didn't know about the full professorship and didn't include it in his August 2024 report but that it was included in the March 2025 report in response to questioning.  But, as I recall from the motion in limine

hearing, Dr. Bancroft had said he used the 2023 W-2 and information from UVM as to what salary Dr. Porter would earn as a result of the full professorship.  There was discussion of the letter that the University of Vermont sent detailing that, and, as I understand it, that is in the possession of counsel. And then the updated report in March of 2024 incorporates that W-2, but that does not mean that Dr. Bancroft did not have knowledge of that full professorship at the time that he rendered his report.

So, with respect to the decision now, I'm just going to create a record here as to what brings us here.  So Plaintiff's counsel, on Friday, began his direct examination of Dr. Bancroft on Friday, March 28th.  When counsel began to ask Dr. Bancroft questions about his assessment of damages as it related to a retirement plan Dr. Porter participated in while employed at Dartmouth Health, defendants objected.

The apparent basis for the objection at that time was defendants' assertion that Dr. Bancroft's retirement plan analysis was not included in the expert report, and that report included his stated assumptions on the line report and the chart representing the results of his analysis and that the chart did not take into account the present value of the benefit plaintiff would obtain by receipt of lifelong payments from her Dartmouth Health pension plan.

The Court excused the jury and heard from the parties on

their respective positions.  Dr. Bancroft was also examined on the issue, and the Court ultimately reserved judgment on the issue and directed the parties to file written submissions over the weekend, which the parties did.

In the case cited by defendants, *McLaughlin v. Langrock, Sperry & Wool*, 2020 Westlaw 3118646, this court cited authority for the proposition that, quote, "Although experts must supplement their reports if incorrect or incomplete, they're not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon or to continually supplement their opinions. Supplementation under Rule 26(e) is thus generally only appropriate when the expert learns of information that was not previously made known or available to him or her."

In this case, it appears that Dr. Bancroft's initial expert report issued more than five years ago.  Plaintiff's exhibit list for this trial includes a revised analysis dated August 26th 2024, and the cover letter of the report suggests that, in part, the reason for the revised analysis was to account for new data acquired since the last report was issued years earlier.  As I mentioned earlier, there were obviously summary judgment proceedings in this court and then appealed to the Second Circuit, which accounts for a period of years between the report issued in 2019 and the revised analysis in August of 2024.

VOLUME: 6
PAGES: 1-221

In a second case cited by defendants, *Chart v. Town of Parma*, 2014 Westlaw 4923166 at Star 20, the court stated, "An expert should be precluded from testifying about previously undisclosed opinions, particularly where they expound a wholly new and complex approach.  In contrast, expert testimony can provide additional information or elaborate on previously expressed opinions so long as the testimony is within the scope of the expert's report."

*Chart v. Town of Parma* provides an illustration of the type of subsequent opinion that warrants preclusion of the expert's subsequent report.  There, in the context of a case involving contaminated soil in a town park and complex mathematical calculations of potential risk to human health, the court precluded certain portions of the subsequent opinion stating as follows:

"The human health risk assessment contained in the second report is an untimely new opinion because it is supported by different calculations and assumptions."

In this case, the evidence does not amount to a previously undisclosed opinion that expounds a wholly new and complex approach.  Rather, the testimony objected to on Friday is an elaboration on a previously expressed opinion, and the testimony was within the scope of the expert's report. Dr. Bancroft was deposed on October, in October of 2019.  At the deposition defendant's counsel, Jessica Joseph, asked

Dr. Bancroft what documents he had reviewed to reach his damages opinion.

He responded that he had reviewed a benefits statement from Dartmouth-Hitchcock dealing with pensions and a letter from Dartmouth-Hitchcock to Dr. Porter regarding her pension benefits at the time of her termination.  And that's at Document 257-1 at 3, using the ECF page numbers.

Also, at deposition Dr. Bancroft explained to counsel the analytical process he followed, explicitly stating that it included accounting for gross earnings at Dartmouth-Hitchcock, which was salary plus fringe benefits, and offsetting that amount by the value of total benefits received post-termination, again, including salary and fringe benefits.  Dr. Bancroft confirmed that he has used this approach for estimating loss for some 20 or 25 years and that the approach was generally accepted by economists.

Defendant's counsel also inquired about the basis for assuming that Dartmouth-Hitchcock would contribute 12 percent to retirement.  Counsel also inquired about the basis for the assumption in the report that UVM's contribution to Dr. Porter's retirement plan would be 9 percent.  That is at Document 257-1 at 19.

The August 2024 report assumes Dartmouth-Hitchcock Medical Center's retirement plan contributions to be 12 percent of earned income.  It also assumes UVM's contribution to a

retirement plan to equal 8.5 percent of income.  The report also assumes, quote, "the difference between DHMC and post-termination projections of total earnings".  That is Assumption 7.

The March 19th 2025 updated analysis similarly assumes a 12 percent Dartmouth-Hitchcock Medical Center contribution and a slightly higher UVM contribution at 9 percent.  The report again assumes, quote, "the difference between DHMC and UVMMC post-termination projections of total earnings".

In terms of changes to the most recent report, as discussed with counsel this morning, these appear to be either in response to issues counsel explored with Dr. Bancroft at the motion in limine evidentiary hearing on March 14th, for example, no salary increases from 2020 to 2021, tuition remission at UVM in 2019, and actual earned income in 2024.  More additional information reflecting Dr. Porter's actual 2024 income and adjusted assumed settlement date to account for the timing of this trial and the current interest rate.

Importantly, Dr. Bancroft confirmed that his methodology had not changed across all his reports, and that is at 257-2 at 5, that the exercise is to determine total earnings at DHMC and offset it by total earnings post-termination.  And Dr. Bancroft was also questioned about fringe benefits at DHMC and UVM.  The August 2024 report and March 2025 reports reflect this particular aspect of the analysis, which appears to have been

33

VOLUME: 6
PAGES: 1-221

consistent over time.

So, having addressed some of the factual issues at the outset and explaining why I think this does not fit within the scope of the cited case law, I am not going to preclude Dr. Bancroft from testifying further this morning or otherwise impose any other sanction related to his testimony.  So I'm going to ask that the jury be brought in.

ATTORNEY VITT:  I have a scheduling issue, Your Honor, and I hesitate, and I do mean hesitate, to raise this issue, but I think it's best that I get it out on the table now.  Dr. Bancroft is here.  We are prepared to put him on and proceed with his direct and, what I expect and have been told, maybe a lengthy cross-examination.  In addition, Dr. Leslie DeMars is here, at least I think so.  I saw somebody out in the lobby that I think was Leslie DeMars.

And the reason I'm up here now is I've been told that she has a need to absolutely finish her testimony today, got to be done.  She has to leave.  She has an appointment or something.  I don't know what it is.  But, anyway, the representation is she has to finish her testimony today, and, in light of that and the amount of time that I think it's going to take with Leslie DeMars -- this is not going to be a short exam.  There are multiple exhibits.  Her testimony, you know, her name comes up repeatedly.

And we'd suggest that, all right, Dr. Bancroft lives

VOLUME: 6
PAGES: 1-221

for another moment the issue of whether Dr., if we do not finish Dr. DeMars, whether she comes back tomorrow? That issue is kind of on the table but not being resolved now?

THE COURT: Perhaps it's one that won't need to be resolved depending on how things go.

ATTORNEY VITT: There's always hope.

THE COURT: I think we'll put Dr. Bancroft on the stand and then bring the jury in.

(The Jury enters the courtroom.)

COURTROOM DEPUTY: Your Honor, the matter before the Court is Case Number 17-cv-194, Misty Blanchette Porter versus Dartmouth-Hitchcock Medical Center. Present on behalf of the plaintiffs or plaintiff is Attorneys Geoffrey Vitt, Eric Jones, and Sarah Nunan. Present on behalf of the defendants are Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder. We are here for day six of a jury trial.

THE COURT: Okay. Good morning, everyone. Over the weekend, have you spoken to anyone about the case or otherwise heard about this case since Friday? Okay. Seeing no hands raised.

Dr. Bancroft is back on the stand. As I mentioned to you on Friday, sometimes it's necessary for the Court to speak with the lawyers. That has happened, and we are ready to proceed. So thank you for your patience. Mr. Vitt. We can swear in Dr. Bancroft again.

A-631

38

VOLUME: 6
PAGES: 1-221

Robert L. Bancroft,

having been duly sworn to tell the truth,

testifies as follows:

DIRECT EXAMINATION BY ATTORNEY VITT

Q.   Good morning, Dr. Bancroft.

A.   Good morning.

ATTORNEY VITT:  Your Honor, when Dr. Bancroft was on the stand before, I think we had Plaintiff's Exhibit 1B on the screen.  If that could come back up, I'd appreciate it.

THE COURT:  Okay.

ATTORNEY VITT:  Actually, I've got a paper copy.

ATTORNEY JONES:  I'm sorry.  We're going to have to use the projector.

BY ATTORNEY VITT:

Q.   Just to recap where we were when we had the little break, the analysis that you did reflects lost earnings for what years?

A.   From 2017, actually, from June 3rd of 2017 through 2033.

Q.   2033?

A.   Yes.

Q.   And, at that point, Dr. Porter would be 70 years old?

A.   Yes, that's correct.

Q.   All right.  And you're not projecting or predicting that she would work up until she's 70, right?

A.   No, I'm not.  I'm leaving that to the jury to decide

2:17-cv-00194-kjd   Document 290   Filed 04/23/25   Page 39 of 221

39

VOLUME: 6
PAGES: 1-221

what's a reasonable expectation on how long she's going to work.

Q.   And could you briefly recap how you proceeded with your analysis and reached your conclusions?

A.   Sure.  Just a quick overview, what I'm doing is projecting out what her earnings, what I believe her earnings would be if she continued to work at Dartmouth.  That's being offset by her actual earnings to date or through 2024, and then I'm projecting what her earnings could be in the future, and that's based on her continuing employment at UVM.  And then I make some other calculations, back out taxes, determine present value, and have to look at settlement taxes that would be assessed on a settlement.

Q.   Okay.  What assumption -- I'm going to back up.  Excuse me.  Did you make assumptions about the raises that Dr. Porter would receive at UVM?

A.   Yes.  In developing my projections of her earnings, which is -- and I'm going to refer to the footnotes as the column numbers, but in Column 1 under the Dartmouth-Hitchcock Medical Center gross earned income, there are assumptions about how her income would have grown over time.  It's predicated for the most part with prior to 2017 is predicated on what her salary was in 2017.

Q.   Right.

A.   Most of the years have a 2.5 percent salary inflator.

A-633

2:17-cv-00194-kjd   Document 290   Filed 04/23/25   Page 40 of 221   40

VOLUME: 6
PAGES: 1-221

There are two exceptions, well, three exceptions to that, if you will.

Q.   Okay.

A.   One is in 2019.  Instead of 2.5, I assumed that the increase would be 5 percent based on Dr. Porter's representation that she would have been promoted to a full professor.

Q.   And, in fact, she was promoted to full professor, correct? I'm sorry.  This was for 2019?

A.   This is 2019.

Q.   I'm sorry.  At Dartmouth, okay.

A.   Yes.  And then the other two exceptions are in the year 2000 and 2021.  Based on representation from defense counsel that there were no wage increases during those two years, I eliminated the 2.5 percent figure.  And then that, starting in 2022, I used the 2.5 percent wage salary inflator.

Q.   Did you make an assumption about whether there would be a raise to try and make up for the Covid years?

A.   No, I didn't.  I, again, I went back and used the 2.5.

Q.   Okay.  So, using the report, can you explain your analysis by year and what you're attempting to do?

A.   Sure.  So, as I just discussed, the first three columns are under the Dartmouth-Hitchcock Medical Center, and what I'm estimating there is what I believe the value which she would have earned and the value of fringe benefits if she continued

VOLUME: 6
PAGES: 1-221

to work at Dartmouth.

The first column, the gross earned income, I think I pretty much went over, but it's, for all intents and purposes, it's based on her salary in 2017 at the time she was terminated and a 2.5 percent inflator for most years with, with three exceptions.  the 5 percent in 2019, when I, based on her representations, she would have been promoted to a full professor, and then no increases for 2000 and 2021.

2017 was a little different because she was, obviously, she worked part of the year, but she was on disability, and the expectation is that she wasn't going to go back full time until the fall.  And so that's, those numbers are relatively small, and, actually, there's minimal loss in the year 2017.

Q.   And the disability income that she received, is that reflected in your chart?

A.   Yes.

Q.   You also project fringe benefits do you not, Column 2?

A.   Yes.

Q.   How did you do that?

A.   So the Column 2, for all intents, for most every single -- in every single year I have assumed, estimated the value of Dartmouth's contribution to her retirement plan for the years 2018 going forward, very simple.  In 2018 they made everybody go onto a defined contribution plan, and Dr. Porter, if she was there, would have received a, 12 percent of her salary would

VOLUME: 6
PAGES: 1-221

have been put into a 403(b).

In 2017, if she continued to work for that additional seven months, she would have been under their prior defined benefit program.  And so in that year I had to estimate what, how much her, her pension would go up if she had worked that additional seven months, and it turned out it was around -- I think it was about $3,000 or $4,000 a year.  And then I had to do some calculations, how much money would Dartmouth need to have put into the defined benefit program that would fund that additional three, the additional $3,000 when she retired, and that turned out to be about 12.4 percent.  But I just, I used 12 percent to be, to be consistent with the other years.

Q.   You mentioned two types of plans, a defined benefit versus defined contribution.  Can you describe briefly what the differences are?

A.   Sure.  The defined benefit program, there's not many of those around.  State employees of the  State of Vermont have a defined benefit.  Teachers have a defined benefit.  And that's, there's a formula for it.  In Dartmouth's case, you have to take the average of your high five years of earnings, and then there is a formula that you break the earnings down between some covered and some -- I forget what the term they use for it.

Basically, the first 10 percent, roughly 10 percent is, there's a factor of 1.75 percent.  It's multiplied by that

A-636

VOLUME: 6
PAGES: 1-221

number, and then for the 90 percent the factor is 2.3 percent, and both, both calculations also have the number of years that the employee has served.  In Dr. Porter's case, she had served 20.69 years.  So you go through that calculation.  There's basically two calculations, one for the 1.75 percent and the other one for the the 2.3 percent.

Q.   Will Dr. Porter still receive a retirement payment, will be eligible to receive a retirement payment from Dartmouth-Hitchcock when she turns 65?

A.   Yes, she would be.  She, that's locked in.  The defined benefit plan locks that number in.  And so whether, even if she had continued working on, she would have received what she, what she was entitled to up through June 3rd of 2017, and then she would have got a little bit more if she continued to work a little bit more under that defined benefit plan until the end of 2017.  And then in 2018 Dartmouth moved all, everybody into a defined contribution plan, and she would get 12 percent.

Q.   If she had remained an employee at Dartmouth-Hitchcock, would the retirement payments that she would be entitled to receive be higher?

A.   Oh, absolutely.

Q.   And you've taken that into account when you're analyzing the fringe benefit component on your chart, right?

A.   Yes.  I'm measuring the additional benefit that she has. She has, still has a benefit that she's going to receive when

A-637

44

VOLUME: 6
PAGES: 1-221

she retires or decides to draw on that retirement.  I'm only interested in how that would have increased, what was the value of the increases over time.  So I'm looking at the marginal or the additional value of that benefit.

I should also point out that in the fringe benefits in the year 2017 and 2018, I do have Dartmouth's, some measure of Dartmouth's contribution to a health insurance.  For the first seven, for the last seven months of 2017, She had no health insurance, and then for the first four months of 2018, she had no health insurance.  So I put in the value of Dartmouth's health insurance.  Going forward, I eliminated it because she was getting coverage at UVM and so it was a wash.

Q.   Is it your understanding that, while she was a per diem employee before she was a full-time employee, UVM did not provide her with health insurance?

A.   That's correct.

Q.   And that, after she became a full-time employee, did you understand that health insurance was part of the package?

A.   That's right, yes.

Q.   So, going back to your chart --

A.   Okay.  So the third column there, it's a mathematical calculation.  It's adding the numbers from Column 1 and Column 2.  So that's my estimate of what the total value of her earnings would be if she continued to work at Dartmouth.

Q.   You've done that for each year?

A-638

VOLUME: 6
PAGES: 1-221

A.   Added it up for each year, yes, correct.  And then the next three columns over are my, are the post-termination.  I title them post-termination projections UVM although for '17 through 2024 I'm using her actual earnings.  So my notes start projecting until the year 2025, and the projections on 2025 are based on what she earned in 2024 and Dr. Porter's representation that she would go to a 75 percent part-time position where she's currently at an 8 percent.

So in 2025 I've got, I have a 3 percent wage inflator that I'm assuming in the UVM projections.

Q.   Do you believe that's reasonable?

A.   Yes, and I, the reason that I had 3 percent, half a percent higher than I had in the Dartmouth one was, when I initially did this analysis in 2018 and then I did do an update early in 2019, she'd just started at UVM it's been me experience that new employees, at least initially for one, two years get slightly above average wage increases, assuming they prove themselves.  So I used the 3 percent and to, I just continued on using it, although, you know, probably to be consistent I really probably should have used 2.5 percent starting in 2005, but I didn't.

Q.   But you using 3 percent instead of 2.5 reduces the loss of Dr. Porter, right?

A.   Yeah, because it increases her earnings at UVM.  So, in determining the 2025 earnings at UVM I had, there was two

VOLUME: 6
PAGES: 1-221

operations.  In July 1, because the raise, UVM is on a fiscal year, July 1 to June 30th.  So I assumed that she would get a 3 percent increase on June 1 of 2025, but, at that point, she would go from an 80 percent part-time employment to a 75 percent, which that's really about a 6 percent reduction, and so I reduced it by 6 percent.  And then, going forward from that, I used that number as a basis for a forecasting forward with a 3 percent annual salary inflator that goes into effect every July 1.

Q.   I want to make sure I've got this right.  So, going forward, the assumption is that Dr. Porter would work at a .75, 75 percent of a full-time position, right?

A.   Yes, starting in July 1 of this year.

Q.   Right.

A.   And so the next -- so that's how I developed the gross earned income under the post-termination projections.  The next column over, it's fringe benefits, and for the only fringe benefit I've included in here in this analysis is UVM's contribution to a retirement plan, which is 9 percent.  And then the next column over would be 6.  It is nothing more than the addition of prior two columns, the gross earned income and the fringe benefits, and so that's added up each one of the years out through 2033.

Q.   So that's Column 6, right, on your report?

A.   Yes.

A-640

47

VOLUME: 6
PAGES: 1-221

Q.   All right.  And what does Column 7 reflect?

A.   Column 7 is another simple mathematical calculation, and what it does is it takes the numbers from Column 3, the total earnings for Dartmouth-Hitchcock, and then I subtract out the total earnings under the post-termination projections.  So it's a, it's a, I subtract Column 6 from Column 3 to come up with what I'm titling as the gross, and that's a key word, the gross adjusted lost earnings.

Q.   And then, going to the next column, which is --

A.   Yes.  The next column is I back out income taxes.  And so the premise here is that, if Dr. Porter had earned this additional money at Dartmouth, she'd earned more at Dartmouth than she would have at UVM, which she did for all the years except for one, she would have to pay taxes on that money.

Q.   Right.

A.   So I estimated what would be a tax liability of earning this additional money, and, and that calculation is based on looking at the difference between Column 1 and Column 3. Fringe benefits aren't taxable.  You will notice that in one year, the year 2021, it's not a negative number.  It's a positive number, because in that year, in 2021, she actually earned more at UVM than she did at, or would have, my projections of what she would have earned at Dartmouth.  And that's primarily because of no wage increases for 2000 and 2021.

A-641

VOLUME: 6
PAGES: 1-221

So that's actually a credit that her, her taxes would have been $1,600 less.  So it's a, I'm crediting her with that, if you will.  It offsets the other taxes that she would have had to pay.  So that's how I estimated Column 8 was estimating what she, what she would have to pay in taxes, and in doing that I look at what the income that I looked at, you know, prior tax returns, and I look at what income she earned.  Well, I know what I'm projecting what her income, but then her husband's income and what their taxes would be based on that, and then I recalculate with the additional loss and see how much the taxes would go up, and that's what Column 8 is measuring is the additional taxes.

Q.   Then what does Column 9 reflect?

A.   That's a simple mathematical calculation there.  It's subtracting the income taxes from the gross adjusted lost earnings.  So it's a, I'm titling it tax adjusted lost earnings.

Q.   Right.  This column reflects the income assuming that Dr. Porter pays the income taxes owed on the additional amount, right?

A.   Yes.  In each year if she earned higher income, she would have to pay taxes on it, and so I'm backing those taxes out. If you will, the numbers in Column 9 are what I believe she should be made whole if she received those numbers depending on which year you pick or, well, in each one of the years, and

VOLUME: 6
PAGES: 1-221

there were no tax consequences of receiving a settlement.

Q.    Sorry.  So, if we could go to Column 10 which is entitled "Present Value" --

A.    Yes.

Q.    -- what is that?

A.    So what I'm doing there is I'm converting those numbers to how much would be needed now to -- I'm not sure how to explain this -- what the present value is, and there's two components to that.  One is the historical.  So that's from 2017 up through 2024 Is historical.  And the law in Vermont passed by the legislature is that interest on past losses are to be calculated at the rate of 1 percent per month simple interest.  So --

ATTORNEY COFFIN:  Objection, Your Honor.  We have to approach for a second, please.

THE COURT:  Yes.

(Bench conference begins.)

ATTORNEY COFFIN:  I don't mean to slow things down, but I think we need to clearly cross this bridge or figure out what we're going to do.  First of all, Dr. Bancroft shouldn't be providing legal opinions about what the law in Vermont is, and we ask that to be struck.

Secondly, the 12 percent interest statute that's, you know, supported by case law only applies to a sum certain.  I would renew strenuously or our continued objection that, you

know, we do not have a sum certain that can be applied here, and it really is the for the jury to determine based on examination of the Witness what the proper interest rate to be applied, if any, is and if anything that changed from the August '24 report coupled to the change to the report last week demonstrates that there is, you know, no way one could have come up with a sum certain in this case.

THE COURT:  Okay.  So, if we strike his answer with respect to his representation as to the law that Vermont requires and then his testimony just talks about what interest rate he applied, does that satisfy your concern?

ATTORNEY COFFIN:  Yeah, that's fine, as long as the way he answers it does not indicate there's some sort of rule or authority for that but that he, in his expertise, applied 12 percent.

ATTORNEY VITT:  That's fine.  As Your Honor, I'm sure, appreciates, we disagree, and I'm sure we'll brief this at the appropriate point saying it's 12 percent in this situation, period, but, for purposes of the testimony, saying, you know, the Court will instruct the jury on the law or however you want to do it is fine.  And then, obviously, the 12 percent is included.  So he's done that calculation.  So I just want to make clear that that's, he's included that calculation in the information that appears on the report.

ATTORNEY COFFIN:  Very good.  And I would just ask

VOLUME: 6
PAGES: 1-221

the ability, as described by the case law, to be able to cross-examine him on that point.

THE COURT: Yes. So what I'll indicate then is that I'm striking the last answer to the extent that it makes a representation about what Vermont law requires. Is that --

ATTORNEY VITT: Fine with me.

ATTORNEY COFFIN: Yes. And then, you know, I will, and I'm sure I can take care of it. That's good. Thank you.

THE COURT: Okay. Thank you. We're good.

(Bench conference ends.)

THE COURT: Okay. So, before we proceed, I am going to strike the Witness's last answer to the extent that it made a representation about what Vermont law requires with respect to interest rate, okay? Mr. Vitt.

BY ATTORNEY VITT:

Q. Dr. Bancroft, without getting into what the law is, what you did was you used 12 percent as the calculation for each of these, for each year in the calculation, right?

A. Yes. So 1 percent per month.

Q. Per month? Okay, got it. And was there any other part of the answer that you --

A. No.

Q. -- didn't get to in terms of calculating the present value?

A. Present value? Yes. Going forward, what I want to do is

2:17-cv-00194-kjd   Document 290   Filed 04/23/25   Page 52 of 221

52

VOLUME: 6
PAGES: 1-221

convert those numbers.  Just the opposite of adding interest, I want to convert them back to a present value, and, basically, what I'm calculating there in each one of those years is how much money would be needed right now to generate that, that figure in that future year.

So I'm looking at, for instance, in order for -- let's take the year 2033 because it's at the bottom of the page and I can read it.  In 2033 I'm estimating that the after-tax loss is $51,744.  I'm, after calculating the present value of that, the number is $41,329, and what that's saying is that, if you take $41,329 and you invested it into a tax-free municipal bond paying around 2.8 percent, that would generate, in the year 2033, $51,744.

Q.   Is this process or approach that you've just described standard for economists who are trying to evaluate future losses?

A.   Yes, it is.

Q.   And then you've got, I believe the next column is settlement income tax, correct?

A.   Well, the next, actually, the next column is the cumulative present value --

Q.   I'm sorry.

A.   -- which is nothing more than a running total, just taking the numbers from Column 10 and adding them up over time.  And I should point out that I think it's important to understand

that, if this was a personal injury case, in a personal injury case, the award is not taxable.  That would be -- the table would end there.  There wouldn't be -- the next two columns would be, would not be necessary because the awards are not taxable.  But in an employment case, the awards are --

ATTORNEY COFFIN:  Objection, Your Honor.  Approach?  I think it's a legal issue.

THE COURT:  Yes.

(Bench conference begins.)

THE COURT:  Similar objection?

ATTORNEY COFFIN:  Yeah, similar.  I just don't think he should be providing, you know, legal opinion.  You can, you can ask and he can answer the question based on sort of an understanding that such-and-such.

THE COURT:  Right.  You can just ask him generally about the fact that the settlement income tax figure -- so, obviously, he should not be testifying as to the difference legally between a personal jury case and an employment case, but he can testify generally to the fact that he did do a settlement income tax calculation.

ATTORNEY VITT:  All right.

ATTORNEY SCHROEDER:  I still feel like he's doing the direct and the cross.  I'm not quite sure what the question was.  I mean, we're trying to move this along.  Not really getting there with the long-winded answer that has nothing to

A-647

VOLUME: 6
PAGES: 1-221

do with the question when he starts going off on personal injury.

THE COURT:  So he's not going to be talking about personal injury.

ATTORNEY VITT:  All right.  That's fine.

(Bench conference ends.)

THE COURT:  Yes, proceed.

BY ATTORNEY VITT:

Q.   So the settlement income tax, I've got a quick question. Can you explain the difference in taxes calculation when they're paid each year versus in a lump sum?

A.   Sure.  Obviously, in calculating the taxes in Column 8, I'm looking at one year, the loss in one year where, if you move over to Column 11 where I have a cumulative total, I'm looking at lumping several years together.

Q.   Right.

A.   And so it's critical to understand that in column the present values in Column 10 are after-tax dollars because I've already backed taxes out.  So now, because it's taxable, I need to calculate the taxes, and, because I'm getting so much more, my taxes are going to be significantly higher.

I'll give you an example.  If an individual has lost, has lost, somebody caused somebody to lose $50,000 a year for the next ten years, the taxes on, for a single person, just federal taxes -- lower for state taxes -- the taxes for that individual

would be about $4,000.  The federal tax would be about $4,000.

Q.   That's per year?

A.   That's per year.

Q.   All right.

A.   So over the ten years they would pay about $40,000.  Now, if they were to receive that $50,000 for all ten years at once, that's $500,000 all at once.  When they report that on their income tax, they're going to be kicked up into the -- some of them actually might be in the highest tax bracket, and in that case, assuming they earned no other income that they were -- so that, the tax on that would be, I think, about $125,000, three times higher than it would be if it was spread out over time.

And the higher the income is, the greater that difference becomes.  So that's what I, in calculating the settlement income tax, I've had to estimate, determine what kind of taxes Dr. Porter would have to pay if she was to receive a settlement.  And so Column 13 is the addition of the cumulative values in 1 and the settlement taxes.  So let me go through an example in case there's some confusion.

Q.   Go ahead.

A.   So, in the year 2033 I'm estimating that the total economic loss is $1,787,722.

Q.   That's if she works up to when she's 70?

A.   Yes.  I'm not saying that she would, but I'm just using it as an example.  So, if she was to be awarded that amount when

A-649

56

VOLUME: 6
PAGES: 1-221

she filled out her income taxes in 2005, she would put that down along with her other income, her income this year at UVM and any investment income, plus her husband's in income.

I took that into account. I made an estimate of what their income would be, what kind of taxes they would pay on this income. And so what I'm now estimating is that, if she was to get this award of $1,787,000 on top of her other income, she would have to pay $878,000 in income taxes on that, that over and above the income taxes she'd pay on her salary and her husband's business income. And so, if you subtract the $878,000 from the $1,787,722, you get cumulative present value in that column for 2033 of $909,722. And so it's my contention that then she would be made whole.

Q. I want to make sure that the point you covered when we were talking about the income taxes and the tax adjusted lost earnings that's Column 9, right?

A. Yes.

Q. That column assumes that Dr. Porter has paid the income taxes on that lost income, correct?

A. That's correct. Yes.

Q. All right. So the taxes have already been paid, and what you're calculating is -- tell me if I got this right. You're calculating the additional amount that would be incurred because it comes in a lump sum at a later date?

A. That's correct, yes. What, getting all that income lumped

A-650

VOLUME: 6
PAGES: 1-221

in one year, what the impact would be.  Now, if excuse me.  I hope this doesn't complicate things, but, if she was to be paid in each one of those years in the year that the loss occurred, -- you'd have to go back to 17 --

Q.   Right.

A.   -- then there you could eliminate the Column 8, But that's not the case.  She's going to receive one payment.  Assuming she prevails, she's going to receive one payment, and so, therefore, because of the marginal tax bracket, both federal and state, significant tax consequences.

Q.   Your last column reflects total economic loss, and the amount through 2033 is what?

A.   Yes.  That's my projections of what her total economic loss is.  That takes into account what her present value cumulative loss is, plus whatever, in each year, what the income tax, income tax liability would be.

Q.   Can you bring up the last page which is entitled "Additional University of Vermont Employment-Related Costs"?  It's the last page of the exhibit.

         COURTROOM DEPUTY:  I don't have the ability to bring it up here.  You can -- can you put it up on the ELMO?

         ATTORNEY VITT:  I can put it up.  Does that show up?

         COURTROOM DEPUTY:  Yes.

         ATTORNEY VITT:  Will that show up on all the --

         COURTROOM DEPUTY:  Yeah.

VOLUME: 6
PAGES: 1-221

BY ATTORNEY VITT:

Q.   I would like to direct your attention to the page of the chart that appears on your screen there, at least I hope it does.

A.   Yes, I see it, yes.

Q.   Okay.  Tell me what that reflects, please.

A.   It reflects the additional costs, employment costs that Dr. Porter has incurred, basically by having to set up housekeeping, if you will, in the Burlington area, Chittenden area and that she has to commute and her husband are commuting from their home in Norwich.  The costs were provided by Dr. Porter to me what her costs were.

For the first year or so when she was up here, she was renting, and then they ended up buying a place.  I didn't include anything associated with the buying.  But so she had provided information on what she was having to pay utilities on their house, well, in their apartment initially and then on their house and then what they had to pay in heat, again, on the rental unit and then on the house.  And then the rent, she provided me information on the rent.

Q.   The rent's only for two years, right?

A.   Beg your pardon.

Q.   The rent is for two years?

A.   Well, it's not even two years.  It was a partial year in 2018.  Well, both years were partial.

A-652

59

VOLUME: 6
PAGES: 1-221

Q.   Okay.

A.   Both years were partial.

Q.   And, when she bought a home or a condominium, there was there was no rent component, correct?

A.   That's correct, no rent component.  And then, moving across the table, the next two columns are travel, and that is based on the number of miles that Dr. Porter represented to me that she traveled on a weekly basis, monthly basis -- I scaled it up to an annual basis -- traveled between Norwich and her place in her condominium, well, in her rental unit, condominium here in Chittenden County and also her husband assuming the assumption.  She said that he came up as much as she did.

So that's, those were the one, two, three, four, categories of additional expenses, and so Column 6 is the addition of those five.  And then I go through the same exercise that I talked about on the previous table of determining the present value, the historical amounts from 2017 to 2024.  That's, I'm using that 12 percent simple interest rate figure and then going forward, 2005 out to 2033.  I'm discounting those numbers and discounting.  The interest rate that I'm using to discount that is based on tax-free municipal bonds, Triple A value.

Q.   You've got a number under the travel column.  Do you see that?

A.   Yes.

VOLUME: 6
PAGES: 1-221

Q.    How do you come up with that number?  What does it reflect?

A.    What I did was I took the mileage that Dr. Porter gave me and multiplied it by the federal mileage rate over, in each one of the years.  I went and got the historical mileage rate in each year, and I multiplied the mileage times that federal mileage rate.

Q.    And it appears to go up each year.

A.    Beg your pardon.

Q.    It appears to go up each year, the amount?

A.    Yes.  I used, in all the columns, I used an inflator of 2.5 percent, which inflation over this period has averaged historically.  If you look at the last, since the year 2000, inflation has been increasing on average about 2.65 percent a year, but I used 2.5.  The mileage rate has increased at around 3.2 percent.  Average increase has been around 3.2 percent, but I used the 2.5 percent inflator on this to be conservative.

      So I forget where we were, but so I determined the present value, and then if you want me, the last column is a running total.

            ATTORNEY VITT:  Excuse me a second, Your Honor.

            THE COURT:  Yes.

            ATTORNEY VITT:  Nothing further, Your Honor.

            THE COURT:  Okay.  Cross-examination?

            ATTORNEY COFFIN:  Thank you, Your Honor.  Give me a

VOLUME: 6
PAGES: 1-221

moment to make the move here.

THE COURT:  Yes.

CROSS-EXAMINATION BY ATTORNEY COFFIN

Q.  Good morning, Dr. Bancroft.

A.  Good morning.

Q.  Are you able to get a drink water and clear your throat a little bit?  Good.

A.  I just did.  Hopefully it will work.

Q.  Perfect.  Thank you.  Good to see you again.  You've been qualified as an expert economist many times, isn't that right?

A.  Yes.

Q.  And, particularly, your credentials that we went through a little bit with plaintiff were that you got a BA in economics at UVM in '74, right?

A.  Yes.

Q.  And then you got a masters in agricultural economics at UVM in '76; is that right?

A.  Yes.

Q.  And then you got a PhD in agricultural economics from Purdue in 1981; is that correct?

A.  Yes.

Q.  And you served as a policy analyst at USDA for a time in the 70s and 80s before your PhD was awarded; is that right?

A.  Yes.

Q.  Okay.  And that was essentially analyzing agricultural

A-655

VOLUME: 6
PAGES: 1-221

economic policy?

A.   Well, it wasn't, it wasn't analyzing actual policy.  It was developing an econometric statistical model, a forecasting model.

Q.   Okay.  For agricultural?

A.   Agricultural, yes.  Yeah.

Q.   Okay.  And then you had an assistant professorship from August 1981 to July of 1991 in the department of agricultural and resource economics at UVM; is that right?

A.   Yes.

Q.   Okay.  Again, oriented towards agricultural economics, isn't that right?

A.   Well, some of it was, but not all of it.

Q.   Okay.  But you were in the department of agricultural and resource economics?

A.   Yes, I was.  There was a small business program.

Q.   It says that on your CV, right, that you were in the department of agricultural and resource economics?

A.   Yes.

Q.   Okay.  And then you were an adjunct professor in the department of community development and applied economics at UVM from 1992 to 1996; isn't that right?

A.   I think from July of '91 when I left UVM into 1996.

Q.   Okay.  Now, throughout that time, though, your primary role has been to be an economic consultant in litigation; isn't

VOLUME: 6
PAGES: 1-221

that right?

A.   Well, during the first -- it grew from --

ATTORNEY VITT:  Objection, Your Honor.  Can he finish the answer, please?

THE COURT:  He's rephrasing the question.

BY ATTORNEY COFFIN:

Q.   Yeah, I'm just trying to expedite things.  I should have said, since about 1986 to present, your primary role in economics has been as an economic litigation consultant; isn't that right?

A.   Yes, but that '86 to '91 I would say that my earnings at UVM were equivalent to what I was earning in consulting.  I might have earned a little bit more in consulting, but, basically, but then after '91 that really did become the predominant source of my income.

Q.   So, basically, from 1991 until the present, your primary income as a consulting litigation witness; isn't that right?

A.   Well, over that year -- so the, the consulting income, the majority of it -- I'm going to say -- I don't know what the percent is -- 80 percent came from forensic, but I did a lot of other types of consulting over those years that were nonlitigation types of work.

Q.   My question was -- it will go quicker if you answer my questions -- is, from 1986 to the present, the majority of your income has been made by being an economic litigation

VOLUME: 6
PAGES: 1-221

consultant; isn't that right?

A.   Yes.

Q.   Now, am I correct that you've worked on, as of the time you were deposed in this case in 2019 -- there's been some hiatus -- but you gave a figure of about 2,500 cases at that time you'd served as a litigation witness?

A.   That's my estimate back then, how many cases I worked on.

Q.   And so that's going back now, like, 30 years or so; is that right?

A.   Back to my first litigation case was in 1982.

Q.   Okay.  So however long that is, right?

A.   Yes.

Q.   Quite a long time?

A.   Yes.

Q.   Okay.  And how much do you charge per hour for your work as a litigation consultant?

A.   Today, I assume?

Q.   Yes.

A.   $400 an hour.

Q.   Say that again.

A.   $400 an hour.

Q.   Okay.  And since, you know, about 2010 to the last time your rates changed, were they the same, or how did they differ?

A.   They've grown.

Q.   In say 2010 to 2025, how would you describe your rates

A-658

VOLUME: 6
PAGES: 1-221

other than they've grown?

A.   I don't remember what they were in 2010, but I'm going to say maybe they were around 200.

Q.   About 200?

A.   I'm, I don't know that for sure, but --

Q.   $200 an hour?

A.   $200 an hour, yes.

Q.   Do did you charge a difference for court testimony or deposition testimony and review or --

A.   No.  It's the same rate across for everything I do except for travel, and I basically charge half rate for travel.

Q.   Okay.  And, between 2000 and 2010, were your rates the same as during the later period of 2010 to 2020?

A.   No.  My rates were, but may I go back to the previous question?  I should point out that, recently, in the last four or five years, I, my rate for depositions is, is half again as higher than my regular rate.  That's to take account of reviewing the depo, deposition.

Q.   Okay.  Meaning it's more than $400 an hour?

A.   Yes.  It would be $600 an hour.  I used to charge for both the deposition time and reviewing it, and so now I just, instead of having to put in the time for reviewing it.

Q.   Okay.  So, currently, you charge $400 an hour for your work on the case, right?

A.   Yes.

VOLUME: 6
PAGES: 1-221

Q.   For deposition testimony it's $600 an hour; is that right?

A.   Yes.  Now it is.

Q.   How about trial testimony?

A.   $400.

Q.   $400?  Okay.  And, you know, to the best you can kind of reconstruct it from about 2000 to 2010, what were your hourly rates?

A.   2000 to 2010?  I don't know.

Q.   $200 an hour?

A.   Well, I said that I'm guessing that in 2010 they were $200, but I don't remember what they were in 2000.

Q.   Can you give me an approximation?

A.   Yes.  Somewhere between 150 and 50.

Q.   Okay.  So your testimony here today is, from 2000 to 2010, your expert witness rates were somewhere between $50 and $150?

A.   I'm guessing.  I don't know what --

Q.   Could it be that they were higher than that?

A.   It might have been, yeah.  I think you have a bill that I submitted to, to in this case that goes back to 2019, and on that has my hourly rate.  I don't remember offhand what it is, but you have it.

Q.   Okay.  About how many cases would you estimate you've served as an expert witness on?

A.   Well, as I indicated, it's probably closer to 3,000 now. Back when in 2019 when my deposition, I was saying

A-660

VOLUME: 6
PAGES: 1-221

approximately 2,500.  I have not kept a, you know, an itemized number.  I am estimating.

Q.   This is a question that you're asked regularly in depositions, though, isn't it?

A.   No, not necessarily, no.

Q.   Not necessarily?

A.   No.

Q.   But regularly?

A.   Actually quite seldom.

Q.   Say that --

A.   Quite seldom am I asked about the number of cases I worked on.

Q.   So in the 3,000 or so cases you've done, that's a question that's asked seldomly?  That's a question you're seldom asked in depositions?

A.   Yeah.  That's, yes.

Q.   And about how many times have you given a deposition out of the 3,000 cases you've served as an expert consultant?

ATTORNEY VITT:  Could Mr. Coffin closer to the microphone?  It's a little hard to hear.

ATTORNEY COFFIN:  Maybe I'll turn it this way. Apologize.  Thank you.  Sorry.  Sometimes I can be a low talker too.

THE WITNESS:  I wouldn't have the foggiest idea over that from '82 to present how many depositions I've given, but

VOLUME: 6
PAGES: 1-221

there have been many.

BY ATTORNEY COFFIN:

Q.   Would you say thousands?

A.   No, I wouldn't say thousands.

Q.   High hundreds?

A.   I don't know if I'd go high hundreds, but I'd certainly say it's well into the hundreds.

Q.   Okay.  And am I correct that you do about 75 percent of your work for the plaintiff's side in your litigation consulting?

A.   Yeah.  Yes.  Currently, that's what it is.  If you went back to -- if you looked at the longer period of time, it would be slightly less for plaintiffs.  Back in the 90s if you asked me that question, I would say that it was 65 percent defense.

Q.   But for, like, the last 20 years, about 75 percent plaintiffs?

A.   I'd say the last 20 years about 75 percent, yes.

Q.   Okay.  And the work that you do is all sorts of plaintiff's side litigation; is that right?

A.   Well, I do defense work too.

Q.   And so some defense work?  Fair enough, okay.

A.   Yeah.

Q.   But it's the broad spectrum of litigation; is that right?

A.   Yes.  Predominantly personal injury, wrongful death, employment cases, and lost business profits, and then there are

VOLUME: 6
PAGES: 1-221

a couple of other types in there.

Q.   More unusual types?

A.   More unusual.

Q.   And am I correct that about 20 percent of your litigation consulting work in the last 10 or 15 years has related to employment claims?

A.   I would think that's a reasonable estimate.  Again, I haven't kept count of it, but it's a reasonable estimate

ATTORNEY COFFIN:  We're not publishing anything.  I wanted to display for the parties Dr. Bancroft's December 30, 2024 invoice preliminary to its introduction.

COURTROOM DEPUTY:  Just the parties?  Who should be seeing this?

ATTORNEY COFFIN:  Oh, I'm sorry.  Witness, judge, and litigants.

COURTROOM DEPUTY:  Oh, okay.  Thank you.

BY ATTORNEY COFFIN:

Q.   Dr. Bancroft, you mentioned an invoice for your work previously.  I'm showing you a document dated December 30th 2024 which is a unsigned letter from you to Geoffrey Vitt. Does that appear to be an invoice for work you've done on this case?

A.   Yes.

ATTORNEY COFFIN:  We'd move its admission, Your Honor.

A-663

VOLUME: 6
PAGES: 1-221

THE COURT:  Any objection?

ATTORNEY VITT:  No objection.

THE COURT:  Okay.  It's admitted.

ATTORNEY COFFIN:  If we could publish to the jury, please.

THE COURT:  Yes.  Do we have an exhibit number for that?

ATTORNEY COFFIN:  I'm not sure we do.  C18, Your Honor.

THE COURT:  Okay.  Defendant's C18 is admitted.

BY ATTORNEY COFFIN:

Q.   Okay.  Dr. Bancroft, is this an exhibit or, sorry, an invoice for work you've done on this case?

A.   Yes.

Q.   And by an invoice it describes generally the nature of the work you've done and the amount you've done and charged for the case; is that correct?

A.   Yes.

Q.   And I note that it's not signed.

A.   No.

Q.   What do you make of that?

A.   Well, you requested a copy of the file, and I went in my computer and printed it off, but, when I sent one out, it was signed.

Q.   Okay, okay.  When did you print this out and provide it?

VOLUME: 6
PAGES: 1-221

A.   This one was printed out last, sometime last week.

Q.   Okay.  So scrolling up, please, the date on this is December 30th 2024, right?

A.   Yes.

Q.   And so that describes work that you've done this calendar, in the calendar year of 2024; is that right?

A.   It turns out it was all done in '24.

Q.   It turns out --

A.   Everything was done, in this particular case, everything was done in '24.

Q.   Okay.  And by that you mean everything that was done was done in '24, you know that you issued three prior reports in this case.  They were done in '24?  I'm not following.

A.   No, no.  All I'm saying is that many times the bills that I send out may include a couple of years.  This one only included time that I spent in 2024.

Q.   Okay.  I see what you're saying.  Okay.  So this describes accurately the work you've done on the case and did in the case in 2024 then?

A.   Yes.

Q.   And this work involved $6,650 worth of work; is that right?

A.   Yes.

Q.   And the reports that you generated in 2024 were one dated August 26th 2024; is that right?

VOLUME: 6
PAGES: 1-221

A.   Yes.

Q.   And so this would be the work that went into that report; is that correct?

A.   Yes.  Yeah.  I was -- I had, was contacted by Mr. Vitt in the first part of 2024, and I had thrown my file away.

Q.   Okay.

A.   So I had to resurrect my file.  I had to, if you will, kind of reinvent the wheel.

Q.   Okay.  You had thrown your work file away; is that what you're testifying here today?

A.   Yes, yes.  I had my electronic file, but I had a file with some notes in it from over the years, and I, after not hearing anything for five years, I assumed the case had, had gone away, and I had a house fire last April, and I believe it may have gotten destroyed then too.

Q.   Okay.  But you don't have your original work file in this case; is that what you're telling me?

A.   I don't have those original handwritten notes, no.

Q.   And we didn't receive in discovery any other invoices for your work in this case.  How come?

A.   When Mr. Vitt asked me to print out my invoices, I thought I'd printed out both of them.  It appears what I did was I printed out this one twice, but I provided him today with the invoice from 2019.

ATTORNEY COFFIN:  Okay.  I hate to do this, Your

VOLUME: 6
PAGES: 1-221

Honor, but could we approach, please?

(Bench conference begins.)

ATTORNEY COFFIN:  I truly don't want to take more time than we need to, but this document was specifically requested.  It was requested in discovery.  Should have been produced then.  It was requested in seriatim many times over the last few days, and for me to be hearing from this witness on the stand that Mr. Vitt has a copy of this and it wasn't provided to us is, shall I say, extremely surprising.

THE COURT:  Mr. Vitt?

ATTORNEY VITT:  I just got this this morning.  I don't -- Your Honor, this is a bill for $2,648 going back to November of 2019.  I don't see this as a particularly shocking or surprising document, you know, and I'm not sure it was requested either, but we're certainly not hiding the ball.

THE COURT:  So, Mr. Vitt, I received this document this morning from your witness, but you didn't provide it to opposing counsel?

ATTORNEY JONES:  He literally handed it to me as he was walking to the stand.  I didn't have a chance to give it to Mr. Vitt or do anything because the jury was seated, and we were walking to the stand.  I was hoping for a break.

ATTORNEY COFFIN:  Just to be really clear, it's not really so much the size of the document that's the issue.  You know, I asked many Mr. Vitt -- Sorry.  Sometimes I can be a

VOLUME: 6
PAGES: 1-221

loud talker.

THE COURT:  A little less loud.

ATTORNEY COFFIN:  I asked Mr. Vitt and Mr. Jones specifically about this.  Mr. Jones deferred me to Mr. Vitt.  I followed Mr. Vitt last week, had, you know, some back-and-forths with him, was told by him on Friday, Oh, there's only this one invoice, there aren't other invoices, which was different than what he had told me before.  And so, you know, I'm just surprised that, given the weekend's work on these, briefing these issues, given the hour-long conference on these issues today, to find this out on direct examination of a witness.  But this is what it's been like for this witness, and it's not okay.

THE COURT:  Okay.  So this is the same line of questioning, obviously, for this witness.  I hear your objection.  I agree.  I'm not sure why this wasn't turned over before.  That's not acceptable.  The request was made.  It wasn't disclosed.  I'm not hearing a good reason why it wasn't disclosed.

That said, it's impeachment of this witness along the same lines of what you're doing now.  I'm happy to give you a break if you want to review this.  We're coming close to a break.  You know, I want to allow you make to make full use of this if that's what you'd like to do.

ATTORNEY COFFIN:  Sure, yeah.  I haven't seen it yet.

A-668

VOLUME: 6
PAGES: 1-221

Just looking over his shoulder, it appears to be something that I can absorb quickly and incorporate quickly.  It's 10:30.  If the Court wants to take a break, I'm totally good with that.

THE COURT:  Why don't we take the morning break, and then you can take a look at that?

ATTORNEY COFFIN:  Can I get a copy?

ATTORNEY VITT:  You can have this one.

ATTORNEY COFFIN:  Oh, this is for me?  Okay.

THE COURT:  Okay.

(Bench conference ends.)

THE COURT:  Okay.  At this time, we're going to take our morning break.  So I will see you back here at 10:40.

(A recess was taken from 10:27 a.m. to 10:42 a.m.)

THE COURT:  Okay.  Anything to take up before I bring the jury back?

ATTORNEY COFFIN:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Plaintiff?

ATTORNEY VITT:  No.

THE COURT:  Okay.

(The Jury enters the courtroom.)

THE COURT:  Mr. Coffin?

ATTORNEY COFFIN:  Thank you, Your Honor.

BY ATTORNEY COFFIN:

Q.   Good morning, Dr. Bancroft.

A.   Good morning.

76

VOLUME: 6
PAGES: 1-221

Q.   When we took a break, I was asking you about invoices you prepared in this case, right?

A.   Yes.

Q.   And I think you mentioned that you had thrown out your entire file for this case because you thought the case was over; is that right?

A.   Yes.

Q.   And you mentioned that there was a fire at your house?

A.   Yes.

Q.   Which I apologize for that.  I'm sorry for you.  You're not sure whether these, the file was destroyed in that fire, were you?

A.   No, I'm, I'm not sure.  When I first was contacted about the case, I knew that I -- I went and looked at the electronic file, and then sometime after that, a month or two months, I said, Well, I'll see if I can find the paper file, the notes that I had, and I wasn't able to find it.

Q.   Okay.  I'd ask you to please answer my yes-or-no questions with a "yes" or "no" if you can, please.  So the bottom line is you know your file disappeared; is that right?

A.   Yes.

Q.   And you don't -- you're not saying it was because of the fire here today?

A.   No, I'm not saying it's because of the fire.

Q.   And it sounded from the import of your answer, but I want

VOLUME: 6
PAGES: 1-221

to probe you jut a second on that, is you think that you thought the case was over so you got rid of those materials?

A.   Yes.

Q.   But, at Mr. Vitt's request, you dug up two invoices related to the case; is that right?

A.   Yes.

Q.   And one was the one we admitted into evidence December 30th 2024, correct?

A.   Yes.

Q.   And there was another one that you provided to Mr. Vitt dated November 19th 2019; is that correct?

A.   I believe that's correct, yes, the date.

ATTORNEY COFFIN:  Your Honor, I'd ask that the document that the Witness provided and attorneys provided that we had a sidebar on be introduced into evidence at this time, and let's call it C18-A.

THE COURT:  Okay.  Any objection?

ATTORNEY VITT:  No objection.

THE COURT:  Okay.  C18-A is admitted.

ATTORNEY COFFIN:  And, with the Court's permission and help from the deputy clerk, I'd like to display it on the ELMO.

THE COURT:  Yes.

BY ATTORNEY COFFIN:

Q.   And so this is an invoice, is it not, Dr. Bancroft, for

A-671

VOLUME: 6
PAGES: 1-221

$2,628 for work you've done on this case; is that correct?

A.    Yes.

Q.    And it lists the dates and the nature of the work you did; is that right?

A.    Yes.

Q.    Okay.  Specifically, it says, "Economic analysis, consultation, and report update, $1,352".  Is that what it says?

A.    Yes.

Q.    And noting the billable hour was $260 an hour; is that right?

A.    Yes.

Q.    So down from the $350 an hour you were charging in your, under the prior invoice; is that right?

A.    I'm sorry.

Q.    That's less than the $350 an hour you charged in your 2024 invoice that we looked at, right?

A.    Yes.

Q.    Okay.  Now, it says report update, doesn't it?

A.    Yes.

Q.    And that would imply that there was work done on a report prior to this that wasn't a report update, wouldn't it?

A.    There were two reports that I generated.

Q.    Well --

A.    The last one -- well, that --

A-672

VOLUME: 6
PAGES: 1-221

Q.   There were four reports that you generated, right?

A.   Yes.

Q.   Okay.  And what I think you're saying is that this bill is meant to reflect the work done on one of those reports; is that right?

A.   No.

Q.   Okay.  And there was another report that was done in 2018; is that right?

A.   Yes.

Q.   Okay.  And this report -- strike that.

     Does this invoice cover and bill for the work done on the initial report in 2018?

A.   Yes.

Q.   Okay.  And so --

A.   At least I was not able to find in my billing file another invoice.

Q.   Okay.  Are you here today testifying that you're sure you sent an invoice as to that 2018 report or that you didn't?

A.   I don't remember.

Q.   One way or the other?

A.   Yeah.  Because it's not in the file, my computer file, I would suspect that this covers both reports.

Q.   Even though it says it's a bill for a report update?

A.   Yes.

Q.   Okay.  So the billings you've sent to Mr. Vitt in this

A-673

case are this bill that's on Exhibit 16A for --

THE COURT:  I think it's 18A.

BY ATTORNEY COFFIN:

Q.   I apologize.  18A, right?

A.   Yeah.

Q.   And the amount that you provided for $6,650 on C18, is that right?

A.   I believe that's correct.

Q.   And so those cover three of the four reports that have been done in this case, correct?

A.   Yes.

Q.   And now you issued another report more recently; is that right?

A.   Yes.

Q.   The one that has been introduced into the, well, the report, the chart that has been introduced into evidence earlier through Mr. Vitt; is that correct?

A.   Yes.

Q.   And you haven't submitted an invoice yet for that work; is that right?

A.   That's correct.

Q.   You plan to, though?

A.   Yes.

Q.   And for your time here today; is that correct?

A.   Yes.

VOLUME: 6
PAGES: 1-221

Q.   Now, so we've got for three reports, a tick under $10,000;
is that right?

A.   Yes.

Q.   And, with another report coming, that would be another 3
or $4,000, estimated, with your testimony time?

A.   Maybe.  I don't know.  I don't know.  I haven't written
the time down, but that seems high, but I don't know.

Q.   What would you approximate it as?

A.   I don't know.  I just don't remember the amount of time
I've got put in, and I've been down to the courthouse here
several times.

Q.   So that would strike me as maybe it's higher than --

A.   I don't know.  It's, I --

Q.   Just guessing, you can't estimate?

A.   No.

Q.   Okay.  So, if I said that the, suppose that that report
will be worth $5,000 when that invoice is in, would you argue
with me about that?

A.   Yeah, I would.  I hope it is, but I'm sure it is.

Q.   Okay.  $2,500, how about that?

A.   It's probably at least $2,500.

Q.   Okay.  At least $2,500.  So the work that you've done in
the case for the three reports and the report you've done now
is about $12,000; is that right?

A.   Yes.

82

VOLUME: 6
PAGES: 1-221

Q.   Okay.  So you've worked on about 3,000 of these cases over the years?

A.   I've been involved in about 3,000 litigation cases, yes.

Q.   And I presume that a $10,000, $12,000 bill is on the high end of the report and billing services that you charge; is that fair to say?

A.   Extremely high.

Q.   Okay.  And more average is about 4 or $5,000?

A.   No, less than that.

Q.   Okay.  $3,000?

A.   Less than that.

Q.   $2,000?

A.   Between 2 and now, with my current rates, it's between 2 and 3,000 for a normal wrongful termination case.

Q.   Okay.  So, if we called it 3,000 to make math simple, 3,000 times 3,000 cases --

ATTORNEY VITT:  Objection.  Can we approach the bench?

ATTORNEY COFFIN:  Equals --

THE COURT:  He's in the middle of a question, but come on up.

ATTORNEY COFFIN:  Well, if I can finish the question -- equals $9 million?

THE COURT:  Okay.

THE WITNESS:  No, that ain't no $9 million.  You're

VOLUME: 6
PAGES: 1-221

multiplying my rate now to what I got back in '82?

BY ATTORNEY COFFIN:

Q.   I asked you what your average case was, and I think you said $2,000 to $3,000.  So the exact question, Doctor, is, What's 3,000 times 3,000?

ATTORNEY VITT:  Objection.

THE WITNESS:  Maybe I misunderstood you.  I thought you were talking about how much I would be a normal case today.  I can't tell you what a normal case was 25 years ago, what the bill was.  Today, a wrongful employment case is going to be somewhere, assuming there's nothing unusual in the case and I don't have to spend a lot of time on the phone, it's going to be somewhere between 2 and $3,000.

THE COURT:  So there's a request for a bench conference.  Is that still the request?

ATTORNEY VITT:  Yes, please.

THE COURT:  All right.  Please approach.

(Bench conference begins.)

ATTORNEY VITT:  Your Honor, I understand that counsel gets considerable latitude, but going back this far, and, basically, I'm not even sure what the argument is.  25 years of work, how much do you charge in each one, trying to come up with some sort of number.  What is the point that this is driving toward?  I don't understand it.

ATTORNEY COFFIN:  It's driving towards the obvious

VOLUME: 6
PAGES: 1-221

point that he's fiscally biased because of the millions of dollars he's made through his expert analysis, and it's totally appropriate, relevant cross-examination on, Are you unbiased? And Dr., Mr. Vitt can ask his questions to clarify it, even though, I would say, just like Dr. Bancroft has expanded beyond my cross to provide a lot of his rationale as well.

THE COURT:  It's valid on cross-examination.  I'll allow it.  You can ask him questions on redirect.

(Bench conference ends.)

BY ATTORNEY COFFIN:

Q.   Okay.  Again, my questions, I think, will go more quickly if you answer "yes" or "no", please, to them.  You estimated on direct that sort of your average case in recent times, maybe not going back to the 1980s, but recent times was $2,000 to $3,000 a case; isn't that right?

A.   No.

Q.   You didn't?  Okay.  And you estimated that you'd done about 3,000 cases; isn't that right?

A.   Yes, since '82.

Q.   So, if you'd done, your average for a case was $3,000 a case and you've done 3,000 cases, what would that be in terms of the amount of compensation you've received from doing these cases?

A.   Well, if you did that calculation, if that was correct, that would be a lot of money, and I'm sure, if I'd earned

VOLUME: 6
PAGES: 1-221

$3,000 in each one of those cases, I'm pretty sure I wouldn't be here now.

Q.  Well, you know the math is the math, right?  So 3,000 times 3,000 is what, $9 million?

A.  You are twisting this around.  I did not charge --

THE COURT:  Dr. Bancroft, I'll direct you to answer the question, please.

THE WITNESS:  I did not charge $400 an hour back in 1982.  My charge in '82 was probably well less than $50, and it's grown over that period of time.

BY ATTORNEY COFFIN:

Q.  We've had testimony significantly about your rates and case work in the 2000s, and I'll ask you again.  If your average remuneration for a case was $3,000 and you'd done 3,000 cases, wouldn't be that be $9 million?

A.  I'll take your word for it, but I haven't earned anywhere near that, not anywhere near that.

Q.  Now, you have worked with Attorney Vitt before?

A.  Yes, I think one time before.

Q.  Okay.  And what was the nature of that case?

A.  I believe it was an employment case.

Q.  Was it also an employment case involving my client, Dartmouth-Hitchcock?

A.  I don't remember.

Q.  Okay.  It was an employment case where you were asked to

provide opinions related to a resident who was terminated from the residency program; is that correct?

A.   I don't know.  I said I don't know if it was against Dartmouth or not, so I can't answer the question.

Q.   And do you recall a judge ruling on your opinions in that case?

A.   No.

Q.   No.  You don't recall the judge excluding your opinions based on improper speculation?

ATTORNEY VITT:  Objection.  Can you repeat the question, please?  I'm sorry.

BY ATTORNEY COFFIN:

Q.   Do you recall a judge ruling your opinions were not to be admitted due to improper methodology and speculation on your part?

A.   No.  I remember that there was one time that it was not allowed in because it was too, the disclosure was too late.

Q.   And so that's the only case you've worked on with Mr. Vitt; is that right?

A.   That's the only one I remember.

Q.   Oh, okay.  Think hard.  Can you remember any others where you've worked with him as a retained expert witness in his -- I don't know -- 20-plus years of practicing law?

A.   I'll think real hard on it.  That's the only one I remember.

A-680

VOLUME: 6
PAGES: 1-221

Q. Okay. How about the firm Langrock Sperry; have you ever done work for them?

A. Yes, a lot.

Q. A lot of work for them?

A. Yes.

Q. Okay. And Langrock Sperry is the firm that Mr. Jones is a partner at; is that right?

A. Yes.

Q. And what do you mean by doing a lot of work for them?

A. Well, over the years, I think probably I go back into the, you know, in the 90s and maybe into the 80s that I had some cases with them. But, over the years, I've had some cases with them, and I suspect it's less than 20, but maybe more than 10.

Q. Less than 20 and more than 10?

A. Over a 30-some-odd-year, 40-year period.

Q. Okay. And same assumption. Assuming you're charging three, just to make the math easy, $3,000 per case and you've had 20 cases or so with them, that firm; is that right?

A. I've had 20 -- I don't know if it's 20 cases or not, but I'm --

Q. You're estimating?

A. I don't know. I think it's probably somewhere between 10 and 20.

Q. So we'll call it 15, 15 cases with them where you've made $3,000 a case?

A.   No.

Q.   That comes out to about -- well, or your average case, if, if you assume it's $3,000 a case, and you fight that assumption, but let's, for the sake of discussion, assume that it is.  You would have made some $45,000 on cases from Langrock Sperry; is that fair to say?

A.   No, nowhere close to that, because the average over the 40 years that I have worked and done cases for Sperry Langrock, the average value was not $3,000.  And I'm not sure that I ever had a case with Sperry Langrock that had to do with employment.

Q.   Okay.  Now, do you have any cases with Mr. Vitt's firm other than this now?

A.   No.

Q.   And how about with Langrock Sperry?

A.   I don't think I do, but there's one that I haven't thrown the file away.  It's been a couple years since I've heard anything about it, so I'm not sure if it's still active.

Q.   Now, you described that about 20 percent, maybe 25 percent of your cases are employment discrimination cases, correct?

A.   In recent years, yes.

Q.   Now, we had a hearing last week where I asked you a bunch of questions about things.  Do you remember that?

A.   Yes.

Q.   And do you recall me asking you some questions about your work on academic medical cases involving the transfer of a

A-682

VOLUME: 6
PAGES: 1-221

physician from one academic medical institution to another?

A.   Vaguely.  I think that was a topic, but I don't remember much about it, but --

Q.   Okay.  Do you remember testifying that you had maybe one, maybe two of those cases in your experience prior to this?

A.   An employment -- let me make sure I understand you.  An employment case where we're dealing with a doctor in a hospital, is that --

Q.   Yes, transferring employment.

A.   I think that's probably fair.  I don't remember, but I'm going to say it's probably at least maybe three.

Q.   You wouldn't fight me if you said at the hearing it was one, maybe two?

A.   Well, maybe.  I don't remember, so --

Q.   Now, you prepared four reports in this case; isn't that correct?

A.   Yes.

Q.   And am I correct that one was on October 30th 2018?  Is that correct?

A.   I'll take your word for it, yes.

Q.   And, in all of the reports, you have a chart similar to the chart that's been introduced here today or shown to the jury today.  It's not in evidence yet, but shown to the jury today, right?

A.   Yes.

Q.   And the right column is kind of the ultimate loss column where it says "Total Economic Loss"; is that fair to say?

A.   Yes.

Q.   And it's divided up by years; is that right?

A.   Yes.

Q.   Now, in the October 30, 2018 report, do you agree that you calculated the total economic loss there in this case for as $3,000,022?

A.   I'll take your word for it.  I don't have it in front of me.

Q.   Okay.  And how about would you take my word for it that, on October 19, 2019, you calculated the loss at $4,835,000?

A.   I'll take your word for it.

Q.   Similarly, August 26th 2024, would you take my word that you calculated a loss of $4,329,258?

A.   I'll take your word for it.

Q.   And then, most recently on March 19th, last Tuesday, you calculated a total economic loss of $1,787,722; is that right?

A.   Yes.

Q.   That's right?

A.   Yes.

Q.   So your loss figures dropped by almost $2.6 million between August 26, 2024 and your most recent report last week; isn't that right?

A.   Dropped how much?

Q.   About $2.6 million.

A.   Okay.  I'll take your representation, yes.

Q.   Well, do you agree with that?

A.   I don't, I don't have them in front of me so I can't tell you, but I'll take your word for it.

Q.   Do you want me to put it in front of you?

A.   Sure.

Q.   Can you show him --

                (Brief pause.)

     Let me keep going.  We can circle back to this.  In any event, I'll refresh your recollection with it, but I don't hear you saying that you disagree with my assertion that your August 26, 2024 report had a total economic loss of $4,328,258.

A.   No.  I think that's in the area, yeah.  I know it was, it was much larger than this one.

Q.   Okay.  And so the most recent report from last week dropped it down to $1,787,722.  That sounds right?

A.   Yes.

Q.   Okay.  And you report that you did most recently made eight substantive changes from your report before; is that right?

A.   Yes.

Q.   And four were due to new information, and four were due to the passage of time?

A.   Yeah, I think it's four and four.  It might be five and

A-685

2:17-cv-00194-kjd   Document 290   Filed 04/23/25   Page 92 of 221

92

VOLUME: 6
PAGES: 1-221

three.  I think it's three and five, but I may have said four and four.

ATTORNEY COFFIN:  Okay.  Can we please display the March 19th 2025 report?  It's been admitted for identification.  I believe that has been shown to the jury, hasn't it?  I just want to make sure I'm not --

THE COURT:  Talking about the chart?  The chart has been.

ATTORNEY COFFIN:  Okay.  Not the report, but the chart?

THE COURT:  Right.

ATTORNEY VITT:  Could we move for the admission of that chart now?  Will that be possible, or should I wait until I redirect?

ATTORNEY COFFIN:  Objection for reasons we've gone over thoroughly.

THE COURT:  I'll reserve ruling on that at this time.

ATTORNEY COFFIN:  Please put it up for the Witness, the judge, and myself, please.

COURTROOM DEPUTY:  Hold on one second.

BY ATTORNEY COFFIN:

Q.  Okay. Does everybody have it?  Okay, good.  Thank you.  Now, Dr. Bancroft, directing your attention to the screen, this is your March 19th 2025 projected lost earnings for Dr. Porter chart; is that right?

VOLUME: 6
PAGES: 1-221

A.   Yes.

Q.   And you described the structure of the report as it goes along on direct examination.  Now, am I correct that your reports as you generate them, all these reports, are based significantly on what the plaintiff and her lawyers have told you?

A.   Yes, that and Dr. Porter, primarily on UVM side.

Q.   Dr. Porter, what Dr. Porter and her attorneys have told you; is that correct?

A.   Yes.

Q.   Like, in conversations, right?

A.   Yes.

Q.   In emails, right?

A.   There probably was some emails.  I'm not sure.

Q.   Okay.  It's not all based on sort of objective economic financial information; isn't that right?

A.   Well, I don't know.  You'll have to talk with Dr. Porter on this.  What she's was basing it on, I don't know, but I took her, I took her word that this is what her employment was going to be in the future.

Q.   Right.  And so the point is the transmission to you is you are relying on what she is telling you; is that correct?

A.   Absolutely.

Q.   You're basically a microphone for what she is telling you is her career situation; isn't that right?

A-687

94

VOLUME: 6
PAGES: 1-221

A.    Well, I might put it a different way, but I'll stipulate. I'll agree.

Q.    And she's ultimately your client, isn't she?

A.    Ultimately, I guess, yes.

Q.    You're getting paid pretty well for providing her a microphone for her views; is that right?

A.    I am representing -- I was detained by her to estimate what her losses were, yes.

Q.    Well, one of the things that's embedded in your report is the assumption that in 2019 she would become a full professor at Dartmouth; isn't that right?

A.    Yes.

Q.    And that would have resulted in a 5 percent increase in her salary at Dartmouth; is that correct?

A.    Yes.  Technically, it would have been a 2.5 percent increase because there would have been a 2.5 percent normal increase irrespective of being promoted.

Q.    But it would be 5 percent for that year because of the midyear timing of that; is that your point?

A.    Yes.

Q.    But, ultimately, the net from that is a 5 percent increase for her for becoming a professor at Dartmouth, right?

A.    Yes.

Q.    And you're not on the credential committee or the professor review committee or anything like that at Dartmouth,

2:17-cv-00194-kjd   Document 290   Filed 04/23/25   Page 95 of 221        95

VOLUME: 6
PAGES: 1-221

correct?  And so you don't know whether she can qualify to be a professor at Dartmouth or not, right?

A.   No, I did not look into it, no.

Q.   No, because you relied on what she told you, right?

A.   Yes, and I wouldn't -- I don't know how I'd even begin to do it.

Q.   Now, she ultimately wasn't selected to be a professor at Dartmouth because her employment was terminated when the REI division ended; isn't that right?

A.   I don't know about that.

Q.   Now, you did not include -- so the chart, just to kind of make it simple for me anyways, essentially, your, one of your primary tasks here is to compare what she would have made at Dartmouth to what she would be making and did make at the University of Vermont, correct?

A.   Yes, that's the primary objective.

Q.   Because you want to compare the difference between the two so, if her pay at Dartmouth was higher than her pay at UVM she may have sustained some damages from that, correct?

A.   Yes.

Q.   And she has a duty to mitigate her damages; you understand that, correct?

A.   I'm not a lawyer here, but that's my understanding, that the plaintiff does have an obligation to mitigate.

Q.   You know, in your 3,000 cases, all of them have dealt with

96

VOLUME: 6
PAGES: 1-221

the issue that a plaintiff can't just let the damages accumulate, they need to do what they can reasonably to make up for those damages; is that correct?

A.   Well, no.  I've had cases where a person had a very unique profession and it was unreasonable for them to pick up their family and move cross-country to mitigate their losses.

Q.   Okay.

A.   And by that several, I've had several over the, over the 30 years that I've been doing employment cases where that situation has arisen.

Q.   Okay.  But that's in contrast to the general rule where an employee who is wrongfully terminated needs to attempt to gain gainful employment, right?

A.   It's my understanding, within reason.

Q.   Yes.  Now, you, at the time of the hearing we had last week when I asked you some questions, you had issued a report in August of 2024, as I discussed, that outlined the damages as being $4.3 million, correct?

A.   As of, yes, 2033.

Q.   Yeah.  And one of the things I pointed out to you in the report is that we at least had not received the 2004 pay information from Dr. Porter.  Do you remember that?

A.   No, I don't.

Q.   Do you remember that you testified under oath like you are today that you had not used the 2004 (sic.) pay information in

VOLUME: 6
PAGES: 1-221

calculating your August 2004 report?

A.   Yeah, I did use the information that I had on her earnings up, in 2004 up to about the time that I issued my report.

Q.   But, when you came into court, you had not received her W-2 from 2004; isn't that right?

A.   It would be pretty hard to receive her W-2 for 2004 in August of 2004.  W-2s aren't generated until the end of the year.

Q.   Yes, but you, but you didn't obtain the 2004 and update your report until I specifically pointed that out to you; isn't that right?

A.   No.  I had received her W-2 after the 1st of the year.  I had that in my possession before I came to court last week, the W-2.

Q.   You had the 2024 W-2 in your possession before you came to court last week?

A.   Yes.

Q.   Had you provided it to Ms. Porter, Dr. Porter's counsel?

A.   I received it from Dr. Porter's counsel, I believe, or Dr. Porter.  I don't remember which one sent it to me.

Q.   In your August 2024 analysis, you hadn't used the most recent numbers; is that correct?

A.   I used what she had for information up to this point in time.  I looked at what she had earned and what her earnings were after July 1 and used that as a basis to forecast forward.

VOLUME: 6
PAGES: 1-221

Q.   Okay.  And you also hadn't been made aware that, in July of 2023, she became a full professor at the University of Vermont; isn't that right?

A.   I don't remember.  I'm sure that I was told that, but I don't remember that.

Q.   Your testimony here today under oath is that you were told that and you just don't remember that?  Is that, is that what your testimony is?

A.   I believe I was -- I don't remember.  I assume that I was told.  I had extensive, as the bill demonstrates, I had, the reason that bill is so high is I spent an inordinate amount of time on the phone with attorneys and with Dr. Porter.  It's hard to remember everything that was said and/or provided to me in 2024.

Q.   Your August 2024 report which was heading into a big settlement conference with, at the hospital, by the way, showed $4.3 million, correct?

ATTORNEY VITT:  Your Honor, objection.  I don't think there's any testimony about some big settlement conference.

THE COURT:  Please approach.

(Bench conference begins.)

THE COURT:  So what's your point here?

ATTORNEY VITT:  I don't think -- I don't believe that there's some big settlement conference.  I mean, I'm not sure what he's referring to.

VOLUME: 6
PAGES: 1-221

ATTORNEY SCHROEDER:  There was a mediation on September 9th.

ATTORNEY VITT:  Yes.

ATTORNEY SCHROEDER:  Yes.

ATTORNEY VITT:  Well, I wouldn't describe that as a big settlement conference.  I don't want to get into the discussion of it, but I think we have a different view about how things shook out.  I mean, he certainly prepared a report to try.  You know, the case came back to the Second Circuit.  We tried to, you know --

THE COURT:  Okay.  You're going to --

ATTORNEY COFFIN:  I'm not going to go into it, but it is relevant, I think, for the reasons that we've outlined and can explain those if necessary.  I'm not going to go into it much more, but it's not improper at all to ask that he made a report really high before the settlement conference to try and leverage this.

THE COURT:  She's telling me she can hear you.

ATTORNEY COFFIN:  I apologize.  And try and leverage a settlement and, after that, when he's got to put it on for trial, he drops it down a lot.

THE COURT:  I just want to be clear about the comment you just made.  Did you not hear that the law clerk could kind of overhear?  I want to be clear on the record.  So, basically, if Mr. Coffin going to be asking not much more on this topic

and certainly not getting into the substance of that, but, basically the point is, in preparation for mediation, I think the point he's trying to make is, Wouldn't you have gotten up to speed on exactly what your report says?

ATTORNEY SCHROEDER:  There's a court record that reflects the fact that there was a mediation on September 9th before John Schraven, because he charged moneys by both sides to conduct that mediation here in Burlington, just for the record.

THE COURT:  Right.  Just a little bit concerned about getting into that --

ATTORNEY COFFIN:  I don't need to get into it.

THE COURT:  -- to any more degree.  Frankly, even another mention if this gave me pause because now the jury is hearing that there was prior proceedings in the case that didn't involve litigation.  So I think it's something we should be frankly steering clear of.

ATTORNEY COFFIN:  I can steer clear.

THE COURT:  While we're still here, with respect to the other claim that was made, I think it was about the W-2, you asked him questions about whether it was presented before the hearing.  Are you talking about the motion in limine hearing?

ATTORNEY COFFIN:  Yeah.

THE COURT:  His first testimony on Friday in this

A-694

VOLUME: 6
PAGES: 1-221

trial?

ATTORNEY COFFIN:  I'm talking about the motion in limine hearing.  I needed to clarify that.

ATTORNEY SCHROEDER:  March 14th?

THE COURT:  March 14th.  That's the W-2 that was then disclosed to you?

ATTORNEY COFFIN:  Yes, right.

(Bench conference ends.)

BY ATTORNEY COFFIN:

Q.   Now, in your, in your practice calculating income and lost income, you believe it's important to get the most accurate and immediate payroll information, correct?

A.   I agree, yes.

Q.   Because how much money someone's making at the time is important if you're going to compare a prior employer to a current employer; isn't that right?

A.   It's important to have, yeah, appropriate and current information.

Q.   A simple yes-or-no will suffice.  I don't mean to cut you off, but we're taking a long time.

And you did that when you obtained the information that went into your report that I have on the screen before you now, which is the March 19th 2025 report, correct?

A.   I had what?  What did I have?

Q.   You obtained her most recent payroll information from 2024

A-695

VOLUME: 6
PAGES: 1-221

when you prepared this report that's on the screen in front of you from March 19th 2025, right?

A.    Yes.

Q.    And you did didn't choose to do that when you prepared your 2024 report; isn't that right?

A.    I beg your pardon.

Q.    When you prepared your August 2024 report.

A.    Yes.  What did I do?  What are you saying I did?

Q.    Aren't I correct, Dr. Bancroft, that, when you prepared your August 2024 report, you did not consider Dr. Porter's most recent payroll information?

A.    I considered her payroll information at the time I did the report.

Q.    From 2023, correct?

A.    No, from 2024.  I had information of what she'd earned up through -- I don't -- I assume up through July.  I don't know exactly when I had it up to, but I had her earnings that she earned in 2024 for a significant part of the year.

Q.    Okay.  And was that provided to you by counsel?

A.    I don't remember if it was provided by counsel or directly from Dr. Porter.

Q.    Okay.  You did not get the information that she'd actually been elevated to full professor a year before that in July of 2023, though, did you?

A.    I had --

A-696

VOLUME: 6
PAGES: 1-221

Q.   Yes or no, please.

A.   Well, it's not -- I can't answer the question yes or no. I'm sorry.

THE COURT:  Dr. Bancroft, it is a yes-or-no question. You're going to have to answer the question yes or no.  Your attorney will have an opportunity to ask you further questions

THE WITNESS:  No.

BY ATTORNEY COFFIN:

Q.   You didn't have that information --

A.   Yes.

Q.   -- correct?  And am I correct that you did not have that information?

A.   I don't know.  I don't know how to answer the question.

Q.   Okay.  In any event, your report in August 2024 did not include any assumed 5 percent pay bump from becoming a professor at UVM correct?

A.   I used her current earnings at the time I issued the report.

ATTORNEY COFFIN:  And, Your Honor, please ask the Witness to be responsive.

THE COURT:  Answer the question, Dr. Bancroft.

THE WITNESS:  No.

BY ATTORNEY COFFIN:

Q.   Okay.  And you did assume a 5 percent pay increase for her professorship, which she never even got when she was at

Dartmouth, correct?

A.    I did, yes.

Q.    And changing those numbers matters because it is, again, if she's making more at Dartmouth and less at UVM the difference between the two is greater, correct?

A.    Yes.

Q.    And so you chose not to include that information on the report in August of 2024 for UVM but you did for Dartmouth; is that right?

A.    No.

Q.    Now, your report in March of 2025 does include some increase in her salary while she's at University of Vermont from your August 2024 report, doesn't it?

A.    Yes.

Q.    Now, the March 2025 report includes a number of new assumptions.  Well, you assume -- just put the chart up.  You assume that there are -- if you can turn that, please.  You assume that, for a couple of years, pay was stable at Dartmouth due to, due to Covid; is that correct?

A.    Yes.

Q.    You assume that she received $8,000 for one semester, a little less than $8,000 for one semester of tuition remission for her son?

A.    Yes.

Q.    Okay.  And that wasn't done in your prior report, correct?

A-698

A.   No, it was not.

Q.   And who pointed that out to you?

A.   You did.

Q.   Yes.  And same thing with the Covid increases?

A.   Yes.

Q.   And how about the professor, did I point to that out to you too?

A.   I don't remember if you did or not.

Q.   Oh, you don't remember me in court on March 14th telling you that Dr. Porter had been, had become a professor and asking you if you knew that?

A.   I don't specifically remember that.  I'm not saying it didn't happen.

Q.   Now, this report on the right-hand column, total economic loss, uses a compound interest rate to account for the expansion in dollar amounts due to inflation, basically; isn't that correct?

A.   I'm not sure I understand your question.

Q.   The right-hand column, total economic loss, provides a running total of losses that increases in part due to compounding that value using an interest rate; isn't that right?

A.   Only on the historical.

Q.   Okay.  And the historical rate you chose to use was 12 percent; isn't that correct?

A.   Yes.

Q.   And there are other interest rates an economist could use, correct?

A.   Not in Vermont.

ATTORNEY COFFIN:  Your Honor, I think we need to have a quick approach on that.

THE COURT:  Yes.

(Bench conference begins.)

THE COURT:  Okay.  So this obviously is going to lead him to testifying something about Vermont law again.  I think that's the concern.

ATTORNEY COFFIN:  Yeah, and, really, the witness should have been instructed.

ATTORNEY VITT:  Excuse me.  I'm sorry.  It's loud enough that everybody can hear.

ATTORNEY COFFIN:  I would have expected that the witness, during a break, would have somehow been instructed about the Court's rulings, but, regardless, he should not be testifying with the tone, Vermont says this, and Vermont says that.  It's not his role.  It's an implication that it's a Vermont law thing, and we need to unwind that.

THE COURT:  He was on the stand on cross-examination when the break happened, right?

ATTORNEY COFFIN:  Well, I still think he's -- I would say there's a difference between discussing substantive

A-700

VOLUME: 6
PAGES: 1-221

testimony and informing him about the Court's rulings about guiding and limiting their testimony.

ATTORNEY VITT:  I understand that the defendants want to argue that there is some other rate that ought to be applied.  We will address that on substance.  I think they're dead wrong, but we're going to deal with that, and we're happy to brief the issue, Judge.  Dr. Bancroft understands that his job is to determine in Vermont what's the amount that somebody normally gets in terms of interest rates, and he says it's 12 percent.  He's not saying necessarily it's the law, but is he saying that's what he does on employment cases?  Yeah.  Every case is 12 percent.  That's what he does.  He calculates 12 percent interest on back pay.  I don't know how to avoid that.

THE COURT:  He believes Vermont law requires it?

ATTORNEY COFFIN:  Well, he shouldn't be testifying law.

THE COURT:  No, totally.

ATTORNEY COFFIN:  And I would say this case has federal law, Vermont law, and New Hampshire law, and it's an open question.  You know, Attorney Vitt and I may not see eye-to-eye on what the ruling on it for, right ruling on it is for the law that applies, but it is not what Dr. Bancroft says it's going to be.  That's not how it works.

ATTORNEY VITT:  He was in the legislature for eight years.  He's got some familiarity with these issues.  So I'm

not saying he's an expert, but --

THE COURT:  I am going to have to instruct him about not testifying as to what the law requires.  I've already stricken an answer from earlier saying that he testified that he felt that's what Vermont law requires.  So I may instruct the witness to say, As you answer questions, answer Mr. Coffin's questions on this topic, you shouldn't be speaking as to your understanding of the law but just as to what your analysis is.

ATTORNEY COFFIN:  I think you need to remove the geographic reference because that as well -- I would just say to cure it, you know, he can't say -- he said, Well, that's what it is in Vermont, like, implying there's some sort of Vermont rule, and I think you need to be clear that, you know, even just talking about law, because he might not understand that, but and also strike the reference to Vermont or somehow modify it.  I don't have a verbatim suggestion for Your Honor, but I think you get my import.

THE COURT:  Mr. Vitt?

ATTORNEY VITT:  I'm certainly fine with Dr. Bancroft avoiding it, and you're right.  I didn't talk to him on the break.  I didn't think it was my position to do that.  Avoiding saying, you know, this is what Vermont requires, but this is what happens all the time in Vermont, that's fine.  He does, as a matter of practice when it's an employment case in Vermont,

A-702

VOLUME: 6
PAGES: 1-221

use 12 percent.  I happen to think he's right, but we'll get to that another day.

THE COURT:  I mean, on the other hand, it feels like he has the right to testify how he makes use of this particular rate, and it's a tough question to balance here.  I don't think he can provide a backbone opinion on it.

ATTORNEY COFFIN:  He can say he used it because he thought it was appropriate, but he can't say, Well, it's because my understanding of law is such-and-such because it just is too much of an open legal question, especially on this record, and, you know, I'll just restate my concerns about, you know, repeated admissions of discovery failures here, and it's a little concerning.

THE COURT:  Okay.  So then I'm going to do my best to -- he shouldn't be testifying as to what he thinks the law and particularity the law in Vermont requires.

ATTORNEY COFFIN:  Perfect.  Okay.

ATTORNEY SCHROEDER:  Will you strike the answer as well?  Because he said, In Vermont it is blank.

THE COURT:  Right, yeah.  I think I'll have to.

ATTORNEY SCHROEDER:  Thank you.

(Bench conference ends.)

THE COURT:  Okay.  So the Court is going to strike the previous answer to the extent that it references what the State of Vermont, in the Witness's view, requires, and I'll

A-703

VOLUME: 6
PAGES: 1-221

also direct the Witness not to, not to answer any of the questions along this line involving your understanding of the law or particularly what Vermont law requires.

THE WITNESS:  Okay.

BY ATTORNEY COFFIN:

Q.   All right.  You said, Dr. Bancroft, that you used the 12 percent figure as an interest rate for accounting for inflation on past damages in your total economic loss column; is that right?

A.   If I got to answer yes or no, no.

Q.   Okay.  Aren't I correct that you used the figure of 12 percent as an inflator as an adjustment in your total economic loss column?

A.   I used 12 percent interest, right.

Q.   12 percent interest, okay.  Sorry about that.  And so, if you had used another interest rate such as 3 percent, wouldn't the damages on past economic loss be about a quarter of what you have opined here?

A.   Well, I don't think they'd be a quarter, but they'd be lower.

Q.   A lot lower?

A.   Um, no.  I don't know if you want me to deal with a particular year, try to give you an idea what.

Q.   Well, yeah.  So, like, each year your total economic loss, you adjust the amount of the prior year's loss by 12 percent,

A-704

VOLUME: 6
PAGES: 1-221

and my question to you is, If you adjusted it by a quarter of that, say 3 percent, wouldn't the total economic loss be essentially a quarter of your projection for a particular year?

A.   No.

Q.   No?

A.   No.  It's going to reduce the present value.  It will reduce the interest part, but the basic loss that is in Column 9 is going to stay the same.  The interest, if you use 3 percent as opposed to 12 percent, the interest on that component will be about a quarter.

Q.   Okay.

A.   But you've still got the base loss.

Q.   Okay.

A.   So you can't, you can't just go over to the further column and say, If I use 3 percent, that number is going to be reduced by 75 percent.

Q.   Okay.  So it wouldn't be a full reduction there, but, basically, all of the accumulating interest in those losses would be reduced by a quarter if you used 3 percent instead of 12 percent; is that right?

A.   Yes.

Q.   Okay.  And you wouldn't describe that as a significant difference?

A.   Yes.

Q.   You would describe it as a significant difference?

A-705

112

VOLUME: 6
PAGES: 1-221

A.   Yes.

Q.   Okay.  And so that would make, if the economic loss figures were significantly different as a result of using 3 percent versus 12 as an inflator, basically, everything in your chart is not correct; isn't that right?

A.   Yes, because it has a cumulative total, and the present value numbers out through 2024 would be smaller.

Q.   Okay.  And you described in Assumption 10 of the March 19th 2025 report which is C11, if you could go to the second page of the assumptions, please.  You described a discount rate of 2.79 percent, five-year tax-free Triple A municipal bonds, March 19th, is used to derive the present value for future income, right?

A.   Yes.

Q.   And so that's an example of another interest rate one could use based on those tax-free municipal bonds, right?

A.   I guess you could use whatever interest rate you wanted to.

Q.   Now, your exercise on the fringe benefits attempted to compare the value of her fringe benefits at Dartmouth to the value of her fringe benefits at UVM; is that correct?

A.   Yes.

Q.   And, again, a lot of that was dependent on what she told you, correct?

A.   No.

A-706

VOLUME: 6
PAGES: 1-221

Q.   She didn't tell you, for example, that she got a fringe benefit from the University of Vermont for tuition remission, free tuition for her son; is that correct?

A.   That part is true.  I did not know that until you brought it up.

Q.   I told you that, right?

A.   Yes, you did.

Q.   And okay.  And she continues to have the benefit of tuition-free school for her kids going forward; isn't that right?

A.   I assume she does.

Q.   And I'm not sure if she has any kids in school or not.  Do you know?

A.   No, I don't.

Q.   Okay.  But you don't account for that specifically in your report, right?

A.   Well, it would be speculation.

Q.   Now, can we please put up Page 34 of the Exhibit 5 of the deposition testimony?  Okay.  And this should just go to the witness, the judge.  And do you recognize this document, Dr. Bancroft?

A.   I do.

Q.   And is this a part of your work papers that was produced in discovery?

A.   I believe, yes, it was, and I had it in my initial file,

A-707

VOLUME: 6
PAGES: 1-221

yes.

Q.   And we talked a little bit about this at the hearing on March 14th, didn't we?

A.   I think we did.  I don't know if we talked about this specific piece of paper.

Q.   Maybe this will refresh your memory.  This document looks like it's a page of something called "Pension Plan of Employees of Dartmouth-Hitchcock".  See that?

A.   Yes.

Q.   And you reviewed information about the pension in her fringe benefits isn't that correct?

A.   Yes, I did.

Q.   Okay.  And I think you testified that the amounts you put in her fringe benefits were 12 percent of her pay; is that correct?

A.   Yes.

Q.   And, and, really, not so much her past pay, but your projections of her future pay; isn't that right?

A.   Yeah, not her past pay, only on what she would, my projections of what she would have earned at Dartmouth.  The contribution to a defined contribution is spent, laid right out by the Dartmouth document as 12 percent.

Q.   And my question is, So the, the, first of all, the total pensionable pay that you see there, from your review of the records, those look like her earnings at Dartmouth; is that

A-708

VOLUME: 6
PAGES: 1-221

fair to say?

A.   Well, that's what they're using to calculate with.

Q.   Okay.  Do you remember testifying that you thought those were her earnings at the hearing last week?

A.   I don't -- no.  I don't remember seeing this.

Q.   Okay.

A.   This wasn't up there last week.

Q.   And do you recall -- strike that.

Would her qualified pensionable pay, is that the amount of her salary above which they no longer pay additional fringe benefits to her retirement program, to your knowledge?

A.   Run that by me again.

Q.   Yeah.  So the total pensionable pay on the column on this document is larger than the qualified pensionable pay, isn't it?

A.   What numbers are you referring to?

ATTORNEY COFFIN:  First of all, may I move this document's admission?  We're getting into it more than I expected.

THE COURT:  Okay.  Any objection?

ATTORNEY VITT:  I didn't hear the question.  I'm sorry.

THE COURT:  Asking for the admission into evidence of this document.

ATTORNEY VITT:  Can we get a little more information

VOLUME: 6
PAGES: 1-221

about where it came from?

ATTORNEY COFFIN:  I believe the witness, the witness testified it was part of his work papers.  You produced it in discovery.

ATTORNEY VITT:  No objection.

THE COURT:  And is this B21, Mr. Coffin?

ATTORNEY COFFIN:  Yeah, let's call it that.  Yes.

THE COURT:  All right.  Then Defendant's B21 is admitted.

(Defense Exhibit B21 is admitted into evidence.)

BY ATTORNEY COFFIN:

Q.   Okay.  So qualified pensionable pay is lower throughout the total than total pensionable pay; do you see that?

A.   No, I don't see that it's lower.  Oh, yeah, I do see that.  There's two columns here.  Yes.  There's different calculations for this.  The column over on the right-hand side is by law.  Law specifies the maximum amount of income that you can calculate a pension on.

Q.   Okay.  And so, if you make more than that, it doesn't calculate in your pension; is that what you're saying?

A.   That's correct.

ATTORNEY COFFIN:  Okay.  And so -- oh, yeah, yeah.  Yes.  Can we publish this to the jury?  Thank you?

THE COURT:  Yes.

BY ATTORNEY COFFIN:

A-710

VOLUME: 6
PAGES: 1-221

Q.   Sorry.  So here we see total pensionable pay, qualified pensionable pay years 2008 to 2017, right?

A.   Yes.

Q.   Okay.  And so, if, and you note that throughout here qualified pensionable pay is lower than total pensionable pay, correct?

A.   Yes.  There's a formula for calculating that.  You can see at the bottom of the, at the bottom of the original document you had up there.

Q.   Okay.  And on the right there's sort of a cap that occurs above which you don't get your income to count towards your increased pension; is that right?

A.   Yes.

Q.   Okay.  And so, when you calculated her fringe benefits going forward, you calculated them to be 12 percent of her total pay; isn't that right?

A.   Yes, because that is what the defined contribution, not, not the defined benefit package.  This right here is the defined benefit package that ended at December 31st of 2017.  Going forward, it's a defined benefit package, which there's a document that was in my folder back in my deposition that laid it right out.  It was published.  It was a colored folder that laid out that Dr. Porter was eligible, not eligible, would receive contributions to a 403(b) equivalent to 12 percent of her actual earnings.

A-711

VOLUME: 6
PAGES: 1-221

Q.    Actual earnings, not qualified pensionable pay?

A.    Not qualified pensionable pay, because this is under a different, whole different law.  It's a defined benefit package.

Q.    Okay.  And still you have made the assumption in assessing what her fringe benefits would be that they'd be 12 percent of the, of your estimated pay that she would receive from Dartmouth?

A.    I'm using --

Q.    Yes or no?

A.    Yes.

Q.    Okay.  And so, to the extent that she would not receive 2.5 percent increases every year, that may result in a lower salary from Dartmouth and mean your 12 percent figure is exaggerated; isn't that right?

A.    Well, it would lower the fringe benefits, yes, but it would still be 12 percent of whatever the number is in that first column.

Q.    But it's of whatever the number is, not necessarily your projections, correct?

A.    It's 12 percent times the number, the income projection.

Q.    Now, you don't calculate -- you can take that down.  You don't calculate -- well, actually, put it back up really quickly.  Sorry.  Just real quick, one more question on this, maybe two.

A-712

VOLUME: 6
PAGES: 1-221

The earnings in this column do not go up uniformly 2.5 percent each year; isn't that correct?

A.   As I said before --

Q.   Yes or no, isn't that correct?

A.   They do not.  They, pensionable income does not go up by law.  It goes up by a set amount that's specified each year by law, not by what Dartmouth wants to do.

Q.   Let's go to -- you can take that down, please.  Do you know whether Dr. Porter qualifies for a pension from UVM Medical Center or UVM Medical College, also known as the College of Medicine or the Larner College of Medicine?

A.   Yeah, there's a 403(b) plan at UVM of which UVM contributes 9 percent of her salary into it so she will have a, when she retires, she can draw on that fund just as if she could if she continued working at Dartmouth.  She could draw on that fund that they contributed 12 percent to.

Q.   Do you know whether she would qualify for a pension as a professor of OB/GYN at the University of Vermont?

A.   No.  There's no such thing.  I don't know what your definition of pension is.  If your definition -- I believe, if I remember correctly -- it may have been last week -- the pension you associated with the defined benefit package where there's a formula to determine it.  That's not the case at UVM nor is it the case at Dartmouth now.

Q.   Okay.  Not talking about Dartmouth now.  I'm asking about

A-713

120

VOLUME: 6
PAGES: 1-221

UVM

A.   Well, it's the same thing.  There's a 403(b) plan of which money is put in.  UVM puts money into that plan, and that's her money and she can start withdrawing that at -- I forget exactly.  I think there's some qualification where you might be able to draw it before 65, but that's her money, and she can decide how she wants to withdraw it.

Q.   And how much is her yearly benefit from that?

A.   It's whatever she wants to withdraw.  There will be, there are rules and regulations.  There's a required minimum withdrawal specified by law, but you can take the minimum, and you don't have to start taking that until 73, or you can take more, but it's entirely up to the individual how they want to receive that money.

Q.   Can you put up 34, please?  And just for the judge, the witness, and the -- page, oh, I'm -- 35, 35 is what I wanted.  Sorry.  Looking at this document, does that refresh your recollection about what the withdrawal would be for certain years?

A.   On, yes, on her old plan.

Q.   Yes.

A.   The one that they, they eliminated as of January 1 2018.

Q.   Right.  And what does that say?

A.   It says --

          ATTORNEY COFFIN:  Can we move the admission, please?

A-714

121

VOLUME: 6
PAGES: 1-221

THE COURT:  Any objection?

ATTORNEY VITT:  No objection.

THE COURT:  All right.  And what is -- hold on, Dr. Bancroft.  What is the number on this exhibit?

ATTORNEY McDONALD:  This is a different page from the same exhibit.

THE COURT:  So C?

ATTORNEY McDONALD:  B21.

THE COURT:  Oh, so this has already been admitted?

ATTORNEY COFFIN:  I think that's next page of the same exhibit, and only those two pages should be admitted.  We can clear that up at a break, Your Honor.

THE COURT:  Okay.  So then C21 is admitted, this page.

ATTORNEY McDONALD:  B21, Your Honor.

ATTORNEY COFFIN:  I apologize, Your Honor.  It's B21.

ATTORNEY McDONALD:  B, as in boy, 21.

THE COURT:  Okay, thank you.  B21 is admitted.

BY ATTORNEY COFFIN:

Q.   Dr. Porter, does that say that -- excuse me, Dr. Bancroft, does this say that Dr. Porter gets a pension from Dartmouth still?  Even though she's separated from them, she's eligible for a pension where she could get a single life annuity worth $9,431?

A.   Yes, she's entitled to that for the work that she did up

A-715

122

VOLUME: 6
PAGES: 1-221

to '17.

Q.   Okay.  And so she's entitled to that, and she could be getting that even now, correct?

A.   Well, there is a, there's penalties if she was to take it before 65.  They're quite severe.

Q.   And no penalties at 65?

A.   No penalties at 65.

Q.   Your chart doesn't show that addition to her income, does it?

A.   No.  Don't need to.  I'm only interested in that, in estimating what the loss is.  I'm not going to -- I don't need to put down on the chart what she earned in the past --

Q.   Okay.

A.   -- both as income and as benefits.  This program is done. She's going to receive, depending on how they she ticks it, if she ticks a single life annuity, she's going to get $9,400, but the issue is, How much more would she get from a 403(b) if she continued to work at Dartmouth?

Q.   Now you can take that down and put up the chart from March 19th 2025, please.  Now, this chart goes to the out years of 2033; isn't that right?

A.   Yes.

Q.   And you testified at the beginning that you're not projecting that she'll work until age 70; is that correct?

A.   Yes, correct.

A-716

VOLUME: 6
PAGES: 1-221

Q.   And, however, you have underlined the amounts at age 70; isn't that right?

A.   Yes.

Q.   And it says in a little note at the bottom, "The year 2033", underlined, "is consistent with the work life of a 62-year-old female with a graduate degree"; is that correct?

A.   Yes.

Q.   And that's the basis for your emphasis of that; is that correct?

A.   Yes, yes.

Q.   But you're not estimating that she would work this long; is that correct?

A.   No, I'm not.  I put that in there to help the jury.  It's some additional information.

Q.   Because you have breakdowns for each year.  So at 65, for instance, it's the, the total economic loss would be 1.360, correct?

A.   Yes.

Q.   You know, not accounting for the higher compound interest rate than I've suggested you might be appropriate; isn't that right?

A.   Repeat that last part.

Q.   Yeah.  It's 1.3 million, but that doesn't take any amount you might reduce if you used an interest rate of, say, 3 percent versus 12 percent?

A-717

124

VOLUME: 6
PAGES: 1-221

A.   No, it takes -- that represents a 12 percent on historical losses.

Q.   Right.  And, if you used a lower rate, you'd have a lower number?

A.   Yes.

Q.   And, looking at this, you have the gross earned income from Dartmouth in Column 1 and the gross earned income from UVM in Column 4; is that correct?

A.   Yes.

Q.   And looking at between '24 and '25, the gross income from Dartmouth or, excuse me, from UVM drops from $313,000 to $302,000; isn't that correct?

A.   Yes.

Q.   And that is to reflect, is it not, the change in her work from full-time, 1.0, to .75; isn't that correct?

A.   No.

Q.   No, it's not?

A.   No.

Q.   Why does it go down after that?

A.   She's moving from a .8 part-time position.  She is not working full time.  She works .8, and she's moving down to a .75.

Q.   I see.  I see.  And so the salary numbers that you used in there reflecting a .8 position, not a full-time position; is that correct?

A-718

125

VOLUME: 6
PAGES: 1-221

A.    Her --

Q.    Yeah, the numbers you put in there -- strike that.

For 2017 to '24, the numbers you put in there are assuming a .8 position?

A.    Well, from 2017 to 2024, the numbers in that gross earned income column under the UVM are her actual earnings.  I'm not doing any forecasting.  Those are her actual earnings out through the year 2024.  Projections start in 2025.

Q.    Okay.  And actual being a 1.0 position?

A.    No, I don't think she was 1.0.  It's, I don't know if she ever had a 1.0.  I know recently it's .8.  But what I'm concerned about, well, not concerned -- the important thing is I need to put in what she actually earned.

Q.    Yes.

A.    And I did.

Q.    But you do more than that, because you project going forward earnings at what you calculated would be a .75 position at UVM isn't that right?

A.    Yes.  I went forward forecasting.  Starting at 2025, I'm starting to forecast, project out what her earnings, what I believe her earnings would be, and I, that's based on starting July 1 on a .75 part-time appointment.

Q.    Okay, okay.  Got you.  Just a second, please.  Did you -- you must have come up with this number by reducing to .75 from what you, her, her projection was for her; isn't that right?

A-719

A.    Yes.

Q.    Okay.  So you'd done that math before, correct?

A.    I'm not sure what quite what your question is, but, if you're talking about 2025 --

Q.    Yeah.

A.    As I explained on direct, two-step process.  The first thing I did was increase her 2024 income by 2.5 percent, and then, starting on July 1, I reduced it by a little over 6 percent, reflecting her moving from a .8 to a .75 position.

Q.    Okay.  So what I would like to do is just have you do a little math with me, please.  Take the numbers of her total earnings from -- I'll give you a pad you can write on in a second.

ATTORNEY VITT:  I'm having a hard time hearing.  I'm sorry.

BY ATTORNEY COFFIN:

Q.    I apologize.  Doing the math, from 2005 to 2027 and looking at gross earned income, I'm going to have you divide that by .75, which would give you the figure for a 1.0 position.

THE COURT:  So, Mr. Coffin, I'll ask you to pull the microphone a little closer to you.  People are having a difficulty hearing you.

ATTORNEY COFFIN:  I apologize.  Do I need to repeat that?

A-720

VOLUME: 6
PAGES: 1-221

ATTORNEY VITT:  We couldn't hear it.  I'm sorry.

ATTORNEY COFFIN:  Yeah, I apologize.  I'll try and project.

THE COURT:  If you want to discuss it with the Witness at the stand, you might be able to take his microphone.

BY ATTORNEY COFFIN:

Q.   Share?  Do you mind if I share?  Thank you.  Okay. Dr. Bancroft, I'm showing you the -- you have before you the March 19th 2025 chart, and I'd like you, with the calculator, and I'm going to get you a pad so you can write it down in a second, to calculate what the gross earned income for a .75 position you have in there is for a 1.0.  So you divide 302 by .75 for that, for year 2025.  And I'll be back in a second. You can use my calculator.  Let me just get a pad and --

A.   Well, may I comment?  The 2025 figure includes six months at .8 and six months at .7.  So calculation is not as simple as dividing it by .75.  Now, when I get to year 2026 and forward, I can divide that by .75 to see what a full-time position is.

Q.   Just for rough, rough cutting here, can you please do what I asked you to do and divide the $302,000 that is on your chart for her total earnings at UVM for 2024 by .75, which would give you what 1.0 is for that figure?

A.   No, it will not.

Q.   Well, can you just do it and --

A.   I'll do it anyways, but it's not correct.

A-721

VOLUME: 6
PAGES: 1-221

(The Witness uses the calculator.)

Q.   That's $403,000?

A.   Yes.

Q.   I'll go put a star by that so because you've raised some points about how you calculated that.  Do the same thing for 2006 and 2027.  I'll let you write it.

(Witness complies.)

A.   I'll let you write it.

Q.   What is it?

A.   $427,888.

Q.   $427,888?  That's a 1.0 position for 2026 at University of Vermont Medical Center --

A.   Yes.

Q.   -- correct?  2027, please.

A.   That was 2027.

Q.   Can you do 2026 then?

A.   Oh, I'm sorry.

Q.   That was 2027?  You're sure?

A.   No, I'm not.  Hold on just a second.

Q.   Sure.

A.   That number I gave was for '27.

Q.   Okay.  $427,888 for 2027; is that right?

A.   Yes.  And '26 --

Q.   What's 2026?

A.   $415,425.

A-722

129

VOLUME: 6
PAGES: 1-221

Q.   Okay, thank you.  I'll take my phone.  So you calculated a full-time position for 2025 with a couple of notes that, you know, you had differing methodologies for the first half of the year, second half of the year, but the .75 to 1 conversion was $403,000, approximately, right?

A.   I'll take your word for it.  I don't have in front of me.

Q.   2026, the calculation of a full-time position, and, again, here looking at the chart -- what is this exhibit number, by the way?  C11, looking at this chart that's C11 and going down to 2026, the amount you have written there for a gross income from Dartmouth at or from UVM you have at a .75 position.  If that was a full-time position, 1.0, the amount you calculated would be $415,925; isn't that correct?

A.   I don't know.  I'll take your word for it.

Q.   Okay.  And 2027, the calculation if you converted the .75 gross figure from $320,000 to 1.0 would be $427,888, correct?

A.   Take your word for it.

Q.   Okay.  So I note that all three of those years her earnings at Dartmouth if she was a 1.0 employee, a full-time employee, would be higher, excuse me, at UVM would be higher than what it was at Dartmouth; isn't that right?

A.   Higher than what I'm projecting, yes.

Q.   Okay.  And so, by that time, she would have fully mitigated her losses and, going forward, luckily for her, she's going to be making more at the University of Vermont than she

A-723

130

VOLUME: 6
PAGES: 1-221

is at Dartmouth?

ATTORNEY VITT:  Objection.  It's speculation, Judge.

THE COURT:  Overruled.

ATTORNEY COFFIN: Can you read the question back, please?

(Question read by the reporter.)

THE WITNESS:  She would be making more at UVM based on a full-time position than my projections at Dartmouth.

BY ATTORNEY COFFIN:

Q.   Okay.  Now, thank you.  Now I'd like you to make another --

THE COURT:  I'm sorry, Mr. Coffin Dr. Bancroft, can you please pull the microphone closer?

THE WITNESS:  Sorry.

ATTORNEY COFFIN:  And I think we'll be done with cross soon if that's okay, Your Honor.  I don't have a lot more to do.

THE COURT:  All right.  Go ahead.

BY ATTORNEY COFFIN:

Q.   Now, more math, but you're a math guy.  You're an economist.  36 weeks is 9 months, approximately?

A.   What's that?

Q.   36 weeks equals 9 months, approximately?

A.   Yeah.

Q.   Yeah.  Four weeks in a month, right?

A-724

VOLUME: 6
PAGES: 1-221

A.   A little over, yes.

Q.   And nine months is about three-quarters of a year?

A.   Yes.

Q.   Okay.  Now, you estimated that, at Dartmouth, when she left Dartmouth, she would have been making a gross income of $309,000 in 2018; is that right?

A.   That's my estimate.

Q.   Okay.

A.   I don't know because I have to estimate it.

Q.   Okay.  And so you might be able to do this in your head, but we'll do with it with the calculator.  .75 times $309,000 is what?

A.   I don't know.  You have the calculator.  What am I supposed to do here?

Q.   .75 times $309,000, your 2018 projection.

A.   319,000?  $232,019.

Q.   Okay.  So in 2018 if she had received three-quarters' pay for the year, that means that that would be, like, $232,000; is that right?

A.   Well, that's the -- the math works out that way.

Q.   Right, right.  Fair enough.  And you never heard -- well, strike that.

      Wouldn't all of your assumption be thrown radically off course if she had received $228,000 in the second half 2017 and had been able to keep working at UVM?

A-725

VOLUME: 6
PAGES: 1-221

A.   Run that by me again.

Q.   Yeah.  Assume, please, that in 2017 -- strike that.

In the second half of 2017 and into early 2018, she had received $228,000, just gift, but had been able to pursue her now current employment which started then at University of Vermont Medical Center.  Assume that.  How, wouldn't that mean that your calculations here are completely thrown out the window?

A.   Well, if you're going to assume less Dartmouth earnings, obviously, my numbers are going to be off because my numbers are predicated on my projections of what she would have earned at Dartmouth, and so, if you change those numbers, it's going to change the total economic loss.

Q.   Correct.  And you base a lot of your projections both for Dartmouth and UVM on what she told you, correct?

A.   Yes.

Q.   And what Counsel Vitt told you, correct?

A.   Yes, I mean, but, but most of the times I talked with counsel, Dr. Porter was on the line.

Q.   Okay.  No one mentioned to you, I presume, that anything well -- strike that.

Can you please show what's been admitted as C6A?  And I'm publishing this to the jury, Your Honor.

THE COURT:  Okay.  It's published.

ATTORNEY COFFIN:  And now please publish C13.  Blow

A-726

VOLUME: 6
PAGES: 1-221

up that paragraph on severance pay.

ATTORNEY VITT:  May we approach the bench, Judge?

THE COURT:  Yes.

(Bench conference begins.)

ATTORNEY VITT:  I think what they're doing is taking the severance offer if she had agreed to waive her rights and accept the money. They can't take the severance offer and say, Well, you should have taken that and, therefore, the payment would have been greater.  That is -- I just figured out what they're doing here.

ATTORNEY COFFIN:  Well, I'm asking this economic expert to describe another "what if", which is, What if she had taken the severance offer, which has been admitted into the evidence without objection, and say whether he could project how that would affect her future earnings.  And, of course, it would affect them greatly because he doesn't, it appears he doesn't know about that because he's relying on selective information from the plaintiff, which is all impeachment.  It goes to his credibility, and it goes to the substance of what's going on here.

ATTORNEY VITT:  She has no obligation to accept a severance offer that asks her to give up her various rights. She had no obligation.  You can't say, Well, we made a decent offer; you had to give up your rights, you know, confidentiality.  I mean, you know, there's settlement offers,

A-727

VOLUME: 6
PAGES: 1-221

I've seen these before.  Basically, you know, you have to be quiet.  You can't disclose the amount.  You can't talk, you know, nondefamation clause in there.  Absolutely not.  You don't get to say, Here's a settlement offer, and, oh, by the way, when it comes time for damages, we're going to consider that and you should have accepted it, and this somehow affects your damages.

ATTORNEY COFFIN:  So we have been asked to deal with, on the fly, repeated last-second reports, nondisclosure, varying economic opinions, and that's all supposed to be good for us, and we're supposed to deal with it, but the remedy for that, of course, is cross-examination on these documents, and, if this information has been already submitted without objection, it's relevant, already found, already admitted to the case for any purposes, no limiting purposes.  I think it's a fair point.

THE COURT:  It's in evidence.  So, Mr. Vitt, it would be very difficult for me to limit cross-examination on this when it's before the jury already and has been since last week.  You'll obviously have an opportunity to speak to your witness again on redirect and examine him on this.

ATTORNEY VITT:  All right.  Thank you.

(Bench conference ends.)

BY ATTORNEY COFFIN:

A-728

VOLUME: 6
PAGES: 1-221

Q.   Now, Dr. Bancroft, you saw, as we published to the jury, the last two exhibits which are -- find I piece of paper here -- C6A and C13, correct?

A.   Yeah, I believe so.  I'm seeing C13.

Q.   Yes or no, you see them?

A.   I see 13.

Q.   Before you were just shown C6A.

A.   I'll take your word for it.

Q.   Would you like to see it again?

A.   If you want me to, absolutely, sure, yes.

Q.   Could you put up C6A, please?  And, directing your attention to that first paragraph -- the rest is on another issue -- you've read that now?

A.   Yes.

Q.   And look at, please -- we're going to put C13 up again.  And, directing your attention to the highlighted paragraph, which there it is, this paragraph describes that they're willing to give a severance to 36 weeks, see that?

A.   Yes.

Q.   Did Dr. Porter or Attorney Vitt discuss anything about the payment of $228,000 in 2017 to Ms. Porter, Dr. Porter, excuse me, with you prior to your testifying here today?

A.   I don't remember if they specifically talked about it, but what I looked at is what she actually earned, and if you'll notice in 2017 I'm saying her loss is, what, $600.

A-729

VOLUME: 6
PAGES: 1-221

Q.   Yes-or-no questions are really important here, not side tours, please.  You cannot testify that they provided this information that she was offered a $228,000 severance in 2017 today, correct, yes or no?

A.   I don't see that number, so I don't know what she was offered.

Q.   Excuse me.  Yes or no, please?

ATTORNEY COFFIN:  Can you read me my question back, please?

(Question read by the reporter.)

A.   I don't remember.

Q.   If they had described a 228-some-odd-thousand-dollar payment that would be made then, would that have affected your economic analysis?

A.   No.

Q.   Okay.  And so, if Dr. Porter had received -- can you put up the 2025 chart, please?  If Dr. Porter had received a $228,000 payment in 2017, your gross earnings figure for that, assuming it was earnings, your gross earnings figure for that year would have gone up by $228,000; isn't that right?

A.   Well, if you were to add those two together, it would, but I looked at what she actually received.

Q.   I understand what you did.  I'm just asking you a hypothetical.

A.   If it's a hypothetical, yes, it's a hypothetical.

A-730

2:17-cv-00194-kjd  Document 290  Filed 04/23/25  Page 137 of 221  137

VOLUME: 6
PAGES: 1-221

Q.   Okay.  And so that increased earnings capacity or that lump sum earnings --

ATTORNEY VITT:  Objection, Your Honor.

ATTORNEY COFFIN:  Would have --

ATTORNEY VITT:  Accepting a severance payment to give up your claims is not --

THE COURT:  Well, Mr. Vitt, instead of a speaking objection, I'd ask you to come up.

(Bench conference begins.)

THE COURT:  I understand your point.  I think what you're asking to say is accepting a severance --

ATTORNEY VITT:  Is not an increased earnings capacity.

THE COURT:  He's asking him this as a hypothetical, if she had accepted the severance pay, right?  Why can't you come back on redirect and reestablish what he's saying now, which is that she --

ATTORNEY VITT:  Severance, but it's not, it doesn't increase her earnings capacity.  That's what that increases earnings capacity.  No, it doesn't.  She's simply accepting a severance, giving up rights that she otherwise has.  That doesn't increase her earning capacity.

THE COURT:  I don't know that your questioning is to make the point that it increases earning capacity.

ATTORNEY COFFIN:  No, it's not.

A-731

VOLUME: 6
PAGES: 1-221

THE COURT:  It would have been in red of that particular amount.

ATTORNEY COFFIN:  Yes, and he should and she would have had less to mitigate, and she would have been able to mitigate earlier, though it's crazy how quickly she did mitigate.

ATTORNEY VITT:  There wouldn't have been a lawsuit.

ATTORNEY COFFIN:  It might have been in her interest to take that, but, yes, it's a legitimate cross.

THE COURT:  As I said before, you can come back on redirect, and he'll make that point for you.  It sounds like she didn't accept it and his basis of calculation is what she actually received.

ATTORNEY COFFIN:  This is probably the one or two, if I can spit them out, and then we're done.

ATTORNEY VITT:  Take a break and then --

THE COURT:  Yes.

(Bench conference ends.)

BY ATTORNEY COFFIN:

Q.   Dr. Bancroft, if Dr. Porter had received a payment of $280,000 as earnings in 2017, that would have increased her earnings column in Column 1, Line 1 on 2017 by some $228,000; isn't that correct?

A.   I'm not sure of that.  I can't answer yes or no.  I don't know.  I'd have to see the circumstances what she got.  I told

A-732

VOLUME: 6
PAGES: 1-221

you the measure I have there is actual earnings.

Q.   Okay.  I'm asking for a hypothetical.

A.   Okay.

Q.   Okay.  So please answer my question.

A.   Make it clearer to me that it's a hypothetical.

Q.   Okay, I'll try.  If she, if, if, hypothetically, she had received $228,000 in earnings in 2017 and that would be in something using the methodology you've talked about here, you would add it to her gross earned income, right?

A.   No.  Maybe.  I don't know.  I can't answer.  I don't know, no.

Q.   You can't say that, if it's earnings and she had it, you'd consider it?

A.   I put in her actual earnings.

Q.   Well, let's assume she actually earned that, she got, actually got a $228,000 payment in 2017, she actually got that as reflected by the letter offering her that, for example, right?  Then you would have that added to the gross earned income column, correct?

A.   If it's not already taken into account.

Q.   Okay.  And from there that flow-down would be moneys that she could use to offset other deficiencies in her earnings later on, correct?

A.   Yes.  So you're assuming that she would have, she would have left Dartmouth?

VOLUME: 6
PAGES: 1-221

Q.    Let's assume what happened happened, she left and she went to UVM

A.    Yeah, I'm just trying to understand your hypothetical.

Q.    Okay.  Apologize.  And she's working away at Dartmouth for a while, but she leaves and is offered a position, you know, pretty much right way at UVM and she works there and has a successful career there, correct?

A.    Yes.

Q.    But maybe in the first couple of years it's a little bit less than what she was making at Dartmouth, correct?

A.    Quite a bit.

Q.    Okay.  But $228,000 could do quite a lot to fill up that divot; isn't that correct?

A.    If this is some new money that she would have received, yes.

ATTORNEY COFFIN:  Okay.  Those are all I got, Your Honor.

THE COURT:  Okay, all right.  So we'll take our lunch break.  We'll be ready to go at 1:30, please.

(A recess was taken from 12:26 p.m. to 1:32 p.m.)

THE COURT:  Okay.  Mr. Coffin

ATTORNEY COFFIN:  On very minor matter, Your Honor.

THE COURT:  Yes.

ATTORNEY COFFIN:  In the rush to get jury and all of us to lunch, I wanted to move the admission of what I'm calling

C19, which is the little handwritten chart that Dr. Bancroft prepared during his cross. I propose that this be admitted at this time as demonstrative evidence and that we likely will follow with asking for it be substantive evidence should the plaintiff's chart be admitted as substantive evidence.

THE COURT: Is there any objection, Mr. Vitt?

ATTORNEY VITT: Well, we certainly object to it being admitted into evidence under any circumstances. Dr. Bancroft said it was inaccurate. So, to the extent it's been used demonstrably, fine, but I don't know about admitting as demonstrative. I don't know what that means.

THE COURT: So a demonstrative would be that, obviously, he did some calculations on cross-examination. It could be shown to the jury for, for whatever purpose the defense has asked him to do those calculations. If it's admitted as a demonstrative now, then on redirect, if you choose, you can make use of that as well to speak to Dr. Bancroft about that.

ATTORNEY VITT: I don't intend to use it at all.

THE COURT: Okay. Do you object to it?

ATTORNEY VITT: I do.

THE COURT: Okay. Can I actually see it? I haven't --

ATTORNEY COFFIN: If I might approach, Your Honor.

THE COURT: Yes of course. This is

VOLUME: 6
PAGES: 1-221

ATTORNEY COFFIN:  This is the only copy in the world.

THE COURT:  So it says very little, but I know it's because your questions were kind of prompting.  So this is the ultimate sum total on the cell phone of the calculations you directed him to make?

ATTORNEY COFFIN:  Yes.  These were the calculations that were made using the addition based on the cell phone calculator and written in.

THE COURT:  Okay.  And, if this were to be admitted as a demonstrative now, Mr. Vitt objects to that, but he is also not going to be making any use of it.  Is there any reason why we can't take this up at a later time?

ATTORNEY COFFIN:  No.  I just didn't want him to be deprived of it on redirect.  We just created it, and I wanted him to be aware of it.

THE COURT:  Given that he's not going to use it, I guess I won't rule on this right now, but let's not forget it.

ATTORNEY COFFIN:  Okay.  I do view this as important cross-examination admissions of this witness, by the way.

THE COURT:  Okay.  But, again, Mr. Vitt, you have no intentions of using this on redirect?

ATTORNEY VITT:  None.

ATTORNEY SCHROEDER:  Judge, I also asked Emerson if we could come in a little bit early, just to go over, knowing that we have a lineup for tomorrow.  I've spoken with

A-736

143

VOLUME: 6
PAGES: 1-221

Dr. DeMars about, Hey, I don't think the other side is going to be done with you today. Can you figure out how to come back tomorrow? She's making arrangements to do that.

But then we have Dr. Conroy, CEO, coming, and it's really important to get her on and off since Dr. DeMars is sitting out there for the whole day since 9:00 a.m. without her phone. So she doesn't have the ability to get any work done. The same is going to be true for Dr. Conroy. I know of they have a few other witnesses that may or may not have some other issues, Dr. DeMars was here for today. We're making arrangements to have her back tomorrow morning. But, given the fact that they don't have the ability to sit out there and do work while they're here, it is really important for us that Dr. Conroy then gets on right after and gets off quickly. Because I don't think that's going to take more than 15 minutes.

THE COURT: Okay. And Dr. Conroy is for tomorrow?

ATTORNEY SCHROEDER: Correct.

ATTORNEY NUNAN: Well, okay. So we had given Michelle Russell a subpoena for 9:00 o'clock tomorrow, which we understand she would go on after Dr. DeMars, and we had been accommodating to allow Dr. Conroy to come on Tuesday instead of Wednesday. So, again, I do not think that Dr. Russell will take long, but she does have childcare duties at the end of the day in the Upper Valley, and I am going to try to get her on, like I told her, as soon as possible in the morning. And she

VOLUME: 6
PAGES: 1-221

also will be without her phone and not able to work in the lobby.

THE COURT:  Okay.  So Dr. DeMars, after the remaining redirect today, possibly coming back in the morning if necessary.  Plaintiff then intended to call Dr. Russell after that and then Dr. Conroy, right?

ATTORNEY NUNAN:  Right.

ATTORNEY SCHROEDER:  Yes.

THE COURT:  Dr. Conroy after that.  So thank you for letting me know.  Let's see how the day goes, see what we get through, and I'll be asking the same questions at the end of the day.  Anything else?

ATTORNEY McDONALD:  One minor exhibit issue.  I think the Court admitted the entirety of B21.  I've spoken with opposing counsel, and I think the intention was just that two pages from that larger set be admitted.  So they have agreed that B21A should be Page 34 from B21 and B21B should be Page 35 from the original B21 but that the entirety of B21 not be admitted.

THE COURT:  Okay.  Mr. Vitt, is that accurate?

ATTORNEY VITT:  Yes.  Thank you, Your Honor.

THE COURT:  Okay.  So then B21A and B21B are admitted, B21A being Page 34 and B21B being Page 35.

ATTORNEY McDONALD:  Thank you, Your Honor.

THE COURT:  Okay.  The bench conferences, I have to

VOLUME: 6
PAGES: 1-221

tell you.  It's, it's a little cacophonous up here.

ATTORNEY COFFIN:  I apologize, Your Honor.

THE COURT:  Yeah, I know we have to be very much on top of this.  If people are not going to keep the volume down, I'm just going to have to ask the jury to leave every time we have a bench conference.  I honestly don't know what else I can do in that circumstance.  Please be mindful of it.  I certainly have noticed -- how could you not notice it -- that there does seem to be a fair amount of tension here between the lawyers. I know you're both advocates for your position, but it certainly hasn't gone unnoticed.  This really is, it seems to me, anyway, among some of the more contention interactions between the lawyers.

Again, I'm not trying to rein people in in terms of being zealous advocates, but, when it comes to things like this, let's please do our best to keep it within the bounds of normal in terms of volume level, okay?  All right.  We'll bring the jury in.

(The Jury enters the courtroom.)

THE COURT:  Mr. Vitt, redirect?

REDIRECT EXAMINATION BY ATTORNEY VITT

Q.    Thank you.  Dr. Bancroft, all set?

A.    Yes.

Q.    You were asked on cross-examination if you had worked with my firm and Eric Jones's firm on other employment matters,

VOLUME: 6
PAGES: 1-221

correct?

A.   Yes.

Q.   Do you also with work with Downs Rachlin Martin, the firm Mr. Coffin is associated with?

A.   Yes.

Q.   For how long a period?

A.   I believe my first litigation case for them was in 1984, and I just finished up one with them in January of this year.

Q.   I'd like to direct your attention, if I may, to the 2023 earnings for Dr. Porter.  Had you obtained documents from Dr. Porter to support the earnings data that you provided in your report?

A.   Yes.

Q.   Was it relevant whether Dr. Porter was a full professor or not, so long as you had accurate salary information for her for that year?

A.   No, it wasn't relevant.  What I want is the actual.

Q.   All right.  And you actually had the actual numbers that you obtained from documents provided by Dr. Porter?

A.   Yes.

Q.   There is a question or two about reductions in Dr. Porter's salaries in 2016 and 2017 at Dartmouth-Hitchcock.  Was she on disability during those years?

A.   Yes.

Q.   Did that have an impact on her salary?

A-740

VOLUME: 6
PAGES: 1-221

A.   Yes.

Q.   I'm going to show you what has been marked as -- I think it's C13.  It's defendant's June 5, 2017 letter to Dr. Porter and then a number of documents, including a confidential separation agreement and general release.  Hand that up to you.

Over the years in working on employment cases, have you seen settlement documents that include a general release?

A.   I'm sorry.

Q.   Have you seen settlement documents that include a general release over the years in working on employment cases?

A.   I probably have.  None come to mind.

Q.   All right.  If you look at that, there is a reference to, I think, Paragraph 4, a general release.  Do you see that, Paragraph 4?

A.   Paragraph 4 on the June 5, 2017 --

Q.   Yes

A.   -- letter?

Q.   Well, actually, it's in the document.  I'm sorry.  My fault.  Okay.  I'll get it for you.  Hold on.  What's the title of that paragraph?

A.   Paragraph 4?

Q.   Yes, please.

A.   Release by physician.

THE COURT:  Mr. Vitt, I'm not seeing this exhibit. Did you intend to show this exhibit or just ask the witness

A-741

2:17-cv-00194-kjd   Document 290   Filed 04/23/25   Page 148 of 221

148

VOLUME: 6
PAGES: 1-221

about it?

          ATTORNEY VITT:  Actually, if I could show it, I would appreciate it, Judge.

          THE COURT:  Okay.  This is admitted?

          ATTORNEY VITT:  Yes, C13.

          THE COURT:  Yes.

          ATTORNEY VITT:  If that's the case, if you'll give that back to me, it will show up here on your screen.

          THE WITNESS:  Do you want the whole packet?

BY ATTORNEY VITT:

Q.   Thanks.  I realize you're an economist and don't spend a lot of time reading general releases and documents like that, but are you aware generally that, when employment cases get settled, the person receiving money is expected to release any and all claims that they have against the employer?

A.   That's sort of roughly my understanding, but, again, I have all I can do to handle the economics.

Q.   And, right, and if you go to Paragraph 5, there is a move to Paragraph 5.

A.   It's not here.

Q.   Oh, it's not on your screen?  Let me put it here.  Thank you.  Do you see that?

A.   Paragraph, what's the first couple words?  The term?

Q.   Paragraph 5 confidential physician --

A.   Oh, yes okay.  Yes.

A-742

VOLUME: 6
PAGES: 1-221

Q.   "Physician agrees to keep the terms and conditions relating to this agreement confidential", do you see that?

A.   Yes.

Q.   Okay.  And then I'm going to put Paragraph 6 up here entitled "nondisparagement".  Do you see that?

A.   Yes.

Q.   The first sentence, "Neither physician nor anyone acting on physician's behalf will make derogatory, disparaging, or critical statements about employer or any employer releasee".  Do you see that?

A.   Yes, I do.

Q.   So, given the obligations that Dartmouth-Hitchcock sought to impose on Dr. Porter in order to receive this payment of $228,000, did you see any reason that that $228,000 hypothetical payment should be reflected in your report?

ATTORNEY COFFIN:  Objection, totally leading.

THE COURT:  I'll allow it.

THE WITNESS:  No.

THE COURT:  Go ahead.  You may answer the question.

THE WITNESS:  No.

BY ATTORNEY VITT:

Q.   No reason to include it, correct?

A.   No.

ATTORNEY VITT:  Nothing further.

THE COURT:  Any recross, Mr. Coffin?

A-743

VOLUME: 6
PAGES: 1-221

ATTORNEY COFFIN:  Yeah, briefly, Your Honor.

RECROSS-EXAMINATION BY ATTORNEY COFFIN

Q.   You testified that, beginning in 2025 for this analysis, one of your assumptions is the plaintiff would be working .75 hours for her position at UVMMC; isn't that right?

A.   Yes, starting July 1.

Q.   And yet you continued when she was at Dartmouth from 2025 until your posited age of her retirement in 2033 --

ATTORNEY VITT:  Objection.

BY ATTORNEY COFFIN:

Q.   -- that she would be working in a full position; isn't that right?

ATTORNEY VITT:  Objection, Judge.  This is beyond scope.

THE COURT:  No, I'll allow this.

ATTORNEY VITT:  All right.

THE WITNESS:  Yes, I'm assuming.  Based on her salary at the time she was terminated, I've used that number to go forward, and I'm assuming that was for a full-time position.

BY ATTORNEY COFFIN:

Q.   Your assumption is, while at Dartmouth, she would work from 2025 until her posited retirement age in 2033 full time, correct?

A.   Yes, I think that's the case.

Q.   While at UVM she would work from 2025 until the time of

A-744

VOLUME: 6
PAGES: 1-221

her retirement in 2033 only at .75; isn't that correct?

A.   Yes.

Q.   And that's based on what she told you; isn't that correct?

A.   Yes.

Q.   Now, the difference between what she's making at Dartmouth as a full-time employee and what she's making at UVMMC as a theoretical .75 employee you calculate each year as damages incurred by the plaintiff; isn't that right?

A.   Yes.

Q.   So, if she's working less than full time at UVMMC, her damages are increased just because of that hypothesis?

A.   If she's working -- yes.

Q.   And we went through some of the numbers which showed, if you converted the .75 first to full time during her '25 through '27 UVMMC employment, she actually would be making more in salary at UVMMC; isn't that right?

A.   Yes.

Q.   Now, we talked a little bit about your cases, your prior work as an expert witness, and we talked about 2,500 cases, and it was hard to pin down some amounts related to your less recent work.  Let me ask you about your more recent work.

If we take the 500 cases or so that you've described doing since the time of your deposition in October of 2019, I think you said that was your estimate about the number of cases you've done, correct?

VOLUME: 6
PAGES: 1-221

ATTORNEY VITT:  Objection.

THE WITNESS:  That was what is on my resume.

THE COURT:  Dr. Bancroft, please don't answer the question.

ATTORNEY VITT:  Objection, Judge.  This is well beyond scope of what I covered in my redirect.

THE COURT:  Sustained.

ATTORNEY COFFIN:  No further questions.

THE COURT:  All right.  Dr. Bancroft, you may step down.  Plaintiff may call the next witness.

ATTORNEY NUNAN:  We call Leslie DeMars.

Leslie DeMars,

having been duly sworn to tell the truth,

testifies as follows:

THE COURT:  Please proceed.

ATTORNEY NUNAN:  Just a technical issue, can we shut the ELMO off?  I'm going to plug in my computer.  The document that's going to come up first has already been admitted, 83.

THE COURT:  Okay.

ATTORNEY SCHROEDER:  Sorry, Sarah.  What number is that?

ATTORNEY NUNAN:  83.  Sorry.

ATTORNEY VITT:  If you could get a little closer to the microphone --

ATTORNEY NUNAN:  Yeah, not a problem.  I have one

A-746

221

VOLUME: 6
PAGES: 1-221

ATTORNEY SCHROEDER:  I mean, I always like to take up scheduling issues, Your Honor.  Just, the only thing is that Dr. Conroy, we've just got to make sure, if you're going to put Dr. Russell on, I want to give her some clarity on when she needs to be here because I want her to be able to work outside of the courthouse and then get here when you need her to testify.

ATTORNEY NUNAN:  I think that it's safe to say not until 1:00 o'clock.

ATTORNEY SCHROEDER:  Okay.  That's fair.

THE COURT:  This is for Dr. Conroy?

ATTORNEY SCHROEDER:  Yes.

THE COURT:  Okay.  Thank you, everyone.

(Whereupon at 4:32 p.m. the hearing was adjourned.)

C E R T I F I C A T E

I, Sunnie Donath, RMR, Official Court Reporter for the United States District Court, District of Vermont, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes of the hearing taken before me in the above-titled matter on March 31, 2025 to the best of my skill and ability.

*Sunnie Donath, RMR*
-------------------------------
Sunnie Donath, RMR

432

VOLUME: 8
PAGES: 432-646

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter        )
                               )
                               )
v.                             ) Case No. 2:17-cv-194
                               )
                               )
Dartmouth-Hitchcock            )
Medical Center, et al.         )
                               )
_____)

RE:  Day 8 of Jury Trial

DATE: April 2, 2025

LOCATION: Burlington, Vermont

BEFORE:  Honorable Kevin J. Doyle
         Magistrate Judge

**APPEARANCES**:

Geoffrey J. Vitt, Esq.
Sarah H. Nunan, Esq.
Vitt & Nunan, PLC
8 Beaver Meadow Road
Norwich, VT 05055

Eric D. Jones, Esq.
Langrock, Sperry & Wool
210 College Street, Suite 400
Burlington, VT 05410

Donald W. Schroeder, Esq.
Morgan McDonald, Esq.
Foley & Lardner, LLP
111 Huntington Avenue, Suite 2500
Boston, MA 02199

- Continued on Next Page -

A-748

486

VOLUME: 8
PAGES: 432-646

Q.   You testified today that discussions about closure of the REI division began around the April of 2017 timeframe.  Prior to April of 2017, were you aware of issues with the REI division?

A.   I was not.

ATTORNEY McDONALD:  If I could just have one moment.

THE COURT:  Yes.

ATTORNEY McDONALD:  Nothing further.  Thank you.

THE COURT:  Okay.  Thank you.  Any further questions, Mr. Jones?

ATTORNEY JONES:  Nothing further.

THE COURT:  Okay.  Dr. Merrens, you may step down.  Okay.  So, at this time, we will take our midmorning break.  This break may be a little bit longer than typical, I'll just let you know.  Maybe it won't be, but maybe.  So I don't want you to be surprised by that, all right?

(The Jury leaves the courtroom.)

THE COURT:  Does the plaintiff have any more witnesses to call?

ATTORNEY JONES:  That's it, Judge.  We're done with our case in chief.

THE COURT:  So you rest?  Okay.

ATTORNEY JONES:  We rest.

THE COURT:  Defense, Mr. Schroeder?

ATTORNEY SCHROEDER:  Yes, Your Honor.  We'd like to

A-749

487

VOLUME: 8
PAGES: 432-646

move under Rule 50 for a motion for -- oh, I will apologize. My co-counsel wanted to deal with an admission of an exhibit issue.

ATTORNEY COFFIN:  Yeah.  Your Honor, we would like to renew our request to admit what I think has been marked C19, but it's the chart that Dr. Bancroft made on cross-examination.

THE COURT:  Okay.  Could I see a copy of that again? I do have questions about what exactly it shows.

ATTORNEY COFFIN:  Sure.  Just a second, Your Honor, if I might.

THE COURT:  Yes.

ATTORNEY VITT:  To refresh my recollection, can I see that for a second, please?

THE COURT:  Let me just take a quick look.  I think I know exactly -- yeah.  Okay, thank you.  All right.  So, Mr. Coffin, you're requesting admission of C19 into evidence as some type of demonstrative?

ATTORNEY COFFIN:  Yes, correct.

THE COURT:  Okay.  So why is this different than Dr. Bancroft's chart which has been offered as a demonstrative?

ATTORNEY COFFIN:  It may or may not be, but we want this into evidence.  I do think it's different because it is impeachment.  It's a statement by a party opponent.  It goes directly to his methodology in how he calculated the loss figure, and he chose to do it in a way that is not readily

A-750

488

VOLUME: 8
PAGES: 432-646

apparent.  And, in fact, it shows that she was actually, if you used the same amount of employment, 1.0 at Dartmouth and 1.0 at UVM, that she mitigated her damages by 2025.  So I think it's a statement by a party opponent, impeachment, and directly relevant to the case.

THE COURT:  Okay.  Impeachment doesn't necessarily mean it's evidence, right?

ATTORNEY COFFIN:  No, but it is substantive if it goes to the core matter in the case, which is the damages for this witness.  It is admissible.  It's his statement of -- it's sort of a parallel way of doing the chart and statement about that.

THE COURT:  Okay.  I'm just concerned about this going back to the jury room as is and the jury picking this up.  I mean, I understand what you did with it with the Witness when the Witness was testifying.  This seems to me to be more in the category, if it's going to be any type of an exhibit, it would be a demonstrative, perhaps, that you would be able to reference during closing, but it just doesn't real speak for itself.

ATTORNEY COFFIN:  Well, but the Witness testified about it extensively and explained what he was doing without objection, and it would be, I think, helpful to the jury to remember that important testimony and have those numbers there. We will use a demonstrative exhibit to explain it, but I don't

A-751

see any basis for excluding it from evidence.  It's clearly relevant, certainly not more prejudicial than probative, and it's not confusing to the jury.  And, indeed, in comparison, the testimony and the, you know, charts that were put, provided at the very last minute to us and after discovery violations, by the way, and we were asked to respond to, though, I don't think it's unreasonable for us to seek its admission as substantive evidence.

THE COURT:  Okay.  Mr. Vitt or whoever wants to argue this point?

ATTORNEY VITT:  We object, Judge.  It's inaccurate, it's incomprehensible, and I see no reason this should go back to the jury at all.  It shouldn't be admitted.  Dr. Bancroft said it was inaccurate.  In his testimony, he said it's simply inaccurate.  So we object.

THE COURT:  Okay.  Do you have any objection to this being used as a demonstrative?

ATTORNEY VITT:  I mean, in closing?

THE COURT:  Yes.

ATTORNEY VITT:  I think I do.  I want to think about that, but, certainly, for purposes of admissibility now, we disagree.

THE COURT:  All right.  So this is being brought up now because of the anticipated motion.  So is this kind of your -- you want this to be part of the record right now so that,

490

VOLUME: 8
PAGES: 432-646

because it's relevant to your Rule 50?

ATTORNEY COFFIN:  I'm worried that, if we proceed with our motion and we rest without this being introduced, we may not be able to get it introduced into evidence in our case. So we raised this before when this first came up with this witness, and the Court deferred a ruling on it.  I just didn't want to lose our opportunity to have it admitted.  I do think it is directly impeachment.  Doesn't matter that Dr. Bancroft disagreed with it.  That's the point.  We should be able to show that.  You know, we've been left with the remedy of cross-examination as an alternative to present his projections, and I think this is part and parcel to that.

THE COURT:  Okay.  So, at this time, I'm going to decline the request to make it substantive evidence admitted into evidence in the case.  The issue of whether it can be used as a demonstrative is something I'm certainly open to considering at a later time in the case, but, at this time, anyway, not as substantive evidence.

ATTORNEY VITT:  While we're on the issue of the Bancroft report and the chart, I think you might have deferred the issue of admissibility, and I want to make sure.

THE COURT:  Yes, at the request of defense counsel, right?  Mr. Coffin?

ATTORNEY COFFIN:  Oh, I didn't realize that look was asking for me to comment.

491

VOLUME: 8
PAGES: 432-646

THE COURT:  Well, I don't know.  Mr. Vitt's bringing it up.  I do recall that --

ATTORNEY COFFIN:  I do think you had deferred that.

THE COURT:  Yes.

ATTORNEY COFFIN:  I disagree that they are exactly equivalent, but the plaintiffs have now rested, and I don't know what the Court's plan to do with that deference, and I don't know what Mr. Vitt's request to the Court.  I don't think I've heard him say that he now wants to seek its admission or permission to use it as demonstrative evidence.  Perhaps that's where he's going, but I haven't quite heard that from him.

THE COURT:  Okay.  Mr. Vitt?

ATTORNEY VITT:  Well, we're to the point of resting, and I don't want to leave it sort of hanging out there.  If it's going to be resolved at a later time, that's fine, as long as we're not prejudiced in any way not getting it admitted now.

THE COURT:  Okay.  As I recall -- please correct me if I'm wrong -- I thought Mr. Coffin said, We may be okay with it being a demonstrative, we may be okay with it coming in as substantive evidence, and the request was that I wait in ruling on it, and I thought I was going to be hearing back from defendants on that issue.  I figured you were waiting for your cross-examination of Dr. Bancroft.

ATTORNEY COFFIN:  Well, I guess what I was waiting for was what the plaintiffs were going to seek the Court to do,

A-754

492

VOLUME: 8
PAGES: 432-646

and they've now rested without renewing their motion to admit it. I don't know if that formality matters or not, but we wanted to make sure that we were able to have that document admitted as substantive evidence, and I'll leave it to them to sort of decide what they want to do with their document.

You know, we continue to think that their chart with its various iterations and the discovery problems and the late disclosures and the very elaborate analysis is unclear and misrepresentative and should not be admitted as substantive evidence. To the extent that their chart is admitted as substantive evidence, certainly, ours should be, and, you know, I leave it to the Court's discretion about whether the appropriate thing to do with both is to admit them only as demonstrative evidence.

I would urge the Court, though, to see ours just a little differently, because that was direct impeachment on something that was incredibly important and central to the case, and it's a statement by the Witness on the stand, and it's sort of a different category of item.

THE COURT: Okay, all right. So, with respect to the Bancroft chart, so I will not allow its admission as substantive evidence. It can be used as a demonstrative exhibit, which is parallel and the equivalent of the ruling with respect to C19 that was made today. So both can be used as demonstrative exhibits, okay?

A-755

VOLUME: 8
PAGES: 432-646

ATTORNEY COFFIN:  Thank you, Your Honor.

THE COURT:  You're welcome.

ATTORNEY COFFIN:  May I approach to grab that?

THE COURT:  Yes, of course.

ATTORNEY JONES:  And, Mr. Coffin, could we get a copy at some point?  Because you have the only copy that exists right now.

ATTORNEY COFFIN:  Fair enough.  We'll make you a copy.

ATTORNEY SCHROEDER:  Your Honor, if we may, at this point, defendants would like to move for directed verdict pursuant to Rule 50.  I'd appreciate if we had perhaps a quick break, because this will, I think, be rather lengthy.

THE COURT:  Okay.

ATTORNEY SCHROEDER:  If we could have five minutes, I'd appreciate that, to come back, and if you are prepared to hear oral argument on that.

THE COURT:  Okay.  So five minutes, is that what you're asking?

ATTORNEY SCHROEDER:  That would be ideal.

THE COURT:  Okay.  We'll do that.

ATTORNEY SCHROEDER:  Thank you.

(A recess was taken from 10:27 a.m. to 10:42 a.m.)

THE COURT:  Mr. Schroeder?

ATTORNEY SCHROEDER:  Thank you, Your Honor.  May I

A-756

646

VOLUME: 8
PAGES: 432-646

C E R T I F I C A T E

I, Sunnie Donath, RMR, Official Court Reporter for the United States District Court, District of Vermont, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes of the hearing taken before me in the above-titled matter on April 2, 2025 to the best of my skill and ability.

*Sunnie Donath, RMR*
-------------------------------
Sunnie Donath, RMR

VOLUME:  11
PAGES:  970-1056

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter        )
                               )
                               )
v.                             ) Case No. 2:17-cv-194
                               )
                               )
Dartmouth-Hitchcock Medical    )
Center, et al.                 )
                               )
_____)

RE: Day 11 of Jury Trial, Charge Conference

DATE: April 7, 2025

LOCATION: Burlington, Vermont

BEFORE:  Honorable Kevin J. Doyle
         Magistrate Judge

**APPEARANCES**:

Geoffrey J. Vitt, Esq.
Sarah H. Nunan, Esq.
Vitt & Nunan, PLC
8 Beaver Meadow Road
Norwich, VT 05055

Eric D. Jones, Esq.
Langrock, Sperry & Wool
210 College Street, Suite 400
Burlington, VT 05410

Donald W. Schroeder, Esq.
Morgan McDonald, Esq.
Foley & Lardner, LLP
111 Huntington Avenue, Suite 2500
Boston, MA 02199

- Continued on Next Page -

A-758

971

VOLUME:  11
PAGES:   970-1056


Tristram J. Coffin, Esq.
Downs Rachlin Martin, PLLC
199 Main Street, Suite 600
Burlington, VT 05401-8339


TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
United States District Court Reporter
*verbatim@vermontel.net*

A-759

972

VOLUME:  11
PAGES:  970-1056

(The hearing began at 1:03 p.m.)

COURTROOM DEPUTY:  Your Honor, the matter before the Court is Civil Case Number 17-cv-194, Misty Blanchette Porter versus Dartmouth-Hitchcock Medical Center, et al.  Present on behalf of the plaintiff are Attorneys Geoffrey Vitt and Eric Jones.  Present on behalf of the defendants are Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We are here for a charge conference.

THE COURT:  Good afternoon.  Nice to see everyone again.  Okay.  So, turning to the charge conference, so just kind of for your knowledge, I've kind of set aside about 90 minutes.  I'm hoping that that should be enough to get through this.  So let's start with the actual charge, of course, and particularly the "General Instructions" beginning on Page 1. I'll just go through kind of what I'll call, you know, the more general charges that this court issues in pretty much every case just to make sure that people are okay with that for the record.

So, in terms of Page 1 as well as leading onto Page 2, "Jurors as Finders of Fact/Rulings of the Court", do plaintiffs have any comments or objections to those?

ATTORNEY JONES:  No objection.

THE COURT:  Okay.  Defendants?

ATTORNEY COFFIN:  No, Your Honor.

THE COURT:  Okay.  "Sympathy/Prejudice" is the next

A-760

973

VOLUME:  11
PAGES:  970-1056

category, as well as "Evidence in the Case".  Plaintiffs have any objections to that?

ATTORNEY JONES:  No objection.

THE COURT:  Okay.  And defendants?

ATTORNEY COFFIN:  No, Your Honor.

THE COURT:  All right.  Page 3, "Arguments/Statements/Objections of the Attorneys", "Court's Rulings on Objections", and "Evidence: Direct or Circumstantial", does plaintiff have any objections?

ATTORNEY JONES:  No, Your Honor.

THE COURT:  Okay.  And defendants?

ATTORNEY COFFIN:  No.

THE COURT:  Okay.  On Page 4, "Credibility of Witnesses", plaintiff, any objections to that charge?

ATTORNEY JONES:  No.

THE COURT:  And defendants?

ATTORNEY COFFIN:  No, Your Honor.

THE COURT:  On Page 5, "Impeachment of a Witness", plaintiff, any objections to that?

ATTORNEY JONES:  No, Your Honor.

THE COURT:  And defendants?

ATTORNEY COFFIN:  No.

THE COURT:  Okay.  Page 6, "Expert Witnesses", any objections from the plaintiff?

ATTORNEY JONES:  None.

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 5 of 87

974

VOLUME: 11
PAGES: 970-1056

THE COURT:  And defendant?

ATTORNEY SCHROEDER:  Just a minor edit, Your Honor, and, if it pleases the Court on this one, we've got our red lines that we actually did so that, to the extent that they would be beneficial to the Court to understand our position on a few things.

THE COURT:  Do you mean red lines with law or just kind of a proposed --

ATTORNEY SCHROEDER:  Just proposed red lines of your instructions.  We just figured that was the most efficient way to do it if you --

THE COURT:  Okay.  Well, let's see how it works if you just explain to me what your proposals are.

ATTORNEY SCHROEDER:  Sure.  I would just say in the first line it would be better read to say, "You may have heard from one witness -- you have heard from one witness, Dr. Robert Bancroft, who was presented by Dr. Porter as an expert witness".  I don't think saying "who was known as an expert witness" is necessarily appropriate.  So this is more of a proposed revision.

THE COURT:  Okay.

ATTORNEY SCHROEDER:  That's it on that one.

THE COURT:  That's it?  Okay.  Plaintiff, any objection to that proposed change?

ATTORNEY JONES:  No.  That would be acceptable.

VOLUME:  11
PAGES:  970-1056

THE COURT:  Okay, all right.  And then the next charge, "Number of Witnesses", plaintiff, any objection?

ATTORNEY JONES:  No, Your Honor.

THE COURT:  And defendant?

ATTORNEY SCHROEDER:  No, Your Honor.

THE COURT:  Okay.  The next category, "Personal Knowledge and Experience of Jurors", plaintiff, any objection to that?

ATTORNEY JONES:  No.

THE COURT:  Okay.  And defendants?

ATTORNEY SCHROEDER:  None.

THE COURT:  Page 7, "Burden of Proof: Preponderance of the Evidence", any objections, plaintiff?

ATTORNEY JONES:  No.

THE COURT:  And defendants?

ATTORNEY SCHROEDER:  Your Honor, minor comments.  At the -- so I would just go through them very quickly.  At the bottom, "If you find that the credible" -- it's the last paragraph, "If you find that the credible evidence on an issue is evenly divided between the parties, you must decide that issue", I would just say "against Dr. Porter", because it is her burden, instead of just "the party having the burden of proof".

THE COURT:  Okay.

ATTORNEY SCHROEDER:  The same, just inserting

A-763

976

VOLUME:  11
PAGES:  970-1056

"Dr. Porter" instead of "he or she", and then at the end of the second full paragraph on Page 8 --

THE COURT:  And where is that, "he or she"?

ATTORNEY SCHROEDER:  I'm sorry.  Right at the top, Your Honor, of Page 8, "simple equality of the evidence, he or she", I would just put "Dr. Porter".  And the first full paragraph would suggest language at the end that says, "You must find for Dartmouth Health on those claims", period.

THE COURT:  Okay.  Where exactly are you in that section?

ATTORNEY SCHROEDER:  Sure.  Oh, I'm looking at Page 8 before "Corporation Acts Through Its Employees".

THE COURT:  Yes.

ATTORNEY SCHROEDER:  I would request, respectfully request, "You must find for Dartmouth Health on those claims", at the end of that paragraph, just inserting the words "on those claims".

THE COURT:  Oh, okay.  Just so I'm clear, so on Page 7 at the bottom of that line, are defendants proposing that the second clause of that sentence read, "You must decide that issue against Dr. Porter", period, and then the next sentence, "That rule follows from the fact that the party bearing this burden must prove more than simple equality of evidence:  Dr. Porter must prove the element at issue"?

ATTORNEY SCHROEDER:  Yes, Your Honor.

A-764

977

VOLUME:  11
PAGES:  970-1056

THE COURT:  And then the final sentence of that section, the final clause, "Then Dr. Porter has failed to sustain her burden, and you must find for Dartmouth Health on those claims", or on these claims?

ATTORNEY SCHROEDER:  I'm agnostic on that part, Your Honor.

THE COURT:  Plaintiff, any objections to that proposal?

ATTORNEY JONES:  Well, I think it should be "on that claim".  Otherwise, it sounds like it's global, like a failure to meet a burden of proof on one means it affects others. Otherwise, I don't have a problem with that concept.

With regard to the remaining edits, my concern is that there are affirmative defenses in this case on which Dartmouth Health bears the burden of proof.  So I don't think it's accurate to say that only Dr. Porter bears the burden of proof on all issues before the Court.

So I would argue that you retain the language at the bottom of Page 7, "the party having the burden of proof", because, for example, mitigation of damages is an issue on which Dartmouth Health has that burden.  On Page 8 I understand getting rid of "he", but maybe it should be, "Dr. Porter or Dartmouth Health must prove the element" to be accurate with regard to multiple burdens of proof in this case.

THE COURT:  Dr. Porter or Dartmouth Health?

A-765

VOLUME: 11
PAGES: 970-1056

ATTORNEY JONES: Correct.

THE COURT: Yeah, it is true there are affirmative defenses in the case, right?

ATTORNEY SCHROEDER: Well, there's only -- I believe it's affirmative defense of mitigation of damages, but there are six claims in this case, and all six are plaintiff's burden. So is there an affirmative defense at the end? Yes, but you have a specific jury instruction to that point. But this isn't a case of claims and counterclaims, right? It is six claims. All of them are Dr. Porter's. That, I think, is the general point of why, raising that up front. I think you deal with it, quite honestly, Your Honor, to the extent that there is an affirmative defense, it is at the end of the jury instructions relating to just that one issue.

ATTORNEY JONES: I would just be concerned, Your Honor, that, if the jury is thinking about that and there's a question in the jury room about who does bear the burden of proof and they go back to your burden of proof section and there's no reference to the fact that both parties may bear a burden depending on the issue, that it could be confusing to the jury.

THE COURT: So on the top of Page 8, Mr. Jones, where you have suggested, I believe, "Dr. Porter or Dartmouth Health", right?

ATTORNEY JONES: That's correct, but, also, at the

A-766

979

VOLUME:  11
PAGES:  970-1056

bottom of Page 7, I would just retain the language you had that refers to, "You must decide that issue against the party having the burden of proof", because it depends on who has the burden of proof on that issue.

THE COURT:  Okay, all right.  So this particular issue, let me take a look at the later instructions and figure out what I'll do there, and you'll have another opportunity to see that.  So, just by the way, if it turns out -- looks like there may be some edits that we'll have to make, unsurprisingly, and, if that happens, what I'll do is we're going to get you another copy this evening of any changes that were made, and, because it will be later tonight, hopefully we'll get you a red line kind of track changes version as well so you can see whatever has been made, and then we can come back tomorrow morning a little bit on the earlier side.  This way, if you want to lodge any additional objections, you'll have an opportunity to.

ATTORNEY SCHROEDER:  Thank you, Your Honor.  That's why we did the red line as well and give copies to the Court so that, if I'm not as articulate as our red lines are, you'll at least know what I was speaking about today.

THE COURT:  Okay, all right.  "Corporation Acts Through Its Employees", plaintiff, any objection to that?

ATTORNEY JONES:  No objection.

THE COURT:  And defendants?

A-767

980

VOLUME:  11
PAGES:  970-1056

ATTORNEY SCHROEDER:  Your Honor, one change there, and, actually, it really relates to the next paragraph.  The next paragraph, we would agree to the whole paragraph but move it up first, because I think it actually flows, like first stating "All Persons Equal Before the Law" and then "Corporation Acts Through Its Employees".

And then, with respect -- but more specifically on just this paragraph, "Corporation Acts Through Its Employees", the third sentence, "Therefore, the act", I think the law is more appropriate to say that the act of a high-level Dartmouth Health employee that occurred while he or she was on duty and acting within the scope of his or her employment duties.

I mean, otherwise, you could hold Dartmouth Health liable for any act of any employee, and I don't think that's -- even with the more liberal standard of agency law under the Second Circuit precedent, it needs to be a high-level employee acting within the scope.

THE COURT:  Okay.  Plaintiffs, do you have any objection to that?

ATTORNEY JONES:  Well, I guess that begs the question of what's a high-level employee, and how is that going to be defined and how is that going to provide guidance to the jury?

THE COURT:  Mr. Schroeder, is that the specific language you're proposing is the words "high-level"?

ATTORNEY SCHROEDER:  That's what we have here, but,

A-768

981

VOLUME:  11
PAGES:  970-1056

you know what, Your Honor?  I would be inclined to put executive.

THE COURT:  Executive?

ATTORNEY JONES:  I think that's a very limited statement of the law.

THE COURT:  Yeah.  Is executive the same as supervisory?  I don't think so.

ATTORNEY JONES:  Officials well below the executive level can bind a corporation.

THE COURT:  That seems true.

ATTORNEY SCHROEDER:  Management level then, I guess, would be -- management level, Your Honor?

THE COURT:  It seems like supervisory would work better there, little more --

ATTORNEY SCHROEDER:  Maybe I'll let Ms. McDonald argue since she's the one that actually suggested that language.  But very well, Your Honor.

THE COURT:  Mr. Jones?

ATTORNEY JONES:  We would agree to that.

THE COURT:  Okay.  And, again, in the section, "Corporation Acts Through Its Employees", then the last sentence of that section, "Therefore, the act of any supervisory level Dartmouth Health employee" is the agreement?

ATTORNEY JONES:  Yeah.

THE COURT:  Okay.  And, Mr. Jones, what about the

A-769

982

VOLUME:  11
PAGES:  970-1056

proposal that the two sections be kind of --

ATTORNEY JONES:  That's fine.

THE COURT:  So then the "All Persons Equal Before the Law" would precede "Corporation Acts Through Its Employees".  I believe Mr. Schroeder has already indicated no substantive objections to "All Persons Equal Before the Law".

ATTORNEY SCHROEDER:  Correct, Your Honor.

THE COURT:  And, plaintiff, any objections to the language in "All Persons Equal Before the Law"?

ATTORNEY JONES:  No objection.

THE COURT:  Okay, all right.  So those are kind of the general charges.  On Page 9 then, "Influenced Decision-Maker", plaintiff have any objection to that?

ATTORNEY JONES:  No objection.

THE COURT:  Defendants?

ATTORNEY SCHROEDER:  Continuing objection, Your Honor, just on the inclusion of anything relating to the cat's paw theory.  One of the supplemental jury instructions that we sent the Court, which was not a case that we cited before but we did cite in the supplemental jury instructions, was *Gentleman v. State University of New York Stony Brook*, Second Circuit, May 9, 2022, Westlaw cite 2022 WL 1447381.

In that the court said, quote, "We have never determined whether the 'cat's paw' theory of liability can apply under the 'but-for' standard of causation applicable to claims under the

983

VOLUME:  11
PAGES:  970-1056

ADA and Rehab Act", end quote.

And so I'd submit, Your Honor, that that should not be before the Court.  Obviously, you've heard our arguments -- I'm not going to repeat them -- on New Hampshire and Vermont law, but this, I think, is, this particular case, I think, from it you can glean that that is not a theory that has been recognized under ADA and Rehab Act cases as opposed to Title VII cases, which this case is not, and so I'd submit that the, that the entire instruction is inappropriate.

In addition, I don't think it's appropriate to say, use the words "without reassignment to another position at Dartmouth Health" in this particular section, but that's a separate issue that we would raise.  So I would remove that language in both places, but I think that the overall objection, Your Honor, is based on Second Circuit precedent that, where we're talking about ADA or Rehab Act claims, and what I understood from earlier hearings that it is, the cat's paw theory, is recognized under Title VII as well as ADA and USERRA claims.  This case, though, the *Gentleman* case, I think, is helpful guidance or instructive guidance for the Court on why the cat's paw theory shouldn't be given to the jury.

The other issue separate and apart from that, the law, is just from the facts in the record, Your Honor, that, respectfully, unlike the Second Circuit, which made lots of inferences in its decision, there is a stark difference between

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 15 of 87

984

VOLUME:  11
PAGES:  970-1056

what was inferred by the Second Circuit and the record evidence in this case.  And I don't believe there is any evidence to suggest even remotely that somehow Leslie DeMars was playing the role of the supervisor under, you know, the supervisor with animus under the cat's paw theory.

THE COURT:  Okay, all right.  Obviously, that all depends on what the jury makes of the facts that have been presented, but let me just be clear, Mr. Schroeder, on the objection.  So you are objecting globally, first off, to the instruction.  I think I got that much.  To the extent that the instruction is included, then your objection is more specifically to the last words of that section, "without reassignment to another position at Dartmouth Health"?

ATTORNEY SCHROEDER:  Right.  And then further down it actually says "without reinstatement to another position at Dartmouth Health".  So that's, I think that's inappropriate, anyway.

THE COURT:  Oh, sorry.  So let me just be clear about that.  So in the second paragraph, fourth line up where the sentence begins, well, not the sentence begins, but the line begins "unlawful bias" --

ATTORNEY SCHROEDER:  Yes.

THE COURT:  -- "or retaliatory motive to terminate Dr. Porter", you object to "without reinstatement to another position at Dartmouth Health"?

985

VOLUME:  11
PAGES:  970-1056

ATTORNEY SCHROEDER:  Correct.

THE COURT:  And then the next line you also object to "without reassignment to another position at Dartmouth Health"?

ATTORNEY SCHROEDER:  There as well as at the -- yes, Your Honor, but also at the second line of that paragraph where it also says "without reassignment to another position at Dartmouth Health", so it's actually three places.

THE COURT:  And, just so I'm clear, the basis for that objection is what if this instruction were included?

ATTORNEY SCHROEDER:  I think where the cat's paw theory -- the cat's paw theory, to the extent that it's been employed, is with respect to termination, and I, we'll get into the issue of where the ADA relates to, and Rehab Act, relate to disability discrimination in the context of termination and potential claims for disability discrimination relating to retaliation or a failure to reassign to another vacant, open position.

I think part of my issue here, Your Honor, is that the law is really clear on this, the statute's clear, the case law is clear that it has to be a vacant, existing, open position. It has to be an available position, and I think throughout the charge it's stated as reassignment to another position. That's not the, that's not what the statute says, and it's certainly not what the case law that's developed under the statute since 1993 has held.

A-773

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 17 of 87

986

VOLUME:  11
PAGES:  970-1056

So my general objection, really, and, again, it flows through our red line, is to the issue of, to the extent that the Court is going to insert language on potential reassignment, potential reassignment to an open, vacant, existing position, that would be in concert with the law, as opposed to just saying reassignment or, in this case, reinstatement to another position.  That's not, that's not consistent with the ADA, in our opinion.

THE COURT:  Okay, all right.  So I will take another look at the *Gentleman* case that you cited, but, at this time, I'm going to leave the "Influenced Decision-Maker" section in, but I've heard your objections and will take that into consideration after the hearing.

So, with respect to "Overview of Claims" on Page 9, plaintiff, any objection to that section?

ATTORNEY JONES:  No objection.

THE COURT:  Okay.  Defendants?

ATTORNEY SCHROEDER:  Just at the last line, Your Honor, of that paragraph, I would propose or will propose right before the next heading to say, "regarding potential damages, if any".

THE COURT:  Oh, where it now says "and regarding damages", you're saying "and regarding potential damages"?

ATTORNEY SCHROEDER:  If any.

THE COURT:  Plaintiff, what's your view on that?

A-774

987

VOLUME:  11
PAGES:  970-1056

ATTORNEY JONES:  I think we prefer the existing language.  I think that it's standard language.  I think injecting the phraseology of potential coming from a judge kind of suggests to the jury that maybe there aren't any.  So I think the language currently is neutral and that makes it less than neutral.

THE COURT:  Though, in the damages section of the instruction, there is language "if any".

ATTORNEY JONES:  Exactly.  That's fine, talking about the damages there, that's fine.

THE COURT:  Okay, all right.  I'll take that under consideration too.  I see the arguments on both sides there.  Okay.  Now, getting into the substance, "New Hampshire Whistleblowers' Protection Act", plaintiff, any objections?

ATTORNEY JONES:  No objection, Judge.

THE COURT:  Okay.  Defendants?

ATTORNEY SCHROEDER:  Your Honor, a couple of points here.  I'm not necessarily going to go in the same order.  Well, let me start at the top.  In the first paragraph, and I'll just go according to the chronology of paragraphs here.  The second-to-last line of the first full paragraph it states, "asserts that it had a legitimate business reason".  I think we've put sufficient evidence on in the case to say it had legitimate business reasons.  It was not one reason.

In terms of the next paragraph, I think the third

VOLUME:  11
PAGES:  970-1056

sentence, "its purpose", I don't think that's necessary for purposes of the instruction, but, obviously, it's the discretion of the Court in terms of whether that's necessary or not.  I don't believe it's necessary.

THE COURT:  Okay.

ATTORNEY SCHROEDER:  But the bigger issue, Your Honor, really comes down to the elements, the first, second, third elements and specifically, not the first, but on the next page, the Whistleblower Act claim as alleged in the first amended complaint does not include in it a failure to reassign her to another job at Dartmouth Health, and so it's our position that that would be inappropriate to include that as part of the elements.  It's a Whistleblower Act claim.  When you look at the first amended complaint, it does not include any allegations regarding that statement there in the second and third elements.

In addition, with respect to "Termination of Employment", which is Paragraph 2, I don't -- I, I think there is a, perhaps a disagreement in terms of whether or not we agree on the second element.  I think saying that Dartmouth Health terminated Dr. Porter's employment and did not reassign her to another job at Dartmouth Health leaves out the fact that there was an REI division closure and she was terminated along with two other physicians.

And so whether it just says "Dartmouth Health terminated

989

VOLUME:  11
PAGES:  970-1056

her employment", period, that would perhaps be a secondary or alternative statement, but I think getting into whether or not we even had a duty to reassign and the fact that it doesn't say anything about the REI division closure, as well as the fact that, the undisputed fact that two other physicians were terminated at the same time, I think, if the Court was going to say that we agreed to certain language, I think it would be, it needs to be more comprehensive than as currently constituted.

THE COURT:  But doesn't closure go to the kind of legitimate business reason part of the instruction?

ATTORNEY SCHROEDER:  It does, but I think putting in there "and did not reassign her to another job at Dartmouth Health", once again, that's not part of the Whistleblower Act claim as it's been alleged in this case.

THE COURT:  Okay.  Anything else for --

ATTORNEY SCHROEDER:  Yes.  I think, on the next page, which is Page 12, still in the top paragraph, I'm not sure I understand the last sentence of the first paragraph on Page 12. It states, "Other ways you may find causation could be through, A, Dartmouth Health's disparate treatment of fellow employees who engaged in similar conduct as Dr. Porter".  I'm not sure. I would think that that would say, "Other ways you may find causation does not exist would be disparate treatment of fellow employees".  I think it might need some wordsmithing.

The other issue is relating to subparagraph B,

A-777

990

VOLUME:  11
PAGES:  970-1056

"deficiencies in Dartmouth Health's articulated".  I would recommend language that says "actual", and I think here, Your Honor --

THE COURT:  Let me just stop you, Mr. Schroeder. Where are you in the --

ATTORNEY SCHROEDER:  Sure.  It's still in that same paragraph, Your Honor.

THE COURT:  So Page 12 at the top?  Okay.

ATTORNEY SCHROEDER:  Yeah, right at the top in the second-to-last.  The last sentence says, "Other ways you may find causation could be through Dartmouth Health's disparate treatment of fellow employees who engaged in similar conduct as Dr. Porter".

THE COURT:  Right.

ATTORNEY SCHROEDER:  It's actually the inverse.  It's that, you know, our -- causation, if other people who had complained were not fired or terminated or subject to adverse employment action, well, that would obviously go against causation, actually.  Subparagraph B, our suggested language is actual instead of articulated reasons, because articulated reasons doesn't make the distinction, and, obviously, we've put a lot of evidence in front of the jury.

What you say to the media or what you say to a nurse who is not in that division in an email or what you say to the media in terms of whether or not you share all the information,

A-778

991

VOLUME:  11
PAGES:   970-1056

that doesn't make it pretext because you do that.  They can argue that, but to say "articulated reasons" is a loaded term, I believe, and it should be "actual reasons", because that's, that's our position in this case, and it's also a way to rebut a whistleblower claim.

THE COURT:  Okay.  But then aren't I kind of crediting then kind of your theory of the case in the instructions if I leave it as actual, kind of saying, This is what was proffered, and it's the actual reasons?

ATTORNEY SCHROEDER:  No.  I think they're still going to argue that, Well, they said this in writing, so isn't that their actual reasons?  And we obviously have explained why what is said to the media and what may or may not be attributed as a quote to the media does not suffice.  If it's articulated, I think that's a loaded term as it is.

Actual, they can still argue, and they have argued, that, Well, look at what they say in this email to this one nurse, and look what they say to the media, and I think they, based on that, saying the actual reasons, and they have to determine that, right?  They either believe Dartmouth Health, or they don't, and they may determine that the actual reasons are contrary to what we say, but that's open for dispute by both sides, and I think it's neutral in that regard.

THE COURT:  Okay.  Anything else for that section?

ATTORNEY SCHROEDER:  I think further down, Your

A-779

992

VOLUME:  11
PAGES:  970-1056

Honor, on that page, on Page 12, the last full paragraph starts "Dartmouth Health claims it did not terminate Dr. Porter because of her whistleblowing activity".

Now, she's claimed a lot of different things, but saying, "i.e. reporting that two Dartmouth Health physicians were engaging in conduct that she thought was unlawful, unethical, or dangerous to patients", I think the "i.e." clause is inappropriate because she's -- and I would just leave it at whistleblowing activity because she's complained about a lot of things, and whether or not that rises to the level of whistleblowing activity is for the jury to decide, but saying "i.e. reporting that two Dartmouth Health physicians were engaging in conduct that she thought was unlawful, unethical, or dangerous", I think we're getting into parsing the facts in the record through testimony and emails as opposed to leaving it to the jury to decide.

THE COURT:  I can't recall exactly what the allegations were in the first amended complaint under this particular claim, but is it along those lines where that's specifically articulated?

ATTORNEY SCHROEDER:  I think, Your Honor, it goes above and beyond that.  In the first amended complaint, I think it -- well, I have it in front of me.  It's 35 pages.  Page 31 relates to this issue, relates to the compensation, participating in activities she believed in good faith violated

A-780

993

VOLUME:   11
PAGES:   970-1056

the law.

THE COURT:  A, B, C, and D, that's Dr. Hsu and Dr. Seifer, isn't it?

ATTORNEY SCHROEDER:  That is Dr. Hsu and Dr. Seifer, but she's not enunciate -- I just think we're getting into, Well, are we guiding the jury on what plaintiff's claims are at this point as opposed to anyone else -- specifically pointing out "i.e.", I would just say it should be whistleblowing activity.  They've got to determine that.  You've got instructions on that.

And further in that paragraph, to this, to the point of "but rather made a business decision to close its REI division resulting in the termination of all three physicians in the REI division".  It then goes on to say, "and that there was no other suitable position for Dr. Porter at Dartmouth Health".  That's not the standard under a whistleblower claim, and I would just delete the phrase "and that there was no other suitable position for Dr. Porter at Dartmouth Health".  That's not part of a whistleblower claim.

The same holds true, Your Honor, and this is all reflected in what we'll give you so that the Court understands our position, but the last full sentence of that section which goes on to Page 13 then says, quote, "and not reassigning her to another job at Dartmouth Health", end quote.  That's not the standard under -- that's not a whistleblower claim, but, also,

A-781

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 25 of 87

994

VOLUME:  11
PAGES:  970-1056

it's not the standard under the ADA, and my fear, our fear is that we need to make sure that the standard -- well, first of all, what is the requirement under each claim?  And that's certainly not part of their whistleblower claim, but also that's kind of a watered-down version of what the law is under the ADA and Rehab Act for purposes of reasonable accommodation.

THE COURT:  All right.  So that's kind of a global concern you've raised for that particular charge.  Obviously, I'm going to give that consideration.

ATTORNEY SCHROEDER:  I understand that.  Thank you.

THE COURT:  Yeah, yeah.  No.  I understand your objections.  I just wanted to be clear on them.  So, plaintiffs, let's go back to this particular --

ATTORNEY JONES:  Can I just start with that global issue?

THE COURT:  Yes.

ATTORNEY JONES:  Because, from our perspective, the nonreassignment issue is very much part of the whistleblower claim.  In fact, from our perspective, it's part of all the claims, that this is a case where Dartmouth Health terminated Dr. Porter and failed to retain her in some capacity, either in retaliation for whistleblower activities or as a form of discrimination or retaliation with regard to the disability issue.  So we believe that is part of all of the claims.  It's not limited to the ADA.

995

VOLUME:  11
PAGES:  970-1056

And I would also note that the Second Circuit was very clear in its articulation of all the various claims, and they also used that language.  So, from our view, you have correctly identified the claims.  So that's the global issue.

THE COURT:  Okay.

ATTORNEY JONES:  Did you want to start from the beginning?

THE COURT:  Yes.  So, so the first objection on Page 10 in the first paragraph, the last sentence, I believe the objection was, not "a legitimate business reason", but "legitimate business reasons".

ATTORNEY JONES:  Well, I mean, I guess it's disputed as to whether it had any legitimate business reason or how many there may have been, but that's not a hill I need to die on.  So, if the Court were inclined to take that correction, I wouldn't object.

THE COURT:  Okay, all right.  And then, and then the next paragraph, Dartmouth is claiming that the sentence beginning "its purpose is to encourage employees", the purpose is not necessary in the charge.

ATTORNEY JONES:  I disagree.  I think the purpose is important.  It explains why we have whistleblower protection laws.  So I think, I think it's valuable to have it in there, and I don't see any prejudice from it.

THE COURT:  I'm going to leave the purpose sentence

VOLUME:  11
PAGES:  970-1056

as it is for that.  And, with respect to the one that we just talked about in the first paragraph, you know, reason versus reasons, I'll, you know, take that under consideration and make a decision about that.  So I think, I think those were all of them, if I'm not mistaken, for that section.

ATTORNEY JONES:  Well, there was the issue of, on Page 12 at the bottom of the first paragraph, Mr. Schroeder wants to change the word "articulated" to "actual".  I would object to that.  As Your Honor points it out, that, that does seem to credit their case.  But, more importantly, Mr. Schroeder calls it a loaded term.  I call it a legal term.  Every case I think I've ever read that refers to, you know, an employer's burden in these cases, that the employer must articulate a legitimate business reason.  So it's, it's the articulation that is the legal standard.  So I think that should stay in.  That's the accurate statement of the law.

THE COURT:  And that's why the term, frankly, was used, so I'm going to leave that term in there.  And then, going down two paragraphs, the "i.e." clause --

ATTORNEY JONES:  Well, I think that that is her claim, and, as was discussed, that's in the complaint.  Again, that's also exactly how the Second Circuit describes her claim.  So I, I don't see any -- I think it's accurate.  I'd note that the remainder of the paragraph is a full description of their defenses.  So if, you know, if they get to talk about -- well,

A-784

997

VOLUME:  11
PAGES:  970-1056

if the Court is going to talk about the defenses of closing the REI, terminating all the other physicians, I don't see any problem with the balance of accurately describing what her claim is.

THE COURT:  Yeah, that was in the Porter decision, if I'm not mistaken.

ATTORNEY SCHROEDER:  Judge.

THE COURT:  No, the description.  I'm not talking about the facts how they came in.  I understand your point on that, I do.

ATTORNEY SCHROEDER:  Right, right.  If I may just on this one point, because I knew it was going to come up and -- well, you know, the Second Circuit said this, and the Second Circuit said that.  We put a bench memo on that issue, Your Honor, which didn't even receive a response, so -- because I think the law is clear, right?  They were talking about the summary judgment standard, all inferences in favor of the nonmoving party.  That is not what happened here.  That is --

THE COURT:  No, no.  Mr. Schroeder, I am crystal clear on your point in that regard, but, to the extent that the Second Circuit has described the whistleblower activity as the reporting on those two physicians, that has nothing to do with the summary judgment standard versus the standard at trial.

ATTORNEY SCHROEDER:  It doesn't, Your Honor, other than the fact that there was evidence in the trial of

A-785

998

VOLUME:  11
PAGES:  970-1056

complaints about a whole range of things, not just -- I don't believe it was just complaints about those two physicians.  She complained about Dr. DeMars.  She complained about a whole range of issues, including Dr. Reindollar, including the former physician Sophia.

So I think limiting it to the two physicians is, would be inappropriate because then you're basically -- that's different from, and this is why this goes back to what was in the Second Circuit decision and what was put in front of the jury was the complaints to Reindollar, the conflicts with Reindollar, the complaints about other physicians.

We had Judy Stern, Kelly Mousley, Katy Mansfield, all of those people, so I think it's way beyond that, Your Honor, and limiting it to, well, the two physicians, yes, she did make those complaints, no question.  I don't even think we disputed that.  I think we even acknowledged it in the opening statement, but the evidence of whistleblowing activity is much broader than that, and hyperfocusing on just the two physicians, I think, would be inappropriate.

ATTORNEY JONES:  Your Honor, if I may.

THE COURT:  Okay.

ATTORNEY JONES:  The way you have it actually describes the complaints that we say were the whistleblowing activity.  All the other complaints they're talking about is their attempt to say she complained about everything.  The

999

VOLUME:  11
PAGES:  970-1056

petty complaints they're talking about, that's not our whistleblowing.  She wasn't blowing the whistle over that stuff.

THE COURT:  Yeah, and, in particular when you look on Page 11, Number 1, "Reported in good faith", I mean, that kind of, you know, provides a little bit more in the way of context as to what type of reporting fits within a whistleblower claim.  It's not simply kind of complaining about other people generically, it's about the types of things that she reported in her letters about Dr. Hsu and Dr. Seifer, isn't it?

ATTORNEY SCHROEDER:  It could be.  I think it's way beyond just that, and there are other complaints.

THE COURT:  So whistleblowing -- I just want to be clear.  So, in your view, there is other evidence in the record of whistleblowing activity, legitimate kind of -- legitimate, that suggests the answer, I guess, but, in terms of the charge, this particular charge, you're saying there's other evidence in the record that meets the legal definition of reported in good faith other than the commentary on Dr. Hsu and Dr. Seifer?  There's other evidence of whistleblowing activity?

ATTORNEY SCHROEDER:  I think there's evidence that they could argue is whistle -- listen, I don't believe any of this meets the definition of a whistleblower retaliation claim, Your Honor.  Let me be clear about that.  My point is that whistleblowing activity, stating that just in and of itself is

1000
VOLUME:  11
PAGES:  970-1056

sufficient, and then to say "i.e." and making a specific reference to just those two physicians leaves out all the other times in evidence.

Because, when we get into a retaliation case, one of those issues further on down the line is temporal proximity, right? So there is evidence of complaints, and we could assume for sake of argument for this purpose that they were legitimate back to 2012 with Dr. Reindollar and conflicts and disputes about skills and techniques.  So my only point here is that you're hyperfocusing the jury on one specific item that was in the record, and I'm not disputing that it was in the record, but calling attention to it, I think, is inappropriate in the jury instruction.

THE COURT:  Okay, all right.  And, you know, as I said, you know, the complaint under this section, though, does essentially zero in on the Hsu/Seifer information, and that's in large part why this instruction reads the way it does, right?  Because that's what the claim is focusing on in the complaint.

ATTORNEY SCHROEDER:  I understand your point, Your Honor.

THE COURT:  Okay, all right.  So, I mean, we'll, at least I'll take another look in terms of the way it's phrased in terms of the "i.e.", but, at this point, I'm going to leave that in there but take under consideration, as I say, your

A-788

1001

VOLUME:  11
PAGES:  970-1056

arguments in that regard.

Mr. Jones, I'm not sure if you responded to everything, or maybe you did.  No other suitable position, I have in my notes here on Page 12, the last full paragraph.

ATTORNEY JONES:  Yeah, that's part of my global.  I addressed that.

THE COURT:  Got it.

ATTORNEY JONES:  Like I said, it's part of our case.

THE COURT:  Yeah, yeah.

ATTORNEY JONES:  I don't see anything else that we haven't covered here.

ATTORNEY SCHROEDER:  And, just on that last point, Your Honor --

THE COURT:  Yes, yes.

ATTORNEY SCHROEDER:  Thank you for your indulgence.  We're either going to live by the first amended complaint, or we're not, and I understand the Court's highlighting of the various things that can be related to Hsu and Seifer, but, if the Court is so indulged in that point, well, there is nothing about reassignment as part of a whistleblower claim in this case.  There's just nothing.  And that's not part of what a typical whistleblower claim.  It's discrimination and termination or retaliation with respect to termination.

But adding in this commentary about there was no other suitable position, that's not what the law says.  It's, Did you

1002

VOLUME:  11
PAGES:  970-1056

retaliate by terminating somebody, period?  And so I'd submit that that's going way beyond the pale.  It's also not in their claim.

THE COURT:  Okay.  So you're saying as a legal matter, though, reassignment is not part of this particular claim?  As a matter of law, you're saying that can't be part of it?

ATTORNEY SCHROEDER:  Correct, reassignment, correct, Your Honor.  One, it's not pled that way.  Two, it's never been alleged that way in any of, in any of the discovery in this case.  Three, the reassignment issue goes to the ADA and Rehab Act claims and disability discrimination claims.  It does not go to, well, reassignment is something that should be considered in the context of a whistleblower claim.  I've never -- so, yes, I would submit legally that that would not be an appropriate remedy or a suitable part of the elements of the claim.

THE COURT:  Excuse me.  So I was just handed a copy of the actual New Hampshire statute.  So it reads, "No employer shall harass, abuse, intimidate, discharge, threaten, or otherwise discriminate against any employee regarding compensation, terms, conditions, location, or privileges of employment".

So, in your view, that particular language is not broad enough to encompass that aspect of the claim?

A-790

1003

VOLUME:  11
PAGES:  970-1056

ATTORNEY SCHROEDER:  Reassignment to another suitable position as it's stated three or four times in this instruction is not an appropriate basis for relief under the whistleblower statute.

ATTORNEY JONES:  And we would submit that it is a form of otherwise discriminating against a covered employee. Also, in this case, I've heard Mr. Schroeder argue this many times, but this has been a part of the case for many years.  It was part of the appellate proceedings, and the Second Circuit certainly has characterized all the claims as including that part of it.  This has been part of the case for a very long time.  I know Mr. Schroeder wants to box this issue into a sliver of ADA land where a reasonable accommodation can be reassignment to a vacant position.  That's not this case.  So I think you understand our position.

THE COURT:  Right.  We've been over that before, yeah, that particular argument. All right.  So "Americans With Disabilities Act", I'm on Page 13.  Plaintiff, maybe we should take it piece by piece.

ATTORNEY JONES:  I'll make it easy for you.  No objection.

THE COURT:  To the whole charge?

ATTORNEY JONES:  The whole thing's acceptable to us.

THE COURT:  Okay.  Defendants?

ATTORNEY SCHROEDER:  This is not my first rodeo,

A-791

1004

VOLUME:  11
PAGES:  970-1056

Judge.  I knew that this was going to be the way that we would be doing jury instructions.  Most of the time plaintiff, in every other case I've had, usually agrees to the jury instructions, and I seem to be standing up making suggested recommendations on revisions to language.

If we go by the compliant, the ADA claim is disability discrimination and retaliation.  There's not three types; there's two types, first of all, as just a threshold issue.  Saying that Dr. Porter may prove that Dartmouth Health retaliated against her for making a reasonable accommodation request, if we're going to go back to the Second Circuit decision, they were very clear.  The issue of reasonable accommodation only comes up in the context of termination.  All of the other claims relating to reasonable accommodation were dismissed or affirmed dismissal at the Second Circuit, and I think the Court was clear on that.

So saying, well, making it retaliating against her for making a reasonable accommodation request, I think that's the third type.  I think it's only disability discrimination in the context of termination and retaliation.

THE COURT:  But isn't kind of failure to accommodate and the allegation of retaliating against someone for accommodations two separate kind of conceptually distinct things?

ATTORNEY SCHROEDER:  I think they are, Your Honor,

1005
VOLUME:  11
PAGES:  970-1056

but I think there's two types of allegations here, not three. And so I've never interpreted this case to be -- and, if I'm wrong, I'm wrong, and you'll certainly correct me, but I don't believe that there were three types of disability discrimination claims in this, that were brought in this case. It was disability discrimination and retaliation, and I think breaking it down in that regard would be inappropriate.  I have a few other comments.

THE COURT:  Okay, yeah.  Please go ahead.

ATTORNEY SCHROEDER:  Okay.  Bear with me a second here.  This is just a general statement on the "Otherwise qualified to perform essential functions", 1.3, subsection 14. So under the ADA the definition of -- first, you have to show that somebody's disabled.  Then you have to -- then the plaintiff has to show that they're a qualified individual with a disability, meaning they can perform the essential functions of the job with or without reasonable accommodation.

We don't agree that they are otherwise, that Dr. Porter was otherwise qualified to perform the essential functions of her job because there was no job.  And what I don't think anybody's disputing that, at the time she was terminated, that she could do her job, but then it gets to the issue of reasonable accommodation, and we believe there was -- it's our position, as shown by the evidence, that there was no reasonable accommodation.  So, therefore -- for her, there was

no open, vacant position for her to go to.  Under that scenario she is not considered an otherwise qualified individual with a disability under the ADA.

THE COURT:  Okay.  So this comes back again, though, to the position, your position about there needing to be an open, vacant position.  This is your global issue?

ATTORNEY SCHROEDER:  Correct.

THE COURT:  And, therefore, your 1.3 objection derives from that?

ATTORNEY SCHROEDER:  Correct.  But also then, not -- I don't think anybody's disputing that, at the time she, her position was terminated, that she could perform the essential functions of her job, but she was not a qualified individual with a disability, meaning able to perform the essential functions of her job with or without reasonable accommodation. There was no position for her at that point.  That's our position, and so, therefore, there was no reasonable accommodation for her.

THE COURT:  Right, okay.  So is there a proposal about what that should look like?

ATTORNEY SCHROEDER:  Yes, yes, Your Honor.

THE COURT:  Okay.

ATTORNEY SCHROEDER:  That paragraph, we would submit, should read, "You must determine whether Dr. Porter was qualified to perform the essential functions of the job she

VOLUME:  11
PAGES:  970-1056

held".  So it's getting into that's just on the essential functions part.  So, "You must determine whether Dr. Porter was qualified to perform the essential functions of the job she held", that's not the whole story, but that's how we would read it there in that particular place.

THE COURT:  Okay.  So obviously not agreed?

ATTORNEY SCHROEDER:  Yes, Your Honor.

THE COURT:  Okay.

ATTORNEY SCHROEDER:  In the next paragraph, 1.4, I think the second paragraph there, the first two lines, I think, blur the distinction.  I mean, this is a but-for.  We've gone, we've had some discussion about the ADA but-for causation standard.  I think that actually blurries it or blurs the lines there when it says, quote, "Keep in mind that an employee does not need to prove that discrimination was the only or even the predominant factor that motivated an employer.  You may decide that other factors were involved in the decision to terminate Dr. Porter's employment".  I think the earlier instruction, I think, is very clear that you've got to, it's got to be but-for, but for her disability, this would not happen, as opposed to you could look at other motivations, et cetera.

So we would submit that we would strike those two lines after "as you assess causation" and just then proceed to, "For Dr. Porter to meet her burden, you must conclude".  Going on to the next page at the end of that sentence, we would, we would

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 39 of 87

1008

VOLUME:  11
PAGES:  970-1056

submit that it should say, "She would not have been terminated but for her disability", just to be consistent with Second Circuit precedent.

THE COURT:  Okay.  So the bottom of Page 14 it would read, "For Dr. Porter to meet her burden, you must conclude that she has proved by a preponderance of the evidence", and you're proposing taking out the next clause?

ATTORNEY SCHROEDER:  No, no.  There are -- everything is fine until the last part of it.  I would just say she would not have been terminated but for her disability, just to be consistent with *Natofsky*.

THE COURT:  Okay.  Again, something I'll take a look at, but I'm inclined to leave that in.  We also researched the law on this pretty exhaustively.  We're not employment lawyers like you are, but I'm going to leave it for now, and, like I said, we'll take a look at that.  Next paragraph?

ATTORNEY SCHROEDER:  In the middle of the paragraph on Page 15, there is a phrase "however misguided they may appear to you".  We would strike that part of the sentence.

THE COURT:  That didn't come from your proposed charges?

ATTORNEY SCHROEDER:  I don't think so.

THE COURT:  I think it did.

ATTORNEY JONES:  I think it's in there.

ATTORNEY SCHROEDER:  Well, if it is, I would, then I

A-796

1009

VOLUME:  11
PAGES:  970-1056

guess we'll keep it in, Your Honor.  I didn't have a chance to go -- I mean, this took a little while to get through 30 pages this morning.

THE COURT:  No, I understand.  Because, when I first read it, too, I was thinking, trying to be down the middle, and I'm almost positive I checked defendants' charge and that was in there.

ATTORNEY SCHROEDER:  Your Honor, if it's in there, then let's keep it.  That's one less thing that we have to worry about or the Court needs to consider.

THE COURT:  I'll just turn to the law clerks here. Am I mistaken about that?  No, it was in your proposed charge.

ATTORNEY SCHROEDER:  I take everybody's word for that.

THE COURT:  Okay.

ATTORNEY SCHROEDER:  The last paragraph before Number 2 on Page 15, once again, this goes to whether you believe Dartmouth Health's reasons for the decision.  If you do not believe Dartmouth Health's reasons, you may consider whether the reasons are so unbelievable that they are a cover-up to hide the true discriminatory reason for the decision.  So I just want to make sure that globally that it's reasons, because there were reasons.  It wasn't just one reason.

THE COURT:  Okay.  This is the last paragraph before 2, right?

1010

VOLUME: 11
PAGES: 970-1056

ATTORNEY SCHROEDER: Correct, Your Honor.

THE COURT: And doesn't -- so the "for example" sentence, is that the one that you're -- towards the bottom of that paragraph?

ATTORNEY SCHROEDER: Yes, right before that there is, it starts, For example, you may consider whether you believe Dartmouth Health's reasons for the decision. If you do not believe Dartmouth health's reasons, you may consider whether the reasons are so unbelievable.

THE COURT: So they're plural now, and that's your suggestion, right?

ATTORNEY SCHROEDER: Yes.

THE COURT: Okay. So no change?

ATTORNEY SCHROEDER: I was just wordsmithing a little bit there, Your Honor, but --

THE COURT: Okay, all right. Now I'm in 2 on Page 15, "Failure to grant reasonable accommodation request".

ATTORNEY SCHROEDER: No issues there. No issues in 2.1. No issues in 2.2. In 2.3 where it states "first" in the second line, we would remove everything after "first" and put that she was, put the following: "That she was able to perform the essential functions of her job with or without reasonable accommodation".

THE COURT: Okay.

ATTORNEY SCHROEDER: On the top of Page 17, Your

A-798

1011

VOLUME:  11
PAGES:  970-1056

Honor -- so nothing in 2.3.1 other than the, 2.3.1, other than at the end of that paragraph which goes on to the top of Page 17.  We would ask that "with or without a reasonable accommodation" as opposed to just "an accommodation".

THE COURT:  Okay.  Top of Page 17, second line, "with or without a reasonable accommodation" is the request?

ATTORNEY SCHROEDER:  Correct.

THE COURT:  Okay.

ATTORNEY SCHROEDER:  In 2.3.2 "Essential Functions", at the end of the first paragraph, we would just put what this case is about, which is really the only reasonable accommodation is, may include job reassignment or reassignment, just include reassignment.  Because that's really the only issue before the jury.

THE COURT:  So, even if that is generally part of the law of what a reasonable accommodation could be, do you think that should come out?

ATTORNEY SCHROEDER:  I do, Your Honor, because there's no -- I think they can get confused by part-time or modified work schedule or job restriction.  Those are certainly under the statute, Section 12111(B), (9)(B), they are listed as potential reasonable accommodations, no question about that.  I just think this case is all about reassignment, and I don't want, I don't want the jury to think that there are other things at play here in this particular case, because there's no

A-799

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 43 of 87                1012

VOLUME:  11
PAGES:  970-1056

evidence to suggest that there was a part-time or modified work schedule or a job restructuring.  There's no evidence of that in the record.

THE COURT:  Okay.

ATTORNEY SCHROEDER:  In terms of the end of Paragraph 17 which goes on to 18, I don't think that the parties are disputing the job functions and whether they're essential.  So I don't -- I think it's superfluous to put in, "In determining whether a job, particular job function is essential", and then it goes all the way to the middle of Paragraph 18.  I don't think it's necessary to go through all that with them because we're, really, what the case is about is whether or not there was reassignment to a vacant, open position.

And so, obviously, these instructions are long.  I just did not think in this particular case that we were talking about whether or not something was an essential function or whether or not it was a marginal job function, which is in play in a lot of ADA cases, but that's not really at play in this case.

THE COURT:  So you're saying A through H, all of that should come out?

ATTORNEY SCHROEDER:  Yes, Your Honor.

THE COURT:  And the objection, though, is just superfluous, not legally inappropriate?

ATTORNEY SCHROEDER:  Correct.  I think it's not

A-800

1013

VOLUME:  11
PAGES:  970-1056

really an issue that this jury needs to worry about, and, obviously these are 30 pages long, and I just --

THE COURT:  I thought they'd be longer.

ATTORNEY SCHROEDER:  Yeah.  Well, I'm doing my level best to hopefully keep it short with you.  So that, that's just a suggestion just based upon what's before the Court.

In 2.4 our suggestion is the following, that that first paragraph and second paragraph should be limited to the following:  So delete what's there and put, "You must determine whether Dartmouth Health failed to make a reasonable accommodation for Dr. Porter by reassigning her to a vacant, existing position", period.

Once again, I think putting in language about the term "reasonable accommodation", I think it's redundant with the following paragraph where you actually do have language about what a reasonable accommodation may include and that we're not objecting to that or the following paragraph.  But I think the whole case comes down to whether or not Dartmouth Health had a duty to reassign her to a vacant, open position, and so --

THE COURT:  So, to the extent that that's your objection, I think we've established now that you have your view on that.  It may be a little bit more fluid and a little bit more nuanced than that.  That's my understanding of the law as well.  So, to the extent that that is your objection, I mean, obviously, make those objections for the record as you

A-801

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 45 of 87

1014

VOLUME:  11
PAGES:  970-1056

will, I know, but, you know, again, I'm not, I'm not certain that that's something that the Court agrees with on that point. So but I hear your position.

ATTORNEY SCHROEDER:  Just on that, Your Honor, and I'm not trying to belabor this point, but the *Graves v. Finch* case, the *Payne v. Cornell University* case, the *Finch v. New York City Department of Persons* case, the *Noll v. International Business Machines Corp.* case, all of those are Second Circuit decisions on this specific issue, and I know I mentioned them in my motion for directed verdict in fairly quick fashion, but they go right to the heart of that issue, and I realize that I'm making somewhat of a continuing objection in that regard, but and I appreciate the Court's indulgence.

THE COURT:  Okay.  So are we still on 2.4 with your --

ATTORNEY SCHROEDER:  Yes, Your Honor, the middle of Page 19 now.  The paragraph, there's two paragraphs identifying the term "reasonable accommodation".  We have no objections there.  What we object to, though, is the third paragraph which starts "an employer has a duty".  We would strike that entire paragraph with the exception of the last part which is, "Both employer and employee must cooperate in the interactive process in good faith".

The law on the ADA, specifically physical disabilities as opposed to mental disabilities, is that the employee has a duty

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 46 of 87

1015

VOLUME:  11
PAGES:  970-1056

to request an accommodation.  The only place where the duty kind of falls back to the employer is on the issue of mental health disabilities because, as courts have logically said, well, if somebody's got a mental health disability, they may not be in a position to actually ask for an accommodation.  So I don't believe that that paragraph as written is consistent with the law on that point.

THE COURT:  Okay.  So your proposal is to strike the entire paragraph except for the --

ATTORNEY SCHROEDER:  The last sentence.

THE COURT:  -- last sentence?

ATTORNEY SCHROEDER:  Which is true.  The last paragraph on that page we would strike the last sentence which is, states, quote, "An employer, by failing to engage in a sufficient interactive process, risks not discovering a means by which an employee's disability could have been accommodated and thereby increases the chances of failing to reasonably accommodate the employee".  I think that's making a judgment call, and I'm not sure why we would be calling out one side versus the other there.  I think it's inappropriate to have that sentence.

THE COURT:  Okay.  So I'm hearing your objections, but I, I know they're based on kind of your view of the law, so I'm not kind of ruling on these particular ones with respect to the ADA until revisiting some of these legal questions.  So

1016

VOLUME: 11
PAGES: 970-1056

that's the bottom of Page 19?

ATTORNEY SCHROEDER: Yes, Your Honor.

THE COURT: Okay. So I know plaintiffs indicated no objection at all to this section. Any comments on the objections that have been raised?

ATTORNEY JONES: Well, the last two proposed revisions would completely eliminate all reference to the interactive process from the instructions, which I think would be highly inappropriate. We do think there was a failure to engage in the interactive process here, and that's part of our alleged violation. With regard to all the others, I think our global position on the nature of the case we've already articulated and the Court understands.

THE COURT: Okay, okay. So now sub 3, "Retaliation", on Page 20, defendants, any objection?

ATTORNEY SCHROEDER: Yes, Your Honor, not in subsection "Retaliation", but further down in "Protected Activity", 3.1 on Page 20. The second paragraph, "The parties have agreed on the first element: that Dr. Porter made a reasonable accommodation request", I think that's -- well, first of all, "for changes to her work schedule and environment", those were parts of the things that she asked for during her, the term of her employment. The Court has already dismissed those. So I don't think this is one that we've, that it would be -- we could say that she's made a reasonable

A-804

1017
VOLUME:  11
PAGES:  970-1056

accommodation request and leave it at that.

THE COURT:  Okay.

ATTORNEY SCHROEDER:  The second point is in 3.2, "Aware of Activity".  Once again, this is not about work schedule or environment.  It's made a reasonable accommodation request.  I would delete the rest of that sentence and put the following:  "Seeking reassignment to the OB/GYN department or radiology department", period.  And that's consistent with the evidence in the record.

THE COURT:  Okay.  And so are you saying then that the parties are in agreement on the second element with those proposed changes; is that the idea?

ATTORNEY SCHROEDER:  No, no, I didn't suggest, I didn't suggest that plaintiff's counsel agree to it.  I'm, I bet I can predict that they would be fine with keeping it as is, but I would submit that that is what this case is about and that, therefore, we're only dealing with termination on accommodation and whether or not there is a position available for her, available position available at the time that the REI division was closed.

THE COURT:  All right.  "Adverse action", 3.3?

ATTORNEY SCHROEDER:  With respect to that one, Your Honor, this is the point we raised earlier, and I'm not going to belabor it.  We would just have it state, instead of that we agree to that element, just that, in conjunction with the

A-805

1018

VOLUME:  11
PAGES:  970-1056

closure of the REI division, Dartmouth Health terminated Dr. Porter along with two other physicians, and whether it says "along with two other physicians", I don't think we want to say adverse employment action.  I would just say terminated her employment.

THE COURT:  That's the language of the law, though, isn't it, adverse action?

ATTORNEY SCHROEDER:  I think it's easier for a jury to understand what the law is based on that, but I'd defer to the Court on that.

THE COURT:  And the closing of the REI division, it's kind of similar to an objection you made earlier that kind of goes to the legitimate --

ATTORNEY SCHROEDER:  Understood.

THE COURT:  I know.  Kind of you have similar arguments, and I have similar responses, so --

ATTORNEY SCHROEDER:  I just have to put them on the record, Your Honor.

THE COURT:  No, I totally understand that.
Mr. Jones, did you have any comments on these?

ATTORNEY JONES:  No.  We were content with the language as it was.  I do think adding that language, "in conjunction with the closure of the REI division" makes it very one-sided and it becomes inaccurate in terms of the nature of plaintiff's claim.

A-806

1019

VOLUME:  11
PAGES:  970-1056

THE COURT:  Okay.  "Causal connection", 3.4?

ATTORNEY SCHROEDER:  In the second paragraph of 3.4, Your Honor, we would delete the first sentence.  I think it, it confuses it for the jury because it gets away from the but-for standard for the ADA claims.  I think the rest of the paragraph reads well and actually is consistent, but I don't think that the first sentence of that paragraph is appropriate.

THE COURT:  Okay.  And that's related to the argument you made earlier about causation, the but-for standard?

ATTORNEY SCHROEDER:  Correct, Your Honor.

THE COURT:  Okay, all right.  The Rehabilitation Act claim, so, as you can see, it's a shortened section just because of how it follows the ADA.  So, plaintiffs, no objections, I'm assuming, to that?

ATTORNEY JONES:  Correct.

THE COURT:  Okay.  And, Mr. Schroeder, how do you want to do this with respect to the Rehab Act?  Are you basically the same objections that you raised to the ADA you raise to the Rehab Act section?

ATTORNEY SCHROEDER:  Exactly, Your Honor.

THE COURT:  Okay, all right.  Then "Disability Discrimination Claims Under New Hampshire State Law", Page 22, plaintiff, any objections?

ATTORNEY JONES:  No objection.

THE COURT:  Okay.  And defendants?

A-807

1020

VOLUME:  11
PAGES:  970-1056

ATTORNEY SCHROEDER:  Nothing.

THE COURT:  Okay.  "Disability Discrimination Claims Under Vermont State Law", Page 22, plaintiff?

ATTORNEY JONES:  No objection

THE COURT:  Okay.  Defendants?

ATTORNEY SCHROEDER:  Your Honor, our submission would be just an objection for the record on whether or not it should be motivating factor versus but-for.  So we're just stating that objection for the record.

THE COURT:  Okay.  But no, no specific changes other than that objection to that particular legal standard?

ATTORNEY SCHROEDER:  Correct, Your Honor.

THE COURT:  Okay, okay.  "Wrongful Discharge under New Hampshire Law", Page 24, plaintiff, any objection?

ATTORNEY JONES:  No objection, Judge.

THE COURT:  Okay.  Defendants?

ATTORNEY SCHROEDER:  Just a second, Your Honor.

THE COURT:  Yes.

ATTORNEY SCHROEDER:  Your Honor, we'd submit that the third paragraph on Page 24 that that's really what should be above the paragraph on the prevailing rule.  Because, otherwise, if you read the prevailing rule section first, it looks like there's only one element, and we want to make sure that the jury is aware there's two.

THE COURT:  Okay.  So no objection to the substance

A-808

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 52 of 87

1021

VOLUME:  11
PAGES:  970-1056

of the paragraph that contains the elements, just where it's located?

ATTORNEY SCHROEDER:  Yes.

THE COURT:  Plaintiff, any objection to moving that around?

ATTORNEY JONES:  I mean, I think it makes sense as it currently is if it's kind of a background of the nature of at-will employment and that there are exceptions to that nature of employment, and then it explains that one of those exceptions is this bad faith exception that is then explained. I think it makes logical sense the way it currently reads.  I think that actually would be more confusing if it's altered the way that Mr. Schroeder suggests.

THE COURT:  Okay.  I'm going to leave it the way it is for now, and we'll also take another look at that after reading all of them together.  Number 1, "Termination motivated by bad faith, malice, or retaliation", Mr. Schroeder?

ATTORNEY SCHROEDER:  On that one, Your Honor, the first element, the first subparagraph, little I, I don't -- I think that's circular, "an employee is discharged for pursuing policies condoned by the employer"?  I'm not -- maybe I'm, maybe I'm misreading that, but I'm not sure if that's what was meant there.

THE COURT:  So you're saying little I is circular?

ATTORNEY SCHROEDER:  I'm going to remove that

VOLUME:  11
PAGES:  970-1056

objection, Your Honor.

THE COURT:  Okay, all right.

ATTORNEY SCHROEDER:  Nothing else in subparagraph 1 at all.

THE COURT:  Okay.  Subparagraph 2, "Acts that public policy would encourage", plaintiff, any objection to that?

ATTORNEY JONES:  No objection.

THE COURT:  Okay.  Defendants?

ATTORNEY SCHROEDER:  Your Honor, I think it's on Page 26.  There's a couple of examples of what could be, you know, what could be considered acts that public policy would encourage, but I think it's prejudicial to then say after the third example, "Other examples of acts that public policy would encourage could be reporting physician conduct that is illegal, fraudulent, unethical, or unlawful to patients; ensuring that a medical provider or medical facility obtain patient consent before performing procedures on patients; and objecting to improper patient billing procedures".

We would agree to the first three examples, but I think now we're getting into how the jury is going to interpret the evidence in the record and apply it to the law.  I think now we are getting into multiple examples beyond the three that are there, and I think that would be unfairly prejudicial to us.

THE COURT:  And, obviously, these acts are this case, right?

A-810

1023

VOLUME:  11
PAGES:  970-1056

ATTORNEY SCHROEDER:  I'm not suggesting they aren't, Your Honor.

THE COURT:  No, no.  I understand that.  I understand that.  I'm just wondering if part of the objection is the example begins to become too much about the facts of this case, which may not be improper, but that's part of your objection, presumably?

ATTORNEY SCHROEDER:  Correct, that, that we are getting into the nitty-gritty of what we're alleging, and, if we're not going to get into the REI division closing and three physicians terminated at the same time, well, I'd submit that we can't get into this specific issue, which obviously is part of the plaintiff's case.

THE COURT:  Yeah, but, again, we're going to go round and round, you know, on this, but that's, that wouldn't be an act that public policy would encourage, the closure of the division, right?

ATTORNEY SCHROEDER:  I agree with you, Your Honor, except that that's the fourth, fifth, sixth example.  I don't think we need to give the jury six examples.  I think there's three already, and I think that it's unfairly prejudicial of our case.

THE COURT:  Okay.  Plaintiff, any response?

ATTORNEY JONES:  We think it's simply a description of the claim and it's appropriate, and we would note that the

A-811

1024

VOLUME: 11
PAGES: 970-1056

sentence starts, "Other examples of acts that public policy would encourage could be". I mean, you're not saying it is; it could be. And it just simply summarizes the claim made. So I think it's okay as written.

THE COURT. All right. I'll take a look at that. "Damages", Page 26, plaintiff?

ATTORNEY JONES: No objection.

THE COURT: And defendants?

ATTORNEY SCHROEDER: We would strike the second bullet point at the bottom of Page 27.

THE COURT: That's a different section, right? I was just talking about the first paragraph.

ATTORNEY SCHROEDER: Oh, I'm sorry, Your Honor.

THE COURT: Yeah, "Damages" on 26, 27?

ATTORNEY SCHROEDER: No, no objection, Your Honor.

THE COURT: So the next section, "Economic and Non-Economic Damages", plaintiff, any objections?

ATTORNEY JONES: No objection.

THE COURT: Okay. Go ahead, Mr. Schroeder, on this section.

ATTORNEY SCHROEDER: Sure. The first bullet point and the third bullet point we would have it state that Dr. Porter "may be entitled to damages" as opposed to "is entitled to damages", and we would strike the second bullet because there has been no evidence put forth in the record about

A-812

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 56 of 87   1025

VOLUME:  11
PAGES:  970-1056

medical care and treatment relating to her claims.  There's just no --

THE COURT:  Yeah, I was going to ask about that.  I mean, this is obviously coming from a, you know, more general charge relating to these kinds of damages, so I appreciate that information.

ATTORNEY SCHROEDER:  Understood.

THE COURT:  Is there any objection to that?

ATTORNEY JONES:  No objection.  There's no claim here for medical expenses.

THE COURT:  So then the second bullet will be removed.  And the first, Mr. Schroeder, your objection to the first bullet is "may be entitled"

ATTORNEY SCHROEDER:  Yes, the same as the third, Your Honor.

THE COURT:  So what about above, in the paragraph right above it, "These damages may include compensation for past and future harm, depending on the evidence", doesn't that kind of make the point that it's certainly not required, but it's based on the evidence in the case?

ATTORNEY SCHROEDER:  Your Honor, it's a fair point. I just, I think I just want to make sure they understand that it's not a fait accompli.

THE COURT:  Okay.  So, for the reason that I've just said, I'm just going leave it, the first bullet, as "Dr. Porter

1026

VOLUME: 11
PAGES: 970-1056

is entitled" because I think the paragraph before makes the point that damages are not required.  The third bullet, anything there?

ATTORNEY SCHROEDER:  Just the same suggestion as before, Your Honor, "may be".

THE COURT:  Okay.  The "is entitled" language? Mr. Schroeder, I was just confirming.

ATTORNEY SCHROEDER:  I'm sorry.  I didn't hear you, Your Honor.

THE COURT:  Okay.  The third bullet, your objection is to the "is entitled" language?

ATTORNEY SCHROEDER:  Right, correct, Your Honor.  I'm sorry.  I didn't hear you.

THE COURT:  All right.  Okay. "Mitigation of Damages", Page 28, plaintiff, any objections?

ATTORNEY JONES:  No objection.

THE COURT:  Okay.  Defendants?

ATTORNEY SCHROEDER:  Your Honor, in the first sentence as well as the sentence, "If you find", we would just -- the first sentence -- well, let's start with the first sentence.  It's Dartmouth Health's position that Dr. Porter has mitigated or could have fully mitigated her damages.  It's not that she's failed to mitigate or minimize.  We know she's mitigated some of her damages, if not all of them.  In fact, we believe, based upon the demonstrative that we want to show that

1027

VOLUME:  11
PAGES:  970-1056

we talked about before, that she has mitigated all of her damages.  So stating that she has mitigated or could have fully mitigated her damages would be appropriate there.

THE COURT:  Sorry.  Has mitigated or --

ATTORNEY SCHROEDER:  Could have fully mitigated her damages.

THE COURT:  Mr. Jones?

ATTORNEY JONES:  I mean, I'm not sure I understand that so I'm not sure the jury would understand it.  I mean, the way this is phrased is the law of the duty to mitigate.  So then rephrasing it as the defense claims that she mitigated her damages, that just seems illogical.

THE COURT:  Yeah, it does seem to be -- I don't know about illogical, but I don't know if it works given that this section is all about the duty to mitigate and we're saying Dartmouth Health claims that Dr. Porter did mitigate.

ATTORNEY SCHROEDER:  Well, I think we put -- the evidence in the record is clear, at least from our standpoint, that, based upon her ability to get this other job right away, have it right away, that she had mitigated her damages, and, in fact, if you compared her at a 1.0 FTE at Dartmouth Health, which is how her expert assumed it, and you did the same for UVM Medical Center, she's actually making more money as of 2025 going forward.

So we are making the -- we're not suggesting that she

1028

VOLUME:  11
PAGES:  970-1056

hasn't mitigate her damages.  We believe she's fully mitigated her damages, to the extent that there were any.

THE COURT:  Okay.  Mr. Jones?

ATTORNEY JONES:  I mean, that sounds like an argument that they're making that she has not suffered damages, which I think is somewhat different than the mitigation issue.  I do think it's important to have something about the mitigation issue, however, in an instruction because a big part of this case, you know, their argument that she suffered no losses or has fully mitigated her damages assumes that she should have been working a full-time position.  We argue that for her to do a full-time FTE at University of Vermont would have required her to relocate, and that's not reasonable, and the duty to mitigate doesn't require that.

So I think we need to be able to argue to the jury what the duty to mitigate is, what it requires, what's reasonable, what is not reasonable, and to explain to the jury that her actions exceeded any duty to mitigate that she had and she still suffered significant financial loss.

THE COURT:  Okay.  I'm going to leave it as worded right now.  Anything else in that section?  I think that -- was that the only objection from the defendants?

ATTORNEY SCHROEDER:  Yes.

THE COURT:  Okay.  Next section, Page 29, "Punitive Damages", plaintiff?

A-816

1029

VOLUME:  11
PAGES:  970-1056

ATTORNEY JONES:  No objection.

THE COURT:  Okay.  Defendants?

ATTORNEY SCHROEDER:  Yes, Your Honor.  I think that we would suggest halfway down in the, where it says second, well, "Second", comma, halfway down it says, "You may also find malice even if Dartmouth Health's motivation behind the intentional, outrageous conduct was to benefit itself".  We would add "in a way tantamount to a crime" rather than "to harm Dr. Porter".

THE COURT:  So the fact that the second paragraph in that section lays out this "to a degree of outrage frequently associated with a crime", that's not sufficient?

ATTORNEY COFFIN:  If I might, Your Honor.

THE COURT:  Yes.

ATTORNEY COFFIN:  The concern there is that to describe that punitive damages are appropriate where Dartmouth Health has done something to benefit itself, you know, obviously, a legitimate business reason, part of the reasons they're doing that is to benefit the institution, and we just thought that that needed a little bit more elaboration, that the benefit has to be something, you know, commensurately outrageous, immoral, like a, tantamount to a crime.

The "tantamount to a crime" language, there's nothing magic about that, but I do think that, if you just leave that implication that a benefit could be, Hey, if they benefit, that

A-817

1030

VOLUME:  11
PAGES:  970-1056

could be subject to punitive damages, is not the law.

THE COURT:  Okay.  So the proposal then is "in a way tantamount to a crime" rather than "to harm Dr. Porter"?

ATTORNEY COFFIN:  Yes.

THE COURT:  Okay.  Mr. Jones?

ATTORNEY JONES:  We believe that the language as written is appropriate.  The second paragraph already provides for the basic standard, which concludes the language up to a degree of outrage, frequently associated with a crime.  I don't think that needs to be reinforced here.  So we would stick with the language as drafted.

THE COURT:  Is the "in a way tantamount to a crime" linked to the outrageous conduct or to the benefit?  Is your idea that it's both?

ATTORNEY COFFIN:  Sort of both, but I think that the notion fundamentally more, if you can split it, is that the receiving a benefit in those circumstances in that context would be extreme bad behavior rather than, you know, reasonable business behavior which benefits the company.

THE COURT:  Okay.  I'm just going to leave that the way it is for now and, again, take that under consideration.  "Remaining Damages Issues", plaintiff?

ATTORNEY JONES:  No objection.

THE COURT:  Okay.  And defendants?

ATTORNEY SCHROEDER:  Just, Your Honor, before you get

1031

VOLUME:  11
PAGES:  970-1056

there, at the last part of "Punitive Damages", the second-to-last paragraph had a provision, "Where the management of the corporation has knowledge of wrongful conduct by lower-level employees, the corporation may be deemed to have permitted the conduct", we don't believe that that's consistent with Vermont law on punitive damages.  Specifically, the issue of punitive damages in this case only comes up in the context of the ADA and, obviously, the Rehab Act then because of the ADA, but there's a cap limit.

There are a couple of cases under Vermont law, specifically *Shortle v. Central Vermont Public Service Corporation*, *Sparrow v. Vermont Savings Bank*, which relate to -- and these were not FEPA claims, but they go to the issue of punitive damages and whether or not the malicious or unlawful act relied upon is that of a governing officer.  So just saying, Well, the management of the corporation knew what somebody was doing, I think that has kind of watered down the standard of what it takes to hold a corporation liable for punitive damages.

THE COURT:  Okay.  And do you have citations for your cases?

ATTORNEY SCHROEDER:  I do, Your Honor.  137 Vt. 32, and 95 Vt. 29.  That's a rather old case from 1921.  The first one is *Shortle v. Central Vermont Public Service Corp.*  That's from 1979.  These are not FEPA claims, but they go to the issue

A-819

1032

VOLUME: 11
PAGES: 970-1056

of punitive damages and when they may be assessed against a corporation.

THE COURT: Okay, all right. I'll take a look at those cases. And then is there a proposal for that particular sentence?

ATTORNEY SCHROEDER: My, the proposal, Your Honor, is to delete that sentence.

THE COURT: Oh, delete it? Okay, all right. And "Remaining Damages Issues", plaintiff, any objection?

ATTORNEY JONES: No objection.

THE COURT: Okay. Defendants?

ATTORNEY SCHROEDER: No objection.

THE COURT: "Insurance and Taxes", plaintiff?

ATTORNEY JONES: No objection.

THE COURT: Okay. Defendants?

ATTORNEY SCHROEDER: No objection.

THE COURT: "Final Instructions", plaintiff?

ATTORNEY JONES: Not an objection but just a suggestion.

THE COURT: Yes.

ATTORNEY JONES: I think it would be best if we could clarify that the jury is expected to answer "yes" or "no" with regard to each of the Roman numeral I through VI items on the form. I just want to avoid a situation where the jury answers some of them and not all of them and then there's confusion

A-820

VOLUME: 11
PAGES: 970-1056

about what the jury did.

THE COURT: Okay. So are you saying the third line of that section, "The answer to each question" should be more specific about, like, listing the actual issues?

ATTORNEY JONES: Well, I might -- I have here my handwritten notes are to add a fourth sentence. After saying, "The answer to each question on the form must be the unanimous answer of the jury", I would say, "In addition, each question numbered Roman numeral I through VI must be answered".

THE COURT: Okay. Defendants, any objection to that?

ATTORNEY SCHROEDER: Just a second, Your Honor.

THE COURT: Yes.

ATTORNEY SCHROEDER: No issue, Your Honor.

THE COURT: Okay. So we'll add that. And everything else with the "Final Instructions" section, no objections?

ATTORNEY JONES: Yeah, correct, no further objections.

ATTORNEY SCHROEDER: Yes, Your Honor.

THE COURT: Okay, all right. Let's turn to the verdict form then. So I'll just take, I guess, objections from each side all at once. Seven-page document. Plaintiff have any objections?

ATTORNEY JONES: No objections.

THE COURT: Okay. Defendants?

ATTORNEY SCHROEDER: Yes, Your Honor.

A-821

1034

VOLUME:  11
PAGES:  970-1056

THE COURT:  Okay.

ATTORNEY SCHROEDER:  With respect to Roman Numeral I, we would delete the phrase, "and failed to reassign her to another position at Dartmouth Health", for all the reasons we've stated previously.

THE COURT:  Right.

ATTORNEY SCHROEDER:  There are no changes to Roman numeral II.  Roman numeral III, "Rehabilitation Act", we would insert the word "intentionally".

THE COURT:  Before "terminated"?

ATTORNEY SCHROEDER:  Yes.  Because the Rehabilitation Act requires intentional violation.  That's the *Loeffler v. Staten Island University Hospital* decision from the Second Circuit, 582 F.3d 268.  So we would insert the word "intentionally" in each subparagraph A, B, and C.

THE COURT:  Even though the legal instructions section for them to make the finding lays that out?

ATTORNEY SCHROEDER:  From the jury instructions, Your Honor?

THE COURT:  Yes.

ATTORNEY SCHROEDER:  Well, I think, you know, there's one thing to go through 30 pages of jury instructions and then you've got the verdict form.  So I think, you know, I think saying it more than once would be appropriate, especially since that's what the law requires.

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 66 of 87   1035

VOLUME:  11
PAGES:  970-1056

THE COURT:  Okay.

ATTORNEY SCHROEDER:  Ms. McDonald just referred to the fact that she did not believe that the jury instructions actually refer to the word "intentionally".

THE COURT:  Okay.

ATTORNEY SCHROEDER:  In Roman numeral IV, I think -- and this is a continuing rephrasing of subparagraph B for Roman numeral IV and Roman numeral V.  we would just have it say, instead of "by reassigning her to another department instead of terminating her employment", we would have it say "by terminating her employment instead of reassigning her in violation of the law", so by terminating her employment instead of reassigning her in violation of whatever law we're talking about, whether it's Roman numeral IV or Roman numeral V.

And we, certainly like the jury instructions, we'll send Your Honor, too, red-lined provisions.

ATTORNEY McDONALD:  In the punitive damages question, Section 3, where it states, "If you checked 'yes' to any of the questions in parts 2, 4, or 5 above", we would strike the Roman numeral IV.

THE COURT:  Yes, I had a feeling you might say that, but please go ahead, let me hear why.

ATTORNEY McDONALD:  We don't -- we believe that's a New Hampshire claim.  We don't believe that punitive damages are available under that claim.

1036
VOLUME:  11
PAGES:  970-1056

THE COURT:  Right.  So we found the same, but there is a -- what's the term of art for it -- kind of like excess compensatory damages under New Hampshire law.

ATTORNEY VITT:  I think it's enhanced.

THE COURT:  Enhanced, that's it, enhanced compensatory damages.  The legal distinction between the two, there must be one, but I think, as I understand it from the law, that's kind of New Hampshire's kind of way of getting at that concept.

ATTORNEY McDONALD:  It's, we do have a case, and it's *State v. Hynes*, which is 159 N.H. 187, a 2009 case, and at Page 198 there's a quote, "Enhanced compensatory damages are, as their name indicates, compensatory and not punitive in nature".

THE COURT:  Yeah.  So what's the difference between punitive damages and enhanced compensatory damages, or what's the difference between compensatory damages and enhanced compensatory?

ATTORNEY SCHROEDER:  Well, I think compensatory goes the issue of back pay, front pay.  Perhaps you add emotional distress in there.  But it certainly doesn't include the category of punitive, which has its own standard no matter what state we're in, and compensatory is always considered looking back and saying, all right, How do we -- whether it's back pay, front pay, reimbursement for expenses, it is not anything that's, quote, unquote, punitive.

1037

VOLUME:  11
PAGES:  970-1056

THE COURT:  Okay.  Mr. Jones, any thoughts on that?

ATTORNEY JONES:  Well, admittedly it's been a while since I did extensive research into the New Hampshire law of enhanced compensatory damages.  My recollection -- and my first bar license was in New Hampshire -- is that this really is New Hampshire's attempt to get at a similar notion that, in cases involving particularly egregious behavior, there is the ability to have the jury award an extra amount to take that into account, and they call that enhanced compensatory damages.

THE COURT:  That was kind of my understanding as well with some research this morning on this.  This came up for me this morning, so that's why the form you have didn't even make that change to it.  But, Ms. McDonald, do you --

ATTORNEY McDONALD:  I was just going add.  I think also enhanced compensatory damages relate to they're in lieu of an administrative fine, right?  So I think the amount, that goes to the amount of the --

THE COURT:  So you're looking at the statute?

ATTORNEY McDONALD:  Yes.

THE COURT:  So I'm at the same provision, "Except that in lieu of an administrative fine, enhanced compensatory damages may be awarded when the court finds the respondent's discriminatory conduct to have been taken with willful or reckless disregard of the charging party's rights under this chapter".

A-825

1038

VOLUME:  11
PAGES:  970-1056

Seems kind of cognate of punitive to some degree.  I'm not saying they're the same, but it seems like New Hampshire's way of getting at similar type conduct.  But we're looking at this, and I will make an adjustment to that and any necessary kind of adjustments to the jury instructions in that regard.  Is that it for the verdict form, defendants?

ATTORNEY SCHROEDER:  Yes, Your Honor.

THE COURT:  Okay.  And, plaintiffs, you're good with it?

ATTORNEY JONES:  We are, yes.

THE COURT:  Okay.  So the motions, then, filed over the weekend.  So, first, taking up Document 266, defendant's memorandum regarding law applicable to a potential award of prejudgment interest, I'm wondering if this is kind of mooted out just because you have probably seen the instructions say that interest is not to be taken into account?

ATTORNEY COFFIN:  Yes, that was our understanding, Your Honor, and they've agreed to that instruction, so this would be mooted out.

THE COURT:  Okay, thank you.  And then the other one, 267 filed by plaintiffs, so motion to preclude any reduction of damages based on conditional offer of severance pay.  So what is the request here, right?  So I understand your argument, certainly, right, that her decision to forego a severance agreement or severance payment in favor of proceeding with

1039
VOLUME:   11
PAGES:   970-1056

legal claims means she made her decision and that is her decision and she shouldn't be, you know, any award of damages she might receive in this case shouldn't be reduced by that amount.  Is that --

ATTORNEY JONES:  Correct.  And we want to make sure that there's no argument that, as a matter of mitigation of damages, that somehow the duty to mitigate would have required her to accept a severance payment when that would have required her to sign a general release of all her claims.  And the idea that you have to sign a separation agreement with a general release to comply with the duty to mitigate would seem to be legally contrary, and so I think that would be confusing if that were allowed to be an argument to the jury, that the duty to mitigate somehow required her to or that she should otherwise somehow be penalized and that the damage award should be reduced by what she would have been offered.

Had she accepted a severance payment without a general release, then obviously that payment would be a reduction of her damages, but in this case the fact that she was offered it in exchange for a general release we don't think should be used in argument to the jury as a way to offset, reduce, or otherwise be a part of the duty to mitigate.

THE COURT:  Okay.  So this is not a request for any kind of an instruction, it is more of a statement about what you think they should be able to argue at closing relative to

1040
VOLUME: 11
PAGES: 970-1056

this?

ATTORNEY JONES: Correct.

THE COURT: So, defendants, so your response is all about Rule 408. I'm not sure that this is really a Rule 408 question so much as it is mitigation. 408, right, as I understand it, is just about you shouldn't be introducing evidence of settlement. I understand the severance issues are in evidence.

ATTORNEY COFFIN: Yeah, I wasn't sure exactly what they were seeking, and so we responded substantively. One, the information was admitted without any kind of an objection by them and without any kind of request that it be so limited. I think, at that point, the parties are able to point to the evidence before the jury and present the matter and reasonable inference is drawn from the evidence in the case, including damages and including mitigation. They did offer and question witnesses following up on that with regard to the contours of the severance and what's normal in a severance situation and so forth.

Furthermore, we've cited in that memo two cases that discuss, you know, in very similar circumstances that the 408 does not apply in this context because they are not actually offers to compromise a dispute. And the Ninth Circuit case we cited there, *Cassino*, actually found that the offer of severance could be presented in favor of mitigation.

A-828

VOLUME:  11
PAGES:  970-1056

And the Second Circuit case is very similar.  It tracks that and cites it approvingly, the *Tripler* case.  So I don't understand how the evidence being admitted and the jury having heard testimony about this that damages are, and mitigation of damages are kind of such a central issue in the case that we should be limited in reasonably pointing to the inferences that can be drawn from the evidence in the case.

THE COURT:  But what are those inferences?  I guess I'm curious what that would look like in closing, right?  She's offered severance.  She chooses not to take severance.  She chooses to bring legal claims.  Is the argument going to be, not to put words in your mouth, but is the argument going to essentially she could have taken the severance agreement, and that would have reduced her damages?  I feel like that's a tough spot, isn't it, for the plaintiff to be in for you to argue that when she chose to pursue legal claims instead of severance.

ATTORNEY SCHROEDER:  Well, first of all, Your Honor, there was no objection to the admission of that evidence in this case.  They could have made that argument before.  So it's in.

But it also goes to the issue of meeting with the plaintiff after the letter that went -- actually, she references it in her letter about going to meet with Aimee Claiborne to go over whether or not, you know, what's going to

1042

VOLUME:  11
PAGES:  970-1056

happen with her job, and it's a fact that she did not accept the severance package.  They've heard that testimony.  I think that it's, it's -- how I present it, I mean, I think we're certainly open to present it however we want because it's evidence in the record.

THE COURT:  I don't know about that.  Truly, I don't know the answer to that, but to make the argument that she failed to mitigate because she didn't accept the severance package, which is her right --

ATTORNEY SCHROEDER:  No, no, I'm not really getting -- I'm not saying it for just fact of failure to mitigate, Your Honor.  I think one of the issues is that she had a severance package on the table.  She sought more money, and she didn't take it, period, full stop.  I don't have to get into, Well, she didn't mitigate her damages.  I wasn't going to make that statement.  But the facts in the record, C13 is a document in the record, and so I certainly feel I have the ability to refer to the actual language of it.

She's already admitted that on the stand, Well, it was a nominal amount.  Well, I mean, that just goes to, you know, some of our, some of the statements that we'll make specifically on the issue of she was asking for additional money at the time in addition to what she had in the letter that she was sending to a number of individuals, and this was their response.  They did meet with her.  They enunciated that

A-830

VOLUME:  11
PAGES:  970-1056

there was no position for her.  It's all in that document.

In addition, at the end of that severance agreement, there was testimony by Heather Gunnell, the fact that it states that Beth Todd was already a point, was already working in the OB/GYN department, was part of the OB/GYN department, and was assumed back into the OB/GYN department on a full-time basis. That goes to our defenses, Your Honor.  She made complaints about Dr. Hsu and Seifer.  That's in the record.  But that document has already been -- the horse has left the barn on that.  How do we not have the liberty of at least referring to it, not necessarily to say, Well, she failed to mitigate her damages?

I'm not, I don't need to say that, nor was I planning on it, but, certainly, referring to the sequence of events and what the company did, what they were prepared to do in terms of severance.  I mean, this whole case is about intent, right? Well, they put a severance package on the table.  She rejected it.  They said, Okay, you know what?  We've reconsidered. We're going to put $228,000 on the table for you.  How do I not get to talk about that?  This whole case is about intent, respectfully.

THE COURT:  I guess the question is just how you go about using it.  I still have questions about that.  Mr. Vitt?

ATTORNEY VITT:  If I may be heard, Judge.  Yes, the severance document was introduced really on the issue of, Was

A-831

1044

VOLUME:  11
PAGES:  970-1056

there some offer?  It wasn't sort of minimal.  But, when they made this argument, it was stunning.  The idea that a defendant can present a discharged employee with a severance agreement which requires confidentiality, no disparagement, and a total waiver of all of her rights and then go to a jury and say, We offered, whatever it is, a hundred, $150,000, and that should be deducted from whatever damages you're going to give her.

There is simply no law in the Second Circuit and no law that we could find that supports that.  And, as you said, it puts the plaintiff in a terrible position.  It's absolutely outside the bounds, and it shouldn't happen.  They should not be able to make that argument.

THE COURT:  Mr. Coffin?

ATTORNEY COFFIN:  Mr. Vitt says there is no Second Circuit case law on this.  There is.  The *Tripler* case discusses this, and the *Cassino* case, you know, in very similar circumstances provides that the offer of severance which wasn't rejected could be offered into evidence in that case and was used to mitigate damages.  You know, so I do think there is law on this.  I think the cases that he cited for various reasons just are not factually specific and don't hold, as these two cases we found do hold, that this evidence is admissible.

You know, furthermore, we're not even at that point because this evidence has been admitted, and I don't see why it's not proper impeachment of Dr. Bancroft, of the information

A-832

1045

VOLUME:  11
PAGES:  970-1056

the plaintiff was telling him and whether that was cherry-picked or not.  And, of course, you know, we have this version of events from Dr. Bancroft which is highly transmitted from the plaintiff to him, and, if they're allowed to describe all of these ramifications of what would happen with her salary and her position and her pay and her damages, this seems to me to be totally legitimate cross-examination, which was admitted and the jury has now heard and it's part of the case, and we should be able to argue it from there.

I don't see prejudice here, at least I've not heard kind of what the prejudice is other than it is, you know, frankly powerful evidence that she had a chance to bridge over to a good position which she had at the time and that it would have helped her carry through and not have kind of damages in the case.

ATTORNEY SCHROEDER:  One other point, Your Honor. This harkens back to earlier in the case when Dr. Porter was on the stand.  She opened the door to this subject for a lot of reasons, but one of which was, I had to take a second mortgage on my home in order to buy this condo in Vermont.  So, one, she opened the door to it.  Two, the evidence is in the case. Like, how do I not have the ability, Your Honor?

And, certainly, obviously, I do not want to be interrupted in my closing argument, not as I'm sure plaintiff's counsel doesn't want to be interrupted.  So I certainly want to deal

1046

VOLUME:  11
PAGES:  970-1056

with this ahead of time.  Not to say, I mean, this is a small part of my closing argument because, obviously, our position is she's not entitled to any damages, but, based upon the somewhat all-over-the-map presentation by Dr. Bancroft, how do I not have the opportunity?  How do I not have the ability to refer to, This is what was on the table.  They had this discussion?

She said, Nobody talked to me about this.  She actually refers to it in her letter.  You know, I don't want to -- this is going to be a really small part of the presentation because, like I said, I don't really feel that we need to get into damages very much, but, certainly, it's part of the case.  It's going to be part of my closing, and the fact that it's in the case makes it germane to my closing argument.

THE COURT:  Okay.  Well, I'm definitely going to take -- it's *Tripler*, I believe, is the case that Mr. Coffin cites?  I'm just curious.  Is it, procedurally, is it similar?  You say the court there says the evidence of the severance agreement is relevant to come in for similar purposes, that there are, there was kind of a, a waiver of the severance in favor of, say, discrimination claims, and the Court found that the severance information was still relevant to come in in a case like that?

ATTORNEY COFFIN:  I think that the *Cassino* case is more relevant to the facts that the Court is describing.  The Second Circuit case had similar facts, but it cited *Cassino* approvingly for that proposition.

A-834

1047

VOLUME:  11
PAGES:  970-1056

THE COURT:  Okay, all right.  Well, as you can tell, I mean, I do have, I have some questions about that.  I'm going to read those cases, and I think I understand both sides of the argument.  Okay.  I think that was it as far as motions go.

ATTORNEY JONES:  Yes.

THE COURT:  Right?

ATTORNEY SCHROEDER:  Yes, Your Honor.  The only thing I would ask -- obviously up to your discretion, but I want to know exactly where my bounds are in terms of my closing argument.

THE COURT:  Right.

ATTORNEY SCHROEDER:  And, if you do need us to come in early to discuss that, I'd rather know today, but I understand that you have to consider it, and that is understandable.  I just, I want to make sure that I am following the Court's instruction.

THE COURT:  Right.  No, I think, if you come in a little early tomorrow to receive kind of the final version of the jury charge so you can see where things ended up in light of the objections that were made, we'll have a talk about that at that time as well.  So I certainly understand your desire to have kind of guidance.

ATTORNEY SCHROEDER:  One last point, it's kind of corollary to that, and I realize, Your Honor, you set aside only 90 minutes, and so I want to be mindful of that.  We would

A-835

1048

VOLUME:  11
PAGES:  970-1056

like the opportunity to do a very short PowerPoint demonstrative of what the evidence we believe shows.  And, obviously, we'd be prepared to show it to the plaintiff's counsel.  We haven't drafted it yet, so there's nothing to share right now.  But a very short PowerPoint which would --

You know, one of the demonstratives is the issue of her pay at 1.0 FTE, which is the document that we've had various discussions about.  We'd like to be able to show that but, in conjunction with that, a very short PowerPoint that would lay out some of the facts as we see them and as far as the record is reflecting them.

THE COURT:  Okay.  So, obviously, plaintiff needs to see it and determine -- you know, obviously, if you have the consent of plaintiff, it's kind of an easy issue.  In that regard, it has to, obviously, you know, the standard has to accurately summarize the testimony and kind of the evidence in the case.  So I'll leave that to you to confer with plaintiff on it.

On the related topic, though, C19, that's the other exhibit you're talking about, the Dr. Bancroft letter.  So I want to tell you I've reconsidered that issue.  I'm not going to allow it as substantive evidence or as a demonstrative, and I'm going to read into the record right now why, okay?  I've been able to give this more thought.

So, by oral motion during a break in the trial, defendants

A-836

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 80 of 87

1049
VOLUME:  11
PAGES:  970-1056

requested that a handwritten note generated by Dr. Bancroft during cross-examination be admitted into evidence or, alternatively, that it be permitted as a demonstrative aid. That exhibit has been marked as Exhibit C19.  The Court ruled that C19 would not be admitted into evidence but that it could be used as a demonstrative aid during closing.  As I said, since that ruling, I've had an opportunity to review the transcript of Dr. Bancroft's testimony pertaining to the generation of the note, as well as consider the legal arguments of defendant's counsel for its proposed admissibility.

So, as to the factual setting of the generation of this note, Dr. Bancroft was asked to explain his forecasting of plaintiff's earnings.  As part of the cross-examination, counsel asked Dr. Bancroft to perform specific calculations using numbers provided by counsel.  Before performing the requested calculations, Dr. Bancroft disagreed that the proposed calculations would result in the conclusion counsel sought to establish.

He was directed to perform the calculations anyway. Dr. Bancroft specifically stated, quote, "I'll do it anyways, but it's not correct".  That's at Page 91 of the transcript, Lines 1 to 3.  He then wrote down the numbers on the paper. That paper is C19.

So, first, I reaffirm the ruling that the handwritten note will not be admitted as evidence, finding that the note is not

1050

VOLUME:  11
PAGES:  970-1056

admissible as a statement by a party opponent under Rule 801. Dr. Bancroft is not a party for purposes of Rule 801(d)(2)(A). The note he generated on cross-examination is also not admissible under 801(d)(2)(C) as the statement of an agent authorized to speak on behalf of the party.

Courts have been skeptical of the notion that an expert is an agent of the party who retained them.  As one example, I cite *Kirk v. Raymark Industries*, 61 F.3d 147, Third Circuit 1995.  The circumstances of this note do not raise the reasonable possibility of an adopted admission under the rules. Defendants have asserted, at the time of the argument last week, I believe, on this, that it is impeachment evidence. Defendants may comment on the calculation to argue that the damage calculations are flawed, but it is not evidence in the case.

As to whether it is proper for the note to be used as a demonstrative exhibit, as I say, I'm altering the ruling to find that it may not be used as a demonstrative.  The general rule is that the Court may allow the use of demonstrative aids such as charts or tables, so long as those charts or tables accurately summarize the content of the primary testimony and do not misstate the testimony of the expert witness or otherwise mischaracterize the expert's opinion.

For that I'll cite *Castaldi*, 363 Fed.App'x 761, a Second Circuit decision from 2009.  So here the circumstances of the

A-838

1051

VOLUME:  11
PAGES:  970-1056

testimony that resulted in the generation of the note raised a significant question about whether it accurately summarizes the testimony.  Dr. Bancroft acquiesced in performing the requested calculations while protesting that the calculations were not correct.  Under these circumstances, I don't think it's appropriate to permit C19 to be used as a demonstrative exhibit.  Obviously, it was his testimony at the trial, and, if counsel wants to discuss his testimony on that point, that's fine.  Mr. Schroeder?

ATTORNEY SCHROEDER:  Your Honor, just on a related point, with respect to the demonstrative exhibits that the plaintiff wanted to use in this case, obviously, you've heard from my partner here, Mr. Coffin, on the issue of the federal rate of interest versus the state equivalent.  For that reason and that reason among maybe 50 other reasons, then Dr. Bancroft's chart should not be used as a demonstrative exhibit in plaintiff's closing because it relies upon the 12 percent interest rate in coming to those calculations among other things that we've objected to already.

THE COURT:  Right, but, when an expert is subject to cross-examination and the cross-examination lays out perhaps flaws in the analysis, you're saying that's a reason for a demonstrative aid for the expert's primary testimony on direct not to come in?  I mean, experts are undermined all the time in their cross-examinations.

A-839

1052

VOLUME:  11
PAGES:  970-1056

ATTORNEY SCHROEDER:  I understand.  This just goes to the demonstrative exhibit, Your Honor, and whether or not the plaintiffs can use his chart as a demonstrative in the closing.

THE COURT:  Right.

ATTORNEY SCHROEDER:  Since Dr. Bancroft's testimony, we have put in motions regarding the issue of prejudgment interest and whether or not, which one should be used.  Well, if they get to put in a chart that includes the 12 percent calculation embedded into their numbers, how is that not prejudicial to us?

THE COURT:  Well, I mean, that was part of kind of the analysis that he generated.  I understand you disagree with it.  This was created on cross-examination with numbers that he did not even agree were accurate predicates for the calculations.  Arguably, all Bancroft did on the stand was perform certain calculations with certain numbers.  He didn't draw any conclusions as to what those numbers showed.  I think they're substantively different.  Mr. Coffin?

ATTORNEY COFFIN:  Yeah.  So I guess I parsed Dr. Bancroft's testimony a little differently.  First, there was really only, as I see it, only as to 2025 that he had a colorable claim to disagree with it.  Because all we did was take the numbers from his chart for three years and divide them by .75 to equal what the numbers he used would be at 1.0.

And I would suggest his protestations that, Oh, that's

A-840

1053

VOLUME:  11
PAGES:  970-1056

going to be wrong; Oh, that doesn't make sense; I don't agree with it, you know, were actually very effective impeachment for the jury because they could see what was going on with him, and it was really a credibility assessment that they should be allowed to make.

Nonetheless, that was just for one year and, again, for sort of a, a reason that didn't have a lot of water to it, which was, in 2025 for half the year, he used a calculation before he had adopted the assumption that she would go to .75 in July.  So you had sort of like a half year that there really wasn't a full year at 1.0, and yet the difference in the salary was something like close to $50,000.  So it was a lot more than reasonably could be found to have been the difference.

You know, I would ask the Court, if we took out year 2025, could we present our chart with just 2026 and 2027, you having read the testimony closely?  So that's one comment I'd make, but, overall, I do think it's important impeachment as to him and what he's about.  And, again, we had this rapidly evolving chart, and we're forced to kind of take assumption after assumption, you know, a week before trial that just radically changed by millions of dollars his conclusions, and our remedy, since we didn't disclose an expert five years ago, is to cross-examine.  Well, I think we should be entitled to that remedy, Your Honor.

And I, so I would sort of ask the Court what the Court's

A-841

1054

VOLUME:  11
PAGES:  970-1056

view on our demonstrative chart were we to use 2026 and 2027, which he didn't have that problem with.

THE COURT:  Yeah.  I mean, it's not really a chart. That's also part of the problem.  It's minimal.  It's, it's, he puts a couple of numbers down with the years next to it.  I don't know how that's kind of a summary of testimony in the same way that the plaintiff's kind of chart is.

ATTORNEY COFFIN:  Well, if I might politely push back on that, Your Honor --

THE COURT:  Sure.

ATTORNEY COFFIN:  You know, a chart isn't defined by having lots and lots of parts and lots and lots of columns. It's designed by, defined and considered to be useful to the jury by kind of the information that can import, and, really, this just shows what two years of his particular earnings.  And we could have done, you know, out ten years, but, you know, three, we thought, made the point.

And so I don't think the fact that the chart is simple and understandable is the basis for the Court to allow or disallow it.  It's whether it's something that the jury would find reasonable and probative.  So I would suggest that we do be allowed to use a '26 and '27 year chart.  And then sort of my follow-on is I just want to get clarification on behalf of Don, I think, which is what I do understand the Court to be saying. While we can't use the chart, we can still point to

A-842

2:17-cv-00194-kjd   Document 295   Filed 04/23/25   Page 86 of 87

1055

VOLUME:  11
PAGES:  970-1056

Dr. Bancroft's testimony, the Court's, sorry, the Court's ruling on it; is that correct?

THE COURT:  Right, right.  Yes.  No.  You're obviously allowed to talk about what was said on the stand during cross-examination, but I've ruled on the, on the chart, on C, whatever, C19.  So that will remain the ruling, but it can be commented on at closing.

ATTORNEY COFFIN:  All right.  Thank you, Your Honor.

THE COURT:  Okay.  Does that cover everything, two hours later?

ATTORNEY JONES:  From our perspective, yes, Your Honor.  Thank you.

THE COURT:  Okay.  Defendants, Mr. Schroeder?

ATTORNEY SCHROEDER:  Yes, Your Honor.

THE COURT:  Okay, all right.  So, as I said, we will get you a new version of the jury instructions, and why don't we plan to meet at 8:30, if that works for everyone, tomorrow?  Thank you.

(Whereupon at 3:03 p.m. the hearing was adjourned.)

1056

VOLUME:  11
PAGES:   970-1056

C E R T I F I C A T E

I, Sunnie Donath, RMR, Official Court Reporter for the United States District Court, District of Vermont, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes of the hearing taken before me in the above-titled matter on April 7, 2025 to the best of my skill and ability.

*Sunnie Donath, RMR*
--------------------------------
Sunnie Donath, RMR

A-844

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

    Plaintiff,

    v.

Dartmouth-Hitchcock Medical Center,
Dartmouth-Hitchcock Clinic,
Mary Hitchcock Memorial Hospital, and
Dartmouth-Hitchcock Health,

    Defendants.

Civil Action No. 2:17–cv–194

**JURY CHARGE**

**General Instructions**

Now that you have heard the evidence and arguments, it is my duty to instruct you on the applicable law. My instructions come in two parts. The first part consists of general instructions about the task of the jury and the rules and principles that should guide you in your deliberations. The second part consists of instructions that apply to the specific claims and defenses in this case. I ask that you pay equal attention to both parts.

It is your duty as jurors to follow the law, and to apply it to the facts as you find them from the evidence presented in the courtroom. You are not to single out one instruction alone as stating the law but must consider the instructions as a whole. You are not to be concerned with the wisdom of or reasoning behind any rule of law stated by the court. Regardless of any opinion you may have as to what the law is or ought to be, it would be a violation of your sworn duty to base a verdict on any view of the law other than that given to you in these instructions. It would

1

also be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything other than the evidence presented during the trial.

The lawyers have referred to some of the rules of law in their arguments. If any difference appears between the law as stated by the lawyers and the law as stated by the court in these instructions, you must follow the court's instructions.

Our judicial system requires you to carefully and impartially consider all of the evidence, follow the law, and reach a just verdict, regardless of the consequences.

### Jurors as Finders of Fact/Rulings of the Court

You and you alone are the triers of the facts. Each of you, as jurors, must determine the facts for yourself in reaching a verdict. By the rulings that I made during the course of the trial, I did not intend to express my own views about this case.

### Sympathy/Prejudice

Neither sympathy nor prejudice, for or against the parties or any other person involved with this case, should influence you in any manner in reaching your verdict. Your deliberations should be well reasoned and impartial.

### Evidence in the Case

The evidence in this case consists of the sworn testimony of the witnesses, the exhibits admitted into evidence, and any stipulated facts, regardless of which party presented the evidence. When the attorneys on both sides stipulate or agree to the existence of a fact, you must, unless otherwise instructed, accept the stipulation and regard that fact as proved. You may give the stipulated fact, like any other evidence, the weight you think it deserves. Any evidence that has been stricken or excluded, as when an objection is sustained by the court, must be disregarded and you may not consider it in rendering your verdict.

2

**Arguments/Statements/Objections of the Attorneys**

The opening statements and closing arguments of the attorneys, their questions and objections, and all other statements they made during the course of the trial, are not evidence. The attorneys have a duty to object to evidence that they believe is not admissible. You should not draw any conclusions or make any judgment from the fact that an attorney has objected to evidence.

**Court's Rulings on Objections**

From time to time, the court has been called on to determine the admissibility of certain evidence following the attorneys' objections. You should not concern yourself with the court's reason for any rulings on objections. Whether offered evidence is admissible is purely a question of law for the court and not a concern of the jury. In admitting evidence to which objections have been made, the court does not determine what weight should be given to that evidence, nor does it assess the credibility of the evidence. If the court excludes evidence in response to an attorney's objection, you will dismiss the evidence from your mind completely and entirely, and you will refrain from speculation about the nature of any exchange regarding the evidence between the court and the attorneys held out of your hearing.

**Evidence: Direct or Circumstantial**

There are two types of evidence from which you may find the facts of this case: direct and circumstantial. Direct evidence is the testimony of someone who asserts actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances tending to prove or disprove an issue in the case. For example, if a witness were to testify that he or she had seen cows in a field, that would be an example of direct evidence that there were cows in a field. On the other hand, if a witness were to testify that he or she had seen

3

cow tracks in the field, that would be an example of circumstantial evidence that there had been cows in the field. The law does not require a party to prove its claims or defenses by direct evidence alone. Rather, one or more of the essential elements of each of the claims or defenses may be established by reasonable inference from other facts which are established by direct testimony; and circumstantial evidence alone may be sufficient proof.

The law makes no distinction between the weight to be given to direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should consider all the evidence in the case and give it as much or as little weight as you think it deserves.

### Credibility of Witnesses

You are the sole judges of the credibility of the witnesses, and the weight to give their testimony is up to you. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe; his or her demeanor while testifying; any interest or bias he or she may have; and the reasonableness of his or her testimony, considered in light of all the evidence in the case. Consider also any relation each witness may bear to either side of the case, any bias or prejudice, the manner in which each witness might be affected by the verdict, and the extent to which each witness's testimony is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit a witness's testimony. Two or more persons witnessing an incident or transaction may see or hear it differently. It is your duty to reconcile conflicting testimony if you can. In weighing the effect of a discrepancy, consider

4

whether it pertains to a matter of importance or to an unimportant detail, and whether the discrepancy may result from innocent error or intentional falsehood.

You may give the testimony of each witness the amount of weight you think it deserves: you may believe all of it, part of it, or none of it at all. You do not have to accept the testimony of any witness, even if it is uncontradicted. It is for you to say what you believe and disbelieve.

In other words, what you must try to do in deciding credibility is to size up a witness in light of his or her demeanor, the explanations given, and all the other evidence in the case. Always remember that you should use your common sense and good judgment.

### Impeachment of a Witness

A witness may be discredited or "impeached" by contradictory evidence, by a showing that the witness testified falsely concerning a matter, or by evidence that at some other time the witness said or did something inconsistent with the witness's present testimony. It is your exclusive province to give the testimony of each witness whatever degree of credibility or amount of weight you think it deserves.

If you find that a witness testified untruthfully in some respect, you may consider that fact in deciding what credence to attach to other testimony from that witness. Considering that fact as well as all other relevant evidence, you may accept or reject the testimony of the witness in whole or in part. In making this determination, you may consider whether the witness purposely made a false statement or merely made an innocent mistake, whether the inconsistency concerns an important fact or a small detail, and whether the witness had a reasonable explanation for the inconsistency.

A-849

**Expert Witnesses**

You have heard evidence from one witness, Dr. Robert Bancroft, who is known as an "expert witness." An expert witness is a person who has special knowledge, experience, training, or education in his or her profession or area of study. Because of this expertise, an expert witness may offer an opinion about one or more of the issues in the case. In evaluating the testimony of Dr. Bancroft in this case, you should evaluate his credibility and statements just as you would for any other witness. You should also evaluate whether Dr. Bancroft's opinion is supported by the facts that have been proved, and whether the opinion is supported by Dr. Bancroft's knowledge, experience, training, or education. You are not required to give the testimony of Dr. Bancroft any greater weight than you believe it deserves just because he has been referred to as an expert witness.

**Number of Witnesses**

The fact that one side may have called more witnesses than the other side is of no significance. Your task is to evaluate the credibility of the witnesses and to weigh all of the evidence.

**Personal Knowledge and Experience of Jurors**

In deliberating, you are not expected to put aside your common sense or your own observations and life experience. However, a juror having special knowledge of a subject may neither state this knowledge to fellow jurors nor act upon it himself or herself in arriving at a verdict. You must not tell your fellow jurors about matters that are based on your own special knowledge concerning an issue in the case that did not come from evidence received in the courtroom.

6

As jurors, your job is to decide this case based solely on the evidence presented during the trial and my instructions to you. As you were instructed at the beginning of the trial, you are not to investigate or research the law or facts relevant to the trial. I remind you that you must not seek or receive any information about this case from the Internet, including Google, Facebook, Wikipedia, or any other websites, or from any other source including newspapers, magazines, law books, or dictionaries. Do not search for or receive any information about the parties, the lawyers, the witnesses, the evidence, the law, or any place or location mentioned in the trial. Until I tell you that your jury service is completed, do not communicate with anyone, including your family and friends, about the evidence or issues in this case.

### Burden of Proof: Preponderance of the Evidence

Because Dr. Porter is the one bringing this case, she has the burden of proof. She must prove each essential element of the claims she alleges by what is known as "a preponderance of the evidence," i.e., the greater weight of the evidence. To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not. In other words, a preponderance of the evidence means evidence that—when considered and compared with evidence opposed to it—has more convincing force and produces in your minds a belief that what is sought to be proved is more likely true than not true. A preponderance of the evidence refers to the quality and the persuasiveness of the evidence, not to the number of witnesses or documents. In determining whether a claim has been proven by a preponderance of the evidence, you may consider the relevant testimony of all the witnesses, regardless of who called them, and all exhibits received into evidence, regardless of who submitted them.

If you find that the credible evidence on an issue is evenly divided between the parties, you must decide that issue against the party having the burden of proof. That rule follows from

7

the fact that the party bearing this burden must prove more than simple equality of evidence: he or she must prove the element at issue by a preponderance of the evidence. On the other hand, the party with this burden of proof need prove no more than a preponderance. So long as you find that the scales tip, however slightly, in favor of the party with this burden of proof—meaning, what that party claims is true is more likely true than not true—then that element will have been proven by a preponderance of the evidence.

If, after considering all the evidence, you are satisfied that Dr. Porter has carried her burden on at least one of the claims she alleges, then you must find for Dr. Porter on that/those claims. On the other hand, if after such consideration, you find the evidence to be in balance or equally probable, or if you find the evidence tips in favor of Dartmouth Health, then Dr. Porter has failed to sustain her burden and you must find for Dartmouth Health.

## Corporation Acts Through Its Employees

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (referred to throughout the trial and in this document as "Dartmouth Health") are corporate entities. A corporation acts through its employees. Therefore, the act of any Dartmouth Health employee that occurred while he or she was on duty and acting within the scope of his or her employment duties shall be considered the act of Dartmouth Health.

## All Persons Equal Before the Law

The fact that Dartmouth Health is a corporation and Dr. Porter is an individual must not enter into or affect your verdict. This case should be considered and decided by you as a dispute between parties of equal standing in the community. All persons, both corporations and individuals, stand equal before the law and are to be treated as equals in a court of justice.

8

**Influenced Decision-Maker**

An employer may be liable for unlawful acts, even when so-called "neutral decision-makers" made the final decision regarding the act, if the employee proves, by a preponderance of the evidence, that the neutral decision-maker relied on a supervisor who had an unlawful bias or retaliatory motive against the employee.

In other words, if you find that Dr. Merrens was the decision-maker regarding the termination of Dr. Porter's employment without reassignment to another position at Dartmouth Health, and if you find that Dr. Merrens did not personally have an unlawful bias or retaliatory motive against Dr. Porter, Dartmouth Health may nonetheless be held liable if you find, by a preponderance of the evidence, that a supervisor of Dr. Porter's (like Dr. DeMars) had an unlawful bias or retaliatory motive to terminate Dr. Porter without reinstatement to another position at Dartmouth Health and Dr. Merrens relied on that supervisor when deciding to terminate Dr. Porter's employment without reassignment to another position at Dartmouth Health.

**Overview of Claims**

As you have seen and heard in this trial, this is an employment lawsuit brought by Dr. Misty Blanchette Porter against Dartmouth Health. Dr. Porter claims that she was terminated by Dartmouth Health because of her whistleblower complaints about conduct by other physicians and because of her disability. Dartmouth Health claims it had a legitimate, non-discriminatory business reason for terminating the employment of Dr. Porter in conjunction with the closure of Dartmouth Health's Reproductive Endocrinology and Infertility (REI) Division.

Now I will instruct you regarding each of Dr. Porter's claims: (1) violation of the New Hampshire Whistleblowers' Protection Act; (2) disability discrimination and retaliation under the

9

Americans with Disabilities Act (ADA), the Rehabilitation Act, and the applicable laws of New Hampshire and Vermont; (3) wrongful discharge under New Hampshire law; and (4) retaliation under the applicable laws of New Hampshire. I will also instruct you regarding Dartmouth Health's defenses and regarding damages.

### New Hampshire Whistleblowers' Protection Act

Dr. Porter alleges that she was terminated by Dartmouth Health, and was not reassigned to another position at Dartmouth Health, in retaliation for her reporting about (and/or advising others to report about) the conduct of two physicians at Dartmouth Health that she reasonably believed to be illegal, fraudulent, unethical, or harmful to patients, in violation of New Hampshire's Whistleblowers' Protection Act. Dartmouth Health denies these claims, and asserts that it had a legitimate business reason for its decision to terminate Dr. Porter's employment and not reassign her to another position with Dartmouth Health.

New Hampshire's Whistleblowers' Protection Act prohibits employers from retaliating against an employee for reporting what he or she reasonably believes is a violation of the law. The Act safeguards employees from being discriminated against for making a good faith report, verbally or in writing. Its purpose is to encourage employees to come forward and report violations without fear of losing their jobs and to ensure that as many alleged violations as possible are resolved informally within the workplace.

In order to establish a claim under New Hampshire's Whistleblowers' Protection Act, Dr. Porter must demonstrate, by a preponderance of the evidence, the following three elements:

| First: | Dr. Porter, in good faith, reported or caused to be reported, what she had reasonable cause to believe was a violation of any law or rule adopted under the laws of New Hampshire, a political subdivision of New Hampshire, or the United States; |
|--------|---|

10

Second:      Dartmouth Health terminated Dr. Porter's employment and failed to reassign her to another job at Dartmouth Health; and

Third:       There was a causal connection between Dr. Porter's reporting and her termination from Dartmouth Health without reassignment to another job at Dartmouth Health.

## 1. "Reported in good faith"

In this context, "good faith" means "absence of malice" and "honesty of intention." Reporting "in good faith" means the employee *reasonably believed* that a violation of a law or rule was happening; the employee need not prove that a violation of a law or rule *was in fact* happening. In other words, the Act does not require an actual violation of a law or rule but only that an employee reasonably believe that such a violation has occurred.

In reporting a violation to her employer, the employee is not required to reference any specific law or rule that the employer has allegedly violated. The employer is presumed to be familiar with the laws and regulations governing its business, and to consider a report to have been made if a reasonable employer would have understood from an employee's complaint that the employee was reciting a violation of law.

## 2. "Termination of employment"

The parties have agreed on the second element: that Dartmouth Health terminated Dr. Porter's employment and did not reassign her to another job at Dartmouth Health. Thus, this element is satisfied.

## 3. "Causal connection"

To find in favor of Dr. Porter on this claim, you must find a causal connection between her termination and her reporting about (and/or advising others to report about) the conduct of two physicians at Dartmouth Health that she reasonably believed to be illegal, fraudulent,

11

unethical, or harmful to patients. In other words, you must find that Dr. Porter's termination occurred "because" of her reporting. This may be shown by circumstantial evidence. For example, you may find that there is sufficient causation through temporal proximity, that is, that Dartmouth Health's termination of Dr. Porter followed shortly after Dartmouth Health became aware of Dr. Porter's reporting. Other ways you may find causation could be through (a) Dartmouth Health's disparate treatment of fellow employees who engaged in similar conduct as Dr. Porter, or (b) deficiencies in Dartmouth Health's articulated reasons for terminating Dr. Porter.

In addition, to support the required finding of causation for this claim, you must find that Dr. Porter reported the alleged violations to a person having supervisory authority over her. In other words, at least one supervisor or decisionmaker at Dartmouth Health must have known that Dr. Porter had reported about (and/or advised others to report about) the conduct that she believed to be illegal, fraudulent, unethical, or harmful to patients.

Dartmouth Health claims it did not terminate Dr. Porter because of her whistleblowing activity (i.e., reporting that two Dartmouth Health physicians were engaging in conduct that she thought was unlawful, unethical, or dangerous to patients), but rather, because it made a business decision to close its REI Division, resulting in the termination of all three physicians in the Division, and that there was no other suitable position for Dr. Porter at Dartmouth Health. Dr. Porter asserts that this reason for her termination is not the true reason but instead is a pretext (or excuse) to cover up Dartmouth Health's unlawful retaliation against her for whistleblowing. If you do not believe the reason Dartmouth Health has offered for termination of Dr. Porter's employment and not reassigning her to a different job at Dartmouth Health, then you may, but are not required to, infer that retaliation was a factor that made a difference in Dartmouth

12

A-856

Health's decision to terminate Dr. Porter's employment and not reassign her to another job at Dartmouth Health.

**Americans with Disabilities Act (ADA) Claim**

In this case, Dr. Porter claims that Dartmouth Health terminated her employment and did not reassign her to another division because of her disability.

Dr. Porter has asserted three distinct but related types of disability discrimination claims. First, Dr. Porter may prove that Dartmouth Health would not have terminated her employment but for her disability. Second, Dr. Porter may prove that Dartmouth Health failed to reasonably accommodate her disability by reassigning her to another division instead of terminating her employment. Third, Dr. Porter may prove that Dartmouth Health retaliated against her for making a reasonable accommodation request. You must determine whether Dr. Porter has proven that Dartmouth Health has discriminated against her because of her disability in any or all of these ways or none of these ways. For Dr. Porter to prove her ADA claim against Dartmouth Health, she must prove that Dartmouth Health discriminated against her in at least one of these ways.

### 1. "But for" discrimination

To prevail under this theory, Dr. Porter must prove all of the following by a preponderance of the evidence:sss

First:      Dartmouth Health is an employer subject to the ADA.

Second:    Dr. Porter has a "disability" within the meaning of the ADA.

Third:     Dr. Porter was otherwise qualified to perform the essential functions of her job, either with or without reasonable accommodation.

Fourth:    Dr. Porter was terminated because of her disability.

13

To prevail under this theory, Dr. Porter must prove all of the following by a preponderance of the evidence:

### 1.1. "Employer"

The parties have agreed on the first element: that Dartmouth Health is an employer subject to the ADA. Thus, the first element is satisfied.

### 1.2. "Disability"

The parties have agreed on the second element: that Dr. Porter has a "disability" as defined by the ADA. Thus, the second element is satisfied.

### 1.3. "Otherwise qualified to perform essential functions"

The parties have agreed on the third element: that Dr. Porter was qualified to perform the essential functions of the job she held. Thus, the third element is satisfied.

### 1.4. "Because of"

You must determine whether Dartmouth Health terminated Dr. Porter's employment because of her disability. An employee must prove that the employer would not have terminated their employment but for their disability. To determine that Dartmouth Health terminated Dr. Porter because of her disability, you must decide that Dartmouth Health would not have terminated Dr. Porter if Dr. Porter had not had a disability but everything else had been the same.

As you assess causation, keep in mind that an employee does not need to prove that discrimination was the only or even the predominant factor that motivated an employer. You may decide that other factors were involved in the decision to terminate Dr. Porter's employment. But, for Dr. Porter to meet her burden, you must conclude that she has proved by a

14

preponderance of the evidence that, although there may have been other factors, she would not have been terminated if she had not had a disability.

An employer may not discriminate against an employee because of the employee's disability, but an employer may terminate an employee for any other lawful reason, good or bad, fair or unfair. An employer is entitled to make subjective policy and business judgments, and an employer may therefore terminate an employee—even an outstanding employee—for reasons that it considers to be in its best interests. An employer is entitled to make its own personnel decisions, however misguided they may may appear to you. If you believe Dartmouth Health's reasons for its decision to terminate Dr. Porter and find that its decision was not because of Dr. Porter's disability, you must not substitute your own judgment—even if you do not agree with Dartmouth Health's decision.

As I have explained, Dr. Porter has the burden to prove that Dartmouth Health's decision to discharge her was because of her disability. I have explained to you that evidence can be direct or circumstantial. To decide whether Dartmouth Health's decision to discharge Dr. Porter was because of her disability, you may consider the circumstances of Dartmouth Health's decision. For example, you may consider whether you believe the reasons Dartmouth Health gave for the decision. If you do not believe the reasons it gave for the decision, you may consider whether the reasons were so unbelievable that they are a cover-up to hide the true discriminatory reason for the decision.

### 2. Failure to grant reasonable accommodation request

An employee may also establish a claim under the ADA by showing that the employer failed to provide a reasonable accommodation.

15

To establish such a claim, Dr. Porter must prove each of the following elements by a preponderance of the evidence:

First:        Dartmouth Health is an employer subject to the ADA.

Second:       Dr. Porter has a "disability" within the meaning of the ADA.

Third:        Dr. Porter was otherwise qualified to perform the essential functions of her job, either with or without reasonable accommodation.

Fourth:       Dartmouth Health failed to make a reasonable accommodation.

### 2.1.  "Employer"

The parties have agreed on the first element: that Dartmouth Health is an employer subject to the ADA. Thus, the first element is satisfied.

### 2.2. "Disability"

The parties have agreed on the second element: that Dr. Porter has a "disability" as defined by the ADA. Thus, the second element is satisfied.

### 2.3. "Otherwise qualified to perform essential functions"

You must determine whether Dr. Porter was a "qualified individual." To satisfy this element, Dr. Porter must prove two things by a preponderance of the evidence: first, that she was "otherwise qualified" for the position she desired; and second, that either with or without reasonable accommodation, she could perform the essential functions of that position.

#### 2.3.1.   "Otherwise qualified"

An individual is "otherwise qualified" if they have the requisite skill, experience, education, and other job-related requirements of the employment position involved in the case. If Dr. Porter cannot satisfy this standard, then she was not a qualified individual, even if the reason that Dr. Porter is not qualified is solely a result of her disability. The ADA does not require an

16

employer to hire or retain an individual who cannot perform the job in question either with or without an accommodation.

### 2.3.2.  "Essential functions"

If you find that Dr. Porter was "otherwise qualified," then the next step is to determine whether she has proven by a preponderance of the evidence that she was able to perform the essential functions of the position either with or without reasonable accommodation. A reasonable accommodation may include job restructuring or part-time or modified work schedules.

To make this determination, you will need to determine the essential functions of the employment position. The "essential functions of an employment position" are the basic, fundamental duties of a job that a person must be able to perform to hold a particular position. Essential functions do not include marginal job duties of the position.

A job function may be considered essential for any of several reasons. These include, but are not limited to, the following:

1.  The reason that the position exists is to perform that function;

2.  There are a limited number of employees available among whom the performance of that job function can be distributed; and

3.  The job function is highly specialized and the person in that position is hired for their expertise or ability to perform that particular job function.

In determining whether a particular job function is essential, you may, along with all of the evidence that has been presented to you, consider the following factors:

a.  The employer's judgment as to which functions of the job are essential;

17

b.  Written job descriptions prepared by the employer for advertising or posting the position;

c.  Written job descriptions prepared by the employer for use in interviewing applicants for the position;

d.  The amount of time spent performing the function;

e.  The consequences of not requiring the person holding the position to perform the function;

f.  The terms of any collective bargaining agreement;

g.  The work experience of past employees who have held the position; and

h.  The work experience of current employees who hold similar positions.

An employee must have been able to perform all of the essential functions of the desired position either with or without reasonable accommodation at the time of their termination. An employer may not base an employment decision on speculation that the employee's disability might worsen to the extent that they would not be a qualified individual at some time in the future. On the other hand, an employer is not required to speculate that an employee's condition will improve if that employee is not able to fulfill all of the essential functions of the position at the time in question.

### 2.4. "Failed to make a reasonable accommodation"

You must determine whether Dartmouth Health failed to make a reasonable accommodation for Dr. Porter by reassigning her to another department instead of terminating her employment.

The term "reasonable accommodation" means making modifications to the workplace that allows a person with a disability to perform the essential functions of the job or allows a

18

person with a disability to enjoy the same benefits and privileges as an employee without a disability.

A "reasonable accommodation" may include job restructuring, part-time or modified work schedules, reassignment to a vacant position, or other similar accommodations for individuals with disabilities. A reasonable accommodation does not require an employer to create a new position for an employee.

The term "reasonable accommodation" does not include efforts that would cause an "undue hardship"—an action requiring significant difficulty or expense—on an employer. An employer must show special (typically case-specific) circumstances to demonstrate undue hardship in the particular case.

An employer has a duty to make a reasonable accommodation for an employee if the employer knows or reasonably should have known that the employee was disabled, even if the employee did not explicitly request an accommodation. If the employer knows or should have known that the employee was disabled, the employer is obligated to engage in an interactive process with the employee to determine whether a possible reasonable accommodation exists. Both employer and employee must cooperate in this interactive process in good faith.

Neither side can prevail in this case simply because the other did not cooperate in the interactive process. However, you may consider whether a party cooperated in good faith in evaluating the merit of that party's claim that a reasonable accommodation did or did not exist. An employer, by failing to engage in a sufficient interactive process, risks not discovering a means by which an employee's disability could have been accommodated and thereby increases the chance of failing to reasonably accommodate the employee.

19

### 3. Retaliation

The ADA prohibits an employer from discriminating against an employee because the employee has opposed an unlawful employment practice under the ADA. This is called retaliation. To establish retaliation, Dr. Porter must prove each of the following elements by a preponderance of the evidence:

First:        Dr. Porter engaged in an activity protected by the ADA.

Second:       Dartmouth Health knew that Dr. Porter engaged in protected activity.

Third:        Dartmouth Health took adverse action against Dr. Porter.

Fourth:       A causal connection exists between the adverse action and the protected activity.

### 3.1. "Protected activity"

A protected activity is an act that opposes any perceived discriminatory practice made unlawful by the ADA. "Protected activity" includes making a request for a reasonable accommodation.

The parties have agreed on the first element: that Dr. Porter made a reasonable accommodation request for changes to her work schedule and environment. Thus, the first element is satisfied.

### 3.2. "Aware of activity"

The parties have agreed on the second element: that Dartmouth Health was aware that Dr. Porter made a reasonable accommodation request for accommodation for changes to her work schedule and environment. Thus, the second element is satisfied.

### 3.3. "Adverse action"

The parties have agreed on the third element: that Dartmouth Health took adverse action against Dr. Porter by terminating her employment. Thus, the third element is satisfied.

### 3.4. "Causal connection"

You must determine whether there is a causal connection between Dr. Porter's reasonable accommodation request and Dartmouth Health's decision to terminate Dr. Porter's employment. Dr. Porter must prove that Dartmouth Health would not have terminated her employment but for her reasonable accommodation request. To determine that there is a causal connection between Dartmouth Health's decision to terminate Dr. Porter's employment and Dr. Porter's reasonable accommodation request, you must decide that Dartmouth Health would not have terminated Dr. Porter if Dr. Porter had not made a reasonable accommodation request but everything else had been the same.

Dr. Porter does not need to prove that retaliation was the only or even the predominant factor that motivated Dartmouth Health. You may determine that other factors contributed to Dartmouth Health's decision to terminate Dr. Porter's employment. But, in order to return a verdict in favor of Dr. Porter on her ADA retaliation claim, you must conclude that she has proved by a preponderance of the evidence that, even if other factors contributed to the decision, Dartmouth Health would not have terminated her employment if she had not made a reasonable accommodation request.

### Rehabilitation Act Claim

Dr. Porter has also brought disability discrimination claims under Section 504 of the Rehabilitation Act (29 U.S.C. § 794). Section 504 of the Rehabilitation Act applies to entities

21

that receive federal funds, and it prohibits these entities from excluding or discriminating against individuals based on their disability.

Dr. Porter has brought claims for discriminatory termination, failure to make a reasonable accommodation, and retaliation under Section 504 of the Rehabilitation Act. The elements and instructions for these claims are the same as those under the ADA. Thus, the instructions I previously gave you on disability discrimination under the ADA apply equally to the claims under Section 504 of the Rehabilitation Act.

**Disability Discrimination Claims Under New Hampshire State Law**

In addition to the federal claims, there are also claims in this case for disability discrimination under New Hampshire's Law Against Discrimination. New Hampshire state law prohibits discrimination in employment based on disability.

Dr. Porter has brought claims for discriminatory termination, failure to make a reasonable accommodation, and retaliation under the New Hampshire Law Against Discrimination. The elements and instructions for these claims are the same as those under the ADA. Thus, the instructions I previously gave you on disability discrimination under the ADA apply equally to the claims under the New Hampshire Law Against Discrimination.

**Disability Discrimination Claims Under Vermont State Law**

In addition to the federal claims and the claims under New Hampshire state law, there are also claims in this case for disability discrimination under Vermont's Fair Employment Practices Act (FEPA). Vermont state law prohibits discrimination in employment based on disability.

Dr. Porter has brought claims for discriminatory termination, failure to make a reasonable accommodation, and retaliation under Vermont's Fair Employment Practices Act. The elements and instructions for these claims are mostly the same as those under the ADA. However, there is

22

one important difference in the claim for discriminatory termination. For the fourth element, Vermont's Fair Employment Practices Act uses the "motivating factor" test instead of the "because of" test used under the ADA. In other words, Dr. Porter must prove the following by a preponderance of the evidence:

| | |
|---|---|
| First: | Dartmouth Health is an employer subject to the FEPA. |
| Second: | Dr. Porter has a "disability" within the meaning of FEPA. |
| Third: | Dr. Porter was otherwise qualified to perform the essential functions of her job, either with or without reasonable accommodation. |
| Fourth: | Dr. Porter's disability was a *motivating factor* in Dartmouth Health's decision to terminate her employment. |

Under the motivating factor test, an employee must prove that their disability was a motivating factor that prompted the employer to terminate the employment. It is not necessary for the employee to prove that disability was the sole or exclusive reason for the employer's decision. It is sufficient if the employee proves that the alleged disability was a motivating factor in the employer's decision. A motivating factor is a factor that played some part in an employer's adverse employment action. Under the motivating factor test, an employer cannot avoid liability by proving that it would still have taken the same adverse action in the absence of discriminatory motivation. This is a difference between the motivating factor test and the "because of" test.

You should apply the motivating factor test, not the "because of" test, to Dr. Porter's claim for discriminatory termination under the Vermont Fair Employment Practices Act. With this exception, the instructions I previously gave you on disability discrimination under the ADA apply equally to the claims under the Vermont Fair Employment Practices Act.

23

**Wrongful Discharge under New Hampshire Law**

Based on Dartmouth Health's termination of Dr. Porter's employment at Dartmouth-Hitchcock Medical Center, Dr. Porter has brought a claim for wrongful discharge against Dartmouth Health under New Hampshire law.

The prevailing rule in New Hampshire is that where, as here, there is no employment contract between employer and employee, the relationship is termed "at will." In an at-will employment situation, both parties are generally free to terminate the employment relationship at any time, with or without cause, and it is implied that the parties will carry out their obligations in good faith. But there is an exception to this "at-will" rule: an employer's termination of an employee that is motivated by bad faith or malice, or is based on retaliation, is not in the best interest of the economic system of the public good, and is therefore unlawful. An employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment and the public's interest in maintaining a proper balance between the two.

In order to establish a claim for wrongful discharge under New Hampshire law, Dr. Porter must demonstrate the following two elements by a preponderance of the evidence:

First:    Dartmouth Health's termination of Dr. Porter was motivated by bad faith, malice, or retaliation; and

Second:    Dartmouth Health terminated Dr. Porter because she performed one or more acts that public policy would encourage.

## 1. "Termination motivated by bad faith, malice, or retaliation"

For purposes of this claim, "bad faith" is the equivalent of malice, and may be established where (i) an employee is discharged for pursuing policies condoned by the employer, (ii) the record does not support the stated reason for the discharge, or (iii) disparate treatment was administered to a similarly situated employee. Bad faith can also be discerned from the course of

24

events surrounding an employee's discharge, the manner in which the plaintiff was discharged, or shifting reasons for an employee's termination. Stated another way, "malice" or "bad faith" may be shown where the employer's decision to terminate the employee was without reasonable cause or excuse as the facts would have appeared to a reasonable person, and that the termination was willful and intentional; that is, the employer knew that the termination was unreasonable and still decided to terminate the employee's employment; or that the termination was motivated by ill will or a purpose to harass. "Bad faith" or "malice" may therefore be established by proof that the evidence does not support the stated reason for the discharge.

The general meaning of "retaliation" is the act of doing someone harm in return for actual or perceived injuries or wrongs, in other words, revenge.

### 2.  "Acts that public policy would encourage"

"Public policy," as used in this claim, includes a wide range of societal goals including safety and public welfare, protection of an at-will employee's promised compensation, and good faith reporting of reasonably perceived improper activity. The employee need not show a strong and clear public policy, and the public policy may be based on statutory or non-statutory policies at the state or federal level. An employee's mere expression of disagreement with a management decision, however, is not an act protected by public policy. Moreover, the public policy exception to termination of at-will employment does not deprive an employer of the right to make business decisions which are necessary to effectuate the efficient and profitable operation of its business; nor does the public policy exception interfere with an employer's ability to hire and retain those individuals best qualified for the job.

An example of a case where an employee is terminated for doing an act that public policy would encourage is an employee being terminated for refusing to provide to his or her employer

25

private medical records and personal health information of patients. A second example is an employee being terminated for missing work because they reported to jury duty. A third example is an employee being terminated for protecting employees who worked under him from workplace hazards that could cause serious physical harm to those employees. Other examples of acts that public policy would encourage could be reporting physician conduct that is illegal, fraudulent, unethical, or unlawful to patients; ensuring that a medical provider or medical facility obtain patient consent before performing procedures on patients; and objecting to improper patient billing procedures. In these cases, if the termination is because of the act that public policy encourages, and the employer acted with malice and bad faith or in retaliation, the employee is entitled to recover damages for wrongful termination.

It is your job to determine if Dartmouth Health terminated Dr. Porter because of her performance of one or more acts that public policy would encourage. In determining whether Dr. Porter performed an act that public policy would encourage, you are not limited to the above examples, nor must you find that the facts support the above examples in this case.

In order to find in favor of Dr. Porter on this claim, you not only must find that Dr. Porter performed one or more acts that public policy would encourage, and that Dartmouth Health's termination of Dr. Porter was motivated by bad faith, malice, or retaliation; you must also find that Dr. Porter was terminated "because" of her performance of an act that public policy would encourage. Thus, Dr. Porter must show a causal link between her performance of an act that public policy would encourage and her termination.

### Damages

If you decide in favor of Dartmouth Health on all claims, you will not consider these instructions about damages. But if you decide for Dr. Porter on any claim, you must determine

26

the amount of money that will compensate her for each item of harm that was caused by Dartmouth Health's conduct. This compensation is called "damages."

Please keep in mind the following general principles as you deliberate. Remember that Dr. Porter has the burden of proving damages by a preponderance of the evidence. Damages may not be based on sympathy, speculation, or guesswork. In making your decision, you should be guided by the evidence, common sense, and your best judgment.

**Economic and Non-Economic Damages**

Damages for Dr. Porter's claims can fall into two different categories: economic damages and non-economic damages. Economic damages include such items as lost income and medical expenses. Non-economic damages include such items as lost enjoyment of life, mental anguish, pain and suffering, disability and disfigurement. These damages may include compensation for past harm and future harm, depending on the evidence. If you find that Dr. Porter is entitled to damages, you must determine the total amount and place that amount on the verdict form.

There is no precise standard for calculating these damages. Your damages determination must be just and reasonable in light of the evidence. In determining the damages that Dr. Porter has suffered as a result of her injuries, you should consider the following items:

- Dr. Porter is entitled to damages for any earnings lost in the past, and any probable loss of ability to earn money in the future, caused by Dartmouth Health's conduct. When considering Dr. Porter's future earnings, you should consider Dr. Porter's expected working lifetime.

- Dr. Porter is entitled to damages for the reasonable cost of necessary medical care and other treatment that she has received or is likely to receive in the future, caused by Dartmouth Health's conduct.

27

- Dr. Porter is entitled to damages for any lost enjoyment of life, mental anguish, and pain and suffering caused by Dartmouth Health's conduct. These damages may include any pain, discomfort, fears, anxiety, humiliation, lost enjoyment of life's activities, and any other mental and emotional distress suffered by her in the past, or likely to be suffered in the future.

**Mitigation of Damages**

Dartmouth Health claims that Dr. Porter has failed to mitigate, or minimize, her damages. A plaintiff ordinarily has a general duty to mitigate the damages she incurs, meaning she has a duty to take steps to try to minimize the harm or prevent it from increasing further. In this context, that means Dr. Porter has a duty to attempt to secure or to secure employment that is a suitable alternative to her employment at Dartmouth Health. This duty applies only to those damages that Dr. Porter could have avoided with reasonable effort and without undue risk, burden, or expense, as the duty to mitigate requires only reasonable, practical care and diligence, not extraordinary measures.

The burden is on Dartmouth Health to prove this affirmative defense by a preponderance of the evidence. As part of bearing this burden, Dartmouth Health must present evidence not only that Dr. Porter did not make reasonable efforts to obtain employment, but also that suitable work existed. To sustain its burden, Dartmouth Health must present concrete evidence; mere speculation is not sufficient.

If you find that Dr. Porter failed to mitigate her damages, you must reduce your award of damages, if any, by the amount you find she could have avoided.

28

A-872

**Punitive Damages**

Punitive damages are meant to punish a party for its clearly outrageous conduct, and to stop others from acting similarly in the future. In order to award punitive damages, you must find two things:

First, you must find that Dartmouth Health's wrongful conduct was outrageously reprehensible; that is, that the conduct – whether acts or failures to act – was egregious, morally deserving of blame, to a degree of outrage frequently associated with a crime.

Second, you must find that Dartmouth Health acted with malice. You may find malice if you find that Dartmouth Health's reprehensible conduct was intentional and deliberate; that is, that the conduct was the result of Dartmouth Health's bad motive, ill will, or personal spite or hatred toward Dr. Porter. You may also find malice even if Dartmouth Health's motivation behind the intentional, outrageous conduct was to benefit itself, rather than to harm Dr. Porter. Alternatively, you may find malice if Dartmouth Health's wrongful conduct was not intentional, but instead was done with a reckless or wanton disregard of the substantial likelihood that it would cause egregious harm to Dr. Porter; that is, if Dartmouth Health acted – or failed to act – with conscious and deliberate disregard of a known, substantial, and intolerable risk of harm to Dr. Porter, with the knowledge that the conduct was substantially certain to result in the threatened harm.

Where the defendant is a corporation, as is the case here, in order to find that the corporation must pay punitive damages, you must find that the conduct justifying punitive damages was corporate conduct, or was conduct permitted by the corporation. Where the management of the corporation was involved in the conduct itself, it may be considered to be corporate conduct. Where the management of the corporation has knowledge of wrongful

29

conduct by lower-level employees, the corporation may be determined to have permitted the conduct. If you find either corporate conduct, or conduct permitted by the corporation, you may find that the corporation must pay punitive damages.

In determining the amount of punitive damages to award, if any, you may consider such factors as the nature of Dartmouth Health's conduct, the nature of the resulting harm to Dr. Porter, Dartmouth Health's wealth or financial status, and the degree of malice or wantonness in its acts.

### Remaining Damages Issues

It is solely the province of the jury to decide the amount of any damages award. I am giving you these damages instructions so you will know how to proceed if you reach this point in your deliberations. But by giving you these instructions, I do not intend to suggest whether an award is appropriate or what the amount of that award should be.

Where the amount of the damages can be calculated in specific dollar terms, the party seeking damages must present evidence to demonstrate the appropriate amount. With certain types of damages, however, there is no precise measurement, and it is up to you to decide what is fair monetary compensation for those damages. Under no circumstances may you award damages that are speculative or conjectural.

I remind you that any amount of recovery that may have been suggested by the attorneys is not evidence. Moreover, you need not adopt the approaches the attorneys have suggested for calculating damages. As the jury, it is your obligation to arrive at an amount which is supported by the evidence and fair to both parties. The amount of damages, if any, is a determination for the jury.

30

You should not add any sum for interest to the damages awarded in this case. The court will make such award if appropriate. Similarly, you must not include in your award any costs that Dr. Porter may, or may not, have incurred due to her filing of this lawsuit, or her attorneys' fees. These are matters for the court.

You should not award damages for one item that duplicates an award for another item. In other words, a party is entitled to only one recovery for his or her damages.

### Insurance and Taxes

You should not speculate about whether either Dartmouth Health or Dr. Porter has any insurance that might cover, or has covered, any damages that you find Dr. Porter has experienced. You also should not speculate about what taxes Dr. Porter might owe on any damage award. You have heard testimony from Dr. Bancroft that Dr. Porter's damages include amounts owed in taxes on any damages award. You may, or may not, take this into account in assessing the amount of Dr. Porter's damages, if any.

The rules that jurors are not to speculate about insurance and taxes are special rules that apply to lawsuits. Those issues are not relevant to your task here. Your job is to award the amount of damages that you determine has been established by the evidence presented to you. Any other issues that have to be resolved are my job, not yours.

### Final Instructions

This completes my instructions to the jury. I will now provide a copy of these instructions to you, and you will retire to the jury room to deliberate in privacy about the issues in this case. I will also provide a Verdict Form to guide you in your deliberations. The answer to each question on the form must be the unanimous answer of the jury. This means you cannot answer a question

31

A-875

on the Verdict Form unless and until all twelve of you agree on the answer. You will also receive the exhibits which were admitted into evidence.

I appoint _____ as your foreperson. (S)he will be responsible for making sure that the deliberations occur in an orderly fashion and that every juror has an opportunity to participate. (S)he will record the unanimous answers of the jury on the verdict form, and date and sign the jury form. (S)he will also be your spokesperson here in court.

If you need to communicate with the court, please do so in writing. I will then confer with the lawyers about your question and send a written response to you. Please advise the court officer after you reach a verdict, but do not tell the court officer or anyone else what the verdict is until you return to the courtroom at which time I will receive the Verdict Form from your foreperson.

Dated at Burlington, in the District of Vermont, this _____ day of April 2025.


_____
Kevin J. Doyle
United States Magistrate Judge