# 25-1382-cv(L), 25-3155-cv(XAP)

# United States Court of Appeals
### for the
## Second Circuit

MISTY BLANCHETTE PORTER, M.D.,

*Plaintiff-Appellee-Cross-Appellant,*

– v. –

DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, DARTMOUTH-HITCHCOCK HEALTH,
DARTMOUTH-HITCHCOCK MEDICAL CENTER,

*Defendants-Appellants-Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT (BURLINGTON)

## JOINT APPENDIX
### Volume 6 of 6 (Pages A-1445 to A-1719)

DONALD W. SCHROEDER
MORGAN MCDONALD
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199
(617) 342-4041
    – and –
TRISTRAM J. COFFIN
DOWNS RACHLIN MARTIN PLLC
199 Main Street,
P.O. Box 190, 6th Floor
Burlington, Vermont 05402
(802) 863-2375

*Attorneys for Defendants-Appellants-
  Cross-Appellees*

SARAH NUNAN
GEOFFREY J. VITT
VITT & NUNAN, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, Vermont 05055
(802) 649-5700
    – and –
ERIC D. JONES
LANGROCK SPERRY & WOOL, LLP
210 College Street, Suite 400
Burlington, Vermont 05401
(802) 864-0217

*Attorneys for Plaintiff-Appellee-
  Cross-Appellant*

CP COUNSEL PRESS    (800) 4-APPEAL • (390775)

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, filed October 11, 2017 ........................... A-35

    Attached to Complaint -
    Civil Cover Sheet.................................................. A-68

First Amended Complaint, filed August 1, 2018 ....... A-69

Certificate of Service of First Amended Complaint,
    filed August 1, 2018.............................................. A-105

Defendants' Answer to Plaintiff's Amended
    Complaint, filed September 7, 2018 ...................... A-106

Mandate in Docket No. 20-3894, issued on
    February 27, 2024.................................................. A-133

Order of the United States Court of Appeals for the
    Second Circuit, filed February 27, 2024................ A-134

Motion *In Limine* by Defendants to Preclude the
Testimony of Robert Bancroft, filed
February 14, 2025 ...................................................... A-234

Memorandum of Law by Defendants in Support of
Motion *In Limine*, filed February 14, 2025 .............. A-237

    Exhibit A to Memorandum of Law -
    Expert Report of Robert L. Bancroft, dated
    October 30, 2018 .................................................. A-247

    Exhibit B to Memorandum of Law -
    Expert Report of Robert L. Bancroft, dated
    October 1, 2019 .................................................... A-253

ii

**Page**

Exhibit C to Memorandum of Law -
Deposition Transcript of Robert L. Bancroft,
dated October 30, 2019 .......................................... A-261

Exhibit D to Memorandum of Law -
Expert Report of Robert L. Bancroft, dated
August 26, 2024 ..................................................... A-289

Memorandum of Law by Plaintiff in Opposition to
Defendants' Motion *In Limine*, filed
February 28, 2025 .................................................. A-296

Notice of Hearing, filed March 6, 2025 ..................... A-309

Reply Memorandum of Law by Defendants in
Further Support of Motion *In Limine*, filed
March 11, 2025 ...................................................... A-310

Revised Notice of Hearing, filed March 13, 2025 ..... A-319

Transcript of Motion *In Limine* Hearing, dated
March 14, 2025 and filed March 19, 2025 ............ A-320

Renewed Motion *In Limine* by Defendants to
Preclude the Testimony of Robert Bancroft
("Renewed Motion"), filed March 20, 2025 .......... A-424

Exhibit A to Renewed Motion -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit B to Renewed Motion -
Expert Report of Robert L. Bancroft, dated
March 19, 2025 ...................................................... A-433

Memorandum of Law by Plaintiff in Opposition to
Defendants' Renewed Motion, filed
March 21, 2025 ...................................................... A-439

iii

**Page**

Order Denying Motion to Preclude Robert
Bancroft's Testimony, filed March 21, 2025 ......... A-442

Motion *In Limine* by Defendants to Preclude the
Expert Report, filed March 26, 2025 ..................... A-459

Motion *In Limine* by Defendants Regarding
Undisclosed Expert Opinions of Robert Bancroft,
filed March 29, 2025.............................................. A-464

Exhibit 1 to Motion -
Expert Report of Robert L. Bancroft, dated
October 30, 2018
(Reproduced herein at pp. A-248 - A-252)

Exhibit 2 to Motion -
Expert Report of Robert L. Bancroft, dated
October 1, 2019
(Reproduced herein at pp. A-254 - A-260)

Exhibit 3 to Motion -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit 4 to Motion -
Expert Report of Robert L. Bancroft, dated
March 19, 2025
(Reproduced herein at pp. A-434 - A-438)

Plaintiff's Opposition to Defendants' Motion *In
Limine* Regarding Undisclosed Expert Opinions
of Robert Bancroft, filed March 30, 2025 ............. A-474

Exhibit A to Plaintiff's Opposition -
Deposition Transcript of Robert L. Bancroft,
dated October 30, 2019
(Reproduced herein at pp. A-262 - A-288)

iv

**Page**

Exhibit B to Plaintiff's Opposition -
Transcript of Motion *In Limine* Hearing, dated
March 14, 2025
(Reproduced herein at pp. A-320 - A-423)

Exhibit C to Plaintiff's Opposition -
Excerpts from the Rough Draft of Robert
Bancroft's Trial Testimony ..................................... A-484

Exhibit D to Plaintiff's Opposition -
Plaintiff's Response to Defendant Mary
Hitchcock Memorial Hospital's First Set of
Interrogatories Propounded on Plaintiff, dated
April 20, 2018 ........................................................ A-488

Exhibit E to Plaintiff's Opposition -
Dartmouth-Hitchcock 2017 Benefits Guide .......... A-492

Excerpts from the Jury Trial Transcript, dated
March 27, 2025 (Day 4).......................................... A-540

Excerpts from the Jury Trial Transcript, dated
March 28, 2025 (Day 5).......................................... A-547

Excerpts from the Jury Trial Transcript, dated
March 31, 2025 (Day 6).......................................... A-599

Excerpts from the Jury Trial Transcript, dated
April 2, 2025 (Day 8).............................................. A-747

Jury Trial Transcript, dated April 7, 2025 (Day 11)... A-757

Court Jury Charge, filed April 7, 2025 ...................... A-844

Excerpts from the Jury Trial Transcript, dated
April 8, 2025 (Day 12)........................................... A-876

Jury Charge, filed April 8, 2025................................. A-895

Jury Verdict Form, filed April 10, 2025 ..................... A-929

v

**Page**

Motion by Plaintiff for Prejudgment Interest, filed
April 23, 2025 ...................................................... A-936

Opposition by Defendants to Plaintiff's Motion for
Prejudgment Interest, filed May 7, 2025 ............... A-940

Index of Exhibits to Defendants' Opposition, filed
May 7, 2025 .......................................................... A-955

Exhibit 1 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
October 30, 2018
(Reproduced herein at pp. A-248 - A-252)

Exhibit 2 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
October 1, 2019
(Reproduced herein at pp. A-254 - A-260)

Exhibit 3 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit 4 to Defendants' Opposition -
Expert Report of Robert L. Bancroft, dated
March 19, 2025
(Reproduced herein at pp. A-434 - A-438)

Exhibit 5 to Defendants' Opposition -
DH Simple Interest Chart 12% .............................. A-957

Exhibit 6 to Defendants' Opposition -
DH Simple Interest Chart 3% ................................ A-959

Motion by Plaintiff for Attorneys' Fees, filed
May 8, 2025 .......................................................... A-961

vi

**Page**

Exhibit 1 to Motion for Attorneys' Fees -
Declaration of Geoffrey J. Vitt, dated
May 6, 2025 ........................................................ A-973

Exhibit 2 to Motion for Attorneys' Fees -
Declaration of Eric D. Jones, dated May 7, 2025,
with Exhibit A...................................................... A-981

Exhibit A to Motion for Attorneys' Fees -
Vitt & Associates' Invoices for Professional
Services Rendered ............................................... A-993

Exhibit B to Motion for Attorneys' Fees -
DGW Kramer LLP's Invoices for Professional
Services Rendered ............................................... A-1254

Exhibit C to Motion for Attorneys' Fees -
Vitt & Associates' Invoices for Professional
Services Rendered ............................................... A-1262

Motion by Plaintiff to Amend Judgment, filed
May 8, 2025 ........................................................ A-1397

Reply by Plaintiff in Further Support of Motion for
Prejudgment Interest, filed May 21, 2025 ............. A-1404

Exhibit A to Plaintiff's Reply -
Excerpts from the Draft Trial Transcript of
March 28, 2025.................................................... A-1413

Exhibit B to Plaintiff's Reply -
Excerpts from the Draft Trial Transcript of
March 26, 2025.................................................... A-1428

Motion by Defendants to Alter or Amend the
Judgment and, in the Alternative, for a New Trial
on Plaintiff's VFEPA Claim, filed May 22, 2025 .. A-1445

Opposition by Defendants to Plaintiff's Motion to
Amend Judgment, filed May 22, 2025 .................. A-1459

vii

**Page**

Motion by Defendants for a New Trial Related to
Damages Issues, filed May 22, 2025 ..................... A-1468

Index to Exhibits to Defendants' Motion for a New
Trial Related to Damages Issues, filed
May 22, 2025 ......................................... A-1481

Exhibit 1 to Defendant's Motion -
Expert Report of Robert L. Bancroft, dated
August 26, 2024
(Reproduced herein at pp. A-290 - A-295)

Exhibit 2 to Defendants' Motion -
Demonstrative Excerpt from Expert Report of
Robert L. Bancroft, dated March 19, 2025 ............ A-1482

Exhibit 3 to Defendants' Motion -
Robert Bancroft Cross Examination Exhibit,
Marked C19 ........................................... A-1484

Exhibit 4 to Defendants' Motion -
Email Correspondence, dated June 6, 2017, with
Attachment ............................................ A-1486

Opposition by Defendants to Plaintiff's Motion for
Attorneys' Fees, filed May 22, 2025 ..................... A-1499

Opposition by Plaintiff to Defendants' Motion to
Alter Judgment, filed June 5, 2025 ...................... A-1512

Reply by Plaintiff in Further Support of Motion to
Amend Judgment, filed June 5, 2025 ................... A-1523

Memorandum of Law by Plaintiff in Opposition to
Defendants' Motion for a New Trial, filed
June 5, 2025 .......................................... A-1525

Reply Memorandum of Law by Plaintiff in
Response to Defendants' Opposition to Motion
for Attorneys' Fees, filed June 5, 2025 .................. A-1533

viii

**Page**

Exhibit A to Plaintiff's Reply Memorandum -
Itemized Chart and Invoices .................................. A-1542

Reply by Defendants in Further Support of Motion
to Alter Judgment, filed June 20, 2025 .................. A-1556

Reply Memorandum of Law by Defendants in
Further Support of Motion for a New Trial
Related to Damages Issues, filed June 20, 2025.... A-1566

Supplemental Memorandum of Law by Plaintiff in
Further Support of Motion for Attorneys' Fees,
filed June 25, 2025.................................................. A-1574

Excerpts from the Post-Trial Motions Hearing,
dated July 1, 2025 .................................................. A-1577

Second Supplemental Memorandum of Law by
Plaintiff in Support of Motion for Attorneys'
Fees, filed July 11, 2025 ........................................ A-1591

Exhibit A to Second Supplemental
Memorandum -
Chart (Attorneys and Paralegals)........................... A-1594

Exhibit B to Second Supplemental
Memorandum -
Chart (Fees for Four Attorneys)............................. A-1596

Exhibit C to Second Supplemental
Memorandum -
Statements from Vitt & Nunan .............................. A-1597

Exhibit D to Second Supplemental
Memorandum -
Statements from Langrock, Sperry & Wool .......... A-1604

ix

**Page**

Response by Defendants in Opposition to Plaintiff's
    Second Supplemental Memorandum in Support
    of Motion for Attorneys' Fees, filed
    July 18, 2025 ...................................................... A-1607

Judgment of the United States District Court for the
    District of Vermont, filed April 24, 2025,
    Appealed From (Doc. 297), with Notice to
    Litigants ................................................................ A-1612

Notice of Appeal by Defendants, filed
    May 27, 2025 ........................................................ A-1614

Order of the Honorable Kevin J. Doyle, filed
    July 7, 2025, Appealed From (Doc. 329) ............... A-1616

Order of the Honorable Kevin J. Doyle, filed
    November 26, 2025, Appealed From (Doc. 334) .. A-1619

Opinion and Order of the Honorable Kevin J.
    Doyle, filed November 26, 2025, Appealed From
    (Doc. 335) .............................................................. A-1630

Order of the Honorable Kevin J. Doyle, filed
    November 26, 2025, Appealed From (Doc 336) ... A-1685

Order of the Honorable Kevin J. Doyle, filed
    November 26, 2025, Appealed From (Doc. 337) .. A-1697

Amended Judgment of the United States District
    Court for the District of Vermont, filed December
    2, 2025, Appealed From (Doc. 338) ...................... A-1713

Notice of Cross-Appeal by Plaintiff, filed
    December 15, 2025 ................................................. A-1715

Amended Notice of Appeal by Defendants, filed
    December 16, 2025 ................................................. A-1717

A-1445

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

<table>
<tr><td>

MISTY BLANCHETTE PORTER, M.D.,


      Plaintiff,

vs.


DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,


      Defendants.

</td><td>

Case No. 2:17-cv-194

</td></tr>
</table>

**DEFENDANTS' MOTION TO ALTER OR AMEND THE JUDGMENT
AND, IN THE ALTERNATIVE, FOR A NEW TRIAL ON PLAINTIFF'S VFEPA CLAIM**

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Defendants" or "Dartmouth Health") hereby move, pursuant to Rule 59 of the Federal Rules of Civil Procedure, to alter or amend the judgment rendered on Plaintiff Misty Blanchette Porter's ("Plaintiff" or "Dr. Porter") claim for violation of the Vermont Fair Employment Practices Act ("VFEPA"). In the alternative, Dartmouth Health moves for a new trial solely on the same claim. Despite the fact that all of Dr. Porter's other disability discrimination claims applied the same "but for" causation standard, the Court – despite Dartmouth Health's multiple, timely objections – instructed the jury to apply a much lower burden to Dr. Porter's VFEPA claim. Setting aside the inexplicable

1

departure from federal and state court precedent, this improper distinction (and instruction) warrants immediate redress by this Court.

In connection with this Motion, Dartmouth Health requests that the Court certify to the Vermont Supreme Court the question of the appropriate causation standard for a disability-based discrimination claim brought under the VFEPA.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Misty Blanchette Porter ("Dr. Porter") was previously employed as a physician in the Reproductive Endocrinology and Infertility ("REI") Division within Dartmouth Health's Department of Obstetrics and Gynecology ("OB/GYN"). Following longstanding, well-documented issues with, *inter alia*, recruitment and retention of skilled nurses in the REI Division, Dartmouth Health made the decision to shut down the REI Division entirely and to terminate all three physicians employed therein—including Dr. Porter.

Dr. Porter filed suit against Dartmouth Health in October of 2017. (ECF No. 1). In her initial Complaint, Dr. Porter asserted claims for (i) wrongful discharge, (ii) violation of the New Hampshire Whistleblowers' Protection Act, (iii) disability discrimination and retaliation under the Americans with Disabilities Act, and (iv) disability discrimination and retaliation under New Hampshire law. *Id.* In August of 2018, Dr. Porter amended her Complaint to add claims for disability discrimination under both the Rehabilitation Act of 1973 and the Vermont Fair Employment Practices Act ("VFEPA"). (ECF No. 50).

On January 29, 2020, Dartmouth Health moved for summary judgment. (ECF No. 139). The District Court granted summary judgment in Dartmouth Health's favor on all counts. With respect to Dr. Porter's VFEPA claim, the District Court noted that "the [VFEPA] follows the language of the Rehabilitation Act. The Vermont Supreme Court follows federal case law

2

regarding 'the allocations of burdens and standards of proof.'" *Porter v. Dartmouth-Hitchcock Med. Ctr.*, No. 5:17-cv-194, 2020 WL 6789564 (D. Vt. Nov. 3, 2020) (quoting *State v. G.S. Blodgett Co.*, 163 Vt. 175, 180 (1995).

Dr. Porter appealed the District Court's grant of summary judgment to the Second Circuit Court of Appeals. In her briefing, Dr. Porter acknowledged the absence of any binding case law as to the appropriate causation standard for a disability-based VFEPA claim, and twice asked the Second Circuit to certify that question to the Vermont Supreme Court. *See Blanchette Porter vs. Dartmouth Hitchcock Medical Center*, 2d Circuit Court of Appeals Docket # 20-3894, ECF No. 53 ("Porter Appeal Brief") at 45 ("To the extent this Court concludes that Dr. Porter could meet a mixed-motive standard and not a but-for standard, … Dr. Porter requests certification of the state law claims to the … Vermont Supreme Court[] for determination of whether the state law claims apply a mixed-motive standard or a but-for standard for causation."), 49 ("Plaintiff is not aware of any Vermont Supreme Court, published trial court order, or published administrative agency decision construing the impact of *Natcfsky* on state-law disability discrimination claims. Because the lower court failed to analyze the issue, this Court may either remand for assessment by the District Court under the motivating-factor standard…or certify the question to the Vermont Supreme Court.").

On February 6, 2024, the Second Circuit affirmed the District Court's decision in part, vacated in part, and remanded the matter for trial. *Porter v. Dartmouth-Hitchcock Medical Center*, 92 F.4th 129 (2024). The Second Circuit declined to certify the causation standard question to the Vermont Supreme Court, and instead "[left] it to the district court on remand to reassess and reconsider the causation standards governing Dr. Porter's disability claims under the relevant State laws." *Porter*, 92 F.4th at 149.

3

A-1448

The matter was tried before a jury between March 24, 2025 and April 10, 2025. (ECF Nos. 244-281). Dartmouth Health moved for a directed verdict upon the close of Dr. Porter's case-in-chief and renewed that motion upon the close of its own case. (ECF Nos. 261 and 264). The Court denied both motions. (ECF Nos. 261 and 264). The jury ultimately found that Dartmouth Health did not violate the New Hampshire Whistleblowers' Protection Act, and that Dr. Porter was not wrongfully discharged in violation of New Hampshire state law. (ECF No. 281).

With respect to Dr. Porter's disability discrimination claims, the jury found that Dartmouth Health (i) did not violate the ADA, (ii) did not violate the Rehabilitation Act, and (iii) did not violate the New Hampshire Law Against Discrimination. *Id.* The jury did, however, find that "Dr. Porter's disability was <u>a motivating factor</u> in Dartmouth Health's decision to terminate Dr. Porter's employment in violation of the Vermont Fair Employment Practices Act."[1] *Id.* (emphasis added). It awarded $1,125,000 in damages in connection with that claim. *Id.*

The trial record is clear: each of Dr. Porter's four disability discrimination-based claims was premised on the exact same underlying set of facts. Indeed, the jury was instructed – without objection from Dr. Porter – that the instructions it was given on disability discrimination under the ADA "appl[ied] equally" to the Rehabilitation Act claim and to the claim for disability discrimination under New Hampshire state law. (ECF No. 275). With respect to Dr. Porter's VFEPA claim, the jury was instructed that "[t]he elements and instructions… are *mostly* the same as those under the ADA." *Id.* (emphasis added). Critically, however, the Court instructed the

---

[1] The jury found in Dartmouth Health's favor on the questions of (i) whether Dartmouth Health failed to make a reasonable accommodation for Dr. Porter by terminating her employment instead of reassigning her to another department in violation of the VFEPA and (ii) whether Dartmouth Health retaliated against Dr. Porter by terminating her employment in violation of the VFEPA. (ECF No. 281).

4

jury—over Dartmouth Health's objection—that "there is one important difference in the claim for discriminatory termination. For the fourth element, the FEPA uses the 'motivating factor' test instead of the 'because of' test used under the ADA." *Id.*; *see also* ECF No. 295 at 51. The jury charge further stated:

> Under the motivating factor test, an employee must prove that their disability was a motivating factor that prompted the employer to terminate the employment. It is not necessary for the employee to prove that disability was the sole or exclusive reason for the employer's decision. It is sufficient if the employee proves that the alleged disability was a motivating factor in the employer's decision. **A motivating factor is a factor that played some part in an employer's adverse employment action**. Under the motivating factor test, an employer cannot avoid liability by proving that it would still have taken the same adverse action in the absence of discriminatory motivation. This is a difference between the motivating factor test and the "because of" test.
>
> **You should apply the motivating factor test, not the "because of" test, to Dr. Porter's claim for discriminatory termination under the FEPA. With this exception, the instructions I previously gave you on disability discrimination under the ADA regarding failure to make a reasonable accommodation and retaliation apply equally to the claims under the FEPA.**

(ECF No. 275) (emphases added). The jury was thus instructed, in no uncertain terms, that the only difference between Dr. Porter's ADA/Rehabilitation Act/New Hampshire disability discrimination claims and her VFEPA claim was the applicable causation standard. That the jury found in Dartmouth Health's favor on the federal and New Hampshire claims, and in Dr. Porter's favor on the VFEPA claim, speaks to the import of that instruction. Had the jury been informed of the correct causation standard (that is, "but-for" causation rather than "motivating factor" causation), Dartmouth Health would have rightfully prevailed on all six claims at trial and Dr. Porter would have been awarded no damages.

5

2:17-cv-00194-kjd    Document 305    Filed 05/22/25    Page 6 of 14

## II.  LEGAL STANDARD

A court may "alter or amend a judgment" upon motion brought no later than 28 days after the entry of judgment.  Fed R. Civ. P. 59(e).  Alternatively, a court may grant a new trial on "all or some of the issues… after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1); *see also Kaufmann v. Kjakazi*, 32 F.4th 843, 846 (9th Cir. 2022) ("Because the district court properly concluded that it had clearly erred in its original ruling… the court's granting of the [] Rule 59(e) motion fell within the court's considerable discretion."); *Murray v. USB Securities, LLC*, 128 F.4th 363 (2d Cir. 2025) (vacating judgment and remanding for further proceedings where jury was instructed as to incorrect legal standard); *Folger Adam v. PMI Indus., Inc.* 938 F.2d 1529 (2d Cir. 1991) (reversing and remanding for a new trial with corrected jury instructions);  *Paolillo v. Dresser Indus., Inc.*, 865 F.2d 37 (2d Cir.), modified on other grounds, 884 F.2d 707 (2d Cir.1989) (remanding for a new trial where it could not be said for certain that jury instruction did not cause the jury to apply the wrong legal standard).

A jury instruction "is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury of the law." *Murray*, 128 F.4th at 368 (quoting *Ashley v. City of New York,* 992 F.3d 128, 142 (2d Cir. 2021)); *see also Paolillo,* 865 F.2d at 40 (in employment discrimination case, finding error where instruction misstated the required level of importance of protected status to employer's decision).

In employment cases, the Second Circuit requires "jury instructions to be precise about the influence that a protected trait must produce and the level of abstraction at which the jury should assess whether that influence occurred." *Murray,* 128 F.4th at 370 (citing *Paolillo,* 865 F.2d at 40). "[W]here jury instructions create an erroneous impression regarding the standard of liability, it is

6

A-1451

not harmless error because it goes directly to plaintiff's claim, and a new trial is warranted." *Id.* at 372 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 554-55 (2d Cir. 1996)). A judgment should be reversed where the erroneous instruction "was prejudicial or the charge was highly confusing." *Ashley*, 992 F.3d at 143 (citation omitted).

## III.   **ARGUMENT**

### a.   *The Court's Instruction as to the Causation Standard for Violation of the VFEPA Was Just Plain Wrong.*

Pursuant to the VFEPA, it is unlawful for an employer to "discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability." 21 Vt. Stat. Ann. § 495(a)(1). The jury should have been instructed that, for Dr. Porter to succeed on her VFEPA claim, she must have proven that her disability was a "but-for" cause of Dartmouth Health's decision to terminate her employment. *See, e.g., Newton v. Kohl's, Inc.,* No. 5:21-CV-268, 2024 WL 4986303, at *13 (D. Vt. Nov. 12, 2024) ("[A] plaintiff need only show that her disability was a ***but-for cause*** of the adverse employment action…") (emphasis added). Instead, the charge provided to the jury utilized an erroneous "motivating factor" causation standard.[2]

Consistent with federal court precedent in this Court, Vermont courts have consistently held that the VFEPA follows the standards and burdens of proof articulated for the equivalent federal disability discrimination claims. *See, e.g., Gates v. Mack Molding Co., Inc.,* 216 Vt. 379, 386, 279 A.3d 656, 663 (2022) ("The disability-discrimination provisions under the FEPA are

---

[2] Dartmouth Health timely objected to this instruction at the charge conference held on April 7, 2024. (ECF No. 295 at 51).

A-1452

patterned after the federal Rehabilitation Act, which in turn incorporates standards from the federal Americans with Disabilities Act (ADA), so we look to federal case law to guide our interpretation, the allocations of burdens, and standards of proof."); *Kennedy v. Dep't of Pub. Safety*, 168 Vt. 601, 601–02, 719 A.2d 405, 406 (1998) ("Because the handicapped discrimination provisions of VFEPA are patterned on § 504 of the Rehabilitation Act … we look to interpretations of that statute in determining whether plaintiff has met the elements of his claim.") (citation omitted); *G.S. Blodgett Co.,* 163 Vt. at 180 ("The handicapped discrimination provisions under VFEPA are patterned after § 504 of the Rehabilitation Act of 1973…Therefore, we look to federal case law to guide our interpretation, the allocations of burdens and standards of proof.") (citations omitted); *Newton,* 2024 WL 4986303 at *13 ("Because FEPA's disability-discrimination provisions are patterned after the federal Rehabilitation Act, which in turn incorporates standards from the federal American with Disabilities Act (ADA), the court looks to both state and federal case law to guide its analysis.") (citation omitted); *Mueller v. Rutland Mental Health Servs.,* File No. 1:05-cv-38, 2006 WL 2585101, at *2 (D. Vt. Aug. 17, 2006) ("The standards and burdens of proof under the VFEPA are identical to those under the ADA.") (citation omitted).

Here, the equivalent federal claims—namely, the ADA and the Rehabilitation Act—utilize "but-for" causation rather than "motivating factor" causation. *Natofsky v. City of New York*, 921 F.3d 337 (2d Cir. 2019). In *Natofsky*, the Second Circuit held, as a matter of first impression, "that when a plaintiff alleges an employment discrimination claim under the Rehabilitation Act, the causation standard that applies is the same one that would govern a complaint alleging employment discrimination under the ADA." *Id.* at 345. It further held that "the ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was ***the but-for cause*** of any adverse employment action." *Id.* at 348 (emphasis added). Because the VFEPA's

8

disability discrimination provisions are patterned on the ADA and Rehabilitation Act, and because Vermont courts have repeatedly stated that the standards of proof for VFEPA are guided by the same, the Court should have instructed the jury on "but-for" rather than "motivating factor" causation. *See, e.g., Natofsky,* 921 F.3d at 345-48; *Gates,* 216 Vt. at 386.

Notwithstanding the Second Circuit's holding in *Natofsky*, Dr. Porter argued in her previous appellate briefing that "motivating factor" causation should apply to her VFEPA claim because **non-disability** VFEPA claims follow Title VII Standards. Porter Appeal Brief at 48-49 (citing *Witherbee v. Town of Brattleboro*, No. 2:18-CV-00113, 2019 WL 2476722, at *9 (D. Vt. June 13, 2019)) (sex discrimination). If this were a race or gender-based discrimination case, her argument might be persuasive. However, this is a *disability discrimination* VFEPA claim. It is irrational to assume that Vermont disability discrimination claims would continue to follow the standard for Title VII, which does not relate to disability, after *Natofsky*. This is particularly true given that Title VII—**unlike** the ADA, the Rehabilitation Act, and the VFEPA—states that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice…." 42 U.S.C.A. § 2000e-2; *see also Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 174, 129 S. Ct. 2343 (2009) (suggesting that an anti-discrimination statute must expressly provide for a "motivating factor" test before that test can be applied); *Natofsky*, 921 F.3d at 348 (noting that the ADA does not contain the "motivating factor language"). Accordingly, the Court should have instructed the jury as to "but-for" rather than "motivating factor" causation.

9

A-1454

>   *b. Even if the VFEPA Applied a "Motivating Factor" Causation Standard, the*
>   *Instructions Would Still be Incorrect.*

Even if "motivating factor" causation were the appropriate standard, which it is not, post-trial relief for Dartmouth Health would still be warranted because the Court's instructions were also erroneous in other respects.

In a pre-*Natofsky* opinion considering a VFEPA claim of disability discrimination, the Vermont Supreme Court held that "the jury should have been instructed that if [employee] showed that her handicap was a motivating factor in [employer's] decision to terminate her employment, ***then [employer] had to prove that it would have made the same decision even absent the discriminatory motive.*" *Knapp v. State*, 168 Vt. 590, 592, 729 A.2d 719, 721 (1998) (reversing and remanding). Here, the jury received no such instruction. To the contrary, the jury was instructed that "[u]nder the motivating factor test, an employer <u>cannot</u> avoid liability by proving that it would still have taken the same adverse action in the absence of discriminatory motivation." (ECF No. 275) (emphasis added). Thus, the jury in this matter was instructed *exactly the opposite* of what the Vermont Supreme Court said is required of motivating factor causation. This was clear error.

Here, the distinction is one that makes a difference: as evidenced by its verdict on Dr. Porter's federal and New Hampshire disability discrimination claims, Dartmouth Health proved to the jury that "Dartmouth Health would [] have terminated Dr. Porter [even] if Dr. Porter had not had a disability but everything else had been the same." *Id*. The instruction contravened an established rule of law and goes to the very essence of the case. Dartmouth Health is entitled to an amended judgment.

10

### c. The Error Was Not Harmless, and No Additional Trial is Needed.

The Court's instruction on the appropriate legal standard for a VFEPA violation was indisputably outcome-determinative. To be sure, the jury found for Dr. Porter on her ADA, Rehabilitation Act, and New Hampshire state disability discrimination claims. The jury had been explicitly instructed that the sole difference between Dr. Porter's federal and New Hampshire disability discrimination claims, on the one hand, and her VFEPA claim on the other was the applicable causation standard. *Id.* There is no basis in law or logic for an assertion that the jury would have found in favor of Dr. Porter if it had been instructed as to the appropriate standard. Accordingly, there is no need for a new trial, and alteration or amendment of the judgment is appropriate. *See* Fed. R. Civ. P. 59(e); *cf. Folger Adam Co.,* 938 F.2d at 1534-35 (rejecting request for directed verdict in lieu of new trial because a correctly instructed jury might have been persuaded otherwise).

## IV.  REQUEST FOR CERTIFICATION

In connection with the Court's consideration of this Motion, Dartmouth Health hereby requests that the Court certify to the Vermont Supreme Court the question of the appropriate causation standard for a disability discrimination-based VFEPA claim. *See Chauca v. Abraham,* 885 F.3d 122, 124 (2d Cir. 2018) (holding, after post-trial certification of legal question related to jury instructions and receipt of response from New York Court of Appeals, that the district court did not apply the proper standard and remanding for further proceedings).

Pursuant to Rule 14 of the Vermont Rules of Appellate Procedure [3], "[t]he Vermont Supreme Court may answer a question of Vermont law certified to it by a federal court if the answer might determine an issue in pending litigation and there is no clear and controlling Vermont precedent." In her appellate briefing, Dr. Porter acknowledged the absence of "any Vermont Supreme Court, published trial court order, or published administrative agency decision construing the impact of *Natcfsky* on state-law disability discrimination claims." (Porter Appeal Brief at 49). Further, it is indisputable that an answer to the question of the appropriate causation standard would determine an issue in this pending litigation. As discussed herein, the jury found in Dartmouth Health's favor on Dr. Porter's ADA, Rehabilitation Act, and New Hampshire state disability discrimination claims. Per the jury instructions, the only difference between those claims and Dr. Porter's VFEPA claim is whether "but-for" or "motivating factor" causation applies. (ECF No. 275). Accordingly, the Court should certify the question of the appropriate causation standard after *Natcfsky* to the Vermont Supreme Court.

## V.   **REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7(a)(6), Dartmouth Health respectfully requests to be heard at oral argument.

## VI.   **CONCLUSION**

For the reasons stated herein, Dartmouth Health respectfully requests that the Court alter or amend the judgment rendered on Dr. Porter's VFEPA claim. In the alternative, Dartmouth Health moves for a new trial solely on the same claim. On a separate but equally important track,

---

[3] *See also* Rule 74 of the Local Rules of Procedure ("When authorized by state law, the court may certify to the state's highest court an unsettled and significant question of state law that will control the outcome of a pending case.").

A-1457

Dartmouth Health asks that the Court certify the question of the appropriate causation standard for a disability-based VFEPA claim to the Vermont Supreme Court.

Date: May 22, 2025

Respectfully submitted,

*/s/ Tristram J. Coffin*

**DOWNS RACHLIN MARTIN PLLC**

Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

**FOLEY & LARDNER LLP**

Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

*Attorneys for Defendants*

13

## CERTIFICATE OF SERVICE

I hereby certify that, on May 22, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.


*/s/ Morgan McDonald*
Morgan McDonald

A-1459

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,


        Plaintiff,

vs.


DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,


        Defendants.

Case No. 2:17-cv-194

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION TO AMEND JUDGMENT**

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary

Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Defendants" or

"Dartmouth Health") hereby submit this Opposition to Plaintiff's Motion to Amend Judgment

(ECF No. 302) (the "Motion" or "Mot."). With the Motion, Misty Blanchette Porter, M.D.

("Plaintiff" or "Dr. Porter") seeks to relitigate a number of issues that have either already been

decided by this Court or are currently pending before it, as well as to request multiple forms of

relief that are plainly not available to her. For the reasons stated herein and in both Dartmouth

Health's Opposition to Plaintiff's Motion for Prejudgment Interest (ECF No. 299) and Opposition

to Plaintiff's Motion for Attorneys' Fees, the Motion should be denied to the extent it requests

1

prejudgment interest, requests pre- or post-judgment interest at a rate of 12%, seeks costs, or requests an unreasonably excessive amount of attorneys' fees.

## I.    Prejudgment Interest

In the Motion, Dr. Porter yet again requests an award of prejudgment interest at a rate of 12%. (Mot. at 3; *see* ECF No. 260 (Plaintiff's Motion for Pre-Judgment Interest)).[1]  In addition to being an impermissible attempt at a second bite at the apple, the Motion represents yet another misstatement by Plaintiff of both the facts and the law.  For the reasons cited herein and in Dartmouth Health's Opposition to Plaintiff's Motion for Prejudgment Interest, Plaintiff's request should be denied in full.

Astonishingly, Plaintiff doubles down in the Motion on her false claim that her "economic damages have, at all relevant times, been readily ascertainable and not subject to significant dispute." (Mot. at 2).  Dr. Porter's assertion insults the Court.  As discussed in Defendants' Opposition to Plaintiff's Motion for Pre-Judgment Interest, Dr. Porter's damages were not readily ascertainable *even to Dr. Porter herself.*  (ECF No. 299 at 3–8).

Adding insult to injury, the Motion also contains a misleading "quote" from a Second Circuit decision that omits critical language which changes its meaning entirely.  In her brief, Dr. Porter attributes the following quote to *Brennan-Centrella v. Ritz-Craft Corp. of Pennsylvania*, 942 F.3d 106 (2d Cir. 2019): "…the Vermont legislature's policy choice that plaintiffs are not fully compensated unless they can recover the interest". Mot. at 3.  Critically, the entire sentence from *Brennan-Centrella* reads as follows:  "These cases reflect the Vermont legislature's policy choice that plaintiffs are not fully compensated unless they can recover the interest ***that accrues on***

---

[1] This time, she omits her astounding assertion that she should be awarded $341,429 in prejudgment interest on a $1,000,000 economic damages award. *See id.*

2

A-1461

*reasonably ascertainable damages*." *Brennan-Centrella,* 942 F.3d at 110 (emphasis added).  Dr. Porter knows all too well that her damages are not readily ascertainable, and the omission of this language therefore suggests an intentional misstatement of the law.  Such conduct is, at best, poor form and, at worst, egregious enough to warrant sanctions.  *See Humana Inc. v. Teva Pharms. USA, Inc.,* 2025 U.S. Dist. LEXIS 80116 at *11, n. 7 (requiring Plaintiff's counsel to show cause as to why sanctions should not be imposed for counsel's omission of a key word from quoted case law such that the meaning of the legal authority was changed).

Moreover, even if Dr. Porter had accurately represented the holdings of her cited cases, her argument would still fail.  *Brennan-Centrella* is not an employment case; rather, it concerned "whether a court may grant prejudgment interest to private litigants who are awarded compensatory damages under the Vermont Consumer Protection Act[.]" *Brennan-Centrella*, 942 F.3d at 107, 113.  Finding no clear and controlling precedent on that question, and noting that the Vermont Consumer Protection Act (like the VFEPA) does not explicitly provide for an award of prejudgment interest, the Second Circuit certified the question to the Vermont Supreme Court.  *Id.* at 110–13.  In doing so, it made clear that prejudgment interest is <u>not</u> available as of right to any and all claims brought under Vermont state law.  Moreover, the parties in *Brennan-Centrella* had stipulated to the amount of damages owed and the Second Circuit *still* sought guidance as to whether an award of prejudgment interest was appropriate.  *Id.* at 113.  This case belies Dr. Porter's assertion that she is entitled to an award of prejudgment interest on her non-liquidated award of damages.

*Gierlinger v. Gleason* is also of no help to Dr. Porter.  *See* Mot. at 3 (quoting *Gierlinger v. Gleason,* 160 F.3d 858 (2d Cir. 1998)).  There, the Second Circuit's reference to the exclusion of pre-judgment interest on an award for lost wages as "an abuse of discretion" referred to lost wages

3

awarded in "a suit to enforce a federal right." *Gierlinger*, 160 F.3d at 873–74 (internal quotations omitted) (citing case law applying Title VII, the Rehabilitation Act, the Equal Pay Act, and the Fair Labor Standards Act). Of course, Dr. Porter's VFEPA award cannot be categorized as enforcement of "a federal right"[2], and the highest court of Vermont has indicated that pre-judgment interest is only available as of right when damages are readily ascertainable. *See Brennan-Centrella*, 942 F.3d at 110 (citing *Smedberg v. Detlef's Custodial Serv., Inc.*, 182 Vt. 349, 365, 940 A.2d 674 (2007)). Dr. Porter's suggestion that this Court's denial of a request for prejudgment interest would be an "abuse of discretion" is a blatant misstatement of the applicable law. (Mot. at 3). Her request for prejudgment interest should be denied in full.

## II.    Post-Judgment Interest

Plaintiff also incorrectly suggests that the Court erred in awarding post-judgment interest at the federal rate of 3.98%. (Mot. at 3; ECF No. 297). This assertion merits little discussion. It is well settled that, for "*any* money judgment in a civil case recovered in a district court", the post-judgment interest rate is "equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [] the date of the judgment." 28 U.S.C.A. § 1961(a) (emphasis added); *see also Cappiello v. ICD Publications, Inc.*, 720 F.3d 109, 112 (2d Cir. 2013) (holding that "under § 1961, federal district courts must apply the federal rate of post-judgment interest to judgments rendered in diversity actions … and that such application does not violate the Constitution"). The Court's award of post-judgment interest at a rate of 3.98% was proper.

---

[2] The jury found that Dartmouth Health was not liable to Dr. Porter for either of her federal claims. (ECF No. 297).

4

A-1463

### III.    Costs

As a threshold matter, Plaintiff failed to meet multiple procedural prerequisites for an award of costs. Pursuant to Local Rule 54(a), "[t]axable costs are limited to those specified by 28 U.S.C. § 1920 and must be claimed using the Bill of Costs [Form AO-133]. All costs must be itemized *and include supporting documentation, such as billing statements, invoices, or receipts for expenses*." (emphasis added). Moreover, per 28 USC § 1924:

> Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed.

Plaintiff did not attach any affidavit or supporting billing statements, invoices, or receipts to her Bill of Costs. (ECF No. 301). Dartmouth Health therefore has no way to meaningfully assess the accuracy of the costs listed therein. As Dr. Porter acknowledges, the Court has discretion with respect to an award of costs. (Mot. at 4). Dartmouth Health requests that it exercise that discretion and decline to award any costs based on these procedural blunders alone.

Even if the Court elects to forgive Plaintiff's repeated flouting of the rules, it should not award the requested $19,736.80. Dartmouth Health objects, *inter alia*, to Plaintiff's inclusion of $10,029.90 in costs for court reporter services at depositions.[3] As Dr. Porter acknowledges, available "costs" are limited to those expenses set forth in 28 U.S.C. § 1920. (Mot. at 4). She cites no authority for the proposition that court reporter services at depositions are available costs under the statute. And, even assuming that those expenses could appropriately be classified as "[f]ees

---

[3] Dartmouth Health reserves the right to file additional objections if the Court permits Dr. Porter to cure her faulty submission by providing supporting documentation.

5

A-1464

for printed or electronically recorded transcripts" under § 1920(2), the cost award would still need to be reduced to account for the numerous unnecessary depositions taken by Dr. Porter. *See* § 1920(2) (limiting availability of costs to those "necessarily obtained for use in the case").

Dr. Porter deposed eleven witnesses in this matter, only four of whom she called to testify at trial. Dartmouth Health objects to her request for costs associated with the numerous other depositions she needlessly took as part of an ill-fated fishing expedition in discovery. Those entries are listed below.

| Date (Witness) | Cost Item | Transcripts |
| --- | --- | --- |
| 7/17/2019 (Beth Todd) | North Country Court Reporters | $1,010.95 |
| 7/24/2019 (Karen Boeddeker) | Verbatim Reporters | $625.35 |
| 7/25/2019 (Daniel Herrick) | North Country Reporters | $754.75 |
| 8/2/2019 (Heather Gunnell) | Verbatim Reporters | $923.75 |
| 8/8/2019 (Kimberly Fleury) | North County Court Reporters | $805.65 |
| 8/26/2019 (Heather Gunnell) | O'Brien Reporting Service | $597.15 |
| 8/27/2019 (Michele King) | Verbatim Reporters | $548.80 |
| 12/21/2019 (Aimee Giglio)[4] | North Country Court Reporter | $917.55 |
| | | **TOTAL:** $6,183.95 |

Dartmouth Health further objects to Plaintiff's request for payment of her allocated share of Special Settlement Master John Schraven's fees. First, a special settlement master is not a court

---

[4] Dartmouth Health is not aware of a deposition taken on December 21, 2019, but assumes this entry refers to the December 10, 2019 deposition of Aimee Giglio.

6

A-1465

appointed "expert" within the meaning of § 1920(6). Second, Plaintiff has already been explicitly ordered by the Court to pay her half of Mr. Schraven's fees. (ECF No. 158 at 2) ("Each side shall be responsible for half."). Dr. Porter's request is a clear end-run around the Court's prior order. The award of costs, if any, must therefore be reduced by an additional $2,204.05.

## IV.    Attorney's Fees

Dartmouth Health repeats and reincorporates arguments made in its Opposition to Plaintiff's Motion for Attorneys' Fees. To the extent Plaintiff seeks to include "costs" within her award of attorneys' fees, her request must be denied for the reasons stated therein.

## V.    Request for Oral Argument

Pursuant to Local Rule 7(a)(6), Dartmouth Health respectfully requests to be heard at oral argument.

A-1466

Date: May 22, 2025

Respectfully submitted,

*/s/ Tristram J. Coffin*

**DOWNS RACHLIN MARTIN PLLC**

Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

**FOLEY & LARDNER LLP**

Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald-Ramos (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

*Attorneys for Defendants*

8

A-1467

## CERTIFICATE OF SERVICE

I hereby certify that, on May 22, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

*/s/ Morgan McDonald*
Morgan McDonald

A-1468

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,

        Plaintiff,

vs.

DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,

        Defendants.

Case No. 2:17-cv-194

### DEFENDANTS' MOTION FOR A NEW TRIAL RELATED TO DAMAGES ISSUES

Pursuant to Rule 59 of the Federal Rules of Civil Procedure, Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Defendants" or "Dartmouth Health") hereby move, in the alternative to their motion for amendment of the judgment or a new trial on Plaintiff's VFEPA claim (ECF No. 305), for a new trial limited to the issue of Plaintiff's damages.

**I.**     **Plaintiff Failed to Abide by Her Expert Discovery and Disclosure Obligations and the Court Admitted this Crucial and Prejudicial Testimony**

Dartmouth Health is entitled to a new trial because Plaintiff repeatedly and flagrantly violated the Federal and Local Rules of Civil Procedure. Notwithstanding these discovery violations, Plaintiff's economics expert, Dr. Robert Bancroft, was permitted to testify at length

1

regarding opinions that were not timely disclosed and based on information that was discoverable and not timely disclosed or disclosed at all prior to his testimony. These failures had a material impact on at least the damages evidence presented to the jury. A new trial on the issues of damages should be awarded.

Expert disclosures are governed by Rule 26(a)(2) of the Federal Rules of Civil Procedure. That rule provides that a disclosure be made of "all opinions the witness will present and the basis and reasons for them", "the facts and data considered by the witness in forming them", and "any exhibits that will be used to summarize or support them." Fed. R. Civ. P. 26(a)(2)(b)(i)-(iii). The timing and contents of the expert disclosure in the District of Vermont are also governed by Local Rule 26, dealing with the discovery schedule. After the discovery deadline expires, the discovery schedule can only be extended due to "extraordinary circumstances." Local Rule 26(a)(7).

In this case, pursuant to the last Discovery Order entered by the Court, discovery was closed on December 15, 2019. Based on the discovery produced at the time, Dartmouth Health filed for summary judgment pursuant to Rule 56. The court entered judgment in favor of Dartmouth Health on November 3, 2020. Plaintiff appealed.

Ultimately, the Second Circuit Court of Appeals affirmed in part and reversed in part, and remanded a portion of the case back to the district court on February 27, 2024. Neither side moved to reopen discovery. The court held a status conference, and after a period, scheduled the case for trial. Discovery was not reopened, and no discovery schedule upon remand was entered.

On August 26, 2024, Plaintiff's expert economist, Dr. Robert Bancroft, Ph.D., issued a new expert opinion in the case. A copy of that opinion is attached as Exhibit 1. The August 2024 opinion included many complex and intertwined assumptions and projections, many of which were based on Plaintiff's undisclosed and undocumented assertions to Dr. Bancroft. The opinion

2

expressed a total economic loss figure of $4.3 million that Plaintiff allegedly incurred due to Dartmouth Health's conduct.

As the case progressed toward trial, Dartmouth Health moved *in limine* against permitting Dr. Bancroft to offer opinions in the case, including the August 2024 opinion. The court held an evidentiary hearing on March 12, 2025 at which Dartmouth Health was able to cross-examine Dr. Bancroft. Defendants' cross examination focused on the insubstantial underpinnings of Dr. Bancroft's August 2024 opinion and assumptions. It was revealed that Dr. Bancroft had not included key facts and assumptions in his August 2024 opinion, such as Dr. Porter's promotion to full professor in July 2023 and her most recent earnings from UVMMC at a higher rate of pay than what Dr. Bancroft had projected. These facts undermined the findings of the August 2024 report because they demonstrated that Dr. Porter had made more money at UVMMC than Dr. Bancroft had projected, and thus her purported damages from her termination were less.

A few days after the hearing, Dr. Bancroft made a new expert report, the March 19, 2025 report. This report attempted to correct some of the shortcomings revealed in the evidentiary hearing, and concluded that Dr. Porter's total economic loss was in fact $1.787 million. This dramatic shift in the expert opinion came merely five days before trial.

Dartmouth Health continued to object to the evolving nature of the report and to Dr. Bancroft's testimony. It specifically objected to Dr. Porter's failure to disclose key economic information to her expert or to provide expert discovery to Dartmouth Health. Dartmouth Health also requested the opportunity to provide its own expert witness to rebut Dr. Bancroft's expert opinion and chart, but this request was denied. The remedy for Dartmouth Health to rebut Dr. Porter's changing economic loss opinions was left to cross examination of Plaintiff's expert. Thus, even though Plaintiff was permitted to author and present to the jury repeated versions of her expert

A-1471

loss analysis, bolstering and fine-tuning her expert's opinions along the way, Dartmouth Health was not permitted the same opportunity.

At trial, Dr. Bancroft testified largely, although not completely, in accord with his March 19, 2025 opinion. Dartmouth Health did engage in cross of him, pointing out how if Dr. Bancroft had adjusted the term of Dr. Porter's position to .75 at DHMC, rather than assuming she would work fulltime at DHMC and part-time at UVMMC, her losses as calculated by Dr. Bancroft would have been fully mitigated by 2025 or 2026. Further, Dr. Bancroft was forced to admit that his loss calculations set forth in the March 19, 2025 report would be incorrect and have to be changed if it was assumed that Dr. Porter accepted a large severance package of 9 months of salary ($228,000) at the time of her termination, and also accepted her new position at UVMMC as an attending OB-GYN. Accepting the severance would have essentially allowed Dr. Porter to double bill as a senior attending physician and assistant professor for nine months. This was not something that was set forth in Dr. Bancroft's complex figures or on his chart.

Dartmouth Health should be permitted a new trial due to these shortcomings in expert discovery and the uneven treatment of the parties regarding them. In short, Plaintiff was permitted multiple, late, unjustified revisions to her expert reports and opinions to be presented to trial. This included a drastic revision less than a week before trial. Dartmouth Health was not permitted the opportunity to disclose its expert economist to appropriately rebut these repeated, new opinions by Plaintiff. Plaintiff never showed cause for the delay in these opinions and the discovery violations regarding them. Dartmouth Health thus had to face unwarned, constantly evolving, weakly-based and sharply prejudicial expert opinions and was not permitted its own opposing presentation to be voiced through its own witness. Instead, it was forced to be satisfied with whatever its counsel could elicit on cross examination. Respectfully, this decision was not evenhanded and was unfair.

4

Key to all of this was the use of Dr. Bancroft's expert analytical chart, attached as Exhibit 2, as a demonstrative exhibit to guide Dr. Bancroft's testimony and for use at closing argument. This chart, very succinctly and in a focused way, allowed Plaintiff to train the jury's attention on the bottom-line: nearly $1.8 million in losses supported by an allegedly expert economist. Dartmouth Health was afforded no such opportunity.

Because of the decisions to permit Dr. Bancroft to testify to his report without providing proper discovery and notice and also precluding Dartmouth Health from presenting its own expert at trial to explain its view of the evidence, Dartmouth Health was severely prejudiced and should be afforded a new trial. At least as to damages, a new trial is warranted.

## II.     The Court Improperly Instructed the Jury on Mitigation

The court also erred in instructing the jury on mitigation issues. The court did not clearly and directly inform the jury that it could account for and deduct the amount of salary that Dr. Porter received and was receiving as a UVMMC OB-GYN attending physician and medical school full professor from her loss of salary damages.

On mitigation, the court instructed the jury in relevant part as follows: "[i]f you find that Dr. Porter failed to mitigate her damages, you must reduce your award of damages, if any, by the amount you find she could have avoided." Jury Charge at 30 (ECF No. 275).

The law on compensatory damages provides that a damaged party be made whole, not obtain a windfall. These instructions did not make that clear to the jury, and instead were framed as "if you find that the plaintiff has failed to mitigate damages" you may consider this. The directions from the court unfortunately thus conditioned deduction of other salary on the jury finding as a preliminary condition that Plaintiff failed to mitigate her damages. This was confusing and does not accurately reflect the law. The jury can consider Dr. Porter's outside pay in arriving

5

at an award of damages, whether or not they find that she failed to mitigate her damages. Indeed, the whole point of the defense's theory on damages was that Dr. Porter found another job – with the help of Dartmouth Health medical staff – in her highly specialized subspeciality, and did mitigate her damages.

Dartmouth objected to the mitigation of damages instruction because the defense was "not that she's failed to mitigate or minimize" but rather, Dartmouth's assertion that she "mitigated some of her damages, if not all of them." Tr. of Jury Trial at 1026:14–1028:22 (ECF No. 295). As such, Dartmouth was requesting an instruction that would advise the jury on how to calculate damages based on this mitigation, not an instruction that she couldn't recover if she failed to mitigate damages. Here, the jury was instructed that "[i]f you find that Dr. Porter failed to mitigate her damages, you must reduce your award of damages, if any, by the amount you find she could have avoided" but does not similarly instruct the jury to reduce her damages by the amount she actually avoided through successful mitigation. Jury Charge at 30 (ECF No. 275). From these instructions, the jury could read this as "we found she mitigated her damages, so we don't need to reduce the award because of this mitigation." This wording unfortunately was unclear and confusing to the jury. Dartmouth Health objected to it, but the court declined to change the instructions.

In the employment discrimination context, after calculating an appropriate amount of compensation, "courts must then subtract any mitigation that reasonably could be obtained." *See Tudor v. Se. Oklahoma State Univ.*, 13 F.4th 1019 (10th Cir. 2021) (citing *Davoll v. Webb*, 194 F.3d 1116, 1143 (10th Cir. 1999)). Here, the evidence of what Dr. Porter could have reasonably obtained was not hypothetical, but rather evidence to be decided upon based on her new employment. Failing to instruct the jury to adjust the damages accordingly invited a windfall for Plaintiff. *See*

6

A-1474

*Jones v. Consol. Rail Corp.*, 800 F.2d 590, 594 (6th Cir. 1986) (finding jury instruction on mitigation of damages caused by loss of past earnings did not adequately inform jury that plaintiff was entitled to difference between what he would have earned on the railroad and what he might have earned in another position and thus in view of the fact that jury instruction may have affected award of damages, it constituted reversible error); *cf. Moysis v. DTG Datanet*, 278 F.3d 819, 829 (8th Cir. 2002) (affirming the district court's conclusion that, in light of the plaintiff's current employment, awarding front pay would confer a windfall to plaintiff).

Accordingly, a new trial should be awarded based on improper mitigation instructions as well.

**III.    The Court Improperly Declined Introduction of Dartmouth Health's Demonstrative Exhibit and Limited Argument at Closing about Crucial Mitigation Evidence**

On cross examination, counsel for Dartmouth Health sought to elicit key testimony undermining Dr. Bancroft's damages opinions by having him calculate what his projected salary would be if he assumed Dr. Porter was working a 1.0 position at UVMMC in three years, since he had calculated she would be working at that full time rate at Dartmouth Health for the same time period.  At defense counsel's request, Dr. Bancroft actually did the math on an iPhone calculator to adjust his figures to account for equivalent positions.  Dr. Bancroft wrote out these figures in hand on a document which was marked for identification as Exhibit C-19, which is attached hereto as Exhibit 3.  The figures showed that if you adjusted for the equivalency of the positions, Dr. Bancroft's damages calculations were essentially fully mitigated by year 2025 or 2026.  Thus, this testimony, and the chart Dr. Bancroft wrote out by hand were very powerful admissions and impeachment of Plaintiff's key damages witness.

Dartmouth Health moved for the admission of the chart, C-19, into evidence.  The court declined to do that.  Dartmouth renewed the request for admission in later conferences, and

7

A-1475

ultimately moved for it to be used as a demonstrative exhibit at closing. The court denied admission of this exhibit and denied permission for Dartmouth Health to use it as a demonstrative exhibit at closing. Despite the late disclosure, unrebutted discovery violations, and the misrepresentative nature of Dr. Bancroft's March 19, 2025 chart, Plaintiff was permitted to present her demonstrative chart to the jury both in Dr. Bancroft's testimony and at closing, which she did.

Respectfully, permitting Plaintiff to display a late disclosed chart, which represented a massive change in Dr. Bancroft's opinions on the eve of trial, and use it as a demonstrative exhibit at closing, while affording Dartmouth Health no such opportunities, was not evenhanded, violated the rules of evidence, and was inequitable. This was an admission by the (highly-paid) agent of a party opponent. It was directly relevant. It was necessary to rebut key testimony which the court had prohibited Dartmouth Health from rebutting through offering its own expert witness. Moreover, by seeking to use the chart as a demonstrative exhibit in Dr. Bancroft's testimony and before the jury at closing, Plaintiff surely opened the door to such demonstrative or even substantive evidence by Dartmouth Health. Dartmouth Health's chart should have been admitted as substantive evidence, or at least Dartmouth Health should have been able to use it as a demonstrative exhibit at closing.

The court's reliance at trial on *Kirk v. Raymark Industries,* 61 F.3d 147 (3d Cir. 1995) to deny admission of C-19 is inapposite. In *Kirk*, the court was considering whether to admit the prior testimony of an out-of-court witness. The purported statement of a party opponent in that case was testimony from one of the parties' expert witnesses in a different case—not on trial in that case or subject to cross in that case—which was read into trial by a different expert. Here, the statements and C-19 exhibit were made by the declarant during the trial and subject to cross-examination. As such, the court's reliance on excluding the exhibit because Dr. Bancroft was not

8

A-1476

an agent of the party was improper. Not only was it a party admission by the party's agent, but it was also an in-court statement, and was thus admissible. *See ONTI, Inc. v. Integra Bank*, No. CIV. A. 14514, 1998 WL 671263, at \*3 (Del. Ch. Aug. 25, 1998) (distinguishing *Kirk*); *see also Long v. Fairbank Farms, Inc.*, No. 1:09-CV-592-GZS, 2011 WL 2516378, at \*9–10 & n. 18 (D. Me. May 31, 2011) (distinguishing *Kirk*).

## IV.    The Court Improperly Limited Use of Evidence of the Severance Package at Closing

As described above, Dartmouth Health introduced evidence at trial that it offered Dr. Porter a severance package of 6 months salary, which was increased at Dr. Porter's request to 9 months. See Exhibit 4. This evidence was introduced without objection. Multiple witnesses testified about this evidence. Dr. Bancroft was cross-examined, over Plaintiff's objection, about the effect of the offered severance package on his conclusions. In summary, on cross examination, he admitted that if Plaintiff had received a $228,000 payment at the time of her termination, it would have affected his loss calculations.

At the charge conference, the court informed the parties that it had concerns that it had admitted the evidence of the severance package, and limited the extent to which Dartmouth Health could argue at closing that Plaintiff could have mitigated her damages if she had taken it.

The evidence relating to the severance package was properly admitted and should have been able to be freely referred to by Dartmouth Health in arguing the proper amount of compensatory damages in closing.

First, the evidence of the severance package was admitted without objection or limitation. Therefore, the contemporaneous objection rule required that the evidence having been admitted without objection could not later be challenged as inadmissible. No Federal Rule of Evidence 408

9

issue was raised by Plaintiff when the evidence was offered, and no objection was made at the time to the relevance of the testimony about the severance and job offer.

Second, the email transmitting the severance proposal, and granting Dr. Porter's request that it be raised from six to nine months was not a settlement proposal or communication subject to Rule 408, notwithstanding the waiver issue noted above. The severance offer is admissible because it was offered relatively contemporaneously with her termination and was not offered in compromise of a claim, following a Rule 408 analysis. The critical distinction is it was not a "settlement agreement" that arose during the post-termination negotiation of a dispute, which implicates Rule 408, but rather a "termination agreement" offered contemporaneously with termination, which does not implicate Rule 408. *See Pierce v. F.R. Tripler & Co.*, 955 F.2d 820 (2d Cir. 1992) (citing *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338 (9th Cir. 1987)).

Further, as the Court had already ruled, the severance offer was relevant. The issue of whether the severance offer was made in good faith (there was no testimony to the contrary, nor was there cross on this issue), and whether Dr. Porter acted reasonably in refusing to accept the offer, are questions for the finder of fact. *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298 (2d Cir. 2017). Arguably, it is also relevant for determining whether the court should impose prejudgment interest in its discretionary capacity. Dr. Bancroft was permitted to testify to broad and changing factual assumptions. Cross of his testimony was the only permissible way to challenge his conclusions. The evidence was admitted without objection and without limitation. The parties should have been able to argue to the jury reasonable inferences to be drawn therefrom without limitation.

A-1478

## V.   Request for Oral Argument

Pursuant to Local Rule 7(a)(6), Dartmouth Health respectfully requests to be heard at oral argument.

## VI.   Conclusion

For the reasons stated herein, the Court should grant Dartmouth Health's request for a new trial.

A-1479

Date: May 22, 2025

Respectfully submitted,

/s/ Tristram J. Coffin

**DOWNS RACHLIN MARTIN PLLC**

Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

**FOLEY & LARDNER LLP**

Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

*Attorneys for Defendants*

12

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 22, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.


*/s/ Morgan McDonald*
Morgan McDonald

A-1481

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D., <br>       Plaintiff, <br><br> vs. <br> DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, <br>       Defendants. | Case No. 2:17-cv-194 |

### INDEX TO EXHIBITS TO DEFENDANTS' MOTION FOR
### A NEW TRIAL RELATED TO DAMAGES ISSUES

| Exhibit | Description |
|---|---|
| 1 | Expert Report of Robert Bancroft Dated August 26, 2024 |
| 2 | Demonstrative Excerpt from Expert Report of Robert Bancroft Dated March 19, 2025 |
| 3 | Robert Bancroft Cross Examination Exhibit, Marked C19 |
| 4 | Email from A. Giglio to L. DeMars RE: Confidential: Connect re: REI with attachment of MBP Packet, Marked C13 |

A-1482

# EXHIBIT 2

A-1483

# Projected Lost Earnings for Dr. Misty Blanchette Porter

### Reduce University of Vermont Medical Center Appointment to 75% of a Part-Time Position, Starting July 1, 2025

Prepared by: Robert L. Bancroft, Ph.D.

March 19, 2025

| | | Dartmouth-Hitchcock Medical Center | | | Post-Termination Projections (UVM) | | | | | | | | | |
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Year | Age | Gross Earned Income | Fringe Benefits | Total Earnings | Gross Earned Income | Fringe Benefits | Total Earnings | Gross Adjusted Lost Earnings | Income Taxes | Tax Adjusted Lost Earnings | Present Value | Cumulative Present Value | Settlement Income Tax | Total Economic Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2017 ^ | 54 | $180,954 | $29,965 | $210,919 | $180,340 | $3,825 | $184,165 | $26,754 | ($227) | $26,527 | $50,666 | $50,666 | $58,000 | $108,666 |
| 2018 | 55 | $309,358 | $42,583 | $351,941 | $217,607 | $19,585 | $237,192 | $114,750 | ($33,948) | $80,802 | $147,059 | $197,725 | $199,000 | $396,725 |
| 2019 | 56 | $324,826 | $38,979 | $363,805 | $254,995 | $30,918 | $285,913 | $77,893 | ($25,838) | $52,055 | $88,494 | $286,219 | $284,000 | $570,219 |
| 2020 | 57 | $324,826 | $38,979 | $363,805 | $269,272 | $24,234 | $293,506 | $70,299 | ($20,555) | $49,744 | $78,595 | $364,814 | $359,000 | $723,814 |
| 2021 | 58 | $324,826 | $38,979 | $363,805 | $329,333 | $29,640 | $358,973 | $4,832 | $1,668 | $6,500 | $9,490 | $374,304 | $368,000 | $742,304 |
| 2022 | 59 | $332,947 | $39,954 | $372,900 | $310,271 | $27,924 | $338,195 | $34,705 | ($8,390) | $26,315 | $35,262 | $409,566 | $402,000 | $811,566 |
| 2023 | 60 | $341,270 | $40,952 | $382,223 | $300,741 | $27,067 | $327,808 | $54,415 | ($14,996) | $39,419 | $48,092 | $457,657 | $447,000 | $904,657 |
| 2024 | 61 | $349,802 | $41,976 | $391,779 | $313,263 | $28,194 | $341,457 | $50,322 | ($13,520) | $36,802 | $37,170 | $494,828 | $482,000 | $976,828 |
| 2025 | 62 | $358,547 | $43,026 | $401,573 | $302,494 | $27,225 | $329,719 | $71,854 | ($20,740) | $51,114 | $50,881 | $545,708 | $531,000 | $1,076,708 |
| 2026 | 63 | $367,511 | $44,101 | $411,612 | $311,569 | $28,041 | $339,611 | $72,002 | ($20,698) | $51,303 | $49,682 | $595,391 | $579,000 | $1,174,391 |
| 2027 | 64 | $376,699 | $45,204 | $421,903 | $320,916 | $28,882 | $349,799 | $72,104 | ($20,639) | $51,464 | $48,486 | $643,876 | $624,000 | $1,267,876 |
| 2028 | 65 | $386,116 | $46,334 | $432,450 | $330,544 | $29,749 | $360,293 | $72,157 | ($20,562) | $51,596 | $47,290 | $691,166 | $669,000 | $1,360,166 |
| 2029 | 66 | $395,769 | $47,492 | $443,261 | $340,460 | $30,641 | $371,102 | $72,160 | ($20,464) | $51,696 | $46,095 | $737,261 | $714,000 | $1,451,261 |
| 2030 | 67 | $405,663 | $48,680 | $454,343 | $350,674 | $31,561 | $382,235 | $72,108 | ($20,346) | $51,762 | $44,902 | $782,164 | $756,000 | $1,538,164 |
| 2031 | 68 | $415,805 | $49,897 | $465,702 | $361,194 | $32,507 | $393,702 | $72,000 | ($20,206) | $51,794 | $43,710 | $825,874 | $798,000 | $1,623,874 |
| 2032 | 69 | $426,200 | $51,144 | $477,344 | $372,030 | $33,483 | $405,513 | $71,831 | ($20,043) | $51,788 | $42,519 | $868,393 | $840,000 | $1,708,393 |
| 2033 | 70 | $436,855 | $52,423 | $489,278 | $383,191 | $34,487 | $417,678 | $71,600 | ($19,856) | $51,744 | $41,329 | $909,722 | $878,000 | $1,787,722 |

^ Partial year (June 4 through Dec. 31).

The year 2033 (under lined) is consistent with the worklife of a 62 year old female with a graduate degree..

A-1484

# EXHIBIT 3

A-1485

2025 — 403,000 *

2026 ~~427,888~~ 40,925

2027 427,888

C19

A-1486

# EXHIBIT 4

**From:**       Aimee M. Giglio [Aimee.M.Giglio@hitchcock.org]
**Sent:**        6/6/2017 6:00:51 PM
**To:**          Leslie R. DeMars [Leslie.R.DeMars@hitchcock.org]
**Subject:**     Confidential: Connect re: REI
**Attachments:** MBP Packet.pdf


Hi Leslie,
I would like to connect re: REI transition.
Do you have some time to talk via phone … alternatively, I can connect in person at 11a tomorrow.

Confidentially, in the meantime, here is the letter correspondence to Misty – cc'd to you.
Thank you,
Aimee


**Aimee M. Giglio, DA**
Chief Human Resources Officer (Interim)
Vice President, Total Rewards
aimee.m.giglio@hitchcock.org
dartmouth-hitchcock.org

phone: 603.653.1417  |  fax: 603.727.7912


Dartmouth-Hitchcock
A CULTURE OF CARING


**C13 (001)**

CONFIDENTIAL

 **Dartmouth-Hitchcock**

**Dartmouth-Hitchcock Medical Center**
One Medical Center Drive
Lebanon, NH 03756-0001
Phone (603) 650-5000
Dartmouth-Hitchcock.org

June 5, 2017

Misty Blanchette-Porter, M.D.

████████████

Dear Dr. Blanchette-Porter,

This letter serves as a response to your letter dated May 25, 2017 and to questions posed during our meeting together with your husband on Friday, May 26, 2017.

First, on behalf of Dartmouth-Hitchcock (D-H), I would like to thank you for your years of service to D-H and to our patients, and for your many accomplishments over the years, as you outline in your letter, which have supported D-H's clinical and academic mission.

In your letter you have requested reconsideration of your employment termination date, which is June 3, 2017. I reviewed your request with clinical and operational leadership. With the Reproductive Endocrinology and Infertility Program winding down as of May 31, 2017, Dartmouth-Hitchcock is not in a position to reconsider your last date of employment.

In addition, in our meeting you had requested an increase in the severance amount. After considering this request, D-H is willing to extend severance to thirty-six weeks of severance. As communicated to you in writing on May 4, 2017, enclosed please find a severance and general release agreement, which states that June 3, 2017 will be your last date of employment and increases severance payments from twenty-four weeks to thirty-six weeks, which is equivalent to nine months of pay.

As a participant in D-H's long-term disability program, The Hartford will determine ongoing medical necessity of your disability and long-term disability payments. Upon your last date of employment, your disability payments will be based on your full base rate of pay prior to your disability at a 1.0 FTE level. For as long as you remain eligible to receive long-term disability payments, as determined by The Hartford, you will be eligible to continue D-H's medical and dental insurance coverage for you and your covered dependents. Please note that you will remain responsible for the portion of the medical and dental insurance premiums that all active employees are responsible for and that all premiums for medical and dental insurance are billed directly to you for as long as you are eligible to continue long-term disability payments. In addition, The Hartford will manage your eligibility to continue life insurance coverage for yourself through the disability premium program.

Please note that eligibility for severance payments is independent of receipt of disability payments and disability determination by The Hartford. I appreciate you reaching out to me with your questions and hope this information is helpful. On behalf of the organization, I wish you well and thank you again for your contributions to D-H and our patients.

Sincerely,



Aimee M. Giglio, DA
Interim Chief Human Resources Officer
Aimee.M.Giglio@Hitchcock.org

cc: Leslie DeMars, M.D

**C13 (002)**

CONFIDENTIAL

DH0006627

A-1489

 Dartmouth-Hitchcock

June 6, 2017

Misty M. Blanchette Porter, M.D.

RE:    Separation and General Release Agreement

Dear Misty:

Consistent with the notification that you received on May 4, 2017, your active employment with Dartmouth-Hitchcock ("D-H"), to include your membership on the D-H Professional Staff, terminates effective June 3, 2017, as a result of the closure of our Reproductive Endocrinology and Infertility program. In connection with the termination of your employment from D-H, you are eligible to receive severance benefits to assist in your transition.

If you agree with and sign the enclosed Separation Agreement and General Release (the "Agreement"), it will become a binding and legally enforceable agreement under which you will receive the described pay in return for making certain promises and releasing claims arising from your active employment at D-H. Because this is an important and legally binding document, you are encouraged to carefully consider and seek the advice of an attorney concerning the terms and conditions prior to signing it.

The box below contains important information about your separation from active employment and severance package. Your receipt of your severance package is conditioned on you signing, not revoking, and complying with the Agreement. If there is any inconsistency or conflict between the terms of this letter and the terms of the enclosed Agreement, the terms in the enclosed Agreement will govern.

| | |
|---|---|
| **Separation Date:** | June 3, 2017 |
| **Separation Pay:** | Thirty-six (36) weeks of pay continuation at your base pay rate. Separation pay is subject to applicable taxes and withholdings. |

As described more fully in the Agreement, you have a period of forty-five (45) calendar days from the date you received the Agreement to decide whether to sign the Agreement. You may sign before the end of the forty-five (45) day period (though you are under no obligation to do so) so long as the date you sign is not earlier than your Separation Date. You will have a period of seven (7) calendar days after the date you sign this Agreement to revoke your acceptance. Provided you have not revoked your acceptance, on the eighth (8th) day following your execution of the Agreement, the Agreement will become a binding Separation Agreement and General Release between you and D-H, and D-H will provide you with the severance package described above and discussed further in the Agreement.

If you wish to receive the severance benefits and you agree to the terms and conditions in the Agreement, please initial each page of the Agreement (including both pages of this letter), sign and date the last page and place it in the enclosed postage paid envelope returned to Dartmouth-Hitchcock, Attn: Karen Aframe, Director of Employee Relations, One Medical Center Drive, Lebanon, NH 03756. Please return one (1) signed Agreement in the envelope provided, keeping the other for your records (2 copies enclosed). You must ensure that your signed Agreement is postmarked **no later than forty-five (45) days** from the date you received these documents. Once received, D-H will return a copy of the fully executed Agreement to you via your home mailing address.

CONFIDENTIAL
Page | 1

INITIALS_____

**C13 (003)**

CONFIDENTIAL

DH0006628

A-1490

Regardless of whether you sign the Agreement, you will receive a final paycheck that shall include payment for all wages due through the Separation Date. Your final paycheck will be mailed within seventy-two (72) hours of the Separation Date.

Please understand that if you timely execute and do not revoke the Severance Agreement, the payment of severance will not affect your ability to remain on any approved leave for disability. To the extent you remain approved for disability by The Hartford, you will retain the status of an on-leave employee of Dartmouth-Hitchcock during the term of that coverage. You are enrolled in medical, dental, vision and identity theft coverage, and will remain eligible for those benefits at active employee rates for the period of your approved disability coverage through The Hartford, subject to all plan terms and conditions. All other benefits will cease as of your Separation Date, except as required by applicable law.

Please consult the enclosed documents and contact Karen Aframe, Director of Employee Relations at 603.653.1570 if you have any questions about this letter or the Agreement.

Sincerely,

Leslie R. DeMars, MD
Vice President, Women's Health Service Line
Chair, Department of Obstetrics and Gynecology

CONFIDENTIAL
Page | 2

INITIALS_____

C13 (004)

CONFIDENTIAL

DH0006629

A-1491

 **Dartmouth-Hitchcock**

### CONFIDENTIAL SEPARATION AGREEMENT AND GENERAL RELEASE

This Confidential Separation Agreement and General Release (the "Agreement") by and between **Mary Hitchcock Memorial Hospital** and **Dartmouth-Hitchcock Clinic** (collectively, "D-H" or the "Employer") and **Misty M. Blanchette Porter, M.D.** ("Physician"), is effective as of the date of execution by D-H as set forth on the signature page. Physician and D-H shall together be referred to herein as the "Parties" and each shall be referred to as a "Party."

WHEREAS, Physician has been employed by Employer as a physician practicing within the D-H Department of Obstetrics and Gynecology/Reproductive Endocrinology and Infertility program; and

WHEREAS, Physician's active employment with Employer will terminate on June 3, 2017, which shall also result in the termination of Physician's appointment to the Dartmouth-Hitchcock Professional Staff and all clinical privileges associated with her appointment.

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration as provided under this Agreement, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. <u>Separation</u>. Employer has terminated Physician's active employment resulting in the termination of Physician's appointment to the Professional Staff of Mary Hitchcock Memorial Hospital (including the relinquishment of her clinical privileges in connection with her appointment to the Professional Staff), effective June 3, 2017 (the "Separation Date"). Physician acknowledges and confirms that, effective as of the Separation Date, her separation from active employment with D-H is effective, and Physician will not, and shall not, have the authority to represent or hold himself out as an active employee of D-H.

2. <u>Separation Pay</u>. In exchange for the consideration provided under this Agreement, Employer agrees, in the event of Employee's execution and non-revocation of this Agreement, and subject to all provisions of this Agreement, as follows:

Following the Separation Date, and following the passage or waiver of the forty-five (45) day pre-execution consideration period and the seven (7) day post-execution revocation period, Employer will provide Physician with Separation Pay, as set forth in the box on page 1 of the cover letter dated June 6, 2017, provided with this Agreement. Separation Pay will be paid in accordance with Employer's customary payroll practices. In connection with the Separation Pay, Employer shall withhold and remit to the tax authorities the amounts required under applicable law, and Physician shall be responsible for all applicable taxes with respect to such Separation Pay and benefits under applicable law. Physician acknowledges that Physician is not relying upon advice or representation by D-H with respect to the tax treatment of any of the severance benefits provided for herein.

If Physician becomes employed or earns other income while receiving the Severance Pay, all wages and other income will reduce Physician's Severance Pay by that amount. In the event Physician becomes employed or earns other income while receiving the Severance Pay, Physician will notify John Kacavas, Chief Legal Officer, in a timely manner in writing at One Medical Center Drive, Lebanon, NH 03756. For purposes of this paragraph, "wages and other income" shall include

CONFIDENTIAL
Page | 3

INITIALS_____

**C13 (005)**

CONFIDENTIAL

DH0006630

compensation earned as an employee, independent contractor, or otherwise earned in connection with any other work for hire; it shall not include any investment income.

3. Benefits. Physician's benefits shall terminate effective on the Separation Date, except that to the extent that Physician remains approved for disability by The Hartford, Physician will retain the status of an on-leave employee of Dartmouth-Hitchcock during the term of that coverage. Physician is enrolled in medical, dental, vision and identity theft coverage, and will remain eligible for those benefits at active employee rates for the period of Physician's approved disability coverage through The Hartford, subject to all plan terms and conditions. Except as specifically stated herein, Physician understands that all of her entitlement to compensation and all other Employer-provided benefits will cease no later than June 3, 2017 under this Agreement. Physician further understands and agrees that she is not entitled to any additional consideration or benefits other than as set forth herein.

4. Release by Physician. As a material inducement to Employer to enter into this Agreement, and in consideration of its obligations to Physician under this Agreement and for other good and valuable consideration, Physician hereby irrevocably, unconditionally and generally releases Employer and each of its present and former divisions, branches, subsidiaries, affiliates (including without limitation Dartmouth-Hitchcock Health and Dartmouth Hitchcock Medical Center), parents, predecessors, successors, assigns, joint venture partners, assignees, grantees, fiduciaries, officers, directors, shareholders, employees, agents, representatives and attorneys (collectively hereinafter referred to as the "Employer Releasees") from, and to the greatest extent permitted by law hereby waive and/or settle any and all claims, charges, complaints, liabilities, obligations, promises, agreements, contracts, doings, omissions, controversies, actions, rights, costs, debts, sums of money, reckonings, covenants, demands, causes of action, suits at law or equity, damages, punitive damages, verdicts, losses, executions, expenses, attorneys' fees, costs and judgments of every kind and nature whatsoever, whether known or unknown, and which Physician ever had, now have or hereafter can, shall or may have, for upon, or by reason of any matter, thing, event, act, omission or situation whatsoever, from the beginning of the world to the date of Physician's execution of this Agreement, including claims related directly or indirectly to Physician's employment with Employer or any Employer Releasee and, specifically, without limitation, any rights and/or claims (a) arising under, pursuant to, or relating to any contract, express or implied, written or oral; (b) related to Physician's employment or termination of employment; (c) arising under or relating to any federal, state, local or other statutes, orders, laws, ordinances, regulations, rules or the like that relate to the employment relationship, including, without limitation statutes, orders, laws, ordinances, regulations, and rules, and/or specifically that prohibit discrimination, harassment and/or retaliation based upon age, race, religion, sex, national origin, disability, sexual orientation, military service, or any other unlawful bases under state or federal law, including, without limitation, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.; the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.; COBRA; the Family Medical Leave Act, 29 U.S.C. § 2601, et seq.; the New Hampshire Law Against Discrimination, N.H.R.S.A. § 354-A, et seq.; and any applicable rules and regulations promulgated pursuant to or concerning any of the foregoing statutes; for any claims alleging wrongful discharge, whistleblower, negligent or intentional infliction of emotional distress, interference with contract, fraud, libel, slander, or any other claim arising from or relating to tortious, harassing, or otherwise actionable conduct; and for damages, including, without limitation, punitive or compensatory damages or for attorneys' fees, expenses, costs, wages, injunctive or equitable relief. Excluded from the foregoing release are claims that by law cannot be released in this Agreement (such as workers compensation claims). **Physician understands and agrees that Physician is releasing all claims, whether or not they are known to Physician at the time Physician signs this Release.**

CONFIDENTIAL
Page | 4

INITIALS_____

**C13 (006)**

CONFIDENTIAL

DH0006631

A-1493

By signing this Agreement, Physician voluntarily waives any and all procedural rights and/or substantive rights arising out of Physician's D-H medical staff appointment and privileges/scope of practice and employment by D-H.

Physician acknowledges that Physician has had the opportunity to consult with an attorney of her choice with respect to all terms and conditions set forth in the Agreement and has had the opportunity to obtain advice of counsel with respect to her decision to sign and enter into this Agreement.

5. Confidentiality. Physician agrees to keep the terms and conditions relating to this Agreement confidential. Physician agrees that she will not disclose the terms and conditions of this Agreement to any person except her spouse and accountant or lawyer as necessary in connection with the services either may provide, unless she shall first obtain the express written consent of the other Party. Physician further agrees that, in the event she discloses the terms and conditions of this Agreement to her spouse, accountant or lawyer, she shall advise them in advance of her obligation to preserve and maintain the confidentiality of the separation terms and conditions as expressed herein.

In addition, Physician acknowledges that, during her employment with D-H, Physician has acquired knowledge of confidential and sensitive information pertaining to D-H operations and D-H's patients, and that this information was only disclosed to Physician in furtherance of Physician's role. Accordingly, Physician acknowledges and agrees that this information is the property of D-H, and agrees that Physician may not disclose such confidential and sensitive information to any person or entity, either directly or indirectly, without the express written permission of D-H. For purposes of this Agreement, the term "confidential and sensitive information" means information that is not generally known to the public and that is used, developed, or obtained by D-H in connection with its operations, including but not limited to: (a) patient lists; (b) medical or clinical records or information; (c) business plans; (d) operating plans; (e) risk management data and investigation materials; (f) Joint Commission (formerly, JCAHO) survey materials or data; (g) incident reports; (h) internal review materials; (i) fees, costs, and pricing structures; (j) marketing plans; (k) bid strategies and proposals; (l) computer software, including operating systems, applications and program listings; (m) financial models and reports; (n) operating data and budgets; (o) wage and salary rates; (p) pricing strategies and information; (q) terms of agreements with suppliers, with sources of financial support or reimbursement, with clients, and with others; (r) flow charts, manuals and documentation; (s) data bases; (t) accounting and business methods; (u) inventions, devices, new developments, methods, and processes, whether patentable or un-patentable and whether or not reduced to practice; (v) copyrightable works; (w) all technology and trade secrets; (x) information pertaining to future developments, such as, but not limited to, research and development and strategic plans; and (y) all similar and related information in whatever form ("Confidential Information"). Physician also acknowledges and understands that her obligation to maintain patient confidentiality survives her employment relationship with D-H.

Physician hereby represents and agrees that (a) Physician has returned to D-H, and has not retained any copies of all documents, records or materials of any kind, whether written or electronically created or stored, which contain, relate to or refer to any Confidential Information; and (b) in consideration of D-H entering into this Agreement, Physician shall not disclose any Confidential Information in any manner whatsoever, except as shall be required by law, provided that Physician notify D-H in a timely manner so that it may take measures to prevent or limit such required disclosure.

The term "Confidential Information" shall not include any information: (1) known to Physician before her affiliation with D-H; (2) of which Physician learned from sources other than D-H, not involving the breach of any confidentiality obligation; or (3) which is published in a form generally available to the public prior to the date Physician discloses such information, and the information is not available to the public due to any act or omission

INITIALS_____

**C13 (007)**

CONFIDENTIAL                                                                                          DH0006632

on Physician's part. Information shall not be deemed to have been published merely because individual portions of the information have been separately published, but only if all material portions thereof have been published.

6. Non-Disparagement. Neither Physician, nor anyone acting on Physician's behalf, will make derogatory, disparaging or critical statements about Employer or any Employer Releasee. Nothing in this Agreement shall prevent Employer from providing certain employment information relating to Physician's employment at D-H as required by N.H. Rev. Stat. Ann. § 151:16-c.

7. Challenge to Validity, Truthful Testimony Under Oath and Cooperation with Government Agency. Nothing in this Agreement, including but not limited to the provisions in the Release, Confidential Information and Non-Disparagement sections herein, shall: limit or affect Physician's right to challenge the validity of this Agreement, including a challenge under the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended; interfere with Physician's right and responsibility to give truthful testimony under oath; or, preclude Physician from participating in an investigation, filing a charge, or otherwise communicating with the Equal Employment Opportunity Commission ("EEOC"), New Hampshire Commission for Human Rights ("NHCHR"), or any other government investigatory body. Physician agrees, however, that should Physician participate in any EEOC or NHCHR charge, investigation or proceeding, Physician will not seek or accept any monetary relief or other relief personally related to any claims released in this Agreement. In addition, to the extent allowed by law, Physician will notify D-H's Office of General Counsel if she is contacted by any government investigators regarding her work at D-H.

8. No Pending Claims. Physician hereby acknowledges and agrees that Physician has not filed any complaints, claims, or actions against D-H or any of the Releasees with any state, federal, or local agency or court as of the date Physician signed this Agreement, agrees that Physician has been properly paid for all hours worked up to and including Physician's Separation Date, and agrees that she has not suffered any on the job injury for which she has not already filed a claim.

9. Return of D-H Property. On or before the Separation Date, Physician shall return to D-H all keys, files, records, emails (and copies thereof), computers and related equipment, mobile devices, equipment, D-H identification, and all other D-H-owned property in Physician's possession or control and Physician agrees to have left intact all electronic D-H documents, including but not limited to, those which Physician developed or helped develop during the period of employment. This obligation specifically includes, but is not limited to, any of the aforementioned property issued to Physician to perform duties at D-H. To the extent that they exist, Physician will confirm that she has cancelled all accounts for her benefit, if any, in D-H's name, including but not limited to, credit cards, telephone charge cards, cellular phone and/or pager accounts and computer accounts.

10. Medical Malpractice Insurance-Tail Coverage. During the period of her employment, Physician was covered under the D-H medical malpractice insurance policy so long as she was employed and acting within the scope of her duties. Coverage under this policy ends upon termination of employment. D-H agrees that tail coverage will exist so long as the current D-H program is in existence.

11. No Admission. Physician understands that this Agreement does not constitute an admission by D-H of any violation of any law, ordinance or statute, claim for relief or cause of action of any nature. Physician agrees and acknowledges that Physician has not relied upon any representations of D-H except as set forth in this Agreement.

12. Cooperation. Physician agrees that, after the Separation Date, to reasonably cooperate with D-H in providing and discussing facts pertaining to matters which occurred during Physician's employment (for example,

CONFIDENTIAL
Page | 6

INITIALS_____

C13 (008)

CONFIDENTIAL

DH0006633

A-1495

in connection with lawsuits or governmental investigations) and Physician agrees to make himself reasonably available for interviews by D-H without the necessity of a subpoena.

13. Severability. If any term or provision of this Separation Agreement and General Release shall be held invalid or unenforceable, the Parties may enforce the remainder of this Agreement or the application of such term or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, and each such term and provision of this Agreement shall be valid and shall be enforced to the fullest extent permitted by law.

14. Governing Law. This Separation Agreement and General Release shall be construed under the laws of the State of New Hampshire and shall be binding and ensure to the benefit of the parties, their heirs, legal representatives, successors and assigns.

15. Breach. Without limiting the rights of D-H under this Agreement or otherwise, Physician agrees that any breach of this Agreement by Physician will entitle D-H to recover the payments specified herein, as well as any attorneys' fees and costs associated with recovering that payment.

16. Entire Agreement; Amendment. This Agreement: (a) constitutes the sole and entire understanding and agreement between the Parties hereto with respect to the matters set forth herein and there are no other agreements or understandings, whether written or oral and whether made contemporaneously or otherwise, that are binding upon the Parties hereto; (b) may not be amended unless in writing signed by the Parties hereto; and (c) shall inure to the benefit of and be binding upon the heirs, devisees, legatees, executors, administrators, successors, assigns, officers, directors and affiliates of each of the Parties hereto.

17. OWBPA Acknowledgement. The release and waiver in this Agreement, includes any claims Physician may have arising under the ADEA as amended by the Older Workers' Benefit Protection Act Of 1990 ("OWBPA"), relating to any claims of age discrimination. To comply with the OWBPA, this Agreement hereby advises Physician of the legal requirements of the OWBPA and fully incorporates its legal requirements by reference into this Agreement. Physician acknowledges that Physician is knowingly and voluntarily waiving and releasing any rights Physician may now have under the ADEA. Physician also acknowledges that the valuable consideration given for the release as described above is in addition to anything of value to which Physician was already entitled. Physician further acknowledges the following:

> Time to Consider This Agreement. Physician acknowledges that Physician has been provided with a copy of this Agreement and has been given forty-five (45) consecutive calendar days in which to review and consider the Agreement. Physician agrees that any revisions to this Agreement, whether material or immaterial, during that forty-five (45) day period shall not be deemed to restart the consideration period. Physician acknowledges that while Physician has forty-five (45) consecutive calendar days to review and consider this Agreement, Physician has the right to sign this Agreement at any time within the forty-five (45) consecutive calendar days from Physician's receipt of this document.
>
> Legal Counsel. Physician is advised to consult with legal counsel and seek clarification of any of the terms of the Agreement prior to signing this Agreement.
>
> Revocation. Physician acknowledges that Physician has a period of seven (7) calendar days following Physician's signing of this Agreement to revoke the Agreement. Any such revocation of the Agreement must be in writing, signed by Physician and delivered to Deputy General Counsel, One Medical Center Drive, Lebanon, NH 03756, not later than 5:00 p.m. on the end of the seventh day period. Any revocation hereunder shall not affect the termination of Physician's employment.

A-1496

When the Terms Become Effective. The terms of the Agreement shall become final and binding only upon expiration of the revocation period provided in subsection 17(c) above. No payments shall be made under Section 2 until the Agreement becomes final and binding upon the parties.

18. Return of Agreement. You have received up to forty-five (45) consecutive calendar days to consider this Agreement. If you wish to receive the severance benefits and you agree to the terms and conditions in the Agreement, please initial each page of the Agreement (including both pages of the cover letter), sign and date the last page and place it in the enclosed postage paid envelope returned to Dartmouth-Hitchcock, Attn: Karen Aframe, Director of Employee Relations, One Medical Center Drive, Lebanon, NH 03756. Please return one (1) signed Agreement in the envelope provided, keeping the other for your records (2 copies enclosed). You must ensure that your signed Agreement is postmarked no later than forty-five (45) days from the date you received these documents. Once received, D-H will return a copy of the fully executed Agreement to you via your home mailing address.

**THIS AGREEMENT IS A LEGAL DOCUMENT AND CONTAINS A WAIVER OF ALL KNOWN OR UNKNOWN CLAIMS. READ THIS ENTIRE DOCUMENT CAREFULLY BEFORE SIGNING. YOU ARE ADVISED TO CONSULT WITH A LAWYER OR ANY OTHER ADVISOR OF YOUR CHOOSING. BY SIGNING THIS AGREEMENT, YOU ARE AGREEING THAT YOU UNDERSTAND THIS AGREEMENT, THAT YOU ARE VOLUNTARILY SIGNING IT, AND THAT YOU HAVE NOT BEEN COERCED IN ANY WAY INTO SIGNING THE AGREEMENT.**

**IN WITNESS WHEREOF,** the Employer and Physician have executed this Agreement on the date set forth below.

_____
**Misty M. Blanchette Porter, M.D.**

Date: _____, 2017

**Mary Hitchcock Memorial Hospital** and
**Dartmouth-Hitchcock Clinic**

By:_____
Aimee M. Giglio, DA
Chief Human Resources Officer (Interim)
Vice President of Total Rewards

Date: _____, 2017

INITIALS_____

**C13 (010)**

DH0006635

A-1497

2:17-cv-00194-kjd   Document 308-5   Filed 05/22/25   Page 12 of 13

## 〰 Dartmouth-Hitchcock
### NOTICE TO TERMINATED EMPLOYEES

**June 5, 2017**

The following informational disclosures are provided pursuant to the Older Workers Benefit Protection Act of 1990, which is an amendment to the Age Discrimination in Employment Act of 1967 (the "ADEA"). This statute requires Dartmouth-Hitchcock ("D-H") to disclose information about D-H employees who were selected or not selected for inclusion in the involuntary separation program that D-H has implemented in connection with its decision to close the D-H Reproductive Endocrinology and Infertility ("REI") program (the "Program"). All of the D-H employees who worked within the D-H REI program were initially selected for layoff.

The enclosed chart contains information regarding the employees who were eligible to be selected for layoff in connection with the Program and offered severance if they were selected and their employment was involuntarily terminated. The data provided includes department title/department code, job title/job code, employee ages, and anticipated layoff dates. We recognize that the data contains personal information related to age about D-H employees. We are providing it in compliance with federal law.

All of the D-H employees who worked within the D-H REI program were eligible to be laid off. If there is an asterisk (*) for an employee designated as "Not Selected for Layoff," this indicates that the employee worked primarily outside of the REI program and the employee's duties were reassigned such that the employee was not ultimately selected for layoff.

Employees whose employment will terminate pursuant to the Program will cease employment with D-H effective June 3, 2017. The enclosed chart also identifies which employees that were selected for layoff may be eligible for severance benefits. If there is a double asterisk (**) for an employee designated as "Selected for Layoff," this indicates that the employee held a per diem position within the D-H REI program and is therefore not eligible to receive severance benefits in connection with the Program. All other employees selected for layoff and whose employment terminates pursuant to the Program are eligible to receive severance benefits, as described in the Severance and General Release Agreement, provided that (1) they sign the Severance and General Release Agreement and return it within the permitted time period, and (2) if applicable, do not revoke it within seven (7) days after signing it.

All ages listed in the charts reflect the individual's age as of June 2, 2017.

**C13 (011)**

CONFIDENTIAL

DH0006636

A-1498

The following chart provides a list of the job titles for those positions considered for elimination and, if eligible, an offer of severance in connection with the decision to close the D-H Reproductive Endocrinology and Infertility ("REI") program, the ages of those who were selected for layoff, and the ages of those not selected for layoff. All ages are accurate as of June 2, 2017.

| Department Title/ Department Code | Job Title/Job Code | Age | Selected for Layoff | Not Selected for Layoff | Eligible for and Offered Severance | Anticipated Layoff Date |
|---|---|---|---|---|---|---|
| OB-GYN - B00116100 | Adv Prac Nrs-400135 | 57 | | X* | N | 6/3/2017 |
| OB-GYN - B00116101 | Clinical Nurse-400948 | 37 | X | | Y | 6/3/2017 |
| OB-GYN - B00116102 | Staff Physician-002721 | 42 | X | | Y | 6/3/2017 |
| OB-GYN - B00116102 | Staff Physician-002721 | 54 | X | | Y | 6/3/2017 |
| OB-GYN - B00116102 | Staff Physician-002721 | 57 | X | | N** | 6/3/2017 |
| OB-GYN - B00116102 | Staff Physician-002721 | 62 | X | | Y | 6/3/2017 |

\* Indicates that employee primarily worked outside of the REI program and the employee's duties were reassigned such that the employee was not ultimately selected for layoff.

\*\* Indicates that employee held a per diem position within the D-H REI program and is therefore not eligible for severance benefits.

**C13 (012)**

CONFIDENTIAL

DH0006637

A-1499

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,

      Plaintiff,

vs.

DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,

      Defendants.

Case No. 2:17-cv-194

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR ATTORNEYS' FEES

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary

Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Defendants" or

"Dartmouth Health") hereby submit this Opposition to Plaintiff's Motion for Attorneys' Fees (the

"Motion"). (ECF No. 300). In the Motion, Plaintiff Misty Blanchette Porter, M.D. ("Plaintiff" or

"Dr. Porter") requests an astounding total amount of $1,742,649.70 in "attorney's fees" she

purportedly incurred prosecuting claims that were, in the end, overwhelmingly unsuccessful.[1]

While Plaintiff is the prevailing party on a single claim – one out of three theories – brought under

---

[1] To the extent the Court's analysis would be aided by highlighted excerpts of Plaintiff's invoices reflecting the specific entries objected to herein, Defendants would be happy to prepare and forward them under separate cover.

the Vermont Fair Employment Practices Act ("VFEPA"), she ultimately lost on each of her five other claims and received only a limited damages award.[2]  Despite her numerous failed claims, and notwithstanding the fact that she was awarded only $1.125 million in damages, Plaintiff now seeks over $1.7 million in attorneys' fees and costs.  Her request is excessive, unreasonable, and contrary to controlling authority.  The Court should substantially reduce the requested amount for the following independent bases: (1) excessive and redundant billing; (2) work unrelated to the successful claim; (3) limited success at trial; and (4) improper demands for prejudgment interest.  Courts do not reward inefficiency or inflate limited verdicts into windfalls, and the Court must reject Plaintiff's attempt to do so here.

## BACKGROUND

Plaintiff filed suit in October 2017.  (ECF No. 1).   Her initial complaint set forth four separate claims for whistleblower and disability discrimination in violation of federal and New Hampshire law.  *Id.*  In August 2018, Plaintiff amended her complaint to include two additional disability discrimination causes of action, including a claim for violation of the VFEPA.  (ECF No. 50).   Dartmouth Health filed a motion for summary judgment in January 2020, which the Court granted in full in November 2020.  (ECF Nos. 139, 152).  Plaintiff appealed the decision, and briefing took place until June 2021. *See Blanchette Porter vs. Dartmouth Hitchcock Medical Center*, 2d Circuit Court of Appeals Docket # 20-3894.  Oral argument occurred before the Second Circuit in February 2022.  *Id.*  The matter remained under consideration for nearly two years until the Second Circuit issued a decision on February 6, 2024, partially reversing the district court's judgment and remanding the case for further proceedings. *Porter v. Dartmouth-Hitchcock Med.*

---

[2] Defendants respectfully request that the Court defer any ruling on the Motion until after it has ruled on Defendants' motions for post-trial relief to accommodate the possibility that those rulings might reverse judgment in Plaintiff's favor.

2

A-1501

*Ctr.*, 92 F.4th 129 (2d Cir. 2024).  On June 17, 2024, this Court set trial to begin on March 24, 2025.  (ECF No. 179).  The trial, including jury deliberations, occurred from March 25 to April 10, 2025.  (ECF Nos. 244–81).  The jury rendered a verdict in Plaintiff's favor on only one of the fourteen (14) questions presented on the Verdict Form.  (ECF No. 281).  Judgment was subsequently entered on April 24, 2025, holding Defendants liable on only one of Plaintiff's six claims and awarding $1,000,000 for economic damages and $125,000 for non-economic damages.  (ECF No. 297).

## ARGUMENT

### 1. Availability of Attorneys' Fees and Costs

"Vermont follows the [] 'American Rule' of attorney's fees, under which parties to litigation are generally responsible for their own fees in the absence of a statute or agreement to the contrary." *Perez v. Travelers Ins. ex rel. Ames Dep't Stores, Inc.*, 2006 VT 123, ¶ 8, 181 Vt. 45, 49–50, 915 A.2d 750, 754 (2006).  Under VFEPA, a prevailing party may only recover "reasonable attorney's fees." *See* 21 V.S.A. § 495b(b); *Spooner v. Town of Topsham*, 2010 VT 71, ¶ 8, 188 Vt. 293, 9 A.3d 672.  The Court must exclude from any award "excessive, redundant, or otherwise [] unnecessary" hours. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).  In applying the lodestar method, the Court may adjust the amount based on the degree of success and other relevant considerations. *Spooner*, 2010 VT 71, ¶¶ 11–12.

### 2. The Number of Hours Spent on the Case Was Highly Unreasonable.

It is well-settled that a fee award must be "reasonable as to the number of hours spent in advancing the successful claims." *Human Rights Comm'n v. LaBrie, Inc.*, 164 Vt. 237, 250 (1995) (internal quotations and citation omitted).  While Plaintiff cites fee rates in other cases as comparable, *see* ECF No. 300 at 5–6, she fails to identify any cases supporting the reasonableness

3

**A-1502**

of the total hours or fees she now requests. That is because they are unjustifiable. Plaintiff's staffing decisions reflect duplication and inefficiency, and courts routinely reduce fee awards where, as here, "plaintiffs overstaffed the case, resulting in the needless duplication of work and retention of unnecessary personnel." *Lochren v. Cnty. of Suffolk*, 344 F. App'x 706, 709 (2d Cir. 2009).

Plaintiff's counsel's billing records are replete with vague and incomplete narrative entries, making it impossible to determine (1) whether the time billed relates to this litigation—particularly the sole claim on which Plaintiff prevailed—and (2) whether the time expended is reasonable. The lack of specificity in the billing entries substantially impairs Defendants' ability to conduct a meaningful review of the invoices. Compounding this issue, many entries utilize block billing, grouping multiple tasks into a single entry without itemization. Like vague descriptions, block billing obscures the nature of the work performed and precludes proper scrutiny of the reasonableness of the claimed fees. These deficiencies in Plaintiff's counsel's billing records should weigh against a full fee award and support a reduction in any fees awarded as part of the Court's reasonableness determination.[3]

**Fees Incurred Prior to the Addition of the Successful Claim Are Not Recoverable**. Plaintiff is not entitled to recover fees for time spent before the VFEPA claim was added to the Amended Complaint on August 1, 2018. "Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." *Anderson v. Sebelius*, No. 5:09-CV-16, 2011 WL 1832771, at *4 (D. Vt. May 12, 2011) (citation omitted). Plaintiff's

---

[3] As a result of Plaintiff's block billing, Defendants were sometimes forced to include entries in their below calculations that include more than the relevant task identified.

4

A-1503

VFEPA claim – the sole claim upon which the jury found in her favor – did not exist in this case until nearly a year into the litigation. Fees predating its inclusion necessarily relate to unsuccessful claims and must be excluded. While it may be difficult to parse through every invoice entry to determine which entries relate to which claims, here the Court must, at the very least, deduct any fees and costs incurred prior to August 1, 2018, which total 833.45 hours, $146,338.50 in fees, and in $894.39 in costs.

**Excessive Depositions.** Plaintiff deposed eleven (11) witnesses, one over two separate days, in a single-plaintiff employment case—far outpacing Defendants, who deposed only two witnesses. Of Plaintiff's eleven witnesses, she called only <u>four</u> as part of her case in chief at trial. Though she did not ultimately call the remaining seven witnesses, Plaintiff's counsel spent 124.1 hours and incurred $26,933.00 solely on their depositions. Defendants should not be penalized for Plaintiff's needlessly overbroad discovery tactics. This disparity necessitates a significant downward adjustment.

**Overstaffing Depositions and Trial**. Plaintiff's counsel also unnecessarily overstaffed the depositions, attending every single one with at least two partners present. The below chart provides a summary of the depositions taken in this matter with a comparison of the attending attorneys.

| Witness | Date | Taken By | Plaintiff Attorneys Attending | Defendant Attorneys Attending |
|---------|------|----------|-------------------------------|-------------------------------|
| Porter | 06/11/19 | Defendants | Vitt; Kramer | Schroeder; Joseph |
| Todd | 07/17/19 | Plaintiff | Vitt; Kramer | Joseph |
| Porter | 07/18/19 | Defendants | Vitt; Kramer | Schroeder |
| Boedtker | 07/24/19 | Plaintiff | Vitt; Nunan; Kramer | Schroeder |
| Herrick | 07/25/19 | Plaintiff | Vitt; Nunan; Kramer | Schroeder |
| Merrens | 07/30/19 | Plaintiff | Vitt; Nunan; Kramer | Schroeder |
| Gunnell | 08/02/19 | Plaintiff | Vitt; Nunan; Kramer | Joseph |
| Fleury | 08/08/19 | Plaintiff | Vitt; Kramer | Joseph |

5

A-1504

| Gunnell | 08/26/19 | Plaintiff | Vitt; Nunan; Kramer | Joseph |
|---------|----------|-----------|---------------------|--------|
| King | 08/27/19 | Plaintiff | Vitt; Nunan | Joseph |
| Conroy | 09/24/19 | Plaintiff | Vitt; Nunan; Kramer | Schroeder |
| Padin | 09/25/19 | Plaintiff | Kramer; Nunan; Vitt | Schroeder |
| DeMars | 10/23/19 | Plaintiff | Vitt; Nunan; Kramer; Korkus (paralegal) | Schroeder |
| Bancroft | 10/30/19 | Defendants | Vitt; Korkus (paralegal) | Joseph |
| Giglio | 12/10/19 | Plaintiff | Vitt; Nunan; Kramer | Schroeder |

Collectively, Plaintiff's counsel spent 253.4 hours and incurred $53,910.00 in fees on depositions alone. The award must be reduced to reflect these and other obvious examples of multiple lawyers performing overlapping work.

Plaintiff's flagrant overstaffing continued through all stages of these proceedings. For example, at trial, Plaintiff staffed her team with three partners and zero associates, a clear sign of inefficiency in a straightforward employment case. This Court has discretion to reduce hours where, as here, attorney work is duplicative or there is inefficient staffing. *Centrella v. Ritz-Craft Corp. of Pennsylvania, Inc.*, No. 2:14-CV-00111-JMC, 2018 WL 840041, at *8 (D. Vt. Feb. 12, 2018) (reducing hours where one attorney's attendance at a deposition was duplicative of the time a second attorney spent on the deposition); *see also IMS Health Inc. v. Sorrell*, No. 1:07-CV-188-JGM, 2012 WL 2915845, at *5-6 (D. Vt. July 17, 2012) (reducing hours where inordinate amount of attorneys were staffed, causing inefficiency).

**Time Spent on Opening Statement Was Duplicative and Unjustifiably High.** The time Plaintiff's counsel spent preparing Mr. Vitt's opening statement provides just one example, among a sea of others, of duplicative and excessive billing. To be sure, multiple attorneys worked on the statement over a period of multiple months. Mr. Vitt and Ms. Nunan billed 70.4 hours and $26,487.50, and Mr. Jones billed 23.6 hours and $9,302 for what amounted to a 23-minute opening

6

A-1505

statement.[4]  Given counsel's experience, such a level of preparation is wholly unreasonable and warrants a reduction.

**Hours Spent on Initial Disclosures and Initial Discovery Requests Were Excessive for Experienced Counsel.**  Time spent on routine discovery was also excessive.  Plaintiff's counsel—described as experienced and well-suited to the case (ECF No. 300 at 10)—should not have required 38.6 hours to prepare initial disclosures and document requests.  Courts routinely reduce such charges.  *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 212 (E.D.N.Y. 2006), aff'd, 531 F.3d 127 (2d Cir. 2008) (reducing the 36 hours it took experienced counsel to prepare initial disclosures and initial discovery requests by 30 percent).

**Redundancy Due to Attorney Substitution Immediately Before Trial**.  Further redundancy arose when attorney Katie Kramer ceased involvement shortly before trial and was replaced by attorney Eric Jones.  This substitution introduced inevitable inefficiencies, including duplicative preparation and "catch up" time.  Mr. Jones billed 24.3 hours and $8,936.50 for that onboarding, even though Ms. Kramer had already spent seven years on this case.  *See Huard v. Henry,* 2010 VT 43, ¶¶ 13-14, 188 Vt. 540, 544, 999 A.2d 1264, 1270 (2010) (hours reduced for a number of reasons including inefficiencies); *IMS Health Inc.,* 2012 WL 2915845 at *5 (hours reduced to account for onboarding of separate appellate counsel, which "required yet more time for new counsel to familiarize themselves with the litigation"); *Anderson,* 2011 WL 1832771 (reduced attorneys' fees where work was potentially duplicative).

**Time Spent on Plaintiff's Motion for Attorneys' Fees Was Highly Unreasonable.**  The time spent preparing the Motion for Attorneys' Fees itself is similarly excessive.  The Motion is

---

[4] Collectively, Plaintiff's counsel billed 94 hours and $35,789.50 just for preparation of the opening statement.

**A-1506**

only 12 pages long. Most exhibits are contemporaneous invoices, requiring little preparation. Yet just the law office of Vitt & Nunan billed 77.2 hours or $23,222.50 to prepare the Motion. Mr. Jones added another 14.5 hours or $5,727.50. The total time and cost for the fee motion is 91.7 hours or $28,950.00, and the lodestar should be reduced accordingly. *See Brady,* 455 F. Supp. 2d at 212 (reducing the lodestar hours by half for excessive billing related to a fee application); *Murray ex rel. Murray v. Mills*, 354 F. Supp. 2d 231, 241 (E.D.N.Y. 2005) (suggesting that even in a complex case a fee application should not take more than 30 hours); *Levy v. Powell*, 2005 WL 1719972, at *8 (E.D.N.Y. July 22, 2005) (justifying an across-the-board 35 percent reduction based in part on the hours billed for the fee application).

**3. Plaintiff's Limited Success and Limited Jury Award Warrant a Substantial Downward Adjustment.**

Beyond excessive hours, Plaintiff's limited success and comparatively small damages award warrant a substantial downward adjustment. "Once the court arrives at a lodestar amount, the court can then adjust the number upward or downward based on a number of factors, including . . . the results obtained in the litigation." *Huard*, 2010 VT 43, ¶ 11 (internal quotations removed).

In passing and without much explanation, Plaintiff requests an upward adjustment of the lodestar amount. (ECF No. 300 at 8, 10). She reasons that she is entitled to such an adjustment based on "[t]he excellent result achieved here." *Id.* at 10. However, Plaintiff prevailed on only one of six claims[5] and secured a fraction—less than 25%—of the damages she originally sought. Moreover, the jury answered only one of 14 questions in her favor—just 7.14%. This is far from

---

[5] Plaintiff brought claims for (1) violation of the New Hampshire Whistleblowers' Protection Act, (2) violation of the American with Disabilities Act, (3) violation of the Rehabilitation Act, (4) Disability Discrimination under New Hampshire law, (5) Disability Discrimination under Vermont law, and (6) Wrongful Discharge under New Hampshire law. Plaintiff was only successful on her fifth claim, Disability Discrimination under Vermont law.

8

A-1507

an "excellent result." Indeed, Plaintiff's limited success actually warrants a substantial *downward* adjustment. *See Hensley*, 461 U.S. at 436 ("[H]ad respondents prevailed on only one of their six general claims . . . a fee award based on the claimed hours clearly would have been excessive"). Given that the jury only found in Plaintiff's favor on 7.14% of the questions on the Verdict Form, and recognizing that Plaintiff only prevailed on one out of six claims (the exact situation the Supreme Court referred to in *Hensley*), the Court should apply a substantial downward reduction of no less than 83.3% (5/6) and as much as 92.86% (13/14).

The most critical factor in any fee and costs award is the degree of success. *Id.* at 436. The Supreme Court distinguishes between cases with "distinctly different claims" and cases with "a common core of facts." *Id.* at 434–35. Here, Plaintiff's whistleblower and wrongful discharge claims were entirely distinct from her successful VFEPA claim and must be excluded entirely. *Id.* Even claims arising from the same or similar set of facts—such as disability discrimination under the ADA, Rehabilitation Act, and applicable New Hampshire and Vermont state laws—warrant a reduction based on Plaintiff's minimal overall success. *Id.* at 436 (finding that hours spent on unsuccessful claims, interrelated or not, may be excluded in calculating a reasonable fee).

Here, the jury rejected the bulk of Plaintiff's case, including her request for punitive damages and multiple other theories that were vigorously pursued through discovery, motion practice, and trial. Courts routinely reduce fee awards in such circumstances. Where "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount . . . even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Hensley*, 461 U.S. at 436; *see also Huard*, 2010 VT 43, ¶ 16 (recognizing that fee awards may be adjusted to reflect the degree of success); *Centrella,* 2018 WL 840041, at *11 (lodestar reduced because of only

9

A-1508

partial success); *Diamond v. O'Connor*, 2010 WL 9459022, at \*2 (D. Vt. June 10, 2010) (reducing lodestar by fifty percent because plaintiff prevailed on only one of two counts).

The Court may identify hours for exclusion or apply a percentage reduction at its discretion. *Hensley*, 461 U.S. at 436–37. Based on Plaintiff's one successful claim out of the six causes of action she pursued (16.7%), and one favorable answer out of 14 questions submitted to the jury (7.14%), the Court should reduce the lodestar by at least 83.3% and as much as 92.86%.

**4. Plaintiff Seeks Costs to Which She is Not Entitled.**

Plaintiff argues that expenses not considered "taxable costs" are nevertheless recoverable as attorneys' fees. (ECF No. 300 at 11). Accordingly, she seeks $29,959.20 for deposition costs, mediation costs, and travel expenses. As an initial matter, Dr. Porter appears to request deposition costs in both her Motion for Attorneys' Fees and in her Bill of Costs. (ECF No. 300 at 11–12; ECF No. 301-1). To the extent those expenses are double counted, they should be excluded from the Court's calculations.

Second, Dr. Porter's argument suggests that the Vermont Rules of Civil Procedure, rather than the Federal Rules of Civil Procedure, govern her request for costs such that they may properly be considered within the realm of "attorney's fees." But V.R.C.P. 54(d) is clear that it does not control where "the court otherwise specifically directs." Here, the Local Rules of the District of Vermont specifically direct that "[t]axable costs are limited to those specified by 28 U.S.C. § 1920[.]" L.R. 54(a). The applicable federal statute, 28 U.S.C. § 1920, does not provide for an award of costs related to depositions, mediations, attorney travel, parking, or attorney meals. Moreover, as set forth in Defendants' Opposition to Plaintiff's Motion to Amend Judgment, Dr. Porter also failed to comply with multiple procedural prerequisites for an award of costs.

**A-1509**

2:17-cv-00194-kjd    Document 309    Filed 05/22/25    Page 11 of 13

Those costs are inappropriately included in the Motion and must be excluded from any relief awarded thereon.

**5. Plaintiff Seeks Prejudgment Interest to Which She is Not Entitled As a Matter of Law.**

Plaintiff asks the Court—without citing to any authority—to award prejudgment interest on all of her fees. (ECF No. 300 at 3–4). Plaintiff is not entitled to the prejudgment interest she seeks here. As discussed in Defendants' Response in Opposition to Plaintiff's Motion for Prejudgment Interest,[6] Dr. Porter's costs and fees are not liquidated or readily ascertainable until determined by this Court. *Ring v. Carriage House Condo. Owners' Ass'n*, 2014 VT 127, ¶¶ 35-36, 198 Vt. 109, 125–26, 112 A.3d 754, 766 (2014) (finding that lower court acted within its discretion in denying prejudgment interest on attorneys' fees award because those fees are not liquidated until fixed by the trial court); *Salatino v. Chase*, 2007 VT 81, ¶ 15, 182 Vt. 267, 275, 939 A.2d 482, 488 (2007) ("[W]e note that other courts have concluded, for purposes of prejudgment-interest awards, that attorney's fees are not liquidated until fixed by the trial court[.]") .

For the reasons cited both herein and in Defendants' Response in Opposition to Motion for Prejudgment Interest, Plaintiff's request for prejudgment interest on her attorneys' fees and costs should be rejected by the Court in its entirety.

## CONCLUSION

For the foregoing reasons, Dartmouth Health opposes Plaintiff's Motion for Attorneys' Fees and Costs because Plaintiff's fee request is unreasonably high and unsupported by her limited success. She prevailed on one of six claims and obtained a fraction of the relief sought. Her counsel overbilled, duplicated work, and now seeks interest to which they are not entitled.

---

[6] Defendants refer the Court to its reasoning in its Response in Opposition to Plaintiff's Motion for Prejudgment Interest. (ECF No. 296).

11

A-1510

Accordingly, the Court should exercise its discretion to reduce Plaintiff's fee and cost request by no less than 83% and as much as 92.86%, consistent with her limited success.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7(a)(6), Dartmouth Health respectfully requests to be heard at oral argument.

A-1511

Date: May 22, 2025

Respectfully submitted,

*/s/ Tristram J. Coffin*

**DOWNS RACHLIN MARTIN PLLC**

Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com


**FOLEY & LARDNER LLP**

Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

*Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that, on May 22, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.


*/s/ Morgan McDonald*
Morgan McDonald

13

**A-1512**

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| MISTY BLANCHETTE PORTER, M.D., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:17-CV-194 |
| | ) | |
| DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, | ) | |
| Defendants. | ) | |

### PLAINTIFF'S OPPOSITION IN RESPONSE TO DEFENDANTS' MOTION TO ALTER OR AMEND THE JUDGMENT AND, IN THE ALTERNATIVE, FOR A NEW TRIAL ON PLAINTIFF'S VFEPA CLAIM

Plaintiff Misty Blanchette Porter, M.D. ("Dr. Porter"), opposes Defendants' post-judgment motion (Doc. 305) seeking to undo the jury's April verdict in favor of Dr. Porter on her disability discrimination claim under Vermont's Fair Employment Practices Act ("FEPA"). The Court properly instructed the jury on Vermont law when it cited "motivating factor" as the applicable standard to apply to a FEPA claim, and Defendants' other challenge to the jury instructions was waived. As there was no error (and thus no resulting "harm") requiring amendment or a new trial, Defendants' motion must be denied.

### Motivating Factor is the Standard Under Vermont Law

Vermont case law is clear that disability discrimination claims under FEPA are decided under the motivating factor standard. *See, e.g., Gallipo v. City of Rutland*, 163 Vt. 83, 89 (1994) (noting, in case involving claim of disability discrimination, that a plaintiff makes a prima facie case of discrimination under FEPA if she shows "that an impermissible factor played a

motivating part in the employment decision");[1] *Weatherly v. Gravel and Shea PC*, No. 977-9-11 Cncv, 2014 WL 12722849, \*12 (Vt. Super. May 1, 2014) (referencing "motivating factor" as the applicable standard in disability claim under FEPA).

Defendants argue that Vermont courts should/will follow the Second Circuit's decision in *Natofsky v. City of New York*, 921 F. 3d 337 (2d Cir. 2019), which determined that disability discrimination under the Rehabilitation Act and the ADA is subject to the "but for" causation standard. The parties are not aware of any post-*Natofsky* disability discrimination cases to suggest that the Vermont courts intend or are likely to discontinue use of the motivating factor test nor should such an intent or likelihood be presumed.

VFEPA is patterned on Title VII[2] and incorporates the same "standards and burdens of proof" including the motivating factor standard. *Hodgdon v. Mt. Mansfield Co., Inc.*, 160 Vt. 150, 161–62 (1992). *See also Newton v. Kohl's, Inc.*, No. 5:21-CV-268, 2024 WL 4986303, at \*4 (D. Vt. Nov. 12, 2024) (referring to VFEPA as a whole and stating that it "uses identical

---

[1] *See also Gallipo v. City of Rutland*, 173 Vt. 223, 237 (2001) (also referencing "motivating factor").

[2] The cases Defendants cite referencing the Rehabilitation Act and ADA, (Doc. 305 at 2–3, 7–9), are not dispositive here. In *Gates v. Mack Molding Co., Inc.*, the Vermont Supreme Court declined to decide whether FEPA should be interpreted to include reassignment as a reasonable accommodation (noting that unlike FEPA, the ADA and the Rehabilitation Act expressly define reasonable accommodation to include reassignment). *Gates v. Mack Molding Co., Inc.*, 2022 VT 24, ¶ 26, 216 Vt. 379, 279 A.3d 656. The *Newton* court identifies "but for" as the standard, citing the Second Circuit's decision in *Porter* in support. *Newton v. Kohl's, Inc.*, No. No. 5:21-CV-268, \*13 & \*15, 2024 WL 4986303 (D. Vt. Nov. 12, 2024) (granting summary judgment where plaintiff failed to prove she had a qualifying disability). The Second Circuit, however, *did not* conclude that "but for" is the proper standard for disability discrimination under FEPA and indeed expressly left "it to the district court on remand to reassess and reconsider the causation standards governing Dr. Porter's disability claims under the relevant State laws." *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 149 (2d Cir. 2024). In *Kennedy v. Dep't of Pub. Safety*, 168 Vt. 601, 601–02 (1998), the court did not discuss the applicable standard to apply under FEPA's disability provisions, noting only that the court looks to the Rehabilitation Act to determine whether plaintiff has met the elements of his claim.

2

standards and burdens of proof as Title VII"); *Hammond v. Univ. of Vermont Med. Ctr.*, 2023 VT 31, ¶ 24 & ¶ 35, 218 Vt. 250, 308 A.3d 421, *reargument denied* (July 17, 2023), *cert. denied*, 144 S. Ct. 507 (2023) (noting that FEPA is patterned on Title VII and employs identical standards and burdens and concluding, without discussing the standard further, that "plaintiff failed to provide evidence sufficient to create an inference that their termination was related to their disabilities"); *Dowling v. the State of Vermont*, No. 21-CV-2629, 2024 WL 945170, at *3 (Vt. Super. Feb. 12, 2024) (reaffirming that FEPA applies the standards and burdens of Title VII). Although Vermont courts often look to comparable federal law for guidance on novel issues under Vermont law, including to cases involving Title VII, the Rehabilitation Act, and the ADA, they are also quick to acknowledge that they are not bound by such law. *See, e.g.*, *Westcott v. Mack Molding Co.*, 2024 VT 85, ¶ 17, 331 A.3d 1083, 1088 ("Because employee's claims call on us to interpret the scope of state law, we consider federal opinions to be persuasive, but not binding, authority."); *Lavalley v. E.B. & A.C. Whiting Co.*, 166 Vt. 205, 209–11 (1997) (noting that Vermont courts "will not adopt an interpretation of FEPA solely because the federal courts, including the United States Supreme Court, have so interpreted Title VII" nor must the "Vermont Legislature react to every federal decision interpreting Title VII or risk that its inaction will be interpreted as an endorsement of the federal decision"). The Vermont courts have not hesitated to forge an alternative path where federal law is not consistent with Vermont's policies. *See id.* (choosing to follow guidance from "sister states" on issue of pregnancy discrimination as sex discrimination rather than federal decisions).

Several years after *Natofsky* was decided, the Appellate Court of Connecticut considered whether the state's courts should follow the reasoning of *Natofsky* and interpret its own Fair Employment Practices Act (CFEPA)[3] as requiring "but for" causation. *Wallace v. Caring*

---

[3] Like Vermont's FEPA, CFEPA covers multiple protected traits in one statute.

3

*Solutions, LLC*, 278 A.3d 586, 600–02 (Conn. App. 2022).  Like Vermont, no Connecticut case had yet addressed the impact of *Natofsky* on the state's causation standard.  The *Wallace* court noted that federal precedent provides non-binding guidance on issues of employment law, but it is the Connecticut Supreme Court that "is the ultimate authority on interpreting Connecticut statutes." *Id.* at 600.  The *Wallace* court rejected the idea that "but for" causation should apply, noting that the reasoning behind the federal decisions (different language in different statutes implies legislative intent to apply different standards of causation to discrimination depending on which protected trait was involved) was inapplicable in states using a single statute. *See id.* at 601 ("There is no basis for us to conclude that our legislature intended one causation standard for claims based on race, color, religion, sex, or national origin and a more stringent standard for disability based claims.").

Like Connecticut, the Vermont legislature chose not to follow the federal style of different statutes depending on which protected trait was involved.  Similarly, the Vermont courts have not historically applied different causation standards to different elements of FEPA and there is no basis to conclude that Vermont would apply a different causation standard to disability claims than to other forms of discrimination. *Cf. Payne v. U.S. Airways, Inc.*, 2009 VT 90, ¶¶ 11, 21, 186 Vt. 458, 987 A.2d 944 (noting the "remedial purpose" of Vermont's discrimination statutes and explaining that "we may depart from federal interpretations of Title VII when we construe our own fair employment practices law").

**Certification to the Vermont Supreme Court**

"[C]lear and controlling Vermont precedent" identifies motivating factor as the applicable causation standard for VFEPA claims. *Gallipo v. City of Rutland*, 163 Vt. 83 (1994).

4

Because Vermont law is "settled" on the standard to apply to VFEPA claims and because further clarification by the Vermont Supreme Court would not determine the outcome of this case, certification to the Vermont Supreme Court is not appropriate.[4]

The decision to certify a question of law to the state court as well as the state court's decision to accept a certified question are both discretionary. *McCarthy v. Olin Corp.*, 119 F.3d 148, 153 (2d Cir. 1997). *See also Valls v. Allstate Ins. Co.*, 919 F.3d 739, 742–44 (2d Cir. 2019) (describing "potential benefits" and "inevitable burdens" of certification and declining to certify because the burdens outweighed the benefits). The Local Rules permit this Court to certify a question of law to the Vermont Supreme Court where an "unsettled and significant question of state law … will control the outcome of a pending case." L.R. 74. *See also* 2d Cir. R. 0.27 ("[T]his Court may certify to the highest court of a state an unsettled and significant question of state law that will control the outcome of a case pending before this Court.").[5] Here, the Vermont Supreme Court's answer to the question of which causation standard to apply will not "control the outcome" of this case, and thus is not appropriate for certification. *Compare, e.g., Doe v. Newbury Bible Church*, 445 F.3d 594, 596–97 (2d Cir. 2006), *certified question answered,* 2007 VT 72, 182 Vt. 174, 933 A.2d 196 (deciding to certify question to the Vermont Supreme Court after concluding that the question "presents purely state law issues, controls the outcome of this case, and was explicitly left open [by] the Vermont Supreme Court[ ]"); *Preseault v. City of Burlington, VT*, 412 F.3d 96, 102 (2d Cir. 2005), *certified question answered*

---

[4] Defendants argue that certification is appropriate because Dr. Porter offered the idea of certification during the Second Circuit appeal; however, that was pre-trial and more than a few years ago. Circumstances have changed and the impact on Dr. Porter would be significantly greater at present.

[5] The corresponding Vermont rule authorizes, but does not require, the Vermont Supreme Court to "answer a question of Vermont law certified to it by a federal court if the answer might determine an issue in pending litigation and there is no clear and controlling Vermont precedent." V.R.A.P. 14(a).

*sub nom. Preseault v. City of Burlington*, 2006 VT 63, 180 Vt. 597, 908 A.2d 419 (noting the question to be certified "presents purely state law issues, controls the outcome of this case, and lacks controlling precedent"). A decision that the motivating factor standard continues to apply will not alleviate Defendants other complaints. Even a decision that but-for causation applies to disability discrimination claims under FEPA—it does not—the decision would lead to a retrial and thus would not be outcome determinative here.

In addition, as explained above, existing Vermont precedent confirms that the motivating factor standard applies and therefore the causation question is not an "unsettled" question of law in Vermont. The federal court's role in diversity cases is to apply the law of the forum state and, if that law is unclear, to predict how the state's highest court would likely rule. *See Egbujo v. Jackson Lewis P.C.*, No. 22-2854-CV, 2023 WL 8295317, at *2 (2d Cir. Dec. 1, 2023) (stating that where the state court is silent, "our role 'is carefully to predict how [it] would resolve the uncertainty or ambiguity[,]' considering decisions of the lower state courts and, to the extent that the forum state's highest court would consider them persuasive, cases from other jurisdictions") (quoting *McCarthy*, 119 F.3 at 153. *See also Knapik v. Mary Hitchcock Mem'l Hosp.*, No. 5:12-CV-175, 2014 WL 12717446, at *1–2 (D. Vt. May 30, 2014) (although acknowledging importance of certification process to allow federal courts to "give deference to state courts in establishing what state law is," noting that "the Second Circuit has cautioned that courts should resort to certification only sparingly, mindful that, in diversity cases that require us to apply state law, it is our job to predict how the forum state's highest court would decide the issues before us") (internal quotations and citations omitted). If sufficient precedent exists for the federal court to make a determination, then certification to the state supreme court is not appropriate. *See, e.g., McCarthy*, 119 F.3d at 153–54 ("Because it is our job to predict how the forum state's highest court would decide the issues before us, we will not certify questions of law where

6

2:17-cv-00194-kjd     Document 314     Filed 06/05/25     Page 7 of 11

sufficient precedent exists for us to make this determination."). "Ordinarily, certification is proper only where there is a split of authority on the issue, where a statute's plain language does not indicate the answer, or when presented with a complex question of [ ] common law for which no [ ] authority can be found." *Id.* (internal quotations omitted). *See also Elliot Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363, 370 (2d Cir. 1999) (noting that certification should not be "routine" and denying motion to certify where state law precedent was sufficient to enable the federal court to decide the case); *Baring Indus., Inc. v. 3 BP Prop. Owner LLC*, No. 22-3123, 2023 WL 8253258, at *2 (2d Cir. Nov. 29, 2023) (finding no need to certify questions to state court where sufficient state precedent existed); *Guterman v. Costco Wholesale Corp.*, 927 F.3d 67, 70 (2d Cir. 2019) (declining certification after concluding plain language of state statute provided the answer and no "split of authority" existed in the state courts on that issue); *French v. Wells Fargo Advisors, LLC*, No. 5:11-CV-246, 2012 WL 1066775, at *2–3 (D. Vt. Mar. 28, 2012) (denying certification, finding sufficient Vermont law existed to determine enforceability of arbitration agreement, and further stating that "the court cannot find that comity, judicial economy, or fairness weigh in favor of revisiting the underlying dispute and then forwarding it to the Vermont Supreme Court for its own resolution which may or may not be forthcoming").

Under the Court's rules, certification is not appropriate unless there is insufficient precedent under state law to make a decision and the question to be certified will determine the outcome of the case. As neither condition would be satisfied here by certifying the causation question to the Vermont Supreme Court, the Court should decline the request to certify.

!

**Defendants Failed to Timely Object**

Defendants additionally complain about the Court's instruction regarding proof that Defendants would have taken the same adverse action in the absence of discriminatory

7

motivation. (Doc. 305 at 5, 10–11.) Defendants do not purport to have objected to this portion of the instruction during the charge conference or otherwise or to offer good cause for their failure to do so. As such, this argument should be deemed to be waived. *See, e.g., In re Est. of Tucker*, 2011 VT 54, ¶ 16, 190 Vt. 530, 533, 25 A.3d 547, 552 (2011) (noting objection as to jury instruction is not preserved unless made prior to the start of jury deliberations and made or renewed after the court has instructed the jury).

At the charge conference, the Court asked the parties for comments and objections as to "Disability Discrimination Claims Under Vermont State Law." (Trial Tr., Vol. 11, 1020:3-1020:12 (Apr. 7, 2025).) As they note in their motion, counsel for Defendants objected to "whether or not it should be motivating factor versus but-for," (Trial Tr., Vol. 11, 1020:6-1020:9 (Apr. 7, 2025)). Counsel for Defendants then agreed that they had "no specific changes other than that objection to that particular legal standard." (Trial Tr., Vol. 11, 1020:10-1020:12 (Apr. 7, 2025).)

### A Partial New Trial is Not Appropriate

The jury was properly instructed on causation and decided in favor of Dr. Porter on her disability discrimination claim under FEPA. The standard to disturb a jury verdict is understandably quite high, and Defendants' arguments fall far short. In addition, a new trial would impose significant additional delay and burden on a case that took nearly eight years to bring to trial the first time, especially where there is already a second appeal to the Second Circuit pending. In the event, however, that the Court determines that a new trial is appropriate, the new trial must be on all the issues, not just FEPA.

Defendants' basis for requesting a new trial is allegedly improper jury instructions. Where the error occasioned by an improper jury instruction is "not harmless" (meaning that the error may have influenced the verdict), a new trial may be appropriate. *Sanders v. New York*

A-1520

*City Hum. Res. Admin.*, 361 F.3d 749, 758 (2d Cir. 2004). Defendants, however, seek not a full retrial, but a new trial only on the single count of disability discrimination under FEPA. (Doc. 305 at 1.) Partial retrials were not recognized at common law. "If the verdict was erroneous with respect to any issue, a new trial was directed as to all." *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 497–98 (1931). Although partial new trials are now permitted in many jurisdictions, their use is limited to situations where the issue to be retried is fully separate from the other issues in the original trial and the new trial will not cause injustice. *See, e.g., Simmons v. Fish*, 210 Mass. 563, 564–65 (1912) (noting that to order a partial retrial, the error should be "of a kind which could be readily separated from the general issues, and applied without injustice to one matter"); *Norfolk S. R. Co. v. Ferebee*, 238 U.S. 269, 273–74 (1915) (noting that to grant a partial new trial, it must be clear that the issue to be retried is "entirely distinct and separable" and "no possible injustice can be done to either party"); *Parizo v. Wilson*, 101 Vt. 514, 144 A. 856, 859 (1929) (noting the power to set aside the verdict and order a partial new trial "ought to be exercised with great caution, with a careful regard to the rights of both parties, and only in infrequent cases where it is certain and plain that the error which has crept into one element of the verdict by no means can have affected its other elements"). Where an error as to one issue is "of such a character as to have a prejudicial effect upon the other [issues] … a full retrial should be had." *Id.* at 860.

This case involves multiple, interwoven federal and state claims. Under the circumstances, a new trial on a single issue is not appropriate. *See, e.g.,* 11 Wright & Millers' Federal Practice & Procedure § 2814 (3d ed.) (explaining that a new trial on a single issue is appropriate only if the single issue is "separate from the other issues in this case and the error did not affect the determination of the other issues"); *Gasoline Products Co.*, 283 U.S. at 500 (noting a partial new trial "may not properly be resorted to unless it clearly appears that the issue to be

9

retried is so distinct and separate from the others that a trial of it alone may be had without injustice" and finding the issues in that case were "so interwoven" that a partial new trial would "amount to a denial of a fair trial"); *Simmons v. Fish*, 210 Mass. 563, 570–72 (1912) (stating that "[u]nless the circumstances would justify a judgment as a matter of law on an issue, the court, by granting only a partial new trial, cannot exclude from the jury an issue on which it has not yet passed or on which it has made a determination against the party seeking the partial new trial").

A partial new trial is similarly improper where the "verdict may represent a compromise among jurors with different views on whether defendant was liable." 11 Wright & Millers' Federal Practice & Procedure § 2814 (3d ed.); *Parizo v. Wilson*, 101 Vt. 514, 144 A. 856, 859–60 (1929). A compromise verdict occurs where jury members compromise or split the difference on the outcome in order to reach agreement. *Simmons v. Fish*, 210 Mass. 563, 570–72 (1912). It cannot be said with confidence that the jury did not "compromise" when it decided in favor of Dr. Porter on FEPA and in favor of Defendants on other counts. This split may have been based on a division in the jury as to liability, such that the jury compromised by finding in Dr. Porter's favor on FEPA. If the Court determines the causation standard should be "but for" across the board, then it cannot also assume that the jury would not have still decided in Dr. Porter's favor on FEPA or, conversely, that it would still decide in Defendants' favor on the other claims. *See, e.g., Sanders*, 361 F.3d at 753, 755 (noting that the Constitution allocates "fact-finding to the jury and law-giving to judges," such that the Court's role in the jury's fact-finding is by necessity strictly limited).

## Conclusion

For the reasons stated above, Defendants' motion to amend judgment or for a new trial, including their request to certify a question of law to the Vermont Supreme Court must be denied.

10

A-1522

Dated: June 5, 2025            /s/ Geoffrey J. Vitt

Geoffrey J. Vitt, Esq.
Vitt & Nunan, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittnunanlaw.com

Eric D. Jones, Esq.
Langrock Sperry & Wool, LLP
210 College Street
P.O. Box 721
Burlington, VT 05402
(802) 864-0217
ejones@langrock.com

Sarah H. Nunan, Esq.
Vitt & Nunan PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055
(802) 649–5700
snunan@vittnunanlaw.com

***Attorneys for Plaintiff,***
***Misty Blanchette Porter, M.D.***

11

A-1523

## UNITED STATES DISTRICT COURT
### DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER,     )
M.D.,     )
     **Plaintiff,**     )
     )
     v.     )     **Docket No. 2:17-CV-194**
     )
DARTMOUTH-HITCHCOCK     )
MEDICAL CENTER,     )
DARTMOUTH-HITCHCOCK     )
CLINIC, MARY HITCHCOCK     )
MEMORIAL HOSPITAL, and     )
DARTMOUTH-HITCHCOCK     )
HEALTH,     )
     **Defendants.**     )

### PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF HER MOTION TO AMEND JUDGMENT

Plaintiff Misty Blanchette Porter, M.D. ("Dr. Porter" or "Plaintiff") submits this reply memorandum to respond briefly to Defendants' Opposition to Plaintiff's Motion to Amend Judgment (Doc. 306). Defendants argue that Dr. Porter "seeks to relitigate a number of issues" and seeks "multiple forms of relief that are plainly not available to her." (*Id.* at 1).

Dr. Porter does not seek to relitigate any issue, and the relief she seeks is clearly authorized by applicable law. Dr. Porter's motion simply seeks to have the Court amend the judgment in this case to include (1) prejudgment interest, (2) post-judgment interest at the Vermont statutory rate of 12% per annum, (3) an award of costs, and (4) an award of attorneys' fees. These are all proper issues for post-trial motions and they reflect proper elements of recovery for a successful plaintiff. The substantive bases for Dr. Porter's requests for interest, cost, and fees are set forth in her Motion for Pre-Judgment Interest (Doc. 296), her Bill of Costs (Doc. 300), and her Motion for Attorneys' Fees (Doc. 301). In addition, her arguments for

A-1524

awarding post-judgment interest at the Vermont statutory rate of 12% are set forth in her Motion

to Amend Judgment (Doc. 302). For the reasons set forth in all these pending motions, Dr. Porter

asks the Court to grant her motion and amend the judgment to include all of the relief to which

she is entitled.

CONCLUSION

For the foregoing reasons, and for all the reasons set forth in her initial motion papers, Dr.

Porter requests that the Court GRANT her Motion to Amend Judgment (Doc. 302).

Dated: June 5, 2025

/s/ Geoffrey J. Vitt
Geoffrey J. Vitt, Esq.
Vitt & Nunan, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittnunanlaw.com

/s/ Eric D. Jones
Eric D. Jones, Esq.
Langrock Sperry & Wool, LLP
210 College Street
P.O. Box 721
Burlington, VT 05402
(802) 864-0217
ejones@langrock.com

/s/ Sarah H. Nunan
Sarah H. Nunan, Esq.
Vitt & Nunan PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055
(802) 649-5700
snunan@vittnunanlaw.com

**Attorneys for Plaintiff,**
**Misty Blanchette Porter, M.D.**

2

A-1525

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| MISTY BLANCHETTE PORTER, M.D., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:17-CV-194 |
| | ) | |
| DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR A NEW TRIAL RELATED TO DAMAGES ISSUES

Plaintiff Misty Blanchette Porter, M.D. ("Dr. Porter" or "Plaintiff") submits this memorandum to oppose Defendants' Motion For a New Trial Related to Damages Issues (Doc. 308). Defendants have failed to identify any trial error regarding damages, and they have failed to offer a valid basis for a new trial. Instead, Defendants' motion is simply a rehash of old, unsuccessful arguments made earlier in these proceedings. Accordingly, the Court should deny Defendants' motion.

Defendants rely on four positions. First, they claim – yet again – that Dr. Bancroft's expert testimony should have been excluded or limited. Defendants again rely upon a misleading and inaccurate series of assertions regarding the bases for Dr. Bancroft's opinion, and then they renew their tired argument that the Court should have excluded the testimony. Second, Defendants repeat an unfounded argument made at the Charge conference concerning the jury instruction on the duty to mitigate damages. The Court's instruction reflects an accurate and

proper statement of the law, however, and Defendants offer no valid claim of error. Third, Defendants assert that they were prejudiced by the Court's decision to exclude from closing argument a so-called "chart" of calculations that Defense counsel directed Dr. Bancroft to create on the stand. Because this chart had absolutely no evidentiary value and was produced under protest by Dr. Bancroft because the calculations Defense counsel wanted were simply incorrect and inaccurate, Defendants' argument lacks merit. Finally, Defendants repeat an absurd argument that they should have been permitted to argue to the jury that Dr. Porter's failure to accept a severance package – which contained a release of claims – somehow shows a failure to mitigate damages. This Court has already properly rejected this argument, in part for the obvious reason that Dr. Porter would have had no lawsuit at all (and could not have claimed any damages) if she had accepted the severance agreement.

All of Defendants' arguments are completely unfounded.

<u>The Court Properly Permitted Dr. Bancroft to Testify as An Expert Economist</u>

As the Hall of Fame Baseball Catcher Yogi Berra is reported to have said, "it's like déjà vu all over again." Incredibly, this is Defendants' fifth formal motion (on top of countless objections, side bars, and oral arguments) asserting their position that Dr. Bancroft's testimony should have been excluded or limited. *See, e.g.,* Defendants' Motion In Limine to Preclude the Testimony of Robert Bancroft (Doc. 198); Defendants' Renewed Motion to Preclude the Testimony of Robert Bancroft Based on New March 19, 2025 Report (Doc. 235); Defendants' Motion In Limine to Preclude the Expert Report (Doc. 248); Defendants' Motion In Limine Regarding Undisclosed Expert Opinions of Dr. Bancroft (Doc. 257). All of Defendants' prior arguments on this issue were rejected because they were unfounded. *See, e.g.,* Orders on Motions

2

A-1527

(Docs. 238 and 258). Nothing has changed, and Defendants' latest motion on the same issue should again be denied.

Notably, Defendants make no new arguments to supplement their four previous, failed attempts to limit or exclude Dr. Bancroft's testimony. Rather, Defendants rely on the same positions they have previously advanced. For example, Defendants continue with their misleading argument that Dr. Bancroft's updated reports (he issued three updates over 8 years) somehow contain substantial changes in methodology based on supposedly undisclosed information from Dr. Porter. Defendants thus raise the specter of an "undisclosed expert opinion." But Dr. Porter has already repeatedly debunked this claim, and she incorporates her prior memoranda on the issue. *See,* Plaintiff's Opposition to Defendants' Motion In Limine to Preclude the Testimony of Robert Bancroft (Doc. 208); Plaintiff's Opposition to Defendants' Renewed Motion to Preclude the Testimony of Robert Bancroft Based on New March 19, 2025 Report (Doc. 236); Plaintiff's Opposition to Defendants' Motion In Limine Regarding Undisclosed Expert Opinions of Dr. Bancroft (Doc. 257). Dr. Bancroft never changed his methodology. He merely updated his report to ensure that his testimony was based on the most current information available. The reality that circumstances changed over the 8 years that this case was pending should be no surprise. Experts routinely update their reports before trial, and the federal courts have recognized the propriety of this practice. *See, e.g., Kahle v. Leonard,* 563 F.3d 736, 741 (8th Cir. 2009) (finding district court within its discretion in admitting psychologist expert report updated shortly before trial where the report "updated a previously-disclosed assessment of Kahle's treatment needs based on additional information—her expected release date"); *Miller v. Pfizer, Inc.,* 356 F.3d 1326, 1332 (10th Cir.2004) (noting that "an expert's initial Rule 26 report cannot always anticipate every possible challenge to the report" and that refusing

3

A-1528

to allow the expert "to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning" may, in some instances, "even constitute an abuse of discretion"); *Minebea Co. v. Papst*, 231 F.R.D. 3, 6–8 (D.D.C. 2005) (noting the exception permitting a supplemental expert report "for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report"); *see* FRCP 26(e) (permitting supplements or corrections in response to new information).

Defendants' continued argument that Dr. Bancroft's testimony somehow contains undisclosed facts or opinions is similarly unsound. As Dr. Porter has previously demonstrated, Defendants' attorneys – including Vermont trial counsel – in fact already questioned Dr. Bancroft repeatedly during pre-trial proceedings to explore the very issues they now claim were not disclosed. It is simply untrue to suggest that Defendants were somehow surprised or prejudiced by any new information. *See, e.g., Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 63-64 (1st Cir. 2011) (finding that although expert's testimony used different language than the report, "it was a reasonable elaboration of the opinion disclosed in the report," and that plaintiff could reasonably have anticipated the testimony based on the report "and, therefore, could not have been unfairly surprised to warrant striking the challenged testimony"); *Walsh v. Chez*, 583 F.3d 990, 992-95 (7th Cir. 2009) (noting that the purpose of an expert report "is not to replicate every word that the expert might say on the stand" but rather to "convey the substance of the expert's opinion … so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary").

Defendants have raised no new arguments. These arguments have been rejected four times before and they should be rejected again.

4

A-1529

<u>The Court's Jury Instruction on The Duty To Mitigate Damages Was Accurate and Proper</u>

Defendants assert that the Court somehow erred in instructing the jury about mitigation of damages. According to Defendants, the court's instruction permitted the jury to deduct an amount from damages only after it first concluded that Dr. Porter failed to mitigate her damages. (Doc. 308 at 5). But this is the law. As the Court properly explained to the jury, "[a] plaintiff ordinarily has a general duty to mitigate the damages she incurs, meaning she has a duty to take steps to try to minimize the harm or prevent it from increasing further." Jury Charge at 30 (Doc. 275). This is an accurate statement of the duty to mitigate damages. *Schnabel v. Nordic Toyota, Inc.*, 168 Vt. 354, 361, 721 A.2d 114, 119-20 (1998); *Dailey v. Societe Generale*, 108 F.3d 451, 455-56 (2nd Cir. 1997); *Wills-Hingos v. The Raymond Corporation*, 104 Fed.Appx. 773,775 (2nd Cir. 2004); *In re Davidson*, 186 Vt. 45 (2009), 978 A.2d 1, 2009 VT 45. If a plaintiff fails to meet this duty, then her damages may be reduced at the jury's discretion. This is precisely what the Court instructed.

Defendants argue that this formulation of the duty to mitigate is "confusing" because – according to Defendants – Dr. Porter did mitigate her damages. (Doc. 308 at 5-6). Respectfully, the only confusion here is Defendants' own conflation of a theory of damages on the one hand with the affirmative defense of a duty to mitigate on the other hand. What Defendants are really arguing is that Dr. Porter did not suffer damages in the first instance because she found another job. This is not a duty to mitigate issue. Defendants are simply confused between (1) the argument that a plaintiff did not suffer damages, and (2) the argument that a plaintiff suffered damages, but failed to take reasonable steps to minimize her losses. But the confusion is Defendants' alone. The Court's instruction was not confusing, and there is no reason to conclude

5

that the jury shared Defendants' confusion. Of course, Defendants' confusion is no basis to order a new trial and their argument on this issue should be dismissed.[1]

<u>The Handwritten Notes With Defense Counsel's Inaccurate Calculations Were Properly Excluded For Closing Argument Because They Were Incorrect and Misleading</u>

Defendants next claim error in the Court's decision to prevent defense counsel from using a page of handwritten notes during closing argument. The notes – which Defendants characterize as a "chart" – were notes taken by Dr. Bancroft on the stand while he was testifying under cross examination. Dr. Bancroft was not the author of the content of the notes, however. Rather, defense counsel instructed him on the contents he should write. These notes simply reflect Defense counsel's "lawyer math" using Dr. Bancroft as a medium to write them in his handwriting. But, as Dr. Bancroft clearly protested during this spectacle, the calculations were inaccurate and incorrect. Defendants now claim that this "chart" somehow contains Dr. Bancroft's calculations and should have been used as demonstrative evidence during closing argument.

The Court properly limited Defense counsel's use of this document.[2] This document was not a legitimate chart prepared by an expert. It was merely the result of a trial stunt in which Defense counsel directed the witness to write down content he had previously prepared. The document was wholly misleading (Dr. Bancroft himself immediately disclaimed it as incorrect) and the document lacks any probative value. Indeed, the document is so unreliable as evidence

---

[1] Notably, Defendants do not cite a single case authorizing a specific jury instruction with the formulation they propose.

[2] Plaintiff notes that the first time she or her lawyers even saw the document was when Defendants attached it as an exhibit to their current motion. Even though Plaintiff requested a copy during the trial, Defendants never gave her a copy. Thus, Defendants refused to produce the document but they now claim error in being unable to cite it in closing argument.

6

that it would have been error to permit defense counsel to use it during closing argument. The Court's decision to limit use of this document was proper, and Defendants' argument should again be rejected.

### The Court Properly Limited Defendants' Use of Evidence Regarding A Severance Agreement That Dr. Porter Did Not Accept

Finally, Defendants complain that they were not permitted to argue in closing argument that the jury could consider Dr. Porter's rejection of a severance package when considering the duty to mitigate damages. Defendants argue that Dr. Porter's duty to mitigate damages somehow required her to accept a severance package, and that her decision to reject the package should have been considered by the jury to reduce her damages. This argument is, frankly, absurd.

The severance package contained a release of claims. Had Dr. Porter accepted the package, she would have been precluded from filing this lawsuit at all. Clearly it would be improper to permit Defendants to ask the jury to penalize Dr. Porter for having decided to exercise her right to file this lawsuit instead of accepting the severance package. Defendants' argument, if accepted, would essentially compel plaintiffs to accept any severance package their employer presents (or risk having damages limited or precluded under the duty to mitigate). Defendants' argument is simply unfounded and should be rejected.

### CONCLUSION

For the foregoing reasons, Dr. Porter requests that the Court DENY Defendants' motion.

Dated: June 5, 2025      /s/ Geoffrey J. Vitt
                                       Geoffrey J. Vitt, Esq.
                                       Vitt & Nunan, PLC
                                       8 Beaver Meadow Road
                                       P.O. Box 1229
                                       Norwich, VT 05055-1229
                                       (802) 649-5700
                                       gvitt@vittnunanlaw.com

A-1532

/s/ Eric D. Jones
Eric D. Jones, Esq.
Langrock Sperry & Wool, LLP
210 College Street
P.O. Box 721
Burlington, VT 05402
(802) 864-0217
ejones@langrock.com

/s/ Sarah H. Nunan
Sarah H. Nunan, Esq.
Vitt & Nunan PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055
(802) 649-5700
snunan@vittnunanlaw.com

*Attorneys for Plaintiff,*
*Misty Blanchette Porter, M.D.*

8

A-1533

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER,  )
M.D.,                     )
      Plaintiff,         )
                          )
  v.                      )      Docket No. 2:17-CV-194
                          )
DARTMOUTH-HITCHCOCK       )
MEDICAL CENTER,           )
DARTMOUTH-HITCHCOCK       )
CLINIC, MARY HITCHCOCK    )
MEMORIAL HOSPITAL, and    )
DARTMOUTH-HITCHCOCK       )
HEALTH,                   )
      Defendants.        )

## PLAINTIFF'S REPLY MEMORANDUM TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEY'S FEES

Introduction

Plaintiff Misty Blanchette Porter, M.D. ("Dr. Porter") filed a motion that seeks an award

of attorney's fees in the amount of $1,712,690.50.[1] This amount reflects the number of hours

reasonably spent by the lawyers and paralegals who worked on her case in the almost eight years

it has been pending, multiplied by their normal and customary hourly rates. In preparing a reply

to Defendants' Opposition to Plaintiff's Motion for Attorneys' Fees, Plaintiff checked the

addition of the multiple invoices of the lawyers who have worked on the case. The correct

lodestar amount is $1,738,341.50. We apologize for the oversight.

Defendants oppose the motion. They describe the amount sought in attorney's fees as

"astounding;" they claim that Dr. Porter was "overwhelmingly unsuccessful" having received

"only a limited damages award;" and they add: "[S]he was awarded only $1,125 million in

---

[1] This was the amount of fees incurred as of the date Dr. Porter filed the motion, As stated in the motion, Dr. Porter will submit a supplemental accounting to cover fees incurred during post-trial matters.

damages." This is an unusual description of a verdict in an employment case brought on behalf of one person. Dr. Porter believes, based on an admittedly informal survey, that this is among the largest verdicts in Vermont for an individual employment case. It is difficult to imagine a Vermont employment lawyer using the language "limited" or "awarded only" when describing a verdict that exceeds $1 million. Despite Defendants' attempts to minimize the award, the truth is that Dr. Porter won an extraordinary verdict and is the prevailing party in this litigation.

Vermont courts and the Second Circuit have held that the lodestar, the product of reasonable hourly rates and the reasonable number of hours required by the complexity of the case, creates a "presumptively reasonable fee." *Millea v. Metro-North R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011); *Human Rts. Comm'n v. LaBrie, Inc.*, 164 Vt. 237, 250 (1995) (noting lodestar represents a "strong presumption"). This is a complex case that included more than three years of intensively contested litigation before the District Court, an appeal to the Second Circuit, and a jury trial that lasted almost three weeks. There have been few, if any, employment cases in this court of similar complexity.

Defendants have multiple objections to plaintiff's fee request including assertions that fees incurred before addition of the successful claim are not recoverable, excessive depositions, overstaffing, redundancy due to attorney substitution immediately before trial, and Plaintiff's "limited jury award" requires a substantial attorney's fee reduction. Dr. Porter will respond to each objection in turn, but before doing that, we turn to the lodestar and ask whether $1.7 million is a reasonable attorney's fee for the work done by lawyers and paralegals over more than seven years.

One measure of the reasonableness of the number of hours and hourly rates sought by Dr. Porter is what Defendants' lawyers charged. If Defendants insist on criticizing Dr. Porter's fees

2

as "astounding," it is reasonable to ask what Defendants' attorneys' fees and expenses have been. It is likely that Defendants' fees greatly exceed the fees Plaintiff now seeks to recover. Accordingly, if Defendants proceed with their challenge to the amount of fees Plaintiff seeks, then they should be required to produce information on the fees they have paid.

The court in *Frommert v. Conkright*, No. 00-CV-6311L, 2016 WL 6093998, *1 (W.D.N.Y. Oct. 19, 2016), faced a situation not unlike this case in ruling on a fee application. The case involved an award of attorney's fees pursuant to ERISA's fee-shifting statute. Defendant challenged "virtually every aspect of plaintiff's application for fees." Defendant was represented by two major law firms. The case involved appeals to the Second Circuit and an appeal to the Supreme Court. The case was vigorously contested ("to say that this case has been hard-fought would be an understatement") and it was "complex." *Id.* at *2. In ruling on the request for defendants' fee information, the Court held:

> Whatever might be the case in another action, because of the unique and long history of this case, I believe that the rates and fees charged and paid by defendants to their several law firms are clearly relevant and would be helpful to this Court in determining the amount of fees that should be awarded to plaintiff's counsel. Again, the Court is not suggesting that there must be a dollar-for-dollar equivalence, but the information would be relevant.

*Id.* at *3.

Two major law firms represented Defendants throughout the case. They are unsparing in their criticism of plaintiffs' "flagrant overstaffing," "redundancy," "excessive billing" and the like. One measure of the accuracy of these charges is what the two firms billed Defendants throughout the case including trial. The information is not privileged and, as the *Frommert* court noted, "is clearly relevant." *Id.* at *3

3

A-1536

Defendants rely upon *Anderson v. Sebelius*, No. 5:09-cv-16, 2011 WL 1832771, *4 (D. Vt. May 12, 2011), to argue that plaintiff is not entitled to recover any fees before she added the Fair Employment Practices Act ("FEPA") claim in her Amended Complaint on August 1, 2018. The case provides no support for that argument. When Dr. Porter amended her complaint on August 1, 2018, her existing complaint in Count 3 included allegations of disability discrimination under the Americans with Disabilities Act and New Hampshire law. The Amended Complaint in Count 6 included the FEPA allegations, but it also retained in Count 3 the existing disability allegations. The substance of the disability discrimination allegations did not change in the Amended Complaint. All of the work that her lawyers had done before filing the Amended Complaint was useful, indeed necessary, in order for Dr. Porter to pursue her claim under FEPA.

Defendants' examples of what it claims are Plaintiff's excessive or unreasonable billing include:

Excessive Depositions

Plaintiff is faulted for taking eleven depositions when Defendants only took two. Of course Plaintiff took substantially more depositions. As the plaintiff, Dr. Porter bore the burden of proof and thus must make an evidentiary record. In addition, most of the witnesses are Dartmouth Health employees and could not be informally interviewed (indeed, Defendants vigorously asserted that ex parte communications with staff were improper). The only way Plaintiff could obtain necessary information known by the witnesses was to notice multiple depositions. Lawyers representing Defendants, by contrast, could obtain information by meeting with anyone on the staff or requesting information through a phone call or email.

4

Notably, shortly after the case began, Plaintiff filed a motion seeking permission to contact Dartmouth Health employees ex parte pursuant to VRPC 4.2. Defendants filed a 15-page memorandum in response opposing the motion. Although the Court entered an order that resolved the motion, Plaintiff avoided contacting Defendants' staff. Depositions were essential to learn about how management reached the decision to terminate Dr. Porter's employment.

On the topic of depositions and the transcript costs, Plaintiff included the transcript costs in the original Bill of Costs. These deposition transcript costs were included in the $475,096 that was paid by Dr. Porter. Her motion for Award of Attorney's Fees seeks reimbursement of this amount. An itemized chart and the invoices are attached as Exhibit A.

Overstaffing Depositions and Trial

Defendants allege that every single deposition included "at least two partners present." This charge is both inaccurate and misleading. It is inaccurate because Katie Kramer was a contract employee charging $175 an hour, not a partner. As described in earlier pleadings, Ms. Kramer had a law degree from Stanford, clerkships for two federal judges including Judge Reiss, work at a major New York firm, and then time at the Langrock firm. She had spent time away from the practice of law and gradually returned to practice by working on this case. At $175 an hour, she was a bargain.

The charge is misleading because it is easier to defend a deposition than to take one. Having a second lawyer present is helpful especially when there has been an extensive document production and the subject matter is complicated. Both conditions existed in this case.

Defendants' complaints about trial staffing is puzzling. There was certainly nothing in the makeup of the trial team that can fairly be called "flagrant overstaffing." When Katie Kramer had to withdraw as counsel, Dr. Porter needed help from another lawyer. Eric Jones had

5

wide experience in handling employment cases, and his firm was prepared to take the case on a straight contingency basis. Defendants refer to "zero associates" which they say is a "clear sign of inefficiency." No—it is a sign that there are no associates at the firm. The two Vitt & Nunan lawyers present at trial—both experienced—are partners. Defendants' law firms appear to have hundreds of associates to choose from, but that is not the case with the Plaintiffs' firms. Additionally, Defendants are silent about the four lawyers and paralegal who were there every day at trial on their side of the courtroom. Defendants had five timekeepers every day; Plaintiff had three.

Opening Statement Time Duplicative and Unjustifiably High

At the time that counsel began to prepare for trial, it had been many months since they had worked on the case. There were hundreds upon hundreds of documents to review and thousands of page of depositions to read, and then witnesses to contact about possible trial testimony. Much of the time described as "opening statement" work reflected time devoted to getting back up to speed on the case. Moreover, an opening statement is essentially a high-level outline of a case. It is useful to prepare an early draft and develop it as a trial team prepares a case for trial. In this sense, work on an opening statement is also fundamentally work analyzing the strategy and structure for a case presentation (as opposed to being simply an outline for a thirty-minute statement).

Hours on Initial Disclosures and Initial Discovery Requests Were Excessive

Plaintiffs disagree that the hours were excessive. The hours spent on these tasks were reasonable given the number of issues in the case and the uncertainty about what caused the decision to close the REI Division and to terminate Dr. Porter's employment.

6

Jury Award and Amount of Attorney's Fees Sought by Plaintiff

Defendants assert that the Court should make a "substantial downward adjustment" in its award of attorney's fees. It includes a series of numbers, e.g., the jury found in plaintiff's favor "on 7.14% of the questions on the Verdict Form," and, from those numbers, concludes that the Court should apply a downward reduction of "no less than 83.3% (5/6) and as much as 92.86% (13/14)." (Doc. 309 at 10.)

Defendants rely heavily on *Hensley v. Eckerhart*, 461 U.S. 424 (1983), in support of their argument for the substantial fee reduction. Plaintiff agrees that *Hensley* is a good starting point in evaluating what would be an appropriate, fair award of attorney's fees.

*Hensley* directs that the "most critical factor is degree of success obtained." *Id.* at 436. The jury awarded $1 million in economic losses and $125,000 in emotional distress damages. There is no reason to believe that the verdict would have changed in the slightest if the jury had also found for Dr. Porter on the whistleblower claims. The jury had not been instructed to apply a different standard or method of damages analysis if they found in favor of Dr. Porter on the whistleblower claims. The likelihood of a punitive damages award might have increased by reason of a favorable jury verdict on the whistleblower claim, but there is certainly no support for the proposition that an attorney's fee award should be reduced because a plaintiff did not succeed in getting a verdict for punitive damages.

*Hensley* effectively describes Dr. Porter's case:

> In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis.

7

A-1540

*Id.* at 461 U.S. at 435. There was a lot going on within Dartmouth Health that led directly to the decision to terminate Dr. Porter's employment. Her lawyers devoted their time to "the litigation as a whole." Defendants suggest that Dr. Porter lost on a completely separate claim, such as a HIPPA violation, and because that discrete claim was lost, the attorney's fees for that work should be denied. There was no such discrete claim and there should be no attorney's fee reduction.

And finally, from *Hensley*: "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensable fee. Normally this will encompass all hours reasonably expended on the litigation..." *Id.* Dr. Porter and Defendants have a fundamental disagreement—she believes an award of over $1 million is exceptional or, to use the *Hensley* language, an "excellent result[]"—Dartmouth Health asserts that the award is barely a peppercorn.

Plaintiff Is Entitled to Pre-Judgment Interest on Attorney's Fees Already Paid

Plaintiff sought pre-judgment interest on the jury's award of $1,000,000 in economic damages. Vermont law recognizes that a plaintiff is not fully compensated unless she can recover the interest on her economic loss. *Brennan-Centrella v. Ritz-Craft Corp. of Pennsylvania,* 942 F.3d 106, 110-11 (2d Cir. 2019).

Plaintiff's Motion for Attorney's Fees seeks prejudgment interest on the attorney's fees that Dr. Porter has already paid. As reflected in the Vitt Declaration attached to that Motion, through August 2020, Dr. Porter paid $475,096.06 in attorney's fees. The dates of the payments are reflected in Exhibit A to the Motion.

Plaintiff seeks $1,738,341.50 as the lodestar amount. Defendants insist that this amount be reduced by "at least 83.3% and as much as 92.86%." Plaintiff has obtained an "excellent

8

A-1541

result" in this case with the $1,125,000 verdict and, accordingly, she should receive "a fully compensable fee." *Hensley,* at 461 U.S. at 438. If the Court agrees, the fee award should include 12% interest on the $475,096.06 paid by Dr. Porter.

Dated: June 5, 2025

/s/ Geoffrey J. Vitt
Geoffrey J. Vitt, Esq.
Vitt & Nunan, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittnunanlaw.com

Eric D. Jones, Esq.
Langrock Sperry & Wool, LLP
210 College Street
P.O. Box 721
Burlington, VT 05402
(802) 864-0217
ejones@langrock.com

Sarah H. Nunan, Esq.
Vitt & Nunan PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055
(802) 649-5700
snunan@vittnunanlaw.com

***Attorneys for Plaintiff,***
***Misty Blanchette Porter, M.D.***

9

| Date | Cost Item | Clerk | Service | Transcripts | Printing | Witness | Copies | Docket | Ct Appt |
|---|---|---|---|---|---|---|---|---|---|
| 10/15/2018 | Seacoast Transcription | | | $174.25 | | | | | |
| 6/11/2019 | Verbatim Reporter | | | $274.75 | | | | | |
| 7/17/2019 | North Country Court Reporters | | | $1,010.95 | | | | | |
| 7/24/2019 | Verbatim Reporters | | | $625.35 | | | | | |
| 7/25/2019 | North Country Reporters | | | $754.75 | | | | | |
| 7/30/2019 | Verbatim Reporters | | | $1,181.40 | | | | | |
| 8/2/2019 | Verbatim Reporters | | | $923.75 | | | | | |
| 8/8/2019 | North Country Court Reporters | | | $805.65 | | | | | |
| 8/26/2019 | O'Brien Reporting Service | | | $597.15 | | | | | |
| 8/27/2019 | Verbatim Reporters | | | $548.80 | | | | | |
| 9/18/2019 | North Country Court Reporters | | | $546.85 | | | | | |
| 9/25/2019 | North Country Court Reporters | | | $1,192.65 | | | | | |
| 10/23/2019 | North Country Court Reporters | | | $925.05 | | | | | |
| 12/21/2019 | North Country Court Reporter | | | $917.55 | | | | | |
| | Totals by Category | $0.00 | $0.00 | $10,478.90 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |

Case: 25-1382, 03/19/2026, DktEntry: 65.1, Page 108 of 285

A-1542



**Verbatim Reporters**

PO Box 142, Saxtons River VT 05154

| | |
|---|---|
| Invoice Number | 51598 |
| Invoice Date | 6/13/2019 |

Misty Blanchette Porter, MD vs. Dartmouth-
Hitchcock Medical Center, et al. Case No.
5:17-cv-194

KBK Law
Katherine Burghardt Kramer
6 Mill Street
PO Box 23
Middlebury VT 05753

Witness: Misty Blanchette Porter, MD

Deposition Date: 6/11/2019

| Item | Quantity | Rate | Item Total |
|---|---|---|---|
| Transcript Copy (per page) | 157 | $1.75 | $274.75 |
| | | Postage: | |

Make Checks Payable To:

Verbatim Reporters
PO Box 142
Saxtons River VT 05154

EIN: 20-4302195

| | | |
|---|---|---|
| Invoice Total: | | $274.75 |
| Due Date: | | 7/13/2019 |

A-1544

**Cynthia Foster d/b/a North Country Court Reporters**
P.O. Box 1250
New London, NH  03257 AF
(603) 443-1157
northcountrycr@gmail.com

# Invoice

**BILL TO**
Geoffrey Judd Vitt Esquire
Vitt & Associates, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT  05055

**INVOICE #** 11815
**DATE** 07/26/2019
**DUE DATE** 08/25/2019
**TERMS** Net 30

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Attendance Fee**<br>7-17-19 at your office in Norwich, Vermont | 1 | 150.00 | 150.00 |
| **Original and one copy - VT - 25 lines**<br>Elizabeth C. Todd, APRN | 168 | 3.95 | 663.60 |
| **Exhibits scanned** | 5 | 0.40 | 2.00 |
| **Postage And Delivery**<br>Original mailed to Ms. Joseph for signature of deponent | 1 | 8.30 | 8.30 |
| **Copy of deposition**<br>Misty Blanchette Porter, MD, Volume II, taken on 7-18-19 at DRM, Lebanon, New Hampshire | 109 | 1.65 | 179.85 |
| **Exhibits scanned** | 18 | 0.40 | 7.20 |
| Misty Blanchette Porter, M.D., v. Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health | | | |

BALANCE DUE                **$1,010.95**



PO Box 142, Saxtons River VT 05154

| | |
|---|---|
| Invoice Number | 51617 |
| Invoice Date | 8/1/2019 |

KBK Law
Katherine Burghardt Kramer
6 Mill Street
PO Box 23
Middlebury VT 05753

Misty Blanchette Porter, MD vs. Dartmouth-Hitchcock Medical Center, et al. Case No. 5:17-cv-194

Witness: Karen Boedtker

Deposition Date: 7/24/2019

| Item | Quantity | Rate | Item Total |
|---|---|---|---|
| Transcript Copy (per page) | 118 | $1.75 | $206.50 |
| Scanned Exhibit | 77 | $0.25 | $19.25 |
| | | Postage: | |

Make Checks Payable To:

Verbatim Reporters
PO Box 142
Saxtons River VT 05154

EIN: 20-4302195

| | |
|---|---|
| Invoice Total: | $225.75 |
| Due Date: | 8/31/2019 |

Verbatim Reporters    •    Phone: (802) 869-1665    •    Fax: (802) 869-1557    •    Email: verbatim@vermontel.net

A-1546

# Verbatim Reporters

| Invoice Number | 51620 |
|---|---|
| Invoice Date | 8/8/2019 |

PO Box 142, Saxtons River VT 05154

KBK Law
Katherine Burghardt Kramer
6 Mill Street
PO Box 23
Middlebury VT 05753

Misty Blanchette Porter, MD v. Dartmouth-Hitchcock Medical Center, et al.
Case No. 5:17-cv-194

Witness: Edward J. Merrens, MD

Deposition Date: 7/30/2019

| Item | Quantity | Rate | Item Total |
|---|---|---|---|
| Transcript Copy (per page) *etrans* | 242 | $1.75 | $423.50 |
| Scanned Exhibit | 70 | $0.25 | $17.50 |
| | | Postage: | |
| | | Invoice Total: | $441.00 |
| | | Due Date: | 9/7/2019 |

Make Checks Payable To:

Verbatim Reporters
PO Box 142
Saxtons River VT 05154

EIN: 20-4302195

Verbatim Reporters    •    Phone: (802) 869-1665    •    Fax: (802) 869-1557    •    Email: verbatim@vermontel.net

A-1547

**Cynthia Foster d/b/a North Country Court
Reporters**
P.O. Box 1250
New London, NH  03257 AF
(603) 443-1157
northcountrycr@gmail.com

# Invoice

**BILL TO**
Geoffrey Judd Vitt Esquire
Vitt & Associates, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT  05055

**INVOICE #** 11824
**DATE** 08/09/2019
**DUE DATE** 09/08/2019
**TERMS** Net 30

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Attendance Fee**<br>7-25-19 at your office in Norwich, Vermont | 1 | 150.00 | 150.00 |
| **Original and one copy - VT - 25 lines**<br>Daniel Herrick | 145 | 3.95 | 572.75 |
| **Exhibits scanned** | 80 | 0.40 | 32.00 |
| Original deposition delivered in hand to Atty.<br>Joseph on 8-8-19 | | | |
| Misty Blanchette Porter, M.D., v. Dartmouth-<br>Hitchcock Medical Center, Dartmouth-<br>Hitchcock Clinic, Mary Hitchcock Memorial<br>Hospital, and Dartmouth-Hitchcock Health | | | |

BALANCE DUE     **$754.75**



PO Box 142, Saxtons River VT 05154

| Invoice Number | 51623 |
|---|---|
| Invoice Date | 8/14/2019 |

Misty Blanchette Porter, MD v. Dartmouth-
Hitchcock Medical Center, et al.
Case No. 5:17-cv-194

KBK Law
Katherine Burghardt Kramer
6 Mill Street
PO Box 23
Middlebury VT 05753

Witness: Heather Gunnell

Deposition Date: 8/2/2019

| Item | Quantity | Rate | Item Total |
|---|---|---|---|
| Transcript Copy (per page) | 195 | $1.75 | $341.25 |
| Scanned Exhibit | 22 | $0.25 | $5.50 |
| | | Postage: | |
| | | Invoice Total: | $346.75 |
| | | Due Date: | 9/13/2019 |

Make Checks Payable To:

Verbatim Reporters
PO Box 142
Saxtons River VT 05154

EIN: 20-4302195

A-1549

**Cynthia Foster d/b/a North Country Court Reporters**
P.O. Box 1250
New London, NH  03257 AF
(603) 443-1157
northcountrycr@gmail.com

# INVOICE

**BILL TO**
Geoffrey Judd Vitt Esquire
Vitt & Associates, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT  05055

**INVOICE #** 11827
**DATE** 08/21/2019
**DUE DATE** 09/20/2019
**TERMS** Net 30

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Attendance Fee**<br>August 8, 2019, at your offices in Norwich, Vermont | 1 | 150.00 | 150.00 |
| **Original and one copy - VT - 25 lines**<br>Elizabeth Todd, MS, APRN, Volume II | 72 | 3.95 | 284.40 |
| **Original and one copy - VT - 25 lines**<br>Kimberly Fleury | 85 | 3.95 | 335.75 |
| **Exhibits scanned** | 68 | 0.40 | 27.20 |
| **Postage And Delivery**<br>Original depositions mailed to Atty. Joseph for signature of deponents | 1 | 8.30 | 8.30 |
| Misty Blanchette Porter, M.D., v. Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health | | | |

BALANCE DUE          **$805.65**

A-1550

**Cynthia Foster d/b/a North Country Court Reporters**
P.O. Box 1250
New London, NH  03257 AF
(603) 443-1157
northcountrycr@gmail.com

# INVOICE

**BILL TO**
Geoffrey Judd Vitt Esquire
Vitt & Associates, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT  05055

**INVOICE #** 11849
**DATE** 10/01/2019
**DUE DATE** 10/31/2019
**TERMS** Net 30

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Appearance Fee - half day**<br>September 18, 2019, at DHMC, Lebanon, New Hampshire, 1 - 4 p.m. | 1 | 105.00 | 105.00 |
| **Original and one copy - NH**<br>Joanne Conroy | 105 | 3.95 | 414.75 |
| **Exhibits scanned** | 47 | 0.40 | 18.80 |
| **Postage And Delivery**<br>Original transcrript mailed to your office | 1 | 8.30 | 8.30 |
| Misty Blanchette Porter, M.D., v. Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health | | | 0.00 |

BALANCE DUE     **$546.85**

A-1551

**Cynthia Foster d/b/a North Country Court Reporters**
P.O. Box 1250
New London, NH  03257 AF
(603) 443-1157
northcountrycr@gmail.com

# INVOICE

**BILL TO**
Geoffrey Judd Vitt Esquire
Vitt & Associates, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT  05055

**INVOICE #** 11853
**DATE** 10/08/2019
**DUE DATE** 11/07/2019
**TERMS** Net 30

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Attendance Fee**<br>September 25, 2019, at your offices in Norwich, Vermont, 9:30 to 6 p.m. | 1 | 150.00 | 150.00 |
| **Original and one copy - VT - 25 lines**<br>Maria Padin | 257 | 3.95 | 1,015.15 |
| **Exhibits scanned** | 48 | 0.40 | 19.20 |
| **Postage And Delivery**<br>Original deposition sent to your office | 1 | 8.30 | 8.30 |
| Misty Blanchette Porter, M.D., v. Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health | | | |

BALANCE DUE      **$1,192.65**

A-1552

**Cynthia Foster d/b/a North Country Court Reporters**
P.O. Box 1250
New London, NH  03257 AF
(603) 443-1157
northcountrycr@gmail.com

# INVOICE

**BILL TO**
Geoffrey Judd Vitt Esquire
Vitt & Associates, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT  05055

**INVOICE #** 11869
**DATE** 10/27/2019
**DUE DATE** 11/26/2019
**TERMS** Net 30

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Attendance Fee**<br>October 23, 2019, at your offices | 1 | 150.00 | 150.00 |
| **Original and one copy - VT - 25 lines**<br>Leslie DeMars | 175 | 3.95 | 691.25 |
| **Exhibits scanned** | 185 | 0.40 | 74.00 |
| **Postage And Delivery**<br>Original sent to Atty. Schroeder for signature<br>of the deponent | 1 | 9.80 | 9.80 |
| Misty Blanchette Porter, M.D., v. Dartmouth-<br>Hitchcock Medical Center, Dartmouth-<br>Hitchcock Clinic, Mary Hitchcock Memorial<br>Hospital, and Dartmouth-Hitchcock Health | | | |

BALANCE DUE          **$925.05**

A-1553

**Cynthia Foster d/b/a North Country Court Reporters**
P.O. Box 1250
New London, NH  03257 AF
+60 34431157
northcountrycr@gmail.com

# INVOICE

**BILL TO**
Geoffrey Judd Vitt Esquire
Vitt & Associates, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT  05055

**INVOICE #** 11920
**DATE** 12/21/2019
**DUE DATE** 01/20/2020
**TERMS** Net 30

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Attendance Fee** <br> 12-10-19 at your offices | 1 | 150.00 | 150.00 |
| **Original and one copy - VT - 25 lines** <br> Aimee Giglio | 178 | 4.00 | 712.00 |
| **Postage And Delivery** <br> Original sent to Mr. Schroeder for signature of the deponent | 1 | 8.75 | 8.75 |
| **Exhibits scanned** | 117 | 0.40 | 46.80 |
| Misty Blanchette Porter, M.D., v. Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health | | | |

BALANCE DUE **$917.55**

CHECK: 10974 597.15, Date: 10/21/2019




A-1555

A-1556

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,

       Plaintiff,

vs.

DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,

       Defendants.

Case No. 2:17-cv-194

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO ALTER OR AMEND THE JUDGMENT AND, IN THE ALTERNATIVE, FOR A NEW TRIAL ON PLAINTIFF'S VFEPA CLAIM

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Defendants" or "Dartmouth Health") respectfully submit this Reply Memorandum in support of Defendants' Motion to Alter or Amend the Judgment and, In the Alternative, for a New Trial on Plaintiff's VFEPA Claim (the "Motion" or "Mot.") (ECF No. 305).

1

A-1557

I.   **Plaintiff's Argument in Support of Motivating Factor Causation Misses the Mark Entirely.**

In Plaintiff Misty Blanchette Porter's ("Plaintiff" or "Dr. Porter") Opposition to the Motion (ECF No. 314) (the "Opposition" or "Opp."), Dr. Porter repeatedly asserts that a 1994 decision, issued twenty-five years before the precedent upon which the Motion is based, makes "clear" that VFEPA disability discrimination claims are decided under the motivating factor standard. Opp. at 1, 4 (citing *Gallipo v. City of Rutland*, 163 Vt. 83 (1994)). This position is disingenuous because that it is both non-responsive to Defendants' argument and plainly at odds with Dr. Porter's previous representations to the Second Circuit.

As an initial matter, Dartmouth Health does not contest that, prior to 2019, Vermont courts assessed certain VFEPA claims using the "motivating factor" standard. But Defendants' argument, set forth in clear terms over multiple pages of the Motion, is that the standard was altered by the Second Circuit's decision in *Natofsky v. City of New York*, 921 F.3d 337 (2d Cir. 2019). Therefore, case law predating *Natofsky* is irrelevant to the Court's analysis. *Cf.* Opp. at 1-2 (citing case law from 1994, 2001, 2014, and 1992).

Plaintiff's willful blindness to the legal framework surrounding this issue continues throughout her Opposition. To be sure, Dr. Porter goes on to claim that the parties are "not aware of any post-*Natofsky* disability discrimination cases to suggest that the Vermont courts intend or are likely to discontinue use of the motivating factor test[.]" Opp. at 2. On the very same page, however, she acknowledges a 2024 decision from the District of Vermont in which the Court identified "but for" causation as the appropriate standard. *Id.* at 2 (citing *Newton v. Kohl's, Inc.*, No. 5:21-CV-268, 2024 WL 4986303, at *4 (D. Vt. Nov. 12, 2024)).

But, Dr. Porter goes one step further, misstating the law when she asserts that Vermont courts are not bound to follow federal anti-discrimination laws. In *Payne v. U.S. Airways, Inc.*,

2

A-1558

2009 VT 90, 186 Vt. 458, 987 A.2d 944 (2009), which Plaintiff cites for the proposition that Vermont courts "depart from federal interpretations of Title VII when [construing Vermont] fair employment practices law", the Court was clear that its decision to go against federal precedent was because the issue before it was <u>not</u> a question of the applicable "standard or burden of proof[.]" *Payne*, 2009 VT 90, ¶ 10 (citing *Hodgdon v. Mt. Mansfield Co.*, 160 Vt. at 161, 624 A.2d at 1128 for the proposition that VFEPA's "standards and burdens of proof ... <u>are identical</u> to those under Title VII[.]") (emphasis added).    Here, the issue before the Court is indeed a question of the appropriate legal standard and requisite burden of proof.    Thus, the Court should follow federal precedent.

Realizing that her trial "win" – one theory within one out of six claims – is inextricably linked to the Court's causation instruction, Plaintiff also asserts that, because the Connecticut Court of Appeals found motivating factor causation applicable to its own anti-discrimination statute, the same result should apply here.    Opp. at 3-4 (citing *Wallace v. Caring Sols.*, LLC, 213 Conn. App. 605, 613, 278 A.3d 586, 595 (2022)).    The Opposition omits, however, that the specific question considered by the Connecticut Court is entirely distinct from the question at issue here.    Indeed, in *Wallace*, the Connecticut Court considered "<u>whether the 'because of'</u> <u>language</u> in the [Connecticut] statute requires a plaintiff to establish but-for causation[.]" *Wallace*, 213 Conn. App. at 613.    There, the relevant statute included "because of" language that was uniformly applied to all protected categories, including disability.    In contrast, here, the VFEPA's "because of" language is tied *only* to the categories protected by Title VII, and not to disability discrimination.    See below:

3

A-1559

| Connecticut<br><br>General Statutes § 46a-60 (b) (emphasis added) | "It shall be a discriminatory practice in violation of this section ... [f]or an employer… to refuse to hire or employ ... any individual ... **because of the individual's race, color, religious creed, age, sex, gender identity or expression, marital status, national origin, ancestry, present or past history of mental disability, intellectual disability, learning disability, physical disability**..." |
|---|---|
| Vermont<br><br>21 Vt. Stat. § 495(a)(1) (emphasis added) | "It shall be unlawful employment practice… [f]or any employer … to harass or discriminate against any individual **because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age *or against a* qualified individual with a disability**." |
| ADA<br><br>42 U.S.C. § 12112 | "No covered entity shall discriminate against a qualified individual on the basis of disability…." |

As the Connecticut Court explained: "There is no basis for us to conclude that our legislature intended one causation standard for claims based on race, color, religion, sex, or national origin and a more stringent standard for disability based claims." *Wallace,* 213 Conn. App. at 625. Here, the plain language of the VFEPA distinguishes between those categories protected by Title VII and the categories protected by the ADA. Accordingly, the result reached in *Wallace* has no impact on this Court's analysis.

## II.    Plaintiff's Arguments Against Certification Defy Logic and Contradict Her Earlier Representations to the Second Circuit.

Dr. Porter next moves on to arguing that certification to the Vermont Supreme Court is inappropriate "[b]ecause Vermont law is 'settled' on the standard to apply to VFEPA claims and because further clarification by the Vermont Supreme Court would not determine the outcome of this case[.]" Opp. at 5. This position is in direct conflict with her earlier position in this lawsuit, and she should be judicially estopped from asserting it here. *See* Porter Appeal Brief at 45, 49

4

A-1560

(acknowledging the absence of "any Vermont Supreme Court, published trial court order, or published administrative agency decision construing the impact of *Natcfsky* on state-law disability discrimination claims" and requesting certification to the Vermont Supreme Court).

Plaintiff attempts to distance herself from her previous position by arguing that "[c]ircumstances have changed and the impact on Dr. Porter would be significantly greater at present." Opp. at 5, n.4. She cites no authority for the proposition that, where the impact of a decision a party previously advocated for has changed from positive to negative, the party should be allowed to change their position to the other party's detriment. Nor could she, as the concept of judicial estoppel is designed to avoid *exactly that scenario. See Kennedy v. Basil,* 531 F. Supp. 3d 828, 837 (S.D.N.Y. 2021) (quoting *DeRosa v. Nat'l Envelope Corp.,* 595 F.3d 99, 103 (2d Cir. 2010)) ("The equitable doctrine of judicial estoppel provides that '[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position[.]'"). She submits that she only "offered the idea of certification" but "that was pre-trial and more than a few years ago." Opp. at 5, n. 4.

Even if Dr. Porter is not estopped from arguing that certification is inappropriate, her argument that this is a "settled" issue is illogical. She cites no authority post-dating her appellate brief that would impact her previous acknowledgment that this is, indeed, an unsettled question. As discussed *supra*, the only court that appears to have analyzed this question post-*Natcfsky* ruled in Defendants' favor. *See Newton,* 2024 WL 4986303, at *13. If Dr. Porter believes that the *Newton* decision renders this question "settled", then Defendants are happy to rely upon it and to accept an amended judgment or a new trial on that basis.

5

A-1561

Dr. Porter's argument that the Vermont Supreme Court's answer to this question does not control the outcome of the entire case is also a red herring. A question need not be dispositive of the *entirety* of a case to be suitable for certification. *See Brennan-Centrella v. Ritz-Craft Corp. of Pennsylvania*, 942 F.3d 106, 110-13 (2d Cir. 2019) (certifying question related to the availability of pre-judgment interest). In *Brennan-Centrella*, for example, the Second Circuit certified a question on the grounds that it was "[d]eterminative of the *[i]ssue*" before the Court. *Id.* at 113.

Finally, contrary to the Opposition's suggestion, both the United States Second Circuit Court of Appeals and the District of Vermont have an extensive history of certifying questions to the Vermont Supreme Court. *See, e.g., RSD Leasing, Inc. v. Navistar Int'l Corp.,* 81 F.4th 153, 168-70 (2d Cir. 2023) (certifying question related to statutory interpretation of the Vermont Consumer Protection Act ("VCPA"), after the District Court declined to do so, where there was "no clear basis to confidently predict" how the Vermont Supreme Court would rule); *Brennan-Centrella,* 942 F.3d at 113 (certifying question of statutory interpretation under the VCPA); *Hunt Const. Grp., Inc. v. Brennan Beer Gorman/Architects, P.C.,* 607 F.3d 10, 18 (2d Cir. 2010) (certifying open questions of Vermont law pertaining to the economic loss doctrine); *Doe v. Newbury Bible Church,* 445 F.3d 594, 596–97 (2d Cir. 2006) (certifying question related to interpretation of the Restatement of Agency); *Preseault v. City of Burlington, VT*, 412 F.3d 96, 102-03 (2d Cir. 2005) (certifying question of statutory interpretation). The Court should follow that precedent and certify this question such that Vermont's highest court can answer for itself this significant and unsettled question of state law.

### III.   Defendants' Related Objection to the Court's Instruction is Not Waived.

Dr. Porter's contention that Defendants waived their right to dispute the Court's jury instruction regarding the appropriate standard for "motivating factor" causation is likewise

6

**A-1562**

incorrect. "[N]o particular formality is required of [an] objection so long as it is clear that the trial judge was informed of possible errors in the charge and was given an opportunity to correct them." *Ashley v. City of New York*, 992 F.3d 128, 142 (2d Cir. 2021) (citation omitted). At the charge conference, Defendants made a broad objection to the causation standard articulated by the Court in connection with Dr. Porter's VFEPA claim. (ECF No. 295 at 51). As such, their objection is preserved in full.

But even if Defendants were required to, and did not, object to a specific subset of the overall causation standard, an appellate court would simply review this question for plain error as opposed to *de novo*. *See Ashley*, 992 F.3d at 142 ("Where the challenging party failed to object to the charge at trial, we review the jury instructions for plain error[.]"); *Rasanen v. Doe*, 723 F.3d 325, 331–32 (2d Cir. 2013) ("In general, we review challenges to jury instructions in civil cases *de novo*... If, however, the challenging party failed to object to the charge at trial, we review for plain error, that is if the error affects substantial rights.") (internal marks omitted).

Here, the instruction given to the jury stated exactly the opposite of an established rule of law. It is hard to imagine a stronger example of "plain error."[1] This error went to the very essence of the case for all the reasons set forth in the Motion. Mot. at 10-11. Defendants are entitled to a new trial or an amended judgment.

## IV.    A Partial Retrial is Appropriate.

Dr. Porter spends several pages of her Opposition arguing that a partial retrial is improper, citing exclusively to case law pre-dating 1932 by way of support. Opp. at 8-10. The outdated precedent offered by Plaintiff is unsurprising given that the Federal Rules of Civil Procedure were adopted in 1937. The Federal Rules state, unambiguously, that the Court may

---

[1] Tellingly, Dr. Porter's sole argument against this assignment of error is that it was waived. Opp. at 7-8.

7

"grant a new trial on all <u>or some</u> of the issues." Fed. R. Civ. P. 59(a)(1) (emphasis added). That each and every case cited by Dr. Porter predates adoption of the Federal Rules should tell the Court all it needs to know about the veracity (or lack thereof) of her position.

For nearly the last century, federal courts have exercised their authority to grant partial retrials in accordance with the procedure set forth in Rule 59. *See, e.g., Cammeby's Mgmt. Co., LLC v. Alliant Ins. Servs., Inc.,* 720 F. App'x 18, 23 (2d Cir. 2017) (summary order) (holding that lower court did not abuse its discretion in granting a partial retrial rather than a complete retrial); *Crane v. Consolidated Rail Corp.,* 731 F.2d 1042, 1050-52 (2d Cir. 1984) (finding error in district court's award of a new trial on both liability and damages, where there was no finding of error with respect to the jury's damages award); *Fibermark, Inc. v. Brownville Specialty Paper Products, Inc.,* 419 F.Supp.2d 225, 234-35 (N.D. N.Y. 2005) (ordering a retrial on anti-dilution claim but not on trademark infringement claim because "[a]lthough the evidence in support of each of these issues may be similar, they remain distinct legal issues"). In granting such motions, courts have recognized the impropriety of disregarding any material jury finding where, as here, the jury made specific findings with respect to each individual claim. "Where a jury has reached a verdict on one issue of fact, the Seventh Amendment does not compel a new trial of that issue even though another and separable issue must be tried again." *Cammeby's,* 720 F. App'x at 23 (quoting *Gasoline Prod. Co. v. Champlin Ref. Co.,* 283 U.S. 494, 499, 51 S.Ct. 513, 75 L.Ed. 1188 (1931)); *see also Crane,* 731 F.2d at 1050 ("[E]rror with respect to one issue will ordinarily not constitute reason to retry an issue that was separately determined"); *Fibermark,* 419 F. Supp. 2d. at 235 ("A new trial on the trademark infringement claim is unwarranted because it would result in disregarding a material jury finding").

8

A-1564

In further support of her abrogated argument, Plaintiff makes the speculative assertion that "it cannot be said with confidence that the jury did not 'compromise' when it decided in favor of Dr. Porter on FEPA and in favor of Defendants on other counts." Opp. at 10. There is absolutely nothing in the record to suggest that was the case. To be sure, it also "cannot be said with confidence" that the jury didn't, say, flip a coin to decide Plaintiff's VFEPA claim. To that end, the Court cannot engage in rank speculation about what happened in the jury room. *See Akermanis v. Sea-Land Service, Inc.,* 688 F.2d 898, 906 (2d Cir. 1982) ("Although it is possible that the jury's special verdicts encompassed some undisclosed compromise, absent obvious inconsistencies we will not presume that the jury's findings represent anything other than good faith responses to the questions presented[.]"). It must limit its analysis to the facts actually before it; namely, that the jury was expressly instructed that the only difference between Plaintiff's VFEPA claim and her other disability claims was the applicable causation standard, and that the jury found in Dr. Porter's favor on her VFEPA claim and in Dartmouth Health's favor on all other claims. Because the causation standard instruction was incorrect, Dartmouth Health is entitled to an amended judgment as a matter of law or, in the alternative, a new trial on this sole claim.

9

A-1565

Date: June 20, 2025

Respectfully submitted,

*/s/ Tristram J. Coffin*

**DOWNS RACHLIN MARTIN PLLC**

Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

**FOLEY & LARDNER LLP**

Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 20, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

*/s/ Morgan McDonald*
Morgan McDonald

10

A-1566

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

|  |  |
|---|---|
| MISTY BLANCHETTE PORTER, M.D.,<br><br>Plaintiff,<br><br>vs.<br><br>DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH,<br><br>Defendants. | Case No. 2:17-cv-194 |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL RELATED TO DAMAGES ISSUES

Plaintiff's Memorandum in Opposition to Defendants' Motion for a New Trial Related to Damages Issues (ECF No. 316) ("Opposition" or "Opp.") does not respond to the substance of Dartmouth Health's Motion for New Trial Related to Damages Issues (ECF No. 308) ("Motion"), namely that the repeated expert disclosures violated the discovery rules and unfairly impacted Dartmouth Health's defense, and that other issues with evidence and jury instructions undermined Dartmouth Health's ability to present its damages case. Rather, Plaintiff sets up the straw man (again) that these issues have already been decided and there is nothing to see here.

1

Dartmouth Health submits that the unwillingness to engage directly on the issues[1] speaks to the strength of Dartmouth Health's points, and the weakness of the Opposition.

A. Improper Admission of Expert Testimony

The plain fact of the matter is that Plaintiff's serial roll-outs of ad hoc, new information at her own time and choosing, amplified by making this evidence "expert" opinion from a well-paid mouthpiece, materially affected the ability of Dartmouth Health to present its defense. Speaking to the expert disclosure issues, which are intertwined with most of the issues in the current Motion, this was not in keeping with the expert disclosure and discovery rules, and the inability of Dartmouth Health to present its own economist in response to these last-minute changes on the heels of trial had a severe negative impact on the trial presentation.

Dr. Bancroft's repeated reports were not mere updates made necessary and predictable by the passage of time. They included multiple, significantly revised assumptions and added material factual information. For example, the March 2025 report added the "new" information that Dr. Porter had received a full professorship at UVM medical school almost two years earlier, which naturally triggered higher pay at UVMMC (and higher pay in a position at UVMMC meant that Dr. Porter suffered less damages from her position being eliminated at Dartmouth Health). Since this actually occurred in July 2023, it was hardly "new" information. Yet after the defense elicited it from Dr. Bancroft on cross-examination at an evidentiary hearing less than two weeks before trial, suddenly it resulted in a new report from Dr. Bancroft tailored to address this new, undisclosed fact.

Similarly, at the evidentiary hearing, defense counsel – not Plaintiff or Plaintiff's expert – revealed that Dr. Porter's prior year earnings figure was not used in the August 2024 expert

---

[1] "[R]ehash," "misleading and inaccurate", "tired", "unfounded", "absolutely no evidentiary value", "absurd" etc. See Opp. at 1-2.

A-1568

report. Because her earnings were quite high, again this showed that she had less damages from losing her Dartmouth Health position and working at UVMMC. Indeed, in many respects, she made more at UVMMC. These revelations, and the new report in March 2025 – five days before trial – that they precipitated, were not mere updates or new information provided at the first reasonable opportunity because a trial was upcoming. There was absolutely no showing of cause for these delays in disclosure. Flouting the rules at every turn, they were permitted by the Court without any legitimate excuse.

The March 19, 2025 report – five days before trial – changed the assumptions for how long Dr. Porter planned to work, and the amount of time she would work at UVMMC versus Dartmouth Health, both aimed at increasing her damages figure and bolstering deficiencies in her report. These were not just "routine updates" before trial. They were new, drastically different damages approaches and calculations. Against this backdrop, Plaintiff's reliance on case law to support revised expert testimony is, at a minimum, misplaced.

The purpose of the expert disclosure rule is to prevent unfair surprise at trial. This did not happen here. The problem was compounded because Dartmouth Health was denied its motion to have its own expert economist provide a rebuttal to the new opinions presented by Dr. Bancroft at this late juncture. Dartmouth Health could not predict that Plaintiff's expert would present a fundamentally different report – his fourth one –immediately before trial. Thus, Plaintiff was unfairly advantaged by the dropping of surprise, significantly revised reports with no basis for predictability and no showing of cause, while Dartmouth Health was not permitted a corresponding expert economist witness to rebut the new presentations. Dartmouth Health was left with eliciting from the Plaintiff's highly experienced expert witness whatever admissions that could be obtained. That sequence of events which unfairly titled the balance in Plaintiff's

3

favor on an important evidentiary issue– which was implicitly condoned by the Court – was naturally prejudicial to Dartmouth Health's interests.

B.   Limitations on Mitigation Admissions Elicited on Cross Examination

Further, the only remedy with which the Court left Dartmouth Health – eliciting evidence on cross examination – was improperly hampered when the Court would not permit admission of key statements from Plaintiff's expert elicited in cross examination for use in evidence or even as a demonstrative piece of evidence at closing.  When Dr. Bancroft performed the iPhone calculations showing that, when calculated with an equivalent work position at Dartmouth Health and UVMMC, Dr. Porter would have fully mitigated her damages by 2025 or 2026 (at the latest), it was a definite "moment" in the trial. In defense counsel's view, that evidence, presented in a simple handwritten chart from the stand, was critical because it undermined the complex, meandering, and evolving expert tables of Dr. Bancroft.  His protestations and asserted inability to answer direct questions on cross were non-sensical, and even further undermined his credibility.  The math was the math.  Even if others observing it disagreed with defense counsel's assessment, it was up to the jury to make that determination.

The handwritten entries or "chart" that Dr. Bancroft made on the stand should have been admitted as the admissions of the Plaintiff's agent, just as he was allowed to testify to so many facts based wholly on Plaintiff's hearsay statements to him.  Precluding this important cross-examination as substantive or even demonstrative evidence was doubly prejudicial to Dartmouth Health when it was not permitted to have its own expert testify in rebuttal to Dr. Bancroft. Respectfully, this evidence should have been admitted and Dartmouth Health permitted to use it in full in arguing its damages position to the jury.   The form did not matter.  The substance did.

C. The Court's Instruction on Mitigation Was Unfortunately Unclear

Dartmouth Health should be granted a new trial additionally because the Court's instruction on mitigation issues was unclear. The way the mitigation concept was formulated for the jury, it could be misunderstood that the jury needed to find that the Plaintiff failed to mitigate her damages before it could offset earnings between her "new" promotion at UVMMC and her similar position at Dartmouth Hitchcock. The formulation was unfortunately confusing. Nowhere in the instructions was it clearly stated that the jury should deduct from Dr. Porter's damages calculation the amount of her earnings at UVMMC. The lack of a clear statement on this left the jury unguided on this point, and was error.

D. The Court Improperly Limited the Use of Evidence on Plaintiff's Severance Agreement.

Finally, Plaintiff offers nothing in response to the two federal appeals court decisions – one of them from the Second Circuit – that support the premise that severance package offers can be admissible to prove the extent of mitigation of damages. The Court erred in limiting the full use of this admitted evidence at closing. Dartmouth Health, again, reiterates that under the Tripler and Cassino cases, this was not evidence of settlement of a claim precluded by Rule of Evidence 408. Rather, this was a termination agreement offered contemporaneously with Dr. Porter's termination. See Pierce v. F.R. Tripler & Co., 955 F.2d 820 (2d Cir. 1992); Cassino v. Reichhold Chemicals, Inc. 817 F.2d 1338 (9th Cir. 1987). It is relevant (as the Court found) because evidence that Dr. Porter chose to forego receiving nine months' salary ($228,000), when she had a new position that paid her essentially the same as the position that was eliminated at Dartmouth Health within days of her separation, plainly goes to whether she chose to mitigate her damages. It does not take a Ph.D. in economics to know that if Dr. Porter had received $228,000 in 2017 as a severance payment, at the same time she was essentially double-dipping

5

A-1571

for her position as an attending physician at UVMMC, her compensatory damages would be "different" (as Dr. Bancroft admitted).

Having $228,000 dropped into her compensation in addition to the amount paid by UVMMC and UVM Medical College would have made her losses from the change in jobs clearly less or non-existent. An expert economist called by Dartmouth Health would have been helpful in explaining that point. But barring that, there should have been no limitation placed on Dartmouth Health's counsel's use of this evidence at closing. It was highly probative, extensively undercut Plaintiff's damages claims from the very beginning of her separation, and was permissible based on the authority of two circuit cases, one of them from the Second Circuit. Plaintiffs have offered no authority or logical explanation for their claim that this evidence was wrongly admitted, other than calling it absurd. Dartmouth Health should have been permitted to argue the full implications of this evidence. It was for the jury to decide this issue of how the $228,000 severance package would have impacted Dr. Porter's damages, and Dartmouth Health should not have been limited on this point.

Equally troubling, and perhaps most important, the Court acknowledged that Plaintiff's counsel did not object to admission of the severance agreement or damning cross examination by Defendants' counsel. As a result, this evidence was "fair game" for closing arguments and should not have been limited by the Court.

E. Conclusion

Due to these material issues during trial, Dartmouth Health unfortunately was not able to make a full and fair presentation of its case on damages. It is therefore entitled to a new trial. There could perhaps be a way that the Court could keep the liability verdict in place and have an expedited trial just on the damages issues, but a new trial is warranted nonetheless.

A-1572

Date: June 20, 2025

Respectfully submitted,

/s/ Tristram J. Coffin

**DOWNS RACHLIN MARTIN PLLC**

Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com


**FOLEY & LARDNER LLP**

Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com


*Attorneys for Defendants*

7

A-1573

2:17-cv-00194-kjd   Document 325   Filed 06/20/25   Page 8 of 8

## CERTIFICATE OF SERVICE

I hereby certify that, on June 20, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

*/s/ Morgan McDonald*
Morgan McDonald

8

**A-1574**

## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | | |
|---|---|---|
| MISTY BLANCHETTE PORTER, M.D., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Docket No. 2:17-CV-194** |
| | ) | |
| DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, | ) | |
| Defendants. | ) | |

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF HER MOTION FOR ATTORNEYS' FEES

Plaintiff Misty Blanchette Porter ("Dr. Porter") submits this Supplemental Memorandum to show how the Second Circuit has interpreted and applied the Supreme Court's *Hensley* decision.

Dr. Porter filed a motion that seeks an award of attorney's fees in the amount of $1,738,341.50. (Doc. 300.) Defendants characterize this lodestar amount as "astounding." Defendants assert that the lodestar amount should be adjusted downward by no less than 83.3% or as much as 92.86% because Dr. Porter was "overwhelmingly unsuccessful" with a "limited damages award." (Doc. 309.) In arguing for a downward departure from the lodestar figure, Defendants bear the burden.

The parties agree that *Hensley v. Eckerhardt,* 461 U.S. 424 (1983), is the place to begin in evaluating whether there should be a downward adjustment in the lodestar. The Second Circuit in *Grant v. Martinez*, 973 F.2d 96, 101 (2d Cir. 1992), describes the "analytic framework"

mandated by *Hensley* in "determining whether a plaintiff's partial success requires a reduction in the lodestar." In step one, "the district court examines whether the plaintiff failed to succeed on any claims wholly unrelated to the claims on which the plaintiff succeeded." *Id.* Hours spent on these claims are excluded. At step two, "the district court determines whether there are any unsuccessful claims interrelated with the successful claims. If such unsuccessful claims exist, the court must determine whether plaintiff's level of success warrants a reduction in the fee award." *Id.* "If a plaintiff has obtained excellent results, however, the attorneys should be fully compensated." *Id.*

As in *Grant*, the claims made by Dr. Porter at trial are closely related and "based on a common core of facts," and thus step one of the *Hensley* framework does not support a reduction. *Id.* The jury's award of over $1 million is an excellent result, and there should not be any downward adjustment.

Dated: June 25, 2025

/s/ Geoffrey J. Vitt
Geoffrey J. Vitt, Esq.
Vitt & Nunan, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittnunanlaw.com

Eric D. Jones, Esq.
Langrock Sperry & Wool, LLP
210 College Street
P.O. Box 721
Burlington, VT 05402
(802) 864-0217
ejones@langrock.com

Sarah H. Nunan, Esq.
Vitt & Nunan PLC
8 Beaver Meadow Road

2

A-1576

P.O. Box 1229
Norwich, VT 05055
(802) 649−5700
snunan@vittnunanlaw.com

**_Attorneys for Plaintiff,_**
**_Misty Blanchette Porter, M.D._**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,       )    CIVIL ACTION NO.
            Plaintiff,               )    2:17-cv-194
                                     )
        v.                           )
                                     )
DARTMOUTH-HITCHCOCK MEDICAL CENTER,  )
*et al.*                             )
            Defendants.              )


POSTTRIAL MOTIONS
Tuesday, July 1, 2025
Burlington, Vermont


BEFORE:

    THE HONORABLE KEVIN J. DOYLE,
    Magistrate Judge


APPEARANCES:

GEOFFREY J. VITT, ESQ., and SARAH H. NUNAN, ESQ., Vitt & Nunan,
    PLC, 8 Beaver Meadow Road, P. O. Box 1229, Norwich, VT
    05055, Counsel for the Plaintiff

ERIC D. JONES, ESQ., Langrock, Sperry & Wool, LLP, 210 College
    Street, 4th Floor, Burlington, VT 05402-0721, Counsel for
    the Plaintiff

DONALD W. SCHROEDER, ESQ., MEGAN E. MARTINEZ, ESQ., and MORGAN
    McDONALD-RAMOS, ESQ., Foley & Lardner LLP, 111 Huntington
    Avenue, Suite 2500, Boston, MA 02199, Counsel for the
    Defendants


Johanna Massé, RMR, CRR
Transcriber
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

(Proceedings recorded by electronic sound recording, transcript
produced by transcription service.)

because of all those protected categories, including disability. So it's separate -- it is distinct.

So I understand the argument about uniform application of the law. I don't believe that *Hammond* stands for that, that you take the jump then that, well, it applies even to disability discrimination cases.

And if you look at all the persuasive authority at the Second Circuit and the *Newton v. Kohl's* case, whether it was -- I guess the argument from plaintiff's counsel was that it was *dicta*. The Court was clear, at least in that language, but-for causation for a FEPA claim for disability discrimination. So I think that, one, *Hammond* doesn't stand for the proposition that this has been a decided issue or that -- or that it actually is persuasive for the Court, and respectfully submit that the Court takes the leap that this is what Vermont would say.

We never asked for certification of this question at the Second Circuit. They did.

THE COURT: Right. Okay.

MR. SCHROEDER: And, yes, times may change and maybe they have a different -- difference of opinion now, but just because they don't want to doesn't make that a legitimate rebuttal, respectfully.

THE COURT: Okay. All right. It's an interesting question. It is.

All right. Let's move on to the motions pertaining to

damages issues. Defendants' motion. Mr. Schroeder, I wonder if I should take these motions out of order so I can give Mr. Jones the opportunity to jump up so that you can take a breather.

MR. SCHROEDER: Yeah. Don't worry. This is -- this is -- other than the prejudgment interest, Ms. McDonald and then plaintiff's counsel will have a chance. I'll do whatever you want. It does go in this -- I figured this was the order that you were probably picking.

THE COURT: Okay.

MR. SCHROEDER: Because obviously if you decide the first matter --

THE COURT: Right.

MR. SCHROEDER: -- a certain way, then the other things probably don't matter until later point.

Very quickly, Your Honor, and a number of these arguments obviously were made during trial, they were made during objections. Mr. Coffin is somewhere with his family, so I said, hey, we'll take this -- this up in his stead.

So a couple -- a couple bases. And if -- Your Honor, if you've got something you want me to address first --

THE COURT: No. Go ahead, please.

MR. SCHROEDER: I'll try to be very quick, because obviously I want to be mindful of time.

We have a couple of reasons why we would ask for a new

trial on the issue of damages. Number one, plaintiff failed to abide by her expert discovery and disclosure obligations, and the Court admitted this crucial and prejudicial testimony. You may recall, Your Honor, that discovery in this case ended December 2019. Dr. Bancroft issued entirely new report in August of 2024. We had a *Daubert*-like hearing, for lack of a better description, on March 12th, and the Court allowed cross-examination of Dr. Bancroft, which revealed two important facts that completely gutted his third report, because that was the one from August of 2024.

One, he never -- and he did it in August of 2024. He never referred to the fact that Dr. Porter was given a full-time appointment, professorship. Number two, didn't include anything about her earnings in 2022 and 2023. And the Court allowed basically a do-over at the last minute for plaintiff to -- even though they'd been cross-examined and everything had been decimated in terms of his underlying premises, and in fact his own new report demonstrates that -- because it went from 4.3 million to 1.787, but the Court allowed them to put that report in and have Dr. Bancroft talk about that report, in our estimation improperly. We didn't have a chance to actually put on a rebuttal expert.

Now, the Court may say, "Well, you didn't have an expert up front." You're right, we didn't have an expert in December of 2019 because we didn't think we would need one, and

that's -- that was our prerogative, but because the Court allowed the plaintiff to put in a fourth report -- this is a single-plaintiff discrimination case -- fourth report which completely -- it's not like it went from 4.3 million to, say, I don't know, 4.8 million, which you would expect in a plaintiff case where, time delay, many times the number goes up.  In this case it was dramatically different.

So not only was the *Daubert* hearing, *Daubert*-like hearing, effective- -- was used for the purpose that it exists, which is to determine whether or not this person is qualified to give an expert opinion, all of his opinions were gutted.

He then gets -- he pivots and puts a new report in on March 19th, five days before trial.  How is that not prejudicial to defendants in this case?  And you could submit, Your Honor, "Well, you didn't have an expert before."  Well, obviously we didn't have an expert back five years ago, nor did we think that the expert, despite the rules, would be allowed to amend their report so much so that we'd never have the opportunity to cross -- to depose him again and establish a record for purposes of cross-examination at trial, and so we'd submit that that is the first issue for which we believe that we should be entitled to a new trial.

The second one -- and this gets to the issue of -- of mitigation of damages, Your Honor, and our position was that when you get to the -- this goes to what the Court said in

terms of page 30 of the jury charge on April 8th, and it was -- the jury was told, "If you find that Dr. Porter failed to mitigate her damages, you must reduce your award," dot dot dot, and that was page 30, ECF No. 275.

And our position was, yes, failure to mitigate, affirmative defense, no question. But we should have been given the opportunity, and the instruction should have included language, and we objected to this, the -- a number of times, the fact that she actually did mitigate her damages, but you need to actually consider that in terms of deciding the award.

Now, we can talk about the severance issue subsequent- -- we'll get to that issue, but in terms of mitigating her damages, it was like -- it was the inverse of what defendants' position was, which was actually Dr. Porter did a good job of mitigating her damages. We only learned that because of the March 12th hearing, really. And we should have been able to establish that -- or that should have been an instruction to the jury so they can understand how mitigation of damages works so that if they -- we say failure to mitigate because that's an affirmative defense that an employer would always have, but we also wanted to establish that, assuming she did mitigate, you certainly can take that into account in determining her actual damages on the back end if you find a violation.

The third issue was the fact that the Court -- and this goes to the demonstrative exhibit issue, page -- Exhibit 3 to

our motion.  The Court improperly declined introduction of Dartmouth Health's demonstrative exhibit and limited argument at closing about crucial mitigation evidence.  Whether Dr. Bancroft disagreed with the underlying assumptions, that argument could be made by plaintiff's counsel in closing, but the fact that the Court originally said we could introduce the demonstrative evidence, just like they were allowed to in their closing, but the fact that we could and then it was rescinded, just in and of itself, that was -- we believe the first call was the right call, that in fact that was an admission. Whether -- whether there was color to it or not, he did the exercise, and it was on a piece of paper.  It was submitted as C19.

The Court initially ruled we could refer to it and show it as a demonstrative - it's not going back with the jury - but then flipped -- reversed course the next day or a few days later, and we believe that that was inappropriate, because there was a legitimate basis for putting it in.  It was admitted -- it was cross-examination of the plaintiff's expert, and we should have been able to refer to that at least as a demonstrative exhibit, just as the Court originally ruled.

The other issue and the final issue in terms of seeking a new trial is C13, the severance agreement.  And I went back to the transcript, and I know -- I was very mindful of the judge's ruling and instruction, and I wanted to be extremely careful

about what I said about the severance agreement, and the Court was very clear that there were certain areas that we were not allowed to go into on the severance agreement in terms of mitigation of damages at the closing.  However, Your Honor, what I submitted at the time, and certainly cross-examined Dr. Porter without objection, the document was admitted.  I should have had no restrictions whatsoever about what I said about the severance agreement.

THE COURT:  So it's interesting you raise the transcript.  I was going to raise it with you.  I wonder if we're talking about the same lines of the transcript.  Because I want to make sure I fully understand your argument on the severance agreement.  Are you -- are you arguing now that you should have been able to talk about basically mitigation in terms of, you know, reduction of damages based on the severance agreement?  So as I look at this, and I don't know if you have the transcript in front of you, but --

MR. SCHROEDER:  I did.

THE COURT:  -- page 16, Document 322:

"THE COURT."  I am saying that "the argument during closing is not going to be . . . making the point that if they should find damages, it's going to be reduced by the amount of the severance agreement?"  I don't know if you -- if you're following along.

MR. SCHROEDER:  Judge, I do -- if you just give me one

A-1585

second, Your Honor.

THE COURT:  Yes, of course.

MR. SCHROEDER:  Let me just refer to it.

THE COURT:  Yeah.

MR. SCHROEDER:  I've got, like, various transcripts.

THE COURT:  Yeah.

MR. SCHROEDER:  Which --

THE COURT:  It's Document 322, page 16, beginning around line --

MR. SCHROEDER:  What day was it, Your Honor?  I think it was the 7th?

THE COURT:  You know, I don't have the -- I have an excerpt.  The deputy clerk is telling me it was -- when was it?

COURTROOM DEPUTY:  Day 12.

THE COURT:  Day 12.

COURTROOM DEPUTY:  April 8th.

MR. SCHROEDER:  So that would be April 8th.

COURTROOM DEPUTY:  8th.

MR. SCHROEDER:  Just give me one second, Your Honor.

THE COURT:  Yes.

MR. SCHROEDER:  I -- I did -- I did review it this morning.

Do you have it right there?

Just give me one second.  Page 16?

THE COURT:  Yes.  Page 16, line 16.

MR. SCHROEDER:  Yes.

THE COURT:  See where it says "THE COURT:  Okay, but the argument during closing is not going to be . . . to be making the point that if they should find damages, it's going to be reduced by the amount of the severance agreement?

"MR. SCHROEDER:  No, I have no intent of saying that, your Honor."

Next page.  Middle of the page.

"MR. SCHROEDER:  So I want to know that I have free reign *[sic]* to at least talk about the document, but not its import in terms of damages."

So that, in your view, is not acquiescing?  You're telling me that you're following the Court's order at that point?

MR. SCHROEDER:  I -- I actually was, Your Honor. You made -- I raised it because I wanted to know where the line was and whether I said, "Well, Your Honor, I object for the record and let's put this on the record," you made it very clear and I -- that that was a no-go zone, and so -- and that was your ruling, and -- and so I would submit that, one, I should have had the opportunity to discuss the severance agreement in any way I wanted to because it was an admitted exhibit and it was admitted into evidence, and so I should have had free rein to say whatever I wanted about it, specifically the number as well as any description to it.  But to the extent -- I wasn't going to violate the Court's instruction on

that, which is why I asked for real clarity on that, and you made it very clear where I could and could not go, but I raised it for that very reason.

THE COURT: Okay.

MR. SCHROEDER: And I submit that because it was an admitted exhibit with no objection, that it was open season to discuss it in any way I wanted to for -- for the jury's consideration in any way they might apply it, not even have to say mitigation. So I understood that you didn't want me to say anything about mitigation, but the import of your ruling was that I steered very clear and I did not want -- and the reason why I raised it is because I've seen this happen. We have a sidebar during closing arguments, right, and that's just -- I want to avoid that at all costs, and that was the reason for why I made that inquiry.

THE COURT: Okay. And with respect to your other arguments about the note, the demonstrative, everything else, I was fairly clear at trial in terms of what the ruling was on that, which is why I'm not kind of engaging with you right now.

MR. SCHROEDER: Understood.

THE COURT: You kind of know what my view was on that. I don't foresee myself changing my perspective on that, but I certainly understand your position on that. Okay?

MR. SCHROEDER: Thank you.

THE COURT: All right. Plaintiff.

MR. JONES:  I think I'll be pretty brief, Judge.  You know, on the -- on the Bancroft issue, there's nothing new in the motion that hasn't already been decided multiple times by Your Honor.  I think you got it right the first time you ruled, and they haven't given you a reason now to change that.

Just a couple of quick points on that.  They keep saying things like it was revealed at the *Daubert* hearing that Dr. Bancroft never mentioned or referenced the fact that Dr. Porter had received a promotion.  He testified on the stand in this room - I remember it - very clearly that while he did not know if she had received a promotion in that year, he was relying on actual wage data from her.  So it's the numbers and the salary that's being reported that matters, not the fact that she got a different salary because she got promoted.  Again, it's the same red herring being recycled.

You know, nothing was hidden.  Dr. Bancroft never changed the basic methodology of his analysis, as you have noted many times before, so I don't believe there's any grounds to that argument.

The mitigation instruction, we think the jury instruction accurately reflects the law and was not confusing at all.  As we noted -- quite frankly, I heard Mr. Schroeder, again, make the argument "I'm still confused by what their argument is."  I think they are confusing a lack of damages argument with a failure to mitigate, but the failure to mitigate was the

instruction you gave. It was accurate. It was appropriate. Not confusing.

Again, for the reasons we've already said, we don't think the handwritten notes prepared at Mr. Coffin's instructions under a protest by the witness was probative at all and was properly limited.

And then with regard to the severance agreement, we went over it at length that morning, so I don't think I have more to add than that, but it would have been unduly confusing and prejudicial to suggest that a plaintiff should be punished for not having accepted a severance agreement that would have included a release of all of her claims and prevented the trial at all from ever having happened, that that's somehow relevant to -- under the [unclear] analysis [unclear].

For all those reasons, we think the motion should be denied.

THE COURT: All right. Thank you.

Mr. Schroeder, anything in reply?

MR. SCHROEDER: Nothing, Your Honor.

THE COURT: Okay. All right. So now plaintiff's motion for prejudgment interest I believe is the last -- well, there's attorney's fees as well, but let's start with the prejudgment interest motion, plaintiff.

MR. JONES: I think I'll be just as brief.

THE COURT: So could I just ask you right out, so

C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the audio recording of proceedings in the above-entitled matter.

July 24, 2025

Johanna Masse
Digitally signed by Johanna Masse
Date: 2025.07.24 15:38:13 -04'00'

Johanna Massé, RMR, CRR

A-1591

**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

| | | |
|---|---|---|
| MISTY BLANCHETTE PORTER, M.D., | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Docket No. 2:17-CV-194 |
| DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S SECOND SUPPLEMENTAL MEMORANDUM**
**IN SUPPORT OF HER MOTION FOR ATTORNEY'S FEES**

Plaintiff, Misty Blanchette Porter, M.D ("Dr. Porter"). submits the following response to the Court's Order of July 7, 2025. In Section 1 of this Supplemental Memorandum, Dr. Porter provides a completed chart that reflects the total number of hours billed by each timekeeper, the dates the services were provided, and the hourly rates for each timekeeper at the time the services were provided.

Plaintiff's Motion for Attorney's Fees includes the attorney's fees incurred through May 8, 2025. Since that date, there has been an extensive motions practice that involved multiple briefs and an oral argument on July 1, 2025. In Section 2 of this Supplemental Memorandum, Dr. Porter provides information about the time devoted by each timekeeper, the dates of the services, and the hourly rates charged at the time. Dr. Porter requests a supplemental award of the attorney's fees incurred by her lawyers from May 8, 2025, through July 1, 2025.

1. Chart with Information Requested - July 7, 2025 Order

**A-1592**

Attached as Exhibit A is the Chart requested by the Court. It reflects the requested information for all of the attorneys and paralegals who have worked on this matter since its filing. For each timekeeper, we have included the various hourly rates, the hours billed, and the total amount billed.

2.  Supplemental Attorney's Fees

Exhibit B is a chart that reflects the fees for the four attorneys who have represented Dr. Porter since May 8, 2025. Three of the attorneys work at Vitt & Nunan and the fourth attorney, Eric Jones, is a partner at Langrock, Sperry & Wool, L.L.P.

Plaintiff has also included statements from Vitt & Nunan (Exhibit C) and Langrock, Sperry & Wool (Exhibit D) for the period May 8, 2025 – July 1, 2025.

Dated: July 11. 2025

/s/ Geoffrey J. Vitt
Geoffrey J. Vitt, Esq.
Vitt & Nunan, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittnunanlaw.com

Eric D. Jones, Esq.
Langrock Sperry & Wool, LLP
210 College Street
P.O. Box 721
Burlington, VT 05402
(802) 864-0217
ejones@langrock.com

Sarah H. Nunan, Esq.
Vitt & Nunan PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055
(802) 649–5700

A-1593

2:17-cv-00194-kjd    Document 330    Filed 07/11/25    Page 3 of 3

snunan@vittnunanlaw.com

*Attorneys for Plaintiff,*
*Misty Blanchette Porter, M.D.*

## Attorney and Paralegal
## Rates, Time, and Charges

Case: 25-1382, 03/19/2026, DktEntry: 65.1, Page 160 of 285

A-1594

| Timekeeper | Hourly Rate | Hours Billed | Total |
|---|---|---|---|
| Attorney Geoffrey Vitt | $320 (2017-2022) | 1240.5 | $396,960.00 |
| Attorney Geoffrey Vitt | $400 (2024) | 369 | $158,400.00 |
| Attorney Geoffrey Vitt | $400 (January 2025) | 122.90 | $49,160.00 |
| Attorney Geoffrey Vitt | $400 (February 2025) | 185.20 | $74,080.00 |
| Attorney Geoffrey Vitt | $400 (March 2025) | 280.20 | $112,080.00 |
| Attorney Geoffrey Vitt | $400 (April - May 2025) | 136.60 | $54,640.00 |
|  |  |  |  |
| Attorney Sarah Nunan | $150.00 (2020-2022) | 152 | $22,830.00 |
| Attorney Sarah Nunan | $250 (2024) | 66.4 | $16,600.00 |
| Attorney Sarah Nunan | $250 (January 2025) | 83.2 | $20,800.00 |
| Attorney Sarah Nunan | $250 (February 2025) | 168.7 | $42,175.00 |
| Attorney Sarah Nunan | $250 (March 2025) | 325.2 | $81,300.00 |
| Attorney Sarah Nunan | $250 (April - May 2025) | 117.3 | $29,325.00 |
|  |  |  |  |
| Attorney Sarah Merlo | $200-230 (2017-2020) | 419.7 | $85,011.58 |
| Attorney Sarah Merlo | $325 (2024) | 32.8 | $10,660.00 |
| Attorney Sarah Merlo | $325 (January 2025) | 44.3 | $14,397.50 |
| Attorney Sarah Merlo | $325 (February 2025) | 67.6 | $21,970.00 |
| Attorney Sarah Merlo | $325 (March 2025) | 79.1 | $25,707.50 |
| Attorney Sarah Merlo | $325 (April - May 2025) | 57.2 | $18,590.00 |
|  |  |  |  |
| Attorney Phillipa Lilienthal | $175.00 (2018-2019) | 1.7 | $340.00 |
| Attorney Katie Kramer - solo and at DGW Kramer, LLP | $175 (2018-2020) | 787.9 | $138,003.50 |
| Attorney Katie Kramer at DTO Law | $450 (2024) | 20.4 | $9,180.00 |
| Attroney Eric Jones | $375 (2024) | 36.1 | $13,537.50 |
| Attroney Eric Jones | $395 (2025) | 358 | $141,410.00 |
| Attroney Alison Bell | $415 | 9.6 | $3,984.00 |
| Attroney Bridget Grace | $225 | 2 | $450.00 |
| Attroney Wendy Radcliff | $250 | 0.25 | $62.50 |
| Paralegal Sherri Lehouiller | $155 | 38.3 | $5,936.50 |

Attorney and Paralegal
Rates, Time, and Charges

| Timekeeper | Hourly Rate | Hours Billed | Total |
| --- | --- | --- | --- |
| Paralegal Sarah Nunan | $80.00 (2017-2020) | 173.2 | $13,942.91 |
| Paralegal Julia Korkus | $100.00 (2017-2021) | 1269 | $126,850.00 |
| Paralegal Katherine Fenton | $50.00 (2017 & 2022) | 2.35 | $117.50 |
| Paralegal Shannon Edson | $50.00 (2018-2022) | 60.3 | $3,015.00 |
| Paralegal Paula Howes | $100.00 (2024) | 7.9 | $790.00 |
| Paralegal Robyn Sweet | $130.0 (2024) | 69.3 | $9,009.00 |
| Paralegal Christine Lyon | $130 (February 2025) | 33.1 | $4,303.00 |
| Paralegal Marianne McCann | $100 (February 2025) | 32 | $3,200.00 |
|  | $100 (March 2025) | 25.4 | $2,540.00 |
|  | $100  (April - May 2025) | 7.3 | $730.00 |
|  |  | 6882 | $1,712,087.99 |

Case: 25-1382, 03/19/2026, DktEntry: 65.1, Page 161 of 285

A-1595

**Attorneys' Time since May 8, 2025**

| Timekeeper | Hourly Rate | Hours Billed | Total |
|---|---|---|---|
| Attorney Geoffrey Vitt | $400 (May - June - July 2025) | 66.50 | $26,600.00 |
| Attorney Sarah Nunan | $250 (May - June - July 2025) | 44.7 | $11,175.00 |
| Attorney Sarah Merlo | $325 (May - June - July 2025) | 63.8 | $20,735.00 |
| Attorney Eric Jones | $395 (May - June - July 2025) | 30.2 | $11,929.00 |
| | | 205.20 | $70,439.00 |

**A-1597**

Ex. C



## Vitt & Nunan
LAW OFFICE

Invoice # 1409
Date: 07/10/2025

Misty Blanchette Porter
128 Mystic Drive
Norwich, VT 5055

### Porter-V/1001 Re. Employment matter

| Date | Attorney | Description | Quantity | Rate | Total |
|------|----------|-------------|----------|------|-------|
| 05/07/2025 | SM | Emails re: interest, costs, and fees | 1.80 | $325.00 | $585.00 |
| 05/07/2025 | SM | Research re attorney's fees | 1.00 | $325.00 | $325.00 |
| 05/08/2025 | GJV | Work on fee petition and team conference; edit motion and supporting documents | 1.80 | $400.00 | $720.00 |
| 05/08/2025 | SM | Emails with S. Nunan | 1.60 | $325.00 | $520.00 |
| 05/08/2025 | SM | Meeting with S. Nunan, E. Jones, and G. Vitt | 1.80 | $325.00 | $585.00 |
| 05/08/2025 | SM | Meeting with S. Nunan; finalizing and filing bill of costs | 2.70 | $325.00 | $877.50 |
| 05/08/2025 | SHN | Prepare and revise fee petition and supporting documents; conf. with S. Merlo; emails with S. Merlo; conf. with G. Vitt and E. Jones; prepare and file attorney fee petition | 11.20 | $250.00 | $2,800.00 |
| 05/12/2025 | GJV | Review motion of DH for new trial | 0.20 | $400.00 | $80.00 |
| 05/12/2025 | GJV | Emails to Dr. Porter and co-counsel re: motions filed by DH | 0.20 | $400.00 | $80.00 |
| 05/12/2025 | SM | Review court notice and G. Vitt email | 0.20 | $325.00 | $65.00 |
| 05/13/2025 | GJV | T/c S. Merlo re motions re attorney fees and new trial | 0.30 | $400.00 | $120.00 |
| 05/13/2025 | GJV | Review DH reply memorandum re: pre-judgment interest, review E. Jones email and t/c S. Merlo re: reply memo on prejudgment interest | 0.30 | $400.00 | $120.00 |
| 05/13/2025 | SM | Call with G. Vitt re: attorney's fees and new trial | 0.30 | $325.00 | $97.50 |
| 05/13/2025 | SM | Emails with E. Jones re: interest | 0.10 | $325.00 | $32.50 |
| 05/15/2025 | SM | Call with G. Vitt; emails with E. Jones and G. Vitt re: interest | 0.20 | $325.00 | $65.00 |
| 05/15/2025 | GJV | Review DH opposition to motion re: prejudgment interest and t/c S. Merlo re: reply memorandum | 0.80 | $400.00 | $320.00 |

| Date | Initials | Description | Hours | Rate | Amount |
|------|----------|-------------|-------|------|--------|
| 05/16/2025 | GJV | Review D-H opposition to plaintiffs' motion re: prejudgment interest on judgment; emails with team | 1.20 | $400.00 | $480.00 |
| 05/16/2025 | SM | Emails with E. Jones and G. Vitt re: reply memo | 0.10 | $325.00 | $32.50 |
| 05/17/2025 | SM | Review S. Nunan email re: transcripts | 0.10 | $325.00 | $32.50 |
| 05/17/2025 | SHN | Compiling documents needed for next steps; emailing S. Merlo | 0.60 | $250.00 | $150.00 |
| 05/18/2025 | GJV | Review D-H opposition to plaintiff's motion re: prejudgment interest and review authority in Vermont re: awarding prejudgment interest; prepare for 5/19 conf. call with E. Jones and S. Merlo | 0.90 | $400.00 | $360.00 |
| 05/19/2025 | GJV | Review DH reply memorandum re: pre-judgment interest and prepare memo on issues; t/c S. Merlo and E. Jones re: response to DH memorandum | 1.80 | $400.00 | $720.00 |
| 05/19/2025 | GJV | Review Dr. Porter email and prepare summary for Dr. Porter re: pending legal issues and advice | 0.40 | $400.00 | $160.00 |
| 05/19/2025 | SM | Conf. with E. Jones and G. Vitt re: reply memo | 0.60 | $325.00 | $195.00 |
| 05/19/2025 | SHN | Email exchange with S. Merlo | 0.10 | $250.00 | $25.00 |
| 05/19/2025 | SM | Emails with E. Jones, G. Vitt, and S. Nunan | 0.10 | $325.00 | $32.50 |
| 05/19/2025 | SM | Research re: meet & confer requirements; draft reply memo on prejudgment interest | 1.90 | $325.00 | $617.50 |
| 05/20/2025 | GJV | Review draft reply memorandum re: prejudgment interest; emails with E. Jones and S. Merlo; review motion filed by DH during trial re: interest | 0.60 | $400.00 | $240.00 |
| 05/20/2025 | GJV | Emails with S. Merlo and E. Jones re: comments on reply brief and review revised draft reply memorandum from S. Merlo and provide comments | 0.80 | $400.00 | $320.00 |
| 05/20/2025 | SM | Emails with G. Vitt and E. Jones re reply memo on interest | 0.80 | $325.00 | $260.00 |
| 05/20/2025 | SM | Research re: prejudgment interest | 0.60 | $325.00 | $195.00 |
| 05/21/2025 | GJV | T/c S. Merlo re: reply memorandum, transcript issue | 0.20 | $400.00 | $80.00 |
| 05/21/2025 | GJV | Review draft of reply memorandum and provide comments; t/c S. Merlo re motions | 0.60 | $400.00 | $240.00 |
| 05/21/2025 | SM | Calls with G. Vitt | 0.20 | $325.00 | $65.00 |
| 05/21/2025 | SM | Review court notices; emails with G. Vitt and E. Jones | 0.30 | $325.00 | $97.50 |
| 05/21/2025 | SM | Research re: motion for new trial | 0.30 | $325.00 | $97.50 |
| 05/22/2025 | GJV | Review D-H motion for new trial | 0.90 | $400.00 | $360.00 |
| 05/22/2025 | GJV | T/c S. Merlo | 0.20 | $400.00 | $80.00 |
| 05/22/2025 | SM | Review court notices; emails with E. Jones and G. Vitt | 0.20 | $325.00 | $65.00 |
| 05/22/2025 | SM | Research re: VFEPA | 0.30 | $325.00 | $97.50 |
| 05/22/2025 | SM | Call with G. Vitt re: VFEPA | 0.20 | $325.00 | $65.00 |
| 05/23/2025 | SHN | Conf. with G. Vitt re: responses due 6/5 | 0.30 | $250.00 | $75.00 |
| 05/23/2025 | GJV | Review D-H filing/motion and email Porter team | 0.30 | $400.00 | $120.00 |

| 05/23/2025 | GJV | Review Bill of Costs issues; t/c S. Nunan | 0.50 | $400.00 | $200.00 |
|---|---|---|---|---|---|
| 05/23/2025 | SM | Emails with E. Jones, G. Vitt, and S. Nunan | 0.20 | $325.00 | $65.00 |
| 05/24/2025 | SM | Research re: VFEPA and new trial motion | 6.60 | $325.00 | $2,145.00 |
| 05/25/2025 | GJV | Review costs issue for including Bill of Costs | 0.20 | $400.00 | $80.00 |
| 05/25/2025 | GJV | D-H motion re: Rule 59 | 0.30 | $400.00 | $120.00 |
| 05/25/2025 | SM | Research re: VFEPA and new trial | 2.40 | $325.00 | $780.00 |
| 05/26/2025 | GJV | Review DH motion to alter or amend the judgment, etc.; review cases | 1.70 | $400.00 | $680.00 |
| 05/27/2025 | SM | Conf. with G. Vitt, S. Nunan, and E. Jones re: post-trial motions | 0.90 | $325.00 | $292.50 |
| 05/27/2025 | GJV | Review defendants' motion to alter or amend judgment and several cases; t/c S. Merlo re: motion | 0.60 | $400.00 | $240.00 |
| 05/27/2025 | GJV | Conf. call Porter team re: pending motions, responses due, etc. and assign responsibility for drafting | 0.90 | $400.00 | $360.00 |
| 05/27/2025 | GJV | Research of attorney's fees including DH argument re: partial success | 1.40 | $400.00 | $560.00 |
| 05/27/2025 | GJV | Draft portion of reply memorandum on attorney's fees | 0.70 | $400.00 | $280.00 |
| 05/27/2025 | SM | Review court notices | 0.10 | $325.00 | $32.50 |
| 05/27/2025 | SM | Call with G. Vitt | 0.20 | $325.00 | $65.00 |
| 05/27/2025 | SHN | Review DH filing and prepare for meeting with team; review updated cost sheet; meeting with team; review draft on reply memorandum | 4.60 | $250.00 | $1,150.00 |
| 05/28/2025 | SM | Research re: VFEPA | 1.60 | $325.00 | $520.00 |
| 05/29/2025 | SM | Emails and call with G. Vitt re: fee research; review court notices | 0.70 | $325.00 | $227.50 |
| 05/29/2025 | SM | Research re: relevance of opposing counsel's fees and costs | 2.30 | $325.00 | $747.50 |
| 05/29/2025 | GJV | Research re: "partial success" and DH position that should be substantial reduction because of lack of success on whistleblower claims | 2.70 | $400.00 | $1,080.00 |
| 05/29/2025 | GJV | Review DH motion to set aside verdict and for new trial | 0.70 | $400.00 | $280.00 |
| 05/29/2025 | GJV | Review Bill of Costs objection | 0.20 | $400.00 | $80.00 |
| 05/29/2025 | GJV | Outline for reply memorandum on attorney's fees and review Declaration and calculation of hours | 0.90 | $400.00 | $360.00 |
| 05/30/2025 | SM | Research re: VFEPA and certification of questions of law | 1.80 | $325.00 | $585.00 |
| 05/30/2025 | GJV | Response to DH opposition on attorney's fees | 0.50 | $400.00 | $200.00 |
| 05/31/2025 | GJV | Review DH opposition to award of attorney's fees; research; outline response | 1.80 | $400.00 | $720.00 |
| 06/01/2025 | SM | Further research re: VFEPA and certification of questions of law | 2.40 | $325.00 | $780.00 |

**A-1600**

| 06/01/2025 | GJV | Reply memorandum and research re: attorney's fees | 1.40 | $400.00 | $560.00 |
|---|---|---|---|---|---|
| 06/01/2025 | SM | Review team emails | 0.10 | $325.00 | $32.50 |
| 06/02/2025 | GJV | Reply brief re: attorney's fees | 1.10 | $400.00 | $440.00 |
| 06/02/2025 | SM | Emails with S. Nunan re: transcripts; review court order | 0.20 | $325.00 | $65.00 |
| 06/03/2025 | GJV | Reply memorandum re: D-H opposition to award of attorney's fees | 2.80 | $400.00 | $1,120.00 |
| 06/03/2025 | GJV | Conf. call all counsel re: pending reply memos | 0.70 | $400.00 | $280.00 |
| 06/03/2025 | SM | Conf. with Porter attorney team | 0.70 | $325.00 | $227.50 |
| 06/03/2025 | SM | Review court notices | 0.10 | $325.00 | $32.50 |
| 06/03/2025 | SHN | Review Bill of Cost issues; meeting with team; emails with S. Merlo | 1.10 | $250.00 | $275.00 |
| 06/04/2025 | GJV | Review draft of reply brief from S. Merlo re: opposition to motion to set aside verdict/new trial; conf. call E. Jones and S. Merlo | 0.80 | $400.00 | $320.00 |
| 06/04/2025 | GJV | Draft reply to defendants' opposition to award of attorney's fees | 2.40 | $400.00 | $960.00 |
| 06/04/2025 | GJV | Review Bill of Costs and edit | 0.50 | $400.00 | $200.00 |
| 06/04/2025 | GJV | Review E. Jones drafts re: DH motions new trial on damages and opposition to plaintiff motion to amend judgment | 0.50 | $400.00 | $200.00 |
| 06/04/2025 | SM | Team emails re: draft responses; review court notices | 0.30 | $325.00 | $97.50 |
| 06/04/2025 | SM | Research; work on responses | 3.70 | $325.00 | $1,202.50 |
| 06/05/2025 | GJV | Reply briefs re: Attorney's Fees and review drafts of reply briefs from S. Merlo and E. Jones; file reply briefs with S. Nunan and revision of Bill of Costs | 4.30 | $400.00 | $1,720.00 |
| 06/05/2025 | SM | Call with G. Vitt | 0.10 | $325.00 | $32.50 |
| 06/05/2025 | SM | Work on opposition memos | 3.40 | $325.00 | $1,105.00 |
| 06/05/2025 | SM | Work on reply memo | 1.20 | $325.00 | $390.00 |
| 06/05/2025 | SM | Numerous emails with team re: finalizing responses; review court notices | 1.30 | $325.00 | $422.50 |
| 06/05/2025 | SHN | Conf. with G. Vitt; emails with team; review drafts; revise and finalize reply document; file with G. Vitt | 6.20 | $250.00 | $1,550.00 |
| 06/06/2025 | GJV | Emails among counsel and with court re: argument dates; email S. Nunan | 0.20 | $400.00 | $80.00 |
| 06/06/2025 | SM | Review hearing notice | 0.10 | $325.00 | $32.50 |
| 06/06/2025 | SHN | Emails with G. Vitt | 0.20 | $250.00 | $50.00 |
| 06/11/2025 | GJV | Outline for argument on Motion for Attorney's Fees | 0.60 | $400.00 | $240.00 |
| 06/11/2025 | SHN | Prepare for oral argument | 0.30 | $250.00 | $75.00 |
| 06/12/2025 | GJV | Review Hensley and related cases; review DH opposition re; attorney's fees | 0.70 | $400.00 | $280.00 |

A-1601

| Date | Initials | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 06/13/2025 | GJV | Outline for argument on Attorney's Fees issues; review Second Circuit authority | 0.40 | $400.00 | $160.00 |
| 06/16/2025 | SHN | Meeting with G. Vitt; legal research re: employment cases on full compensatory fees and excellent results | 1.70 | $250.00 | $425.00 |
| 06/16/2025 | GJV | Research and prepare for argument on motion for attorney's fees; conf. S. Nunan re: Second Circuit and district court cases in Second Circuit; review several Second Circuit cases and outline for argument | 2.10 | $400.00 | $840.00 |
| 06/17/2025 | SHN | Conf. with G. Vitt re mixed motives | 0.40 | $250.00 | $100.00 |
| 06/17/2025 | GJV | Conf. S. Nunan re: oral argument and D-H emails re: Dr. Porter termination which include disability and whistleblower; review court exhibits | 0.40 | $400.00 | $160.00 |
| 06/17/2025 | GJV | Review Second Circuit cases re: "unrelated claims" and send memorandum to S. Merlo re: employment cases dealing with unrelated claims | 1.20 | $400.00 | $480.00 |
| 06/17/2025 | SM | Review G. Vitt email | 0.20 | $325.00 | $65.00 |
| 06/18/2025 | GJV | Review evidence at trial re: related vs. unrelated claims and prepare for oral argument; email S. Merlo | 0.40 | $400.00 | $160.00 |
| 06/18/2025 | SM | Review court notices and G. Vitt email | 0.20 | $325.00 | $65.00 |
| 06/19/2025 | SHN | Conf. with G. Vitt re Exhibits; text E. Jones re prep session | 0.30 | $250.00 | $75.00 |
| 06/19/2025 | SHN | Review motions and prep for oral argument; follow up team communication | 0.30 | $250.00 | $75.00 |
| 06/19/2025 | GJV | Outline for argument on Motion for Attorney's fees | 0.60 | $400.00 | $240.00 |
| 06/20/2025 | GJV | Review DH memorandum in opposition to attorney's fees and prepare outline for reply | 1.20 | $400.00 | $480.00 |
| 06/20/2025 | SM | Review court notices | 0.10 | $325.00 | $32.50 |
| 06/20/2025 | GJV | Conf. with S. Nunan; attend team meeting to prepare for oral argument | 4.20 | $400.00 | $1,680.00 |
| 06/20/2025 | SHN | Conf. with G. Vitt working through issues for oral argument; meeting with team | 4.20 | $250.00 | $1,050.00 |
| 06/21/2025 | GJV | Several emails with Dr. Porter re: status of case and pending motions; timing | 0.30 | $400.00 | $120.00 |
| 06/22/2025 | GJV | Draft Supplemental Memorandum for court re: Second Circuit authority | 0.30 | $400.00 | $120.00 |
| 06/22/2025 | GJV | Conf. S. Nunan and email Dr. Porter re status | 0.30 | $400.00 | $120.00 |
| 06/22/2025 | SHN | Review new pleadings; conf. with G. Vitt; email team | 0.40 | $250.00 | $100.00 |
| 06/23/2025 | SM | Conf. with G. Vitt and S. Nunan re: new projects; emails with team | 0.50 | $325.00 | $162.50 |
| 06/23/2025 | SM | Review defendants' reply memo re: new trial on damages and provide comments; research re: duty to supplement | 4.20 | $325.00 | $1,365.00 |
| 06/23/2025 | GJV | Supplemental memorandum on Second Circuit authority | 0.50 | $400.00 | $200.00 |

2:17-cv-00194-kjd    Document 330-3    Filed 07/11/25    Page 6 of 7

| 06/23/2025 | GJV | Emails S. Merlo | 0.20 | $400.00 | $80.00 |
|---|---|---|---|---|---|
| 06/23/2025 | GJV | Edits to Supplemental memorandum | 0.20 | $400.00 | $80.00 |
| 06/23/2025 | GJV | Review DH reply memorandum re: damages and S. Merlo comments | 0.30 | $400.00 | $120.00 |
| 06/23/2025 | SHN | Review reply memo; review exhibits; conf. with team ; follow up with G. Vitt | 1.40 | $250.00 | $350.00 |
| 06/24/2025 | SM | Review defendants' Reply (VFEPA); research | 7.80 | $325.00 | $2,535.00 |
| 06/24/2025 | GJV | Outline and review issues re: oral argument on attorney's fees and review cases from S. Merlo re: motion for new trial/damages | 0.60 | $400.00 | $240.00 |
| 06/24/2025 | GJV | Supplemental memorandum edits and review proposed changes | 0.30 | $400.00 | $120.00 |
| 06/24/2025 | SM | Review G. Vitt email; email to E. Jones re: case research | 0.70 | $325.00 | $227.50 |
| 06/25/2025 | GJV | Review E. Jones email re: supplemental memorandum | 0.10 | $400.00 | $40.00 |
| 06/25/2025 | GJV | Review S. Merlo comments on defendants VFEPA reply memorandum | 0.20 | $400.00 | $80.00 |
| 06/25/2025 | SHN | Format and finalize documents for filing; email team; revisions per E. Jones and filed | 0.90 | $250.00 | $225.00 |
| 06/25/2025 | SM | Emails with team re: comments on draft motions and responses | 0.20 | $325.00 | $65.00 |
| 06/25/2025 | SM | Revisions to draft supplemental memo | 0.80 | $325.00 | $260.00 |
| 06/25/2025 | SM | Research on certification to VT Supreme Court | 0.60 | $325.00 | $195.00 |
| 06/26/2025 | SHN | Communication with E. Jones re oral argument; follow up email | 0.20 | $250.00 | $50.00 |
| 06/26/2025 | GJV | Review exhibits for oral argument and email D. Schroeder | 0.40 | $400.00 | $160.00 |
| 06/26/2025 | GJV | Prepare argument on motion for attorney's fees | 1.20 | $400.00 | $480.00 |
| 06/27/2025 | SHN | Meeting with G. Vitt; preparing for team meeting; communications with E. Jones; attended team meeting; reviewed and revised draft of G. Vitt for hearing | 3.80 | $250.00 | $950.00 |
| 06/27/2025 | SM | Compile cases for PJI argument; email to E. Jones re: same; Preparation meeting for July 1 hearing | 2.60 | $325.00 | $845.00 |
| 06/27/2025 | SM | Review court notice; email to E. Jones re: case law | 0.10 | $325.00 | $32.50 |
| 06/27/2025 | GJV | Review and revise outline for oral argument re; motions for attorney's fees and review of DH opposition; meeting with S. Nunan, S. Merlo and E. Jones to review draft | 3.10 | $400.00 | $1,240.00 |
| 06/28/2025 | GJV | Conf. S. Nunan and edit draft argument; review Second Circuit authority re: defendant required to provide information re: its attorney's fees; review elements of argument | 1.20 | $400.00 | $480.00 |
| 06/28/2025 | SHN | Meeting with G. Vitt re issues for oral argument | 1.20 | $250.00 | $300.00 |
| 06/29/2025 | GJV | Prepare for oral argument; conf. S. Nunan | 1.30 | $400.00 | $520.00 |

| 06/29/2025 | SHN | Meeting with G. Vitt re oral argument | 1.30 | $250.00 | $325.00 |
| 06/30/2025 | GJV | Prepare for oral argument re: attorney's fees | 0.90 | $400.00 | $360.00 |
| 07/01/2025 | GJV | Prepare for oral argument; travel to Burlington; court argument; conf. Dr. Porter; conf. E. Jones | 4.00 | $400.00 | $1,600.00 |
| 07/01/2025 | SHN | Travel to Burlington for hearing; meeting with team; attend hearing | 4.00 | $250.00 | $1,000.00 |
| | | | **Quantity Subtotal** | | **175.0** |

| Time Keeper | Quantity | Rate | Total |
|---|---|---|---|
| Sarah Merlo | 63.8 | $325.00 | $20,735.00 |
| Sarah Nunan | 44.7 | $250.00 | $11,175.00 |
| Geoffrey Vitt | 66.5 | $400.00 | $26,600.00 |
| | **Quantity Total** | | **175.0** |
| | | **Subtotal** | **$58,510.00** |
| | | **Total** | **$58,510.00** |

**A-1604**

Ex. D



# Langrock
## SPERRY & WOOL
www.langrock.com

Misty B. Porter
mbporter@me.com

         July 08, 2025
Client:      272397
Matter:    000001
Invoice #:   255671
Resp. Atty:    EDJ
Page:        1

RE: Claim against DHMC et al.

For Professional Services Rendered Through July 07, 2025      Federal Tax I.D. No.: 03-0283046

## SERVICES

| Date | Person | Description of Services | Hours | Amount |
|------|--------|-------------------------|-------|--------|
| 05/19/2025 | EDJ | Video conference with Geoffrey Vitt and Sarah Merlo regarding reply in support of request for interest; research record regarding prior litigation of interest issue; outline reply arguments; research in support of reply memorandum. | 1.40 | $553.00 |
| 05/20/2025 | EDJ | Review and analyze draft reply memorandum in support of prejudgment interest. | 0.80 | $316.00 |
| 05/21/2025 | EDJ | Review and revise updated draft reply memorandum regarding prejudgment interest. | 0.60 | $237.00 |
| 05/22/2025 | EDJ | Review DH motion to alter judgment or for new trial; analyze response positions. | 0.80 | $316.00 |
| 05/23/2025 | EDJ | Review and analyze DH post-trial submissions; research and analysis regarding response arguments; outline response positions. | 1.70 | $671.50 |
| 05/27/2025 | EDJ | Video conference with litigation team regarding post trial submissions; review and analyze DH filings. | 1.20 | $474.00 |
| 06/02/2025 | EDJ | Research and analyze positions in response to DH motion for new trial on damages; outline opposition; draft opposition. | 3.60 | $1,422.00 |
| 06/03/2025 | EDJ | Draft opposition to motion for new trial regarding damages issues; analyze responses to remaining post-trail motions; video conference with trial team regarding strategy and status of post trial motions practice. | 2.80 | $1,106.00 |
| 06/04/2025 | EDJ | Legal research in support of positions on post trial motions; draft opposition to motion for new trial and reply in support of motion to alter or amend the judgment. | 3.80 | $1,501.00 |
| 06/05/2025 | EDJ | Review and analyze and revise draft papers in response to defendants' post trial motions and oppositions. | 1.00 | $395.00 |
| 06/20/2025 | EDJ | Review and analyze papers regarding all pending post-trail motions; analyze strategy and arguments in preparation for hearing; conference with trial team to prepare for hearing. | 3.50 | $1,382.50 |

A-1605

# Langrock
## SPERRY & WOOL

July 08, 2025
Client:       272397
Matter:       000001
Invoice #:    255671
Resp. Atty:      EDJ
Page:              2

## SERVICES

| Date | Person | Description of Services | Hours | Amount |
|------|--------|-------------------------|-------|--------|
| 06/23/2025 | EDJ | Review and analyze reply memoranda filed by DH regarding post-trial motions; preparation for hearing regarding same. | 1.00 | $395.00 |
| 06/24/2025 | EDJ | Legal research in preparation for hearing on post trial motions. | 0.80 | $316.00 |
| 06/27/2025 | EDJ | Preparation for motions hearing; video conference with litigation team to prepare arguments for hearing. | 1.30 | $513.50 |
| 06/30/2025 | EDJ | Preparation for hearing on post-trial motions. | 2.40 | $948.00 |
| 07/01/2025 | EDJ | Preparation for motions hearing; correspondence with client regarding motions hearing; attend motions hearing. | 3.50 | $1,382.50 |
| | | Total Professional Services | 30.20 | $11,929.00 |

## PERSON RECAP

| Person | | | Hours | Rate | Amount |
|--------|---|---|-------|------|--------|
| EDJ | Eric D. Jones | Partner | 30.20 | $395.00 | $11,929.00 |

| | |
|---|---|
| Total Services | $11,929.00 |
| Total Current Charges | $11,929.00 |

| | |
|---|---|
| **PAY THIS AMOUNT** | **$11,929.00** |

A-1606

2:17-cv-00194-kjd    Document 330-4    Filed 07/11/25    Page 3 of 3



# Langrock
## SPERRY & WOOL
www.langrock.com

Misty B. Porter
mbporter@me.com

,

July 08, 2025
Client:        272397
Matter:        000001
Invoice #:     255671
Resp. Atty:       EDJ
Page:             1

RE:  Claim against DHMC et al.

For Professional Services Rendered Through July 07, 2025

Federal Tax I.D. No.: 03-0283046

Total Services                                                           $11,929.00
Total Current Charges                                                    $11,929.00

**PAY THIS AMOUNT**                                                      **$11,929.00**

**Remittance Advice**
Payment is due 15 days from the invoice date.
If paying by check, please reference the invoice number or return this remittance page with your payment.  Thank you.
**Check Payable To:**
Langrock Sperry & Wool, LLP
Attn.: Accounts Receivable
111 S. Pleasant St.
Middlebury, VT 05753
**eCheck & Credit Card:**
Payments can be made by eCheck, American Express, Discover, MasterCard & VISA. To make a secure payment online, please  click here
or type the following information into your browser:   https://langrock.com/payments/

MIDDLEBURY: 111 S. Pleasant St., Middlebury, VT 05753 | 802.388.6356
BURLINGTON: 210 College St., Suite 400, Burlington, VT 05401 | 802.864.0217
A Limited Liability Partnership Including a Professional Corporation

A-1607

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,

        Plaintiff,

vs.

DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,

        Defendants.

Case No. 2:17-cv-194

### DEFENDANTS' RESPONSE IN OPPOSITION TO
### PLAINTIFF'S SECOND SUPPLEMENTAL MEMORANDUM IN SUPPORT OF HER
### MOTION FOR ATTORNEYS' FEES

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary

Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Defendants" or

"Dartmouth Health") respectfully submit this response in opposition to Plaintiff's Second

Supplemental Memorandum in Support of Her Motion for Attorney's Fees (ECF No. 330)

("Second Supplemental Memorandum").

In response to the Court's specific request for detailed summary information related to

*previously* submitted bills, Plaintiff has doubled down in her response, boldly seeking "a

supplemental award" of attorneys' fees, beyond the more than $1.7 million previously requested,

for work performed subsequent to the submission of her initial fee petition.  The fact that Plaintiff

1

failed to follow specific requirements the first time around does not afford her a "mulligan" to address a completely different procedural infirmity. In addition to being untimely, this request suffers from the same infirmities addressed in Dartmouth Health's earlier Opposition to Plaintiff's Motion for Attorneys' Fees (ECF No. 309) ("Opposition" or "Opp."). For the reasons set forth both in the Opposition and herein, Plaintiff's request for "a supplemental award" should be rejected in full.

**I.     The Second Supplemental Memorandum Fails to Comply with Fed. R. Civ. P. 54.**

As an initial matter, Plaintiff's request for a supplemental award of attorneys' fees should be rejected for its untimeliness alone. Pursuant to Rule 54 of the Federal Rules of Civil Procedure, a motion for attorneys' fees must "be filed no later than 14 days after the entry of judgment[.]" Plaintiff's request for an additional $70,439.00 in fees comes a full *seventy-eight* (78) days after entry of judgment. Dr. Porter cites no authority that would permit such an untimely request. Her application for additional fees should be rejected based on this procedural limitation alone.

**II.    Dr. Porter's Supplemental Fee Request Is Unreasonable to the Extent It Seeks Hours That Are Excessive, Redundant, or Otherwise Unnecessary.**

Even if Plaintiff is permitted to seek additional fees beyond those reflected in her initial petition, the Court should nevertheless exclude the "excessive, redundant, or otherwise unnecessary" hours reflected in the Second Supplemental Memorandum and accompanying documents for all of the reasons set forth in the original Opposition. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

As noted in the Opposition, Dr. Porter's previous petition included a request for 91.7 hours (or $28,950.00) spent preparing the original fees motion. ECF No. 309 at 7-8. Now, Plaintiff requests an additional fourteen (14) hours (or $3,845), for a total of 105.7 hours (or $32,795.00) spent preparing what amounted to a twelve (12) page motion. The Second Supplemental

2

A-1609

Memorandum further seeks fees for work preparing Plaintiff's Supplemental Memorandum in Further Support of her Motion for Attorneys' Fees (ECF No. 326) ("First Supplemental Memorandum"), which presented exactly zero new arguments and served merely to summarize case law from more than three decades ago. The amount of time spent on both the original motion and the First Supplemental Memorandum is excessive and plainly unreasonable, and the lodestar should be reduced accordingly.

The Second Supplemental Memorandum is replete with additional examples of excessive and duplicative work performed by counsel for Dr. Porter. As just one example, Attorney Vitt billed 66.5 hours for the period from May 8, 2025 to July 11, 2025, despite apparently having taken the lead on only one of the filings submitted during that timeframe. *See, e.g*, ECF No. 330-3 at 4 ("GJV: Review draft of reply brief from S. Merlo re: opposition to motion to set aside verdict/new trial…"), ("GJV: Review E. Jones drafts re: DH motions new trial on damages and opposition to plaintiff motion to amend judgment"), ("GJV: … [R]eview drafts of reply briefs from S. Merlo and E. Jones…").[1] This goes well beyond what could conceivably be deemed reasonable.

Counsel for Plaintiff also spent an unreasonable amount of hours preparing for the July 1, 2025 hearing on the parties' post-trial motions. Attorneys Vitt and Nunan alone spent a total of 31.6 hours (or $10,705.00) preparing for oral argument, despite the fact that Attorney Vitt argued only one motion and Attorney Nunan argued none. In comparison, Attorney Jones spent a total of 4.5 hours (or $1,777.50) preparing for oral argument and argued a total of four motions. It is unclear why Attorney Vitt required so much time to prepare for such a limited oral argument, but Dartmouth Health should not be held responsible for his patently inefficient billing practices.

---

[1] Notably, Attorney Vitt – the most expensive of the four attorneys who performed work reflected in the Memorandum – billed more hours than any of his colleagues. *See* ECF No. 330-2.

3

A-1610

2:17-cv-00194-kjd    Document 331    Filed 07/18/25    Page 4 of 5

### III.  Conclusion

It is undisputed that Dr. Porter is entitled to nothing more than "reasonable" attorneys' fees. Vt. Stat. tit. 21, § 495b(b).  Once again, she has fallen far short of establishing that the nearly $1.8 million she seeks resulted from reasonable litigation strategies, and the Court should use its discretion to reject the fees requested in the Second Supplemental Memorandum in full.

Date: July 18, 2025

Respectfully submitted,

/s/ Donald W. Schroeder
Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

Tristram J. Coffin
DOWNS RACHLIN MARTIN PLLC
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

*Attorneys for Defendants*

A-1611

## CERTIFICATE OF SERVICE

I hereby certify that, on July 18, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

*/s/ Morgan McDonald*
Morgan McDonald

A-1612

# UNITED STATES DISTRICT COURT
for the
District of Vermont

| | |
|---|---|
| Misty Blanchette Porter, M.D. | ) |
| *Plaintⱼf(s)* | ) |
| | ) |
| v. | ) Civil Action No. 2:17-cv-194 |
| | ) |
| Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health | ) ) ) |
| *Defendant(s)* | ) |

## JUDGMENT IN A CIVIL ACTION

☑ **Jury Verdict.**

☐ **Decision by Court.**

**IT IS ORDERED AND ADJUDGED** that pursuant to the Jury Verdict Form (Doc. 281) filed April 10, 2025, Defendants were not liable to Plaintiff Misty Blanchette Porter under the New Hampshire Whistleblowers' Protection Act, the Americans with Disabilities Act, the Rehabilitation Act, the New Hampshire Law Against Discrimination, and New Hampshire State Law prohibiting Wrongful Discharge. Defendants were liable to Plaintiff under the Vermont Fair Employment Practices Act.

Plaintiff was awarded One Million Dollars ($1,000,000.00) for economic damages and One Hundred Twenty-Five Thousand Dollars ($125,000.00) for non-economic damages. JUDGMENT IS HEREBY entered in the amount of One Million One Hundred Twenty-Five Thousand Dollars ($1,125,000.00) for Plaintiff Misty Blanchette Porter, against Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health.

The effective post-judgment interest rate is 3.98%

Date:    April 24, 2025

*JEFFREY S. EATON*
*CLERK OF COURT*

JUDGMENT ENTERED ON DOCKET
DATE ENTERED:  4/24/2025

*/s/ Emerson Howe*
*Signature of Clerk or Deputy Clerk*

A-1613

2:17-cv-00194-kjd   Document 297-1   Filed 04/24/25   Page 1 of 1

**UNITED STATES DISTRICT COURT**

**OFFICE OF THE CLERK**

DISTRICT OF VERMONT
FEDERAL BUILDING
**BURLINGTON, VERMONT 05402-0945**

⊠ P.O. BOX 945
BURLINGTON 05402-0945
(802) 951-6301

□ P.O. BOX 607
RUTLAND 05702-0607
(802) 773-0245

**JEFFREY S. EATON**

CLERK

Civil Action: 2:17-cv-194                                        Date: April 24, 2025

Blanchette Porter v. Dartmouth Hitchcock Medical Center et al.

NOTICE TO LITIGANTS

If you wish to appeal the enclosed judgment or order, you must file a Notice of Appeal within 30 days after entry of the judgment or order appealed from (or 60 days if the United States or an officer or agency of the United States is a party). Fed. R. App. P. 4(a)(1). The fee for filing an appeal is $605.00.

If you wish to appeal but are unable to file your Notice of Appeal within 30 days [or 60 days if applicable] after the date of entry shown on line 2 below, then you have an additional 30 days to file a Motion for Extension of Time. The Motion for Extension of Time **must** be filed within 30 days after the date on line 3 below. Every Motion for Extension of Time must contain an explanation which demonstrates "good cause" or "excusable neglect" for failure to file the Notice of Appeal within the time limit required. Fed. R. App. P. 4(a)(5).

**PLEASE TAKE NOTICE**

1. Judgment filed                                   April 24, 2025

2. Date of Entry of Judgment on
   the docket of this court                    April 24, 2025

3. Notice of Appeal **MUST** be
   filed on or before                            May 27, 2025

*/s/ Emerson Howe*
Signature of Clerk or Deputy Clerk

A-1614

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

|  |  |
|---|---|
| MISTY BLANCHETTE PORTER, M.D.,<br><br><br>Plaintiff,<br><br>vs.<br><br><br>DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH,<br><br><br>Defendants. | Case No. 2:17-cv-194 |

### DEFENDANTS' NOTICE OF APPEAL[1]

Notice is hereby given that Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health, Defendants in the above-named case, appeal to the United States Court of Appeals for the Second Circuit from the Judgment (Doc. 297) entered in this action on the 24th day of April, 2025.

---

[1] Defendants also notify the United States Court of Appeals for the Second Circuit of their pending Motion to Alter Judgment and, in the Alternative, for a New Trial (Doc. 305) and Motion for New Trial (Doc. 308), which may affect this notice. *See* Federal Rule of Appellate Procedure 4(a)(4)(A)(iv) and (v).

1

A-1615

Date: May 27, 2025

Respectfully submitted,

*/s/ Tristram J. Coffin*

**DOWNS RACHLIN MARTIN PLLC**

Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

**FOLEY & LARDNER LLP**

Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 27, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

*/s/ Morgan McDonald*
Morgan McDonald

A-1616

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

    Plaintiff,

    v.                                                              Civil Action No. 2:17–cv–194

Dartmouth-Hitchcock Medical Center,
Dartmouth-Hitchcock Clinic,
Mary Hitchcock Memorial Hospital, and
Dartmouth-Hitchcock Health,

    Defendants.

## ORDER

Plaintiff's Motion for Attorney Fees (Doc. 300), including attached Declarations (Docs. 300-1 and 300-2), does not include certain information necessary for the Court to calculate the lodestar in this case. The Motion states the number of hours billed by each attorney and paralegal at Langrock Sperry & Wool, and the respective billing rates (*see* Doc. 300 at 4–5). However, with respect to work performed by Vitt & Nunan attorneys and paralegals, the submissions only provide information for work done "[f]rom 2024 through trial and preparation of th[e] Motion [for Attorney Fees]" (*id.* at 4).

Plaintiff has not provided the following critical information in the Motion (and attached Declarations), Reply (Doc. 318), or Supplemental Memorandum (Doc. 326): (1) the number of hours billed by Attorney Vitt before 2024 (at the rate of $320/hour); (2) the number of hours billed by Attorney Nunan before 2024, and the applicable rate; (3) the number of hours billed by paralegal Nunan (at the rate of $80/hour); (4) the number of hours billed by other non-attorney legal staff at Vitt & Nunan (at rates of $50–$100/hour); and (5) the number of hours billed by

A-1617

Attorney Kramer at each of her two different billing rates. These numbers may be calculated based on a review of the billing records submitted to the Court (*see* Doc. 300-3 at 1–261; Doc. 300-4 at 1–8; Doc. 300-5 at 1–53), but it is not for the Court to calculate the number of hours billed, at different rates, by at least seven different timekeepers, as documented in over three hundred pages of billing records.

Plaintiff is ordered to submit the specific numbers listed above to the Court by **Friday July 11, 2025**, in a second supplemental memorandum in support of the Motion for Attorney Fees. The Court requires *the total number of hours billed by each individual timekeeper, specifying the timekeeper's respective hourly rate at the time the services were rendered.* Without this information, the Court is unable to adjust the calculations based on hourly billing rates or number of hours billed, to the extent the Court determines any such adjustments may be warranted. It may be most efficient for this information to be submitted to the Court in a chart. The chart below specifies the information currently lacking in Plaintiff's submissions:

| Timekeeper | Hourly Rate | Hours Billed | Total |
|---|---|---|---|
| Attorney Geoffrey Vitt | $320 (2017–2023) $400 (2024–2025) | [unknown] 1,120.9 | **$?** **$448,360** |
| Attorney Sarah Nunan | $? (2019?–2023) $260 (2024–2025) | [unknown] 760.8 | **$?** **$197,808** |
| Attorney Sarah Merlo | $230 (2017) $325 (2024–2025) | [unknown] 281 | **$?** **$91,325** |
| Attorney Katie Kramer: solo and at DGW Kramer, LLP at DTO Law | $175 (2018–2020) $450 (2024) | 33.4 [+?] 20.4 | **$5,845 [+$?]** **$9,180** |
| Attorney Eric Jones | $375 (2024) $395 (2025) | 36.10 358 | **$13,537.50** **$141,410** |
| Attorney Alison Bell | $415 | 9.6 | **$3,984** |
| Attorney Bridget Grace | $225 | 2 | **$450** |

2

A-1618

| | | | |
|---|---|---|---|
| Attorney Wendy Radcliff | $250 | .25 | **$62.50** |
| Paralegal Sherri Lehouiller | $155 | 38.3 | **$5,936.50** |
| Paralegal Sarah Nunan | $80 | [unknown] | **$?** |
| Other legal staff<br>(Julia Korkus, Katie/Katherine Fenton, Shannon Edson, Christine Lyon, Marianne McCann) | $50–$130 | [unknown] | **$?** |
| **TOTAL** | | | **$917,898.50 + $?** |

Dated at Burlington, in the District of Vermont, this 7th day of July 2025.

/s/ Kevin J. Doyle
United States Magistrate Judge

3

A-1619

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

Plaintiff,

v.

Dartmouth-Hitchcock Medical Center et al.,

Defendants.

Civil Action No. 2:17–cv–194–kjd

## ORDER
(Doc. 296)

After trial in this case arising from the end of an employment relationship, the jury found Defendants (Dartmouth Health) liable for disability discrimination under the Vermont Fair Employment Practices Act and awarded Dr. Porter $1,000,000 in economic damages and $125,000 in non-economic damages. (Doc. 281.) Dr. Porter requests prejudgment interest on the $1,000,000 economic damages award. (Doc. 296 at 3.) Dartmouth Health opposes Dr. Porter's motion for prejudgment interest, requesting that the Court deny prejudgment interest in the first instance or, if prejudgment interest is imposed, apply a reduced interest rate. (Docs. 299, 299-6, 299-7.)

### Standard

A plaintiff's postjudgment motion for prejudgment interest "constitutes a motion to alter or amend the judgment under Rule 59(e)." *See Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989) (holding same with respect to discretionary prejudgment interest); *id.* at 176 n.3 (explaining that Rule 59(e) also controls when "prejudgment interest is available as a matter of right"). A district court has broad discretion to determine whether to grant a motion to alter or amend the judgment. *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000).

"[F]ederal law does not apply to the calculation of prejudgment interest on supplemental state law claims." *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998) *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008). Under Vermont law, "[i]n an action where monetary relief is awarded, the amount of the judgment shall include the principal amount found to be due, all interest accrued on that amount up to and including the date of entry of judgment, and all costs allowed to the prevailing party." Vt. R. Civ. P. 54(a).

### Analysis

### I.    Plaintiff's Non-Compliance with Local Rule 7(a)(7)

Dartmouth Health asks the Court to deny Dr. Porter's Motion due to noncompliance with Local Rule 7(a)(7), which requires a party filing a non-dispositive motion to "certify that the party has made a good faith attempt to obtain the opposing party's agreement to the requested relief." (Doc. 299 at 2–3.) However, Dartmouth Health has previously taken the position that prejudgment interest is inappropriate in this case, and in the event that prejudgment interest is imposed, it should be calculated at a reduced rate. (Doc. 266 at 3.) It has maintained this position in its post-trial filing on this issue, strongly suggesting that it would "have been unlikely to have agreed to the relief" requested. *See Kew v. Town of Northfield, Vt.*, Case No. 5:19-CV-78, 2021 WL 11719002, at *2 (D. Vt. Mar. 9, 2021); (Doc. 266 at 3.)

In these circumstances, the Court will not deny Plaintiff's Motion for Prejudgment Interest based on non-compliance with Local Rule 7(a)(7).

### II.   Dr. Porter is entitled to prejudgment interest as of right because her damages are readily ascertainable.

"Prejudgment interest is awarded as of right when the principal sum recovered is liquidated or capable of ready ascertainment. . . ." *Hirchak v. Hirchak*, 2024 VT 81, ¶ 37, ___ Vt. ___, 331 A.3d 1051 (citation modified). Courts reason that when "damages are liquidated or

2

A-1621

determinable by a reasonably certain standard of measurement, the defendant can avoid the accrual of interest by simply tendering to the plaintiff a sum equal to the amount of damages." *Windsor Sch. Dist. v. State*, 2008 VT 27, ¶ 30, 183 Vt. 452, 956 A.2d 528. Damages are not reasonably ascertainable when "the parties dispute how the jury could arrive at the damages it awarded." *Winey v. William E. Dailey, Inc.*, 636 A.2d 744, 752 (Vt. 1993). For example, unjust-enrichment claims do not result in mandatory prejudgment interest because "the measure of damages does not just require calculation of the amount of benefit conferred, but also an assessment of how much of that benefit would be inequitable for the defendant to retain." *Hirchak*, 2024 VT at ¶ 38. "The uncertainty in this calculation means that the parties will invariably dispute how the jury could arrive at the damages." *Id.* By contrast, damages are typically "reasonably certain" in lost-wage and medical-expense claims because, although these damages "are 'unliquidated' in the sense that a precise amount may not be known to either party, they are 'liquidated' in that they can be measured against a reasonably certain standard." *Smedberg v. Detlef's Custodial Serv., Inc.*, 2007 VT 99, ¶ 37, 182 Vt. 349, 940 A.2d 674 (citation modified).

Dr. Porter's damages—lost earnings and employment-related expenses (including rent and utilities in Burlington and travel costs between her place of employment in Burlington and her home in Norwich)—are readily ascertainable.[1] Similar to the plaintiff in *Smedberg*, Dr. Porter's "salar[ies] [were] known with reasonable certainty," and "the damage measure" for her increased employment expenses "is simply the reasonable value of the services rendered." *Id* at ¶¶ 37–38 (citation modified); *see also id* at ¶ 38 (holding that "[i]t works no unfairness on

---

[1] The Vermont Supreme Court has acknowledged that the terms "readily ascertainable" and "reasonably ascertainable" are substantively similar with respect to an award for prejudgment interest. *See Est. of Fleming v. Nicholson*, 724 A.2d 1026, 1030 n.2 (Vt. 1998).

3

tortfeasors to require them to pay prejudgment interest on" expenses flowing from their wrongs when the cost and date of each expense, as it was incurred, "was known precisely.").

Dartmouth Health contends that Dr. Porter's damages are not "reasonably certain" because Dr. Bancroft, her damages expert, produced four different reports over several years, reaching different results each time. As the Court discussed in detail in its Order denying Dartmouth Health's Motion to exclude Dr. Porter's expert witness, Dr. Bancroft issued several updates to his reports because new information impacted the damages Dr. Porter sustained from losing her job. (*See* Doc. 238 at 7.) For example, while Dr. Porter first believed she would resign her full-time position (0.8 FTE) at the University of Vermont Medical Center (UVMMC) to find a part-time job closer to home, she continued working at UVMMC for several years longer than she had expected. As a result, Dr. Bancroft updated his predictions of Dr. Porter's future lost earnings and employment expenses to account for Dr. Porter's higher salary. Perhaps neither party could have predicted how Dr. Porter's damages would change over the eight years of this case, but Dr. Porter's UVMMC salary and employment expenses on any given day were reasonably certain such that Dartmouth Health could "avoid the accrual of interest by simply tendering to [Dr. Porter] a sum equal to the amount of damages." *See Windsor Sch. Dist.*, 2008 VT at ¶ 30.

Nor are Dr. Porter's damages rendered reasonably uncertain because, as Dartmouth Health argues, "[it] is not even readily ascertainable when Dr. Porter plans to retire." (Doc. 299 at 5.) As this Court has previously observed, Dr. Porter is a reliable source of information regarding whether and when she intends to decrease her working hours for the purpose of calculating damages. (*See* Doc. 238 at 7–8.) Dr. Porter has provided a reasonable explanation for why she intends to decrease her hours at UVMMC: the stresses associated with commuting from

4

her home in Norwich, Vermont to a job in Burlington instead of her former job at Dartmouth Health in New Hampshire. (Doc. 230 at 37:2–17, 38:21–39:1); (*see also* Doc. 198-4 at 11, 37:10–18 (testimony by Dr. Porter that she did not know how long she would stay at UVMMC because she enjoyed the work but "didn't like being away from her family and having to commute")); *cf. Bergerson v. N. Y. State C₌f. cf Mental Health, Cent. N. Y. Psychiatric Ctr.*, 526 F. App'x 109, 111–12 (2d Cir. 2013) (summary order) (finding district court erred in concluding that employee failed to mitigate damages when she resigned from employment located two and a half to three hours from her home because employee "was not obligated to mitigate damages by pursuing or continuing employment located such an unreasonable distance from her home"). To avoid the accrual of interest, Dartmouth Health could have determined Dr. Porter's work status, salary, and employment expenses with certainty simply by inquiring. *See Windsor Sch. Dist.*, 2008 VT at ¶ 30.

Dartmouth Health's cited authorities are distinguishable. In *Windsor School District*, the damages could not be measured against a reasonably certain standard because they depended on undocumented or unreliable evidence of expenses and thus required inherently subjective determinations. 2008 VT at ¶¶ 14–15, 21 (upholding trial court's denial of prejudgment interest on award of attorney's fees and environmental consultant costs when attorney's filings did not distinguish between compensable and non-compensable activity under relevant statute, attorney's time records were "somewhat inflated" or did not bill for all work performed, and certain consultant costs were duplicative of work performed by the State or otherwise unreasonable). *Winey* similarly required subjective interpretation—whether a contractor's choices made in the course of constructing a house could be characterized as deviations from the plans and specifications—and, unlike this case, involved conflicting expert testimony regarding

5

A-1624

damages. *See* 636 A.2d at 754. In *Brody v. Simpson Dev. Corp.*, a defective construction case, the parties disputed which repairs were actually necessary and how much they would cost. File No. 2:05-CV-293, 2007 WL 9710665, at *1 (D. Vt. Dec. 19, 2007). Unlike *Brody*, there is no genuine factual dispute that Dr. Porter earned less money at UVMMC and incurred expenses associated with working farther from home.[2]

The Court concludes that Dr. Porter's damages can be measured against reasonably certain standards—her salaries and the reasonable amount of her expenses. *See Smedberg*, 2007 VT at ¶ 37. Therefore, she is entitled to an award of prejudgment interest as of right.

## III.   The Court would exercise its discretion to award prejudgment interest even if Dr. Porter's damages were not reasonably ascertainable.

Even assuming such an award of prejudgment interest were not mandatory, the Court would exercise its discretion to award prejudgment interest to make Dr. Porter whole. *See, e.g., id.* at ¶ 36 (citation modified) (holding that Vermont "allow[s] prejudgment interest in the trial court's discretion where such an award is required to make the plaintiff whole"); *Merritt v. United States*, Case No. 5:18-CV-200, 2022 WL 17573683, at *1 (D. Vt. Nov. 15, 2022) (Crawford, J.) (holding courts may consider request for discretionary interest on award for pain and suffering that was not reasonably certain to avoid injustice).

---

[2] At trial, Dartmouth Health contended that Dr. Porter suffered no compensatory damages from losing her job. (Doc. 295 at 57–59, 1026:18–1028:2.) Dartmouth Health argued that if Dr. Porter had hypothetically worked full-time—that is, 1.0 FTE at UVMMC rather than 0.8 FTE—she would have earned more money than she earned working 1.0 FTE at Dartmouth Health and therefore would not have suffered any losses. (Doc. 290 at 129:1–130:1.) But the record does not support Dartmouth Health's argument. First, Dartmouth Health's calculation of what Dr. Porter would have earned from a 1.0 FTE position at UVMMC relies only on Dr. Bancroft's testimony on cross-examination, and Dr. Bancroft testified that Dartmouth Health's 1.0 FTE calculation was not correct. *Id.* at 127:19–25. Second, the parties do not dispute that Dr. Porter actually worked 0.8 FTE at UVMMC and therefore actually earned less money than she would have earned had she remained 1.0 FTE at Dartmouth Health. Dartmouth Health appears to argue both that Dr. Porter did not suffer any compensatory damages at all and that she failed to take reasonable steps—such as working 1.0 FTE at UVMMC—to mitigate her losses. The record does not contain evidence that Dr. Porter actually earned more money at UVMMC than she would have earned at Dartmouth Health.

A-1625

Prejudgment interest "should generally be made available to plaintiffs when there has been a delay in judgment." *Fleming*, 724 A.2d at 1031. "As the Second Circuit has explained, a dollar in hand today is worth more than a dollar to be paid a year from today, and a dollar a year from today is worth more than a dollar to be received in two years." *Epstein v. Kalvin-Miller Int'l, Inc.*, 139 F. Supp. 2d 469, 485 (S.D.N.Y. 2001) (citation modified) (quoting *McCrann v. U.S. Lines, Inc.*, 803 F.2d 771, 722 (2d Cir. 1986)). "Prejudgment interest on compensatory damage awards is meant to restore—to the extent possible—harmed plaintiffs to the financial position they would have enjoyed but for the tort, and should not be limited to such a tiny fraction of tort cases." *Smedberg*, 2007 VT at ¶ 39.

The record demonstrates that Dr. Porter experienced economic damages due to the delay in reimbursement of her associated monetary losses. *See Fleming*, 724 A.2d at 1031. When Dr. Porter first began working per diem at UVMMC, she paid for hotels several nights per week. (Doc. 287 at 102:10–17.) Dr. Porter eventually purchased a condominium in Burlington, requiring remortgaging of the family home to afford the new down payment. (*Id.* at 102:18–104:7.) She also paid utility bills for the Burlington condominium and bills for the family home in Norwich. (Doc. 290 at 58:13–20.) The date of Dr. Porter's termination also affected when she could withdraw money from her pension and how much money she will receive. (Doc. 287 at 107:1–8.) Dr. Porter experienced these financial burdens and lost investment opportunities over the eight years of this case. She also earned less at UVMMC than she would have earned at Dartmouth Health. (Doc. 290 at 60:11–17.) An award of prejudgment interest in these circumstances is required to make her whole.

Dartmouth Health contends that prejudgment interest does not serve the interests of justice because the majority of the damages results from future earnings. (Doc. 299 at 9.) But the

7

A-1626

record equally supports the conclusion that the $1 million award was comprised entirely of back pay and employment expenses. (*See* Doc. 235-2 at 3; *id.* at 6.) The possibility that Dr. Porter may only be entitled to prejudgment interest on *some* of her damages award does not mean that she cannot receive interest on *any* of her award.

For these reasons, the Court would exercise its discretion to award pre-judgment interest even if Dr. Porter's damages were found not to be "reasonably certain."

## IV.    Vermont law mandates an annual interest rate of 12% for prejudgment interest.

After judgment, if the parties have not stipulated a rate of interest by contract, "the statutory or legal rate applies." *Greenmoss Builders, Inc. v. King*, 580 A.2d 971, 975 (Vt. 1990). Vermont law establishes the legal rate of 12% per annum. 9 V.S.A. § 41a(a).

Dartmouth Health contends that awarding 12% interest for a period of time when market interest rates were significantly lower would constitute a "windfall." The Vermont Supreme Court, however, has considered and rejected similar logic. *See Concord Gen. Mut. Ins. Co. v. Gritman*, 2016 VT 45, ¶¶ 34–35, 202 Vt. 155, 146 A.3d 882 (citation modified) ("The Legislature could reasonably conclude that a fixed rate of simple interest is a more efficient and predictable way to calculate prejudgment and postjudgment interest than a floating rate pegged to the national prime rate. . . . The argument that a fixed 12% rate creates a windfall to plaintiffs and is punitive to defendants in periods like the present when market interest rates are low is more appropriately presented to the Legislature.").

Contrary to Dartmouth Health's position, the Court may not exercise its discretion to apply a lower interest rate. (Doc. 299 at 10.) In the absence of a stipulated interest rate, the application of a prejudgment interest rate "contrary to the clearly-enumerated statutory rate of 12%[] constitutes an abuse of discretion warranting reversal." *New England P'ship, Inc. v. Rutland City Sch. Dist.*, 786 A.2d 408, 416 (Vt. 2001).

8

A-1627

Finally, Dartmouth Health asks the Court to reduce any prejudgment interest amount as an equitable matter because the judgment was delayed by "extraordinary circumstances," including time spent on appeal and "pandemic-related disruption—akin to a force majeure." (Doc. 299 at 12–13.) Although prejudgment interest should not be punitive, it is well established that "[t]he purpose of a prejudgment interest award in a wrongful termination case is to compensate a plaintiff for the loss of use of money that the plaintiff otherwise would have earned had he not been unjustly discharged." *Chandler v. Bombardier Cap., Inc.*, 44 F.3d 80, 83 (2d Cir. 1994). Prejudgment interest also "discourages an employer from attempting to enjoy an interest-free loan for as long as it can delay paying out back wages." *Id.* (citation modified). No party could have predicted that any award of damages in this case would occur eight years after the case began. But given the dual purposes of prejudgment interest—compensation for plaintiff's loss of the use of money had the wrongful discharge not occurred and disincentivizing delay in payment of back wages—it is appropriate that Dartmouth Health, rather than Dr. Porter, shoulder the financial burden of the delay in judgment. "It works no unfairness on tortfeasors to require them to pay prejudgment interest" on expenses "flowing from their wrongs." *Smedberg*, 2007 VT at ¶ 38.

Dr. Porter is entitled to prejudgment interest at an annual rate of 12% calculated according to the actuarial method. 9 V.S.A. § 41a(a). The Vermont Supreme Court has interpreted the phrase "actuarial method" to allow "simple interest and not compound interest to be accorded to judgment awards." *Greenmoss Builders*, 543 A.2d at 1324.

Courts retain discretion to vary the method of calculating prejudgment interest. *Remes v. Nordic Grp., Inc.*, 726 A.2d 77, 81 (Vt. 1999). The trial court should use a "reasonable and established method to calculate prejudgment interest." *Id.* "Further, there may be several equally

9

A-1628

valid methods of computation, each yielding a somewhat different result." *Id.* (citation modified).

The Second Circuit has held that prejudgment interest should be calculated separately for each lost payment. *See Chandler*, 44 F.3d at 84. However, "where an undifferentiated verdict makes it 'impossible to discern which of the costs formed the basis of the award,' prejudgment interest may be calculated within the range of the court's discretion to 'roughly and fairly' compensate the plaintiff." *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 445 (2d Cir. 1995); *see also Rao v. New York City Health & Hosps. Corp.*, 882 F. Supp. 321, 326–27 (S.D.N.Y. 1995) (awarding plaintiff prejudgment interest on entire damages award because all or virtually all of the award was compensation for lost wages and it would have been inequitable to withhold prejudgment interest on the ground that some portion of the award may have been intended to compensate the plaintiff for damages other than wages, when the parties agreed that the issue of prejudgment interest would be left to the court and defendants did not request that the jury specifically allocate the amount of lost wages).

The Court elects to allocate the $1 million award evenly between June 3, 2017 (the effective date of Dr. Porter's termination) and December 31, 2033 (the year Dr. Porter testified she intended to stop working). *See, e.g., Marfia*, 147 F.3d at 91 (noting the equal payment method); *Cheney v. New England Publishers Inc.*, No. 5091012, 2014 WL 8515132, at *3 (Vt. Super. July 8, 2014) (allocating jury award evenly over 39 months from end of employment through date of verdict).

A-1629

Dr. Porter is entitled to prejudgment interest in the amount of **$225,340.62** calculated as follows:

| | |
|---|---|
| **Prejudgment interest through April 11, 2025** | **$225,335.58 (205 full pay periods between June 3, 2017, and April 11, 2025, at $2320.19 per pay period)** |
| **Prejudgment interest from April 12, 2025, through April 24, 2025** | **$5.04** |
| **TOTAL** | **$225,340.62** |

## Conclusion

For the reasons explained above, Dr. Porter's Motion for Prejudgment Interest (Doc. 296) is GRANTED IN PART AND DENIED IN PART. The Court imposes prejudgment interest in the amount of $225,340.62.

Dated at Burlington, in the District of Vermont, this 26th day of November 2025.

*/s/ Kevin J. Doyle*
United States Magistrate Judge

11

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

    Plaintiff,

    v.

Dartmouth-Hitchcock Medical Center,
Dartmouth-Hitchcock Clinic,
Mary Hitchcock Memorial Hospital, and
Dartmouth-Hitchcock Health,

    Defendants.

Civil Action No. 2:17–cv–194

**OPINION AND ORDER**
(Docs. 300, 302, 318, 319, 330)

In March and April 2025, the Court held a fourteen-day trial in this employment lawsuit brought by Plaintiff Misty Blanchette Porter, MD, against Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth Health"). Dr. Porter claimed she was unlawfully terminated by Dartmouth Health because of her disability and her whistleblowing complaints to Dartmouth Health supervisors about the allegedly incompetent and unethical conduct of two other Dartmouth Health physicians. Dartmouth Health claimed it had legitimate, nondiscriminatory business reasons for terminating Dr. Porter's employment, in conjunction with its 2017 closure of Dartmouth Health's Reproductive Endocrinology and Infertility (REI) Division.

The jury found in favor of Dr. Porter on her disability discrimination claim under the Vermont Fair Employment Procedures Act (VFEPA), and against Dr. Porter on her remaining claims under New Hampshire law and under federal disability discrimination and retaliation laws,

A-1631

including the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. (*See* Doc. 281 at 1–4.) The jury awarded Dr. Porter $1,000,000 in economic damages for lost income and expenses, and $125,000 in non-economic damages for lost enjoyment of life, mental anguish, or pain and suffering, for a total award of $1,125,000. (*Id.* at 5.) Finally, the jury found that Dr. Porter was not entitled to punitive damages. (*Id.* at 6.)

This Opinion and Order addresses Dr. Porter's Motion for Attorney Fees (Doc. 300) and Bill of Costs (Doc. 319). Dr. Porter requests $1,738,341.50 in attorney fees. (Doc. 318 at 1, 8; *see* Doc. 300 at 1, 12.)[1] Dartmouth Health has filed an Opposition to Dr. Porter's Motion for Attorney Fees (Doc. 309); and Dr. Porter has filed a Reply (Doc. 318) and a "Supplemental Memorandum" (Doc. 326) in support of the Motion. At the Court's request (*see* Doc. 329), Dr. Porter filed a "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees" (Doc. 330) to provide particular information required by the Court to decide the Motion. In the "Second Supplemental Memorandum," Dr. Porter seeks an additional $70,439 in attorney fees for work done by her attorneys since the filing of the pending Motion for Attorney Fees. (*See* Doc. 330 at 1; Doc. 330-2.) Dartmouth Health filed a "Response in Opposition to Plaintiff's Second Supplemental Memorandum," asking the Court to deny Dr. Porter's request for additional attorney fees in full. (Doc. 331.)

As to costs, Dartmouth Health filed a Notice of Objection to Dr. Porter's original Bill of Costs (Doc. 307; *see* Doc. 301), resulting in Dr. Porter's subsequent revision of the Bill of Costs (*see* Doc. 319). The Court considers only the most recently filed Bill of Costs in which Dr. Porter seeks $9,420.79. (*Id.*)

---

[1] Dr. Porter originally sought $1,742,649.70 in her Motion for Attorney Fees. (*See* Doc. 300 at 1, 12.) She subsequently revised the amount requested to $1,738,341.50, explaining that she discovered an "oversight" when she "checked the addition of the multiple invoices of the lawyers who have worked on the case." (Doc. 318 at 1.)

2

On July 1, 2025, the Court held a hearing on all post-trial motions, including Dr. Porter's

Motion for Attorney Fees. (*See* ECF No. 328.) At the hearing, Dr. Porter requested that the Court

require Dartmouth Health's counsel to submit their billing records to compare them to Dr. Porter's

counsel's billing records in support of the Motion for Attorney Fees.[2] Courts in this Circuit have

_____

[2] Dr. Porter also included this request in her Reply brief on the Motion for Attorney Fees. According to Dr. Porter, "[i]f Defendants insist on criticizing Dr. Porter's fees as 'astounding,' it is reasonable to ask what Defendants' attorneys' fees and expenses have been," and "if Defendants proceed with their challenge to the amount of fees Plaintiff seeks, then they should be required to produce information on the fees they have paid." (Doc. 318 at 2–3.) At the hearing on the Motion, Dartmouth Health's counsel resisted the request to provide its own billing records to the Court, contending that comparing the billing records of Dartmouth Health's attorneys to those of Dr. Porter's attorneys would be an "apples-to-oranges comparison," in part because "Dartmouth Health . . . had to defend itself against claims that put its reputation at stake," given that Dr. Porter's claims "are related to . . . patient safety," which in their view made the case "more than just a single-plaintiff employment case." (Doc. 332 at 62:10–16.) This argument is not well-taken. Though it is true that corporate defendants are often represented by larger law firms, which generally have higher overhead costs that may be reflected in their billing rates, the Court is unaware of any principle of law directing that an individual plaintiff's attorney fees should generally be lower than those of a corporate defendant because the corporate defendant is defending its reputation whereas the plaintiff is merely pursuing claims of alleged wrongdoing against the corporation. Regardless the party requesting attorney fees, be it an individual or a corporate entity, the Court's responsibility is the same—to determine fair compensation under governing legal standards for services rendered on behalf of the party entitled to a fees award.

Dartmouth Health's counsel also argued at the hearing that comparing the billing records of Dartmouth Health's attorneys and Dr. Porter's attorneys would not be useful because Dartmouth Health "determined [their attorneys'] fees were reasonable" and "paid [their attorneys'] fees," whereas Dr. Porter's attorneys worked primarily under a contingency fee arrangement. (*Id.* at 62:16–17.) This distinction is not material, as "a [prevailing] plaintiff's recovery [of attorney fees] will not be reduced by what he must pay his counsel." *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989); *see id.* at 92 ("[T]he fee arrangement is but a single factor [in the calculation of a fee award] and [is] not determinative."). As the Second Circuit has explained, "[t]he reasonableness of a fee award does not depend on whether the attorney works at a private law firm or a public interest organization, nor is the award necessarily limited because the attorney has agreed to undertake the case for a reduced fee compared to the customary market rate." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 184 n.2 (2d Cir. 2008) (citing *Blum v. Stenson*, 465 U.S. 886, 894 (1984) and *Reiter v. MTA N.Y. City Transit Auth.*, 457 F.3d 224, 233 (2d Cir. 2006)). Indeed, courts have held that prevailing plaintiffs whose attorneys were employed under a contingency agreement may merit an *increase* in the lodestar to reflect the risk of nonpayment, particularly in civil rights cases. *See, e.g.*, *Yates v. Mobile Cnty. Pers. Bd.*, 719 F.2d 1530, 1533 (11th Cir. 1983) ("Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result. . . . The standard of compensation must enable counsel to accept apparently just causes without awaiting sure winners." (internal quotation marks omitted)); *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1357 (11th Cir. 1983) ("The Fifth Circuit has held that a bonus multiplier may be applied to increase an award of attorney's fees in civil rights actions since recovery of attorney's fees in such actions is contingent on success."); *Palmigiano v. Garrahy*, 466 F. Supp. 732, 737 (D.R.I. 1979) ("Certainly the contingency factor is cause for a more liberal application of the consideration guiding a court in awarding a fee[.]"), *aff'd*, 616 F.2d 598 (1st Cir. 1980). In any event, counsel may not be penalized by a reduction in, or a cap on, the amount of their fee award due to the contingency-fee arrangement. *See Hughes v. Repko*, 578 F.2d 483, 487–88 (3d Cir. 1978) (finding that the contingency factor "may not be used to decrease the amount of the final fee award"); *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 142 (2d Cir. 2007) ("It is true that a reviewing authority may consider the contingency fee paid in determining a reasonable attorney's fee; it is also undisputed, however, that the contingency fee may not serve as a cap on an attorney fee award." (citations omitted)).

3

A-1633

found merit to such comparisons of billing records. *See, e.g., Frommert v. Conkright*, 00-CV-6311L, 2016 WL 6093998, at *3 (W.D.N.Y. Oct. 19, 2016) (stating that, although there need not be "a dollar-for-dollar equivalence," "the rates and fees charged and paid by defendants to their several law firms are clearly relevant and would be helpful to th[e] [c]ourt in determining the amount of fees that should be awarded to plaintiffs' counsel," especially given "the unique and long history of th[e] case"); *Mendez v. Radec Corp.*, 818 F. Supp. 2d 667, 669–70 (W.D.N.Y. 2011) ("recogniz[ing] that there may be significant differences in the ways that plaintiffs' counsel and defense counsel litigate a case, and that this could cause a disparity between the two sides' respective hours and hourly rates[, and that s]uch a disparity would not necessarily mean that one side's fees were necessarily unreasonable or excessive," but finding that "[s]uch considerations . . . are best taken into account in determining the weight to be given to defense counsel's billing records, and do not render them non-discoverable").

Nevertheless, the Court declines to require Dartmouth Health counsel to submit their billing records. The Court finds that requiring Dartmouth Health to submit its counsel's billing records would waste judicial resources and cause unnecessary delay in this case. The Court is fully capable of evaluating Dr. Porter's fee application based on its knowledge of the case, its general experience with fee applications in this District, and the parties' briefs, affidavits, and billing records. *See, e.g., Costa v. Sears Home Improvement Prods., Inc.*, 178 F. Supp. 3d 108, 113 (W.D.N.Y. 2016) (finding that "the Court's task in evaluating the reasonableness of Plaintiff[']s fee application would not be promoted by comparing the time spent by Plaintiff's counsel on various tasks with the time incurred by defense counsel" because "[t]his would not reflect an appropriate use of the Court's or the parties' time, as such an evaluation would rest on the faulty assumption that Defendants' billing records are a benchmark for reasonableness").

4

Also at the July 1 hearing, Dartmouth Health moved for the Court to strike the "Supplemental Memorandum" Dr. Porter filed in support of the Motion for Attorney Fees because it was "filed significantly after the deadlines." (Doc. 332 at 62:24.) This request is DENIED, given Dartmouth Health's delay in making the request and the Court's finding that, although the Supplemental Memorandum was unnecessary, its filing has not prejudiced Dartmouth Health.

## Background

Dr. Porter filed the initial Complaint in this case on October 11, 2017, asserting claims of wrongful discharge, violation of the New Hampshire Whistleblowers' Protection Act, and disability discrimination and retaliation under the ADA and New Hampshire law. (Doc. 1.) On July 30, 2018, the Court granted Dr. Porter's Stipulated Motion for Leave to Amend, and the First Amended Complaint was filed on August 1, 2018. (Docs. 49, 50.) The First Amended Complaint alleged claims of wrongful discharge (Count 1); violation of the New Hampshire Whistleblowers' Protection Act (Count 2); disability discrimination and retaliation under the ADA (Count 3); disability discrimination under Section 504 of the Rehabilitation Act of 1973 (Count 4); disability discrimination and retaliation under New Hampshire law (Count 5); and disability discrimination and retaliation under the VFEPA (Count 6). (Doc. 50.) Over the next sixteen months, through approximately December 2019, the parties engaged in discovery, including taking/defending thirteen depositions, and filing/opposing at least five motions to compel[3] and one motion for protective order. According to Dr. Porter's counsel, discovery was "time[-]consuming," with Dartmouth Health producing approximately 32,000 documents and Dr. Porter producing approximately 1,200 documents. (Doc. 300-1 at 3.) In November 2019, the parties attended an

---

[3] Dr. Porter filed all of the Motions to Compel. (*See* Docs. 20, 26, 61, 64, 120.) The Court granted four of the Motions in full (*see* Docs. 51, 73, 123), and the fifth in part (*see* Doc. 84). Dr. Porter asserts that she "file[d] and litigate[d] eight motions to compel" (Doc. 300 at 6; *see* Doc. 300-1 at 2). However, she has not referenced the specific motions by name or ECF document number, and the Court is unable to confirm Dr. Porter's count based on a review of the docket.

5

Early Neutral Evaluation (ENE) session with Gregory Clayton, but no settlement was reached. (Doc. 131.)

In January 2020, Dartmouth Health filed a Motion for Summary Judgment, attaching ten exhibits and four affidavits. (Doc. 139.) Dr. Porter opposed the Motion, attaching twenty-two exhibits including four affidavits. (Doc. 140.) Dartmouth Health filed a Reply, attaching one exhibit. (Doc. 143.) The parties also filed memoranda regarding designating several documents confidential. (Docs. 141, 142, 145.) The Court held a status conference in June 2020. At that conference, the Court ordered Documents 10 and 11 sealed, and discussed with the parties possible settlement, oral argument on the pending Motion for Summary Judgment, and trial. (*See* ECF No. 148.) The Court granted Dartmouth Health's Motion for Summary Judgment on November 3, 2020 (Doc. 152), and Dr. Porter appealed.

The Second Circuit held oral argument on February 24, 2022. (Doc. 300-1 at 4.) On February 27, 2024, the Second Circuit issued a 100-page Judgment affirming in part, and vacating and remanding in part. (Doc. 157.) Specifically, the Second Circuit found that the District Court "did not properly apply summary judgment standards in considering the evidence as to pretext and causation, and therefore it erred in concluding that no rational juror could infer that plaintiff was terminated, and not retained, based on her disability or her whistleblowing-type activity." (Doc. 157-1 at 3.) The Judgment vacated "so much of the [district court] judgment as dismissed plaintiff's claims of disability discrimination in the termination of her employment, in violation of the ADA, the Rehabilitation Act, and the laws of New Hampshire and Vermont, and her claims of whistleblower discrimination and wrongful discharge in violation of New Hampshire law, and . . . remand[ed] for trial of those claims." (*Id.* at 100.) The Judgment affirmed insofar as the District Court had dismissed Dr. Porter's claims "that she was otherwise discriminated against by denial of

6

a reasonable accommodation for her disability prior to her termination or was retaliated against for exercising her rights to such accommodation." (*Id.* at 3.)

On remand, the Court appointed John Schraven as "special settlement master," allowing each party time to object or otherwise respond. (Docs. 158, 170.) At a March 2024 hearing, the Court introduced the parties to Mr. Schraven and discussed reassignment of the case to the undersigned Magistrate Judge. (*See* ECF No. 169.) Upon consent of the parties, the case was reassigned to the undersigned on April 16, 2024. (Doc. 174.) At some point afterwards, the parties participated in a mediation session with Mr. Schraven, but "failed to make progress toward settlement." (Doc. 300-1 at 6.) On June 17, 2024, the Court set the case for jury draw and trial beginning on March 24, 2025. (Doc. 179.)

In August 2024, Dr. Porter's designated damages expert, Robert Bancroft, Ph.D., submitted an expert report opining that Dr. Porter's total economic loss in connection with her loss of employment with Dartmouth Health was $4,329,258.[4] (*See* Doc. 235-1.)

The Court held a pretrial conference on January 13, 2025,[5] and set a February 14 filing deadline for any pretrial motions including motions *in limine*. (*See* ECF No. 194.) On February 4, Dr. Porter filed a Motion to Unseal Documents 10 and 11 (Doc. 197), which the Court granted over Dartmouth Health's opposition (*see* Doc. 226). On February 14, Dartmouth Health filed four Motions *in Limine*, including a motion to preclude the testimony of Dr. Bancroft and a Motion to Quash Trial Subpoena. (Docs. 198–202.) Oppositions and replies were filed regarding these five Motions. On March 14, the Court heard oral argument on the Motions and held a *Daubert* hearing

---

[4] Dr. Bancroft had previously submitted two expert reports in October 2018 and October 2019. (*See* Docs. 198-2 and 198-3.) The 2018 report estimated Dr. Porter's damages at $3,022,020 (*see* Doc. 198-2 at 4); and the 2019 report estimated the damages at either $4,835,551 or $6,438,646, depending on several variables (*see* Doc. 198-3 at 3, 6).

[5] All dates referenced from this point forward are for the year 2025, unless otherwise indicated.

7

A-1637

regarding Dr. Bancroft's qualifications, ultimately taking the Motions under advisement. (*See* ECF No. 228.) During the course of the above-described briefing, Dr. Porter filed a Motion for Leave to Amend Complaint (Doc. 213), seeking to file a second amended complaint adding a claim under Vermont's Whistleblower Protection Act, 21 V.S.A. § 507 *et seq*. (*see* Doc. 213-2 at 32–33). Dartmouth Health opposed the Motion. (*See* Doc. 224.)

On March 19, Dr. Bancroft submitted an additional expert report, reducing Dr. Porter's total economic loss from approximately $4 million, as noted above, to $1,787,722. (Doc. 235-2.) This prompted Dartmouth Health to file a renewed motion to preclude Dr. Bancroft's testimony, arguing that if the Court allowed such testimony, it should permit Dartmouth Health to present its own expert witness, who could be deposed "perhaps over one of the weekends during trial." (Doc. 235 at 7 n.3.) Dr. Porter opposed the renewed motion, explaining that Dr. Bancroft's updated report simply included "the most current and accurate information" and responded to issues that Dartmouth Health had identified during its questioning of Dr. Bancroft at the March 14 evidentiary hearing. (Doc. 236 at 2.)

Between March 18 and March 21, the Court issued orders denying Dartmouth Health's four Motions *in Limine*, its renewed Motion *in Limine* regarding Dr. Bancroft, and its Motion to Quash. (Docs. 229, 231, 234, 238–39.) The Court also issued an order denying Dr. Porter's Motion for Leave to Amend Complaint. (Doc. 233.)

On March 24, a jury was selected and counsel delivered opening statements. (*See* ECF No. 247.) Over the fourteen days of trial, each party was represented by three attorneys: Gregory Vitt, Eric Jones, and Sarah Nunan for Dr. Porter; and Tristram Coffin, Donald Schroeder, and Morgan McDonald for Dartmouth Health.[6] Dr. Porter called fourteen witnesses, including expert witness

---

[6] Attorney Megan Martinez also assisted in the representation of Dartmouth Health, but did not make any oral argument or question any witnesses.

Dr. Bancroft, and Dartmouth Health called eight witnesses. (*See* Doc. 286.) Ninety documentary

exhibits were admitted into evidence. (*See* Doc. 285.) Notwithstanding the Court's earlier denial

of Dartmouth Health's two Motions *in Limine* to preclude the testimony of Dr. Bancroft (*see*

Docs. 198, 235, 238), on March 26 and March 29 Dartmouth Health filed a Motion *in Limine* to

preclude the admission of Dr. Bancroft's expert report (Doc. 248) and a Motion *in Limine* to limit

or strike Dr. Bancroft's undisclosed expert opinions (Doc. 254). Dr. Porter filed an Opposition to

the latter Motion. (Doc. 257.) The Court issued an oral ruling on March 31 denying the Motion.

(*See* ECF No. 258.) On April 1, Dartmouth Health made an oral motion regarding the testimony of

Dr. Porter's witness Dr. Michelle Russell, which the Court granted in part and denied in part,

issuing a limiting instruction regarding Dr. Russell's testimony. (*See* ECF No. 260; *see also* Doc.

291 at 124–210.)

Dr. Porter rested her case on April 2, and Dartmouth Health renewed its request to

preclude the admission of Dr. Bancroft's expert report. The Court ruled that the report would not

be admitted into evidence but could be used for demonstrative purposes. (*See* ECF No. 261; *see*

*also* Doc. 292 at 59–61.) On the same date, Dartmouth Health made an oral motion for directed

verdict, which the Court denied. (*See* ECF No. 261; *see also* Doc. 292 at 65–110.) On April 4,

Dartmouth Health rested its case and renewed its motion for directed verdict, which the Court

again denied. (*See* ECF No. 264.) On April 6, Dartmouth Health filed a memorandum requesting

jury instructions regarding the interest rate that should apply to any damages awarded to Dr. Porter

(Doc. 266), and Dr. Porter filed a motion to preclude any reduction of damages based on

Dartmouth Health's conditional offer of severance pay at the time of her termination (Doc. 267).

Each party opposed in writing the other party's filing. (*See* Docs. 268–29.) The Court found that

Dartmouth Health's memorandum was moot. (*See* Doc. 295 at 69.) After providing counsel with

the proposed jury charge and verdict form (*see* Docs. 270–71), the Court held the charge

9

conference with counsel on April 7 (*see* ECF No. 272). On April 8, the Court granted in part and denied in part Dr. Porter's motion seeking to preclude a reduction in damages based on the offer of severance (*see* Doc. 267); the parties made their closing arguments; Dartmouth Health moved to strike Dr. Porter's rebuttal statement; the Court denied Dartmouth Health's motion to strike; the Court read the Jury Charge to the jury; and the jury began its deliberations. (*See* ECF No. 274.)

After deliberating for part of the day on April 8 and all day on April 9, the jury submitted a note to the Court requesting transcripts of testimony from four key trial witnesses: Dr. Porter, Dr. DeMars, Dr. Merrens, and Dr. Herrick. (*See* ECF No. 277, Doc. 279.) On the morning of April 10, the jury withdrew its request for transcripts, deliberated for almost all of that day, and rendered a verdict in favor of Dr. Porter on the VFEPA claim in the amount of $1,125,000. (ECF No. 280; *see* Doc. 281.)

## Analysis

### I.    Motion for Attorney Fees

State law governs the determination of attorney fees in diversity cases. *Grand Union Co. v. Cord Meyer Dev. Co.*, 761 F.2d 141, 147 (2d Cir. 1985) (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 n. 31 (1975)). In Vermont, parties are generally required to bear their own litigation costs, including attorney fees, absent a statutory or contractual provision to the contrary. *See Ring v. Carriage House Condo. Owners' Ass'n*, 2014 VT 127, ¶ 19, 198 Vt. 109, 119, 112 A.3d 754, 762; *L'Esperance v. Benware*, 2003 VT 43, ¶ 21, 175 Vt. 292, 300, 830 A.2d 675, 682. A prevailing party in a VFEPA action may seek compensation for "reasonable attorney's fees." *Spooner v. Town of Topsham*, 2010 VT 71, ¶ 8, 188 Vt. 293, 297, 9 A.3d 672, 675 (quoting 21 V.S.A. § 495b(b)). In relevant part, VFEPA provides: "Any person aggrieved by a violation of the provisions of this subchapter may bring an action in Superior Court seeking," among other items, "costs [and] reasonable attorney's fees." 21 V.S.A. § 495b(b); *see Payne v.*

10

*U.S. Airways, Inc.*, 2009 VT 90, ¶ 15, 186 Vt. 458, 467, 987 A.2d 944, 950; *McHugh v. Univ. of Vermont*, 758 F. Supp. 945, 948–49 (D. Vt. 1991), *aff'd*, 966 F.2d 67 (2d Cir. 1992); *Clark v. Metro. Life Ins. Co.*, CIV. A. No. 88–95, 1990 WL 1222107, at *7 (D. Vt. May 3, 1990).

In determining a reasonable attorney fees award, courts generally "begin by calculating the 'lodestar' amount—the number of hours reasonably spent on the case times a reasonable hourly rate." *Ring*, 2014 VT 127, ¶ 20, 198 Vt. at 119, 112 A.3d at 762 (citing *Huard v. Henry*, 2010 VT 43, ¶ 11, 188 Vt. 540, 999 A.2d 1264 (mem.)). "Once the court arrives at a lodestar amount, the court can then adjust the number upward or downward based on a number of factors, including the novelty of the legal issue, the experience of the attorney, and the results obtained in the litigation."[7] *Ring*, 2014 VT 127, ¶ 20, 198 Vt. at 119, 112 A.3d at 762 (internal quotation marks omitted); *see Spooner*, 2010 VT 71, ¶ 8, 188 Vt. 293, 297, 9 A.3d 672, 675 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) and enumerating twelve *Johnson* factors). Because the attorney fees award is based on the specific facts of each case, trial courts are granted wide discretion in determining the amount of the award, and the appellate court "will not reverse that

---

[7] The case law refers to these considerations as "the *Johnson* factors," which include: (1) "[t]he time and labor required"; (2) "[t]he novelty and difficulty of the questions"; (3) "[t]he skill requisite to perform the legal service properly"; (4) "[t]he preclusion of other employment by the attorney due to acceptance of the case"; (5) "[t]he customary fee"; (6) "[w]hether the fee is fixed or contingent"; (7) "[t]ime limitations imposed by the client or the circumstances"; (8) "[t]he amount involved and the results obtained"; (9) "[t]he experience, reputation, and ability of the attorneys"; (10) "[t]he 'undesirability' of the case"; (11) "[t]he nature and length of the professional relationship with the client"; and (12) "[a]wards in similar cases." *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 90, 92–93, 96 (1989); *see Hensley v. Eckerhart*, 461 U.S. 424, 429–30 (1983). More recently, the Second Circuit held that the District Court should, "in determining what a reasonable, paying client would be willing to pay, consider factors including, but not limited to, the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation." *Arbor Hill*, 522 F.3d at 184; *see id.* at 190 (abandoning the term "lodestar," finding that its meaning "has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness"). In sum, the Second Circuit explained that "[t]he net result of the fee-setting jurisprudence here and in the Supreme Court is that the district courts must engage in an equitable inquiry of varying methodology while making a pretense of mathematical precision." *Id.* at 189.

11

award absent an abuse of discretion." *L'Esperance*, 2003 VT 43, ¶ 28, 175 Vt. 292, 303, 830 A.2d 675, 684.

"For purposes of an award of attorney's fees under Vermont law, the touchstone is reasonableness." *Perez v. Travelers Ins. ex rel. Ames Dep't Stores, Inc.*, 2006 VT 123, ¶ 13, 181 Vt. 45, 52, 915 A.2d 750, 755. Similarly, VFEPA explicitly provides for an award of "reasonable attorney's fees." 21 V.S.A. § 495b(b). "The presumptively reasonable fee boils down to 'what a reasonable, paying client would be willing to pay,' given that such a party wishes 'to spend the minimum necessary to litigate the case effectively.'" *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quoting *Arbor Hill Concerned Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 118 (2d Cir. 2007), *amended and superseded on other grounds by* 522 F.3d 182 (2d Cir. 2008) and 575 F.3d 170 (2d Cir. 2009)). "Both [the Second Circuit] and the [United States] Supreme Court have held that the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'" *Degreenia-Harris v. Life Ins. Co. of N. Am.*, Case No. 2.19-CV-00218, 2021 WL 5979683, at *8 (D. Vt. Dec. 17, 2021) (first alteration in original) (footnote omitted) (quoting *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011)) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008); *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010)). The Vermont Supreme Court adheres to the same principle. "There is a strong presumption that th[e] 'lodestar figure' represents a reasonable fee." *Hum. Rts. Comm'n v. LaBrie, Inc.*, 164 Vt. 237, 250, 668 A.2d 659, 668 (1995). Given the strong presumption of reasonableness, "the lodestar can be adjusted only in 'rare and exceptional circumstances.'" *Degreenia-Harris*, 2021 WL 5979683, at *8 (quoting *Perdue*, 559 U.S. at 552–53).

A request for attorney fees "should not result in a second major litigation." *Hensley*, 461 U.S. at 437. In fact, "[i]deally, . . . litigants will settle the amount of a fee." *Id.* Where

12

settlement is not possible, "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Id.* But "trial courts need not, and indeed should not, become green-eyeshade accountants" in determining attorney fee motions. *Fox v. Vice,* 563 U.S. 826, 838 (2011). The Supreme Court has described the nature of the fee determination inquiry and the corresponding deference to a trial court's reasonable assessment of fees:

> The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations, in light of the district court's superior understanding of the litigation. We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it.

*Id.* (citations and internal quotation marks omitted). To arrive at an appropriate award, the district court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award" by a reasonable percentage. *Hensley*, 461 U.S. at 436–37. "[D]istrict courts in our Circuit regularly employ percentage reductions as an efficient means of reducing excessive fee applications." *Pasini v. Godiva Chocolatier, Inc.*, 764 F. App'x 94, 95 (2d Cir. 2019) (quoting *Marion S. Mishkin L. Off. v. Lopalo*, 767 F.3d 144, 150 (2d Cir. 2014)); *see Pasini*, 764 F. App'x at 95 ("Where a fee application is excessive, . . . a district court may exercise its discretion to 'use a percentage deduction as a practical means of trimming fat from a fee application.'" (quoting *McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006))); *New York State Ass'n for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983) ("In . . . cases with voluminous fee applications, courts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application[, and t]hese courts have endorsed percentage cuts as a practical means of trimming fat from a fee application" (citations omitted)).

13

Dr. Porter requests an attorney fees award of $1,738,341.50, which she asserts is the lodestar amount, representing the number of hours that her lawyers and paralegals reasonably expended on the case multiplied by the normal and customary hourly billing rates of these attorneys and paralegals.[8]

### A.     Reasonableness of Hourly Rates

In calculating the lodestar, the first step is to determine reasonable hourly rates. "A district court has discretion to determine a reasonable hourly rate based on considerations such as the complexity of the case, the prevailing rates in similar cases in the district, and the quality of representation." *Pasini*, 764 F. App'x at 95. As this Court recently explained, "[a] court calculating the appropriate hourly rate will . . . consider . . . factors . . . [such as] the time and labor required, the novelty and the difficulty of the questions, and the level of skill required to perform the legal service properly." *Chaney v. Vermont Bread Co.*, Case No. 2:21-cv-120, 2024 WL 1270788, at *2 (D. Vt. Mar. 26, 2024) (citing *Arbor Hill*, 522 F.3d at 186 n.3, 190); *see Shapiro v. United States Soc. Sec. Admin.*, Case No. 2:19-cv-000238, 2022 WL 951371, at *2 (D. Vt. Mar. 30, 2022) (listing factors) (quoting *Arbor Hill*, 522 F.3d at 186 n.3); *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 204 (E.D.N.Y. 2006), *aff'd*, 531 F.3d 127 (2d Cir. 2008) ("The specific rate that is reasonable for a given attorney depends on such factors as the attorney's experience and expertise, the novelty and complexity of the issues presented, and the overall success achieved in the case."). Courts may consider these factors "holistically, rather than applying each factor

---

[8] Dr. Porter includes in her Motion for Attorney Fees a request for costs totaling $29,959.20, which she claims she incurred for: (1) attorney travel, hotel stays, and meals during the trial; (2) the deposition of her expert witness, Dr. Robert Bancroft; (3) Dr. Bancroft's attendance at the pretrial *Daubert* hearing; and (4) two mediations. (Doc. 300 at 11–12.) Dartmouth Health notes, however (*see* Doc. 306 at 5, Doc. 309 at 10–11), that neither the Motion for Attorney Fees nor any subsequent filing by Dr. Porter—including the revised Bill of Costs which attaches documentation of other costs (*see* Doc. 319–319-2)—includes a receipt, invoice, proof of payment, affidavit, declaration, or any other documentation evidencing these costs. Furthermore, Dr. Porter has presented no legal argument in any of her post-trial submissions to support an entitlement to these particular costs. The Court therefore does not consider them part of Dr. Porter's request for either attorney fees or costs. Moreover, at this late date the Court will not entertain a future request for consideration of these costs.

individually to the facts of the case." *K.K. v. New York City Dep't of Educ.*, 23-CV-4430 (JMF) (VF), 2024 WL 4203783, at *5 (S.D.N.Y. Aug. 22, 2024), *report and recommendation adopted*, 2024 WL 4203251 (Sept. 16, 2024). As noted above, the court's goal should be "to do rough justice, not to achieve auditing perfection." *Id.* (quoting *Fox*, 563 U.S. at 838); *see Lochren v. County of Suffolk*, 344 F. App'x 706, 709 (2d Cir. 2009) ("*Arbor Hill* did not hold that district courts must recite and make separate findings as to all twelve *Johnson* factors.").

"Because fee-shifting statutes provide little incentive to negotiate rates prior to litigation, the court 'bears the burden of disciplining the market' and setting a 'reasonable hourly rate' for the services of counsel." *Shapiro*, 2022 WL 951371, at *2 (quoting *Arbor Hill*, 522 F.3d at 184). The "touchstone" of fee-shifting statutes is "that district courts should award fees *just high enough* to attract competent counsel." *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 176 (2d Cir. 2009) (internal quotation marks omitted).

Courts typically apply the "forum rule" in determining reasonable hourly rates, which sets "the hourly rates employed in the district in which the reviewing court sits" as a "presumptively reasonable fee." *Bergerson v. N.Y. State Off. of Mental Health*, 652 F.3d 277, 290 (2d Cir. 2011) (internal quotation marks omitted); *see Fine Foods, Inc. v. Dahlin*, 147 Vt. 599, 605, 523 A.2d 1228, 1232 (1986) (holding that, in deciding reasonableness of fees, courts must consider "the usual prices charged by other attorneys for similar services in the same vicinity and in the same court"). To determine the prevailing market rate, the court is to "take judicial notice of the rates awarded in other cases," and may "rely on its own familiarity with the prevailing market rates in the . . . [d]istrict." *Farbotko v. Clinton County*, 433 F. 3d 204, 210–11 (2d Cir. 2005); *see Chaney*, 2024 WL 1270788, at *2. When considering rates awarded in other cases, the court should increase those rates to account for the passage of time. *See, e.g., Minott v. Google LLC*, 24-CV-01674 (MMG), 2024 WL 3518525, at *6 (S.D.N.Y. July 24, 2024) (finding that increase in

15

attorney's hourly rate was warranted where rate was determined in a case approximately two years earlier), *aff'd sub nom. Minott v. The Washington L. Firm PLLC*, No. 24-2275, 2025 WL 2111878 (2d Cir. July 29, 2025); *Wang v. Shun Lee Palace Rest., Inc.*, 17-CV-840 (VSB), 2023 WL 5022758, at *3 (S.D.N.Y. July 24, 2023) ("Given that two calendar years have passed between the first instance of sanctioned behavior and the currently discussed behavior, and that annual increases in billing rates are customary at many law firms, . . . rate increases . . . [are] reasonable."). The court may also consider "any credible evidence that [the moving party] submits in advocating a higher prevailing rate." *Brady*, 455 F. Supp. 2d at 204. The burden rests with the attorney seeking a fee award to establish the hourly rate "with satisfactory evidence—in addition to the attorney's own affidavits." *Hugee v. Kimso Apartments, LLC*, 852 F. Supp. 2d 281, 298 (E.D.N.Y. 2012) (internal quotation marks omitted).

To aid in the determination of the appropriate hourly rates in this case, the Court reviews rates awarded in this District in recent cases. Approximately seven years ago, this Court allowed attorneys hourly rates of $225 and $275 in a case involving relatively straightforward consumer protection and warranty issues. *See Centrella v. Ritz-Craft Corp. of Pa., Inc.*, Civil Action No. 2:14–cv–111–jmc, 2018 WL 840041, at *6–7 (D. Vt. Feb. 12, 2018). About three years later, this Court allowed hourly rates of $350 for a senior partner, $225 for associate attorneys, and $110 for paralegals at the Vermont law firm Langrock Sperry & Wool (one of the firms representing Dr. Porter in this case). *See Sullivan v. Saint-Gobain Performance Plastics Corp.*, Case No. 5:16-cv-125, 2021 WL 1851404, at *2 (D. Vt. May 10, 2021). In the same case, the Court found that, with respect to "national-level environmental counsel," hourly rates of $400 for senior attorneys, $250 for associate attorneys, and $125 for legal assistants were appropriate. *Id.* at *3. In a 2021 case, where one Vermont attorney sought hourly fees of between $400 and $450 and a second Vermont attorney requested an hourly rate between $350 and $400, and where an expert witness

16

testified that such fees "are on the high end of what the Vermont market will bear and are reserved for cases with complex issues," this Court reduced the rates to $275 and $225, respectively. *Degreenia-Harris*, 2021 WL 5979683, at \*10–11. In a 2022 Freedom of Information Act case against the Social Security Administration, the Court allowed hourly rates of $270 for a partner and $185 for an associate at the Langrock Sperry & Wool firm. *See Shapiro*, 2022 WL 951371, at \*3.

In a 2023 tort case that did not require specialized legal expertise, this Court allowed an hourly rate of $225 for Vermont counsel, despite a request for $350–$365, and an hourly paralegal rate of $125. *See Ha v. Conn*, Case No. 2:20-cv-155, 2023 WL 5287214, at \*2 (D. Vt. Aug. 17, 2023). In a contemporaneous case involving claims of libel, defamation, negligence, and false light, a Vermont Superior Court Judge allowed an hourly rate of $435 for local counsel, finding the rate to be "commensurate with [counsel's] statewide experience, training, reputation, and expertise in this specific area of law." *Rivard v. Smallheer*, No. 22-CV-04364, 2023 WL 7309300, at \*2 (Vt. Super. Wash. Cnty. Oct. 20, 2023).

In 2024, this Court allowed hourly attorney rates of $200, $225, $350, $450, and $600, depending on the location and experience of each attorney. *See Chaney*, 2024 WL 1270788, at \*3–4. The Court explained that the case was a "uniquely complex" class action, "requiring specialized knowledge of the [Worker Adjustment and Retraining Notification] Act." *Id.* at \*3. In another 2024 case, this Court allowed an hourly request for attorney fees in the amount of $205, agreeing with the expert opinion of local counsel that "$205 is at the lower end of usual and customary rates charged in Burlington and Vermont for litigation in 2022." *Cole v. Foxmar, Inc.*, Case No. 2:18-cv-00220, 2024 WL 4609023, at \*4 (D. Vt. Oct. 29, 2024) (internal quotation marks omitted), *vacated and remanded on other grounds*, 2025 WL 3152782 (2d Cir. Nov. 12, 2025). In a third 2024 case, the Court allowed the requested hourly rate of $250. *Jankowski v. Centurion of*

17

A-1647

*Vermont, LLC*, Civil Action No. 2:22-cv-169-cr-kjd, 2024 WL 48855, at *2 (D. Vt. Jan. 4, 2024).

Finally, in July 2025, the Court allowed an hourly attorney rate of $350, noting the attorney's

"skill and experience," and the case's "complex legal issues" and "protracted discovery dispute."

*Concepts NREC, LLC v. Xuwen Qiu*, Civil Action No. 5:20-cv-133, 2025 WL 2793049, at *3 (D.

Vt. July 21, 2025.) The decision explained that "this Court has deemed a $300 hourly rate

reasonable for an experienced attorney in a standard case." *Id.* The Court further reasoned that the

case warranted a higher than normal hourly rate because it "involved complex legal issues,

including the development of an evidentiary record substantiating personal jurisdiction under an

alter ego theory to enforce subpoenas against a non-party foreign corporation, as well as litigation

regarding potential legal consequences to [a company] in China for its compliance with [a]

subpoena." *Id.*

In this case, Dr. Porter seeks reimbursement for services rendered by various attorneys and

paralegals, all but one of whom are affiliated with two Vermont law firms. One of the firms, Vitt

& Nunan, has two member attorneys, Geoffrey Vitt and Sarah Nunan, and one "of counsel"

attorney, Sarah Merlo. The firm is based in Norwich, Vermont. The other firm, Langrock Sperry

& Wool, has approximately twenty-five attorneys, including one of Dr. Porter's trial attorneys,

Eric Jones. The Langrock firm has offices in Burlington and Middlebury. The remaining attorney

who represented Dr. Porter in this case is Attorney Katie Kramer. When Attorney Kramer entered

an appearance on behalf of Dr. Porter in January 2018, she was a solo practitioner in Middlebury,

Vermont. (Doc. 300-1 at 2.) In late 2020, Kramer joined the New York law firm DGW Kramer

LLP (*id.* at 2, 7),[9] and in 2024 she joined the New York office of DTO Law (*id.* at 7), at which

---

[9] According to DGW Kramer LLP's billing records, a timekeeper named Gareth Turo billed for .3 hours of time on July 16, 2020, at a rate of $250/hour, for a total charge of $75. (*See* Doc. 300-4 at 4.) This individual is not referenced in any of Dr. Porter's filings. Accordingly, the Court does not include this charge in its lodestar calculation.

18

A-1648

time her hourly rate increased substantially (*see id.* at 6–7). Dr. Porter has submitted

contemporaneous time records from each law firm and from Attorney Kramer, as well as

affidavits from Attorney Vitt and Attorney Jones. Dr. Porter seeks the following hourly rates for

the legal professionals involved with the case:

<u>Vitt & Nunan Attorneys (Norwich, VT)</u>

| | |
|---|---|
| Geoffrey Vitt | $320 (2017–2022); $400 (2024–2025) |
| Sarah Nunan | $150 (2020–2022); $250[10] (2024–2025) |
| Sarah Merlo | $200–$230 (2017–2020)[11]; $325 (2024–2025)[12] |

<u>Langrock Sperry & Wool Attorneys (Burlington and Middlebury, VT)</u>

| | |
|---|---|
| Eric Jones | $375 (2024); $395 (2025) |
| Alison Bell | $415 |
| Bridget Grace | $225 |
| Wendy Radcliff | $250 |

<u>Solo Attorney (Middlebury, VT) and DGW Kramer LLP Attorney (New York, NY)</u>

| | |
|---|---|
| Katie Kramer | $175 (2018–2020) |

---

[10]  Although Dr. Porter states in her Motion for Attorney Fees that Attorney Nunan billed at a rate of $260/hour from 2024 through preparation of the Motion (*see* Doc. 300 at 4; Doc. 300-1 at 6), the actual billing records attached to the Motion indicate that her billing rate was $250/hour during that period (*see, e.g.*, Doc. 300-5 at 127–34). Likewise, the chart attached as Exhibit A to Dr. Porter's "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees" indicates a rate of $250/hour and not $260/hour. (*See* Doc. 330-1 at 1.) The Court therefore uses the $250 hourly rate for Attorney Nunan's work done in 2024 and 2025 in calculating the lodestar.

[11]  Dr. Porter does not state in her Motion for Attorney Fees or in either of the attached Declarations what Attorney Merlo's hourly rates were before 2024. The billing records themselves, however, indicate that Attorney Merlo billed at a rate of $200/hour in 2019 (*see, e.g.*, Doc. 300-3 at 198, 224), and the chart attached as Exhibit A to Dr. Porter's "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees" indicates an hourly rate of "$200-230" for Attorney Merlo during the years 2017 through 2020 (Doc. 330-1 at 1). Given the Court's inability to accurately calculate the lodestar without knowing the hours expended at each rate within this range, the Court assigns an hourly rate of $200 to Attorney Merlo for the period from 2020 and earlier.

[12]  In Exhibit A to her "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees," Dr. Porter lists an attorney named Phillipa Lilienthal among the timekeepers in this case, indicating that this attorney billed a total of $340 in 2018 and 2019. (*See* Doc. 330-1 at 1.) This attorney is not mentioned in Dr. Porter's Motion for Attorney Fees or in either of the attached Declarations. This attorney also was not mentioned in Dr. Porter's Reply or in either of her supplemental memoranda. The Court therefore does not include any time billed by Attorney Lilienthal in calculating the lodestar.

DTO Law Attorney (New York, NY)

Katie Kramer          $450 (2024)

Paralegals (all firms)  $50–$155 (2017–2025)

As an initial matter, the Court notes that Dartmouth Health does not challenge the requested rates. Moreover, the Court finds that this case was fairly complex, raising federal claims and claims under Vermont and New Hampshire law. Moreover, the Second Circuit's lengthy decision over six years after the lawsuit was filed represented a substantial change in the posture of the case as the matter was remanded for trial. The Court also takes into account the following factors: (1) the pendency of the case for nearly eight years; (2) the heavily contested nature of the litigation, evidenced by the filing of numerous pretrial motions—including discovery motions and motions *in limine*—and at least two unsuccessful mediations conducted by a special settlement master; (3) the almost three-week trial during which each party was represented by three or more attorneys; and (4) the jury's deliberations over approximately three days before reaching a verdict.

Although these factors might warrant somewhat higher than normal hourly rates, the Court is nevertheless constrained by market rates in this District to find that some of the requested hourly rates are either not reasonable or not warranted in this case. "[A] cost-conscious, rate-paying client would not necessarily seek out the most expensive trial lawyers in Vermont" for this case, but rather would hire competent Vermont attorneys with the requisite skill in employment litigation and knowledge of the state and federal laws governing the asserted claims. *Degreenia-Harris*, 2021 WL 5979683, at *10.

Mindful of rates this Court has applied in previous cases (and the parties having provided no reason to depart from these rates), I find that attorney hourly rates of over $350 and paralegal hourly rates of over $90 are not reasonable in this case. This conclusion is consistent with the Second Circuit's admonition that "attorney's fees are to be awarded with an eye to moderation,

seeking to avoid either the reality or the appearance of awarding windfall fees." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 266 (2d Cir. 2014) (internal quotation marks omitted). In the end, "a reasonable, paying client wishes to spend the minimum necessary to litigate the[ir] case effectively." *Degreenia-Harris*, 2021 WL 5979683, at *11 (internal quotation marks omitted). Accordingly, after consideration of the factors identified above and the information Dr. Porter includes in her fees submissions to the Court, including the Declarations of Attorneys Vitt and Jones, I find that the following rates are reasonable in this case:

| | |
|---|---|
| Geoffrey Vitt | ~~$320~~ $300 (2017–2022); ~~$400~~ $350 (2024–2025) |
| Sarah Nunan | $150 (2020–2022); $250 (2024–2025) |
| Sarah Merlo | $200 (2017–2020); ~~$325~~ $250[13] (2024–2025) |
| Eric Jones | ~~$375~~ $325 (2024); ~~$395~~ $350 (2025) |
| Alison Bell | ~~$415~~ $300[14] |
| Bridget Grace | $225 |
| Wendy Radcliff | $250 |
| Katie Kramer | $175 (2018–2020) |
| Katie Kramer | ~~$450~~ $350 (2024) |
| Paralegals | ~~$50 – $155~~ $90[15] (2017–2025) |

---

[13] Although Attorney Merlo apparently billed at an hourly rate of $325 in 2024 and 2025, Dr. Porter has not provided any information regarding Attorney Merlo's experience or background. Therefore, the Court finds that an hourly rate above $250 is not justified.

[14] Dr. Porter represents in her Motion for Attorney Fees that Attorney Bell is a partner at Langrock Sperry & Wool, LLP (Doc. 300 at 4), but beyond that provides no further information bearing on the hourly rate determination. Therefore, the Court finds that an hourly rate above $300 is not justified.

[15] The Court has received no information regarding the professional experience of any of the paralegals who billed for work in this case other than the very limited information in Attorney Vitt's Declaration about former paralegal Nunan. (*see* Doc. 300-1 at 6). Dr. Porter also has not cited caselaw supporting the hourly paralegal rates in this case. Therefore, the Court sets a uniform rate, relying on its own familiarity with hourly paralegal rates prevailing in this District, reduced slightly to account for the absence of information about each individual paralegal who billed in this case. *See, e.g., H.B. Auto. Grp., Inc. v. Kia Motors Am., Inc.*, 13cv4441 (VEC) (DF), 2018 WL 4017698, at *9 (S.D.N.Y. July 25, 2018) (finding that "courts . . . have reduced [paralegal] rate[s] substantially where there was no explanation of a paralegal's expertise or experience"), *report and recommendation adopted sub nom. H.B. Auto. Grp., Inc. v. Kia Motors Am.*, 2018 WL 4007636 (Aug. 22, 2018); *Malletier v. Apex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 362 (S.D.N.Y. 2010) ("Where the moving party fails to provide information on the attorneys' and paralegals'

21

A-1651

### B.     Reasonableness of Hours Expended

The Court must next determine whether the number of hours that the attorneys and paralegals worked on the case was reasonable. A fee award should compensate only for those hours that were "reasonably expended." *McDonald*, 450 F.3d at 96 (quoting *Hensley*, 461 U.S. at 434–35). "As evidence that the number of attorney hours are reasonable, the fee application must be supported by contemporaneous time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Drywall Tapers and Pointers of Greater New York Loc. Union 1974, IUPAT, AFL-CIO v. Bronx Base Builders, Ltd.*, 18 Civ. 1088 (VSB) (JLC), 2019 WL 181214, at *5 (S.D.N.Y. Jan. 14, 2019) (internal quotation marks omitted); *see Carey*, 711 F.2d at 1154 ("All applications for attorney's fees, whether submitted by profit-making or non-profit lawyers, . . . should normally be disallowed unless accompanied by contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done."). In determining the number of hours reasonably expended, the court "should exclude excessive, redundant[,] or otherwise unnecessary hours." *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999). The court should also consider whether a case was "particularly complicated" or involved "novel legal issues significant to the legal community." *Millea*, 658 F.3d at 167 (internal quotation marks omitted). "In evaluating the reasonableness of hours expended, courts consider 'not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" *O.R. v. N.Y.C. Dep't of Ed.*, 340 F. Supp. 3d 357, 366–67 (S.D.N.Y. 2018) (quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1999)).

---

backgrounds and experience, courts have used their discretion to award fees at a rate lower than requested."); *Gen. Motors Corp. v. Villa Marin Chevrolet, Inc.*, 240 F. Supp. 2d 182, 188 (E.D.N.Y. 2002) (reducing paralegal fees because "[n]o information was submitted . . . concerning the levels of experience or expertise of any of the paralegals, and no information was submitted concerning the rates customarily charged for paralegals in this area").

The determination of reasonable hours expended is "best made by the district court on the basis of its own assessment of what is appropriate for the scope and complexity of the particular litigation." *Carey*, 711 F.2d at 1146; *see also Lore v. City of Syracuse*, 670 F.3d 127, 175 (2d Cir. 2012) (holding that "the district court, which is intimately familiar with the nuances of the case," is in the best position to determine an appropriate fee award (internal quotation marks omitted)). In making this decision, the district court "does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir. 1998) (quoting *DiFilippo v. Morizio*, 759 F.2d 231, 236 (2d Cir. 1985)). The court has "ample discretion" in assessing "the amount of work that was necessary to achieve the results in a particular case." *Ortiz v. Regan*, 980 F.2d 138, 141 (2d Cir. 1992); *see LaBrie*, 164 Vt. at 252, 668 A.2d at 670 (holding that trial court's factual determination that hours claimed for attorney activities were not excessive "is best left undisturbed absent strong evidence of excessiveness"). The court may exercise that discretion, "based on its experience in general and with the particular case at issue, to 'trim[ the] fat from a fee application.'" *N.Y. Youth Club v. Town of Harrison*, 12-CV-7534 (CS), 2016 WL 3676690, at *2 (S.D.N.Y. July 6, 2016) (alteration in original) (quoting *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998)). In other words, "[i]f a court finds that the fee applicant's claim is excessive, or that time spent was wasteful or duplicative, it may decrease or disallow certain hours[,] or, where the application for fees is voluminous, order an across-the-board percentage reduction in compensable hours." *Santa Fe Nat'l Tobacco Co. v. Spitzer*, Nos. 00 Civ. 7274(LAP), 00 CIV 7750(LAP), 2002 WL 498631, at *3 (S.D.N.Y. Mar 29, 2002).

Dr. Porter has submitted over four hundred pages of billing records documenting the time each legal professional spent on the case. (*See* Docs. 300-2 at 4 through 300-5 at 135.) Moreover,

23

at the Court's request, Dr. Porter has submitted a chart listing the total number of hours each legal professional spent on the case and their respective hourly rates. (*See* Doc. 330-1 at 1–2.) Given the volume of billing records in this case, the Court has not "engage[d] in a painstaking line-item review of each billing entry" in its determination of the appropriate number of compensable hours. *R.P. v. N.Y.C. Dep't of Educ.*, 21-CV-4054 (JMF), 2022 WL 1239860, at *5 (S.D.N.Y. Apr. 27, 2022); *see Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) ("We do not require that the court set forth item-by-item findings concerning what may be countless objections to individual billing items."); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 64 (2d Cir. 2014) (upholding district court's "across-the-board 50 percent reduction based on a perceived lack of detail in the billing records"). The Court has considered Dartmouth Health's objections in its review of the records and addresses the objections below.

### i.    Impermissibly Vague or Block-Billed Entries

Dartmouth Health argues that Dr. Porter's counsel's billing records "are replete with vague and incomplete narrative entries." (Doc. 309 at 4.) Dartmouth Health further asserts that many entries in the billing records "utilize block billing," or "grouping multiple tasks into a single entry without itemization." (*Id.*) Although Dartmouth Health does not point to any specific instances of vague/incomplete entries or block billing, they are readily apparent in the records. For example, a January 13, 2025 entry bills 7.7 hours of attorney time and includes the following explanation: "Prepare for and attend hearing with Judge Doyle re: status conference; review outline for witnesses and conf. E. Jones and S. Nunan re: order of witnesses and testimony of multiple possible trial witnesses; review Dr. Porter draft statements and comments." (Doc. 300-5 at 93.) Another example is found in a December 17, 2024 entry billing for 5.0 hours of attorney time and explaining: "Review and analyze documents regarding witnesses; analyze trial presentation strategy; video conference with Geoffrey Vitt and Sarah Nunan regarding trial preparation;

24

research HIPAA issues regarding witness examinations." (Doc. 300-2 at 6.) The billing records also contain vague or incomplete entries. For example, a March 13, 2024 entry states: "Work on motion" and "Call with G. Vitt" (Doc. 300-5 at 63), without identifying the type of motion and the purpose of the call. And a February 13, 2025 entry states only: "Research" and "Conf. with C. Lyon." (*Id.* at 105.)

Attorneys are not required to "record in great detail how each minute of [their] time was expended," but their billing records should "identify the general subject matter of [their] time expenditures." *Cole v. Foxmar, Inc.*, Case No. 2:18-cv-00220, 2024 WL 4609023, at *5 (D. Vt. Oct. 29, 2024) (quoting *Hensley*, 461 U.S. at 437 n.12), *vacated and remanded on other grounds*, 2025 WL 3152782 (2d Cir. Nov. 12, 2025). Although "[b]lock billing is not automatically prohibited, . . . the practice makes it difficult for the court to assess the reasonableness of individual activities." *Id.* (internal quotation marks omitted); *see Green v. City of New York*, 403 F. App'x 626, 630 (2d Cir. 2010) (affirming district court's across-the-board reduction due to "obfuscation inherent in block billing"); *Degreenia-Harris*, 2021 WL 5979683, at *11, 12 (finding that "the court cannot determine whether the hours incurred are reasonable" because "[s]ome entries are too vague to determine what work was performed" and because of "[t]he extensive use of block billing," resulting in a failure to "indicat[e] the amount of time spent on discrete tasks"). "[B]lock billing is most problematic where large amounts of time (e.g., five hours or more) are block billed; in such circumstances, the limited transparency afforded by block billing meaningfully clouds a reviewer's ability to determine the projects on which significant legal hours were spent." *King Fook Jewellry Grp. Ltd. v. Jacob & Co. Watches, Inc.*, 14 Civ. 742 (ER) (JLC), 2019 WL 2535928, at *9 (S.D.N.Y. June 20, 2019) (alteration in original) (internal quotation marks omitted), *report and recommendation adopted sub nom. King Fook Jewellery Grp. Ltd. v. Jacob & Co. Watches Inc.*, 2019 WL 4879212 (Oct. 3, 2019); *see id.* (citing cases and applying a

10% across-the-board reduction where some billing records "contain[ed] vague entries and extensive block-billing, . . . mak[ing] the overall reasonableness of the listed tasks difficult to discern").

The Court can generally discern the tasks completed and the amount of time expended in many of counsel's vague/incomplete and block-billed entries. But that is not the case for all of such entries. Therefore, the Court will reduce the fee award to account for these deficiencies in the billing. *See Raja v. Burns*, 43 F.4th 80, 87 (2d Cir. 2022) (holding that, to address vagueness and other deficiencies in the billing records, "the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application" (internal quotation marks omitted)); *Kirsch*, 148 F.3d at 172, 173 (upholding percentage reduction of award due to vague entries and "other deficiencies in the billing records").

### ii.     Fees Incurred Before Addition of VFEPA Claim

Dartmouth Health contends that any attorney fees Dr. Porter incurred before the addition of the successful VFEPA claim are not recoverable. (Doc. 309 at 4–5.) Dartmouth Health argues that "[w]hile it may be difficult to parse through every invoice entry to determine which entries relate to which claims, here the Court must, at the very least, deduct any fees and costs incurred prior to August 1, 2018, which total 833.45 hours, $146,338.50 in fees, and in $894.39 in costs." (*Id.* at 5.) Dartmouth Health cites *Anderson v. Sebelius*, No. 5:09–cv–16, 2011 WL 1832771, at *5 (D. Vt. May 12, 2011), to support its position. But *Anderson* is inapposite. In that case, this Court reduced an attorney fees award in favor of an individual plaintiff because the plaintiff's unsuccessful effort to obtain discovery and to terminate referral of the case to the magistrate judge were "distinct from other parts of the case and were wholly unsuccessful." *Id.*

As discussed in more detail below, Dr. Porter's VFEPA claim is not distinct from the other claims alleged in this lawsuit. All of Dr. Porter's claims are interrelated both factually and

26

A-1656

legally.[16] Moreover, the original Complaint in this case included disability discrimination claims under the ADA and New Hampshire law. The substance of those claims did not change in the Amended Complaint; Dr. Porter simply added additional claims of disability discrimination, including under VFEPA. The work that Dr. Porter's lawyers had done on the case before they filed the Amended Complaint was likely the impetus to pursue the VFEPA claim as an alternative theory of liability.

Therefore, the Court will not reduce Dr. Porter's attorney fees award by the amount of fees incurred prior to the addition of the VFEPA claim to the case. *See, e.g., Post & Beam Equities Grp., LLC v. Sunne Vill. Dev. Prop. Owners Ass'n*, 2015 VT 60, ¶¶ 49, 50, 199 Vt. 313, 337, 124 A.3d 454, 472–73 (2015) (rejecting argument that evidence regarding claims litigated before plaintiff filed amended complaint were "distinct and easy to parse," and finding that "most of the evidence presented was relevant to all claims" and that "the overarching narrative at the heart of th[e] case from the outset was part and parcel of the . . . claims [on which plaintiff prevailed]").

### iii.    Number of Depositions Conducted

Dartmouth Health claims it was excessive for Dr. Porter to have deposed eleven witnesses, one over two days, especially given that Dartmouth Health deposed only two witnesses and that Dr. Porter ultimately called only four of her deponents to testify at trial. (Doc. 309 at 5.) Dartmouth Health asserts that it should not be penalized for Dr. Porter's "needlessly overbroad discovery tactics." (*Id.*)

The Court finds no reason to reduce the number of hours billed based on the number of depositions counsel conducted. It is not unusual for plaintiffs, who bear the burden of proof, to

---

[16] Dartmouth Health's counsel conceded this fact, at least to some extent, at the hearing on the Motion for Attorney Fees: "Certainly there is some factual intermingling [between the VFEPA claim and the other claims]." (Doc. 332, at 59:18.) As a result of this "intermingling," counsel acknowledged that it would be difficult for the Court to separate out the work Dr. Porter's attorneys performed on the VFEPA claim, from the work they performed on the other claims. (*See id.* at 59:17–22, 60:17–22.)

27

take more depositions than defendants. Particularly in an employment case like this, where an individual employee is suing her prior employer, it is understandable that the employee would need to depose individuals who were also employed by the employer during the relevant period.

About four months after filing this case, Dr. Porter attempted to limit the number of depositions by requesting authorization to contact certain Dartmouth Health employees on a more informal basis, explaining: "Given the factual complexity and the large number of individuals with knowledge of relevant facts, [Dr. Porter] wants to engage in informal discovery, including interviews of current and former [Dartmouth Health] employees." (Doc. 20 at 3.) Dartmouth Health strenuously opposed the Motion, arguing that Dr. Porter was improperly asking the Court "to sanction her attempt to do an end-run around the discovery process." (Doc. 21 at 1.) Although the Court granted Dr. Porter's request, in part, listing categories of Dartmouth Health employees that Dr. Porter could not contact informally and allowing contact with all other Dartmouth Health employees (*see* Doc. 51 at 6), Dr. Porter ultimately opted to formally depose the relevant Dartmouth Health employees, thereby assuaging Dartmouth Health's concerns. Now, after Dr. Porter obtained a hard-fought verdict in her favor, Dartmouth Health argues that Dr. Porter should have deposed fewer individuals. The Court finds the argument unpersuasive. *See Ring*, 2014 VT 127, ¶ 26, 198 Vt. at 122, 112 A.3d at 764 (increasing attorney fee award "because of the role defendants played in increasing the costs of the litigation").

### iv.    Overstaffing Depositions and Trial / Redundant Billing Before Trial

Dartmouth Health next argues that Dr. Porter overstaffed depositions "with at least two partners present." (Doc. 309 at 5; *see id.* at 5–6 (chart documenting attorneys that attended depositions).) Dr. Porter responds that Attorney Kramer was not a partner; she was a contract employee charging Dr. Porter only $175/hour at the time of the depositions (Doc. 318 at 5), a lower rate than most associate attorneys bill in this District, as discussed above. Moreover, the

28

billing records reveal that Sarah Nunan was also not a partner during the relevant period, and in fact may not have been an attorney yet, as she was charging only $80/hour for her time at the depositions. (*See, e.g.*, Doc. 300-3 at 162, 163, 165, 168, 177, 178.) Furthermore, Dr. Porter notes that "it is easier to defend a deposition than to take one," and that "[h]aving a second lawyer present [at a deposition] is helpful especially when[,as here,] there has been an extensive document production and the subject matter is complicated." (Doc. 318 at 5.)

"In assessing the extent of staffing . . . appropriate for a given case, a district court must be accorded ample discretion." *Carey*, 711 F.2d at 1146. "While a court can generally reduce the number of hours charged by attorneys due to duplication, there are situations in which a certain level of duplication between attorneys is reasonable." *Spooner*, 2010 VT 71, ¶ 18, 188 Vt. at 302, 9 A.3d at 678 (citations omitted). The Vermont Supreme Court has explained that "[a] reduction in a fee is warranted only if the attorneys are *unreasonably* doing the *same* work," and that "[a]n award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation." *Id.* (quoting *Afro-American Patrolmen's League v. City of Atlanta*, 817 F.2d 719, 725–26 (11th Cir. 1987)). "[I]f multiple attorneys performed unique work on the case, plaintiff should be compensated for each attorney's distinct inputs." *Spooner*, 2010 VT 71, ¶ 19, 188 Vt. at 303, 9 A.3d at 679. Therefore, although "prevailing parties are not barred as a matter of law from receiving fees for sending a second attorney to depositions," "where two attorneys appear at a deposition on behalf of a single set of clients, they have some burden to show that each had a distinct responsibility in the case necessitating his or her presence." *Walker v. Coughlin*, 909 F. Supp. 872, 880 (W.D.N.Y. 1995) (internal quotation marks omitted).

Dartmouth Health does not identify specific duplicative work conducted by Dr. Porter's attorneys at depositions in this case. By the same token, Dr. Porter offers no particular reason why

two attorneys (plus a paralegal in some cases) needed to attend these depositions. Dr. Porter does not carry her burden by generally asserting that it is helpful to have a second lawyer at depositions in cases where there has been extensive document production and where the subject matter is complicated. Though there are situations where it is reasonable for two (or more) attorneys to attend a deposition, Dr. Porter has not offered sufficient explanation as to why it was reasonable with respect to each particular deposition at issue in this case. (*See* Doc. 318 at 5–6; *see also* Doc. 309 at 5–6 (chart).) Therefore, the Court will reduce Dr. Porter's fee award to account for this duplicative billing. *See IMS Health Inc. v. Sorrell*, No. 1:07–cv–188–jgm, 2012 WL 2915845, at *5 (D. Vt. July 17, 2012) (finding that plaintiffs "staffed the case with an inordinate number of attorneys, and other timekeepers, causing . . . inefficiency," and explaining that "[w]hen a large number of attorneys work on a case, duplicative billing is often the result").

The Court will also reduce the fee award to account for the substitution of Attorney Eric Jones for Attorney Katie Kramer shortly before trial. This substitution resulted in inefficiencies, as Attorney Jones was required to spend significant time acquainting himself with the facts and law of this case after it had been pending for approximately seven years. *See id.* (reducing the claimed hours, in part because "Plaintiffs' choice to retain separate appellate counsel required . . . more time for new counsel to familiarize themselves with the litigation"); *Concrete Flotation Sys., Inc. v. Tadco Constr. Corp.*, No. 07–CV–319 (ARR)(VVP), 2010 WL 2539771, at *6 (E.D.N.Y. Mar. 15, 2010) ("Staffing this litigation with a high number of attorneys ensured that (1) unnecessary time was spent so that each attorney acquainted himself or herself with the facts and the issues; and (2) unnecessary time was spent in communication with the other attorneys on the matter."), *report and recommendation adopted*, 2010 WL 2539661 (June 17, 2010).

On the other hand, the fee award will not be reduced due to Dr. Porter's staffing of attorneys at trial. Dartmouth Health claims that Dr. Porter "flagrant[ly] overstaff[ed]" her team at

30

trial because she had "three partners and zero associates" in attendance, which Dartmouth Health calls "a clear sign of inefficiency." (Doc. 309 at 6.) First, Dartmouth Health staffed its trial team with four attorneys (plus a paralegal), seemingly reflecting its own determination that three attorneys, whether partner or associate, were not enough to defend against Dr. Porter's claims in this case. As the plaintiff, Dr. Porter's burden to prove her claims was more substantial than Dartmouth Health's burden to defend against them. Therefore, the Court is not persuaded that Dr. Porter should have required fewer attorneys than Dartmouth Health at the trial of this case. *See Williamsburg Fair Hous. Comm. v. Ross-Rodney Hous. Corp.*, 599 F. Supp. 509, 518 (S.D.N.Y. 1984) ("[D]ivision of responsibility may make it necessary for more than one attorney to attend activities such as depositions and hearings[, and] [m]ultiple attorneys may be essential for planning strategy, eliciting testimony[,] or evaluating facts or law."). Second, the Court cannot credit Dartmouth Health's criticism that Dr. Porter staffed her trial team with "zero associates" when the law firm of Vitt & Nunan consists of only two member attorneys, Attorney Vitt and Attorney Nunan (*see* Doc. 318 at 6).

v.      **Number of Hours Spent on Opening Statement**

Dartmouth Health claims Dr. Porter's attorneys spent excessive time preparing Attorney Vitt's opening statement for trial, noting that Attorneys Vitt, Nunan, and Jones collectively billed 94 hours to complete this task over the course of multiple months. (Doc. 309 at 6.) Dr. Porter responds that, by the time counsel began preparing for trial, it had been many months since they had worked on the case, and there were "hundreds upon hundreds of documents to review and thousands of page[s] of depositions to read, and then witnesses to contact about possible trial testimony." (Doc. 318 at 6.) Recognizing the lengthy duration of this case and the large number of relevant documents and potential witnesses, the Court nonetheless finds that Dr. Porter's counsel excessively billed for their preparation of Dr. Porter's opening statement at trial. Therefore, the

31

A-1661

Court will reduce Dr. Porter's fee award to account for her attorneys' excessive billing for preparation of the opening statement at trial.

### vi.   Number of Hours Spent on Initial Discovery

Dartmouth Health contends that Dr. Porter's counsel spent excessive time on initial disclosures and discovery requests, which Dartmouth Health describes as "routine discovery" work. (Doc. 309 at 7.) Specifically, Dartmouth Health states that Dr. Porter's counsel required over 38 hours to prepare initial disclosures and document requests. (*Id.*) Dr. Porter responds that the hours spent on these tasks were reasonable, "given the number of issues in the case and the uncertainty about what caused the decision to close the REI Division and to terminate Dr. Porter's employment." (Doc. 318 at 6.)

Counsel may in some cases be justified in spending over 38 hours on initial disclosures and discovery requests, but Dr. Porter has not provided sufficient specific justification in this case. Therefore, the Court reduces Dr. Porter's fee award to account for her attorneys' excessive billing for initial disclosures and discovery requests. *See HVT, Inc. v. Port Auth. of N.Y. & N.J.*, 15 Civ. 5867 (MKB) (VMS), 2018 WL 6079932, at *6 (E.D.N.Y. Nov. 21, 2018) (reducing 67.3 hours to 20 hours for time spent preparing initial disclosures and responding to interrogatories, considering that "there were no issues of fact with regard to liability to be uncovered in this case"); *Brady*, 455 F. Supp. 2d at 212 (reducing lodestar hours by 30% due to excessive charge of 36 hours to draft initial disclosures and discovery requests).

### vii.   Amount of Time Spent on Motion for Attorney Fees

Finally, Dartmouth Health claims the amount of time that Dr. Porter's counsel spent preparing the pending Motion for Attorney Fees—over 91 hours—was excessive. (*See* Doc. 309 at 7–8.) Dr. Porter does not directly respond to this argument. (*See* Doc. 318.) The Court finds that, although the prevailing party has a right to seek reimbursement for fees incurred for preparing and

A-1662

arguing a motion for attorney fees, *see Murray ex rel. Murray v. Mills*, 354 F. Supp. 2d 231, 241 (E.D.N.Y. 2005) ("recogniz[ing] Plaintiffs' right to bill for time spent applying for fees and costs"), Dr. Porter's attorneys' billing records demonstrate excessive billing for their work on her Motion for Attorney Fees. Therefore, the Court will reduce the fee award on this ground. *See H.W. v. N.Y.C. Dep't of Educ.*, No. 1:21-CV-08604 (JLR), 2023 WL 5529932, at *11 (S.D.N.Y. Aug. 28, 2023) (reducing number of hours billed by 25% and noting: "[c]ourts in this District . . . routinely reduce the hours spent on attorneys' fees litigation when those actions concern only the simple and straightforward issue of the reasonable amount of fees and costs that Plaintiff's attorneys should be paid for prevailing on behalf of the Plaintiff" (omission in original) (internal quotation marks omitted)); *Brady*, 455 F. Supp. 2d at 212 (reducing lodestar hours by 50% due to excessive charge of 257 hours on attorney fees litigation); *Levy v. Powell*, No. CV–00–4499(SJF), 2005 WL 1719972, at *8 (E.D.N.Y. July 22, 2005) (reducing lodestar hours by 35% due to excessive charge of 101.3 hours on attorney fees motion); *Murray*, 354 F. Supp. 2d at 241 (finding that fifteen hours was a reasonable amount of time to spend on attorney fees motion in that case, and that even in a complex case, attorney fees motion should not require more than thirty hours of attorney time).

### C.   Lodestar Calculation/Amount

Using the approved hourly rates for each attorney and paralegal who worked on the case, as noted above, and the number of hours requested in Dr. Porter's Motion for Attorney Fees, the lodestar is $1,562,286, as shown in the following chart:

| Timekeeper | Approved Hourly Rate | Hours Billed | Total |
|---|---|---|---|
| Attorney Geoffrey Vitt | $300 (2017–2022) $350 (2024–2025) | 1,240.5 1,093.9 | **$372,150** **$382,865** |
| Attorney Sarah Nunan | $150 (2020–2022) $250 (2024–2025) | 152 760.8 | **$22,800** **$190,200** |
| Attorney Sarah Merlo | $200 (2017–2020) $250 (2024–2025) | 419.7 281 | **$83,940** **$70,250** |
| Attorney Katie Kramer: solo and at DGW Kramer, LLP at DTO Law | $175 (2018–2020) $350 (2024) | 787.9 20.4 | **$137,882.50** **$7,140** |
| Attorney Eric Jones | $325 (2024) $350 (2025) | 36.1 358 | **$11,732.50** **$125,300** |
| Attorney Alison Bell | $300 | 9.6 | **$2,880** |
| Attorney Bridget Grace | $225 | 2 | **$450** |
| Attorney Wendy Radcliff | $250 | .25 | **$62.50** |
| Paralegals | $90 | 1,718.15 | **$154,633.50** |
| **TOTAL** | | | **$1,562,286** |

But given the above-described deficiencies—including vague/incomplete and block-billing entries; duplicative billing for multiple counsel at depositions; substitution of counsel shortly before trial; excessive time spent on preparation of the opening statement, initial disclosures and discovery requests, and preparation of the Motion for Attorney Fees—the Court imposes a 20% reduction to the lodestar. The revised lodestar is therefore **$1,249,828.80** ($1,562,286 − $312,457.20).

**D.     Adjustment of Lodestar Based on Degree of Success Obtained**

The court's determination of the amount of the attorney fees award "does not end with the lodestar calculation." *Grant*, 973 F.2d at 101. Although there is a strong presumption that the lodestar represents the reasonable fee, "other considerations may lead to an upward or downward departure from the lodestar." *Id.* (citing *Hensley*, 461 U.S. at 434). "The party advocating such a departure . . . bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee." *Id.* (citing *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 413 (2d Cir. 1989)).

34

A-1664

Noting that Dr. Porter prevailed on only one of six claims, that she secured less than 25% of the damages she originally sought, and that the jury answered only one of fourteen questions in Dr. Porter's favor, Dartmouth Health contends that "[Dr. Porter's] limited success and comparatively small damages award warrant a substantial downward adjustment" of the lodestar amount. (Doc. 309 at 8.) Dartmouth Health seeks a downward reduction in the amount of "no less than 83.3% (5/6) and as much as 92.86% (13/14)." (*Id.* at 9.) Dr. Porter, on the other hand, describes her award of over one million dollars as "an extraordinary verdict," "exceptional," and "an excellent result," particularly in an employment case brought by one person. (Doc. 318 at 2, 8–9 (internal quotation marks omitted).) Dr. Porter asserts that "based on an admittedly informal survey, this [verdict] is among the largest verdicts in Vermont for an individual employment case." (*Id.* at 2.)

The Court does not agree with Dartmouth Health that the jury's verdict awarding Dr. Porter over one million dollars was "overwhelmingly unsuccessful" (Doc. 309 at 1), warranting a downward adjustment of 80–90% to the lodestar amount. Although the jury found in Dr. Porter's favor on only one of six claims, that single successful claim resulted in a substantial monetary award. It strains credulity to accept that a Vermont jury awarding over one million dollars to a single plaintiff is not a significant verdict for the plaintiff.

The subject matter of this case further persuades the Court that a significant reduction would be inappropriate. Under statutes such as VFEPA, the purpose of fee-shifting is "to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel." *Raishevich v. Foster*, 247 F.3d 337, 344 (2d Cir. 2001) (internal quotation marks omitted). But for the availability of fee-shifting, Dr. Porter may not have retained counsel able to expend the substantial time and resources to litigate civil rights claims against a corporate defendant. *See Brady*, 455 F.

35

Supp. 2d at 203; *King Fook Jewelly Grp.*, 2019 WL 2535928, at *10 ("[P]reventing . . . prevailing parties from recovering fees for unsuccessful efforts during the course of an otherwise successful litigation may discourage attorneys from zealously representing their clients and raising novel but reasonable arguments on their behalf." (omission in original) (internal quotation marks omitted)). The Court agrees with Dr. Porter that a significant reduction to the lodestar amount in this case would: (a) demonstrate "why it is often hard for [individual civil rights] plaintiffs to find counsel equally competent as those employed by deep-pocket defendants," and (b) "disincentivize future counsel from taking similar cases." (Doc. 300 at 10.)

The parties agree, as they must, that "[t]he 'most critical factor' in determining the amount of attorney's fees 'is the degree of success obtained.'" *Anderson v. Sebelius*, No. 5:09–cv–16, 2011 WL 1832771, at *4 (D. Vt. May 12, 2011) (quoting *Hensley*, 461 U.S. at 436). "Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." *Hensley*, 461 U.S. at 440, In determining whether the losing claim is "distinct in all respects" from the successful claims, the court considers whether the claims "involve a common core of facts" or are "based on related legal theories." *Id.* at 435. Where "[m]uch of counsel's time [is] devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis," the suit "cannot be viewed as a series of discrete claims," and thus the court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.*; *see Quaratino*, 166 F.3d at 425 ("Attorney's fees may be awarded for unsuccessful claims as well as successful ones . . . where they are inextricably intertwined and involve a common core of facts or are based on related legal theories." (internal quotation marks omitted)); *Post & Beam Equities Grp.*, 2015 VT 60, ¶ 48, 199 Vt. at 335–36, 124 A.3d at 471 (noting that "it is frequently impossible to parse

36

out, claim-by-claim, legal services rendered in cases involving a common core of facts," and

therefore, "the trial court has the discretion to focus on the significance of the plaintiff's overall

results in relation to the work reasonably performed in cases where the plaintiff's claims contained

a common core of facts or were based on related legal theories" (internal quotation marks

omitted)).

To determine whether a plaintiff's partial success requires a reduction in the lodestar

amount, courts in this Circuit apply the following framework:

> At step one of this analysis, the district court examines whether the plaintiff failed to
> succeed on any claims wholly unrelated to the claims on which the plaintiff
> succeeded. The hours spent on such unsuccessful claims should be excluded from
> the calculation. At step two, the district court determines whether there are any
> unsuccessful claims interrelated with the successful claims. If such unsuccessful
> claims exist, the court must determine whether the plaintiff's level of success
> warrants a reduction in the fee award. If a plaintiff has obtained excellent results,
> however, the attorneys should be fully compensated.

*Grant v. Martinez*, 973 F.2d at 101 (citations omitted). Where a plaintiff's claims were "based on

a common core of facts," then the successful and unsuccessful claims are not considered "wholly

unrelated." The Court then proceeds to step two of the analysis. *Id.*; *see Brady*, 455 F. Supp. 2d at

216 (in disability lawsuit brought under the ADA and New York Human Relations Law, finding

that "all of [plaintiff's] claims involve a common core of facts and related legal theories," "[a]s is

often true of lawsuits arising from alleged deprivations of civil rights" (internal quotation marks

omitted)); *Baird v. Boies, Schiller & Flexner LLP*, 219 F. Supp. 2d 510, 521–22 (S.D.N.Y. 2002)

("[A]ll of plaintiffs' claims—whether styled as Equal Pay Act, Title VII, or state law claims—

involve a common core of facts resulting in one injury. The legal claims interrelated and

overlapped; plaintiffs' EEOC charges alleged violations of Title VII, the Equal Pay Act, and New

York State's Equal Pay and Human Rights Laws based on the same factual allegations.").

37

All of the claims in Dr. Porter's case, including the VFEPA claim, share a common core of facts and legal issues. The evidence presented at trial in this case underscores the relatedness of the facts and legal issues. For example, a May 2017 email from Dr. DeMars to Dr. Merrens discusses in the same paragraph both Dr. Porter's claimed "disruptive/splitting behavior," which the jury could have understood to include Dr. Porter's whistleblower complaints about Drs. Hsu and Seifer, and Dr. Porter's disability: "[e]veryone . . . is remembering [Dr. Porter] as a full time employee wearing 3 hats, and not the one who has been out for almost 18 months." (Doc. 140-16 at 2.) Furthermore, all the claims in this case are premised on whether Dartmouth Health's reason for Dr. Porter's termination was unlawful. The jury found that Dartmouth Health unlawfully terminated Dr. Porter based on disability in violation of VFEPA, which was only one of the legal claims she asserted. The jury awarded Dr. Porter a considerable monetary verdict. It is plausible that the amount of the verdict would have been the same had the jury found in favor of Dr. Porter on any of her other claims instead of the VFEPA claim or in addition to the VFEPA claim. *See, e.g., Dominic v. Consol. Edison Co. of N.Y.*, 822 F.2d 1249, 1259–60 (2d Cir. 1987) (where factual and legal theories underlying unsuccessful age discrimination and successful retaliation claims were inextricably intertwined, court found fully compensatory fee award "justified" "because [plaintiff] recovered the same relief on the retaliation claim that he would have on his discrimination claim"). For these reasons, step one of the analysis does not support a substantial reduction in the lodestar amount.

At step two of the analysis, the Court determines whether there are any unsuccessful claims interrelated with the successful claims and whether the ultimate level of success justifies a reduction in the award. *Grant*, 973 F.2d at 101. Although Dr. Porter's unsuccessful non-VFEPA claims are interrelated with her successful VFEPA claim, the Court must account for the fact that the jury did not find in Dr. Porter's favor on five of her six claims; declined to award punitive

38

damages; and awarded a lesser amount of damages than Dr. Porter's expert opined she incurred.

These considerations warrant a modest downward adjustment to Dr. Porter's fee award,

notwithstanding what may fairly be considered an "excellent result," i.e., a jury verdict exceeding

one million dollars. *See, e.g., Kassim v. City of Schenectady*, 415 F.3d 246, 256 (2d Cir. 2005)

(affirming district court's authority "to reduce the fee awarded to a prevailing plaintiff below the

lodestar by reason of the plaintiff's partial or limited success" (internal quotation marks omitted));

*Centrella*, 2018 WL 840041, at *10 (finding downward adjustment of lodestar warranted, "though

in a lesser amount than requested," because plaintiffs achieved success on only one of three

claims); *McDow v. Rosado*, 657 F. Supp. 2d 463, 469–70 (S.D.N.Y. 2009) (reducing fee by 12%

and explaining, "it is difficult to conclude that plaintiff achieved anything close to what was

sought"); *Parrish v. Sollecito*, 280 F. Supp. 2d 145, 173 (S.D.N.Y. 2003) (reducing lodestar by

10%, "despite [plaintiff's] obviously considerable success entailed in the jury's punitive damage

award," because punitive damage award was capped at $50,000, plaintiff succeeded on only one

of two claims, and jury awarded "far less than [plaintiff] sought"). The Court therefore applies an

across-the-board reduction of 10% to the revised lodestar (noted above) to account for Dr. Porter's

somewhat limited success in this case.

Accordingly, Dr. Porter's attorney fees award is reduced to **$1,124,845.92** ($1,249,828.80

− $124,982.88).

## II.   Additional Fees Incurred After Filing Motion for Attorney Fees

Dr. Porter filed her Motion for Attorney Fees on May 8, 2025. She advised in the Motion

that she would "supplement [it] with a final accounting" to seek "additional compensable fees"

incurred after the filing of the Motion, including for time spent "in connection with litigation

associated with th[e] Motion and with litigating other post-trial motions."[17] (Doc. 300 at 3 n.2.) On

July 11, 2025, Dr. Porter filed a "Second Supplemental Memorandum in Support of Her Motion

for Attorney's Fees," which includes a request for a "supplemental award of the attorney's fees

incurred by [Dr. Porter's] lawyers from May 8, 2025, through July 1, 2025." (Doc. 330 at 1.)

Attached to the Memorandum are: (a) a chart displaying the hourly rates and hours billed for the

four attorneys representing Dr. Porter from May 8 through July 1 (see Doc. 330-2); and (b) billing

records of Vitt & Nunan and Langrock Sperry & Wool documenting the work that Dr. Porter's

attorneys completed on the case in the same time period (see Docs. 330-3, 330-4). The total

amount of fees requested in these documents for the period from May 8 through July 1 is $70,439.

(Doc. 330-2.) Dartmouth Health has filed an Opposition to Dr. Porter's Second Supplemental

Memorandum, asserting both procedural and substantive reasons for the Court to disallow the fees

requested in the Second Supplemental Memorandum. (Doc. 331 at 4.)

In an effort to avoid a third major litigation regarding Dr. Porter's Motion for Attorney

Fees, see Hensley, 461 U.S. at 437, the Court will rule on Dr. Porter's request for supplemental

fees at this time. In doing so, the Court notes that Dartmouth Health has had ample opportunity to

respond to Dr. Porter's supplemental submission of billing records and has in fact responded to

those records (see Doc. 331). Therefore, Dartmouth Health suffers no prejudice from the Court

deciding this issue without further briefing and without a hearing.

The Second Circuit, Vermont state courts, and this Court all agree that "[a]ttorney fees for

the preparation of an attorney fee application and other post-trial motions [are] compensable,"

particularly in civil rights cases. See Centrella v. Ritz-Craft Corp. of Pa., Inc., Civil Action No.

2:14–cv–111–jmc, 2018 WL 1750568, at *2 (D. Vt. Apr. 11, 2018) (citing Weyant v. Okst, 198

---

[17] Dr. Porter also represented that she "will submit a supplemental accounting to cover fees incurred during post-trial matters." (Doc. 318 at 1 n.1.)

F.3d 311, 316 (2d Cir. 1999) ("[A] reasonable fee should be awarded for time reasonably spent in preparing and defending an application for [statutory attorney] fees."); *Vt. Hum. Rts. Comm'n v. Benevolent and Protective Order of Elks*, No. 404–8–98 Wncv, 2009 WL 5454429 (Vt. Super. Wash. Cnty. Apr. 6, 2009) ("Plaintiffs are . . . entitled to an award of fees and expenses for litigating the fee application itself."); *Monahan v. GMAC Mortg. Corp.*, No. S0275–01 RcC, 2003 WL 25782721 (Vt. Super. Rutland Cnty. Oct. 6, 2003) ("Supplementary fees that result from prosecution of post[-]trial fees have been allowed to prevailing parties in federal cases dealing with civil rights."); *LaBrie*, 164 Vt. at 252, 668 A.2d at 669 ("[P]laintiff is entitled to fees for time spent on the motion [for attorney fees.]")). The reason courts permit attorney fees for work performed related to a fees application is clear:

> If an attorney is required to expend time litigating his fee claim, yet may not be compensated for that time, the attorney's effective rate for all the hours expended on the case will be correspondingly decreased. . . . Such a result would not comport with the purpose behind most statutory fee authorizations, Viz, the encouragement of attorneys to represent indigent clients and to act as private attorneys general in vindicating congressional policies. . . . [T]o hold otherwise would permit a deep pocket losing party to dissipate the incentive provided by an award through recalcitrance and automatic appeals.

*Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir. 1979), *aff'd* 448 U.S. 122 (1980) (first omission in original) (internal quotation marks omitted); *see Donovan v. CSEA Loc. Union 1000, Am. Fed'n of State, Cnty. & Mun. Emps., AFL–CIO*, 784 F.2d 98, 106 (2d Cir. 1986) ("The fee application is a necessary part of the award of attorney's fees. If the original award is warranted, we think that a reasonable amount should be granted for time spent in applying for the award."); *Weyant*, 198 F.3d at 316 ("A culpable defendant should not be allowed to cause the erosion of fees awarded to the plaintiff for time spent in obtaining the favorable judgment by requiring additional time to be spent thereafter without compensation. Thus, a reasonable fee should be awarded for opposing the culpable defendant's unsuccessful postjudgment motions.").

41

Accordingly, Dr. Porter is entitled to recover a reasonable fee for her attorneys' handling of post-trial motions in this case, including her Motion for Attorney Fees. *See LaBrie*, 164 Vt. at 250, 668 A.2d at 658 ("Fee awards are to be reasonable, reasonable as to billing rates and reasonable as to the number of hours spent in advancing the successful claims." (internal quotation marks omitted)).

Dr. Porter seeks $70,439 for attorney fees incurred from May 8 through July 1. (Doc. 330-2; *see* Doc. 330-3.) As explained above, the Court maintains Attorney Nunan's 2025 hourly rate of $250, but reduces the remaining 2025 hourly rates as follows: Attorney Vitt's rate is reduced from $400 to $350; Attorney Merlo's rate is reduced from $325 to $250; and Attorney Jones's rate is reduced from $395 to $350. After these reductions, the amount of hours billed at these rates yields a lodestar amount of $60,970.

Additionally, the billing records attached to the Second Supplemental Memorandum (*see* Docs. 330-3 and 330-4) contain several of the same deficiencies that the pre-May 8 billing records contain, including vague/incomplete entries (*see, e.g.*, Doc. 330-3 at 1 ("Emails with S. Nunan" and "Meeting with S. Nunan, E. Jones, and G. Vitt"); *id.* at 2 ("T/c S. Merlo"); *id.* at 6 ("Emails S. Merlo")) and block-billing entries (*see, e.g.*, Doc. 330-3 at 1 ("Prepare and revise fee petition and supporting documents; conf. with S. Merlo; emails with S. Merlo; conf. with G. Vitt and E. Jones; prepare and file attorney fee petition"); Doc. 330-4 at 2 ("Preparation for motions hearing; correspondence with client regarding motions hearing; attend motions hearing")). Further, the billing records reveal that excessive or duplicative time was spent on certain tasks, including: (1) preparation of the Motion for Attorney Fees (see above discussion); (2) preparation of the "Supplemental Memorandum in Further Support of" the Motion for Attorney Fees (*see* Doc. 326), which Dartmouth Health correctly notes added no new law or argument regarding the Motion; and (3) preparation of reply briefs and for the hearing regarding Dr. Porter's post-trial motions.

42

Regarding counsel's preparation of reply briefs, it is unclear from the billing records which attorneys drafted which replies, and some of the time spent appears to have been duplicative. (*See* Doc. 330-3 at 4.) Moreover, as Dartmouth Health notes (*see* Doc. 331 at 3), the billing records reflect that Attorneys Vitt and Nunan spent over thirty-one hours preparing for the July 1 hearing (*see* Doc. 330-3 at 4–7), but Attorney Vitt argued only one of the four Motions under review at that hearing and Attorney Nunan did not present any argument at the hearing. In comparison, Attorney Jones's billing records indicate that he spent only approximately ten total hours preparing for the July 1 hearing (*see* Doc. 330-4 at 1–2), though he argued the majority of the Motions at the hearing. The Court recognizes that counsel could not have anticipated the issues the Court would focus on during the hearing, and it is possible that Attorney Vitt was prepared to present a more extensive argument on the Motion for Attorney Fees than was actually required at the hearing. The Court's observations are not intended to suggest that counsel should spend less time preparing for hearings. In this instance, however, the billing records indicate that some of the work performed on Dr. Porter's behalf in preparation for the July 1 hearing was excessive or duplicative.

To account for these deficiencies, the Court reduces the lodestar amount for fees incurred from May 8 through July 1 by 20%, resulting in a total of **$48,776** ($60,970 − $12,194). Adding this amount to the revised and adjusted lodestar for attorney fees incurred from the beginning of this case until the filing of the Motion for Attorney Fees ($1,124,845.92), results in an attorney fee award totaling **$1,173,621.92** ($1,124,845.92 + $48,776).

## III.    Interest

In the Motion for Attorney Fees and Motion to Amend Judgment, Dr. Porter argues that prejudgment interest should be added to her attorney fees award,[18] and that both pre- and postjudgment interest on the award should be calculated at Vermont's rate of 12% pursuant to 9 V.S.A. § 41a(a). (*See* Doc. 300 at 3 n.3, 4 nn.4–5; Doc. 302 at 3, 5 n.3.) Dartmouth Health responds that Dr. Porter is not entitled to any prejudgment interest on her attorney fees award, and that postjudgment interest should be calculated at the federal rate of 3.98%. (*See* Doc. 306 at 4; Doc. 309 at 11.)

Dr. Porter does not cite binding precedent, or advance persuasive argument, to substantiate the claim that prejudgment interest should be applied to her attorney fees award,[19] or that the postjudgment interest rate on the attorney fees award should be Vermont's 12% rate.[20] Generally, prejudgment interest is not recoverable on attorney fees awards because "those fees are not liquidated until fixed by the trial court." *Ring*, 2014 VT 127, ¶ 35, 198 Vt. at 126, 112 A.3d at 766; *see Vastano v. Killington Valley Real Est.*, 2010 VT 12, ¶ 10 n.3, 187 Vt. 628, 632, 996 A.2d 170, 174 (2010) (noting "general rule prohibiting an award of prejudgment interest on attorney's fees" and "delet[ing]" from fee award "that portion [that was] attributed to prejudgment interest"); *Salatino v. Chase*, 2007 VT 81, ¶ 15, 182 Vt. 267, 275, 939 A.2d 482, 488 (2007) (citing cases)

---

[18]  It is unclear if Dr. Porter is claiming that prejudgment interest should be added only to that portion of her attorney fees that she paid. Her Motion for Attorney Fees appears to request prejudgment interest on *all* fees incurred (*see* Doc. 300 at 3–4, nn. 2–4), while her Motion to Amend Judgment explicitly requests prejudgment interest only for the attorney fees she paid, i.e., for attorney work done through August 2020 (*see* Doc. 302 at 5 n.3 ("The Court should include an award of prejudgment interest on [$475,096] in order to compensate Dr. Porter for the loss of use of the funds used to pay attorneys' fees prior to August 2020.")). The Court need not resolve this issue because it concludes that no prejudgment interest should be added to the attorney fees award.

[19]  Although Dr. Porter cites a case in her Motion to Amend Judgment that recognizes the court's discretion to award prejudgment interest on attorney fee awards in civil rights cases (*see* Doc. 302 at 5 n.3), the case is from the District of Massachusetts and no argument is made to support the Court's application of that case here.

[20]  Dr. Porter cites two cases in her Motion to Amend Judgment for the proposition that, in cases decided based on state claims, "[c]ourts appl[y] the interest rate of the state rather than the federal rate." (Doc. 302 at 3.) The cases, however, discuss only prejudgment interest, not postjudgment interest.

44

(noting that courts have generally concluded that, "for purposes of prejudgment-interest awards, . . . attorney's fees are not liquidated until fixed by the trial court following discretionary calculations [to determine the amount of a reasonable fee award]"); *cf. Wells Fargo Bank N.A. v. Sinnott*, No. 2:07–CV–169, 2010 WL 297830, at *12 (D. Vt. Jan. 19, 2010) ("In Vermont, it is unclear whether attorney's fees are 'liquidated' before the Court determines the exact amount to be paid."). Although there may be cases where attorney fees are liquidated, Dr. Porter has offered no basis for such a conclusion in this case. Therefore, Dr. Porter's request for prejudgment interest on her attorney fees award is DENIED.

Dr. Porter is, however, entitled to postjudgment interest on her award. *See Kirshner v. Smith*, Civil Action No. 2:23-cv-397, 2024 WL 3640619, at *8 (D. Vt. July 10, 2024), *report and recommendation adopted*, 2024 WL 3638901 (Aug. 2, 2024); *Brady*, 455 F. Supp. 2d at 217 (holding that "a plaintiff who prevailed on a federal claim . . . is entitled to interest on his entire damage award from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment" (internal quotation marks omitted)). "[F]ederal law governs post-judgment interest." *SuperCom Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*, No. 21 CV 2857 (LAP), 2023 WL 8372271, at *2 (S.D.N.Y. Dec. 4, 2023). 28 U.S.C. § 1961(a) provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," and that "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment." Accordingly, "under § 1961, federal district courts must apply *the federal rate* of post-judgment interest to judgments rendered in diversity actions, even when those judgments have been docketed in state court." *Cappiello v. ICD Publ'ns, Inc.*, 720 F.3d 109, 112 (2d Cir. 2013) (emphasis added). The "primary objective" of § 1961 is "to maintain

the federal court system without altering the substantive rights and interests the system adjudicates." *Id.* at 114. As the Second Circuit has explained:

> Unlike pre-judgment interest, post-judgment interest is not awarded to make a plaintiff whole for his injury. Rather, [o]nce a claim is reduced to judgment, the original claim is extinguished and merged into the judgment; and a new claim, called a judgment debt, arises. Section 1961 acts only upon final federal judgments, not upon the claims—whether state or federal—that give rise to, and are extinguished by, them.

*Id.* at 115 n.6 (alteration in original) (citations and internal quotation marks omitted).

Dr. Porter has not provided legal authority justifying the application of an interest rate different from the rate specified in § 1961. Therefore, the Court GRANTS Dr. Porter's request for postjudgment interest but DENIES the request that a rate of 12% should apply. The Court will calculate postjudgment interest from the date of entry of the Judgment in this case—April 24, 2025—until satisfaction of the Judgment, consistent with the formula set forth in 28 U.S.C. § 1961.

## IV.   Costs

In addition to an award of attorney fees, Dr. Porter seeks payment from Dartmouth Health for the reasonable costs she has incurred in this case. (*See* Doc. 300 at 11–12, Doc. 302 at 3–5, Doc. 317, Doc. 318 at 5, Doc. 318-1, Docs. 319–319-2.) Specifically, Dr. Porter seeks $19,899.69 in total, for the following costs incurred: $10,478.90 for deposition transcripts (*see* Doc. 318-1; *see also* Doc. 318 at 5), $4,478.72 for trial transcripts (*see* Doc. 319 at 1, Doc. 319-1 at 1); $1,106.65 for clerk, docket, and witness fees (*id.*); and $10.43 for service of summons and subpoena fees (*id.*).[21] Dartmouth Health generally argues that the Court should "exercise [its]

_____

[21] As noted in footnote 8 above, Dr. Porter requested additional costs in her Motion for Attorney Fees, totaling $29,959.20, for attorney travel, hotel stays, and meals during the trial; costs related to the deposition of expert witness Dr. Bancroft and Dr. Bancroft's attendance at the *Daubert* hearing; and two mediations. (*See* Doc. 300 at 11–12.) But Dr. Porter has not submitted documentation substantiating these costs. The Court finds that Dr. Porter has since abandoned the request, as she has filed numerous documents since the filing of the Motion for Attorney Fees and none have addressed or reflected those costs.

46

discretion and decline to award any costs [to Dr. Porter] based on [her] procedural blunders," including her failure to "attach any affidavit or supporting billing statements, invoices, or receipts to her Bill of Costs." (Doc. 306 at 5.) This argument is no longer tenable because Dr. Porter has filed a revised Bill of Costs (Doc. 319) that includes documentation supporting the request for costs (Docs. 319-2), as discussed in detail below. Dartmouth Health has not filed an objection to the revised Bill of Costs.

VFEPA permits an award of costs to a prevailing plaintiff. *See* 21 V.S.A. § 495b(b) ("Any person aggrieved by a violation of the provisions of this subchapter may bring an action in Superior Court seeking compensatory and punitive damages or equitable relief, including . . . costs, reasonable attorney's fees, and other appropriate relief."). Federal Rule of Civil Procedure 54(d)(1) similarly provides that "costs--other than attorney's fees--should be allowed to the prevailing party." In deciding the costs that the prevailing party may recover, the Second Circuit has consistently held that "attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *H.B. Auto. Grp., Inc. v. Kia Motors Am., Inc.*, 13cv4441 (VEC) (DF), 2018 WL 4017698, at *3 (S.D.N.Y. July 25, 2018) (quoting *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir. 1989)), *report and recommendation adopted sub nom. H.B. Auto. Grp., Inc. v. Kia Motors Am.*, 2018 WL 4007636 (Aug. 22, 2018). "Such costs may properly include, for example, shipping fees, filing fees, printing, process servers, travel, telephone costs, legal research, deposition-related expenses, and litigation support." *Id.*

Courts may tax costs pursuant to Federal Rule 54(d)(1) "only if authorized by 28 U.S.C. § 1920." *Grajeda v. Vail Resorts Inc.*, Case No. 2:20-cv-00165, 2024 WL 3950919, at *1 (D. Vt. Aug. 27, 2024). This Court's Local Rule of Civil Procedure 54(a) explicitly limits the taxation of costs "to those specified by 28 U.S.C. § 1920," and provides that all costs "must be itemized and

47

include supporting documentation, such as billing statements, invoices, or receipts for expenses."

28 U.S.C. § 1920 lists the following costs as those that may be awarded under the applicable

Federal and Local Rule:

> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

Because an award of costs against the losing party "is the normal rule . . . in civil litigation,

not an exception[,] . . . the losing party has the burden to show that costs should not be imposed."

*Whitfield v. Scully*, 241 F.3d 264, 270 (2d Cir. 2001), *abrogated on other grounds by Bruce v.*

*Samuels*, 577 U.S. 82 (2016); *see Portelos v. Hill*, 830 F. App'x 66, 67 (2d Cir. 2020); *Hiramoto*

*v. Goddard Coll. Corp.*, Case No. 5:14-cv-142, 2019 WL 13248656, at *3 (D. Vt. Sept. 12, 2019).

The decision to award costs "rests within the sound discretion of the district court" and "will be

reviewed . . . only for abuse of discretion." *Javier v. Deringer-Ney Inc.*, 501 F. App'x 44, 45 (2d

Cir. 2012) (internal quotation marks omitted).

Preliminarily, the Court considers Dr. Porter's request to include in her attorney fees

award—as opposed to in her taxed costs—the costs she incurred for deposition transcripts. (*See*

Doc. 300 at 11; Doc. 302 at 5–6; Doc. 318 at 5.) Dr. Porter relies on case law from the Second

Circuit and from this Court to argue that these expenses are "recoverable as a component of

attorney's fees," even though they are not considered "taxable costs." (Doc. 300 at 11 (internal

quotation marks omitted).) Dartmouth Health counters that: (a) these expenses may not be "double

counted," and thus if the Court includes them in the attorney fees award, it must exclude them

48

from the costs taxed; (b) 28 U.S.C. § 1920 does not provide for an award for the cost of court reporter services at depositions, so those costs should not be taxed; and (c) if the Court includes deposition-related expenses in Dr. Porter's award, those expenses should be reduced to account for depositions that Dr. Porter needlessly conducted in this case. (*See* Doc. 306 at 5–6; Doc. 309 at 10.) Regarding the last item, Dartmouth Health provides a chart of the alleged "unnecessary" depositions, showing the cost of transcripts for those depositions totaling over $6,000. (Doc. 306 at 6.) As explained above, however, the Court does not agree that Dr. Porter conducted an excessive number of depositions in this case. Therefore, it is not a reason to reduce the allowable costs.

Furthermore, the Court does not agree that Dr. Porter's costs related to either deposition or trial transcripts are not allowed under the applicable statute, 28 U.S.C. § 1920. To the contrary, section (2) of the statute provides that the court may tax as costs "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case." Many courts in this Circuit, including this Court, have interpreted this section to include the costs of deposition and trial transcripts provided they are "necessarily obtained." *See, e.g., Perks v. Town of Huntington,* 331 F. App'x 769, 770 (2d Cir. 2009) (identifying "no error" in finding that daily trial transcripts were taxable costs, as they were "necessarily obtained by defendants for use in the case" (internal quotation marks omitted)); *In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975,* 687 F.2d 626, 631 (2d Cir. 1982) (finding no error in taxing costs of "transcripts of depositions not used . . . at trial, of transcripts of pretrial proceedings, and of daily transcripts of the trial"); *Cole v. Foxmar, Inc.,* Case No. 2:18-cv-00220, 2023 WL 2632845, at *2 n.1 (D. Vt. Mar. 24, 2023) ("Transcript fees are recoverable under 28 U.S.C. § 1920(2)."); *Vermont Right to Life Comm., Inc. v. Sorrell,* No. 2:09–cv–188, 2015 WL 1481619, at *2 (D. Vt. Mar. 31, 2015) (finding that awarding costs for deposition transcripts was appropriate under 28 U.S.C. § 1920(2));

49

*Lasek v. Vt. Vapor, Inc.*, 2014 VT 33, ¶ 28, 196 Vt. 243, 257, 95 A.3d 447, 457 (2014) (finding that "trial court has broad discretion" to award prevailing party costs of obtaining copies of deposition transcripts "provided that the depositions were reasonably necessary to prepare for the litigation" (internal quotation marks omitted)); *Carrasco Flores v. NYC Pasta & Risotto Co.*, 17-CV-6915 (LGS)(KNF), 2019 WL 8331463, at *4 (S.D.N.Y. Sept. 19, 2019) (citing § 1920 to award costs for deposition transcripts and trial transcripts); *Cleveland v. N. Am. Van Lines, Inc.*, 154 F.R.D. 37, 38 (N.D.N.Y. 1994) (finding that depositions "properly taken within the bounds of discovery [are] . . . necessarily obtained for use in the case" for purposes of taxing costs under § 1920). Accordingly, the Court includes Dr. Porter's costs for deposition transcripts and trial transcripts in her request for costs, rather than as part of her request for attorney fees.

In terms of the substance of Dr. Porter's requested costs for deposition and trial transcripts, the depositions reflected in the billing documents attached to Dr. Porter's Reply (*see* Docs. 318-1 at 2–12) were "necessarily obtained for use in the case," as required by 28 U.S.C. § 1920(2), even though not all of the deponents testified at trial. Therefore, they are allowable costs.[22] *See Zulu v. Barnhart*, 9:16-CV-1408 (MAD/ML), 2019 WL 4544420, at *2 (N.D.N.Y. Sept. 19, 2019) (taxing deposition costs where "[losing party] has not demonstrated that any portion of his deposition was not related to an issue relevant to the case at the time the deposition was taken"); *Jim Billado Roofing, LLC v. Custom Copper & Slate, Ltd.*, No. 1:08-CV-97, 2010 WL 1881097, at *3 (D. Vt. May 10, 2010) (holding that "deposition costs are taxable so long as the deposition reasonably seemed necessary at the time it was taken," and noting that although plaintiff "did not use the deposition transcripts at trial, . . . it was reasonable to anticipate requiring them," and therefore

---

[22] The last two documents attached to the Reply are checks from Attorney Nunan for transcription services. (*See* Doc. 318-1 at 13–14.) As they do not reference this case or any particular deposition or other event in this case, the Court does not include them in its cost award.

"these costs are allowed"); *Anderson v. City of New York*, 132 F. Supp. 2d 239, 246 (S.D.N.Y. 2001) (holding that "deposition transcripts need not be introduced into evidence at trial in order to be taxed as costs; it suffices that at the time the deposition was taken it was reasonably expected that the transcript would be used for trial preparation").

However, each of the court reporter costs listed in the chart attached to the Reply (*see* Doc. 318-1 at 1) is not supported by the documentation attached to the chart. Specifically, Dr. Porter has not provided sufficient documentation to support the chart's listed deposition transcription charges of $174.25, $625.35, $1,181.40, $923.75, $597.15, and $548.80. (*See id.*) Therefore, these amounts are not included in the taxable costs. Documentation attached to the chart does, however, support deposition transcript cost totals that are not listed in the chart, specifically in the amounts of $225.75 (*Id.* at 4), $441 (*id.* at 5), and $346.75 (*id.* at 7). Therefore, the total amount of costs taxed for deposition transcripts, as reflected in the documents attached to Dr. Porter's Reply regarding her Motion for Attorney Fees (Doc. 318-1), is **$7,441.70**.

In addition, Dr. Porter seeks $4,478.72 for the cost of trial transcripts, as reflected in her Bill of Costs[23] (Doc. 319 at 1) and attached documents (Doc. 319-1 at 1, Docs. 319-2 at 23–29, 33–34). Trial transcript costs may be taxed, provided they were "necessarily obtained for use in the case." 28 U.S.C. § 1920(2). The Court finds that the trial transcripts documented in Dr. Porter's Bill of Costs and attached documents were necessarily obtained for use in this case and therefore the associated costs are recoverable. *See, e.g., Karibian v. Columbia Univ.*, No. 91 Civ. 3153 (TPG), 1997 WL 2538, at *2 (S.D.N.Y. Jan. 3, 1997) (finding it "appropriate" to tax cost of daily trial transcripts, where trial was "of substantial length" and "involv[ed] hotly contested

---

[23] As noted earlier, after her initial filing of a Bill of Costs on May 8, 2025 (Doc. 301), and after Defendants filed their "Objection to Plaintiff's Bill of Costs" (Doc. 307), Dr. Porter filed a revised Bill of Costs on June 5, 2025 (Doc. 319). The Court refers to that most recent Bill of Costs, docketed as ECF No. 319, as Dr. Porter's "Bill of Costs" herein, given that it provides the most accurate and up-to-date information and attached documentation.

51

issues including sharp and crucial questions of credibility," and where there were "extensive post-trial motions"). However, it is unclear why $224.27 for "Grafton County Sheriff" is included in the amount of costs requested for "Transcripts." (Doc. 319-1 at 1.) Moreover, the only documentation for that cost is a check in the amount of $224.27 to the Grafton County Sheriff, which includes no reference to this case and no indication of its purpose. (*See* Doc. 319-2 at 5.) This cost is therefore not taxed. The total amount of costs taxed for trial transcripts is **$4,254.45**.

The remaining requested costs are for clerk fees ($31), docket fees ($400), fees for service of summons and subpoena ($10.43), witness fees ($675.65), copy fees ($1,620.94), and half of Special Master John Schraven's mediation-related fees ($2,204.05). (*See* Doc. 319 at 1–2, Doc. 319-1.) The Court allows the requested clerk fee, docket fees, and witness fees in their entirety, totaling **$1,106.65**. *See* 28 U.S.C. § 1920(1), (3), (5); *see also Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441–42 (1987) (finding that witness fees are part of section 1920 taxable costs); *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 601 (2d Cir. 2020) (taxing filing fees); *Degreenia-Harris*, 2021 WL 5979683, at *15 (taxing "costs of initiating the action"); *Zulu*, 2019 WL 4544420, at *2 (finding that "costs attributed to [prevailing party's] witnesses from [an evidentiary] hearing and [the] trial are both properly taxable to [losing party]"); *Anderson v. City of N.Y.*, 132 F. Supp. 2d 239, 245 (S.D.N.Y. 2001) (finding that costs for filing and witness fees are "ordinarily recoverable as costs pursuant to 28 U.S.C. § 1920 and [the applicable] Local Rule").

Although fees for service of summons and subpoena are generally allowed, *see U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 172 (2d Cir. 1996) (citing 28 U.S.C. § 1920(1)), the Court deducts $4.85 from the $10.43 requested because the receipt in the amount of $4.85 from the United States Postal Service contains no indication of what the payment is for, and no reference to this case, and no affidavit or

52

declaration has been submitted to testify to these facts. (*See* Doc. 319-2 at 6.) Therefore, only **$5.58** is taxed for service of summons and subpoena costs.

Regarding copy fees, no costs are taxed because the documentation provided does not reference the case in any way, and the Bill of Costs does not attach an affidavit or declaration explaining the reason for these fees. (*See* Doc. 319-2 at 30–32.) *See King Fook Jewellry Grp.*, 2019 WL 2535928, at *11 ("The Court . . . will not award costs for photocopying and meals because these expenses did not come with supporting documentation."); *Whitehead v. Mix Unit, LLC*, 17 Civ. 9476 (VSB) (JLC), 2019 WL 384446, at *6 (S.D.N.Y. Jan. 31, 2019) (plaintiff "not entitled to full recovery of costs," where "counsel . . . failed to provide any documentation to support . . . request for costs"), *report and recommendation adopted*, 2019 WL 1746007 (Apr. 18, 2019); *Lee v. Santiago*, No. 12 Civ. 2558(PAE)(DF), 2013 WL 4830951, at *5 (S.D.N.Y. Sept. 10, 2013) ("A mere assertion that a certain cost was incurred . . . is insufficient, where such an assertion is made in a conclusory fashion in a brief or bill of costs, without a supporting affidavit, declaration, or documentation.").

Finally, the Court denies Dr. Porter's request to tax half of the fees billed by Special Master John Schraven for his work on this case. (*See* Doc. 319-1 at 1; Doc. 319-2 at 3–4.) Dr. Porter has not cited authority holding that a special master appointed by the court to assist parties with settlement efforts may be considered a "court[-]appointed expert[]" within the meaning of 28 U.S.C. § 1920(6) for the purpose of taxing costs. Because section 1920 embodies a congressional policy "to impose rigid controls on cost-shifting in federal courts," *Crawford Fitting Co.*, 482 U.S. at 444, the Court is reluctant to adopt a broad interpretation of its provisions. But the Court need not decide whether § 1920 generally allows for the taxing of a court-appointed special master's fees because the Court expressly directed that "[e]ach side shall be responsible for half" of Mr. Schraven's compensation. (Doc. 158 at 2; *see also* Doc. 170 (providing that Mr. Schraven's

53

fees "shall be . . . divided evenly between the two parties"). The Court declines to revisit or amend that directive.

Accordingly, the Court will tax Dr. Porter's costs as follows: $7,441.70 for deposition transcripts; $4,254.45 for trial transcripts; $1,106.65 for clerk, docket, and witness fees; and $5.58 for fees for service of summons and subpoena. The total amount of taxable costs is **$12,808.38**.

## Conclusion

For these reasons, the Court finds as follows:

*Attorney Fees*

The Court GRANTS IN PART AND DENIES IN PART Dr. Porter's Motion for Attorney Fees (Doc. 300), awarding Dr. Porter $1,124,845.92 in attorney fees for work completed through May 7, 2025, which reflects a 20% reduction of the lodestar amount ($1,562,286.00 − $312,457.20 = $1,249,828.80) to account for the instances of vague/incomplete and block-billing entries, duplicative billing, and excessive billing; and a 10% reduction of the revised lodestar amount ($1,249.828.80 − $124,982.88 = $1,124,845.92) to account for Dr. Porter's success on only one of six claims in this lawsuit.

The Court GRANTS IN PART AND DENIES IN PART Dr. Porter's Second Supplemental Memorandum in support of her Motion for Attorney Fees (Doc. 330), awarding Dr. Porter $48,776 in attorney fees for work completed from May 8, 2024 to July 1, 2025, which reflects a 20% reduction of the lodestar amount to account for the same billing deficiencies listed above ($60,970 − $12,194).

The total amount of the attorney fees award is **$1,173,621.92** ($1,124,845.92 + $48,776).

*Costs*

The Court GRANTS IN PART AND DENIES IN PART Dr. Porter's request for costs (*see* Docs. 300, 302, 318, 319), awarding Dr. Porter **$12,808.38** in costs, including costs related to

deposition and trial transcripts, clerk and docket fees, witness fees, and fees for service of summons and subpoena, which represents approximately a 35% reduction of the amount of costs requested ($19,899.69) due to insufficient documentation of certain costs and failure to provide a justification for taxing Special Master John Schraven's fees.

### Total Attorney Fees and Costs Awarded

The total award to Dr. Porter for attorney fees and costs is therefore **$1,186,430.30** ($1,173,621.92 + $12,808.38).

### Prejudgment Interest

The Court DENIES Dr. Porter's request for prejudgment interest on her attorney fees award. (*See* Doc. 300 at 3 n.3, 4 nn.4–5; Doc. 302 at 3, 5 n.3.)

### Postjudgment Interest

The Court GRANTS IN PART AND DENIES IN PART Dr. Porter's request for postjudgment interest. (*See* Doc. 302 at 2, 3.) The Court GRANTS the request for postjudgment interest but DENIES the request to apply Vermont's 12% interest rate. Postjudgment interest shall be calculated from the date of entry of the Judgment in this case—April 24, 2025—until satisfaction of the Judgment, in accordance with the formula set forth in 28 U.S.C. § 1961.

### Motion to Amend Judgment

As explained above, the Court GRANTS IN PART AND DENIES IN PART certain requests contained in Dr. Porter's Motion to Amend Judgment. (*See* Doc. 302 at 1, 3–6.) Regarding the request in that Motion for an award of prejudgment interest on the jury award at the rate of 12% (*see id.* at 1–3), the Court addresses this issue in a separate order.

Dated at Burlington, in the District of Vermont, this 26th day of November 2025.

/s/ Kevin J. Doyle
United States Magistrate Judge

55

A-1685

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

    Plaintiff,

    v.                                                      Civil Action No. 2:17–cv–194–kjd

Dartmouth-Hitchcock Medical Center et al.,

    Defendants.

## ORDER
(Doc. 305)

Defendants (Dartmouth Health) filed a motion to alter or amend the judgment or, in the alternative, for a new trial on Dr. Porter's claim of disability discrimination under the Vermont Fair Employment Practices Act (VFEPA). After a three-week trial, a jury found by a preponderance of the evidence that Dr. Porter's disability was a motivating factor in Dartmouth Health's decision to terminate Dr. Porter's employment in violation of VFEPA. (Doc. 281 at 3.) Judgment on this claim entered for Plaintiff on April 24, 2025. (Doc. 297.) Dartmouth Health seeks relief under Rule 59 on the grounds that the Court erroneously instructed the jury to apply the "motivating factor" causation standard to the VFEPA claim rather than the higher "but-for" standard. (Doc. 305 at 1.) Dartmouth Health asks the Court to certify the question of the appropriate causation standard to the Vermont Supreme Court. (*Id.* at 11.) Dartmouth Health further contends that the jury instructions contained an incorrect statement of law regarding the "motivating factor" test. (*Id.* at 10.) Dr. Porter opposes the motion, asserting that Dartmouth Health did not preserve all of its objections and that Vermont has consistently applied the "motivating factor" standard to claims under VFEPA. (Doc. 314.)

For the reasons explained below, Dartmouth Health's motion (Doc. 305) is DENIED.

A-1686

### Standard

A district court has broad discretion in determining whether to grant a motion to alter or amend the judgment. *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000). Appellate courts review the district court's decision for abuse of discretion and will reverse only if the court's judgment was based on clearly erroneous factual findings or erroneous legal conclusions. *Id.*

A district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 112 n.34 (2d Cir. 2013) (citation modified). Denial of a motion for a new trial under Rule 59 will not be reversed unless denial constituted an abuse of discretion. *See Mirlis v. Greer*, 952 F.3d 36, 48 (2d Cir. 2020).

### Analysis

**I.    The Court correctly instructed the jury to apply the "motivating factor" standard to the VFEPA claim instead of the "but-for" standard.**

Dartmouth Health contends that the Court should alter the judgment or grant a new trial because the instruction "as to the causation standard for violation of the VFEPA was just plain wrong." (Doc. 305 at 7 (citation modified).) According to Dartmouth Health, "[t]he jury should have been instructed" that Dr. Porter must prove "that her disability was a 'but-for' cause of Dartmouth Health's decision to terminate her employment." (*Id.*) Dartmouth Health notes that VFEPA's disability discrimination provisions "are patterned after the federal Rehabilitation Act, which in turn incorporates standards from the federal Americans with Disabilities Act (ADA)," and contends that the proper standard is "but-for" causation because courts in the Second Circuit apply "but-for" causation to ADA and Rehab Act claims. (*Id.* at 7–8.)

VFEPA provides:

It shall be unlawful employment practice . . . [f]or any employer . . . to harass or discriminate against any individual because of race, color, religion, ancestry,

2

national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age *or against a qualified individual with a disability*.

21 Vt. Stat. Ann. § 495(a)(1) (emphasis added).

With respect to discrimination claims under VFEPA, the Vermont Supreme Court has repeatedly held and recently reiterated that the standards and burdens of proof to be applied under VFEPA are identical to those applied under Title VII of the Civil Rights Act of 1964. *See, e.g., Hammond v. Univ. of Vt. Med. Ctr.*, 2023 VT 31, ¶ 24, 218 Vt. 250, 308 A.3d 421; *Kelly v. Univ. of Vt. Med. Ctr.*, 2022 VT 26, ¶ 17, 216 Vt. 445, 280 A.3d 366; *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 16, 176 Vt. 356, 848 A.2d 310; *Lavalley v. E.B. & A.C. Whiting Co.*, 692 A.2d 367, 370 (Vt. 1997); *Gallipo v. City of Rutland*, 656 A.2d 635, 640 (Vt. 1994); *Hodgdon v. Mt. Mansfield Co.*, 624 A.2d 1122, 1128 (Vt. 1992); *Graff v. Eaton*, 598 A.2d 1383, 1384 (Vt. 1991). Title VII employs the "motivating factor" standard of causation—that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Moreover, the Vermont Supreme Court has consistently applied the "motivating factor" test to claims under VFEPA, including at least one disability discrimination claim. *See, e.g., Hammond*, 2023 VT at ¶¶ 26, 34; *Robertson*, 2004 VT at ¶¶ 18, 22; *Gallipo*, 656 A.2d at 640; *Hodgdon*, 624 A.2d at 1128; *Graff*, 598 A.2d at 1385.

Dartmouth Health argues that the "but-for" standard should apply because after the Second Circuit's decision in *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019), "the equivalent federal claims—namely, the ADA and the Rehabilitation Act—utilize 'but-for' causation rather than 'motivating factor' causation." (Doc. 305 at 8.) The Court disagrees.

3

First, the Vermont Supreme Court has never suggested that a different causation standard applies to disability discrimination than to the other categories protected by VFEPA. To the contrary, the Vermont Supreme Court recently had the opportunity in *Hammond* to apply "but-for" causation to a disability discrimination claim post-*Natcfsky* and did not do so. *Hammond* involved race and disability discrimination claims and a retaliation claim under VFEPA. 2023 VT at ¶ 21. The Vermont Supreme Court outlined "the legal framework applicable to employment discrimination and retaliatory discharge claims under Vermont's FEPA"—drawing no distinction between the disability discrimination and race discrimination claims—and stated that VFEPA "makes it unlawful for an employer to discriminate against any individual based on race or disability." *Id.* at ¶ 24. *Hammond* also reaffirmed that "the standards and burdens of proof under [the] FEPA are identical to those under Title VII." *Id. Hammond* does not reference the ADA or the Rehabilitation Act at all.

Second, state courts interpreting statutes similar to VFEPA have applied the "motivating factor" standard to disability discrimination claims, not the "but-for" standard. *See Lavalley*, 692 A.2d at 369 (citation modified) ("Federal decisions represent persuasive authority on the proper interpretation of FEPA. They are not, however, the only sources of persuasive authority. Many states have enacted employment discrimination laws patterned in whole or in part on Title VII. Decisions from the courts of those states are also sources of persuasive authority."). Vermont prohibits employment discrimination with a comprehensive statute covering a series of protected traits. *See* Sandra F. Sperino, *Revitalizing State Employment Discrimination Law*, 20 Geo. Mason L. Rev. 545, 567 (2013) (describing such an approach as a "unified statutory regime"). By contrast, federal "civil rights protections against employment discrimination are scattered" across several statutes that protect different traits, resulting in "numerous fractures in

4

the federal law . . . depending upon the statute involved." *Goodpaster v. Schwan's Home Serv.,*

*Inc.*, 849 N.W.2d 1, 10 (Iowa 2014). Courts in states with similar unified employment

discrimination statutes, in the absence of statutory language providing the causation standard,

have applied the "motivating factor" standard to disability discrimination claims. *See, e.g.,*

*Wallace v. Caring Sols., LLC*, 278 A.3d 586, 602 (Conn. App. Ct. 2022); *McClure v. E. I. du*

*Pont de Nemours & Co.*, 23 N.W.3d 33, 41 (Iowa 2025); *Stoughton Trailers, Inc. v. Lab. &*

*Indus. Rev. Comm'n*, 2007 WI 105, ¶¶ 36, 70–71, 303 Wis. 2d 514, 735 N.W.2d 477. Dartmouth

Health has not cited any cases in which a state court applied "but-for" causation to a disability

discrimination claim brought under a unified statutory regime such as VFEPA.

Third, the plain text and the remedial purpose of VFEPA support the "motivating factor"

standard. As the Connecticut Appellate Court recently observed, a legislature's choice to enact

one comprehensive employment discrimination law indicates that lawmakers intended a single

uniform standard to apply to all protected classes:

> Our legislature has chosen not to follow the legislative approach taken by Congress
> of adopting different statutes to address different types of employment discrimina-
> tion with varying causation burdens. Our legislature's decision to include multiple
> types of unlawful employment discrimination within a single statutory provision,
> without setting out distinctive standards for the different types, leads to the logical
> conclusion that it intended that the same standard of proof be applied to all the types
> of discrimination set forth in [the employment discrimination statute].

*Wallace*, 278 A.3d at 602 (citation modified). Moreover, the motivating factor standard—as

opposed to the higher "but-for" standard—is "consistent with the remedial purpose of [VFEPA]

to deter and to eradicate discrimination in the state." *See Payne v. U.S. Airways, Inc.*, 2009 VT

90, ¶ 21, 186 Vt. 458, 987 A.2d 944 (citation modified).

The Court is not persuaded by Dartmouth Health's argument that "the plain language of

the VFEPA distinguishes between those categories protected by Title VII and the categories

5

protected by the ADA." (Doc. 324 at 4.) VFEPA makes it unlawful for an employer "to harass or discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability." 21 Vt. Stat. Ann. § 495(a)(1). Dartmouth Health appears to argue that because under VFEPA an employer shall not "harass or discriminate . . . against a qualified individual with a disability," the statute reserves the causation language—"because of"—for the non-disability traits. In other words, Dartmouth Health posits that by excluding disability from the "because of" clause, the legislature distinguished between disability discrimination claims and other claims under VFEPA. But the Vermont Supreme Court has consistently applied the "because of" causation language to disability claims under VFEPA. *See, e.g., Hammond,* 2023 VT at ¶¶ 35, 37; *Gates v. Mack Molding Co., Inc.,* 2022 VT 24, ¶ 16, 216 Vt. 379, 279 A.3d 656; *Knapp v. State,* 729 A.2d 719, 720 (Vt. 1998).

Further, the cases Dartmouth Health cites do not compel the conclusion that the "but-for" standard applies to discrimination claims on the basis of disability under VFEPA. Dartmouth Health cites *Newton v. Kohl's, Inc.,* Case No. 5:21-cv-268, 2024 WL 4986303, at *13 (D. Vt. Nov. 12, 2024), to argue that "[t]he jury should have been instructed that, for Dr. Porter to succeed on her VFEPA claim, she must have proven that her disability was a 'but-for' cause of Dartmouth Health's decision to terminate her employment." (Doc. 305 at 7.) The Court disagrees. *Newton* first cited *Hammond* to observe that "[t]he VFEPA is patterned after Title VII . . . and uses identical standards and burdens of proof as Title VII." *Newton,* 2024 WL 4986303, at *4. Later in the decision, the court noted that VFEPA's disability-discrimination provisions "are patterned after the federal Rehabilitation Act, which in turn incorporates standards from the federal Americans with Disabilities Act." *Id.* at *13. And in summarizing the *federal* anti-

6

discrimination framework, the court explained that the ADA applies the "but for" standard. *Id.*

However, *Newton* noted that "the court looks to both state and federal case law to guide its

analysis" of VFEPA's disability discrimination provisions. *Id.* The Court does not read *Newton*

to hold that disability discrimination claims under VFEPA must meet the "but-for" standard.

*Newton* did not reach the question of the causation standard under VFEPA because the employee

did not establish a prima facie case of disability discrimination. Specifically, Newton could not

show that she was an "individual with a disability" and, consequently, she could not demonstrate

that she suffered an adverse employment action because of her disability. *Id.* at *14.

Dartmouth Health cites several cases for the proposition that "Vermont courts have

consistently held that the VFEPA follows the standards and burdens of proof articulated for the

equivalent federal disability discrimination claims." (Doc. 305 at 7.) Each of the cited cases is

distinguishable. *Gates v. Mack Molding Co., Inc.*, 279 A.3d 656 (Vt. 2022) and *Mueller v.*

*Rutland Mental Health Servs., Inc.*, 2006 WL 2585101 (D. Vt. Aug. 17, 2006) both address

failure-to-accommodate under VFEPA, a claim that has different elements from the claim at

issue in this case. *Caldwell v. Champlain Coll. Inc.*, 2025 VT 17, ¶ 12, 336 A.3d 423, 427 (Vt.

2025). The standards and burdens of proof under VFEPA are identical to those under the ADA

for failure-to-accommodate claims, *Mueller*, 2006 WL 2585101 at *2, but that is simply because

Title VII does not contain provisions related to reasonable accommodations for disability.

In *Kennedy v. Department of Public Safety*, 719 A.2d 405, 406 (Vt. 1998), the Vermont

Supreme Court did not discuss the legal standards or burdens of proof applicable to VFEPA

claims, noting only that it looks to interpretations of the Rehabilitation Act "in determining

whether plaintiff has met the elements of his [VFEPA] claim." Finally, *State of Vermont v. G.S.*

*Blodgett Co.*, 656 A.2d 984 (Vt. 1995) considered a failure-to-accommodate claim under

7

VFEPA. The court generally observed that its consideration of VFEPA disability discrimination claims "look[s] to federal case law to guide [its] interpretation, the allocations of burdens and standards of proof," but the court did not examine the causation standard for disability discrimination claims under VFEPA because the parties agreed on every element of the claim except whether the employee was a "qualified handicapped individual." *Id.* at 988.

In short, longstanding precedent, recent case law, the plain language and purpose of VFEPA, and decisions of other state courts interpreting similar statutes support the application of the "motivating factor" standard to disability discrimination claims under VFEPA. Dartmouth Health has not demonstrated that the Court erred in its "motivating factor" instruction on the VFEPA claim.

## II.   The Court properly instructed the jury that Dartmouth Health could not avoid liability under VFEPA by proving that it would have terminated Dr. Porter's employment in the absence of a discriminatory motivation.

Dartmouth Health contends that "the jury in this matter was instructed *exactly the opposite* of what the Vermont Supreme Court said is required of motivating factor causation." (Doc. 305 at 10.) Dartmouth Health argues that the jury should have been instructed that a defendant may avoid liability under the "motivating factor" standard by proving "that it would have made the same decision 'even absent the discriminatory motive.'" (*Id.* (quoting *Knapp v. State*, 168 Vt. 590, 592, 729 A.2d 719, 721 (1998)) (emphasis omitted).) Because the jury instructions provided that "an employer <u>cannot</u> avoid liability by proving that it would still have taken the same adverse action in the absence of discriminatory motivation," Dartmouth Health contends that it is entitled to an amended judgment. (Doc. 305 at 10.)

As a threshold matter, Dartmouth Health did not preserve this objection at trial. *See, e.g., John Wiley & Sons, Inc. v. Kirtsaeng*, 654 F.3d 210, 223 (2d Cir. 2011) (citation modified) ("Failure to object to a jury instruction prior to the jury retiring results in a waiver of that

8

A-1693

objection."), *rev'd and remanded on other grounds*, 568 U.S. 519 (2013). Dartmouth Health

objected to the use of the "motivating factor" standard rather than the "but-for" standard (Doc.

295 at 51:2–9), but it did not request any other changes to the instruction (*id.* at 51:10–12).

Dartmouth Health did not raise an objection that "sufficiently called the court's attention" to the

language in the instruction that Dartmouth Health now challenges. *See Ashley v. City of New

York*, 992 F.3d 128, 142 (2d Cir. 2021).

In any event, the Court finds no error in the instruction. As discussed above, the standards

and burdens of proof to be applied under VFEPA are identical to those applied under Title VII.

Title VII expressly permits liability even if the defendant proves it would have "taken the same

action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B)(i).

The jury instruction properly reflected the standards and burdens of proof established in Title

VII.

*Knapp* does not compel a different conclusion. *Knapp* expressly "based [its]

determination on *Price Waterhouse v. Hopkins*, [a 1989 decision] where the Supreme Court held

that [shifting the burden to the employer to show that it would have taken the same adverse

action in the absence of discriminatory motive] was appropriate in employment discrimination

cases" under Title VII. *Knapp*, 729 A.2d at 721. But Congress amended Title VII to overrule the

portion of the *Price Waterhouse* burden-shifting framework upon which *Knapp* relied. As one

district court explained:

> In 1991, Congress amended Title VII and partially overruled *Price Waterhouse*
> when it enacted the Civil Rights Act of 1991. Section 107 of the 1991 Act permitted
> a finding of liability if the plaintiff demonstrated that "race, color, religion, sex, or
> national origin was a motivating factor" for the adverse employment decision,
> "even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).
> Section 107 also provided that, once a plaintiff established a violation under
> § 2000e–2(m) by demonstrating that race, color, religion, sex, or national origin

9

was a motivating factor for the defendant employer's adverse employment deci-
sion, the employer would not be absolved of liability by proving it would have
made the same decision even in the absence of such consideration . . . .

*King v. United States*, 694 F. Supp. 2d 1020, 1023 (N.D. Iowa 2010) (citation modified).[1] Since

*Knapp*, the Vermont Supreme Court has reiterated several times that VFEPA applies the

standards and burdens of proof of Title VII. *See, e.g.*, *Hammond*, 2023 VT at ¶ 24; *Kelly*, 2022

VT at ¶ 17; *Robertson*, 2004 VT at ¶ 16. Moreover, the Vermont legislature has amended

VFEPA several times since Congress amended Title VII, but it has not opted to distinguish

VFEPA's standards and burdens of proof from those of Title VII or to codify the language from

*Price Waterhouse* that Congress overruled. *See State v. Messier*, 2005 VT 98, ¶ 10, 178 Vt. 412,

885 A.2d 1193 (citation modified) ("We must presume that the Legislature made changes in the

law in light of the relevant decisions of this Court, and with knowledge of prior legislation on the

same subject.").

Because the challenged jury instruction tracks the standards and burdens of proof

established by Title VII, Dartmouth Health has not shown error warranting an amended

judgment.

## III.    Vermont precedent is adequate for this Court to determine the VFEPA causation standard without certification to the Vermont Supreme Court.

Dartmouth Health asks the Court to "certify to the Vermont Supreme Court the question

of the appropriate causation standard for a disability discrimination-based VFEPA claim." (Doc.

305 at 11.)

---

[1] As the court further explained, while an employer could not avoid liability by showing that it would have made the same decision even in the absence of the prohibited consideration, "such proof merely restricted the remedies to which a plaintiff who proved a violation . . . was entitled." *King*, 694 F. Supp. 2d at 1023 & n.5. This limitation of remedies under the amended Title VII is immaterial to the damages award in this case. Unlike Title VII, VFEPA draws no distinction between "motivating factor" remedies and "but for" remedies. *See* 21 V.S.A. § 495b(b) ("Any person aggrieved by a violation of the provisions of this subchapter may bring an action . . . seeking compensatory and punitive damages or equitable relief, including restraint of prohibited acts, restitution of wages or other benefits, reinstatement, costs, reasonable attorney's fees, and other appropriate relief.").

The Court may certify "an unsettled and significant question of state law that will control the outcome of a pending case" to the Vermont Supreme Court. L.R. 74(a); *see also* Vt. R. App. P. 14(a) ("The Vermont Supreme Court may answer a question of Vermont law certified to it by a federal court if the answer might determine an issue in pending litigation and there is no clear and controlling Vermont precedent."). Certification is appropriate "where state law is not clear and state courts have had little opportunity to interpret it, where an unsettled question of state law raises important issues of public policy, where the question is likely to recur, and where the result may significantly impact a highly regulated industry." *Jenkins v. Miller*, Case No. 2:12-cv-184, 2017 WL 4402431, at *7 (D. Vt. Sept. 29, 2017), *modified*, 2018 WL 11418392 (Aug. 29, 2018).

However, courts should "resort to certification only sparingly, mindful that, in diversity cases that require [the court] to apply state law, it is [the court's] job to predict how the [state's highest court] would decide the issues before" the court. *Amerex Grp., Inc. v. Lexington Ins. Co.*, 678 F.3d 193, 200 (2d Cir. 2012) (citation modified). "Certification is to be used in those cases where there is a split of authority on the issue or when presented with a complex question of state common law for which no state authority can be found." *Knapik v. Mary Hitchcock Mem'l Hosp.*, Case No. 5:12-cv-175, 2014 WL 12717446, at *1 (D. Vt. May 30, 2014) (citation modified). Even when state law is unclear or uncertain, courts should not certify questions of law when "sufficient precedents exist for [the court] to make a determination." *See Amerex Grp., Inc.*, 678 F.3d at 200 (citation modified).

As discussed above, the Vermont Supreme Court has repeatedly held that the standards and burdens of proof to be applied under VFEPA are identical to those applied under Title VII, including in the disability discrimination context. *See, e.g., Hammond*, 2023 VT at ¶ 24. There is

11

no dispute that Title VII requires the "motivating factor" standard. 42 U.S.C. § 2000e-2(m).

Considering Vermont precedent on this issue, this Court predicts that the Vermont Supreme

Court would apply the "motivating factor" test to a disability discrimination claim under

VFEPA.

Therefore, the Court denies Dartmouth Health's request to certify this question of law to

the Vermont Supreme Court.

### Conclusion

For the reasons explained above, Dartmouth Health's Motion to Alter or Amend the

Judgment and, in the Alternative, for a New Trial on Plaintiff's VFEPA Claim (Doc. 305) is

DENIED.

Dated at Burlington, in the District of Vermont, this 26th day of November 2025.

/s/ Kevin J. Doyle
United States Magistrate Judge

12

**A-1697**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

    Plaintiff,

    v.                                                    Civil Action No. 2:17–cv–194–kjd

Dartmouth-Hitchcock Medical Center et al.,

    Defendants.

## ORDER
(Doc. 308)

Contending that the Court committed several errors during the trial of this case, Defendants (Dartmouth Health) move under Federal Rule of Civil Procedure 59 for a new trial limited to the issue of Dr. Porter's damages. First, Dartmouth Health argues that the testimony of Dr. Porter's damages expert, Dr. Bancroft, should have been excluded due to untimely disclosure under Rule 26. Second, Dartmouth Health challenges the Court's jury instructions on economic damages for failing to clearly instruct the jury to consider Dr. Porter's earnings from her job at the University of Vermont Medical Center (UVMMC). Third, Dartmouth Health objects to the Court's exclusion of a note written by Dr. Bancroft on cross-examination. The note consists of three numbers Dr. Bancroft wrote after defense counsel requested that he perform alternative damages calculations. Finally, Dartmouth Health claims that the Court improperly restricted its closing arguments concerning a severance offer Dartmouth Health extended to Dr. Porter. Dr. Porter opposes Dartmouth Health's Motion.

For the reasons explained below, Dartmouth Health's Motion (Doc. 308) is DENIED.

A-1698

## Standard

"A district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 112 n.34 (2d Cir. 2013) (citation modified). In reviewing a motion for a new trial, the Court must view the evidence in the light most favorable to the nonmoving party. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 624 (2d Cir. 2001).

## Analysis

**I.  Dartmouth Health has not shown error under Rules 26 and 37 warranting a new trial.**

Dartmouth Health contends that the Court erred by admitting testimony and exhibits offered by Dr. Porter's expert damages witness, Dr. Bancroft, because Dr. Porter failed to timely disclose several of his expert opinions under Rule 26. According to Dartmouth Health, "[p]laintiff was permitted multiple, late, unjustified revisions to her expert reports and opinions to be presented [at] trial," including "a drastic revision less than a week before trial," and Dartmouth Health "thus had to face unwarned, constantly evolving, weakly-based and sharply prejudicial expert opinions and was not permitted" to "disclose its expert economist to appropriately rebut these repeated, new opinions." (Doc. 308 at 4.) Dartmouth Health argues that Dr. Porter's Rule 26 violations warranted exclusion of Dr. Bancroft's testimony in its entirety.

Rule 26(e)(1) provides:

A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

2

Rule 26(e) "does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect." *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011). A party's duty to "supplement its initial expert report does not arise when [the party] seeks to bolster its earlier submission, but rather, arises only if the expert *subsequently* learns of information that was previously unknown or unavailable, that renders information previously provided in an initial report inaccurate or misleading because it was incomplete." *Levinson v. Westport Nat. Bank*, Civil Action No. 3:09-CV-1955(VLB), 2013 WL 3280013, at *4 (D. Conn. June 27, 2013) (citation modified) (alteration in original). Therefore, "if an expert's report does not rely on any information that was previously unknown or unavailable to him, it is not an appropriate supplemental report under Rule 26." *Id.* at *5 (citation modified). In other words, Rule 26 permits supplemental expert reports after the deadlines provided in the Rule "only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." *Minebea Co., Ltd. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005).

With respect to the August 26, 2024 supplemental report, a motion for a new trial may be based only on the grounds on which the party objected at the time the evidence was offered for admission. *See Rivenburgh v. CSX Transp.*, 280 F. App'x 61, 63–64 (2d Cir. 2008) (summary order); Fed. R. Evid. 103. Dartmouth Health did not object under Rules 26 and 37 to the timeliness of the disclosure of Dr. Bancroft's August 26 report in motions in limine or at trial. (*See, e.g.*, Doc. 198.) Dartmouth Health challenged Dr. Bancroft's testimony under Rule 702. (*Id.*) For this reason, Dartmouth Health has waived its timeliness arguments concerning the August 2024 report.

3

A-1700

Even assuming Dartmouth Health has not waived its arguments, it has not shown that the timing of the August 2024 disclosure warrants a new trial. The October 1, 2019 expert report calculated Dr. Porter's lost earnings and employment costs assuming that she left her full-time position at UVMMC in June 2021 to obtain a position closer to her home in Norwich, Vermont. (Doc. 198-3 at 2.) Dr. Porter ultimately remained at UVMMC full-time longer than she had anticipated. However, this Court granted summary judgment for Dartmouth Health on all claims on November 4, 2020. (Doc. 153.) In other words, Dr. Porter did not submit an updated expert report because her case was not expected to proceed to trial at that time. On February 27, 2024, the Second Circuit vacated judgment on Dr. Porter's claims of disability discrimination, whistleblower discrimination, and wrongful discharge and remanded the case for trial. (Doc. 157-1 at 100.) After remand, Dr. Porter supplemented her expert's report based on information that was not available in 2019—that she would continue working full-time at UVMMC. This is precisely the type of correction that Rule 26(e) requires.

The Court further finds that the timing of the disclosure of Dr. Bancroft's March 19, 2025, supplemental report does not warrant a new trial. The March 2025 supplemental report was a direct response to defense counsel's cross-examination of Dr. Bancroft at a hearing on Dartmouth Health's motion to exclude Dr. Bancroft from testifying as an expert witness at trial. Cross-examination elicited that Dr. Bancroft was unaware of certain information relevant to his calculations, including that Dartmouth Health instituted salary freezes in 2020 and 2021 and that Dr. Porter received a $7,698 tuition credit for her son's undergraduate education at UVM in 2019. Dr. Bancroft subsequently updated his report on March 19 to incorporate this new information. Dartmouth Health plainly knew this information before Dr. Bancroft issued his March 19 report, as defense counsel raised the issue at the evidentiary hearing. *Cf. Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1332 (10th Cir. 2004) (citation modified) ("On occasion it may be appropriate to permit the

4

party using the expert to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning.") Moreover, Dr. Bancroft did not change the substance of his opinion. He used the same methodology in his March supplemental report as in his prior reports, changing only the inputs to produce updated damages calculations.

The Court does not share Defendants' view that Dr. Bancroft issued his corrective March 2025 report because his testimony at the March 12 evidentiary hearing revealed that his August 2024 report "had not included key facts and assumptions . . . such as Dr. Porter's promotion to full professor in July 2023 and her most recent earnings from UVMMC at a higher rate of pay than what Dr. Bancroft had projected." (Doc. 308 at 3.) Rather, Dr. Bancroft testified at the hearing that although he was uncertain whether he knew at the time of his August 2024 report that Dr. Porter became a professor in summer 2023, he *did* know Dr. Porter's compensation for the relevant period of time after she became a professor and used that information to predict her annual salary. (*See* Doc. 230 at 28:7–29:24, 45:24–46:14.) Dr. Porter's salary—not her job title— appropriately factored into Dr. Bancroft's assessment of her damages.

Even if the disclosures were untimely, admitting Dr. Bancroft's testimony was not error because the disclosures were substantially justified or harmless under Rule 37. The Second Circuit has identified a broad range of non-exclusive factors to consider when deciding whether to preclude evidence as a sanction for failure to disclose. *Negron v. Cigna Health & Life Ins. Co.*, No. 3:16-cv-01702 (JAM), 2021 WL 2010788, at *4 (D. Conn. May 20, 2021). In one case, the Second Circuit instructed courts to consider: (1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Funk v. Belneftekhim*, 861 F.3d 354, 366 (2d Cir. 2017). In another case, the non-exclusive factors included: (1) the party's explanation for the failure to comply with the

5

disclosure requirement; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new evidence; and (4) the possibility of a continuance. *See Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (citation modified). Any sanctions imposed under Rule 37 must be "just," and their severity must be "commensurate with the non-compliance." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007).

The first factor—the willfulness of the non-compliance regarding the March 2025 report and the reason for the noncompliance—does not weigh definitively in either party's favor. Dr. Porter knew well before March 2025 that she had received a $7,698 tuition credit for her son's undergraduate education at UVM in 2019, and Dr. Bancroft could have included that information in his August 2024 report. On the other hand, Dartmouth Health knew that it had approved salary freezes in 2020 and 2021, and Dartmouth Health does not allege that Dr. Porter or Dr. Porter's expert had that information until March 2025. Dr. Porter also explained that she had asked UVMMC to adjust her schedule to a .6 FTE with no call obligation, but UVMMC had not yet agreed to that arrangement as of trial. (Doc. 236 at 2.) Therefore, Dr. Porter worked .75 FTE instead of the predicted .6 FTE with no call, and the March 2025 report accounted for this change in Dr. Bancroft's revised damages calculations. The first factor is therefore inconclusive.

The efficacy of lesser sanctions and the possibility of a continuance weigh against excluding Dr. Bancroft's testimony. Dartmouth Health's proposed alternative—introducing its own expert witness to rebut Dr. Bancroft's supplemental report—was simply not feasible only four days before a three-week trial. *See* Fed. R. Civ. P. 26(a)(2) (providing for disclosure of expert witnesses and specifying deadlines for disclosures of experts and rebuttal experts). Dartmouth Health did not identify or provide any information about its proposed expert witness or explain why it did not disclose an expert witness sooner in compliance with the Federal Rules.

6

Nor did Dartmouth Health offer any proposals for reopening discovery in the middle of trial beyond suggesting that it could "offer the Plaintiff the opportunity to depose its expert economist witness prior to testimony, perhaps over one of the weekends during trial." (Doc. 235 at 7 n.3.) Dartmouth Health itself acknowledged it was "not yet able to determine" whether it was "fully viable" to produce an expert witness only four days before trial. *Id.* at 7. As the Court previously explained, "[t]he untimely disclosure and the absence of an expert report may prejudice Dr. Porter by denying her a clear understanding of the expert's intended testimony and compromising her ability to prepare effective cross-examination or rebuttal evidence." (Doc. 238 at 16.) Nor was the Court obligated to continue an anticipated three-week trial—with multiple out-of-state witnesses scheduled to testify—to cure the potential prejudice, particularly when Dartmouth Health did not make this request. *See Patterson*, 440 F.3d at 118 (citation modified) ("Though a continuance might have cured the alleged prejudice to Patterson, Balsamico cannot rely on this possibility when there is no indication in the record that he requested a continuance at the time. Given the fact that, after almost four years of litigation, the case was set for trial within ten days of Balsamico's Rule 26(a)(3) disclosure, we cannot say that the district court was obligated to continue the trial on its own initiative.").

The duration of noncompliance factor is inconclusive. As discussed above, although Dr. Porter was aware of some information that impacted her expert's damages calculations well in advance of the March 2025 report, other information was only in the possession, custody, or control of Dartmouth Health until the March evidentiary hearing. Dr. Bancroft submitted his updated report one week after the evidentiary hearing.

The Court is unaware of any previous warning to Dr. Porter that an untimely supplemental expert report could result in exclusion of the expert witness. This factor weighs against excluding Dr. Bancroft's testimony.

7

A-1704

The importance of Dr. Bancroft's testimony also weighs against excluding his testimony. Without Dr. Bancroft's testimony, Dr. Porter would have been severely disadvantaged in quantifying her claimed economic damages. Such a sanction would have been disproportionate to the alleged noncompliance given that the late disclosure had a reasonable basis; Dr. Bancroft's methodology did not change from one report to the next, and Dr. Bancroft's final report substantially reduced Dr. Porter's estimated damages.

The potential for prejudice to the opposing party further weighs against excluding Dr. Bancroft's testimony. As discussed, Dartmouth Health already had a significant amount of the updated information Dr. Bancroft relied on for his March 2025 supplemental report. It is difficult to conceive how admitting the March 2025 report, or Dr. Bancroft's testimony consistent with that report, prejudiced Dartmouth Health given that the report estimated substantially lower damages figures than any of Dr. Bancroft's previous reports.

In sum, the relevant factors weigh against excluding Dr. Bancroft's testimony. On this issue, Dartmouth Health has not demonstrated a seriously erroneous result or a miscarriage of justice warranting a new trial.

## II. Dartmouth Health has not shown that the Court erred in its instructions to the jury on damages.

Dartmouth Health contends that the Court incorrectly instructed the jury on the assessment of damages. "Instructions are erroneous if they mislead the jury as to the correct legal standard or do not adequately inform the jury of the law." *Hudson v. New York City*, 271 F.3d 62, 67 (2d Cir. 2001) (citation modified). When considering challenges to jury instructions, the Court must "review[] the charge as a whole to see if the entire charge delivered a correct interpretation of the law" and, if the charge contains an error, determine whether "the error was prejudicial." *See United States v. Vargas-Cordon*, 733 F.3d 366, 379 (2d Cir. 2013) (citation modified).

A-1705

2:17-cv-00194-kjd    Document 337    Filed 11/26/25    Page 9 of 16

Dartmouth Health contends that the Court "did not clearly and directly inform the jury that it could account for and deduct the amount of salary that Dr. Porter received" from her work at UVMMC "from her loss of salary damages." (Doc. 308 at 5.) Dartmouth Health's theory of damages "was that Dr. Porter found another job—with the help of Dartmouth Health medical staff—in her highly specialized subspecialty, and did mitigate her damages." *Id.* at 6. Dartmouth Health challenges one instruction in particular: "If you find that Dr. Porter failed to mitigate her damages, you must reduce your award of damages, if any, by the amount you find she could have avoided." (Doc. 275 at 30.) According to Dartmouth Health, the jury instructions do "not similarly instruct the jury to reduce [Dr. Porter's] damages by the amount she actually avoided through successful mitigation." (Doc. 308 at 6.) In other words, Dartmouth Health contends that "[f]rom these instructions, the jury could read this as, 'we found she mitigated her damages, so we don't need to reduce the award because of this mitigation.'" *Id.*

Dartmouth Health appears to combine two distinct legal concepts: 1) that Dr. Porter's lost earnings after termination from Dartmouth Health were reduced by earnings from her new job at UVMMC; and 2) that Dr. Porter suffered economic damages from termination but, according to Dartmouth Health, those damages should be reduced because Dr. Porter failed to take reasonable steps to minimize her losses ("failure to mitigate"). The instruction Dartmouth Health challenges accurately informs the jury to deduct any damages Dr. Porter could have avoided—by, for example, taking another job—from the damages award. (*Jury Charge*, Doc. 275 at 29-30) ("A plaintiff ordinarily has a general duty to mitigate the damages she incurs, meaning she has a duty to take steps to try to minimize the harm or prevent it from increasing further. In this context, that means Dr. Porter has a duty to attempt to secure or to secure employment that is a suitable alternative to her employment at Dartmouth Health.").

9

A-1706

Dartmouth Health contends that the Court should have further instructed the jury to reduce the award by the amount Dr. Porter earned at UVMMC. But the Court had already instructed the jury on how to calculate Dr. Porter's economic damages: "Economic damages include such items as lost income and medical expenses . . . . Dr. Porter is entitled to damages for any earnings lost in the past . . . caused by Dartmouth Health's conduct." (Doc. 275 at 29.) The terms "lost income" and "lost earnings" informed the jury to consider the difference between what Dr. Porter would have earned at Dartmouth Health and what she earned at UVMMC when calculating damages. By definition, "lost earnings" excludes earnings that Dr. Porter actually received. Additional instruction was unnecessary to explain the concept. Dr. Porter's UVMMC earnings are necessarily excluded from what Dr. Porter "lost."

Moreover, the Court is unaware of—and Dartmouth Health has not offered—any authority recommending or applying Dartmouth Health's requested instruction. *Cf. Vt. Civ. Jury Instructions* § 11.5 (Vt. Trial Ct. Civ. Jury Instruction Comm.) (emphasis added) (a plaintiff "is entitled to compensation for *any earnings lost* in the past, and any probable loss of ability to earn money in the future, because of" defendant's violations); Dinse, Berger, & Lane, *Vt. Jury Instructions—Civil & Criminal* § 7.43 (1993) (emphasis added) (a plaintiff "is entitled to be compensated for *all lost earnings or wages* to date caused by the injuries resulting from" defendant's violations).

Even assuming the jury instructions did not adequately inform the jury on how to calculate Dr. Porter's economic damages, the error did not prejudice Dartmouth Health. Dr. Bancroft's expert testimony explicitly subtracted Dr. Porter's actual earnings at UVMMC from the damages projections. (*See* Doc. 235-2 at 3, n. 4–7); (Doc. 290 at 39:3–10, 47:1–8.) And the jury's economic damages award suggests that the jury deducted Dr. Porter's actual earnings when calculating damages. The damages period for back wages alone spanned more than seven years—

10

A-1707

from Dr. Porter's termination in 2017 to trial in March 2025. Dr. Bancroft projected Dr. Porter's total earnings at Dartmouth Health in 2024 as $391,779, and Dr. Porter actually earned $341,457 at UVMMC that year. (Doc. 235-2 at 3.) But the jury awarded $1,000,000 in economic damages—a much smaller amount than would be expected if the jury had double-counted Dr. Porter's Dartmouth Health income and UVMMC income for several years. The relatively lower award suggests that the jury correctly understood the Court's instructions on lost earnings. Viewing the evidence in the light most favorable to Dr. Porter as the non-moving party, the Court is not "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *See In re Methyl*, 725 F.3d at 112 n.34.

The cases Dartmouth Health cites do not alter the Court's decision. In *Jones v. Consol. Rail Corp.*, 800 F.2d 590 (6th Cir. 1986), the court addressed whether jury instructions properly explained that the plaintiff was entitled to the difference between what he would have earned at his prior job and what he might have earned at a potential new job. *See id.* at 594. *Jones* held that the jury instructions did not adequately explain the law. Specifically, the instruction that the jury "must not award [plaintiff] damages for loss of whatever earnings for the period of time during which he might have worked . . . could refer just as easily to his previous railroad job's wages as to his potential new job's wages." *Id.* (citation modified). As discussed above, however, the phrase "lost earnings" in this case could not reasonably be interpreted to include both Dr. Porter's earnings from UVMMC and her projected earnings at Dartmouth Health. Finally, Dartmouth Health's reliance on *Moysis v. DTG Datanet*, 278 F.3d 819 (8th Cir. 2002) is misplaced because, as Dartmouth Health acknowledges, the case addressed whether an award of front pay constituted an unnecessary windfall. *Id.* at 829.

Dartmouth Health has not shown error in the jury instructions warranting a new trial.

11

III.    **The Court correctly excluded Exhibit C-19 from evidence because the exhibit did not fairly or accurately represent Dr. Bancroft's testimony.**

At trial, Dartmouth Health "sought to elicit key testimony undermining Dr. Bancroft's damages opinions by having him calculate what his projected salary would be if he assumed Dr. Porter [were] working a 1.0 position at UVMMC in three years." (Doc. 308 at 7.) During cross examination, defense counsel provided Dr. Bancroft a calculator and directed him to enter specific numbers, perform certain calculations, and write down the results. (Doc. 290 at 127:7–128:25.) Dartmouth Health subsequently moved to admit that document, marked for identification as C-19, into evidence. The Court denied Dartmouth Health's motion. Dartmouth Health also requested to use Exhibit C-19 as a demonstrative exhibit during closing argument. The Court also denied this motion. Dartmouth Health contends that these denials were "not evenhanded, violated the rules of evidence, and [were] inequitable" because "the figures showed that if" Dr. Porter had worked a 1.0 position at UVMMC, "Dr. Bancroft's damages calculations were essentially fully mitigated by year 2025 or 2026." (Doc. 308 at 7, 8.)

Dartmouth Health primarily argues that Exhibit C-19 was admissible as an admission of a party opponent. (*Id.* at 8-9.) During the trial, the Court explained its reasoning on the record for excluding Exhibit C-19 as substantive evidence and as a demonstrative exhibit. (Doc. 295 at 78–82.) The Court has considered Dartmouth Health's cited authorities and finds no basis to revisit the ruling. The Court further observes that while the note was excluded, counsel was of course free at closing to make use of Dr. Bancroft's testimony associated with the creation of the note. (*Id.* at 82.)

Apart from its admissibility as an evidentiary matter, the Court properly excluded Exhibit C-19 from evidence because of the danger of confusing the issues or misleading the jury. *See* Fed. R. Evid. 403. Assuming Exhibit C-19 is properly considered a "chart," "[s]ummary charts should

12

A-1709

not be admitted unless a proper foundation is established connecting the numbers on the chart with the underlying evidence." *United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986). "Courts have long required that district courts ascertain that summary charts fairly represent and summarize the evidence upon which they are based. Unless this requirement is met, the chart is more likely to confuse or mislead the jury than it is to assist it." *Id.* (citation modified). A similar requirement applies to demonstrative aids. A court may only exercise its discretion to permit the use of demonstrative aids "accurately summarizing the content of primary testimony." *See Castaldi v. Land Rover N. Am., Inc.*, 363 F. App'x 761, 762 (2d Cir. 2009) (summary order) (citing *United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988)).

Dartmouth Health did not demonstrate that the handwritten note fairly represented the testimony at trial. As the Court previously explained in its verbal decision excluding Exhibit C-19, "the circumstances of the testimony that resulted in the generation of the note raised a significant question about whether it accurately summarizes the testimony. Dr. Bancroft acquiesced in performing the requested calculations while protesting that the calculations were not correct." (Doc. 295 at 81–82, 1050:25–1051:5); (*see also* Doc. 290 at 127:8–25) (testimony by Dr. Bancroft that the calculation defense counsel asked Dr. Bancroft to perform would not accurately reflect Dr. Porter's earnings at UVMMC for 2025 if she had worked a 1.0 FTE position and that Dr. Bancroft would "do it anyways, but it's not correct").

Because Exhibit C-19 did not amount to a fair representation of Dr. Bancroft's testimony, the Court did not err by excluding the exhibit from evidence and denying Dartmouth Health's request to use it as a demonstrative aid.

**IV.   Dartmouth Health voluntarily limited its use of the severance offer in its closing argument, and the Court made no express ruling restricting its use.**

Dartmouth Health contends that the Court improperly "limited the extent to which Dartmouth Health could argue at closing that Plaintiff could have mitigated her damages if she had taken" the severance package and that it should have been able to "freely refer[]" to the severance package "in arguing the proper amount of compensatory damages in closing." (Doc. 308 at 9.) The Court first notes that while it raised concerns regarding counsel's intended use of the severance agreement at closing, it made no express ruling barring Dartmouth Health from using the proposed severance agreement as part of a failure to mitigate defense. Further, the colloquy between the Court and Dartmouth Health's counsel on this issue is clear that Dartmouth Health itself elected not to use the severance package as part of a failure to mitigate defense:

> THE COURT: Okay, and then I'll turn now to the plaintiff's motion to preclude any reduction of damages based on conditional offer of severance pay. So having heard the arguments yesterday and considering this, I think that it would be inappropriate to comment on the severance agreement. To the extent I don't know what the defendants might actually argue so I can't really speak specifically to perhaps what the intention is. But would you like to let me know, or I can give you my thoughts on it first? Mr. Schroeder?
>
> MR. SCHROEDER: Sure, Your Honor. I want to make sure we're clear on that. The evidence in the record is that C-13, I believe, I'm certainly going to reference it because C-13 was given after the meeting, which arguably was part of the interactive process.
>
> . . . .
>
> MR. SCHROEDER: And that's all wrapped up in that chronology of events. She argued, and this goes to lack of malice, et cetera, and also just to intent, right?
>
> THE COURT: Lack of malice. You said this yesterday, too. So when you say lack of malice, meaning that Dartmouth was making an effort to reach some type of a severance agreement with her?
>
> MR. SCHROEDER: Exactly, just like they did with the other two physicians at the time.
>
> THE COURT: Okay, **but the argument during closing is not going to be** -- I just want to be really clear -- **it's not going to be making the point that if they should**

14

**find damages, it's going to be reduced by the amount of the severance agreement?**

MR. SCHROEDER: **No, I have no intent of saying that, your Honor.**

THE COURT: Okay.

MR. SCHROEDER: But I want to come back to the fact that this document, I certainly have the ability to discuss it as much as I want, I believe, in terms of admitted evidence into the record, and it relates exactly to the chronology of events. It actually rebuts many of the things that Dr. Porter testified to. I never talked to anybody. Never talked to anybody. Well, no, actually you did. You talked to the head of HR.

THE COURT: Okay.

MR. SCHROEDER: So I want to know that I have free [rein] to at least talk about the document, **not its import in terms of damages**, but I do want to know that I don't have to go rewrite my closing to deal with the fact that I'm addressing -- and I'm going to put it on the screen. Admit it an exhibit. We're not going to have a PowerPoint, but we're going to put in exhibits on the screen, and I want to make sure that I have full carte blanche to discuss what he said in that agreement.

. . . .

THE COURT: All right. So then it sounds like we have clarity on this. Mr. Schroeder, just to be clear then, your discussion of the document, as you said in the ways that you have described, will be fine. We're just talking about the mitigation of the damages issue and the amount of the severance agreement.

MR. SCHROEDER: Understood.

(Doc. 322 at 14:14–15:7, 16:5–17:21, 18:12–20) (emphases added).

Without a limiting ruling, there is no error warranting a new trial. *See, e.g., Winfrey v. Rogers*, 901 F.3d 483, 497 (5th Cir. 2018) ("[A]fter our examination of the record, we conclude that the district court never decided whether Kunkle could testify at trial. . . . Inasmuch as the district court made no decision and issued no ruling, it could not have made an error or otherwise created an issue for appeal."); *United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009) (citation modified) ("By failing to request that the district court rule on the admissibility of that

A-1712

evidence, Basham has waived this argument. . . . It would be difficult to see how the district court committed plain error when it never even issued a ruling to be found in error.").

Because the Court did not issue a ruling limiting use of the severance agreement in the manner Dartmouth Health describes—and at trial Dartmouth Health affirmatively represented that it was not seeking to use the agreement as part of a failure to mitigate defense—its argument that the Court committed error on this issue is without merit and a new trial is not warranted on this ground.

## Conclusion

For the reasons explained above, Dartmouth Health's Motion for a New Trial Related to Damages Issues (Doc. 308) is DENIED.

Dated at Burlington, in the District of Vermont, this 26th day of November 2025.

/s/ Kevin J. Doyle
United States Magistrate Judge

16

A-1713

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

    Plaintiff,

    v.

Dartmouth-Hitchcock Medical Center,
Dartmouth-Hitchcock Clinic,
Mary Hitchcock Memorial Hospital, and
Dartmouth-Hitchcock Health,

    Defendants.

Civil Action No. 2:17–cv–194

**AMENDED JUDGMENT IN A CIVIL ACTION**

☒ **Jury Verdict**

☐ **Decision by Court**

**IT IS ORDERED AND ADJUDGED** that pursuant to the Jury Verdict Form filed on April 10, 2025 (Doc. 281), Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health are liable to Plaintiff Misty Blanchette Porter, M.D., under the Vermont Fair Employment Practices Act; and Defendants are not liable to Plaintiff under the New Hampshire Whistleblowers' Protection Act, the Americans with Disabilities Act, the Rehabilitation Act, the New Hampshire Law Against Discrimination, and New Hampshire's laws prohibiting wrongful discharge.

Pursuant to the jury verdict, Plaintiff is awarded $1,000,000 for economic damages, and $125,000 for non-economic damages, for a total of **$1,125,000**. By Order of the Court (*see* Doc. 334), Plaintiff is also awarded prejudgment interest on that amount through April 24, 2025, at the rate of 12%, totaling **$225,340.62**.

In addition, by Order of the Court (*see* Doc. 335), Plaintiff is awarded **$1,173,621.92** in attorney fees, plus **$12,808.38** in costs.

Accordingly, JUDGMENT IS HEREBY ENTERED in favor of Plaintiff and against Defendants in the total amount of **$2,536,770.92**.

Post-judgment interest is to be calculated from the date this judgment is entered until the date of payment, in accordance with the formula set forth in 28 U.S.C. § 1961.

A-1714

Date:   12/2/2025

*JEFFREY S. EATON*
*CLERK OF COURT*


*/s/ Carl Crawford*
*Signature of Clerk or Deputy Clerk*


JUDMENT ENTERED ON DOCKET
DATE: 12/2/2025

**A-1715**

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER,      )
M.D.,                         )
   Plaintiff,  )
                             )
 v.                      )   **Docket No. 2:17-CV-194**
                             )
DARTMOUTH-HITCHCOCK           )
MEDICAL CENTER,               )
DARTMOUTH-HITCHCOCK           )
CLINIC, MARY HITCHCOCK        )
MEMORIAL HOSPITAL, and        )
DARTMOUTH-HITCHCOCK           )
HEALTH,                       )
   Defendants.  )

## PLAINTIFF'S NOTICE OF CROSS-APPEAL

Notice is hereby given that Misty Blanchette Porter, M.D., plaintiff in the above-named case, hereby cross-appeals to the United Stated Court of Appeals for the Second Circuit from the November 26, 2025 Opinion and Order (Docs. 300, 302, 318, 319, 330) which was incorporated within the Amended Judgment entered in this action on December 2, 2025.

Dated: <u>December 15, 2025</u>    /s/ Geoffrey J. Vitt
             Geoffrey J. Vitt, Esq.
             Vitt & Nunan, PLC
             8 Beaver Meadow Road
             P.O. Box 1229
             Norwich, VT 05055-1229
             (802) 649-5700
             gvitt@vittnunanlaw.com

             Eric D. Jones, Esq.
             Langrock Sperry & Wool, LLP
             210 College Street
             P.O. Box 721
             Burlington, VT 05402

A-1716

(802) 864-0217
ejones@langrock.com

Sarah H. Nunan, Esq.
Vitt & Nunan PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055
(802) 649‒5700
snunan@vittnunanlaw.com

*Attorneys for Plaintijf,*
*Misty Blanchette Porter, M.D.*

2

A-1717

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,


Plaintiff,

vs.


DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,


Defendants.

Case No. 2:17-cv-194

### DEFENDANTS' AMENDED NOTICE OF APPEAL

Notice is hereby given that Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health, Defendants in the above-named case, appeal to the United States Court of Appeals for the Second Circuit from the judgment (ECF No. 297) entered in this action on the 24th day of April, 2025; the Orders on Plaintiff's Motion for Prejudgment Interest (ECF No. 334), Plaintiff's Motion for Attorney Fees and Motion to Alter Judgment (ECF No. 335), Defendant's Motion to Alter Judgment and, in the Alternative, for a New Trial on Plaintiff's VFEPA Claim (ECF No. 336), and Defendant's Motion for a New Trial Related to Damages Issues (ECF No. 337) entered in this action on the 26th day of November, 2025; and the Amended Judgment (ECF No. 338) entered in this action on the 2nd day of December, 2025.

1

A-1718

Date: December 16, 2025

Respectfully submitted,

*/s/ Donald W. Schroeder*

**FOLEY & LARDNER LLP**

Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

**DOWNS RACHLIN MARTIN PLLC**

Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

*Attorneys for Defendants*

A-1719

## CERTIFICATE OF SERVICE

I hereby certify that, on December 16, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

*/s/ Morgan McDonald*
Morgan McDonald