# 25-1382-cv(L), 25-3155-cv(XAP)

# United States Court of Appeals
## for the
## Second Circuit

MISTY BLANCHETTE PORTER, M.D.,

*Plaintiff-Appellee-Cross-Appellant,*

– v. –

DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, DARTMOUTH-HITCHCOCK HEALTH,
DARTMOUTH-HITCHCOCK MEDICAL CENTER,

*Defendants-Appellants-Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT (BURLINGTON)

## SPECIAL APPENDIX

DONALD W. SCHROEDER
MORGAN MCDONALD
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199
(617) 342-4041
– and –
TRISTRAM J. COFFIN
DOWNS RACHLIN MARTIN PLLC
199 Main Street,
P.O. Box 190, 6th Floor
Burlington, Vermont 05402
(802) 863-2375

*Attorneys for Defendants-Appellants-
Cross-Appellees*

SARAH NUNAN
GEOFFREY J. VITT
VITT & NUNAN, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, Vermont 05055
(802) 649-5700
– and –
ERIC D. JONES
LANGROCK SPERRY & WOOL, LLP
210 College Street, Suite 400
Burlington, Vermont 05401
(802) 864-0217

*Attorneys for Plaintiff-Appellee-
Cross-Appellant*

CP COUNSEL PRESS    (800) 4-APPEAL • (390775)

i

**SPECIAL APPENDIX TABLE OF CONTENTS**

**Page**

Judgment of the United States District Court for the District of Vermont, filed April 24, 2025, Appealed From (Doc. 297), with Notice to Litigants ................................................................. SPA-1

Order of the Honorable Kevin J. Doyle, filed July 7, 2025, Appealed From (Doc. 329)............... SPA-3

Order of the Honorable Kevin J. Doyle, filed November 26, 2025, Appealed From (Doc. 334) .. SPA-6

Opinion and Order of the Honorable Kevin J. Doyle, filed November 26, 2025, Appealed From (Doc. 335) ............................................................. SPA-17

Order of the Honorable Kevin J. Doyle, filed November 26, 2025, Appealed From (Doc 336) ... SPA-72

Order of the Honorable Kevin J. Doyle, filed November 26, 2025, Appealed From (Doc. 337) .. SPA-84

Amended Judgment of the United States District Court for the District of Vermont, filed December 2, 2025, Appealed From (Doc. 338) ...................... SPA-100

Order Denying Motion to Preclude Robert Bancroft's Testimony, filed March 21, 2025 ......... SPA-102

Jury Charge, filed April 8, 2025................................ SPA-119

42 U.S.C.A. § 2000e-2............................................... SPA-153

42 U.S.C.A. § 2000e-5............................................... SPA-187

21 V.S.A. § 495 ........................................................ SPA-208

N.H. Rev. Stat. § 354-A:7......................................... SPA-212

SPA-1

# UNITED STATES DISTRICT COURT

for the
District of Vermont

| | |
|---|---|
| Misty Blanchette Porter, M.D. | ) |
| *Plaintiff(s)* | ) |
| | ) |
| v. | ) |
| | ) |
| Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health | ) |
| *Defendant(s)* | ) |

Civil Action No.   2:17-cv-194

## JUDGMENT IN A CIVIL ACTION

☑   **Jury Verdict.**

☐   **Decision by Court.**

**IT IS ORDERED AND ADJUDGED** that pursuant to the Jury Verdict Form (Doc. 281) filed April 10, 2025, Defendants were not liable to Plaintiff Misty Blanchette Porter under the New Hampshire Whistleblowers' Protection Act, the Americans with Disabilities Act, the Rehabilitation Act, the New Hampshire Law Against Discrimination, and New Hampshire State Law prohibiting Wrongful Discharge. Defendants were liable to Plaintiff under the Vermont Fair Employment Practices Act.

Plaintiff was awarded One Million Dollars ($1,000,000.00) for economic damages and One Hundred Twenty-Five Thousand Dollars ($125,000.00) for non-economic damages. JUDGMENT IS HEREBY entered in the amount of One Million One Hundred Twenty-Five Thousand Dollars ($1,125,000.00) for Plaintiff Misty Blanchette Porter, against Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health.

The effective post-judgment interest rate is 3.98%

Date:    April 24, 2025

*JEFFREY S. EATON*
*CLERK OF COURT*

JUDGMENT ENTERED ON DOCKET
DATE ENTERED:  4/24/2025

*/s/ Emerson Howe*

*Signature of Clerk or Deputy Clerk*

SPA-2

**UNITED STATES DISTRICT COURT**

**OFFICE OF THE CLERK**

DISTRICT OF VERMONT

FEDERAL BUILDING

**BURLINGTON, VERMONT 05402-0945**

☒ P.O. BOX 945
BURLINGTON 05402-0945
(802) 951-6301

☐ P.O. BOX 607
RUTLAND 05702-0607
(802) 773-0245

**JEFFREY S. EATON**
CLERK

Civil Action: 2:17-cv-194                                     Date:  April 24, 2025

Blanchette Porter v. Dartmouth Hitchcock Medical Center et al.

NOTICE TO LITIGANTS

If you wish to appeal the enclosed judgment or order, you must file a Notice of Appeal within 30 days after entry of the judgment or order appealed from (or 60 days if the United States or an officer or agency of the United States is a party).  Fed. R. App. P. 4(a)(1).  The fee for filing an appeal is $605.00.

If you wish to appeal but are unable to file your Notice of Appeal within 30 days [or 60 days if applicable] after the date of entry shown on line 2 below, then you have an additional 30 days to file a Motion for Extension of Time.  The Motion for Extension of Time **must** be filed within 30 days after the date on line 3 below.  Every Motion for Extension of Time must contain an explanation which demonstrates "good cause" or "excusable neglect" for failure to file the Notice of Appeal within the time limit required. Fed. R. App. P. 4(a)(5).

**PLEASE TAKE NOTICE**

1.  Judgment filed                                     April 24, 2025

2.  Date of Entry of Judgment on
    the docket of this court                       April 24, 2025

3.  Notice of Appeal **MUST** be
    filed on or before                               May 27, 2025

*/s/ Emerson Howe*
*Signature of Clerk or Deputy Clerk*

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

|  |  |
|---|---|
| Misty Blanchette Porter, M.D., <br><br> Plaintiff, <br><br> v. <br><br> Dartmouth-Hitchcock Medical Center, <br>Dartmouth-Hitchcock Clinic, <br>Mary Hitchcock Memorial Hospital, and <br>Dartmouth-Hitchcock Health, <br><br> Defendants. | Civil Action No. 2:17–cv–194 |

## ORDER

Plaintiff's Motion for Attorney Fees (Doc. 300), including attached Declarations (Docs. 300-1 and 300-2), does not include certain information necessary for the Court to calculate the lodestar in this case. The Motion states the number of hours billed by each attorney and paralegal at Langrock Sperry & Wool, and the respective billing rates (*see* Doc. 300 at 4–5). However, with respect to work performed by Vitt & Nunan attorneys and paralegals, the submissions only provide information for work done "[f]rom 2024 through trial and preparation of th[e] Motion [for Attorney Fees]" (*id.* at 4).

Plaintiff has not provided the following critical information in the Motion (and attached Declarations), Reply (Doc. 318), or Supplemental Memorandum (Doc. 326): (1) the number of hours billed by Attorney Vitt before 2024 (at the rate of $320/hour); (2) the number of hours billed by Attorney Nunan before 2024, and the applicable rate; (3) the number of hours billed by paralegal Nunan (at the rate of $80/hour); (4) the number of hours billed by other non-attorney legal staff at Vitt & Nunan (at rates of $50–$100/hour); and (5) the number of hours billed by

Attorney Kramer at each of her two different billing rates. These numbers may be calculated based on a review of the billing records submitted to the Court (*see* Doc. 300-3 at 1–261; Doc. 300-4 at 1–8; Doc. 300-5 at 1–53), but it is not for the Court to calculate the number of hours billed, at different rates, by at least seven different timekeepers, as documented in over three hundred pages of billing records.

Plaintiff is ordered to submit the specific numbers listed above to the Court by **Friday July 11, 2025**, in a second supplemental memorandum in support of the Motion for Attorney Fees. The Court requires *the total number of hours billed by each individual timekeeper, specifying the timekeeper's respective hourly rate at the time the services were rendered*. Without this information, the Court is unable to adjust the calculations based on hourly billing rates or number of hours billed, to the extent the Court determines any such adjustments may be warranted. It may be most efficient for this information to be submitted to the Court in a chart. The chart below specifies the information currently lacking in Plaintiff's submissions:

| Timekeeper | Hourly Rate | Hours Billed | Total |
|---|---|---|---|
| Attorney Geoffrey Vitt | $320 (2017–2023)<br>$400 (2024–2025) | [unknown]<br>1,120.9 | **$?**<br>**$448,360** |
| Attorney Sarah Nunan | $? (2019?–2023)<br>$260 (2024–2025) | [unknown]<br>760.8 | **$?**<br>**$197,808** |
| Attorney Sarah Merlo | $230 (2017)<br>$325 (2024–2025) | [unknown]<br>281 | **$?**<br>**$91,325** |
| Attorney Katie Kramer:<br>solo and at DGW Kramer, LLP<br>at DTO Law | $175 (2018–2020)<br>$450 (2024) | 33.4 [+?]<br>20.4 | **$5,845 [+$?]**<br>**$9,180** |
| Attorney Eric Jones | $375 (2024)<br>$395 (2025) | 36.10<br>358 | **$13,537.50**<br>**$141,410** |
| Attorney Alison Bell | $415 | 9.6 | **$3,984** |
| Attorney Bridget Grace | $225 | 2 | **$450** |

2

SPA-5

2:17-cv-00194-kjd    Document 329    Filed 07/07/25    Page 3 of 3

| | | | |
|---|---|---|---|
| Attorney Wendy Radcliff | $250 | .25 | **$62.50** |
| Paralegal Sherri Lehouiller | $155 | 38.3 | **$5,936.50** |
| Paralegal Sarah Nunan | $80 | [unknown] | **$?** |
| Other legal staff<br>(Julia Korkus, Katie/Katherine Fenton, Shannon Edson, Christine Lyon, Marianne McCann) | $50–$130 | [unknown] | **$?** |
| **TOTAL** | | | **$917,898.50 + $?** |

Dated at Burlington, in the District of Vermont, this 7th day of July 2025.

/s/ Kevin J. Doyle
United States Magistrate Judge

3

SPA-6

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

 Plaintiff,

 v.         Civil Action No. 2:17–cv–194–kjd

Dartmouth-Hitchcock Medical Center et al.,

 Defendants.

## ORDER
(Doc. 296)

After trial in this case arising from the end of an employment relationship, the jury found Defendants (Dartmouth Health) liable for disability discrimination under the Vermont Fair Employment Practices Act and awarded Dr. Porter $1,000,000 in economic damages and $125,000 in non-economic damages. (Doc. 281.) Dr. Porter requests prejudgment interest on the $1,000,000 economic damages award. (Doc. 296 at 3.) Dartmouth Health opposes Dr. Porter's motion for prejudgment interest, requesting that the Court deny prejudgment interest in the first instance or, if prejudgment interest is imposed, apply a reduced interest rate. (Docs. 299, 299-6, 299-7.)

## Standard

A plaintiff's postjudgment motion for prejudgment interest "constitutes a motion to alter or amend the judgment under Rule 59(e)." *See Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989) (holding same with respect to discretionary prejudgment interest); *id.* at 176 n.3 (explaining that Rule 59(e) also controls when "prejudgment interest is available as a matter of right"). A district court has broad discretion to determine whether to grant a motion to alter or amend the judgment. *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000).

"[F]ederal law does not apply to the calculation of prejudgment interest on supplemental state law claims." *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998) *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008). Under Vermont law, "[i]n an action where monetary relief is awarded, the amount of the judgment shall include the principal amount found to be due, all interest accrued on that amount up to and including the date of entry of judgment, and all costs allowed to the prevailing party." Vt. R. Civ. P. 54(a).

<u>**Analysis**</u>

**I.      Plaintiff's Non-Compliance with Local Rule 7(a)(7)**

Dartmouth Health asks the Court to deny Dr. Porter's Motion due to noncompliance with Local Rule 7(a)(7), which requires a party filing a non-dispositive motion to "certify that the party has made a good faith attempt to obtain the opposing party's agreement to the requested relief." (Doc. 299 at 2–3.) However, Dartmouth Health has previously taken the position that prejudgment interest is inappropriate in this case, and in the event that prejudgment interest is imposed, it should be calculated at a reduced rate. (Doc. 266 at 3.) It has maintained this position in its post-trial filing on this issue, strongly suggesting that it would "have been unlikely to have agreed to the relief" requested. *See Kew v. Town of Northfield, Vt.*, Case No. 5:19-CV-78, 2021 WL 11719002, at *2 (D. Vt. Mar. 9, 2021); (Doc. 266 at 3.)

In these circumstances, the Court will not deny Plaintiff's Motion for Prejudgment Interest based on non-compliance with Local Rule 7(a)(7).

**II.     Dr. Porter is entitled to prejudgment interest as of right because her damages are readily ascertainable.**

"Prejudgment interest is awarded as of right when the principal sum recovered is liquidated or capable of ready ascertainment. . . ." *Hirchak v. Hirchak*, 2024 VT 81, ¶ 37, ___ Vt. ___, 331 A.3d 1051 (citation modified). Courts reason that when "damages are liquidated or

determinable by a reasonably certain standard of measurement, the defendant can avoid the accrual of interest by simply tendering to the plaintiff a sum equal to the amount of damages." *Windsor Sch. Dist. v. State*, 2008 VT 27, ¶ 30, 183 Vt. 452, 956 A.2d 528. Damages are not reasonably ascertainable when "the parties dispute how the jury could arrive at the damages it awarded." *Winey v. William E. Dailey, Inc.*, 636 A.2d 744, 752 (Vt. 1993). For example, unjust-enrichment claims do not result in mandatory prejudgment interest because "the measure of damages does not just require calculation of the amount of benefit conferred, but also an assessment of how much of that benefit would be inequitable for the defendant to retain." *Hirchak*, 2024 VT at ¶ 38. "The uncertainty in this calculation means that the parties will invariably dispute how the jury could arrive at the damages." *Id.* By contrast, damages are typically "reasonably certain" in lost-wage and medical-expense claims because, although these damages "are 'unliquidated' in the sense that a precise amount may not be known to either party, they are 'liquidated' in that they can be measured against a reasonably certain standard." *Smedberg v. Detlef's Custodial Serv., Inc.*, 2007 VT 99, ¶ 37, 182 Vt. 349, 940 A.2d 674 (citation modified).

Dr. Porter's damages—lost earnings and employment-related expenses (including rent and utilities in Burlington and travel costs between her place of employment in Burlington and her home in Norwich)—are readily ascertainable.[1] Similar to the plaintiff in *Smedberg*, Dr. Porter's "salar[ies] [were] known with reasonable certainty," and "the damage measure" for her increased employment expenses "is simply the reasonable value of the services rendered." *Id* at ¶¶ 37–38 (citation modified); *see also id* at ¶ 38 (holding that "[i]t works no unfairness on

---

[1] The Vermont Supreme Court has acknowledged that the terms "readily ascertainable" and "reasonably ascertainable" are substantively similar with respect to an award for prejudgment interest. *See Est. of Fleming v. Nicholson*, 724 A.2d 1026, 1030 n.2 (Vt. 1998).

3

tortfeasors to require them to pay prejudgment interest on" expenses flowing from their wrongs when the cost and date of each expense, as it was incurred, "was known precisely.").

Dartmouth Health contends that Dr. Porter's damages are not "reasonably certain" because Dr. Bancroft, her damages expert, produced four different reports over several years, reaching different results each time. As the Court discussed in detail in its Order denying Dartmouth Health's Motion to exclude Dr. Porter's expert witness, Dr. Bancroft issued several updates to his reports because new information impacted the damages Dr. Porter sustained from losing her job. (*See* Doc. 238 at 7.) For example, while Dr. Porter first believed she would resign her full-time position (0.8 FTE) at the University of Vermont Medical Center (UVMMC) to find a part-time job closer to home, she continued working at UVMMC for several years longer than she had expected. As a result, Dr. Bancroft updated his predictions of Dr. Porter's future lost earnings and employment expenses to account for Dr. Porter's higher salary. Perhaps neither party could have predicted how Dr. Porter's damages would change over the eight years of this case, but Dr. Porter's UVMMC salary and employment expenses on any given day were reasonably certain such that Dartmouth Health could "avoid the accrual of interest by simply tendering to [Dr. Porter] a sum equal to the amount of damages." *See Windsor Sch. Dist.*, 2008 VT at ¶ 30.

Nor are Dr. Porter's damages rendered reasonably uncertain because, as Dartmouth Health argues, "[it] is not even readily ascertainable when Dr. Porter plans to retire." (Doc. 299 at 5.) As this Court has previously observed, Dr. Porter is a reliable source of information regarding whether and when she intends to decrease her working hours for the purpose of calculating damages. (*See* Doc. 238 at 7–8.) Dr. Porter has provided a reasonable explanation for why she intends to decrease her hours at UVMMC: the stresses associated with commuting from

her home in Norwich, Vermont to a job in Burlington instead of her former job at Dartmouth Health in New Hampshire. (Doc. 230 at 37:2–17, 38:21–39:1); (*see also* Doc. 198-4 at 11, 37:10–18 (testimony by Dr. Porter that she did not know how long she would stay at UVMMC because she enjoyed the work but "didn't like being away from her family and having to commute")); *cf. Bergerson v. N. Y. State Off. of Mental Health, Cent. N. Y. Psychiatric Ctr.*, 526 F. App'x 109, 111–12 (2d Cir. 2013) (summary order) (finding district court erred in concluding that employee failed to mitigate damages when she resigned from employment located two and a half to three hours from her home because employee "was not obligated to mitigate damages by pursuing or continuing employment located such an unreasonable distance from her home"). To avoid the accrual of interest, Dartmouth Health could have determined Dr. Porter's work status, salary, and employment expenses with certainty simply by inquiring. *See Windsor Sch. Dist.*, 2008 VT at ¶ 30.

Dartmouth Health's cited authorities are distinguishable. In *Windsor School District*, the damages could not be measured against a reasonably certain standard because they depended on undocumented or unreliable evidence of expenses and thus required inherently subjective determinations. 2008 VT at ¶¶ 14–15, 21 (upholding trial court's denial of prejudgment interest on award of attorney's fees and environmental consultant costs when attorney's filings did not distinguish between compensable and non-compensable activity under relevant statute, attorney's time records were "somewhat inflated" or did not bill for all work performed, and certain consultant costs were duplicative of work performed by the State or otherwise unreasonable). *Winey* similarly required subjective interpretation—whether a contractor's choices made in the course of constructing a house could be characterized as deviations from the plans and specifications—and, unlike this case, involved conflicting expert testimony regarding

5

damages. *See* 636 A.2d at 754. In *Brody v. Simpson Dev. Corp.*, a defective construction case, the parties disputed which repairs were actually necessary and how much they would cost. File No. 2:05-CV-293, 2007 WL 9710665, at *1 (D. Vt. Dec. 19, 2007). Unlike *Brody*, there is no genuine factual dispute that Dr. Porter earned less money at UVMMC and incurred expenses associated with working farther from home.[2]

The Court concludes that Dr. Porter's damages can be measured against reasonably certain standards—her salaries and the reasonable amount of her expenses. *See Smedberg*, 2007 VT at ¶ 37. Therefore, she is entitled to an award of prejudgment interest as of right.

### III. The Court would exercise its discretion to award prejudgment interest even if Dr. Porter's damages were not reasonably ascertainable.

Even assuming such an award of prejudgment interest were not mandatory, the Court would exercise its discretion to award prejudgment interest to make Dr. Porter whole. *See, e.g.*, *id.* at ¶ 36 (citation modified) (holding that Vermont "allow[s] prejudgment interest in the trial court's discretion where such an award is required to make the plaintiff whole"); *Merritt v. United States*, Case No. 5:18-CV-200, 2022 WL 17573683, at *1 (D. Vt. Nov. 15, 2022) (Crawford, J.) (holding courts may consider request for discretionary interest on award for pain and suffering that was not reasonably certain to avoid injustice).

---

[2] At trial, Dartmouth Health contended that Dr. Porter suffered no compensatory damages from losing her job. (Doc. 295 at 57–59, 1026:18–1028:2.) Dartmouth Health argued that if Dr. Porter had hypothetically worked full-time—that is, 1.0 FTE at UVMMC rather than 0.8 FTE—she would have earned more money than she earned working 1.0 FTE at Dartmouth Health and therefore would not have suffered any losses. (Doc. 290 at 129:1–130:1.) But the record does not support Dartmouth Health's argument. First, Dartmouth Health's calculation of what Dr. Porter would have earned from a 1.0 FTE position at UVMMC relies only on Dr. Bancroft's testimony on cross-examination, and Dr. Bancroft testified that Dartmouth Health's 1.0 FTE calculation was not correct. *Id.* at 127:19–25. Second, the parties do not dispute that Dr. Porter actually worked 0.8 FTE at UVMMC and therefore actually earned less money than she would have earned had she remained 1.0 FTE at Dartmouth Health. Dartmouth Health appears to argue both that Dr. Porter did not suffer any compensatory damages at all and that she failed to take reasonable steps—such as working 1.0 FTE at UVMMC—to mitigate her losses. The record does not contain evidence that Dr. Porter actually earned more money at UVMMC than she would have earned at Dartmouth Health.

6

SPA-12

Prejudgment interest "should generally be made available to plaintiffs when there has been a delay in judgment." *Fleming*, 724 A.2d at 1031. "As the Second Circuit has explained, a dollar in hand today is worth more than a dollar to be paid a year from today, and a dollar a year from today is worth more than a dollar to be received in two years." *Epstein v. Kalvin-Miller Int'l, Inc.*, 139 F. Supp. 2d 469, 485 (S.D.N.Y. 2001) (citation modified) (quoting *McCrann v. U.S. Lines, Inc.*, 803 F.2d 771, 722 (2d Cir. 1986)). "Prejudgment interest on compensatory damage awards is meant to restore—to the extent possible—harmed plaintiffs to the financial position they would have enjoyed but for the tort, and should not be limited to such a tiny fraction of tort cases." *Smedberg*, 2007 VT at ¶ 39.

The record demonstrates that Dr. Porter experienced economic damages due to the delay in reimbursement of her associated monetary losses. *See Fleming*, 724 A.2d at 1031. When Dr. Porter first began working per diem at UVMMC, she paid for hotels several nights per week. (Doc. 287 at 102:10–17.) Dr. Porter eventually purchased a condominium in Burlington, requiring remortgaging of the family home to afford the new down payment. (*Id.* at 102:18–104:7.) She also paid utility bills for the Burlington condominium and bills for the family home in Norwich. (Doc. 290 at 58:13–20.) The date of Dr. Porter's termination also affected when she could withdraw money from her pension and how much money she will receive. (Doc. 287 at 107:1–8.) Dr. Porter experienced these financial burdens and lost investment opportunities over the eight years of this case. She also earned less at UVMMC than she would have earned at Dartmouth Health. (Doc. 290 at 60:11–17.) An award of prejudgment interest in these circumstances is required to make her whole.

Dartmouth Health contends that prejudgment interest does not serve the interests of justice because the majority of the damages results from future earnings. (Doc. 299 at 9.) But the

record equally supports the conclusion that the $1 million award was comprised entirely of back pay and employment expenses. (*See* Doc. 235-2 at 3; *id.* at 6.) The possibility that Dr. Porter may only be entitled to prejudgment interest on *some* of her damages award does not mean that she cannot receive interest on *any* of her award.

For these reasons, the Court would exercise its discretion to award pre-judgment interest even if Dr. Porter's damages were found not to be "reasonably certain."

**IV.     Vermont law mandates an annual interest rate of 12% for prejudgment interest.**

After judgment, if the parties have not stipulated a rate of interest by contract, "the statutory or legal rate applies." *Greenmoss Builders, Inc. v. King*, 580 A.2d 971, 975 (Vt. 1990). Vermont law establishes the legal rate of 12% per annum. 9 V.S.A. § 41a(a).

Dartmouth Health contends that awarding 12% interest for a period of time when market interest rates were significantly lower would constitute a "windfall." The Vermont Supreme Court, however, has considered and rejected similar logic. *See Concord Gen. Mut. Ins. Co. v. Gritman*, 2016 VT 45, ¶¶ 34–35, 202 Vt. 155, 146 A.3d 882 (citation modified) ("The Legislature could reasonably conclude that a fixed rate of simple interest is a more efficient and predictable way to calculate prejudgment and postjudgment interest than a floating rate pegged to the national prime rate. . . . The argument that a fixed 12% rate creates a windfall to plaintiffs and is punitive to defendants in periods like the present when market interest rates are low is more appropriately presented to the Legislature.").

Contrary to Dartmouth Health's position, the Court may not exercise its discretion to apply a lower interest rate. (Doc. 299 at 10.) In the absence of a stipulated interest rate, the application of a prejudgment interest rate "contrary to the clearly-enumerated statutory rate of 12%[] constitutes an abuse of discretion warranting reversal." *New England P'ship, Inc. v. Rutland City Sch. Dist.*, 786 A.2d 408, 416 (Vt. 2001).

Finally, Dartmouth Health asks the Court to reduce any prejudgment interest amount as an equitable matter because the judgment was delayed by "extraordinary circumstances," including time spent on appeal and "pandemic-related disruption—akin to a force majeure." (Doc. 299 at 12–13.) Although prejudgment interest should not be punitive, it is well established that "[t]he purpose of a prejudgment interest award in a wrongful termination case is to compensate a plaintiff for the loss of use of money that the plaintiff otherwise would have earned had he not been unjustly discharged." *Chandler v. Bombardier Cap., Inc.*, 44 F.3d 80, 83 (2d Cir. 1994). Prejudgment interest also "discourages an employer from attempting to enjoy an interest-free loan for as long as it can delay paying out back wages." *Id.* (citation modified). No party could have predicted that any award of damages in this case would occur eight years after the case began. But given the dual purposes of prejudgment interest—compensation for plaintiff's loss of the use of money had the wrongful discharge not occurred and disincentivizing delay in payment of back wages—it is appropriate that Dartmouth Health, rather than Dr. Porter, shoulder the financial burden of the delay in judgment. "It works no unfairness on tortfeasors to require them to pay prejudgment interest" on expenses "flowing from their wrongs." *Smedberg*, 2007 VT at ¶ 38.

Dr. Porter is entitled to prejudgment interest at an annual rate of 12% calculated according to the actuarial method. 9 V.S.A. § 41a(a). The Vermont Supreme Court has interpreted the phrase "actuarial method" to allow "simple interest and not compound interest to be accorded to judgment awards." *Greenmoss Builders*, 543 A.2d at 1324.

Courts retain discretion to vary the method of calculating prejudgment interest. *Remes v. Nordic Grp., Inc.*, 726 A.2d 77, 81 (Vt. 1999). The trial court should use a "reasonable and established method to calculate prejudgment interest." *Id.* "Further, there may be several equally

valid methods of computation, each yielding a somewhat different result." *Id.* (citation modified).

The Second Circuit has held that prejudgment interest should be calculated separately for each lost payment. *See Chandler*, 44 F.3d at 84. However, "where an undifferentiated verdict makes it 'impossible to discern which of the costs formed the basis of the award,' prejudgment interest may be calculated within the range of the court's discretion to 'roughly and fairly' compensate the plaintiff." *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 445 (2d Cir. 1995); *see also Rao v. New York City Health & Hosps. Corp.*, 882 F. Supp. 321, 326–27 (S.D.N.Y. 1995) (awarding plaintiff prejudgment interest on entire damages award because all or virtually all of the award was compensation for lost wages and it would have been inequitable to withhold prejudgment interest on the ground that some portion of the award may have been intended to compensate the plaintiff for damages other than wages, when the parties agreed that the issue of prejudgment interest would be left to the court and defendants did not request that the jury specifically allocate the amount of lost wages).

The Court elects to allocate the $1 million award evenly between June 3, 2017 (the effective date of Dr. Porter's termination) and December 31, 2033 (the year Dr. Porter testified she intended to stop working). *See, e.g.*, *Marfia*, 147 F.3d at 91 (noting the equal payment method); *Cheney v. New England Publishers Inc.*, No. 5091012, 2014 WL 8515132, at *3 (Vt. Super. July 8, 2014) (allocating jury award evenly over 39 months from end of employment through date of verdict).

SPA-16

Dr. Porter is entitled to prejudgment interest in the amount of **$225,340.62** calculated as follows:

| | |
|---|---|
| **Prejudgment interest through April 11, 2025** | **$225,335.58 (205 full pay periods between June 3, 2017, and April 11, 2025, at $2320.19 per pay period)** |
| **Prejudgment interest from April 12, 2025, through April 24, 2025** | **$5.04** |
| **TOTAL** | **$225,340.62** |

## Conclusion

For the reasons explained above, Dr. Porter's Motion for Prejudgment Interest (Doc. 296) is GRANTED IN PART AND DENIED IN PART. The Court imposes prejudgment interest in the amount of $225,340.62.

Dated at Burlington, in the District of Vermont, this 26th day of November 2025.

/s/ Kevin J. Doyle
United States Magistrate Judge

11

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

    Plaintiff,

    v.

Dartmouth-Hitchcock Medical Center,
Dartmouth-Hitchcock Clinic,
Mary Hitchcock Memorial Hospital, and
Dartmouth-Hitchcock Health,

    Defendants.

Civil Action No. 2:17–cv–194

**OPINION AND ORDER**
(Docs. 300, 302, 318, 319, 330)

In March and April 2025, the Court held a fourteen-day trial in this employment lawsuit brought by Plaintiff Misty Blanchette Porter, MD, against Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth Health"). Dr. Porter claimed she was unlawfully terminated by Dartmouth Health because of her disability and her whistleblowing complaints to Dartmouth Health supervisors about the allegedly incompetent and unethical conduct of two other Dartmouth Health physicians. Dartmouth Health claimed it had legitimate, nondiscriminatory business reasons for terminating Dr. Porter's employment, in conjunction with its 2017 closure of Dartmouth Health's Reproductive Endocrinology and Infertility (REI) Division.

The jury found in favor of Dr. Porter on her disability discrimination claim under the Vermont Fair Employment Procedures Act (VFEPA), and against Dr. Porter on her remaining claims under New Hampshire law and under federal disability discrimination and retaliation laws,

including the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. (*See* Doc. 281 at 1–4.) The jury awarded Dr. Porter $1,000,000 in economic damages for lost income and expenses, and $125,000 in non-economic damages for lost enjoyment of life, mental anguish, or pain and suffering, for a total award of $1,125,000. (*Id.* at 5.) Finally, the jury found that Dr. Porter was not entitled to punitive damages. (*Id.* at 6.)

This Opinion and Order addresses Dr. Porter's Motion for Attorney Fees (Doc. 300) and Bill of Costs (Doc. 319). Dr. Porter requests $1,738,341.50 in attorney fees. (Doc. 318 at 1, 8; *see* Doc. 300 at 1, 12.)[1] Dartmouth Health has filed an Opposition to Dr. Porter's Motion for Attorney Fees (Doc. 309); and Dr. Porter has filed a Reply (Doc. 318) and a "Supplemental Memorandum" (Doc. 326) in support of the Motion. At the Court's request (*see* Doc. 329), Dr. Porter filed a "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees" (Doc. 330) to provide particular information required by the Court to decide the Motion. In the "Second Supplemental Memorandum," Dr. Porter seeks an additional $70,439 in attorney fees for work done by her attorneys since the filing of the pending Motion for Attorney Fees. (*See* Doc. 330 at 1; Doc. 330-2.) Dartmouth Health filed a "Response in Opposition to Plaintiff's Second Supplemental Memorandum," asking the Court to deny Dr. Porter's request for additional attorney fees in full. (Doc. 331.)

As to costs, Dartmouth Health filed a Notice of Objection to Dr. Porter's original Bill of Costs (Doc. 307; *see* Doc. 301), resulting in Dr. Porter's subsequent revision of the Bill of Costs (*see* Doc. 319). The Court considers only the most recently filed Bill of Costs in which Dr. Porter seeks $9,420.79. (*Id.*)

---

[1] Dr. Porter originally sought $1,742,649.70 in her Motion for Attorney Fees. (*See* Doc. 300 at 1, 12.) She subsequently revised the amount requested to $1,738,341.50, explaining that she discovered an "oversight" when she "checked the addition of the multiple invoices of the lawyers who have worked on the case." (Doc. 318 at 1.)

2

2:17-cv-00194-kjd     Document 335     Filed 11/26/25     Page 3 of 55

On July 1, 2025, the Court held a hearing on all post-trial motions, including Dr. Porter's

Motion for Attorney Fees. (*See* ECF No. 328.) At the hearing, Dr. Porter requested that the Court

require Dartmouth Health's counsel to submit their billing records to compare them to Dr. Porter's

counsel's billing records in support of the Motion for Attorney Fees.[2] Courts in this Circuit have

---

[2] Dr. Porter also included this request in her Reply brief on the Motion for Attorney Fees. According to Dr. Porter, "[i]f Defendants insist on criticizing Dr. Porter's fees as 'astounding,' it is reasonable to ask what Defendants' attorneys' fees and expenses have been," and "if Defendants proceed with their challenge to the amount of fees Plaintiff seeks, then they should be required to produce information on the fees they have paid." (Doc. 318 at 2–3.) At the hearing on the Motion, Dartmouth Health's counsel resisted the request to provide its own billing records to the Court, contending that comparing the billing records of Dartmouth Health's attorneys to those of Dr. Porter's attorneys would be an "apples-to-oranges comparison," in part because "Dartmouth Health . . . had to defend itself against claims that put its reputation at stake," given that Dr. Porter's claims "are related to . . . patient safety," which in their view made the case "more than just a single-plaintiff employment case." (Doc. 332 at 62:10–16.) This argument is not well-taken. Though it is true that corporate defendants are often represented by larger law firms, which generally have higher overhead costs that may be reflected in their billing rates, the Court is unaware of any principle of law directing that an individual plaintiff's attorney fees should generally be lower than those of a corporate defendant because the corporate defendant is defending its reputation whereas the plaintiff is merely pursuing claims of alleged wrongdoing against the corporation. Regardless the party requesting attorney fees, be it an individual or a corporate entity, the Court's responsibility is the same—to determine fair compensation under governing legal standards for services rendered on behalf of the party entitled to a fees award.

Dartmouth Health's counsel also argued at the hearing that comparing the billing records of Dartmouth Health's attorneys and Dr. Porter's attorneys would not be useful because Dartmouth Health "determined [their attorneys'] fees were reasonable" and "paid [their attorneys'] fees," whereas Dr. Porter's attorneys worked primarily under a contingency fee arrangement. (*Id.* at 62:16–17.) This distinction is not material, as "a [prevailing] plaintiff's recovery [of attorney fees] will not be reduced by what he must pay his counsel." *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989); *see id.* at 92 ("[T]he fee arrangement is but a single factor [in the calculation of a fee award] and [is] not determinative."). As the Second Circuit has explained, "[t]he reasonableness of a fee award does not depend on whether the attorney works at a private law firm or a public interest organization, nor is the award necessarily limited because the attorney has agreed to undertake the case for a reduced fee compared to the customary market rate." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 184 n.2 (2d Cir. 2008) (citing *Blum v. Stenson*, 465 U.S. 886, 894 (1984) and *Reiter v. MTA N.Y. City Transit Auth.*, 457 F.3d 224, 233 (2d Cir. 2006)). Indeed, courts have held that prevailing plaintiffs whose attorneys were employed under a contingency agreement may merit an *increase* in the lodestar to reflect the risk of nonpayment, particularly in civil rights cases. *See, e.g.*, *Yates v. Mobile Cnty. Pers. Bd.*, 719 F.2d 1530, 1533 (11th Cir. 1983) ("Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result. . . . The standard of compensation must enable counsel to accept apparently just causes without awaiting sure winners." (internal quotation marks omitted)); *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1357 (11th Cir. 1983) ("The Fifth Circuit has held that a bonus multiplier may be applied to increase an award of attorney's fees in civil rights actions since recovery of attorney's fees in such actions is contingent on success."); *Palmigiano v. Garrah*y, 466 F. Supp. 732, 737 (D.R.I. 1979) ("Certainly the contingency factor is cause for a more liberal application of the consideration guiding a court in awarding a fee[.]"), *aff'd*, 616 F.2d 598 (1st Cir. 1980). In any event, counsel may not be penalized by a reduction in, or a cap on, the amount of their fee award due to the contingency-fee arrangement. *See Hughes v. Repko*, 578 F.2d 483, 487–88 (3d Cir. 1978) (finding that the contingency factor "may not be used to decrease the amount of the final fee award"); *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 142 (2d Cir. 2007) ("It is true that a reviewing authority may consider the contingency fee paid in determining a reasonable attorney's fee; it is also undisputed, however, that the contingency fee may not serve as a cap on an attorney fee award." (citations omitted)).

found merit to such comparisons of billing records. *See, e.g., Frommert v. Conkright*, 00-CV-6311L, 2016 WL 6093998, at *3 (W.D.N.Y. Oct. 19, 2016) (stating that, although there need not be "a dollar-for-dollar equivalence," "the rates and fees charged and paid by defendants to their several law firms are clearly relevant and would be helpful to th[e] [c]ourt in determining the amount of fees that should be awarded to plaintiffs' counsel," especially given "the unique and long history of th[e] case"); *Mendez v. Radec Corp.*, 818 F. Supp. 2d 667, 669–70 (W.D.N.Y. 2011) ("recogniz[ing] that there may be significant differences in the ways that plaintiffs' counsel and defense counsel litigate a case, and that this could cause a disparity between the two sides' respective hours and hourly rates[, and that s]uch a disparity would not necessarily mean that one side's fees were necessarily unreasonable or excessive," but finding that "[s]uch considerations . . . are best taken into account in determining the weight to be given to defense counsel's billing records, and do not render them non-discoverable").

Nevertheless, the Court declines to require Dartmouth Health counsel to submit their billing records. The Court finds that requiring Dartmouth Health to submit its counsel's billing records would waste judicial resources and cause unnecessary delay in this case. The Court is fully capable of evaluating Dr. Porter's fee application based on its knowledge of the case, its general experience with fee applications in this District, and the parties' briefs, affidavits, and billing records. *See, e.g., Costa v. Sears Home Improvement Prods., Inc.*, 178 F. Supp. 3d 108, 113 (W.D.N.Y. 2016) (finding that "the Court's task in evaluating the reasonableness of Plaintiff[']s fee application would not be promoted by comparing the time spent by Plaintiff's counsel on various tasks with the time incurred by defense counsel" because "[t]his would not reflect an appropriate use of the Court's or the parties' time, as such an evaluation would rest on the faulty assumption that Defendants' billing records are a benchmark for reasonableness").

Also at the July 1 hearing, Dartmouth Health moved for the Court to strike the "Supplemental Memorandum" Dr. Porter filed in support of the Motion for Attorney Fees because it was "filed significantly after the deadlines." (Doc. 332 at 62:24.) This request is DENIED, given Dartmouth Health's delay in making the request and the Court's finding that, although the Supplemental Memorandum was unnecessary, its filing has not prejudiced Dartmouth Health.

**Background**

Dr. Porter filed the initial Complaint in this case on October 11, 2017, asserting claims of wrongful discharge, violation of the New Hampshire Whistleblowers' Protection Act, and disability discrimination and retaliation under the ADA and New Hampshire law. (Doc. 1.) On July 30, 2018, the Court granted Dr. Porter's Stipulated Motion for Leave to Amend, and the First Amended Complaint was filed on August 1, 2018. (Docs. 49, 50.) The First Amended Complaint alleged claims of wrongful discharge (Count 1); violation of the New Hampshire Whistleblowers' Protection Act (Count 2); disability discrimination and retaliation under the ADA (Count 3); disability discrimination under Section 504 of the Rehabilitation Act of 1973 (Count 4); disability discrimination and retaliation under New Hampshire law (Count 5); and disability discrimination and retaliation under the VFEPA (Count 6). (Doc. 50.) Over the next sixteen months, through approximately December 2019, the parties engaged in discovery, including taking/defending thirteen depositions, and filing/opposing at least five motions to compel[3] and one motion for protective order. According to Dr. Porter's counsel, discovery was "time[-]consuming," with Dartmouth Health producing approximately 32,000 documents and Dr. Porter producing approximately 1,200 documents. (Doc. 300-1 at 3.) In November 2019, the parties attended an

---

[3] Dr. Porter filed all of the Motions to Compel. (*See* Docs. 20, 26, 61, 64, 120.) The Court granted four of the Motions in full (*see* Docs. 51, 73, 123), and the fifth in part (*see* Doc. 84). Dr. Porter asserts that she "file[d] and litigate[d] eight motions to compel" (Doc. 300 at 6; *see* Doc. 300-1 at 2). However, she has not referenced the specific motions by name or ECF document number, and the Court is unable to confirm Dr. Porter's count based on a review of the docket.

Early Neutral Evaluation (ENE) session with Gregory Clayton, but no settlement was reached. (Doc. 131.)

In January 2020, Dartmouth Health filed a Motion for Summary Judgment, attaching ten exhibits and four affidavits. (Doc. 139.) Dr. Porter opposed the Motion, attaching twenty-two exhibits including four affidavits. (Doc. 140.) Dartmouth Health filed a Reply, attaching one exhibit. (Doc. 143.) The parties also filed memoranda regarding designating several documents confidential. (Docs. 141, 142, 145.) The Court held a status conference in June 2020. At that conference, the Court ordered Documents 10 and 11 sealed, and discussed with the parties possible settlement, oral argument on the pending Motion for Summary Judgment, and trial. (*See* ECF No. 148.) The Court granted Dartmouth Health's Motion for Summary Judgment on November 3, 2020 (Doc. 152), and Dr. Porter appealed.

The Second Circuit held oral argument on February 24, 2022. (Doc. 300-1 at 4.) On February 27, 2024, the Second Circuit issued a 100-page Judgment affirming in part, and vacating and remanding in part. (Doc. 157.) Specifically, the Second Circuit found that the District Court "did not properly apply summary judgment standards in considering the evidence as to pretext and causation, and therefore it erred in concluding that no rational juror could infer that plaintiff was terminated, and not retained, based on her disability or her whistleblowing-type activity." (Doc. 157-1 at 3.) The Judgment vacated "so much of the [district court] judgment as dismissed plaintiff's claims of disability discrimination in the termination of her employment, in violation of the ADA, the Rehabilitation Act, and the laws of New Hampshire and Vermont, and her claims of whistleblower discrimination and wrongful discharge in violation of New Hampshire law, and . . . remand[ed] for trial of those claims." (*Id.* at 100.) The Judgment affirmed insofar as the District Court had dismissed Dr. Porter's claims "that she was otherwise discriminated against by denial of

6

a reasonable accommodation for her disability prior to her termination or was retaliated against for exercising her rights to such accommodation." (*Id.* at 3.)

On remand, the Court appointed John Schraven as "special settlement master," allowing each party time to object or otherwise respond. (Docs. 158, 170.) At a March 2024 hearing, the Court introduced the parties to Mr. Schraven and discussed reassignment of the case to the undersigned Magistrate Judge. (*See* ECF No. 169.) Upon consent of the parties, the case was reassigned to the undersigned on April 16, 2024. (Doc. 174.) At some point afterwards, the parties participated in a mediation session with Mr. Schraven, but "failed to make progress toward settlement." (Doc. 300-1 at 6.) On June 17, 2024, the Court set the case for jury draw and trial beginning on March 24, 2025. (Doc. 179.)

In August 2024, Dr. Porter's designated damages expert, Robert Bancroft, Ph.D., submitted an expert report opining that Dr. Porter's total economic loss in connection with her loss of employment with Dartmouth Health was $4,329,258.[4] (*See* Doc. 235-1.)

The Court held a pretrial conference on January 13, 2025,[5] and set a February 14 filing deadline for any pretrial motions including motions *in limine*. (*See* ECF No. 194.) On February 4, Dr. Porter filed a Motion to Unseal Documents 10 and 11 (Doc. 197), which the Court granted over Dartmouth Health's opposition (*see* Doc. 226). On February 14, Dartmouth Health filed four Motions *in Limine*, including a motion to preclude the testimony of Dr. Bancroft and a Motion to Quash Trial Subpoena. (Docs. 198–202.) Oppositions and replies were filed regarding these five Motions. On March 14, the Court heard oral argument on the Motions and held a *Daubert* hearing

---

[4] Dr. Bancroft had previously submitted two expert reports in October 2018 and October 2019. (*See* Docs. 198-2 and 198-3.) The 2018 report estimated Dr. Porter's damages at $3,022,020 (*see* Doc. 198-2 at 4); and the 2019 report estimated the damages at either $4,835,551 or $6,438,646, depending on several variables (*see* Doc. 198-3 at 3, 6).

[5] All dates referenced from this point forward are for the year 2025, unless otherwise indicated.

regarding Dr. Bancroft's qualifications, ultimately taking the Motions under advisement. (*See* ECF No. 228.) During the course of the above-described briefing, Dr. Porter filed a Motion for Leave to Amend Complaint (Doc. 213), seeking to file a second amended complaint adding a claim under Vermont's Whistleblower Protection Act, 21 V.S.A. § 507 *et seq.* (*see* Doc. 213-2 at 32–33). Dartmouth Health opposed the Motion. (*See* Doc. 224.)

On March 19, Dr. Bancroft submitted an additional expert report, reducing Dr. Porter's total economic loss from approximately $4 million, as noted above, to $1,787,722. (Doc. 235-2.) This prompted Dartmouth Health to file a renewed motion to preclude Dr. Bancroft's testimony, arguing that if the Court allowed such testimony, it should permit Dartmouth Health to present its own expert witness, who could be deposed "perhaps over one of the weekends during trial." (Doc. 235 at 7 n.3.) Dr. Porter opposed the renewed motion, explaining that Dr. Bancroft's updated report simply included "the most current and accurate information" and responded to issues that Dartmouth Health had identified during its questioning of Dr. Bancroft at the March 14 evidentiary hearing. (Doc. 236 at 2.)

Between March 18 and March 21, the Court issued orders denying Dartmouth Health's four Motions *in Limine*, its renewed Motion *in Limine* regarding Dr. Bancroft, and its Motion to Quash. (Docs. 229, 231, 234, 238–39.) The Court also issued an order denying Dr. Porter's Motion for Leave to Amend Complaint. (Doc. 233.)

On March 24, a jury was selected and counsel delivered opening statements. (*See* ECF No. 247.) Over the fourteen days of trial, each party was represented by three attorneys: Gregory Vitt, Eric Jones, and Sarah Nunan for Dr. Porter; and Tristram Coffin, Donald Schroeder, and Morgan McDonald for Dartmouth Health.[6] Dr. Porter called fourteen witnesses, including expert witness

---

[6] Attorney Megan Martinez also assisted in the representation of Dartmouth Health, but did not make any oral argument or question any witnesses.

Dr. Bancroft, and Dartmouth Health called eight witnesses. (*See* Doc. 286.) Ninety documentary exhibits were admitted into evidence. (*See* Doc. 285.) Notwithstanding the Court's earlier denial of Dartmouth Health's two Motions *in Limine* to preclude the testimony of Dr. Bancroft (*see* Docs. 198, 235, 238), on March 26 and March 29 Dartmouth Health filed a Motion *in Limine* to preclude the admission of Dr. Bancroft's expert report (Doc. 248) and a Motion *in Limine* to limit or strike Dr. Bancroft's undisclosed expert opinions (Doc. 254). Dr. Porter filed an Opposition to the latter Motion. (Doc. 257.) The Court issued an oral ruling on March 31 denying the Motion. (*See* ECF No. 258.) On April 1, Dartmouth Health made an oral motion regarding the testimony of Dr. Porter's witness Dr. Michelle Russell, which the Court granted in part and denied in part, issuing a limiting instruction regarding Dr. Russell's testimony. (*See* ECF No. 260; *see also* Doc. 291 at 124–210.)

Dr. Porter rested her case on April 2, and Dartmouth Health renewed its request to preclude the admission of Dr. Bancroft's expert report. The Court ruled that the report would not be admitted into evidence but could be used for demonstrative purposes. (*See* ECF No. 261; *see also* Doc. 292 at 59–61.) On the same date, Dartmouth Health made an oral motion for directed verdict, which the Court denied. (*See* ECF No. 261; *see also* Doc. 292 at 65–110.) On April 4, Dartmouth Health rested its case and renewed its motion for directed verdict, which the Court again denied. (*See* ECF No. 264.) On April 6, Dartmouth Health filed a memorandum requesting jury instructions regarding the interest rate that should apply to any damages awarded to Dr. Porter (Doc. 266), and Dr. Porter filed a motion to preclude any reduction of damages based on Dartmouth Health's conditional offer of severance pay at the time of her termination (Doc. 267). Each party opposed in writing the other party's filing. (*See* Docs. 268–29.) The Court found that Dartmouth Health's memorandum was moot. (*See* Doc. 295 at 69.) After providing counsel with the proposed jury charge and verdict form (*see* Docs. 270–71), the Court held the charge

9

conference with counsel on April 7 (*see* ECF No. 272). On April 8, the Court granted in part and denied in part Dr. Porter's motion seeking to preclude a reduction in damages based on the offer of severance (*see* Doc. 267); the parties made their closing arguments; Dartmouth Health moved to strike Dr. Porter's rebuttal statement; the Court denied Dartmouth Health's motion to strike; the Court read the Jury Charge to the jury; and the jury began its deliberations. (*See* ECF No. 274.)

After deliberating for part of the day on April 8 and all day on April 9, the jury submitted a note to the Court requesting transcripts of testimony from four key trial witnesses: Dr. Porter, Dr. DeMars, Dr. Merrens, and Dr. Herrick. (*See* ECF No. 277, Doc. 279.) On the morning of April 10, the jury withdrew its request for transcripts, deliberated for almost all of that day, and rendered a verdict in favor of Dr. Porter on the VFEPA claim in the amount of $1,125,000. (ECF No. 280; *see* Doc. 281.)

## Analysis

### I.    Motion for Attorney Fees

State law governs the determination of attorney fees in diversity cases. *Grand Union Co. v. Cord Meyer Dev. Co.*, 761 F.2d 141, 147 (2d Cir. 1985) (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 n. 31 (1975)). In Vermont, parties are generally required to bear their own litigation costs, including attorney fees, absent a statutory or contractual provision to the contrary. *See Ring v. Carriage House Condo. Owners' Ass'n*, 2014 VT 127, ¶ 19, 198 Vt. 109, 119, 112 A.3d 754, 762; *L'Esperance v. Benware*, 2003 VT 43, ¶ 21, 175 Vt. 292, 300, 830 A.2d 675, 682. A prevailing party in a VFEPA action may seek compensation for "reasonable attorney's fees." *Spooner v. Town of Topsham*, 2010 VT 71, ¶ 8, 188 Vt. 293, 297, 9 A.3d 672, 675 (quoting 21 V.S.A. § 495b(b)). In relevant part, VFEPA provides: "Any person aggrieved by a violation of the provisions of this subchapter may bring an action in Superior Court seeking," among other items, "costs [and] reasonable attorney's fees." 21 V.S.A. § 495b(b); *see Payne v.*

10

*U.S. Airways, Inc.*, 2009 VT 90, ¶ 15, 186 Vt. 458, 467, 987 A.2d 944, 950; *McHugh v. Univ. of Vermont*, 758 F. Supp. 945, 948–49 (D. Vt. 1991), *aff'd*, 966 F.2d 67 (2d Cir. 1992); *Clark v. Metro. Life Ins. Co.*, CIV. A. No. 88–95, 1990 WL 1222107, at *7 (D. Vt. May 3, 1990).

In determining a reasonable attorney fees award, courts generally "begin by calculating the 'lodestar' amount—the number of hours reasonably spent on the case times a reasonable hourly rate." *Ring*, 2014 VT 127, ¶ 20, 198 Vt. at 119, 112 A.3d at 762 (citing *Huard v. Henry*, 2010 VT 43, ¶ 11, 188 Vt. 540, 999 A.2d 1264 (mem.)). "Once the court arrives at a lodestar amount, the court can then adjust the number upward or downward based on a number of factors, including the novelty of the legal issue, the experience of the attorney, and the results obtained in the litigation."[7] *Ring*, 2014 VT 127, ¶ 20, 198 Vt. at 119, 112 A.3d at 762 (internal quotation marks omitted); *see Spooner*, 2010 VT 71, ¶ 8, 188 Vt. 293, 297, 9 A.3d 672, 675 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) and enumerating twelve *Johnson* factors). Because the attorney fees award is based on the specific facts of each case, trial courts are granted wide discretion in determining the amount of the award, and the appellate court "will not reverse that

---

[7] The case law refers to these considerations as "the *Johnson* factors," which include: (1) "[t]he time and labor required"; (2) "[t]he novelty and difficulty of the questions"; (3) "[t]he skill requisite to perform the legal service properly"; (4) "[t]he preclusion of other employment by the attorney due to acceptance of the case"; (5) "[t]he customary fee"; (6) "[w]hether the fee is fixed or contingent"; (7) "[t]ime limitations imposed by the client or the circumstances"; (8) "[t]he amount involved and the results obtained"; (9) "[t]he experience, reputation, and ability of the attorneys"; (10) "[t]he 'undesirability' of the case"; (11) "[t]he nature and length of the professional relationship with the client"; and (12) "[a]wards in similar cases." *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 90, 92–93, 96 (1989); *see Hensley v. Eckerhart*, 461 U.S. 424, 429–30 (1983). More recently, the Second Circuit held that the District Court should, "in determining what a reasonable, paying client would be willing to pay, consider factors including, but not limited to, the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation." *Arbor Hill*, 522 F.3d at 184; *see id.* at 190 (abandoning the term "lodestar," finding that its meaning "has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness"). In sum, the Second Circuit explained that "[t]he net result of the fee-setting jurisprudence here and in the Supreme Court is that the district courts must engage in an equitable inquiry of varying methodology while making a pretense of mathematical precision." *Id.* at 189.

11

award absent an abuse of discretion." *L'Esperance*, 2003 VT 43, ¶ 28, 175 Vt. 292, 303, 830 A.2d 675, 684.

"For purposes of an award of attorney's fees under Vermont law, the touchstone is reasonableness." *Perez v. Travelers Ins. ex rel. Ames Dep't Stores, Inc.*, 2006 VT 123, ¶ 13, 181 Vt. 45, 52, 915 A.2d 750, 755. Similarly, VFEPA explicitly provides for an award of "reasonable attorney's fees." 21 V.S.A. § 495b(b). "The presumptively reasonable fee boils down to 'what a reasonable, paying client would be willing to pay,' given that such a party wishes 'to spend the minimum necessary to litigate the case effectively.'" *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quoting *Arbor Hill Concerned Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 118 (2d Cir. 2007), *amended and superseded on other grounds by* 522 F.3d 182 (2d Cir. 2008) and 575 F.3d 170 (2d Cir. 2009)). "Both [the Second Circuit] and the [United States] Supreme Court have held that the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'" *Degreenia-Harris v. Life Ins. Co. of N. Am.*, Case No. 2.19-CV-00218, 2021 WL 5979683, at *8 (D. Vt. Dec. 17, 2021) (first alteration in original) (footnote omitted) (quoting *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011)) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008); *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010)). The Vermont Supreme Court adheres to the same principle. "There is a strong presumption that th[e] 'lodestar figure' represents a reasonable fee." *Hum. Rts. Comm'n v. LaBrie, Inc.*, 164 Vt. 237, 250, 668 A.2d 659, 668 (1995). Given the strong presumption of reasonableness, "the lodestar can be adjusted only in 'rare and exceptional circumstances.'" *Degreenia-Harris*, 2021 WL 5979683, at *8 (quoting *Perdue*, 559 U.S. at 552–53).

A request for attorney fees "should not result in a second major litigation." *Hensley*, 461 U.S. at 437. In fact, "[i]deally, . . . litigants will settle the amount of a fee." *Id.* Where

12

settlement is not possible, "the fee applicant bears the burden of establishing entitlement to an

award and documenting the appropriate hours expended and hourly rates." *Id.* But "trial courts

need not, and indeed should not, become green-eyeshade accountants" in determining attorney fee

motions. *Fox v. Vice,* 563 U.S. 826, 838 (2011). The Supreme Court has described the nature of

the fee determination inquiry and the corresponding deference to a trial court's reasonable

assessment of fees:

> The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations, in light of the district court's superior understanding of the litigation. We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it.

*Id.* (citations and internal quotation marks omitted). To arrive at an appropriate award, the district

court "may attempt to identify specific hours that should be eliminated, or it may simply reduce

the award" by a reasonable percentage. *Hensley*, 461 U.S. at 436–37. "[D]istrict courts in our

Circuit regularly employ percentage reductions as an efficient means of reducing excessive fee

applications." *Pasini v. Godiva Chocolatier, Inc.*, 764 F. App'x 94, 95 (2d Cir. 2019) (quoting

*Marion S. Mishkin L. Off. v. Lopalo*, 767 F.3d 144, 150 (2d Cir. 2014)); *see Pasini*, 764 F. App'x

at 95 ("Where a fee application is excessive, . . . a district court may exercise its discretion to 'use

a percentage deduction as a practical means of trimming fat from a fee application.'" (quoting

*McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96

(2d Cir. 2006))); *New York State Ass'n for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1146

(2d Cir. 1983) ("In . . . cases with voluminous fee applications, courts have recognized that it is

unrealistic to expect a trial judge to evaluate and rule on every entry in an application[, and t]hese

courts have endorsed percentage cuts as a practical means of trimming fat from a fee application"

(citations omitted)).

Dr. Porter requests an attorney fees award of $1,738,341.50, which she asserts is the lodestar amount, representing the number of hours that her lawyers and paralegals reasonably expended on the case multiplied by the normal and customary hourly billing rates of these attorneys and paralegals.[8]

### A. Reasonableness of Hourly Rates

In calculating the lodestar, the first step is to determine reasonable hourly rates. "A district court has discretion to determine a reasonable hourly rate based on considerations such as the complexity of the case, the prevailing rates in similar cases in the district, and the quality of representation." *Pasini*, 764 F. App'x at 95. As this Court recently explained, "[a] court calculating the appropriate hourly rate will . . . consider . . . factors . . . [such as] the time and labor required, the novelty and the difficulty of the questions, and the level of skill required to perform the legal service properly." *Chaney v. Vermont Bread Co.*, Case No. 2:21-cv-120, 2024 WL 1270788, at *2 (D. Vt. Mar. 26, 2024) (citing *Arbor Hill*, 522 F.3d at 186 n.3, 190); *see Shapiro v. United States Soc. Sec. Admin.*, Case No. 2:19-cv-000238, 2022 WL 951371, at *2 (D. Vt. Mar. 30, 2022) (listing factors) (quoting *Arbor Hill*, 522 F.3d at 186 n.3); *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 204 (E.D.N.Y. 2006), *aff'd*, 531 F.3d 127 (2d Cir. 2008) ("The specific rate that is reasonable for a given attorney depends on such factors as the attorney's experience and expertise, the novelty and complexity of the issues presented, and the overall success achieved in the case."). Courts may consider these factors "holistically, rather than applying each factor

---

[8] Dr. Porter includes in her Motion for Attorney Fees a request for costs totaling $29,959.20, which she claims she incurred for: (1) attorney travel, hotel stays, and meals during the trial; (2) the deposition of her expert witness, Dr. Robert Bancroft; (3) Dr. Bancroft's attendance at the pretrial *Daubert* hearing; and (4) two mediations. (Doc. 300 at 11–12.) Dartmouth Health notes, however (*see* Doc. 306 at 5, Doc. 309 at 10–11), that neither the Motion for Attorney Fees nor any subsequent filing by Dr. Porter—including the revised Bill of Costs which attaches documentation of other costs (*see* Doc. 319–319-2)—includes a receipt, invoice, proof of payment, affidavit, declaration, or any other documentation evidencing these costs. Furthermore, Dr. Porter has presented no legal argument in any of her post-trial submissions to support an entitlement to these particular costs. The Court therefore does not consider them part of Dr. Porter's request for either attorney fees or costs. Moreover, at this late date the Court will not entertain a future request for consideration of these costs.

14

individually to the facts of the case." *K.K. v. New York City Dep't of Educ.*, 23-CV-4430 (JMF) (VF), 2024 WL 4203783, at *5 (S.D.N.Y. Aug. 22, 2024), *report and recommendation adopted*, 2024 WL 4203251 (Sept. 16, 2024). As noted above, the court's goal should be "to do rough justice, not to achieve auditing perfection." *Id.* (quoting *Fox*, 563 U.S. at 838); *see Lochren v. County of Suffolk*, 344 F. App'x 706, 709 (2d Cir. 2009) ("*Arbor Hill* did not hold that district courts must recite and make separate findings as to all twelve *Johnson* factors.").

"Because fee-shifting statutes provide little incentive to negotiate rates prior to litigation, the court 'bears the burden of disciplining the market' and setting a 'reasonable hourly rate' for the services of counsel." *Shapiro*, 2022 WL 951371, at *2 (quoting *Arbor Hill*, 522 F.3d at 184). The "touchstone" of fee-shifting statutes is "that district courts should award fees *just high enough* to attract competent counsel." *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 176 (2d Cir. 2009) (internal quotation marks omitted).

Courts typically apply the "forum rule" in determining reasonable hourly rates, which sets "the hourly rates employed in the district in which the reviewing court sits" as a "presumptively reasonable fee." *Bergerson v. N.Y. State Off. of Mental Health*, 652 F.3d 277, 290 (2d Cir. 2011) (internal quotation marks omitted); *see Fine Foods, Inc. v. Dahlin*, 147 Vt. 599, 605, 523 A.2d 1228, 1232 (1986) (holding that, in deciding reasonableness of fees, courts must consider "the usual prices charged by other attorneys for similar services in the same vicinity and in the same court"). To determine the prevailing market rate, the court is to "take judicial notice of the rates awarded in other cases," and may "rely on its own familiarity with the prevailing market rates in the . . . [d]istrict." *Farbotko v. Clinton County*, 433 F. 3d 204, 210–11 (2d Cir. 2005); *see Chaney*, 2024 WL 1270788, at *2. When considering rates awarded in other cases, the court should increase those rates to account for the passage of time. *See, e.g.*, *Minott v. Google LLC*, 24-CV-01674 (MMG), 2024 WL 3518525, at *6 (S.D.N.Y. July 24, 2024) (finding that increase in

15

attorney's hourly rate was warranted where rate was determined in a case approximately two years earlier), *aff'd sub nom. Minott v. The Washington L. Firm PLLC*, No. 24-2275, 2025 WL 2111878 (2d Cir. July 29, 2025); *Wang v. Shun Lee Palace Rest., Inc.*, 17-CV-840 (VSB), 2023 WL 5022758, at *3 (S.D.N.Y. July 24, 2023) ("Given that two calendar years have passed between the first instance of sanctioned behavior and the currently discussed behavior, and that annual increases in billing rates are customary at many law firms, . . . rate increases . . . [are] reasonable."). The court may also consider "any credible evidence that [the moving party] submits in advocating a higher prevailing rate." *Brady*, 455 F. Supp. 2d at 204. The burden rests with the attorney seeking a fee award to establish the hourly rate "with satisfactory evidence—in addition to the attorney's own affidavits." *Hugee v. Kimso Apartments, LLC*, 852 F. Supp. 2d 281, 298 (E.D.N.Y. 2012) (internal quotation marks omitted).

To aid in the determination of the appropriate hourly rates in this case, the Court reviews rates awarded in this District in recent cases. Approximately seven years ago, this Court allowed attorneys hourly rates of $225 and $275 in a case involving relatively straightforward consumer protection and warranty issues. *See Centrella v. Ritz-Craft Corp. of Pa., Inc.*, Civil Action No. 2:14–cv–111–jmc, 2018 WL 840041, at *6–7 (D. Vt. Feb. 12, 2018). About three years later, this Court allowed hourly rates of $350 for a senior partner, $225 for associate attorneys, and $110 for paralegals at the Vermont law firm Langrock Sperry & Wool (one of the firms representing Dr. Porter in this case). *See Sullivan v. Saint-Gobain Performance Plastics Corp.*, Case No. 5:16-cv-125, 2021 WL 1851404, at *2 (D. Vt. May 10, 2021). In the same case, the Court found that, with respect to "national-level environmental counsel," hourly rates of $400 for senior attorneys, $250 for associate attorneys, and $125 for legal assistants were appropriate. *Id.* at *3. In a 2021 case, where one Vermont attorney sought hourly fees of between $400 and $450 and a second Vermont attorney requested an hourly rate between $350 and $400, and where an expert witness

16

testified that such fees "are on the high end of what the Vermont market will bear and are reserved for cases with complex issues," this Court reduced the rates to $275 and $225, respectively. *Degreenia-Harris*, 2021 WL 5979683, at *10–11. In a 2022 Freedom of Information Act case against the Social Security Administration, the Court allowed hourly rates of $270 for a partner and $185 for an associate at the Langrock Sperry & Wool firm. *See Shapiro*, 2022 WL 951371, at *3.

In a 2023 tort case that did not require specialized legal expertise, this Court allowed an hourly rate of $225 for Vermont counsel, despite a request for $350–$365, and an hourly paralegal rate of $125. *See Ha v. Conn*, Case No. 2:20-cv-155, 2023 WL 5287214, at *2 (D. Vt. Aug. 17, 2023). In a contemporaneous case involving claims of libel, defamation, negligence, and false light, a Vermont Superior Court Judge allowed an hourly rate of $435 for local counsel, finding the rate to be "commensurate with [counsel's] statewide experience, training, reputation, and expertise in this specific area of law." *Rivard v. Smallheer*, No. 22-CV-04364, 2023 WL 7309300, at *2 (Vt. Super. Wash. Cnty. Oct. 20, 2023).

In 2024, this Court allowed hourly attorney rates of $200, $225, $350, $450, and $600, depending on the location and experience of each attorney. *See Chaney*, 2024 WL 1270788, at *3–4. The Court explained that the case was a "uniquely complex" class action, "requiring specialized knowledge of the [Worker Adjustment and Retraining Notification] Act." *Id.* at *3. In another 2024 case, this Court allowed an hourly request for attorney fees in the amount of $205, agreeing with the expert opinion of local counsel that "$205 is at the lower end of usual and customary rates charged in Burlington and Vermont for litigation in 2022." *Cole v. Foxmar, Inc.*, Case No. 2:18-cv-00220, 2024 WL 4609023, at *4 (D. Vt. Oct. 29, 2024) (internal quotation marks omitted), *vacated and remanded on other grounds*, 2025 WL 3152782 (2d Cir. Nov. 12, 2025). In a third 2024 case, the Court allowed the requested hourly rate of $250. *Jankowski v. Centurion of*

17

*Vermont, LLC*, Civil Action No. 2:22-cv-169-cr-kjd, 2024 WL 48855, at *2 (D. Vt. Jan. 4, 2024).

Finally, in July 2025, the Court allowed an hourly attorney rate of $350, noting the attorney's

"skill and experience," and the case's "complex legal issues" and "protracted discovery dispute."

*Concepts NREC, LLC v. Xuwen Qiu*, Civil Action No. 5:20-cv-133, 2025 WL 2793049, at *3 (D.

Vt. July 21, 2025.) The decision explained that "this Court has deemed a $300 hourly rate

reasonable for an experienced attorney in a standard case." *Id.* The Court further reasoned that the

case warranted a higher than normal hourly rate because it "involved complex legal issues,

including the development of an evidentiary record substantiating personal jurisdiction under an

alter ego theory to enforce subpoenas against a non-party foreign corporation, as well as litigation

regarding potential legal consequences to [a company] in China for its compliance with [a]

subpoena." *Id.*

In this case, Dr. Porter seeks reimbursement for services rendered by various attorneys and

paralegals, all but one of whom are affiliated with two Vermont law firms. One of the firms, Vitt

& Nunan, has two member attorneys, Geoffrey Vitt and Sarah Nunan, and one "of counsel"

attorney, Sarah Merlo. The firm is based in Norwich, Vermont. The other firm, Langrock Sperry

& Wool, has approximately twenty-five attorneys, including one of Dr. Porter's trial attorneys,

Eric Jones. The Langrock firm has offices in Burlington and Middlebury. The remaining attorney

who represented Dr. Porter in this case is Attorney Katie Kramer. When Attorney Kramer entered

an appearance on behalf of Dr. Porter in January 2018, she was a solo practitioner in Middlebury,

Vermont. (Doc. 300-1 at 2.) In late 2020, Kramer joined the New York law firm DGW Kramer

LLP (*id.* at 2, 7),[9] and in 2024 she joined the New York office of DTO Law (*id.* at 7), at which

---

[9] According to DGW Kramer LLP's billing records, a timekeeper named Gareth Turo billed for .3 hours of time on July 16, 2020, at a rate of $250/hour, for a total charge of $75. (*See* Doc. 300-4 at 4.) This individual is not referenced in any of Dr. Porter's filings. Accordingly, the Court does not include this charge in its lodestar calculation.

time her hourly rate increased substantially (*see id.* at 6–7). Dr. Porter has submitted

contemporaneous time records from each law firm and from Attorney Kramer, as well as

affidavits from Attorney Vitt and Attorney Jones. Dr. Porter seeks the following hourly rates for

the legal professionals involved with the case:

<u>Vitt & Nunan Attorneys (Norwich, VT)</u>

Geoffrey Vitt          $320 (2017–2022); $400 (2024–2025)

Sarah Nunan          $150 (2020–2022); $250[10] (2024–2025)

Sarah Merlo          $200–$230 (2017–2020)[11]; $325 (2024–2025)[12]

<u>Langrock Sperry & Wool Attorneys (Burlington and Middlebury, VT)</u>

Eric Jones          $375 (2024); $395 (2025)

Alison Bell          $415

Bridget Grace          $225

Wendy Radcliff          $250

<u>Solo Attorney (Middlebury, VT) and DGW Kramer LLP Attorney (New York, NY)</u>

Katie Kramer          $175 (2018–2020)

---

[10]  Although Dr. Porter states in her Motion for Attorney Fees that Attorney Nunan billed at a rate of $*260*/hour from 2024 through preparation of the Motion (*see* Doc. 300 at 4; Doc. 300-1 at 6), the actual billing records attached to the Motion indicate that her billing rate was $*250*/hour during that period (*see, e.g.*, Doc. 300-5 at 127–34). Likewise, the chart attached as Exhibit A to Dr. Porter's "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees" indicates a rate of $250/hour and not $260/hour. (*See* Doc. 330-1 at 1.) The Court therefore uses the $250 hourly rate for Attorney Nunan's work done in 2024 and 2025 in calculating the lodestar.

[11]  Dr. Porter does not state in her Motion for Attorney Fees or in either of the attached Declarations what Attorney Merlo's hourly rates were before 2024. The billing records themselves, however, indicate that Attorney Merlo billed at a rate of $200/hour in 2019 (*see, e.g.*, Doc. 300-3 at 198, 224), and the chart attached as Exhibit A to Dr. Porter's "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees" indicates an hourly rate of "$200-230" for Attorney Merlo during the years 2017 through 2020 (Doc. 330-1 at 1). Given the Court's inability to accurately calculate the lodestar without knowing the hours expended at each rate within this range, the Court assigns an hourly rate of $200 to Attorney Merlo for the period from 2020 and earlier.

[12]  In Exhibit A to her "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees," Dr. Porter lists an attorney named Phillipa Lilienthal among the timekeepers in this case, indicating that this attorney billed a total of $340 in 2018 and 2019. (*See* Doc. 330-1 at 1.) This attorney is not mentioned in Dr. Porter's Motion for Attorney Fees or in either of the attached Declarations. This attorney also was not mentioned in Dr. Porter's Reply or in either of her supplemental memoranda. The Court therefore does not include any time billed by Attorney Lilienthal in calculating the lodestar.

19

<u>DTO Law Attorney (New York, NY)</u>

Katie Kramer                $450 (2024)

<u>Paralegals (all firms)</u>  $50–$155 (2017–2025)

As an initial matter, the Court notes that Dartmouth Health does not challenge the requested rates. Moreover, the Court finds that this case was fairly complex, raising federal claims and claims under Vermont and New Hampshire law. Moreover, the Second Circuit's lengthy decision over six years after the lawsuit was filed represented a substantial change in the posture of the case as the matter was remanded for trial. The Court also takes into account the following factors: (1) the pendency of the case for nearly eight years; (2) the heavily contested nature of the litigation, evidenced by the filing of numerous pretrial motions—including discovery motions and motions *in limine*—and at least two unsuccessful mediations conducted by a special settlement master; (3) the almost three-week trial during which each party was represented by three or more attorneys; and (4) the jury's deliberations over approximately three days before reaching a verdict.

Although these factors might warrant somewhat higher than normal hourly rates, the Court is nevertheless constrained by market rates in this District to find that some of the requested hourly rates are either not reasonable or not warranted in this case. "[A] cost-conscious, rate-paying client would not necessarily seek out the most expensive trial lawyers in Vermont" for this case, but rather would hire competent Vermont attorneys with the requisite skill in employment litigation and knowledge of the state and federal laws governing the asserted claims. *Degreenia-Harris*, 2021 WL 5979683, at *10.

Mindful of rates this Court has applied in previous cases (and the parties having provided no reason to depart from these rates), I find that attorney hourly rates of over $350 and paralegal hourly rates of over $90 are not reasonable in this case. This conclusion is consistent with the Second Circuit's admonition that "attorney's fees are to be awarded with an eye to moderation,

20

seeking to avoid either the reality or the appearance of awarding windfall fees." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 266 (2d Cir. 2014) (internal quotation marks omitted). In the end, "a reasonable, paying client wishes to spend the minimum necessary to litigate the[ir] case effectively." *Degreenia-Harris*, 2021 WL 5979683, at *11 (internal quotation marks omitted). Accordingly, after consideration of the factors identified above and the information Dr. Porter includes in her fees submissions to the Court, including the Declarations of Attorneys Vitt and Jones, I find that the following rates are reasonable in this case:

| | |
|---|---|
| Geoffrey Vitt | ~~$320~~ $300 (2017–2022); ~~$400~~ $350 (2024–2025) |
| Sarah Nunan | $150 (2020–2022); $250 (2024–2025) |
| Sarah Merlo | $200 (2017–2020); ~~$325~~ $250[13] (2024–2025) |
| Eric Jones | ~~$375~~ $325 (2024); ~~$395~~ $350 (2025) |
| Alison Bell | ~~$415~~ $300[14] |
| Bridget Grace | $225 |
| Wendy Radcliff | $250 |
| Katie Kramer | $175 (2018–2020) |
| Katie Kramer | ~~$450~~ $350 (2024) |
| Paralegals | ~~$50–$155~~ $90[15] (2017–2025) |

---

[13] Although Attorney Merlo apparently billed at an hourly rate of $325 in 2024 and 2025, Dr. Porter has not provided any information regarding Attorney Merlo's experience or background. Therefore, the Court finds that an hourly rate above $250 is not justified.

[14] Dr. Porter represents in her Motion for Attorney Fees that Attorney Bell is a partner at Langrock Sperry & Wool, LLP (Doc. 300 at 4), but beyond that provides no further information bearing on the hourly rate determination. Therefore, the Court finds that an hourly rate above $300 is not justified.

[15] The Court has received no information regarding the professional experience of any of the paralegals who billed for work in this case other than the very limited information in Attorney Vitt's Declaration about former paralegal Nunan. (*see* Doc. 300-1 at 6). Dr. Porter also has not cited caselaw supporting the hourly paralegal rates in this case. Therefore, the Court sets a uniform rate, relying on its own familiarity with hourly paralegal rates prevailing in this District, reduced slightly to account for the absence of information about each individual paralegal who billed in this case. *See, e.g.*, *H.B. Auto. Grp., Inc. v. Kia Motors Am., Inc.*, 13cv4441 (VEC) (DF), 2018 WL 4017698, at *9 (S.D.N.Y. July 25, 2018) (finding that "courts . . . have reduced [paralegal] rate[s] substantially where there was no explanation of a paralegal's expertise or experience"), *report and recommendation adopted sub nom. H.B. Auto. Grp., Inc. v. Kia Motors Am.*, 2018 WL 4007636 (Aug. 22, 2018); *Malletier v. Apex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 362 (S.D.N.Y. 2010) ("Where the moving party fails to provide information on the attorneys' and paralegals'

B.      Reasonableness of Hours Expended

The Court must next determine whether the number of hours that the attorneys and paralegals worked on the case was reasonable. A fee award should compensate only for those hours that were "reasonably expended." *McDonald*, 450 F.3d at 96 (quoting *Hensley*, 461 U.S. at 434–35). "As evidence that the number of attorney hours are reasonable, the fee application must be supported by contemporaneous time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Drywall Tapers and Pointers of Greater New York Loc. Union 1974, IUPAT, AFL-CIO v. Bronx Base Builders, Ltd.*, 18 Civ. 1088 (VSB) (JLC), 2019 WL 181214, at *5 (S.D.N.Y. Jan. 14, 2019) (internal quotation marks omitted); *see Carey*, 711 F.2d at 1154 ("All applications for attorney's fees, whether submitted by profit-making or non-profit lawyers, . . . should normally be disallowed unless accompanied by contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done."). In determining the number of hours reasonably expended, the court "should exclude excessive, redundant[,] or otherwise unnecessary hours." *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999). The court should also consider whether a case was "particularly complicated" or involved "novel legal issues significant to the legal community." *Millea*, 658 F.3d at 167 (internal quotation marks omitted). "In evaluating the reasonableness of hours expended, courts consider 'not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" *O.R. v. N.Y.C. Dep't of Ed.*, 340 F. Supp. 3d 357, 366–67 (S.D.N.Y. 2018) (quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1999)).

---

backgrounds and experience, courts have used their discretion to award fees at a rate lower than requested."); *Gen. Motors Corp. v. Villa Marin Chevrolet, Inc.*, 240 F. Supp. 2d 182, 188 (E.D.N.Y. 2002) (reducing paralegal fees because "[n]o information was submitted . . . concerning the levels of experience or expertise of any of the paralegals, and no information was submitted concerning the rates customarily charged for paralegals in this area").

The determination of reasonable hours expended is "best made by the district court on the basis of its own assessment of what is appropriate for the scope and complexity of the particular litigation." *Carey*, 711 F.2d at 1146; *see also Lore v. City of Syracuse*, 670 F.3d 127, 175 (2d Cir. 2012) (holding that "the district court, which is intimately familiar with the nuances of the case," is in the best position to determine an appropriate fee award (internal quotation marks omitted)). In making this decision, the district court "does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir. 1998) (quoting *DiFilippo v. Morizio*, 759 F.2d 231, 236 (2d Cir. 1985)). The court has "ample discretion" in assessing "the amount of work that was necessary to achieve the results in a particular case." *Ortiz v. Regan*, 980 F.2d 138, 141 (2d Cir. 1992); *see LaBrie*, 164 Vt. at 252, 668 A.2d at 670 (holding that trial court's factual determination that hours claimed for attorney activities were not excessive "is best left undisturbed absent strong evidence of excessiveness"). The court may exercise that discretion, "based on its experience in general and with the particular case at issue, to 'trim[ the] fat from a fee application.'" *N.Y. Youth Club v. Town of Harrison*, 12-CV-7534 (CS), 2016 WL 3676690, at *2 (S.D.N.Y. July 6, 2016) (alteration in original) (quoting *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998)). In other words, "[i]f a court finds that the fee applicant's claim is excessive, or that time spent was wasteful or duplicative, it may decrease or disallow certain hours[,] or, where the application for fees is voluminous, order an across-the-board percentage reduction in compensable hours." *Santa Fe Nat'l Tobacco Co. v. Spitzer*, Nos. 00 Civ. 7274(LAP), 00 CIV 7750(LAP), 2002 WL 498631, at *3 (S.D.N.Y. Mar 29, 2002).

Dr. Porter has submitted over four hundred pages of billing records documenting the time each legal professional spent on the case. (*See* Docs. 300-2 at 4 through 300-5 at 135.) Moreover,

23

at the Court's request, Dr. Porter has submitted a chart listing the total number of hours each legal professional spent on the case and their respective hourly rates. (*See* Doc. 330-1 at 1–2.) Given the volume of billing records in this case, the Court has not "engage[d] in a painstaking line-item review of each billing entry" in its determination of the appropriate number of compensable hours. *R.P. v. N.Y.C. Dep't of Educ.*, 21-CV-4054 (JMF), 2022 WL 1239860, at *5 (S.D.N.Y. Apr. 27, 2022); *see Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) ("We do not require that the court set forth item-by-item findings concerning what may be countless objections to individual billing items."); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 64 (2d Cir. 2014) (upholding district court's "across-the-board 50 percent reduction based on a perceived lack of detail in the billing records"). The Court has considered Dartmouth Health's objections in its review of the records and addresses the objections below.

### i.     Impermissibly Vague or Block-Billed Entries

Dartmouth Health argues that Dr. Porter's counsel's billing records "are replete with vague and incomplete narrative entries." (Doc. 309 at 4.) Dartmouth Health further asserts that many entries in the billing records "utilize block billing," or "grouping multiple tasks into a single entry without itemization." (*Id.*) Although Dartmouth Health does not point to any specific instances of vague/incomplete entries or block billing, they are readily apparent in the records. For example, a January 13, 2025 entry bills 7.7 hours of attorney time and includes the following explanation: "Prepare for and attend hearing with Judge Doyle re: status conference; review outline for witnesses and conf. E. Jones and S. Nunan re: order of witnesses and testimony of multiple possible trial witnesses; review Dr. Porter draft statements and comments." (Doc. 300-5 at 93.) Another example is found in a December 17, 2024 entry billing for 5.0 hours of attorney time and explaining: "Review and analyze documents regarding witnesses; analyze trial presentation strategy; video conference with Geoffrey Vitt and Sarah Nunan regarding trial preparation;

research HIPAA issues regarding witness examinations." (Doc. 300-2 at 6.) The billing records also contain vague or incomplete entries. For example, a March 13, 2024 entry states: "Work on motion" and "Call with G. Vitt" (Doc. 300-5 at 63), without identifying the type of motion and the purpose of the call. And a February 13, 2025 entry states only: "Research" and "Conf. with C. Lyon." (*Id.* at 105.)

Attorneys are not required to "record in great detail how each minute of [their] time was expended," but their billing records should "identify the general subject matter of [their] time expenditures." *Cole v. Foxmar, Inc.*, Case No. 2:18-cv-00220, 2024 WL 4609023, at *5 (D. Vt. Oct. 29, 2024) (quoting *Hensley*, 461 U.S. at 437 n.12), *vacated and remanded on other grounds*, 2025 WL 3152782 (2d Cir. Nov. 12, 2025). Although "[b]lock billing is not automatically prohibited, . . . the practice makes it difficult for the court to assess the reasonableness of individual activities." *Id.* (internal quotation marks omitted); *see Green v. City of New York*, 403 F. App'x 626, 630 (2d Cir. 2010) (affirming district court's across-the-board reduction due to "obfuscation inherent in block billing"); *Degreenia-Harris*, 2021 WL 5979683, at *11, 12 (finding that "the court cannot determine whether the hours incurred are reasonable" because "[s]ome entries are too vague to determine what work was performed" and because of "[t]he extensive use of block billing," resulting in a failure to "indicat[e] the amount of time spent on discrete tasks"). "[B]lock billing is most problematic where large amounts of time (e.g., five hours or more) are block billed; in such circumstances, the limited transparency afforded by block billing meaningfully clouds a reviewer's ability to determine the projects on which significant legal hours were spent." *King Fook Jewellry Grp. Ltd. v. Jacob & Co. Watches, Inc.*, 14 Civ. 742 (ER) (JLC), 2019 WL 2535928, at *9 (S.D.N.Y. June 20, 2019) (alteration in original) (internal quotation marks omitted), *report and recommendation adopted sub nom. King Fook Jewellery Grp. Ltd. v. Jacob & Co. Watches Inc.*, 2019 WL 4879212 (Oct. 3, 2019); *see id.* (citing cases and applying a

25

10% across-the-board reduction where some billing records "contain[ed] vague entries and extensive block-billing, . . . mak[ing] the overall reasonableness of the listed tasks difficult to discern").

The Court can generally discern the tasks completed and the amount of time expended in many of counsel's vague/incomplete and block-billed entries. But that is not the case for all of such entries. Therefore, the Court will reduce the fee award to account for these deficiencies in the billing. *See Raja v. Burns*, 43 F.4th 80, 87 (2d Cir. 2022) (holding that, to address vagueness and other deficiencies in the billing records, "the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application" (internal quotation marks omitted)); *Kirsch*, 148 F.3d at 172, 173 (upholding percentage reduction of award due to vague entries and "other deficiencies in the billing records").

### ii.   Fees Incurred Before Addition of VFEPA Claim

Dartmouth Health contends that any attorney fees Dr. Porter incurred before the addition of the successful VFEPA claim are not recoverable. (Doc. 309 at 4–5.) Dartmouth Health argues that "[w]hile it may be difficult to parse through every invoice entry to determine which entries relate to which claims, here the Court must, at the very least, deduct any fees and costs incurred prior to August 1, 2018, which total 833.45 hours, $146,338.50 in fees, and in $894.39 in costs." (*Id.* at 5.) Dartmouth Health cites *Anderson v. Sebelius*, No. 5:09–cv–16, 2011 WL 1832771, at *5 (D. Vt. May 12, 2011), to support its position. But *Anderson* is inapposite. In that case, this Court reduced an attorney fees award in favor of an individual plaintiff because the plaintiff's unsuccessful effort to obtain discovery and to terminate referral of the case to the magistrate judge were "distinct from other parts of the case and were wholly unsuccessful." *Id.*

As discussed in more detail below, Dr. Porter's VFEPA claim is not distinct from the other claims alleged in this lawsuit. All of Dr. Porter's claims are interrelated both factually and

26

legally.[16] Moreover, the original Complaint in this case included disability discrimination claims under the ADA and New Hampshire law. The substance of those claims did not change in the Amended Complaint; Dr. Porter simply added additional claims of disability discrimination, including under VFEPA. The work that Dr. Porter's lawyers had done on the case before they filed the Amended Complaint was likely the impetus to pursue the VFEPA claim as an alternative theory of liability.

Therefore, the Court will not reduce Dr. Porter's attorney fees award by the amount of fees incurred prior to the addition of the VFEPA claim to the case. *See, e.g.*, *Post & Beam Equities Grp., LLC v. Sunne Vill. Dev. Prop. Owners Ass'n*, 2015 VT 60, ¶¶ 49, 50, 199 Vt. 313, 337, 124 A.3d 454, 472–73 (2015) (rejecting argument that evidence regarding claims litigated before plaintiff filed amended complaint were "distinct and easy to parse," and finding that "most of the evidence presented was relevant to all claims" and that "the overarching narrative at the heart of th[e] case from the outset was part and parcel of the . . . claims [on which plaintiff prevailed]").

### iii.    Number of Depositions Conducted

Dartmouth Health claims it was excessive for Dr. Porter to have deposed eleven witnesses, one over two days, especially given that Dartmouth Health deposed only two witnesses and that Dr. Porter ultimately called only four of her deponents to testify at trial. (Doc. 309 at 5.) Dartmouth Health asserts that it should not be penalized for Dr. Porter's "needlessly overbroad discovery tactics." (*Id.*)

The Court finds no reason to reduce the number of hours billed based on the number of depositions counsel conducted. It is not unusual for plaintiffs, who bear the burden of proof, to

---

[16] Dartmouth Health's counsel conceded this fact, at least to some extent, at the hearing on the Motion for Attorney Fees: "Certainly there is some factual intermingling [between the VFEPA claim and the other claims]." (Doc. 332, at 59:18.) As a result of this "intermingling," counsel acknowledged that it would be difficult for the Court to separate out the work Dr. Porter's attorneys performed on the VFEPA claim, from the work they performed on the other claims. (*See id.* at 59:17–22, 60:17–22.)

27

take more depositions than defendants. Particularly in an employment case like this, where an individual employee is suing her prior employer, it is understandable that the employee would need to depose individuals who were also employed by the employer during the relevant period.

About four months after filing this case, Dr. Porter attempted to limit the number of depositions by requesting authorization to contact certain Dartmouth Health employees on a more informal basis, explaining: "Given the factual complexity and the large number of individuals with knowledge of relevant facts, [Dr. Porter] wants to engage in informal discovery, including interviews of current and former [Dartmouth Health] employees." (Doc. 20 at 3.) Dartmouth Health strenuously opposed the Motion, arguing that Dr. Porter was improperly asking the Court "to sanction her attempt to do an end-run around the discovery process." (Doc. 21 at 1.) Although the Court granted Dr. Porter's request, in part, listing categories of Dartmouth Health employees that Dr. Porter could not contact informally and allowing contact with all other Dartmouth Health employees (*see* Doc. 51 at 6), Dr. Porter ultimately opted to formally depose the relevant Dartmouth Health employees, thereby assuaging Dartmouth Health's concerns. Now, after Dr. Porter obtained a hard-fought verdict in her favor, Dartmouth Health argues that Dr. Porter should have deposed fewer individuals. The Court finds the argument unpersuasive. *See Ring*, 2014 VT 127, ¶ 26, 198 Vt. at 122, 112 A.3d at 764 (increasing attorney fee award "because of the role defendants played in increasing the costs of the litigation").

### iv.   Overstaffing Depositions and Trial / Redundant Billing Before Trial

Dartmouth Health next argues that Dr. Porter overstaffed depositions "with at least two partners present." (Doc. 309 at 5; *see id.* at 5–6 (chart documenting attorneys that attended depositions).) Dr. Porter responds that Attorney Kramer was not a partner; she was a contract employee charging Dr. Porter only $175/hour at the time of the depositions (Doc. 318 at 5), a lower rate than most associate attorneys bill in this District, as discussed above. Moreover, the

28

billing records reveal that Sarah Nunan was also not a partner during the relevant period, and in fact may not have been an attorney yet, as she was charging only $80/hour for her time at the depositions. (*See, e.g.*, Doc. 300-3 at 162, 163, 165, 168, 177, 178.) Furthermore, Dr. Porter notes that "it is easier to defend a deposition than to take one," and that "[h]aving a second lawyer present [at a deposition] is helpful especially when[,as here,] there has been an extensive document production and the subject matter is complicated." (Doc. 318 at 5.)

"In assessing the extent of staffing . . . appropriate for a given case, a district court must be accorded ample discretion." *Carey*, 711 F.2d at 1146. "While a court can generally reduce the number of hours charged by attorneys due to duplication, there are situations in which a certain level of duplication between attorneys is reasonable." *Spooner*, 2010 VT 71, ¶ 18, 188 Vt. at 302, 9 A.3d at 678 (citations omitted). The Vermont Supreme Court has explained that "[a] reduction in a fee is warranted only if the attorneys are *unreasonably* doing the *same* work," and that "[a]n award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation." *Id.* (quoting *Afro-American Patrolmen's League v. City of Atlanta*, 817 F.2d 719, 725–26 (11th Cir. 1987)). "[I]f multiple attorneys performed unique work on the case, plaintiff should be compensated for each attorney's distinct inputs." *Spooner*, 2010 VT 71, ¶ 19, 188 Vt. at 303, 9 A.3d at 679. Therefore, although "prevailing parties are not barred as a matter of law from receiving fees for sending a second attorney to depositions," "where two attorneys appear at a deposition on behalf of a single set of clients, they have some burden to show that each had a distinct responsibility in the case necessitating his or her presence." *Walker v. Coughlin*, 909 F. Supp. 872, 880 (W.D.N.Y. 1995) (internal quotation marks omitted).

Dartmouth Health does not identify specific duplicative work conducted by Dr. Porter's attorneys at depositions in this case. By the same token, Dr. Porter offers no particular reason why

29

two attorneys (plus a paralegal in some cases) needed to attend these depositions. Dr. Porter does not carry her burden by generally asserting that it is helpful to have a second lawyer at depositions in cases where there has been extensive document production and where the subject matter is complicated. Though there are situations where it is reasonable for two (or more) attorneys to attend a deposition, Dr. Porter has not offered sufficient explanation as to why it was reasonable with respect to each particular deposition at issue in this case. (*See* Doc. 318 at 5–6; *see also* Doc. 309 at 5–6 (chart).) Therefore, the Court will reduce Dr. Porter's fee award to account for this duplicative billing. *See IMS Health Inc. v. Sorrell*, No. 1:07–cv–188–jgm, 2012 WL 2915845, at *5 (D. Vt. July 17, 2012) (finding that plaintiffs "staffed the case with an inordinate number of attorneys, and other timekeepers, causing . . . inefficiency," and explaining that "[w]hen a large number of attorneys work on a case, duplicative billing is often the result").

The Court will also reduce the fee award to account for the substitution of Attorney Eric Jones for Attorney Katie Kramer shortly before trial. This substitution resulted in inefficiencies, as Attorney Jones was required to spend significant time acquainting himself with the facts and law of this case after it had been pending for approximately seven years. *See id.* (reducing the claimed hours, in part because "Plaintiffs' choice to retain separate appellate counsel required . . . more time for new counsel to familiarize themselves with the litigation"); *Concrete Flotation Sys., Inc. v. Tadco Constr. Corp.*, No. 07–CV–319 (ARR)(VVP), 2010 WL 2539771, at *6 (E.D.N.Y. Mar. 15, 2010) ("Staffing this litigation with a high number of attorneys ensured that (1) unnecessary time was spent so that each attorney acquainted himself or herself with the facts and the issues; and (2) unnecessary time was spent in communication with the other attorneys on the matter."), *report and recommendation adopted*, 2010 WL 2539661 (June 17, 2010).

On the other hand, the fee award will not be reduced due to Dr. Porter's staffing of attorneys at trial. Dartmouth Health claims that Dr. Porter "flagrant[ly] overstaff[ed]" her team at

trial because she had "three partners and zero associates" in attendance, which Dartmouth Health

calls "a clear sign of inefficiency." (Doc. 309 at 6.) First, Dartmouth Health staffed its trial team

with four attorneys (plus a paralegal), seemingly reflecting its own determination that three

attorneys, whether partner or associate, were not enough to defend against Dr. Porter's claims in

this case. As the plaintiff, Dr. Porter's burden to prove her claims was more substantial than

Dartmouth Health's burden to defend against them. Therefore, the Court is not persuaded that

Dr. Porter should have required fewer attorneys than Dartmouth Health at the trial of this case. *See*

*Williamsburg Fair Hous. Comm. v. Ross-Rodney Hous. Corp.*, 599 F. Supp. 509, 518 (S.D.N.Y.

1984) ("[D]ivision of responsibility may make it necessary for more than one attorney to attend

activities such as depositions and hearings[, and] [m]ultiple attorneys may be essential for

planning strategy, eliciting testimony[,] or evaluating facts or law."). Second, the Court cannot

credit Dartmouth Health's criticism that Dr. Porter staffed her trial team with "zero associates"

when the law firm of Vitt & Nunan consists of only two member attorneys, Attorney Vitt and

Attorney Nunan (*see* Doc. 318 at 6).

### v.       Number of Hours Spent on Opening Statement

Dartmouth Health claims Dr. Porter's attorneys spent excessive time preparing Attorney

Vitt's opening statement for trial, noting that Attorneys Vitt, Nunan, and Jones collectively billed

94 hours to complete this task over the course of multiple months. (Doc. 309 at 6.) Dr. Porter

responds that, by the time counsel began preparing for trial, it had been many months since they

had worked on the case, and there were "hundreds upon hundreds of documents to review and

thousands of page[s] of depositions to read, and then witnesses to contact about possible trial

testimony." (Doc. 318 at 6.) Recognizing the lengthy duration of this case and the large number of

relevant documents and potential witnesses, the Court nonetheless finds that Dr. Porter's counsel

excessively billed for their preparation of Dr. Porter's opening statement at trial. Therefore, the

Court will reduce Dr. Porter's fee award to account for her attorneys' excessive billing for preparation of the opening statement at trial.

### vi.   Number of Hours Spent on Initial Discovery

Dartmouth Health contends that Dr. Porter's counsel spent excessive time on initial disclosures and discovery requests, which Dartmouth Health describes as "routine discovery" work. (Doc. 309 at 7.) Specifically, Dartmouth Health states that Dr. Porter's counsel required over 38 hours to prepare initial disclosures and document requests. (*Id.*) Dr. Porter responds that the hours spent on these tasks were reasonable, "given the number of issues in the case and the uncertainty about what caused the decision to close the REI Division and to terminate Dr. Porter's employment." (Doc. 318 at 6.)

Counsel may in some cases be justified in spending over 38 hours on initial disclosures and discovery requests, but Dr. Porter has not provided sufficient specific justification in this case. Therefore, the Court reduces Dr. Porter's fee award to account for her attorneys' excessive billing for initial disclosures and discovery requests. *See HVT, Inc. v. Port Auth. of N.Y. & N.J.*, 15 Civ. 5867 (MKB) (VMS), 2018 WL 6079932, at *6 (E.D.N.Y. Nov. 21, 2018) (reducing 67.3 hours to 20 hours for time spent preparing initial disclosures and responding to interrogatories, considering that "there were no issues of fact with regard to liability to be uncovered in this case"); *Brady*, 455 F. Supp. 2d at 212 (reducing lodestar hours by 30% due to excessive charge of 36 hours to draft initial disclosures and discovery requests).

### vii.   Amount of Time Spent on Motion for Attorney Fees

Finally, Dartmouth Health claims the amount of time that Dr. Porter's counsel spent preparing the pending Motion for Attorney Fees—over 91 hours—was excessive. (*See* Doc. 309 at 7–8.) Dr. Porter does not directly respond to this argument. (*See* Doc. 318.) The Court finds that, although the prevailing party has a right to seek reimbursement for fees incurred for preparing and

32

arguing a motion for attorney fees, *see Murray ex rel. Murray v. Mills*, 354 F. Supp. 2d 231, 241 (E.D.N.Y. 2005) ("recogniz[ing] Plaintiffs' right to bill for time spent applying for fees and costs"), Dr. Porter's attorneys' billing records demonstrate excessive billing for their work on her Motion for Attorney Fees. Therefore, the Court will reduce the fee award on this ground. *See H.W. v. N.Y.C. Dep't of Educ.*, No. 1:21-CV-08604 (JLR), 2023 WL 5529932, at *11 (S.D.N.Y. Aug. 28, 2023) (reducing number of hours billed by 25% and noting: "[c]ourts in this District . . . routinely reduce the hours spent on attorneys' fees litigation when those actions concern only the simple and straightforward issue of the reasonable amount of fees and costs that Plaintiff's attorneys should be paid for prevailing on behalf of the Plaintiff" (omission in original) (internal quotation marks omitted)); *Brady*, 455 F. Supp. 2d at 212 (reducing lodestar hours by 50% due to excessive charge of 257 hours on attorney fees litigation); *Levy v. Powell*, No. CV–00–4499(SJF), 2005 WL 1719972, at *8 (E.D.N.Y. July 22, 2005) (reducing lodestar hours by 35% due to excessive charge of 101.3 hours on attorney fees motion); *Murray*, 354 F. Supp. 2d at 241 (finding that fifteen hours was a reasonable amount of time to spend on attorney fees motion in that case, and that even in a complex case, attorney fees motion should not require more than thirty hours of attorney time).

### C.     Lodestar Calculation/Amount

Using the approved hourly rates for each attorney and paralegal who worked on the case, as noted above, and the number of hours requested in Dr. Porter's Motion for Attorney Fees, the lodestar is $1,562,286, as shown in the following chart:

| Timekeeper | Approved Hourly Rate | Hours Billed | Total |
|---|---|---|---|
| Attorney Geoffrey Vitt | $300 (2017–2022) $350 (2024–2025) | 1,240.5 1,093.9 | **$372,150** **$382,865** |
| Attorney Sarah Nunan | $150 (2020–2022) $250 (2024–2025) | 152 760.8 | **$22,800** **$190,200** |
| Attorney Sarah Merlo | $200 (2017–2020) $250 (2024–2025) | 419.7 281 | **$83,940** **$70,250** |
| Attorney Katie Kramer: solo and at DGW Kramer, LLP at DTO Law | $175 (2018–2020) $350 (2024) | 787.9 20.4 | **$137,882.50** **$7,140** |
| Attorney Eric Jones | $325 (2024) $350 (2025) | 36.1 358 | **$11,732.50** **$125,300** |
| Attorney Alison Bell | $300 | 9.6 | **$2,880** |
| Attorney Bridget Grace | $225 | 2 | **$450** |
| Attorney Wendy Radcliff | $250 | .25 | **$62.50** |
| Paralegals | $90 | 1,718.15 | **$154,633.50** |
| **TOTAL** | | | **$1,562,286** |

But given the above-described deficiencies—including vague/incomplete and block-billing entries; duplicative billing for multiple counsel at depositions; substitution of counsel shortly before trial; excessive time spent on preparation of the opening statement, initial disclosures and discovery requests, and preparation of the Motion for Attorney Fees—the Court imposes a 20% reduction to the lodestar. The revised lodestar is therefore **$1,249,828.80** ($1,562,286 − $312,457.20).

## D.    Adjustment of Lodestar Based on Degree of Success Obtained

The court's determination of the amount of the attorney fees award "does not end with the lodestar calculation." *Grant*, 973 F.2d at 101. Although there is a strong presumption that the lodestar represents the reasonable fee, "other considerations may lead to an upward or downward departure from the lodestar." *Id.* (citing *Hensley*, 461 U.S. at 434). "The party advocating such a departure . . . bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee." *Id.* (citing *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 413 (2d Cir. 1989)).

34

Noting that Dr. Porter prevailed on only one of six claims, that she secured less than 25% of the damages she originally sought, and that the jury answered only one of fourteen questions in Dr. Porter's favor, Dartmouth Health contends that "[Dr. Porter's] limited success and comparatively small damages award warrant a substantial downward adjustment" of the lodestar amount. (Doc. 309 at 8.) Dartmouth Health seeks a downward reduction in the amount of "no less than 83.3% (5/6) and as much as 92.86% (13/14)." (*Id.* at 9.) Dr. Porter, on the other hand, describes her award of over one million dollars as "an extraordinary verdict," "exceptional," and "an excellent result," particularly in an employment case brought by one person. (Doc. 318 at 2, 8–9 (internal quotation marks omitted).) Dr. Porter asserts that "based on an admittedly informal survey, this [verdict] is among the largest verdicts in Vermont for an individual employment case." (*Id.* at 2.)

The Court does not agree with Dartmouth Health that the jury's verdict awarding Dr. Porter over one million dollars was "overwhelmingly unsuccessful" (Doc. 309 at 1), warranting a downward adjustment of 80–90% to the lodestar amount. Although the jury found in Dr. Porter's favor on only one of six claims, that single successful claim resulted in a substantial monetary award. It strains credulity to accept that a Vermont jury awarding over one million dollars to a single plaintiff is not a significant verdict for the plaintiff.

The subject matter of this case further persuades the Court that a significant reduction would be inappropriate. Under statutes such as VFEPA, the purpose of fee-shifting is "to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel." *Raishevich v. Foster*, 247 F.3d 337, 344 (2d Cir. 2001) (internal quotation marks omitted). But for the availability of fee-shifting, Dr. Porter may not have retained counsel able to expend the substantial time and resources to litigate civil rights claims against a corporate defendant. *See Brady*, 455 F.

35

Supp. 2d at 203; *King Fook Jewellry Grp.*, 2019 WL 2535928, at *10 ("[P]reventing . . .

prevailing parties from recovering fees for unsuccessful efforts during the course of an otherwise

successful litigation may discourage attorneys from zealously representing their clients and raising

novel but reasonable arguments on their behalf." (omission in original) (internal quotation marks

omitted)). The Court agrees with Dr. Porter that a significant reduction to the lodestar amount in

this case would: (a) demonstrate "why it is often hard for [individual civil rights] plaintiffs to find

counsel equally competent as those employed by deep-pocket defendants," and (b) "disincentivize

future counsel from taking similar cases." (Doc. 300 at 10.)

The parties agree, as they must, that "[t]he 'most critical factor' in determining the amount

of attorney's fees 'is the degree of success obtained.'" *Anderson v. Sebelius*, No. 5:09–cv–16,

2011 WL 1832771, at *4 (D. Vt. May 12, 2011) (quoting *Hensley*, 461 U.S. at 436). "Where the

plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims,

the hours spent on the unsuccessful claim should be excluded in considering the amount of a

reasonable fee." *Hensley*, 461 U.S. at 440, In determining whether the losing claim is "distinct in

all respects" from the successful claims, the court considers whether the claims "involve a

common core of facts" or are "based on related legal theories." *Id.* at 435. Where "[m]uch of

counsel's time [is] devoted generally to the litigation as a whole, making it difficult to divide the

hours expended on a claim-by-claim basis," the suit "cannot be viewed as a series of discrete

claims," and thus the court "should focus on the significance of the overall relief obtained by the

plaintiff in relation to the hours reasonably expended on the litigation." *Id.*; *see Quaratino*,

166 F.3d at 425 ("Attorney's fees may be awarded for unsuccessful claims as well as successful

ones . . . where they are inextricably intertwined and involve a common core of facts or are based

on related legal theories." (internal quotation marks omitted)); *Post & Beam Equities Grp.*, 2015

VT 60, ¶ 48, 199 Vt. at 335–36, 124 A.3d at 471 (noting that "it is frequently impossible to parse

out, claim-by-claim, legal services rendered in cases involving a common core of facts," and

therefore, "the trial court has the discretion to focus on the significance of the plaintiff's overall

results in relation to the work reasonably performed in cases where the plaintiff's claims contained

a common core of facts or were based on related legal theories" (internal quotation marks

omitted)).

To determine whether a plaintiff's partial success requires a reduction in the lodestar

amount, courts in this Circuit apply the following framework:

> At step one of this analysis, the district court examines whether the plaintiff failed to succeed on any claims wholly unrelated to the claims on which the plaintiff succeeded. The hours spent on such unsuccessful claims should be excluded from the calculation. At step two, the district court determines whether there are any unsuccessful claims interrelated with the successful claims. If such unsuccessful claims exist, the court must determine whether the plaintiff's level of success warrants a reduction in the fee award. If a plaintiff has obtained excellent results, however, the attorneys should be fully compensated.

*Grant v. Martinez*, 973 F.2d at 101 (citations omitted). Where a plaintiff's claims were "based on

a common core of facts," then the successful and unsuccessful claims are not considered "wholly

unrelated." The Court then proceeds to step two of the analysis. *Id.*; *see Brady*, 455 F. Supp. 2d at

216 (in disability lawsuit brought under the ADA and New York Human Relations Law, finding

that "all of [plaintiff's] claims involve a common core of facts and related legal theories," "[a]s is

often true of lawsuits arising from alleged deprivations of civil rights" (internal quotation marks

omitted)); *Baird v. Boies, Schiller & Flexner LLP*, 219 F. Supp. 2d 510, 521–22 (S.D.N.Y. 2002)

("[A]ll of plaintiffs' claims—whether styled as Equal Pay Act, Title VII, or state law claims—

involve a common core of facts resulting in one injury. The legal claims interrelated and

overlapped; plaintiffs' EEOC charges alleged violations of Title VII, the Equal Pay Act, and New

York State's Equal Pay and Human Rights Laws based on the same factual allegations.").

37

All of the claims in Dr. Porter's case, including the VFEPA claim, share a common core of facts and legal issues. The evidence presented at trial in this case underscores the relatedness of the facts and legal issues. For example, a May 2017 email from Dr. DeMars to Dr. Merrens discusses in the same paragraph both Dr. Porter's claimed "disruptive/splitting behavior," which the jury could have understood to include Dr. Porter's whistleblower complaints about Drs. Hsu and Seifer, and Dr. Porter's disability: "[e]veryone . . . is remembering [Dr. Porter] as a full time employee wearing 3 hats, and not the one who has been out for almost 18 months." (Doc. 140-16 at 2.) Furthermore, all the claims in this case are premised on whether Dartmouth Health's reason for Dr. Porter's termination was unlawful. The jury found that Dartmouth Health unlawfully terminated Dr. Porter based on disability in violation of VFEPA, which was only one of the legal claims she asserted. The jury awarded Dr. Porter a considerable monetary verdict. It is plausible that the amount of the verdict would have been the same had the jury found in favor of Dr. Porter on any of her other claims instead of the VFEPA claim or in addition to the VFEPA claim. *See, e.g., Dominic v. Consol. Edison Co. of N.Y.*, 822 F.2d 1249, 1259–60 (2d Cir. 1987) (where factual and legal theories underlying unsuccessful age discrimination and successful retaliation claims were inextricably intertwined, court found fully compensatory fee award "justified" "because [plaintiff] recovered the same relief on the retaliation claim that he would have on his discrimination claim"). For these reasons, step one of the analysis does not support a substantial reduction in the lodestar amount.

At step two of the analysis, the Court determines whether there are any unsuccessful claims interrelated with the successful claims and whether the ultimate level of success justifies a reduction in the award. *Grant*, 973 F.2d at 101. Although Dr. Porter's unsuccessful non-VFEPA claims are interrelated with her successful VFEPA claim, the Court must account for the fact that the jury did not find in Dr. Porter's favor on five of her six claims; declined to award punitive

38

damages; and awarded a lesser amount of damages than Dr. Porter's expert opined she incurred. These considerations warrant a modest downward adjustment to Dr. Porter's fee award, notwithstanding what may fairly be considered an "excellent result," i.e., a jury verdict exceeding one million dollars. *See, e.g.*, *Kassim v. City of Schenectady*, 415 F.3d 246, 256 (2d Cir. 2005) (affirming district court's authority "to reduce the fee awarded to a prevailing plaintiff below the lodestar by reason of the plaintiff's partial or limited success" (internal quotation marks omitted)); *Centrella*, 2018 WL 840041, at *10 (finding downward adjustment of lodestar warranted, "though in a lesser amount than requested," because plaintiffs achieved success on only one of three claims); *McDow v. Rosado*, 657 F. Supp. 2d 463, 469–70 (S.D.N.Y. 2009) (reducing fee by 12% and explaining, "it is difficult to conclude that plaintiff achieved anything close to what was sought"); *Parrish v. Sollecito*, 280 F. Supp. 2d 145, 173 (S.D.N.Y. 2003) (reducing lodestar by 10%, "despite [plaintiff's] obviously considerable success entailed in the jury's punitive damage award," because punitive damage award was capped at $50,000, plaintiff succeeded on only one of two claims, and jury awarded "far less than [plaintiff] sought"). The Court therefore applies an across-the-board reduction of 10% to the revised lodestar (noted above) to account for Dr. Porter's somewhat limited success in this case.

Accordingly, Dr. Porter's attorney fees award is reduced to **$1,124,845.92** ($1,249,828.80 − $124,982.88).

## II.   Additional Fees Incurred After Filing Motion for Attorney Fees

Dr. Porter filed her Motion for Attorney Fees on May 8, 2025. She advised in the Motion that she would "supplement [it] with a final accounting" to seek "additional compensable fees" incurred after the filing of the Motion, including for time spent "in connection with litigation

associated with th[e] Motion and with litigating other post-trial motions."[17] (Doc. 300 at 3 n.2.) On July 11, 2025, Dr. Porter filed a "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees," which includes a request for a "supplemental award of the attorney's fees incurred by [Dr. Porter's] lawyers from May 8, 2025, through July 1, 2025." (Doc. 330 at 1.) Attached to the Memorandum are: (a) a chart displaying the hourly rates and hours billed for the four attorneys representing Dr. Porter from May 8 through July 1 (*see* Doc. 330-2); and (b) billing records of Vitt & Nunan and Langrock Sperry & Wool documenting the work that Dr. Porter's attorneys completed on the case in the same time period (*see* Docs. 330-3, 330-4). The total amount of fees requested in these documents for the period from May 8 through July 1 is $70,439. (Doc. 330-2.) Dartmouth Health has filed an Opposition to Dr. Porter's Second Supplemental Memorandum, asserting both procedural and substantive reasons for the Court to disallow the fees requested in the Second Supplemental Memorandum. (Doc. 331 at 4.)

In an effort to avoid a third major litigation regarding Dr. Porter's Motion for Attorney Fees, *see Hensley*, 461 U.S. at 437, the Court will rule on Dr. Porter's request for supplemental fees at this time. In doing so, the Court notes that Dartmouth Health has had ample opportunity to respond to Dr. Porter's supplemental submission of billing records and has in fact responded to those records (*see* Doc. 331). Therefore, Dartmouth Health suffers no prejudice from the Court deciding this issue without further briefing and without a hearing.

The Second Circuit, Vermont state courts, and this Court all agree that "[a]ttorney fees for the preparation of an attorney fee application and other post-trial motions [are] compensable," particularly in civil rights cases. *See Centrella v. Ritz-Craft Corp. of Pa., Inc.*, Civil Action No. 2:14–cv–111–jmc, 2018 WL 1750568, at *2 (D. Vt. Apr. 11, 2018) (citing *Weyant v. Okst*, 198

---

[17] Dr. Porter also represented that she "will submit a supplemental accounting to cover fees incurred during post-trial matters." (Doc. 318 at 1 n.1.)

F.3d 311, 316 (2d Cir. 1999) ("[A] reasonable fee should be awarded for time reasonably spent in preparing and defending an application for [statutory attorney] fees."); *Vt. Hum. Rts. Comm'n v. Benevolent and Protective Order of Elks*, No. 404–8–98 Wncv, 2009 WL 5454429 (Vt. Super. Wash. Cnty. Apr. 6, 2009) ("Plaintiffs are . . . entitled to an award of fees and expenses for litigating the fee application itself."); *Monahan v. GMAC Mortg. Corp.*, No. S0275–01 RcC, 2003 WL 25782721 (Vt. Super. Rutland Cnty. Oct. 6, 2003) ("Supplementary fees that result from prosecution of post[-]trial fees have been allowed to prevailing parties in federal cases dealing with civil rights."); *LaBrie*, 164 Vt. at 252, 668 A.2d at 669 ("[P]laintiff is entitled to fees for time spent on the motion [for attorney fees.]")). The reason courts permit attorney fees for work performed related to a fees application is clear:

> If an attorney is required to expend time litigating his fee claim, yet may not be compensated for that time, the attorney's effective rate for all the hours expended on the case will be correspondingly decreased. . . . Such a result would not comport with the purpose behind most statutory fee authorizations, Viz, the encouragement of attorneys to represent indigent clients and to act as private attorneys general in vindicating congressional policies. . . . [T]o hold otherwise would permit a deep pocket losing party to dissipate the incentive provided by an award through recalcitrance and automatic appeals.

*Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir. 1979), *aff'd* 448 U.S. 122 (1980) (first omission in original) (internal quotation marks omitted); *see Donovan v. CSEA Loc. Union 1000, Am. Fed'n of State, Cnty. & Mun. Emps., AFL–CIO*, 784 F.2d 98, 106 (2d Cir. 1986) ("The fee application is a necessary part of the award of attorney's fees. If the original award is warranted, we think that a reasonable amount should be granted for time spent in applying for the award."); *Weyant*, 198 F.3d at 316 ("A culpable defendant should not be allowed to cause the erosion of fees awarded to the plaintiff for time spent in obtaining the favorable judgment by requiring additional time to be spent thereafter without compensation. Thus, a reasonable fee should be awarded for opposing the culpable defendant's unsuccessful postjudgment motions.").

41

Accordingly, Dr. Porter is entitled to recover a reasonable fee for her attorneys' handling of post-trial motions in this case, including her Motion for Attorney Fees. *See LaBrie*, 164 Vt. at 250, 668 A.2d at 658 ("Fee awards are to be reasonable, reasonable as to billing rates and reasonable as to the number of hours spent in advancing the successful claims." (internal quotation marks omitted)).

Dr. Porter seeks $70,439 for attorney fees incurred from May 8 through July 1. (Doc. 330-2; *see* Doc. 330-3.) As explained above, the Court maintains Attorney Nunan's 2025 hourly rate of $250, but reduces the remaining 2025 hourly rates as follows: Attorney Vitt's rate is reduced from $400 to $350; Attorney Merlo's rate is reduced from $325 to $250; and Attorney Jones's rate is reduced from $395 to $350. After these reductions, the amount of hours billed at these rates yields a lodestar amount of $60,970.

Additionally, the billing records attached to the Second Supplemental Memorandum (*see* Docs. 330-3 and 330-4) contain several of the same deficiencies that the pre-May 8 billing records contain, including vague/incomplete entries (*see, e.g.*, Doc. 330-3 at 1 ("Emails with S. Nunan" and "Meeting with S. Nunan, E. Jones, and G. Vitt"); *id.* at 2 ("T/c S. Merlo"); *id.* at 6 ("Emails S. Merlo")) and block-billing entries (*see, e.g.*, Doc. 330-3 at 1 ("Prepare and revise fee petition and supporting documents; conf. with S. Merlo; emails with S. Merlo; conf. with G. Vitt and E. Jones; prepare and file attorney fee petition"); Doc. 330-4 at 2 ("Preparation for motions hearing; correspondence with client regarding motions hearing; attend motions hearing")). Further, the billing records reveal that excessive or duplicative time was spent on certain tasks, including: (1) preparation of the Motion for Attorney Fees (see above discussion); (2) preparation of the "Supplemental Memorandum in Further Support of" the Motion for Attorney Fees (*see* Doc. 326), which Dartmouth Health correctly notes added no new law or argument regarding the Motion; and (3) preparation of reply briefs and for the hearing regarding Dr. Porter's post-trial motions.

SPA-59

Regarding counsel's preparation of reply briefs, it is unclear from the billing records which attorneys drafted which replies, and some of the time spent appears to have been duplicative. (*See* Doc. 330-3 at 4.) Moreover, as Dartmouth Health notes (*see* Doc. 331 at 3), the billing records reflect that Attorneys Vitt and Nunan spent over thirty-one hours preparing for the July 1 hearing (*see* Doc. 330-3 at 4–7), but Attorney Vitt argued only one of the four Motions under review at that hearing and Attorney Nunan did not present any argument at the hearing. In comparison, Attorney Jones's billing records indicate that he spent only approximately ten total hours preparing for the July 1 hearing (*see* Doc. 330-4 at 1–2), though he argued the majority of the Motions at the hearing. The Court recognizes that counsel could not have anticipated the issues the Court would focus on during the hearing, and it is possible that Attorney Vitt was prepared to present a more extensive argument on the Motion for Attorney Fees than was actually required at the hearing. The Court's observations are not intended to suggest that counsel should spend less time preparing for hearings. In this instance, however, the billing records indicate that some of the work performed on Dr. Porter's behalf in preparation for the July 1 hearing was excessive or duplicative.

To account for these deficiencies, the Court reduces the lodestar amount for fees incurred from May 8 through July 1 by 20%, resulting in a total of **$48,776** ($60,970 − $12,194). Adding this amount to the revised and adjusted lodestar for attorney fees incurred from the beginning of this case until the filing of the Motion for Attorney Fees ($1,124,845.92), results in an attorney fee award totaling **$1,173,621.92** ($1,124,845.92 + $48,776).

### III.    Interest

In the Motion for Attorney Fees and Motion to Amend Judgment, Dr. Porter argues that prejudgment interest should be added to her attorney fees award,[18] and that both pre- and postjudgment interest on the award should be calculated at Vermont's rate of 12% pursuant to 9 V.S.A. § 41a(a). (*See* Doc. 300 at 3 n.3, 4 nn.4–5; Doc. 302 at 3, 5 n.3.) Dartmouth Health responds that Dr. Porter is not entitled to any prejudgment interest on her attorney fees award, and that postjudgment interest should be calculated at the federal rate of 3.98%. (*See* Doc. 306 at 4; Doc. 309 at 11.)

Dr. Porter does not cite binding precedent, or advance persuasive argument, to substantiate the claim that prejudgment interest should be applied to her attorney fees award,[19] or that the postjudgment interest rate on the attorney fees award should be Vermont's 12% rate.[20] Generally, prejudgment interest is not recoverable on attorney fees awards because "those fees are not liquidated until fixed by the trial court." *Ring*, 2014 VT 127, ¶ 35, 198 Vt. at 126, 112 A.3d at 766; *see Vastano v. Killington Valley Real Est.*, 2010 VT 12, ¶ 10 n.3, 187 Vt. 628, 632, 996 A.2d 170, 174 (2010) (noting "general rule prohibiting an award of prejudgment interest on attorney's fees" and "delet[ing]" from fee award "that portion [that was] attributed to prejudgment interest"); *Salatino v. Chase*, 2007 VT 81, ¶ 15, 182 Vt. 267, 275, 939 A.2d 482, 488 (2007) (citing cases)

---

[18]  It is unclear if Dr. Porter is claiming that prejudgment interest should be added only to that portion of her attorney fees that she paid. Her Motion for Attorney Fees appears to request prejudgment interest on *all* fees incurred (*see* Doc. 300 at 3–4, nn. 2–4), while her Motion to Amend Judgment explicitly requests prejudgment interest only for the attorney fees she paid, i.e., for attorney work done through August 2020 (*see* Doc. 302 at 5 n.3 ("The Court should include an award of prejudgment interest on [$475,096] in order to compensate Dr. Porter for the loss of use of the funds used to pay attorneys' fees prior to August 2020.")). The Court need not resolve this issue because it concludes that no prejudgment interest should be added to the attorney fees award.

[19]  Although Dr. Porter cites a case in her Motion to Amend Judgment that recognizes the court's discretion to award prejudgment interest on attorney fee awards in civil rights cases (*see* Doc. 302 at 5 n.3), the case is from the District of Massachusetts and no argument is made to support the Court's application of that case here.

[20]  Dr. Porter cites two cases in her Motion to Amend Judgment for the proposition that, in cases decided based on state claims, "[c]ourts appl[y] the interest rate of the state rather than the federal rate." (Doc. 302 at 3.) The cases, however, discuss only prejudgment interest, not postjudgment interest.

(noting that courts have generally concluded that, "for purposes of prejudgment-interest awards, . . . attorney's fees are not liquidated until fixed by the trial court following discretionary calculations [to determine the amount of a reasonable fee award]"); *cf. Wells Fargo Bank N.A. v. Sinnott*, No. 2:07–CV–169, 2010 WL 297830, at *12 (D. Vt. Jan. 19, 2010) ("In Vermont, it is unclear whether attorney's fees are 'liquidated' before the Court determines the exact amount to be paid."). Although there may be cases where attorney fees are liquidated, Dr. Porter has offered no basis for such a conclusion in this case. Therefore, Dr. Porter's request for prejudgment interest on her attorney fees award is DENIED.

Dr. Porter is, however, entitled to postjudgment interest on her award. *See Kirshner v. Smith*, Civil Action No. 2:23-cv-397, 2024 WL 3640619, at *8 (D. Vt. July 10, 2024), *report and recommendation adopted*, 2024 WL 3638901 (Aug. 2, 2024); *Brady*, 455 F. Supp. 2d at 217 (holding that "a plaintiff who prevailed on a federal claim . . . is entitled to interest on his entire damage award from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment" (internal quotation marks omitted)). "[F]ederal law governs post-judgment interest." *SuperCom Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*, No. 21 CV 2857 (LAP), 2023 WL 8372271, at *2 (S.D.N.Y. Dec. 4, 2023). 28 U.S.C. § 1961(a) provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," and that "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment." Accordingly, "under § 1961, federal district courts must apply *the federal rate* of post-judgment interest to judgments rendered in diversity actions, even when those judgments have been docketed in state court." *Cappiello v. ICD Publ'ns, Inc.*, 720 F.3d 109, 112 (2d Cir. 2013) (emphasis added). The "primary objective" of § 1961 is "to maintain

45

the federal court system without altering the substantive rights and interests the system

adjudicates." *Id.* at 114. As the Second Circuit has explained:

> Unlike pre-judgment interest, post-judgment interest is not awarded to make a plaintiff whole for his injury. Rather, [o]nce a claim is reduced to judgment, the original claim is extinguished and merged into the judgment; and a new claim, called a judgment debt, arises. Section 1961 acts only upon final federal judgments, not upon the claims—whether state or federal—that give rise to, and are extinguished by, them.

*Id.* at 115 n.6 (alteration in original) (citations and internal quotation marks omitted).

Dr. Porter has not provided legal authority justifying the application of an interest rate

different from the rate specified in § 1961. Therefore, the Court GRANTS Dr. Porter's request for

postjudgment interest but DENIES the request that a rate of 12% should apply. The Court will

calculate postjudgment interest from the date of entry of the Judgment in this case—April 24,

2025—until satisfaction of the Judgment, consistent with the formula set forth in 28 U.S.C.

§ 1961.

## IV.    Costs

In addition to an award of attorney fees, Dr. Porter seeks payment from Dartmouth Health

for the reasonable costs she has incurred in this case. (*See* Doc. 300 at 11–12, Doc. 302 at 3–5,

Doc. 317, Doc. 318 at 5, Doc. 318-1, Docs. 319–319-2.) Specifically, Dr. Porter seeks $19,899.69

in total, for the following costs incurred: $10,478.90 for deposition transcripts (*see* Doc. 318-1;

*see also* Doc. 318 at 5), $4,478.72 for trial transcripts (*see* Doc. 319 at 1, Doc. 319-1 at 1);

$1,106.65 for clerk, docket, and witness fees (*id.*); and $10.43 for service of summons and

subpoena fees (*id.*).[21] Dartmouth Health generally argues that the Court should "exercise [its]

---

[21] As noted in footnote 8 above, Dr. Porter requested additional costs in her Motion for Attorney Fees, totaling $29,959.20, for attorney travel, hotel stays, and meals during the trial; costs related to the deposition of expert witness Dr. Bancroft and Dr. Bancroft's attendance at the *Daubert* hearing; and two mediations. (*See* Doc. 300 at 11–12.) But Dr. Porter has not submitted documentation substantiating these costs. The Court finds that Dr. Porter has since abandoned the request, as she has filed numerous documents since the filing of the Motion for Attorney Fees and none have addressed or reflected those costs.

46

discretion and decline to award any costs [to Dr. Porter] based on [her] procedural blunders," including her failure to "attach any affidavit or supporting billing statements, invoices, or receipts to her Bill of Costs." (Doc. 306 at 5.) This argument is no longer tenable because Dr. Porter has filed a revised Bill of Costs (Doc. 319) that includes documentation supporting the request for costs (Docs. 319-2), as discussed in detail below. Dartmouth Health has not filed an objection to the revised Bill of Costs.

VFEPA permits an award of costs to a prevailing plaintiff. *See* 21 V.S.A. § 495b(b) ("Any person aggrieved by a violation of the provisions of this subchapter may bring an action in Superior Court seeking compensatory and punitive damages or equitable relief, including . . . costs, reasonable attorney's fees, and other appropriate relief."). Federal Rule of Civil Procedure 54(d)(1) similarly provides that "costs--other than attorney's fees--should be allowed to the prevailing party." In deciding the costs that the prevailing party may recover, the Second Circuit has consistently held that "attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *H.B. Auto. Grp., Inc. v. Kia Motors Am., Inc.*, 13cv4441 (VEC) (DF), 2018 WL 4017698, at *3 (S.D.N.Y. July 25, 2018) (quoting *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir. 1989)), *report and recommendation adopted sub nom. H.B. Auto. Grp., Inc. v. Kia Motors Am.*, 2018 WL 4007636 (Aug. 22, 2018). "Such costs may properly include, for example, shipping fees, filing fees, printing, process servers, travel, telephone costs, legal research, deposition-related expenses, and litigation support." *Id.*

Courts may tax costs pursuant to Federal Rule 54(d)(1) "only if authorized by 28 U.S.C. § 1920." *Grajeda v. Vail Resorts Inc.*, Case No. 2:20-cv-00165, 2024 WL 3950919, at *1 (D. Vt. Aug. 27, 2024). This Court's Local Rule of Civil Procedure 54(a) explicitly limits the taxation of costs "to those specified by 28 U.S.C. § 1920," and provides that all costs "must be itemized and

include supporting documentation, such as billing statements, invoices, or receipts for expenses."

28 U.S.C. § 1920 lists the following costs as those that may be awarded under the applicable

Federal and Local Rule:

> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

Because an award of costs against the losing party "is the normal rule . . . in civil litigation,

not an exception[,] . . . the losing party has the burden to show that costs should not be imposed."

*Whitfield v. Scully*, 241 F.3d 264, 270 (2d Cir. 2001), *abrogated on other grounds by Bruce v.*

*Samuels*, 577 U.S. 82 (2016); *see Portelos v. Hill*, 830 F. App'x 66, 67 (2d Cir. 2020); *Hiramoto*

*v. Goddard Coll. Corp.*, Case No. 5:14-cv-142, 2019 WL 13248656, at *3 (D. Vt. Sept. 12, 2019).

The decision to award costs "rests within the sound discretion of the district court" and "will be

reviewed . . . only for abuse of discretion." *Javier v. Deringer-Ney Inc.*, 501 F. App'x 44, 45 (2d

Cir. 2012) (internal quotation marks omitted).

Preliminarily, the Court considers Dr. Porter's request to include in her attorney fees

award—as opposed to in her taxed costs—the costs she incurred for deposition transcripts. (*See*

Doc. 300 at 11; Doc. 302 at 5–6; Doc. 318 at 5.) Dr. Porter relies on case law from the Second

Circuit and from this Court to argue that these expenses are "recoverable as a component of

attorney's fees," even though they are not considered "taxable costs." (Doc. 300 at 11 (internal

quotation marks omitted).) Dartmouth Health counters that: (a) these expenses may not be "double

counted," and thus if the Court includes them in the attorney fees award, it must exclude them

48

from the costs taxed; (b) 28 U.S.C. § 1920 does not provide for an award for the cost of court reporter services at depositions, so those costs should not be taxed; and (c) if the Court includes deposition-related expenses in Dr. Porter's award, those expenses should be reduced to account for depositions that Dr. Porter needlessly conducted in this case. (*See* Doc. 306 at 5–6; Doc. 309 at 10.) Regarding the last item, Dartmouth Health provides a chart of the alleged "unnecessary" depositions, showing the cost of transcripts for those depositions totaling over $6,000. (Doc. 306 at 6.) As explained above, however, the Court does not agree that Dr. Porter conducted an excessive number of depositions in this case. Therefore, it is not a reason to reduce the allowable costs.

Furthermore, the Court does not agree that Dr. Porter's costs related to either deposition or trial transcripts are not allowed under the applicable statute, 28 U.S.C. § 1920. To the contrary, section (2) of the statute provides that the court may tax as costs "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case." Many courts in this Circuit, including this Court, have interpreted this section to include the costs of deposition and trial transcripts provided they are "necessarily obtained." *See, e.g.*, *Perks v. Town of Huntington*, 331 F. App'x 769, 770 (2d Cir. 2009) (identifying "no error" in finding that daily trial transcripts were taxable costs, as they were "necessarily obtained by defendants for use in the case" (internal quotation marks omitted)); *In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975*, 687 F.2d 626, 631 (2d Cir. 1982) (finding no error in taxing costs of "transcripts of depositions not used . . . at trial, of transcripts of pretrial proceedings, and of daily transcripts of the trial"); *Cole v. Foxmar, Inc.*, Case No. 2:18-cv-00220, 2023 WL 2632845, at *2 n.1 (D. Vt. Mar. 24, 2023) ("Transcript fees are recoverable under 28 U.S.C. § 1920(2)."); *Vermont Right to Life Comm., Inc. v. Sorrell*, No. 2:09–cv–188, 2015 WL 1481619, at *2 (D. Vt. Mar. 31, 2015) (finding that awarding costs for deposition transcripts was appropriate under 28 U.S.C. § 1920(2));

49

*Lasek v. Vt. Vapor, Inc.*, 2014 VT 33, ¶ 28, 196 Vt. 243, 257, 95 A.3d 447, 457 (2014) (finding

that "trial court has broad discretion" to award prevailing party costs of obtaining copies of

deposition transcripts "provided that the depositions were reasonably necessary to prepare for the

litigation" (internal quotation marks omitted)); *Carrasco Flores v. NYC Pasta & Risotto Co.*, 17-

CV-6915 (LGS)(KNF), 2019 WL 8331463, at *4 (S.D.N.Y. Sept. 19, 2019) (citing § 1920 to

award costs for deposition transcripts and trial transcripts); *Cleveland v. N. Am. Van Lines, Inc.*,

154 F.R.D. 37, 38 (N.D.N.Y. 1994) (finding that depositions "properly taken within the bounds of

discovery [are] . . . necessarily obtained for use in the case" for purposes of taxing costs under

§ 1920). Accordingly, the Court includes Dr. Porter's costs for deposition transcripts and trial

transcripts in her request for costs, rather than as part of her request for attorney fees.

In terms of the substance of Dr. Porter's requested costs for deposition and trial transcripts,

the depositions reflected in the billing documents attached to Dr. Porter's Reply (*see* Docs. 318-1

at 2–12) were "necessarily obtained for use in the case," as required by 28 U.S.C. § 1920(2), even

though not all of the deponents testified at trial. Therefore, they are allowable costs.[22] *See Zulu v.*

*Barnhart*, 9:16-CV-1408 (MAD/ML), 2019 WL 4544420, at *2 (N.D.N.Y. Sept. 19, 2019) (taxing

deposition costs where "[losing party] has not demonstrated that any portion of his deposition was

not related to an issue relevant to the case at the time the deposition was taken"); *Jim Billado*

*Roofing, LLC v. Custom Copper & Slate, Ltd.*, No. 1:08-CV-97, 2010 WL 1881097, at *3 (D. Vt.

May 10, 2010) (holding that "deposition costs are taxable so long as the deposition reasonably

seemed necessary at the time it was taken," and noting that although plaintiff "did not use the

deposition transcripts at trial, . . . it was reasonable to anticipate requiring them," and therefore

---

[22] The last two documents attached to the Reply are checks from Attorney Nunan for transcription services. (*See* Doc. 318-1 at 13–14.) As they do not reference this case or any particular deposition or other event in this case, the Court does not include them in its cost award.

"these costs are allowed"); *Anderson v. City of New York*, 132 F. Supp. 2d 239, 246 (S.D.N.Y. 2001) (holding that "deposition transcripts need not be introduced into evidence at trial in order to be taxed as costs; it suffices that at the time the deposition was taken it was reasonably expected that the transcript would be used for trial preparation").

However, each of the court reporter costs listed in the chart attached to the Reply (*see* Doc. 318-1 at 1) is not supported by the documentation attached to the chart. Specifically, Dr. Porter has not provided sufficient documentation to support the chart's listed deposition transcription charges of $174.25, $625.35, $1,181.40, $923.75, $597.15, and $548.80. (*See id.*) Therefore, these amounts are not included in the taxable costs. Documentation attached to the chart does, however, support deposition transcript cost totals that are not listed in the chart, specifically in the amounts of $225.75 (*Id.* at 4), $441 (*id.* at 5), and $346.75 (*id.* at 7). Therefore, the total amount of costs taxed for deposition transcripts, as reflected in the documents attached to Dr. Porter's Reply regarding her Motion for Attorney Fees (Doc. 318-1), is **$7,441.70**.

In addition, Dr. Porter seeks $4,478.72 for the cost of trial transcripts, as reflected in her Bill of Costs[23] (Doc. 319 at 1) and attached documents (Doc. 319-1 at 1, Docs. 319-2 at 23–29, 33–34). Trial transcript costs may be taxed, provided they were "necessarily obtained for use in the case." 28 U.S.C. § 1920(2). The Court finds that the trial transcripts documented in Dr. Porter's Bill of Costs and attached documents were necessarily obtained for use in this case and therefore the associated costs are recoverable. *See, e.g.*, *Karibian v. Columbia Univ.*, No. 91 Civ. 3153 (TPG), 1997 WL 2538, at *2 (S.D.N.Y. Jan. 3, 1997) (finding it "appropriate" to tax cost of daily trial transcripts, where trial was "of substantial length" and "involv[ed] hotly contested

---

[23] As noted earlier, after her initial filing of a Bill of Costs on May 8, 2025 (Doc. 301), and after Defendants filed their "Objection to Plaintiff's Bill of Costs" (Doc. 307), Dr. Porter filed a revised Bill of Costs on June 5, 2025 (Doc. 319). The Court refers to that most recent Bill of Costs, docketed as ECF No. 319, as Dr. Porter's "Bill of Costs" herein, given that it provides the most accurate and up-to-date information and attached documentation.

issues including sharp and crucial questions of credibility," and where there were "extensive post-trial motions"). However, it is unclear why $224.27 for "Grafton County Sheriff" is included in the amount of costs requested for "Transcripts." (Doc. 319-1 at 1.) Moreover, the only documentation for that cost is a check in the amount of $224.27 to the Grafton County Sheriff, which includes no reference to this case and no indication of its purpose. (*See* Doc. 319-2 at 5.) This cost is therefore not taxed. The total amount of costs taxed for trial transcripts is **$4,254.45**.

The remaining requested costs are for clerk fees ($31), docket fees ($400), fees for service of summons and subpoena ($10.43), witness fees ($675.65), copy fees ($1,620.94), and half of Special Master John Schraven's mediation-related fees ($2,204.05). (*See* Doc. 319 at 1–2, Doc. 319-1.) The Court allows the requested clerk fee, docket fees, and witness fees in their entirety, totaling **$1,106.65**. *See* 28 U.S.C. § 1920(1), (3), (5); *see also Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441–42 (1987) (finding that witness fees are part of section 1920 taxable costs); *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 601 (2d Cir. 2020) (taxing filing fees); *Degreenia-Harris*, 2021 WL 5979683, at *15 (taxing "costs of initiating the action"); *Zulu*, 2019 WL 4544420, at *2 (finding that "costs attributed to [prevailing party's] witnesses from [an evidentiary] hearing and [the] trial are both properly taxable to [losing party]"); *Anderson v. City of N.Y.*, 132 F. Supp. 2d 239, 245 (S.D.N.Y. 2001) (finding that costs for filing and witness fees are "ordinarily recoverable as costs pursuant to 28 U.S.C. § 1920 and [the applicable] Local Rule").

Although fees for service of summons and subpoena are generally allowed, *see U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 172 (2d Cir. 1996) (citing 28 U.S.C. § 1920(1)), the Court deducts $4.85 from the $10.43 requested because the receipt in the amount of $4.85 from the United States Postal Service contains no indication of what the payment is for, and no reference to this case, and no affidavit or

52

declaration has been submitted to testify to these facts. (*See* Doc. 319-2 at 6.) Therefore, only **$5.58** is taxed for service of summons and subpoena costs.

Regarding copy fees, no costs are taxed because the documentation provided does not reference the case in any way, and the Bill of Costs does not attach an affidavit or declaration explaining the reason for these fees. (*See* Doc. 319-2 at 30–32.) *See King Fook Jewellry Grp.*, 2019 WL 2535928, at *11 ("The Court . . . will not award costs for photocopying and meals because these expenses did not come with supporting documentation."); *Whitehead v. Mix Unit, LLC*, 17 Civ. 9476 (VSB) (JLC), 2019 WL 384446, at *6 (S.D.N.Y. Jan. 31, 2019) (plaintiff "not entitled to full recovery of costs," where "counsel . . . failed to provide any documentation to support . . . request for costs"), *report and recommendation adopted*, 2019 WL 1746007 (Apr. 18, 2019); *Lee v. Santiago*, No. 12 Civ. 2558(PAE)(DF), 2013 WL 4830951, at *5 (S.D.N.Y. Sept. 10, 2013) ("A mere assertion that a certain cost was incurred . . . is insufficient, where such an assertion is made in a conclusory fashion in a brief or bill of costs, without a supporting affidavit, declaration, or documentation.").

Finally, the Court denies Dr. Porter's request to tax half of the fees billed by Special Master John Schraven for his work on this case. (*See* Doc. 319-1 at 1; Doc. 319-2 at 3–4.) Dr. Porter has not cited authority holding that a special master appointed by the court to assist parties with settlement efforts may be considered a "court[-]appointed expert[]" within the meaning of 28 U.S.C. § 1920(6) for the purpose of taxing costs. Because section 1920 embodies a congressional policy "to impose rigid controls on cost-shifting in federal courts," *Crawford Fitting Co.*, 482 U.S. at 444, the Court is reluctant to adopt a broad interpretation of its provisions. But the Court need not decide whether § 1920 generally allows for the taxing of a court-appointed special master's fees because the Court expressly directed that "[e]ach side shall be responsible for half" of Mr. Schraven's compensation. (Doc. 158 at 2; *see also* Doc. 170 (providing that Mr. Schraven's

53

fees "shall be . . . divided evenly between the two parties"). The Court declines to revisit or amend that directive.

Accordingly, the Court will tax Dr. Porter's costs as follows: $7,441.70 for deposition transcripts; $4,254.45 for trial transcripts; $1,106.65 for clerk, docket, and witness fees; and $5.58 for fees for service of summons and subpoena. The total amount of taxable costs is **$12,808.38**.

### Conclusion

For these reasons, the Court finds as follows:

*Attorney Fees*

The Court GRANTS IN PART AND DENIES IN PART Dr. Porter's Motion for Attorney Fees (Doc. 300), awarding Dr. Porter $1,124,845.92 in attorney fees for work completed through May 7, 2025, which reflects a 20% reduction of the lodestar amount ($1,562,286.00 − $312,457.20 = $1,249,828.80) to account for the instances of vague/incomplete and block-billing entries, duplicative billing, and excessive billing; and a 10% reduction of the revised lodestar amount ($1,249.828.80 − $124,982.88 = $1,124,845.92) to account for Dr. Porter's success on only one of six claims in this lawsuit.

The Court GRANTS IN PART AND DENIES IN PART Dr. Porter's Second Supplemental Memorandum in support of her Motion for Attorney Fees (Doc. 330), awarding Dr. Porter $48,776 in attorney fees for work completed from May 8, 2024 to July 1, 2025, which reflects a 20% reduction of the lodestar amount to account for the same billing deficiencies listed above ($60,970 − $12,194).

The total amount of the attorney fees award is **$1,173,621.92** ($1,124,845.92 + $48,776).

*Costs*

The Court GRANTS IN PART AND DENIES IN PART Dr. Porter's request for costs (*see* Docs. 300, 302, 318, 319), awarding Dr. Porter **$12,808.38** in costs, including costs related to

54

deposition and trial transcripts, clerk and docket fees, witness fees, and fees for service of summons and subpoena, which represents approximately a 35% reduction of the amount of costs requested ($19,899.69) due to insufficient documentation of certain costs and failure to provide a justification for taxing Special Master John Schraven's fees.

### Total Attorney Fees and Costs Awarded

The total award to Dr. Porter for attorney fees and costs is therefore **$1,186,430.30** ($1,173,621.92 + $12,808.38).

### Prejudgment Interest

The Court DENIES Dr. Porter's request for prejudgment interest on her attorney fees award. (*See* Doc. 300 at 3 n.3, 4 nn.4–5; Doc. 302 at 3, 5 n.3.)

### Postjudgment Interest

The Court GRANTS IN PART AND DENIES IN PART Dr. Porter's request for postjudgment interest. (*See* Doc. 302 at 2, 3.) The Court GRANTS the request for postjudgment interest but DENIES the request to apply Vermont's 12% interest rate. Postjudgment interest shall be calculated from the date of entry of the Judgment in this case—April 24, 2025—until satisfaction of the Judgment, in accordance with the formula set forth in 28 U.S.C. § 1961.

### Motion to Amend Judgment

As explained above, the Court GRANTS IN PART AND DENIES IN PART certain requests contained in Dr. Porter's Motion to Amend Judgment. (*See* Doc. 302 at 1, 3–6.) Regarding the request in that Motion for an award of prejudgment interest on the jury award at the rate of 12% (*see id.* at 1–3), the Court addresses this issue in a separate order.

Dated at Burlington, in the District of Vermont, this 26th day of November 2025.

/s/ Kevin J. Doyle
United States Magistrate Judge

55

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

    Plaintiff,

    v.                                                    Civil Action No. 2:17–cv–194–kjd

Dartmouth-Hitchcock Medical Center et al.,

    Defendants.

## ORDER
(Doc. 305)

Defendants (Dartmouth Health) filed a motion to alter or amend the judgment or, in the alternative, for a new trial on Dr. Porter's claim of disability discrimination under the Vermont Fair Employment Practices Act (VFEPA). After a three-week trial, a jury found by a preponderance of the evidence that Dr. Porter's disability was a motivating factor in Dartmouth Health's decision to terminate Dr. Porter's employment in violation of VFEPA. (Doc. 281 at 3.) Judgment on this claim entered for Plaintiff on April 24, 2025. (Doc. 297.) Dartmouth Health seeks relief under Rule 59 on the grounds that the Court erroneously instructed the jury to apply the "motivating factor" causation standard to the VFEPA claim rather than the higher "but-for" standard. (Doc. 305 at 1.) Dartmouth Health asks the Court to certify the question of the appropriate causation standard to the Vermont Supreme Court. (*Id.* at 11.) Dartmouth Health further contends that the jury instructions contained an incorrect statement of law regarding the "motivating factor" test. (*Id.* at 10.) Dr. Porter opposes the motion, asserting that Dartmouth Health did not preserve all of its objections and that Vermont has consistently applied the "motivating factor" standard to claims under VFEPA. (Doc. 314.)

For the reasons explained below, Dartmouth Health's motion (Doc. 305) is DENIED.

**Standard**

A district court has broad discretion in determining whether to grant a motion to alter or amend the judgment. *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000). Appellate courts review the district court's decision for abuse of discretion and will reverse only if the court's judgment was based on clearly erroneous factual findings or erroneous legal conclusions. *Id.*

A district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 112 n.34 (2d Cir. 2013) (citation modified). Denial of a motion for a new trial under Rule 59 will not be reversed unless denial constituted an abuse of discretion. *See Mirlis v. Greer*, 952 F.3d 36, 48 (2d Cir. 2020).

**Analysis**

I.    **The Court correctly instructed the jury to apply the "motivating factor" standard to the VFEPA claim instead of the "but-for" standard.**

Dartmouth Health contends that the Court should alter the judgment or grant a new trial because the instruction "as to the causation standard for violation of the VFEPA was just plain wrong." (Doc. 305 at 7 (citation modified).) According to Dartmouth Health, "[t]he jury should have been instructed" that Dr. Porter must prove "that her disability was a 'but-for' cause of Dartmouth Health's decision to terminate her employment." (*Id.*) Dartmouth Health notes that VFEPA's disability discrimination provisions "are patterned after the federal Rehabilitation Act, which in turn incorporates standards from the federal Americans with Disabilities Act (ADA)," and contends that the proper standard is "but-for" causation because courts in the Second Circuit apply "but-for" causation to ADA and Rehab Act claims. (*Id.* at 7–8.)

VFEPA provides:

It shall be unlawful employment practice . . . [f]or any employer . . . to harass or discriminate against any individual because of race, color, religion, ancestry,

2

national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age *or against a qualified individual with a disability*.

21 Vt. Stat. Ann. § 495(a)(1) (emphasis added).

With respect to discrimination claims under VFEPA, the Vermont Supreme Court has repeatedly held and recently reiterated that the standards and burdens of proof to be applied under VFEPA are identical to those applied under Title VII of the Civil Rights Act of 1964. *See, e.g.*, *Hammond v. Univ. of Vt. Med. Ctr.*, 2023 VT 31, ¶ 24, 218 Vt. 250, 308 A.3d 421; *Kelly v. Univ. of Vt. Med. Ctr.*, 2022 VT 26, ¶ 17, 216 Vt. 445, 280 A.3d 366; *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 16, 176 Vt. 356, 848 A.2d 310; *Lavalley v. E.B. & A.C. Whiting Co.*, 692 A.2d 367, 370 (Vt. 1997); *Gallipo v. City of Rutland*, 656 A.2d 635, 640 (Vt. 1994); *Hodgdon v. Mt. Mansfield Co.*, 624 A.2d 1122, 1128 (Vt. 1992); *Graff v. Eaton*, 598 A.2d 1383, 1384 (Vt. 1991). Title VII employs the "motivating factor" standard of causation—that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Moreover, the Vermont Supreme Court has consistently applied the "motivating factor" test to claims under VFEPA, including at least one disability discrimination claim. *See, e.g.*, *Hammond*, 2023 VT at ¶¶ 26, 34; *Robertson*, 2004 VT at ¶¶ 18, 22; *Gallipo*, 656 A.2d at 640; *Hodgdon*, 624 A.2d at 1128; *Graff*, 598 A.2d at 1385.

Dartmouth Health argues that the "but-for" standard should apply because after the Second Circuit's decision in *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019), "the equivalent federal claims—namely, the ADA and the Rehabilitation Act—utilize 'but-for' causation rather than 'motivating factor' causation." (Doc. 305 at 8.) The Court disagrees.

3

First, the Vermont Supreme Court has never suggested that a different causation standard applies to disability discrimination than to the other categories protected by VFEPA. To the contrary, the Vermont Supreme Court recently had the opportunity in *Hammond* to apply "but-for" causation to a disability discrimination claim post-*Natofsky* and did not do so. *Hammond* involved race and disability discrimination claims and a retaliation claim under VFEPA. 2023 VT at ¶ 21. The Vermont Supreme Court outlined "the legal framework applicable to employment discrimination and retaliatory discharge claims under Vermont's FEPA"—drawing no distinction between the disability discrimination and race discrimination claims—and stated that VFEPA "makes it unlawful for an employer to discriminate against any individual based on race or disability." *Id.* at ¶ 24. *Hammond* also reaffirmed that "the standards and burdens of proof under [the] FEPA are identical to those under Title VII." *Id. Hammond* does not reference the ADA or the Rehabilitation Act at all.

Second, state courts interpreting statutes similar to VFEPA have applied the "motivating factor" standard to disability discrimination claims, not the "but-for" standard. *See Lavalley*, 692 A.2d at 369 (citation modified) ("Federal decisions represent persuasive authority on the proper interpretation of FEPA. They are not, however, the only sources of persuasive authority. Many states have enacted employment discrimination laws patterned in whole or in part on Title VII. Decisions from the courts of those states are also sources of persuasive authority."). Vermont prohibits employment discrimination with a comprehensive statute covering a series of protected traits. *See* Sandra F. Sperino, *Revitalizing State Employment Discrimination Law*, 20 Geo. Mason L. Rev. 545, 567 (2013) (describing such an approach as a "unified statutory regime"). By contrast, federal "civil rights protections against employment discrimination are scattered" across several statutes that protect different traits, resulting in "numerous fractures in

the federal law . . . depending upon the statute involved." *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 10 (Iowa 2014). Courts in states with similar unified employment discrimination statutes, in the absence of statutory language providing the causation standard, have applied the "motivating factor" standard to disability discrimination claims. *See, e.g., Wallace v. Caring Sols., LLC*, 278 A.3d 586, 602 (Conn. App. Ct. 2022); *McClure v. E. I. du Pont de Nemours & Co.*, 23 N.W.3d 33, 41 (Iowa 2025); *Stoughton Trailers, Inc. v. Lab. & Indus. Rev. Comm'n*, 2007 WI 105, ¶¶ 36, 70–71, 303 Wis. 2d 514, 735 N.W.2d 477. Dartmouth Health has not cited any cases in which a state court applied "but-for" causation to a disability discrimination claim brought under a unified statutory regime such as VFEPA.

Third, the plain text and the remedial purpose of VFEPA support the "motivating factor" standard. As the Connecticut Appellate Court recently observed, a legislature's choice to enact one comprehensive employment discrimination law indicates that lawmakers intended a single uniform standard to apply to all protected classes:

> Our legislature has chosen not to follow the legislative approach taken by Congress of adopting different statutes to address different types of employment discrimination with varying causation burdens. Our legislature's decision to include multiple types of unlawful employment discrimination within a single statutory provision, without setting out distinctive standards for the different types, leads to the logical conclusion that it intended that the same standard of proof be applied to all the types of discrimination set forth in [the employment discrimination statute].

*Wallace*, 278 A.3d at 602 (citation modified). Moreover, the motivating factor standard—as opposed to the higher "but-for" standard—is "consistent with the remedial purpose of [VFEPA] to deter and to eradicate discrimination in the state." *See Payne v. U.S. Airways, Inc.*, 2009 VT 90, ¶ 21, 186 Vt. 458, 987 A.2d 944 (citation modified).

The Court is not persuaded by Dartmouth Health's argument that "the plain language of the VFEPA distinguishes between those categories protected by Title VII and the categories

protected by the ADA." (Doc. 324 at 4.) VFEPA makes it unlawful for an employer "to harass or discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability." 21 Vt. Stat. Ann. § 495(a)(1). Dartmouth Health appears to argue that because under VFEPA an employer shall not "harass or discriminate . . . against a qualified individual with a disability," the statute reserves the causation language—"because of"—for the non-disability traits. In other words, Dartmouth Health posits that by excluding disability from the "because of" clause, the legislature distinguished between disability discrimination claims and other claims under VFEPA. But the Vermont Supreme Court has consistently applied the "because of" causation language to disability claims under VFEPA. *See, e.g.*, *Hammond*, 2023 VT at ¶¶ 35, 37; *Gates v. Mack Molding Co., Inc.*, 2022 VT 24, ¶ 16, 216 Vt. 379, 279 A.3d 656; *Knapp v. State*, 729 A.2d 719, 720 (Vt. 1998).

Further, the cases Dartmouth Health cites do not compel the conclusion that the "but-for" standard applies to discrimination claims on the basis of disability under VFEPA. Dartmouth Health cites *Newton v. Kohl's, Inc.*, Case No. 5:21-cv-268, 2024 WL 4986303, at *13 (D. Vt. Nov. 12, 2024), to argue that "[t]he jury should have been instructed that, for Dr. Porter to succeed on her VFEPA claim, she must have proven that her disability was a 'but-for' cause of Dartmouth Health's decision to terminate her employment." (Doc. 305 at 7.) The Court disagrees. *Newton* first cited *Hammond* to observe that "[t]he VFEPA is patterned after Title VII . . . and uses identical standards and burdens of proof as Title VII." *Newton*, 2024 WL 4986303, at *4. Later in the decision, the court noted that VFEPA's disability-discrimination provisions "are patterned after the federal Rehabilitation Act, which in turn incorporates standards from the federal Americans with Disabilities Act." *Id*. at *13. And in summarizing the *federal* anti-

6

discrimination framework, the court explained that the ADA applies the "but for" standard. *Id*. However, *Newton* noted that "the court looks to both state and federal case law to guide its analysis" of VFEPA's disability discrimination provisions. *Id*. The Court does not read *Newton* to hold that disability discrimination claims under VFEPA must meet the "but-for" standard. *Newton* did not reach the question of the causation standard under VFEPA because the employee did not establish a prima facie case of disability discrimination. Specifically, Newton could not show that she was an "individual with a disability" and, consequently, she could not demonstrate that she suffered an adverse employment action because of her disability. *Id.* at *14.

Dartmouth Health cites several cases for the proposition that "Vermont courts have consistently held that the VFEPA follows the standards and burdens of proof articulated for the equivalent federal disability discrimination claims." (Doc. 305 at 7.) Each of the cited cases is distinguishable. *Gates v. Mack Molding Co., Inc.*, 279 A.3d 656 (Vt. 2022) and *Mueller v. Rutland Mental Health Servs., Inc.*, 2006 WL 2585101 (D. Vt. Aug. 17, 2006) both address failure-to-accommodate under VFEPA, a claim that has different elements from the claim at issue in this case. *Caldwell v. Champlain Coll. Inc.*, 2025 VT 17, ¶ 12, 336 A.3d 423, 427 (Vt. 2025). The standards and burdens of proof under VFEPA are identical to those under the ADA for failure-to-accommodate claims, *Mueller*, 2006 WL 2585101 at *2, but that is simply because Title VII does not contain provisions related to reasonable accommodations for disability.

In *Kennedy v. Department of Public Safety*, 719 A.2d 405, 406 (Vt. 1998), the Vermont Supreme Court did not discuss the legal standards or burdens of proof applicable to VFEPA claims, noting only that it looks to interpretations of the Rehabilitation Act "in determining whether plaintiff has met the elements of his [VFEPA] claim." Finally, *State of Vermont v. G.S. Blodgett Co.*, 656 A.2d 984 (Vt. 1995) considered a failure-to-accommodate claim under

7

VFEPA. The court generally observed that its consideration of VFEPA disability discrimination claims "look[s] to federal case law to guide [its] interpretation, the allocations of burdens and standards of proof," but the court did not examine the causation standard for disability discrimination claims under VFEPA because the parties agreed on every element of the claim except whether the employee was a "qualified handicapped individual." *Id*. at 988.

In short, longstanding precedent, recent case law, the plain language and purpose of VFEPA, and decisions of other state courts interpreting similar statutes support the application of the "motivating factor" standard to disability discrimination claims under VFEPA. Dartmouth Health has not demonstrated that the Court erred in its "motivating factor" instruction on the VFEPA claim.

**II.  The Court properly instructed the jury that Dartmouth Health could not avoid liability under VFEPA by proving that it would have terminated Dr. Porter's employment in the absence of a discriminatory motivation.**

Dartmouth Health contends that "the jury in this matter was instructed *exactly the opposite* of what the Vermont Supreme Court said is required of motivating factor causation." (Doc. 305 at 10.) Dartmouth Health argues that the jury should have been instructed that a defendant may avoid liability under the "motivating factor" standard by proving "that it would have made the same decision 'even absent the discriminatory motive.'" (*Id*. (quoting *Knapp v. State*, 168 Vt. 590, 592, 729 A.2d 719, 721 (1998)) (emphasis omitted).) Because the jury instructions provided that "an employer <u>cannot</u> avoid liability by proving that it would still have taken the same adverse action in the absence of discriminatory motivation," Dartmouth Health contends that it is entitled to an amended judgment. (Doc. 305 at 10.)

As a threshold matter, Dartmouth Health did not preserve this objection at trial. *See, e.g., John Wiley & Sons, Inc. v. Kirtsaeng*, 654 F.3d 210, 223 (2d Cir. 2011) (citation modified) ("Failure to object to a jury instruction prior to the jury retiring results in a waiver of that

8

objection."), *rev'd and remanded on other grounds*, 568 U.S. 519 (2013). Dartmouth Health objected to the use of the "motivating factor" standard rather than the "but-for" standard (Doc. 295 at 51:2–9), but it did not request any other changes to the instruction (*id.* at 51:10–12). Dartmouth Health did not raise an objection that "sufficiently called the court's attention" to the language in the instruction that Dartmouth Health now challenges. *See Ashley v. City of New York*, 992 F.3d 128, 142 (2d Cir. 2021).

In any event, the Court finds no error in the instruction. As discussed above, the standards and burdens of proof to be applied under VFEPA are identical to those applied under Title VII. Title VII expressly permits liability even if the defendant proves it would have "taken the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B)(i). The jury instruction properly reflected the standards and burdens of proof established in Title VII.

*Knapp* does not compel a different conclusion. *Knapp* expressly "based [its] determination on *Price Waterhouse v. Hopkins*, [a 1989 decision] where the Supreme Court held that [shifting the burden to the employer to show that it would have taken the same adverse action in the absence of discriminatory motive] was appropriate in employment discrimination cases" under Title VII. *Knapp*, 729 A.2d at 721. But Congress amended Title VII to overrule the portion of the *Price Waterhouse* burden-shifting framework upon which *Knapp* relied. As one district court explained:

> In 1991, Congress amended Title VII and partially overruled *Price Waterhouse* when it enacted the Civil Rights Act of 1991. Section 107 of the 1991 Act permitted a finding of liability if the plaintiff demonstrated that "race, color, religion, sex, or national origin was a motivating factor" for the adverse employment decision, "even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). Section 107 also provided that, once a plaintiff established a violation under § 2000e–2(m) by demonstrating that race, color, religion, sex, or national origin

9

> was a motivating factor for the defendant employer's adverse employment deci-
> sion, the employer would not be absolved of liability by proving it would have
> made the same decision even in the absence of such consideration . . . .

*King v. United States*, 694 F. Supp. 2d 1020, 1023 (N.D. Iowa 2010) (citation modified).[1] Since

*Knapp*, the Vermont Supreme Court has reiterated several times that VFEPA applies the

standards and burdens of proof of Title VII. *See, e.g.*, *Hammond*, 2023 VT at ¶ 24; *Kelly*, 2022

VT at ¶ 17; *Robertson*, 2004 VT at ¶ 16. Moreover, the Vermont legislature has amended

VFEPA several times since Congress amended Title VII, but it has not opted to distinguish

VFEPA's standards and burdens of proof from those of Title VII or to codify the language from

*Price Waterhouse* that Congress overruled. *See State v. Messier*, 2005 VT 98, ¶ 10, 178 Vt. 412,

885 A.2d 1193 (citation modified) ("We must presume that the Legislature made changes in the

law in light of the relevant decisions of this Court, and with knowledge of prior legislation on the

same subject.").

Because the challenged jury instruction tracks the standards and burdens of proof

established by Title VII, Dartmouth Health has not shown error warranting an amended

judgment.

**III.    Vermont precedent is adequate for this Court to determine the VFEPA causation standard without certification to the Vermont Supreme Court.**

Dartmouth Health asks the Court to "certify to the Vermont Supreme Court the question

of the appropriate causation standard for a disability discrimination-based VFEPA claim." (Doc.

305 at 11.)

---

[1] As the court further explained, while an employer could not avoid liability by showing that it would have made the same decision even in the absence of the prohibited consideration, "such proof merely restricted the remedies to which a plaintiff who proved a violation . . . was entitled." *King*, 694 F. Supp. 2d at 1023 & n.5. This limitation of remedies under the amended Title VII is immaterial to the damages award in this case. Unlike Title VII, VFEPA draws no distinction between "motivating factor" remedies and "but for" remedies. *See* 21 V.S.A. § 495b(b) ("Any person aggrieved by a violation of the provisions of this subchapter may bring an action . . . seeking compensatory and punitive damages or equitable relief, including restraint of prohibited acts, restitution of wages or other benefits, reinstatement, costs, reasonable attorney's fees, and other appropriate relief.").

The Court may certify "an unsettled and significant question of state law that will control the outcome of a pending case" to the Vermont Supreme Court. L.R. 74(a); *see also* Vt. R. App. P. 14(a) ("The Vermont Supreme Court may answer a question of Vermont law certified to it by a federal court if the answer might determine an issue in pending litigation and there is no clear and controlling Vermont precedent."). Certification is appropriate "where state law is not clear and state courts have had little opportunity to interpret it, where an unsettled question of state law raises important issues of public policy, where the question is likely to recur, and where the result may significantly impact a highly regulated industry." *Jenkins v. Miller*, Case No. 2:12-cv-184, 2017 WL 4402431, at *7 (D. Vt. Sept. 29, 2017), *modified*, 2018 WL 11418392 (Aug. 29, 2018).

However, courts should "resort to certification only sparingly, mindful that, in diversity cases that require [the court] to apply state law, it is [the court's] job to predict how the [state's highest court] would decide the issues before" the court. *Amerex Grp., Inc. v. Lexington Ins. Co.*, 678 F.3d 193, 200 (2d Cir. 2012) (citation modified). "Certification is to be used in those cases where there is a split of authority on the issue or when presented with a complex question of state common law for which no state authority can be found." *Knapik v. Mary Hitchcock Mem'l Hosp.*, Case No. 5:12-cv-175, 2014 WL 12717446, at *1 (D. Vt. May 30, 2014) (citation modified). Even when state law is unclear or uncertain, courts should not certify questions of law when "sufficient precedents exist for [the court] to make a determination." *See Amerex Grp., Inc.*, 678 F.3d at 200 (citation modified).

As discussed above, the Vermont Supreme Court has repeatedly held that the standards and burdens of proof to be applied under VFEPA are identical to those applied under Title VII, including in the disability discrimination context. *See, e.g.*, *Hammond*, 2023 VT at ¶ 24. There is

11

no dispute that Title VII requires the "motivating factor" standard. 42 U.S.C. § 2000e-2(m).

Considering Vermont precedent on this issue, this Court predicts that the Vermont Supreme

Court would apply the "motivating factor" test to a disability discrimination claim under

VFEPA.

Therefore, the Court denies Dartmouth Health's request to certify this question of law to

the Vermont Supreme Court.

### Conclusion

For the reasons explained above, Dartmouth Health's Motion to Alter or Amend the

Judgment and, in the Alternative, for a New Trial on Plaintiff's VFEPA Claim (Doc. 305) is

DENIED.

Dated at Burlington, in the District of Vermont, this 26th day of November 2025.

*/s/ Kevin J. Doyle*
United States Magistrate Judge

12

SPA-84

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| Misty Blanchette Porter, M.D., | |
| Plaintiff, | |
| v. | Civil Action No. 2:17–cv–194–kjd |
| Dartmouth-Hitchcock Medical Center et al., | |
| Defendants. | |

**ORDER**
(Doc. 308)

Contending that the Court committed several errors during the trial of this case, Defendants (Dartmouth Health) move under Federal Rule of Civil Procedure 59 for a new trial limited to the issue of Dr. Porter's damages. First, Dartmouth Health argues that the testimony of Dr. Porter's damages expert, Dr. Bancroft, should have been excluded due to untimely disclosure under Rule 26. Second, Dartmouth Health challenges the Court's jury instructions on economic damages for failing to clearly instruct the jury to consider Dr. Porter's earnings from her job at the University of Vermont Medical Center (UVMMC). Third, Dartmouth Health objects to the Court's exclusion of a note written by Dr. Bancroft on cross-examination. The note consists of three numbers Dr. Bancroft wrote after defense counsel requested that he perform alternative damages calculations. Finally, Dartmouth Health claims that the Court improperly restricted its closing arguments concerning a severance offer Dartmouth Health extended to Dr. Porter. Dr. Porter opposes Dartmouth Health's Motion.

For the reasons explained below, Dartmouth Health's Motion (Doc. 308) is DENIED.

SPA-85

**Standard**

"A district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 112 n.34 (2d Cir. 2013) (citation modified). In reviewing a motion for a new trial, the Court must view the evidence in the light most favorable to the nonmoving party. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 624 (2d Cir. 2001).

**Analysis**

**I.     Dartmouth Health has not shown error under Rules 26 and 37 warranting a new trial.**

Dartmouth Health contends that the Court erred by admitting testimony and exhibits offered by Dr. Porter's expert damages witness, Dr. Bancroft, because Dr. Porter failed to timely disclose several of his expert opinions under Rule 26. According to Dartmouth Health, "[p]laintiff was permitted multiple, late, unjustified revisions to her expert reports and opinions to be presented [at] trial," including "a drastic revision less than a week before trial," and Dartmouth Health "thus had to face unwarned, constantly evolving, weakly-based and sharply prejudicial expert opinions and was not permitted" to "disclose its expert economist to appropriately rebut these repeated, new opinions." (Doc. 308 at 4.) Dartmouth Health argues that Dr. Porter's Rule 26 violations warranted exclusion of Dr. Bancroft's testimony in its entirety.

Rule 26(e)(1) provides:

A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

2

Rule 26(e) "does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect." *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011). A party's duty to "supplement its initial expert report does not arise when [the party] seeks to bolster its earlier submission, but rather, arises only if the expert *subsequently* learns of information that was previously unknown or unavailable, that renders information previously provided in an initial report inaccurate or misleading because it was incomplete." *Levinson v. Westport Nat. Bank*, Civil Action No. 3:09-CV-1955(VLB), 2013 WL 3280013, at *4 (D. Conn. June 27, 2013) (citation modified) (alteration in original). Therefore, "if an expert's report does not rely on any information that was previously unknown or unavailable to him, it is not an appropriate supplemental report under Rule 26." *Id.* at *5 (citation modified). In other words, Rule 26 permits supplemental expert reports after the deadlines provided in the Rule "only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." *Minebea Co., Ltd. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005).

With respect to the August 26, 2024 supplemental report, a motion for a new trial may be based only on the grounds on which the party objected at the time the evidence was offered for admission. *See Rivenburgh v. CSX Transp.*, 280 F. App'x 61, 63–64 (2d Cir. 2008) (summary order); Fed. R. Evid. 103. Dartmouth Health did not object under Rules 26 and 37 to the timeliness of the disclosure of Dr. Bancroft's August 26 report in motions in limine or at trial. (*See, e.g.*, Doc. 198.) Dartmouth Health challenged Dr. Bancroft's testimony under Rule 702. (*Id.*) For this reason, Dartmouth Health has waived its timeliness arguments concerning the August 2024 report.

Even assuming Dartmouth Health has not waived its arguments, it has not shown that the timing of the August 2024 disclosure warrants a new trial. The October 1, 2019 expert report calculated Dr. Porter's lost earnings and employment costs assuming that she left her full-time position at UVMMC in June 2021 to obtain a position closer to her home in Norwich, Vermont. (Doc. 198-3 at 2.) Dr. Porter ultimately remained at UVMMC full-time longer than she had anticipated. However, this Court granted summary judgment for Dartmouth Health on all claims on November 4, 2020. (Doc. 153.) In other words, Dr. Porter did not submit an updated expert report because her case was not expected to proceed to trial at that time. On February 27, 2024, the Second Circuit vacated judgment on Dr. Porter's claims of disability discrimination, whistleblower discrimination, and wrongful discharge and remanded the case for trial. (Doc. 157-1 at 100.) After remand, Dr. Porter supplemented her expert's report based on information that was not available in 2019—that she would continue working full-time at UVMMC. This is precisely the type of correction that Rule 26(e) requires.

The Court further finds that the timing of the disclosure of Dr. Bancroft's March 19, 2025, supplemental report does not warrant a new trial. The March 2025 supplemental report was a direct response to defense counsel's cross-examination of Dr. Bancroft at a hearing on Dartmouth Health's motion to exclude Dr. Bancroft from testifying as an expert witness at trial. Cross-examination elicited that Dr. Bancroft was unaware of certain information relevant to his calculations, including that Dartmouth Health instituted salary freezes in 2020 and 2021 and that Dr. Porter received a $7,698 tuition credit for her son's undergraduate education at UVM in 2019. Dr. Bancroft subsequently updated his report on March 19 to incorporate this new information. Dartmouth Health plainly knew this information before Dr. Bancroft issued his March 19 report, as defense counsel raised the issue at the evidentiary hearing. *Cf. Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1332 (10th Cir. 2004) (citation modified) ("On occasion it may be appropriate to permit the

4

party using the expert to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning.") Moreover, Dr. Bancroft did not change the substance of his opinion. He used the same methodology in his March supplemental report as in his prior reports, changing only the inputs to produce updated damages calculations.

The Court does not share Defendants' view that Dr. Bancroft issued his corrective March 2025 report because his testimony at the March 12 evidentiary hearing revealed that his August 2024 report "had not included key facts and assumptions . . . such as Dr. Porter's promotion to full professor in July 2023 and her most recent earnings from UVMMC at a higher rate of pay than what Dr. Bancroft had projected." (Doc. 308 at 3.) Rather, Dr. Bancroft testified at the hearing that although he was uncertain whether he knew at the time of his August 2024 report that Dr. Porter became a professor in summer 2023, he *did* know Dr. Porter's compensation for the relevant period of time after she became a professor and used that information to predict her annual salary. (*See* Doc. 230 at 28:7–29:24, 45:24–46:14.) Dr. Porter's salary—not her job title— appropriately factored into Dr. Bancroft's assessment of her damages.

Even if the disclosures were untimely, admitting Dr. Bancroft's testimony was not error because the disclosures were substantially justified or harmless under Rule 37. The Second Circuit has identified a broad range of non-exclusive factors to consider when deciding whether to preclude evidence as a sanction for failure to disclose. *Negron v. Cigna Health & Life Ins. Co.*, No. 3:16-cv-01702 (JAM), 2021 WL 2010788, at *4 (D. Conn. May 20, 2021). In one case, the Second Circuit instructed courts to consider: (1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Funk v. Belneftekhim*, 861 F.3d 354, 366 (2d Cir. 2017). In another case, the non-exclusive factors included: (1) the party's explanation for the failure to comply with the

disclosure requirement; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new evidence; and (4) the possibility of a continuance. *See Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (citation modified). Any sanctions imposed under Rule 37 must be "just," and their severity must be "commensurate with the non-compliance." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007).

The first factor—the willfulness of the non-compliance regarding the March 2025 report and the reason for the noncompliance—does not weigh definitively in either party's favor. Dr. Porter knew well before March 2025 that she had received a $7,698 tuition credit for her son's undergraduate education at UVM in 2019, and Dr. Bancroft could have included that information in his August 2024 report. On the other hand, Dartmouth Health knew that it had approved salary freezes in 2020 and 2021, and Dartmouth Health does not allege that Dr. Porter or Dr. Porter's expert had that information until March 2025. Dr. Porter also explained that she had asked UVMMC to adjust her schedule to a .6 FTE with no call obligation, but UVMMC had not yet agreed to that arrangement as of trial. (Doc. 236 at 2.) Therefore, Dr. Porter worked .75 FTE instead of the predicted .6 FTE with no call, and the March 2025 report accounted for this change in Dr. Bancroft's revised damages calculations. The first factor is therefore inconclusive.

The efficacy of lesser sanctions and the possibility of a continuance weigh against excluding Dr. Bancroft's testimony. Dartmouth Health's proposed alternative—introducing its own expert witness to rebut Dr. Bancroft's supplemental report—was simply not feasible only four days before a three-week trial. *See* Fed. R. Civ. P. 26(a)(2) (providing for disclosure of expert witnesses and specifying deadlines for disclosures of experts and rebuttal experts). Dartmouth Health did not identify or provide any information about its proposed expert witness or explain why it did not disclose an expert witness sooner in compliance with the Federal Rules.

6

Nor did Dartmouth Health offer any proposals for reopening discovery in the middle of trial beyond suggesting that it could "offer the Plaintiff the opportunity to depose its expert economist witness prior to testimony, perhaps over one of the weekends during trial." (Doc. 235 at 7 n.3.) Dartmouth Health itself acknowledged it was "not yet able to determine" whether it was "fully viable" to produce an expert witness only four days before trial. *Id.* at 7. As the Court previously explained, "[t]he untimely disclosure and the absence of an expert report may prejudice Dr. Porter by denying her a clear understanding of the expert's intended testimony and compromising her ability to prepare effective cross-examination or rebuttal evidence." (Doc. 238 at 16.) Nor was the Court obligated to continue an anticipated three-week trial—with multiple out-of-state witnesses scheduled to testify—to cure the potential prejudice, particularly when Dartmouth Health did not make this request. *See Patterson*, 440 F.3d at 118 (citation modified) ("Though a continuance might have cured the alleged prejudice to Patterson, Balsamico cannot rely on this possibility when there is no indication in the record that he requested a continuance at the time. Given the fact that, after almost four years of litigation, the case was set for trial within ten days of Balsamico's Rule 26(a)(3) disclosure, we cannot say that the district court was obligated to continue the trial on its own initiative.").

The duration of noncompliance factor is inconclusive. As discussed above, although Dr. Porter was aware of some information that impacted her expert's damages calculations well in advance of the March 2025 report, other information was only in the possession, custody, or control of Dartmouth Health until the March evidentiary hearing. Dr. Bancroft submitted his updated report one week after the evidentiary hearing.

The Court is unaware of any previous warning to Dr. Porter that an untimely supplemental expert report could result in exclusion of the expert witness. This factor weighs against excluding Dr. Bancroft's testimony.

The importance of Dr. Bancroft's testimony also weighs against excluding his testimony. Without Dr. Bancroft's testimony, Dr. Porter would have been severely disadvantaged in quantifying her claimed economic damages. Such a sanction would have been disproportionate to the alleged noncompliance given that the late disclosure had a reasonable basis; Dr. Bancroft's methodology did not change from one report to the next, and Dr. Bancroft's final report substantially reduced Dr. Porter's estimated damages.

The potential for prejudice to the opposing party further weighs against excluding Dr. Bancroft's testimony. As discussed, Dartmouth Health already had a significant amount of the updated information Dr. Bancroft relied on for his March 2025 supplemental report. It is difficult to conceive how admitting the March 2025 report, or Dr. Bancroft's testimony consistent with that report, prejudiced Dartmouth Health given that the report estimated substantially lower damages figures than any of Dr. Bancroft's previous reports.

In sum, the relevant factors weigh against excluding Dr. Bancroft's testimony. On this issue, Dartmouth Health has not demonstrated a seriously erroneous result or a miscarriage of justice warranting a new trial.

## II. Dartmouth Health has not shown that the Court erred in its instructions to the jury on damages.

Dartmouth Health contends that the Court incorrectly instructed the jury on the assessment of damages. "Instructions are erroneous if they mislead the jury as to the correct legal standard or do not adequately inform the jury of the law." *Hudson v. New York City*, 271 F.3d 62, 67 (2d Cir. 2001) (citation modified). When considering challenges to jury instructions, the Court must "review[] the charge as a whole to see if the entire charge delivered a correct interpretation of the law" and, if the charge contains an error, determine whether "the error was prejudicial." *See United States v. Vargas-Cordon*, 733 F.3d 366, 379 (2d Cir. 2013) (citation modified).

Dartmouth Health contends that the Court "did not clearly and directly inform the jury that it could account for and deduct the amount of salary that Dr. Porter received" from her work at UVMMC "from her loss of salary damages." (Doc. 308 at 5.) Dartmouth Health's theory of damages "was that Dr. Porter found another job—with the help of Dartmouth Health medical staff—in her highly specialized subspecialty, and did mitigate her damages." *Id.* at 6. Dartmouth Health challenges one instruction in particular: "If you find that Dr. Porter failed to mitigate her damages, you must reduce your award of damages, if any, by the amount you find she could have avoided." (Doc. 275 at 30.) According to Dartmouth Health, the jury instructions do "not similarly instruct the jury to reduce [Dr. Porter's] damages by the amount she actually avoided through successful mitigation." (Doc. 308 at 6.) In other words, Dartmouth Health contends that "[f]rom these instructions, the jury could read this as, 'we found she mitigated her damages, so we don't need to reduce the award because of this mitigation.'" *Id.*

Dartmouth Health appears to combine two distinct legal concepts: 1) that Dr. Porter's lost earnings after termination from Dartmouth Health were reduced by earnings from her new job at UVMMC; and 2) that Dr. Porter suffered economic damages from termination but, according to Dartmouth Health, those damages should be reduced because Dr. Porter failed to take reasonable steps to minimize her losses ("failure to mitigate"). The instruction Dartmouth Health challenges accurately informs the jury to deduct any damages Dr. Porter could have avoided—by, for example, taking another job—from the damages award. (*Jury Charge*, Doc. 275 at 29-30) ("A plaintiff ordinarily has a general duty to mitigate the damages she incurs, meaning she has a duty to take steps to try to minimize the harm or prevent it from increasing further. In this context, that means Dr. Porter has a duty to attempt to secure or to secure employment that is a suitable alternative to her employment at Dartmouth Health.").

Dartmouth Health contends that the Court should have further instructed the jury to reduce the award by the amount Dr. Porter earned at UVMMC. But the Court had already instructed the jury on how to calculate Dr. Porter's economic damages: "Economic damages include such items as lost income and medical expenses . . . . Dr. Porter is entitled to damages for any earnings lost in the past . . . caused by Dartmouth Health's conduct." (Doc. 275 at 29.) The terms "lost income" and "lost earnings" informed the jury to consider the difference between what Dr. Porter would have earned at Dartmouth Health and what she earned at UVMMC when calculating damages. By definition, "lost earnings" excludes earnings that Dr. Porter actually received. Additional instruction was unnecessary to explain the concept. Dr. Porter's UVMMC earnings are necessarily excluded from what Dr. Porter "lost."

Moreover, the Court is unaware of—and Dartmouth Health has not offered—any authority recommending or applying Dartmouth Health's requested instruction. *Cf. Vt. Civ. Jury Instructions* § 11.5 (Vt. Trial Ct. Civ. Jury Instruction Comm.) (emphasis added) (a plaintiff "is entitled to compensation for *any earnings lost* in the past, and any probable loss of ability to earn money in the future, because of" defendant's violations); Dinse, Berger, & Lane, *Vt. Jury Instructions—Civil & Criminal* § 7.43 (1993) (emphasis added) (a plaintiff "is entitled to be compensated for *all lost earnings or wages* to date caused by the injuries resulting from" defendant's violations).

Even assuming the jury instructions did not adequately inform the jury on how to calculate Dr. Porter's economic damages, the error did not prejudice Dartmouth Health. Dr. Bancroft's expert testimony explicitly subtracted Dr. Porter's actual earnings at UVMMC from the damages projections. (*See* Doc. 235-2 at 3, n. 4–7); (Doc. 290 at 39:3–10, 47:1–8.) And the jury's economic damages award suggests that the jury deducted Dr. Porter's actual earnings when calculating damages. The damages period for back wages alone spanned more than seven years—

10

SPA-94

from Dr. Porter's termination in 2017 to trial in March 2025. Dr. Bancroft projected Dr. Porter's total earnings at Dartmouth Health in 2024 as $391,779, and Dr. Porter actually earned $341,457 at UVMMC that year. (Doc. 235-2 at 3.) But the jury awarded $1,000,000 in economic damages—a much smaller amount than would be expected if the jury had double-counted Dr. Porter's Dartmouth Health income and UVMMC income for several years. The relatively lower award suggests that the jury correctly understood the Court's instructions on lost earnings. Viewing the evidence in the light most favorable to Dr. Porter as the non-moving party, the Court is not "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *See In re Methyl*, 725 F.3d at 112 n.34.

The cases Dartmouth Health cites do not alter the Court's decision. In *Jones v. Consol. Rail Corp.*, 800 F.2d 590 (6th Cir. 1986), the court addressed whether jury instructions properly explained that the plaintiff was entitled to the difference between what he would have earned at his prior job and what he might have earned at a potential new job. *See id.* at 594. *Jones* held that the jury instructions did not adequately explain the law. Specifically, the instruction that the jury "must not award [plaintiff] damages for loss of whatever earnings for the period of time during which he might have worked . . . could refer just as easily to his previous railroad job's wages as to his potential new job's wages." *Id.* (citation modified). As discussed above, however, the phrase "lost earnings" in this case could not reasonably be interpreted to include both Dr. Porter's earnings from UVMMC and her projected earnings at Dartmouth Health. Finally, Dartmouth Health's reliance on *Moysis v. DTG Datanet*, 278 F.3d 819 (8th Cir. 2002) is misplaced because, as Dartmouth Health acknowledges, the case addressed whether an award of front pay constituted an unnecessary windfall. *Id.* at 829.

Dartmouth Health has not shown error in the jury instructions warranting a new trial.

11

III.   **The Court correctly excluded Exhibit C-19 from evidence because the exhibit did not fairly or accurately represent Dr. Bancroft's testimony.**

At trial, Dartmouth Health "sought to elicit key testimony undermining Dr. Bancroft's damages opinions by having him calculate what his projected salary would be if he assumed Dr. Porter [were] working a 1.0 position at UVMMC in three years." (Doc. 308 at 7.) During cross examination, defense counsel provided Dr. Bancroft a calculator and directed him to enter specific numbers, perform certain calculations, and write down the results. (Doc. 290 at 127:7–128:25.) Dartmouth Health subsequently moved to admit that document, marked for identification as C-19, into evidence. The Court denied Dartmouth Health's motion. Dartmouth Health also requested to use Exhibit C-19 as a demonstrative exhibit during closing argument. The Court also denied this motion. Dartmouth Health contends that these denials were "not evenhanded, violated the rules of evidence, and [were] inequitable" because "the figures showed that if" Dr. Porter had worked a 1.0 position at UVMMC, "Dr. Bancroft's damages calculations were essentially fully mitigated by year 2025 or 2026." (Doc. 308 at 7, 8.)

Dartmouth Health primarily argues that Exhibit C-19 was admissible as an admission of a party opponent. (*Id.* at 8-9.) During the trial, the Court explained its reasoning on the record for excluding Exhibit C-19 as substantive evidence and as a demonstrative exhibit. (Doc. 295 at 78–82.) The Court has considered Dartmouth Health's cited authorities and finds no basis to revisit the ruling. The Court further observes that while the note was excluded, counsel was of course free at closing to make use of Dr. Bancroft's testimony associated with the creation of the note. (*Id*. at 82.)

Apart from its admissibility as an evidentiary matter, the Court properly excluded Exhibit C-19 from evidence because of the danger of confusing the issues or misleading the jury. *See* Fed. R. Evid. 403. Assuming Exhibit C-19 is properly considered a "chart," "[s]ummary charts should

12

not be admitted unless a proper foundation is established connecting the numbers on the chart with the underlying evidence." *United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986). "Courts have long required that district courts ascertain that summary charts fairly represent and summarize the evidence upon which they are based. Unless this requirement is met, the chart is more likely to confuse or mislead the jury than it is to assist it." *Id.* (citation modified). A similar requirement applies to demonstrative aids. A court may only exercise its discretion to permit the use of demonstrative aids "accurately summarizing the content of primary testimony." *See Castaldi v. Land Rover N. Am., Inc.*, 363 F. App'x 761, 762 (2d Cir. 2009) (summary order) (citing *United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988)).

Dartmouth Health did not demonstrate that the handwritten note fairly represented the testimony at trial. As the Court previously explained in its verbal decision excluding Exhibit C-19, "the circumstances of the testimony that resulted in the generation of the note raised a significant question about whether it accurately summarizes the testimony. Dr. Bancroft acquiesced in performing the requested calculations while protesting that the calculations were not correct." (Doc. 295 at 81–82, 1050:25–1051:5); (*see also* Doc. 290 at 127:8–25) (testimony by Dr. Bancroft that the calculation defense counsel asked Dr. Bancroft to perform would not accurately reflect Dr. Porter's earnings at UVMMC for 2025 if she had worked a 1.0 FTE position and that Dr. Bancroft would "do it anyways, but it's not correct").

Because Exhibit C-19 did not amount to a fair representation of Dr. Bancroft's testimony, the Court did not err by excluding the exhibit from evidence and denying Dartmouth Health's request to use it as a demonstrative aid.

13

IV.    **Dartmouth Health voluntarily limited its use of the severance offer in its closing argument, and the Court made no express ruling restricting its use.**

Dartmouth Health contends that the Court improperly "limited the extent to which Dartmouth Health could argue at closing that Plaintiff could have mitigated her damages if she had taken" the severance package and that it should have been able to "freely refer[]" to the severance package "in arguing the proper amount of compensatory damages in closing." (Doc. 308 at 9.) The Court first notes that while it raised concerns regarding counsel's intended use of the severance agreement at closing, it made no express ruling barring Dartmouth Health from using the proposed severance agreement as part of a failure to mitigate defense. Further, the colloquy between the Court and Dartmouth Health's counsel on this issue is clear that Dartmouth Health itself elected not to use the severance package as part of a failure to mitigate defense:

> THE COURT: Okay, and then I'll turn now to the plaintiff's motion to preclude any reduction of damages based on conditional offer of severance pay. So having heard the arguments yesterday and considering this, I think that it would be inappropriate to comment on the severance agreement. To the extent I don't know what the defendants might actually argue so I can't really speak specifically to perhaps what the intention is. But would you like to let me know, or I can give you my thoughts on it first? Mr. Schroeder?
>
> MR. SCHROEDER: Sure, Your Honor. I want to make sure we're clear on that. The evidence in the record is that C-13, I believe, I'm certainly going to reference it because C-13 was given after the meeting, which arguably was part of the interactive process.
>
> . . . .
>
> MR. SCHROEDER: And that's all wrapped up in that chronology of events. She argued, and this goes to lack of malice, et cetera, and also just to intent, right?
>
> THE COURT: Lack of malice. You said this yesterday, too. So when you say lack of malice, meaning that Dartmouth was making an effort to reach some type of a severance agreement with her?
>
> MR. SCHROEDER: Exactly, just like they did with the other two physicians at the time.
>
> THE COURT: Okay, **but the argument during closing is not going to be** -- I just want to be really clear -- **it's not going to be making the point that if they should**

14

**find damages, it's going to be reduced by the amount of the severance agreement?**

MR. SCHROEDER: **No, I have no intent of saying that, your Honor.**

THE COURT: Okay.

MR. SCHROEDER: But I want to come back to the fact that this document, I certainly have the ability to discuss it as much as I want, I believe, in terms of admitted evidence into the record, and it relates exactly to the chronology of events. It actually rebuts many of the things that Dr. Porter testified to. I never talked to anybody. Never talked to anybody. Well, no, actually you did. You talked to the head of HR.

THE COURT: Okay.

MR. SCHROEDER: So I want to know that I have free [rein] to at least talk about the document, **not its import in terms of damages**, but I do want to know that I don't have to go rewrite my closing to deal with the fact that I'm addressing -- and I'm going to put it on the screen. Admit it an exhibit. We're not going to have a PowerPoint, but we're going to put in exhibits on the screen, and I want to make sure that I have full carte blanche to discuss what he said in that agreement.

. . . .

THE COURT: All right. So then it sounds like we have clarity on this. Mr. Schroeder, just to be clear then, your discussion of the document, as you said in the ways that you have described, will be fine. We're just talking about the mitigation of the damages issue and the amount of the severance agreement.

MR. SCHROEDER: Understood.

(Doc. 322 at 14:14–15:7, 16:5–17:21, 18:12–20) (emphases added).

Without a limiting ruling, there is no error warranting a new trial. *See, e.g.*, *Winfrey v. Rogers*, 901 F.3d 483, 497 (5th Cir. 2018) ("[A]fter our examination of the record, we conclude that the district court never decided whether Kunkle could testify at trial. . . . Inasmuch as the district court made no decision and issued no ruling, it could not have made an error or otherwise created an issue for appeal."); *United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009) (citation modified) ("By failing to request that the district court rule on the admissibility of that

15

evidence, Basham has waived this argument. . . . It would be difficult to see how the district court committed plain error when it never even issued a ruling to be found in error.").

Because the Court did not issue a ruling limiting use of the severance agreement in the manner Dartmouth Health describes—and at trial Dartmouth Health affirmatively represented that it was not seeking to use the agreement as part of a failure to mitigate defense—its argument that the Court committed error on this issue is without merit and a new trial is not warranted on this ground.

### Conclusion

For the reasons explained above, Dartmouth Health's Motion for a New Trial Related to Damages Issues (Doc. 308) is DENIED.

Dated at Burlington, in the District of Vermont, this 26th day of November 2025.

/s/ Kevin J. Doyle
United States Magistrate Judge

16

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

     Plaintiff,

     v.                                 Civil Action No. 2:17–cv–194

Dartmouth-Hitchcock Medical Center,
Dartmouth-Hitchcock Clinic,
Mary Hitchcock Memorial Hospital, and
Dartmouth-Hitchcock Health,

     Defendants.

**AMENDED JUDGMENT IN A CIVIL ACTION**

☒ **Jury Verdict**

☐ **Decision by Court**

**IT IS ORDERED AND ADJUDGED** that pursuant to the Jury Verdict Form filed on April 10, 2025 (Doc. 281), Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health are liable to Plaintiff Misty Blanchette Porter, M.D., under the Vermont Fair Employment Practices Act; and Defendants are not liable to Plaintiff under the New Hampshire Whistleblowers' Protection Act, the Americans with Disabilities Act, the Rehabilitation Act, the New Hampshire Law Against Discrimination, and New Hampshire's laws prohibiting wrongful discharge.

Pursuant to the jury verdict, Plaintiff is awarded $1,000,000 for economic damages, and $125,000 for non-economic damages, for a total of **$1,125,000**. By Order of the Court (*see* Doc. 334), Plaintiff is also awarded prejudgment interest on that amount through April 24, 2025, at the rate of 12%, totaling **$225,340.62**.

In addition, by Order of the Court (*see* Doc. 335), Plaintiff is awarded **$1,173,621.92** in attorney fees, plus **$12,808.38** in costs.

Accordingly, JUDGMENT IS HEREBY ENTERED in favor of Plaintiff and against Defendants in the total amount of **$2,536,770.92**.

Post-judgment interest is to be calculated from the date this judgment is entered until the date of payment, in accordance with the formula set forth in 28 U.S.C. § 1961.

*JEFFREY S. EATON*
*CLERK OF COURT*

Date:   12/2/2025

*/s/ Carl Crawford*
*Signature of Clerk or Deputy Clerk*

JUDMENT ENTERED ON DOCKET
DATE: 12/2/2025

SPA-102

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

    Plaintiff,

    v.                                  Civil Action No. 2:17–cv–194

Dartmouth-Hitchcock Medical Center,
Dartmouth-Hitchcock Clinic,
Mary Hitchcock Memorial Hospital, and
Dartmouth-Hitchcock Health,

    Defendants.

## ORDER
(Docs. 198, 235)

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth Health") filed a Motion *In Limine* to exclude in full the testimony of Plaintiff's expert witness, Dr. Robert Bancroft. (*See generally* Doc. 198.) Dr. Porter seeks to introduce Dr. Bancroft's testimony on her economic losses, including lost wages, lost benefits, compensatory damages, and future lost income. (*See* Doc. 208 at 3.)

Dartmouth Health asks the Court to exclude Dr. Bancroft's testimony for two reasons. First, Dartmouth Health argues that Dr. Bancroft is unqualified because he lacks sufficient experience with employment cases and because his expert report relies on speculation and opinion. (*See* Doc. 198-1 at 4–6.) Second, Dartmouth Health contends that Dr. Bancroft's testimony is not reliable because his expert report incorporates several of Dr. Porter's predictions regarding her future earning potential and because Dr. Bancroft assumes that Dr. Porter's damages should be increased to account for taxes (that is, "grossed up"). (*Id.* at 7.)

Dr. Porter opposes Dartmouth Health's Motion. (*See generally* Doc. 208.) The Court held an evidentiary hearing on March 14, 2025. On March 20, 2025, Dartmouth Health filed its Renewed Motion to Preclude the Testimony of Robert Bancroft Based on New March 19, 2025 Report. (Doc. 235.) Dr. Porter filed her memorandum in opposition to the Renewed Motion on March 21, 2025. (Doc. 236.)

**Standard**

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 obligates the court to serve as a gatekeeper for expert testimony, ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

Although the proponent of the expert testimony bears the burden of establishing by a preponderance of the evidence that the demands of Rule 702 are met, "the district court is the ultimate gatekeeper," *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted), and the court has "broad latitude" to admit or exclude proffered expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142, 153 (1999). "[T]he Second Circuit has espoused a particularly broad standard for the admissibility of expert testimony," *Sec. Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 275 (S.D.N.Y. 2016)

2

(internal quotation marks and alterations omitted), where exclusion is "the exception rather than the rule." *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (quoting Fed. R. Evid. 702 Advisory Comm. Note (2000)).

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also United States v. LaVictor*, 848 F.3d 428, 444 (6th Cir. 2017) (holding that "[a]ny emerging prejudice [from an expert witness's testimony] was addressed during cross-examination").

To determine whether the requirements of Rule 702 have been satisfied, the Court considers: (1) the proposed expert's qualifications; (2) whether the expert's opinion is based on reliable data and methodology; and (3) whether the expert's testimony will assist the trier of fact. *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005).

## A.     Dr. Bancroft's Qualifications

A witness may give opinion testimony if "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The Court first asks "whether the proffered expert has the educational background or training in a relevant field by looking at the totality of the witness's background." *I.M. v. United States*, 362 F. Supp. 3d 161, 192 (S.D.N.Y. 2019) (internal alterations and quotation marks omitted). Next, the Court "compare[s] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony to ensure that the expert will actually be testifying on issues or subject matters within his or her area of expertise." *Id.* (internal quotation marks omitted). "Courts in the Second Circuit liberally construe the expert qualifications requirement, and generally will not exclude expert testimony provided the expert has educational and experiential qualifications in a

3

general field closely related to the subject matter in question." *Id.* (internal quotation marks omitted); *see also United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (holding that the qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the Rule").

Dr. Bancroft has extensive education and work experience in a field relevant to Dr. Porter's economic losses: applied economics. Dr. Bancroft holds a bachelor's degree in economics from the University of Vermont ("UVM"); a Master of Science in agricultural economics from UVM; and a Ph.D. in agricultural economics from Purdue University. (Doc. 198-4 at 2, 4:15–19.) Agricultural economics focuses more on practical application of economics than on economic theory. (*Id.* at 2–3, 4:20–5:8.) Individuals with advanced degrees in agricultural economics work in a range of disciplines including labor, natural resources, and business management. (*Id.*)

From June 1979 until August 1981, Dr. Bancroft worked for the United States Department of Agriculture to develop an econometric forecasting model to forecast farmers' participation in certain government programs and to provide testimony and research to the U.S. House of Representatives. (*Id.* at 3, 6:8–8:3.) Next, Dr. Bancroft began work as an assistant professor in the Department of Agriculture and Resource Economics—later renamed the Department of Community Development and Applied Economics—at the University of Vermont in August 1981. (*Id.*) Dr. Bancroft continued as an assistant professor of economics until 1991, when he became an adjunct professor. (Doc. 230 at 10:5–11.) He worked as an adjunct professor of economics until 1996. (*Id.*)

Dr. Bancroft's proffered testimony on economic losses falls squarely within his area of expertise. While at UVM, Dr. Bancroft started a solo practice as an economic consultant in

4

October 1981. (Doc. 198-4 at 3, 8:4–7.) His practice as an economic consultant has been his primary occupation since approximately 1986. (Doc. 230 at 10:12–16.) Dr. Bancroft estimates that 70% of his work in his thirty-eight years as a consultant has been in the field of forensic economics. (Doc. 198-4 at 5, 14:3–15.) In the last five years, that percentage has increased to "pretty much 100%." (*Id.* at 14:25–15:19.) Dr. Bancroft has been retained in over 2,500 lawsuits. (*Id.*) Since the early 2000s, Dr. Bancroft estimates that 20% of his cases relate to employment lawsuits. (*Id.*) Considering Dr. Bancroft's extensive credentials in the field of applied economics, including his education, experience, and general knowledge of the subject matter, the Court finds him qualified to offer expert testimony on Dr. Porter's damages.

Although Dartmouth Health points out that Dr. Bancroft has not testified in many, if any, employment cases over the last several years, (Doc. 198-1 at 4–5), that does not impact Dr. Bancroft's qualifications as an expert witness. The threshold question under Rule 702 is "whether the witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions," not whether the expert has recent experience testifying at trial. *Nimely*, 414 F.3d at 396, n.11 (internal quotation marks omitted); *see also, e.g.*, *First Marblehead Corp. v. House*, 541 F.3d 36, 41 (1st Cir. 2008) (although defendant's expert witness was not certified financial planner who focused entirely on individual investment decisions, expert, who had extensive consulting experience in economics, finance, and strategy and provided investment advice to employees and accredited investors, was qualified to testify about how individuals choose investments and arrange portfolios); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) ("It is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."); Dr. Porter

5

has shown that Dr. Bancroft is qualified by education and experience to give his opinion on Dr. Porter's economic losses. Such a showing is sufficient for the first step in the Court's inquiry.

Dartmouth Health also contends that Dr. Bancroft is unqualified because he relies on subjective experience and speculation for his opinions. (Doc. 198-1 at 5–6.) In particular, Dartmouth Health contends that Dr. Bancroft's opinions are speculative because: (1) he relied on "imprecise statistical evidence," including a 2.5% annual salary increase, to support his findings; (2) he considers multiple possibilities for Dr. Porter's career; (3) he "assumes that Dr. Porter would remain employed at Dartmouth Health on a full-time basis until 2033;" (4) his most recent report, in which he assumes that Dr. Porter will not leave her full-time position at UVM until January 2025, differs from an assumption used in an earlier report; (5) "Dartmouth Health is unfairly held responsible for . . . Dr. Porter's voluntary decision to fundamentally alter her work arrangements with UVM by assuming a part-time position;" and (6) he inappropriately applied Vermont's statute requiring 12% prejudgment interest. (*Id.* at 6); (Doc. 223 at 3.)

The Court does not find that any of these objections warrant excluding Dr. Bancroft's testimony in its entirety. Although a court should exclude expert testimony "if it is speculative or conjectural," or "based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an 'apples and oranges comparison,' other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (per curiam) (internal citations and quotation marks omitted). Dartmouth Health challenges Dr. Bancroft's use of information from the U.S. Bureau of Labor Statistics ("BLS") regarding average annual salary increases of 2.5% nationwide as "imprecise statistical evidence," but courts have frequently upheld use of similar statistics by both lay and expert witnesses. *See, e.g.*, *id.* at 23 (internal quotation marks and

6

alterations omitted) ("Statistical charts, such as the mortality tables and the work-life expectancy tables prepared by the United States Department of Labor are often deemed authoritative. . . ."); *Carroll v. Xerox Corp.*, 294 F.3d 231, 240 (1st Cir. 2002) (holding that a plaintiff might have shown that he was limited from other jobs besides his own using expert vocational testimony or publicly available labor market statistics); *Higgins v. Kinnebrew Motors, Inc.*, 547 F.2d 1223, 1225–26 (5th Cir. 1977) (upholding expert witness's use of statistics from the BLS instead of a couple's actual expenses); *Kenealy v. Saul*, No. 19-cv-40-jdp, 2019 U.S. Dist. LEXIS 206866, at *17 (W.D. Wis. Dec. 2, 2019) (internal quotation marks omitted) ("An expert can support her estimates by drawing on knowledge of labor market conditions and occupational trends, gleaned from reviewing relevant data sources or from placing workers in jobs."). The same is true for Dr. Bancroft's use of data on work-life expectancy to predict that Dr. Porter may continue to work until the year 2033. (*See* Doc. 198-4 at 26, 98:18–99:25); *see also Boucher*, 73 F.3d at 23; *Weil v. Seltzer*, 873 F.2d 1453, 1465 (D.C. Cir. 1989) ("Statistics, such as those prepared by the Department of Labor on work-life expectancy, are only one tool which may be used by an expert in forming an opinion.").

Nor does the Court find that Dr. Bancroft's choice to consider multiple possible future career paths for Dr. Porter or to update the assumptions used in his August 2024 report render his opinion testimony too speculative. Dr. Porter's most recent filing clarifies that the "internal inconsistencies" in Dr. Bancroft's expert reports resulted from new information that impacted Dr. Bancroft's economic loss analysis:

> While Dr. Porter initially projected that she would resign her full-time position at UVM to find a part-time job closer to her Norwich home in 2021, that did not happen. Instead, she remained in her full-time position and changed her projected horizon for a change to 2025. Dr. Bancroft merely updated his report to reflect these facts as they arose.

(Doc. 208 at 9–10.) Dr. Bancroft's decision to update his expert reports after receiving new information was entirely appropriate, as was his decision to include multiple scenarios for Dr. Porter's potential damages depending on how many years she continues to work. *See Rosario v. City of New York*, No. 18 Civ. 4023 (LGS), 2021 U.S. Dist. LEXIS 91675, at *15 (S.D.N.Y. May 13, 2021*) ("[E]xperts may provide opinions tailored to different factual scenarios that the jury may consider.")

The Court is also not persuaded that Dr. Porter's plan to decrease her work at UVM from full-time employment ("FTE") to .6 FTE is too speculative for Dr. Bancroft's use. Dr. Bancroft "may base an opinion on facts or data in the case." Fed. R. Evid. 703. Dr. Porter is the most reliable—perhaps the only—source of information on whether and when she intends to decrease her working hours. And as Dr. Bancroft testified, Dr. Porter has a reasonable explanation for why she intends to decrease her hours at UVM: she finds it more stressful to commute from her home in Norwich, VT, to Burlington (as opposed to Lebanon). (Doc. 230 at 37:2–17, 38:21–39:1; *see also* Doc. 198-4 at 11, 37:10–18 (testimony that Dr. Porter said that she didn't know how long she would stay at UVM because she enjoyed the work but "didn't like being away from her family and having to commute")).

As to Dartmouth Health's argument that it has "no legal obligation to finance Dr. Porter's voluntary decision to fundamentally alter her work arrangements with UVM by assuming a part-time position," (Doc. 198-1 at 6), the Court finds this objection goes to the weight of Dr. Bancroft's testimony rather than its admissibility. It appears to pertain more to Dr. Porter's duty to mitigate damages than to Dr. Bancroft's qualifications as an expert. *See, e.g.*, *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998). Dr. Bancroft may properly rely on Dr. Porter's assumption that she will decrease her work at UVM to .6 FTE because this

8

assumption is "not so unrealistic and contradictory as to suggest bad faith" given that the substantial commute from Norwich to Burlington apparently increases her stress and reduces time with her family. *See Boucher* 73 F.3d at 21; *cf. Bergerson v. New York State Off. of Mental Health, Cent. New York Psychiatric Ctr.*, 526 F. App'x 109, 111–12 (2d Cir. 2013) (summary order) (finding district court erred in concluding that employee failed to mitigate damages when she resigned from employment located two and a half to three hours from her home because employee "was not obligated to mitigate damages by pursuing or continuing employment located such an unreasonable distance from her home"). Considering the broad standard for admissibility of expert testimony in this Circuit, the Court declines to find Dr. Bancroft unqualified on this basis. Dartmouth Health will have the opportunity to challenge Dr. Porter's alleged damages through cross-examination or the presentation of conflicting evidence at trial. *See Daubert*, 509 U.S. at 596.

Dartmouth Health further contends that Dr. Bancroft's opinion relies on subjective experience and speculation because he applies 9 V.S.A. § 41a(a), which mandates a prejudgment interest rate of 12% per year, in the absence of an agreement as to the rate of interest, to his analysis. (Doc. 223 at 3.) Dartmouth Health argues that Dr. Bancroft should not have used Vermont's statutory prejudgment interest rate to calculate Dr. Porter's damages because the statute only applies to a "sum certain" and not an "unquantifiable, indirect or disputable sum." (*Id.*) The Court disagrees for two reasons.

First, the Court anticipates that the Vermont Supreme Court would hold that prejudgment interest is available as of right in this case. Prejudgment interest is "awarded as of right when the principal sum recovered is liquidated or capable of ready ascertainment and may be awarded in the court's discretion for other forms of damage." *Hirchak v. Hirchak*, 2024 VT 81, ¶¶ 36–37,

___ Vt. ___, ___ A.3d ___ (internal quotation marks omitted). The Vermont Supreme Court has upheld a trial court's award of mandatory prejudgment interest for lost wages and medical expenses as "reasonably ascertainable"[1] because the plaintiff's "salary was known with reasonable certainty, as was the general nature of her injuries and the likely course of treatment." *See Smedberg v. Detlef's Custodial Serv., Inc.*, 2007 VT 99, ¶¶ 37–39, 182 Vt. 349, 940 A.2d 674 (2007). Noting that "reasonable ascertainment" does not mandate that "the amounts be precisely or infallibly ascertainable," the *Smedberg* court rejected the defendant's "proposed rule, which would appear to limit prejudgment interest to a very narrow class of cases in which a known sum of money was converted to the tortfeasor's use on a precisely known date" because "[p]rejudgment interest on compensatory damage awards is meant to restore—to the extent possible—harmed plaintiffs to the financial position they would have enjoyed but for the tort, and should not be limited to such a tiny fraction of tort cases." *Id.* at ¶¶ 38–39. Under *Smedberg*, Dr. Porter's compensatory damages—comprised of lost earnings and extraordinary employment costs—are "reasonably ascertainable" because they can be "measured against a reasonably certain standard." (S*ee* Doc. 198-5 at 5–6); *Smedberg*, 2007 VT at ¶ 37. Therefore, Dr. Porter is likely entitled to prejudgment interest as of right under 9 V.S.A. § 41a(a).

Second, even if Dr. Porter could not receive prejudgment interest as of right under 9 V.S.A. § 41a(a), a jury may still award her prejudgment interest in a discretionary capacity. *See Est. of Fleming*, 724 A.2d at 1030 (emphasizing that the trier of fact has the discretionary capacity to award prejudgment interest in cases where damages are not liquidated or reasonably ascertainable "where it is required to make the plaintiff whole"). Therefore, Dr. Bancroft's use of

---

[1] The Vermont Supreme Court has acknowledged that the terms "readily ascertainable" and "reasonably ascertainable" are substantively similar with respect to an award for prejudgment interest. *See Est. of Fleming v. Nicholson*, 724 A.2d 1026, 1030 n.2 (Vt. 1998).

the statutory prejudgment interest rate in 9 V.S.A. § 41a(a) is not based on unreliable data and methodology, and the Court declines to exclude Dr. Bancroft's testimony on this basis.

In short, the Court finds Dr. Bancroft qualified to give testimony on Dr. Porter's economic losses and proceeds to the next step of the analysis: whether Dr. Bancroft's testimony is reliable.

**B.     Whether Dr. Bancroft's Testimony Is Based on Reliable Data and Methodology**

Dartmouth Health asks the Court to find that Dr. Bancroft's testimony is not reliable for two reasons. First, Dartmouth Health argues that Dr. Bancroft's analysis "relies on Dr. Porter's subjective belief that she would be promoted by Dartmouth Health to a full professor and receive a 5% salary increase in 2017" without considering whether this belief is reasonable. (Doc. 198-1 at 7.) Second, Dartmouth Health argues that Dr. Bancroft's report impermissibly "grosses up" Dr. Porter's damages to account for federal and state taxes. (*Id.*)

"[W]here lost future earnings are at issue, an expert's testimony should be excluded . . . if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Sinkov v. Americor, Inc.*, 419 F. App'x 86, 90–91 (2d Cir. 2011) (summary order) (internal quotation marks omitted), quoting *Boucher*, 73 F.3d at 21. It is within the district court's discretion to "determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Shatkin v. McDonnell Douglas Corp.,* 727 F.2d 202, 208 (2d Cir. 1984). While a court may exclude opinion evidence when the "court concludes that there is simply too great an analytical gap between the data and the opinion proffered," the Second Circuit has noted that "[f]requently . . ., gaps or inconsistencies in the reasoning leading to the expert's opinion go to the weight of the evidence, not to its admissibility." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (internal quotation marks and alterations omitted).

11

On this record, the Court does not find that Dr. Porter's assumption that she would have been promoted to full professor and received a 5% salary increase in 2018 is unrealistic such that Dr. Bancroft's opinion testimony is unreliable. Dr. Porter's professional skills are widely recognized. Dr. Porter began working as a staff physician at Dartmouth Health in 1996. (Doc. 139-3 at 4.) One year later, she was promoted to Medical Director of the IVF/ART program and appointed jointly to Dartmouth Health's Department of Radiology. *Porter v. Dartmouth-Hitchcock Med. Ctr.* 92 F.4th 129, 133 (2024). Dr. Porter became a senior voting member of Dartmouth Health's Professional Staff in 2001. *Id.* In 2011, she became Acting Director of the REI Division and continued in that role until Dr. David Seifer was appointed Director in May 2016. *Id.* at 134. Before Dr. Porter became ill, she also served as Vice Chair of Perioperative Services and Director of Gynecological Ultrasound. (Doc. 139-4 at 28–30, 27:3–29:20.) Dr. Leslie DeMars, the chair of the OB/GYN Department and Dr. Porter's supervisor at Dartmouth Health, has described Dr. Porter as "an amazingly gifted and dedicated reproductive endocrinologist and infertility specialist" and described her skills using the term "Misty magic." (Doc. 140-8 at 3, 42:25–43:10.) Other providers at Dartmouth Health have also attested to the high quality of Dr. Porter's professional skills. (*See, e.g.*, Doc. 140-5 at 2–4; Doc. 140-6 at 2; Doc. 140-4 at 2–6.)

In short, while the Court does not express an opinion on whether Dr. Porter would indeed have been promoted to full professor at Dartmouth Health, "the possibility . . . was hardly so unlikely as to preclude the jury from considering it." *See Sinkov*, 419 F. App'x at 90–91 (upholding damages award based on expert analysis providing three alternative calculations of loss of earning potential, including that of a secondary schoolteacher and a typical man with either an associate's or a bachelor's degree, because expert's appraisals were "rooted in the

12

evidence" that individual had already earned educational credits towards his associate's degree and stated his intention to become a teacher). In fact, after leaving Dartmouth Health Dr. Porter did get promoted to full professor at UVM Medical Center, a "similar, rural academic REI center" to Dartmouth Health. (*See* Doc. 230 at 28:7–29:3; Doc. 140-19 at 2.)

Moreover, Dr. Porter's possible promotion at Dartmouth Health differs from the types of assumptions the Second Circuit has considered speculative because it is rooted in record evidence. *See Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 511 F. App'x 54, 56–57 (2d Cir 2013) (summary order) (finding no error in district court's exclusion of expert testimony composed of "sweeping statements that were detached from the actual evidence"); *Boucher*, 73 F.3d at 22 (overturning damages awards when expert estimated lost earnings based on assumptions that plaintiff would work full-time every week with fringe benefits and regular pay increases for the rest of his career when plaintiff's "sporadic employment had yielded fluctuating low levels of income, with long spells of no income whatsoever" and few, if any, fringe benefits). Dr. Bancroft reasonably assumed that Dr. Porter would be promoted to full professor at Dartmouth Health in 2018, and any gaps in the reasoning go to the weight of the evidence, not to its admissibility. *See Shatkin*, 727 F.2d at 208; *Restivo*, 846 F.3d at 577.

As to Dartmouth Health's argument that Dr. Bancroft's use of a 5% increase in salary from becoming a full professor is speculative, Dr. Bancroft's analysis may properly rest on his personal knowledge and experience. (*See* Doc. 230 at 21:10–22:6) (testimony of Dr. Bancroft that in his experience, a promotion to full professor at UVM tended to include a 5% increase in salary). The Court declines to strike Dr. Bancroft's testimony on this basis.

Finally, Dartmouth Health argues that Dr. Bancroft's analysis is not based on reliable methods because it "artificially inflat[es]" Dr. Porter's damages through a "post-tax calculation

13

where state and federal taxes should be deducted from compensation attributable to back pay or front pay." (Doc. 198-1 at 7.) Dartmouth Health challenges Dr. Bancroft's assumption that Dr. Porter's total damages award should include funds to cover state and federal taxes because the salary numbers that he uses "are all drawn from W2 and other salary information that are amounts before taxes." (Doc. 226 at 6.) Therefore, "there is no need" to account for tax liability from a damages award because the salary numbers Dr. Bancroft uses "already include the amounts [Dr. Porter] would need to pay in taxes in them." (*Id.*) In other words, Dartmouth Health argues that Dr. Bancroft is double counting. (*Id.*)

The Court need not exclude Dr. Bancroft's testimony on this point as unreliable. To the Court's understanding, Dr. Bancroft's analysis estimates and subtracts federal and state income taxes from Dr. Porter's damages before calculating the current present value of Dr. Porter's lost earnings. (*See* Doc. 198-5 at 4–5, n.7–9.)[2] In other words, Dr. Bancroft uses a post-tax potential damages award to calculate the estimated settlement tax Dr. Porter would incur. (*See id.* at 4–6, n.9.) Thus, Dr. Bancroft's analysis appears to account for tax liability only once rather than double-counting. Dr. Bancroft has explained that he uses this method because the progressive income tax causes an individual who receives lost earnings as a lump sum award to pay higher taxes on that award than she would have if she had received the same amount divided over several years as part of her salary. (*See* Doc. 230 at 41:4–18; Doc. 198-4 at 12, 41:24–43:24.)

---

[2] In addition to challenging the substance of Dr. Bancroft's testimony, Dartmouth Health characterizes Dr. Bancroft's expert report dated August 26, 2024, as "inadmissible hearsay" and asks the Court to preclude him from using the Lost Earnings Chart (Doc. 198-5 at 4) at trial because Dr. Porter "has not identified [it] as substantive or demonstrative evidence in relation to" the expert report. (Doc. 223 at 2–3.) Dr. Porter's Exhibit List identifies "Bancroft Analysis" as Exhibit 1. (Doc. 219 at 1.) The descriptor "Bancroft Analysis" adequately identifies the Lost Earnings Chart because Dr. Bancroft's "analysis" encompasses the detailed breakdown of each step of his damages calculations contained within the Chart. And Dr. Bancroft's expert report, including the Chart, is "not inadmissible hearsay, because it reflects his own opinions." *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 980 F. Supp. 2d 425, 442 (S.D.N.Y. 2013); *see also Muto v. Cty. of Mendocino*, Case No. 20-cv-06232-SK, 2022 U.S. Dist. LEXIS 80131, at *31 (N.D. Cal. May 3, 2022) ("It is axiomatic that the opinion of an expert witness is not hearsay.").

For the reasons explained above, the Court finds that Dr. Bancroft's proffered testimony on Dr. Porter's damages is based on reliable data and methodology.

**C.      Whether Dr. Bancroft's Testimony Will Assist the Trier of Fact**

Finally, the Court must determine whether Dr. Bancroft's opinion will assist the trier of fact. The Court must make a "common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993) (internal quotation marks omitted).

Dartmouth Health does not appear to contest that Dr. Bancroft's testimony would assist the trier of fact. (*See generally* Docs. 198, 223.) The Court finds that Dr. Bancroft's testimony would be helpful to a jury. The use of a damages expert at trial "is . . . commonplace and may be essential." *In re KeySpan Corp. Sec. Litig.*, No. CV 2001-5852 (ARR) (MDG), 2005 U.S. Dist. LEXIS 29068, at *21 (E.D.N.Y. Aug. 25, 2005). Dr. Bancroft's testimony would benefit a jury because the advanced economics and mathematics required to calculate lost earnings goes beyond the knowledge of the average juror. (*See* Doc. 198-4 at 11–12, 39:23–43:24) (describing Dr. Bancroft's methodology for projecting gross loss, present value, and estimated tax liabilities); *see also*, *e.g.*, *Jackson v. State Farm Fire & Cas. Co.*, Civil No. 1:23-cv-24-HSO-BWR, 2024 U.S. Dist. LEXIS 38993, at *27 (S.D. Miss. Mar. 6, 2024) (internal alteration and quotation marks omitted) ("Generally speaking, expert testimony on damages frequently will help the trier of fact because damage calculations often involve complex aspects of economics and mathematics.").

15

**D.    Dartmouth Health's Request to Present Its Own Expert Economist**

Dartmouth Health has requested that, if the Court does not preclude Dr. Bancroft's testimony in full, Dartmouth Health be permitted to "present its own expert economist to provide analysis of the discrete universe of financial documents in the case." (Doc. 235 at 7.) In general, before a party can introduce expert testimony at trial, it must disclose the expert at least ninety days before the date set for trial. Fed. R. Civ. P. 26(a)(2)(D)(i). Moreover, Rule 26(a)(2)(B) requires that the disclosure of the expert must be accompanied by a written report prepared and signed by the witness. According to the most recent scheduling order, Dartmouth Health's deadline to submit any expert reports was December 15, 2018. (Doc. 138 at 2.) If the party fails to make a timely disclosure, the undisclosed witness cannot testify at trial unless the failure to disclose was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1).

The Court cannot find that Dartmouth Health's untimely disclosure is substantially justified or harmless. Dartmouth Health has not identified or provided any information about its expert witness and that witness's expected testimony or explained why it did not disclose an expert witness sooner in compliance with the Federal Rules. Courts in this Circuit have ruled that the failure to disclose an expert witness may prejudice the opposing party. *See, e.g.*, *Evans v. United States*, 978 F. Supp. 2d 148, 153 (E.D.N.Y. 2013); *Palma v. Pharmedica Commc'ns, Inc.*, No. 00-CV-1128 (AHN), 2002 WL 32093275, at *2 (D. Conn. Mar. 27, 2002). The untimely disclosure and the absence of an expert report may prejudice Dr. Porter by denying her a clear understanding of the expert's intended testimony and compromising her ability to prepare effective cross-examination or rebuttal evidence. Under these circumstances, the Court cannot find that Dartmouth Health's disclosure of a potential expert witness four days before trial is

16

substantially justified or harmless. The Court therefore declines Dartmouth Health's belated

request "to present its own expert economist." (Doc. 235 at 7.)

## **Conclusion**

For the reasons explained above, Dartmouth Health's Motion *In Limine* to Preclude the

Testimony of Robert Bancroft (Doc. 198) and Renewed Motion to Preclude the Testimony of

Robert Bancroft Based on New March 19, 2025 Report (Doc. 235) are DENIED.


Dated at Burlington, in the District of Vermont, this 21st day of March 2025.

*/s/ Kevin J. Doyle*_____
United States Magistrate Judge

SPA-119

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

    Plaintiff,

    v.

Dartmouth-Hitchcock Medical Center,
Dartmouth-Hitchcock Clinic,
Mary Hitchcock Memorial Hospital, and
Dartmouth-Hitchcock Health,

    Defendants.

Civil Action No. 2:17–cv–194

## JURY CHARGE

### General Instructions

Now that you have heard the evidence and arguments, it is my duty to instruct you on the applicable law. My instructions come in two parts. The first part consists of general instructions about the task of the jury and the rules and principles that should guide you in your deliberations. The second part consists of instructions that apply to the specific claims and defenses in this case. I ask that you pay equal attention to both parts.

It is your duty as jurors to follow the law, and to apply it to the facts as you find them from the evidence presented in the courtroom. You are not to single out one instruction alone as stating the law but must consider the instructions as a whole. You are not to be concerned with the wisdom of or reasoning behind any rule of law stated by the court. Regardless of any opinion you may have as to what the law is or ought to be, it would be a violation of your sworn duty to base a verdict on any view of the law other than that given to you in these instructions. It would

1

SPA-120

also be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything other than the evidence presented during the trial.

The lawyers have referred to some of the rules of law in their arguments. If any difference appears between the law as stated by the lawyers and the law as stated by the court in these instructions, you must follow the court's instructions.

Our judicial system requires you to carefully and impartially consider all of the evidence, follow the law, and reach a just verdict, regardless of the consequences.

### Jurors as Finders of Fact/Rulings of the Court

You and you alone are the triers of the facts. Each of you, as jurors, must determine the facts for yourself in reaching a verdict. By the rulings that I made during the course of the trial, I did not intend to express my own views about this case.

### Sympathy/Prejudice

Neither sympathy nor prejudice, for or against the parties or any other person involved with this case, should influence you in any manner in reaching your verdict. Your deliberations should be well reasoned and impartial.

### Evidence in the Case

The evidence in this case consists of the sworn testimony of the witnesses, the exhibits admitted into evidence, and any stipulated facts, regardless of which party presented the evidence. When the attorneys on both sides stipulate or agree to the existence of a fact, you must, unless otherwise instructed, accept the stipulation and regard that fact as proved. You may give the stipulated fact, like any other evidence, the weight you think it deserves. Any evidence that has been stricken or excluded, as when an objection is sustained by the court, must be disregarded and you may not consider it in rendering your verdict.

2

**Arguments/Statements/Objections of the Attorneys**

The opening statements and closing arguments of the attorneys, their questions and objections, and all other statements they made during the course of the trial, are not evidence. The attorneys have a duty to object to evidence that they believe is not admissible. You should not draw any conclusions or make any judgment from the fact that an attorney has objected to evidence.

**Court's Rulings on Objections**

From time to time, the court has been called on to determine the admissibility of certain evidence following the attorneys' objections. You should not concern yourself with the court's reason for any rulings on objections. Whether offered evidence is admissible is purely a question of law for the court and not a concern of the jury. In admitting evidence to which objections have been made, the court does not determine what weight should be given to that evidence, nor does it assess the credibility of the evidence. If the court excludes evidence in response to an attorney's objection, you will dismiss the evidence from your mind completely and entirely, and you will refrain from speculation about the nature of any exchange regarding the evidence between the court and the attorneys held out of your hearing.

**Evidence: Direct or Circumstantial**

There are two types of evidence from which you may find the facts of this case: direct and circumstantial. Direct evidence is the testimony of someone who asserts actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances tending to prove or disprove an issue in the case. For example, if a witness were to testify that he or she had seen cows in a field, that would be an example of direct evidence that there were cows in a field. On the other hand, if a witness were to testify that he or she had seen

3

cow tracks in the field, that would be an example of circumstantial evidence that there had been cows in the field. The law does not require a party to prove its claims or defenses by direct evidence alone. Rather, one or more of the essential elements of each of the claims or defenses may be established by reasonable inference from other facts which are established by direct testimony; and circumstantial evidence alone may be sufficient proof.

The law makes no distinction between the weight to be given to direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should consider all the evidence in the case and give it as much or as little weight as you think it deserves.

### Credibility of Witnesses

You are the sole judges of the credibility of the witnesses, and the weight to give their testimony is up to you. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe; his or her demeanor while testifying; any interest or bias he or she may have; and the reasonableness of his or her testimony, considered in light of all the evidence in the case. Consider also any relation each witness may bear to either side of the case, any bias or prejudice, the manner in which each witness might be affected by the verdict, and the extent to which each witness's testimony is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit a witness's testimony. Two or more persons witnessing an incident or transaction may see or hear it differently. It is your duty to reconcile conflicting testimony if you can. In weighing the effect of a discrepancy, consider

4

whether it pertains to a matter of importance or to an unimportant detail, and whether the discrepancy may result from innocent error or intentional falsehood.

You may give the testimony of each witness the amount of weight you think it deserves: you may believe all of it, part of it, or none of it at all. You do not have to accept the testimony of any witness, even if it is uncontradicted. It is for you to say what you believe and disbelieve.

In other words, what you must try to do in deciding credibility is to size up a witness in light of his or her demeanor, the explanations given, and all the other evidence in the case. Always remember that you should use your common sense and good judgment.

### Impeachment of a Witness

A witness may be discredited or "impeached" by contradictory evidence, by a showing that the witness testified falsely concerning a matter, or by evidence that at some other time the witness said or did something inconsistent with the witness's present testimony. It is your exclusive province to give the testimony of each witness whatever degree of credibility or amount of weight you think it deserves.

If you find that a witness testified untruthfully in some respect, you may consider that fact in deciding what credence to attach to other testimony from that witness. Considering that fact as well as all other relevant evidence, you may accept or reject the testimony of the witness in whole or in part. In making this determination, you may consider whether the witness purposely made a false statement or merely made an innocent mistake, whether the inconsistency concerns an important fact or a small detail, and whether the witness had a reasonable explanation for the inconsistency.

SPA-124

### Expert Witnesses

You have heard evidence from one witness, Dr. Robert Bancroft, who is known as an "expert witness." An expert witness is a person who has special knowledge, experience, training, or education in his or her profession or area of study. Because of this expertise, an expert witness may offer an opinion about one or more of the issues in the case. In evaluating the testimony of Dr. Bancroft in this case, you should evaluate his credibility and statements just as you would for any other witness. You should also evaluate whether Dr. Bancroft's opinion is supported by the facts that have been proved, and whether the opinion is supported by Dr. Bancroft's knowledge, experience, training, or education. You are not required to give the testimony of Dr. Bancroft any greater weight than you believe it deserves just because he has been referred to as an expert witness.

### Number of Witnesses

The fact that one side may have called more witnesses than the other side is of no significance. Your task is to evaluate the credibility of the witnesses and to weigh all of the evidence.

### Personal Knowledge and Experience of Jurors

In deliberating, you are not expected to put aside your common sense or your own observations and life experience. However, a juror having special knowledge of a subject may neither state this knowledge to fellow jurors nor act upon it himself or herself in arriving at a verdict. You must not tell your fellow jurors about matters that are based on your own special knowledge concerning an issue in the case that did not come from evidence received in the courtroom.

6

As jurors, your job is to decide this case based solely on the evidence presented during the trial and my instructions to you. As you were instructed at the beginning of the trial, you are not to investigate or research the law or facts relevant to the trial. I remind you that you must not seek or receive any information about this case from the Internet, including Google, Facebook, Wikipedia, or any other websites, or from any other source including newspapers, magazines, law books, or dictionaries. Do not search for or receive any information about the parties, the lawyers, the witnesses, the evidence, the law, or any place or location mentioned in the trial. Until I tell you that your jury service is completed, do not communicate with anyone, including your family and friends, about the evidence or issues in this case.

### Burden of Proof: Preponderance of the Evidence

Because Dr. Porter is the one bringing this case, she has the burden of proof. She must prove each essential element of the claims she alleges by what is known as "a preponderance of the evidence," i.e., the greater weight of the evidence. To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not. In other words, a preponderance of the evidence means evidence that—when considered and compared with evidence opposed to it—has more convincing force and produces in your minds a belief that what is sought to be proved is more likely true than not true. A preponderance of the evidence refers to the quality and the persuasiveness of the evidence, not to the number of witnesses or documents. In determining whether a claim has been proven by a preponderance of the evidence, you may consider the relevant testimony of all the witnesses, regardless of who called them, and all exhibits received into evidence, regardless of who submitted them.

If you find that the credible evidence on an issue is evenly divided between the parties, you must decide that issue against the party having the burden of proof. That rule follows from

7

the fact that the party bearing this burden must prove more than simple equality of evidence: he or she must prove the element at issue by a preponderance of the evidence. On the other hand, the party with this burden of proof need prove no more than a preponderance. So long as you find that the scales tip, however slightly, in favor of the party with this burden of proof—meaning, what that party claims is true is more likely true than not true—then that element will have been proven by a preponderance of the evidence.

If, after considering all the evidence, you are satisfied that Dr. Porter has carried her burden on at least one of the claims she alleges, then you must find for Dr. Porter on that/those claims. On the other hand, if after such consideration, you find the evidence to be in balance or equally probable, or if you find the evidence tips in favor of Dartmouth Health, then Dr. Porter has failed to sustain her burden and you must find for Dartmouth Health on that/those claims.

### All Persons Equal Before the Law

The fact that Dartmouth Health is a corporation and Dr. Porter is an individual must not enter into or affect your verdict. This case should be considered and decided by you as a dispute between parties of equal standing in the community. All persons, both corporations and individuals, stand equal before the law and are to be treated as equals in a court of justice.

### Corporation Acts Through Its Employees

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (referred to throughout the trial and in this document as "Dartmouth Health") are corporate entities. A corporation acts through its employees. Therefore, the act of any Dartmouth Health employee that occurred while he or she was on duty and acting within the scope of his or her employment duties shall be considered the act of Dartmouth Health.

8

SPA-127

### Influenced Decisionmaker

An employer may be liable for unlawful acts, even when so-called "neutral decisionmakers" made the final decision regarding the act, if the employee proves, by a preponderance of the evidence, that the neutral decisionmaker relied on a supervisor who had an unlawful bias or retaliatory motive against the employee.

In other words, if you find that Dr. Merrens was the decisionmaker regarding the termination of Dr. Porter's employment without reassignment to another position at Dartmouth Health, and if you find that Dr. Merrens did not personally have an unlawful bias or retaliatory motive against Dr. Porter, Dartmouth Health may nonetheless be held liable if you find, by a preponderance of the evidence, that a supervisor of Dr. Porter's (like Dr. DeMars) had an unlawful bias or retaliatory motive to terminate Dr. Porter without reassignment to another position at Dartmouth Health and Dr. Merrens relied on that supervisor when deciding to terminate Dr. Porter's employment without reassignment to another position at Dartmouth Health.

### Overview of Claims

As you have seen and heard in this trial, this is an employment lawsuit brought by Dr. Misty Blanchette Porter against Dartmouth Health. Dr. Porter claims that she was terminated by Dartmouth Health because of her whistleblower complaints about conduct by other physicians and because of her disability. Dartmouth Health claims it had legitimate, non-discriminatory business reasons for terminating the employment of Dr. Porter in conjunction with the closure of Dartmouth Health's Reproductive Endocrinology and Infertility (REI) Division.

Now I will instruct you regarding each of Dr. Porter's claims: (1) violation of the New Hampshire Whistleblowers' Protection Act; (2) disability discrimination and retaliation under the

9

Americans with Disabilities Act (ADA), the Rehabilitation Act, and the applicable laws of New Hampshire and Vermont; (3) wrongful discharge under New Hampshire law; and (4) retaliation under the applicable laws of New Hampshire. I will also instruct you regarding Dartmouth Health's defenses and regarding damages.

### New Hampshire Whistleblowers' Protection Act

Dr. Porter alleges that she was terminated by Dartmouth Health, and was not reassigned to another position at Dartmouth Health, in retaliation for her reporting about (and/or advising others to report about) the conduct of two physicians at Dartmouth Health that she reasonably believed to be illegal, fraudulent, unethical, or harmful to patients, in violation of New Hampshire's Whistleblowers' Protection Act. Dartmouth Health denies these claims, and asserts that it had legitimate business reasons for its decision to terminate Dr. Porter's employment and not reassign her to another position with Dartmouth Health.

New Hampshire's Whistleblowers' Protection Act prohibits employers from retaliating against an employee for reporting what he or she reasonably believes is a violation of the law. The Act safeguards employees from being discriminated against for making a good faith report, verbally or in writing. Its purpose is to encourage employees to come forward and report violations without fear of losing their jobs and to ensure that as many alleged violations as possible are resolved informally within the workplace.

In order to establish a claim under New Hampshire's Whistleblowers' Protection Act, Dr. Porter must demonstrate, by a preponderance of the evidence, the following three elements:

First:      Dr. Porter, in good faith, reported or caused to be reported, what she had reasonable cause to believe was a violation of any law or rule adopted under the laws of New Hampshire, a political subdivision of New Hampshire, or the United States;

10

Second:   Dartmouth Health terminated Dr. Porter's employment and failed to reassign her to another job at Dartmouth Health; and

Third:   There was a causal connection between Dr. Porter's reporting and her termination from Dartmouth Health without reassignment to another job at Dartmouth Health.

### 1. "Reported in good faith"

In this context, "good faith" means "absence of malice" and "honesty of intention." Reporting "in good faith" means the employee *reasonably believed* that a violation of a law or rule was happening; the employee need not prove that a violation of a law or rule *was in fact* happening. In other words, the Act does not require an actual violation of a law or rule but only that an employee reasonably believe that such a violation has occurred.

In reporting a violation to her employer, the employee is not required to reference any specific law or rule that the employer has allegedly violated. The employer is presumed to be familiar with the laws and regulations governing its business, and to consider a report to have been made if a reasonable employer would have understood from an employee's complaint that the employee was reciting a violation of law.

### 2. "Termination of employment"

You must decide whether Dartmouth Health terminated Dr. Porter's employment and did not reassign her to another job at Dartmouth Health.

### 3. "Causal connection"

To find in favor of Dr. Porter on this claim, you must find a causal connection between her termination and her reporting about (and/or advising others to report about) the conduct of two physicians at Dartmouth Health that she reasonably believed to be illegal, fraudulent, unethical, or harmful to patients. In other words, you must find that Dr. Porter's termination

11

occurred "because" of her reporting. This may be shown by circumstantial evidence. For example, you may find that there is sufficient causation through temporal proximity, that is, that Dartmouth Health's termination of Dr. Porter followed shortly after Dartmouth Health became aware of Dr. Porter's reporting. Other ways you may find causation could be through (a) Dartmouth Health's disparate treatment of fellow employees who engaged in similar conduct as Dr. Porter, or (b) deficiencies in Dartmouth Health's articulated reasons for terminating Dr. Porter.

In addition, to support the required finding of causation for this claim, you must find that Dr. Porter reported the alleged violations to a person having supervisory authority over her. In other words, at least one supervisor or decisionmaker at Dartmouth Health must have known that Dr. Porter had reported about (and/or advised others to report about) the conduct that she believed to be illegal, fraudulent, unethical, or harmful to patients.

Dartmouth Health claims it did not terminate Dr. Porter because of her whistleblowing activity—here, reporting that two Dartmouth Health physicians were engaging in conduct that she thought was unlawful, unethical, or dangerous to patients—but rather, because it made a business decision to close its REI Division, resulting in the termination of all three physicians in the Division, and that there was no other position to which Dr. Porter could be reassigned at Dartmouth Health. Dr. Porter asserts that the reasons given for her termination are not the true reasons but instead are a pretext (or excuse) to cover up Dartmouth Health's unlawful retaliation against her for whistleblowing. If you do not believe the reasons Dartmouth Health has offered for termination of Dr. Porter's employment and not reassigning her to a different job at Dartmouth Health, then you may, but are not required to, infer that retaliation was a factor that

12

made a difference in Dartmouth Health's decision to terminate Dr. Porter's employment and not reassign her to another job at Dartmouth Health.

## Americans with Disabilities Act (ADA) Claim

In this case, Dr. Porter claims that Dartmouth Health terminated her employment and did not reassign her to another division because of her disability.

Dr. Porter has asserted three distinct but related types of disability discrimination claims. First, Dr. Porter may prove that Dartmouth Health would not have terminated her employment but for her disability. Second, Dr. Porter may prove that Dartmouth Health failed to reasonably accommodate her disability by reassigning her to another division instead of terminating her employment. Third, Dr. Porter may prove that Dartmouth Health retaliated against her for making a reasonable accommodation request. You must determine whether Dr. Porter has proven that Dartmouth Health has discriminated against her because of her disability in any or all of these ways or none of these ways. For Dr. Porter to prove her ADA claim against Dartmouth Health, she must prove that Dartmouth Health discriminated against her in at least one of these ways.

### 1. "But for" discrimination

To prevail under this theory, Dr. Porter must prove all of the following by a preponderance of the evidence:

First:       Dartmouth Health is an employer subject to the ADA.

Second:    Dr. Porter has a "disability" within the meaning of the ADA.

Third:      Dr. Porter was otherwise qualified to perform the essential functions of her job, either with or without reasonable accommodation.

Fourth:    Dr. Porter was terminated because of her disability.

13

To prevail under this theory, Dr. Porter must prove all of the following by a preponderance of the evidence:

### 1.1. "Employer"

The parties have agreed on the first element: that Dartmouth Health is an employer subject to the ADA. Thus, the first element is satisfied.

### 1.2. "Disability"

The parties have agreed on the second element: that Dr. Porter has a "disability" as defined by the ADA. Thus, the second element is satisfied.

### 1.3. "Otherwise qualified to perform essential functions"

You must determine whether Dr. Porter was a "qualified individual." To satisfy this element, Dr. Porter must prove two things by a preponderance of the evidence: first, that she was "otherwise qualified" for the position she held; and second, that either with or without reasonable accommodation, she could perform the essential functions of that position.

#### 1.3.1.   "Otherwise qualified"

An individual is "otherwise qualified" if they have the requisite skill, experience, education, and other job-related requirements of the employment position involved in the case. If Dr. Porter cannot satisfy this standard, then she was not a qualified individual, even if the reason that Dr. Porter is not qualified is solely a result of her disability. The ADA does not require an employer to hire or retain an individual who cannot perform the job in question either with or without an accommodation.

#### 1.3.2.   "Essential functions"

14

If you find that Dr. Porter was "otherwise qualified," then the next step is to determine whether she has proven by a preponderance of the evidence that she was able to perform the essential functions of the position either with or without reasonable accommodation. A reasonable accommodation may include job restructuring or part-time or modified work schedules.

To make this determination, you will need to determine the essential functions of the employment position. The "essential functions of an employment position" are the basic, fundamental duties of a job that a person must be able to perform to hold a particular position. Essential functions do not include marginal job duties of the position.

A job function may be considered essential for any of several reasons. These include, but are not limited to, the following:

1. The reason that the position exists is to perform that function;

2. There are a limited number of employees available among whom the performance of that job function can be distributed; and

3. The job function is highly specialized and the person in that position is hired for their expertise or ability to perform that particular job function.

In determining whether a particular job function is essential, you may, along with all of the evidence that has been presented to you, consider the following factors:

a. The employer's judgment as to which functions of the job are essential;

b. Written job descriptions prepared by the employer for advertising or posting the position;

c. Written job descriptions prepared by the employer for use in interviewing applicants for the position;

15

    d.   The amount of time spent performing the function;

    e.   The consequences of not requiring the person holding the position to perform the function;

    f.   The terms of any collective bargaining agreement;

    g.   The work experience of past employees who have held the position; and

    h.   The work experience of current employees who hold similar positions.

An employee must have been able to perform all of the essential functions of the position either with or without reasonable accommodation at the time of their termination. An employer may not base an employment decision on speculation that the employee's disability might worsen to the extent that they would not be a qualified individual at some time in the future. On the other hand, an employer is not required to speculate that an employee's condition will improve if that employee is not able to fulfill all of the essential functions of the position at the time in question.

### 1.4. "Because of"

You must determine whether Dartmouth Health terminated Dr. Porter's employment because of her disability. An employee must prove that the employer would not have terminated their employment but for their disability. To determine that Dartmouth Health terminated Dr. Porter because of her disability, you must decide that Dartmouth Health would not have terminated Dr. Porter if Dr. Porter had not had a disability but everything else had been the same.

An employee does not need to prove that discrimination was the only or even the predominant factor that motivated an employer. You may decide that other factors were involved in the decision to terminate Dr. Porter's employment. But, for Dr. Porter to meet her burden, you

must conclude that she has proved by a preponderance of the evidence that, although there may have been other factors, she would not have been terminated if she had not had a disability.

An employer may not discriminate against an employee because of the employee's disability, but an employer may terminate an employee for any other lawful reason, good or bad, fair or unfair. An employer is entitled to make subjective policy and business judgments, and an employer may therefore terminate an employee—even an outstanding employee—for reasons that it considers to be in its best interests. An employer is entitled to make its own personnel decisions, however misguided they may appear to you. If you believe Dartmouth Health's reasons for its decision to terminate Dr. Porter and find that its decision was not because of Dr. Porter's disability, you must not substitute your own judgment—even if you do not agree with Dartmouth Health's decision.

As I have explained, Dr. Porter has the burden to prove that Dartmouth Health's decision to discharge her was because of her disability. I have explained to you that evidence can be direct or circumstantial. To decide whether Dartmouth Health's decision to discharge Dr. Porter was because of her disability, you may consider the circumstances of Dartmouth Health's decision. For example, you may consider whether you believe the reasons Dartmouth Health gave for the decision. If you do not believe the reasons it gave for the decision, you may consider whether the reasons were so unbelievable that they are a cover-up to hide the true discriminatory reason for the decision.

### 2.  Failure to grant reasonable accommodation request

An employee may also establish a claim under the ADA by showing that the employer failed to provide a reasonable accommodation.

17

To establish such a claim, Dr. Porter must prove each of the following elements by a preponderance of the evidence:

First:        Dartmouth Health is an employer subject to the ADA.

Second:       Dr. Porter has a "disability" within the meaning of the ADA.

Third:        Dr. Porter was otherwise qualified to perform the essential functions of her job, either with or without reasonable accommodation.

Fourth:       Dartmouth Health failed to make a reasonable accommodation.

### 2.1. "Employer"

The parties have agreed on the first element: that Dartmouth Health is an employer subject to the ADA. Thus, the first element is satisfied.

### 2.2. "Disability"

The parties have agreed on the second element: that Dr. Porter has a "disability" as defined by the ADA. Thus, the second element is satisfied.

### 2.3. "Otherwise qualified to perform essential functions"

You must determine whether Dr. Porter was a "qualified individual." To satisfy this element, Dr. Porter must prove two things by a preponderance of the evidence: first, that she was "otherwise qualified" for the position she desired; and second, that either with or without reasonable accommodation, she could perform the essential functions of that position.

#### 2.3.1. "Otherwise qualified"

An individual is "otherwise qualified" if they have the requisite skill, experience, education, and other job-related requirements of the employment position involved in the case. If Dr. Porter cannot satisfy this standard, then she was not a qualified individual, even if the reason that Dr. Porter is not qualified is solely a result of her disability. The ADA does not require an

18

employer to hire or retain an individual who cannot perform the job in question either with or without a reasonableaccommodation.

### 2.3.2. "Essential functions"

If you find that Dr. Porter was "otherwise qualified," then the next step is to determine whether she has proven by a preponderance of the evidence that she was able to perform the essential functions of the position either with or without reasonable accommodation. A reasonable accommodation may include job restructuring or part-time or modified work schedules.

To make this determination, you will need to determine the essential functions of the employment position. The "essential functions of an employment position" are the basic, fundamental duties of a job that a person must be able to perform to hold a particular position. Essential functions do not include marginal job duties of the position.

A job function may be considered essential for any of several reasons. These include, but are not limited to, the following:

1. The reason that the position exists is to perform that function;

2. There are a limited number of employees available among whom the performance of that job function can be distributed; and

3. The job function is highly specialized and the person in that position is hired for their expertise or ability to perform that particular job function.

In determining whether a particular job function is essential, you may, along with all of the evidence that has been presented to you, consider the following factors:

i. The employer's judgment as to which functions of the job are essential;

19

j.  Written job descriptions prepared by the employer for advertising or posting the position;

k.  Written job descriptions prepared by the employer for use in interviewing applicants for the position;

l.  The amount of time spent performing the function;

m.  The consequences of not requiring the person holding the position to perform the function;

n.  The terms of any collective bargaining agreement;

o.  The work experience of past employees who have held the position; and

p.  The work experience of current employees who hold similar positions.

An employee must have been able to perform all of the essential functions of the desired position either with or without reasonable accommodation at the time of their termination. An employer may not base an employment decision on speculation that the employee's disability might worsen to the extent that they would not be a qualified individual at some time in the future. On the other hand, an employer is not required to speculate that an employee's condition will improve if that employee is not able to fulfill all of the essential functions of the position at the time in question.

### 2.4. "Failed to make a reasonable accommodation"

You must determine whether Dartmouth Health failed to make a reasonable accommodation for Dr. Porter by reassigning her to another department instead of terminating her employment.

The term "reasonable accommodation" means making modifications to the workplace that allows a person with a disability to perform the essential functions of the job or allows a

20

person with a disability to enjoy the same benefits and privileges as an employee without a disability.

A "reasonable accommodation" may include job restructuring, part-time or modified work schedules, reassignment to a vacant position, or other similar accommodations for individuals with disabilities. A reasonable accommodation does not require an employer to create a new position for an employee.

The term "reasonable accommodation" does not include efforts that would cause an "undue hardship"—an action requiring significant difficulty or expense—on an employer. An employer must show special (typically case-specific) circumstances to demonstrate undue hardship in the particular case.

An employer has a duty to make a reasonable accommodation for an employee if the employer knows or reasonably should have known that the employee was disabled, even if the employee did not explicitly request an accommodation. If the employer knows or should have known that the employee was disabled, the employer is obligated to engage in an interactive process with the employee to determine whether a possible reasonable accommodation exists. Both employer and employee must cooperate in this interactive process in good faith.

Neither side can prevail in this case simply because the other did not cooperate in the interactive process. However, you may consider whether a party cooperated in good faith in evaluating the merit of that party's claim that a reasonable accommodation did or did not exist. An employer, by failing to engage in a sufficient interactive process, risks not discovering a means by which an employee's disability could have been accommodated and thereby increases the chance of failing to reasonably accommodate the employee.

### 3. Retaliation

The ADA prohibits an employer from discriminating against an employee because the employee has opposed an unlawful employment practice under the ADA. This is called retaliation. To establish retaliation, Dr. Porter must prove each of the following elements by a preponderance of the evidence:

| | |
|---|---|
| First: | Dr. Porter engaged in an activity protected by the ADA. |
| Second: | Dartmouth Health knew that Dr. Porter engaged in protected activity. |
| Third: | Dartmouth Health took adverse action against Dr. Porter. |
| Fourth: | A causal connection exists between the adverse action and the protected activity. |

#### 3.1. "Protected activity"

A protected activity is an act that opposes any perceived discriminatory practice made unlawful by the ADA. "Protected activity" includes making a request for a reasonable accommodation.

The parties have agreed on the first element: that Dr. Porter made a reasonable accommodation request. Thus, the first element is satisfied.

#### 3.2. "Aware of activity"

The parties have agreed on the second element: that Dartmouth Health was aware that Dr. Porter made a reasonable accommodation request seeking reassignment to the OB/GYN Department or the Radiology Department. Thus, the second element is satisfied.

#### 3.3. "Adverse action"

You must determine whether Dartmouth Health took adverse action against Dr. Porter by terminating her employment.

22

### 3.4. "Causal connection"

You must determine whether there is a causal connection between Dr. Porter's reasonable accommodation request and Dartmouth Health's decision to terminate Dr. Porter's employment. Dr. Porter must prove that Dartmouth Health would not have terminated her employment but for her reasonable accommodation request. To determine that there is a causal connection between Dartmouth Health's decision to terminate Dr. Porter's employment and Dr. Porter's reasonable accommodation request, you must decide that Dartmouth Health would not have terminated Dr. Porter if Dr. Porter had not made a reasonable accommodation request but everything else had been the same.

Dr. Porter does not need to prove that retaliation was the only or even the predominant factor that motivated Dartmouth Health. You may determine that other factors contributed to Dartmouth Health's decision to terminate Dr. Porter's employment. But, in order to return a verdict in favor of Dr. Porter on her ADA retaliation claim, you must conclude that she has proved by a preponderance of the evidence that, even if other factors contributed to the decision, Dartmouth Health would not have terminated her employment if she had not made a reasonable accommodation request.

### Rehabilitation Act Claim

Dr. Porter has also brought disability discrimination claims under Section 504 of the Rehabilitation Act (29 U.S.C. § 794). Section 504 of the Rehabilitation Act applies to entities that receive federal funds, and it prohibits these entities from excluding or discriminating against individuals based on their disability.

Dr. Porter has brought claims for discriminatory termination, failure to make a reasonable accommodation, and retaliation under Section 504 of the Rehabilitation Act. The elements and

23

instructions for these claims are the same as those under the ADA. Thus, the instructions I previously gave you on disability discrimination under the ADA apply equally to the claims under Section 504 of the Rehabilitation Act.

### Disability Discrimination Claims Under New Hampshire State Law

In addition to the federal claims, there are also claims in this case for disability discrimination under New Hampshire's Law Against Discrimination. New Hampshire state law prohibits discrimination in employment based on disability.

Dr. Porter has brought claims for discriminatory termination, failure to make a reasonable accommodation, and retaliation under the New Hampshire Law Against Discrimination. The elements and instructions for these claims are the same as those under the ADA. Thus, the instructions I previously gave you on disability discrimination under the ADA apply equally to the claims under the New Hampshire Law Against Discrimination.

### Disability Discrimination Claims Under Vermont State Law

In addition to the federal claims and the claims under New Hampshire state law, there are also claims in this case for disability discrimination under Vermont's Fair Employment Practices Act (FEPA). Vermont state law prohibits discrimination in employment based on disability.

Dr. Porter has brought claims for discriminatory termination, failure to make a reasonable accommodation, and retaliation under Vermont's FEPA. The elements and instructions for these claims are mostly the same as those under the ADA. However, there is one important difference in the claim for discriminatory termination. For the fourth element, the FEPA uses the "motivating factor" test instead of the "because of" test used under the ADA. In other words, Dr. Porter must prove the following by a preponderance of the evidence:

First:        Dartmouth Health is an employer subject to the FEPA.

Second:       Dr. Porter has a "disability" within the meaning of FEPA.

Third:        Dr. Porter was otherwise qualified to perform the essential functions of her job, either with or without reasonable accommodation.

Fourth:       Dr. Porter's disability was a *motivating factor* in Dartmouth Health's decision to terminate her employment.

Under the motivating factor test, an employee must prove that their disability was a motivating factor that prompted the employer to terminate the employment. It is not necessary for the employee to prove that disability was the sole or exclusive reason for the employer's decision. It is sufficient if the employee proves that the alleged disability was a motivating factor in the employer's decision. A motivating factor is a factor that played some part in an employer's adverse employment action. Under the motivating factor test, an employer cannot avoid liability by proving that it would still have taken the same adverse action in the absence of discriminatory motivation. This is a difference between the motivating factor test and the "because of" test.

You should apply the motivating factor test, not the "because of" test, to Dr. Porter's claim for discriminatory termination under the FEPA. With this exception, the instructions I previously gave you on disability discrimination under the ADA regarding failure to make a reasonable accommodation and retaliation apply equally to the claims under the FEPA.

**Wrongful Discharge under New Hampshire Law**

Based on Dartmouth Health's termination of Dr. Porter's employment at Dartmouth-Hitchcock Medical Center, Dr. Porter has brought a claim for wrongful discharge against Dartmouth Health under New Hampshire law.

The prevailing rule in New Hampshire is that where, as here, there is no employment contract between employer and employee, the relationship is termed "at will." In an at-will employment situation, both parties are generally free to terminate the employment relationship at

25

any time, with or without cause, and it is implied that the parties will carry out their obligations in good faith. But there is an exception to this "at-will" rule: an employer's termination of an employee that is motivated by bad faith or malice, or is based on retaliation, is not in the best interest of the economic system of the public good, and is therefore unlawful. An employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment and the public's interest in maintaining a proper balance between the two.

In order to establish a claim for wrongful discharge under New Hampshire law, Dr. Porter must demonstrate the following two elements by a preponderance of the evidence:

First:  Dartmouth Health's termination of Dr. Porter was motivated by bad faith, malice, or retaliation; and

Second:  Dartmouth Health terminated Dr. Porter because she performed one or more acts that public policy would encourage.

### 1. "Termination motivated by bad faith, malice, or retaliation"

For purposes of this claim, "bad faith" is the equivalent of malice, and may be established where (i) an employee is discharged for pursuing policies condoned by the employer, (ii) the record does not support the stated reason for the discharge, or (iii) disparate treatment was administered to a similarly situated employee. Bad faith can also be discerned from the course of events surrounding an employee's discharge, the manner in which the plaintiff was discharged, or shifting reasons for an employee's termination. Stated another way, "malice" or "bad faith" may be shown where the employer's decision to terminate the employee was without reasonable cause or excuse as the facts would have appeared to a reasonable person, and that the termination was willful and intentional; that is, the employer knew that the termination was unreasonable and still decided to terminate the employee's employment; or that the termination was motivated by

26

ill will or a purpose to harass. "Bad faith" or "malice" may therefore be established by proof that the evidence does not support the stated reason for the discharge.

The general meaning of "retaliation" is the act of doing someone harm in return for actual or perceived injuries or wrongs, in other words, revenge.

### 2.  "Acts that public policy would encourage"

"Public policy," as used in this claim, includes a wide range of societal goals including safety and public welfare, protection of an at-will employee's promised compensation, and good faith reporting of reasonably perceived improper activity. The employee need not show a strong and clear public policy, and the public policy may be based on statutory or non-statutory policies at the state or federal level. An employee's mere expression of disagreement with a management decision, however, is not an act protected by public policy. Moreover, the public policy exception to termination of at-will employment does not deprive an employer of the right to make business decisions which are necessary to effectuate the efficient and profitable operation of its business; nor does the public policy exception interfere with an employer's ability to hire and retain those individuals best qualified for the job.

An example of a case where an employee is terminated for doing an act that public policy would encourage is an employee being terminated for refusing to provide to his or her employer private medical records and personal health information of patients. A second example is an employee being terminated for missing work because they reported to jury duty. A third example is an employee being terminated for protecting employees who worked under him from workplace hazards that could cause serious physical harm to those employees. Other examples of acts that public policy would encourage could be reporting physician conduct that is illegal, fraudulent, unethical, or unlawful to patients; ensuring that a medical provider or medical facility

27

obtain patient consent before performing procedures on patients; and objecting to improper patient billing procedures. In these cases, if the termination is because of the act that public policy encourages, and the employer acted with malice and bad faith or in retaliation, the employee is entitled to recover damages for wrongful termination.

It is your job to determine if Dartmouth Health terminated Dr. Porter because of her performance of one or more acts that public policy would encourage. In determining whether Dr. Porter performed an act that public policy would encourage, you are not limited to the above examples, nor must you find that the facts support the above examples in this case.

In order to find in favor of Dr. Porter on this claim, you not only must find that Dr. Porter performed one or more acts that public policy would encourage, and that Dartmouth Health's termination of Dr. Porter was motivated by bad faith, malice, or retaliation; you must also find that Dr. Porter was terminated "because" of her performance of an act that public policy would encourage. Thus, Dr. Porter must show a causal link between her performance of an act that public policy would encourage and her termination.

## Damages

If you decide in favor of Dartmouth Health on all claims, you will not consider these instructions about damages. But if you decide for Dr. Porter on any claim, you must determine the amount of money that will compensate her for each item of harm that was caused by Dartmouth Health's conduct. This compensation is called "damages."

Please keep in mind the following general principles as you deliberate. Remember that Dr. Porter has the burden of proving damages by a preponderance of the evidence. Damages may not be based on sympathy, speculation, or guesswork. In making your decision, you should be guided by the evidence, common sense, and your best judgment.

28

**Economic and Non-Economic Damages**

Damages for Dr. Porter's claims can fall into two different categories: economic damages and non-economic damages. Economic damages include such items as lost income and medical expenses. Non-economic damages include such items as lost enjoyment of life, mental anguish, pain and suffering, disability and disfigurement. These damages may include compensation for past harm and future harm, depending on the evidence. If you find that Dr. Porter is entitled to damages, you must determine the total amount and place that amount on the verdict form.

There is no precise standard for calculating these damages. Your damages determination must be just and reasonable in light of the evidence. In determining the damages that Dr. Porter has suffered as a result of her injuries, you should consider the following items:

- Dr. Porter is entitled to damages for any earnings lost in the past, and any probable loss of ability to earn money in the future, caused by Dartmouth Health's conduct. When considering Dr. Porter's future earnings, you should consider Dr. Porter's expected working lifetime.

- Dr. Porter is entitled to damages for any lost enjoyment of life, mental anguish, and pain and suffering caused by Dartmouth Health's conduct. These damages may include any pain, discomfort, fears, anxiety, humiliation, lost enjoyment of life's activities, and any other mental and emotional distress suffered by her in the past, or likely to be suffered in the future.

**Mitigation of Damages**

Dartmouth Health claims that Dr. Porter has failed to mitigate, or minimize, her damages. A plaintiff ordinarily has a general duty to mitigate the damages she incurs, meaning she has a duty to take steps to try to minimize the harm or prevent it from increasing further. In this

29

context, that means Dr. Porter has a duty to attempt to secure or to secure employment that is a suitable alternative to her employment at Dartmouth Health. This duty applies only to those damages that Dr. Porter could have avoided with reasonable effort and without undue risk, burden, or expense, as the duty to mitigate requires only reasonable, practical care and diligence, not extraordinary measures.

The burden is on Dartmouth Health to prove this affirmative defense by a preponderance of the evidence. As part of bearing this burden, Dartmouth Health must present evidence not only that Dr. Porter did not make reasonable efforts to obtain employment, but also that suitable work existed. To sustain its burden, Dartmouth Health must present concrete evidence; mere speculation is not sufficient.

If you find that Dr. Porter failed to mitigate her damages, you must reduce your award of damages, if any, by the amount you find she could have avoided.

### Punitive Damages

Punitive damages are meant to punish a party for its clearly outrageous conduct, and to stop others from acting similarly in the future. In order to award punitive damages, you must find two things:

First, you must find that Dartmouth Health's wrongful conduct was outrageously reprehensible; that is, that the conduct – whether acts or failures to act – was egregious, morally deserving of blame, to a degree of outrage frequently associated with a crime.

Second, you must find that Dartmouth Health acted with malice. You may find malice if you find that Dartmouth Health's reprehensible conduct was intentional and deliberate; that is, that the conduct was the result of Dartmouth Health's bad motive, ill will, or personal spite or hatred toward Dr. Porter. You may also find malice even if Dartmouth Health's motivation

30

behind the intentional, outrageous conduct was to benefit itself, rather than to harm Dr. Porter. Alternatively, you may find malice if Dartmouth Health's wrongful conduct was not intentional, but instead was done with a reckless or wanton disregard of the substantial likelihood that it would cause egregious harm to Dr. Porter; that is, if Dartmouth Health acted – or failed to act – with conscious and deliberate disregard of a known, substantial, and intolerable risk of harm to Dr. Porter, with the knowledge that the conduct was substantially certain to result in the threatened harm.

Where the defendant is a corporation, as is the case here, in order to find that the corporation must pay punitive damages, you must find that the conduct justifying punitive damages was corporate conduct, or was conduct permitted by the corporation. Where the management of the corporation was involved in the conduct itself, it may be considered to be corporate conduct. Where the management of the corporation has knowledge of wrongful conduct by lower-level employees, the corporation may be determined to have permitted the conduct. If you find either corporate conduct, or conduct permitted by the corporation, you may find that the corporation must pay punitive damages.

In determining the amount of punitive damages to award, if any, you may consider such factors as the nature of Dartmouth Health's conduct, the nature of the resulting harm to Dr. Porter, Dartmouth Health's wealth or financial status, and the degree of malice or wantonness in its acts.

### Remaining Damages Issues

It is solely the province of the jury to decide the amount of any damages award. I am giving you these damages instructions so you will know how to proceed if you reach this point in

31

your deliberations. But by giving you these instructions, I do not intend to suggest whether an award is appropriate or what the amount of that award should be.

Where the amount of the damages can be calculated in specific dollar terms, the party seeking damages must present evidence to demonstrate the appropriate amount. With certain types of damages, however, there is no precise measurement, and it is up to you to decide what is fair monetary compensation for those damages. Under no circumstances may you award damages that are speculative or conjectural.

I remind you that any amount of recovery that may have been suggested by the attorneys is not evidence. Moreover, you need not adopt the approaches the attorneys have suggested for calculating damages. As the jury, it is your obligation to arrive at an amount which is supported by the evidence and fair to both parties. The amount of damages, if any, is a determination for the jury.

You should not add any sum for interest to the damages awarded in this case. The court will make such award if appropriate. Similarly, you must not include in your award any costs that Dr. Porter may, or may not, have incurred due to her filing of this lawsuit, or her attorneys' fees. These are matters for the court.

You should not award damages for one item that duplicates an award for another item. In other words, a party is entitled to only one recovery for his or her damages.

**Insurance and Taxes**

You should not speculate about whether either Dartmouth Health or Dr. Porter has any insurance that might cover, or has covered, any damages that you find Dr. Porter has experienced. You also should not speculate about what taxes Dr. Porter might owe on any damage award. You have heard testimony from Dr. Bancroft that Dr. Porter's damages include

32

amounts owed in taxes on any damages award. You may, or may not, take this into account in assessing the amount of Dr. Porter's damages, if any.

The rules that jurors are not to speculate about insurance and taxes are special rules that apply to lawsuits. Those issues are not relevant to your task here. Your job is to award the amount of damages that you determine has been established by the evidence presented to you. Any other issues that have to be resolved are my job, not yours.

**Final Instructions**

This completes my instructions to the jury. I will now provide a copy of these instructions to you, and you will retire to the jury room to deliberate in privacy about the issues in this case. I will also provide a Verdict Form to guide you in your deliberations. The answer to each question on the form must be the unanimous answer of the jury. This means you cannot answer a question on the Verdict Form unless and until all twelve of you agree on the answer. Each question numbered I–VI must be answered. You will also receive the exhibits which were admitted into evidence.

I appoint ███████████████████ as your foreperson. (S)he will be responsible for making sure that the deliberations occur in an orderly fashion and that every juror has an opportunity to participate. (S)he will record the unanimous answers of the jury on the verdict form, and date and sign the jury form. (S)he will also be your spokesperson here in court.

If you need to communicate with the court, please do so in writing. I will then confer with the lawyers about your question and send a written response to you. Please advise the court officer after you reach a verdict, but do not tell the court officer or anyone else what the verdict is until you return to the courtroom at which time I will receive the Verdict Form from your foreperson.

SPA-152

Dated at Burlington, in the District of Vermont, this 8th  day of April 2025.

_____
Kevin J. Doyle
United States Magistrate Judge

United States Code Annotated
   Title 42. The Public Health and Welfare
      Chapter 21. Civil Rights (Refs & Annos)
         Subchapter VI. Equal Employment Opportunities (Refs & Annos)

42 U.S.C.A. § 2000e-2

§ 2000e-2. Unlawful employment practices [Statutory
Text & Notes of Decisions subdivisions I to IV]

Currentness

<Notes of Decisions for 42 USCA § 2000e-2 are displayed in multiple documents.>

**(a) Employer practices**

It shall be an unlawful employment practice for an employer--

**(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

**(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**(b) Employment agency practices**

It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

**(c) Labor organization practices**

It shall be an unlawful employment practice for a labor organization--

**(1)** to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

**(2)** to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities,

or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

**(3)** to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

**(d) Training programs**

It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

**(e) Businesses or enterprises with personnel qualified on basis of religion, sex, or national origin; educational institutions with personnel of particular religion**

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise, and (2) it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

**(f) Members of Communist Party or Communist-action or Communist-front organizations**

As used in this subchapter, the phrase "unlawful employment practice" shall not be deemed to include any action or measure taken by an employer, labor organization, joint labor-management committee, or employment agency with respect to an individual who is a member of the Communist Party of the United States or of any other organization required to register as a Communist-action or Communist-front organization by final order of the Subversive Activities Control Board pursuant to the Subversive Activities Control Act of 1950.

**(g) National security**

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to fail or refuse to hire and employ any individual for any position, for an employer to discharge any individual from any position, or for an employment agency to fail or refuse to refer any individual for employment in any position, or for a labor organization to fail or refuse to refer any individual for employment in any position, if--

**(1)** the occupancy of such position, or access to the premises in or upon which any part of the duties of such position is performed or is to be performed, is subject to any requirement imposed in the interest of the national security of the United

States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President; and

**(2)** such individual has not fulfilled or has ceased to fulfill that requirement.

**(h) Seniority or merit system; quantity or quality of production; ability tests; compensation based on sex and authorized by minimum wage provisions**

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.

**(i) Businesses or enterprises extending preferential treatment to Indians**

Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.

**(j) Preferential treatment not to be granted on account of existing number or percentage imbalance**

Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

**(k) Burden of proof in disparate impact cases**

**(1)(A)** An unlawful employment practice based on disparate impact is established under this subchapter only if--

**(i)** a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

**(ii)** the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

**(B)(i)** With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

**(ii)** If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.

**(C)** The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice".

**(2)** A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this subchapter.

**(3)** Notwithstanding any other provision of this subchapter, a rule barring the employment of an individual who currently and knowingly uses or possesses a controlled substance, as defined in schedules I and II of section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6)), other than the use or possession of a drug taken under the supervision of a licensed health care professional, or any other use or possession authorized by the Controlled Substances Act or any other provision of Federal law, shall be considered an unlawful employment practice under this subchapter only if such rule is adopted or applied with an intent to discriminate because of race, color, religion, sex, or national origin.

**(l) Prohibition of discriminatory use of test scores**

It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.

**(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices**

Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

**(n) Resolution of challenges to employment practices implementing litigated or consent judgments or orders**

**(1)(A)** Notwithstanding any other provision of law, and except as provided in paragraph (2), an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged under the circumstances described in subparagraph (B).

**(B)** A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal civil rights laws--

**(i)** by a person who, prior to the entry of the judgment or order described in subparagraph (A), had--

**(I)** actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain; and

**(II)** a reasonable opportunity to present objections to such judgment or order; or

**(ii)** by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.

**(2)** Nothing in this subsection shall be construed to--

**(A)** alter the standards for intervention under rule 24 of the Federal Rules of Civil Procedure or apply to the rights of parties who have successfully intervened pursuant to such rule in the proceeding in which the parties intervened;

**(B)** apply to the rights of parties to the action in which a litigated or consent judgment or order was entered, or of members of a class represented or sought to be represented in such action, or of members of a group on whose behalf relief was sought in such action by the Federal Government;

**(C)** prevent challenges to a litigated or consent judgment or order on the ground that such judgment or order was obtained through collusion or fraud, or is transparently invalid or was entered by a court lacking subject matter jurisdiction; or

**(D)** authorize or permit the denial to any person of the due process of law required by the Constitution.

**(3)** Any action not precluded under this subsection that challenges an employment consent judgment or order described in paragraph (1) shall be brought in the court, and if possible before the judge, that entered such judgment or order. Nothing in this subsection shall preclude a transfer of such action pursuant to section 1404 of Title 28.

### CREDIT(S)

(Pub.L. 88-352, Title VII, § 703, July 2, 1964, 78 Stat. 255; Pub.L. 92-261, § 8(a), (b), Mar. 24, 1972, 86 Stat. 109; Pub.L. 102-166, Title I, §§ 105(a), 106, 107(a), 108, Nov. 21, 1991, 105 Stat. 1074-1076.)

Notes of Decisions (5670)

**O'CONNOR'S CROSS REFERENCES**

EEOC Enforcement Guidances: *National Origin Discrimination*, Nov. 2016, www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination; *Pregnancy Discrimination & Related Issues*, June 2015, www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues; *Consideration of Arrest & Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act*, Apr. 2012, www.eeoc.gov/laws/guidance/enforcement-guidance-consideration-arrest-and-conviction-records-employment-decisions; *Unlawful Disparate Treatment of Workers with Caregiving Responsibilities*, May 2007, www.eeoc.gov/laws/guidance/enforcement-guidance-unlawful-disparate-treatment-workers-caregiving-responsibilities; *Sex Discrimination in the Compensation of Sports Coaches in Educational Institutions*, Oct. 1997, www.eeoc.gov/laws/guidance/enforcement-guidance-sex-discrimination-compensation-sports-coaches-educational; *After-Acquired Evidence & McKennon v. Nashville Banner Publishing Co.*, Dec. 1995, www.eeoc.gov/laws/guidance/enforcement-guidance-after-acquired-evidence-and-mckennon-v-nashville-banner.

See also 29 C.F.R. pts. 30, 1608; 36 C.F.R. pt. 906; 41 C.F.R. pts. 60-2 to 60-741; *O'Connor's Federal Forms*, FORMS 2B:12, 2B:13; 3L:14, 3L:15; 6G:15 to 6G:18; 6H:15 to 6H:18; 6I:15 to 6I:18.

**O'CONNOR'S ANNOTATIONS**

*Generally*

*EEOC v. Abercrombie & Fitch Stores*, 575 U.S. 768, 771 (2015). The "two proscriptions [in §2000e-2(a)], often referred to as the 'disparate treatment' (or 'intentional discrimination') provision and the 'disparate impact' provision, are the only causes of action under Title VII."

*EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 592 (1981). Title VII limits the authority of the EEOC to "make public disclosure of information it has obtained in investigating and attempting to resolve a claim of employment discrimination. *At 598:* Congress did not include charging parties within the 'public' to whom disclosure of confidential information is illegal under the provisions of Title VII here at issue."

*Fitzpatrick v. Bitzer*, 427 U.S. 445, 448-49 (1976). "Title VII, which originally did not include state and local governments, [has] been amended to bring the States within its purview."

*Griffin v. Finkbeiner*, 689 F.3d 584, 600 (6th Cir.2012). "An individual cannot be held personally liable for violations of Title VII." *See also Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir.2006) (unlike Title VII claim, claim under 42 U.S.C. §1983 can be brought against individuals); *Dearth v. Collins*, 441 F.3d 931, 933-34 (11th Cir.2006) (no individual liability under Title VII based on alter-ego doctrine).

*Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 392 (7th Cir.2010). "Employers need not divine complaints from the ether, guessing at the subjective suspicions of employees. An aggrieved employee must at least report--clearly and directly-- nonobvious policy violations troubling him so that supervisors may intervene."

*Thorn v. Amalgamated Transit Un.*, 305 F.3d 826, 832 (8th Cir.2002). "A labor organization is liable for an employer's discrimination in the workplace if it causes or attempts to cause the employer to discriminate, … or if the union 'purposefully acts or refuses to act in a manner which prevents or obstructs a reasonable accommodation by the employer,' … or if the union 'pursue[s] a policy of rejecting disparate-treatment grievances' meant to vindicate employee rights protected by Title VII…." *See also Beck v. United Food & Commercial Workers Un.*, 506 F.3d 874, 882 (9th Cir.2007) (union violates Title VII if it deliberately declines to pursue member's claim because of her gender); *EEOC v. Pipefitters Ass'n Local Un. 597*, 334 F.3d 656, 659 (7th Cir.2003) (union that does not effect changes in workplace is not guilty of discrimination in workplace).

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

*Bona Fide Occupational Qualification (BFOQ)*

*UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 203 (1991). See annotation under *Sex Discrimination--Pregnancy Discrimination Act*.

**Editor's note:** Neither race nor color is included within Title VII §703(e)(1) as a basis for a BFOQ defense. *See* 42 U.S.C. §2000e-2(e).

*Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir.2010). "It is now widely accepted that a company's desire to cater to the perceived racial preferences of its customers is not a defense under Title VII for treating employees differently based on race. [ER] argues that this well-settled reading of Title VII does not apply--or should not apply--in the long-term care setting. [ER] contends that long-term care facilities have obligations to their clients that place them in a different position from most employers. [¶] [G]ender may be a legitimate criterion--a [BFOQ]--for accommodating patients' privacy interests. It does not follow, however, that patients' privacy interests excuse disparate treatment based on race. Title VII forbids employers from using race as a BFOQ…. Just as the law tolerates same-sex restrooms or same-sex dressing rooms, but not white-only rooms, to accommodate privacy needs, Title VII allows an employer to respect a preference for same-sex health providers, but not same-race providers."

*Breiner v. Nevada Dept. of Corr.*, 610 F.3d 1202, 1212 (9th Cir.2010). "Appellate courts … requir[e] prison administrators to identify a concrete, logical basis for concluding that gender restrictions are 'reasonably necessary.' *At 1213:* [E]ven in the unique context of prison employment, administrators seeking to justify a BFOQ must show 'a high correlation between sex and ability to perform job functions.' Moreover, the particular staffing restriction at issue must match those 'job functions' with a high degree of specificity to be found reasonably necessary. *At 1215:* A BFOQ can be established only by 'objective, verifiable requirements [that] concern job-related skills and aptitudes.'"

*Pime v. Loyola Univ.*, 803 F.2d 351, 354 (7th Cir.1986). "[I]n looking at claims of BFOQ, courts have considered only the content of the particular job at issue." Held: Requirement that philosophy professor at a Jesuit university be a Jesuit was a BFOQ.

*Constructive Discharge*

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 140-41 (2004). See annotation under *Vicarious Liability*.

*Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir.2007). "[A] 'constructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.' *At 1184 n.7:* Unlike some of our sister circuits, we do not require that, in addition to proving that working conditions were intolerable, a plaintiff must establish that his employer created the intolerable conditions with the intent to cause the employee to resign. *At 1185:* Because we require job conditions to be worse than those which a reasonable person could tolerate, '[a]n employee may not … be unreasonably sensitive to a change in job responsibilities.'" *See also U.S. EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 143-44 (4th Cir.2017) (in *Green v. Brennan*, 578 U.S. 547 (2016), Supreme Court rejected element of intent). *But see Ames v. Nationwide Mut. Ins.*, 760 F.3d 763, 767-68 (8th Cir.2014) (EE must prove that ER created intolerable conditions with intent to cause EE to quit and that EE gave ER reasonable opportunity to resolve problem before quitting).

*Harvill v. Westward Comms.*, 433 F.3d 428, 439-40 (5th Cir.2005). See annotation under 42 U.S.C. §2000e-3, *Retaliation-- Materially Adverse Action*.

***Disparate Impact--Generally***

*Ricci v. DeStefano*, 557 U.S. 557, 580 (2009). See annotation under *Disparate Treatment--Generally*.

*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645-46 (1989). Under the disparate-impact theory, "a facially neutral employment practice may be deemed violative of Title VII without evidence of the employer's subjective intent to discriminate that is required in a 'disparate-treatment' case. *At 656:* '[T]he plaintiff's burden in establishing a prima facie [disparate-impact] case goes beyond the need to show that there are statistical disparities in the employer's work force. The plaintiff must begin by identifying the specific employment practice that is challenged.'" *See also Adams v. City of Indianapolis*, 742 F.3d 720, 731-32 (7th Cir.2014) (disparate-impact claim can be based on any employment practice, not just facially neutral practice).

**Editor's note:** Other aspects of ***Wards Cove*** were effectively overruled by §105 of the Civil Rights Act of 1991. *See* 42 U.S.C. §2000e-2(k).

*Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude [minorities] cannot be shown to be related to job performance, the practice is prohibited. *At 432:* [G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and unrelated to measuring job capability."

**Editor's note:** The ***Griggs*** decision was codified in §105 of the Civil Rights Act of 1991. *See* 42 U.S.C. §2000e-2(k).

*U.S. v. Brennan*, 650 F.3d 65, 113-14 (2d Cir.2011). "[A] strong basis in evidence of disparate-impact liability is an objectively reasonable basis to fear such liability. It is evaluated at the time an employer takes a race-conscious action. It relies on real evidence, not just subjective fear or speculation. Because it focuses on liability rather than mere litigation, it requires both objectively strong evidence of a *prima facie* case (or perhaps actual proof of a *prima facie case*) of disparate impact, and objectively strong evidence of non-job-relatedness or a less discriminatory alternative. [¶] Even after an employer has shown a strong basis in evidence that it faces disparate-impact liability, the employer does not have *carte blanche* to take whatever race- or gender-conscious actions it pleases. Rather, 'the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability *if it fails to take the race-conscious [or gender-conscious], discriminatory action*.' That is to say, there must be a strong basis in evidence that the race- or gender-conscious action taken by the employer is *necessary* to avoid disparate-impact liability."

*Candelario Ramos v. Baxter Healthcare Corp.*, 360 F.3d 53, 61 (1st Cir.2004). "[D]ifferent treatment in different locations is permissible absent an intent to discriminate. *At 62:* Location is often a proxy for differences in cost and other competitive circumstances; and while Congress could have made those circumstances a separate defense, the difficulties of showing that a difference in pay precisely correlated with a difference in cost would be formidable. In effect, different locations are simply a safe harbor in cases where there is no intentional discrimination."

***Disparate Impact--Prima Facie Case***

*Lewis v. City of Chi.*, 560 U.S. 205, 213 (2010). Section 2000e-2(k) "does indeed address the burden of proof--not just who bears it, however, but also what it consists of. It *does* set forth the essential ingredients of a disparate-impact claim: It says that a claim 'is established' if an employer 'uses' an 'employment practice' that 'causes a disparate impact' on one of the enumerated bases. That it also sets forth a business-necessity defense employers may raise … and explains how plaintiffs may prevail despite that defense … is irrelevant. Unless and until the defendant pleads and proves a business-necessity defense, the plaintiff wins simply by showing the stated elements."

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988). "[S]ubjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases. *At 994:* [T]he plaintiff's burden in establishing a prima

facie case goes beyond the need to show that there are statistical disparities in the employer's work force. [T]he plaintiff is … responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *See also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1224 (10th Cir.2013) (when challenged employment practice involves ER discretion, EE's statistical analysis must control for constraints on decisionmaker's discretion); *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1486 (9th Cir.1993) (in disparate-impact case involving terms, conditions, or privileges of employment, EE must prove significant adverse effects of ER's policy that do not affect EE population in general to the same degree).

**Editor's note:** Other aspects of *Watson* were effectively overruled by §105 of the Civil Rights Act of 1991. *See* 42 U.S.C. §2000e-2(k).

*New York City Transit Auth. v. Beazer*, 440 U.S. 568, 584 (1979). "A prima facie violation of [§2000e-2] may be established by statistical evidence showing that an employment practice has the effect of denying the members of one race equal access to employment opportunities." *See also Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) (Title VII does not require that statistical evidence of disparate impact be based on characteristics of actual applicants; potential applicants might be discouraged from applying by discriminatory standards); *International Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 339-40 (1977) (statistics' usefulness depends on all surrounding facts and circumstances); *Bolden-Hardge v. Office of the Cal. State Controller*, 63 F.4th 1215, 1227-28 (9th Cir.2023) (statistics are not strictly necessary, especially where disparate impact is obvious); *Bolden-Hardge v. Office of the Cal. State Controller*, 63 F.4th 1215, 1227-28 (9th Cir.2023) (statistics are not strictly necessary, especially where disparate impact is obvious); *Jones v. City of Boston*, 752 F.3d 38, 49, 52-53 (1st Cir.2014) (statistically significant results need not be sufficiently large or "practically significant" to establish a prima facie disparate-impact claim; rejecting EEOC's four-fifths rule to measure practical significance of disparate impact); *Isabel v. City of Memphis*, 404 F.3d 404, 412-13 (6th Cir.2005) (four-fifths rule is not the only statistical analysis; other alternative statistical analyses are acceptable).

*Disparate Impact--Tests*

*Washington v. Davis*, 426 U.S. 229, 246-47 (1976). "[W]hen hiring and promotion practices disqualifying substantially disproportionate numbers of blacks are challenged, discriminatory purpose need not be proved, and … it is an insufficient response to demonstrate some rational basis for the challenged practices. It is necessary, in addition, that they be 'validated' in terms of job performance in any one of several ways, perhaps by ascertaining the minimum skill, ability, or potential necessary for the position at issue and determining whether the qualifying tests are appropriate for the selection of qualified applicants for the job in question. However this process proceeds, it involves a more probing judicial review of, and less deference to, the seemingly reasonable acts of administrators and executives than is appropriate under the [U.S.] Constitution where special racial impact, without discriminatory purpose, is claimed." *See also* 29 C.F.R. §1607.5 (ERs may use content-related, construct-related, or criterion-related validity studies); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 998 (1988) (standardized tests and criteria need not be justified through formal validation studies); *Ernst v. City of Chi.*, 837 F.3d 788, 796 (7th Cir.2016) (when ER relies on formal validation studies, studies must comply with federal regulations establishing technical standards for validation studies).

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975). "[D]iscriminatory tests are impermissible unless shown, by professionally acceptable methods, to be 'predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.'" *Compare Bauer v. Lynch*, 812 F.3d 340, 351 (4th Cir.2016) (physical fitness tests that distinguish between sexes because of physiological differences but impose equal burden of compliance on both men and women, requiring same level of physical fitness of each, do not violate Title VII)*, with Dean v. City of Shreveport*, 438 F.3d 448, 463 (5th Cir.2006) (oral or written tests violate Title VII when they require different cutoff scores, based solely on race and sex, for continuing further in hiring process).

*Disparate Impact--Defenses*

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 998 (1988). "[W]hen the defendant has met its burden of producing evidence that its employment practices are based on legitimate business reasons, the plaintiff must 'show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship.' Factors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals." *See also **Griggs v. Duke Power Co.**, Disparate Impact--Generally.*

**Editor's note:** Other aspects of *Watson* were effectively overruled by §105 of the Civil Rights Act of 1991. *See* 42 U.S.C. §2000e-2(k).

*Connecticut v. Teal*, 457 U.S. 440, 442 (1982). Under the bottom-line defense theory, "an employer's acts of racial discrimination in promotions--effected by an examination having disparate impact--would not render the employer liable for the racial discrimination suffered by employees barred from promotion if the 'bottom-line' result of the promotional process was an appropriate racial balance. We hold that the 'bottom line' does not preclude [EEs] from establishing a prima facie case, nor does it provide [ER] with a defense to such a case." *See also **Diaz v. Kraft Foods Global, Inc.**, 653 F.3d 582, 588 (7th Cir.2011)* (discrimination against one member of protected class violates Title VII, no matter how well others in class are treated; "there is no token exception to anti-discrimination law").

*NAACP v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 477 (3d Cir.2011). "We have interpreted the business-necessity defense to mean that employers may not use criteria which have a discriminatory effect unless those criteria define the minimum qualifications necessary to perform the job. The employer bears the burdens of production and persuasion … and must assert *actual* reasons why the challenged employment practice is important to the position; the mere assertion of conceivable bases is not sufficient…. The Supreme Court has refused to accept bare or common-sense-based assertions of business necessity and instead requires some level of empirical proof that challenged hiring criteria accurately predict job performance. Employers cannot rely on rough-cut measures of employment-related qualities; rather they must tailor their criteria to measure those qualities accurately and directly for each applicant. [¶] [A] plaintiff can overcome an employer's business-necessity defense by showing that alternative practices would have less discriminatory effects while ensuring that candidates are duly qualified." (Internal quotes omitted.) *See also **IBEW v. Mississippi Power & Light Co.**, 442 F.3d 313, 318 (5th Cir.2006)* (Title VII Ps bear burden of demonstrating existence of acceptable alternative business practices).

*Disparate Pay*

For more annotations on this topic, see 29 U.S.C. §206, *Equal Pay Act--EPA & Title VII*.

*Taylor v. UPS, Inc.*, 554 F.3d 510, 523 (5th Cir.2008). "An individual plaintiff claiming disparate treatment in pay under Title VII must show that his circumstances are 'nearly identical' to those of a better-paid employee who is not a member of the protected class. In making this showing, an individual plaintiff pursuing an *individual* claim may not rely on the type of pattern-or-practice evidence that is acceptable in class action suits alleging similar conduct, such as general statistical evidence. [¶] Instead, he must present *prima facie* evidence that his pay was lower than *specific* employees who are not members of the protected class."

*Fair v. Norris*, 480 F.3d 865, 870 (8th Cir.2007). "While Title VII does prohibit race-based wage discrimination, … a plaintiff who pursues such a claim must show that her employer 'paid different wages to employees of different races for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'"

*Dandy v. UPS, Inc.*, 388 F.3d 263, 274 (7th Cir.2004). "To state a *prima facie* case of disparate compensation, a plaintiff must show that: (1) she is a member of a protected group; (2) she was fulfilling her employer's legitimate performance expectations;

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

and (3) she suffered an adverse employment action in that she was paid a lower salary than a 'similarly situated' nonprotected class member. To be 'similarly situated,' [EE] must show that her performance, qualifications, and conduct were comparable to the nonprotected class member in 'all material respects.' [¶] We must … reject [EE's] disparate compensation claim as she has failed to identify any 'similarly situated' male or white employees who were given higher compensation. [S]he has not provided us with any necessary comparative evidence such as: (1) her current salary; (2) her past salary; (3) the salary of her [comparators] during the relevant time period; (4) when her [comparators] began working for [ER]; or most importantly, (5) their qualifications, experience, or education. [A]n employee has failed to prove that she was 'similarly situated' to her comparitors when she did not present evidence that she and coworkers shared the similar 'attributes, experience, education, and qualifications relevant to the position sought….'" *See also Ottman v. City of Independence*, 341 F.3d 751, 758 (8th Cir.2003) (explaining burden-shifting in disparate-pay cases).

### Disparate Treatment--Generally

*EEOC v. Abercrombie & Fitch Stores*, 575 U.S. 768, 772 (2015). ER argues "that an applicant cannot show disparate treatment without first showing that an employer has 'actual knowledge' of the applicant's need for an accommodation. We disagree. Instead, an applicant need only show that his need for an accommodation was a motivating factor in the employer's decision. *At 773:* [T]he intentional discrimination provision prohibits certain *motives*, regardless of the state of the actor's knowledge. … An employer who has actual knowledge of the need for an accommodation does not violate Title VII by refusing to hire an applicant if avoiding that accommodation is not his *motive*. Conversely, an employer who acts with the motive of avoiding accommodation may violate Title VII even if he has no more than an unsubstantiated suspicion that accommodation would be needed. *At 773*: A request for accommodation, or the employer's certainty that the practice exists, may make it easier to infer motive, but is not a necessary condition of liability." *See also Nobach v. Woodland Vill. Nursing Ctr., Inc.*, 799 F.3d 374, 378 (5th Cir.2015).

*Ricci v. DeStefano*, 557 U.S. 557, 580 (2009). "We consider … whether the purpose to avoid disparate-impact liability excuses what otherwise would be prohibited disparate-treatment discrimination. *At 585:* [U]nder Title VII, before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *See also Briscoe v. City of New Haven*, 654 F.3d 200, 208 (2d Cir.2011) (*Ricci*'s "strong basis in evidence" standard expressly applies to disparate-treatment claims and does not extend to disparate-impact claims).

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C.Cir.2008). "In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not--*and should not*--decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*. Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *But see Hinds v. Sprint/United Mgmt.*, 523 F.3d 1187, 1202 n.12 (10th Cir.2008) (court reserves the right to use *McDonnell Douglas* framework in analyzing discrimination and retaliation claims on summary judgment).

### Disparate Treatment--Adverse Employment Action

*Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024). "To make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment. [¶] What the transferee does not have to show, according to [§2000e-2(a)(1)], is that the harm incurred was 'significant.' Or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *See also Arnold v. United Airlines, Inc.*, 142 F.4th 460, 470 (7th Cir.2025) (*Muldrow* applies to situations not involving a transfer); *McNeal v. City of Blue Ash*, 117 F.4th 887, 900 (6th Cir.2024) (although *Muldrow* involved transfers, Court made clear its interpretation stemmed from Title VII's generally applicable statutory language which contains no language requiring Ps to show high level of harm).

*Hamilton v. Dallas Cty.*, 79 F.4th 494, 499-500 (5th Cir.2023). "For decades, our precedent has limited disparate-treatment liability under [Title VII] §703(a)(1) [now 42 U.S.C. §2000e-2(a)(1)] to 'ultimate employment decisions.' By this phrase, we meant only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating. *At 501:* But that's not what the statute says--at all. Nowhere does Title VII say, explicitly or implicitly, that employment discrimination is lawful if limited to non-ultimate employment decisions. *At 502-03:* [N]o other court of appeals applies so narrow a concept of an adverse employment action as the 'ultimate employment decision' rule. Satisfied that our 'ultimate employment decision' standard lies on fatally flawed foundations, we flatten it today [and] apply the statute as it is written and as construed by the Supreme Court. [¶] To plead a disparate-treatment claim under Title VII, a plaintiff must allege facts plausibly showing (1) an adverse employment action, (2) taken against a plaintiff because of her protected status. [¶] At issue in this case is the first element: whether [EEs] have adequately shown an 'adverse employment action' for Title VII purposes. That term, which appears nowhere in the statute, is a judicially-coined term utilized as shorthand for the statutory phrase 'compensation, terms, conditions, or privileges of employment.' Thus, to plead an adverse employment action, a plaintiff need only allege facts plausibly showing discrimination in hiring, firing, compensation, or in the terms, conditions, or privileges of his or her employment." (Internal quotes omitted.) *See also* *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 305-06 (2d Cir.2017) (notice of termination itself is adverse employment action, even if ER later rescinds termination).

*Phelan v. Cook Cty.*, 463 F.3d 773, 780-81 (7th Cir.2006), *overruled on other grounds*, *Ortiz v. Werner Enters.*, 834 F.3d 760 (7th Cir.2016). See annotation under 42 U.S.C. §2000e-5, *Remedies*.

**Disparate Treatment--Mixed or Dual Motives**
*University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013). "An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act. So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision. This principle is the result of an earlier case from this Court, *Price Waterhouse v. Hopkins*, 490 U.S. 228 … (1989), and an ensuing statutory amendment by Congress that codified in part and abrogated in part the holding in **Price Waterhouse** [in 42 U.S.C.] §§2000e-2(m), 2000e-5(g)(2)(B)."

*Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92 (2003). "The question before us in this case is whether a plaintiff must present direct evidence of discrimination in order to obtain a mixed-motive instruction under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991…. We hold that direct evidence is not required. *At 101:* In order to obtain an instruction under §2000e-2(m), a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'"

*Makky v. Chertoff*, 541 F.3d 205, 215 (3d Cir.2008). "We hold today that a mixed-motive plaintiff has failed to establish a prima facie case of a Title VII employment discrimination claim if there is unchallenged objective evidence that s/he did not possess the minimal qualifications for the position plaintiff sought to obtain or retain. *At 216:* We caution that we are not imposing a requirement that mixed-motive plaintiffs show that they were subjectively qualified for their jobs, i.e., performed their jobs well. Rather, we speak only in terms of an absolute minimum requirement of qualification…."

*White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir.2008), *overruled on other grounds*, *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024). "[T]he **McDonnell Douglas/Burdine** burden-shifting framework does *not* apply to the summary judgment analysis of Title VII mixed-motive claims. We … hold that to survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was *a* motivating factor' for the defendant's adverse employment action. This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim. [I]t is irrelevant, for purposes of a summary judgment determination, whether the

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

plaintiff has presented direct or circumstantial evidence in support of the mixed-motive claim….” *See also Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1238-39 & n.8 (11th Cir.2016) (collecting cases; majority of circuits hold that **McDonnell Douglas** framework does not apply to mixed-motive claims). *But see Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir.2004) (**McDonnell Douglas/Burdine** burden-shifting framework continues to apply to summary-judgment analysis of mixed-motive claims after **Desert Palace**).

### *Disparate Treatment--Shifting Burdens of Production/Proof*

*Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-58 (2006). “The Court of Appeals, in finding [EE’s] evidence [of superior qualification to a comparator] insufficient, cited one of its earlier precedents and stated: Pretext can be established through comparing qualifications only when the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face. [¶] The visual image of words jumping off the page to slap you (presumably a court) in the face is unhelpful and imprecise as an elaboration of the standard for inferring pretext from superior qualifications. … This is not the occasion to define more precisely what standard should govern pretext claims based on superior qualifications.” (Internal quotes omitted.) *See also King v. Rumsfeld*, 328 F.3d 145, 149-50 (4th Cir.2003) (proof that EE’s performance was comparable to coworkers’ is not proof that EE met ER’s legitimate job-performance expectations; EE must offer expert testimony on ER’s expectations and analysis of EE’s performance).

*St. Mary’s Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). “The factfinder’s disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant’s proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and … upon such rejection, ‘[n]o additional proof of discrimination is *required*[ ]’….” *See also Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) (it is permissible for trier of fact to infer ultimate fact of discrimination from falsity of ER’s explanation).

*Anderson v. City of Bessemer City*, 470 U.S. 564, 566 (1985). “[A] finding of discriminatory intent in an action brought under Title VII … is a factual finding that may be overturned on appeal only if it is clearly erroneous.” *See also Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1285 (5th Cir.1994).

*Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). “The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination. *At 254:* The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant’s evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.” *See also USPS Bd. of Govs. v. Aikens*, 460 U.S. 711, 715 (1983) (“Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.”).

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). “The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant’s qualifications.” *See also O’Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 310-11 (1996).

*Ortiz v. Werner Enters.*, 834 F.3d 760, 765 (7th Cir.2016). To evaluate evidence, the correct legal standard “is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff’s race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself--or whether just the ‘direct’ evidence does so, or the ‘indirect’ evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled ‘direct’ or ‘indirect.’” *See also Cornwell v. Electra*

*Cent. Credit Un.*, 439 F.3d 1018, 1030 (9th Cir.2006) (for purposes of summary judgment, disparate-treatment-P relying on circumstantial evidence does not need to produce more, or better, evidence than P relying on direct evidence).

### *Disparate Treatment--Stray Remarks*

*Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 476 (5th Cir.2015). "To determine whether comments in the workplace constitute 'direct evidence,' or only 'stray remarks,' we have looked to four factors: whether the comments are (1) related to the plaintiff's protected characteristic; (2) proximate in time to the challenged employment decision; (3) made by an individual with authority over the challenged employment decision; and (4) related to the challenged employment decision. In applying this test, our ultimate focus is on whether the comments prove, 'without inference or presumption, that race was *a* basis in employment decisions' in the plaintiff's workplace. Notably, when the proximity in time of the comments to the challenged employment decision is unclear, we have found the proximity-in-time factor to be satisfied when the comments were 'routine['] or 'made over a lengthy period of time.'" *See also DeJesus v. WP Co.*, 841 F.3d 527, 536 (D.C.Cir.2016) (although isolated stray remarks unrelated to employment decision do not, without more, permit jury to infer discrimination, remarks can be circumstantial evidence of decisionmaker's broad-based animus or bias).

### *Disparate Treatment--Systemic & Pattern-or-Practice Discrimination*

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501-02 (1989). "In the employment context, we have recognized that for certain entry level positions or positions requiring minimal training, statistical comparisons of the racial composition of an employer's work force to the racial composition of the relevant population may be probative of a pattern of discrimination. But where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task."

*Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 869 (1984). "The question to be decided is whether a judgment in a class action determining that an employer did not engage in a general pattern or practice of racial discrimination against the certified class of employees precludes a class member from maintaining a subsequent civil action alleging an individual claim of racial discrimination against the employer." Held: Subsequent individual action not precluded.

*Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir.2005). "[B]ecause [EE] alleged a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, [EE] ultimately had to prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts. He had to establish, by a preponderance of the evidence, that racial discrimination was [ER's] standard operating procedure…. By demonstrating the existence of a discriminatory pattern or practice, [EE] would establish a presumption that he had been discriminated against on account of race. [¶] In a case in which the plaintiff has alleged that his employer has engaged in a pattern or practice of discrimination, statistical data is relevant because it can be used to establish a general discriminatory pattern in an employer's hiring or promotion practices. Such a discriminatory pattern is probative of motive and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue." (Internal quotes omitted.) *See also Morgan v. UPS*, 380 F.3d 459, 471 (8th Cir.2004) (individual testimony regarding intentional discrimination brings statistical evidence convincingly to life).

*Bacon v. Honda of Am. Mfg.*, 370 F.3d 565, 575 (6th Cir.2004). "We … hold that the pattern-or-practice method of proving discrimination is not available to individual plaintiffs. We subscribe to the rationale that a pattern-or-practice claim is focused on establishing a policy of discrimination; because it does not address individual hiring decisions, it is inappropriate as a vehicle for proving discrimination in an individual case. … However, pattern-or-practice evidence may be relevant to proving an otherwise-viable individual claim for disparate treatment under the *McDonnell Douglas* framework." *See also Taylor v. UPS, Inc.*, 554 F.3d 510, 523 (5th Cir.2008).

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

***Disparate Treatment--Failure to Promote***

*Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1204 (11th Cir.2013). "To make out a prima facie case in a failure to promote case, the plaintiff needs to show, among other things, that she 'applied for and was qualified for a promotion.' [¶] Our circuit precedent considers an employee qualified for a promotion if the employee offers evidence that 'she satisfied an employer's objective qualifications.' But where the qualifications for the job are neither 'objectively verifiable' nor 'easily obtainable or within the plaintiff's possession,' … the plaintiff need not satisfy this portion of the prima facie case."

*Breiner v. Nevada Dept. of Corr.*, 610 F.3d 1202, 1208-09 (9th Cir.2010). "It is beyond dispute that the denial of a single promotion opportunity … is actionable under Title VII. Whether there will be other promotional opportunities for which the person may become eligible has never been a consideration. [¶] Further, Title VII is offended when an *individual* suffers discrimination with respect to a particular adverse employment decision, even if others of the same protected group are not similarly disadvantaged. … Put another way, Title VII protects the ability to pursue one's own career goals without being discriminated against on the basis of race or sex, even if others of the same race or sex were not subject to disadvantage."

*Jones v. City of Springfield*, 554 F.3d 669, 673 (7th Cir.2009). "The lack of an opening is always a legitimate reason for refusing to hire or promote. If, for example, no employee is promoted during the relevant time period, a failure-to-promote claim must fail because the claimant cannot argue that he was treated differently than anyone else. In other words, Title VII does not mandate the creation of new positions. In rare cases, the decision not to create a position can be discriminatory, but there must be evidence showing that the decision was racially motivated." *See also* *Chambers v. Burwell*, 824 F.3d 141, 145 (D.C.Cir.2016) (when supervisor regularly requested upgraded vacancies to promote EEs, decision not to request one for EE because of her protected characteristic could be adverse employment action).

*Alvarado v. Texas Rangers*, 492 F.3d 605, 614 (5th Cir.2007), *overruled on other grounds*, *Hamilton v. Dallas Cty.*, 79 F.4th 494 (5th Cir.2023). "[T]he denial of a transfer *may* be the objective equivalent of the denial of a promotion …; if the position sought was objectively better, then the failure to award the position to the plaintiff can constitute an adverse employment action. In determining whether the new position is objectively better, a number of factors may be relevant, including whether the position: entails an increase in compensation or other tangible benefits; provides greater responsibility or better job duties; provides greater opportunities for career advancement; requires greater skill, education, or experience; is obtained through a complex competitive selection process; or is otherwise objectively more prestigious. *At 616:* An employer's subjective reason for not selecting a candidate, such as a subjective assessment of the candidate's performance in an interview, may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection. Such a reason will satisfy the employer's burden of production, however, only if the employer articulates a clear and reasonably specific basis for its subjective assessment."

*Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719-20 (6th Cir.2006). "To set forth a prima facie case of discrimination based on a failure to promote, plaintiffs must show: (1) they are members of a protected class; (2) they applied and were qualified for promotion; (3) they were considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions. [¶] [T]he burden then shifts to the defendants to articulate some legitimate, nondiscriminatory reason for [their] action. If the defendants carry this burden, plaintiffs must prove that the legitimate reasons offered by defendants were in fact a pretext for discrimination. A plaintiff establishes pretext by showing that the reason offered by the defendant: (1) has no basis in fact; (2) did not actually motivate the decision not to promote, or (3) was insufficient to warrant the decision not to promote." *See also* *Nichols v. Southern Ill. Univ.-Edwardsville*, 510 F.3d 772, 783-84 (7th Cir.2007); *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir.2004).

*Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir.2004). "If an employer has a formal system of posting vacancies and allowing employees to apply for such vacancies, an employee who fails to apply for a particular position cannot establish a prima facie case of discriminatory failure to promote. *At 431:* On the other hand, if the employer fails to make its employees aware of vacancies, the application requirement may be relaxed and the employee treated as if she had actually applied for a specific position. *At 433:* '[T]he failure to apply for a job does not preclude recovery if a claimant can demonstrate that he would have applied but for an accurate knowledge of the employer's discrimination and that he would have been discriminatorily

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

rejected had he actually applied.'" *See also Volling v. Kurtz Paramedic Servs.*, 840 F.3d 378, 384 (7th Cir.2016); *EEOC v. Audrain Health Care, Inc.*, 756 F.3d 1083, 1087 (8th Cir.2014).

*Employment Agency*

*EEOC v. Kelly Servs.*, 598 F.3d 1022, 1030 (8th Cir.2010). "An employment agency's referral obligations under [42 U.S.C.] §2000e-2 is a question of first impression for this court. [¶] [T]he plaintiff must show that the employment agency discriminated against her 'based on her [religion] in relation to referrals.' [¶] In a typical … discrimination claim against an employer, once the plaintiff establishes a prima facie case, we require 'the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action.' We see no reason to vary from this burden-shifting scheme simply because the claim is against an employment agency instead of an employer. *At 1031:* [N]othing in [42 U.S.C.] §2000e(j) suggests that an 'employment agency,' in defending itself against a claim of … discrimination, must demonstrate that *the employer* to which it would be referring the temporary worker would suffer an undue hardship if it had to accommodate that worker. *At 1032:* Nothing in §2000e-2(b) suggests that an employment agency should be held liable if the agency has no reason to believe that the 'the employer's claim of bona fide occupations qualification is without substance.'"

*Hostile Work Environment--Generally*

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). "In determining whether an actionable hostile work environment claim exists, we look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *See also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001); *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir.2014).

*Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment. When the workplace is permeated with discriminatory intimidation, ridicule, and insult … that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, … Title VII is violated. *At 22:* Title VII comes into play before the harassing conduct leads to a nervous breakdown. [¶] Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological wellbeing, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, … there is no need for it also to be psychologically injurious." (Internal quotes omitted.) *See also Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986); *Gentry v. Export Packaging Co.*, 238 F.3d 842, 850 (7th Cir.2001).

*Rasmy v. Marriott Int'l*, 952 F.3d 379, 389 (2d Cir.2020). "[C]onduct not directly targeted at or spoken to an individual but purposefully taking place in his presence can nevertheless transform his work environment into a hostile or abusive one…."

*Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir.2018). "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *See also Smith v. Rock-Tenn Servs.*, 813 F.3d 298, 309-10 (6th Cir.2016).

*Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 213 n.11 (3d Cir.2017). "Some of our sister circuits have concluded that the *McDonnell Douglas* framework does not apply in hostile work environment sexual harassment cases. We agree that the burden-shifting framework is inapplicable … because … there can be no legitimate justification for a hostile work environment." *See also Pollard v. E.I. DuPont de Nemours Co.*, 213 F.3d 933, 943 (6th Cir.2000), *rev'd on other grounds*, 532 U.S. 843 (2001).

*Castleberry v. STI Grp.*, 863 F.3d 259, 264-65 (3d Cir.2017). "The Supreme Court's decision to adopt the 'severe or pervasive' standard … lends support that an isolated incident of discrimination (if severe) can suffice to state a claim for harassment. Otherwise, why create a disjunctive standard where alleged 'severe' conduct--even if not at all 'pervasive'--can establish a

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

plaintiff's harassment claim? [¶] Indeed, other Circuits have similarly held that an extreme isolated act of discrimination can create a hostile work environment." *See also* ***EEOC v. Management Hospitality***, 666 F.3d 422, 433 (7th Cir.2012) (even one act of harassment can suffice if it is egregious).

***Adams v. Austal, U.S.A., L.L.C.***, 754 F.3d 1240, 1245 (11th Cir.2014). "Although we have held that an employee may introduce evidence of harassment [of] which he is not personally aware to prove that his employer is responsible for the harassment or to rebut an affirmative defense, … an employee alleging a hostile work environment cannot complain about conduct of which he was oblivious for the purpose of proving that his work environment was objectively hostile."

***EEOC v. Boh Bros. Constr. Co.***, 731 F.3d 444, 453 (5th Cir.2013). "Where a harassment claim arises out of a supervisor's conduct, there are four elements of a hostile working environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on a protected characteristic; and (4) that the harassment affected a term, condition, or privilege of employment. To affect a term, condition, or privilege of employment, the harassing conduct must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. We use an objective reasonable person standard to evaluate severity and pervasiveness. Ultimately, whether an environment is hostile or abusive depends on the totality of circumstances." (Internal quotes omitted.) *See also* ***Baker v. John Morrell & Co.***, 382 F.3d 816, 828 (8th Cir.2004) (no bright line between sexual harassment and merely unpleasant conduct).

***Duncan v. County of Dakota***, 687 F.3d 955, 959-60 (8th Cir.2012). "To determine whether the harassment affected a term, condition, or privilege of employment, this court considers 'the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with [EE's] performance on the job.' 'Simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.' This court examines the totality of the circumstances to determine if the environment was sufficiently hostile. This analysis includes examining the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' [¶] [T]o create an objectively hostile work environment, the harassment must be severe or pervasive. [EE] must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult.' She must prove the conduct was 'extreme in nature and not merely rude or unpleasant.'"

***Ladd v. Grand Trunk W. R.R.***, 552 F.3d 495, 500 (6th Cir.2009). "'[T]otality of the circumstances' mean[s] that: (1) offensive conduct need not be directed at the plaintiff …; (2) the plaintiff need not be present at the time of the offensive conduct; instead, she or he can learn of the conduct second-hand …; (3) racial or sexual animus can be inferred from conduct not overtly racial or sexual in nature when the context suggests it …; and (4) blue collar work environments do not have more leeway when it comes to offensive conduct…." *See also* ***Ziskie v. Mineta***, 547 F.3d 220, 225 (4th Cir.2008) (conduct P did not witness may be less probative than conduct experienced by P; that is a consideration of evidence's weight, not its admissibility); ***Smith v. Northeastern Ill. Univ.***, 388 F.3d 559, 567 (7th Cir.2004) (secondhand harassment is relevant to claim for hostile work environment, but its impact is less than that of harassment directed at P).

***Harvill v. Westward Comms.***, 433 F.3d 428, 436 (5th Cir.2005). "To require that [EE] provide precise dates for the occurrences or provide an exact number of occurrences to support her allegations is an onerous burden not required by law. Whether her allegations are too vague to ultimately carry the day is a credibility determination, or requires weighing the evidence, both of which are more appropriately done by the trier of fact."

***Singletary v. Missouri Dept. of Corr.***, 423 F.3d 886, 892 (8th Cir.2005). "For harassment to affect a condition of employment the conduct must be severe 'as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim.'" *See also* ***Hernandez v. Valley View Hosp. Ass'n***, 684 F.3d 950, 957 (10th Cir.2012) (dual standard asks both whether EE was offended by work environment and whether reasonable person would likewise be offended, and both must be proved).

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.   17

***Hostile Work Environment--Harassment by Nonemployees***

*Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 326 (5th Cir.2019). "[T]here is not a categorical bar on hostile environment claims arising from harassment by patients. The 'specific circumstances' of such claims 'must be judged to determine whether a reasonable person would find the work environment hostile or abusive' taking due account of the 'unique circumstances involved in caring for mentally diseased elderly patients.'"

*EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 624 (7th Cir.2018). "[A]n employer can be liable for a hostile work environment that results from the acts of non-employees, including customers."

*Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1073-74 (10th Cir.1998). "We agree with our sister circuits that an employer may be found liable for the harassing conduct of its customers. The focus of the inquiry in a hostile work environment claim, as the name suggests, is on whether the workplace is permeated with discriminatory intimidation, ridicule, and insult. An employer who condones or tolerates the creation of such an environment should be held liable regardless of whether the environment was created by a co-employee or a nonemployee, since the employer ultimately controls the conditions of the work environment. [¶] Because harassment by customers is more analogous to harassment by co-workers than by supervisors, we hold the same standard of liability applies to both co-worker and customer harassment. Thus, employers may be held liable in these circumstances if they fail to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." (Internal quotes omitted.) *But see **Bivens v. Zep, Inc.**,* 147 F.4th 635, 646-47 (6th Cir.2025) (Title VII imposes liability for nonemployee harassment only when ER intends for harassment to occur; besides Seventh Circuit, every other circuit to reach issue has applied some form of negligence theory of liability to harassing acts of customers), *cert. filed*, __ S.Ct. __ (2026) (No. 25-932; 2-3-26).

***Limit, Segregate, or Classify***

*U.S. EEOC v. AutoZone, Inc.*, 860 F.3d 564, 569 (7th Cir.2017). "We note … that §2000e-2(a)(2) makes it unlawful to segregate employees by race even if that action has only a *tendency* to deprive a person of employment opportunities. In that sense subsection (a)(2) *does* cast a wider net than subsection (a)(1), which speaks more concretely in terms of actions that 'discriminate against any individual.' So we reject [the] argument … that the lack of an 'adverse employment action' defeats a suit under §2000e-2(a)(2)."

***National-Origin Discrimination***

*Espinoza v. Farah Mfg.*, 414 U.S. 86, 89 (1973). "Congress did not intend the term 'national origin' to embrace citizenship requirements." *See also* 29 C.F.R. §1606.1 (EEOC definition of "national origin discrimination"); *Cortezano v. Salin Bank & Trust Co.*, 680 F.3d 936, 940 (7th Cir.2012) (national-origin discrimination under Title VII encompasses discrimination based on ancestry, not on citizenship or immigration status); *EEOC v. WC&M Enters.*, 496 F.3d 393, 401 (5th Cir.2007) (EEOC guidelines define "discrimination based on national origin" broadly and do not require that discrimination be based on EE's actual national origin).

**Editor's note:** After *Espinoza* was decided, Congress enacted 8 U.S.C. §1324b, which prohibits immigration-related employment discrimination on the basis of national origin or citizenship status.

*Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir.2007). "English-only instructions indeed can, in certain circumstances, 'create[ ] a hostile atmosphere for Hispanics in their workplace' and thus violate Title VII. *At 1171:* With respect to policies blithely enforced at all times and places in the work environment, the EEOC presumes, subject to rebuttal, that they violate Title VII. With respect to tailored policies applicable only at 'certain times' or places, the EEOC endorses no such presumption, suggesting that such rules may more often be linked to legitimate 'business necessit[ies].'" *See also **Village of Freeport***

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

*v. Barrella*, 814 F.3d 594, 607 (2d Cir.2016) (discrimination based on Hispanic ethnicity or lack thereof can be basis for discrimination claim based on race or national origin).

*DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir.2004). "A plaintiff who alleges discrimination on the basis of national origin and wishes to prove a prima facie case through the use of circumstantial evidence must prove four elements: (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees."

*Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir.2003). "[R]aising a national origin claim before the EEOC does not automatically suffice to alert the agency to investigate incidences of racial discrimination. *At 202:* '[A]n attempt to make [a line between race and origin] before both parties have had an opportunity to offer evidence at trial is inappropriate.' Similarly, courts should not attempt to draw overly fine distinctions between race and national origin claims as part of the threshold exhaustion inquiry prior to the full development of a plaintiff's claims, given the potential overlap between the two forms of discrimination, and the 'loose pleading' which is permitted in the EEOC complaint…."

### Native Americans

*Morton v. Mancari*, 417 U.S. 535, 545 (1974). Section 2000e-2 "was the first major piece of federal legislation prohibiting discrimination in *private* employment on the basis of 'race, color, religion, sex, or national origin.' Significantly, [§2000e-2(b) and (i)] explicitly exempted from its coverage the preferential employment of Indians by Indian tribes or by industries located on or near Indian reservations." *See also Malabed v. North Slope Borough*, 335 F.3d 864, 874 (9th Cir.2003) (§2000e-2(i) does not preempt state law prohibiting reverse discrimination in employment in favor of members of federally recognized tribes).

### Pretext

*Estate of Bassatt v. School Dist. No. 1*, 775 F.3d 1233, 1240 (10th Cir.2014). "The failure to conduct a fair investigation can raise an inference of pretext."

*Lobato v. New Mexico Env't Dept.*, 733 F.3d 1283, 1289 (10th Cir.2013). "'Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.' 'In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision[,] not the plaintiff's subjective evaluation of the situation.' Thus, '[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs.' [¶] [O]ur inquiry is not mechanistic; it is designed to tease out factual questions that are legitimately in dispute. And summary judgment is appropriate where the plaintiff cannot demonstrate any genuine dispute of material fact for the jury to resolve." *See also Caldwell v. KHOU-TV*, 850 F.3d 237, 242-43 (5th Cir.2017); *Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1012 (7th Cir.2004). *But see Clay v. UPS, Inc.*, 501 F.3d 695, 713 (6th Cir.2007) (ERs must show nondiscriminatory reason is honest and reasonably based on particularized fact).

*Martino v. Western & S. Fin. Grp.*, 715 F.3d 195, 202-03 (7th Cir.2013). "An employee may show that his employer's explanation for an adverse action is pretextual by showing that similarly situated persons outside the protected class received more favorable treatment from the employer. In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. The similarly-situated inquiry should not devolve into a mechanical, one-to-one mapping between employees. It does, however, require enough common factors to allow for a meaningful comparison in order to divine whether intentional discrimination was at play." (Internal quotes omitted.) *See also Lee v. Kansas City S. Ry.*, 574 F.3d 253, 259-60 (5th Cir.2009) (EE must show that employment actions against EE and comparator were taken under nearly identical circumstances).

*Everroad v. Scott Truck Sys.*, 604 F.3d 471, 477-78 (7th Cir.2010). "Normally, we first determine whether a plaintiff has established a *prima facie* case before putting the employer to the burden of demonstrating a non-discriminatory reason for a termination and engaging in the pretext analysis. In some cases, though, the issue of satisfactory performance and the question of pretext overlap. When the employer asserts as the nondiscriminatory reason for termination that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is at issue for both the second element of the plaintiff's *prima facie* case and the pretext analysis." *See also **Brady v. Office of Sergeant at Arms**, Disparate Treatment--Generally.*

*Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir.2006). "[I]n cases where 'the employee was hired and fired by the same person within a relatively short time span,' there is 'a strong inference that the employer's stated reason for acting against the employee is not pretextual.' *At 1183 n.4:* The temporal separation between hiring and firing has varied widely in cases applying the same actor inference. *At 1183:* We emphasize, however, that '[t]he plaintiff still has the opportunity to present countervailing evidence of pretext,' … and that 'same actor' evidence gives rise to an inference, rather than a presumption, that no discriminatory animus motivated the employer's actions…." *See also **McKinney v. Office of the Sheriff of Whitley Cty.**, 866 F.3d 803, 814-15 (7th Cir.2017).*

*Plotke v. White*, 405 F.3d 1092, 1102-03 (10th Cir.2005). "'[T]he evidence which a plaintiff can present in an attempt to establish that a defendant's stated reasons are pretextual may take a variety of forms…. *A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual.* A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false …; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances …; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.' The plaintiff's evidence can also allow for an inference that the 'employer's proffered non-discriminatory reasons [were] either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).'"

*Carter v. University of Toledo*, 349 F.3d 269, 274 (6th Cir.2003). "Determining whether the reasons proffered by an employer are pretextual requires a heightened examination of 'the specific proofs and rebuttals of discriminatory motivation the parties have introduced.' To demonstrate pretext, a plaintiff may show that the defendant's proffered reason '(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *But see **Forrester v. Rauland-Borg Corp.**, 453 F.3d 416, 417-18 (7th Cir.2006)* ("insufficient to warrant the challenged conduct" adds nothing but confusion to analysis of pretext).

### *Race-Conscious & Gender-Conscious Programs*

*Johnson v. Transportation Agency, Santa Clara Cty.*, 480 U.S. 616, 640-42 (1987). "[ER] has undertaken … a voluntary effort, and has done so in full recognition of both the difficulties and the potential for intrusion on males and nonminorities. [ER] has identified a conspicuous imbalance in job categories traditionally segregated by race and sex. It has made clear from the outset, however, that employment decisions may not be justified solely by reference to this imbalance, but must rest on a multitude of practical, realistic factors. [ER] earmarks no positions for anyone; sex is but one of several factors that may be taken into account in evaluating qualified applicants for a position. As both [ER's affirmative-action plan's] language and its manner of operation attest, [ER] has no intention of establishing a work force whose permanent composition is dictated by rigid numerical standards. [¶] We therefore hold that [ER] appropriately took into account as one factor the sex of [female EE-applicant] in determining that she should be promoted to the road dispatcher position."

*Sheet Metal Workers' Int'l v. EEOC*, 478 U.S. 421, 445 (1986). 42 U.S.C. §2000e-5(g) "does not prohibit a court from ordering, in appropriate circumstances, affirmative race-conscious relief as a remedy for past discrimination. Specifically, … such relief may be appropriate where an employer or a labor union has engaged in persistent or egregious discrimination, or where necessary to dissipate the lingering effects of pervasive discrimination."

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

*United Steelworkers v. Weber*, 443 U.S. 193, 197 (1979). Held: Title VII does not prohibit race-conscious affirmative-action plans, such as one that reserves 50% of the openings in an in-plant craft-training program for black employees until the percentage of black craftworkers at the plant is commensurate with the percentage of black workers in the local labor force.

*U.S. v. Brennan*, 650 F.3d 65, 97 (2d Cir.2011). "The Supreme Court's … decision in *Ricci* [*v. DeStefano*, 557 U.S. 557 (2009),] indicates that not all voluntary race- or gender-conscious employer action is properly analyzed under [*United Steelworkers v. Weber*, 443 U.S. 193 (1979),] and *Johnson* [*v. Transportation Agency*, 480 U.S. 616 (1987)]. *At 98:* A *prima facie* case of disparate impact is not, post-*Ricci*, an adequate factual predicate for *all* types of race- or gender-conscious employer actions. At least some race- or gender-conscious actions, such as the rejection of test scores because of their racial distribution, are not affirmative action and therefore cannot be supported by a mere 'manifest imbalance,' or even by a *prima facie* case of disparate impact. *At 99:* Since, after *Ricci*, not all race-or sex-conscious voluntary employer actions constitute 'affirmative action' that might be properly analyzed under *Johnson* and *Weber*, we must decide what is an affirmative action plan and what is not. We agree with [EEs] that in order to be an affirmative action plan, an employer action must benefit all members of a protected class. Although the plan may call for individualized determinations, the plan itself cannot be individualized. *At 104: Ricci* is not limited to cases where the employer seeks to avoid a current violation. As the *Ricci* Court itself stated, its core holding applies whenever an employer takes race-conscious action 'for the asserted purpose of avoiding *or remedying* an unintentional disparate impact.' … *Ricci* also is not solely about hiring or promotion. Nothing in the case suggests that when other past established employment benefits are involved employers can take individualized race- or gender-conscious action to remedy an asserted disparate impact without meeting the 'strong basis in evidence' test. For similar reasons, *Ricci* does not require that specific individuals be entitled to specific positions. When an employer lacks a strong basis in evidence that it would otherwise be liable for disparate impact, the employer should not 'upset[ ] an employee's legitimate expectation not to be judged on the basis of race.' That expectation is upset by the race-conscious discarding of conditional entitlements to employment or employment benefits, just as much as it is when the entitlement is absolute. [¶] We therefore hold that [Title VII] §703(a) [now 42 U.S.C. §2000e-2(a)], like [Title VII] §706(g) [now 42 U.S.C. §2000e-5(g)], draws a distinction between *affirmative action* plans, which are intended to provide *ex ante* benefits to all members of a racial or gender class, and *make-whole relief*, which is intended to provide *ex post* benefits to specified individuals who have suffered discrimination. And where this latter form of benefits is at issue, the employer may not invoke the 'affirmative action' defense of *Johnson* and *Weber*." *See also Ricci v. DeStefano*, *Disparate Treatment--Generally*; *Shea v. Kerry*, 796 F.3d 42, 53-55 (D.C.Cir.2015).

### Race Discrimination--Generally

*Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006). "Although it is true the [use of the word 'boy'] will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom and historical usage. Insofar as the Court of Appeals held that modifiers or qualifications are necessary in all instances to render the disputed term probative of bias, the court's decision is erroneous."

*Goodman v. Lukens Steel Co.*, 482 U.S. 656, 669 (1987). Title VII and 42 U.S.C. §1981 "do not permit a union to refuse to file any and all grievances presented by a black person on the ground that the employer looks with disfavor on and resents such grievances. It is no less violative of these laws for a union to pursue a policy of rejecting disparate-treatment grievances presented by blacks solely because the claims assert racial bias and would be very troublesome to process."

*Threat v. City of Cleveland*, 6 F.4th 672, 677 (6th Cir.2021). "Do discriminatory shift changes based on race violate Title VII …? We think so. [¶] The main debate in this case turns on the meaning of 'compensation, terms, conditions, or privileges of employment.' Do the city's shift schedules amount to 'terms' of employment? Does getting priority because of seniority in choosing shifts amount to a 'privilege' of employment? *At 678:* [T]he city decided when [EE] had to work based on his race--and in the process discriminated against him based on race with respect to his terms and privileges of employment. The race-based shift change controlled when and with whom he worked, prohibited him from exercising his seniority rights, and diminished his supervisory responsibilities when the city imposed the night shift on him. All told, the action amounted to discrimination with respect to his terms and privileges of employment…." *See also Hamilton v. Dallas Cty.*, 79 F.4th 494, 503-04 (5th Cir.2023).

*Kengerski v. Harper*, 6 F.4th 531, 537-38 (3d Cir.2021). "Amici … ask us to hold that an employee may be protected from retaliation when he reports a work environment that he reasonably believes is hostile to him because of his association with persons of another race. [¶] [A]ssociational discrimination is well grounded in the text of Title VII. In a practical sense, the name is a misnomer because, when you discriminate against an employee because of his association with someone of a different race, you are in effect discriminating against him 'because of [his own] race' in violation of Title VII. *At 539:* This theory of discrimination is not limited to close or substantial relationships. While 'one might expect the degree of an association to correlate with the likelihood of severe or pervasive discrimination on the basis of that association,' the 'degree of association is irrelevant' to whether a plaintiff 'is eligible for the protections of Title VII in the first place.' Employees thus may not be discriminated against because of their interracial relationships with distant relatives…."

*EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1026 (11th Cir.2016). "Title VII does not define the term 'race.' *At 1030:* [A]s a general matter, Title VII protects persons in covered categories with respect to their immutable characteristics, but not their cultural practices. [¶] We recognize that the distinction between immutable and mutable characteristics of race can sometimes be a fine (and difficult) one, but it is a line that courts have drawn. So, for example, discrimination on the basis of black hair texture (an immutable characteristic) is prohibited by Title VII, while adverse action on the basis of black hairstyle (a mutable choice) is not. *At 1032:* As far as we can tell, every court to have considered the issue has rejected the argument that Title VII protects hairstyles culturally associated with race."

*Village of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir.2016). "[W]e have not yet resolved whether Hispanics constitute a race for purposes of Title VII. [¶] Most courts have assumed that Hispanics constitute a 'protected class' but without saying whether that protection derives from race or national origin. *At 607:* [We conclude that] discrimination based on ethnicity, including Hispanicity or lack thereof, constitutes racial discrimination under Title VII."

*Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir.2008). "[EE] alleges that he was discriminated against, not solely because of his own race, but as a result of his marriage to a black woman. This Court has never ruled on the question of whether Title VII applies in these circumstances. We … hold that an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race. *At 139:* [W]here an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race."

***Race Discrimination--Reduction in Force***
*Davis v. District of Columbia*, 925 F.3d 1240, 1250 (D.C.Cir.2019). "This is the first time this court has been asked whether a [reduction in force (RIF)] or, more precisely, the practices through which an employer implements a RIF are subject to disparate-impact review under Title VII, but we see no basis to exempt such practices from otherwise-applicable law. *At 1251-52:* We need not generally decide whether a RIF as [occurred here] might ever be a 'particular employment practice' under §2000e-2(k)(1)(A)(i). Terminating a large group of employees in a compressed timeframe is clearly an adverse employment action within the meaning of Title VII, and an employer's assertion that the firings were a 'RIF' required by budget cuts does not somehow immunize them from Title VII scrutiny."

*Juarez v. ACS Gov't Sols. Grp.*, 314 F.3d 1243, 1245-46 (10th Cir.2003). "The required elements of a prima facie case of intentional race discrimination involving [a reduction in force (RIF)] are (1) a plaintiff was within the protected group, (2) plaintiff was doing satisfactory work, (3) plaintiff was discharged despite the adequacy of his work, and (4) there is some evidence that the employer intended to discriminate against the plaintiff in reaching its RIF decision. The fourth element can be satisfied by showing that the employer could have retained plaintiff but instead chose to keep someone of a different race." *See also* *Rachells v. Cingular Wireless Emp. Servs.*, 732 F.3d 652, 661 (6th Cir.2013).

### Religious Discrimination--Generally

*Fallon v. Mercy Catholic Med. Ctr. of Se. Pa.*, 877 F.3d 487, 490 (3d Cir.2017). "[W]e are left to consider … whether [EE's] opposition to vaccination is a religious belief under Title VII. If not, [EE] has not pleaded a prima facie case. *At 491:* 'First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.' This definition has [been] met with considerable agreement. *At 492-93:* [EE's] objection to vaccination [was] not religious and not protected by Title VII. [C]ertain anti-vaccination beliefs are not religious. This is not to say that anti-vaccination beliefs cannot be part of a broader religious faith; in some circumstances, they can, and in those circumstances, they are protected." *See also Thornton v. Ipsen Biopharmaceuticals, Inc.*, 126 F.4th 76, 83-84 (1st Cir.2025) (collecting cases; for claims of opposing COVID-19 vaccination requirement at motion-to-dismiss stage, "my-body-is-my-temple" argument rooted in EE's religious beliefs is sufficient to plead existence of bona fide religious belief).

*U.S. EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 142-43 (4th Cir.2017). "It is not [ER's] place as an employer, nor ours as a court, to question the correctness or even the plausibility of [EE's] religious understandings. [EE's] religious beliefs are protected whether or not his pastor agrees with them … and whether [anyone] thinks that [EE], in seeking to protect his religious conscience, has drawn the line in the right place…. So long as there is sufficient evidence that [EE's] beliefs are sincerely held … and conflict with [ER's] employment requirement, that is the end of the matter."

*Davis v. Fort Bend Cty.*, 765 F.3d 480, 485 (5th Cir.2014). "'To establish a prima facie case of religious discrimination under Title VII, the plaintiff must present evidence that (1) she held a bona fide religious belief, (2) her belief conflicted with a requirement of her employment, (3) her employer was informed of her belief, and (4) she suffered an adverse employment action for failing to comply with the conflicting employment requirement.'" *See also Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir.2013); *Webb v. City of Phila.*, 562 F.3d 256, 259 (3d Cir.2009); *Berry v. Department of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir.2006).

*Bodett v. Coxcom, Inc.*, 366 F.3d 736, 743 (9th Cir.2004). "In the context of a disparate treatment claim based on religious discrimination, … a plaintiff can meet his or her *prima facie* burden. He or she must show that '(1) [s]he is a member of a protected class; (2) [s]he was qualified for [her] position; (3) [s]he experienced an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably, *or* other circumstances surrounding the adverse employment action give rise to an inference of discrimination.'" *See also DeFreitas v. Horizon Inv. Mgmt.*, 577 F.3d 1151, 1162 n.3 (10th Cir.2009) (standard is not suitable for religious-discrimination claims brought against members of minority religion).

### Religious Discrimination--Reasonable Accommodation

*Groff v. DeJoy*, 600 U.S. 447, 454 (2023). "Based on a line in … *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 … (1977), many lower courts … have interpreted 'undue hardship' to mean any effort or cost that is 'more than ... *de minimis*.' *At 468:* We hold that showing 'more than a *de minimis* cost,' as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII. … In describing an employer's 'undue hardship' defense, *Hardison* referred repeatedly to 'substantial' burdens, and that formulation better explains the decision. We therefore … understand *Hardison* to mean that 'undue hardship' is shown when a burden is substantial in the overall context of an employer's business. This fact-specific inquiry comports with both *Hardison* and the meaning of 'undue hardship' in ordinary speech. *At 470-71:* [A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business. [¶] [C]ourts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.' *At 472:* An employer who fails to provide an accommodation has a defense only if the hardship is 'undue,' and a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.' *At 473:* Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations."

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

*EEOC v. Abercrombie & Fitch Stores*, 575 U.S. 768, 773 (2015). "[T]he rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions. *At 774-75:* [ER] argues … that a claim based on a failure to accommodate an applicant's religious practice must be raised as a disparate-impact claim, not a disparate-treatment claim. We think not. [R]eligious practice is one of the protected characteristics that cannot be accorded disparate treatment and must be accommodated. [¶] Nor does [Title VII] limit disparate-treatment claims to only those employer policies that treat religious practices less favorably than similar secular practices. … Title VII does not demand mere neutrality with regard to religious practices--that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual … because of such individual's' 'religious observance and practice.' … Title VII requires otherwise-neutral policies to give way to the need for an accommodation." *See also EEOC v. Abercrombie & Fitch Stores*, *Disparate Treatment--Generally.*

*US Airways, Inc. v. Barnett*, 535 U.S. 391, 403 (2002). "[I]n the context of a Title VII religious discrimination case, an employer need not adapt to an employee's special worship schedule as a 'reasonable accommodation' where doing so would conflict with the seniority rights of other employees."

*Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68-69 (1986). "[W]here the employer has already reasonably accommodated the employee's religious needs, [t]he employer need not further show that each of the employee's alternative accommodations would result in undue hardship. [U]ndue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship." *See also Antoine v. First Student, Inc.*, 713 F.3d 824, 839-40 (5th Cir.2013) (CBA provision for accommodation procedure that did not require forced unilateral reassignment by ER precluded determination that accommodation would violate CBA and constitute undue burden on ER); *EEOC v. Townley Eng'g & Mfg.*, 859 F.2d 610, 615 (9th Cir.1988) (undue-hardship claim must be supported by proof of actual imposition on coworkers or disruption of work routine, not merely conceivable or hypothetical hardships). *But see Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 135 (1st Cir.2004) (ER can prove undue hardship without any accommodations by examining specific hardships imposed by specific proposals).

*Tabura v. Kellogg USA*, 880 F.3d 544, 553-54 (10th Cir.2018). "[W]e see no need to adopt a per se rule requiring that an accommodation, to be reasonable, must eliminate, or totally eliminate, or completely eliminate, any conflict between an employee's religious practice and his work requirements. The statute requires the accommodation to be reasonable and ultimately the question of whether an accommodation is reasonable must be made on a case-by-case basis, grounded on the specific facts presented by a particular situation." *See also Sánchez-Rodríguez v. AT&T Mobility*, 673 F.3d 1, 12 (1st Cir.2012); *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 313 (4th Cir.2008); *Sturgill v. UPS, Inc.*, 512 F.3d 1024, 1031 (8th Cir.2008). *But see Baker v. Home Depot*, 445 F.3d 541, 547-48 (2d Cir.2006) (accommodation that did not eliminate conflict between EE's work requirements and religious practices was not reasonable); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576 (7th Cir.1997) (same); *Opuku-Boateng v. California*, 95 F.3d 1461, 1467 (9th Cir.1996) (where proposed accommodation does not eliminate religious conflict, ER must either accept EE's proposal or demonstrate that it would cause undue hardship to do so).

*Reed v. UAW*, 569 F.3d 576, 579 (6th Cir.2009). "Although the definition [of 'religion' in 42 U.S.C. §2000e(j)] mentions only employers, 'courts have held that the duty to accommodate an employee's religious beliefs extends to unions as well as employers.'"

*Reed v. Great Lakes Cos.*, 330 F.3d 931, 935-36 (7th Cir.2003). "There is a line … between an employee who seeks an accommodation to his religious faith and an employee who asserts … an unqualified right to disobey orders that he deems inconsistent with his faith though he refuses to indicate at what points that faith intersects the requirements of his job. [¶] Title VII imposes a duty on the employer but also a reciprocal duty on the employee to give fair warning of the employment practices that will interfere with his religion and that he therefore wants waived or adjusted. [E]mployers are not charged with detailed knowledge of the beliefs and observances associated with particular sects." *See also Sturgill v. UPS, Inc.*, 512 F.3d

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

1024, 1033 (8th Cir.2008) (bilateral cooperation requires serious efforts by both ER and EE to accommodate conflict between work demands and EE's sincere religious beliefs); *Vetter v. Farmland Indus.*, 120 F.3d 749, 751 (8th Cir.1997) (ER need not accommodate "purely personal preference").

*Reverse Discrimination*

*Ames v. Ohio Dept. of Youth Servs.*, 605 U.S. 303, 305-06 (2025). "Under our Title VII precedents, a plaintiff may make out a prima facie case of disparate treatment by showing that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination. [¶] The question in this case is whether, to satisfy that prima facie burden, a plaintiff who is a member of a majority group must also show background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority. We hold that this additional background circumstances requirement is not consistent with Title VII's text or our case law construing the statute. *At 309:* As a textual matter, Title VII's disparate-treatment provision draws no distinctions between majority-group plaintiffs and minority-group plaintiffs. *At 310:* Our case law … makes clear that the standard for proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group. *At 313:* The Sixth Circuit has implemented a rule that requires certain Title VII plaintiffs--those who are members of majority groups--to satisfy a heightened evidentiary standard in order to carry their burden under the first step of the **McDonnell Douglas** framework. We conclude that Title VII does not impose such a heightened standard on majority-group plaintiffs." (Internal quotes omitted.)

*McDonald v. Santa Fe Trail Transp.*, 427 U.S. 273, 280 (1976). Held: Section 2000e-2(a)(1) prohibits racial discrimination against whites, just as it does for any other race.

*Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir.2004). "[F]or two or more employees to be considered similarly-situated for purposes of creating an inference of disparate treatment in a reverse discrimination case, the plaintiff must prove that all of the relevant aspects of his employment situation are nearly identical to those of the female employee who he alleges was treated more favorably. The similarities between the plaintiff and the female employee must exist in all relevant aspects of their respective employment circumstances. Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated." (Internal quotes omitted.)

*Seniority Systems*

*Pullman-Standard v. Swint*, 456 U.S. 273, 277 (1982). "Under [§2000e-2(h)], a showing of disparate impact is insufficient to invalidate a seniority system…. '[A]bsent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences.' Thus, any challenge to a seniority system under Title VII will require a trial on the issue of discriminatory intent…." *See also American Tobacco Co. v. Patterson*, 456 U.S. 63, 76 (1982) (§2000e-2(h) applies to all seniority systems, whether adopted before or after Title VII).

*California Brewers Ass'n v. Bryant*, 444 U.S. 598, 605-06 (1980). "A 'seniority system' is a scheme that, alone or in tandem with non-'seniority' criteria, allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase. Unlike other methods of allocating employment benefits and opportunities, such as subjective evaluations or educational requirements, the principal feature of any and every 'seniority system' is that preferential treatment is dispensed on the basis of some measure of time served in employment."

*Franks v. Bowman Transp. Co.*, 424 U.S. 747, 761-62 (1976). "[I]t is apparent that the thrust of [Title VII] §703(h) [now 42 U.S.C. §2000e-2(h)] is directed toward defining what is and what is not an illegal discriminatory practice in instances in which the post-Act operation of a seniority system is challenged as perpetuating the effects of discrimination occurring prior to the effective date of the Act. There is no indication … that §703(h) was intended to modify or restrict relief otherwise appropriate once an illegal discriminatory practice occurring after the effective date of the Act is proved…. We therefore hold that … §703(h) [does not bar] the award of seniority relief to [identifiable applicants who were denied employment because of race after the effective date and in violation of Title VII]." *See also United Air Lines, Inc. v. Evans*, 431 U.S. 553, 560 (1977).

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

*Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 258 (6th Cir.2002). "To demonstrate pretext in the context of a seniority system, plaintiff must show that either 'the employer's practice is not a seniority system or part of a seniority system, or that the seniority system is not *bona fide*.' [¶] To show that the seniority system is not *bona fide*, plaintiff can show either that (1) 'the seniority system was adopted or negotiated with a discriminatory motivation or purpose,' or (2) 'the seniority system was administered in an irregular or arbitrary way with intent to harm members of a protected class.'"

### Sex Discrimination--Generally

*Bostock v. Clayton Cty.*, 590 U.S. 644, 650-52 (2020). "[W]e must decide whether an employer can fire someone simply for being homosexual or transgender. The answer is clear. An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids." *See also* **U.S. v. Skrmetti**, 605 U.S. 495, 519-20 (2025) (declining to consider whether **Bostock**'s reasoning reaches beyond context of Title VII). *But see* **Braidwood Mgmt. v. EEOC**, 70 F.4th 914, 937 (5th Cir.2023) (affirming exemption under Religious Freedom Restoration Act of 1993 (42 U.S.C. §2000bb et seq.) for ER because compliance with Title VII post-**Bostock** would substantially burden its ability to operate per its religious beliefs about homosexual and transgender conduct).

*UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 203 (1991). See annotation under *Sex Discrimination--Pregnancy Discrimination Act*.

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). "As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes. An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind." (Internal quotes omitted.)

**Editor's note:** Other aspects of **Price Waterhouse** were effectively overruled and codified by the Civil Rights Act of 1991. *See* 42 U.S.C. §§2000e-2(l), 2000e-2(m), 2000e-5(g)(2)(B); *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348-49 (2013).

*Maner v. Dignity Health*, 9 F.4th 1114, 1116 (9th Cir.2021). "The main question presented in this case is whether an employer who exhibits preferential treatment toward a supervisor's sexual or romantic partner discriminates against other employees because of their sex. We hold that discrimination motivated by an employer's 'paramour preference' is not unlawful sex discrimination against the complaining employee within the ordinary public meaning of Title VII's terms."

*Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1045 (10th Cir.2020). "[W]e must determine whether sex-plus-age claims are cognizable under Title VII. [¶] Title VII … prohibits discrimination based on a combination of protected characteristics, such as 'sex-plus-race' discrimination, i.e., discrimination targeted only at employees of a particular race and sex. [¶] In this case, [EEs'] sex-plus-age claim is not based on a combination of protected characteristics enumerated in the statute; rather, the 'plus-' characteristic is age, which is not a protected class under Title VII. *At 1047*: [W]e [first] conclude that a sex-plus plaintiff does not need to show discrimination against a subclass of men or women. Instead, if a female plaintiff shows that she would not have been terminated if she had been a man--in other words, if she would not have been terminated but for her sex--this showing is sufficient to establish liability under Title VII. *At 1048*: We [next] hold that sex-plus-age claims are cognizable under Title VII. There is no material distinction between a sex-plus-age claim and the other sex-plus claims we have previously recognized for which the 'plus-' characteristic is not protected under Title VII."

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

*Tovar v. Essentia Health*, 857 F.3d 771, 775-76 (8th Cir.2017). "[EE] has not alleged that she was discriminated against on the basis of her own sex; rather, she alleges that she was discriminated against because of her son's sex. By its terms the protections of Title VII do not extend to such discrimination."

*Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 45 (1st Cir.2009). "[A]n employer is not free to assume that a woman, because she is a woman, will necessarily be a poor worker because of family responsibilities. The essence of Title VII in this context is that women have the right to prove their mettle in the work arena without the burden of stereotypes regarding whether they can fulfill their responsibilities."

*Adamson v. Multi Cmty. Diversified Servs.*, 514 F.3d 1136, 1141 (10th Cir.2008). "[W]e reject the assertion that 'familial status' is a protected classification under Title VII…. *At 1148:* Title VII protects neither the family unit nor individual family members from discrimination [in the form of anti-nepotism policies] based on their 'familial status' alone. [¶] 'Familial status' is not a classification based on sex any more than is being a 'sibling' or 'relative' generally. It is, by definition, gender neutral."

### Sex Discrimination--Disparate Impact

*EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir.2000). "[A] plaintiff in a sex discrimination suit [under a disparate-impact theory] must establish three elements: *first*, that there is a significant statistical disparity between the proportion of women in the available labor pool and the proportion of women hired; *second*, that there is a specific, facially-neutral, employment practice which is the alleged cause of the disparity; and *finally*, … that a causal nexus exists between the specific employment practice identified and the statistical disparity shown. *At 1275:* Once each of these three elements are shown, a plaintiff has established a prima facie case of disparate impact discrimination. The burden of production then shifts to the defendant to establish that the challenged employment practice serves a legitimate, non-discriminatory business objective. However, even if the defendant satisfies this burden, a plaintiff may still prevail by proving that an alternative, non-discriminatory practice would have served the defendant's stated objective equally as well." *See also Farrell v. Butler Univ.*, 421 F.3d 609, 617 (7th Cir.2005) (EE must show that she was personally injured by ER's alleged discriminatory practice).

### Sex Discrimination--Disparate Pay

*County of Wash. v. Gunther*, 452 U.S. 161, 168 (1981). See annotation under 29 U.S.C. §206, *Equal Pay Act--EPA & Title VII*.

### Sex Discrimination--Harassment--Generally

*Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998). See annotation under *Vicarious Liability*.

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998). "'The critical issue … is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *See also Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 907 (8th Cir.2006) (Title VII's prohibition on discrimination on the basis of "sex" does not prohibit termination on the basis of EE's admitted, consensual sexual conduct with supervisor).

*EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 626 (7th Cir.2018). "[ER's] argument implies a position inconsistent with our case law: that harassment must be overtly sexual to be actionable under Title VII. To be sure, the alleged harassment must occur because of the plaintiff's sex. But it need not consist of pressure for sex, intimate touching, or a barrage of deeply offensive sexual comments. Actionable discrimination can take other forms, such as demeaning, ostracizing, or even terrorizing the victim because of her sex. Here, we must decide whether a reasonable juror could find [harasser's] conduct objectively intimidating or frightening."

*Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 750 (7th Cir.2018). "Title VII does not impose a flat ban on all harassment. It prohibits harassment that discriminates against an individual 'because of such individual's … sex.' *At 751-52:* [U]nwanted

sexual behavior--including the touching of genitals and buttocks--is not necessarily actionable under Title VII. … Title VII is an anti-discrimination statute, not an anti-harassment statute.”

*Huston v. Procter & Gamble Paper Prods.*, 568 F.3d 100, 107-08 (3d Cir.2009). “[A]n employee's knowledge of sexual harassment may be imputed to the employer when the employee is employed to report or respond to sexual harassment. We thus conclude that an employee's knowledge of allegations of coworker sexual harassment may typically be imputed to the employer in two circumstances: first, where the employee is sufficiently senior in the employer's governing hierarchy, or otherwise in a position of administrative responsibility over employees under him, such as a departmental or plant manager, so that such knowledge is important to the employee's general managerial duties. In this case, the employee usually has the authority to act on behalf of the employer to stop the harassment, for example, by disciplining employees or by changing their employment status or work assignments. The employee's knowledge of sexual harassment is then imputed to the employer because it is significant to the employee's general mandate to manage employer resources, including human resources. [¶] Second, an employee's knowledge of sexual harassment will be imputed to the employer where the employee is specifically employed to deal with sexual harassment. Typically such an employee will be part of the employer's human resources, personnel, or employee relations group or department. Often an employer will designate a human resources manager as a point person for receiving complaints of harassment. In this circumstance, employee knowledge is imputed to the employer based on the specific mandate from the employer to respond to and report on sexual harassment.”

*EEOC v. National Educ. Ass'n*, 422 F.3d 840, 842 (9th Cir.2005). “This appeal presents the question whether harassing conduct directed at female employees may violate Title VII in the absence of direct evidence that the harassing conduct or the intent that produced it was because of sex. We hold that offensive conduct that is not facially sex-specific nonetheless may violate Title VII if there is sufficient circumstantial evidence of qualitative and quantitative differences in the harassment suffered by female and male employees. *At 847:* The precise determination of how much qualitative and quantitative difference in treatment is enough circumstantial evidence to support a Title VII claim is a question for the jury.”

*Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1063-64 (9th Cir.2002). “[A]n employee's sexual orientation is irrelevant for purposes of Title VII. It neither provides nor precludes a cause of action for sexual harassment. That the harasser is, or may be, motivated by hostility based on sexual orientation is similarly irrelevant, and neither provides nor precludes a cause of action. It is enough that the harasser have engaged in severe or pervasive unwelcome physical conduct of a sexual nature. *At 1066:* The premise of a sexual touching hostile work environment claim is that the conditions of the work environment have been made hostile 'because of … sex.' … '[S]o long as the environment itself is hostile to the plaintiff because of [his] sex, why the harassment was perpetrated … is beside the point.'” *See also Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir.1999).

*Sex Discrimination--Harassment--Same-Sex*

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998). “[W]e hold today that nothing in Title VII necessarily bars a claim of discrimination 'because of … sex' merely because the plaintiff and the defendant … are of the same sex. *At 81:* Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* because of … sex.'” *See also EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 455-56 (5th Cir.2013) (*Oncale* categories are illustrative, not exhaustive, in nature); *Pedroza v. Cintas Corp.*, 397 F.3d 1063, 1070 (8th Cir.2005) (male same-sex harassment cases are relevant to prove based-on-sex requirement in female cases).

*McCown v. St. John's Health Sys.*, 349 F.3d 540, 543 (8th Cir.2003). “Same-sex harassment claims differ from those between males and females because the latter 'typically involve[ ] explicit or implicit proposals of sexual activity,' which create a presumption that the underlying conduct was based on sex. However, this presumption is applicable only if there is credible evidence to show that the alleged harasser is sexually attracted to the plaintiff. Consequently, without this presumption, a same-sex harassment plaintiff needs other methods to prove that the conduct was based on sex. [¶] [There are] three evidentiary routes by which a same-sex plaintiff can show that the conduct was based on sex. First, a plaintiff can show that the conduct was motivated by sexual desire. Second, a plaintiff can show that the harasser was motivated by a general hostility to the presence of

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

the same gender in the workplace. And third, a plaintiff may offer direct comparative evidence about how the harasser treated both males and females in a mixed-sex workplace." *See also **Dick v. Phone Directories Co.**, 397 F.3d 1256, 1263-64 (10th Cir.2005).*

***La Day v. Catalyst Tech.**, 302 F.3d 474, 478 (5th Cir.2002).* "In a case of alleged same-sex harassment, courts first must determine whether the harasser's conduct constitutes sex discrimination. If the answer is 'yes,' the court must decide whether the challenged conduct meets the applicable standards for either a *quid pro quo* or hostile environment claim. For example, same-sex harassment that is 'severe or pervasive' enough to create a hostile environment … might be excluded from the coverage of [T]itle VII because it was not discriminatory on the basis of sex. On the other hand, same-sex harassment that is indisputably discriminatory might not be serious enough to make out either a *quid pro quo* or hostile environment claim."

### Sex Discrimination--Harassment--Tangible Employment Action

***Cotton v. Cracker Barrel Old Country Store, Inc.**, 434 F.3d 1227, 1231-32 (11th Cir.2006).* "'A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' A tangible employment action 'in most cases inflicts direct economic harm.' An employment decision that 'alters the employee's compensation' qualifies as a tangible employment action. A reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a tangible employment action. [¶] There also must be a causal link between the tangible employment action and the sexual harassment. [EE] had to prove more than the mere reduction of her hours; [EE] had to prove that the reduction was causally related to the incident of harassment. [¶] When an employer contemplates a given action before the harassment takes place, temporal proximity between the action and the incident of harassment alone will not suffice to show causation." *See also **Leibowitz v. Cornell Univ.**, 584 F.3d 487, 501 (2d Cir.2009)* (when EE seeks renewal of employment contract, nonrenewal constitutes an adverse employment action under ADEA and Title VII); ***Holly D. v. California Inst. of Tech.**, 339 F.3d 1158, 1162 (9th Cir.2003)* (threats of discharge are tangible employment action).

***Hulsey v. Pride Rests., LLC**, 367 F.3d 1238, 1245 n.4 (11th Cir.2004).* "Like a lot of other courts, we formerly used the term '*quid pro quo*' to describe situations where a benefit of employment was tied to a demand for sexual favors. Since the Supreme Court [in ***Burlington Indus. v. Ellerth**, 524 U.S. 742 (1998),*] instructed us that term should no longer be used in the analysis of whether an employer is liable under Title VII, … we have used the preferred term 'tangible employment action' to refer to harassment that culminates in a discharge, demotion, or undesirable reassignment." *See also **Bonenberger v. Plymouth Township**, 132 F.3d 20, 28 (3d Cir.1997)* (harasser must have authority to carry out quid pro quo offer or threat).

### Sex Discrimination--Hostile Work Environment

***Sharp v. S&S Activewear, L.L.C.**, 69 F.4th 974, 976-77 (9th Cir.2023).* "This appeal calls on us to consider whether music with sexually derogatory and violent content, played constantly and publicly throughout the workplace, can foster a hostile or abusive environment and thus constitute discrimination because of sex. [¶] [H]arassment, whether aural or visual, need not be directly targeted at a particular plaintiff in order to pollute a workplace and give rise to a Title VII claim. [Also], the challenged conduct's offensiveness to multiple genders is not a certain bar to stating a Title VII claim. *At 979:* More than offhand foul comments, the music at [ER] allegedly infused the workplace with sexually demeaning and violent language, which may support a Title VII claim even if it offended men as well as women. Although we have not before addressed the specific issue of music-as-harassment, this court and our sister circuits have recognized Title VII redress for other auditory offenses in the workplace and for derogatory conduct to which all employees are exposed. [¶] A workplace saturated with sexually derogatory content can constitute harassment 'because of sex.' *At 981:* '[S]exually graphic, violently misogynistic' music [is] one form of harassment that can pollute a workplace and give rise to a Title VII claim. … Whether sung, shouted, or whispered, blasted over speakers or relayed face-to-face, sexist epithets can offend and may transform a workplace into a hostile environment that violates Title VII."

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

*Sex Discrimination--Pregnancy Discrimination Act*

*Young v. UPS, Inc.*, 575 U.S. 206, 228 (2015). "[A]n individual pregnant worker who seeks to show disparate treatment through indirect evidence may do so through application of the *McDonnell Douglas* framework. *At 229-30:* If the employer offers an apparently 'legitimate, non-discriminatory' reason for its actions, the plaintiff may … show that the employer's proffered reasons are … pretextual … by providing sufficient evidence that the employer's policies impose a significant burden on pregnant workers, and that the employer's 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden, but rather--when considered along with the burden imposed--give rise to an inference of intentional discrimination. [¶] The plaintiff can create a genuine issue of material fact as to whether a significant burden exists by providing evidence that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers." *See also Durham v. Rural/Metro Corp.*, 955 F.3d 1279, 1285-86 (11th Cir.2020); *Legg v. Ulster Cty.*, 820 F.3d 67, 72-74 (2d Cir.2016).

*AT&T Corp. v. Hulteen*, 556 U.S. 701, 712-13 (2009). Held: Pregnancy Discrimination Act does not apply retroactively.

*UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 203 (1991). "[I]n order to qualify as a BFOQ, a job qualification must relate to the 'essence,' … or to the 'central mission of the employer's business[ ]'…. *At 204:* [T]he safety exception is limited to instances in which sex or pregnancy actually interferes with the employee's ability to perform the job. *At 206:* We conclude that the language of both the BFOQ provision and the [Pregnancy Discrimination Act] prohibit an employer from discriminating against a woman because of her capacity to become pregnant unless her reproductive potential prevents her from performing the duties of her job."

*California Fed. S&L Ass'n v. Guerra*, 479 U.S. 272, 288-89 (1987). "Rather than limiting existing Title VII principles and objectives, the [Pregnancy Discrimination Act] extends them to cover pregnancy." *See also Hall v. Nalco Co.*, 534 F.3d 644, 647 (7th Cir.2008) (Pregnancy Discrimination Act clarified scope of Title VII and did not create any new rights or remedies).

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 683-84 (1983). "[ER's] plan provides limited pregnancy-related benefits for employees' wives, and affords more extensive coverage for employees' spouses for all other medical conditions requiring hospitalization. [ER's] plan unlawfully gives married male employees a benefit package for their dependents that is less inclusive than the dependency coverage provided to married female employees." Held: ER's pregnancy limitation violates Title VII by discriminating against male employees.

*Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1258 (11th Cir.2017). The Pregnancy Discrimination Act (PDA) prohibits "discrimination 'on the basis of pregnancy, childbirth, or related medical conditions.' *At 1259-60:* A plain reading of the PDA supports the finding that … breastfeeding … is covered under the PDA. … Given that Congress included pregnancy and childbirth and explicitly used the words 'not limited to,' it is a common-sense conclusion that breastfeeding is a sufficiently similar gender-specific condition covered by the broad catchall phrase included in the PDA. Breastfeeding is a gender-specific condition because it 'clearly imposes upon women a burden that male employees need not--indeed, could not--suffer.'" *See also EEOC v. Houston Funding II, Ltd.*, 717 F.3d 425, 428 (5th Cir.2013) (lactation is protected related medical condition of pregnancy under PDA); *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir.2008) (abortion is protected related medical condition of pregnancy under PDA); *In re Union Pac. R.R. Empl. Practices Litig.*, 479 F.3d 936, 942 (8th Cir.2007) (like infertility, contraception is not "related to" pregnancy and is outside protection of PDA).

*Hall v. Nalco Co.*, 534 F.3d 644, 648-49 (7th Cir.2008). "Employees terminated for taking time off to undergo [in vitro fertilization (IVF)]--just like those terminated for taking time off to give birth or receive other pregnancy-related care--will always be women. This is necessarily so; IVF is one of several assisted reproductive technologies that involves a surgical impregnation procedure. Thus, [EE] was terminated not for the gender-neutral condition of infertility, but rather for the gender-specific quality of childbearing capacity."

*Maldonado v. U.S. Bank*, 186 F.3d 759, 767 (7th Cir.1999). "The [Pregnancy Discrimination Act] does not create such an artificial divide between pregnancy, childbirth and related medical conditions and the secondary effects of a pregnancy which might affect job performance. Pregnancy causes normal inconveniences that might 'interrupt the workplace's daily routines[ ]'…. It is not merely a question whether the pregnant employee asks for special treatment, however; other evidence might also be probative of the employee's ability to continue to meet the employer's legitimate job expectations. But an employer cannot take anticipatory action unless it has a good faith basis, supported by sufficiently strong evidence, that the normal inconveniences of an employee's pregnancy will require special treatment." *See also Laxton v. Gap Inc.*, 333 F.3d 572, 583-84 (5th Cir.2003).

### Sex Discrimination--Reduction in Force

*Corti v. Storage Tech.*, 304 F.3d 336, 340 n.6 (4th Cir.2002). "To establish a prima facie case for gender discrimination in a reduction in force … context, a plaintiff must show that (1) she was protected under Title VII, (2) she was selected from a larger group of candidates, (3) she was performing at a level substantially equivalent to the lowest level of that in the group retained, and (4) the process of selection produced a residual work force that contained some unprotected persons who were performing at a level lower than that at which the plaintiff was performing."

### Sex Discrimination--Retirement Benefits

*Florida v. Long*, 487 U.S. 223, 230 (1988). "We have identified three criteria for determining whether retroactive awards are appropriate in Title VII pension cases involving the use of sex-based actuarial tables. The first is to examine whether the decision established a new principle of law…. The second criterion is to test whether retroactive awards are necessary to the operation of Title VII principles by acting to deter deliberate violations or grudging compliance. The third is to ask whether retroactive liability will produce inequitable results for the States, employers, retirees, and pension funds affected by our decision."

*Arizona Governing Cmte. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1086 (1983). Held: Offering EEs the option of receiving retirement benefits from one of several companies selected by ER, all of which pay lower monthly retirement benefits to a woman than to a man who has made the same contributions, is discrimination on the basis of sex in violation of Title VII.

### Subordinate Bias--Cat's Paw Liability

*Staub v. Proctor Hosp.*, 562 U.S. 411, 413 (2011). See annotation under 38 U.S.C. §4311, *Prima Facie Case*.

*Velázquez-Pérez v. Developers Diversified Rlty. Corp.*, 753 F.3d 265, 274 (1st Cir.2014). "[A]n employer can be held liable under Title VII if: the plaintiff's co-worker makes statements maligning the plaintiff, for discriminatory reasons and with the intent to cause the plaintiff's firing; the co-worker's discriminatory acts proximately cause the plaintiff to be fired; and the employer acts negligently by allowing the co-worker's acts to achieve their desired effect though it knows (or reasonably should know) of the discriminatory motivation."

*Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 352-53 (6th Cir.2012). "An employer will not be liable for its intermediate employee's discrimination if 'the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action.' However, if the adverse employment action is related to the discriminatory action, the employer may be liable. Neither independent investigation nor independent judgment on the part of the employer provides a *per se* defense. [¶] We have previously held that an employer is liable for an intermediate employee's discrimination when there is proof of a 'causal nexus' between the discrimination and the adverse action, … or when the intermediate employee 'influences the unbiased decision-maker' to take an adverse action…." *See also Matthews v. Waukesha Cty.*, 759 F.3d 821, 829 (7th Cir.2014); *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir.2007). *But see Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 291 (4th Cir.2004) (ER not liable even if biased subordinate exercises "substantial influence" or plays "significant" role in employment decision).

**Terms, Conditions, or Privileges of Employment**

*Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). See annotation under *Hostile Work Environment--Generally*.

*Hishon v. King & Spalding*, 467 U.S. 69, 75-76 (1984). "An employer may provide its employees with many benefits that it is under no obligation to furnish by any express or implied contract. Such a benefit, though not a contractual *right* of employment, may qualify as a 'privileg[e]' of employment under Title VII. A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all. Those benefits that comprise the 'incidents of employment[ ]' … or that form 'an aspect of the relationship between the employer and employees[ ]' … may not be afforded in a manner contrary to Title VII. *At 77:* A benefit need not accrue before a person's employment is completed to be a term, condition, or privilege of that employment relationship."

**Title VII & 42 U.S.C. §1981**

*CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 449 (2008). *Patterson v. McLean Credit Un.*, 491 U.S. 164 (1989), "significantly limited the scope of [42 U.S.C.] §1981. The Court focused upon §1981's words 'to make and enforce contracts' and interpreted the phrase narrowly. It wrote that the statutory phrase did not apply to 'conduct by the employer *after the contract relation has been established*, including breach of the terms of the contract or imposition of discriminatory working conditions.' [¶] Since victims of an employer's retaliation will often have opposed discriminatory conduct taking place *after* the formation of the employment contract, *Patterson*'s holding, for a brief time, seems in practice to have foreclosed retaliation claims. *At 450:* Congress passed the Civil Rights Act of 1991 … with the design to supersede *Patterson*. [¶] Among other things, it would 'ensure that Americans may not be harassed, *fired* or otherwise discriminated against in contracts because of their race.' *At 451:* After enactment of the new law, the Federal Courts of Appeals again reached a broad consensus that §1981, as amended, encompasses retaliation claims."

*Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460 (1975). 42 U.S.C. §1981 "is not coextensive in its coverage with Title VII. The latter is made inapplicable to certain employers. Also, Title VII offers assistance in investigation, conciliation, counsel, waiver of court costs, and attorneys' fees, items that are unavailable at least under the specific terms of §1981. *At 461:* [T]he remedies available under Title VII and under §1981, although related, and although directed to most of the same ends, are separate, distinct, and independent." *See also McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir.2009) (methods of proof and elements of case are essentially identical under Title VII and 42 U.S.C. §1981).

**Training Programs**

*Maalik v. International Un. of Elevator Constructors*, 437 F.3d 650, 653 (7th Cir.2006). Union "is not vicariously liable for the mechanics' discriminatory refusal to train [EE], but it *is* liable for its decision to do nothing in response, a passivity that led it to grant mechanics' credentials (and thus higher pay) to many of its members while holding back [EE] because of race and sex. [¶] Now if [union] did everything that was reasonable under the circumstances, it could not be liable. *At 654:* [Union] does not contend that employers control who is certified as a mechanic; that decision is in the union's hands. So it had to do something in its role as manager of the training program. It chose to do nothing…. [U]nion is liable here because [Title VII] §703(d) [now 42 U.S.C. §2000e-2(d)] makes it responsible for the operation of training and apprenticeship programs."

**Unions**

*Green v. American Fed'n of Teachers/Ill. Fed'n of Teachers Local 604*, 740 F.3d 1104, 1105 (7th Cir.2014). "Neither [42 U.S.C.] §2000e-2(c) nor [42 U.S.C.] §2000e-3(a) makes anything turn on the existence of a statutory or contractual duty violated by the act said to be discriminatory. … If a person applies for work and is rejected on account of race, the employer has not broken a contract or violated any statute (other than Title VII itself), yet no one doubts that the victim can recover under Title

VII. And if an employer fires someone on account of race, again it does not matter whether a contract has been broken. [¶] Nothing in the text or genesis of Title VII suggests that claims against labor organizations should be treated differently." Held: Union's failure to pursue EE's grievance against ER because of EE's race could be actionable Title VII discrimination. *See also Peeples v. City of Detroit*, 891 F.3d 622, 636-38 (6th Cir.2018) (Title VII discrimination or retaliation claim against labor union does not require showing that union breached duty of fair representation).

### *Vicarious Liability*

*Vance v. Ball State Univ.*, 570 U.S. 421, 423 (2013). "In this case, we decide a question left open in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. Boca Raton*, 524 U.S. 775 (1998), namely, who qualifies as a 'supervisor' in a case in which an employee asserts a Title VII claim for workplace harassment? *At 431:* We hold that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' *At 443-44:* Under the definition of 'supervisor' that we adopt today, the question of supervisor status, when contested, can very often be resolved as a matter of law before trial. The elimination of this issue from the trial will focus the efforts of the parties, who will be able to present their cases in a way that conforms to the framework that the jury will apply. The plaintiff will know whether he or she must prove that the employer was negligent or whether the employer will have the burden of proving the elements of the *Ellerth*/*Faragher* affirmative defense. Perhaps even more important, the work of the jury, which is inevitably complicated in employment discrimination cases, will be simplified. The jurors can be given preliminary instructions that allow them to understand, as the evidence comes in, how each item of proof fits into the framework that they will ultimately be required to apply. And even where the issue of supervisor status cannot be eliminated from the trial (because there are genuine factual disputes about an alleged harasser's authority to take tangible employment actions), this preliminary question is relatively straightforward."

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 140-41 (2004). "We conclude that an employer does not have recourse to the *Ellerth*/*Faragher* affirmative defense when a supervisor's official act precipitates the constructive discharge; absent such a 'tangible employment action,' however, the defense is available to the employer whose supervisors are charged with harassment." *See also Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir.2008) (supervisor not only has authority to oversee EE's job performance, but also can directly affect terms and conditions of EE's employment).

*Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *At 762:* Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control. *At 765:* An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence…. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *See also Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998); *Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 737-38 (10th Cir.2014).

*Christian v. Umpqua Bank*, 984 F.3d 801, 811-12 (9th Cir.2020). "'[A]n employer may be held liable for sexual harassment on the part of a private individual, such as [a customer], where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct.' '[T]he employer's corrective measures must be reasonably calculated to end the harassment; the reasonableness of the corrective action will depend on, *inter alia*, the employer's ability to stop the harassment and the promptness of the response.' Effectiveness is measured not only by ending the current harassment but also by 'deterring future harassment--by the same offender or others. If 1) no remedy is

§ 2000e-2. Unlawful employment practices [Statutory Text &..., 42 USCA § 2000e-2

undertaken, or 2) the remedy attempted is ineffectual, liability will attach.'" *See also Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir.2015); *Beckford v. Department of Corr.*, 605 F.3d 951, 957-58 (11th Cir.2010); *Porter v. Erie Foods Int'l*, 576 F.3d 629, 637-38 (7th Cir.2009); *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 500 (6th Cir.2009).

*Pullen v. Caddo Parish Sch. Bd.*, 830 F.3d 205, 210 (5th Cir.2016). "'[A]n employer can satisfy the first prong of the *Ellerth*/*Faragher* defense by implementing suitable institutional policies and educational programs regarding sexual harassment.' Both the harasser's knowledge of the policy and the victim's awareness of it (and of associated complaint procedures) are relevant to whether the company acted reasonably. [¶] Where the plaintiff admits that he or she was on notice of a policy and complaint procedure and the court determines that the policy was reasonable, we have consistently found the first prong satisfied. [But we have previously] held that the defendant was not entitled to judgment as a matter of law … when it had only a vague and general antidiscrimination policy without any mention of sexual harassment, the policy did not specify complaint procedures, and employees were not informed of the policy save for inconspicuous postings that the employees did not notice or read. *At 211:* [EE] produced evidence that, if believed, would show that employees … were not trained on sexual harassment, were not informed of the existence of a policy, were not shown where to find it, and were not told whom to contact regarding sexual harassment. This would be a sufficient basis for a reasonable jury to find that the company did not take reasonable steps to prevent and remedy sexual harassment."

*Huston v. Procter & Gamble Paper Prods.*, 568 F.3d 100, 107-08 (3d Cir.2009). See annotation under *Sex Discrimination-- Harassment--Generally*.

*Ocheltree v. Scollon Prods.*, 335 F.3d 325, 334 (4th Cir.2003). "An employer cannot avoid Title VII liability for coworker harassment by adopting a 'see no evil, hear no evil' strategy. Knowledge of harassment can be imputed to an employer if a 'reasonable [person], intent on complying with Title VII,' would have known about the harassment. Under this rule an employer may be charged with constructive knowledge of coworker harassment when it fails to provide reasonable procedures for victims to register complaints." *See also Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1261 (11th Cir.2003) (if ER with actual or constructive notice of harassment takes immediate and appropriate corrective action, ER is not liable).

42 U.S.C.A. § 2000e-2, 42 USCA § 2000e-2
Current through P.L. 119-74. Some statute sections may be more current, see credits for details.

---

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

SPA-187

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

United States Code Annotated
 Title 42. The Public Health and Welfare
  Chapter 21. Civil Rights (Refs & Annos)
   Subchapter VI. Equal Employment Opportunities (Refs & Annos)

42 U.S.C.A. § 2000e-5

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of Decisions subdivisions I to XI]

Effective: January 29, 2009
Currentness

<Notes of Decisions for 42 USCA § 2000e-5 are displayed in multiple documents.>

**(a) Power of Commission to prevent unlawful employment practices**

The Commission is empowered, as hereinafter provided, to prevent any person from engaging in any unlawful employment practice as set forth in section 2000e-2 or 2000e-3 of this title.

**(b) Charges by persons aggrieved or member of Commission of unlawful employment practices by employers, etc.; filing; allegations; notice to respondent; contents of notice; investigation by Commission; contents of charges; prohibition on disclosure of charges; determination of reasonable cause; conference, conciliation, and persuasion for elimination of unlawful practices; prohibition on disclosure of informal endeavors to end unlawful practices; use of evidence in subsequent proceedings; penalties for disclosure of information; time for determination of reasonable cause**

Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer, employment agency, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on such employer, employment agency, labor organization, or joint labor-management committee (hereinafter referred to as the "respondent") within ten days, and shall make an investigation thereof. Charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires. Charges shall not be made public by the Commission. If the Commission determines after such investigation that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action. In determining whether reasonable cause exists, the Commission shall accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law pursuant to the requirements of subsections (c) and (d). If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned. Any person who makes public information in violation of this subsection shall be fined not more than $1,000 or imprisoned for not more than one year, or both. The Commission shall make its determination on reasonable cause as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge or, where applicable under subsection (c) or (d), from the date upon which the Commission is authorized to take action with respect to the charge.

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

**(c) State or local enforcement proceedings; notification of State or local authority; time for filing charges with Commission; commencement of proceedings**

In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (a)[1] by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.

**(d) State or local enforcement proceedings; notification of State or local authority; time for action on charges by Commission**

In the case of any charge filed by a member of the Commission alleging an unlawful employment practice occurring in a State or political subdivision of a State which has a State or local law prohibiting the practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, the Commission shall, before taking any action with respect to such charge, notify the appropriate State or local officials and, upon request, afford them a reasonable time, but not less than sixty days (provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective day of such State or local law), unless a shorter period is requested, to act under such State or local law to remedy the practice alleged.

**(e) Time for filing charges; time for service of notice of charge on respondent; filing of charge by Commission with State or local agency; seniority system**

**(1)** A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

**(2)** For purposes of this section, an unlawful employment practice occurs, with respect to a seniority system that has been adopted for an intentionally discriminatory purpose in violation of this subchapter (whether or not that discriminatory purpose is apparent on the face of the seniority provision), when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system.

SPA-189

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

**(3)(A)** For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

**(B)** In addition to any relief authorized by section 1981a of this title, liability may accrue and an aggrieved person may obtain relief as provided in subsection (g)(1), including recovery of back pay for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge.

**(f) Civil action by Commission, Attorney General, or person aggrieved; preconditions; procedure; appointment of attorney; payment of fees, costs, or security; intervention; stay of Federal proceedings; action for appropriate temporary or preliminary relief pending final disposition of charge; jurisdiction and venue of United States courts; designation of judge to hear and determine case; assignment of case for hearing; expedition of case; appointment of master**

**(1)** If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d), the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge. In the case of a respondent which is a government, governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. The person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission or the Attorney General in a case involving a government, governmental agency, or political subdivision. If a charge filed with the Commission pursuant to subsection (b) is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d), whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action without the payment of fees, costs, or security. Upon timely application, the court may, in its discretion, permit the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, to intervene in such civil action upon certification that the case is of general public importance. Upon request, the court may, in its discretion, stay further proceedings for not more than sixty days pending the termination of State or local proceedings described in subsection (c) or (d) of this section or further efforts of the Commission to obtain voluntary compliance.

**(2)** Whenever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary investigation that prompt judicial action is necessary to carry out the purposes of this Act, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure. It shall be the duty of

a court having jurisdiction over proceedings under this section to assign cases for hearing at the earliest practicable date and to cause such cases to be in every way expedited.

**(3)** Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of Title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought.

**(4)** It shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case.

**(5)** It shall be the duty of the judge designated pursuant to this subsection to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited. If such judge has not scheduled the case for trial within one hundred and twenty days after issue has been joined, that judge may appoint a master pursuant to rule 53 of the Federal Rules of Civil Procedure.

**(g) Injunctions; appropriate affirmative action; equitable relief; accrual of back pay; reduction of back pay; limitations on judicial orders**

**(1)** If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

**(2)(A)** No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e-3(a) of this title.

**(B)** On a claim in which an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court--

**(i)** may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e-2(m) of this title; and

**(ii)** shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

**(h) Provisions of chapter 6 of Title 29 not applicable to civil actions for prevention of unlawful practices**

The provisions of chapter 6 of Title 29 shall not apply with respect to civil actions brought under this section.

**(i) Proceedings by Commission to compel compliance with judicial orders**

In any case in which an employer, employment agency, or labor organization fails to comply with an order of a court issued in a civil action brought under this section, the Commission may commence proceedings to compel compliance with such order.

**(j) Appeals**

Any civil action brought under this section and any proceedings brought under subsection (i) shall be subject to appeal as provided in sections 1291 and 1292, Title 28.

**(k) Attorney's fee; liability of Commission and United States for costs**

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

**CREDIT(S)**

(Pub.L. 88-352, Title VII, § 706, July 2, 1964, 78 Stat. 259; Pub.L. 92-261, § 4, Mar. 24, 1972, 86 Stat. 104; Pub.L. 102-166, Title I, §§ 107(b), 112, 113(b), Nov. 21, 1991, 105 Stat. 1075, 1078, 1079; Pub.L. 111-2, § 3, Jan. 29, 2009, 123 Stat. 5.)

Notes of Decisions (5111)

**O'CONNOR'S CROSS REFERENCES**
EEOC Enforcement Guidances: *Whether "Testers" Can File Charges & Litigate Claims of Employment Discrimination*, May 1996, www.eeoc.gov/laws/guidance/enforcement-guidance-whether-testers-can-file-charges-and-litigate-claims-employment.

See also 29 C.F.R. pt. 1601; *O'Connor's Federal Forms*, FORMS 2B:12, 2B:13, 2B:16; 3L:14, 3L:15, 3L:18; 6G:15 to 6G:18, 6G:23, 6G:24; 6H:15 to 6H:18, 6H:23, 6H:24; 6I:15 to 6I:18, 6I:23, 6I:24; *O'Connor's Federal Rules*, "Motion for Attorney Fees," ch. 9-C, §1 et seq.

**O'CONNOR'S CHARTS REFERENCES**
See timetable and flowchart, "EEOC Discrimination Charge."

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

**O'CONNOR'S ANNOTATIONS**

*Generally*

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 n.6 (2002). "[T]he EEOC's interpretive guidelines ... are entitled to respect under our decision in *Skidmore v. Swift & Co.*, 323 U.S. 134 … (1944), but only to the extent that those interpretations have the power to persuade." (Internal quotes omitted.)

*U.S. v. Paradise*, 480 U.S. 149, 171 (1987). "In determining whether race-conscious remedies are appropriate, we look to several factors, including the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties."

*§1983*

*Williams v. Pennsylvania Human Relations Comm'n*, 870 F.3d 294, 295 (3d Cir.2017). "[W]e address … whether violations of Title VII … may be brought through [42 U.S.C.] §1983. [W]e conclude that these claims, standing alone, may not be asserted under §1983. *At 300:* [W]hile a plaintiff may use §1983 'as a vehicle for vindicating rights independently conferred by the Constitution,' Title VII … statutory rights cannot be vindicated through §1983." *See also Henley v. Brown*, 686 F.3d 634, 641-43 (8th Cir.2012) (Title VII is exclusive remedy for violations of its own terms, but EE may bring §1983 claim if ER's conduct also amounts to violation of constitutional right).

*Aggrieved Person*

*Sheet Metal Workers' Int'l v. EEOC*, 478 U.S. 421, 482 (1986). "[A] district court may, in appropriate circumstances, order preferential relief benefiting individuals who are not the actual victims of discrimination as a remedy for violations of Title VII…." *See also International Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 514-15 (1986) (consent decree may benefit individuals who are not actual victims of ER's discriminatory practices).

*General Tel. Co. v. Falcon*, 457 U.S. 147, 159 n.15 (1982). See annotation under *Class Action*.

*Love v. Pullman Co.*, 404 U.S. 522, 523 (1972). See annotation under *Charge--Generally*.

*Howard R.L. Cook & Tommy Shaw Found. for Black Emps. of the Library of Cong., Inc. v. Billington*, 737 F.3d 767, 771 (D.C.Cir.2013). "Title VII permits a 'person claiming to be aggrieved' by an unlawful employment practice to pursue a charge. In *Thompson v. North American Stainless, LP*[, 562 U.S. 170 (2011)], the Supreme Court held that the language 'person claiming to be aggrieved' in Title VII is similar to the [Administrative Procedure Act (APA)]'s 'aggrieved' language and thus incorporates the 'zone of interests' requirement that the Court has found to apply in the APA context. [¶] That said, the zone of interests requirement poses a low bar. A plaintiff with Art. III standing satisfies the requirement unless his 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.' As the Supreme Court has stressed, the zone of interests requirement 'is not meant to be especially demanding.' *At 772:* Title VII[ ] gives injured employees a right to sue. As employees, the individual plaintiffs' interests obviously cannot be deemed 'marginally related to or inconsistent with' the purposes of Title VII."

*Arbitration Agreements*

*EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002). See annotation under 42 U.S.C. §12212.

*Circuit City Stores v. Adams*, 532 U.S. 105, 122-24 (2001). Held: Arbitration agreements valid under the FAA and state contract law can be used to require arbitration of Title VII claims. *See also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28-29 (1991).

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51-52 (1974). "[T]he rights conferred [by Title VII] can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII. In these circumstances, an employee's rights under Title VII are not susceptible of prospective waiver. [¶] Although presumably an employee may waive his cause of action under Title VII as part of a voluntary settlement, mere resort to the arbitral forum to enforce contractual rights constitutes no such waiver." *See also IUE v. Robbins & Myers, Inc.*, 429 U.S. 229, 236 (1976). *But see 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 263-64 (2009) (*Gardner-Denver* does not control when CBA's arbitration provision expressly covers both statutory and contractual claims); *Grimes v. BNSF Ry.*, 746 F.3d 184, 186-87 (5th Cir.2014) (findings in arbitration proceeding under CBA can be used to collaterally estop findings in federal-court proceeding; *Gardner-Denver* counsels against only claim preclusion, not issue preclusion); *Coleman v. Donahoe*, 667 F.3d 835, 854 (7th Cir.2012) (findings in arbitration proceedings under CBA cannot be used to collaterally estop findings in federal-court proceedings except when CBA explicitly mandates that employment-discrimination claims will be resolved in arbitration).

*Ashbey v. Archstone Prop. Mgmt.*, 785 F.3d 1320, 1323 (9th Cir.2015). "[A] plaintiff cannot waive his right to a judicial forum for Title VII claims unless he does so 'knowingly.' *At 1324:* '[A]ny bargain to waive the right to a judicial forum for civil rights claims … in exchange for employment or continued employment must at the least be express: the choice must be explicitly presented to the employee and the employee must explicitly agree to waive the specific right in question.'"

*Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 3 (1st Cir.2005). "[W]e hold that an employer does not waive its right to arbitration by failing to demand arbitration during the pendency of an EEOC investigation. *At 16 n.13:* We say nothing here about whether or when an employer has a right to initiate an arbitration during the course of an EEOC investigation. We hold only that an employer should not be forced to file for arbitration during an EEOC investigation by finding a waiver of its right to arbitrate if it does not make such a filing. [¶] We reaffirm that an employer cannot waive its right to arbitration by failing to raise the arbitration defense with the EEOC or by failing to initiate arbitration during the pendency of the EEOC proceedings."

*Attorney Fees*

*CRST Van Expedited, Inc. v. EEOC*, 578 U.S. 419, 422-23 (2016). "When a defendant is the prevailing party on a civil rights claim, … district courts may award attorney's fees if the plaintiff's 'claim was frivolous, unreasonable, or groundless,' or if 'the plaintiff continued to litigate after it clearly became so.' *At 431:* This Court … now holds that a defendant need not obtain a favorable judgment on the merits in order to be a 'prevailing party.' [¶] The defendant has … fulfilled its primary objective whenever the plaintiff's challenge is rebuffed, irrespective of the precise reason for the court's decision. The defendant may prevail even if the court's final judgment rejects the plaintiff's claim for a nonmerits reason. *At 432:* Congress must have intended that a defendant could recover fees expended in frivolous, unreasonable, or groundless litigation when the case is resolved in the defendant's favor, whether on the merits or not." *See also Fox v. Vice*, 42 U.S.C. §1988, *Attorney Fees--Reasonable Fees* (D need not show that every claim in a complaint is frivolous to qualify for fees); *EEOC v. Great Steaks, Inc.*, 667 F.3d 510, 517-18 (4th Cir.2012) (denial of motion for judgment as matter of law at close of evidence strongly indicates that P's case is nonfrivolous).

*New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 71 (1980). Title VII §706(f) and (k), now 42 U.S.C. §2000e-5(f) and (k), "authorize a federal-court action to recover an award of attorney's fees for work done by the prevailing complainant in state proceedings to which the complainant was referred pursuant to the provisions of Title VII." *See also Porter v. Winter*, 603 F.3d 1113, 1117-18 (9th Cir.2010) (most circuits agree that *Carey* is valid for Title VII suits even after Court's decision in *North Carolina DOT v. Crest St. Cmty. Council, Inc.*, 479 U.S. 6 (1986), that 42 U.S.C. §1988 does not authorize independent federal-court action for attorney fees).

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978). "[A] district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith. *At 422:* [A] plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

it clearly became so. And, needless to say, if a plaintiff is found to have brought or continued such a claim in *bad faith*, there will be an even stronger basis for charging him with the attorney's fees incurred by the defense." *See also Independent Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 761 (1989) (attorney fees should be awarded against losing intervenors only where the intervenors' action was frivolous, unreasonable, or without foundation); *EEOC v. CVS Pharm.*, 907 F.3d 968, 977 (7th Cir.2018) (fee statute does not punish civil-rights litigant for pursuing novel, even if ambitious, theory).

*Perez-Sosa v. Garland*, 22 F.4th 312, 323 (1st Cir.2022). "[T]he Tenth Circuit [has] held that a prevailing Title VII plaintiff may not recover attorneys' fees for time spent in navigating the employer's optional grievance process even if such work was useful and of a type ordinarily necessary to secure the final result obtained from the litigation. There, the court decided that the useful-and-necessary standard does not apply to actions under Title VII. *At 324:* We do not agree. To determine the number of hours reasonably expended on the litigation, ... an inquiring court must look not to labels but, rather, to the nature of the work and its utility to the case at hand.... That look is not constrained by the four corners of the particular case. Instead, a court should award fees for all hours logged in connection with work that is useful and of a type ordinarily necessary to secure the final result obtained from the litigation. This standard controls even when that work implicates some other [related] case." (Internal quotes omitted.) *But see Barrett v. Salt Lake Cty.*, 754 F.3d 864, 869-70 (10th Cir.2014) (§2000e-5(k) does not authorize award of fees incurred in optional internal grievance process that is not prerequisite to Title VII suit).

*West v. Potter*, 717 F.3d 1030, 1034 (D.C.Cir.2013). "[I]n Title VII cases like this one, attorneys are often not paid until long after services are rendered, and 'payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable.' Accordingly, the Supreme Court has held that 'an enhancement for delay in payment is, where appropriate, part of a reasonable attorney's fee.' If compensation for delay is necessary to provide a reasonable fee, it may be made 'either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value.' For example, instead of using current rates, courts may also compensate for delay by adding interest to the historic rate so that the amount paid today reflects the approximate value of the historical rates charged at the time services were rendered. [¶] [T]he magistrate judge recited as factors in his refusal to provide compensation for delay in payment that the delay was neither unusually long nor attributable to the defendant's dilatory or stalling conduct. While these may be appropriate factors to consider in whether to award an adjustment for delay, neither we nor the Supreme Court have deemed them exclusive. … We are not suggesting that they are inappropriate factors, but we are returning the question to the district court for resolution of an appropriate adjustment, if any, based on the delay without the apparent assumption that none could be made in the absence of the enumerated factors. [¶] We do not hold that compensation for delay is always necessary in Title VII cases."

*Crumpacker v. Kansas, Dept. of Human Res.*, 474 F.3d 747, 756 (10th Cir.2007). "We … hold that appeal-related fees, including those incurred in an interlocutory appeal, must generally be awarded by us. [P]arties who prevail on interlocutory review in this court, and who subsequently become prevailing parties under Title VII or another fee-shifting provision at the conclusion of merits proceedings, are implicitly entitled to reasonable attorneys' fees related to the interlocutory appeal. … Any dispute as to the propriety or amount of fees related to an interlocutory appeal determined by the district court can be resolved on appeal to this court."

*Balmer v. HCA, Inc.*, 423 F.3d 606, 615-16 (6th Cir.2005), *overruled on other grounds*, *Fox v. Vice*, 563 U.S. 826 (2011). "The standard for granting attorneys' fees to a prevailing employer is more stringent than that for awarding attorneys' fees to a prevailing employee. [¶] Courts should consider the following factors when making an attorneys' fees determination: (1) whether plaintiff presented sufficient evidence to establish a prima facie case; (2) whether defendant offered to settle the case; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits."

*Gobert v. Williams*, 323 F.3d 1099, 1100 (5th Cir.2003). 42 U.S.C. §1988 "'itself does not interfere with the enforceability of a contingent-fee contract.' [¶] As with §1988, 'there is nothing in [42 U.S.C. §2000e-5(k)] to regulate what plaintiffs may or may not promise to pay their attorneys if they lose or if they win.' [Moreover], because this dispute turns on the enforceability

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

of the retainer agreement rather than the amount of fees shifted to the losing party, our case law regarding the reasonableness of fee awards under §2000e-5(k) does not apply."

**Charge--Generally**

*Fort Bend Cty. v. Davis*, 587 U.S. 541, 543-44 (2019). "We hold that Title VII's charge-filing instruction is not jurisdictional, a term generally reserved to describe the classes of cases a court may entertain (subject-matter jurisdiction) or the persons over whom a court may exercise adjudicatory authority (personal jurisdiction). Prerequisites to suit like Title VII's charge-filing instruction are not of that character; they are properly ranked among the array of claim-processing rules that must be timely raised to come into play."

*Federal Express Corp. v. Holowecki*, 552 U.S. 389, 402-03 (2008). For a filing to be deemed a charge, it "must be examined from the standpoint of an objective observer to determine whether, by a reasonable construction of its terms, the filer requests the agency to activate its machinery and remedial processes…. [¶] The ADEA, like Title VII, sets up a 'remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.' The system must be accessible to individuals who have no detailed knowledge of the relevant statutory mechanisms and agency processes. It thus is consistent with the purposes of the Act that a charge can be a form, easy to complete, or an informal document, easy to draft." *Compare Patton v. Jacobs Eng'g Grp.*, 874 F.3d 437, 443 (5th Cir.2017) (unverified intake questionnaire alone cannot be charge but can be considered part of charge if filed with formal charge), *and Carlson v. Christian Bros.*, 840 F.3d 466, 467 (7th Cir.2016) (intake questionnaire does not function as charge unless it asks for relief), *and Hildebrand v. Allegheny Cty.*, 757 F.3d 99, 112-13 (3d Cir.2014) (ADEA case; completed revised EEOC intake questionnaire with checked box requesting remedial action can be read as discrimination charge)*, and Aly v. Mohegan Council, Boy Scouts of Am.*, 711 F.3d 34, 43 (1st Cir.2013) (for limitations purposes, intake questionnaire can serve as charge in appropriate circumstances)*, with Balas v. Huntington Ingalls Indus.*, 711 F.3d 401, 408 (4th Cir.2013) (intake questionnaire and letters submitted to EEOC cannot be read as part of formal discrimination charge).

*Edelman v. Lynchburg Coll.*, 535 U.S. 106, 115 (2002). Held: An otherwise timely filer may verify a charge after the time for filing has expired.

*Mohasco Corp. v. Silver*, 447 U.S. 807, 814 n.16 (1980). "[A] complainant in a deferral State having a fair employment practices agency over one year old need only file his charge within 240 days of the alleged discriminatory employment practice in order to insure that his federal rights will be preserved. If a complainant files later than that (but not more than 300 days after the practice complained of), his right to seek relief under Title VII will nonetheless be preserved if the State happens to complete its consideration of the charge prior to the end of the 300-day period." *See also Taylor v. General Tel. Co.*, 759 F.2d 437, 442 (5th Cir.1985) (mailing is not filing for purposes of Title VII).

*United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977). "A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *See also* **Hentosh v. Old Dominion Univ.**, 42 U.S.C. §2000e-16 (claims that are reasonably related to EEOC charge need not be included in charge); *Sitar v. Indiana DOT*, 344 F.3d 720, 726 (7th Cir.2003) (same).

*Love v. Pullman Co.*, 404 U.S. 522, 523 (1972). "A person claiming to be aggrieved by a violation of Title VII … may not maintain a suit for redress in federal district court until he has first unsuccessfully pursued certain avenues of potential administrative relief."

*Lincoln v. BNSF Ry.*, 900 F.3d 1166, 1181 (10th Cir.2018). "[E]ach discrete incident of discriminatory or retaliatory treatment constitutes its own unlawful employment practice for which administrative remedies must be exhausted. Thus, where discrete incidents of discrimination occur after an employee files an initial EEOC charge, the employee must file an additional or amended charge with the EEOC to satisfy the exhaustion requirement as to discrete incidents occurring after the initial

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

charge. *At 1185:* [A] plaintiff's failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim." (Internal quotes omitted.) *See also Hardaway v. Hartford Pub. Works Dept.*, 879 F.3d 486, 490-91 (2d Cir.2018) (D has burden to plead and prove administrative exhaustion as affirmative defense).

*Duplan v. City of N.Y.*, 888 F.3d 612, 621-22 (2d Cir.2018). "[A] Title VII plaintiff generally must file a charge of discrimination with the EEOC 'within 300 days after the alleged unlawful employment practice occurred,' … and must then file an action in federal court within 90 days of receiving a right-to-sue letter from the agency…. [¶] We have … long recognized that in certain circumstances it may be unfair, inefficient, or contrary to the purposes of the statute to require a party to separately re-exhaust new violations that are 'reasonably related' to the initial claim. [¶] It is well established that the plaintiff may … sue in federal court on both the adverse actions that gave the impetus for the initial EEOC charge and the retaliation that occurred thereafter, even though no separate or amended EEOC charge encompassing the subsequent retaliation was ever filed. *At 624:* '[R]easonably related' retaliation claims are excused from the exhaustion requirement *only* if they arise during the pendency of an EEOC investigation *or* a timely filed federal case…." *See also EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 598-99 (6th Cir.2018) (declining to resolve current validity of earlier holding that EEOC cannot sue for matters beyond those reasonably expected to arise from original charge), *aff'd sub nom. Bostock v. Clayton Cty.*, 590 U.S. 644 (2020); *Luevano v. Wal-Mart Stores*, 722 F.3d 1014, 1030 (7th Cir.2013) (P who claims retaliation for filing EEOC charge need not file second charge to sue for that retaliation); *Franceschi v. U.S. Dept. of Veterans Affairs*, 514 F.3d 81, 86-87 (1st Cir.2008) (same). *But see Eisenhour v. Weber Cty.*, 744 F.3d 1220, 1226-27 (10th Cir.2014) (each act of retaliation must be separately exhausted, even those arising from and reasonably related to those in EEOC charge); *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851 (8th Cir.2012) (retaliation claims arising from EEOC charge are not exempt from exhaustion requirement).

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 509 (6th Cir.2011). "[I]n order for an EEOC filing to constitute a 'charge' that is necessary to exhaust an employee's administrative remedies under Title VII, the filing (1) must be 'verified'--that is, submitted under oath or penalty of perjury …; (2) must contain information that is 'sufficiently precise to identify the parties, and to describe generally the action or practices complained of[ ]' …; and (3) must comply with [*Federal Express Corp. v. Holowecki*, 552 U.S. 389 (2008)]--that is, an 'objective observer' must believe that the filing 'taken as a whole' suggests that the employee 'requests the agency to activate its machinery and remedial processes[ ]'…." *See also* 29 C.F.R. §1601.12 (contents of charge); *Gad v. Kansas State Univ.*, 787 F.3d 1032, 1033-34 (10th Cir.2015) (verification defects can be waived because verification requirement is nonjurisdictional condition precedent to suit); *Buck v. Hampton Township Sch. Dist.*, 452 F.3d 256, 262-63 (3d Cir.2006) (same).

*Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir.2006). "[A] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made. In this inquiry, the focus should be on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct…. The central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases. The reasonably related exception to the exhaustion requirement is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering. *At 70 n.1:* Two other types of claims are considered reasonably related to a claim with the EEOC: (1) a claim alleging retaliation by an employer against an employee for filing an EEOC charge, and (2) a claim where the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." (Internal quotes omitted.) *See also Garayalde-Rijos v. Municipality of Carolina*, 747 F.3d 15, 22 n.7 (1st Cir.2014) (separate retaliation claim need not be filed with EEOC to exhaust administrative remedies when retaliation is reasonably related to and grows out of discrimination complaint). *But see Eisenhour v. Weber Cty.*, 744 F.3d 1220, 1227 (10th Cir.2014) (each act of retaliation must be separately exhausted, even when retaliation is reasonably related to and grows out of discrimination complaint).

*Horton v. Jackson Cty. Bd. of Cty. Comm'rs*, 343 F.3d 897, 899 (7th Cir.2003). "The 'single-filing' (or 'piggybacking') doctrine is a judge-made exception to the rule that a timely administrative charge is a prerequisite to suit. The usual formulation is that if

the would-be intervenor's claim arises out of the same or similar discriminatory conduct, committed in the same period, as the claim in the suit in which he wants to intervene, his failure to file a timely charge will be disregarded. *At 901:* Unless the single-filing doctrine is limited to cases in which the claims arise from the same facts rather than merely from facts that resemble each other or are causally linked to each other, courts will perforce be excusing the filing of a timely charge in *every* case in which an employee alleges retaliation for supporting another employee's charge. Such a rule would undermine the EEOC's conciliation procedure for no good reason." *See also Price v. Choctaw Glove & Safety Co.*, 459 F.3d 595, 599 (5th Cir.2006) (setting forth conditions for invocation of single-filing rule). *Compare Peeples v. City of Detroit*, 891 F.3d 622, 631-32 (6th Cir.2018) (single-filing rule is not limited to class actions and permits P to join individual action when P's substantially related claim arises out of same time frame as timely filed claim)*, with Whalen v. W.R. Grace & Co.*, 56 F.3d 504, 507 (3d Cir.1995) (single-filing rule is limited to class actions).

### Charge--Continuing Violation

*Lewis v. City of Chi.*, 560 U.S. 205, 208 (2010). "We consider whether a plaintiff who does not file a timely charge challenging the *adoption* of a practice … may assert a disparate-impact claim in a timely charge challenging the employer's later *application* of that practice." Held: Each new use of an unlawful employment practice is a new Title VII violation.

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-10 (2002). In §2000e-5(e)(1), "[t]he operative terms are 'shall,' 'after … occurred,' and 'unlawful employment practice.' '[S]hall' makes the act of filing a charge within the specified time period mandatory. '[O]ccurred' means that the practice took place or happened in the past. The requirement, therefore, that the charge be filed 'after' the practice 'occurred' tells us that a litigant has up to 180 or 300 days *after* the unlawful practice happened to file a charge with the EEOC. [¶] A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it. *At 114:* Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' *At 117:* A hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.' The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. *At 118:* Given … that the incidents comprising a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *See also Heath v. Board of Supervisors for the S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 737-39 (5th Cir.2017) (date EE knew or should have known she has Title VII claim is irrelevant to continuing-violation doctrine).

*Davis v. Bombardier Transp. Hlds. (USA) Inc.*, 794 F.3d 266, 269 (2d Cir.2015). The Ledbetter Fair Pay Act, which superseded *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), by amending §2000e-5(e)(3)(A), "makes it unlawful to apply a discriminatory compensation decision to an employee and starts a new statute of limitations clock with each paycheck that reflects that decision. [¶] We conclude that the Ledbetter Act does not encompass a claim of a discriminatory demotion decision that results in lower wages where … the plaintiff has not offered any proof that the compensation itself was set in a discriminatory manner. A plaintiff must plead and prove the elements of a pay-discrimination claim to benefit from the Ledbetter Act's accrual provisions. *At 271:* [W]e find that the Ledbetter Act's reference to 'discrimination in compensation' was to traditional pay-discrimination claims rather than to a pay reduction that flows from another adverse employment action." *See also Daniels v. UPS, Inc.*, 701 F.3d 620, 630-31 (10th Cir.2012), *overruled on other grounds*, *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024); *Noel v. Boeing Co.*, 622 F.3d 266, 273-74 (3d Cir.2010).

*Loubriel v. Fondo del Seguro del Estado*, 694 F.3d 139, 144 (1st Cir.2012). "The continuing violation doctrine 'is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims.' The existence of a continuing violation may toll the limitations period for filing an initial claim with either the EEOC or a local

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

antidiscrimination agency. [¶] [But] the existence of a continuing violation does not relax the requirement that a plaintiff file her judicial action within 90 days of the receipt of the EEOC's right-to-sue notice."

*Hutson v. Wells Dairy, Inc.*, 578 F.3d 823, 826 (8th Cir.2009). "A termination is a discrete act, not a continuing violation."

*Elmenayer v. ABF Freight Sys.*, 318 F.3d 130, 134-35 (2d Cir.2003). "[A]n employer's rejection of an employee's proposed accommodation for religious practices does not give rise to a continuing violation. Rather, the rejection is the sort of 'discrete act' that must be the subject of a complaint to the EEOC within 300 days. … The rejection of a proposed accommodation is a single completed action when taken, quite unlike the 'series of separate acts' that constitute a hostile work environment and 'collectively constitute' an unlawful employment practice. Although the *effect* of the employer's rejection continues to be felt by the employee for as long as he remains employed, that continued effect is similar to the continued effect of being denied a promotion or denied a transfer, denials that *Morgan* offered as examples of a discrete act." *See also Ayala v. Shinseki*, 780 F.3d 52, 57-58 (1st Cir.2015) (continuing-violation doctrine applies only to claims that require repeated conduct to establish actionable claim).

### *Charge--Limitations*
*Green v. Brennan*, 578 U.S. 547, 564 (2016). "[W]e hold that a constructive-discharge claim accrues--and the limitations period begins to run--when the employee gives notice of his resignation, not on the effective date of that resignation."

*Stevens v. Department of Treasury*, 500 U.S. 1, 7 (1991). The person alleging discrimination need not "'initiate his federal action within 180 days of the alleged action, but merely give notice to the EEOC of his intention to initiate a civil action.'"

*EEOC v. Commercial Office Prods.*, 486 U.S. 107, 109-10 (1988). "The primary question presented is whether a state agency's decision to waive its exclusive 60-day period for initial processing of a discrimination charge, pursuant to a worksharing agreement with the EEOC, 'terminates' the agency's proceedings within the meaning of [§2000e-5] so that the EEOC immediately may deem the charge filed. In addition, we must decide whether a complainant who files a discrimination charge that is untimely under state law is nonetheless entitled to the extended 300-day federal filing period of [§2000e-5(e)]. *At 125:* Because we find that the extended 300-day federal limitations period is applicable to this case and that [state agency's] waiver of the 60-day deferral period 'terminated' its proceedings within that 300-day limit, we conclude that [complainant's] claim was timely filed under Title VII." *See also Nichols v. Muskingum Coll.*, 318 F.3d 674, 679-80 (6th Cir.2003); *Newbold v. Wisconsin State Pub. Defender*, 310 F.3d 1013, 1015 (7th Cir.2002).

*Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 825 (6th Cir.2019). "This case requires us to determine, as a matter of first impression, whether the statute of limitations of Title VII ... may be contractually shortened for litigation. *At 829:* Title VII is distinguishable from many federally created causes of action in that Title VII contains its own limitation period. In crafting Title VII, Congress could have created a cause of action without any limitation period at all, or Congress could have used a general limitation period. However, Congress created Title VII to be self-contained; that is, the applicable limitation period resides within Title VII itself. [¶] [W]here statutes that create rights and remedies contain their own limitation periods, the limitation period should be treated as a substantive right. [¶] [T]he 300-day limitation period to sue under Title VII is a substantive, rather than procedural, rule. And because 'it [is] clear that there can be no prospective waiver of an employee's rights under Title VII,' ... it naturally follows that the limitation period of this statute is not prospectively waivable as it pertains to litigation."

*Elkadrawy v. Vanguard Grp.*, 584 F.3d 169, 173 (3d Cir.2009). Held: Disposition of Title VII action as untimely filed is decision on the merits for purposes of res judicata.

*Flaherty v. Metromail Corp.*, 235 F.3d 133, 137 (2d Cir.2000). "It has long been settled that a claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct. [¶] In discriminatory discharge cases, then, the illegal act is often the decision to terminate the employee, and the limitations period begins to run on the date that the employer gives definite notice of that decision to the employee."

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

*Charge--Tolling*

*Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 150-51 (1984). Held: The filing of a right-to-sue letter does not toll the 90-day period for filing a civil action under Title VII.

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983). "The filing of a class action [under §2000e-5] tolls the statute of limitations 'as to all asserted members of the class,' … not just as to intervenors."

*IUE v. Robbins & Myers, Inc.*, 429 U.S. 229, 236 (1976). Held: Pendency of grievance or arbitration procedures under a CBA does not toll the 90-day period for filing a charge with the EEOC. *See also Delaware State Coll. v. Ricks*, 449 U.S. 250, 261 (1980); *Board of Regents v. Tomanio*, 446 U.S. 478, 490 (1980).

*Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41, 46 (1st Cir.2005). "While an employer's affirmative misconduct provides one rationale for extending the filing period, we have recognized that an employer's violation of the EEOC posting requirement may provide a second basis for an extended filing period where the employee had no other actual or constructive knowledge of the complaint procedures…. *At 47 n.8:* [T]he failure to post notice of legal rights triggers a totality of the circumstances kind of review. *At 48:* Courts generally weigh five factors when considering whether to allow equitable tolling in a particular case: (1) lack of actual notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the filing requirement. These factors are not exhaustive, however; it is in the nature of equity to entertain case-specific factors that may counsel in favor of tolling." (Internal quotes omitted.)

*Beckel v. Wal-Mart Assocs.*, 301 F.3d 621, 623 (7th Cir.2002). "If the employer merely orders the employee not to talk to anyone except the employer's managers about her allegation of sexual harassment, and she misunderstands this to mean that talking to a lawyer or filing an administrative complaint or a lawsuit would be considered employee misconduct and jeopardize her job, there is no basis for finding equitable estoppel unless the employer phrases the order in a way calculated to mislead a reasonable person. For an employer has a right to take steps to prevent an employee from spreading what may be groundless rumors concerning improper conduct by another employee."

*Civil Action*

*Swierkiewicz v. Sorema*, 534 U.S. 506, 508 (2002). "We hold that an employment discrimination complaint need not include [specific facts establishing a prima facie case of discrimination under the *McDonnell Douglas* burden-shifting framework] and instead must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (not an employment-law case; P must provide enough facts to state a facially plausible claim to relief to overcome dismissal); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (same). *Compare Luevano v. Wal-Mart Stores*, 722 F.3d 1014, 1028 (7th Cir.2013) (Title VII claim; continuing to apply *Swierkiewicz* pleading standard in employment cases; *Iqbal* and *Twombly* did not overrule *Swierkiewicz*), *with Hamilton v. Dallas Cty.*, 79 F.4th 494 (5th Cir.2023) (applying *Iqbal* pleading standard; facts alleged in complaint must state facially plausible claim to relief and support reasonable inference that ER is liable for misconduct), *Littlejohn v. City of N.Y.*, 795 F.3d 297, 309-11 (2d Cir.2015) (*Iqbal* pleading standard applies to Title VII employment complaints; facts alleged in complaint need not give plausible support to ultimate question of whether adverse employment action was attributable to discrimination but only must give plausible support to minimal inference of discriminatory motivation), *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245-46 (11th Cir.2015) (applying *Iqbal* pleading standard; facts alleged in complaint must plausibly suggest that EE suffered adverse employment action due to intentional discrimination), *and McCleary-Evans v. Maryland DOT*, 780 F.3d 582, 585-87 (4th Cir.2015) (*Iqbal* pleading standard applies to Title VII employment complaints; facts alleged in complaint must state facially plausible claim that D failed to hire P because of her race or sex).

SPA-200

*EEOC v. Waffle House, Inc.*, 534 U.S. 279, 291 (2002). Section 2000e-5(f)(1) "clearly … confers on the [EEOC] the authority to evaluate the strength of the public interest at stake. *At 295-96:* [T]he EEOC has the authority to pursue victim-specific relief regardless of the forum that the employer and employee have chosen to resolve their disputes. [W]henever the EEOC chooses from among the many charges filed each year to bring an enforcement action in a particular case, the agency may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief."

*Occidental Life Ins. v. EEOC*, 432 U.S. 355, 361 (1977). Section 2000e-5(f)(1) "provides that a complainant whose charge is not dismissed or promptly settled or litigated by the EEOC may himself bring a lawsuit, but that he must wait 180 days before doing so. After waiting for that period, the complainant may either file a private action within 90 days after EEOC notification or continue to leave the ultimate resolution of his charge to the efforts of the EEOC." *See also McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 214 (2d Cir.2006) (right-to-sue letter enables a private suit only if issued in connection with a timely administrative charge).

*Hardaway v. Hartford Pub. Works Dept.*, 879 F.3d 486, 491 (2d Cir.2018). "[W]e hold that the burden of pleading and proving Title VII exhaustion lies with defendants and operates as an affirmative defense." *But see Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1167 (10th Cir.2007) (P has burden to show compliance with filing deadline as condition precedent to suit).

*Prince v. Stewart*, 580 F.3d 571, 574 (7th Cir.2009). "[T]he limitations period in both Title VII and the ADEA begins to run … when the claimant *receives* the letter, not when it was sent…." *See also* 29 C.F.R. §1601.28(e)(1); *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951-52 (11th Cir.2005); *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir.2002). *But see Scott v. Gino Morena Enters.*, 888 F.3d 1101, 1108 & n.6 (9th Cir.2018) (under §2000e-5(f)(1), 90-day clock runs from "giving" right-to-sue notice, but corresponding regulation requires notice to state that claimant can bring suit "within 90 days from receipt" of notice); *Ebbert v. DaimlerChrysler Corp.*, 319 F.3d 103, 115-16 (3d Cir.2003) (oral notice can suffice to start limitations period if it is equivalent to written notice).

*Surrell v. California Water Serv.*, 518 F.3d 1097, 1105 (9th Cir.2008). "[W]here … a plaintiff is entitled to receive a right-to-sue letter from the EEOC, a plaintiff may proceed absent such a letter, provided she has received a right-to-sue letter from the appropriate state agency."

*Payan v. Aramark Mgmt. Servs.*, 495 F.3d 1119, 1121 (9th Cir.2007). "This appeal turns upon one narrow and discrete issue-- how to determine whether a Title VII action brought in district court after the receipt of an EEOC right-to-sue letter has been timely filed when the actual date of receipt by the litigant is unknown. [W]e hold that in the absence of evidence of actual receipt, we will apply a three-day mailing presumption to determine notice of a right-to-sue letter. *At 1122:* We measure the start of the limitations period from the date on which a right-to-sue notice letter arrived at the claimant's address of record. Where that date is known, we will deem the claimant to have received notice on that date, regardless of whether the claimant personally saw the right-to-sue letter. [¶] Where the date of actual receipt is unknown, we will estimate that date based on the date of EEOC disposition and issuance of notice, with some compensation for mailing time. [¶] Where the actual date of receipt is unknown but receipt itself is not disputed, we have not demanded proof of actual receipt but have applied a presumption to approximate receipt." *See also Loubriel v. Fondo del Seguro del Estado*, 694 F.3d 139, 143 (1st Cir.2012) (notice provided by EEOC is presumed to have been received within reasonable time after date on notice); *Banks v. Rockwell Int'l N. Am. Aircraft Opers.*, 855 F.2d 324, 326 (6th Cir.1988) (five-day presumption).

*Nestor v. Pratt & Whitney*, 466 F.3d 65, 69 (2d Cir.2006). "The issue presented on appeal is whether a Title VII plaintiff who prevailed on her discrimination claims before a state administrative agency and in appeals of the agency decision to state court can subsequently file suit in federal court seeking relief that was unavailable in the state proceedings." Held: Yes. *Compare Porter v. Winter*, 603 F.3d 1113, 1118 (9th Cir.2010) (Title VII-P may bring suit to recover attorney fees after successfully litigating before state administrative body)*, and Jones v. American State Bank*, 857 F.2d 494, 499 (8th Cir.1988) (same)*, with*

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

*Chris v. Tenet*, 221 F.3d 648, 655 (4th Cir.2000) (federal court lacked jurisdiction to hear P's suit solely seeking attorney fees incurred in earlier administrative action).

*Nelson v. Boeing Co.*, 446 F.3d 1118, 1122 (10th Cir.2006). Held: Title VII does not guarantee a right to appointed counsel.

*Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir.2005). "We hold that a plaintiff fails to exhaust his administrative remedies where … his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit. *At 509:* Even after a plaintiff has exhausted his administrative remedies, the administrative framework plays a substantial role in focusing the formal litigation it precedes. If 'the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred.' Consequently, '[t]he allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint.' At the same time, however, lawyers do not typically complete the administrative charges, and so courts construe them liberally. [¶] [H]owever, if the factual allegations in the administrative charge are reasonably related to the factual allegations in the formal litigation, the connection between the charge and the claim is sufficient. *At 512:* A Title VII plaintiff can of course exhaust administrative remedies if a reasonable investigation of his administrative charge would have uncovered the factual allegations set forth in formal litigation." *See also Deravin v. Kerik*, 335 F.3d 195, 200-01 (2d Cir.2003) (claim reasonably related if within EEOC investigation that grows out of charge made); *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 380 (6th Cir.2002) (discussing "expected scope of investigation" test).

*EEOC v. Caterpillar, Inc.*, 409 F.3d 831, 833 (7th Cir.2005). "Were the private party permitted to add claims that had not been presented in the administrative charge filed with the EEOC, the [EEOC's] informal procedures for resolving discrimination charges … would be by-passed, in derogation of the statutory scheme. That is not an issue when the EEOC itself is the plaintiff, which is why a suit by the EEOC is not confined 'to claims typified by those of the charging party,' … and why [D] is mistaken to think that the EEOC's complaint must be closely related to the charge that kicked off the [EEOC's] investigation. 'Any violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable.' The charge incites the investigation, but if the investigation turns up additional violations the [EEOC] can add them to its suit. [¶] If courts may not limit a suit by the EEOC to claims made in the administrative charge, they likewise have no business limiting the suit to claims that the court finds to be supported by the evidence obtained in the [EEOC's] investigation. The existence of probable cause to sue is generally and in this instance not judicially reviewable."

*Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir.2004). "[EEs] assert that under [the] abstention principles enunciated in *Younger v. Harris*, 401 U.S. 37 … (1971), they were obliged to wait until the resolution of the administrative disciplinary charges before filing this suit in federal court. They maintain that the three-year statute of limitations should have been tolled until the resolution of the disciplinary charges. [W]e disagree. [¶] [EEs] argue that the principles enunciated in *Younger* and its progeny--comity, deference to state administrative proceedings, and judicial economy--mandate disposition of pending state administrative proceedings prior to filing [42 U.S.C.] §§1981 and 1983 discrimination claims in federal court. We disagree. *At 319:* We recognize that certain circumstances might militate in favor of abstaining from filing a federal suit until disposition of underlying state administrative proceedings. For example, if the claims raised in federal court would necessarily implicate factual issues pending in the underlying state administrative proceeding, pursuant to *Younger* and its progeny, the federal suit would be stayed pending disposition of the underlying state proceedings."

*Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1335 (3d Cir.2002). Held: EEOC Letter of Determination, which is presumptively probative if not challenged as untrustworthy under FRE 803(8)(C), is not per se admissible in Title VII cases and may be excluded under FRE 403. *See also Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299, 302 (11th Cir.1989) (OSHA investigative report, otherwise admissible under FRE 803(8)(C), could still be excluded under FRE 403). *But see Plummer v. Western Int'l Hotels Co.*, 656 F.2d 502, 505 (9th Cir.1981) (EEOC probable-cause determination is admissible in Title VII lawsuits, regardless of what other claims are asserted).

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

*Herrmann v. Cencom Cable Assocs.*, 999 F.2d 223, 225 (7th Cir.1993). "Parties to Title VII actions enjoy no immunity from res judicata. [When] one transaction was alleged to violate a host of different laws, … it would not make much sense to say that the plaintiff must file all but the Title VII claim in one suit but may wait and bring a second suit charging violations of Title VII alone." *See also Ashbourne v. Hansberry*, 894 F.3d 298, 302-03 (D.C.Cir.2018) (administrative-exhaustion requirement is nonissue if EE had full and fair opportunity to bring Title VII claim in initial action).

**Class Action**

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016). See annotation under 29 U.S.C. §216, *Right of Action*.

*Wal-Mart Stores v. Dukes*, 564 U.S. 338, 349-50 (2011). "Commonality [under FRCP 23] requires the plaintiff to demonstrate that the class members 'have suffered the same injury[ ]'…. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways--by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention--for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. *At 352:* Here [EEs] wish to sue about literally millions of employment decisions at once. Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored. At 360:* We also conclude that respondents' claims for backpay were improperly certified under [FRCP] 23(b)(2). Our opinion in *Ticor Title Ins. v. Brown*, 511 U.S. 117 … (1994) (*per curiam*), expressed serious doubt about whether claims for monetary relief may be certified under that provision. We now hold that they may not, at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief. *At 362:* [W]e think it clear that individualized monetary claims belong in Rule 23(b)(3)." *See also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (at class-certification stage, as at trial, any model supporting P's damages case must be consistent with its liability case); *Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir.2013) (individualized monetary relief is not incidental to the injunctive and declaratory relief P seeks, and the district court was correct to deny class certification under Rule 23(b)(2)).

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983). See annotation under *Charge--Tolling*.

*General Tel. Co. v. Falcon*, 457 U.S. 147, 159 n.15 (1982). "[I]t is noteworthy that Title VII prohibits discriminatory employment *practices*, not an abstract policy of discrimination. The mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer." *See also General Tel. Co. v. EEOC*, 446 U.S. 318, 323 (1980) (FRCP 23 does not apply to enforcement actions brought by EEOC in its own name under §2000e-5 to prevent unlawful employment practices).

*Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478, 478-79 (1978). Held: Denial of class certification cannot be immediately appealed under 28 U.S.C. §1292(a)(1).

*United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977). "[A]s soon as it became clear to the respondent that the interests of the unnamed class members would no longer be protected by the named class representatives, she promptly moved to intervene to protect those interests. *At 395-96:* The critical inquiry in every such case is whether in view of all the circumstances the intervenor acted promptly after the entry of final judgment."

*International Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 360 (1977). "The plaintiff in a pattern-or-practice action is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. At the initial, 'liability' stage of a pattern-or-practice suit the Government is not required

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant. *At 361:* If an employer fails to rebut the inference that arises from the Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy. Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief. Such relief might take the form of an injunctive order against continuation of the discriminatory practice, an order that the employer keep records of its future employment decisions and file periodic reports with the court, or any other order 'necessary to ensure the full enjoyment of the rights' protected by Title VII."

*EEOC v. Bass Pro Outdoor World, L.L.C.*, 826 F.3d 791, 799 (5th Cir.2016). "[ER] correctly notes that, unlike §707 [of Title VII, now 42 U.S.C. §2000e-6], §706 [of Title VII, now 42 U.S.C. §2000e-5] does not explicitly authorize pattern or practice suits. It argues that by limiting its reach to actions under §706, Congress intended to maintain a basic dichotomy between suits under §707, where remedial relief may be had, with §706, with its focus upon individual acts of discrimination and money damages. *At 800:* We conclude that Congress did not prohibit the EEOC from bringing pattern or practice suits under §706 and, in turn, from carrying them to trial with sequential determinations of liability and damages in a bifurcated framework."

*Chicago Teachers Un., Local No. 1 v. Board of Educ.*, 797 F.3d 426, 437 (7th Cir.2015). "[A] company-wide practice is appropriate for class challenge even where some decisions in the chain of acts challenged as discriminatory can be exercised by local managers with discretion--at least where the class at issue is affected in a common manner, such as where there is a uniform policy or process applied to all. *At 438:* [S]ubjective, discretionary decisions can be the source of a common claim if they are, for example, the outcome of employment practices or policies controlled by higher-level directors, if all decision-makers exercise discretion in a common way because of a company policy or practice, or if all decision-makers act together as one unit." *See also Scott v. Family Dollar Stores*, 733 F.3d 105, 113-14 (4th Cir.2013) (to satisfy commonality, P must demonstrate that exercise of discretion is tied to specific employment practice that affected class in uniform manner).

*Monreal v. Potter*, 367 F.3d 1224, 1231-32 (10th Cir.2004). "We conclude that individual allegations of discrimination can be exhausted through a class administrative complaint…. Although the EEOC regulations do address individual and class complaints in separate sections, … we find that they do not mandate exclusive presentation of individual claims of discrimination in individual complaints."

### Conciliation

*Mach Mining, LLC v. EEOC*, 575 U.S. 480, 494-95 (2015). "A sworn affidavit from the EEOC stating that it has performed [its conciliation] obligations … but that its efforts have failed will usually suffice to show that it has met the conciliation requirement. If, however, the employer provides credible evidence of its own, in the form of an affidavit or otherwise, indicating that the EEOC did not provide the requisite information about the charge or attempt to engage in a discussion about conciliating the claim, a court must conduct the factfinding necessary to decide that limited dispute. Should the court find in favor of the employer, the appropriate remedy is to order the EEOC to undertake the mandated efforts to obtain voluntary compliance." *See also* 29 C.F.R. §1614.105(a)(1) (federal EE must consult with Equal Employment Opportunity counselor within 45 days).

*EEOC v. Agro Distrib.*, 555 F.3d 462, 468-69 (5th Cir.2009). "The EEOC has a statutory obligation to attempt conciliation with employers…. [¶] The EEOC's failure to comply with its statutory duty does not, however, deprive this court of subject matter jurisdiction. [W]e conclude that the EEOC's conciliation requirement is a precondition to suit but not a jurisdictional prerequisite. [¶] Holding that conciliation is not jurisdictional does not render this requirement meaningless. Courts remain free to impose a stay for the EEOC to continue prematurely terminated negotiations, and where the EEOC fails to act in good faith, dismissal remains an appropriate sanction."

*EEOC v. Asplundh Tree Expert Co.*, 340 F.3d 1256, 1260 (11th Cir.2003). "The duty to conciliate is … a condition precedent to the [EEOC's] power to sue. [¶] Nothing less than a 'reasonable' effort to resolve with the employer the issues raised by the

complainant will do. This effort must, at a minimum, make clear to the employer the basis for the EEOC's charges against it. Otherwise, it cannot be said that the [EEOC] has provided a meaningful conciliation opportunity."

*Investigation*

*EEOC v. Sterling Jewelers Inc.*, 801 F.3d 96, 101 (2d Cir.2015). "The sole question for judicial review [of an EEOC investigation] is whether the EEOC conducted an investigation. [C]ourts may not review the *sufficiency* of an investigation-- only whether an investigation occurred. [¶] In order to prove that it has fulfilled its pre-suit investigative obligation, the EEOC must show that it took steps to determine whether there was reasonable cause to believe that the allegations in the charge are true. … The EEOC need not, however, describe in detail every step it took or the evidence it uncovered. As with the conciliation process, an affidavit from the EEOC, stating that it performed its investigative obligations and outlining the steps taken to investigate the charges, will usually suffice."

*Jurisdiction*

*Arbaugh v. Y&H Corp.*, 546 U.S. 500, 504 (2006). "We … hold that the numerical threshold does not circumscribe federal-court subject-matter jurisdiction. Instead, the employee-numerosity requirement relates to the substantive adequacy of [P's] Title VII claim, and therefore could not be raised defensively late in the lawsuit, *i.e.*, after [D] had failed to assert the objection prior to the close of trial on the merits." *See also Adamov v. U.S. Bank Nat'l Ass'n*, 726 F.3d 851, 856 (6th Cir.2013).

*Yellow Freight Sys. v. Donnelly*, 494 U.S. 820, 821 (1990). Held: State courts have concurrent jurisdiction to adjudicate federal claims.

*University of Tenn. v. Elliott*, 478 U.S. 788, 796 (1986). "[W]e conclude that … Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims." *See also Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 477 (1982).

*Release & Ratification*

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51-52 (1974). See annotation under *Arbitration Agreements*.

*McClellan v. Midwest Machining, Inc.*, 900 F.3d 297, 303 (6th Cir.2018). "The [tender-back] doctrine provides that 'contracts tainted by mistake, duress, or even fraud are voidable at the option of the innocent party,' but 'before the innocent party can elect avoidance, she must first tender back any benefits received under the contract.' 'If she fails to do so within a reasonable time after learning of her rights … she ratifies the contract and so makes it binding.' At the heart of this appeal is whether the tender-back doctrine applies to claims brought under Title VII and the EPA…. We now hold that a plaintiff is not required to tender back consideration received under a severance agreement before bringing claims for violations of Title VII or the EPA. *At 308:* [A]s the Supreme Court said in *Hogue* [*v. Southern R. Co.*, 390 U.S. 516 (1968)], 'it is more consistent with the objectives of the [EPA] to hold … that … the sum paid shall be deducted from any award determined to be due to the injured employee.'"

*Myricks v. Federal Reserve Bank of Atlanta*, 480 F.3d 1036, 1040 (11th Cir.2007). "To release a cause of action under Title VII, 'the employee's consent to the settlement [must be] voluntary and knowing' based on the totality of the circumstances. Our review of the totality of the circumstances surrounding the signing of a release involves several objective factors: 'the plaintiff's education and business experience; the amount of time the plaintiff considered the agreement before signing it; the clarity of the agreement; the plaintiff's opportunity to consult with an attorney; the employer's encouragement or discouragement of consultation with an attorney; and the consideration given in exchange for the waiver when compared with the benefits to which the employee was already entitled.' These factors provide 'objective evidence tending to support [or undermine the employee's] claim that he was subjectively unaware that he was waiving important statutory rights.'" *See also EEOC v. Allstate Ins.*, 778 F.3d 444, 450-51 (3d Cir.2015) (allowing terminated at-will EE to resume working for ER can be adequate consideration for

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

release of EE's discrimination claims); *Baptist v. City of Kankakee*, 481 F.3d 485, 490-91 & n.3 (7th Cir.2007) (settlement is presumed knowing and voluntary when EE is represented by attorney).

***Remedies***

*Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 848 (2001). Held: Front pay is not an element of compensatory damages and is not subject to Title VII's statutory cap on such damages.

*Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534-35 (1999). See annotation under 42 U.S.C. §1981a.

*Florida v. Long*, 487 U.S. 223, 230 (1988). See annotation under 42 U.S.C. §2000e-2, *Sex Discrimination--Retirement Benefits*.

*Sheet Metal Workers' Int'l v. EEOC*, 478 U.S. 421, 475 (1986). "Although we conclude that [§2000e-5(g)] does not foreclose a district court from instituting some sorts of racial preferences where necessary to remedy past discrimination, we do not mean to suggest that such relief is always proper. *At 482:* [A] district court may, in appropriate circumstances, order preferential relief benefiting individuals who are not the actual victims of discrimination as a remedy for violations of Title VII…."

*Ford Motor Co. v. EEOC*, 458 U.S. 219, 220 (1982). "This case presents the question whether an employer charged with discrimination in hiring can toll the continuing accrual of backpay liability under [Title VII] §706(g) …, [now] 42 U.S.C. §2000e-5(g), simply by unconditionally offering the claimant the job previously denied, or whether the employer also must offer seniority retroactive to the date of the alleged discrimination. *At 241:* [W]e hold that, absent special circumstances, the rejection of an employer's unconditional job offer ends the accrual of potential backpay liability."

*Franks v. Bowman Transp. Co.*, 424 U.S. 747, 767-68 (1976). Held: A court may award retroactive seniority to the date of application for identifiable applicants denied employment because of race under Title VII.

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975). "[G]iven a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *See also Johnson v. Spencer Press*, 364 F.3d 368, 383-84 (1st Cir.2004).

*Clemens v. Centurylink Inc.*, 874 F.3d 1113, 1116 (9th Cir.2017). "[U]nfortunately for successful Title VII plaintiffs, back-pay awards are taxable. [¶] The Third, Seventh, and Tenth Circuits have all held that district courts have the discretion to 'gross up' an award to account for income-tax consequences. *At 1117:* We join [their] thoughtful analysis…. [W]e also agree … that the decision to award a gross up--and the appropriate amount of any such gross up--is left to the sound discretion of the district court." *But see Dashnaw v. Peña*, 12 F.3d 1112, 1116 (D.C.Cir.1994) (there is no legal authority to support tax gross-up).

*Heaton v. Weitz Co.*, 534 F.3d 882, 889-90 (8th Cir.2008). "A plaintiff is entitled to punitive damages in a retaliation case only if the employer retaliated with malice or with reckless indifference to federally protected rights. 'Malice or reckless indifference exhibited by employees working in a managerial capacity can be imputed to the employer if they were acting in the scope of their employment.' [¶] It is insufficient for the employer simply to know it is discriminating against an employee. The employer must also know it may be violating federal law."

*Spencer v. Wal-Mart Stores*, 469 F.3d 311, 317 (3d Cir.2006). "We hold that a successful hostile work environment claim alone, without a successful constructive discharge claim, is insufficient to support a back pay award. Put simply, if a hostile work environment does not rise to the level where one is forced to abandon the job, loss of pay is not an issue. *At 317 n.6:* Several of our sister Circuits have held similarly that a plaintiff alleging employment discrimination must show either actual or constructive discharge in order to receive an award of back pay." *See also Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 28 (1st Cir.2002); *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 659 (7th Cir.2001).

*Phelan v. Cook Cty.*, 463 F.3d 773, 780-81 (7th Cir.2006), *overruled on other grounds*, *Ortiz v. Werner Enters.*, 834 F.3d 760 (7th Cir.2016). "[T]he reinstatement of an employee after a lengthy suspension from work does not prevent the employee from pursuing Title VII claims, even where back pay was awarded. If a suspension that ends in reinstatement and reimbursement can constitute an adverse employment action, it follows that reinstatement and reimbursement do not bar a finding of adverse employment action where there was an actual termination, which is a more serious action than suspension. [A] rule that prevented the finding of an adverse employment action where the terminating or suspending employer later reinstated the employee would 'allow[ ] an employer unilaterally to cut off the employee's claims for other damages, which have been explicitly authorized by Title VII since the Civil Rights Act of 1991, such as interest on the back pay, attorney's fees, emotional suffering, and punitive damages.'" *See also White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789, 791 (6th Cir.2004), *aff'd*, 548 U.S. 53 (2006); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir.2001).

*McInnis v. Fairfield Cmty., Inc.*, 458 F.3d 1129, 1145-46 (10th Cir.2006). "'Front pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement' to make the plaintiff whole. Although reinstatement is the preferred remedy under Title VII, it 'may not be appropriate … when the employer has exhibited such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible.' [¶] 'The amount [of front pay], if any, is set in the court's discretion.' The following factors are relevant in assessing such an award: 'work life expectancy, salary and benefits at the time of termination, any potential increase in salary through regular promotions and cost of living adjustment, the reasonable availability of other work opportunities, the period within which the plaintiff may become re-employed with reasonable efforts, and methods to discount any award to net present value. [¶] In formulating a front-pay award the district court may consider all evidence presented at trial concerning the individualized circumstances of both the employee and employer, but it must avoid granting the plaintiff a windfall.'" *See also Franchina v. City of Providence*, 881 F.3d 32, 60 (1st Cir.2018) (expert testimony is not required to support front pay award).

*Broadnax v. City of New Haven*, 415 F.3d 265, 270 (2d Cir.2005). "[W]e hold that an employer, when arguing that a Title VII plaintiff failed to mitigate damages but seeking to avoid the requirement of showing that comparable employment is available, bears the burden on the issue of whether the plaintiff made no reasonable efforts to seek alternative employment. *At 272:* [H]aving juries calculate lost wages requires no special competence or authority belonging solely to the court. [W]e hold that when a party demands jury consideration of lost wages under Title VII and the party's opponent fails to object, [FRCP] 39(c) permits the district court to submit the lost wages issue for a non-advisory jury determination." *See also Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 800-01 (6th Cir.2018).

*Miles v. Indiana*, 387 F.3d 591, 599 (7th Cir.2004). "The award of either promotion or front pay are equitable remedies left to the district court's discretion, but such discretion must be guided by legal principles. [¶] To make the plaintiff whole, promotion to the position the plaintiff would have held absent the discrimination is often the preferred remedy, and courts should award a promotion when doing so is feasible. However, awarding a promotion may create hostility or friction in the work environment. In these situations, courts are not required to grant such relief; indeed, under certain conditions, such an award is an inappropriate remedy. As an alternative, the district court has discretion to award front pay in order to make the plaintiff whole." *See also McInnis v. Fairfield Cmty., Inc.*, *Remedies*.

### Standing

*Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 178 (2011). "We have described the 'zone of interests' test as denying a right of review 'if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.' We hold that the term 'aggrieved' in [§2000e-5(f) (1)] incorporates this test, enabling suit by any plaintiff with an interest 'arguably [sought] to be protected by the statutes,' … while excluding plaintiffs who might technically be injured in an Art. III sense but whose interests are unrelated to the statutory prohibitions in Title VII. [¶] [EE who was fired shortly after his fiancée filed a discrimination charge against their ER is] well within the zone of interests sought to be protected by Title VII. He is a person aggrieved with standing to sue." *See also Simmons v. UBS Fin. Servs.*, 972 F.3d 664, 668 (5th Cir.2020) (*Thompson* cannot be extended to non-employees).

§ 2000e-5. Enforcement provisions [Statutory Text & Notes of..., 42 USCA § 2000e-5

*General Tel. Co. v. Falcon*, 457 U.S. 147, 159 n.15 (1982). See annotation under *Class Action*.

Footnotes

1        So in original. Probably should be subsection "(b)".

42 U.S.C.A. § 2000e-5, 42 USCA § 2000e-5
Current through P.L. 119-74. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

SPA-208

§ 495. Unlawful employment practice, VT ST T. 21 § 495

West's Vermont Statutes Annotated
   Title Twenty-One. Labor
    Chapter 5. Employment Practices
     Subchapter 6. Fair Employment Practices

21 V.S.A. § 495

§ 495. Unlawful employment practice

Effective: July 1, 2023
Currentness

(a) It shall be unlawful employment practice, except where a bona fide occupational qualification requires persons of a particular race, color, religion, national origin, sex, sexual orientation, gender identity, ancestry, place of birth, age, crime victim status, or physical or mental condition:

(1) For any employer, employment agency, or labor organization to harass or discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability.

(2) For any person seeking employees or for any employment agency or labor organization to cause to be printed, published, or circulated any notice or advertisement relating to employment or membership indicating any preference, limitation, specification, or discrimination based upon race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, age, or disability.

(3) For any employment agency to fail or refuse to classify properly or refer for employment or to otherwise harass or discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability.

(4) For any labor organization to limit, segregate, or qualify its membership with respect to any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability.

(5) For any employer, employment agency, labor organization, or person seeking employees to discriminate against, indicate a preference or limitation, refuse properly to classify or refer, or to limit or segregate membership on the basis of a person's having a positive test result from an HIV-related blood test.

(6) For any employer, employment agency, labor organization, or person seeking employees to request or require an applicant, prospective employee, employee, prospective member, or member to have an HIV-related blood test as a condition of employment or membership, classification, placement, or referral.

(7) For any employer, employment agency, labor organization, or person seeking employees to discriminate between employees on the basis of sex, race, national origin, sexual orientation, or gender identity or against a qualified individual with a disability by paying wages to employees of one sex, race, national origin, sexual orientation, or gender identity or an employee who is a qualified individual with a disability at a rate less than the rate paid to employees of the other sex or a different race, national origin, sexual orientation, or gender identity or without the physical or mental condition of the qualified individual with a disability for equal work that requires equal skill, effort, and responsibility and is performed under similar working conditions. An employer who is paying wages in violation of this section shall not reduce the wage rate of any other employee in order to comply with this subsection.

(A) An employer may pay different wage rates under this subsection when the differential wages are made pursuant to:

(i) A seniority system.

(ii) A merit system.

(iii) A system in which earnings are based on quantity or quality of production.

(iv) A bona fide factor other than sex, race, national origin, sexual orientation, gender identity, or physical or mental condition. An employer asserting that differential wages are paid pursuant to this subdivision (7)(A)(iv) shall demonstrate that the factor does not perpetuate a differential in compensation based on sex, race, national origin, sexual orientation, gender identity, or physical or mental condition; is job-related with respect to the position in question; and is based upon a legitimate business consideration.

(B)(i) No employer may do any of the following:

(I) Require, as a condition of employment, that an employee refrain from disclosing the amount of his or her wages or from inquiring about or discussing the wages of other employees.

(II) Require an employee to sign a waiver or other document that purports to deny the employee the right to disclose the amount of his or her wages or to inquire about or discuss the wages of other employees.

(ii) Unless otherwise required by law, an employer may prohibit a human resources manager from disclosing the wages of other employees.

(C) Nothing in this subdivision (a)(7) shall be construed to:

(i) create any new rights for an employer to inquire about a characteristic of an employee that is otherwise unknown to the employer upon which pay discrimination is prohibited pursuant to the provisions of this subdivision (a)(7); or

§ 495. Unlawful employment practice, VT ST T. 21 § 495

(ii) diminish an employee's right to privacy under any other law, or pursuant to an applicable contract or collective bargaining agreement.

(8) An employer, employment agency, or labor organization shall not discharge or in any other manner discriminate against any employee because the employee:

(A) has opposed any act or practice that is prohibited under this chapter;

(B) has lodged a complaint or has testified, assisted, or participated in any manner with the Attorney General, a State's Attorney, the Department of Labor, or the Human Rights Commission in an investigation of prohibited acts or practices;

(C) is known by the employer to be about to lodge a complaint, testify, assist, or participate in any manner in an investigation of prohibited acts or practices;

(D) has disclosed his or her wages or has inquired about or discussed the wages of other employees; or

(E) is believed by the employer to have acted as described in subdivisions (A) through (D) of this subdivision.

(b) The provisions of this section shall not be construed to limit the rights of employers to discharge employees for good cause shown.

(c) The provisions of this section prohibiting discrimination on the basis of age shall apply for the benefit of persons 18 years of age or older.

(d)(1) An employee shall not have a cause of action in negligence for any injury occurring to the employee on the account of an employer complying with subdivisions (a)(5) and (6) of this section.

(2) A person shall not have a cause of action in negligence for any injury occurring to the person on account of an employer complying with subdivisions (a)(5) and (6) of this section.

(e) The provisions of this section prohibiting discrimination on the basis of sexual orientation and gender identity shall not be construed to prohibit or prevent any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, that is operated, supervised, or controlled by or in connection with a religious organization, from giving preference to persons of the same religion or denomination or from taking any action with respect to matters of employment that is calculated by the organization to promote the religious principles for which it is established or maintained.

(f) Repealed by 2013, No. 35, § 2, eff. July 1, 2013.

(g) Notwithstanding any provision of this subchapter, an employer shall not be prohibited from establishing and enforcing reasonable workplace policies to address matters related to employees' gender identity, including permitting an employer to establish a reasonable dress code for the workplace.

(h) Nothing in this section shall require an employer to disclose the wages of an employee in response to an inquiry by another employee, unless the failure to do so would otherwise constitute unlawful employment discrimination. Unless otherwise required by law, nothing in this section shall require an employee to disclose his or her wages in response to an inquiry by another employee.

(i) An agreement to settle a claim of a violation of subsection (a) of this section shall not prohibit, prevent, or otherwise restrict the employee from working for the employer or any parent company, subsidiary, division, or affiliate of the employer. Any provision of an agreement to settle a claim of a violation of subsection (a) of this section that violates this subsection shall be void and unenforceable with respect to the individual who made the claim.

(j) Except for claims alleging a violation of subdivision (a)(7) of this section or disparate impact discrimination an employee shall not be required to demonstrate the existence of another employee or individual to whom the employee's treatment can be compared to establish a violation of this section.

(k) Notwithstanding any State or federal judicial precedent to the contrary:

(1) harassment and discrimination need not be severe or pervasive to constitute a violation of this section; and

(2) behavior that a reasonable employee with the same protected characteristic would consider to be a petty slight or trivial inconvenience shall not constitute unlawful harassment or discrimination pursuant to this section.

**Credits**

1963, No. 196, § 1; 1971, No. 9; 1975, Adj. Sess., No. 198, § 1; 1981, No. 65, § 1; 1987, Adj. Sess., No. 176, §§ 1, 2; 1987, Adj. Sess., No. 176, §§ 1, 2; 1991, Adj. Sess., No. 135, § 15; 1999, No. 19, § 4; 1999, Adj. Sess., No. 103, § 1; 2001, Adj. Sess., No. 81, § 1; 2005, No. 10, § 1; 2007, No. 41, § 18, eff. July 1, 2007; 2013, No. 31, § 2, eff. July 1, 2013; 2013, No. 35, § 2, eff. July 1, 2013; 2013, Adj. Sess., No. 96, § 129, eff. July 1, 2014; 2017, Adj. Sess., No. 113, § 145, eff. July 1, 2018; 2017, Adj. Sess., No. 184, § 1, eff. July 1, 2018; 2023, No. 6, § 249, eff. July 1, 2023; 2023, No. 80, § 1, eff. July 1, 2023.

Notes of Decisions (298)

21 V.S.A. § 495, VT ST T. 21 § 495
The statutes are current through Chapters 73 (end) and M-5 (end) of the Regular Session of the 2025 Vermont General Assembly.

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

SPA-212

354-A:7 Unlawful Discriminatory Practices., NH ST § 354-A:7

Revised Statutes Annotated of the State of New Hampshire
  Title XXXI. Trade and Commerce (Ch. 333 to 359-U) (Refs & Annos)
    Chapter 354-a. State Commission for Human Rights (Refs & Annos)
      Equal Employment Opportunity (Refs & Annos)

N.H. Rev. Stat. § 354-A:7

354-A:7 Unlawful Discriminatory Practices.

Effective: October 15, 2019

Currentness

It shall be an unlawful discriminatory practice:

I. For an employer, because of the age, sex, gender identity, race, color, marital status, physical or mental disability, religious creed, or national origin of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification. In addition, no person shall be denied the benefit of the rights afforded by this paragraph on account of that person's sexual orientation.

II. For a labor organization, because of the age, sex, gender identity, race, color, marital status, physical or mental disability, creed, or national origin of any individual, to exclude from full membership rights or to expel from its membership such individual or to discriminate in any way against any of its members or against any employer or any individual employed by an employer, unless based upon a bona fide occupational qualification. In addition, no person shall be denied the benefit of the rights afforded by this paragraph on account of that person's sexual orientation.

III. For any employer or employment agency to print or circulate or to cause to be printed or circulated any statement, advertisement or publication, or to use any form of application for employment or to make any inquiry or record in connection with employment, which expresses, directly or indirectly, any limitation, specification or discrimination as to age, sex, gender identity, race, color, marital status, physical or mental disability, religious creed or national origin or any intent to make any such limitation, specification or discrimination in any way on the ground of age, sex, gender identity, race, color, marital status, physical or mental disability, religious creed or national origin, unless based upon a bona fide occupational qualification; provided, however, that nothing in this chapter shall limit an employer after the offer of hire of an individual from inquiring into and keeping records of any existing or pre-existing physical or mental conditions. In addition, no person shall be denied the benefit of the rights afforded by this paragraph on account of that person's sexual orientation.

IV. For any employee to be required, as a condition of employment, to retire upon or before reaching a specified predetermined chronological age, or after completion of a specified number of years of service unless such employee was elected or appointed for a specified term or required to retire pursuant to Pt. II, Art. 78 of the constitution of New Hampshire. It shall not be unlawful for an employer to:

(a) Establish a normal retirement age, based on chronological age or length of service or both, which may be used to govern eligibility for and accrual of pension or other retirement benefits; provided that such normal retirement age shall not be used to justify retirement of or failure to hire any individual; or

(b) Require any individual employee to retire on the basis of a finding that the employee can no longer meet such bona fide, reasonable standards of job performance as the employer may have established.

V. Harassment on the basis of sex constitutes unlawful sex discrimination. Unwelcome sexual advances, requests for sexual favors, and other verbal, non-verbal or physical conduct of a sexual nature constitutes sexual harassment when:

(a) Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

(b) Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or

(c) Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

VI. (a) For the purposes of this chapter, the word "sex" includes pregnancy and medical conditions which result from pregnancy.

(b) An employer shall permit a female employee to take leave of absence for the period of temporary physical disability resulting from pregnancy, childbirth or related medical conditions. When the employee is physically able to return to work, her original job or a comparable position shall be made available to her by the employer unless business necessity makes this impossible or unreasonable.

(c) For all other employment related purposes, including receipt of benefits under fringe benefit programs, pregnancy, childbirth, and related medical conditions shall be considered temporary disabilities, and a female employee affected by pregnancy, childbirth, or related medical conditions shall be treated in the same manner as any employee affected by any other temporary disability.

VII. (a) For any employer not to make reasonable accommodations for the known physical or mental limitations of a qualified individual with a disability who is an applicant or employee, unless such employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer.

(b) For any employer to deny employment opportunities, compensation, terms, conditions, or privileges of employment to a job applicant or employee who is a qualified individual with a disability, if such denial is based on the need of such employer to make reasonable accommodation to the physical or mental impairments of the applicant or employee.

**Credits**
**Source.** 1992, 224:1. 1997, 108:12. 2006, 181:2, eff. Jan. 1, 2007. 2018, 176:5, eff. July 8, 2018. 2019, 332:22, eff. Oct. 15, 2019.

SPA-214

**354-A:7 Unlawful Discriminatory Practices., NH ST § 354-A:7**

Notes of Decisions (118)

Copyright © 2026 by the State of New Hampshire Office of the Director of Legislative Services and Thomson Reuters/West 2026.

N.H. Rev. Stat. § 354-A:7, NH ST § 354-A:7

Current through Chapter 4 of the 2026 Reg. Sess. Some statute sections may be more current, see credit for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.