# 25-1382-cv(L), 25-3155-cv(XAP)

# United States Court of Appeals

## for the

## Second Circuit

MISTY BLANCHETTE PORTER, M.D.,

*Plaintiff-Appellee-Cross-Appellant,*

– v. –

DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, DARTMOUTH-HITCHCOCK HEALTH,
DARTMOUTH-HITCHCOCK MEDICAL CENTER,

*Defendants-Appellants-Cross-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT (BURLINGTON)

## BRIEF FOR PLAINTIFF-APPELLEE-CROSS-APPELLANT

SARAH NUNAN
GEOFFREY J. VITT
VITT & NUNAN, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, Vermont 05055
(802) 649-5700

– and –

ERIC D. JONES
LANGROCK SPERRY & WOOL, LLP
210 College Street, Suite 400
Burlington, Vermont 05401
(802) 864-0217

*Attorneys for Plaintiff-Appellee-
Cross-Appellant*

CP COUNSEL PRESS   (800) 4-APPEAL • (393249)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................... iii

JURISDICTIONAL STATEMENT .........................................................................1

STATEMENT OF ISSUES .....................................................................................2

STATEMENT OF THE CASE.................................................................................6

    I.    INTRODUCTION AND PROCEDURAL HISTORY.................................6

    II.    DR. PORTER'S EMPLOYMENT..........................................................11

    III.    DR. PORTER'S DISABILITY ................................................................13

    IV.    DARTMOUTH HEALTH'S PURPORTED BASIS FOR
    TERMINATION .....................................................................................15

SUMMARY OF ARGUMENT...............................................................................19

ARGUMENT .........................................................................................................24

    I.    STANDARD OF REVIEW.....................................................................24

    II.    THE DISTRICT COURT PROPERLY DENIED DARTMOUTH
    HEALTH'S REQUESTS TO AMEND THE JUDGMENT OR FOR A NEW
    TRIAL ON THE VFEPA CLAIM BECAUSE CHALLENGES TO THE JURY
    INSTRUCTIONS WERE INCORRECT AS A MATTER OF LAW OR
    WAIVED..................................................................................................25

        A.    Dartmouth Health's Rule 59 motion to amend the judgment or for a
        new trial on Dr. Porter's VFEPA claim was properly denied where the motion
        failed to raise new or overlooked arguments...................................................25

        B.    Existing Vermont law was sufficient for the District Court to conclude
        that motivating factor is the applicable causation standard for a disability-
        based claim under VFEPA without certifying the question to the Vermont
        Supreme Court.................................................................................................27

            1.    "Motivating factor" applies to VFEPA claims.................................28

            2.    Certification was not needed.............................................................33

        C.    The District Court's jury instructions on the VFEPA claim were correct
        and, in any event, Dartmouth Health failed to properly preserve the
        argument. ........................................................................................................35

1.      Affirmative defense forfeited by failure to raise in answer or related pleading. ...................................................................................35

2.      Challenge to instruction waived by failure to objection prior to jury deliberations. ................................................................................37

3.      Dartmouth Health could not have avoided liability by proving "same decision" defense.................................................................40

III.    EXPERT TESTIMONY ON DAMAGES ...............................................42

A.      The District Court properly permitted Dr. Porter to elicit expert testimony regarding, and to display a demonstrative exhibit derived from, a supplemental expert report. ...........................................................42

B.      The District Court properly excluded a note containing defense counsel's calculations prepared during the cross examination of Dr. Porter's damages expert under protest by the expert (because they were not accurate) and at defense's counsel's instruction, and then properly precluded Dartmouth Health from using it as a demonstrative exhibit during its closing summation. .........................................................................49

IV.     THE HOURLY RATES AND TOTAL AWARD OF ATTORNEY'S FEES WERE REASONABLE AND SHOULD NOT HAVE BEEN REDUCED ..........................................................................................51

A.      The hourly rates submitted by Dr. Porter's counsel were reasonable and should not have been reduced *sua sponte* by the District Court. ..................52

B.      The District Court misconstrued the law and ignored policy when it applied a 10% across-the-board reduction in Dr. Porter's legal fees claiming "somewhat limited success." ........................................................58

V.      DR. PORTER SHOULD BE AWARDED PREJUDGMENT INTEREST AT 12% ON ATTORNEY'S FEES INCURRED AND PAID THROUGH AUGUST 2020 ..........................................................................................61

CONCLUSION...................................................................................................66

CERTIFICATE OF COMPLIANCE ........................................................68

ii

# TABLE OF AUTHORITIES

**Cases**

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975) ....................51

*Amerex Grp., Inc. v. Lexington Ins. Co.*, 678 F.3d 193 (2d Cir. 2012) .....................34

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182 (2d Cir. 2008) ..........................................................................................................54

*Baker v. Dorfman*, 239 F.3d 415 (2d Cir. 2000) ......................................................26

*Bart v. Golub Corp.*, 96 F.4th 566 (2d Cir. 2024) .....................................................41

*Brennan-Centrella v. Ritz-Craft Corp. of Pennsylvania*, 942 F.3d 106 (2d Cir. 2019) .......................................................................................................................64

*CARCO GROUP, Inc. v. Maconachy*, 718 F.3d 72 (2d Cir. 2013) ..........................58

*Carroll v. Trump*, 88 F.4th 418 (2d Cir. 2023), *adhered to,* 151 F.4th 50 (2d Cir. 2025) .......................................................................................................................36

*Centrella v. Ritz-Craft Corp. of Pennsylvania, Inc.*, No. 2:14-CV-00111-JMC, 2018 WL 840041 (D. Vt. Feb. 12, 2018) ........................................................................63

*Cheney v. New England Publishers, Inc.*, No. 5091012, 2014 WL 8515132 (Vt. Super. July 8, 2014) ...................................................................................................65

*Cole v. Foxmar, Inc.*, 160 F.4th 28 (2d Cir. 2025) .....................................................59

*d'Arc Turcotte v. Est. of LaRose*, 153 Vt. 196 (1989) ...............................................63

*Data Gen. Corp. v. Grumman Sys. Support Corp.*, 825 F. Supp. 361 (D. Mass. 1993), *aff'd and remanded*, 36 F.3d 1147 (1st Cir. 1994) .....................................64

*Davis v. Vermont Dept. of Corrs.*, 868 F. Supp. 2d 313 (D. Vt. 2012) ....................30

*Del Rio v. Amazon.com.dedc, LLC*, 132 F.4th 172 (2d Cir. 2025), *certified question answered sub nom. Del Rio v. Amazon.com Servs., Inc.*, 349 A.3d 570 (Conn. 2026) .......................................................................................................................33

*Dixon v. Maritime Overseas Corp.*, 490 F. Supp. 1191 (S.D.N.Y. 1980), *aff'd* 646 F.2d 560 ........................................................................................................26

*Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063 (2d Cir. 1995) ....24

*Ferrari v. U.S. Equities Corp.*, 661 F. App'x 47 (2d Cir. 2016) .............................54

*Fox v. Vice*, 563 U.S. 826 (2011) ........................................................................53

*Gaffney v. Thandi*, No. 2:20-CV-00173, 2023 WL 4685750 (D. Vt. July 21, 2023) ................................................................................................................65

*Gallipo v. City of Rutland*, 656 A.2d 635 (Vt. 1994) ............................................29

*George A. Fuller Co. v. Alexander & Reed, Esqs.*, 760 F. Supp. 381 (S.D.N.Y. 1991) ................................................................................................................36

*Gierlinger v. Gleason*, No. 89-cv-0686E(F), 1999 WL 222604 (W.D.N.Y. Apr. 2, 1999) ................................................................................................................66

*Graff v. Eaton*, 598 A.2d 1383 (Vt. 1991) ............................................................30

*Grand Union Co. v. Cord Meyer Dev. Co.*, 761 F.2d 141 (2d Cir. 1985) ...............51

*Gym Door Repairs, Inc. v. Guardian Gym Equip.*, No. 23-7924, 2026 WL 891131 (2d Cir. Apr. 1, 2026) ......................................................................................55

*Hammond v. Univ. of Vt. Med. Ctr.*, 2023 VT 31, 218 Vt. 250, 308 A.3d 421 ........29

*Heston v. Norwich Univ.*, No. 24-CV-05311, 2026 WL 921910 (Vt. Super. Mar. 25, 2026) ................................................................................................................29

*Hodgdon v. Mt. Mansfield Co.*, 624 A.2d 1122 (Vt. 1992) ....................................29

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65 (2d Cir. 2013) .......................................................................................................... 26, 40

*Jarvis v. Ford Motor Co.*, 283 F.3d 33 (2d Cir. 2002) ...........................................38

*John Wiley & Sons, Inc. v. Kirtsaeng*, 654 F.3d 210 (2d Cir. 2011), *rev'd and remanded on other grounds*, 568 U.S. 519 (2013) .............................................38

iv

*Kahle v. Leonard*, 563 F.3d 736 (8th Cir. 2009)........................................................43

*Kelly v. Univ. of Vt. Med. Ctr.*, 2022 VT 26, 216 Vt. 445, 280 A.3d 366 ...............29

*Khan v. Yale Univ.*, 27 F.4th 805 (2d Cir. 2022)........................................................34

*Kontrick v. Ryan*, 540 U.S. 443 (2004) ......................................................................36

*Lavalley v. E.B. & A.C. Whiting Co.,* 692 A.2d 367 (Vt. 1997) ..............................29

*Lilly v. City of New York*, 934 F.3d 222 (2d Cir. 2019) .............................................25

*Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83 (2d Cir. 1998) ......................................62

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).......................................28

*Merritt v. United States*, No. 5:18-cv-200, 2022 WL 17573683 (D. Vt. Nov. 15, 2022) ...................................................................................................................62

*Miller v. Pfizer, Inc.*, 356 F.3d 1326 (10th Cir. 2004) ..............................................49

*Minebea Co. v. Papst*, 231 F.R.D. 3 (D.D.C. 2005)..................................................43

*Minott v. Google LLC*, 24-CV-01674 (MMG), 2024 WL 3518525 (S.D.N.Y. July 24, 2024), *aff'd sub nom. Minott v. The Washington L. Firm PLLC*, No. 24-2275, 2025 WL 2111878 (2d Cir. July 29, 2025) .........................................................56

*Murray v. UBS Sec., LLC*, 128 F.4th 363 (2d Cir. 2025) .........................................24

*Natofsky v. City of New York*, 921 F.3d 337 (2d Cir. 2019) .................. 28, 29, 32, 41

*New England P'Ship, Inc. v. Rutland City Sch. Dist.*, No. 2002-476, 2003 WL 25745409 (Vt. June 1, 2003) ................................................................................62

*Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006)..............................................59

*Payne v. U.S. Airways, Inc.*, 2009 VT 90, 186 Vt. 458, 987 A.2d 944 ....................30

*Penzo v. Consol. Edison Co. of New York, Inc.*, No. 24-2466-CV, 2026 WL 905051 (2d Cir. Apr. 2, 2026) .........................................................................................24

*Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129 (2d Cir. 2024)........... passim

*Porter v. Dartmouth-Hitchcock Med. Ctr.*, No. 2:17-CV-194-KJD, 2025 WL 3296225 (D. Vt. Nov. 26, 2025) ...............................................................9

*Price Waterhouse v. Hopkins*, 490 U.S. 28 (1989) ....................................28

*Raja v. Burns*, 43 F.4th 80 (2d Cir. 2022) ................................................59

*Rhodes v. Davis*, 628 F. App'x 787 (2d Cir. 2015) ...................................62

*Rivard v. Smallheer*, No. 22-CV-04364, 2023 WL 7309300 (Vt. Super. Oct. 20, 2023), *aff'd by* No. 23-AP-338, 2024 WL 1481590 (Vt. Apr. 5, 2024)...............55

*Robertson v. Mylan Labs., Inc.*, 2004 VT 15, 176 Vt. 356, 848 A.2d 310 .............29

*RSD Leasing, Inc. v. Navistar Int'l Corp.*, 81 F.4th 153 (2d Cir. 2023) ............ 24, 34

*Saks v. Franklin Covey Co.*, 316 F.3d 337 (2d Cir. 2003) ................................ 37, 38

*Samaha v. Scott's Const., Inc.*, 543 F. Supp. 2d 341 (D. Vt. 2008) ........................34

*Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134 (2d Cir. 1993) ...............................63

*Schneiderman v. Am. Chem. Soc'y*, 172 F.4th 158 (2d Cir. 2026)...........................26

*Smedberg v. Detlef's Custodial Serv., Inc.*, 2007 VT 99, 182 Vt. 349, 940 A.2d 674 ...............................................................................................63

*Spooner v. Town of Topsham*, 2010 VT 71, 188 Vt. 293, 9 A.3d 672......................51

*Spooner v. Town of Topsham*, No. 129-7-04OECV, 2009 WL 6962588 (Vt. Super. Aug. 14, 2009) ...............................................................64

*Sullivan v. Saint-Gobain Performance Plastics Corp.*, Case No. 5:16-cv-125, 2021 WL 1851404 (D. Vt. May 10, 2021) ...................................................55

*Tereshchenko v. Karimi*, 102 F.4th 111 (2d Cir. 2024)..............................................36

*United States Sec. & Exch. Comm'n v. Ahmed*, 72 F.4th 379 (2d Cir. 2023) .........63

*United States v. Mitchell*, 811 F. App'x 50 (2d Cir. 2020).......................................39

*Wallace v. Caring Sols., LLC*, 278 A.3d 586 (Conn. App. 2022) ...........................31

vi

*Wang v. Shun Lee Palace Rest., Inc.*, 17-CV-840 (VSB), 2023 WL 5022758 (S.D.N.Y. July 24, 2023).................................................................56

*Washington v. Philadelphia Cnty. Ct. of Common Pleas*, 89 F.3d 1031 (3d Cir. 1996) ................................................................................................25

*Wood v. Milyard*, 566 U.S. 463 (2012)......................................................37

**Statutes**

21 Vt. Stat. Ann. § 495............................................................... passim

21 Vt. Stat. Ann. § 495b.................................................................51

28 U.S.C. § 1291 .............................................................................1

28 U.S.C. § 1331 .............................................................................1

28 U.S.C. § 1332 .............................................................................1

28 U.S.C. § 1367 .............................................................................1

28 U.S.C. § 1961 ............................................................................65

29 U.S.C. § 794 ....................................................................... passim

42 U.S.C. § 12101 *et seq.*.......................................................... passim

42 U.S.C. § 2000e *et seq.*.......................................................... passim

42 U.S.C. § 2000e-2(m)....................................................................30

9 Vt. Stat. Ann. § 41a ......................................................................65

N.H. Rev. Stat. Ann. § 275-E *et seq.*...................................................7

N.H. Rev. Stat. Ann. § 354-A *et seq.*......................................... 7, 8, 27

**Other Authorities**

11 Fed. Prac. & Proc. Civ. § 2805 (3d ed.) ............................................26

5 Fed. Prac. & Proc. Civ. § 1278 (4th ed.)............................................36

vii

D. Vt. L.R. 51 .............................................................................................37

D. Vt. L.R. 74 .............................................................................................33

Fed. R. App. P. 32 ......................................................................................67

Fed. R. Civ. P. 8 .........................................................................................35

Layne Rouse, *Battling for Attorneys' Fees: The Subtle Influence of "Conservatism" in 42 U.S.C. § 1988*, 59 Baylor L. Rev. 97 (Fall 2007) ..... 51, 52

Michael Starr, *The Muddle of "Motivating Factor": Using the Logic of Human Action to Inform Employment Discrimination Law*, 35 Hofstra Lab. & Emp. L.J. 89 (2017) .............................................................................................41

Robert Belton, *Mixed-Motive Cases in Employment Discrimination Law Revisited: A Brief Updated View of the Swamp*, 51 Mercer L. Rev. 651 (2000) ...................41

Rules 28.1 ...................................................................................................67

Sandra F. Sperino, *Revitalizing State Employment Discrimination Law*, 20 Geo. Mason L. Rev. 545 (2013) ........................................................................31

Second Cir. L.R. 28.1.1 ..............................................................................67

Second Circuit L.R. 27.2 ............................................................................33

Thomas Nuovo, *Vermont Fair Employment Practices Act Does Not Require an Adverse Employment Action*, Vt. Bar J. 27 (Spring 2026) ....................................30

Vt. R. App. P. 14 .........................................................................................33

Vt. R. Civ. P. 51 .........................................................................................37

Vt. R. Civ. P. 54 .........................................................................................62

Vt. R. Civ. P. 8 ...........................................................................................35

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Vermont ("District Court") had subject matter jurisdiction based on diversity pursuant to 28 U.S.C. § 1332 because the plaintiff, Dr. Misty Blanchette Porter ("Dr. Porter"), is a citizen of Vermont; the defendants, Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth Health"), are citizens of New Hampshire; and the amount in controversy exceeds $75,000. In addition, the District Court had federal question jurisdiction under 28 U.S.C. § 1331, with respect to claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act"), and supplemental jurisdiction under 28 U.S.C. § 1367, with respect to the state law claims.

This Court has jurisdiction under 28 U.S.C. § 1291. This appeal is from a final judgment that disposes of all claims. Judgment was entered on April 24, 2025, following a lengthy trial and jury verdict. An amended judgment was entered on December 2, 2025, following decisions on the parties' post-trial motions. Dartmouth Health filed a notice of appeal on May 27, 2025, and an

1

amended notice of appeal on December 16, 2025.  Dr. Porter filed a notice of cross-appeal on December 15, 2025.

## STATEMENT OF ISSUES

*DARTMOUTH HEALTH'S APPEAL*

1. Vermont looks to Title VII, 42 U.S.C. § 2000e *et seq.*, to guide its interpretation of Vermont's Fair Employment Practices Act, 21 Vt. Stat. Ann. § 495 ("VFEPA").  Where prior case law and the 1991 amendments to Title VII identify "motivating factor" as the applicable causation standard, did the District Court properly instruct the jury that "motivating factor" causation, rather than "but for" causation, applied to Dr. Porter's claim for violation of VFEPA?

2. Liability attaches to personnel decisions based, in relevant part, on an improper discriminatory motive, even if the employer would have made the same decision absent the discriminatory motive.  If the District Court properly concluded that "motivating factor" causation applied to Dr. Porter's VFEPA claim, were its jury instructions on the VFEPA claim also correct?

3. A party seeking to amend a judgment or obtain a new trial must identify facts or law that the court overlooked or misapprehended.  Where Dartmouth Health identified only arguments that had been rejected or waived, did the

2

District Court properly deny Dartmouth Health's Motion to Alter or Amend the Judgment and, in the Alternative, for a New Trial on Dr. Porter's claim for violation of VFEPA?

4. Vermont and federal law permit, but do not require, certification of a question of state law where the answer will determine the outcome of the case and where the issue is both important and undecided under existing state law. Vermont precedent and policy support continued use of the "motivating factor" standard. Did the District Court, therefore, appropriately decline to certify to the Vermont Supreme Court the question of which causation standard to apply to a disability discrimination claim under VFEPA?

5. Did the District Court properly permit Dr. Porter to elicit expert testimony regarding, and to display a demonstrative exhibit derived from, a supplemental expert report?

6. Did the District Court properly exclude a note containing defense counsel's calculations prepared during the cross examination of Dr. Porter's damages expert under protest by the expert (because they were not accurate) and at defense's counsel's instruction, and then properly preclude Dartmouth

Health from using it as a demonstrative exhibit during its closing summation?

7. Did the District Court properly deny Defendants' Motion for a New Trial Related to Damages Issues?

## DR. PORTER'S CROSS-APPEAL

8. Where Dr. Porter submitted affidavits from two partners affirming that the rates were their reasonable and customary rates charged to and paid by clients, and where Dartmouth Health did not contest the reasonableness of the requested rates, should the District Court have adopted the hourly rates requested by Dr. Porter, rather than reducing and limiting those rates to a maximum of $350 per hour for counsel and $90 per hour for paralegals?

9. Dr. Porter's claims all shared a common core of facts and legal issues, and her damages are the same for each of her claims of unlawful discrimination and retaliation such that success on multiple claims would not have increased the amount of damages. Where Dr. Porter prevailed at trial on her disability discrimination claim under VFEPA and was awarded a substantial percentage of her requested damages by the jury, did the District Court err in applying a 10% across-the-board reduction in Dr. Porter's legal fees?

10. Where Dr. Porter had incurred and paid out-of-pocket nearly $500,000 in attorney's fees prior to August 2020, and where she had been deprived of the use of that sum for upwards of five years by the time of trial, and where the District Court did not increase the pre-2020 rates to current rates, was it error to deny Dr. Porter's request for prejudgment interest at the Vermont judgment rate?

## STATEMENT OF THE CASE

I.     INTRODUCTION AND PROCEDURAL HISTORY

This action for employment discrimination arose from Dartmouth Health's 2017 decision to close a much-needed and indisputably-profitable[1] Reproductive Endocrinology and Infertility Division ("REI Division") and unlawfully terminate the employment of an experienced, uniquely-skilled, and much-needed physician after twenty-one successful years in Dartmouth Health's OB/GYN Department.  It has now been nine years since the termination of Dr. Porter's employment, and this is the parties' second appeal to this Court.  During those nine years, Dr. Porter incurred damages for which she has still not received a penny of compensation, despite the jury's finding that Dartmouth Health unlawfully discriminated against her because of her disability and the jury's award of more than one million dollars.

Dr. Porter claimed that she was wrongfully terminated by Dartmouth Health because of her disability and the whistleblowing complaints made to her supervisors identifying incompetent and unethical conduct by two physicians in the REI Division.  (A-1630.)  For its part, Dartmouth Health argued that it had legitimate, nondiscriminatory business reasons for abruptly closing the REI Division and terminating Dr. Porter's employment while leaving the OB/GYN

---

[1] (*See* Trial Tr. vol. 8, p. 468 (Dr. Merrens, confirming that the REI Division was profitable and that closure was not based on financial considerations.).)

Department understaffed. (*Id.*) After a lengthy trial, the jury found that disability was a motivating factor in Dartmouth Health's decision to terminate Dr. Porter's employment and awarded $1,000,000 in economic damages and $125,000 in non-economic damages to Dr. Porter on her VFEPA disability discrimination claim. (A-931 to A-934.)

Dr. Porter filed a complaint against Dartmouth Health in the District Court on October 11, 2017. (A-35.) As later amended, the complaint asserted claims of wrongful discharge; violation of the New Hampshire Whistleblowers' Protection Act, N.H. Rev. Stat. Ann. § 275-E *et seq.*; disability discrimination and retaliation under the ADA; disability discrimination under Section 504 of the Rehabilitation Act; disability discrimination and retaliation under New Hampshire law, N.H. Rev. Stat. Ann. § 354-A *et seq.*; and disability discrimination and retaliation under VFEPA. (A-69 to A-104.) With the parties' consent, District Court Judge Crawford referred the case to Magistrate Judge Kevin J. Doyle on April 16, 2024, and Judge Doyle presided over the remainder of the proceedings, including all decisions appealed from herein. (A-18 to A-35.)

On November 3, 2020, the District Court erroneously granted Dartmouth Health's motion for summary judgment. Dr. Porter appealed. (A-169 to A-173.) Following oral argument, this Court issued a 100-page Decision, (A-134 to A-233),

vacating and remanding the majority of the claims, (A-136). *See also Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129 (2d Cir. 2024).

Upon remand, the parties began preparations for the three-week jury trial that began on March 24, 2025. (A-24 to A-30.) The District Court issued proposed jury instructions on the morning of April 7, 2025. (A-27; A-844 to A-875.) At the charge conference that afternoon, (A-757 to A-825), Dartmouth Health objected to use of the "motivating factor" causation standard on Dr. Porter's disability discrimination claim under VFEPA, (A-807), instead of the "but-for" causation standard applied to the ADA, Rehabilitation Act, and New Hampshire disability discrimination claims. (A-856 to A-866.) This was Dartmouth Health's sole objection with respect to the VFEPA instruction, and it was, correctly, overruled. (A-807; A-918 to A-919.) The District Court delivered the final charge to the jury on April 8, 2025. (A-895 to A-928.) The instructions described the motivating factor test as follows:

> Under the motivating factor test, an employee must prove that their disability was a motivating factor that prompted the employer to terminate the employment. It is not necessary for the employee to prove that disability was the sole or exclusive reason for the employer's decision. It is sufficient if the employee proves that the alleged disability was a motivating factor in the employer's decision. A motivating factor is a factor that played some part in an employer's adverse employment action. Under the motivating factor test, an employer cannot avoid liability by proving that it would still have taken the same adverse

8

> action in the absence of discriminatory motivation. This is a difference between the motivating factor test and the "because of" test."

(A-919.)

After several days of deliberation, the jury reached a verdict on April 10, 2025. (A-28 to A-29.) The jury completed the special verdict form, finding that "Dr. Porter's disability was a motivating factor in Dartmouth Health's decision to terminate Dr. Porter's employment in violation of [VFEPA]," (A-931), and awarded $1,000,000.00 in economic damages and $125,000.00 in non-economic damages to Dr. Porter, (A-929 to A-935; A-1630 to A-1631). Judgment was entered on April 24, 2025, in the amount of $1,125,000.00. (A-1612; A-1685.)

The parties filed post-trial motions, which the District Court decided on November 26, 2025.[2] (A-1619 to A-1697.) On Plaintiff's Motion for Prejudgment Interest, (A-936 to A-939), the District Court found that Dr. Porter's economic damages, i.e., lost earnings and employment-related expenses, were "readily ascertainable," (A-1621), and therefore she was entitled to prejudgment interest on those damages as of right, (A-1624), at the Vermont statutory rate of 12%, (A-1626). Plaintiff's Motion for Attorneys' Fees, (A-961 to A-972; A-1574 to A-1576; A-1591 to A-1593), and Motion to Alter or Amend Judgment, (A-1397 to A-1412),

---

[2] The District Court's opinion is also available at *Porter v. Dartmouth-Hitchcock Med. Ctr.*, No. 2:17-CV-194-KJD, 2025 WL 3296225 (D. Vt. Nov. 26, 2025).

9

were granted in part and denied in part. (A-1683 to A-1684 (partially granting requests for attorney's fees, costs, and interest).) Defendants' Motion to Alter or Amend the Judgment, and, in the Alternative for a New Trial, (A-1445 to A-1458), and Defendants' Motion for a New Trial Related to Damages Issues, (A-1468 to A-1480), were denied. (A-1685 to A-1712.) An amended judgment in Dr. Porter's favor was entered on December 2, 2025, in the amount of $2,536,770.92. (A-1713 to A-1714.)

Dartmouth Health filed a notice of appeal on May 27, 2025, (A-1614 to A-1615), and an amended notice of appeal on December 16, 2025, (A-1717 to A-1719). On appeal, Dartmouth Health argues that the District Court failed to certify a question to the Vermont Supreme Court regarding the appropriate standard of causation to apply to the VFEPA claim; improperly instructed the jury on the law with respect to the VFEPA claim; and further challenges decisions to admit/exclude evidence related to Dr. Bancroft, Dr. Porter's damages expert. Dr. Porter filed a notice of cross-appeal on December 15, 2025. (A-1715.) The cross-appeal takes issue with reductions made by the District Court with respect to the rate and amount of attorney's fees as well as with the District Court's denial of prejudgment interest on the portion of Dr. Porter's attorney's fees that were paid out-of-pocket before August 2020.

10

## II.     DR. PORTER'S EMPLOYMENT

Dr. Porter is a highly-respected and superbly-competent physician.  (*See, e.g.,* Trial Tr. vol. 2, pp. 205–09 (testimony by former REI nurse Sharon Parent, describing Dr. Porter as a team player, a "gifted surgeon," and "[d]edicated to … have a very high level of standard for patient care"); Trial Tr. vol. 7, pp. 357–359 (testimony by Dr. Michelle Russell, describing Dr. Porter as a "very experienced, skilled, compassionate, caring physician" and providing an extensive list of Dr. Porter's skills).)  *See also Porter*, 92 F.4th at 133–34.  She started at Dartmouth Health in 1996 and was part of the small team of physicians in Dartmouth Health's REI Division within the OB/GYN Department.  (Trial Tr. vol. 2, p. 349.)  REI is a subspecialty of obstetrics and gynecology that focuses on hormonal functioning, reproductive issues, advanced fertility options, and infertility treatment for women and men.  (Trial Tr. vol. 2, pp. 200–02, 343–45.)  *See also Porter*, 92 F.4th at 133. At the time of her termination, Dr. Porter provided services to Dartmouth Health patients in the REI and Radiology Divisions.  (Trial Tr. vol. 2, pp. 266–67.)  Dr. Porter had unique talents that were in high demand, and it was widely anticipated that she would continue to provide services at Dartmouth Health following closure of the REI Division.  (*See, e.g., id.* (Dr. Julia MacCallum, explaining that it was "rare" to have an OB/GYN physician who also worked in radiology); Trial Tr. vol. 3, pp. 483–84 (Dr. Porter, describing letters and emails from colleagues expressing

11

shock at her termination and offering to advocate with leadership to keep her); Pl.'s Ex. 83 (noting OB/GYN is understaffed and Dr. Porter's skills are needed).) The OB/GYN Department routinely relied on Dr. Porter for help reading difficult ultrasounds, and she could perform complicated gynecological surgeries that no other D-H doctor could perform. (Trial Tr. vol. 2, pp. 207–09 (Ms. Parent, noting that Dr. Porter was frequently consulted by her OB/GYN colleagues with regard to reading ultrasounds, choosing a surgical path for a particular patient, etc.); *id.* at pp. 266–67 (Dr. MacCallum, recalling times when "there was a line of people, literally, sometimes, outside of her door …to ask her questions or follow-up"); Trial Tr. vol. 3, p. 442.) *See also Porter*, 92 F.4th at 133–34.

Following her termination, Dr. Porter took a part-time position at UVM Medical Center in its REI Division. (Trial Tr. vol. 2, p. 340; Trial Tr. vol. 3, pp. 447, 471–72.) Burlington, Vermont was the closest location offering comprehensive REI services but was still more than 90 miles away from her home. The position eventually expanded into a full-time role. (*Id.*) To manage the demanding hours and call schedule of a physician, Dr. Porter was forced to purchase housing in the Burlington area and spend several days and nights away from her family each week. (Trial Tr. vol. 3, pp. 451, 457, 474.)

III.    DR. PORTER'S DISABILITY

In late 2015, Dr. Porter developed a cerebral spinal fluid leak and needed periodic leave for treatment and recovery.  (Trial Tr. vol. 2, pp. 350–58.)  The symptoms included double vision, headaches, fatigue, vertigo, tinnitus, and slowed cognitive processing.  (*Id.*)  *See also Porter*, 92 F.4th at 136.  She was expected to—and did—gradually make a full recovery.[3]  (Trial Tr. vol. 2, pp. 353–55, 408–09.)

By April 2017, Dr. Porter was performing nearly her full range of duties, including surgery, working approximately 20 hours per week.  *Porter*, 92 F.4th at 137.  Nevertheless, Dartmouth Health's OB/GYN Department Chair, Dr. Leslie DeMars, demonstrated increasing frustration with Dr. Porter's disability.  (*See, e.g.,* Trial Tr. vol. 2, pp. 403 (Dr. Porter, describing her pre-disability "working relationship" with Dr. DeMars as "collegial"); *id.* at pp. 408–09 (describing frequent occasions when Dr. DeMars told her to keep her head down and work on getting well, which Dr. Porter interpreted to mean focus on managing your disability and keep out of the performance issues of the other REI physicians); Pl.'s Ex. 89.)  Dr. DeMars made frequent comments about the impact of Dr. Porter's

---

[3] A final surgery in September 2017 resolved the underlying condition, and Dr. Porter went from per-diem to full-time work at the University of Vermont in May of 2018.  (Trial Tr. vol. 3, pp. 474–76.)

disability on the REI Division and OB/GYN Department. In an email communication shortly before Dr. Porter's termination, Dr. DeMars bitterly recalled the pre-disability Dr. Porter: "Everyone also is remembering Misty as a full-time employee wearing three hats, and not the one who has been out for almost 18 months." (Pl.'s Ex. 89, p. 1.) She further speculated that Dr. Porter may never again be able to perform the complex surgeries she once did.[4] (*Id.* at p. 2.) At times, Dr. DeMars couched this frustration in a patronizing attitude towards Dr. Porter, such as when she asserted that terminating Dr. Porter's employment would be "best" for her, in light of the disability. (*See, e.g.,* Trial Tr. vol. 3, pp. 438–39 (Dr. Porter, recounting how Dr. DeMars claimed she couldn't have retained Dr. Porter because it would compromise her long-term disability); Pl.'s Ex. 89.)

Dartmouth Health's Chief Clinical Officer, Dr. Ed Merrens, adopted Dr. DeMars' patronizing attitude, downplaying the termination because Dr. Porter could remain on disability and everyone would be in a "better position" and making assumptions about Dr. Porter's capabilities, capacity, and interest without taking the time to actually ask her. (*See, e.g.,* Trial Tr. vol. 3, pp. 436–37 (Dr.

---

[4] At the time of this email, Dartmouth Health's Chief Medical Officer, Dr. Maria Padin, had recently observed Dr. Porter during surgery to ensure she was ready to return to the OR and concluded that Dr. Porter remained "a talented surgeon." (Trial Tr. vol. 2, pp. 356–58; Trial Tr. vol. 5, pp. 921–22; Pl.'s Ex. 37.) *See also Porter*, 92 F.4th at 136.

14

Porter, recounting her termination meeting where Dr. Merrens repeated three times, before the HR representative stopped him, "Stay out on disability, Misty").)

## IV.  DARTMOUTH HEALTH'S PURPORTED BASIS FOR TERMINATION

Dartmouth Health chose to terminate Dr. Porter's employment with the closure of the REI Division rather than continue to employ her and use her extensive skills to assist the understaffed OB/GYN Department.  (*See, e.g.,* Trial Tr. vol. 5, pp. 923–24 (Dr. Padin acknowledged that the OB/GYN Department was short-staffed at the time the REI Division closed and Dr. Porter's employment was terminated.); Pl.'s Ex. 83.)  Dr. Porter was qualified to do that work and more; her colleagues relied on her expertise; and Dartmouth Health lost that level of expertise when she left.  (*See, e.g.,* Trial Tr. vol. 3, pp. 428–30 (Dr. Porter, describing a request she received post-termination from a former colleague asking her to talk her through an ultrasound-guided tubal patency study because no one remaining in the OB/GYN Department was trained to do them); *id.* at pp. 431, 434, 441–42; Trial Tr. vol. 5, pp. 923–26; Pl.'s Exs. 83, 96.)

Dartmouth Health provided different reasons depending on the audience for the closure of the REI Division and the decision to terminate Dr. Porter's employment rather than utilize her skills elsewhere at the hospital.  (*See, e.g.,* Trial Tr. vol. 8, pp. 459–83 (testimony by Dr. Merrens regarding the different reasons).)

15

In an effort to provide a benign explanation to the community for its actions, Dartmouth Health initially concocted a "nursing shortage" excuse for the need to close the REI Division. That the reason was deliberately pretextual is evidenced by two internal emails: one from Dr. DeMars noting that "staffing issues" would be an "ideal message" and another from Dr. Merrens to a small group of upper-level administrators in which he acknowledged that the nursing shortage story was but a "thin" pretext.[5] (Pl.'s Ex. 60.) Moreover, in a meeting of the entire professional staff of the OB/GYN Department, Dr. Merrens responded to a question about why Dartmouth Health terminated Dr. Porter's employment instead of re-assigning her to another department that could benefit from her skills, by stating simply and clearly that she was "on disability." (Trial Tr. vol. 7, pp. 360–61.) Dartmouth Health's CEO and President, Dr. Joanne Conroy, gave an interview in which she falsely blamed, among other reasons, "the declining birth rate." (*See* Pl.'s Ex. 109; Trial Tr. vol. 7, pp. 386–87, 392; Trial Tr. vol. 8, pp. 465–67.) In the District Court, Dartmouth Health switched course and blamed its decisions on "dysfunction" in the REI Division. (Pl.'s Exs. 60, 84.)

---

[5] Although it was true that nursing staffing was often a challenge throughout Dartmouth Health and hospitals across the country, Dartmouth Health made no meaningful effort to solve this alleged shortage, and this staffing issue was no reason to shutter the entire REI Division. (Trial Tr. vol. 2, pp. 223–28; Trial Tr. vol. 8, pp. 604–05.)

16

"Dysfunction" in this context is simply a code word for Dr. Porter's continual whistleblowing regarding the dangerous and unlawful activities of her colleagues and her need to take time to recover from and be accommodated for her disability. *See Porter*, 92 F.4th at 141, 158–59 (noting that comments by Dr. Merrens about physician "dysfunction" and Dr. Porter "understanding" and "involving herself" reasonably could be interpreted by a jury as "code for her reporting activities").

Dr. Merrens claims responsibility for terminating Dr. Porter's employment and closing the REI Division but admits that he relied heavily on information he received from Dr. DeMars. (Trial Tr. vol. 8, pp. 453–56; 476–83; Pl.'s Ex. 83 (noting that "the recommendations around closing the program and its staff were at the recommendation of Dr. DeMars").) This reliance is evident in a May 12, 2017 email from Dr. Merrens to Dr. DeMars, asking her to help him explain why Dartmouth Health couldn't retain Dr. Porter after the REI Division closure:

> I am getting inundated with heartfelt and long emails wondering why Misty can't stay on to do her ultrasound complex operative and teaching role even if we end REI. I suspect that you considered this in the evaluation [of] the program and your knowledge of Misty. I just need to know how better to answer this question.

(Pl.'s Ex. 89.) *See also Porter*, 92 F.4th at 144 (quoting email).

For her part, Dr. DeMars resented the need to accommodate Dr. Porter's disability and further resented Dr. Porter's on-going and vehement objections to

17

unsafe and unlawful conduct by two physicians in the REI Division. Dr. DeMars concealed relevant information from Dr. Merrens about the REI Division and deliberately steered Dr. Merrens into believing that Dr. Porter was a washed-up, divisive troublemaker whose time at Dartmouth Health needed to end with the closure of the REI Division. The outpouring of shock and support for Dr. Porter when Dartmouth Health announced the decision to close the REI Division and terminate Dr. Porter's employment, however, was entirely contrary to and inconsistent with Dr. DeMars' efforts to paint Dr. Porter as a difficult employee or a "splitting force." (*See, e.g.,* Pl.'s Ex. 89, p. 3; Pl.'s Ex. 83.) *See also Porter*, 92 F.4th at 144–45.

18

## SUMMARY OF ARGUMENT

After a lengthy trial, the jury determined that disability was a motivating factor in Dartmouth Health's decision to terminate the employment of an experienced, uniquely-skilled, and in-demand physician and awarded $1,000,000 in economic damages and $125,000 in non-economic damages to Dr. Porter on her VFEPA disability discrimination claim.

### *DARTMOUTH HEALTH'S APPEAL*

Dartmouth Health's appeal challenges the jury instructions on the VFEPA claim and the admission/exclusion of evidence related to Dr. Bancroft, Dr. Porter's damages expert. Dartmouth Health's appeal should be rejected on both issues. The District Court properly instructed the jury on the legal standards of Vermont law that govern the VFEPA claim. In addition, Dartmouth Health waived its objections when it failed to assert its affirmative defense in its Answer and when it failed to preserve the issue at trial. Finally, the District Court properly admitted the expert testimony of Dr. Bancroft, including his supplemental assessment based on updated factual information.

With regard to the District Court's jury instruction on Vermont law, Dartmouth Health objects to the use of "motivating factor" instead of "but for" as the applicable causation standard on the VFEPA claim. Dartmouth Health further

19

complains that the District Court wrongly instructed the jury with the respect to the "same decision" affirmative defense. Dartmouth Health is wrong on the underlying law on both points. Contrary to Dartmouth Health's objection, the District Court's instruction was correct and accurately reflected Vermont law. Moreover, Dartmouth Health failed to raise—and therefore forfeited—the affirmative defense by not raising it in its answer; Dartmouth Health further waived its challenge to the instruction as given by not raising a timely objection— on three separate occasions—before the jury retired to deliberate.

Dartmouth Health's other objections center around Dr. Porter's damages expert, Dr. Bancroft. Dartmouth Health has tried on numerous occasions to limit or preclude Dr. Bancroft's testimony. This appeal continues the behavior by arguing that Dr. Bancroft should not have been permitted to update his opinion on damages to reflect new information, including facts that Dartmouth Health itself presented to him.[6] (A-1637; Dartmouth Health's Br. 17.) But Dr. Bancroft properly supplemented his opinion to incorporate new information that had developed over the years while this case was pending; indeed, he was arguably required to supplement his report to ensure that it was accurate in light of new factual developments. Dartmouth Health also appeals the District Court's refusal

---

[6] Dartmouth Health's challenges are particularly surprising given that the revisions served to reduce the amounts claimed in damages by Dr. Porter.

20

to admit Exhibit C-19, which consists of handwritten calculations by Dr. Bancroft using inaccurate figures provided by Dartmouth Health's counsel during cross-examination and made under protest. The District Court was correct to exclude this exhibit because it does not reflect Dr. Bancroft's opinion (in fact, Dr. Bancroft expressly stated that he did not agree with the calculations).

The District Court did not commit reversible error, and this Court should affirm the District Court's decisions at issue in Dartmouth Health's appeal.

### DR. PORTER'S CROSS-APPEAL

The District Court awarded attorney's fees to Dr. Porter as the prevailing party but reduced the rates and hours awarded and denied prejudgment interest on the fee award. Dr. Porter cross-appeals the District Court's decision to limit and reduce the hourly rates, the 10% downward adjustment for alleged "limited success," and the denial of prejudgment interest on the portion of attorney's fees that Dr. Porter paid out-of-pocket through August 2020. Dr. Porter's cross-appeal should be granted because these decisions were not required by existing law, were founded on misinterpretations of legal precedent, and are not reflective of the public policies behind the civil rights laws.

The District Court agreed that state law governs the question of attorney's fees in a diversity case and, under Vermont law, a prevailing party under VFEPA is

21

entitled to seek "reasonable attorney's fees." (A-1639.) The District Court acknowledged the many factors supporting rates on the higher end of customary, including the extensive experience of trial counsel, the complexity of the case, the number of years the case had been pending, the contingent fee arrangement, and more. The District Court also agreed that rates (both comparator and actual) should be increased to account for the passage of time. More importantly, although Dartmouth Health objected to nearly everything requested by Dr. Porter throughout this case, Dartmouth Health did not object to the reasonableness of the hourly rates charged by Dr. Porter's attorneys. Despite all of the factors in Dr. Porter's favor, the District Court limited/reduced the hourly rates proposed by Dr. Porter—and accepted as reasonable by Dartmouth Health—because it erroneously believed that it was constrained by the "forum rule."[7]

On top of the reduced rates, the District Court applied a 10% across-the-board reduction for what it termed "somewhat limited success." Despite the District Court's disagreement with Dartmouth Health's characterization of the litigation as "overwhelmingly unsuccessful" in the face of the jury's damage award of over one million dollars to a single plaintiff; its recognition that a substantial reduction would be inconsistent with the principles behind civil rights cases and

---

[7] The "forum rule" identifies the "prevailing market rate" in the jurisdiction in which the court is located as "presumptively reasonable." (A-1644.)

22

could make it difficult for plaintiffs to secure counsel in future cases; and its acknowledgement that a deduction for unsuccessful claims is not appropriate where, as here, the claims share a common core of facts and legal issues, the District Court inexplicably determined that a "modest downward adjustment" was warranted. The District Court's decision misapplied the law and ignored the practical impact of the interrelatedness of all of Dr. Porter's claims, namely, that the requested damages (lost wages, expenses, emotional distress) were the same across all claims, such that the amount of damages would not have been different if Dr. Porter succeeded on one claim or all six.

And finally, the District Court erred in denying Dr. Porter's request under Vermont law for prejudgment interest at 12% on the portion of attorney's fees that Dr. Porter had paid out-of-pocket through August 2020, particularly as the District Court also declined to apply current rates to all requested fees and unreasonably ignored or discounted cases cited by Dr. Porter because they were not "binding."

The District Court's award of attorney's fees should be revised to reflect the higher rates and to remove the 10% reduction. In addition, the judgment should be amended to include prejudgment interest in the attorney's fees incurred and paid by Dr. Porter prior to August 2020.

23

## ARGUMENT

### I. STANDARD OF REVIEW

Denial of a Rule 59 motion is reviewed for abuse of discretion. *Penzo v. Consol. Edison Co. of New York, Inc.*, No. 24-2466-CV, 2026 WL 905051, at *1 (2d Cir. Apr. 2, 2026). Denial of a request to certify a question to a state supreme court, *RSD Leasing, Inc. v. Navistar Int'l Corp.*, 81 F.4th 153, 169–70 (2d Cir. 2023), and the denial of a request for prejudgment interest, *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1071–72 (2d Cir. 1995), are likewise reviewed for abuse of discretion. "A district court abuses its discretion if it (1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions." *Id.*

Timely objections to jury instructions are reviewed *de novo*. Fed. R. Civ. P. 51(d)(2); *Murray v. UBS Sec., LLC*, 128 F.4th 363, 367–68 (2d Cir. 2025). Failure to object results in waiver unless the alleged error affects "substantial rights." In that event, the Court reviews for plain error. Fed. R. Civ. P. 51(d)(2).

The Court's review of an award of attorney's fees is *de novo* with respect to questions of law and abuse of discretion otherwise. *Lilly v. City of New York*, 934

F.3d 222, 227 (2d Cir. 2019). The "question of what standards to apply in calculating an award of attorneys' fees is a legal question" subject to *de novo* review. *Washington v. Philadelphia Cnty. Ct. of Common Pleas*, 89 F.3d 1031, 1034–35 (3d Cir. 1996). The reasonableness of an award made using the correct standards is reviewed for abuse of discretion. *Id.*

## *DR. PORTER'S RESPONSE TO DARTMOUTH HEALTH'S APPEAL*

II.     THE DISTRICT COURT PROPERLY DENIED DARTMOUTH HEALTH'S REQUESTS TO AMEND THE JUDGMENT OR FOR A NEW TRIAL ON THE VFEPA CLAIM BECAUSE CHALLENGES TO THE JURY INSTRUCTIONS WERE INCORRECT AS A MATTER OF LAW OR WAIVED

A. Dartmouth Health's Rule 59 motion to amend the judgment or for a new trial on Dr. Porter's VFEPA claim was properly denied where the motion failed to raise new or overlooked arguments.

Following the trial and entry of judgment, Dartmouth Health moved under Rule 59 to alter or amend the judgment or, in the alternative, for a new trial on Dr. Porter's claim of disability discrimination under VFEPA, arguing that the jury should have been instructed to apply the "but-for" causation standard. (SPA-72.) Dr. Porter opposed the motion, asserting that Vermont has consistently applied the "motivating factor" standard to claims under VFEPA, and the jury was therefore properly instructed to find Dartmouth Health liable if it found that Dr. Porter's disability was a "motivating factor" in the decision to terminate her employment.

25

(A-1512 to A-1515.) The District Court correctly denied the motion because it sought to re-hash arguments that the District Court has already considered—and rejected—and to raise objections that were waived when not made at the time of the jury charge.

The purpose of a Rule 59 motion is to bring alleged errors to the District Court's attention so that the errors can be corrected or a better record developed for review on appeal. Rule 59 cannot be used, however, to raise arguments that could have been—but were not—raised during the trial or to re-hash arguments already made and rejected by the District Court. *See, e.g.,* 11 Fed. Prac. & Proc. Civ. § 2805 (3d ed.) ("A principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result."). Although the District Court has broad discretion in determining whether or not to grant a motion to alter or amend the judgment, *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000), that discretion should not be exercised "lightly," *Dixon v. Maritime Overseas Corp.*, 490 F. Supp. 1191 (S.D.N.Y. 1980), *aff'd* 646 F.2d 560. The standard is "strict" and "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Schneiderman v. Am. Chem. Soc'y*, 172 F.4th 158, 190 (2d Cir. 2026). *See also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 112 n.34 (2d Cir. 2013)

26

(noting that typically a court should grant a new trial only when it is convinced that "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice"). Here, Dartmouth Health objected to use of the "motivating factor" causation standard with respect to Dr. Porter's disability discrimination claim under VFEPA. The District Court had already considered—and correctly rejected—Dartmouth Health's argument, and Dartmouth Health's motion failed to identify new law or factors that the District Court had ignored.

B. Existing Vermont law was sufficient for the District Court to conclude that motivating factor is the applicable causation standard for a disability-based claim under VFEPA without certifying the question to the Vermont Supreme Court.

Under VFEPA, it an "unlawful employment practice … [f]or any employer … to harass or discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability." 21 Vt. Stat. Ann. § 495(a)(1). The District Court instructed the jury to apply "but for" causation to Dr. Porter's claims under the ADA, Section 504 of the Rehabilitation Act, and New Hampshire's Law Against Discrimination, (A-910 to A-911; A-917 to A-918), and to apply "motivating factor" causation to Dr. Porter's claims under VFEPA, (A-918 to A-919; Trial Tr. vol. 1, pp. 173–74). Dartmouth Health objected, arguing that in the wake of this Court's decision in *Natofsky v. City of*

27

*New York*, 921 F.3d 337, 348 (2d Cir. 2019), "but for" should apply to all of Dr. Porter's claims. (SPA-72.) The District Court properly denied Dartmouth Health's request[8] for certification and correctly instructed the jury, over Dartmouth Health's objection, to use "motivating factor" as the applicable causation standard for Dr. Porter's VFEPA claim.

      1. "Motivating factor" applies to VFEPA claims.

At both the federal and state level, the exact contours of the laws around discrimination have been challenging to pin down. The early versions of VFEPA and Title VII and subsequent legislative changes; the non-Title VII discrimination statutes such as the Rehabilitation Act and the ADA; the interplay of the various statutes with the *Price Waterhouse* and *McDonnell Douglas* frameworks, *see Price Waterhouse v. Hopkins*, 490 U.S. 28 (1989); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); and imprecise language in decisions come together to form a sometimes murky, twisted path.

---

[8] Although Dartmouth Health asserts Dr. Porter also requested certification to the Vermont Supreme Court, Dr. Porter argued that motivating factor was already the law in Vermont and only raised the possibility of certification in the alternative should the District Court not find sufficient direction from existing precedent. (Posttrial Motions Hr'g Tr., pp. 21–22 (July 1, 2025).)

Before *Natofsky*, Vermont applied the "motivating factor" standard to VFEPA claims. Dartmouth Health's argument that, following *Natofsky* and without discussion or fanfare, Vermont would switch to applying "but-for" causation to claims of disability discrimination under Vermont law is inconsistent with Vermont practice and policy and not supported by recent case law.

The Vermont Supreme Court has repeatedly held that VFEPA is "patterned after" and generally applies[9] the same "standards and burdens of proof" as cases under Title VII, including in the disability discrimination context. *See, e.g.*, *Heston v. Norwich Univ.*, No. 24-CV-05311, 2026 WL 921910, at *2 (Vt. Super. Mar. 25, 2026); *Hammond v. Univ. of Vt. Med. Ctr.*, 2023 VT 31, ¶ 24, 218 Vt. 250, 308 A.3d 421; *Kelly v. Univ. of Vt. Med. Ctr.*, 2022 VT 26, ¶ 17, 216 Vt. 445, 280 A.3d 366; *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 16, 176 Vt. 356, 848 A.2d 310; *Gallipo v. City of Rutland*, 656 A.2d 635, 640 (Vt. 1994); *Hodgdon v. Mt. Mansfield Co.*, 624 A.2d 1122, 1128–29 (Vt. 1992); *Graff v. Eaton*, 598 A.2d 1383,

---

[9] Vermont is guided, but not constrained, by federal discrimination law. *See Lavalley v. E.B. & A.C. Whiting Co.,* 692 A.2d 367, 369–70 (Vt. 1997) (recognizing VFEPA's roots in Title VII, acknowledging persuasive authority, but stating that Vermont courts "will not adopt an interpretation of FEPA solely because the federal courts … have so interpreted Title VII [nor] do we believe that the Vermont Legislature must react to every federal decision interpreting Title VII or risk that its inaction will be interpreted as an endorsement of the federal decision").

1384 (Vt. 1991); *Davis v. Vermont Dept. of Corrs.*, 868 F. Supp. 2d 313 (D. Vt. 2012). In 1991, Congress expressly codified "motivating factor" as the appropriate causation standard in Title VII cases. 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.").

At the same time, VFEPA contains even broader protections against discrimination and harassment than Title VII. The remedial purpose[10] of VFEPA supports use of the "motivating factor" standard. *See Payne v. U.S. Airways, Inc.*, 2009 VT 90, ¶ 21, 186 Vt. 458, 987 A.2d 944 (noting that the "motivating factor" standard is "consistent with the remedial purpose of [VFEPA] to deter and eradicate discrimination in the state"). *See also* Thomas Nuovo, *Vermont Fair Employment Practices Act Does Not Require an Adverse Employment Action*, Vt. Bar J. 27 (Spring 2026) (positing that, compared to Title VII, VFEPA more broadly prohibits discrimination and harassment, including where no adverse employment

---

[10] The history of amendments to VFEPA showcases the state's commitment to expanding protection to Vermont employees wherever systematic discrimination, harassment, or retaliation is found. *See* series of VFEPA Amendments between 1971 and 2024, regularly adding additional protections. VFEPA protections apply from the first employee hire, unlike the ADA, which applies only to employers with 15 or more employees.

action has occurred and "reflects an intent to remedy a broader range of harms, including emotional injuries").

Vermont chose to enact (and repeatedly expand) a unified statutory scheme[11] in which, like Title VII, the statutory language makes no distinction between the different protected categories with respect to causation. As the Connecticut Appellate Court recently observed when interpreting a similar statute, a legislature's choice to enact one comprehensive employment discrimination law indicates that lawmakers intended a single uniform standard to apply to all protected classes:

> Our legislature has chosen not to follow the legislative approach taken by Congress of adopting different statutes to address different types of employment discrimination with varying causation burdens. Our legislature's decision to include multiple types of unlawful employment discrimination within a single statutory provision, without setting out distinctive standards for the different types, leads to the logical conclusion that it intended that the same standard of proof be applied to all the types of discrimination set forth in [the employment discrimination statute].

*Wallace v. Caring Sols., LLC*, 278 A.3d 586, 602 (Conn. App. 2022). Federal law addresses disability discrimination and age discrimination separately from Title

---

[11] *See* Sandra F. Sperino, *Revitalizing State Employment Discrimination Law*, 20 Geo. Mason L. Rev. 545, 567 (2013) (describing the approach as a "unified statutory regime").

VII, whereas VFEPA broadly includes these categories and more along with those covered by Title VII. *Natofsky* distinguished the language of the ADA from Title VII to conclude that "but for" was the applicable causation standard for disability discrimination. *Natofsky*, 921 F.3d at 348. With VFEPA's unified language, however, there is no basis to treat disability discrimination claims differently from other VFEPA discrimination claims.

Indeed, in the seven years after *Natofsky*, the Vermont Supreme Court has given no indication that it intends to use a different causation standard depending on the type(s) of discrimination alleged. *See Hammond*, 2023 VT at ¶ 21 (deciding race and disability discrimination claims without announcing separate standards and re-affirming practice of looking to Title VII for guidance when interpreting VFEPA).

Dartmouth Health construes the "controlling precedent" question too narrowly. (Dartmouth Health's Br. 40–41.) The operative question is not whether the Vermont Supreme Court has weighed in on the impact of *Natofsky*, but whether the Vermont Supreme Court has ever weighed in on the standard to apply to disability discrimination claims under VFEPA. And it has. As the District Court correctly and succinctly concluded:

> In short, longstanding precedent, recent case law, the plain language and purpose of VFEPA, and decisions of other state courts interpreting similar statutes support the

32

application of the "motivating factor" standard to disability discrimination claims under VFEPA. Dartmouth Health has not demonstrated that the Court erred in its "motivating factor" instruction on the VFEPA claim.

*Porter*, 2025 WL 3296225, at *1–4.

### 2. Certification was not needed.

The District Court reviewed existing Vermont case law and correctly concluded that it had a sufficient basis to predict that Vermont would continue to apply the "motivating factor" standard, thus rendering certification unnecessary.

Certification is considered an "exceptional procedure" to be used sparingly and only as state law permits. *Del Rio v. Amazon.com.dedc, LLC*, 132 F.4th 172, 176–77 (2d Cir. 2025), *certified question answered sub nom. Del Rio v. Amazon.com Servs., Inc.*, 349 A.3d 570 (Conn. 2026). Vermont law and the local rules of the Second Circuit and District Court of Vermont permit, but do not require, certification of "an unsettled and significant question of state law that will control the outcome of a pending case." D. Vt. L.R. 74(a); *see also* Second Cir. L.R. 27.2 (noting certification is permitted where state law permits); Vt. R. App. P. 14(a) ("The Vermont Supreme Court may answer a question of Vermont law certified to it by a federal court if the answer might determine an issue in pending litigation and there is no clear and controlling Vermont precedent."). "When

33

considering whether to exercise our discretion to certify a question, we have traditionally considered (1) whether a state court decision has ever provided an authoritative answer to the disputed issue; (2) the extent to which the question implicates the weighing of policy concerns of particular importance to the state; and (3) if the state court's answer may be determinative of the appeal." *RSD Leasing, Inc.*, 81 F.4th at 169–70 (internal quotations omitted).

Even when state law is unclear or uncertain, the federal court "must endeavor, in the first instance, to 'predict' how that court would resolve those questions," *Khan v. Yale Univ.*, 27 F.4th 805, 818 (2d Cir. 2022), "consider[ing] the highest court's decisions in related cases, as well as relevant decisions of the state's lower courts and of other jurisdictions," and should not certify questions of law when "sufficient precedents exist for [the court] to make a determination," *Amerex Grp., Inc. v. Lexington Ins. Co.*, 678 F.3d 193, 200 (2d Cir. 2012). Only after concluding that the legal landscape is "so uncertain that we can make no reasonable prediction" should the court consider certifying the question to the state's supreme court for resolution. *Samaha v. Scott's Const., Inc.*, 543 F. Supp. 2d 341, 342–43 (D. Vt. 2008).

Because existing Vermont precedent supports continued application of the motivating factor standard, (A-1694 to A-1696), certification to the Vermont

34

Supreme Court was not needed and would have caused unnecessary delay in a case that has already been pending for nearly nine years.

C. The District Court's jury instructions on the VFEPA claim were correct and, in any event, Dartmouth Health failed to properly preserve the argument.

The District Court properly rejected Dartmouth Health's arguments that the jury instructions on VFEPA contained incorrect statements of law and that the jury should have been told that Dartmouth Health could avoid liability if it proved that it would have made the same decision absent a discriminatory motive. The "same decision" argument is an affirmative defense that Dartmouth Health forfeited by failing to raise it in its answer. Dartmouth Health further waived the opportunity to challenge the VFEPA jury instructions by not raising its objections with the District Court despite numerous opportunities to do so. And, in any event, Dartmouth Health is wrong on the law.

1. Affirmative defense forfeited by failure to raise in answer or related pleading.

The "same decision" defense is an affirmative defense. Rule 8(c) of the Vermont Rules of Civil Procedure requires a party, in responding to a complaint or other pleading, to "affirmatively set forth and establish … any … matter constituting an avoidance or affirmative defense." *See also* Fed. R. Civ. P. 8(c)(1) (stating that, "[i]n responding to a pleading, a party must affirmatively state any

35

avoidance or affirmative defense"). Affirmative defenses not raised in an answer or similar responsive pleading are forfeited. *See, e.g., Kontrick v. Ryan*, 540 U.S. 443, 456–60 (2004) (noting defenses not raised in the answer are typically lost and that only a defense of lack of subject-matter jurisdiction remains after the trial); *George A. Fuller Co. v. Alexander & Reed, Esqs.*, 760 F. Supp. 381, 385–86 (S.D.N.Y. 1991) (denying motion to conform pleadings to include affirmative defense of lack of consideration not raised earlier in the case); *Carroll v. Trump*, 88 F.4th 418, 422–32 (2d Cir. 2023), *adhered to,* 151 F.4th 50 (2d Cir. 2025) (finding defendant waived defense of presidential immunity by not raising it in his answer and upholding denial of request to amend to include where it was made three years into litigation, after discovery had closed, and after defendant had moved for summary judgment); *Tereshchenko v. Karimi*, 102 F.4th 111, 128 (2d Cir. 2024) (noting that defenses not raised at the beginning of litigation are forfeited). *See also* 5 Fed. Prac. & Proc. Civ. § 1278 (4th ed.) ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule of Civil Procedure 8(c) results in the waiver of that defense and its exclusion from the case.").

Dartmouth Health did not raise the "same decision" argument in its answer. (*See* A-128 to A-130 (alleging 23 affirmative defenses, none of which include the "same decision" defense).) Nor did Dartmouth Health seek to amend its answer or

otherwise raise the issue in the many years that followed. To allow it now would be prejudicial to Dr. Porter. *Cf. Saks v. Franklin Covey Co.*, 316 F.3d 337, 350–51 (2d Cir. 2003) (noting that the purpose behind Rule 8(c) is to put the plaintiff on notice, and thus prevent surprise or unfair prejudice). "An affirmative defense, once forfeited, is 'exclu[ded] from the case,' … and, as a rule, cannot be asserted on appeal." *Wood v. Milyard*, 566 U.S. 463 (2012) (internal citation omitted).

### 2. Challenge to instruction waived by failure to objection prior to jury deliberations.

Even if Dartmouth Health has not forfeited the same-decision affirmative defense, it nevertheless waived the right to object to its omission from the VFEPA jury instructions by failing to request or challenge the instruction before the jury retired to deliberate. *See* D. Vt. L.R. 51 (stating that "failure to file timely requests for jury instructions may result in a waiver of a party's right to file such a request"); Fed. R. Civ. P. 51(c)(2) (noting that an objection is timely if made before the instructions are delivered and final jury arguments are made); Vt. R. Civ. P. 51(b) ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto either at a charge conference or before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."). *See also, e.g., John Wiley & Sons, Inc. v. Kirtsaeng*, 654 F.3d 210, 223 (2d Cir. 2011) ("Failure to object to a jury instruction prior to

37

the jury retiring results in a waiver of that objection."), *rev'd and remanded on other grounds*, 568 U.S. 519 (2013); *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56–57 (2d Cir. 2002) (noting that failure to object to a jury instruction before the jury retires results in waiver of that objection). Here, the District Court properly found that Dartmouth Health did not timely object to the "same decision" language and therefore waived its objections. *Porter*, 2025 WL 3296225, at *4.

Despite at least three separate opportunities, Dartmouth Health made only a general objection to use of the "motivating factor" standard. A general objection does not suffice. *See Saks*, 316 F.3d at 350–51 (finding that a general defense is not sufficient); *Jarvis*, 283 F.3d at 60 (noting objections must be sufficiently "specific" to alert the judge of the alleged error such that the judge has an opportunity to correct it). On April 7, 2025, at the charge conference, when asked if there were any objections to the instructions proposed for VFEPA, Defense counsel stated:

> ATTORNEY SCHROEDER: Your Honor, our submission would be just an objection for the record on whether or not it should be motivating factor versus but-for. So we're just stating that objection for the record.
>
> THE COURT: Okay. But no, *no specific changes* other than that objection to that particular legal standard?
>
> ATTORNEY SCHROEDER: Correct, Your Honor.

38

(A-807 (emphasis added).)  Following the charge conference, the Court revised the proposed jury instructions and re-circulated them to the parties.  On the morning of April 8, 2025, prior to the jury charge, the Court asked if there were further objections.  (Trial Tr. vol. 1, p. 5. ("I'll give you an opportunity, if you'd like, to kind of make any objections to the instructions as received last night.").)  Defense counsel raised three objections not related to causation and then stated: "We incorporate all of the objections that we put on the record yesterday[.]"  (Trial Tr. vol. 1, pp. 13–14.)  Later that afternoon, once the jury had been charged and retired to the jury room to deliberate, the Court asked if there were any objections to the instructions as given.  (Trial Tr. vol. 2, p. 190.)  Defense counsel renewed prior objections but did not add any additional objections.  (*Id.* (stating, "we incorporate herein all of the prior objections that we've stated on the record").)

Dartmouth Health had multiple opportunities to submit requests and make objections to the jury instructions.  Where Dartmouth Health failed to request or raise an objection to the omission of the "same decision" defense until well after the jury verdict, a finding of waiver is appropriate.  *See United States v. Mitchell*, 811 F. App'x 50, 52 (2d Cir. 2020) (finding waiver where court proposed instructions, counsel requested some changes that the court accepted, and otherwise indicated agreement with the instructions).

3. Dartmouth Health could not have avoided liability by proving "same decision" defense.

A court need only instruct the jury on issues both raised by the evidence and requested by a party; however, a court may review instructions for plain error if the error, not otherwise preserved, affects substantial rights. Fed. R. Civ. P. 51(d)(2) & Advisory Committee Notes, 2003 Amendment. As Dartmouth Health waived any objection to the VFEPA instruction outside of the causation standard, at most, Dartmouth Health's objection would be reviewed for plain error. The Court need not do so here, however, because the instruction that Dartmouth Health now seeks is itself in error. Dartmouth Health argues that the District Court erroneously instructed the jury that "an employer cannot avoid liability by proving that it would still have taken the same adverse action in the absence of discriminatory motivation," when it should have instructed the jury on the "same decision" defense.[12] *See Murray*, 128 F.4th at 368 (An instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury of the law.); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d at 112 n.34 (noting that typically a court should grant a new trial only when it is

---

[12] The District Court instructed: "Under the motivating factor test, an employer cannot avoid liability by proving that it would still have taken the same adverse action in the absence of discriminatory motivation. This is a difference between the motivating factor test and the "because of" test." (A-919.)

40

convinced that "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice").  Dartmouth Health is wrong—the "same decision" defense is not a defense to liability and would not have impacted the outcome with respect to Dartmouth Health's liability under the VFEPA claim.

Under *Price Waterhouse*, once a Title VII plaintiff demonstrated that "discrimination was a motivating factor in the defendant's adverse employment action," a defendant could still "avoid all liability if it could prove it would have taken the same action regardless of any impermissible consideration."  *Natofsky*, 921 F.3d at 347.  That stopped with the 1991 changes to Title VII.  *See, e.g., Bart v. Golub Corp.*, 96 F.4th 566, 571–76 (2d Cir. 2024) (noting that the 1991 changes to Title VII "abrogated *Price Waterhouse* to the extent that the case allowed a defendant-employer to evade liability if it established the 'same decision' defense"); Robert Belton, *Mixed-Motive Cases in Employment Discrimination Law Revisited: A Brief Updated View of the Swamp*, 51 Mercer L. Rev. 651, 660 (2000) (noting that the 1991 changes to Title VII "were enacted to abrogate the fundamental holding of Price Waterhouse insofar as that decision permitted an employer in a mixed-motive case to completely escape a finding of liability by proving the same-decision defense"); Michael Starr, *The Muddle of "Motivating Factor": Using the Logic of Human Action to Inform Employment Discrimination Law*, 35 Hofstra Lab. & Emp. L.J. 89, 115–18 (2017) (explaining that the "whole

41

point" of adding "motivating factor" to Title VII was to impose liability when discrimination was a motivating factor "without also having to show that it was the but-for cause of the challenged action").

Even if Dartmouth Health did not forfeit or waive its challenge to the VFEPA instruction, the appeal fails because the District Court properly instructed the jury that "same decision" is not a defense to liability.

*DR. PORTER'S CROSS-APPEAL*

III.  EXPERT TESTIMONY ON DAMAGES

A. The District Court properly permitted Dr. Porter to elicit expert testimony regarding, and to display a demonstrative exhibit derived from, a supplemental expert report.

Dartmouth Health claims that the District Court erred when it allowed Dr. Robert Bancroft to provide expert testimony on damages.  Specifically, Dartmouth Health asserts that the trial court improperly admitted "an untimely, prejudicial supplement report."  (Dartmouth Health's Br. 49–50.)  As the trial court repeatedly and correctly ruled, however, Dr. Bancroft's supplemental report was neither untimely nor unduly prejudicial.  (SPA 87–91.).  Rather, Dr. Bancroft's supplemental report relied upon the same methodology and theory of damages that is reflected in his initial report and each supplemental analyses.  (*See id*. at 91 ("Dr.

42

Bancroft's methodology did not change from one report to the next").)  Although he updated his report at different points in time throughout this litigation, the only changes he made reflected factual developments over the eight years that the case had been pending by the time it was tried.  In essence, Dr. Bancroft's assumptions about the future made in earlier reports were substituted with the facts that unfolded with the passage of time.  This is a proper reason for an expert to issue a supplemental report, and it does not render the supplemental report untimely or prejudicial.  *See, e.g., Kahle v. Leonard*, 563 F.3d 736, 741 (8th Cir. 2009) (finding district court within its discretion in admitting psychologist expert report updated shortly before trial where the report "updated a previously-disclosed assessment of Kahle's treatment needs based on additional information—her expected release date"); *Minebea Co. v. Papst*, 231 F.R.D. 3, 6–8 (D.D.C. 2005) (noting the exception permitting a supplemental expert report "for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report"); Fed. R. Civ. P. 26(e) (permitting supplements or corrections in response to new information).  Indeed, a party has an obligation to supplement an expert report when factual developments impact the accuracy of the expert's opinion.  Fed. R. Civ. P. 26(e).

Dartmouth Health's challenge to Dr. Bancroft's 2025 supplemental report relies upon several mischaracterizations of the factual and procedural record. According to Dartmouth Health:

– Dr. Bancroft "admitted" during a pre-trial evidentiary hearing that he "lacked factual information underpinning some of his assumptions and findings," (Dartmouth Health's Br. 50);

– Dr. Bancroft "admitted" that "he had not considered Dr. Porter's most recent earnings data" and "was unaware of a promotion to full professor Dr. Porter had received in July of 2023," (*id.* at 50–51);

– Dr. Bancroft testified about pension benefits when such information was "set forth neither in the body nor the charts attached to the 2025 Bancroft Report," (*id.* at 42–53); and

– Dr. Bancroft's supplemental report relied on a "revised … damages theory" that reflected a "drastic change," (*id.* at 56).[13]

None of these statements are supported by facts.[14]

---

[13] Dartmouth Health also makes the unremarkable assertion that "Dr. Bancroft admitted that several key assumptions he had used in developing the 2024 Bancroft Report, if changed, could make his conclusions inaccurate." (Dartmouth Health's Br. 50.) It would seem obvious that if an expert changed the data input into his analysis the results could be different. This is hardly a basis for excluding expert testimony.

[14] Dartmouth Health also falsely states that Dr. Bancroft's testimony was the "sole evidence of damages." (Dartmouth Health's Br. 53.) But Dr. Porter herself testified extensively about her damages. (*See, e.g.*, Trial Tr. vol. 3, pp. 450–458, 469–479, 527–530; Trial Tr. vol. 4, pp. 697–709.)

Regarding Dartmouth Health's claim that Dr. Bancroft somehow "admitted" that he "lacked factual information" and "was unaware of a promotion to full professor Dr. Porter had received," Dr. Bancroft made no such admissions. Dr. Bancroft's testimony during the pre-trial evidentiary hearing confirmed that he had considered complete, accurate, and current factual information in forming his opinions. Although Dr. Bancroft may not have known about Dr. Porter's promotion to full professor in 2023, this information was irrelevant because Dr. Bancroft confirmed that he had reviewed—and relied upon—Dr. Porter's actual earnings. (*See* A-347, A-364 to A-365.) Dr. Bancroft's specific testimony was:

> Q. I want to make sure it's clear. In your August 2024 report, the numbers you used for her UVM earnings were, in fact, the actual earnings she was making with that professorship; is that correct?
>
> A. That's right. I used those. Yes, I used that information, scaled it up, and then used it as the basis to go forward.
>
> ….
>
> Q. [Y]ou have the actual numbers …?
>
> A. I have the actual, yes.

(A-365; *see also* SPA-88.) Dr. Bancroft's opinion was based on earnings, not job titles, and Dr. Bancroft had the complete earnings data needed for his analysis. Dartmouth Health's argument that Dr. Bancroft somehow lacked important information about Dr. Porter's promotion is a red herring.

45

In addition, although Dartmouth Health complains that Dr. Bancroft testified about pension benefits at trial when, according to Dartmouth Health, this was not the subject of his report, Dr. Bancroft's report and opinion has always included an assessment of pension benefits. Indeed, Dartmouth Health's counsel cross-examined Dr. Bancroft about these pension benefits during Dr. Bancroft's deposition in 2019 and again during the pre-trail evidentiary hearing in 2025. During Dr. Bancroft's deposition eight years ago, Dartmouth Health's attorney specifically asked Dr. Bancroft about the pension benefits issue. (*See* A-276 to A-278.) Dartmouth Health was clearly on notice that an analysis of pension benefits was part of Dr. Bancroft's opinion, and Dartmouth Health's counsel had every opportunity to explore the issue with him during his deposition in 2019. Then on March 14, 2025, at the pre-trial evidentiary hearing, Dartmouth Health's attorney again cross-examined Dr. Bancroft about the pension benefits. (A-342 to A-344; A-350 to A-352.) It is simply false for Dartmouth Health to assert now that Dr. Bancroft had not previously disclosed his analysis on the pension benefits at issue or that Dartmouth Health was somehow prejudiced when Dr. Bancroft offered testimony about the pension benefits at trial. *See Minebea Co.*, 231 F.R.D. at 8 (drawing distinction between information in report and information raised during deposition, which may or may not have been covered in the initial report, and

46

noting that plaintiff is not prohibited from eliciting testimony from expert about any "evidence, issues or opinions" raised during the deposition).

Finally, Dartmouth Health's assertion that Dr. Bancroft's supplemental report reflected a "revised … damages theory" or otherwise relied upon a "drastic change" in methodology is plainly incorrect. At the pre-trial evidentiary hearing, Dr. Bancroft testified (under cross-examination by Dartmouth Health's counsel) that his methodology remained the same:

> Q. And your methodology for these reports and all of your reports is fairly consistent in that you're essentially looking for what her earnings were at the place from which she was subject to the personnel action, Dartmouth-Hitchcock, and comparing them with her earnings at the new place – is that right – UVM Medical Center?
>
> A. Yes. And I have an issue with the adjective fairly. They are exactly the same methodology.

(A-333 to A-334; SPA-88.)

Thus, Dartmouth Health's attempt to create the illusion that Dr. Bancroft's supplemental report relied upon incomplete information or reflected a change in theory or methodology is completely unfounded.[15]

---

[15] Dartmouth Health's arguments are most properly the subject of cross-examination at trial and jury argument; and they are not grounds to exclude expert testimony.

47

Dartmouth Health also complains that Dr. Bancroft issued a supplemental report after the evidentiary hearing and that this report addressed "information and testimony elicited at the hearing." (Dartmouth Health's Br. 51–52.) At the hearing on Dartmouth Health's motion in limine, Dartmouth Health's counsel thoroughly cross-examined Dr. Bancroft about the substance of his options and his methodology. In doing so, Dartmouth Health's counsel made the strategic decision to reveal several lines of argument and several questions about Dr. Bancroft's opinions. Dartmouth Health could have waited until trial to ask these questions; but it elected instead to preview its questions in a pre-trial proceeding. Some of these questions were based on information Dr. Bancroft had no reason to know (for example, an assertion that Dartmouth Health had frozen salaries during the shut-down period of the COVID-19 pandemic). After the pre-trial hearing, Dr. Bancroft issued a supplemental report which addressed the new information that Dartmouth Health's counsel had raised at the evidentiary hearing. As the District Court observed, this report was largely a response to the lines of inquiry by Dartmouth Health's lawyer at the pre-trial hearing. (SPA-87.)

Dartmouth Health's counsel surely could have anticipated that Dr. Bancroft would issue a supplemental report to address the issues that Dartmouth Health itself identified. Dartmouth Health cannot credibly claim "surprise" or prejudice when its own lawyer raised the very issues that Dr. Bancroft addressed in his

48

supplemental report. Dartmouth Health could have saved its cross-examination for trial. Instead, it chose to give Dr. Porter and the Court a preview. Dartmouth Health cannot now claim error simply because Dr. Bancroft foreseeably addressed its questions before trial. *See Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1332 (10th Cir. 2004) (noting that "an expert's initial Rule 26 report cannot always anticipate every possible challenge to the report" and that refusing to allow the expert "to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning" may, in some instances, "even constitute an abuse of discretion").

Finally, Dartmouth Health's argument ends with an analysis of case law concerning the proper sanction when a party violates a discovery order or Rule 26 of the Federal Rules of Civil Procedure. These cases are inapposite because there was no violation of a discovery order or discovery rule in this case. Dr. Bancroft's reports complied fully with all applicable discovery rules and orders.

The District Court did not err when it admitted the expert opinion and chart of Dr. Bancroft. Dartmouth Health's appeal on this issue should be dismissed.

B. The District Court properly excluded a note containing defense counsel's calculations prepared during the cross examination of Dr. Porter's damages expert under protest by the expert (because they were not accurate) and at defense's counsel's instruction, and then properly precluded Dartmouth Health from using it as a demonstrative exhibit during its closing summation.

Dartmouth Health next claims error in the District Court's decision to prevent defense counsel from using a page of handwritten notes as a demonstrative exhibit during closing argument. The notes—which Dartmouth Health wrongly characterizes as a "chart"—were physically taken by Dr. Bancroft on the stand while he was testifying under cross-examination. Dr. Bancroft was not the author of the content of the notes, however. Rather, Dartmouth Health's counsel told him what to write. These notes simply reflect Dartmouth Health's counsel's own calculations using Dr. Bancroft as a medium to write them in his handwriting. But, as Dr. Bancroft protested during this spectacle, the calculations were inaccurate and incorrect. (A-720; SPA-96 ("I'll do it anyways, but it's not correct.").) Dartmouth Health argues that this "chart" somehow contains Dr. Bancroft's calculations and should have been used as demonstrative evidence during closing argument.

The Court properly limited Dartmouth Health's use of this document. This document was not a legitimate chart prepared by an expert. It was merely the result of trial theatrics in which defense counsel directed the witness to write down content counsel himself had previously prepared. The document was wholly misleading (Dr. Bancroft himself immediately disclaimed it as incorrect) and lacks probative value. Indeed, the document is so unreliable as evidence that it would have been error to permit Dartmouth Health to use it during closing argument. The

50

District Court's decision to limit use of this document was proper, and Dartmouth Health's claim of error should be rejected.

### IV. THE HOURLY RATES AND TOTAL AWARD OF ATTORNEY'S FEES WERE REASONABLE AND SHOULD NOT HAVE BEEN REDUCED

"A prevailing party in a civil rights action in Vermont may seek compensation for 'reasonable attorney's fees.'" *Spooner v. Town of Topsham*, 2010 VT 71, ¶ 8, 188 Vt. 293, 9 A.3d 672. This is a purposefully low threshold. "To be prevailing, a party need only obtain some relief on any significant issue providing some benefit the party sought." Layne Rouse, *Battling for Attorneys' Fees: The Subtle Influence of "Conservatism" in 42 U.S.C. § 1988*, 59 Baylor L. Rev. 973, 985–87 (Fall 2007). Dr. Porter prevailed on her VFEPA disability discrimination claim at trial and was awarded attorney's fees under 21 Vt. Stat. Ann. § 495b(b). State law governs the determination of attorney fees in diversity cases. *Grand Union Co. v. Cord Meyer Dev. Co.*, 761 F.2d 141, 147 (2d Cir. 1985) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975)).

An award of attorney's fees is a crucial component of civil rights statutes and similar remedial laws. It acts as a deterrent to employers or others who might violate the statutes by increasing the risk and cost of violation. It also acts as an inducement to encourage private citizens and attorneys to pursue violations that might otherwise go unremedied due to the high cost of litigation. *See, e.g.,* Rouse,

*supra* (noting that the Civil Rights' Act was "intended to be a pro-plaintiff law" but subjective analysis, broad discretion, and absence of meaningful review leave the Act "especially vulnerable to influence from pro-establishment, anti-enforcement goals that are contrary to the pro-plaintiff purpose"). According to Mr. Rouse, failure to consider the purpose behind these fee-shifting statutes when establishing a reasonable fee tends to result in a heavier burden of proof on the prevailing plaintiff than intended and leads to "anti-plaintiff" results. *Id.* at 991–94. The net result of the law's ambiguity—as applied by lower courts—is that the prevailing party carries a burden to overcome a presumption of reduction." *Id.* at 994. Vermont courts, consistent with the Second Circuit and the Supreme Court, generally hold that the "lodestar" amount (reasonable hourly rate x reasonable number of hours) is presumptively reasonable, with adjustments up or down made sparingly. (SPA-26 to SPA-29.)

A. The hourly rates submitted by Dr. Porter's counsel were reasonable and should not have been reduced *sua sponte* by the District Court.

The District Court's decision to *sua sponte* reduce counsel's hourly rates[16] was improper where Dartmouth Health's counsel agreed the rates were reasonable

---

[16] The District Court imposed a maximum rate of $350 per hour for attorneys and $90 per hour for paralegals. Individual rates were reduced as follows:

Geoffrey Vitt $~~320~~ $300 (2017–2022); $~~400~~ $350 (2024–2025)
Sarah Nunan $150 (2020–2022); $250 (2024–2025)

and where the District Court indicated that many factors supported "higher than normal" rates.  (A-1632; A-1649.)  If anything, the District Court should have increased the rates from the earlier years of litigation to account for the passage of time.  (A-1644 to A-1645.)

More importantly, although Dartmouth Health objected to nearly everything requested by Dr. Porter throughout this case, Dartmouth Health did not object to the reasonableness of the hourly rates charged by Dr. Porter's attorneys.  Yet. despite all of the factors in Dr. Porter's favor, the District Court limited/reduced the hourly rates proposed by Dr. Porter and accepted as reasonable by Dartmouth Health because it erroneously believed that it was constrained by the "forum rule."

Hourly rates must be "reasonable."  The goal is to achieve "rough justice" and not "auditing perfection."  *Fox v. Vice*, 563 U.S. 826, 838 (2011).  A reasonable hourly rate is one that "a paying client would be willing to pay" given the preference "to spend the minimum necessary to litigate the case effectively."  *Lilly*,

---

Sarah Merlo $200 (2017–2020); ~~$325~~ $250 (2024–2025)
Eric Jones ~~$375~~ $325 (2024); ~~$395~~ $350 (2025)
Alison Bell ~~$415~~ $300
Bridget Grace $225
Wendy Radcliff $250
Katie Kramer $175 (2018–2020)
Katie Kramer ~~$450~~ $350 (2024)
Paralegals ~~$50–$155~~ $90 (2017–2025)

(A-1649 to A-1650.)

53

934 F.3d at 231–32 (internal quotations omitted). *See also Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 184 (2d Cir. 2008) (finding what a "reasonable, paying client would be willing to pay" to be a useful metric of reasonableness); *Ferrari v. U.S. Equities Corp.*, 661 F. App'x 47, 50–52 (2d Cir. 2016) (higher-quality representation commands a better rate than mediocre performance). The District Court acknowledged the many factors supporting rates on the higher end of customary, including the extensive experience of trial counsel, the complexity of the case, the number of years the case had been pending, and the contingent fee arrangement, etc. (SPA-17 to SPA-71.)

Attorneys Vitt and Jones submitted affidavits indicating that the requested rates were consistent with the rates customarily charged to and paid by Vitt & Nunan and LSW's clients, (Vitt Dec. ¶ 23l; Jones Dec. ¶ 6), which is *prima facie* evidence of reasonableness. (*See* A-965 to A-966.) It is particularly significant, given the generally contentious nature of this litigation over the years, that Dartmouth Health agreed that the rates were reasonable. (SPA-36.) *See Washington v. Philadelphia Cnty. Ct. of Common Pleas*, 89 F.3d 1031, 1036–37 (3d Cir. 1996) (noting reduction in rate is not appropriate where plaintiff meets *prima facie* burden for reasonableness and defendant does not produce contrary evidence).

54

The rates charged by Dr. Porter's attorneys—including the four highest rates of $450 per hour (Katie Kramer); $415 per hour (Allison Bell); $400 per hour (Geoffrey Vitt); and $395 per hour (Eric Jones), (SPA-35 to SPA-36)—are in the range of reasonable rates in the Vermont market and within the limits of rates approved by Vermont courts and the District Court. *See Rivard v. Smallheer*, No. 22-CV-04364, 2023 WL 7309300, at *2 (Vt. Super. Oct. 20, 2023), *aff'd by* No. 23-AP-338, 2024 WL 1481590, at *3 (Vt. Apr. 5, 2024) (approving rate of $435 per hour); *Sullivan v. Saint-Gobain Performance Plastics Corp.*, Case No. 5:16-cv-125, 2021 WL 1851404, at *2 (D. Vt. May 10, 2021) (approving, three years' earlier, rates of $400 per hour for a senior partner at the same firm as several of Dr. Porter's counsel). *See also Gym Door Repairs, Inc. v. Guardian Gym Equip.*, No. 23-7924, 2026 WL 891131, at *2 (2d Cir. Apr. 1, 2026) (noting rates "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation"). When comparing rates approved in prior cases, the District Court needed to increase the rates to account for market increases over time.

Dr. Porter presented attorney's fees at the rates that counsel actually charged Dr. Porter and/or customarily charged other clients. The earlier (and significantly lower) rates were not—but should have been—increased to current rates. *See, e.g., Minott v. Google LLC*, 24-CV-01674 (MMG), 2024 WL 3518525, at *6 (S.D.N.Y.

55

July 24, 2024) (finding that increase in attorney's hourly rate was warranted where rate was determined in a case approximately two years earlier), *aff'd sub nom. Minott v. The Washington L. Firm PLLC*, No. 24-2275, 2025 WL 2111878 (2d Cir. July 29, 2025); *Wang v. Shun Lee Palace Rest., Inc.*, 17-CV-840 (VSB), 2023 WL 5022758, at *3 (S.D.N.Y. July 24, 2023) ("Given that two calendar years have passed between the first instance of sanctioned behavior and the currently discussed behavior, and that annual increases in billing rates are customary at many law firms, . . . rate increases . . . [are] reasonable."). This is particularly important in the absence of an award of prejudgment interest on attorney's fees. (A-963.) The attorney's fee award should be recalculated such that all hours reflect the current rates. Conversely (or alternatively), fees awarded at then-current hourly rates and not bumped up to current rates should be awarded prejudgment interest at the Vermont 12% rate.

Another factor in the rate analysis is the novelty or complexity of the case. The more novel or complex a case, the more likely a reasonable client would pay a higher hourly rate. (SPA-26 to SPA-29.) *Lilly*, 934 F.3d at 231–32 (finding a case the required no depositions, involved no substantive motions or appearances, and was completed within 10 months to be "simple" and "garden variety"). The District Court rated the case as "fairly complex." Factors considered by the District Court included:

56

Moreover, the Second Circuit's lengthy decision over six years after the lawsuit was filed represented a substantial change in the posture of the case as the matter was remanded for trial. The Court also takes into account the following factors: (1) the pendency of the case for nearly eight years; (2) the heavily contested nature of the litigation, evidenced by the filing of numerous pretrial motions—including discovery motions and motions *in limine*—and at least two unsuccessful mediations conducted by a special settlement master; (3) the almost three-week trial during which each party was represented by three or more attorneys; and (4) the jury's deliberations over approximately three days before reaching a verdict.

(SPA-36.) Additionally, the District Court noted that civil rights cases handled on a contingency basis command a higher rate to account for the increased risk and delay. (SPA-19.) All of these factors support a higher-than-average hourly rate.

The District Court unreasonably constrained its own exercise of discretion with an incorrect legal standard while indicating that in the absence of such standard, the complexities of the case would justify a higher hourly rate. Under these circumstances, the District Court should not have reduced counsel's hourly rates where those rates reflected the attorneys' customary rates charged to clients, were within the parameters of approved Vermont rates, and were considered reasonable by the opposing party, and where the District Court acknowledged that the case was complex.

57

B. The District Court misconstrued the law and ignored policy when it applied a 10% across-the-board reduction in Dr. Porter's legal fees claiming "somewhat limited success."

Dr. Porter prevailed on the VFEPA claim and was awarded attorney's fees. And, although she did not prevail on every count, success on more counts would not have translated to greater damages. In addition to reducing the hourly rates, however, the District Court applied a 10% across-the-board reduction in fees to account for what it termed Dr. Porter's "somewhat limited success." To the extent that the District Court reduced the award because of "limited success," that was in error. *See CARCO GROUP, Inc. v. Maconachy*, 718 F.3d 72, 88–89 (2d Cir. 2013) (reversing District Court's 20% across-the-board reduction in fees, finding that the decision was based on an "erroneous belief that a legal principle so required").

The party advocating for a departure from the lodestar amount, which is presumed reasonable, bears the burden. The District Court disagreed with Dartmouth Health's characterization of the litigation as "overwhelmingly unsuccessful," noting that "[i]t strains credulity to accept that a Vermont jury awarding over one million dollars to a single plaintiff is not a significant verdict." (SPA-51.) The District Court also noted that a substantial downward adjustment would be inconsistent with the principles behind civil rights cases and could make it difficult for plaintiffs to secure counsel in future cases. (SPA-51 to SPA-52.)

58

And finally, the District Court correctly noted that only when losing claims are entirely "distinct" from successful claims—which it acknowledged was not the case here—should a deduction be made for unsuccessful claims. (SPA-52 to SPA-55.) Nevertheless, the District Court inexplicably determined that a "modest downward adjustment" was warranted. (SPA-54 to SPA-55.) The District Court's decision misapplied the law and ignored the practical impact of the interrelatedness of all of Dr. Porter's claims, namely, that the requested damages (lost wages, expenses, emotional distress) were the same across all claims, such that the amount of damages would not have been different if Dr. Porter succeeded on one claim or all six.

The degree of success is an important factor; however, it is not determined by a simple calculation of counts won versus counts lost or the percentage of requested damages actually recovered. *Patterson v. Balsamico*, 440 F.3d 104, 123–24 (2d Cir. 2006). *See also Cole v. Foxmar, Inc.*, 160 F.4th 28, 33–37 (2d Cir. 2025) (noting that under Vermont law, the proportion of damages recovered to the amount of attorney's fees incurred is not a proper measure of the degree of success, particularly in the context of public interest, fee-shifting statutes such as VFEPA). "Dr. Porter's claims are interrelated both factually and legally." (A-1656.) In such situations, no reduction is made for unsuccessful claims. *See Raja v. Burns*, 43 F.4th 80, 87–88 (2d Cir. 2022). This makes particular sense where, as here, the

59

available relief for success on one claim is identical to the relief that would be available for any other claim.

Dr. Porter's claims can be broadly grouped as "disability" and "whistleblower." Both groups permit similar categories of relief—back pay, front pay, emotional distress, fees and costs. Likewise, the relief available is effectively the same across the federal and state disability discrimination claims. Dr. Porter's damages in large part consisted of lost income and expenses related to having to take a job nearly two hours away from her home. These losses were the same for each count of the complaint, and damages for those losses could only be awarded once, regardless of the number of counts on which Dr. Porter prevailed. (*Cf.* SPA-150 (instructing the jury not to "award damages for one item that duplicates an award for another item" because "a party is entitled to only one recovery for his or her damages").)

Where Dr. Porter proved that her termination was motivated by her disability, where she was awarded a substantial portion of the damages she was seeking at the time of trial, and where success on additional claims would have been unlikely to increase her damage award, it was wrong to characterize her success as "somewhat limited" and error to apply the 10% reduction.

V.     DR. PORTER SHOULD BE AWARDED PREJUDGMENT INTEREST
       AT 12% ON ATTORNEY'S FEES INCURRED AND PAID THROUGH
       AUGUST 2020

The Court should award prejudgment interest on the attorney's fees that she paid prior to August 2020 because the expense was known, the amount was readily ascertainable, Dr. Porter has been deprived of a substantial amount of money for years, and doing so fulfills the public policy behind civil rights remedies of making the plaintiff whole.

Counsel for Dr. Porter billed—and Dr. Porter paid—attorney's fees on an hourly basis through August 2020. Subsequently, and through the present, Dr. Porter and her counsel proceeded under a contingent fee arrangement. The fee award includes attorney's fees incurred both before and after August 2020. Dr. Porter sought prejudgment interest on the $475,096 in fees incurred and paid out-of-pocket by Dr. Porter through August 2020.[17] (A-1401.) The District Court denied the request on the grounds that attorney's fees are generally not "liquidated" until after trial. (A-1673.)

State law governs the question of prejudgment interest where the underlying decision is itself based solely on a state-law claim. *See, e.g., Marfia v. T.C. Ziraat*

---

[17] The Court instructed jurors to "not add any sum for interest to the damages awarded in this case. The court will make such award if appropriate." (A-926.)

61

*Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998) (stating that "federal law does not apply to the calculation of prejudgment interest on supplemental state law claims"); *Rhodes v. Davis*, 628 F. App'x 787, 792 (2d Cir. 2015) (noting that the question of prejudgment interest is one of substantive law and state law applies where plaintiff did not prevail on any federal claims); *Merritt v. United States*, No. 5:18-cv-200, 2022 WL 17573683, *1 (D. Vt. Nov. 15, 2022) (applying Vermont law on prejudgment interest to plaintiff's supplemental state law claims). In Vermont, prejudgment interest is awarded as of right when damages are liquidated or reasonably certain, and in the court's discretion otherwise. *New England P'Ship, Inc. v. Rutland City Sch. Dist.*, No. 2002-476, 2003 WL 25745409, at *4 (Vt. June 1, 2003). *See also* Vt. R. Civ. P. 54(a) (stating prejudgment interest "shall" be included … when the amount of damages is readily ascertainable). The fees in question had been incurred and fully paid for nearly five years before trial began. The amount was "readily ascertainable."[18] In such cases, the fees should be treated like other damages where the amount is in some dispute.

Even if prejudgment interest could not be awarded as of right, it could and should have been awarded in the Court's discretion. Courts should consider "(i)

---

[18] In the alternative, if the Court denies prejudgment interest on the attorney's fees, it should increase the rates to the current counsel rates.

the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *United States Sec. & Exch. Comm'n v. Ahmed*, 72 F.4th 379, 403 (2d Cir. 2023).

An award of prejudgment interest helps to make a plaintiff whole by compensating for the loss of use of money. *See, e.g., Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) (noting award of prejudgment interest prevents an employer from delaying payment to "enjoy an interest-free loan for as long as it can"); *d'Arc Turcotte v. Est. of LaRose*, 153 Vt. 196, 198–200 (1989) ("Plaintiffs who are awarded interest will be made whole; those not awarded interest will not, contrary to the purpose of compensatory damages."); *Smedberg v. Detlef's Custodial Serv., Inc.*, 2007 VT 99, ¶¶ 35–39, 182 Vt. 349, 940 A.2d 674 (explaining prejudgment interest is meant to restore "harmed plaintiffs to the financial position they would have enjoyed"); *Centrella v. Ritz-Craft Corp. of Pennsylvania, Inc.*, No. 2:14-CV-00111-JMC, 2018 WL 840041, at *12–13 (D. Vt. Feb. 12, 2018) (noting it is an appropriate exercise of discretion to award prejudgment interest where there is a "reasonable and established method" available to calculate the amount and where "the plaintiff was harmed by the delay"); *Spooner v. Town of Topsham*, No. 129-7-04OECV, 2009 WL 6962588

(Vt. Super. Aug. 14, 2009) ("Prejudgment interest is intended to make the plaintiff whole where there has been a delay between the date of the injury and the date of the compensatory award."). The equities also favor an award of prejudgment interest. Nine years have passed since Dartmouth Health wrongfully terminated Dr. Porter's employment. Over those years that followed, she has been deprived of the use of nearly half a million dollars. Dartmouth Health is a large medical institution; Dr. Porter is an individual. Between the parties, the deprivation of half-a-million dollars for close to a decade imposes much more of a burden on Dr. Porter. And finally, an award of prejudgment interest is particularly important where Dartmouth Health's own conduct substantially contributed to delay. (*See, e.g.,* SPA-21 (noting that Dr. Porter filed at least five motions to compel, four of which were granted in full, and one in part). Under the circumstances, an award of prejudgment interest is necessary to help make Dr. Porter whole.

The public policy behind the civil rights laws similarly support awarding prejudgment interest to help make victims of discrimination whole. *See, e.g., Data Gen. Corp. v. Grumman Sys. Support Corp.*, 825 F. Supp. 361, 368 (D. Mass. 1993), *aff'd and remanded*, 36 F.3d 1147 (1st Cir. 1994) (recognizing discretion of district court to award prejudgment interest on attorney's fees in a civil rights case to compensate for delay); *Brennan-Centrella v. Ritz-Craft Corp. of Pennsylvania*, 942 F.3d 106, 110-111 (2d Cir. 2019) (noting "the Vermont legislature's policy

64

choice that plaintiffs are not fully compensated unless they can recover the interest").

The Court should include an award of prejudgment interest on the $475,096 in attorney's fees incurred and paid prior to August 2020. The Vermont prejudgment interest rate is 12% simple annual interest. 9 Vt. Stat. Ann. § 41a(a). This is the rate that should be applied to any award of interest in this case. *See, e.g., Gaffney v. Thandi*, No. 2:20-CV-00173, 2023 WL 4685750, at *8–9 (D. Vt. July 21, 2023) (finding question of prejudgment interest governed by state law and affirming calculation of interest at Vermont's 12 percent rate); *Cheney v. New England Publishers, Inc.*, No. 5091012, 2014 WL 8515132, *3 (Vt. Super. July 8, 2014) (applying Vermont's 12% judgment interest rate where both state and federal claims could have justified the jury's verdict).[19] Prejudgment interest under Vermont law is "simple" interest. Alternatively, if the federal rate is applied, interest must be compounded annually. *See, e.g.,* 28 U.S.C. § 1961(b) ("Interest shall be computed daily to the date of payment … and shall be compounded annually."); *Gierlinger v. Gleason*, No. 89-cv-0686E(F), 1999 WL 222604, at *2

---

[19] Where federal law applies, judges have discretion as to the award and rate of prejudgment interest.

(W.D.N.Y. Apr. 2, 1999) (noting that "such rate ordinarily should be compounded annually in an employment discrimination case").

## CONCLUSION

For the reasons stated in this brief, Dartmouth Health's appeal should be denied in its entirety because the District Court correctly instructed the jury on Vermont law, properly allowed updated reports and testimony from Dr. Porter's damages expert, and excluded inaccurate evidence prepared by Dr. Porter's expert at the direction of and with information provided by Dartmouth Health's counsel during cross-examination.

Further, the Court should grant Dr. Porter's appeal and recalculate the attorney's fee award using increased rates and without the 10% reduction. In addition, the Court should award prejudgment interest on that portion of attorney's fees incurred and paid by Dr. Porter through August 2020.

Dated: June 15, 2026

Respectfully Submitted,

*/s/ Geoffrey J. Vitt*
SARAH NUNAN
GEOFFREY J. VITT
VITT & NUNAN, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, Vermont 05055
(802) 649-5700

– and –

ERIC D. JONES
LANGROCK SPERRY & WOOL, LLP
210 College Street, Suite 400
Burlington, Vermont 05401
(802) 864-0217

*Attorneys for*
*Plaintiff-Appellee-Cross-Appellant*

67

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, the foregoing brief is in <u>14-Point Times New Roman</u> proportional font and, exclusive of the exempted portions of the brief as provided by Rule 32(f), contains <u>14,898</u> words and thus is in compliance with the type-volume limitation set forth in Rules 28.1(e)(2)(B)(i) and 32(a)(5)(A) of the Federal Rules of Appellate Procedure and Local Rule 28.1.1(b). The undersigned has relied upon the word-count feature of Microsoft Word in preparing this Certificate, as permitted by Rule 32(g)(1) of the Federal Rules of Appellate Procedure.

Dated: June 15, 2026

*/s/* Geoffrey J. Vitt

*Attorney for*
*Plaintiff-Appellee-Cross-Appellant*
